IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff - Appellee,<br>v.<br>KENNETH JOHNSON,<br>    Defendant - Appellant. | No. 25-3645<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |
| UNITED STATES OF AMERICA,<br>    Plaintiff - Appellee,<br>v.<br>FRANCIS CLEMENT,<br>    Defendant - Appellant. | No. 25-3648<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |

On Appeal from the United States District Court
For the Eastern District of California
The Honorable Jennifer L. Thurston
D.C. No. 1:20-cr-00238-JLT-SKO

**EXCERPTS OF RECORD**
**VOLUME 1 OF 13**

Ryan J. Villa
The Law Office of Ryan J. Villa
5501 Eagle Rock Ave. NE Suite C2
Albuquerque, NM 87113
Ryan@rjvlawfirm.com

Andrea Lee Luem
Andrea Lee Luem, PHV
400 South Fourth Street, Ste 500
Las Vegas, NV 89101
andrea@luemlaw.com

Counsel for Defendant-Appellant
Kenneth Johnson

Jane Fisher-Byrialsen
Fisher & Byrialsen, PLLC
4600 S. Syracuse Street
Denver, CO 80137
jane@fblaw.org

Jean D. Barrett
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
jeanbarrett@ruhnkeandbarrett.com

Counsel for Defendant-Appellant
Francis Clement

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
--oOo--

UNITED STATES OF AMERICA,　) Docket No. 1:20-CR-238-JLT
　　　　　　　　　　　　　　) Fresno, California
　　　　　　　　Plaintiff,　) May 19, 2025
　　　　　　　　　　　　　　) 9:31 a.m.
　　　　　v.　　　　　　　　)
　　　　　　　　　　　　　　)
FRANCIS CLEMENT AND KENNETH　) Re: Motion hearing
JOHNSON,　　　　　　　　　　) Sentencing hearing
　　　　　　　　　　　　　　)
　　　　　　　Defendants.　 )


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JENNIFER L. THURSTON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:　　DEPARTMENT OF JUSTICE by
　　　　　　　　　　　MS. STEPHANIE STOKMAN
　　　　　　　　　　　2500 Tulare Street, Suite 4401
　　　　　　　　　　　Fresno, CA 93721
　　　　　　　　　　　MR. JAMES ROBERT CONOLLY
　　　　　　　　　　　Assistant U.S. Attorneys
　　　　　　　　　　　501 I Street, Suite 10-100
　　　　　　　　　　　Sacramento, CA 95814

Electronic Recorder:　IRMA MUNOZ
　　　　　　　　　　　United States District Court
　　　　　　　　　　　2500 Tulare Street, Suite 1501
　　　　　　　　　　　Fresno, CA 93721
　　　　　　　　　　　(559)499-5682

　　(Appearances cont'd next page.)

Transcribed by:　　　JENNIFER COULTHARD, CSR, RMR, CRR, CRC
　　　　　　　　　　　United States District Court
　　　　　　　　　　　Official Court Stenographer
　　　　　　　　　　　501 I Street, Suite 4-200
　　　　　　　　　　　Sacramento, California 95814
　　　　　　　　　　　Jennifer_Coulthard@Yahoo.com
　　　　　　　　　　　(530)537-9312

Proceedings recorded via electronic means - transcript produced
via computer-aided transcription.

ER 2

APPEARANCES (Cont'd):

For the Defendant          LAW OFFICES OF RYAN J. VILLA by
Kenneth Johnson:           MR. RYAN J. VILLA
                           5501 Eagle Rock Ave., NE
                           Suite C2
                           Albuquerque, NM 87104

For the Defendant          LAW OFFICES OF JEAN deSALLES BARRETT by
Francis Clement:           MS. JEAN DESALLES BARRETT
                           29 Broadway
                           Suite 1412
                           New York, NY 10006

For the Defendant          FISHER & BYRIALSEN, PLLC by
Francis Clement:           MS. JANE FISHER-BYRIALSEN
                           99 Park Avenue
                           26th Floor
                           New York, NY 10016

Also Present:               ROSS NICHELI
                            U.S. Probation

PROCEEDINGS

FRESNO, CALIFORNIA

Monday - May 19, 2025                                      9:31 a.m.

P R O C E E D I N G S

--oOo--

(In open court:)

THE CLERK:  The Court calls Number 2 on calendar, United States versus Francis Clement, Case Number 1:20-CR-238, scheduled for sentencing and also the motion to reconsider document 1901.

THE COURT:  So I'll have counsel on Mr. Johnson come up as well, probably, to address -- wherever you like, Ms. Byrialsen, wherever is comfortable.

MS. STOKMAN:  Good morning, Your Honor; Stephanie Stokman for the United States and James Conolly.

MS. FISHER-BYRIALSEN:  Good morning, Your Honor; Jane Fisher-Byrialsen and Jean Barrett on behalf of Mr. Clement.

MS. BARRETT:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. VILLA:  Good morning, Your Honor; Ryan Villa on behalf of Mr. Johnson, who's presence was waived.

THE COURT:  All right.  And of course Mr. Clement's presence was waived as well.

Starting first with the motion to reconsider the continuance of the sentencing hearing, I looked at your additional motion for reconsideration.  I didn't see anything

PROCEEDINGS

that addressed my concerns.  There was some time spent on the issue of the subpoena.  That was not really a basis for my decision not to continue this hearing.  In any event, it does not appear anything, said or written in that motion to reconsider, convinces me that my order was inappropriate.

Any comments at this time, Mr. Villa?

MR. VILLA:  Your Honor, I guess just to emphasize the point that what we're after is the information that only the government has at this point in time, which is when the threats came to light, because if they came to light -- you know, the information we received is that they were threats specific to Mr. Johnson and Mr. Clement at Kern, which is where they were during -- allegedly -- during the times of the offenses for which they were found guilty.  And so if those threats occurred at that time, that same timeframe when they were supposedly ordering murders, our theory could change, being that if they were under threat from, say, another AB member or something like that, they weren't in good standing anymore with the AB, that they couldn't then direct individuals on the street to commit crimes on their behalf.

That was a critical part of the government's case is that, essentially, their status as AB members gave them the ability to order these individuals on the streets to commit these crimes.  And our contention is that if they had some sort of threat of murder or violence against them that put them out

PROCEEDINGS

of good standing, that would have changed the -- the nature of the case, changed our defense.  And so we don't know when the government came about this information about these threats, and that's the information we're trying to obtain from the government via the motion to compel.

THE COURT:  You seem to be saying that if that is the case, that Mr. Johnson and Mr. Clement would have had to have known that they were not in good standing because it sounds like what you're saying is that would have deprived them of the authority of the AB to order the killings that the jury found them guilty of.  Is that what you're saying?

MR. VILLA:  Well, them and individuals who allegedly received the orders and carry out the orders, many of whom testified against them.  And so if they knew about these threats, if these threats were out there, that would have undermined the government's theory of the case that they would have done something at the request of Mr. Johnson or Mr. Clement.

THE COURT:  Meaning if they had -- if they had known that there was this death order out there that they were then acting not at the behest of the AB?

MR. VILLA:  Or they would say, you know -- yes, exactly, right?  We don't have to listen to you, you know, you guys are not in good standing.  And so whatever conduct they did on the street, whatever -- you know, these killings that

PROCEEDINGS

they allegedly carried out were not at their request because they -- they couldn't make those requests; they weren't in good standing.  They did that on their own for their own reasons.

THE COURT:  I think that was the finding at least as to one of the murders -- right? -- that it was not AB condoned as to Mr. Lowery?

MR. VILLA:  Well, Your Honor, I don't know.  I thought that the -- at least the testimony from the cooperating witness at trial was that multiple AB members allegedly sanctioned this murder; while maybe others disagreed with it, that the main AB members who were running the yard at the time sanctioned it, and Mr. Johnson and Mr. Clement agreed with that.

THE COURT:  I think the evidence was different, right? They were transferred to the prison and they ordered it to occur because of the debts that had been owed by AB members to nonwhite prison members.  I think that was the evidence presented.

MR. VILLA:  That part was right, but I thought that the reason they did that was they wanted to send a message, right?  They had just gotten released from Pelican Bay from being in the hole and they wanted to send a message that the Aryan Brotherhood would not condone members or associates getting into drug debts.  And so it was AB at least had the goal of furthering the enterprise, but if they were under threats at that time, then it may be that it didn't actually

come from them and it came from others and their standing in the gang was no good so their agreement to that course of action or that theory wouldn't have been followed and the murder occurred for other reasons.

THE COURT:  All right.  Ms. Fisher-Byrialsen, do you have comments, or Ms. Barrett?

MS. FISHER-BYRIALSEN:  No.  I agree with what Mr. Villa is saying, Your Honor, and I think the bottom line for us is we need a decision on the motion to compel in order to preserve our appellate issues on that.

THE COURT:  All right.  Ms. Stokman, any comments?

MS. STOKMAN:  Judge, there's not a motion for a new trial in front of the Court, so I'm not going to address any of the defenses' theories on this potential new evidence, if it exists at all.

The Court has a motion to reconsider and, as the government pointed out, the jurisdiction of this Court is not lost when it comes to a motion for a new trial.  So the government's position is that the Court made the correct ruling in denying the original request and we should proceed with sentencing today.

THE COURT:  All right.  In hearing the argument today it does strike me that if that were true, the witnesses did not testify in that way.  They testified that they did it because the defendants, Clement and Johnson, told them to, they didn't

PROCEEDINGS

have options, that's what had to occur and that others, including, for example, Mr. Weaver, also played a role in one of the murders for Mr. -- Mr. Clement was convicted of Mr. -- I want to say it's Brizendine?  I'm probably saying it wrong.

MS. BARRETT:  Brizendine.

MS. FISHER-BYRIALSEN:  Brizendine.

THE COURT:  And then, on the other hand, if they knew that they had been, in essence, disavowed by the AB, that was information that they did know already.  So, again, I'm not seeing any of that argument, which does strike me as mostly speculation.  I don't hear that there's any real basis for believing any of that is true, but certainly that I suppose that set of circumstances could have arisen, but it is directly contrary to the evidence presented at trial.

So that motion to consider -- to reconsider the motion to continue the sentencing is denied.

I will turn to Mr. -- I can do either first, it doesn't matter, Mr. Clement or Mr. Johnson.  You're all up if --

MS. FISHER-BYRIALSEN:  Well, Your Honor, I guess the question then still remains what is the ruling on the motion to compel?

THE COURT:  Well, that's set before Judge Oberto in June, so that will be a hearing you'll have to address before her.

PROCEEDINGS

MS. FISHER-BYRIALSEN:  She won't have jurisdiction, Your Honor, at that time, that's the problem.  So if we don't continue the sentencing --

THE COURT:  I don't believe that's true.

MS. FISHER-BYRIALSEN:  Pardon?

THE COURT:  I don't believe that's true.

If you -- what's more, when I looked at that subpoena -- and I don't pretend that I've got everything that the CDCR provided, but if the CDCR did, in fact, provide you everything that they have, the government's recommendation or representation here is they have nothing else.  I don't know what else that -- what ruling would be necessary.  Ms. Stokman has represented that here this morning as well as in writing that they have nothing on that topic, so I don't know what else the motion to compel could provide you in any event.  But, as Ms. Stokman points out, you can bring your Rule 33 motion despite the sentencing today, so that's --

MS. FISHER-BYRIALSEN:  I think that once Your Honor rules and there -- or once Your Honor sentences Mr. Clement and Mr. Johnson, we have to file a notice of appeal and because the motion to compel is not decided, we would not be able to go forward with that piece of the appeal and we would also -- this district court would lose jurisdiction over the entire case once we do that.

THE COURT:  So be it.  That's where we are.

PROCEEDINGS

If you had asked me for a subpoena based upon the showing that you've made in your motion, I would have denied it, because it is and there is case authority out of this district that says that appears just to be fishing.  The information you provided doesn't bear on sentencing.  The arguments today that somehow it would have borne on your trial tactics, truthfully, if Mr. Clement and Mr. Johnson knew this, they would have told you that.  They wouldn't have been in the position they had.  And every single witness that came in from the AB said:  These are the guys; these guys are AB; when they tell you to do something, you do it.

So the suggestion that somehow everyone who came in who committed these acts and testified who said they did it for the AB or more directly for Mr. Clement and Johnson, never wavered in any way that this was something they did.  In fact -- because they wanted to.  In fact, at least one witness, Mr. Field, said:  I didn't want to do this; I had no choice; that guy was my friend.  We heard that over and over. Mr. Bash, for example, did not want to go and kill those people.  The murders of Mr. --

MS. FISHER-BYRIALSEN:  Do you mean Bannick, Your Honor?

THE COURT:  I'm sorry, Mr. Bannick.  Mr. Rashamsky and Mr. M -- I have never been able to pronounce his name -- that was another murder.  They didn't want to do it.  They did it

PROCEEDINGS

because they were forced to do it. So the evidence is just absolutely contrary. And given the amount of discovery that occurred in this case, it's just pure speculation. There's no basis for me to find any -- that there's anything other than fishing by that motion. So that's where we are today.

Anything else before we move on?

MR. VILLA: Just that Your Honor, Agent Gonzalez was so concerned about it that he made the effort to call the prison and tell them that there's a specific threat for them being in general population, not just some, you know, in the air kind of "maybe somebody wants to hurt them," but it was very specific about keeping them out of general population and in segregation. So it's hard for us to accept the government's representation that they have no other information about it. I understand the Court's ruling about relevance.

THE COURT: I guess I'm trying to understand, though, what you think the ultimate outcome would be if you have a motion to compel and you say: We really, really don't believe the government and the government really says: We really, really don't have anything. What is the Court to do? I mean, I'm not sure what you're asking beyond that because I also think, in some ways, as I pointed out in my order, I think that there is some mis -- I mean, that report can be interpreted more than one way. And what I do note is while the motion to reconsider takes exception to my language saying, you know, we

don't know what Agent Gonzalez says, he's not quoted there. This is what somebody said he said. And I don't know if that's what he said or if that's what their conclusion was that they drew from what he said. I don't know. I just don't know.

So at this point we can keep talking about it, but I don't see that you've made a showing. And given the AB situation, given the findings of the jury, I think the government's argument that the fact that they engaged in unsanctioned murder, at least from what I heard at trial, is a basis for discipline from the AB, including violence up to and including murder, so that rings true.

