IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff - Appellee,<br>v.<br>KENNETH JOHNSON,<br>    Defendant - Appellant. | No. 25-3645<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |
| UNITED STATES OF AMERICA,<br>    Plaintiff - Appellee,<br>v.<br>FRANCIS CLEMENT,<br>    Defendant - Appellant. | No. 25-3648<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |

On Appeal from the United States District Court
For the Eastern District of California
The Honorable Jennifer L. Thurston
D.C. No. 1:20-cr-00238-JLT-SKO

**EXCERPTS OF RECORD**
**VOLUME 2 OF 13**

Ryan J. Villa
The Law Office of Ryan J. Villa
5501 Eagle Rock Ave. NE Suite C2
Albuquerque, NM 87113
Ryan@rjvlawfirm.com

Andrea Lee Luem
Andrea Lee Luem, PHV
400 South Fourth Street, Ste 500
Las Vegas, NV 89101
andrea@luemlaw.com

Counsel for Defendant-Appellant
Kenneth Johnson

Jane Fisher-Byrialsen
Fisher & Byrialsen, PLLC
4600 S. Syracuse Street
Denver, CO 80137
jane@fblaw.org

Jean D. Barrett
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
jeanbarrett@ruhnkeandbarrett.com

Counsel for Defendant-Appellant
Francis Clement

MICHELE BECKWITH
Acting United States Attorney
STEPHANIE M. STOKMAN
Assistant United States Attorney
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.  1:20-CR-00238-JLT |
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM |
| v. | |
| FRANCIS CLEMENT, | |
| Defendant. | |

## I.      INTRODUCTION

Defendant Francis Clement is scheduled for sentencing on May 19, 2025, following a conviction after jury trial of Conspiracy to Participate in a Racketeering Enterprise, and five counts of Murder in Aid of Racketeering.  In the Presentence Investigation Report (PSR), the U.S. Probation Office recommends a lifetime term of imprisonment, a $600 special assessment, and no fine.

The government also recommends a sentence of life, but recommends four consecutive life sentences: one for the RICO Conspiracy, one for the murders of Allan Roshanski and Ruslan Magomedghadziev (as one incident- the Lomita murders), one for the murder of Michael Brizendine (the Lancaster murder), and one for the murders of James Yagle and Ronnie Ennis (as one incident- the Pomona murders).

1

ER 123

## II.    STATEMENT OF FACTS

### A.    Defendant's Conduct

As stated in the PSR and evidence presented at trial, Clement was convicted of RICO Conspiracy and five Counts of Murder in Aid of Racketeering, related to the two victims killed in the Lomita murders- Allan Roshanski and Ruslan Magomedghadziev, the murder of Michael Brizendine, and the two victims killed in the Pomona murders- James Yagle and Ronnie Ennis. To be convicted of Count One no overt act/predicate offense is required to have been committed by the defendant. Yet, proof at trial indicated that not only did defendant commit multiple predicate acts under the RICO statute, but he was a leader within the enterprise.

The government proved at trial that defendant was a member of the Aryan Brotherhood, the racketeering enterprise comprising Count One. Testimony at trial laid out Clement's role within the enterprise: that he is a long-standing made member who also sponsored AB associates for membership.

The jury heard and convicted on evidence that defendant was engaged in or aware of racketeering activities committed by AB members and associates including murder, drug trafficking, robbery, assaults, and fraud, among other offenses. The jury also heard evidence that Clement ordered the murder of Allan Roshanski on October 4, 2020, and that Ruslan Magomedghadziev was also killed during that murder, that Clement ordered the murder of Michael Brizendine on February 22, 2022, and that Clement ordered the murders of James Yagle and Ronnie Ennis on March 8, 2022. Cooperators testified that Clement was personally involved in drug trafficking, and received profits from other AB associates from the drug sales they were engaged in both in the prison system and on the street. Testimony also proved that Clement was part of the orders to commit a home invasion robbery in the Hollywood area of Los Angeles.  Further evidence at trial proved that Clement ordered the murder of other individuals, including Brandon Lowery. Clement was aware of the racketeering activity of the AB, was facilitating some of that activity himself, and was furthering the AB enterprise through his actions.

## III.    ANALYSIS OF THE SECTION 3553(A) FACTORS

In sentencing a defendant, 18 U.S.C. § 3553(a)(1) requires the Court to consider the nature and circumstances of the offense and the history and characteristics of defendant.  18 U.S.C. § 3553(a)(2) requires the Court to consider the need for the sentence to reflect the seriousness of the offense, to

promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from Defendant's further crimes.

Defendant is an Aryan Brotherhood (AB) member, who has been serving a lengthy prison sentence in the California state prison system. During the course of the investigation, leading to and during the offense for which the defendant was convicted, defendant was using a contraband phone within his prison cell to conduct business on behalf of the Aryan Brotherhood. Through the coordination of AB associates under the "sponsorship" of the defendant, criminal activity was conducted on the streets, and within the prison walls, for the benefit of the defendant and other AB members. The criminal ventures that testifying AB associates coordinated ultimately ran up the chain to the defendant, and the defendant held a leadership role when it came to that conduct.

The Government agrees with the assessment and analysis of the above-mentioned factors as listed in the PSR. The government believes the weight of these factors has been reflected in the recommendation of the mandatory life sentence on Counts Two, Three, Four, Five, and Six, and the maximum sentence of life on Count One. Furthermore, the testimony at trial along with defendant's behavior throughout the entirety of the proceedings, including his behavior both in court and within the Fresno County Jail, the role defendant had within the AB, and the murders and violence defendant was responsible for ordering warrants an upward departure. Defendant, as testified to by AB associates, showed a complete disregard for human life, as indicated by the orders to torture and assault Rick Rainey, the callous, remorseless text messages ordering Yagle's and Ennis' deaths, and the recordings of defendant during the course of a drug trafficking venture.

//

//

//

//

GOVERNMENT'S SENTENCING BRIEF

3

ER 125

The upward departure warranted here would be consecutive life sentences. The government believes a sentence of life on Count One with a consecutive sentence of life on Counts Two, Four, and Five, and for the life term of imprisonment on Counts Three and Six to run concurrent to those, is appropriate, reflects the seriousness of the offense, provides just punishment for the offense, and protects the public from Defendant's further crimes.

Dated:  May 13, 2025

MICHELE BECKWITH
Acting United States Attorney

By:  /s/ STEPHANIE M. STOKMAN
STEPHANIE M. STOKMAN
Assistant United States Attorney

MICHELE BECKWITH
Acting United States Attorney
STEPHANIE M. STOKMAN
Assistant United States Attorney
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile:  (559) 497-4099

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KENNETH JOHNSON,<br><br>Defendant. | CASE NO.  1:20-CR-00238-JLT<br><br>GOVERNMENT'S SENTENCING MEMORANDUM |

## I.    INTRODUCTION

Defendant Kenneth Johnson is scheduled for sentencing on May 19, 2025, following a conviction after jury trial of Conspiracy to Participate in a Racketeering Enterprise, and two counts of Murder in Aid of Racketeering.  In the Presentence Investigation Report (PSR), the U.S. Probation Office recommends a lifetime term of imprisonment, a $300 special assessment, and no fine.

The government also recommends a sentence of life, but recommends two consecutive life sentences: one for the RICO Conspiracy, and one for the murders of Allan Roshanksi and Ruslan Magomedghadziev (as one incident- the Lomita murders).

## II.    STATEMENT OF FACTS

### A.    Defendant's Conduct

As stated in the PSR and evidence presented at trial, Johnson was convicted of RICO Conspiracy and two Counts of Murder in Aid of Racketeering, related to the two victims killed in the Lomita

GOVERNMENT'S SENTENCING BRIEF

1

ER 127

murders- Allan Roshanski and Ruslan Magomedghadziev. To be convicted of Count One no overt act/predicate offense is required to have been committed by the defendant. Yet, proof at trial indicated that not only did defendant commit multiple predicate acts under the RICO statute, but he was a leader within the enterprise.

The government proved at trial that defendant was a member of the Aryan Brotherhood, the racketeering enterprise comprising Count One. Testimony at trial laid out Johnson's role within the enterprise: that he is a long-standing made member who sponsored numerous AB associates for membership.

The jury heard and convicted on evidence that defendant was engaged in or aware of racketeering activities committed by AB members and associates including murder, drug trafficking, and fraud, among other offenses. The jury also heard evidence that Johnson ordered the murder of Allan Roshanski on October 4, 2020, and that Ruslan Magomedghadziev was also killed during that murder. Cooperators testified that Johnson was involved in drug trafficking, and received profits from other AB associates from the drug sales they were engaged in both in the prison system and on the street. Testimony also proved that Johnson was receiving money from the EDD fraud that Evan Perkins was committing, as well as from EDD fraud that AB associates were committing. Further evidence at trial proved that Johnson ordered the murder of other individuals, including Brandon Lowery. Johnson was aware of the racketeering activity of the AB, was facilitating some of that activity himself, and was furthering the AB enterprise through his actions.

### III.    ANALYSIS OF THE SECTION 3553(A) FACTORS

In sentencing a defendant, 18 U.S.C. § 3553(a)(1) requires the Court to consider the nature and circumstances of the offense and the history and characteristics of defendant.  18 U.S.C. § 3553(a)(2) requires the Court to consider the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from Defendant's further crimes.

Defendant is an Aryan Brotherhood (AB) member, who has been serving a lengthy prison sentence in the California state prison system.  During the course of the investigation, leading to and during the offense for which the defendant was convicted, defendant was using a contraband phone

within his prison cell to conduct business on behalf of the Aryan Brotherhood. Through the coordination of AB associates under the "sponsorship" of the defendant, criminal activity was conducted on the streets, and within the prison walls, for the benefit of the defendant and other AB members.  The criminal ventures that testifying AB associates coordinated ultimately ran up the chain to the defendant, and the defendant held a leadership role when it came to that conduct.

The Government agrees with the assessment and analysis of the above-mentioned factors as listed in the PSR. The government believes the weight of these factors has been reflected in the recommendation of the mandatory life sentence on Counts Two and Three, and the maximum sentence of life on Count One.  Furthermore, the testimony at trial along with defendant's behavior throughout the entirety of the proceedings, including his behavior both in court and within the Fresno County Jail, the role defendant had within the AB, and the murders and violence defendant was responsible for ordering warrants an upward departure. Defendant, as testified to by AB associates, showed a complete disregard for human life, as indicated in part by his statement that all whites were to be used as tools for the benefit of AB members.

The upward departure warranted here would be consecutive life sentences. The government believes a sentence of life on Count One with a consecutive sentence of life on Count Two, and for Count Three's life term of imprisonment to run concurrent to those, is appropriate, reflects the seriousness of the offense, provides just punishment for the offense, and protects the public from Defendant's further crimes.

Dated:  May 13, 2025

MICHELE BECKWITH
Acting United States Attorney

By:  /s/ STEPHANIE M. STOKMAN
STEPHANIE M. STOKMAN
Assistant United States Attorney

GOVERNMENT'S SENTENCING BRIEF

3

ER 129

JANE FISHER-BYRIALSEN
Fisher & Byrialsen, PLLC
4600 S. Syracuse Street
Denver, CO 80137
(202)256-5664
jane@fblaw.org

JEAN D. BARRETT
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
(973)744-1000
jeanbarrett@ruhnkeandbarrett.com

Attorneys for:     FRANCIS CLEMENT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Criminal case No. 20-CR-238-JLT-SKO |
| Plaintiff, | |
| vs. | **DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT** |
| **(12) FRANCIS CLEMENT,** | |
| Defendant | |

**INTRODUCTION**

This sentencing memorandum will not be like most this Court receives as Mr. Clement's sentence is a foregone conclusion. This Court is required by law to sentence Mr. Clement to life without parole.  That being said, on behalf of Mr. Clement, undersigned counsel nonetheless wishes to file this memorandum in support of Mr. Clement. Francis Scott (Frank) Clement was born in Portland, Oregon on August 4, 1966, the oldest of two children of Shyrl Carpenter and George Rodney Clement. His parents were still in their teens. His sister Corlee was born a year or so later with multiple disabilities. His parents separated shortly after Corlee's birth.

Frank was exposed to violence at home. He was the victim of physical violence at the hands of his father in his later elementary and teenage years. Given these traumatic childhood experiences,

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM
REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 1

not surprisingly, he was committed twice to a mental hospital and spent time in a juvenile facility as a teen. The morning immediately after his 18th birthday, he was arrested for the murder of his friend in California after running away from home.

When Frank entered prison in California in 1985, the penal system was in disarray and plagued by violence. Of his nearly 40 years in prison, 82% of this time was spent in solitary confinement or administrative segregation, the majority of that time during a 25-year stint at the notorious "supermax" at Pelican Bay. As this Court is well aware, his life now consists of repeated, often unanswered, requests for medical care for his serious health problems.

## <u>OBJECTIONS TO THE PRESENTENCE REPORT</u>

The following are objections to the presentence (PSR) report:

<u>Offense Conduct</u>

Par. 6: There was no testimony at trial to support the first and last sentences, which allege in substance that to become a made AB member a person must commit a murder and that a member can only leave by dying.

Par. 7: No testimony supports that AB members are required to kill when ordered to do so. In fact, trial testimony about the murder at Kern Valley State Prison was that such an order was refused and another member committed the crime.

Par. 8: There was no trial testimony regarding quarterly taxes or an annual fee. Although the government had identified an expert who was to testify as to the history and general practices of the AB, the witness was never called.

Par. 12: Although the indictment alleged that extortion and arson were part of the pattern of racketeering activity, no testimony of such acts was elicited at trial.

<u>Offense Behavior Not Part of Relevant Conduct</u>

Par. 119 & 120: These paragraphs allege that there was a conspiracy to commit a robbery in Oregon but concede that no such testimony was elicited at trial. In the absence of any indicia of reliability, these paragraphs should be stricken. *See United States v. Hoang Ai Le*, No. 2:99-cr-00433 WBS, 2023 U.S. Dist. LEXIS 106429, at *18-19 (E.D. Cal. June 20, 2023) ("The court notes that the criminal conduct listed in the PSR at paragraphs 79-84 all involved instances where

defendant was charged with crimes but the charges were eventually dismissed, or prosecution was "released," "discharged," or "rejected," including some counts on the basis of insufficient evidence. The court finds that the government has not proven this uncharged conduct by a preponderance of the evidence, see United States v. Russell, 905 F.2d 1439, 1441 (10th Cir. 1990), and the court gives it no weight. Accordingly, the court ORDERS that paragraphs 79 through 84 regarding "Other Criminal Conduct" be STRICKEN from the Presentence Report.") See also, USSG § 4A1.3(a)(3).

Other Criminal Conduct & Other Arrests

Par. 132-142: Arrests without evidence of conviction are not sufficiently reliable to be considered and should be stricken. *See United States v. Hoang Ai Le, supra* and § 4A1.3(a)(3). This is particularly so for these paragraphs since, with the exception of the case in paragraph 132 which was dismissed, prosecution was declined and there was actually no arrest.

Par 152: Certificates of course work appear as Exhibits D and E of the objections to the PSR. Consequently, this paragraph should include language indicating that the Edovo learning platform studies are verified.

**FRANCIS CLEMENT HISTORY AND CHARACTERISTICS**

A.    Frank was a Victim of Childhood Abuse and Neglect.

Francis Scott "Frank" Clement's mother Shyrl was 17 years old and his father George "Rodney" was 18 at the time of Frank's birth.  The couple married in Idaho about a month prior to Frank's birth and separated before he turned two. The record of the 1969 divorce indicates that Frank's mother filed, while Rodney was incarcerated, citing "cruel and inhuman treatment."

Shyrl's pregnancy with Frank was stressful.  She reported that she attempted suicide using aspirin.  Late in the pregnancy, she had surgery which precipitated early labor. Frank's birth records no longer exist and both parents are deceased, so how premature he was is unknown. Shyrl also reported postpartum depression leading to her withdrawing from care for Frank.

Frank's sister Corlee, the only surviving member of his immediate family, was born just a year after Frank. Corlee was born with dozens of congenital anomalies, including tumors on her optic nerves and epileptic seizures.  She has undergone multiple corrective surgeries and has

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 3

operated at a much lower level of functioning than her peers throughout her life. She currently receives dialysis three days a week, has had a live-in caretaker all her adult life and now lives in an adult care facility.

Although Shyrl and Rodney separated after a year and a half of marriage, the time before Rodney's departure was characterized by Frank's parents' immaturity and Rodney's physical violence. When speaking to professionals about Frank's childhood, Shyrl reported that she and Rodney would exploit Frank as a way to win power over one another. Rodney, an alcoholic with a family history of alcoholism whom Shyrl described as "sociopathic," would beat her severely with the beatings often occurring in front of the children. Tellingly, one of Rodney's subsequent partners reported that he was "a woman beater," who beat her so badly that she required a doctor's care. After Rodney left the family, Frank, his mother and his sister Corlee moved often throughout central Oregon. When Frank was eight, Rodney re-entered Frank's life for the first time asking Shyrl to let him see Frank. Shyrl not only complied with the request but astonishingly agreed to allow Frank to move in with his father. After about nine months, however, Frank was back to living with his mother who continued their itinerant lifestyle. At some point in his early school years, Frank was prescribed Ritalin, but Shyrl thought it slowed him down and stopped administering it.

Frank did not see his father again until he was about 12 when he was once again sent to live with him. After two years in his father's care, he was returned to his mother due to severe beatings from his father. Not surprisingly this abusive conduct and chaotic childhood led to behavioral problems, resulting in foster care placements, juvenile justice involvement, among other things. Frank continued to bounce between his parents before he ran away just before his 18th birthday. One day after he turned 18, he was arrested in California for murder for which he received a sentence of 15 years to life imprisonment after a guilty plea. He has been incarcerated since the day of that arrest.

Frank's life before incarceration was riddled with multiple moves and living with abusive or unstable caretakers. The MacArthur Foundation has described the occasionally subtle, yet compounding effects of frequent residential moves on a child over time, including long-term

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 4

effects on their social-emotional outcomes.[1] Furthermore, researchers have repeatedly found that children who have witnessed domestic violence have more negative external and internal behaviors than those children who have not.[2] They are at a higher risk of developing severe mental health concerns[3] (i.e., attachment disorders, anxiety, depression) and demonstrating behavioral problems[4] (i.e., aggression, delinquency), psychological impacts which have been found to be closely related to Posttraumatic Stress Disorder (PTSD) symptoms.[5]

Children who witness domestic violence are more likely to become victims of physical abuse themselves.[6] Furthermore, child abuse has been associated with compromised mental and physical health concerns throughout the lifetime of the victim.[7] Lifelong physical health consequences can include being at a higher risk of developing diabetes, high blood pressure, cancer, pulmonary diseases, and bowel diseases. Regions of the brain like the amygdala (processing emotions), hippocampus (learning and memory), orbitofrontal cortex (reinforcement-based decision-making and emotion regulation) can all be negatively impacted.[8] Behavioral consequences include alcohol and drug use, and juvenile and adult criminality. Psychological

---

[1] https://www.macfound.org/media/files/hhm_brief_-_is_moving_during_childhood_harmful _2.pdf

[2] Edleson, J. L. (1999). *Children's witnessing of adult domestic violence*. Journal of Interpersonal Violence, 14(8), 839–870; Silverman, A., & Gelles, R. J. (2001). *The double whammy revisited: the impact of exposure to domestic violence and being a victim of parent and child violence*. The Indian Journal of Social Work, 62(3), 23; Ehrensaft, M. K., & Cohen, P. (2012). *Contribution of family violence to the intergenerational transmission of externalizing behavior*. Prevention Science, 13(4), 370–383. doi:10.1007/s11121-011- 0223-8.

[3] Ybarra, G. J., Wilkens, S. L., & Lieberman, A. F. (2007). *The influence of domestic violence on preschooler behavior and functioning*. Journal of Family Violence, 22, 33–42.

[4] *Id.*; English, D. J., Graham, C., Newton, R. R., Lewis, T. L., Thompson, R., Kotch, J. B., & Weisbart, C. (2009). *At-risk and maltreated children exposed to intimate partner aggression/violence: what the conflict looks like and its relationship to child outcomes*. Child Maltreatment, 14, 13.

[5] Levendosky, A. A., Huth-Bocks, A. C., Semel, M. A., & Shapiro, D. L. (2002). *Trauma symptoms in preschool-age children exposed to domestic violence*. Journal of Interpersonal Violence, 17, 15.

[6] Dick, G. (2005). *Witnessing marital violence as children: men's perceptions of their fathers*. Journal of Social Service Research, 32(2), 1– 24. doi:10.1300/J079v32n02 01.

[7] National Child Traumatic Stress Network (www.nctsn.org); Child Welfare Information Gateway – Children's Bureau (https://www.childwelfare.gov/pubpdfs/long_term_ consequences.pdf).

[8] *Id.*; Ibrahim, P., et. al, (2021). *Molecular impacts of childhood abuse on the human brain*. Neurobiology of Stress, 15, 100343. https://www.childwelfare.gov/pubPDFs/brain_ development.pdf

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 5

consequences include the development of severe mental health disorders, diminished executive functioning, poor attachment and poor social connections.[9]

        B.        <u>Frank Spent Important Years of His Life in Institutions</u>.

Frank's critical years for brain development were spent in juvenile detention, the Oregon State Hospital (age 14-17 years old), and in jail, prison and solitary confinement (age 18-25 years old). This was not without consequences for reasons made clear in studies over time. Early in this century, studies of aging adolescents/emerging adults (age 18-25 years old) showed that, during this time of life, people's personalities tend to make significant strides and the prefrontal cortex (in charge of complex cognitive behaviors, personality, moderating social behavior, responses to fear and happiness related stimuli) is becoming more complete.[10] Later studies have reaffirmed that when someone 18 or 21 years old is in an emotionally charged state, they tend to react more like someone who is in their young teens.[11] It is for this reason that prison systems over time have housed juveniles and young adults separately from the adult prison population.

In 1980, California reorganized its juvenile and young adult facilities into the California Youth Authority ("CYA"), to be overseen by what is now the Department of Corrections and Rehabilitation ("CDCR"). In 1986, the National Institute of Justice examined violence inside the CYA from 1981-1985.[12] The resulting report included the Preston School of Industry where Frank

[9] U.S. Department of Health and Human Services, Children's Bureau (www.childwelfare.gov).

[10] Tanner, J.L., and Arnett, J.J. (2009). *The emergence of 'emerging adulthood': The new life stage between adolescence and young adulthood,* <u>Handbook of Youth and young Adulthood: New Perspectives and Agendas</u>, 39-45.; Giedd, J N, et al. (1999) '*Brain development during childhood and adolescence: a longitudinal MRI study*', <u>Nature Neuroscience</u>, 2: 861-3; L.M. Williams, et al. (2006) *The mellow years? Neural basis of improving emotional stability over age*', <u>The Journal of Neuroscience</u>, 26: 6422-30; Donnellan, M. B,. et al., (2007) '*Personality development from late adolescence through young adulthood: differential stability, normative maturity, and evidence for the maturity-stability hypothesis*', <u>Journal of Personality,</u> 752:37-64.

[11] Casey, B. J., et al., (2019). *Development of the emotional brain*. <u>Neuroscience letters</u>, 693, 29–34. https://doi.org/10.1016/j.neulet.2017.11.055; Icenogle, G., Steinberg, L., et al., (2019). *Adolescents' cognitive capacity reaches adult levels prior to their psychosocial maturity: Evidence for a "maturity gap" in a multinational, cross-sectional sample.* <u>Law and human behavior</u>, 43(1), 69–85. https://doi.org/10.1037/lhb0000315

[12] CYA (California Youth Authority) Report Part Two: *Bodily Harm - The Pattern of Fear and Violence at the California Youth Authority*, NCJ Number 104549 (1986). An abstract of this Book's content is available at https://ojp.gov/ncjrs/virtual-library/abstracts/cya-california-youth- authority-report-part-two-bodily-harm-pattern. Undersigned counsel have a copy available for revie upon request.

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 6

ER 135

was first housed after he was sentenced. NIJ found that, in the years leading up to Frank's placement at Preston, the number of cases of battery without a weapon almost doubled. NIJ also reported that the design of the dormitories and dayrooms was poor and the level of overcrowding contributed to the level of violence.[13] In June 2023, in the wake of news that the Division of Juvenile Justice (DJJ, formerly CYA) was shutting down, the Center on Juvenile & Criminal Justice published a report summarizing the brutal history of CYA, writing:

> From their beginnings in the 1890s, confinement in these institutions evoked the worst behaviors among young people and their adult captors. Staff treat youth as prisoners, while youth view staff as hostile guards. Youth from across the state are taken from their families and communities and then hoarded together. Facility staff inform arriving youth about the importance of following rules and not fighting. Staff then place youth in large living units where gang conflict is pervasive and fighting is unavoidable. Survival depends on fighting readiness. Youth have no chance to comply with the institutional rules in such an environment. They quickly resent their confinement and the false promise of rehabilitation.[14]

The largest prison population boom in the United States occurred in the 1980s. In 1980, the total number of people incarcerated in California institutions was 23,264.[15] Within five years the population almost doubled to 50,111 in 1985.[16]

Frank entered the California prison system at a crucial time due to his age and due to the extreme overcrowding and violence in his new environment. Today, at 58 years old, he has been

---

[13] *Ibid.*

[14] https://www.cjcj.org/reports-publications/report/beyond-repair#fnref:2

[15] https://www.ojp.gov/ncjrs/virtual-library/abstracts/california-prisoners-1980-summary -statistics-felon-prisoners-and#:~:text=The%20California%20prison%20population%20increase, 22%2C177%20men%20and%201%2C087%20women.

[16] https://bjs.ojp.gov/content/pub/pdf/cpus85.pdf

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 7

incarcerated for approximately 40 years. Frank has spent well over 31 years (82% of his incarceration and more than half his entire life) in solitary confinement or administrative segregation. He has spent more time in solitary confinement than he ever lived outside of prison.

> C.    Confinement at Pelican Bay State Prison Caused Frank Irreparable Harm.

The majority of Frank's decades in solitary confinement occurred at the Security Housing Unit (SHU) of Pelican Bay State Prison, a notorious facility that has been the subject of decades of litigation, international condemnation, and scientific research and commentary. The SHU at Pelican Bay was one of the first "supermax" facilities in California when it first opened in 1989. Shortly after the opening, Frank was transferred to Pelican Bay and immediately placed into the SHU. Frank went on to spend over 10,000 days (approximately 28 years) in the SHU or in restrictive housing at Pelican Bay.

The Ninth Circuit has observed that Pelican Bay is a maximum security prison, which in the past has been "racked with intense prison violence."[17] In 2018, Akil and Lobel published a review of the horrific history of Pelican Bay's SHU and documented the profound psychological harm caused by prolonged solitary confinement:[18]

> A draconian example of such solitary confinement existed for many years at the Pelican Bay State Prison Security Housing Unit (SHU). At that prison, built in 1989, approximately 1,300 prisoners were imprisoned in small, Spartan, eighty-square-foot cells with no windows for almost twenty-three hours a day. For years, they had no view of the outside world; they saw no

---

[17] *Ramirez v. Reagan*, 82 F.3d 423 (9th Cir. 1996). *See also Clement v. California Dep't of Corr.*, 364 F.3d 1148, 1153 (9th Cir. 2004) ("It is well known that Pelican Bay houses maximum-security prisoners under the most restrictive conditions of any California prison.").

[18] J. Lobel & H. Akil, *Law & Neuroscience: The Case of Solitary Confinement*, Dædalus, the Journal of the American Academy of Arts & Sciences (Amer.Academy of Arts & Sciences 2018), at 61, available at https://www.amacad.org/publication/law-neuroscience-case -solitary-confinement. Huda Akil, Ph.D., is a Gardner Quarton Distinguished University Professor of Neuroscience and Psychiatry and Co-Director and Senior Research Professor of the Molecular and Behavioral Neuroscience Institute at the University of Michigan. Research in Dr. Akil's laboratory is focused on understanding the neurobiology of emotions, including pain, anxiety, and depression. Dr. Akil also served as a past President of the Society for Neuroscience, the largest neuroscience organization in the world, and has been elected a member of the National Academy of Sciences.