Also, when I look at the CDCR's language as to, you know, violence will occur if they're placed in general population, I think the most reasonable explanation of that is at their hands because that is the entire thrust of this case, that they were out there imposing violence and murder on other people, not that it was being imposed on them.

On the other hand, we do know, without doubt, Mr. Johnson was identified as a victim in the companion case in Sacramento. He was identified as a potential murder victim. Am I not right about that -- Mr. Johnson?

MR. VILLA: Your Honor, I believe that was an allegation in the indictment.

THE COURT: So that information has been known for quite some time, right?

PROCEEDINGS

MR. VILLA:  Correct.

THE COURT:  All right.  Anything else on this topic?

MR. VILLA:  Just that, I mean, I guess if that -- if we're connecting the dots, that, you know, came from Mr. Yandell who was not incarcerated at Kern anymore at the time that Agent Gonzalez made the phone call and, of course, it was investigated way back when it was discovered by law enforcement and Mr. Johnson was continued out in general population.  So I don't think that's the same threat that we're talking about.

THE COURT:  I don't mean to suggest that it was.  My point was that despite that threat he did continue on in this course of conduct that became at issue in this trial.  So that was my point there is that one thing doesn't necessarily lead to the other.

MR. VILLA:  I understand the Court's --

THE COURT:  All right.  Anything else at this time?

MS. FISHER-BYRIALSEN:  Your Honor, I think the points you're making is exactly why we need a hearing on this, so we certainly hope you're correct that we will get one in June.

THE COURT:  All right.  Do you wish for me to begin with Mr. Clement or Mr. Johnson?

MR. VILLA:  Mr. Clement can go.

THE COURT:  All right.

In connection with the sentencing, again, Mr. Clement

PROCEEDINGS

has waived his right to be present and to consult with

probation in the preparation of the presentence report.

I did receive the presentence report prepared by

Officer Nicheli on April 29th of 2025.  I also received the

objection and memorandum filed on May 7th of 2025 and the

government's memo filed on May 14th of 2025.  I did receive

today a victim impact letter.

Ms. Stokman, I believe that relates to Mr. Clement; is

that correct?

MS. STOKMAN:  That's correct, for the murder of

Michael Brizendine.

THE COURT:  And I said -- as I said, I received that

this morning.  Was there anything else I should have received

in connection with the sentencing?

MS. STOKMAN:  No.

THE COURT:  For the defense?

MS. BARRETT:  No, Your Honor.

THE COURT:  Counsel, did you receive and read the

presentence report and have an opportunity to discuss that with

your client?

MS. BARRETT:  Yes, Your Honor.

THE COURT:  Beginning with defense objections, when I

look at the objections for example, the paragraph 6, 7, 8 and

12 -- when I look at paragraph 6 in particular, I don't

disagree that that is correct, but when I look at the PSR, it

PROCEEDINGS

acknowledges that, in fact, there were occasions in which that was not required. That was just the very next sentence. It just says traditionally they were required to murder to gain membership -- wasn't even the next sentence; it's after the semi colon -- exceptions were made for willingness to do other things. In any event, that objection does not bear on or would not have an impact on sentencing. I don't find that ruling is necessary as to paragraph 6, but are there any comments as to paragraph 6?

MS. BARRETT: No, Your Honor. With regard to -- I don't want to keep repeating myself, so -- because the objections are all very similar and with regard to whether or not something has an impact on sentencing -- and this is particularly pertinent to the subsequent paragraphs, which allege unadjudicated conduct with no factual statements in connection with them -- that it should not be in the presentence report if it is not legally considered by the Court at the time of sentencing. What belongs in the presentence report is information that is provable and that the Court has to find that the information in the presentence -- that's in the presentence report is provable.

As your colleague has found in another case, actual arrests themselves without adjudications and with no factual explanation should not be in the presentence report. Actual errors with regard to what occurred at trial should not be in

PROCEEDINGS

the presentence report.  And the reason for that is because these reports live forever and the information that's contained in the report is not only there -- and the court rules and the statute provide for this -- it's not only there for Your Honor's consideration but it's also there for consideration of classification down the road.  And if it has not been provable, if there's not been sufficient evidence to prove this, then the Court should not consider it and the Court should strike that information from the presentence report.

THE COURT:  Ms. Stokman, any comments about that?

MS. STOKMAN:  The government agrees with probation's response that these are characterized as being facts that were laid out in the indictment.

The PSR also mentions the acts in the indictment that were not proven at trial against each defendant, and so the government agrees with probation's assessment as far as giving the entire picture by putting all these paragraphs in defense's objections in the PSR.

THE COURT:  Mr. Nicheli, do you have any comments?

PROBATION OFFICER:  Good morning, Your Honor.

I do not, unless the Court has any specific questions. I responded to these objections and I think the Court has that response already.

THE COURT:  I do.  Thank you.

With all due respect to Judge Shubb -- and he's an

PROCEEDINGS

incredible judge -- it's just inconsistent with the guidelines. It's inconsistent with the statutes that say that this type of information may be admitted, which is why I think the statute says the Court must make rulings on objections except where the rulings would have no impact on sentencing. Consequently, that objection is overruled.

And, in fact, while you're on it, I think you're right, Ms. Barrett. Paragraphs 7 and 8 are included, although my recollection was, there was information about paragraph 8 in that maybe it wasn't so much quarterly or annually, but there was testimony from at least two witnesses that they were obligated to pay up on any money that they made in prison or out of prison, and that was part of their obligations as affiliates or members of the AB.

In paragraph 12, while it does allege extortion and arson as part of the pattern of racketeering, there was in evidence, actually, as to the murder of Mr. Roshanski and, again, his companion, where the essence of that testimony was, in fact, that they either had to come into the fold and bring their illegal activities to the AB or take the consequences. While that was not proven and set forth as an overt act of extortion, in essence, that's sort of what it was.

In any event, paragraph 12, to the extent that it talks about arson or activity that wasn't otherwise proved, again, it doesn't have impact on the Court's sentence that will

PROCEEDINGS

be imposed.

And, in fact, when you look at what the maximum penalties are, I think there is some -- and the mandatory penalties, there's not a lot of discretion here.  But, in any event, I don't find those paragraphs would impact sentencing, and no ruling is required unless, Ms. Stokman, did you have anything additional on that?

MS. STOKMAN:  No, but there was discussion as far as the paragraph relating to the quarterly taxes.  There was testimony about that at trial.

THE COURT:  All right.  Again, there wasn't any testimony about a robbery in Oregon in paragraphs 119 and 120, but again, I am not sentencing them or considering any conduct related to robbery in Oregon, but I do feel like that information is properly presented in the PSR.

And again, other arrests, that is a typical piece of information that's put in PSRs; I see it all the time.  In fact, the Sentencing Commission -- Sentencing Commission has considered the issue of this, including conduct for which people have been acquitted and have taken the strong position that acquitted conduct shouldn't be considered but it has not made any steps towards saying that arrests should not be considered.  So that objection as to 132 and 142 is also overlooked -- I mean overruled -- well, to the extent -- actually, it's the other.  I'm not going to issue a ruling on

PROCEEDINGS

those because it does not impact sentencing.

And as to paragraph 152, I do appreciate that there has been coursework done and, in fact, there were -- certificates were attached.

What is it in particular -- I guess I'm not understanding what the objection is there.

MS. BARRETT:  Your Honor, I think it was resolved.

THE COURT:  Okay.  So this objection is --

MS. BARRETT:  By the -- was it not?

THE COURT:  It's attached to the PSR, the certificates.  I'm assuming --

MS. BARRETT:  Yes.

THE COURT:  Okay.  So I'm --

MS. BARRETT:  Yes.  I believe that we didn't have that complete information and we provided complete information about the numerous courses that Mr. Clement undertook while he was incarcerated in Fresno and also that the same thing goes for the medical records, and I believe that the presentence report has adopted the information based on the documents we provided.

THE COURT:  Right.  I did read that.  They adopted it in full or Mr. Nicheli did, so it appears at 152.  Objection is -- it's been resolved.

All right.  After considering those objections, I adopt the guideline calculations, I adopt the findings of the report, determine them to be true and correct.  I find the

PROCEEDINGS

applicable offense level is 43.  Mr. Clement's criminal history has placed him in a criminal history category Roman Numeral V. That results in the advisory sentencing guideline range calling for a term of imprisonment of life and the charge to which he has pled guilty carries with it a term of imprisonment of zero to life.

I am aware of my obligations under *Booker* and *Fanfan* to impose a sentence that is fair and reasonable and I will give due weight to the statutory factors set forth at 18 U.S.C. section 3553(a), which is the balance of the memoranda filed by the defense.

Probation has recommended the sentence of life on Count 1, life on each of Counts 2 through 6 to be served concurrently for a total term of life.

The government is seeking a term of life as to Count 1, life as to Counts 2, 4 and 5 to be served consecutive to Count 1 and life on Counts 3 and 6 to be served concurrently to Counts 1, 2 and -- well, to Count 1 and 2, 4 and 5.

Beginning with you, Mr. Nicheli, do you have any comments at this time?

PROBATION OFFICER:  I do not have any additional comments, Your Honor --

THE COURT:  All right.  Thank you.

MS. BARRETT:  -- unless the Court has any questions.

THE COURT:  I don't have any.  Thank you.

PROCEEDINGS

Ms. Stokman, your comments?

MS. STOKMAN:  Yes, Judge.

The government's recommendation is based on the Court finding that there are facts that were proven in trial for an upward departure.  That would allow the Court to sentence consecutively.

The government's recommendation is not unreasonable in the sense that we are taking into consideration the fact that despite two people being murdered in one event, we're asking for a concurrent sentence for the event itself instead of on each victim.  I think this reflects what the government has put in the sentencing memorandum.  But beyond that, the Court had information as to Defendant Clement's activities both throughout the pendency of this case and through the testimony that was provided at trial.

Inherent in these crimes is not the fact that he needed to be ordering murders from a contraband cell phone within his prison cell; and yet, that is what he was doing. That plus the other conduct, the callousness of his text messages when ordering murders, the human -- the deprivation of just humanity in the way that defendant was treating the people that were doing work for him on the street and the other facts that this Court has show that the upward departure is warranted in this defendant's case.  It's appropriate here.  It is a sentence that reflects the considerations under 3553 and the

PROCEEDINGS

government recommends that -- as laid out by the Court -- that those sentences run consecutive to Count 1.

THE COURT:  Ms. Stokman, what was the section of the guidelines that you're referring to?  Is it 5K2.1 or something else?

MS. STOKMAN:  Judge, I don't have the guideline calculation -- I mean, sorry, the guideline section, but I know that for the Court to find this, it would be finding an upward departure instead of the concurrent role.

THE COURT:  Mr. Nicheli, do you have some help on that?

MS. BARRETT:  I do not, Your Honor.  I have actually reached out to the Sentencing Commission in preparation of writing my recommendation.  We went through some of the guidelines that they felt would be appropriate and based on their representation and their interpretation of the guidelines, they didn't really feel that any of the departures were applicable here.

THE COURT:  All right.  Anything else, Ms. Stokman?

MS. STOKMAN:  No.

THE COURT:  All right.  For Mr. Clement?

MS. BARRETT:  Yes, Your Honor.

Your Honor, I believe that to a certain extent this argument, although not entirely shared, is -- also applies to Mr. Johnson, and so I would ask the Court to give Mr. --

PROCEEDINGS

THE COURT:  Mr. Villa?

MS. BARRETT:  Oh, my God.  The names go.

THE COURT:  That's okay.

MS. BARRETT:  That's what happens.

THE COURT:  Mr. Villa.

MS. BARRETT:  Sorry.

I would ask that he be given the opportunity -- I would just point out at this point that what we're really talking about is a meaningless gesture of an upward departure where the sentence, the guidelines sentence, is life without release.  So that's really the bottom line here as far as we are concerned, that this -- that the guidelines provide for this, they anticipate it, the sentence is life without release and there really is no point in doing that.

It is -- we agree that the government has the right and the Court has the right to make findings and arguments with regard to the nature of the offense here, but in the end it is something that is just something on a piece of paper and seems unnecessary, given the fact that Mr. Clement will spend the rest of his life in prison no matter what.

THE COURT:  All right.  Mr. Villa did you want to make argument on that topic?

MR. VILLA:  Yes, Your Honor.  Thank you.  I think it's more than just meaningless.  I think it's impossible.  To finish serving one life sentence, one has to die, and so I

don't know how you start the second life sentence if there's a consecutive sentence after you've died, I think it's a legal impossibility.

There is a provision of the guidelines, I don't have them in front of me, in Chapter 5 if the Court wanted to run sentences consecutive to accommodate a guideline calculation in a case where someone's -- you know, maybe they're convicted of two sentences or two crimes that carry, you know, 10 years each and the guidelines call for 18 years, you run them consecutive because that was, you know, a sentence you want to impose, but I don't think that applies in this particular situation because of the legal impossibility.

I think there's also double jeopardy concerns, so in looking at -- briefly after I saw the government's sentencing memos, Ninth Circuit and Second Circuit case law generally a Count 1 RICO conspiracy can be consecutive to a VICAR conviction; although, in those cases it didn't involve necessarily consecutive life sentences, but here the life sentence -- at least for Mr. Johnson and I think for Mr. Clement -- was one of the elements or one of the predicates in the RICO conviction.

So you're saying, you know, the two VICAR murders that Mr. Johnson was convicted of were required to be found to convict him under RICO.  Now, I know that the jury could have, say, acquitted him of those two homicides and found him guilty

of the Lowery homicide, but there's no way to untangle that now. The verdict form it is what it is and it included all of the homicides to convict Mr. Johnson and Mr. Clement, I believe, of Count 1. So I think there's a double jeopardy problem. I don't think you have to go there because it's simply impossible. There's -- once Mr. Johnson and Mr. Clement die, they won't be able to start the second sentence.

And, you know, in the old days when there was parole and you could parole up one life sentence and then start the next life sentence, that might be an issue, but given the statute and guidelines say life is life, there's no way for the Court to impose a consecutive life sentence.

THE COURT: That makes sense what you're saying but I also know that I've had cases come to me that have been sentenced in the past where someone's been given a thousand years in custody. That's also not -- that's a legal impossibility too --

MR. VILLA: Well, I don't know.