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 8

birds, trees, cars, or grass. For one-and-a-half hours per day, they went out to a recreation 'yard' attached to their cell block. This was a facility about twice the size of their cell, with fifteen-foot-high walls and a grate over the top where they recreated, alone. If they went out to the yard at the right time during the day, it was possible to see a little sunlight, but, generally, most prisoners had only fleeting, if any, glimpses of direct sunlight during their stay at Pelican Bay. They were allowed no phone calls at all except in an 'emergency,' which was defined as a parent dying, in which case they were allowed a fifteen-minute call with next of kin. They were permitted visits with their family, but no contact visits, meaning they only could speak with their visitors through an intercom, viewing them through a glass window, unable to touch or hug their loved ones. While some had televisions and radios, there was no educational, vocational, or religious programming or activities.[19]

Based on the neuroscientific research available at the time of their 2018 report, the authors concluded: "It is hard to imagine surviving in this environment for more than a few days or weeks without becoming suicidal or mentally ill."[20] Yet many prisoners were able to survive in these "atrocious conditions" for decades; Frank for more than three decades. "Survival does not, however, mean that they did not suffer serious mental harm; depression, paranoia, and loss of concentration and memory are just some of the symptoms associated with extended solitary confinement."[21]

---

[19] *Id.*, at 64-65.
[20] *Id.*, at 65.
[21] *Ibid.*

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 9

1.    *The 1990 Litigation.*

In 1990, a lawsuit was brought challenging the constitutionality of the horrific conditions at Pelican Bay.[22] There, the federal judge ruled that, for prisoners with mental illness, the conditions of confinement violated the Eighth Amendment.[23] The Court observed that "the conditions of extreme social isolation and reduced environmental stimulation found in the Pelican Bay SHU will likely inflict some degree of psychological trauma upon most inmates confined there for more than brief periods."[24] While the state of constitutional law at the time was not such that an across-the-board Eighth Amendment violation could be found, the court did find that the atrocious conditions at Pelican Bay violated the constitutional rights of prisoners with mental illness. The case also revealed the violent and cruel punishments guards inflicted upon prisoners within the SHU, including acts such as caging prisoners naked outside during inclement weather.[25]

In the words of the federal judge presiding over the lawsuit: "For these inmates [with mental illness], placing them in the SHU is the mental equivalent of putting an asthmatic in a place with little air to breathe."[26] The court ruled that such prisoners were not required "to endure the horrific suffering of a serious mental illness or major exacerbation of an existing mental illness before obtaining relief."[27] Sadly, even though the case brought to light the horrors in Pelican Bay SHU, it did not result in meaningful reform.

---

[22] *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995). See also Lobel & Akil, *supra*, at 65-66 (describing judicial findings made during the litigation).
[23] *See discussion,* Arrigo, Bruce A.; Bullock, Jennifer Leslie, *The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units: Reviewing What We Know and Recommending What Should Change*, International Journal of Offender Therapy and Comparative Criminology. 52 (6): 622–40 (Nov. 8, 2007).
[24] *Madrid v. Gomez, supra*, at 1265.
[25] *Id.,* at l171-1172. *See also* Arrigo & Bullock, *supra*.
[26] *Id*, at 1265-1266
[27] *Ibid.*

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 10

ER 139

2.    *Hunger Strikes.*

Over the years, the conditions that Frank was enduring gained national attention due to lengthy coordinated hunger strikes by a large group of prisoners. These hunger strikes provided additional evidence of the severe psychological distress, desperation, and hopelessness that the prisoners experienced from languishing in the SHU for decades. In later lawsuits, almost every plaintiff participant reported viewing the possibility of death by starvation as a worthwhile risk in light of their current situation.

The first Pelican Bay hunger strike, in 2002, lasted approximately 27 days. Frank participated in this hunger strike. The prisoners called off the strike after a California State Senator promised to look into the strikers' complaints, however, no reforms were implemented.

On July 1, 2011, another hunger strike began. At its peak, over 6,600 prisoners from every major ethnic, racial, and geographic group at 13 California prisons – again including Frank – participated. This hunger strike garnered national and international media attention and support. CDCR staff met with prisoner representatives, and on July 20, 2011, the hunger strike was temporarily suspended after officials agreed to provide a few basic amenities and to revise the regulations by which a prisoner would be assigned to and kept in the SHU. However, the promise of reform was short-lived, and meaningful reforms were not implemented.

On September 26, 2011, the hunger strike resumed because prisoners lost faith that CDCR officials would implement the revisions they had promised. This time nearly 12,000 prisoners – including Frank – participated. The hunger strike ended on October 12, 2011, after officials assured the prisoner representatives that they were working on new regulations and would continue conversations about other improvements sought by the prisoners. Again this proved to be an empty promise and no meaningful reforms were implemented.[28]

---

[28] On March 9, 2012, CDCR publicly issued a "concept paper" describing its proposed changes to gang validation regulations. That document has been condemned by prisoners and prisoner-rights advocates as making virtually no meaningful changes and, instead, expanding the net of who may be incarcerated in the SHU.

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 11

On July 8, 2013, another hunger strike began at Pelican Bay and quickly spread throughout the California prison system. At the time, more than 1,000 prisoners remained in solitary confinement in Pelican Bay. It was estimated that over 33,000 prisoners took part in the hunger strike, and many thousands more conducted work strikes throughout CDCR.[29] The hunger strike ended when California lawmakers agreed to hold public hearings on the conditions within California's maximum-security prisons with prolonged solitary confinement. In light of the lawmaker's promise, the prisoners resumed eating on September 5, 2013.

    3.    *The* Ashker *Litigation*

*Ashker v. Governor of California,*[30] a class action suit filed in 2009, was brought by Todd Ashker and other named plaintiffs who had spent many years in solitary confinement at Pelican Bay. The *Ashker* lawsuit was settled in 2015 with an agreement calling for the release of thousands of prisoners being held in indeterminate solitary confinement.  The litigation revealed appalling conditions at the Pelican Bay SHU including "prolonged social isolation and lack of environmental stimuli," which was causing "serious psychological pain and suffering and permanent psychological and physical injury" and such symptoms as "chronic insomnia," "severe concentration and memory problems," "anxiety," and other ailments.[31]

The *Ashker* plaintiffs filed an expert report by Dr. Matthew Lieberman, the director of the Social Cognitive Neuroscience Laboratory at the University of California, Los Angeles. Dr. Lieberman's research on the effect of social isolation on the brain again confirmed the psychological harm of long-term solitary confinement. The Lieberman research, along with the work of others, provided compelling evidence that the social pain of isolation involves "the same

---

[29] "Two Month California Prison Strike Ends," BBC News (Sept. 5, 2013), available at:   https://www.bbc.com/news/world-us-canada-23975602

[30] The lawsuit was initially filed as *Axel and Troxell v. Schwarzenegger,* N.D. Calif. No. 4:09-cv-05796-CW (Complaint filed May 21, 2010). The caption changed over the years, e.g. *Ruiz, et al., v. Brown, et al*. (Second Amended Complaint filed Sept. 10, 2012), *Ashker, et al. v. Brown, et al*. (Supplement Complaint filed March 11, 2015), *Ashker v. Governor of State of California* (Notice of Motion for Final Approval of Settlement Agreement filed Jan. 13, 2016).

[31] See *Ashker v. Brown*, No. C 09-5796 CW, 2013 WL 1435148, at *5 (N.D. Cal. Apr. 9, 2013) (quoting Second Amended Complaint filed Sept. 10, 2012, Doc. 136, ¶¶ 181 and denying Defendants' motions to dismiss).

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 12

neural and neurochemical processes invoked during physical pain."[32] Indeed, fMRI studies that Dr. Lieberman conducted in collaboration with psychologist Naomi Eisenberger demonstrated that when people were subjected to social isolation, it affected neural activity in certain regions of the brain associated with physical distress, in the same way physical pain would. Dr. Lieberman's study has been replicated dozens of times in labs around the world.[33]

The extreme duration of Frank's solitary confinement has meant that the isolative and emotionally numbing effects have become even more pronounced. The symptoms are almost identical to those described in psychological literature about the long-term effects of severe trauma and torture. Whatever reforms followed the *Ashker* lawsuit could not remedy the severe psychological suffering inflicted upon Frank during his decades in Pelican Bay.

D.    Medical History

[32] Matthew D. Lieberman, expert report submitted in *Todd Ashker et al. v. Governor of the State of California et al.*, 4:09-cv-05796-cw (N.D. Cal. 2014), at 2, quoting Roy F. Baumeister and Mark R. Leary, "The Need to Belong: Desire for Interpersonal Attachment as a Fundamental Human Need," Psychology Bulletin 117 (3) (1995).
[33] Lobel & H. Akil, *supra*, at 69.

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 13

F.   During His Time in Prison, Frank Has Participated in Available Educational Programming and Engaged in Self-Education When Programs Were Unavailable.

[34] Manz, C. R., Odayar, V. S., & Schrag, D. (2021). *Disparities in cancer prevalence, incidence, and mortality for incarcerated and formerly incarcerated patients: A scoping review.* Cancer medicine, 10(20), 7277–7288. https://doi.org/10.1002/cam4.4251.

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 14

Most records indicate that Frank was an academically bright student when he was younger. Frank earned his GED and his High School Diploma when he was 16 years old while at the Oregon State Hospital.

Programming at Pelican Bay State Prison was sparse, however, Frank was able to still educate himself. For approximately three years, Frank worked tirelessly and was able to earn two Associates in Arts degrees from Coastline Community College, with high enough grades for him to be part of the Honors List/Dean's List. Frank became a member of Alpha Sigma Lambda[35] due to his superior marks.

In conjunction with his Associates degree, Frank was able to advocate for himself to gain access to programming. As a result of his advocacy Frank was able to complete dozens of courses while at Pelican Bay State Prison. He has received dozens of certificates for completion of various courses and programs. In 2021, Frank earned the Ratcliff Award for his advocacy against solitary confinement[36]. While being housed at the Fresno County Jail, Frank has spent some of his time engaging in and completing various rehabilitative and educational programs. From September 2022 to the beginning of the trial, Frank earned almost 50 certificates through the application known as Edovo Learn which provides educational, vocational, and rehabilitative curriculum, totaling over 270 hours of learning. Wherever there is the opportunity to learn, Frank is an avid participant.

### THE CALIFORNIA DEPARTMENT OF CORRECTIONS

An enormous amount of resources was spent on this case and trial, to prosecute individuals who are serving life in prison. One cannot help but wonder what goals were being met with this. The government will likely say it was to punish the defendants and hold them

---

[35] Alpha Sigma Lambda is a nonprofit national honor society devoted to the advancement of scholarship and to the recognition of nontraditional students continuing their higher education.

[36] This 2021 Ratflicc Award certificate states that Frank has been awarded this award "for all your contributions in helping to liberate our elders principle thinker in the agreement to end hospitalizations and the prisoner's human rights movement blueprint." This award was apart of the *Mandela of the California Prison System* that was important legislation to limit the use of solitary confinement.

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 15

ER 144

accountable, and that is obviously one goal of the justice system.  Where the irony lies here is the way the prosecution chose, randomly based on who they could get to cooperate, the people that were to be held accountable and punished and the people, like Robert Eversole, who were neither held accountable nor punished for the crimes, including murder, that he committed.

The irony also lies in the overall picture of this case.  What difference does it really make to spend millions of tax payer dollars to give three elderly prisoners another life sentence, while not spending a penny on making institutional changes within California Department of Corrections to (1) make prison guards accountable for their roles in this alleged enterprise and (2) make institutional changes that allow prisoners, like Mr. Clement who entered prison at age 18, a chance at rehabilitation instead of solitary confinement for decades.

According to numerous CDCR prisoners who testified in this case, the guards at Kern Valley and other California prisons are some of the main culprits in smuggling narcotics into the prison, cell phones and other contraband needed to commit crimes.  For example, Troy Clowers testified that cell phones are brought into the prison by "cops"/guards.  (Trial Transcript, p. 1197, 1243).  He also testified that the guards ignored prisoners' use of cell phones to communicate.  (Trial Transcript, p. 1279-1280).

CDCR[37] operates 31 adult prison facilities.  Of these facilities, ten are deemed high security institutions, including Pelican Bay State Prison and Kern Valley State Prison[38]. It is understood that contraband cell phones within prisons can be a security risk for inmates, guards, and the community at large.  Even though CDCR has regulations specific to the search of and punishment for contraband cell phones, and CDCR publishes articles documenting their positive endings to finding these cell phones[39] CDCR has a major contraband cell phone issue that spans decades.  A 2011 article published by the National Institute of Justice reported that in the first six

---

[37] See www.cdcr.ca.gov
[38] Ibid.
[39] A 2019 CDCR published article reports donating 442 contraband cell phones to a local soldier focused nonprofit organization.  These cell phones were seized in "a short period."  A 2021 CDCR published article reports seizing and donating approximately 1,000 cell phones just from one facility, *Ironwood State Prison*. See www.cdcr.ca.gov.

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 16

months of 2008, California correctional officers found 1,331[40].  Recent data collection efforts have shown that from 2013-2023, even high security institutions in the CDCR had a major contraband cell phone issue.  See table below.  A complete review of the CDCR contraband data collected from December 2012 through May 2023, reveals 24,541 cell phones were found at the ten high security CDCR institutions alone.

| CDCR - High Security Facilities | KVSP | PBSP |
|---|---|---|
| Possession of Cell Phones 2013 | 304 | 14 |
| Possession of Cell Phones 2014 | 217 | 32 |
| Possession of Cell Phones 2015 | 435 | 10 |
| Possession of Cell Phones 2016 | 78 | 1 |
| Possession of Cell Phones 2017 | 539 | 41 |
| Possession of Cell Phones 2018 | 380 | 26 |
| Possession of Cell Phones 2019 | 669 | 23 |
| Possession of Cell Phones 2020 | 519 | 3 |
| Possession of Cell Phones 2021 | 508 | 28 |
| Possession of Cell Phones 2022 | 341 | 75 |
| Possession of Cell Phones 2023 | 82 | 4 |
| CELL PHONE TOTALS BY FACILITY FOR 10 YEARS | 4072 | 257 |

Undersigned counsel and other defense team members went to numerous prisons in California during the pendency of this case.  We witnessed time and time again, guards enter the prisons many times simply holding a flap open of their coolers and backpacks with no one actually searching the bag, sometimes with no search of them or their person whatsoever.  Other times their bags were placed on a metal detector that no one was actually monitoring.  At some prisons we, and the guards, passed through metal detectors that were not even plugged in.

The CDCR has a lengthy history of mismanagement, staff corruption, and violating prisoner rights.  Compounding CDCRs history of inhumane policies and failure to provide actual rehabilitative services, is a pervasive longstanding culture of abuse and coverups perpetrated by staff.  This would include the well-known "Gladiator fights" which started in the 1990s but

---

[40] See https://nij.ojp.gov/topics/articles/cell-phones-prisons#contraband.

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 17

appear to be continuing still[41], as well as the existence of the violent staff gang, the Green Wall, and its Code of Silence.

The Green Wall is a staff prison gang which started in 1998 by staff at Salinas Valley State Prison following a prisoner riot that resulted in injuries of multiple staff members.

"Guards...began wearing enameled turkey pins to mark their solidarity.
They named themselves after the color of their uniforms and began using
the ganglike tag "7/23," for the seventh and 23rd letters of the alphabet,
G and W. They attacked inmates and planted evidence on them. And they
avoided discipline and prosecution by enforcing their "code of silence.""

*Whistleblower recounts origins of "Green Wall" at Salinas Valley State Prison.*

https://www.montereyherald.com/2009/11/22/whistleblower-recounts-origins-of-green-wall-at-salinas-valley-state-prison/

Since that time, the membership of the clandestine staff gang grew to include members from other CDCR institutions.  One overarching creed of the Green Wall is the "Code of Silence".  The "Code of Silence" among staff was so embedded in the CDCR staff culture that a Senate Bill was introduced in the 2004 legislative session of the California congress to combat it[42].  Interestingly, an organization called California Correctional Peace Officers Association stood in opposition.

While there is little evidence that the Green Wall exists today in the same form as in the late 1990s and 2000s, it is clear the "Code of Silence" persists.  As recently as 2021 two

---

[41] See Officers charged in 'gladiator fights' at California youth detention centre, BBC. com, 4/25/2025
https://www.bbc.com/news/articles/czxneppzvxzo
[42] http://www.leginfo.ca.gov/pub/03-04/bill/sen/sb_1351_1400/sb_1400_cfa_20040614_103808_asm_comm.html

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM
REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 18

whistleblower staff at New Folsom died after notifying top prison officials of corruption in the investigation unit[43].  As reported by the Associated Press, the corruption included:

> ""rogue" guards planted weapons and drugs in inmates' cells to obtain more overtime, spread false rumors and relayed private information from inmates' files to other inmates in violation of department policy, "and on at least two occasions have been directly involved in the killing of a CSP-Sacramento inmate,"

Without hyperbole, the life and death of prisoners at CDCR are very much in the hands of the staff charged with their custody and care and yet not only does CDCR staff not ensure their safety, they have staff themselves committing horrible acts of corruption and violence against prisoners.

Incarcerated people at CDCR are forced to live in a highly violent, unstable, chaotic environment, where evidence can be planted and lives upended, or just ended, by staff with impunity.

This is the environment where Frank and the other prisoners must live and try to survive. Punishing incarcerated people who are necessarily reliant on an organization that has proven time and time it cannot keep them stay safe and will not provide necessary services and resources, without also addressing the systemic issues that give rise to criminal behavior in prison, is akin to treating the symptoms but not the disease.

## CONCLUSION

It is easier to believe that people are evil than to try to understand where the behavior came from and how to change that.  No one is born bad, but we are all capable of becoming so

---

[43] California prison guard died after reporting corruption _ AP News, https://apnews.com/article/sacramento-california-prisons-suicides-d5f204500854e4942a7323da51778904
OFFICIALS IGNORED WARNINGS BEFORE MASSIVE 'GLADIATOR FIGHT' AT SOLEDAD STATE PRISON IN CALIFORNIA https://shadowproof.com/2019/09/04/officials-ignored-warnings-before-massive-gladiator-fight-at-soledad-state-prison-in-california/

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 19

ER 148

given the right neglect and mistreatment.  It is evident from this case, how it is easier for the government and the system to lay blame solely on an individual like Frank, than to reflect on the shortcomings of the institutions that have warehoused him for decades and so significantly contributed to where we are today.

Respectfully submitted,


*/s/Jane Fisher-Byrialsen*
Jane Fisher-Byrialsen

*/s/ Jean DeSalles Barrett*
RUHNKE & BARRETT


**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day May of 2025, I served a true and correct copy of the foregoing via ECF to:

All counsel of record.

s/*Abigail Clement*
Abigail Clement
Paralegal

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 20

ER 149

JANE FISHER-BYRIALSEN
Fisher & Byrialsen, PLLC
4600 S. Syracuse Street
Denver, CO 80137
jane@fblaw.org

JEAN D. BARRETT
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
jeanbarrett@ruhnkeandbarrett.com

Attorneys for:    FRANCIS CLEMENT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Criminal case No. 20-CR-238-JLT-SKO |
| Plaintiff, | |
| | **OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT** |
| v. | |
| **FRANCIS CLEMENT,** | |
| Defendant. | |

### INTRODUCTION

This sentencing memorandum will not be like most this Court receives as Mr. Clement's sentence is a foregone conclusion. This Court is required by law to sentence Mr. Clement to life without parole. That being said, on behalf of Mr. Clement, undersigned counsel nonetheless wishes to file this memorandum in support of Mr. Clement.

ER 150

Francis Scott (Frank) Clement was born in Portland, Oregon on August 4, 1966, the oldest of two children of Shyrl Carpenter and George Rodney Clement. His parents were still in their teens. His sister Corlee was born a year or so later with multiple disabilities. His parents separated shortly after Corlee's birth.

Frank was exposed to violence at home. He was the victim of physical violence at the hands of his father in his later elementary and teenage years. Given these traumatic childhood experiences, not surprisingly, he was committed twice to a mental hospital and spent time in a juvenile facility as a teen. The morning immediately after his 18th birthday, he was arrested for the murder of his friend in California after running away from home.

When Frank entered prison in California in 1985, the penal system was in disarray and plagued by violence. Of his nearly 40 years in prison, 82% of this time was spent in solitary confinement or administrative segregation, the majority of that time during a 25-year stint at the notorious "supermax" at Pelican Bay. As this Court is well aware, his life now consists of repeated, often unanswered, requests for medical care for his serious health problems.

## OBJECTIONS TO THE PRESENTENCE REPORT

The following are objections to the presentence (PSR) report:

Offense Conduct

Par. 6: There was no testimony at trial to support the first and last sentences, which allege in substance that to become a made AB member a person must commit a murder and that a member can only leave by dying.

2

Par. 7: No testimony supports that AB members are required to kill when ordered to do so. In fact trial testimony about the murder at Kern Valley State Prison was that such an order was refused and another member committed the crime.

Par. 8: There was no trial testimony regarding quarterly taxes or an annual fee. Although the government had identified an expert who was to testify as to the history and general practices of the AB, the witness was never called.

Par. 12: Although the indictment alleged that extortion and arson were part of the pattern of racketeering activity, no testimony of such acts was elicited at trial.

<u>Offense Behavior Not Part of Relevant Conduct</u>

Par. 119 & 120: These paragraphs allege that there was a conspiracy to commit a robbery in Oregon, but concede that no such testimony was elicited at trial. In the absence of any indicia of reliability, these paragraphs should be stricken. *See United States v. Hoang Ai Le*, No. 2:99-cr-00433 WBS, 2023 U.S. Dist. LEXIS 106429, at *18-19 (E.D. Cal. June 20, 2023) ("The court notes that the criminal conduct listed in the PSR at paragraphs 79-84 all involved instances where defendant was charged with crimes but the charges were eventually dismissed, or prosecution was "released," "discharged," or "rejected," including some counts on the basis of insufficient evidence. The court finds that the government has not proven this uncharged conduct by a preponderance of the evidence, see United States v. Russell, 905 F.2d 1439, 1441 (10th Cir. 1990), and the court gives it no weight. Accordingly, the court ORDERS that paragraphs 79 through 84 regarding "Other Criminal Conduct" be STRICKEN from the Presentence Report.") See also, USSG § 4A1.3(a)(3).

<u>Other Criminal Conduct & Other Arrests</u>

Par. 132-142: Arrests without evidence of conviction are not sufficiently reliable to be considered and should be stricken. *See United States v. Hoang Ai Le, supra* and § 4A1.3(a)(3). This is particularly so for these paragraphs since, with the exception of the case in paragraph 132 which was dismissed, prosecution was declined and there was actually no arrest.

Par 152: Certificates of course work appear as Exhibits D and E of the objections to the PSR. Consequently, this paragraph should include language indicating that the Edovo learning platform studies are verified.

### FRANCIS CLEMENT HISTORY AND CHARACTERISTICS

A. Frank was a Victim of Childhood Abuse and Neglect.

Francis Scott "Frank" Clement's mother Shyrl was 17 years old and his father George "Rodney" was 18 at the time of Frank's birth.  The couple married in Idaho about a month prior to Frank's birth and separated before he turned two. The record of the 1969 divorce indicates that Frank's mother filed, while Rodney was incarcerated, citing "cruel and inhuman treatment."

Shyrl's pregnancy with Frank was stressful.  She reported that she attempted suicide using aspirin.  Late in the pregnancy, she had surgery which precipitated early labor. Frank's birth records no longer exist and both parents are deceased, so how premature he was is unknown. Shyrl also reported postpartum depression leading to her withdrawing from care for Frank.

Frank's sister Corlee, the only surviving member of his immediate family, was born just a year after Frank. Corlee was born with dozens of congenital anomalies, including tumors on her optic nerves and epileptic seizures.  She has undergone multiple corrective surgeries and has operated at a much lower level of functioning than her peers throughout her life. She currently

receives dialysis three days a week, has had a live-in caretaker all her adult life and now lives in an adult care facility.

Although Shyrl and Rodney separated after a year and a half of marriage, the time before Rodney's departure was characterized by Frank's parents' immaturity and Rodney's physical violence. When speaking to professionals about Frank's childhood, Shyrl reported that she and Rodney would exploit Frank as a way to win power over one another. Rodney, an alcoholic with a family history of alcoholism whom Shyrl described as "sociopathic," would beat her severely with the beatings often occurring in front of the children. Tellingly, one of Rodney's subsequent partners reported that he was "a woman beater," who beat her so badly that she required a doctor's care. After Rodney left the family, Frank, his mother and his sister Corlee moved often throughout central Oregon. When Frank was eight, Rodney re-entered Frank's life for the first time asking Shyrl to let him see Frank. Shyrl not only complied with the request, but astonishingly agreed to allow Frank to move in with his father. After about nine months, however, Frank was back to living with his mother who continued their itinerant lifestyle. At some point in his early school years, Frank was prescribed Ritalin, but Shyrl thought it slowed him down and stopped administering it.

Frank did not see his father again until he was about 12 when he was once again sent to live with him. After two years in his father's care, he was returned to his mother due to severe beatings from his father. Not surprisingly this abusive conduct and chaotic childhood led to behavioral problems, resulting in foster care placements, juvenile justice involvement, among other things. Frank continued to bounce between his parents before he ran away just before his 18th birthday. One day after he turned 18, he was arrested in California for murder for which he

received a sentence of 15 years to life imprisonment after a guilty plea. He has been incarcerated since the day of that arrest.

Frank's life before incarceration was riddled with multiple moves and living with abusive or unstable caretakers. The MacArthur Foundation has described the occasionally subtle, yet compounding effects of frequent residential moves on a child over time, including long-term effects on their social-emotional outcomes.[1]   Furthermore, researchers have repeatedly found that children who have witnessed domestic violence have more negative external and internal behaviors than those children who have not.[2]   They are at a higher risk of developing severe mental health concerns[3] (i.e., attachment disorders, anxiety, depression) and demonstrating behavioral problems[4] (i.e., aggression, delinquency), psychological impacts which have been found to be closely related to Posttraumatic Stress Disorder (PTSD) symptoms.[5]

Children who witness domestic violence are more likely to become victims of physical abuse themselves.[6] Furthermore, child abuse has been associated with compromised mental and

---

[1] https://www.macfound.org/media/files/hhm_brief_-_is_moving_during_childhood_harmful _2.pdf

[2] Edleson, J. L. (1999). *Children's witnessing of adult domestic violence*. Journal of Interpersonal Violence, 14(8), 839–870; Silverman, A., & Gelles, R. J. (2001). *The double whammy revisited: the impact of exposure to domestic violence and being a victim of parent and child violence*. The Indian Journal of Social Work, 62(3), 23; Ehrensaft, M. K., & Cohen, P. (2012). *Contribution of family violence to the intergenerational transmission of externalizing behavior.* Prevention Science, 13(4), 370–383. doi:10.1007/s11121-011- 0223-8.

[3] Ybarra, G. J., Wilkens, S. L., & Lieberman, A. F. (2007). *The influence of domestic violence on preschooler behavior and functioning*. Journal of Family Violence, 22, 33–42.

[4] *Id*.; English, D. J., Graham, C., Newton, R. R., Lewis, T. L., Thompson, R., Kotch, J. B., & Weisbart, C. (2009). *At-risk and maltreated children exposed to intimate partner aggression/violence: what the conflict looks like and its relationship to child outcomes*. Child Maltreatment, 14, 13.

[5] Levendosky, A. A., Huth-Bocks, A. C., Semel, M. A., & Shapiro, D. L. (2002). *Trauma symptoms in preschool-age children exposed to domestic violence*. Journal of Interpersonal Violence, 17, 15.