THE COURT: -- at least according to current medical science.

MR. VILLA: I mean, you know, you keep someone alive long enough, you know, but that's different than life, which says you have to die to finish your sentence.

THE COURT: All right. Anything else on this topic?

MS. BARRETT: No, Your Honor.

PROCEEDINGS

THE COURT:  Ms. Stokman, anything additional?

MS. STOKMAN:  Yes.  I will confirm, Judge, it was under section 5K2.0 and it is not meaningless to the victims and their families.  It is not a meaningless sentence that this Court would impose consecutive life sentences for separate crimes and the legal impossibility is not something that the Court should factor in because this is legally allowed because of situations where one count alone might have an issue on appeal or somewhere down the road and that life sentence goes away.  And so the Court sentencing consecutive life sentences will provide what is appropriate for the victims in this case, the family members who are left from the people that the defendants ordered the murders of.

The government's argument, yes, it was directed towards Defendant Clement because I thought we were starting there, but it also applies to Defendant Johnson, which I think the Court saw in the sentencing memorandum.  So unless there are questions further, I'll submit.

THE COURT:  Well, I mean, the argument that you make that if on appeal one was -- you know, say the RICO count is -- after appeal the sentence is commuted to 20 years, that doesn't mean that the concurrent life sentence goes away, though, right?  It's still there.  It's not that you lose the life sentence.  It's just that it's -- now you've got 20 years plus concurrent life; wouldn't you?

PROCEEDINGS

MS. STOKMAN:  That's correct, Judge, but I don't think that the argument that it is an impossibility because of the way that life sentences work should be something that this Court factors in because that is actually something that happens.  That's a sentence that's imposed -- consecutive life sentences are imposed throughout the federal system, throughout state systems.  That is not an argument that this Court should consider when looking whether to not -- whether or not to impose a consecutive life sentence.

THE COURT:  When I looked at the defense memo in this case, I was struck by an issue that struck me at the very beginning of this case is you have people serving life, they're looking at life or ultimately -- finally it was a life sentence was the maximum and you make the argument:  What's the point of the whole thing?  And I see that.  On the other hand, there has to be accountability for:  You kill a person, you kill five people, shouldn't we value life more than that?

So that's kind of -- I appreciate -- I'm struggling with the same issue that you've raised.  I've considered that, struggled with it the whole time is ultimately how do you deal with somebody who's already got a life sentence because, Mr. Villa, you're not wrong, I mean, you can only give one life, but how do we balance that where somebody has nothing to lose and just giving them free reign to do what they would without having to comport their conduct at all to the law

because they can't have any additional punishment?  Isn't there some issue there as well?  Do you have any comments about that?

MS. BARRETT:  I'm not really sure I understand, Your Honor.

THE COURT:  Well, you said it in your memo.  You said, basically, you wondered what was the point of this prosecution because, in essence, there's nothing that can be done to them.  They already have a sentence of, you know -- the only thing more could be death and that was not on the table, so what can be done to someone who's already in custody for life?  Another life sentence is nothing.  How do we make it be something?

MS. FISHER-BYRIALSEN:  That you give them the life sentences that probation is recommending that's concurrent.

THE COURT:  But that doesn't address the fact that, for example, Mr. Johnson is already on -- serving a life sentence, right?  So, I mean, that -- I'm looking at your argument.  You say this, that what was the point of this prosecution because you can't do anything more to these people.

MS. FISHER-BYRIALSEN:  Well, if you really want my answer, Your Honor, it is that people do more for people and that all the stuff and a lot which we didn't include in here because it was so private but that the lives of people like Mr. Johnson and Clement are given a better chance to begin with, if that's what you're asking, and that somebody look not just at what Mr. Clement and Mr. Johnson and other AB members

PROCEEDINGS

are doing in the system but people look at the system and say, okay, we've spent millions and millions of dollars on this prosecution and we want to punish these guys, and fair enough. I'm not saying that that shouldn't happen -- we don't condone what they did -- but that's other things to consider in the entire system as to why we ended up here.  That's what we were trying to point out.  And I don't think anybody's going to walk away from here and be like:  Oh, great -- right? -- like this feels good or this seems productive or this seems like justice because there are other guys in CDCR right now who are just going to become the new guys because nobody's looking at these other larger problems.  So I don't know, Your Honor, I think it's beyond what we can do as defense lawyers alone.

THE COURT:  I don't disagree with you.  In fact, I sit here every week sentencing people who always -- I mean, I can count on maybe two hands the number of people who come in here with a nice childhood who got every advantage and they still ended up here.  Most of them have a situation, at least the childhood that your clients -- your client had, most of them suffered incredible abuse, neglect, normalization of criminal conduct, a lack of education, a lack of any sort of support system and I do this, so you're not telling me anything I don't know and as unfortunate as that is, in looking at what you put in this memo, it's a tragedy.  I agree with you.  He started out on a path that -- he was like on a train.  You can't just

PROCEEDINGS

turn right. He was going down those tracks. And then being incarcerated as he was in the CDCR fostered that and encouraged that, it bred that to the point where I heard then testimony of horrible things that he's capable of doing. So I appreciate that, but my ultimate point, though, is when you murder one person or you murder five people, each of those lives were valuable and do -- I don't want to make light of this at all, but it does feel like, well, you know, you do one, you might as well do twenty. That's the message -- isn't it? -- because you can't get any more punishment for that twentieth victim as you can for the first.

So that's what I'm wrestling with -- and maybe I didn't put it too clearly -- is how do -- how is the sentence to be imposed to take seriously the conduct at issue and to provide that proper punishment? And that's where I'm struggling.

MS. FISHER-BYRIALSEN: I understand your struggle, Your Honor, but he doesn't have more than one life to give himself.

THE COURT: All right. Anything else then? Obviously Mr. Johnson -- I mean Mr. Clement didn't --

MS. BARRETT: No, Your Honor.

THE COURT: -- have a comment at this because he is not present and did not participate, but Ms. Stokman anything further then?

PROCEEDINGS

MS. STOKMAN: No, but I did want to point out -- sorry -- just one thing that I meant to point out before.

As to Mr. Villa's argument regarding double jeopardy, I don't think that's the appropriate legal term to be using. However, Count 1 absolutely could have a life sentence alone based on the Brandon Lowery murder, and so I think the Court is justified and if the Court decides to order consecutive sentences, doing so on the counts the government has recommended.

THE COURT: All right. Anything else then at this time?

MS. STOKMAN: No.

THE COURT: All right. In considering this case, obviously we spent a lot of time listening to witnesses and comments and argument. It was striking as what Ms. Stokman pointed out, the casual attitude in which people's lives were taken, the casual approach to ending these people's lives, many of them who are young who had been on the wrong path, maybe, but still were put in positions where they didn't have choices either.

The information, as I said, as to Mr. Clement's childhood, his youth, his time in custody is terrible and I -- I've said it a million times that if you can build families, you can build support systems for people, I wouldn't have a job and I'd be happy about that. But, for whatever reason, we

spend more money incarcerating people in a way that is not productive, at least in my opinion, and we end up with people who go in bad and come out worse. I appreciate that and I appreciate that circumstance for Mr. Clement. He did, though, take advantage of some of the opportunities in custody, he's got the certificates provided. He, in fact, got his education, including college degrees while in custody. And I can't get over the fact, too, he's an older man and he's spent most of his life in custody, but as much as he values his own life, he appears to have no value on the lives of others.

It was callous, the conduct at issue, the almost entitlement to do what is done. And maybe that is as a result of the culture in which he's been involved in which somehow he is allowed to do these things, encouraged to do these things, rewarded for doing these things and having the pretty strict adherence to what he says by younger members or affiliates must breed into that as well, but I didn't get a sense of any sort of hesitation or remorse or any sort of pause in deciding to kill people.

In the one murder, I believe it was the Ennis Yagle murders and one instruction was: If he lies, kill him. I have people lie to me every day, especially here in court, and that is not an appropriate punishment for someone who lies, especially in those type of extremities.

Mr. Clement presented himself in this court. He was

PROCEEDINGS

very respectful, he was able to cooperate in the program here and in appropriate fashion despite his medical conditions, so it strikes me that he is not only one thing.  But what I saw on trial is -- in the evidence is something that is so horrible and so concerning to me that I do have to impose a sentence that appropriately addresses that conduct, that tells him that there are consequences for that conduct and that tells him that each life is included, is valuable and that when we lose that, then I don't know how you get it back.  I don't know how he comes back from this.  And I'm here to tell you, he's probably not going to get it in custody.  I doubt very seriously he's going to find what he did here deserves the punishment that I'm giving him.

In any event, I do find the sentence recommended by the government is appropriate.  I think that when we're looking at the number of deaths at issue, the amount of just lack of concern for these victims, their families, the people who cared for them as well as the trauma imposed on those who had to accomplish these acts, justifies an upward departure and I am going to cite 5K -- I'm sorry -- 5K1.2 -- 5K2.0.  But, in the event that that departure is found not to be appropriate, I would vary upward for the same reasons.  I find that sentence is reasonable and sufficient but is not greater than necessary to comply with the purposes stated at 18 U.S.C. section 3553(a).

PROCEEDINGS

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court the Defendant, Francis Clement, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of life on Count 1, life on Count 2 to be served consecutive to life on Count 1, life on Count 3 -- oops, I'm sorry -- life on Count 1, life on Counts 2, 4 and 5 to be served consecutive to Count 1 and life on Counts 1 and on 3 and 6 to be served concurrently to those other counts.

The sentences imposed in this matter are to be served as indicated to any -- are to be served consecutive to any undischarged terms of imprisonment pursuant to United States Sentencing Guideline section 5G1.3(a).

Mr. Clement must be a special assessment of $600, payment to begin immediately.

The Court finds he does not have the ability to pay a fine, imposition of a fine is waived.

If filed, the preliminary order of forfeiture is hereby made final as to this defendant and shall be incorporated into the judgment.

Upon release from imprisonment, he will be placed on supervised release for a term of 60 months on Counts 1 through 6, all to be served concurrently for a total term of 60 months.

Within 72 hours of release from the custody of the Bureau of Prisons, he must report in person to the probation office in the district to which he is released.

PROCEEDINGS

While on supervised release, he must not commit another federal, state or local crime and shall not illegally possess controlled substances.

He must cooperate in the collection of DNA, as directed by the probation officer, and shall comply with the standard conditions which have been recommended by the United States Sentencing Commission and which are adopted by this Court.

He must refrain from any unlawful use of a controlled substance and must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed four drug tests per month.

I adopt the special conditions recommended by the probation officer in the sentencing recommendation report and I impose all of those listed as special conditions.

I should note also that in addition to the murders we've been talking about, there was also the evidence of the drug sales, methamphetamine drug deals, that were at issue as well as the EDD fraud, which also constitutes conduct under the RICO conspiracy.

As to the preferred location of incarceration -- and that, of course, presumes he ever comes into federal custody -- is there a location he prefers?

MS. BARRETT:  No, Your Honor.

THE COURT:  All right.

JENNIFER COULTHARD - U.S. DISTRICT COURT STENOGRAPHER - (530)537-9312

ER 36

PROCEEDINGS

Mr. Clement is not present to hear the Court's advisal.  I will give it to counsel who could forward it.  He is advised that if he wishes to appeal from the sentence I've just imposed, he must file a written notice of appeal within 14 days of today's date.  And if he cannot afford an attorney in connection with his appeal, in connection with the prosecution of the appeal, I will appoint one for him.

Is there anything else then at this time?

MS. BARRETT:  No, Your Honor.

MS. STOKMAN:  No, not for Defendant Clement.

THE COURT:  All right.  Let's turn to Mr. Johnson.

In this sentencing I also received the presentence report from Officer Nicheli filed on April 29th of 2025, received the defense objections filed on May 5th of 2025 as well as the government's memo filed on May 14th of 2025.

Is there anything else I should have received in connection with the sentencing?

MS. STOKMAN:  No.

MR. VILLA:  No, Your Honor.

THE COURT:  Mr. Villa, did you receive and read the presentence report and have an opportunity to discuss that with Mr. Johnson?

MR. VILLA:  Yes, I did.

THE COURT:  All right.  And again, Mr. Johnson has waived his right to be present for purposes of sentencing.

PROCEEDINGS

Beginning with the objections, it does appear to me, Mr. Villa, that you're simply stating the disagreement with the findings of the jury and preserving appeal.  That's how I say see it; is that correct?

MR. VILLA:  That's correct.  The one substantive issue we had was corrected by probation.

THE COURT:  All right.  To the extent a ruling is required on this and it's a little vague, so what I'm going to find is, the objections are just simply inconsistent with the jury verdict, consequently, the objections are overruled.

Otherwise, I adopt the guideline calculations, I find -- I adopt the findings of the presentence report and determine them to be true and correct.  I find the applicable offense level is 43.

Mr. Johnson's criminal history places him in a criminal history category Roman Numeral III.  The advisory sentencing guidelines call for a term of imprisonment of life and the charge to which he has pled guilty carries with it a term of imprisonment of up to life in custody.

The sentencing guidelines are only the beginning point of a sentencing process and the Court is to impose a sentence that is fair and reasonable as required by *Booker* and *Fanfan*. I will give due weight to the statutory factors set forth at 18 U.S.C. section 3553(a).

Once again, probation is recommending a sentence of

JENNIFER COULTHARD - U.S. DISTRICT COURT STENOGRAPHER - (530)537-9312

PROCEEDINGS

life on Count 1, life on Count 2, life on Count 3, all to be served -- with 2 and 3 to be served concurrent to Count 1.

The government is seeking life on Count 1, life on Count 2 to be served consecutive to Count 1 and life on Count 3 to be served concurrently to Count 2.

Mr. Nicheli, do you have any comments at this time?

PROBATION OFFICER:  I do not, Your Honor, unless the Court has any questions.

THE COURT:  I don't.  Thank you.

Ms. Stokman, do you have comments?

MS. STOKMAN:  The comments I made about the upward departure for Mr. Clement are very similar for Mr. Johnson.

The evidence at trial showed the Court that this was -- again, these were murders that were ordered and other acts that were ordered using a contraband cell phone in a prison cell.

I think the Court has seen Mr. Johnson's demeanor and actions during court proceedings.