[6] Dick, G. (2005). *Witnessing marital violence as children: men's perceptions of their fathers*. Journal of Social Service Research, 32(2), 1– 24. doi:10.1300/J079v32n02_01.

physical health concerns throughout the lifetime of the victim.[7]   Lifelong physical health consequences can include being at a higher risk of developing diabetes, high blood pressure, cancer, pulmonary diseases, and bowel diseases. Regions of the brain like the amygdala (processing emotions), hippocampus (learning and memory), orbitofrontal cortex (reinforcement-based decision-making and emotion regulation) can all be negatively impacted.[8] Behavioral consequences include alcohol and drug use, and juvenile and adult criminality. Psychological consequences include the development of severe mental health disorders, diminished executive functioning, poor attachment and poor social connections.[9]

B.    Frank Spent Important Years of His Life in Institutions.

Frank's critical years for brain development were spent in juvenile detention, the Oregon State Hospital (age 14-17 years old), and in jail, prison and solitary confinement (age 18-25 years old).  This was not without consequences for reasons made clear in studies over time. Early in this century, studies of aging adolescents/emerging adults (age 18-25 years old) showed that, during this time of life, people's personalities tend to make significant strides and the prefrontal cortex (in charge of complex cognitive behaviors, personality, moderating social behavior, responses to fear and happiness related stimuli) is becoming more complete.[10]  Later studies have

---

[7] National Child Traumatic Stress Network (www.nctsn.org); Child Welfare Information Gateway – Children's Bureau (https://www.childwelfare.gov/pubpdfs/long_term_ consequences.pdf).

[8] *Id.*; Ibrahim, P., et. al, (2021). *Molecular impacts of childhood abuse on the human brain.* Neurobiology of Stress, 15, 100343. https://www.childwelfare.gov/pubPDFs/brain_ development.pdf

[9] U.S. Department of Health and Human Services, Children's Bureau (www.childwelfare.gov).

[10] Tanner, J.L., and Arnett, J.J. (2009).  *The emergence of 'emerging adulthood': The new life stage between adolescence and young adulthood,* Handbook of Youth and young Adulthood: New Perspectives and Agendas, 39-45.; Giedd, J N, et al. (1999) '*Brain development during childhood and adolescence: a longitudinal MRI study'*, Nature Neuroscience, 2: 861-3; L.M. Williams, et al. (2006) *The mellow years? Neural basis of improving emotional stability over age*', The Journal of Neuroscience, 26: 6422-30; Donnellan, M. B,. et al., (2007) '*Personality development from late adolescence through young adulthood: differential stability, normative maturity, and evidence for the maturity-stability hypothesis*', Journal of Personality, 752:37-64.

reaffirmed that when someone 18 or 21 years old is in an emotionally charged state, they tend to react more like someone who is in their young teens.[11]  It is for this reason that prison systems over time have housed juveniles and young adults separately from the adult prison population.

In 1980, California reorganized its juvenile and young adult facilities into the California Youth Authority ("CYA"), to be overseen by what is now the Department of Corrections and Rehabilitation ("CDCR"). In 1986, the National Institute of Justice examined violence inside the CYA from 1981-1985.[12] The resulting report included the Preston School of Industry where Frank was first housed after he was sentenced. NIJ found that, in the years leading up to Frank's placement at Preston, the number of cases of battery without a weapon almost doubled.  NIJ also reported that the design of the dormitories and dayrooms was poor and the level of overcrowding contributed to the level of violence.[13] In June 2023, in the wake of news that the Division of Juvenile Justice (DJJ, formerly CYA) was shutting down, the Center on Juvenile & Criminal Justice published a report summarizing the brutal history of CYA, writing:

> From their beginnings in the 1890s, confinement in these institutions evoked the worst behaviors among young people and their adult captors. Staff treat youth as prisoners, while youth view staff as hostile guards. Youth from across the state are taken from their families and communities and then hoarded together. Facility staff inform arriving youth about the importance of following rules and not fighting. Staff then place youth in large living units where gang conflict is pervasive and fighting is unavoidable. Survival depends on fighting readiness. Youth have no chance to comply

---

[11] Casey, B. J., et al., (2019). *Development of the emotional brain*. Neuroscience letters, 693, 29–34. https://doi.org/10.1016/j.neulet.2017.11.055; Icenogle, G., Steinberg, L., et al., (2019). *Adolescents' cognitive capacity reaches adult levels prior to their psychosocial maturity: Evidence for a "maturity gap" in a multinational, cross-sectional sample*. Law and human behavior, 43(1), 69–85. https://doi.org/10.1037/lhb0000315

[12]  CYA (California Youth Authority) Report Part Two: *Bodily Harm - The Pattern of Fear and Violence at the California Youth Authority*, NCJ Number 104549 (1986). An abstract of this Book's content is available at https://ojp.gov/ncjrs/virtual-library/abstracts/cya-california-youth-authority-report-part-two-bodily-harm-pattern. Undersigned counsel have a copy available for revie upon request.

[13] *Ibid.*

with the institutional rules in such an environment. They quickly resent their confinement and the false promise of rehabilitation.[14]

The largest prison population boom in the United States occurred in the 1980s. In 1980, the total number of people incarcerated in California institutions was 23,264.[15] Within five years the population almost doubled to 50,111 in 1985.[16]

Frank entered the California prison system at a crucial time due to his age and due to the extreme overcrowding and violence in his new environment. Today, at 58 years old, he has been incarcerated for approximately 40 years. Frank has spent well over 31 years (82% of his incarceration and more than half his entire life) in solitary confinement or administrative segregation. He has spent more time in solitary confinement than he ever lived outside of prison.

C.      Confinement at Pelican Bay State Prison Caused Frank Irreparable Harm.

The majority of Frank's decades in solitary confinement occurred at the Security Housing Unit (SHU) of Pelican Bay State Prison, a notorious facility that has been the subject of decades of litigation, international condemnation, and scientific research and commentary. The SHU at Pelican Bay was one of the first "supermax" facilities in California when it first opened in 1989. Shortly after the opening, Frank was transferred to Pelican Bay and immediately placed into the SHU. Frank went on to spend over 10,000 days (approximately 28 years) in the SHU or in restrictive housing at Pelican Bay.

---

[14] https://www.cjcj.org/reports-publications/report/beyond-repair#fnref:2
[15] https://www.ojp.gov/ncjrs/virtual-library/abstracts/california-prisoners-1980-summary-statistics-felon-prisoners-and#:~:text=The%20California%20prison%20population%20increase,22%2C177%20men%20and%201%2C087%20women.
[16] https://bjs.ojp.gov/content/pub/pdf/cpus85.pdf

The Ninth Circuit has observed that Pelican Bay is a maximum security prison, which in the past has been "racked with intense prison violence."[17]  In 2018, Akil and Lobel published a review of the horrific history of Pelican Bay's SHU and documented the profound psychological harm caused by prolonged solitary confinement:[18]

> A draconian example of such solitary confinement existed for many years at the Pelican Bay State Prison Security Housing Unit (SHU). At that prison, built in 1989, approximately 1,300 prisoners were imprisoned in small, Spartan, eighty-square-foot cells with no windows for almost twenty-three hours a day. For years, they had no view of the outside world; they saw no birds, trees, cars, or grass. For one-and-a-half hours per day, they went out to a recreation 'yard' attached to their cell block. This was a facility about twice the size of their cell, with fifteen-foot-high walls and a grate over the top where they recreated, alone. If they went out to the yard at the right time during the day, it was possible to see a little sunlight, but, generally, most prisoners had only fleeting, if any, glimpses of direct sunlight during their stay at Pelican Bay. They were allowed no phone calls at all except in an 'emergency,' which was defined as a parent dying, in which case they were allowed a fifteen-minute call with next of kin. They were permitted visits with their family, but no contact visits, meaning they only could speak with their visitors through an intercom, viewing them through a glass window, unable to touch or hug their loved ones. While some had televisions and radios, there was no educational, vocational, or religious programming or activities.[19]

Based on the neuroscientific research available at the time of their 2018 report, the authors concluded: "It is hard to imagine surviving in this environment for more than a few days or

---

[17] *Ramirez v. Reagan*, 82 F.3d 423 (9th Cir. 1996). *See also Clement v. California Dep't of Corr.*, 364 F.3d 1148, 1153 (9th Cir. 2004) ("It is well known that Pelican Bay houses maximum-security prisoners under the most restrictive conditions of any California prison.").

[18] J. Lobel & H. Akil, *Law & Neuroscience: The Case of Solitary Confinement*, <u>Dædalus, the Journal of the American Academy of Arts & Sciences</u> (Amer.Academy of Arts & Sciences 2018), at 61, available at https://www.amacad.org/publication/law-neuroscience-case -solitary-confinement. Huda Akil, Ph.D., is a Gardner Quarton Distinguished University Professor of Neuroscience and Psychiatry and Co-Director and Senior Research Professor of the Molecular and Behavioral Neuroscience Institute at the University of Michigan. Research in Dr. Akil's laboratory is focused on understanding the neurobiology of emotions, including pain, anxiety, and depression. Dr. Akil also served as a past President of the Society for Neuroscience, the largest neuroscience organization in the world, and has been elected a member of the National Academy of Sciences.

[19] *Id*., at 64-65.

weeks without becoming suicidal or mentally ill."[20] Yet many prisoners were able to survive in these "atrocious conditions" for decades; Frank for more than three decades. "Survival does not, however, mean that they did not suffer serious mental harm; depression, paranoia, and loss of concentration and memory are just some of the symptoms associated with extended solitary confinement."[21]

> 1.    *The 1990 Litigation.*

In 1990, a lawsuit was brought challenging the constitutionality of the horrific conditions at Pelican Bay.[22] There, the federal judge ruled that, for prisoners with mental illness, the conditions of confinement violated the Eighth Amendment.[23] The Court observed that "the conditions of extreme social isolation and reduced environmental stimulation found in the Pelican Bay SHU will likely inflict some degree of psychological trauma upon most inmates confined there for more than brief periods."[24] While the state of constitutional law at the time was not such that an across-the-board Eighth Amendment violation could be found, the court did find that the atrocious conditions at Pelican Bay violated the constitutional rights of prisoners with mental illness. The case also revealed the violent and cruel punishments guards inflicted upon prisoners within the SHU, including acts such as caging prisoners naked outside during inclement weather.[25]

---

[20] *Id.*, at 65.

[21] *Ibid.*

[22] *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995). See also Lobel & Akil, *supra*, at 65-66 (describing judicial findings made during the litigation).

[23] *See discussion,* Arrigo, Bruce A.; Bullock, Jennifer Leslie, *The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units: Reviewing What We Know and Recommending What Should Change,* International Journal of Offender Therapy and Comparative Criminology. 52 (6): 622–40 (Nov. 8, 2007).

[24] *Madrid v. Gomez, supra*, at 1265.

[25] *Id.,* at l171-1172. *See also* Arrigo & Bullock, *supra*.

In the words of the federal judge presiding over the lawsuit: "For these inmates [with mental illness], placing them in the SHU is the mental equivalent of putting an asthmatic in a place with little air to breathe."[26] The court ruled that such prisoners were not required "to endure the horrific suffering of a serious mental illness or major exacerbation of an existing mental illness before obtaining relief."[27] Sadly, even though the case brought to light the horrors in Pelican Bay SHU, it did not result in meaningful reform.

2.      *Hunger Strikes.*

Over the years, the conditions that Frank was enduring gained national attention due to lengthy coordinated hunger strikes by a large group of prisoners. These hunger strikes provided additional evidence of the severe psychological distress, desperation, and hopelessness that the prisoners experienced from languishing in the SHU for decades. In later lawsuits, almost every plaintiff participant reported viewing the possibility of death by starvation as a worthwhile risk in light of their current situation.

The first Pelican Bay hunger strike, in 2002, lasted approximately 27 days. Frank participated in this hunger strike. The prisoners called off the strike after a California State Senator promised to look into the strikers' complaints, however, no reforms were implemented.

On July 1, 2011, another hunger strike began. At its peak, over 6,600 prisoners from every major ethnic, racial, and geographic group at 13 California prisons – again including Frank – participated. This hunger strike garnered national and international media attention and support. CDCR staff met with prisoner representatives, and on July 20, 2011, the hunger strike was temporarily suspended after officials agreed to provide a few basic amenities and to revise

---

[26] *Id*, at 1265-1266.

[27] *Ibid.*

the regulations by which a prisoner would be assigned to and kept in the SHU. However, the promise of reform was short-lived, and meaningful reforms were not implemented.

On September 26, 2011, the hunger strike resumed because prisoners lost faith that CDCR officials would implement the revisions they had promised. This time nearly 12,000 prisoners – including Frank – participated. The hunger strike ended on October 12, 2011, after officials assured the prisoner representatives that they were working on new regulations and would continue conversations about other improvements sought by the prisoners. Again this proved to be an empty promise and no meaningful reforms were implemented.[28]

On July 8, 2013, another hunger strike began at Pelican Bay and quickly spread throughout the California prison system. At the time, more than 1,000 prisoners remained in solitary confinement in Pelican Bay. It was estimated that over 33,000 prisoners took part in the hunger strike, and many thousands more conducted work strikes throughout CDCR.[29] The hunger strike ended when California lawmakers agreed to hold public hearings on the conditions within California's maximum security prisons with prolonged solitary confinement. In light of the lawmaker's promise, the prisoners resumed eating on September 5, 2013.

3.    *The* Ashker *Litigation*

*Ashker v. Governor of California,*[30] a class action suit filed in 2009, was brought by Todd Ashker and other named plaintiffs who had spent many years in solitary confinement at Pelican

---

[28] On March 9, 2012, CDCR publicly issued a "concept paper" describing its proposed changes to gang validation regulations. That document has been condemned by prisoners and prisoner-rights advocates as making virtually no meaningful changes and, instead, expanding the net of who may be incarcerated in the SHU.

[29] "Two Month California Prison Strike Ends," BBC News (Sept. 5, 2013), available at: https://www.bbc.com/news/world-us-canada-23975602

[30] The lawsuit was initially filed as *Axel and Troxell v. Schwarzenegger,* N.D. Calif. No. 4:09-cv-05796-CW (Complaint filed May 21, 2010). The caption changed over the years, e.g. *Ruiz, et al., v. Brown, et al.* (Second Amended Complaint filed Sept. 10, 2012), *Ashker, et al. v. Brown, et al.* (Supplement Complaint filed March 11, 2015), *Ashker v. Governor of State of California* (Notice of Motion for Final Approval of Settlement Agreement filed Jan. 13, 2016).

Bay. The *Ashker* lawsuit was settled in 2015 with an agreement calling for the release of thousands of prisoners being held in indeterminate solitary confinement. The litigation revealed appalling conditions at the Pelican Bay SHU including "prolonged social isolation and lack of environmental stimuli," which was causing "serious psychological pain and suffering and permanent psychological and physical injury" and such symptoms as "chronic insomnia," "severe concentration and memory problems," "anxiety," and other ailments.[31]

The *Ashker* plaintiffs filed an expert report by Dr. Matthew Lieberman, the director of the Social Cognitive Neuroscience Laboratory at the University of California, Los Angeles. Dr. Lieberman's research on the effect of social isolation on the brain again confirmed the psychological harm of long-term solitary confinement. The Lieberman research, along with the work of others, provided compelling evidence that the social pain of isolation involves "the same neural and neurochemical processes invoked during physical pain."[32] Indeed, fMRI studies that Dr. Lieberman conducted in collaboration with psychologist Naomi Eisenberger demonstrated that when people were subjected to social isolation, it affected neural activity in certain regions of the brain associated with physical distress, in the same way physical pain would. Dr. Lieberman's study has been replicated dozens of times in labs around the world.[33]

The extreme duration of Frank's solitary confinement has meant that the isolative and emotionally numbing effects have become even more pronounced. The symptoms are almost identical to those described in psychological literature about the long-term effects of severe

---

[31] See *Ashker v. Brown*, No. C 09-5796 CW, 2013 WL 1435148, at *5 (N.D. Cal. Apr. 9, 2013) (quoting Second Amended Complaint filed Sept. 10, 2012, Doc. 136, ¶¶ 181 and denying Defendants' motions to dismiss).

[32] Matthew D. Lieberman, expert report submitted in *Todd Ashker et al. v. Governor of the State of California et al.*, 4:09-cv-05796-cw (N.D. Cal. 2014), at 2, quoting Roy F. Baumeister and Mark R. Leary, "The Need to Belong: Desire for Interpersonal Attachment as a Fundamental Human Need," Psychology Bulletin 117 (3) (1995).

[33] Lobel & H. Akil, *supra*, at 69.

trauma and torture. Whatever reforms followed the *Ashker* lawsuit could not remedy the severe psychological suffering inflicted upon Frank during his decades in Pelican Bay.

D.    Medical History

Frank has a complicated and significant medical history, including: Hepatitis C, which was discovered via a liver biopsy in 1996; he subsequently underwent multiple lengthy treatments through the early 2000s. In addition, in 1999, carcinoma was discovered in Frank's rectum. He underwent chemotherapy and radiation and has current orders for continued monitoring. Recently, 2 polyps were found on a surveillance colonoscopy. Frank has a strong family history of colon cancer and therefore has a life-long marked increased risk of developing cancer.

Compounding these health problems are urinary retention issues. In May of 2021, Frank was provided with a permanent order for catheter supplies due to his urinary incontinence. Frank has had to use a foley catheter or condom catheter every day since. This has caused him great distress and embarrassment.

Other serious conditions include hyperthyroidism and hypertension.

Frank's medical ailments are unusually severe, even for a prisoner. A 2016 survey of both state and federal prisoners conducted by the DOJ found that "[a]bout 51% of state and 43% of federal prisoners reported ever having a chronic condition, while 40% of state and 33% of federal prisoners reported currently having a chronic condition." Of these currently having a chronic health condition, only a very small percentage have cancer (1.1% state, 0.7% federal) or hypertension (22.1% state, 19.6% federal). Through a review of published reports from 1990 to 2021 (including the Bureau of Justice Statistics reports and PubMed reports) that focused on cancer diagnoses, prevalence and mortality in US jails and prisons, researchers found that

"Cancer mortality data in state and local jails as well as prisons were robust and suggests that both incarcerated and formerly incarcerated patients have higher cancer mortality than the general population."[34] It is not farfetched to say that Frank's physical health is declining and has been for years.

In August of 2024, Frank was seen by a dentist with only four maxillary teeth (upper teeth) and nine mandibular teeth (lower teeth). Frank was told by medical professionals and by the US Federal Marshals that the only way to potentially receive dentures was to pull all four of his maxillary teeth. Frank made the difficult decision to remove all of his maxillary teeth and wait the required 90 day healing process before being considered for dentures. On January 30th, 2025, Frank was approved for complete maxillary dentures. Even with this approval, he was sent to only one denture appointment in February of 2025 before being moved to a different facility. He still has yet to receive dentures and he still has no upper teeth.

F.   <u>During His Time in Prison, Frank Has Participated in Available Educational Programming and Engaged in Self-Education When Programs Were Unavailable</u>.

Most records indicate that Frank was an academically bright student when he was younger. Frank earned his GED and his High School Diploma when he was 16 years old while at the Oregon State Hospital.

Programming at Pelican Bay State Prison was sparse, however, Frank was able to still educate himself. For approximately three years, Frank worked tirelessly and was able to earn two Associates in Arts degrees from Coastline Community College, with high enough grades for

---

[34] Manz, C. R., Odayar, V. S., & Schrag, D. (2021). *Disparities in cancer prevalence, incidence, and mortality for incarcerated and formerly incarcerated patients: A scoping review*. <u>Cancer medicine</u>, 10(20), 7277–7288. https://doi.org/10.1002/cam4.4251.

him to be part of the Honors List/Dean's List. Frank became a member of Alpha Sigma Lambda[35] due to his superior marks.

In conjunction with his Associates degree, Frank was able to advocate for himself to gain access to programming.  As a result of his advocacy Frank was able to complete dozens of courses while at Pelican Bay State Prison. He has received dozens of certificates for completion of various courses and programs. In 2021, Frank earned the Ratcliff Award for his advocacy against solitary confinement[36].  While being housed at the Fresno County Jail, Frank has spent some of his time engaging in and completing various rehabilitative and educational programs. From September 2022 to the beginning of the trial, Frank earned almost 50 certificates  through the application known as Edovo Learn which provides educational, vocational, and rehabilitative curriculum, totalling  over  270  hours  of  learning.   Wherever  there  is  the  opportunity  to  learn, Frank is an avid participant.

### THE CALIFORNIA DEPARTMENT OF CORRECTIONS

An enormous amount of resources was spent on this case and trial, to prosecute individuals who are serving life in prison.  One cannot help but wonder what goals were being met with this.  The government will likely say it was to punish the defendants and hold them accountable, and that is obviously one goal of the justice system.  Where the irony lies here is the way the prosecution chose, randomly based on who they could get to cooperate, the people that

---

[35] Alpha Sigma Lambda is a nonprofit national honor society devoted to the advancement of scholarship and to the recognition of nontraditional students continuing their higher education.
[36] This 2021 Ratflicc Award certificate states that Frank has been awarded this award "for all your contributions in helping to liberate our elders principle thinker in the agreement to end hospitalizations and the prisoner's human rights movement blueprint."  This award was apart of the *Mandela of the California Prison System* that was important legislation to limit the use of solitary confinement.

were to be held accountable and punished and the people, like Robert Eversole, who were neither held accountable nor punished for the crimes, including murder, that he committed.

The irony also lies in the overall picture of this case. What difference does it really make to spend millions of tax payer dollars to give three elderly prisoners another life sentence, while not spending a penny on making institutional changes within California Department of Corrections to (1) make prison guards accountable for their roles in this alleged enterprise and (2) make institutional changes that allow prisoners, like Mr. Clement who entered prison at age 18, a chance at rehabilitation instead of solitary confinement for decades.

According to numerous CDCR prisoners who testified in this case, the guards at Kern Valley and other California prisons are some of the main culprits in smuggling narcotics into the prison, cell phones and other contraband needed to commit crimes. For example, Troy Clowers testified that cell phones are brought into the prison by "cops"/guards. (Trial Transcript, p. 1197, 1243). He also testified that the guards ignored prisoners' use of cell phones to communicate. (Trial Transcript, p. 1279-1280).

CDCR[37] operates 31 adult prison facilities. Of these facilities, ten are deemed high security institutions, including Pelican Bay State Prison and Kern Valley State Prison[38]. It is understood that contraband cell phones within prisons can be a security risk for inmates, guards, and the community at large. Even though CDCR has regulations specific to the search of and punishment for contraband cell phones, and CDCR publishes articles documenting their positive endings to finding these cell phones[39] CDCR has a major contraband cell phone issue that spans

---

[37] See www.cdcr.ca.gov
[38] Ibid.
[39] A 2019 CDCR published article reports donating 442 contraband cell phones to a local soldier focused nonprofit organization. These cell phones were seized in "a short period." A 2021

decades. A 2011 article published by the National Institute of Justice reported that in the first six months of 2008, California correctional officers found 1,331[40]. Recent data collection efforts have shown that from 2013-2023, even high security institutions in the CDCR had a major contraband cell phone issue. See table below. A complete review of the CDCR contraband data collected from December 2012 through May 2023, reveals 24,541 cell phones were found at the ten high security CDCR institutions alone.

| CDCR - High Security Facilities | KVSP | PBSP |
|---|---|---|
| Possession of Cell Phones 2013 | 304 | 14 |
| Possession of Cell Phones 2014 | 217 | 32 |
| Possession of Cell Phones 2015 | 435 | 10 |
| Possession of Cell Phones 2016 | 78 | 1 |
| Possession of Cell Phones 2017 | 539 | 41 |
| Possession of Cell Phones 2018 | 380 | 26 |
| Possession of Cell Phones 2019 | 669 | 23 |
| Possession of Cell Phones 2020 | 519 | 3 |
| Possession of Cell Phones 2021 | 508 | 28 |
| Possession of Cell Phones 2022 | 341 | 75 |
| Possession of Cell Phones 2023 | 82 | 4 |
| CELL PHONE TOTALS BY FACILITY FOR 10 YEARS | 4072 | 257 |

Undersigned counsel and other defense team members went to numerous prisons in California during the pendency of this case. We witnessed time and time again, guards enter the prisons many times simply holding a flap open of their coolers and backpacks with no one actually searching the bag, sometimes with no search of them or their person whatsoever. Other times their bags were placed on a metal detector that no one was actually monitoring. At some prisons we, and the guards, passed through metal detectors that were not even plugged in.

---

CDCR published article reports seizing and donating approximately 1,000 cell phones just from one facility, *Ironwood State Prison*. See www.cdcr.ca.gov.
[40] See https://nij.ojp.gov/topics/articles/cell-phones-prisons#contraband.

The CDCR has a lengthy history of mismanagement, staff corruption, and violating prisoner rights.  Compounding CDCRs history of inhumane policies and failure to provide actual rehabilitative services, is a pervasive longstanding culture of abuse and coverups perpetrated by staff.  This would include the well-known "Gladiator fights" which started in the 1990s but appear to be continuing still[41], as well as the existence of the violent staff gang, the Green Wall, and its Code of Silence.

The Green Wall is a staff prison gang which started in 1998 by staff at Salinas Valley State Prison following a prisoner riot that resulted in injuries of multiple staff members.

> "Guards...began wearing enameled turkey pins to mark their solidarity. They named themselves after the color of their uniforms and began using the ganglike tag "7/23," for the seventh and 23rd letters of the alphabet, G and W. They attacked inmates and planted evidence on them. And they avoided discipline and prosecution by enforcing their "code of silence.""
>
> *Whistleblower recounts origins of "Green Wall" at Salinas Valley State Prison*
> https://www.montereyherald.com/2009/11/22/whistleblower-recounts-origins-of-green-wall-at-salinas-valley-state-prison/

Since that time, the membership of the clandestine staff gang grew to include members from other CDCR institutions.  One overarching creed of the Green Wall is the "Code of Silence".  The "Code of Silence" among staff was so embedded in the CDCR staff culture that a Senate Bill was introduced in the 2004 legislative session of the California congress to combat it[42].

---

[41] See Officers charged in 'gladiator fights' at California youth detention centre, BBC. com, 4/25/2025 https://www.bbc.com/news/articles/czxneppzvxzo

[42] http://www.leginfo.ca.gov/pub/03-04/bill/sen/sb_1351-1400/sb_1400_cfa_20040614_103808_asm_comm.html

Interestingly, an organization called California Correctional Peace Officers Association stood in opposition.

While there is little evidence that the Green Wall exists today in the same form as in the late 1990s and 2000s, it is clear the "Code of Silence" persists. As recently as 2021 two whistleblower staff at New Folsom died after notifying top prison officials of corruption in the investigation unit[43]. As reported by the Associated Press, the corruption included:

> ""rogue" guards planted weapons and drugs in inmates' cells to obtain more overtime, spread false rumors and relayed private information from inmates' files to other inmates in violation of department policy, "and on at least two occasions have been directly involved in the killing of a CSP-Sacramento inmate,"

Without hyperbole, the life and death of prisoners at CDCR are very much in the hands of the staff charged with their custody and care and yet not only does CDCR staff not ensure their safety, they have staff themselves committing horrible acts of corruption and violence against prisoners.

Incarcerated people at CDCR are forced to live in a highly violent, unstable, chaotic environment, where evidence can be planted and lives upended, or just ended, by staff with impunity.

This is the environment where Frank and the other prisoners must live and try to survive.

---

[43] California prison guard died after reporting corruption _ AP News, https://apnews.com/article/sacramento-california-prisons-suicides-d5f204500854e4942a7323da51778904 OFFICIALS IGNORED WARNINGS BEFORE MASSIVE 'GLADIATOR FIGHT' AT SOLEDAD STATE PRISON IN CALIFORNIA https://shadowproof.com/2019/09/04/officials-ignored-warnings-before-massive-gladiator-fight-at-soledad-state-prison-in-california/

Punishing incarcerated people who are necessarily reliant on an organization that has proven time and time it cannot keep them stay safe and will not provide necessary services and resources, without also addressing the systemic issues that give rise to criminal behavior in prison, is akin to treating the symptoms but not the disease.

### CONCLUSION

It is easier to believe that people are evil than to try to understand where the behavior came from and how to change that. No one is born bad, but we are all capable of becoming so given the right neglect and mistreatment. It is evident from this case, how it is easier for the government and the system to lay blame solely on an individual like Frank, than to reflect on the shortcomings of the institutions that have warehoused him for decades and so significantly contributed to where we are today.