The fact that at some point during the pendency of this case he also wrote a letter that was intimidating in nature that was then provided to a witness but was not known as a cooperator at that point but potentially to incentivize that witness not to cooperate, the Court has ample facts to find that an upward departure is warranted for Mr. Johnson as well.

THE COURT:  All right.  Mr. Villa, your comments?

JENNIFER COULTHARD - U.S. DISTRICT COURT STENOGRAPHER - (530)537-9312

PROCEEDINGS

MR. VILLA:  Your Honor, just briefly.  And since we didn't file anything written, I just want to make sure that the impossibility objection is preserved on the consecutive life sentences as well as double jeopardy.  I do believe the *Blockburger* test does apply to consecutive sentences, concurrent versus consecutive.  And as I argued earlier because the two VICAR murders for which Mr. Johnson was convicted were elements of Count 1 that it would violate double jeopardy to sentence him to consecutive life sentences.

In response to your, perhaps -- I don't know if it's metaphysical inquiry, but, you know, what good does this do in this situation?  So, for Mr. Johnson's case, you know, he -- his life sentences are under the California three strikes law.  And as we saw, I think, during the course of this trial, everybody knows that California laws often change and, you know, if it changed, then Mr. Johnson could then say -- you know, apply for parole because he is at the senior age which he could do that.  Your life sentence in this case would then prevent him from ever being released.

And I do agree with the Court that if you do concurrent sentences on all three counts, if one or even two of the counts get reversed on appeal, then we don't have to come back for a new trial or he's later acquitted, the concurrent life sentence that still stands would not be affected in any way, shape or form and so, regardless, he would be serving a

PROCEEDINGS

life sentence in federal custody until he died.

THE COURT: All right. Ms. Stokman, anything additional?

MS. STOKMAN: Just that the same fact for the Brandon Lowery murder being a special sentencing factor that was found under Count 1 would allow this Court to sentence consecutively here too.

THE COURT: All right. Again, Mr. Johnson decided not to be present and consequently waived his right to address the Court on the issue of sentencing.

And I would just say while it's brought up that the comments made as to Mr. Clement, I'm going to order that there's a transcript prepared in Mr. Johnson's case for today that that should be prepared as well because it does address your comments that you made at that time Mr. Villa and we don't want those to be missed --

MR. VILLA: Thank you, Your Honor.

THE COURT: -- as well as the government's comments and the Court's.

Considering this case as well, Mr. Johnson also demonstrated a lack of hesitation in ordering the murders involved in this case. He appeared to exhibit no remorse. He not only ordered these people to be murdered but also ordered people to accomplish these murders, including some who had no interest in murdering people, people they considered to be

PROCEEDINGS

their friend.  While recognizing that these victims had gotten sideways with the requirements of the AB, I didn't hear anyone say that they were happy to have murdered anybody in connection with this case.  All of them did it out of a responsibility to Mr. Johnson, Mr. Clement and the Aryan Brotherhood itself.

There -- the conduct at issue here is horrible, it is something that while I didn't receive a sentencing memo over Mr. Johnson, I have to understand from the presentence report stems from the same type of things, a terrible childhood, a lack of support and then really just becoming institutionalized.  And then, of course, with the gang getting -- bringing him in and convincing him that this way of life was appropriate.  I've considered that, but the heinousness of the acts at issue just can't be overlooked.

Each of these people killed were entitled to their lives and their loved ones should not have been subject to their loss simply because the AB and Mr. Johnson felt like they needed punishment and apparently getting on the phone to somebody and say smoking someone, killing somebody, it doesn't take a lot of effort; and yet, the result is the same, that people die.

The way the evidence struck me is it was almost like a TV show where you say the words and it happens as opposed to having to feel anything about it.  If -- if they felt anything, I think it was just justified.  I don't think that Mr. Johnson

PROCEEDINGS

had any hesitation about having these people killed in the way that they were.

In addition, it does appear without doubt that he was fully up to his neck in the AB and he was doing whatever that gang required and that he was doing it for his own purposes so that he could maintain his position in the gang itself.

When I look at the PSR, there is the issue of his discipline while in custody a year ago, of course, but when he got into a disagreement with staff, he said:  I spit on you tough guy and I've killed guys bigger than you.  I don't mean to suggest that he was actually talking literally, but that attitude is what seemed to be consistent with what I saw at trial, that he was due respect but not obligated to give it to anyone else, especially the victims in this case.

I appreciate the arguments of Mr. Villa for Mr. Johnson.  Once again, I do think a departure under 5K2.0 is appropriate in order to sufficiently address the seriousness of the conduct at issue, to protect the public and to sufficiently deter this conduct because, again, there has to be some additional punishment when there are more than one victims, when murder is dispensed in such an easy and cruel manner.

Consequently, I will -- I do find that sentence is reasonable and sufficient but is not greater than necessary to comply with the purposes stated at 18 U.S.C. section 3553(a).

Pursuant to the Sentencing Reform Act of 1984, it is

the judgment of the Court that the Defendant, Kenneth Johnson, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of life on Count 1, life on Count 2 to be served consecutive to Count 1 and life on Count 3 to be served concurrent to Count 2.

The sentences imposed in this matter are to be served consecutively to any undischarged term of imprisonment pursuant to section 5G1.3(a) of the United States Sentencing Guidelines.

Mr. Johnson must pay a special assessment of $300 with payment to begin immediately.  I find he does not have the ability to pay a fine and imposition of a fine is waived.

If filed, a preliminary order of forfeiture is made final as to Mr. Johnson and shall be incorporated into the judgment.

Upon release from imprisonment, he will be placed on supervised release for a term of 60 months on each of Counts 1, 2 and 3 to be served concurrently for a total term of 60 months.

Within 72 hours of release from the custody of the Bureau of Prisons, he must report in person to the probation office in the district to which he is released.

While on supervised release, he must not commit another federal, state or local crime and shall not illegally possess controlled substances.

He must cooperate in the collection of DNA, as

PROCEEDINGS

directed by the probation officer and shall comply with the standard conditions which have been recommended by the United States Sentencing Commission which are adopted by this Court.

He must refrain from any unlawful use of a controlled substance.  He must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed four drug tests per month.

I adopt the special conditions recommended by the probation officer in the sentencing recommendation report and I impose all of those listed as special conditions.

Mr. Villa, I don't know if it's going to make any difference, but does Mr. Johnson have any preferred location of incarceration?

MR. VILLA:  No, Your Honor.

THE COURT:  All right.  Again, I'm going to give you the advisal that you will communicate to your client. Mr. Johnson is advised that if he wishes to appeal from the sentence that I have just imposed, he must file a written notice of appeal within 14 days of today's date.  If he cannot afford an attorney in connection with the prosecution of the appeal, I will appoint one for him.

Is there anything else or any objections in this matter?

MS. STOKMAN:  No.

MR. VILLA:  No, Your Honor.

PROCEEDINGS

THE COURT:  All right.  Thank you.

PROBATION OFFICER:  Your Honor, one thing.

THE COURT:  Yes.

PROBATION OFFICER:  Did the Court -- I was taking notes.  I apologize.  Did the Court find that if the departure is not warranted --

THE COURT:  Thank you.  I meant to say that.  If the departure is not warranted, I would vary upward for the same reasons.

All right.  Thank you, Mr. Nicheli.  Anything else?

MR. VILLA:  And Your Honor I guess that makes me want to say just so the record is clear, we would object on both of those legal bases for purposes of appeal.

THE COURT:  Thank you, Mr. Villa.

All right.  Thank you.

PROBATION OFFICER:  Thank you, Judge.

(Concluded at 10:34 a.m.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript of the audio recording of proceedings in the above-entitled matter to the best of my ability, given the limitations of using a digital recording system.

_____          June 25, 2025
JENNIFER L. COULTHARD, RMR, CRR          DATE
Official Court Reporter
CA CSR No. 14457

AO 245B-CAED (Rev. 09/2019) Sheet 1 - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Eastern District of California

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | Case Number: **1:20CR00238-012** |
| **FRANCIS CLEMENT** | Defendant's Attorney: Jane Fisher-Byrialsen, Jean deSalles Barrett, Appointed |
| AKA: Big Frank, Frank Clement, Francis Scott Clement, F. Scott Clement, Francis S. Clement | |

**THE DEFENDANT:**

[ ]  pleaded guilty to count(s) ____.

[ ]  pleaded nolo contendere to count(s) ____ , which was accepted by the court.

[✔]  was found guilty on count(s) __1 through 6__ of the Third Superseding Indictment after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1962(d) | Conspiracy to Participate in Racketeering Enterprise (Class A Felony) | 3/1/2023 | 1 |
| 18 U.S.C. § 1959(a)(1) | Murder in Aid of Racketeering (Class A Felony) | 10/4/2020 | 2 |
| 18 U.S.C. § 1959(a)(1) | Murder in Aid of Racketeering (Class A Felony) | 10/4/2020 | 3 |
| 18 U.S.C. § 1959(a)(1) | Murder in Aid of Racketeering (Class A Felony) | 2/22/2022 | 4 |
| 18 U.S.C. § 1959(a)(1) | Murder in Aid of Racketeering (Class A Felony) | 3/8/2022 | 5 |
| 18 U.S.C. § 1959(a)(1) | Murder in Aid of Racketeering (Class A Felony) | 3/8/2022 | 6 |

The defendant is sentenced as provided in pages 2 through __7__ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ]  The defendant has been found not guilty on count(s) ____ .

[ ]  Count(s) ____ dismissed on the motion of the United States.

[ ]  Indictment is to be dismissed by District Court on motion of the United States.

[✔]  Appeal rights given.          [ ]     Appeal rights waived.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution or fine, the defendant must notify the court and United States attorney of material changes in economic circumstances.

**5/19/2025**
Date of Imposition of Judgment

/s/ Jennifer L. Thurston
Signature of Judicial Officer

**Jennifer L. Thurston**, United States District Judge
Name & Title of Judicial Officer

5/23/2025
Date

ER 47

AO 245B-CAED (Rev. 09/2019) Sheet 2 - Imprisonment

DEFENDANT: **FRANCIS CLEMENT**                                              Page 2 of 7
CASE NUMBER: **1:20CR00238-012**

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
Life on each of Counts 1, 2, 4, and 5 each to be served consecutively. Life on each of Counts 3 and 6 to be served concurrently to
Counts 1, 2, 4, and 5 for a total term of 4 consecutive life sentences. The sentences imposed in this matter are to be served
consecutively to any undischarged terms of imprisonment, pursuant to USSG §5G1.3(a).


[ ]    No TSR: Defendant shall cooperate in the collection of DNA.

[ ]    The court makes the following recommendations to the Bureau of Prisons:

[✓]    The defendant is remanded to the custody of the United States Marshal.

[ ]    The defendant shall surrender to the United States Marshal for this district
    [ ]    at ___ on ___.
    [ ]    as notified by the United States Marshal.

[ ]    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
    [ ]    before ___ on ___.
    [ ]    as notified by the United States Marshal.
    [ ]    as notified by the Probation or Pretrial Services Officer.
    If no such institution has been designated, to the United States Marshal for this district.

[ ]    Other, Please Specify:


## RETURN

I have executed this judgment as follows:

_____

_____

_____


    Defendant delivered on _____ to _____
at _____, with a certified copy of this judgment.


_____
United States Marshal

_____
By Deputy United States Marshal

ER 48

AO 245B-CAED (Rev. 09/2019) Sheet 3 - Supervised Release

DEFENDANT: **FRANCIS CLEMENT**                                          Page 3 of 7
CASE NUMBER: **1:20CR00238-012**

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:
<u>60 months on each of on Counts 1 through 6, all to be served concurrently, for a total term of 60 months.</u>

## MANDATORY CONDITIONS

You must not commit another federal, state or local crime.
You must not unlawfully possess a controlled substance.
You must refrain from any unlawful use of controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two (2) periodic drug tests thereafter, not to exceed four (4) drug tests per month.

[  ]    The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse.

[  ]    You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution.

[✓]    You must cooperate in the collection of DNA as directed by the probation officer.

[  ]    You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense.

[  ]    You must participate in an approved program for domestic violence.

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

ER 49

AO 245B-CAED (Rev. 09/2019) Sheet 3 - Supervised Release

DEFENDANT: **FRANCIS CLEMENT**                                                     Page 4 of 7
CASE NUMBER: **1:20CR00238-012**

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.   You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2.   After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3.   You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4.   You must answer truthfully the questions asked by the probation officer.

5.   You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6.   You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7.   You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment, you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8.   You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9.   If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person, such as nunchakus or tasers).

11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12.  If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

13.  You must follow the instructions of the probation officer related to the conditions of supervision.

### U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.


Defendant's Signature _____          Date _____

ER 50

AO 245B-CAED (Rev. 09/2019) Sheet 3 - Supervised Release

DEFENDANT: **FRANCIS CLEMENT**                                                           Page 5 of 7
CASE NUMBER: **1:20CR00238-012**

## SPECIAL CONDITIONS OF SUPERVISION

1.  You must submit your person, property, house, residence, vehicle, papers, computer, other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer or any law enforcement officer at any time, based upon reasonable suspicion of unlawful conduct or a violation of a condition of supervision, without a search warrant. Failure to submit to a search may be grounds for revocation. You must warn any other occupants that the premises may be subject to searches pursuant to this condition.

2.  You must submit to substance abuse/alcohol abuse testing to determine if you have used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods.

3.  You must provide the probation officer with access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with the U.S. Attorney's Office.

4.  You must not communicate or otherwise interact with any known member of the Aryan Brotherhood gang or any other known member of a criminal gang, without first obtaining the permission of the probation officer.

5.  You must possess and use only those cellular phones and phone numbers (including Voice over Internet Protocol [VoIP] services) that have been disclosed to the probation officer upon commencement of supervision. Any changes or additions are to be disclosed to the probation officer prior to the first use.

6.  You must participate in a co-payment plan for treatment, testing and/or medication and shall make payment directly to the vendor under contract with the United States Probation Office. Your co-payment will be determined utilizing a Sliding Fee Scale based upon your disposable income.

ER 51

AO 245B-CAED (Rev. 09/2019) Sheet 5 - Criminal Monetary Penalties

DEFENDANT: **FRANCIS CLEMENT**                                                                                      Page 6 of 7
CASE NUMBER: **1:20CR00238-012**

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the Schedule of Payments on Sheet 6.