Respectfully submitted,


s/Jane Fisher-Byrialsen
Jane Fisher-Byrialsen
FISHER & BYRIALSEN, PLLC
4600 S. Syracuse Street, 9th Floor
Denver, CO 80237
(303) 256-6345
jane@fblaw.org

Jean Barrett
RUHNKE & BARRETT
47 Park Street
Montclair, NJ 07042
jeanbarrett@ruhnkeandbarrett.com

22

**<u>CERTIFICATE OF SERVICE</u>**

   I hereby certify that on this 6th day May of 2025, I served a true and correct copy of the foregoing via ECF to:

All counsel of record.

<u>s/*Abigail Clement*</u>
Abigail Clement
Paralegal

Ryan J. Villa
5501 Eagle Rock Ave NE, Ste C2
Albuquerque, NM 87113
(505) 639-5709
ryan@rjvlawfirm.com

Andrea Lee Luem, PHV
400 South Fourth Street, Ste 500
Las Vegas, NV 89101
(702) 575-0481
andrea@luemlaw.com

Attorneys for Defendant,
KENNETH JOHNSON

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No.:  20-cr-00238-JLT-SKO |
| Plaintiff, | |
| v. | **DEFENDANT'S OBJECTIONS TO THE PRESENTENCE REPORT** |
| **KENNETH JOHNSON,** | Date:  May 19, 2025 |
| Defendant. | Time: 9:00 a.m. |
| | Place: Hon. Jennifer Thurston |

Defendant Kenneth Johnson, by counsel, submits these objections to the Presentence Report [Doc. 1869].

**Objections to Offense Conduct**: Mr. Johnson continues to dispute all of the facts alleged by the government and presented at trial. PSR, ¶¶ 3-23. Notably, the only evidence that Mr. Johnson was involved in the alleged conspiracy to murder Messrs. Roshanski, Magomedgadshiev came from the testimony of cooperating witness, Robert Eversole. There was no other corroboration of this testimony. In fact, Mr. Bannick, who participated in the murders of Roshanski

1

and Magomedgadshiev, testified that he was unaware that Mr. Johnson had any part in the conspiracy or orders to kill these two individuals. *See* Trial Trans., Day 11, pp. 2528-2533.

Respectfully submitted,

*/s/ Ryan J. Villa*
Ryan J. Villa
5501 Eagle Rock Ave NE, Suite C2
Albuquerque, NM 87113
(505) 639-5709
ryan@rjvlawfirm.com


*/s/ Andrea Lee Luem*
Andrea Lee Luem , PHV
400 South Fourth Street, Ste 500
Las Vegas, NV 89101
(702) 575-0481
andrea@luemlaw.com

<strong><u>CERTIFICATE OF SERVICE</u></strong>

I hereby certify that on this 5th day of May, 2025, I served a true and correct copy of the foregoing via ECF to:

All counsel of record

*/s/ Ryan J. Villa*
Ryan J. Villa

2

ER 174

**FILED**

FEB 14 2025

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
         DEPUTY CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 1:20-cr-00238 JLT SKO |
| Plaintiff, | |
| v. | VERDICT FORM |
| KENNETH JOHNSON, | |
| Defendant. | |

(1)     As to **COUNT ONE** – Conspiracy to Participate in a Racketeering Enterprise, in violation of Title 18, United States Code, Section 1962(d), we, the jury in this matter, unanimously find defendant **KENNETH JOHNSON**:

**GUILTY** $\underline{\quad X \quad}$      **NOT GUILTY** $\underline{\qquad}$

**If you answered "NOT GUILTY" to COUNT ONE, proceed to question (3). If you answered "GUILTY" to COUNT ONE, answer question (2) before proceeding to question (3).**

1

(2)    Having found defendant, **KENNETH JOHNSON**, guilty of the offense charged in **COUNT ONE**, we, the jury, further unanimously find that as part of that offense, defendant **KENNETH JOHNSON**:

a.    On or about October 4, 2020, while aided and abetted by others, did unlawfully, willfully, and intentionally, and with deliberation and premeditation, kill Allan Roshanski with malice aforethought.

**YES** _X___    **NO** _____

b.    On or about October 4, 2020, while aided and abetted by others, did unlawfully, willfully, and intentionally, and with deliberation and premeditation, kill Ruslan Magomedgadzhiev with malice aforethought.

**YES** _X___    **NO** _____

c.    On or about January 24, 2016, while aided and abetted by others, did unlawfully, willfully, and intentionally, and with deliberation and premeditation, kill Brandon Lowrey with malice aforethought.

**YES** _X___    **NO** _____

(3)    As to **COUNT TWO** – Murder in Aid of Racketeering (Allan Roshanski), in violation of Title 18, United States Code, Section 1959(a)(1), we, the jury, unanimously find defendant **KENNETH JOHNSON**:

**GUILTY** _X___        **NOT GUILTY** _____

2

ER 176

(4)    As to **COUNT THREE** – Murder in Aid of Racketeering (Ruslan Magomedgadzhiev), in violation of Title 18, United States Code, Section 1959(a)(1), we, the jury, unanimously find defendant **KENNETH JOHNSON**:

**GUILTY** _X_        **NOT GUILTY** _____

**Please sign, date, and return this verdict.**

Dated: _2/15/25_

3

ER 177

**FILED**

FEB 14 2025

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 1:20-cr-00238 JLT SKO |
| Plaintiff, | |
| v. | VERDICT FORM |
| FRANCIS CLEMENT, | |
| Defendant. | |

(1)    As to **COUNT ONE** – Conspiracy to Participate in a Racketeering Enterprise, in violation of Title 18, United States Code, Section 1962(d), we, the jury in this matter, unanimously find defendant **FRANCIS CLEMENT**:

**GUILTY** _✗_     **NOT GUILTY** _____

**If you answered "NOT GUILTY" to COUNT ONE, proceed to question (3). If you answered "GUILTY" to COUNT ONE, answer question (2) before proceeding to question (3).**

1

ER 178

(2)    Having found defendant, **FRANCIS CLEMENT**, guilty of the offense charged in **COUNT ONE**, we, the jury, further unanimously find that as part of that offense, defendant **FRANCIS CLEMENT**:

a.    On or about October 4, 2020, while aided and abetted by others, did unlawfully, willfully, and intentionally, and with deliberation and premeditation, kill Allan Roshanski with malice aforethought.

**YES** ⨯    **NO** _____

b.    On or about October 4, 2020, while aided and abetted by others, did unlawfully, willfully, and intentionally, and with deliberation and premeditation, kill Ruslan Magomedgadzhiev with malice aforethought.

**YES** ⨯    **NO** _____

c.    On or about February 22, 2022, while aided and abetted by others, did unlawfully, willfully, and intentionally, and with deliberation and premeditation, kill Michael Brizendine with malice aforethought.

**YES** ⨯    **NO** _____

d.    On or about March 8, 2022, while aided and abetted by others, did unlawfully, willfully, and intentionally, and with deliberation and premeditation, kill Ronald Ennis with malice aforethought.

**YES** ⨯    **NO** _____

e.    On or about March 8, 2022, while aided and abetted by others, did unlawfully, willfully, and intentionally, and with deliberation and premeditation, kill James Yagle with malice aforethought.

**YES** ⨯    **NO** _____

2

ER 179

f.    On or about January 24, 2016, while aided and abetted by others, did unlawfully, willfully, and intentionally, and with deliberation and premeditation, kill Brandon Lowrey with malice aforethought.

YES ⟋    NO _____

(3)    As to **COUNT TWO** – Murder in Aid of Racketeering (Allan Roshanski), in violation of Title 18, United States Code, Section 1959(a)(1), we, the jury, unanimously find defendant **FRANCIS CLEMENT**:

GUILTY ⟋    NOT GUILTY _____

(4)    As to **COUNT THREE** – Murder in Aid of Racketeering (Ruslan Magomedgadzhiev), in violation of Title 18, United States Code, Section 1959(a)(1), we, the jury, unanimously find defendant **FRANCIS CLEMENT**:

GUILTY ⟋    NOT GUILTY _____

(5)    As to **COUNT FOUR** – Murder in Aid of Racketeering (Michael Brizendine), in violation of Title 18, United States Code, Section 1959(a)(1), we, the jury, unanimously find defendant **FRANCIS CLEMENT**:

GUILTY ⟋    NOT GUILTY _____

3

ER 180

(6)    As to **COUNT FIVE** – Murder in Aid of Racketeering (Ronald Ennis), in violation of Title 18, United States Code, Section 1959(a)(1), we, the jury, unanimously find defendant **FRANCIS CLEMENT**:

GUILTY  ⨯    NOT GUILTY _____

(7)    As to **COUNT SIX** – Murder in Aid of Racketeering (James Yagle), in violation of Title 18, United States Code, Section 1959(a)(1), we, the jury, unanimously find defendant **FRANCIS CLEMENT**:

GUILTY  ⨯    NOT GUILTY _____

**Please sign, date, and return this verdict.**

Dated: 2/14/25

4

ER 181

FILED

FEB 14 2025

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
　　　　　　DEPUTY CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

UNITED STATES,

|  |  |
|---|---|
| | CASE NO.     1:20-CR-00238 JLT |

vs.

EXHIBIT LIST

KENNETH JOHNSON, FRANCIS
CLEMENT, JOHN STINSON,

_____/

　　　The attached comprises the court's record of trial exhibits in the

jury trial of the above-entitled case.

DATED: February 14, 2025

　　　　　　　　　　　　　　　　__/s/ I. Munoz_____
　　　　　　　　　　　　　　　　I. Munoz, Courtroom Deputy

ER 182

MICHELE BECKWITH
Acting United States Attorney
STEPHANIE M. STOKMAN
JAMES R. CONOLLY
Assistant United States Attorneys
JARED ENGELKING
Trial Attorney, U. S. Department of Justice
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile:  (559) 497-4099
Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO.  1:20-CR-00238-JLT-SKO |
|---|---|
| Plaintiff, | GOVERNMENT'S AMENDED EXHIBIT LIST |
| v. | DATE: January 14, 2025 |
| KENNETH JOHNSON, et al, Defendants. | TIME: 8:30 a.m. COURT: Honorable Jennifer L. Thurston |

The United States, by and through its undersigned counsel, hereby submits the following list of exhibits it intends to introduce in its case-in-chief and all Bates numbers are BASH_000 unless otherwise indicated.

| EXHIBIT NO. | DESCRIPTION | BATES RANGE | OBJECT FOUNDTION | OBJECT OTHER | ADMIT |
|---|---|---|---|---|---|
| 1001 | Evan Perkins | PM 9035 | | 1/23 | A |
| 1002 | Brandon Bannick | PM 9036 | | 1/23 | A |
| 1003 | James Field | PM 9037 | | 1/23 | A |
| 1004 | Francis Clement | PM 9038 | | 1/23 | A |

GOVERNMENT'S EXHIBIT LIST

1

| 1005 | Kenneth Johnson | PM 9039 | | 1/23 | A |
| 1006 | Waylon Pitchford | PM 9040 | | 1/23 | A |
| 1007 | Jason Weaver | PM 9041 | | 1/23 | A |
| 1008 | Robert Eversole | PM 9042 | | 1/23 | A |
| 1009 | Justin Gray | PM 9043 | | 1/23 | A |
| 1010 | Kenneth Bash | PM 9044 | | 1/23 | A |
| 1011 | John Stinson | PM 9045 | | 1/23 | A |
| 1012 | Troy Clowers | PM 9046 | | 1/23 | A |
| 1013 | Andrew Collins | PM 9047 | | 1/23 | A |
| 1014 | Matt O'Day | PM 9048 | | 1/24 | A |
| 1015 | Thrasher Holmeyer | PM 9049 | | | |
| 1016 | Todd Morgan | PM 9050 | | 1/23 | A |
| 1017 | Daniel Rubin | PM 9051 | | 1/23 | A |
| 1018 | Aaron Fogle | PM 9052 | | | |
| 1019 | Nick Calsadillas | PM 9055 | | | |
| 1020 | Josh Cornett | PM 9057 | | | |
| 1021 | Johnson Tattoos | 51059 | | | |
| 1022 | Johnson Tattoos | 51060 | | | |
| 1023 | Johnson Tattoos | 51061 | | | |
| 1024 | Johnson Tattoos | 51062 | | | |
| 1025 | Johnson Tattoos | 51063 | | | |
| 1026 | Johnson Tattoos | 51064 | | | |
| 1027 | Pitchford Tattoos | 51093 | | | |
| 1028 | Pitchford Tattoos | 51094 | | | |
| 1029 | Pitchford Tattoos | 51095 | | | |
| 1030 | Pitchford Tattoos | 51096 | | | |
| 1031 | Pitchford Tattoos | 51097 | | | |

GOVERNMENT'S EXHIBIT LIST

2

| 1032 | Stinson Tattoos | 51051 | | | |
|------|-----------------|-------|--|--|--|
| 1033 | Stinson Tattoos | 51052 | | | |
| 1034 | Stinson Tattoos | 51053 | | | |
| 1035 | Weaver Tattoos | 51047 | | | |
| 1036 | Weaver Tattoos | 51048 | | | |
| 1037 | Weaver Tattoos | 51049 | | | |
| 1038 | Bannick Tattoos | 51025 | | | |
| 1039 | Clement Tattoos | 51034 | | | |
| 1040 | Clement Tattoos | 51035 | | | |
| 1041 | Clement Tattoos | 51036 | | | |
| 1042 | Clement Tattoos | 51037 | | | |
| 1043 | Collins Tattoos | 51020 | | | |
| 1044 | Collins Tattoos | 51021 | | | |
| 1045 | Collins Tattoos | 51022 | | | |
| 1046 | Collins Tattoos | 51023 | | | |
| 1047 | Perkins Tattoos | 51027 | | | |
| 1048 | Perkins Tattoos | 51028 | | | |
| 1049 | Perkins Tattoos | 51029 | | | |
| 1050 | Perkins Tattoos | 51030 | | | |
| 1051 | Perkins Tattoos | 51031 | | | |
| 1052 | Perkins Tattoos | 51032 | | | |
| 1053 | Field Tattoos | 51039 | | | |
| 1054 | Field Tattoos | 51040 | | | |
| 1055 | Field Tattoos | 51041 | | | |
| 1056 | Field Tattoos | 51042 | | | |
| 1057 | Field Tattoos | 51043 | | | |
| 1058 | Field Tattoos | 51044 | | | |

GOVERNMENT'S EXHIBIT LIST

3

| | | | | | | |
|---|---|---|---|---|---|---|
| 1059 | Field Tattoos | 51045 | | | | |
| 1060 | Gray Tattoos | 51055 | | | | |
| 1061 | Gray Tattoos | 51056 | | | | |
| 1062 | Gray Tattoos | 51057 | | | | |
| 1063 | Kites | PM4187-4194 | | | ⅓ Admit | |
| 1064 | Pomona Crime Scene | 47507 | | | 1/24 | A |
| 1065 | Pomona Crime Scene Yagle | 47509 | | | | |
| 1066 | Pomona Crime Scene Yagle | 47510 | | | 1/24 | A |
| 1067 | Pomona Crime Scene Yagle | 47511 | | | | |
| 1068 | Pomona Crime Scene Yagle | 47513 | | | | |
| 1069 | Pomona Crime Scene Yagle | 47514 | | | 1/24 | A |
| 1070 | Pomona Crime Scene | 47518 | | | | |
| 1071 | Pomona Crime Scene | 47519 | | | | |
| 1072 | Pomona Crime Scene | 47520 | | | | |
| 1073 | Pomona Crime Scene | 47522 | | | | |
| 1074 | Pomona Crime Scene | 47523 | | | | |
| 1075 | Pomona Crime Scene Ennis | 47524 | | | | |
| 1076 | Pomona Crime Scene Ennis | 47525 | | | 1/24 | A |
| 1077 | Pomona Crime Scene Ennis | 47525 | | | | |
| 1078 | Pomona Crime Scene Ennis | 47530 | | | | |
| 1079 | Pomona Crime Scene Ennis | 47531 | | | | |
| 1080 | Pomona Crime Scene Ennis | 47532 | | | | |
| 1081 | Pomona Crime Scene | 47551 | | | | |
| 1082 | Pomona Crime Scene | 47565 | | | | |
| 1083 | Pomona Crime Scene | 47593 | | | 1/24 | A |
| 1084 | Pomona Crime Scene | 47603 | | | 1/24 | A |
| 1085 | Pomona Crime Scene | 47606 | | | 1/24 | A |

GOVERNMENT'S EXHIBIT LIST

4

| | | | | | |
|---|---|---|---|---|---|
| 1086 | Pomona Crime Scene | 47607 | | | |
| 1087 | Pomona Crime Scene | 47614 | | 1/24 | A |
| 1088 | Pomona Crime Scene | 47615 | | 1/24 | A |
| 1089 | Pomona Crime Scene | 47616 | | 1/24 | A |
| 1090 | Pomona Crime Scene | 47618 | | 1/24 | A |
| 1091 | Pomona Crime Scene | 47622 | | 1/24 | A |
| 1092 | Pomona Crime Scene | 47624 | | 1/24 | A |
| 1093 | Pomona Crime Scene | 47625 | | 1/24 | A |
| 1094 | Pomona Crime Scene | 47627 | | 1/24 | A |
| 1095 | Pomona Crime Scene | 47628 | | 1/24 | A |
| 1096 | Pomona Crime Scene | 47630 | | 1/24 | A |
| 1097 | Pomona Crime Scene Yagle | 47639 | | | |
| 1098 | Pomona Crime Scene Yagle | 47648 | | | |
| 1099 | Pomona Crime Scene Yagle | 47650 | | | |
| 1100 | Pomona Crime Scene Yagle | 47652 | | | |
| 1101 | Pomona Crime Scene Yagle | 47657 | | | |
| 1102 | Pomona Crime Scene Yagle | 47669 | | | |
| 1103 | Pomona Crime Scene Yagle | 47676 | | 1/24 | A |
| 1104 | Pomona Crime Scene Yagle | 47677 | | 1/24 | A |
| 1105 | Pomona Crime Scene Yagle | 47678 | | | |
| 1106 | Pomona Crime Scene Yagle | 47661 | | | |
| 1107 | Pomona Crime Scene Ennis | 47695 | | | |
| 1108 | Pomona Crime Scene Ennis | 47696 | | | |
| 1109 | Pomona Crime Scene Ennis | 47697 | | | |
| 1110 | Pomona Crime Scene Ennis | 47700 | | | |
| 1111 | Pomona Crime Scene Ennis | 47701 | | | |
| 1112 | Pomona Crime Scene Ennis | 47702 | | | |

| 1113 | Pomona Crime Scene Ennis | 47704 | | | |
| 1114 | Intentionally left blank-no exhibit | | | | |
| 1115 | Pomona Crime Scene Ennis | 47708 | | | |
| 1116 | Intentionally left blank-no exhibit | | | | |
| 1117 | Pomona Crime Scene Ennis | 47711 | | | |
| 1118 | Intentionally left blank-no exhibit | | | | |
| 1119 | Pomona Crime Scene Ennis | 47714 | | 1/24 A | |
| 1120 | Pomona Crime Scene Ennis | 47716 | | | |
| 1121 | Pomona Crime Scene Ennis | 47718 | | | |
| 1122 | Pomona Crime Scene Ennis | 47721 | | | |
| 1123 | Pomona Crime Scene Ennis | 47722 | | | |
| 1124 | Pomona Crime Scene Ennis | 47725 | | | |
| 1125 | Pomona Crime Scene Ennis | 47727 | | | |
| 1126 | Pomona Crime Scene Ennis | 47731 | | 1/24 A | |
| 1127 | Pomona Crime Scene Ennis | 47732 | | | |
| 1128 | Pomona Crime Scene Ennis | 47733 | | | |
| 1129 | Pomona Crime Scene Ennis | 47734 | | | |
| 1130 | Pomona Crime Scene Ennis | 47736 | | | |
| 1131 | Pomona Crime Scene Ennis | 47740 | | | |
| 1132 | Pomona Crime Scene Ennis | 47742 | | | |
| 1133 | Pomona Crime Scene Ennis | 47745 | | | |
| 1134 | Pomona Crime Scene Ennis | 47746 | | | |
| 1135 | Pomona Crime Scene Ennis | 47748 | | | |
| 1136 | Pomona Crime Scene Ennis | 47750 | | | |
| 1137 | Pomona Crime Scene Ennis | 47751 | | | |
| 1138 | Flock photo | 51219 | | 1/23 Admit | |
| 1139 | Flock photo | 51220 | | 1/23 Admit | |

GOVERNMENT'S EXHIBIT LIST

6

| | | | | | | Admit |
|---|---|---|---|---|---|---|
| 1140 | Flock photo | 17479 | | | | |
| 1141 | Perkins apartment | 17497 | | | 1/24 | A |
| 1142 | Perkins apartment | 17498 | | | 1/24 | A |
| 1143 | Perkins apartment | 17500 | | | | |
| 1144 | Perkins apartment | 17502 | | | 1/24 | A |
| 1145 | Perkins apartment | 17503 | | | | |
| 1146 | Perkins apartment | 17508 | | | | |
| 1147 | Perkins apartment | 17512 | | | | |
| 1148 | Perkins apartment | 17514 | | | 1/24 | A |
| 1149 | Perkins apartment | 17518 | | | 1/24 | A |
| 1150 | Perkins apartment | 17519 | | | 1/24 | A |
| 1151 | Perkins apartment | 17521 | | | | |
| 1152 | Perkins apartment | 17522 | | | | |
| 1153 | Perkins apartment | 17526 | | | | |
| 1154 | Perkins apartment | 17527 | | | | |
| 1155 | Perkins apartment | 17532 | | | 1/24 | A |
| 1156 | Perkins Dodge | 20974 | | | 1/24 | A |
| 1157 | Perkins Dodge | 20976 | | | | |
| 1158 | Firearm from Perkins' vehicle | 20978 | | | | |
| 1159 | Firearm from Perkins' vehicle | 20979 | | | | |
| 1160 | Firearm from Perkins' vehicle | 20984 | | | 1/24 | A |
| 1161 | Perkins Dodge | 20985 | | | 1/24 | A |
| 1162 | Perkins Dodge | 20986 | | | | |
| 1163 | Perkins Dodge | 20987 | | | 1/24 | A |
| 1164 | Perkins Dodge | 20988 | | | | |
| 1165 | Perkins Dodge | 20989 | | | | |
| 1166 | Perkins Dodge | 20990 | | | | |

GOVERNMENT'S EXHIBIT LIST

7

| Exhibit | Description | Bates | | Date | Status |
|---|---|---|---|---|---|
| 1167 | Lancaster crime scene | 22665 | | 1/24 | A |
| 1168 | Lancaster crime scene | 22667 | | 1/24 | A |
| 1169 | Lancaster crime scene | 22682 | | 1/24 | A |
| 1170 | Lancaster crime scene | 22684 | | 1/24 | A |
| 1171 | Lancaster crime scene | 22689 | | 1/24 | A |
| 1172 | Lancaster crime scene | 22699 | | | |
| 1173 | Lancaster crime scene | 22703 | | 1/24 | A |
| 1174 | Lancaster crime scene | 22712 | | | |
| 1175 | Lancaster crime scene | 22727 | | 1/24 | A |
| 1176 | Lancaster crime scene | 22731 | | | |
| 1177 | Lancaster crime scene | 22746 | | 1/24 | A |
| 1178 | Lancaster crime scene | 22752 | | | |
| 1179 | Lancaster crime scene | 22753 | | 1/24 | A |
| 1180 | Lancaster crime scene | 22765 | | | |
| 1182 | Lancaster crime scene | 22833 | | 1/24 | A |
| 1183 | Lancaster crime scene | 23179 | | 1/24 | A |
| 1184 | Lancaster crime scene | 23182 | | | |
| 1185 | Lancaster crime scene | 23185 | | | |
| 1186 | Lancaster crime scene | 23188 | | 1/24 | A |
| 1187 | Lancaster crime scene | 23194 | | | |
| 1188 | Lancaster crime scene | 23198 | | 1/24 | A |
| 1189 | Lancaster crime scene | 23200 | | 1/24 | A |
| 1190 | Lancaster crime scene | 23201 | | | |
| 1191 | Lancaster crime scene | 23222 | | | |
| 1192 | Lancaster crime scene Brizendine | 23224 | | 1/24 | A |
| 1193 | Lancaster crime scene | 23225 | | | |
| 1194 | Lancaster crime scene Brizendine | 23228 | | | |

GOVERNMENT'S EXHIBIT LIST

ER 190

| 1195 | Lancaster crime scene Brizendine | 23250 | | | | |
|------|----------------------------------|-------|---|---|---|---|
| 1196 | Brizendine property | 23253 | | | | |
| 1197 | Lancaster crime scene Brizendine | 23292 | | | 1/24 | A |
| 1198 | Lancaster crime scene | 23323 | | | | |
| 1199 | Brizendine vehicle | 23433 | | | 1/24 | A |
| 1200 | Brizendine vehicle | 23434 | | | | |
| 1201 | Brizendine vehicle | 23574 | | | 1/24 | A |
| 1202 | Brizendine vehicle | 23588 | | | 1/24 | A |
| 1203 | Brizendine vehicle receipts | 23594 | | | 1/24 | A |
| 1204 | Brizendine vehicle receipts | 23598 | | | | Au |
| 1205 | Brizendine vehicle | 23690 | | | 1/24 | A |
| 1206 | Brizendine vehicle | 23691 | | | | |
| 1207 | Brizendine vehicle | 23702 | | | | |
| 1208 | Brizendine vehicle backpack | 23719 | | | 1/24 | A |
| 1209 | Brizendine vehicle | 23722 | | | | |
| 1210 | Brizendine vehicle | 23726 | | | 1/24 | A |
| 1211 | Brizendine vehicle receipt | 23728 | | | 1/24 | A |
| 1212 | Brizendine vehicle hotel key | 23732 | | | 1/24 | A |
| 1213 | Roshanski Autopsy report | 12883-12897 | | | 1/28 | A |
| 1214 | Roshanski Autopsy photos | 12927 | | | 1/28 | A |
| 1215 | Roshanski Autopsy photos | 12931 | | | | |
| 1216 | Roshanski Autopsy photos | 12932 | | | 1/28 | A |
| 1217 | Roshanski Autopsy photos | 12934 | | | | |
| 1218 | Roshanski Autopsy photos | 12935 | | | 1/28 | A |
| 1219 | Roshanski Autopsy photos | 12945 | | | 1/28 | A |
| 1220 | Roshanski Autopsy photos | 12946 | | | | |
| 1221 | Magomedgadzhiev Autopsy report | 12903-12917 | | | 1/28 | A |

| 1222 | Magomedgadzhiev Autopsy | 12796 | | | |
|------|--------------------------|-------|---|---|---|
| 1223 | Magomedgadzhiev Autopsy photo | 12799 | | | |
| 1224 | Magomedgadzhiev Autopsy photo | 12802 | | | |
| 1225 | Magomedgadzhiev Autopsy photo | 12803 | | | |
| 1226 | Magomedgadzhiev Autopsy photo | 12805 | | 1/28 | A |
| 1227 | Magomedgadzhiev Autopsy photo | 12807 | | | |
| 1228 | Magomedgadzhiev Autopsy photo | 12812 | | | |
| 1229 | Magomedgadzhiev Autopsy photo | 12811 | | 1/28 | A |
| 1230 | Magomedgadzhiev Autopsy photo | 12817 | | | |
| 1231 | Brizendine autopsy report | 22355-22374 | | 1/28 | A |
| 1232 | Brizendine autopsy photos | 22375 | | | |
| 1233 | Brizendine autopsy photos | 22381 | | | |
| 1234 | Brizendine autopsy photos | 22383 | | | |
| 1235 | Brizendine autopsy photos | 22390 | | | |
| 1236 | Brizendine autopsy photos | 22391 | | | |
| 1237 | Brizendine autopsy photos | 22401 | | | |
| 1238 | Brizendine autopsy photos | 22408 | | | |
| 1239 | Brizendine autopsy photos | 22416 | | 1/28 | A |
| 1240 | Brizendine autopsy photos | 22425 | | 1/28 | A |
| 1241 | Brizendine autopsy photos | 22426 | | | |
| 1242 | Brizendine autopsy photos | 22431 | | | |
| 1243 | Brizendine autopsy photos | 22441 | | | |
| 1244 | Brizendine autopsy photos | 22443 | | | |
| 1245 | Brizendine autopsy photos | 22454 | | | |
| 1246 | Brizendine autopsy photos | 22455 | | | |
| 1247 | Brizendine autopsy photos | 22457 | | | |
| 1248 | Brizendine autopsy photos | 22458 | | 1/28 | A |