**TOTALS**

| Processing Fee | Assessment | AVAA Assessment* | JVTA Assessment** | Fine | Restitution |
|---|---|---|---|---|---|
| | $600.00 | $0.00 | $0.00 | $0.00 | 0.00 |

[ ]     The determination of restitution is deferred until ___ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

[ ]

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

[ ]     Restitution amount ordered pursuant to plea agreement $ ___

[ ]     The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

[ ]     The court determined that the defendant does not have the ability to pay interest and it is ordered that:

[ ]     The interest requirement is waived for the          [ ] fine          [ ] restitution

[ ]     The interest requirement for the          [ ] fine          [ ] restitution is modified as follows:

[ ]     If incarcerated, payment of any unpaid criminal monetary penalties in this case is due during imprisonment at the rate of 10% of the defendant's gross income per month or $25 per quarter, whichever is greater. Payment shall be made through the Bureau of Prisons Inmate Financial Responsibility Program.

[ ]     Other:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299

** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.

*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

ER 52

AO 245B-CAED (Rev. 09/2019) Sheet 6 - Schedule of Payments

DEFENDANT: **FRANCIS CLEMENT**                                                                    Page 7 of 7
CASE NUMBER: **1:20CR00238-012**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A.   [ ]   Lump sum payment of $ ___ due immediately, balance due

     [ ]   Not later than ___, or

     [ ]   in accordance   [ ] C,   [ ] D,   [ ] E, or   [ ] F below; or

B.   [✓]   Payment to begin immediately (may be combined with   [ ] C,   [ ] D,   or [ ] F below); or

C.   [ ]   Payment in equal ___ *(e.g. weekly, monthly, quarterly)* installments of $ ___ over a period of ___ *(e.g. months or years)*, to commence ___ *(e.g. 30 or 60 days)* after the date of this judgment; or

D.   [ ]   Payment in equal ___ *(e.g. weekly, monthly, quarterly)* installments of $ ___ over a period of ___ *(e.g. months or years)*, to commence ___ *(e.g. 30 or 60 days)* after release from imprisonment to a term of supervision; or

E.   [ ]   Payment during the term of supervised release/probation will commence within ___ *(e.g. 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F.   [ ]   Special instructions regarding the payment of criminal monetary penalties:

If incarcerated, payment of any unpaid criminal monetary penalties in this case is due during imprisonment at the rate of 10% of the defendant's gross income per month or $25 per quarter, whichever is greater. Payment shall be made through the Bureau of Prisons Inmate Financial Responsibility Program.

The defendant shall make payments toward any unpaid criminal monetary penalties in this case during supervision at the rate of at least 10% of your gross monthly income. Payments are to commence no later than 60 days from placement on supervision. This payment schedule does not prohibit the United States from collecting through all available means any unpaid criminal monetary penalties at any time, as prescribed by law.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

[ ]   The defendant shall pay the cost of prosecution.

[ ]   The defendant shall pay the following court cost(s):

[✓]   The defendant shall forfeit the defendant's interest in the following property to the United States: The Preliminary Order of Forfeiture is hereby made final as to this defendant and shall be incorporated into the Judgment.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

ER 53

AO 245B-CAED (Rev. 09/2019) Sheet 1 - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Eastern District of California

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | Case Number: **1:20CR00238-011** |
| **KENNETH JOHNSON** | Defendant's Attorney: Ryan Villa, Andrea Lee Luem, Appointed |

**AKA: Benny Woods, Kenneth Gilbert Johnson, Kenwood, Ken William Renolds, Ken Dods, Kenneth Gilbert McGann, Ken William Reynolds, Kenneth Gilbert Reynolds, McGann Dods Reynolds, McGann Reynolds**

**THE DEFENDANT:**

[ ]  pleaded guilty to count(s) ____.

[ ]  pleaded nolo contendere to count(s) ____ , which was accepted by the court.

[✔]  was found guilty on count(s) __1, 2, and 3__ of the Third Superseding Indictment after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1962(d) | Conspiracy to Participate in Racketeering Enterprise (Class A Felony) | 3/1/2023 | 1 |
| 18 U.S.C. § 1959(a)(1) | Murder in Aid of Racketeering (Class A Felony) | 10/4/2020 | 2 |
| 18 U.S.C. § 1959(a)(1) | Murder in Aid of Racketeering (Class A Felony) | 10/4/2020 | 3 |

The defendant is sentenced as provided in pages 2 through __7__ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ]  The defendant has been found not guilty on count(s) ____ .

[ ]  Count(s) ____ dismissed on the motion of the United States.

[ ]  Indictment is to be dismissed by District Court on motion of the United States.

[✔]  Appeal rights given.         [ ]  Appeal rights waived.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution or fine, the defendant must notify the court and United States attorney of material changes in economic circumstances.

**5/19/2025**

Date of Imposition of Judgment

/s/ Jennifer L. Thurston

Signature of Judicial Officer

**Jennifer L. Thurston**, United States District Judge

Name & Title of Judicial Officer

5/23/2025

Date

AO 245B-CAED (Rev. 09/2019) Sheet 2 - Imprisonment

DEFENDANT: **KENNETH JOHNSON**                                                          Page 2 of 7
CASE NUMBER: **1:20CR00238-011**

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
<u>Life on Count 1, Life on Count 2 to be served consecutively, and Life on Count 3, to be served concurrently to Counts 1 and Count 2,</u>
<u>for a total term 2 consecutive life sentences. The sentences imposed in this matter are to be served consecutively to any</u>
<u>undischarged terms of imprisonment, pursuant to USSG §5G1.3(a).</u>

[ ]    No TSR: Defendant shall cooperate in the collection of DNA.

[ ]    The court makes the following recommendations to the Bureau of Prisons:

[✔]    The defendant is remanded to the custody of the United States Marshal.

[ ]    The defendant shall surrender to the United States Marshal for this district
    [ ]    at ___ on ___.
    [ ]    as notified by the United States Marshal.

[ ]    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
    [ ]    before ___ on ___.
    [ ]    as notified by the United States Marshal.
    [ ]    as notified by the Probation or Pretrial Services Officer.
    If no such institution has been designated, to the United States Marshal for this district.

[ ]    Other, Please Specify:

## RETURN

I have executed this judgment as follows:

_____

_____

_____

    Defendant delivered on _____ to _____
at _____, with a certified copy of this judgment.


                                         _____
                                         United States Marshal


                                         _____
                                         By Deputy United States Marshal

AO 245B-CAED (Rev. 09/2019) Sheet 3 - Supervised Release

DEFENDANT: **KENNETH JOHNSON**                                                    Page 3 of 7
CASE NUMBER: **1:20CR00238-011**

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:
60 months on each of Counts 1, 2, and 3, all to be served concurrently, for a total term of 60 months.

## MANDATORY CONDITIONS

You must not commit another federal, state or local crime.
You must not unlawfully possess a controlled substance.
You must refrain from any unlawful use of controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two (2) periodic drug tests thereafter, not to exceed four (4) drug tests per month.

[ ]    The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse.

[ ]    You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution.

[✓]    You must cooperate in the collection of DNA as directed by the probation officer.

[ ]    You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense.

[ ]    You must participate in an approved program for domestic violence.

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

ER 56

AO 245B-CAED (Rev. 09/2019) Sheet 3 - Supervised Release

DEFENDANT: **KENNETH JOHNSON**                                                                    Page 4 of 7
CASE NUMBER: **1:20CR00238-011**

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4.  You must answer truthfully the questions asked by the probation officer.

5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment, you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person, such as nunchakus or tasers).

11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

13. You must follow the instructions of the probation officer related to the conditions of supervision.

### U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.


Defendant's Signature _____          Date _____


ER 57

AO 245B-CAED (Rev. 09/2019) Sheet 3 - Supervised Release

DEFENDANT: **KENNETH JOHNSON**                                                                Page 5 of 7
CASE NUMBER: **1:20CR00238-011**

## SPECIAL CONDITIONS OF SUPERVISION

1.  You must submit your person, property, house, residence, vehicle, papers, computer, other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer or any law enforcement officer at any time, based upon reasonable suspicion of unlawful conduct or a violation of a condition of supervision, without a search warrant. Failure to submit to a search may be grounds for revocation. You must warn any other occupants that the premises may be subject to searches pursuant to this condition.

2.  You must submit to substance abuse/alcohol abuse testing to determine if you have used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods.

3.  You must provide the probation officer with access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with the U.S. Attorney's Office.

4.  You must not communicate or otherwise interact with any known member of the Aryan Brotherhood gang or any other known member of a criminal gang, without first obtaining the permission of the probation officer.

5.  You must possess and use only those cellular phones and phone numbers (including Voice over Internet Protocol [VoIP] services) that have been disclosed to the probation officer upon commencement of supervision. Any changes or additions are to be disclosed to the probation officer prior to the first use.

6.  You must participate in a co-payment plan for treatment, testing and/or medication and shall make payment directly to the vendor under contract with the United States Probation Office. Your co-payment will be determined utilizing a Sliding Fee Scale based upon your disposable income.

ER 58

AO 245B-CAED (Rev. 09/2019) Sheet 5 - Criminal Monetary Penalties

DEFENDANT: **KENNETH JOHNSON**                                                    Page 6 of 7
CASE NUMBER: **1:20CR00238-011**

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the Schedule of Payments on Sheet 6.

**TOTALS**

| Processing Fee | Assessment | AVAA Assessment* | JVTA Assessment** | Fine | Restitution |
|---|---|---|---|---|---|
|  | $300.00 | $0.00 | $0.00 | $0.00 | 0.00 |

[ ]   The determination of restitution is deferred until ___ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

[ ]

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

[ ]   Restitution amount ordered pursuant to plea agreement $ ___

[ ]   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

[ ]   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    [ ]    The interest requirement is waived for the        [ ] fine        [ ] restitution

    [ ]    The interest requirement for the        [ ] fine        [ ] restitution is modified as follows:

[ ]   If incarcerated, payment of any unpaid criminal monetary penalties in this case is due during imprisonment at the rate of 10% of the defendant's gross income per month or $25 per quarter, whichever is greater. Payment shall be made through the Bureau of Prisons Inmate Financial Responsibility Program.

[ ]   Other:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299

\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.

\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B-CAED (Rev. 09/2019) Sheet 6 - Schedule of Payments

DEFENDANT: **KENNETH JOHNSON**                                          Page 7 of 7
CASE NUMBER: **1:20CR00238-011**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A.    [ ]    Lump sum payment of $ ___ due immediately, balance due

        [ ]       Not later than ___, or
        [ ]       in accordance      [ ] C,       [ ] D,       [ ] E,or       [ ] F below; or

B.    [✓]    Payment to begin immediately (may be combined with      [ ] C,       [ ] D,       or [ ] F below); or

C.    [ ]    Payment in equal ___ *(e.g. weekly, monthly, quarterly)* installments of $ ___ over a period of ___ *(e.g. months or years)*, to commence ___ *(e.g. 30 or 60 days)* after the date of this judgment; or

D.    [ ]    Payment in equal ___ *(e.g. weekly, monthly, quarterly)* installments of $ ___ over a period of ___ *(e.g. months or years)*, to commence ___ *(e.g. 30 or 60 days)* after release from imprisonment to a term of supervision; or

E.    [ ]    Payment during the term of supervised release/probation will commence within ___ *(e.g. 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F.    [ ]    Special instructions regarding the payment of criminal monetary penalties:

If incarcerated, payment of any unpaid criminal monetary penalties in this case is due during imprisonment at the rate of 10% of the defendant's gross income per month or $25 per quarter, whichever is greater. Payment shall be made through the Bureau of Prisons Inmate Financial Responsibility Program.

The defendant shall make payments toward any unpaid criminal monetary penalties in this case during supervision at the rate of at least 10% of your gross monthly income. Payments are to commence no later than 60 days from placement on supervision. This payment schedule does not prohibit the United States from collecting through all available means any unpaid criminal monetary penalties at any time, as prescribed by law.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

[ ]    The defendant shall pay the cost of prosecution.

[ ]    The defendant shall pay the following court cost(s):

[✓]    The defendant shall forfeit the defendant's interest in the following property to the United States: The Preliminary Order of Forfeiture is hereby made final as to this defendant and shall be incorporated into the Judgment.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

ER 60

| 05/19/2025 | 1907 | MINUTES (Text Only) for proceedings held before District Judge Jennifer L. Thurston: SENTENCING held on 5/19/2025 for Francis Clement (12) CUSTODY: Life on each of Counts 1, 2, 4, and 5 each to be served consecutively. Life on each of Counts 3 and 6 to be served concurrently to Counts 1, 2, 4, and 5 for a total term of 4 consecutive life sentences on the Third Superseding Indictment. Special Assessment $600. SUPERVISED RELEASE: 60 months on each of on Counts 1 through 6, all to be served concurrently, for a total term of 60 months with conditions. Preliminary Order of Forfeiture-GRANTED. Appeal Rights Given. DEFENDANT TERMINATED. Government Counsel: Stephanie Stokman, James Conolly present. Defense Counsel: Jane Fisher-Byrialsen, Jean deSalles Barrett present. Custody Status: WAIVER. Court Reporter/CD Number: ECRO. (Deputy Clerk IM). (Entered: 05/21/2025) |
|---|---|---|

ER 61

| 05/19/2025 | 1906 | MINUTES (Text Only) for proceedings held before District Judge Jennifer L. Thurston: SENTENCING held on 5/19/2025 for Kenneth Johnson (11) CUSTODY: Life on Count 1, Life on Count 2 both counts to be served consecutively, and Life on Count 3 to be served concurrently to Counts 1 and Count 2, for a total term 2 consecutive life sentence on the Third Superseding Indictment. Special Assessment $300. SUPERVISED RELEASE: 60 months on each of Counts 1, 2, and 3, all to be served concurrently, for a total term of 60 months with conditions. Preliminary Order of Forfeiture-GRANTED. Appeal Rights Given. DEFENDANT TERMINATED. Government Counsel: Stephanie Stokman, James Conolly present. Defense Counsel: Ryan Villa present. Custody Status: WAIVER. Court Reporter/CD Number: ECRO. (Deputy Clerk IM) (Entered: 05/21/2025) |
|---|---|---|

ER 62

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  1:20-CR-00238-JLT-SKO |
| Plaintiff, | ORDER DENYING THE MOTIONS FOR JUDGMENT OF ACQUITTAL BY DEFENDANTS JOHNSON, CLEMENT AND STINSON |
| v. | |
| KENNETH JOHNSON, et al, | |
| Defendants. | |

After the government rested its case, the defendants moved for judgments of acquittal. The defendants argue that because no witnesses directly pointed them out and identified them during trial, the government failed to prove an essential element of its case. They asserted also very generally, that they were entitled to judgments of acquittal as to the remaining merits of the case. For the reasons set forth below, the motions are **DENIED**.