GOVERNMENT'S EXHIBIT LIST

10

| | | | | | |
|---|---|---|---|---|---|
| 1249 | Brizendine autopsy photos | 22466 | | 1/28 | A |
| 1250 | Brizendine autopsy photos | 22467 | | | |
| 1251 | Brizendine autopsy photos | 22476 | | | |
| 1252 | Ennis Autopsy Report | 21780-21849 | | 1/28 | A |
| 1253 | Ennis Autopsy photos | 64523 | | | |
| 1254 | Ennis Autopsy photos | 64528 | | | |
| 1255 | Ennis Autopsy photos | 64531 | | 1/28 | A |
| 1256 | Ennis Autopsy photos | 64534 | | | |
| 1257 | Ennis Autopsy photos | 64535 | | | |
| 1258 | Ennis Autopsy photos | 64536 | | | |
| 1259 | Ennis Autopsy photos | 64541 | | | |
| 1260 | Ennis Autopsy photos | 64542 | | | |
| 1261 | Ennis Autopsy photos | 64544 | | | |
| 1262 | Ennis Autopsy photos | 64545 | | | |
| 1263 | Ennis Autopsy photos | 64546 | | 1/28 | A |
| 1264 | Ennis Autopsy photos | 64548 | | | |
| 1265 | Ennis Autopsy photos | 64550 | | | |
| 1266 | Ennis Autopsy photos | 64575 | | | |
| 1267 | Ennis Autopsy photos | 64586 | | | |
| 1268 | Ennis Autopsy photos | 64589 | | | |
| 1269 | Ennis Autopsy bullets | 64592 | | 1/28 | A |
| 1270 | Yagle Autopsy Report | 21749-21779 | | 1/28 | A |
| 1271 | Yagle Autopsy photos | 51276 | | | |
| 1272 | Yagle Autopsy photos | 51283 | | | |
| 1273 | Yagle Autopsy photos | 51285 | | 1/28 | A |
| 1274 | Yagle Autopsy photos | 51288 | | 1/28 | A |
| 1275 | Yagle Autopsy photos | 51291 | | | |

GOVERNMENT'S EXHIBIT LIST

11

| Exhibit | Description | Bates | | Date | Status |
|---|---|---|---|---|---|
| 1276 | Yagle Autopsy photos | 51292 | | | |
| 1277 | Yagle Autopsy photos | 51294 | | | |
| 1278 | Yagle Autopsy bullet | 51303 | | 1/28 | A |
| 1279 | Yagle Autopsy bullet | 51304 | | | |
| 1280 | Intentionally left blank-no exhibit | | | | |
| 1281 | Pitchford phone photo | 41883 | | | |
| 1282 | Pitchford phone photo | 42178 | | | |
| 1283 | Pitchford phone photo | 41911 | | | |
| 1284 | Pitchford phone photo | 41802 | | 1/29 | A |
| 1285 | Pitchford phone photo | 41814 | | | |
| 1286 | Intentionally left blank-no exhibit | | | | |
| 1287 | Bannick Facebook | 18415-18416 | | | |
| 1288 | Bannick Facebook  Pg 2 | 18393-18394 | | 2/4 | A |
| 1289 | Bannick Facebook  Pg 2 | 18405-18407 | | 2/4 | A |
| 1290 | Bannick Facebook | 18334-18335 | | | |
| 1291 | Gray Facebook | 65080 | | 2/4 | A |
| 1292 | Gray Facebook | 65098 | | 2/4 | A |
| 1293 | Gray Facebook | 66463 | | | |
| 1294 | Gray Facebook | 68556-68557 | | 2/4 | A |
| 1295 | Gray Facebook | 65114-65118 | | | |
| 1296 | Perkins Facebook | 19800 | | | |
| 1297 | Perkins Facebook | 19511 | | | |
| 1298 | Field Facebook | 25360-25363 | | | |
| 1299 | Field Facebook | 26708 | | 1/29 | A |
| 1300 | Field Facebook | 27336-27338 | | | |
| 1301 | Facebook | Pgs 362-364 | | | |
| 1302 | Facebook | Pg 1042-1045 | | | |

Case 1:20-cr-00238-JLT-SKO    Document 1821    Filed 02/14/25    Page 14 of 21

| | | | | | |
|---|---|---|---|---|---|
| 1303 | Field phone messages | 50493-50565 | | 1/29 | A |
| 1304 | Field phone messages | 50473-50476 | | 1/29 | A |
| 1305 | Field phone messages | 50566-50593 | | 1/29 | A |
| 1306 | Field phone messages | 50609-50613 | | | |
| 1307 | San Fernando PD car stop photos | 41585 | | 1/28 | A |
| 1308 | San Fernando PD car stop photos | 41586 | | 1/28 | A |
| 1309 | San Fernando PD car stop photos | 41588 | | 1/28 | A |
| 1310 | San Fernando PD car stop photos | 41589 | | 1/28 | A |
| 1311 | San Fernando PD car stop photos | 41590 | | | |
| 1312 | San Fernando PD car stop photos | 41591 | | | |
| 1313 | San Fernando PD car stop photos | 41592 | | | |
| 1314 | San Fernando PD car stop photos | 41593 | | 1/28 | A |
| 1315 | San Fernando PD car stop photos | 41594 | | 1/28 | A |
| 1316 | San Fernando PD car stop photos | 41595 | | | |
| 1317 | San Fernando PD car stop photos | 41596 | | | |
| 1318 | San Fernando PD car stop photos | 41597 | | 1/28 | A |
| 1319 | San Fernando PD car stop photos | 41598 | | | |
| 1320 | San Fernando PD car stop photos | 41599 | | 1/28 | A |
| 1321 | San Fernando PD car stop photos | 41600 | | | |
| 1322 | San Fernando PD car stop photos | 41601 | | | |
| 1323 | San Fernando PD car stop photos | 41602 | | | |
| 1324 | San Fernando PD car stop photos | 41603 | | | |
| 1325 | San Fernando PD car stop photos | 41604 | | 1/28 | A |
| 1326 | San Fernando PD car stop photos | 41605 | | | |
| 1327 | San Fernando PD car stop photos | 41606 | | | |
| 1328 | San Fernando PD car stop photos | 41607 | | 1/28 | A |
| 1329 | San Fernando PD car stop photos | 41608 | | | |

GOVERNMENT'S EXHIBIT LIST

13

ER 195

| | | | | | | |
|------|-------------------------------|-------|--|------|---|---|
| 1330 | San Fernando PD car stop photos | 41609 | | | | |
| 1331 | San Fernando PD car stop photos | 41610 | | | | |
| 1332 | San Fernando PD car stop photos | 41611 | | | | |
| 1333 | San Fernando PD car stop photos | 41612 | | | | |
| 1334 | San Fernando PD car stop photos | 41613 | | | | |
| 1340 | Laboratory results | 49380 | | | 1/28 | A |
| 1341 | Laboratory results | 49381 | | | | |
| 1342 | Laboratory results | 70260 | | | 1/68 | A |
| 1343 | FCJ photos | 51075 | | | | |
| 1344 | FCJ photos | 51077 | | | | |
| 1345 | FCJ photos | 51078 | | | | |
| 1346 | FCJ photos | 51079 | | | | |
| 1347 | FCJ photos | 51080 | | | | |
| 1348 | Lomita crime scene | 12610 | | | | |
| 1349 | Lomita crime scene | 12611 | | | 1/29 | A |
| 1350 | Lomita crime scene | 12612 | | | 1/29 | A |
| 1351 | Lomita crime scene | 12613 | | | | |
| 1352 | Lomita crime scene | 12615 | | | 1/29 | A |
| 1353 | Lomita crime scene | 12618 | | | | |
| 1354 | Lomita crime scene | 12619 | | | | |
| 1355 | Lomita crime scene | 12628 | | | | |
| 1356 | Lomita crime scene | 12629 | | | 1/29 | A |
| 1357 | Lomita crime scene Magomedgadzhiev | 12631 | | | | |
| 1358 | Lomita crime scene | 12632 | | | | |
| 1359 | Lomita crime scene | 12633 | | | | |

14

ER 196

| | | | | | | |
|---|---|---|---|---|---|---|
| 1360 | Lomita crime scene Magomedgadzhiev | 12635 | | | | |
| 1361 | Lomita crime scene Roshanski | 12636 | | | | |
| 1362 | Lomita crime scene | 12638 | | | | |
| 1363 | Lomita crime scene | 12641 | | | | |
| 1364 | Lomita crime scene | 12643 | | | | |
| 1365 | Lomita crime scene | 12644 | | | | |
| 1366 | Lomita crime scene Roshanski | 12646 | | | | |
| 1367 | Lomita crime scene Roshanski | 12647 | | | 1/29 | A |
| 1368 | Lomita crime scene | 12648 | | | | |
| 1369 | Lomita crime scene Magomedgadzhiev | 12649 | | | | |
| 1370 | Lomita crime scene | 12653 | | | | |
| 1371 | Lomita crime scene | 12654 | | | 1/29 | A |
| 1372 | Lomita crime scene | 12655 | | | | |
| 1373 | Lomita crime scene | 12658 | | | | |
| 1374 | Lomita crime scene | 12659 | | | | |
| 1375 | Lomita crime scene | 12660 | | | | |
| 1376 | Lomita crime scene Magomedgadzhiev | 12672 | | | 1/29 | A |
| 1377 | Lomita crime scene | 12674 | | | 1/29 | A |
| 1378 | Lomita crime scene | 12675 | | | | |
| 1379 | Lomita crime scene | 12676 | | | | |
| 1380 | Lomita crime scene Magomedgadzhiev | 12684 | | | | |
| 1381 | Lomita crime scene Magomedgadzhiev | 12691 | | | | |

| 1382 | Lomita crime scene Magomedgadzhiev | 12692 | | | |
|------|-----------------------------------|-------|--|--|--|
| 1383 | Lomita crime scene Magomedgadzhiev | 12693 | | | |
| 1384 | Lomita crime scene Magomedgadzhiev | 12694 | | | |
| 1385 | Lomita crime scene Magomedgadzhiev | 12695 | | | |
| 1386 | Lomita crime scene Magomedgadzhiev | 12696 | | | |
| 1387 | Lomita crime scene | 12697 | | | |
| 1388 | Lomita crime scene | 12698 | | | |
| 1389 | Lomita crime scene Roshanski | 12700 | | | |
| 1390 | Lomita crime scene Roshanski | 12702 | | | |
| 1391 | Lomita crime scene Roshanski | 12704 | | | |
| 1392 | Lomita crime scene Roshanski | 12705 | | | |
| 1393 | Lomita crime scene Roshanski | 12706 | | | |
| 1394 | Lomita crime scene EDD ppwk | 13012 | | 1/29 | A |
| 1395 | Lomita crime scene EDD ppwk | 13013 | | | A |
| 1396 | Lomita crime scene EDD ppwk | 13014 | | | A |
| 1397 | Lomita crime scene EDD ppwk | 13021 | | | A |
| 1398 | Lomita crime scene EDD ppwk | 13022 | | | A |
| 1399 | Lomita crime scene EDD ppwk | 13024 | | | A |
| 1400 | Lomita crime scene EDD ppwk | 13025 | | | A |
| 1401 | Lomita crime scene EDD ppwk | 13026 | | | A |
| 1402 | Lomita crime scene EDD ppwk | 13027 | | | A |
| 1403 | Lomita crime scene EDD ppwk | 13028 | | | A |

| Ex. No. | Description | Bates | | Date | Adm. |
|---|---|---|---|---|---|
| 1404 | Lomita crime scene EDD ppwk | 13031 | | 1/29 | A |
| 1405 | Lomita crime scene EDD ppwk | 13032 | | | A |
| 1406 | Lomita crime scene EDD ppwk | 13033 | | | A |
| 1407 | Lomita crime scene EDD ppwk | 13034 | | | A |
| 1408 | Lomita crime scene EDD ppwk | 13037 | | | A |
| 1409 | Text messages | PM 0007 | | 1/31 | A |
| 1410 | Text messages | PM 0008 | | 1/31 | A |
| 1411 | Text messages | PM 0009 | | 1/31 | A |
| 1412 | Certificate of Death (Lowrey) | 8637 | | | |
| 1413 | Kern County Coroner Final Report and supporting documents    Pgs  5 to 39 | 64611-64649 | | 2/6 | A |
| 1414 | Abstract of Judgment (Holmeyer) | 64917-64919 | | | |
| 1415 | Felony Amended. Information, People v. Holmeyer, et al., No. BF172209 | 64927–64958 | | | |
| 1416 | Fel. Adv. Rights (Sup. Ct., Kern) | 64920–64926 | | | |
| 1417 | Cont'd Claim Form (Clement) | PM8852-8857 | | 2/4 | A |
| 1418 | Address Change Screen (Clement) | PM 8875 | | 2/4 | A |
| 1419 | UI Online App. Rpt. (Clement) | PM8879-8882 | | 2/4 | A |
| 1420 | Address Change Screen (Stinson) | PM 8913 | | 2/4 | A |
| 1421 | UI Online App. Rpt. (Stinson) | PM8917-8920 | | 1/31 | A |
| 1422 | Field phone messages | 50015 | | | |
| 1423 | Field phone messages | 50011–14 | | | |
| 1424 | Field phone messages | 50034–92 | | | |
| 1425 | Kaylen Chandler | PM 9053 | | | |
| 1426 | Haily Chappell | PM 9054 | | | |
| 1427 | Sabrina Beck | PM 9056 | | | |

| | | | | | |
|---|---|---|---|---|---|
| 1428 | Aryan Brotherhood Members & Associates | No Bates | | | |
| 1429 | Pomona – Persons Involved | No Bates | | | |
| 1430 | Lomita – Persons Involved | No Bates | | | |
| 1431 | Lancaster – Persons Involved | No Bates | | | |
| 1432 | Lomita Cell Site Data Analysis | PM9157-9163 | | 1/30 | A |
| 1433 | Pomona Satellite Map (screenshot) | No Bates | | 1/24 | A |
| 1434 | Pomona Cell Site Data Analysis | PM9397-9478 | | 1/30 | A |
| 1435 | Hollywood Photo | 70221 | | 1/28 | A |
| 1436 | Hollywood Photo | 70224 | | | A |
| 1437 | Hollywood Photo | 70228 | | | A |
| 1438 | Hollywood Photo | 70230 | | | A |
| 1439 | Hollywood Photo | 70234 | | | A |
| 1440 | Hollywood Photo | 70237 | | | A |
| 1441 | Hollywood Photo | 70244 | | | A |
| 1442 | Hollywood Photo | 70248 | | | A |
| 1443 | Hollywood Photo | 70250 | | | A |
| 1444 | Hollywood Photo | 70251 | | | A |
| 1445 | Hollywood Photo | 70255 | | | A |
| 1800 | Clement calls | PM 172 | | 1/31 | A |
| 1801 | Clement calls | PM 175 | | 1/31 | A |
| 1802 | Clement calls | PM 184 | | | |
| 1803 | Clement calls | PM 189 | | | |
| 1804 | Clement calls | PM 3320 | | | |
| 1805 | Clement calls | PM 3322 | | | |
| 1806 | Clement calls | PM 3326 | | 1/31 | A |
| 1807 | Clement calls | PM 3328 | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1808 | Fresno Wiretap call 0246 | 0246 | | | | |
| 1809 | Fresno Wiretap call 1403 | 1403 | | | 2/5 | A |
| 1810 | Fresno Wiretap call 2628 | 2628 | | | 2/5 | A |
| 1811 | Fresno Wiretap call 2665 | 2665 | | | 2/5 | A |
| 1812 | Fresno Wiretap call 3986 | 3986 | | | | |
| 1813 | Fresno Wiretap call 10550 | 10550 | | | | |
| 1814 | Fresno Wiretap call 11626 | 11626 | | | | |
| 1815 | Fresno Wiretap call 12998 | 12998 | | | | |
| 1816 | Fresno Wiretap call 13197 | 13197 | | | | |
| 1817 | Fresno Wiretap call 13249 | 13249 | | | | |
| 1818 | Fresno Wiretap call 13321 | 13321 | | | | |
| 1819 | Fresno Wiretap call 14304 | 14304 | | | | |
| 1820 | Fresno Wiretap call 14321 | 14321 | | | 2/5 | A |
| 1821 | Fresno Wiretap call 15145 | 15145 | | | | |
| 1822 | Fresno Wiretap call 15201 | 15201 | | | | |
| 1823 | Fresno Wiretap call 24362 | 24362 | | | | |
| 1824 | Fresno Wiretap call 26638 | 26638 | | | | |
| 1825 | Lancaster Home Video | 51223 | | | 1/24 | A |
| 1826 | Lancaster Home Video | 51228 | | | 1/24 | A |
| 1827 | Pomona 911 call | 17626 | | | | |
| 1828 | Pomona camera video | 21064 | | | 1/24 | A |
| 1829 | Pomona camera video | 48630 | | | 2/1 | A |
| 1830 | Pomona camera video | 48631 | | | | |
| 1831 | Pomona camera video | 48632 | | | | |
| 1832 | Pomona camera video | 48633 | | | | |
| 1833 | Pomona camera video | 48634 | | | | |
| 1834 | Pomona camera video | 48635 | | | | |

GOVERNMENT'S EXHIBIT LIST

19

ER 201

| | | | | | |
|---|---|---|---|---|---|
| 1835 | Pomona camera video | 48636 | | | 8/11 A |
| 1836 | Pomona camera video | 48637 | | | 1/24 A |
| 1837 | Pomona camera video | 48684 | | | 1/24 A |
| 1838 | Pomona camera video | 49304 | | | 1/24 A |
| 1839 | Pomona camera video | 49377 | | | 1/24 A |
| 1840 | Bannick Facebook | 17801 | | | |
| 1841 | Field Facebook | 23849 | | | |
| 1842 | Gray Facebook | 64959 | | | |
| 1843 | Perkins Facebook | 19440 | | | |
| 1844 | Facebook | PM 1117 | | | |
| 1845 | Lomita phone data | 21870-22171 | | | 1/30 A |
| 1846 | Lomita phone data | 22173-22233 | | | |
| 1847 | Pomona Geofence | 17485-17491 | | | 1/24 A |
| 1848 | Pomona Geofence | 20018-20038 | delete 2/11 | | ~~xxxxxx~~ |
| 1849 | Pomona Geofence | 46557-46631 | | | 1/24 A |
| 1850 | Pomona Toll Records | 17627-17648 | | | 1/24 A |
| 1851 | Pomona Google | 20039-20099 | | | |
| 1852 | Pomona Call Detail Records | 17081-17119 | | | 1/24 A |
| 1853 | Call Detail Records | 23804-28061 | | | |
| 1854 | Field Phone | PM 7904 | | | |
| 1855 | Pitchford Phone | 41701 | | | |
| 1856 | ATF Property Number 106 | ATF 106 | | | 1/28 A |
| 1857 | ATF Property Number 107 | ATF 107 | | | |
| 1858 | ATF Property Number 108 | ATF 108 | | | 1/28 A |
| 1859 | ATF Property Number 109 | ATF 109 | | | |
| 1860 | ATF Property Number 287 | ATF 287 | | | |
| 1861 | ATF Property Number 289 | ATF 289 | | | |

1862 Brian Rapinoe marked on 2/5/25 12:26pm Court Record 20 1Δ A only

GOVERNMENT'S EXHIBIT LIST

Stinson Ex 6000 Admitted 2/6/25 ER-202 Map

1/15/26, 11:07 AM

Case: 25-3648, 03/04/2026, DktEntry: 16.3, Page 82 of 150
LIVE 1.8.5 NEXTGEN CM/ECF - U.S. District Court for Eastern California

| 02/14/2025 | 1816 | MINUTES (Text Only) for proceedings held before District Judge Jennifer L. Thurston: JURY TRIAL (Day Eighteen) as to Kenneth Johnson, Francis Clement, John Stinson held on 2/14/2025. Jury Notes E and F marked and received. Jury verdict. Jury excused. Sentencing as to Kenneth Johnson, Francis Clement, John Stinson set for 5/19/2025 at 09:00 AM in Courtroom 4 (JLT) before District Judge Jennifer L. Thurston. Defendants waive interview for PSR and waive to be present at sentencing. Government Counsel: Stephanie Stokman, James Conolly present. Defense Counsel: Andrea Lee Luem, Ryan Villa, Jean deSalles Barrett, Jane Fisher-Bryialsen, Kennth Reed present. Custody Status: CUSTODY/WAIVERS. Court Reporter/CD Number: Rachel Lundy. (Deputy Clerk IM) (Entered: 02/14/2025) |

ER 203

1/15/26, 11:07 AM

Case: 25-3648, 03/04/2026, DktEntry: 16.3, Page 83 of 150
LIVE 1.8.5 NEXTGEN CM/ECF - U.S. District Court for Eastern California

| 02/13/2025 | 1814 | MINUTES (Text Only) for proceedings held before District Judge Jennifer L. Thurston: JURY TRIAL (Day Seventeen) as to Kenneth Johnson, Francis Clement, John Stinson held on 2/13/2025. The Court heard issues re USA brief re trial transcripts to the jury 1812 related to Jury Note B. The court reporter read the testimony of witness Daniel Rubin in the presence of the jury. Jury returned to jury room for continued deliberations. Jury Notes marked Exhibit C and Exhibit D received. Jury Trial (Day Eighteen) set for 2/14/2025 at 08:00 AM in Courtroom 4 (JLT) before District Judge Jennifer L. Thurston. Government Counsel: Stephanie Stokman, James Conolly, Jared Engelking present. Defense Counsel: Andrea Lee Luem, Ryan Villa, Jean deSalles Barrett, Jane Fisher-Bryialsen, Kennth Reed present. Custody Status: CUSTODY/WAIVERS. Court Reporter/CD Number: Rachel Lundy. (Deputy Clerk IM) Modified on 2/14/2025 (IM). (Entered: 02/13/2025) |
|---|---|---|

| 02/12/2025 | 1811 | MINUTES (Text Only) for proceedings held before District Judge Jennifer L. Thurston: JURY TRIAL (Day Sixteen) as to Kenneth Johnson, Francis Clement, John Stinson held on 2/12/2025. The Court addressed hardship for Juror Seat 5 (#74). Juror Seat 5 (#74) is discharged for hardship. Alternate 1 (#88) will replace Juror Seat 5. Jury instruction given. Jury commence deliberations. Jury Notes marked Exhibit A and Exhibit B received. Jury Trial (Day Seventeen) set for 2/13/2025 at 08:00 AM in Courtroom 4 (JLT) before District Judge Jennifer L. Thurston. Government Counsel: Stephanie Stokman, James Conolly, Jared Engelking present. Defense Counsel: Andrea Lee Luem, Ryan Villa, Jean deSalles Barrett, Jane Fisher-Bryialsen, Kennth Reed present. Custody Status: CUSTODY/WAIVERS. Court Reporter/CD Number: Rachel Lundy. (Deputy Clerk IM) (Entered: 02/12/2025) |

ER 205

| 02/11/2025 | 1807 | MINUTES (Text Only) for proceedings held before District Judge Jennifer L. Thurston: JURY TRIAL (Day Fifteen) as to Kenneth Johnson, Francis Clement, John Stinson held on 2/11/2025. Closing arguments. Final jury instructions given. Oath to bailiff. Jury deliberations. Admitted Exhibits confirmed with counsel. Jury Trial (Day Sixteen) set for 2/12/2025 at 08:00 AM in Courtroom 4 (JLT) before District Judge Jennifer L. Thurston. Government Counsel: Stephanie Stokman, James Conolly, Jared Engelking present. Defense Counsel: Andrea Lee Luem, Ryan Villa, Jean deSalles Barrett, Jane Fisher-Bryialsen, Kennth Reed present. Custody Status: CUSTODY. Court Reporter/CD Number: Rachel Lundy. (Deputy Clerk IM) (Entered: 02/11/2025) |
|---|---|---|

ER 206

1/15/26, 11:06 AM

Case: 25-3648, 03/04/2026, DktEntry: 16.3, Page 86 of 150
LIVE 1.8.5 NEXTGEN CM/ECF - U.S. District Court for Eastern California

| 02/07/2025 | 1798 | MINUTES (Text Only) for proceedings held before District Judge Jennifer L. Thurston: JURY TRIAL (Day Fourteen) as to Kenneth Johnson, Francis Clement, John Stinson held on 2/7/2025. Counsel for defendants informed the Court that there will be no witnesses after consulting with defendants and custody witnesses. Custody witnesses can be transported forthwith. Defendant Johnson rest. Defendant Clement rest. Defendant Stinson rest. No rebuttal by USA. Jury Trial (Day Fifteen) set for 2/11/2025 at 08:00 AM in Courtroom 4 (JLT) before District Judge Jennifer L. Thurston. Government Counsel: Stephanie Stokman, James Conolly, Jared Engelking present. Defense Counsel: Andrea Lee Luem, Ryan Villa, Jean deSalles Barrett, Jane Fisher-Bryialsen, Kennth Reed present. Custody Status: CUSTODY. Court Reporter/CD Number: Rachel Lundy. (Deputy Clerk IM) (Entered: 02/07/2025) |

ER 207

1/15/26, 11:06 AM

Case: 25-3648, 03/04/2026, DktEntry: 16.3, Page 87 of 150
LIVE 1.8.5 NEXTGEN CM/ECF - U.S. District Court for Eastern California

| 02/06/2025 | 1795 | MINUTES (Text Only) for proceedings held before District Judge Jennifer L. Thurston: JURY TRIAL (Day Thirteen) as to Kenneth Johnson, Francis Clement, John Stinson held on 2/6/2025. USA witnesses: Brian Rapinoe, Benjamin Mendoza, Ethan Medley, Timothy True, Eugene Carpenter sworn/testified. USA exhibits ADMITTED. Defendant Stinson Exhibit 6000 ADMITTED. USA rest. Defendants motion for acquittal submitted. Jury Trial (Day Fourteen) set for 2/7/2025 at 08:00 AM in Courtroom 4 (JLT) before District Judge Jennifer L. Thurston. Government Counsel: Stephanie Stokman, James Conolly, Jared Engelking present. Defense Counsel: Andrea Lee Luem, Ryan Villa, Jean deSalles Barrett, Jane Fisher-Bryialsen, Kennth Reed present. Custody Status: CUSTODY. Court Reporter/CD Number: Rachel Lundy. (Deputy Clerk IM) (Entered: 02/06/2025) |
|---|---|---|

ER 208

| 02/05/2025 | 1791 | MINUTES (Text Only) for proceedings held before District Judge Jennifer L. Thurston: JURY TRIAL (Day Twelve) as to Kenneth Johnson, Francis Clement, John Stinson held on 2/5/2025. 1785 MOTION to DISMISS filed by Francis Clement. The Court ruled from the bench and the rulings are preserved on the record. Motion is DENIED. USA witnesses: Daniel Rubin, Brian Rapinoe sworn/testified. USA exhibits ADMITTED. Jury Trial (Day Thirteen) set for 2/6/2025 at 08:00 AM in Courtroom 4 (JLT) before District Judge Jennifer L. Thurston. Government Counsel: Stephanie Stokman, James Conolly, Jared Engelking present. Defense Counsel: Andrea Lee Luem, Ryan Villa, Jane Fisher-Byrialsen, Jean deSalles Barrett, Kenneth Reed present. Custody Status: CUSTODY. Court Reporter/CD Number: Rachael Lundy. (Deputy Clerk IM) (Entered: 02/05/2025) |

ER 209

JANE FISHER-BYRIALSEN
Fisher & Byrialsen, PC
4600 S. Syracuse Street
Denver, CO 80137
jane@fblaw.org

JEAN D. BARRETT
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
jeanbarrett@ruhnkeandbarrett.com

Attorneys for:
FRANCIS CLEMENT

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> Plaintiff, <br><br> v. <br><br> **FRANCIS CLEMENT,** <br><br> Defendant. | Criminal case No. 20-CR-238-JLT-SKO <br><br> **JOINT MOTION TO DISMISS OR IN THE ALTERNATIVE, FOR A MISTRIAL BASED ON DUE PROCESS VIOLATIONS** |

Defendant Francis Clement, by counsel, Jane Fisher-Byrialsen and Jean Barrett, and Mr. Kenneth Johnson, through counsel, Andrea Luem and Ryan Villa, hereby file this motion for dismissal, or in the alternative if that request is denied, a mistrial based on prosecutorial misconduct and violations of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972).