**I.      The defendants have failed to demonstrate they are entitled to judgment in their favor.**

According to Federal Rules of Criminal Procedure Rule 29, the court may grant a motion for judgment of acquittal only if, viewing the evidence in the light most favorable to the government, "no rational trier of fact could find beyond a reasonable doubt that the defendant is the person who committed the charged crime." *United States v. Lucas*, 963 F.2d at 243, 247 (9th Cir. 1992) "The government is entitled to all reasonable inferences that can be drawn from the

evidence." *Id*.

In *United States v. Alexander*, 48 F.3d 1477, 1490 (9th Cir. 1995), the Ninth Circuit held that identification of the defendant is "always" a necessary element of the charged offense. The Court cautioned, however, that in-court identification is not required and "[i]dentification can be inferred from all the facts and circumstances that are in evidence." *Id. Alexander* agreed with other circuits that a witness "'need not physically point out a defendant so long as the evidence is sufficient to permit the inference that the person on trial was the person who committed the crime.' *United States v. Darrell*, 629 F.2d 1089, 1091 (5th Cir.1980)." *Id*.

In this case, no witness pointed to the defendants and identified them as those who committed the charged crimes. However, Los Angeles County Sheriff's Detective Knieriem, testified that he had become familiar with those involved in the investigation, which started in December 2019, into the Aryan Brotherhood, including the defendants. (Doc. 1751 at 10-11) He testified that he became familiar with them through his own experience with them, through his work in the prison gang unit of the Los Angeles County Sheriff's Department, through talking with the targeted people himself and through talking with personnel of other agencies, including the California Department of Corrections and Rehabilitation. *Id*. He then identified photos of each of the defendants, each of which were admitted without objection, and testified as to their nicknames. *Id*. at 11-14, 25, 26. [1]

Troy Clowers testified that he knew John Stinson and Kenneth Johnson. (Doc. 1751 at 44-45, 46-47.) He began speaking with Stinson via a cell phone in about 2020 or 2021 and with Johnson first in 2018 and again in 2020. (Doc. 1751 at 44-45, 46-47, 72, 73-74) He reported that Mr. Stinson eventually sponsored him to become a "made member" of the Aryan Brotherhood. *Id*. at 44, 66-67, 69. Due to their made-member status with the AB, Clowers would share with Stinson and others the proceeds he earned from his various criminal activities. *Id*. at 73-76, 105-106. He also arranged to have drugs sent to Johnson on one occasion. *Id*. He identified the nicknames for Stinson and Johnson. *Id*. at 45, 148. He also committed EDD fraud on behalf of the

---

[1] Though it has little bearing on this motion, counsel conceded while cross-examining Detective Knieriem that the photo identified by Detective Knieriem *was* Mr. Stinson. *Id*. at 28-29.

AB, including obtaining benefits for both Stinson and Johnson.

James Field testified that he knew Mr. Johnson and Mr. Clement. (Doc. 1763 at 16-17) He testified that he was in "personal communication" with Johnson and Clement in 2022 via cell phone and knew their nicknames. *Id*. He had seen Clement on video calls and knew it was him because he had spoken to him by phone before and because another AB member said that the person on the video call was, in fact, Frank Clement. *Id*. at 27-28, 107-108. Field provided messages he exchanged with Clement and Johnson using his cell phone. *Id*. at 66-67, 69-70, 71-72.

Field testified that he was directed by Clement to commit a robbery in the Hollywood Hills and to murder Micheal Brizendine, which he did. *Id*. at 28-32, 34-43, 44-50, 111-113. Field testified that Clement told him to collect money from Evan Perkins that Clement decided that Perkins owed him because Perkins failed to succeed at committing EDD fraud on the scale that Clement wanted.  (Doc. 1763 at 50-58, 50-51) In connection with this, Clement also instructed Field to kill James Yagle and Ronald Ennis. *Id*. at 72-100, 102-108. Field testified that he, Brandon Bannick and Evan Perkins drove Yagle and Ennis to a remote spot where Field shot and killed Yagle while Field was on the phone with Clement. *Id*. While speaking to Clement as the scene of the murders, Clement commented to Fields about hearing Ennis screaming after he had been shot by Brandon Bannick and Evan Perkins. *Id*.

Lana Hailey testified that, though she did not know Mr. Johnson or Mr. Clement personally, she had spoken to both on the telephone. (Doc. 1767 at 18-27) She was put in touch with them by Brandon Bannick, Justin Gray or Evan Perkins. *Id*. Johnson and Clement both told her that each was a member of the Aryan Brotherhood. *Id*. Clement accused Hailey of stealing from the Aryan Brotherhood and told her that she owed them $5,000. *Id.* She paid Clement the money and committed a theft because Clement told her to do it, and she was afraid that she would be hurt if she didn't do it. *Id.*

Hailey testified that Allan Roshanski was committing EDD fraud at the time of his murder. (Doc. 1767 at 22-24) In one conversation with Clement, Clement told her that they were going to kill Roshanski and, not long after, Justin Gray told her than he killed Roshanski. *Id*. at

3

27-28. In a later call, Clement took credit for having Roshanski killed. *Id*. at 28.

Robert Eversole testified that he knew Johnson, Clement and Stinson. (Doc. 1767 at 152-156) His testimony supported that John Stinson was a member of the three-man commission, which oversees the AB enterprise. *Id*. Eversole was a close friend of Johnson and Stinson and an associate of Clement and spoke to them often by voice and video calls. *Id*. 152-156, 157-158, 199-200

Eversole testified about the various criminal activities he was involved in on behalf of the AB. *Id*. at 162, 163-164, 197-201; Doc. 1777 at 164. He committed these crimes and acts of violence on the orders of the AB and gave orders and relayed orders from members of the AB to others to have crimes and violence committed. *Id*. at 164-167; Doc. 1777 at 16. He did this because if he did not, he would be the target of violence, including murder. (Doc. 1767 at 164-167.) In particular, he testified that Johnson and Clement were involved in various forms of fraud through Evan Perkins and others. *Id.* at 158-159, 202. He also discussed the murder of Allan Roshanski. *Id.* He testified that Johnson had learned that Roshanski was committing large-scale EDD fraud and told Eversole to find out whether Roshanski was affiliated with any gang. *Id*. 201-213. When Eversole discovered that Roshanski was not affiliated with a gang, the AB, including Johnson and Clement, determined that Roshanski needed to pay a percentage of money earned from the fraud to the AB as "protection." *Id*.; Doc. 1777 at 19-20.

During this process, Roshanski treated Clement with disrespect, which resulted in Johnson ordering Justin Gray to kill Roshanski. (Doc. 1767 at 20-213) The plan was for Gray to meet with Roshanksi, kill him, and steal a bag from him, which Johnson and Clement believed would contain EDD debit cards. *Id*. Clement told Eversole to help Gray plan out how the murder would occur. *Id*. at 208-213; Doc. 1777 at 18-19, 166-169, 170.

Eversole also testified that Clement and Johnson ordered that an AB associate, Brandon Lowrey, be murdered. (Doc. 1777 at 20-23) He testified that AB associate Thrasher Holmeyer murdered Lowrey because Johnson told Holmeyer to do it. *Id*.

Brian Rapinoe testified that he was an associate of the Aryan Brotherhood. (Doc. 1777 at 181) In that capacity he knew and worked for John Stinson, including committing crimes for him

4

and the AB, including wide-scale EDD fraud. *Id*. at 181-183, 184-187, 188-191, 197-202; Doc. 1786 at 30-. He also knew Kenneth Johnson. (Doc. 1777 at 184. When Rapinoe acted as a paid informant for the ATF, he engaged in audio and video conversations with Johnson in which the two discussed Johnson selling various pound-quantities of methamphetamine to him. *Id*. at 204-211. Johnson gave him prices and Rapinoe agreed to buy the drugs, but the drug purchase did not occur. *Id*.; Doc. 1786 at 29-30.

Brandon Bannick testified that became associated with the AB when he entered state prison and described the rules, activities and crimes of the AB. (Doc. 1786 at 117-121) He testified that, among other AB members and associates, he knew Clement and Johnson and knew their nicknames. *Id*. at 123-125. He had been in personal communication with both. *Id*. He knew others who committed crimes for John Stinson. (Doc. 1786 at 121-122)

In 2020, Bannick learned that Justin Gray was ordered by Clement and Johnson to kill Allan Roshanski. (Doc. 1786 at 126-134) Johnson told him to go with Gray and assist him, in what turned out to be the murders of Roshanski and Ruslan Megomedgadzhiev. *Id*. He did so because Bannick owed Johnson money. *Id*. at 134-140. Gray told Bannick that Johnson and Clement ordered the murder because Roshanski had disrespected Clement. *Id*.

Bannick also testified that he was present when James Yagle and Ronald Ennis were murdered and, in fact, shot Ennis six times. (Doc. 1786 at 141 –166, 179-181) Bannick testified that Clement ordered them to murder Yagle and Ennis. *Id*. at 156, 167-168, 169-170.

Daniel Rubin testified that he was an associate of the AB and explained the rules of the enterprise. (Doc. 1793 at 55-58, 64-73) He testified that he knew John Stinson, Kenneth Johnson and Francis Clement through his cellmate and that he spoke to each of them by telephone. *Id*. at 58-61, 74-76, 77-78, 80, 89, 133. He described the criminal activities of the AB in and out of prison. *Id*. at 61-73, 82, 94-99, 102-112. When he earned money, he paid a percentage to John Stinson. *Id*. at 66-67. John Stinson ordered him to kill an AB member, Yandell, though he didn't do it because Yandell was kept in administrative segregation and Rubin could not get to him. *Id*. at 112-113. Stinson also ordered that AB member Andrew Collins be murdered. *Id*. at 113-115. Stinson told him to find someone who could kill Collins, but the AB did not have a person where

Collins was being housed who could do it. *Id*. Stinson spoke to a leader in the Mexican Mafia to have them kill Collins, but that group would not do it. *Id*.

After considering this evidence and the entirety of the evidence presented by the government, the Court finds that the motions must be denied. Rule 29 requires the Court to evaluate the evidence in the light most favorable to the government and deny the motion it finds that no "rational trier of fact could find the essential elements of the charged crimes beyond a reasonable doubt." *United States v. Nevils*, 598 F.3d 1158, 1161 (9th Cir. 2010). Though the Court has summarized only very broadly *some* of the evidence admitted at trial, it is apparent that there was sufficient evidence to support each of the elements of the charged crimes and sufficient evidence that the defendants committed those crimes. *Alexander*, 48 F.3d at 1490. Though no witness pointed at each defendant and spoke their names, the evidence was sufficient to for the trier of fact to infer that the defendants were the people who committed the crimes. *Darrell*, 629 F.2d at 1091. Thus, the motion is **DENIED.**

## ORDER

For the reasons discussed, the Court **ORDERS**:

1.      The oral motions of the defendants for judgments of acquittal under Rule 29, are **DENIED**.

IT IS SO ORDERED.

Dated:   **February 22, 2025**

UNITED STATES DISTRICT JUDGE

6

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 1:20-cr-00238 JLT SKO |
| Plaintiff, | |
| v. | JURY INSTRUCTIONS |
| KENNETH JOHNSON, et al., | |
| Defendants. | |

The jury instructions attached hereto were read to the jury in open court.

Dated:  February 18, 2025

KEITH HOLLAND, CLERK OF THE COURT

By: __I.M._____

I.M., Deputy Clerk

INSTRUCTION NO. 1

Members of the jury, now that you have heard all the evidence, it is my duty to instruct you on the law that applies to this case.  A copy of these instructions will be available in the jury room for you to consult.

It is your duty to weigh and to evaluate all the evidence received in the case and, in that process, to decide the facts.  It is also your duty to apply the law as I give it to you to the facts as you find them, whether you agree with the law or not.  You must decide the case solely on the evidence and the law.  You will recall that you took an oath promising to do so at the beginning of the case.  You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.  Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases.  Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention.

You must follow all these instructions and not single out some and ignore others; they are all important.  Please do not read into these instructions or into anything I may have said or done as any suggestion as to what verdict you should return—that is a matter entirely up to you.

1

INSTRUCTION NO. 2

The indictment is not evidence.  The defendants have pleaded not guilty to the charges. The defendants are presumed to be innocent unless and until the government proves the defendants guilty beyond a reasonable doubt.  In addition, the defendants do not have to testify or present any evidence.  The defendants do not have to prove innocence; the government has the burden of proving every element of the charges beyond a reasonable doubt.

2

INSTRUCTION NO. 3

A defendant in a criminal case has a constitutional right not to testify. In arriving at your verdict, the law prohibits you from considering in any manner that the defendant did not testify.

3

INSTRUCTION NO. 4

Proof beyond a reasonable doubt is proof that leaves you firmly convinced the defendant is guilty. It is not required that the government prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation. It may arise from a careful and impartial consideration of all the evidence, or from lack of evidence.

If after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty. On the other hand, if after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty.

4

INSTRUCTION NO. 5

The evidence you are to consider in deciding what the facts are consists of:

    (1)   the sworn testimony of any witness;

    (2)   the exhibits received in evidence;

    (3)   the facts accepted by the Court through judicial notice; and

    (4)   any facts to which the parties have agreed.

INSTRUCTION NO. 6

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

(1)    Arguments and statements by the lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, and what they may say in closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

(2)    Questions and objections by the lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

(3)    Testimony that is excluded or stricken, or that I have instructed you to disregard, is not evidence and must not be considered. In addition, some evidence may be received only for a limited purpose; when I instruct you to consider certain evidence only for a limited purpose, you must do so, and you may not consider that evidence for any other purpose.

(4)    Anything you may see or hear when the court is not in session is not evidence even if what you see or hear is done or said by one of the parties or by one of the witnesses. You are to decide the case solely on the evidence received at the trial.