ER 210

**FACTUAL BACKGROUND**

This Court ordered that, by November 6, 2024, the Government was required to produce all material covered by *Giglio v. United States*, 405 U.S. 150 (1972). (Doc. 1286, Order Granting in Part Motion for Scheduling Order, p. 2, para. 7).[1]  The Government did not do so.

This Court has witnessed the rolling discovery provided related to witness B.R.  Not until during his testimony at trial was it disclosed that B.R. is a paid informant and was deactivated as an informant for some kind of misconduct.  This information first began to come to light on Friday, January 31, 2025, during his testimony in trial.  Based on defense complaints during B.R.'s testimony, additional discovery was provided Monday, February 3, 2025, in the form of payment receipts for his cooperation.  By the time of his continued testimony on Tuesday, February 4, 2025, it became obvious that the government had not met its disclosure obligations.  As a result, the cross examination of B.R. was postponed and other government witnesses were put on.   At the end of the trial day on February 4, 2025, the government vigorously pressed for the cross-examination to commence and conclude that day claiming that B.R. could not possibly return to court the next day.  Defense counsel protested that it was impossible because of the new information that had been disclosed.  The government pressed on.  This Court permitted counsel to resume cross-examination on February 5, 2025.

After court on February 4, 2025, even more information has come out.  At 6:04 p.m. on February 4, the government sent an email stating it had "located 2 more payments" made to B.R. and that the total payments from ATF to B.R. are $ 4,200.  (See Exhibit One).  The government further disclosed that the witness was deactivated as a C.I. in 2022 following issuance of a

---

[1] This Court and the Magistrate Court have repeatedly ordered the Government to comply with its constitutional obligations.  See e.g. Doc. 691 (Minute order by Magistrate Judge Barbara A. McAuliffe)(June 16, 2023): "According to the Federal Rules of Criminal Procedure Rule 5(f), the government is ordered to comply with its discovery obligations as required by federal law, including those duties imposed by Brady v. Maryland, 373 U.S. 83 (1963), and all applicable decisions interpreting Brady. This order does not relieve any party of any other discovery obligation. The consequences for violating this order or the government's obligations under Brady may include sanctions, referral to a disciplinary authority, adverse jury instruction, exclusion of evidence, and dismissal of charges, among other consequences."

2

warrant in San Diego County.  Importantly – all of this information was known to the government and its agents long ago.  Yet – even in front of this Court today – the government has never made a full disclosure. Agent Gonzalez sat through the developing events in court of the past days without causing disclosure of information he must have known was still being withheld as he was the agent named on the payment forms disclosed yesterday and today.

This Court queried whether the defense was prepared to cross-examine.  The defense vigorously argued that cross-examination could not proceed without the withheld information and without whatever else is still being withheld.  With the nighttime disclosures made after court, it is now undeniable that defense counsel was correct.  The government was in fact still withholding evidence.  No wonder the government wanted cross-examination to conclude today.

The prejudice to the defense cannot be remedied short of a mistrial.  Since the commencement of this case, counsel has been making discovery requests.  However, it is **not** as the government insisted on the record today, that it is defense counsel's obligation to request a needle in a haystack that the government knows is there, but is hiding.

Late on February 4, 2025, counsel for Mr. Stinson attempted to obtain records from the court in San Diego; however, those records are not scanned and uploaded.  The defense must now send an investigator to the court to obtain a hard copy of the records and, depending upon what is found, interview witnesses.   The reasons for B.R.'s deactivation as a C.I., that was only **today** disclosed to the defense, must now be investigated.  All of this must happen prior to cross-examination.  Given that we are so far into trial a mistrial is the only appropriate remedy.  Anything short of a mistrial would make it appear to the jury as if this is the fault of the defense or that defense is causing the delay.

### LEGAL AUTHORITY

This is not, as the government argued in court, a question of whether the defense asked for it.  When it comes to *Brady/Giglio,* the government's disclosure obligations are self-executing. It is an affirmative obligation.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires the government to disclose, to the defense, favorable evidence that is material to either guilt or punishment. See *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  The *Brady* requirement of disclosing such material applies to all members of the prosecutorial team. *Giglio v. United States*, 405 U.S. 150 (1972). The government's duty includes "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  "As a matter of law, the prosecution is deemed to have knowledge of and access to anything in the possession, custody or control of any federal agency participating in the same investigation of the defendant." *United States v. Bundy*, 968 F.3d 1019, 1037 (9th Cir. 2020); accord, *United States v. Cloud*, 102 F.4th 968, 976 (9th Cir. 2024).

A *Brady* violation does not depend upon the good or bad faith of the government. The Due Process Clause requires that the United States disclose to the defendant any evidence that "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Trial prosecutors must disclose favorable information without attempting to predict whether its disclosure might affect the outcome of the trial. *United States v. Price*, 566 F.3d 900, 913 n.14 (9th Cir. 2009).

A *Giglio* violation occurs where the prosecution fails to disclose evidence that impeaches a witness's credibility, *see Giglio,* 405 U.S. at 154. The Supreme Court of the United States has extended the prosecution's disclosure obligation to include evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory. See *Giglio*, 405 U.S. 153.

*Brady/Giglio* disclosures should occur before trial and at a time when the information would be of value to the accused. *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991).

ER 213

Mr. Clement and other defendants have filed numerous motions for intervention by the Court because of the Government's repeated and flagrant discovery violations.[2]

While good or bad faith is not relevant to whether there is a Due Process violation, it can be relevant to remedy. Where the government's misconduct is repeated, in violation of a court disclosure order, or at best reckless, dismissal can be warranted. Certainly, a mistrial is required to remedy the prejudice and in the interests of justice.

In *United States. v. Chapman*, 524 F.3d 1073 (9th Cir. 2008), the court dealt with a situation where the government delivered hundreds of pages of documents, including rap sheets and cooperation agreements, during the trial. The defense argued that the late disclosure prejudiced their case and that recalling witnesses was impractical. The court ultimately dismissed the indictment due to the discovery violations. The court gave meaning to words long echoed in this Circuit:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation [is] to govern impartially ….; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. … [W]hile [the prosecutor] may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States,* 295 U.S. 78, 88 (1935), *quoted in part in Chapman*, 524 F.3d at 1088.[3]

In *Chapman*, the district court dismissed the case and the Ninth Circuit affirmed. The court was "clearly troubled by the government's conduct and its failure to own up to its actions" and its "lack of contrition." *Ibid.* Here, the government has exhibited a shockingly lackadaisical attitude toward its discovery obligations in this case and toward its obligation to ensure the defendants have a fair trial.

---

[2] Because of the Government's repeated discovery violations, Mr. Clement and other defendants have previously filed motions for sanctions. Mr. Clement incorporates by reference the legal authority cited in those motions without the need to repeat it all here.

[3] The *Chapman* Court attributes the quotation to *N. Mariana Islands v. Bowie,* 236 F.3d 1083, 1089 (9th Cir.2001); that decision in turn quotes *Berger, supra.*

ER 214

The same reasons that prompted a dismissal in *Chapman* should do so here.  There, the court was not in a position to adjourn the trial for 2 or 3 weeks and then hope the jurors would still be around to return for trial. The government's nondisclosure was flagrant and it was not the first time they had failed to provide discovery. As here, the defense was substantially prejudiced. In *United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020), withheld evidence was discovered days into trial. *Id.*, at 1026. *Bundy* confirmed that when favorable suppressed evidence is discovered mid-trial, the materiality standard is benchmarked against the relative value of the evidence in light of the proceedings to date—not as a retrospective evaluation of how the disclosure may have impacted the outcome of a trial that has not yet concluded. *Id.* at 1033.  The district court in *Bundy* ultimately declared a mistrial and dismissed the indictment with prejudice as additional withheld evidence trickled in over many days.

If this Court does not dismiss the case, it should grant a mistrial.  In *United States v. Kohring,* 637 F.3d 895 (9th Cir. 2011), the Ninth Circuit held that ordering a new trial can be the appropriate remedy for a *Brady/Giglio* violation. The Ninth Circuit has also endorsed other remedies. In *United States v. Cloud*, 102 F.4th 968, 980 (9th Cir. 2024), the Ninth Circuit affirmed the trial court's striking witnesses and imposing sanctions, including monetary damages against the government.

If this Court rejects the request to dismiss the case, then this Court should order a mistrial.  The withholding of critical evidence until after opening statements and after weeks of trial, coming literally during the examination of the witness, is flagrant prosecutorial misconduct that has severely prejudiced the defense.  The defendants are left scrambling, trying to pick up the pieces in the few moments before cross-examination.  Further delay in this trial risks

substantial prejudice because it would appear to the jury as if this is the fault of the defense or that defense is unprepared or otherwise causing the delay. This is not fair, nor is it constitutional.

Respectfully submitted,

s/Jane Fisher-Byrialsen
Jane Fisher-Byrialsen, #49133
FISHER & BYRIALSEN, PLLC
4600 S. Syracuse Street, 9th Floor
Denver, CO 80237
(303) 256-6345
jane@fblaw.org

JEAN D. BARRETT
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
jeanbarrett@ruhnkeandbarrett.com

CERTIFICATE OF SERVICE

I certify that on this 4th day of February, 2025, I served a true and correct copy of the foregoing via ECF to:

All Counsel of Record

And a copy by US Mail addressed to:          Brandon Bannick
                                             USMS #20784-510
                                             Central Valley Annex
                                             254 Taylor Avenue
                                             McFarland, CA 93250

                                             s/ Abby Clement
                                             Paralegal

7

ER 216



**Jane Byrialsen <jane@fblaw.org>**

# Rapinoe (Subject to Protective Order)

**Engelking, Jared (CRM)** <Jared.Engelking2@usdoj.gov>

Tue, Feb 4, 2025 at 6:03 PM

To: "andrea@luemlaw.com" <andrea@luemlaw.com>, Jean Barrett <jeanbarrett@ruhnkeandbarrett.com>, Ryan Villa <ryan@rjvlawfirm.com>, Jane Byrialsen <Jane@fblaw.org>, Kenneth Reed <kenneth@kennethreedlaw.net>
Cc: "Stokman, Stephanie (USACAE)" <Stephanie.Stokman@usdoj.gov>, "Conolly, James (USACAE)" <James.Conolly@usdoj.gov>

Counsel,

Pursuant to the Court's protective order (and for attorney eyes only) please find attached a copy of the ATF informant agreement signed by Mr. Rapinoe. In addition to the payment we already disclosed, we located 2 more payments made to Mr. Rapinoe. One of those payments is attached. The other was a $400 subsistence payment on June 22, 2022 from the LA Field Division that was related to a different case. We do not have access to that receipt. In total, Mr. Rapinoe received $4,200 from ATF. Mr. Rapinoe was deactivated as a CI on September 13, 2022 after approximately 3 months. The reason given for his deactivation was that the CI had a warrant issued in San Diego County for conditional release violation.

Best,

Jared

---

**2 attachments**

📄 **06102022 Rapinoe receipt.pdf**
119K

📄 **RAPINOE Informant agreement 2022.pdf**
93K

ER 217

| 02/04/2025 | 1784 | MINUTES (Text Only) for proceedings held before District Judge Jennifer L. Thurston: JURY TRIAL (Day Eleven) as to Kenneth Johnson, Francis Clement, John Stinson held on 2/4/2025. USA witnesses: Brian Rapinoe, Megan Garza, Brandon Bannick sworn/testified. USA exhibits ADMITTED. Jury Trial (Day Twelve) set for 2/5/2025 at 08:00 AM in Courtroom 4 (JLT) before District Judge Jennifer L. Thurston. Government Counsel: Stephanie Stokman, James Conolly, Jared Engelking present. Defense Counsel: Andrea Lee Luem, Ryan Villa, Jean deSalles Barrett, Jane Fisher-Bryialsen, Kennth Reed present. Custody Status: CUSTODY. Court Reporter/CD Number: Rachel Lundy. (Deputy Clerk IM) (Entered: 02/04/2025) |
|---|---|---|

| 01/31/2025 | 1776 | MINUTES (Text Only) for proceedings held before District Judge Jennifer L. Thurston: JURY TRIAL (Day Ten) as to Kenneth Johnson, Francis Clement, John Stinson held on 1/31/2025. USA witnesses: Robert Eversole, Brian Rapinoe sworn/testified. USA exhibits ADMITTED. Jury Trial (Day Eleven) set for 2/4/2025 at 08:00 AM in Courtroom 4 (JLT) before District Judge Jennifer L. Thurston. Government Counsel: Stephanie Stokman, James Conolly, Jared Engelking present. Defense Counsel: Andrea Lee Luem, Ryan Villa, Jean deSalles Barrett, Jane Fisher-Bryialsen, Kennth Reed present. Custody Status: CUSTODY. Court Reporter/CD Number: Rachel Lundy. (Deputy Clerk IM) (Entered: 01/31/2025) |

ER 219

1/15/26, 11:05 AM

Case: 25-3648, 03/04/2026, DktEntry: 16.3, Page 99 of 150
LIVE 1.8.5 NEXTGEN CM/ECF - U.S. District Court for Eastern California

| 01/30/2025 | 1765 | MINUTES (Text Only) for proceedings held before District Judge Jennifer L. Thurston: JURY TRIAL (Day Nine) as to Kenneth Johnson, Francis Clement, John Stinson held on 1/30/2025. USA witnesses: Lana Haley, Danielle Ponce de Leon, Robert Eversole sworn/testified. USA exhibits ADMITTED. Jury Trial (Day Ten) set for 1/31/2025 at 08:00 AM in Courtroom 4 (JLT) before District Judge Jennifer L. Thurston. Government Counsel: Stephanie Stokman, James Conolly, Jared Engelking present. Defense Counsel: Andrea Lee Luem, Ryan Villa, Jean deSalles Barrett, Jane Fisher-Bryialsen, Kennth Reed present. Custody Status: CUSTODY. Court Reporter/CD Number: Rachel Lundy. (Deputy Clerk IM) (Entered: 01/30/2025) |

ER 220

1/15/26, 11:05 AM

Case: 25-3648, 03/04/2026, DktEntry: 16.3, Page 100 of 150
LIVE 1.8.5 NEXTGEN CM/ECF - U.S. District Court for Eastern California

| 01/29/2025 | 1762 | MINUTES (Text Only) for proceedings held before District Judge Jennifer L. Thurston: JURY TRIAL (Day Eight) as to Kenneth Johnson, Francis Clement, John Stinson held on 1/29/2025. Judicial Notice Court Exhibit 1 read into the record. USA witnesses: James Field, Maria Maciel sworn/testified. USA exhibits ADMITTED. Jury Trial (Day Nine) set for 1/30/2025 at 08:00 AM in Courtroom 4 (JLT) before District Judge Jennifer L. Thurston. Government Counsel: Stephanie Stokman, James Conolly, Jared Engelking present. Defense Counsel: Andrea Lee Luem, Ryan Villa, Jane Fisher-Byrialsen, Jean deSalles Barrett, Kenneth Reed present. Custody Status: CUSTODY. Court Reporter/CD Number: Rachael Lundy. (Deputy Clerk IM) (Entered: 01/29/2025) |

| 01/28/2025 | 1758 | MINUTES (Text Only) for proceedings held before District Judge Jennifer L. Thurston: JURY TRIAL (Day Seven) as to Kenneth Johnson, Francis Clement, John Stinson held on 1/28/2025. USA request 1742 MOTION for DISCLOSURE be sealed. The Court ruled from the bench and the rulings are preserved on the record. 1742 MOTION for DISCLOSURE is SEALED. USA witnesses: Terrance Pell, Dr. Paul Gliniecki, Kaylen Chandler, Eric Hale, Christopher Rodriguez, Francia Martinez sworn/testified. USA exhibits ADMITTED. Jury Trial (Day Eight) set for 1/29/2025 at 08:00 AM in Courtroom 4 (JLT) before District Judge Jennifer L. Thurston. Government Counsel: Stephanie Stokman, James Conolly, Jared Engelking present. Defense Counsel: Andrea Lee Luem, Ryan Villa, Jean deSalles Barrett, Jane Fisher-Bryialsen, Kennth Reed present. Custody Status: CUSTODY. Court Reporter/CD Number: Rachel Lundy. (Deputy Clerk IM) (Entered: 01/29/2025) |
|---|---|---|

ER 222

PHILLIP A. TALBERT
United States Attorney
STEPHANIE M. STOKMAN
JAMES R. CONOLLY
Assistant United States Attorneys
JARED ENGELKING
Trial Attorney, U.S. Department of Justice
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone:  (559) 497-4000
Facsimile:   (559) 497-4099

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KENNETH JOHNSON, et al.,<br><br>Defendants. | CASE NO.  1:20-CR-00238-JLT<br><br>UNITED STATES' OPPOSITION TO JOINT MOTION OF FRANCIS CLEMENT AND KENNETH JOHNSON FOR RECONSIDERATION OF THIS COURT'S ORDER RESTRICTING CROSS-EXAMINATION AND CONFRONTATION OF WITNESSES<br><br>DATE: January 28, 2025<br>TIME: 1:30 p.m.<br>COURT: Hon. Jennifer L. Thurston |

## I.     INTRODUCTION

The United States opposes defendants Francis Clement and Kenneth Johnson's Motion for Reconsideration of this Court's Order Restricting Cross-Examination and Confrontation of Witnesses. ECF No. 1736.  The Court's limitation of the defendants' cross examination regarding the maximum possible penalties the witness faced was proper and consistent with Ninth Circuit precedent.  As the Ninth Circuit has found, cross examination regarding the witness's understanding of potential penalties, including maximum possible penalties, is marginally relevant at best and creates the potential for confusion.  The Court's restriction did not limit the defendants' confrontation rights, because the defense was able to inquire about the witness's possible bases for bias, of which the potential benefits he may receive are but one.  And, when inquiring of a witness's potential benefits as a basis for bias, it is the

UNITED STATES' OPPOSITION TO JOINT MOTION OF CLEMENT AND JOHNSON FOR RECONSIDERATION OF THIS COURT'S ORDER RESTRICTING CROSS-EXAMINATION AND CONFRONTATION OF WITNESSES

1

ER 223

witness's overall understanding of his position that is relevant.  What he has been told by any one specific person or document in forming that understanding is of minimal relevance, and risks creating unrelated side issues and confusion among the jury.

## II.    DISCUSSION

### A.    The Court's Limiting Cross Examination About the Witness's Potential Sentence Was Proper.

The Ninth Circuit has recognized that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *United States v. Larson*, 495 F.3d 1094, 1100–01 (9th Cir. 2007) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *see also United States v. Holler*, 411 F.3d 1061, 1065 (9th Cir. 2005) ("A limitation on cross-examination does not violate the Confrontation Clause unless it limits relevant testimony and prejudices the defendant, and denies the jury sufficient information to appraise the biases and motivations of the witness.") (internal quotation marks omitted). Ordinarily, because the "amount of jail time … faced" by a cooperating defendant "is at best marginally relevant" to a witness' "potential bias and motive in testifying," defendants have no right to inquire into potential penalties, so long as the court affords the defendant an adequate opportunity to expose the cooperator's potential bias and motive in testifying. *United States v. Dadanian*, 818 F.2d 1443, 1449 (9th Cir. 1987), rev'd on reh'g on other grounds, 856 F.2d 1391 (9th Cir. 1988); accord *United States v. Rushin*, 844 F.3d 933, 938–39 (11th Cir. 2016) (collecting cases from the First, Fourth, Seventh, Eighth, Ninth, and D.C. Circuits).  The potential sentence a cooperating witness faces is largely speculative and, ultimately, determined by the Court, not the parties.  All plea agreements entered into the record in this case make that abundantly clear.

As the defense acknowledged in its motion, the Ninth Circuit recognizes as an exception to this general rule, allowing the defense to ask during cross-examination about a mandatory life sentence the defendant would have faced if he had not cooperated.  *United States v. Larson*, 495 F.3d 1094, 1102–07 (9th Cir. 2007).   In *Larson*, the Ninth Circuit explained that, like a mandatory minimum sentence, a mandatory life sentence was a sentence the witness knew with certainty he would receive if he did not

UNITED STATES' OPPOSITION TO JOINT MOTION OF
CLEMENT AND JOHNSON FOR RECONSIDERATION OF THIS    2
COURT'S ORDER RESTRICTING CROSS-EXAMINATION AND
CONFRONTATION OF WITNESSES

ER 224

provide "substantial and meaningful cooperation" so that the government would move to reduce his sentence and was therefore relevant to examination of his potential bias. *Id*. at 1106. But this inquiry does not extend to the potential or possible maximum penalties a witness might receive, which *Larson* found specifically to be speculative and therefore of only marginal relevance to the witness's bias or motivation to lie. *Id*. ("The [potential maximum statutory sentence] lacks significant probative force because a defendant seldom receives the maximum penalty permissible under the statute of conviction.")

For these reasons, it was entirely proper for the Court here to limit cross examination into the potential penalties the witness faced beyond those set by statute, while still allowing inquiry into the witness' potential benefits as he understood them. The defense was "thus able to explore how the plea agreement could have impacted the witnesses' testimony," and the Court's limitation did not harm the defendants' confrontation rights. *United States v. Rushin*, 844 F.3d 933, 940 (2016) (finding no violation of the defendant's confrontation rights where the trial court allowed the defense to inquire about the cooperating witnesses' understanding of the general severity of the penalties they faced and whether they expected to receive a benefit under their plea agreements).

**B.    The Court Properly Limited Questions Related to Specific Statements the Witness May Have Heard When Forming His Own Understanding of the Potential Benefits He May Receive.**

Because the inquiry into sentencing exposure is, fundamentally, an attempt to present to the jury a witness's bias or incentive to lie, it is only what the witness understood or believed to be the benefits he may receive that is relevant. *Larson*, 495 F.3d at 1106-07; *United States v. Jones*, 2024 WL 5170284, at *2–3 (D. Haw. Dec. 18, 2024) ("The Government witnesses may be cross-examined about their understandings as to the benefits they may have received from their plea agreements."). From whom the witness received that understanding, or the statements they may have made, specifically, is not relevant to the inquiry and would be, in any event, inadmissible hearsay for which there is not an exception under Federal Rule of Evidence 803. For these reasons, presentation of evidence of a cooperating witness's "presentence reports, sentencing range information in their plea agreements, and cross-examination concerning the United States Sentencing Guidelines, guideline calculations, or possible sentencing ranges is not permitted." *Jones,* 2024 WL 5170284, at *2 (citing *United States v. Williams*, 39 Fed. Appx. 541, 542 (9th Cir. 2002)); *see also United States v. Arocho*, 305 F.3d 627, 636-

UNITED STATES' OPPOSITION TO JOINT MOTION OF
CLEMENT AND JOHNSON FOR RECONSIDERATION OF THIS    3
COURT'S ORDER RESTRICTING CROSS-EXAMINATION AND
CONFRONTATION OF WITNESSES

37 (7th Cir. 2002) ("[T]o the extent the appellants wanted to question [witnesses] as to the sentencing guideline provisions, that detailed inquiry could place in dispute many side issues, and could also confuse the jury as to the real issue at hand."). It is therefore proper for the Court here to limit cross-examination to prevent inquiry into these specific issues, as they would be of little probative value and would likely be confusing to the jury. *Van Arsdall*, 475 U.S. at 679.

    **C.**     **<u>Excessive Cross Examination of Witnesses on the Issue of Sentencing Exposure Risks Diverting the Jury's Attention Improperly to the Issue of Sentencing.</u>**

The Court also has the discretion to limit cross examination about sentencing exposure because such discussion has the collateral effect of putting the question of sentencing in the forefront of the jurors' minds. Cross examining a witness at length about his understanding of his own potential exposure creates a significant risk the jury will focus on the potential sentence the defendants face and that such information could influence the jury's deliberative process. *See United States v. Frank,* 956 F.2d 872, 879 (9th Cir.1991) ("It has long been the law that it is inappropriate for a jury to consider or be informed of the consequences of their verdict."). If the Court determines that the defense's cross examination of a witness has created such a risk, the Court may remind the jury that they are not to consider the potential sentences that the defendants may receive if they are convicted. *United States v. Larson*, 495 F.3d 1094, 1105 (9th Cir. 2007). The court may also immediately remind the jury of its instruction that penalties are for the Court to consider and not the jury. *See id*. at 1105 & n.9. To minimize this issue before any such instructions are needed, however, it is within the Court's discretion to limit cross examination regarding a cooperating witness' sentencing exposure.

    **III.**     **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should not adjust its existing order, consistent with Ninth Circuit authority, limiting defense questioning of cooperating witnesses' sentencing exposure.

Dated: January 28, 2025

PHILLIP A. TALBERT
United States Attorney

By: /s/ JAMES R. CONOLLY
STEPHANIE M. STOKMAN
JAMES R. CONOLLY
Assistant United States Attorney
JARED ENGELKING
Trial Attorney, U.S. Department of Justice

UNITED STATES' OPPOSITION TO JOINT MOTION OF
CLEMENT AND JOHNSON FOR RECONSIDERATION OF THIS
COURT'S ORDER RESTRICTING CROSS-EXAMINATION AND
CONFRONTATION OF WITNESSES

4

ER 226

JANE FISHER-BYRIALSEN
Fisher & Byrialsen, PC
4600 S. Syracuse Street
Denver, CO 80137
jane@fblaw.org

JEAN D. BARRETT
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
jeanbarrett@ruhnkeandbarrett.com

Attorneys for:
FRANCIS CLEMENT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> Plaintiff, <br><br> v. <br><br><br> **FRANCIS CLEMENT,** <br><br> Defendant. | Criminal case No. 20-CR-238-JLT-SKO <br> **JOINT MOTION OF FRANCIS CLEMENT AND KENNTH JOHNSON FOR DISCOVERY OF STATEMENTS BRANDON BANNICK'S ATTORNEY(S) MADE TO THE GOVERNMENT** <br><br> **Date:** <br> **Time:** <br> **Court:** |

Defendant Francis Clement, by and through his attorneys Jane Fisher-Byrialsen and Jean Barrett, joined by defendant Kenneth Johnson, through his counsel Ryan Villa and Andrea Luem, move the court for an order that the government must disclose statements made by Brandon Bannick's attorney to the government, in order to permit Mssrs. Clement and Johnson to cross-examine Brandon Bannick regarding matters disclosed to and to be prepared to call Mr. Bannick's attorney as a defense witness, if necessary.

1

Counsel intend to  cross-examine government witness Brandon Bannick regarding certain matters described in communications from his attorney to the Assistant United States Attorneys in this case. In the event Mr. Bannick testifies inconsistent with the matters disclosed to and by his attorney to the government, counsel intend to call Mr. Bannick's attorney(s) as a defense witness/defense witnesses.