6

ER 75

INSTRUCTION NO. 7

You have heard recordings that have been received in evidence. Displayed to you while listening, was a transcript of the recording to help you identify speakers and as a guide to help you listen to the recording. However, bear in mind that the recordings are the evidence, not the transcript. If you heard something different from what appeared in the transcript, what you heard is controlling.

7

INSTRUCTION NO. 8

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts from which one can find another fact.

You are to consider both direct and circumstantial evidence.  Either can be used to prove any fact.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

8

INSTRUCTION NO. 9

During the trial, certain charts were shown to you to help explain the evidence in the case. These charts were not admitted into evidence and will not go into the jury room with you. They are not themselves evidence or proof of any facts. If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and determine the facts from the underlying evidence.

9

INSTRUCTION NO. 10

You have heard testimony from the following witnesses who testified about his or her opinions and the reasons for those opinions:

    1.    Dr. Paul Gliniecki

    2.    Francia Martinez

    3.    Danielle Ponce de Leon

    4.    Benjamin Mendoza

    5.    Dr. Eugene Carpenter

This opinion testimony is allowed because of the specialized knowledge, skill, experience, training, or education of this witness. Such opinion testimony should be judged like any other testimony. You may accept it or reject it and give it as much weight as you think it deserves, considering the witness's knowledge, skill, experience, training, or education, the reasons given for the opinion, and all the other evidence in the case.

ER 79

INSTRUCTION NO. 11

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1)   the opportunity and ability of the witness to see or hear or know the things testified to;

(2)   the witness's memory;

(3)   the witness's manner while testifying;

(4)   the witness's interest in the outcome of the case, if any;

(5)   the witness's bias or prejudice, if any;

(6)   whether other evidence contradicted the witness's testimony;

(7)   the reasonableness of the witness's testimony in light of all the evidence; and

(8)   any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

You must avoid bias, conscious or unconscious, based on a witness's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances in your determination of credibility.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much

ER 80

weight you think their testimony deserves.

INSTRUCTION NO. 12

You have heard evidence that Robert Eversole, Brian Rapinoe, Daniel Rubin, Brandon Bannick, Lana Haley, James Field, Kaylen Chandler, Troy Clowers, and Timothy True, witnesses who have testified at this trial, each have prior convictions for felony offenses. You may consider this evidence in deciding whether or not to believe each witness and how much weight to give to the testimony of that witness.

INSTRUCTION NO. 13

You have heard testimony from Brandon Bannick and James Field, witnesses who pleaded guilty to crimes arising out of the same events for which each of the defendants is on trial.  Their guilty pleas are not evidence against any of the defendants. You may consider them only in determining each witness's believability.

You have heard testimony from Robert Eversole, Brandon Bannick, James Field, Troy Clowers, and Timothy True.  Their testimony was given in exchange for favored treatment from the government in connection with this case.

You have heard testimony from Kaylen Chandler, a witness who received immunity. That testimony was given in exchange for a promise by the government that the witness will not be prosecuted, and that the testimony will not be used in any case against the witness.

Finally, you heard testimony from Brian Rapinoe, a witness who received compensation from the government in connection with this case.

For these reasons, in evaluating the testimony of these witnesses, you should consider the extent to which or whether each witness's testimony may have been influenced by these factors. In addition, you should examine the testimony of these witnesses with greater caution than that of other witnesses.

14

INSTRUCTION NO. 14

A separate crime is charged against one or more of the defendants in each count. The charges have been joined for trial. You must decide the case of each defendant on each crime charged against that defendant separately. Your verdict on any count as to any defendant should not control your verdict on any other count or as to any other defendant.

All the instructions apply to each defendant and to each count unless an instruction states that it applies only to a specific defendant or count.

15

INSTRUCTION NO. 15

You have heard testimony that the defendants were members of the Aryan Brotherhood. Gang membership alone, without more, does not prove that someone has entered a criminal agreement. As a result, you must not infer from alleged gang membership alone, without more, that Mr. Clement, Mr. Johnson, or Mr. Stinson committed the crimes charged.

16

INSTRUCTION NO. 16

You have heard evidence that each defendant has been convicted of a crime. You may not consider a prior conviction as evidence of guilt of the crimes for which the defendants are now on trial.

INSTRUCTION NO. 17

The indictment charges that the offenses were committed "on or about" or "in or around" certain dates.  Although it is necessary for the government to prove beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged in the indictment, it is not necessary for the government to prove that the offense was committed precisely on the date charged.

INSTRUCTION NO. 18

An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident.  The government is not required to prove that the defendant knew that his acts or omissions were unlawful.  You may consider evidence of a defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly.

19

INSTRUCTION NO. 19

I will now explain to you the general law regarding conspiracies.  Every Count has instructions.  In addition to those, this instruction on conspiracies generally applies to the RICO conspiracy charged in Count One.

First, beginning and ending on or about the dates set forth in the Counts below, there was an agreement between two or more persons to commit at least one crime as charged in the indictment and explained below; and

Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes.  The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy.  It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another.  You must find that there was a plan to commit at least one of the crimes alleged in the indictment as an object of the conspiracy with all of you agreeing as to the particular crime which the conspirators agreed to commit.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy.  Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators.  On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator.  Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

20

INSTRUCTION NO. 20

Count One charges a violation of Section 1962(d) of Title 18 of the United States Code that the defendants Kenneth Johnson, Francis Clement, and John Stinson—along with others known and unknown—knowingly and intentionally conspired with at least one other person to conduct or to participate in the conduct of the affairs of a racketeering enterprise. Specifically, the indictment alleges that the enterprise is the Aryan Brotherhood, including its leaders, members, and associates. This offense is called RICO conspiracy.

"RICO" refers to the Racketeer Influenced and Corrupt Organizations Act found at Sections 1961 and 1962 of Title 18 of the United States Code.

For a defendant to be found guilty of this charge, the government must prove each of the following elements beyond a reasonable doubt as to each defendant:

First, that the charged enterprise existed;

Second, the charged enterprise was or would be engaged in, or its activities affected or would affect, interstate or foreign commerce;

Third, that beginning at a time unknown, but no later than in or around 2015, and continuing to at least on or about March 1, 2023, the defendant knowingly agreed that a conspirator was or would be employed by or associated with the enterprise;

Fourth, the defendant knowingly agreed that a conspirator would conduct or participate, either directly or indirectly, in the conduct of the affairs of the enterprise; and

Fifth, the defendant agreed that a conspirator did or would knowingly participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity; that is, a conspirator did or would commit at least two acts of racketeering activity.

The defendant must have been aware of the essential nature and scope of the enterprise and intended to participate in it.

The government is not required to prove that the defendant personally committed any act of racketeering activity or agreed to do so.

The government is not required to prove that the parties to or members of the conspiracy were successful in achieving any or all of the objects of the conspiracy.

21

You may consider the evidence presented of racketeering acts committed or agreed to be committed by any co-conspirator in furtherance of the enterprise's affairs to determine whether the defendant knew that at least one member of the conspiracy would commit two or more racketeering acts.

22

INSTRUCTION NO. 21

To establish the first element of the RICO conspiracy in Count One, the government must prove that an "enterprise" existed that was engaged in or had an effect on interstate commerce. An enterprise is a group of people who have associated together for a common purpose of engaging in a course of conduct over a period of time. This group of people, in addition to having a common purpose, must have an ongoing organization, either formal or informal. The personnel of the enterprise, however, may change and need not be associated with the enterprise for the entire period alleged in the indictment. This group of people does not have to be a legally recognized entity, such as a partnership or corporation. This group may be organized for a legitimate and lawful purpose, or it may be organized for an unlawful purpose.

Therefore, the government must prove beyond a reasonable doubt that this was a group of people:

    (1)   associated for a common purpose of engaging in a course of conduct;

    (2)   the association of these people was an ongoing formal or informal organization;

    (3)   the group was engaged in or had an effect upon interstate or foreign commerce; and

    (4)   the group had longevity sufficient to permit the associates to pursue the enterprise's purpose.

The government need not prove that the enterprise had any particular organizational structure.

Interstate commerce includes the movement of goods, services, money, and individuals between states. These goods can be legal or illegal. Only a minimal effect on commerce is required and the effect need only be probable or potential, not actual. It is not necessary to prove that the defendant's own acts affected interstate commerce as long as the enterprise's acts had such an effect.

You are instructed that drug trafficking, even local trafficking, has a substantial effect on interstate commerce.

23

INSTRUCTION NO. 22

The government must prove that the enterprise was engaged in racketeering activity. "Racketeering activity" means the commission of certain crimes. These include acts of murder, robbery, fraud, and drug trafficking in violation of state or federal law.

The government must prove beyond a reasonable doubt that the enterprise was engaged in at least one of the crimes listed above.

24

INSTRUCTION NO. 23

To establish a pattern of racketeering activity, the government must prove each of the following beyond a reasonable doubt:

(1)  at least two acts of racketeering were committed within a period of ten years of each other;

(2)  the acts of racketeering were related to each other, meaning that there was a relationship between or among the acts of racketeering; and

(3)  the acts of racketeering amounted to or posed a threat of continued criminal activity.

With respect to the second element above, acts of racketeering are "related" if they embraced the same or similar purposes, results, participants, victims, or methods of commission, or were otherwise interrelated by distinguishing characteristics.

Sporadic, widely separated, or isolated criminal acts do not form a pattern of racketeering activity.

Two racketeering acts are not necessarily enough to establish a pattern of racketeering activity.

25

ER 94

INSTRUCTION NO. 24

The RICO statute defines a "racketeering act" to be any of a list of certain crimes, some of which are federal crimes and some of which are state crimes.  I will now list the racketeering acts charged in this case and describe them.

The pattern of racketeering alleged in this case consists of acts involving: (i) murder; (ii) conspiracy to commit murder; (iii) attempted murder; (iv) robbery; (v) conspiracy to commit robbery; (vi) conspiracy to distribute and possess with intent to distribute a controlled substance; (vii) distribution of a controlled substance and attempt; and (viii) fraud.

I will now instruct you on the definition of each of these racketeering activities that the leaders, members, and associates of the enterprise are alleged to have contemplated as part of their conspiracy.  The crime charged in Count One is RICO conspiracy, which is the agreement to conduct the affairs of the Aryan Brotherhood through a pattern of racketeering.  No racketeering act need to have been committed or even attempted by anyone.  Rather, it is sufficient that you find that the defendant knew or contemplated that one or more members of the conspiracy, not necessarily the defendant, would commit at least two acts of racketeering in furtherance of the conspiracy.

To convict the defendant of the RICO conspiracy offense, your verdict must be unanimous as to the racketeering activity the defendant knew or contemplated would be committed; for example, at least two acts of murder, conspiracy to commit murder, robbery, conspiracy to commit robbery, drug trafficking, fraud, or one of each, or any combination thereof.  I will now instruct you on the specific racketeering acts alleged in this case.

26

INSTRUCTION NO. 25

To prove that a defendant is guilty of murder under California law, the government must prove that:

(1)    the defendant committed an act that caused the death of the alleged victim; and

(2)    when the defendant acted, he had a state of mind called malice aforethought.

The defendant has "malice aforethought" if he unlawfully intended to kill.  Malice aforethought does not require hatred or ill will toward the victim.  It is a mental state that must be formed before the act that causes death is committed.  It does not require deliberation or the passage of any particular period of time.

An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act.  A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

27

INSTRUCTION NO. 26

To prove that a defendant is guilty of conspiracy to commit murder under California law, the government must prove that:

(1)  the defendant intended to agree and did agree with one or more persons to intentionally and unlawfully kill;

(2)  at the time of the agreement, the defendant and one or more persons in the conspiracy intended that one or more of them would intentionally and unlawfully kill;

(3)  one of the persons committed at least one overt act alleged to accomplish the killing; and

(4)  at least one of these overt acts was committed in California.

To decide whether the defendant committed this overt act, consider all of the evidence presented about the overt act.

Conspiracy to commit murder requires an intent to kill.

The members of the alleged conspiracy must have an agreement and intent to commit murder. It is not necessary that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit that crime. An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime.

An "overt act" is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed-upon crime. The overt act must happen after the defendant has agreed to commit the crime. The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be a criminal act itself.

A member of a conspiracy does not have to personally know the identity or roles of all the other members of the conspiracy.

INSTRUCTION NO. 27

To prove that a defendant is guilty of attempted murder under California law, the government must prove that:

(1)    the defendant took at least one direct but ineffective step toward killing another person; and

(2)    the defendant intended to kill that person.

A "direct step" requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt.

29

ER 98

INSTRUCTION NO. 28

To prove that a defendant is guilty of soliciting another person to commit murder under California law, the government must prove that:

    (1)   the defendant requested or asked another person to commit, or join in the commission of murder;

    (2)   the defendant intended that the crime of murder be committed; and

    (3)   the other person received the communication containing the request.

INSTRUCTION NO. 29

To prove that a defendant is guilty of robbery under California law, the government must prove that:

(1) the defendant took property that was not his own;

(2) the property was in the possession of another person;

(3) the property was taken from the other person or his/her immediate presence;

(4) the property was taken against that person's will;

(5) the defendant used force or fear to take the property or to prevent the person from resisting; and

(6) when the defendant used force or fear, he intended to deprive the owner of the property permanently or to remove the property from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property.

A person takes something when he or she gains possession of it and moves it some distance. The distance moved may be short.

Fear, as used here, means fear of injury to the person himself or herself.

An act is accomplished by fear if the other person is actually afraid. The other person's actual fear may be inferred from the circumstances.

Property is within a person's immediate presence if it is sufficiently within his or her physical control that he or she could keep possession of it if not prevented by force or fear.

An act is done against a person's will if that person does not consent to the act. In order to consent, a person must act freely and voluntarily and know the nature of the act.

31

ER 100

INSTRUCTION NO. 30

To prove that a defendant is guilty of attempted robbery under California law, the government must prove that:

    (1)   the defendant took a direct but ineffective step toward committing robbery (as defined in the previous instruction); and

    (2)   the defendant intended to commit robbery.

A "direct step" requires more than merely planning or preparing to commit or obtaining or arranging for something needed to commit. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to commit. It is a direct movement towards the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt.