It is anticipated that Mr. Bannick will testify and be cross-examined about concessions he was seeking and obtained from the government; other considerations he received and/or hoped for; his contacts with agents of the government where he made prior statements regarding his testimony; and other matters.  It is hoped that at trial, Bannick will testify truthfully and consistent with the statements his attorney relayed to the government, as well as other matters reported to the government by his attorney. In the event he does not, counsel will need to cross-examine Bannick by asking him about his attorneys' conversations with the government on his behalf, including his contacts with the government, investigators and others. If Bannick persists in denying he made the statements or that he sought the benefits or considerations described to the government by his attorneys, counsel will seek permission to call his attorney as a defense witness to impeach Bannick. If any claim of privilege is raised by Bannick, it should succumb to the right of Mssrs. Clement and Johnson to confront the witnesses and to present defense evidence. Because Mr. Bannick's conversations with his attorneys  which were in turn relayed to the government relating to matters to which he testifies are not privileged, such orders have been granted in this Circuit. See e.g., *United States v. Ruiz,* No. SACR 11-209-JST, 2013 WL 12219379, at *3 (C.D. Cal. Jan. 8, 2013) ("information relayed by a witness' counsel to the Government can constitute *Brady/Giglio* material); *ibid* ("The Government shall produce to Defendant any proffers by witnesses or potential witnesses, including proffers made by a

2

witness's attorney, that received a benefit of leniency. The Government must further disclose any of its own notes or documents that reflect such proffers."). *See Spicer v. Roxbury Correctional Institute*, 194 F.3d 547, 557–58 (4th Cir. 1999) (concluding *Brady* violation occurred after state prosecutor heard inconsistent versions of witness's testimony—one version from the witness and one version from his counsel).

As the U.S. DOJ recognized long ago,

> Criminals are likely to say and do almost anything to get what they want, especially when what they want is to get out of trouble with the law. This willingness to do anything includes not only truthfully spilling the beans on friends and relatives, but also lying, committing perjury, manufacturing evidence, soliciting others to corroborate their lies with more lies, and double crossing anyone with whom they come into contact.

U.S. Department of Justice, *Prosecution of Public Corruption Cases*, 117-18 (Fed. 1988).

Sometimes, criminally minded witnesses try to hide behind the attorney client privilege in order to conceal the nature and extent of their deal, their motivation for testifying as well as prior inconsistent statements relating to the heart of their testimony. Those efforts must fail. "[C]ommunications between client and attorney for the purpose of relaying communication to a third party is not confidential and not protected by the attorney-client privilege." *United States v. Bergonzi*, 216 F.R.D. 487, 493 (N.D. Cal. 2003). *United States v. Sudikoff,* 36 F.Supp.2d 1196, 1204–05 (C.D.Cal.1999) (finding that client's communication with attorney made with intent that the attorney relay the communication to the government is not protected by the privilege).

In this case there is no telling what Brandon Bannick will say on the witness stand. The requested discovery is necessary so that, should counsel need to cross-examine Mr. Bannick by asking him about matters described by his attorney, they have a meaningful opportunity to do so. The government is obliged to disclose the communications. "[I]nformation that reveals the process by which an accomplice witness and the government reach a leniency agreement is

3

relevant to the witness's credibility because it reveals the witness's motive to testify against the defendant. Therefore, such information is discoverable under *Brady* and *Giglio.*" *Sudikoff*, 36 F. Supp. 2d at 1203.

Some 50 years ago, the United States Supreme Court held that evidentiary privileges could not interfere with a defendant's right of confrontation. *Davis v. Alaska*, 415 U.S. 308 (1974). In *Murdoch v. Castro*, 365 F.3d 699 (9th Cir. 2004) As the Ninth Circuit emphasized as the outset of its opinion, the "central concern of the confrontation clause is to ensure the reliability of the evidence against the criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Murdoch* at 702. Recognizing that "the Supreme Court has not yet examined" a situation where "the confrontation clause and attorney client privilege are essentially at odds" Judge Trott declared explicitly what inevitably flowed from the Supreme Court precedent and which other circuits had only hypothesized: "Evidentiary privileges or other state laws must yield if necessary to ensure the level of cross-examination demanded by the Sixth Amendment." *Murdoch* at 702. "The attorney client privilege should not be an unequivocal bar to access to the evidence of inconsistent statements and ulterior motives made by accomplices turned government witnesses." *Murdoch,* at 704. This is precisely what counsel plans to explore with Mr. Bannick and if necessary, with his attorney.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires the government to disclose, to the defense, favorable evidence that is material to either guilt or punishment. See *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The *Brady* requirement of disclosing such material applies to all members of the prosecutorial team. *Giglio v. United States*, 405 U.S. 150 (1972). The government's duty includes "a duty to learn of any favorable

evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

Indeed, the Due Process Clause of the Constitution requires that the United States disclose to the defendant any evidence that "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Supreme Court of the United States has extended the prosecution's disclosure obligation to include evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory. See *Giglio*, 405 U.S. 153. Trial prosecutors must disclose favorable information without attempting to predict whether its disclosure might affect the outcome of the trial. *United States v. Price*, 566 F.3d 900, 913 n.14 (9th Cir. 2009).

### CONCLUSION

By his own admissions, Mr. Bannick is a guilty perpetrator. The government now wishes to use Mr. Bannick as a witness against Mssrs. Clement and Johnson. They intend to conduct the fullest possible cross examination of Bannick in order to exercise their right to confront witnesses, to present a defense and to a fair trial and due process of law. Pursuant to *Davis v. Alaska, Murdoch v. Castro, Brady, Giglio,* and *Kyles,* this Court should order disclosure of any and all statements made by Mr. Bannick's attorney to the government.

Respectfully submitted,

s/*Jane Fisher-Byrialsen*
JANE-FISHER-BYRIALSEN
JEAN D. BARRETT

*Attorneys for Francis Clement*

5

ER 231

Certificate of Service

I certify that on this 26th day of January, I served a true and correct copy of the foregoing via ECF to:

All Counsel of Record

And a copy by US Mail addressed to:

Brandon Bannick
USMS #20784-510
Central Valley Annex
254 Taylor Avenue
McFarland, CA 93250

/s/ Abby Clement
Paralegal

ER 232

1/15/26, 12:27 PM

Case: 25-3648, 03/04/2026, DktEntry: 16.3, Page 112 of 150
LIVE 1.8.5 NEXTGEN CM/ECF - U.S. District Court for Eastern California

| 01/24/2025 | 1740 | MINUTES (Text Only) for proceedings held before District Judge Jennifer L. Thurston: JURY TRIAL (Day Six) as to Kenneth Johnson, Francis Clement, John Stinson held on 1/24/2025. USA witnesses: Stacey Kenan, Charles Garcia, David Estrada, Michael Rodriguez, Gina Equia sworn/testified. USA exhibits ADMITTED. Jury Trial (Day Seven) set for 1/28/2025 at 08:00 AM in Courtroom 4 (JLT) before District Judge Jennifer L. Thurston. Government Counsel: Stephanie Stokman, James Conolly, Jared Engelking present. Defense Counsel: Andrea Lee Luem, Ryan Villa, Jean deSalles Barrett, Jane Fisher-Bryialsen, Kennth Reed present. Custody Status: CUSTODY. Court Reporter/CD Number: Maryann Valenoti. (Deputy Clerk IM) (Entered: 01/24/2025) |
|---|---|---|

ER 233

| 01/23/2025 | 1738 | MINUTES (Text Only) for proceedings held before District Judge Jennifer L. Thurston: JURY TRIAL (Day Five) as to Kenneth Johnson, Francis Clement, John Stinson held on 1/23/2025. USA witnesses: Michael Kneiriem, Troy Clowers, Mark Smith sworn/testified. USA exhibits admitted. Jury Trial (Day six) set for 1/24/2025 at 08:00 AM in Courtroom 4 (JLT) before District Judge Jennifer L. Thurston. Government Counsel: Stephanie Stokman, James Conolly, Jared Engelking present. Defense Counsel: Andrea Lee Luem, Ryan Villa, Jane Fisher-Byrialsen, Jean deSalles Barrett, Kenneth Reed present. Custody Status: CUSTODY. Court Reporter/CD Number: Maryann Valenoti. (Deputy Clerk IM) (Entered: 01/24/2025) |
|---|---|---|

ER 234

JANE FISHER-BYRIALSEN
Fisher & Byrialsen, PC
4600 S. Syracuse Street
Denver, CO 80137
jane@fblaw.org

JEAN D. BARRETT
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
jeanbarrett@ruhnkeandbarrett.com

Attorneys for:
FRANCIS CLEMENT

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> Plaintiff, <br><br> v. <br><br><br> **FRANCIS CLEMENT,** <br><br> Defendant. | Criminal case No. 20-CR-238-JLT-SKO <br> **JOINT MOTION OF FRANCIS CLEMENT AND KENNTH JOHNSON FOR RECONSIDERATION OF THIS COURT'S ORDER RESTRICTING CROSS-EXAMINATION AND CONFRONTATION OF WITNESSES** <br><br> **Date:  January 24, 2025** <br> **Time: 9:00 am** <br> **Court: Judge Jennifer Thurston** |

Defendant Francis Clement, by and through his attorneys Jane Fisher-Byrialsen and Jean Barrett, joined by defendant Kenneth Johnson, through his counsel Ryan Villa and Andrea Luem, move the court to reconsider its order restricting the ability of Mssrs. Johnson and Clement to confront and cross-examine the witnesses against them. This motion is made pursuant to the Sixth Amendment to the United States Constitution.

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986), *Davis v. Alaska*, 415 U.S. 308 (1974), and numerous other decisions establish that cross-examination regarding a witness's bias created by the threat of prosecution and perceived benefits or incentives for testifying is a core concern

of the Sixth Amendment. "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.'" *Van Arsdall,* 475 U.S. at 678–80, quoting *Davis,* 415 U.S. at 318.

The exposure of a witness's bias directly implicates the Sixth Amendment. *See United States v. Abel*, 469 U.S. 45, 52 (1984) ("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."). *Davis*, 415 U.S. at 316–17; *Alford v. United States*, 282 U.S. 687, 691–92 (1931). "A core value [of the Sixth Amendment] is the ability to expose a witness's motivation for testifying, his bias, or his possible incentives to lie." Proof of bias "is the 'quintessentially appropriate topic for cross-examination.'" *United States v. Recendiz,* 557 F.3d 511, 530 (7th Cir.2009), quoting *United States v. Manske,* 186 F.3d 770, 777 (7th Cir.1999).

Effective cross-examination is critical to a fair trial because "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis,* 415 U.S. at 316. "[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis,* 415 U.S. at 316-17. Thus, "jurors [are] entitled to have the benefit of the defense theory before them so that they [can] make an informed judgment as to the weight to place on the [Government witness'] testimony." *Id.,* at 317.

In *United States v. Larson*, 495 F.3d 1094 (9th Cir. 2007) (en banc), the Ninth Circuit ruled that a mandatory life sentence is qualitatively different than other penalties a witness seeks to avoid by cooperating with the government. The Ninth Circuit explained that a "potential maximum statutory sentence that a cooperating witness *might* receive ... is fundamentally different from the *mandatory* minimum sentence that the witness *will* receive in the absence of a motion by the [g]overnment." *Id.* (emphases in original). While "a defendant seldom receives the

ER 236

maximum penalty permissible under the statute of conviction," "the fact that ... a cooperating witness faced a mandatory life sentence without the possibility of release in the absence of a government motion is highly relevant to the witness'[s] credibility." *Id.* The mandatory life sentence "is a sentence that the witness knows *with certainty* that he will receive unless he satisfies the government with substantial and meaningful cooperation so that it will move to reduce his sentence." *Id.* (emphasis in original). While the error was harmless on the facts of that case, *Larson* does establish that this Court's limitation on cross-examination is unsupported by Ninth Circuit precedent.

Just a month after the *Larson* opinion was issued, the Ninth Circuit issued another ruling that the trial court's refusal to allow the defendant to cross-examine the informant was reversible error. *United States v. Fabricant*, 240 Fed.Appx. 244 (9th Cir. 2007).

In a terse ruling issued twenty years before *Larson* and *Fabricant*, the Ninth Circuit found that on the facts of the case before it, the trial court did not err. *United States v. Dadanian*, 818 F.2d 1443, 1449 (9th Cir. 1987), *opinion modified on reh'g,* 856 F.2d 1391 (9th Cir. 1988). It is unclear what the trial court excluded. The opinion describes only that it concerned the witness's "maximum jail time exposure."   The reference to "jail time" suggests it was a relatively minor potential amount of time. That case bears no resemblance to this one. *Dadanian* holds merely that it was not reversible error in that case; the opinion does not hold that it would be error to permit cross-examination on the severe penalty of life imprisonment and the incentives for the witness to avoid that sentence at all costs.

In *United States v. Schoneberg*, 396 F.3d 1036, 1042 (9th Cir. 2005), the Ninth Circuit ruled that, "[w]here a plea agreement allows for some benefit or detriment to flow to a witness as a result of his testimony, the defendant must be permitted to cross examine the witness sufficiently to make clear to the jury what benefit or detriment will flow, and what will trigger the benefit or detriment, to show why the witness might testify falsely in order to gain the benefit or avoid the detriment."  *Ibid*. The Court explained the import of this type of "motive" cross-examination. For the jury to evaluate the witness's credibility,

ER 237

[T]he jury was entitled to know what motivation a witness might have to lie to them. Because a witness who is party to a forward-looking cooperation agreement, with truthfulness to be determined by the government, has a motivation to satisfy the government, the defendant is entitled through cross examination to prove to the jury that the witness has this incentive and that there may be reason to question the witnesses's credibility.

*Id.,* at 1043.

The proposed testimony certainly is not hearsay. It is not offered for the truth of the matter asserted, but as to what the witness believed the benefit of his testimony to be. Fed. R. Evid. 801(c). *See United States v. Inadi,* 475 U.S. 387, 398 n. 11 (1986) (noting that "statements [that] are not introduced to prove the truth of the matter asserted ... do not come within the traditional definition of hearsay"). Testimony eliciting what the witness *believes* about the plea bargain benefits is admitted for its impact on the listener (the witness), to ascertain bias and motive for testifying. In not a single one of the pertinent cases is this type of cross-examination barred on hearsay grounds.

WHEREFORE, Mssrs. Clement and Johnson request that this Court reconsider its order barring cross-examination and permit recalling the witness for the purpose of continuing the cross-examination.

Respectfully submitted,

s/*Jane Fisher-Byrialsen*
JANE-FISHER-BYRIALSEN
JEAN D. BARRETT

*Attorneys for Francis Clement*

4

ER 238

Certificate of Service

I certify that on this 23rd day of January, 2025, I served a true and correct copy of the foregoing via ECF to:

All Counsel of Record

And a copy by US Mail addressed to:
Brandon Bannick
USMS #20784-510
Central Valley Annex
254 Taylor Avenue
McFarland, CA 93250

*/s/ Abby Clement*
Paralegal

ER 239

*No. 1:20-CR-238-JLT-SKO*

**FILED**

**May 29, 2024**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT

*Eastern District of California*

*Criminal Division*

### THE UNITED STATES OF AMERICA
*vs.*

KENNETH BASH (aka "Kenny" aka "Bash"), JOHN STINSON (aka "Pops"), KENNETH JOHNSON (aka "K" aka "Kenwood"), FRANCIS CLEMENT (aka "Frank"), JAYSON WEAVER (aka "Beaver"), WAYLON PITCHFORD, ANDREW COLLINS (aka "Misfit" aka "Fit"), DEREK SMITH (aka "Pup"), BRANDON BANNICK (aka "Bam Bam" aka "Bam"), JUSTIN GRAY (aka "Sidetrack"), and EVAN PERKINS (aka "Soldier")

### T H I R D  S U P E R S E D I N G  I N D I C T M E N T

**VIOLATION(S):** 18 U.S.C. § 1962(d) – Conspiracy to Participate in a Racketeering Enterprise; 18 U.S.C. § 1959(a)(1)- Murder in Aid of Racketeering (6 counts); 18 U.S.C. § 1959(a)(5) – Conspiracy to Commit Murder in Aid of Racketeering; 21 U.S.C. §§ 846, 841(a)(1) – Conspiracy to Distribute and to Possess with Intent to Distribute Methamphetamine and Heroin; 21 U.S.C. § 841(a)(1) –Possession with Intent to Distribute Methamphetamine; 21 U.S.C. § 841(a)(1) –Possession with Intent to Distribute Heroin; 18 U.S.C. § 924(c)- Using or Carrying a Firearm During and in Relation to a Drug Trafficking Offense; 18 U.S.C. § 922(g)(1)– Felon in Possession of Firearm; 21 U.S.C. § 853(a), 18 U.S.C. §§ 1963(a)(1), 1963(a)(2), 1963(a)(3), 18 U.S.C. § 924(d)(1), and 28 U.S.C. § 2461(c) – Criminal Forfeiture

*A true bill,*

_____ / s / _____
*Foreman.*

*Filed in open court this* _____ *day*

*of* _____ *, A.D. 20* _____

_____
*Clerk.*

*Bail, $* _ _ ISSUE NO-BAIL WARRANTS FOR TWO DEFENDANTS; AS PREVIOUSLY SET FOR ALL REMAINING DEFENDANTS_ _

_____
*Erica P. Grosjean*

AO 257 (CAED rev. 4/2024)

PER 18 U.S.C. 3170

# DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION – – IN U.S. DISTRICT COURT

BY  ☐ COMPLAINT  ☐ INFORMATION  ☐ INDICTMENT
☑ SUPERSEDING: CASE No.  1:20-CR-238-JLT-SKO

Name of District Court, and/or Judge/Magistrate Judge Location (City)
**Eastern District of California, Fresno**

**OFFENSE CHARGED**

☐ Petty

☐ Minor

☐ Misdemeanor

☑ Felony

**DEFENDANT – – U.S. vs.**
BRANDON BANNICK (aka "Bam Bam" aka "Bam")

Address

Place of offense
Multiple States and Counties

U.S.C. Citation
Please see charging document

Birth Date

☐ Male    ☐ Alien

☐ Female    (if applicable)

(Optional unless a juvenile)

**PROCEEDING**

Name of Complainant Agency, or Person (& Title, if any)

SA Anthony Gonzales / ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per FRCrP ☐ 20 ☐ 21 ☐ 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. Att'y  ☐ Defense

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate Judge regarding this defendant were recorded under

SHOW DOCKET NO.

MAGISTRATE JUDGE CASE NO.

**DEFENDANT**

**IS _NOT_ IN CUSTODY**

1) ☐ Has not been arrested, pending outcome of this proceeding
If not detained, give date any prior summons was served on above charges

2) ☐ Is a Fugitive
3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) ☑ On this charge
5) ☐ On another conviction
6) ☐ Awaiting trial on other charges  ☐ Fed'l  ☐ State
If answer to (6) is "Yes," show name of institution

Has detainer been filed?  ☐ Yes  If "Yes," give date filed
☐ No

Mo.    Day    Year

**DATE OF ARREST**

Or . . . if Arresting Agency & Warrant were not Federal

Mo.    Day    Year

**DATE TRANSFERRED TO U.S. CUSTODY**

Name and Office of Person Furnishing Information on THIS FORM

Debra De La Pena

☑ U.S. Att'y  ☐ Other U.S. Agency

Name of Asst. U.S. Att'y (if assigned)  Stephanie Stokman

☑ **FORFEITURE ALLEGATION**

☐ This report amends AO 257 previously submitted

**ADDITIONAL INFORMATION OR COMMENTS**

Next court date is July 17, 2024

ER 241

AO 257 (CAED rev. 4/2024)

PER 18 U.S.C. 3170

---

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION – – IN U.S. DISTRICT COURT

BY ☐ COMPLAINT ☐ INFORMATION ☐ INDICTMENT
☑ SUPERSEDING: CASE No. 1:20-CR-238-JLT-SKO

**OFFENSE CHARGED**

☐ Petty
☐ Minor
☐ Misdemeanor
☑ Felony

Place of offense
Multiple States and Counties

U.S.C. Citation
Please see charging document

Name of District Court, and/or Judge/Magistrate Judge Location (City)
**Eastern District of California, Fresno**

**DEFENDANT** – – U.S. vs.
▶ Kenneth Bash (aka "Kenny" aka "Bash")

Address

Birth Date ☐ Male ☐ Alien
☐ Female (if applicable)

(Optional unless a juvenile)

**PROCEEDING**

Name of Complainant Agency, or Person (& Title, if any)

SA Anthony Gonzales / ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per FRCrP ☐ 20 ☐ 21 ☐ 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. Att'y ☐ Defense

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate Judge regarding this defendant were recorded under

MAGISTRATE JUDGE CASE NO. ▶

Name and Office of Person Furnishing Information on THIS FORM

Debra De La Pena

☑ U.S. Att'y ☐ Other U.S. Agency

Name of Asst. U.S. Att'y (if assigned) | Stephanie Stokman
☑ **FORFEITURE ALLEGATION**

**DEFENDANT**

**IS *NOT* IN CUSTODY**

1) ☐ Has not been arrested, pending outcome of this proceeding
If not detained, give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive
3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) ☑ On this charge
5) ☐ On another conviction
6) ☐ Awaiting trial on other charges ☐ Fed'l ☐ State
If answer to (6) is "Yes," show name of institution

Has detainer been filed? ☐ Yes If "Yes," give date filed
☐ No
Mo. Day Year

**DATE OF ARREST** ▶

Or . . . if Arresting Agency & Warrant were not Federal
Mo. Day Year
**DATE TRANSFERRED TO U.S. CUSTODY** ⇨

☐ This report amends AO 257 previously submitted

ADDITIONAL INFORMATION OR COMMENTS

Next court date is July 17, 2024

ER 242

AO 257 (CAED rev. 4/2024)

PER 18 U.S.C. 3170

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION – – IN U.S. DISTRICT COURT

BY ☐ COMPLAINT ☐ INFORMATION ☐ INDICTMENT
☑ SUPERSEDING: CASE No. 1:20-CR-238-JLT-SKO

**OFFENSE CHARGED**

☐ Petty
☐ Minor
☐ Misdemeanor
☑ Felony

Place of offense
Multiple States and Counties

U.S.C. Citation
Please see charging document

Name of District Court, and/or Judge/Magistrate Judge Location (City)
**Eastern District of California, Fresno**

**DEFENDANT – – U.S. vs.**
FRANCIS CLEMENT (aka "Frank")

Address

Birth Date

☐ Male    ☐ Alien
☐ Female    (if applicable)

(Optional unless a juvenile)

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

SA Anthony Gonzales / ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per FRCrP ☐ 20 ☐ 21 ☐ 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. Att'y ☐ Defense

SHOW
DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate Judge regarding this defendant were recorded under

MAGISTRATE
JUDGE CASE NO.

Name and Office of Person Furnishing Information on THIS FORM

Debra De La Pena

☑ U.S. Att'y ☐ Other U.S. Agency

Name of Asst. U.S. Att'y (if assigned) Stephanie Stokman

☑ **FORFEITURE ALLEGATION**

### DEFENDANT

**IS *NOT* IN CUSTODY**

1) ☐ Has not been arrested, pending outcome of this proceeding
If not detained, give date any prior summons was served on above charges

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) ☑ On this charge
5) ☐ On another conviction
6) ☐ Awaiting trial on other charges ☐ Fed'l ☐ State
If answer to (6) is "Yes," show name of institution

Has detainer been filed?
☐ Yes
☐ No

If "Yes," give date filed

Mo.    Day    Year

**DATE OF ARREST**

Or . . . if Arresting Agency & Warrant were not Federal

Mo.    Day    Year

**DATE TRANSFERRED TO U.S. CUSTODY**

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

Next court date is July 17, 2024

ER 243

Case 1:20-cr-00238-JLT-SKO Document 1098 Filed 06/03/24 Page 5 of 27

AO 257 (CAED rev. 4/2024)

PER 18 U.S.C. 3170

| DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION – – IN U.S. DISTRICT COURT |
|---|

BY ☐ COMPLAINT ☐ INFORMATION ☐ INDICTMENT
☑ SUPERSEDING: CASE No. 1:20-CR-238-JLT-SKO

**OFFENSE CHARGED**

☐ Petty
☐ Minor
☐ Misdemeanor
■ Felony

Place of offense
Multiple States and Counties

U.S.C. Citation
Please see charging document

Name of District Court, and/or Judge/Magistrate Judge Location (City)
**Eastern District of California, Fresno**

**DEFENDANT** – – U.S. vs.
▶ ANDREW COLLINS (aka "Misfit" aka "Fit")

Address

Birth Date

☐ Male ☐ Alien
☐ Female (if applicable)

(Optional unless a juvenile)

**PROCEEDING**

Name of Complainant Agency, or Person (& Title, if any)

SA Anthony Gonzales / ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per FRCrP ☐ 20 ☐ 21 ☐ 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. Att'y ☐ Defense

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate Judge regarding this defendant were recorded under ▶

MAGISTRATE JUDGE CASE NO.

Name and Office of Person Furnishing Information on THIS FORM

**Debra De La Pena**

■ U.S. Att'y ☐ Other U.S. Agency

Name of Asst. U.S. Att'y (if assigned) | **Stephanie Stokman**

☑ **FORFEITURE ALLEGATION**

**DEFENDANT**

**IS *NOT* IN CUSTODY**

1) ☐ Has not been arrested, pending outcome of this proceeding
If not detained, give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive
3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) ■ On this charge
5) ☐ On another conviction
6) ☐ Awaiting trial on other charges ☐ Fed'l ☐ State
If answer to (6) is "Yes," show name of institution

Has detainer been filed?
☐ Yes
☐ No

If "Yes," give date filed
Mo. Day Year

**DATE OF ARREST** ▶
Or . . . if Arresting Agency & Warrant were not Federal

Mo. Day Year

**DATE TRANSFERRED TO U.S. CUSTODY** ⇨

☐ This report amends AO 257 previously submitted

**ADDITIONAL INFORMATION OR COMMENTS**

PLEASE ISSUE NO-BAIL WARRANT

ER 244

AO 257 (CAED rev. 4/2024)

PER 18 U.S.C. 3170

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION – – IN U.S. DISTRICT COURT

BY ☐ COMPLAINT ☐ INFORMATION ☐ INDICTMENT
☑ SUPERSEDING: CASE No. 1:20-CR-238-JLT-SKO

**OFFENSE CHARGED**

Name of District Court, and/or Judge/Magistrate Judge Location (City)
**Eastern District of California, Fresno**

☐ Petty
☐ Minor
☐ Misdemeanor
☑ Felony

Place of offense
Multiple States and Counties

U.S.C. Citation
Please see charging document

**DEFENDANT** – – U.S. vs.
JUSTIN GRAY (aka "Sidetrack")

Address

Birth Date

☐ Male   ☐ Alien
☐ Female   (if applicable)

(Optional unless a juvenile)

**PROCEEDING**

Name of Complainant Agency, or Person (& Title, if any)

SA Anthony Gonzales / ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per FRCrP ☐ 20 ☐ 21 ☐ 40.  Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. Att'y ☐ Defense

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate Judge regarding this defendant were recorded under

MAGISTRATE JUDGE CASE NO.

Name and Office of Person Furnishing Information on
THIS FORM

Debra De La Pena

☑ U.S. Att'y   ☐ Other U.S. Agency

Name of Asst. U.S. Att'y (if assigned)   Stephanie Stokman

☑ **FORFEITURE ALLEGATION**

**DEFENDANT**

**IS *NOT* IN CUSTODY**

1) ☐ Has not been arrested, pending outcome of this proceeding
   If not detained, give date any prior summons was served on above charges

2) ☐ Is a Fugitive
3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) ☑ On this charge
5) ☐ On another conviction
6) ☐ Awaiting trial on other charges   ☐ Fed'l ☐ State
   If answer to (6) is "Yes," show name of institution

Has detainer been filed?   ☐ Yes   If "Yes," give date filed
☐ No

Mo.   Day   Year

**DATE OF ARREST**

Or . . . if Arresting Agency & Warrant were not Federal

Mo.   Day   Year

**DATE TRANSFERRED TO U.S. CUSTODY**

☐ This report amends AO 257 previously submitted

ADDITIONAL INFORMATION OR COMMENTS

Next court date is July 17, 2024

ER 245

AO 257 (CAED rev. 4/2024)

PER 18 U.S.C. 3170

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION – – IN U.S. DISTRICT COURT

BY ☐ COMPLAINT ☐ INFORMATION ☐ INDICTMENT
☑ SUPERSEDING: CASE No. 1:20-CR-238-JLT-SKO

**OFFENSE CHARGED**

Name of District Court, and/or Judge/Magistrate Judge Location (City)
**Eastern District of California, Fresno**

☐ Petty
☐ Minor
☐ Misdemeanor
☑ Felony

Place of offense
Multiple States and Counties

U.S.C. Citation
Please see charging document

**DEFENDANT** – – U.S. vs.

KENNETH JOHNSON (aka "K" aka "Kenwood")

Address

Birth Date

☐ Male ☐ Alien
☐ Female (if applicable)

(Optional unless a juvenile)

**PROCEEDING**

Name of Complainant Agency, or Person (& Title, if any)

SA Anthony Gonzales / ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per FRCrP ☐ 20 ☐ 21 ☐ 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. Att'y ☐ Defense

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate Judge regarding this defendant were recorded under

MAGISTRATE JUDGE CASE NO.