ER 101

INSTRUCTION NO. 31

To prove that a defendant is guilty of conspiracy to commit robbery under California law, the government must prove that:

    (1)   the defendant intended to agree and did agree with one or more persons to commit robbery;

    (2)   at the time of the agreement, the defendant and one or more persons in the conspiracy intended that one or more of them would commit robbery;

    (3)   one of the persons committed at least one overt act alleged to accomplish the taking of property; and

    (4)   at least one of these overt acts was committed in California.

To decide whether the defendant committed this overt act, consider all of the evidence presented about the overt act.

Conspiracy to commit robbery requires an intent to commit robbery.

The members of the alleged conspiracy must have had an agreement and intent to commit robbery.  It is not necessary that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit that crime.  An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime.

An "overt act" is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed upon crime.  The overt act must happen after the defendant has agreed to commit the crime.  The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be a criminal act itself.

A member of a conspiracy does not have to personally know the identity or roles of all the other members.

33

INSTRUCTION NO. 32

To prove that a defendant is guilty of conspiracy to distribute or possess with intent to distribute a controlled substance under federal law, the government must prove that:

    (1)   there was an agreement between two or more persons to distribute and possess with intent to distribute methamphetamine or fentanyl; and

    (2)   the defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose.

"To distribute" means to deliver or transfer possession of methamphetamine or fentanyl to another person, with or without any financial interest in that transaction.

To "possess with intent to distribute" means to possess with intent to deliver or transfer possession of methamphetamine or fentanyl to another person, with or without any financial interest in the transaction.

34

ER 103

INSTRUCTION NO. 33

To prove that a defendant is guilty of distribution of a controlled substance under federal law, the government must prove that:

    (1)   the defendant knowingly distributed methamphetamine or fentanyl; and

    (2)   the defendant knew that the substance was methamphetamine or fentanyl.

"To distribute" means to deliver or transfer possession of methamphetamine or fentanyl to another person, with or without any financial interest in that transaction.

To "possess with intent to distribute" means to possess with intent to deliver or transfer possession of methamphetamine or fentanyl to another person, with or without any financial interest in the transaction.

35

ER 104

INSTRUCTION NO. 34

To prove that a defendant is guilty of attempt to distribute a controlled substance under federal law, the government must prove that:

    (1)   the defendant intended to distribute methamphetamine or fentanyl; and

    (2)   the defendant did something that was a substantial step toward committing the crime.

A "substantial step" is conduct that strongly corroborated a defendant's intent to commit the crime. To constitute a substantial step, a defendant's act or actions must unequivocally demonstrate that the crime will take place unless interrupted by independent circumstances. Mere preparation is not a substantial step toward committing the crime.

36

INSTRUCTION NO. 35

To prove that a defendant is guilty of fraud in connection with identification documents under federal law, the government must prove that:

(1)    the defendant knowingly possessed an identification document;

(2)    the identification document was or appeared to be an identification document of the Department of Motor Vehicles (DMV);

(3)    the identification document was produced without lawful authority; and

(4)    the defendant knew that the identification document was produced without lawful authority.

"Identification document" means a document made or issued by or under the authority of the United States Government, a State, political subdivision of a State, a sponsoring entity of an event designated as a special event of national significance, a foreign government, political subdivision of a foreign government, an international governmental or an international quasi-governmental organization which, when completed with information concerning a particular individual, is of a type intended or commonly accepted for the purpose of identification of individuals.

ER 106

INSTRUCTION NO. 36

To prove that a defendant is guilty of mail fraud under federal law, the government must prove that:

(1)  the defendant knowingly participated in a scheme or plan to defraud for the purposes of obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

(2)  the statements made as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

(3)  the defendant acted with the intent to defraud; that is, the intent to deceive and cheat; and

(4)  the defendant used, or caused to be used, the mails to carry out or attempt to carry out an essential part of the scheme.

A mailing is caused when one knows that the mails will be used in the ordinary course of business or when one can reasonably foresee such use.  It does not matter whether the material mailed was itself false or deceptive so long as the mail was used as a part of the scheme, nor does it matter whether the scheme or plan was successful or that any money or property was obtained.

If you decide that the defendant was a member of a scheme to defraud and that the defendant had the intent to defraud, the defendant may be responsible for other co-schemers' actions during the course of and in furtherance of the scheme, even if the defendant did not know what the other co-schemers said or did.

For the defendant to be guilty of an offense committed by a co-schemer in furtherance of the scheme, the offense must be one that the defendant could reasonably foresee as a necessary and natural consequence of the scheme to defraud.

38

ER 107

INSTRUCTION NO. 37

A person may be found guilty of a crime in two ways.  One, he may have directly committed the crime.  I will call that person the perpetrator.  Two, he may have aided and abetted a perpetrator, who directly committed the crime.

A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator.

Under California law, to prove that the defendant is guilty of a crime based on aiding and abetting that crime, the government must prove that:

    (1)   the perpetrator committed the crime;

    (2)   the defendant knew that the perpetrator intended to commit the crime;

    (3)   before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and

    (4)   the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

Someone "aids and abets" a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor.  However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor.

INSTRUCTION NO. 38

Counts Two, Three, Four, Five, and Six charge certain defendants with committing a crime of violence; specifically, Murder in Aid of Racketeering in violation of Title 18, United States Code, Section 1959(a)(1). For a defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

(1)   on or about the time period described in each of Counts Two through Six, an enterprise affecting interstate commerce existed;

(2)   the enterprise engaged in racketeering activity;

(3)   the defendant committed, or aided and abetted, the following crime of violence: murder (as defined in the earlier instructions) under California law; and

(4)   the defendant's purpose in committing, or aiding and abetting, that murder was to gain entrance to, or to maintain or increase his or another person's position in the Aryan Brotherhood enterprise.

It is not necessary for the government to prove that this motive was the sole purpose, or even the primary purpose of the defendant in committing the charged murder. You need only find that gaining entrance to, or maintaining or increasing his or another person's position in the enterprise, was a substantial purpose of the defendant or that he committed the charged crime as an integral aspect of membership in the enterprise. An incidental motivation, however, is not enough. In determining the defendant's purpose in committing the murder, you must determine what he had in mind. Since you cannot look into a person's mind, you have to determine purpose by considering all the facts and circumstances before you.

The specific murders alleged in this case are listed below. In deciding each Count, you must make a separate determination as to each Count as well as each defendant.

As to Count Two, the indictment alleges that defendants Kenneth Johnson and Francis Clement aided and abetted the murder of Allan Roshanski on or about October 4, 2020.

As to Count Three, the indictment alleges that defendants Kenneth Johnson and Francis Clement aided and abetted the murder of Ruslan Megomedgaozhiev on or about October 4, 2020.

40

As to Count Four, the indictment alleges that defendant Francis Clement aided and abetted the murder of Michael Brizendine on or about February 22, 2022.

As to Count Five, the indictment alleges that defendant Francis Clement aided and abetted the murder of Ronald Ennis on or about March 8, 2022.

As to Count Six, the indictment alleges that defendant Francis Clement aided and abetted the murder of James Yagle on or about March 8, 2022.

INSTRUCTION NO. 39

Pursuant to Section 2(a) of Title 18 of the United States Code, a defendant may be found guilty of Murder in Aid of Racketeering as charged in Counts Two, Three, Four, Five, and Six, even if he personally did not commit the act or acts constituting the crime but aided and abetted in the commission of the act or acts. To "aid and abet" means to intentionally help someone else commit a crime. To prove a defendant guilty of Murder in Aid of Racketeering by aiding and abetting, the government must prove each of the following beyond a reasonable doubt:

(1)  someone other than the defendant committed murder in aid of racketeering (as defined in the previous instruction);

(2)  the defendant aided, counseled, commanded, induced, or procured that person with respect to at least one element of murder in aid of racketeering;

(3)  the defendant acted with the intent to facilitate murder in aid of racketeering; and

(4)  the defendant acted before the crime was completed by the other person.

It is not enough that the defendant merely associated with the person committing the crime, or unknowingly or unintentionally did things that were helpful to that person or was present at the scene of the crime. The evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intent of helping that person commit murder in aid of racketeering.

A defendant acts with the intent to facilitate the crime when the defendant actively participates in a criminal venture with advance knowledge of the crime.

The government is not required to prove precisely which defendant actually committed the crime and which defendant aided and abetted.

42

INSTRUCTION NO. 40

When you begin your deliberations, elect one member of the jury as your foreperson who will preside over the deliberations and speak for you here in Court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so.  Your verdict, whether guilty or not guilty, must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should.  But do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision.  Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Perform these duties fairly and impartially.  You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.  Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases.  Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so.  During your deliberations, you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong.

43

ER 112

INSTRUCTION NO. 41

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves. Except for discussing the case with your fellow jurors during your deliberations:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This restriction includes discussing the case in person, in writing, by phone, tablet, computer, or any other means, via email, text messaging, or any Internet chat room, blog, website or any other forms of social media. This restriction applies to communicating with your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address. A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information, please notify the Court immediately.

INSTRUCTION NO. 42

Some of you have taken notes during the trial.  Whether or not you took notes, you should rely on your own memory of what was said.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of your fellow jurors.

ER 114

INSTRUCTION NO. 43

The punishment provided by law for this crime is for the Court to decide. You may not consider punishment in deciding whether the government has proved its case against each defendant beyond a reasonable doubt.

INSTRUCTION NO. 44

Verdict forms have been prepared for you.  After you have reached unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and, when all three verdict forms are complete, advise the bailiff that you are ready to return to the courtroom.

47

ER 116

INSTRUCTION NO. 45

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff, signed by any one or more of you.  No member of the jury should ever attempt to communicate with me except by a signed writing.  I will not communicate with any member of the jury on anything concerning the case except in writing or here in open court.  If you send out a question, I will consult with the lawyers before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone—including the Court—how the jury stands, whether in terms of vote count or otherwise, until after you have reached a unanimous verdict or have been discharged.

48

| 02/05/2025 | 1791 | MINUTES (Text Only) for proceedings held before District Judge Jennifer L. Thurston: JURY TRIAL (Day Twelve) as to Kenneth Johnson, Francis Clement, John Stinson held on 2/5/2025. 1785 MOTION to DISMISS filed by Francis Clement. The Court ruled from the bench and the rulings are preserved on the record. Motion is DENIED. USA witnesses: Daniel Rubin, Brian Rapinoe sworn/testified. USA exhibits ADMITTED. Jury Trial (Day Thirteen) set for 2/6/2025 at 08:00 AM in Courtroom 4 (JLT) before District Judge Jennifer L. Thurston. Government Counsel: Stephanie Stokman, James Conolly, Jared Engelking present. Defense Counsel: Andrea Lee Luem, Ryan Villa, Jane Fisher-Byrialsen, Jean deSalles Barrett, Kenneth Reed present. Custody Status: CUSTODY. Court Reporter/CD Number: Rachael Lundy. (Deputy Clerk IM) (Entered: 02/05/2025) |

ER 118

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA , <br><br> Plaintiff, <br><br> v. <br><br> KENNETH JOHNSON, <br><br> Defendant. | 1:20-CR-00238 -JLT-SKO <br><br> FURTHER ORDER RE COURTROOM/TRIAL PRACTICES; FURTHER ORDER RE: U.S. v. MIRABAL |

**I.      Courtroom decorum**

Before this trial began, the Court issued an order providing guidance as to the conduct of counsel during trial (Doc. 1663). Counsel SHALL read and abide by that order. The Court reiterates key points here.

First, objections are limited to stating the legal basis for them. There will be **<u>no speaking objections</u>**. (Doc. 1663 at 2). On the other hand, if counsel fail to state a legal basis for the objection, the Court will deny the objection as waived. Second, if counsel wish to refer to a document that has not been marked, they **SHALL** first provide it to the courtroom deputy clerk for marking (*Id.* at 1), and they **SHALL** provide the Court with a copy of the document for its reference, <u>before</u> the document is used in any manner with a witness. Finally, counsel **SHALL** direct their arguments to the Court and not to other counsel. *Id.*

///

1

## II.    *United States v. Mirabal*

At trial, counsel for Mr. Johnson asserted that statements by the government are not hearsay under according to Rule 801(d)(2). There is little doubt that this is true. However, consel has since seemed to take the position that every statement by a government attorney is covered by the Rule and cited *United States v. Mirabal*, 98 F.4th 981, 986 (9th Cir. 2024) for this proposition. In *Mirabal,* the Ninth Circuit found that a sworn statement by a government attorney constitutes a statement by a party opponent for purposes of Rule 801(d)(2). The Court agreed with defense counsel and disagreed with the government's position that *Mirabal* is limited to sworn statements of the government's attorney.

Other courts have found that statements of government attorneys are not hearsay under Rule 801(d)(2) though, seemingly, only as to the statements on which the attorney intends the Court to rely. *See United States v. Kattar*, 840 F.2d 126, 130–31 (1st Cir. 1988) [Positions taken in briefs filed with the court are statements by a party opponent]. The Court agrees with this rationale but finds that the Rule does not limit the statements only to those the government attorney makes in court filings or under oath. The Rule simply does not contemplate this limitation. Even still, because the party opponent in a criminal prosecution is the *government* and not the individual attorney, not every statement made by a government attorney is made with the imprimatur of the government.[1] Each statement must be considered in context to determine whether Rule 801(d)(2) applies.[2]

On the other hand, the Court is aware of no authority for the proposition that the unsworn statements of a law enforcement officer are admissible as non-hearsay under Rule 801(d)(2), and *Mirabal* does not contemplate this. *See United States v. Kampiles*, 609 F.2d 1233, 1246 (7th Cir. 1979); *United States v. Pandilidis*, 524 F.2d 644, 650 (6th Cir.1975); *United States v. Powers*, 467 F.2d 1089, 1095 (7th Cir.1972).

---

[1] This is consistent with the instruction that evidence at trial does not include statements, arguments or questions by counsel. 9th Cir. Crim. Jury Inst. 1.4 (2019); 9th Cir. Crim. Jury Inst. 6.7 (2018)

[2] If the Rules applies and the witness' prior statement is otherwise admissible under Rule 613(b), the question or statement to which he is responding, in general and in appropriate circumstances, may also be used. In this event, the statement or question, is not evidence. The evidence is only that which comes from the witness.

2

Based on the foregoing and unless the Court is provided other authority that contradicts that which is set forth here and analyzed, the Court will expect compliance with this order.

IT IS SO ORDERED.

Dated:    **February 2, 2025**

UNITED STATES DISTRICT JUDGE