Name and Office of Person Furnishing Information on THIS FORM

Debra De La Pena

☑ U.S. Att'y ☐ Other U.S. Agency

Name of Asst. U.S. Att'y (if assigned)
Stephanie Stokman

☑ **FORFEITURE ALLEGATION**

**DEFENDANT**

**IS *NOT* IN CUSTODY**

1) ☐ Has not been arrested, pending outcome of this proceeding
   If not detained, give date any prior summons was served on above charges

2) ☐ Is a Fugitive
3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) ☑ On this charge
5) ☐ On another conviction
6) ☐ Awaiting trial on other charges ☐ Fed'l ☐ State
   If answer to (6) is "Yes," show name of institution

Has detainer been filed? ☐ Yes ☐ No
If "Yes," give date filed
Mo. Day Year

**DATE OF ARREST**

Or . . . if Arresting Agency & Warrant were not Federal
Mo. Day Year

**DATE TRANSFERRED TO U.S. CUSTODY**

☐ This report amends AO 257 previously submitted

**ADDITIONAL INFORMATION OR COMMENTS**

Next court date is July 17, 2024

ER 246

AO 257 (CAED rev. 4/2024)

PER 18 U.S.C. 3170

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION – – IN U.S. DISTRICT COURT

BY ☐ COMPLAINT ☐ INFORMATION ☐ INDICTMENT
☑ SUPERSEDING: CASE No. 1:20-CR-238-JLT-SKO

**OFFENSE CHARGED**

☐ Petty
☐ Minor
☐ Misdemeanor
☑ Felony

Place of offense
Multiple States and Counties

U.S.C. Citation
Please see charging document

Name of District Court, and/or Judge/Magistrate Judge Location (City)
**Eastern District of California, Fresno**

**DEFENDANT – – U.S. vs.**
► EVAN PERKINS (aka "Soldier")

Address

Birth Date

☐ Male   ☐ Alien
☐ Female   (if applicable)

(Optional unless a juvenile)

**PROCEEDING**

Name of Complainant Agency, or Person (& Title, if any)

SA Anthony Gonzales / ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per FRCrP ☐ 20 ☐ 21 ☐ 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. Att'y ☐ Defense

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate Judge regarding this defendant were recorded under

MAGISTRATE JUDGE CASE NO.
►

Name and Office of Person Furnishing Information on THIS FORM

Debra De La Pena

☑ U.S. Att'y ☐ Other U.S. Agency

Name of Asst. U.S. Att'y (if assigned) | Stephanie Stokman
☑ **FORFEITURE ALLEGATION**

**DEFENDANT**

**IS *NOT* IN CUSTODY**
1) ☐ Has not been arrested, pending outcome of this proceeding
If not detained, give date any prior summons was served on above charges ►
2) ☐ Is a Fugitive
3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☑ On this charge
5) ☐ On another conviction
6) ☐ Awaiting trial on other charges ☐ Fed'l ☐ State
If answer to (6) is "Yes," show name of institution

Has detainer been filed? ☐ Yes ☐ No
If "Yes," give date filed
Mo. Day Year

DATE OF ARREST ►

Or . . . if Arresting Agency & Warrant were not Federal
Mo. Day Year

DATE TRANSFERRED TO U.S. CUSTODY ⇨

☐ This report amends AO 257 previously submitted

**ADDITIONAL INFORMATION OR COMMENTS**

Next court date is July 17, 2024

ER 247

AO 257 (CAED rev. 4/2024)

PER 18 U.S.C. 3170

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION – – IN U.S. DISTRICT COURT

BY ☐ COMPLAINT ☐ INFORMATION ☐ INDICTMENT
☑ SUPERSEDING: CASE No. 1:20-CR-238-JLT-SKO

**OFFENSE CHARGED**

☐ Petty
☐ Minor
☐ Misdemeanor
☑ Felony

Place of offense
Multiple States and Counties

U.S.C. Citation
Please see charging document

**PROCEEDING**

Name of Complainant Agency, or Person (& Title, if any)

SA Anthony Gonzales / ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per FRCrP ☐ 20 ☐ 21 ☐ 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. Att'y ☐ Defense

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate Judge regarding this defendant were recorded under

MAGISTRATE JUDGE CASE NO.

Name and Office of Person Furnishing Information on
THIS FORM

Debra De La Pena

☑ U.S. Att'y ☐ Other U.S. Agency

Name of Asst. U.S. Att'y (if assigned)    Stephanie Stokman

☑ **FORFEITURE ALLEGATION**

Name of District Court, and/or Judge/Magistrate Judge Location (City)
**Eastern District of California, Fresno**

**DEFENDANT** – – U.S. vs.

▶ WAYLON PITCHFORD

Address

Birth Date

☐ Male    ☐ Alien
☐ Female    (if applicable)

(Optional unless a juvenile)

**DEFENDANT**

**IS *NOT* IN CUSTODY**

1) ☐ Has not been arrested, pending outcome of this proceeding
If not detained, give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive
3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) ☑ On this charge
5) ☐ On another conviction
6) ☐ Awaiting trial on other charges ☐ Fed'l ☐ State
If answer to (6) is "Yes," show name of institution

Has detainer been filed?
☐ Yes
☐ No

If "Yes," give date filed

Mo.    Day    Year

**DATE OF ARREST** ▶

Or . . . if Arresting Agency & Warrant were not Federal

Mo.    Day    Year

**DATE TRANSFERRED TO U.S. CUSTODY** ▷

☐ This report amends AO 257 previously submitted

**ADDITIONAL INFORMATION OR COMMENTS**

Next court date is July 17, 2024

ER 248

AO 257 (CAED rev. 4/2024)

PER 18 U.S.C. 3170

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION – – IN U.S. DISTRICT COURT

BY ☐ COMPLAINT ☐ INFORMATION ☐ INDICTMENT
☑ SUPERSEDING: CASE No. 1:20-CR-238-JLT-SKO

**OFFENSE CHARGED**

☐ Petty
☐ Minor
☐ Misdemeanor
☑ Felony

Place of offense
Multiple States and Counties

U.S.C. Citation
Please see charging document

Name of District Court, and/or Judge/Magistrate Judge Location (City)
**Eastern District of California, Fresno**

**DEFENDANT – – U.S. vs.**
➤ DEREK SMITH (aka "Pup")

Address

Birth Date

☐ Male        ☐ Alien
☐ Female        (if applicable)

(Optional unless a juvenile)

---

**PROCEEDING**

Name of Complainant Agency, or Person (& Title, if any)

SA Anthony Gonzales / ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per FRCrP ☐ 20 ☐ 21 ☐ 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. Att'y ☐ Defense

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate Judge regarding this defendant were recorded under

MAGISTRATE JUDGE CASE NO.
➤

Name and Office of Person Furnishing Information on
THIS FORM

Debra De La Pena

☑ U.S. Att'y ☐ Other U.S. Agency

Name of Asst. U.S. Att'y (if assigned)
Stephanie Stokman
☑ **FORFEITURE ALLEGATION**

**DEFENDANT**

**IS *NOT* IN CUSTODY**

1) ☐ Has not been arrested, pending outcome of this proceeding
If not detained, give date any prior summons was served on above charges ➤
2) ☐ Is a Fugitive
3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) ☑ On this charge
5) ☐ On another conviction
6) ☐ Awaiting trial on other charges ☐ Fed'l ☐ State
If answer to (6) is "Yes," show name of institution

Has detainer been filed? ☐ Yes ☐ No
If "Yes," give date filed
Mo. Day Year

**DATE OF ARREST** ➤

Or . . . if Arresting Agency & Warrant were not Federal
Mo. Day Year

**DATE TRANSFERRED TO U.S. CUSTODY** ➤

☐ This report amends AO 257 previously submitted

---

ADDITIONAL INFORMATION OR COMMENTS

Next court date is July 17, 2024

ER 249

AO 257 (CAED rev. 4/2024)

PER 18 U.S.C. 3170

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION – – IN U.S. DISTRICT COURT

BY ☐ COMPLAINT ☐ INFORMATION ☐ INDICTMENT
☑ SUPERSEDING: CASE No. 1:20-CR-238-JLT-SKO

**OFFENSE CHARGED**

☐ Petty
☐ Minor
☐ Misdemeanor
☑ Felony

Place of offense
Multiple States and Counties

U.S.C. Citation
Please see charging document

Name of District Court, and/or Judge/Magistrate Judge Location (City)
**Eastern District of California, Fresno**

**DEFENDANT** – – U.S. vs.
▶ JOHN STINSON (aka "Pops")

Address

Birth Date
☐ Male ☐ Alien
☐ Female (if applicable)

(Optional unless a juvenile)

**PROCEEDING**

Name of Complainant Agency, or Person (& Title, if any)

SA Anthony Gonzales / ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per FRCrP ☐ 20 ☐ 21 ☐ 40.   Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. Att'y ☐ Defense

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate Judge regarding this defendant were recorded under

MAGISTRATE JUDGE CASE NO.
➤

Name and Office of Person Furnishing Information on THIS FORM
Debra De La Pena

☑ U.S. Att'y ☐ Other U.S. Agency

Name of Asst. U.S. Att'y (if assigned)
Stephanie Stokman

☑ **FORFEITURE ALLEGATION**

**DEFENDANT**

**IS *NOT* IN CUSTODY**
1) ☐ Has not been arrested, pending outcome of this proceeding
   If not detained, give date any prior summons was served on above charges ▶
2) ☐ Is a Fugitive
3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☑ On this charge
5) ☐ On another conviction
6) ☐ Awaiting trial on other charges ☐ Fed'l ☐ State
   If answer to (6) is "Yes," show name of institution

Has detainer been filed? ☐ Yes   If "Yes," give date filed
☐ No
Mo.   Day   Year

**DATE OF ARREST** ▶
Or . . . if Arresting Agency & Warrant were not Federal
Mo.   Day   Year

**DATE TRANSFERRED TO U.S. CUSTODY** ⇨

☐ This report amends AO 257 previously submitted

**ADDITIONAL INFORMATION OR COMMENTS**

PLEASE ISSUE NO-BAIL WARRANT

ER 250

AO 257
(CAED rev. 4/2024)

PER 18 U.S.C. 3170

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION – – IN U.S. DISTRICT COURT

BY ☐ COMPLAINT ☐ INFORMATION ☐ INDICTMENT
☑ SUPERSEDING: CASE No. 1:20-CR-238-JLT-SKO

**OFFENSE CHARGED**

☐ Petty

☐ Minor

☐ Misdemeanor

☑ Felony

Place of offense
Multiple States and Counties

U.S.C. Citation
Please see charging document

Name of District Court, and/or Judge/Magistrate Judge Location (City)
Eastern District of California, Fresno

**DEFENDANT** – – U.S. vs.
➤ JAYSON WEAVER (aka "Beaver")

Address

Birth Date

☐ Male   ☐ Alien

☐ Female   (if applicable)

(Optional unless a juvenile)

**PROCEEDING**

Name of Complainant Agency, or Person (& Title, if any)

SA Anthony Gonzales / ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per FRCrP ☐ 20 ☐ 21 ☐ 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. Att'y ☐ Defense

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate Judge regarding this defendant were recorded under

MAGISTRATE JUDGE CASE NO.

➤

Name and Office of Person Furnishing Information on
THIS FORM

Debra De La Pena

☑ U.S. Att'y   ☐ Other U.S. Agency

Name of Asst. U.S. Att'y (if assigned)   Stephanie Stokman

☑ **FORFEITURE ALLEGATION**

**DEFENDANT**

**IS _NOT_ IN CUSTODY**

1) ☐ Has not been arrested, pending outcome of this proceeding
If not detained, give date any prior summons was served on above charges ➤

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) ☑ On this charge
5) ☐ On another conviction
6) ☐ Awaiting trial on other charges ☐ Fed'l ☐ State
If answer to (6) is "Yes," show name of institution

Has detainer been filed?   ☐ Yes   If "Yes," give date filed
☐ No
Mo.   Day   Year

**DATE OF ARREST** ➤

Or . . . if Arresting Agency & Warrant were not Federal
Mo.   Day   Year

**DATE TRANSFERRED TO U.S. CUSTODY** ⇨

☐ This report amends AO 257 previously submitted

**ADDITIONAL INFORMATION OR COMMENTS**

Next court date is July 17, 2024

ER 251

**United States v. Kenneth Bash et al**
**Penalties for Indictment**

**Defendant**

**KENNETH BASH**

**COUNT 1:**

VIOLATION:          18 U.S.C. § 1962(d) –Conspiracy to participate in racketeering enterprise

PENALTIES:          Maximum of up to 20 years in prison; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 8:**

VIOLATION:          18 U.S.C. § 1959(a)(5) – Conspiracy to commit Murder in Aid of Racketeering

PENALTIES:          Maximum of up to 10 years in prison; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 9:**

VIOLATION:          21 U.S.C. §§ 846, 841(a)(1) - Conspiracy to Distribute Over 50 Grams of Methamphetamine (actual) and over 100 Grams of Heroin

PENALTIES:          Mandatory minimum of 10 years in prison and a maximum of up to life in prison; or
Fine of up to $10,000,000; or both fine and imprisonment
Supervised release of at least 5 years up to life

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**FORFEITURE ALLEGATION:**

VIOLATION:          21 U.S.C. § 853(a), 18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c) – Criminal Forfeiture
PENALTIES:          As stated in the charging document

1

ER 252

**Defendant**

**JOHN STINSON**

**COUNT 1:**

VIOLATION:         18 U.S.C. § 1962(d) –Conspiracy to participate in racketeering enterprise

PENALTIES:         Maximum of up to 20 years in prison; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**FORFEITURE ALLEGATION:**

VIOLATION:         18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c) – Criminal Forfeiture

PENALTIES:         As stated in the charging document

11

**Defendant**

**KENNETH JOHNSON**

**COUNT 1:**

VIOLATION:       18 U.S.C. § 1962(d) –Conspiracy to participate in racketeering enterprise

PENALTIES:       Maximum of up to life in prison; or
                 Fine of up to $250,000; or both fine and imprisonment
                 Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 2:**

VIOLATION:       18 U.S.C. § 1959(a)(1) – Murder in Aid of Racketeering

PENALTIES:       Mandatory minimum of up to life in prison; or
                 Fine of up to $250,000; or both fine and imprisonment
                 Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 3:**

VIOLATION:       18 U.S.C. § 1959(a)(1) – Murder in Aid of Racketeering

PENALTIES:       Mandatory minimum of up to life in prison; or
                 Fine of up to $250,000; or both fine and imprisonment
                 Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**FORFEITURE ALLEGATION:**

VIOLATION:       21 U.S.C. § 853(a), 18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c) –
                 Criminal Forfeiture

PENALTIES:       As stated in the charging document

2

ER 254

**<u>Defendant</u>**

**FRANK CLEMENT**

**<u>COUNT 1:</u>**

VIOLATION:  18 U.S.C. § 1962(d) –Conspiracy to participate in racketeering enterprise

PENALTIES:  Maximum of up to life in prison; or
       Fine of up to $250,000; or both fine and imprisonment
       Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**<u>COUNT 2:</u>**

VIOLATION:  18 U.S.C. § 1959(a)(1) – Murder in Aid of Racketeering

PENALTIES:  Mandatory minimum of up to life in prison; or
       Fine of up to $250,000; or both fine and imprisonment
       Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**<u>COUNT 3:</u>**

VIOLATION:  18 U.S.C. § 1959(a)(1) – Murder in Aid of Racketeering

PENALTIES:  Mandatory minimum of up to life in prison; or
       Fine of up to $250,000; or both fine and imprisonment
       Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**<u>COUNT 4:</u>**

VIOLATION:  18 U.S.C. § 1959(a)(1) – Murder in Aid of Racketeering

PENALTIES:  Mandatory minimum of up to life in prison; or
       Fine of up to $250,000; or both fine and imprisonment
       Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

ER 255

ER 256

**COUNT 5:**

VIOLATION:             18 U.S.C. § 1959(a)(1) – Murder in Aid of Racketeering

PENALTIES:             Mandatory minimum of up to life in prison; or
                       Fine of up to $250,000; or both fine and imprisonment
                       Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 6:**

VIOLATION:             18 U.S.C. § 1959(a)(1) – Murder in Aid of Racketeering

PENALTIES:             Mandatory minimum of up to life in prison; or
                       Fine of up to $250,000; or both fine and imprisonment
                       Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**FORFEITURE ALLEGATION:**

VIOLATION:             21 U.S.C. § 853(a), 18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c) –
                       Criminal Forfeiture

PENALTIES:             As stated in the charging document

**Defendant**

**JAYSON WEAVER**

**COUNT 1:**

VIOLATION:      18 U.S.C. § 1962(d) –Conspiracy to participate in racketeering enterprise

PENALTIES:      Maximum of up to life; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 4:**

VIOLATION:      18 U.S.C. § 1959(a)(1) – Murder in Aid of Racketeering

PENALTIES:      Mandatory minimum of up to life in prison; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 7:**

VIOLATION:      18 U.S.C. § 1959(a)(1) – Murder in Aid of Racketeering

PENALTIES:      Mandatory minimum of up to life in prison; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 8:**

VIOLATION:      18 U.S.C. § 1959(a)(5) – Conspiracy to commit Murder in Aid of Racketeering

PENALTIES:      Maximum of up to 10 years in prison; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of at least 3 years

ER 257

SPECIAL ASSESSMENT: $100 (mandatory on each count)


**<u>FORFEITURE ALLEGATION:</u>**

VIOLATION:      21 U.S.C. § 853(a), 18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c) – Criminal Forfeiture

PENALTIES:      As stated in the charging document

ER 258

**Defendant**

**WAYLON PITCHFORD**

**COUNT 1:**

VIOLATION:          18 U.S.C. § 1962(d) –Conspiracy to participate in racketeering enterprise

PENALTIES:          Maximum of up to life in prison; or
                    Fine of up to $250,000; or both fine and imprisonment
                    Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 7:**

VIOLATION:          18 U.S.C. § 1959(a)(1) – Murder in Aid of Racketeering

PENALTIES:          Mandatory minimum of up to life in prison; or
                    Fine of up to $250,000; or both fine and imprisonment
                    Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 8:**

VIOLATION:          18 U.S.C. § 1959(a)(5) – Conspiracy to commit Murder in Aid of
                    Racketeering

PENALTIES:          Maximum of up to 10 years in prison; or
                    Fine of up to $250,000; or both fine and imprisonment
                    Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**FORFEITURE ALLEGATION:**

VIOLATION:          21 U.S.C. § 853(a), 18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c) –
                    Criminal Forfeiture

PENALTIES:          As stated in the charging document

7

ER 259

**Defendant**

**ANDREW COLLINS**

**COUNT 1:**

VIOLATION:        18 U.S.C. § 1962(d) –Conspiracy to participate in racketeering enterprise

PENALTIES:        Maximum of up to 20 years in prison; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**FORFEITURE ALLEGATION:**

VIOLATION:        18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c) – Criminal Forfeiture

PENALTIES:        As stated in the charging document

ER 260

**Defendant**

**DEREK SMITH**

**COUNT 1:**

VIOLATION:        18 U.S.C. § 1962(d) –Conspiracy to participate in racketeering enterprise

PENALTIES:        Maximum of up to 20 years in prison; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 9:**

VIOLATION:        21 U.S.C. §§ 846, 841(a)(1) - Conspiracy to Distribute Over 50 Grams of Methamphetamine (actual) and over 100 Grams of Heroin

PENALTIES:        Mandatory minimum of 10 years in prison and a maximum of up to life in prison; or
Fine of up to $10,000,000; or both fine and imprisonment
Supervised release of at least 5 years up to life

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 10:**

VIOLATION:        21 U.S.C. § 841(a)(1) – Possession with Intent to Distribute over 50 Grams of Methamphetamine (actual)

PENALTIES:        Mandatory minimum of 10 years in prison and a maximum of up to life in prison; or
Fine of up to $10,000,000; or both fine and imprisonment
Supervised release of at least 5 years up to life

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 11:**

VIOLATION:        21 U.S.C. § 841(a)(1) – Possession with Intent to Distribute Over 100 Grams of Heroin

13

ER 261

PENALTIES:        A mandatory minimum of 5 years in prison and a maximum of 40 years in prison; or
Fine of up to $5,000,000; or both fine and imprisonment
Supervised release of at least 4 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**<u>COUNT 12:</u>**

VIOLATION:        18 U.S.C. § 924(c) – Possess, Use a Firearm During and in Relation to a Drug Trafficking Offense

PENALTIES:        Minimum of 5 years in prison; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**<u>COUNT 13:</u>**

VIOLATION:        18 U.S.C. § 922(g) – Felon in possession of Firearm

PENALTIES:        Not more than 120 months,
Not more than $250,000 fine or both
A three-year term of Supervised Release

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**<u>FORFEITURE ALLEGATION:</u>**

VIOLATION:        21 U.S.C. § 853(a), 18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c) – Criminal Forfeiture

PENALTIES:        As stated in the charging document

ER 262

**Defendant**

**BRANDON BANNICK**

**COUNT 1:**

VIOLATION:        18 U.S.C. § 1962(d) –Conspiracy to participate in racketeering enterprise

PENALTIES:        Maximum of up to life in prison; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 2:**

VIOLATION:        18 U.S.C. § 1959(a)(1) – Murder in Aid of Racketeering

PENALTIES:        Mandatory minimum of up to life in prison; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 3:**

VIOLATION:        18 U.S.C. § 1959(a)(1) – Murder in Aid of Racketeering

PENALTIES:        Mandatory minimum of up to life in prison; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 5:**

VIOLATION:        18 U.S.C. § 1959(a)(1) – Murder in Aid of Racketeering

PENALTIES:        Mandatory minimum of up to life in prison; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of at least 3 years

ER 263

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 6:**

VIOLATION:        18 U.S.C. § 1959(a)(1) – Murder in Aid of Racketeering

PENALTIES:        Mandatory minimum of up to life in prison; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**FORFEITURE ALLEGATION:**

VIOLATION:        18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c) – Criminal Forfeiture

PENALTIES:        As stated in the charging document

10

ER 264

**Defendant**

**JUSTIN GRAY**


**COUNT 2:**

VIOLATION:          18 U.S.C. § 1959(a)(1) – Murder in Aid of Racketeering

PENALTIES:          Mandatory minimum of up to life in prison; or
                    Fine of up to $250,000; or both fine and imprisonment
                    Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)


**COUNT 3:**

VIOLATION:          18 U.S.C. § 1959(a)(1) – Murder in Aid of Racketeering

PENALTIES:          Mandatory minimum of up to life in prison; or
                    Fine of up to $250,000; or both fine and imprisonment
                    Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)


**FORFEITURE ALLEGATION:**

VIOLATION:          18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c) – Criminal Forfeiture

PENALTIES:          As stated in the charging document

8

ER 265

**Defendant**

**EVAN PERKINS**

**COUNT 1:**

VIOLATION:        18 U.S.C. § 1962(d) –Conspiracy to participate in racketeering enterprise

PENALTIES:        Maximum of up to life in prison; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 5:**

VIOLATION:        18 U.S.C. § 1959(a)(1) – Murder in Aid of Racketeering

PENALTIES:        Mandatory minimum of up to life in prison; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 6:**

VIOLATION:        18 U.S.C. § 1959(a)(1) – Murder in Aid of Racketeering

PENALTIES:        Mandatory minimum of up to life in prison; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**FORFEITURE ALLEGATION:**

VIOLATION:        21 U.S.C. § 853(a), 18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c) – Criminal Forfeiture
PENALTIES:        As stated in the charging document

15

ER 266

PHILLIP A. TALBERT
United States Attorney
STEPHANIE M. STOKMAN
Assistant United States Attorney
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile:  (559) 497-4099


Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br><br>                    v.<br><br>KENNETH BASH, ET AL,<br><br>                          Defendants. | CASE NO.  1:20-CR-238-JLT |

The United States provides notice that it will not seek the death penalty in this case against defendants Kenneth Johnson, Francis Clement, Justin Gray, Brandon Bannick, James Field, Evan Perkins, Jayson Weaver, and Waylon Pitchford.


Dated:  February 21, 2024

PHILLIP A. TALBERT
United States Attorney


By:  /s/ STEPHANIE M. STOKMAN
STEPHANIE M. STOKMAN
Assistant United States Attorney

1

ER 267

Ryan J. Villa, PHV
5501 Eagle Rock Ave NE, Ste C2
Albuquerque, NM 87113
(505) 639-5709
ryan@rjvlawfirm.com

Andrea Lee Luem, PHV
400 South Fourth Street, Ste 500
Las Vegas, NV 89101
(702) 575-0481
andrea@luemlaw.com

Attorneys for:
KENNETH JOHNSON

| | |
|---|---|
| **UNITED STATES OF AMERICA**,<br><br>**Plaintiff,**<br><br><br>**KENNETH JOHNSON,**<br><br>**Defendant.** | Criminal case No. 20-CR-238-JLT-SKO<br><br>**DEFENDANT KENNETH JOHNSON'S NOTICE OF APPEAL** |

### DEFENDANT'S NOTICE OF APPEAL

Defendant Kenneth Johnson, through counsel, the Law Office of Ryan J. Villa and Andrea Luem, respectfully appeals to the United States Court of Appeals for the Ninth Circuit from the Judgment and Sentence entered in this matter on  May 23, 2025. *See* Dkt. #1914.

Respectfully submitted,

*/s/ Ryan J. Villa*
Ryan J. Villa
5501 Eagle Rock Ave NE, Suite C2
Albuquerque, NM 87113
(505) 639-5709
ryan@rjvlawfirm.com

*/s/ Andrea Lee Luem*
Andrea Lee Luem, PHV
400 South Fourth Street, Ste 500
Las Vegas, NV 89101
(702) 575-0481
andrea@luemlaw.com

ER 268

**CERTIFICATE OF SERVICE**

I hereby certify that on June 6, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification to the parties in this matter.

*/s/ Ryan J. Villa*
Ryan J. Villa
Counsel for Defendant

2

JANE FISHER-BYRIALSEN
Fisher & Byrialsen, PC
4600 S. Syracuse Street
Denver, CO 80137
jane@fblaw.org

JEAN D. BARRETT
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
jeanbarrett@ruhnkeandbarrett.com

Attorneys for:   FRANCIS CLEMENT

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> Plaintiff, <br><br> v. <br><br> **FRANCIS CLEMENT,** <br><br> Defendant. | Criminal case No. 20-CR-238-JLT-SKO <br><br> **NOTICE OF APPEAL** |

  Notice is given that Defendant Francis Clement appeals from any adverse rulings and determinations in this matter to the United States Court of Appeals for the Ninth Circuit from the judgment and conviction entered on May 23, 2025 (ECF Doc. 1915).

  Dated:  June 6, 2025.

          Respectfully submitted,

           s/*Jane Fisher-Byrialsen*
          JANE FISHER-BYRIALSEN
          JEAN D. BARRETT

          *Attorneys for Francis Clement*

ER 270

## CERTIFICATE OF SERVICE

      I hereby certify that on this 6th day of June, 2025, I served a true and correct copy of the foregoing via ECF to:
All counsel of record

                                */s/ Abby Clement*
                                Paralegal

ER 271