IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff - Appellee,<br>v.<br>KENNETH JOHNSON,<br>    Defendant - Appellant. | No. 25-3645<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |
| UNITED STATES OF AMERICA,<br>    Plaintiff - Appellee,<br>v.<br>FRANCIS CLEMENT,<br>    Defendant - Appellant. | No. 25-3648<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |

On Appeal from the United States District Court
For the Eastern District of California
The Honorable Jennifer L. Thurston
D.C. No. 1:20-cr-00238-JLT-SKO

**EXCERPTS OF RECORD
VOLUME 4 OF 13**

Ryan J. Villa
The Law Office of Ryan J. Villa
5501 Eagle Rock Ave. NE Suite C2
Albuquerque, NM 87113
Ryan@rjvlawfirm.com

Andrea Lee Luem
Andrea Lee Luem, PHV
400 South Fourth Street, Ste 500
Las Vegas, NV 89101
andrea@luemlaw.com

Counsel for Defendant-Appellant
Kenneth Johnson

Jane Fisher-Byrialsen
Fisher & Byrialsen, PLLC
4600 S. Syracuse Street
Denver, CO 80137
jane@fblaw.org

Jean D. Barrett
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
jeanbarrett@ruhnkeandbarrett.com

Counsel for Defendant-Appellant
Francis Clement

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

UNITED STATES OF AMERICA,    ) Case No. 1:20-CR-00238-JLT-SKO
                             )
                             ) Fresno, California
               Plaintiff,    ) January 23, 2025, 8:32 a.m.
          v.                 )
                             )
KENNETH BASH, et al.         ) Re: Trial Day 5,
                             ) Page 1141 through Page 1315
               Defendant.    )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JENNIFER L. THURSTON
UNITED STATES DISTRICT JUDGE

APPEARANCES:
For the Plaintiff:          U.S. DEPARTMENT OF JUSTICE by
                            MS. STEPHANIE STOCKMAN,
                            ASSISTANT U.S. ATTORNEY
                            2500 Tulare Street, Room 4401
                            Fresno, California  93721

                            U.S. DEPARTMENT OF JUSTICE
                            VIOLENT CRIME & RACKETEERING SECTION by
                            MR. JARED ENGELKING,
                            U.S. TRIAL ATTORNEY
                            1301 New York Avenue, N.W.
                            Washington, D.C.  20005

                            U.S. DEPARTMENT OF JUSTICE by
                            MR. JAMES CONOLLY,
                            ASSISTANT U.S. ATTORNEY
                            501 I Street, Suite 10-100
                            Sacramento, California  93721

                     MARYANN VALENOTI, RMR, CRR
                      Official Court Reporter
                      501 I Street, Suite 4-200
                       Sacramento, CA 95814
                     mvalenotiRMRCRR@gmail.com
                          (916)930-4275

Proceedings reported via mechanical steno - transcript produced
via computer-aided transcription

(APPEARANCES CONTINUED)


For Defendant Johnson:    LAW OFFICES OF ANDREA LEUM by
                          MS. ANDREA LEE LUEM
                          400 South Fourth Street, Suite 500
                          Las Vegas, Nevada 89101

                          LAW OFFICES OF RYAN J. VILLA by
                          MR. RYAN J. VILLA
                          5501 Eagle Rock Avenue NE, Suite C2
                          Albuquerque, New Mexico  87104

For Defendant Clement:    FISHER & BYRIALSEN, PLLC by
                          MS. JANE FISHER-BYRIALSEN
                          99 Park Avenue
                          New York, New York  10016

                          RUHNKE & BARRETT by
                          MS. JEAN de SALLES BARRETT
                          29 Broadway, Suite 1412
                          New York, New York  10016

For Defendant Stinson:    LAW OFFICES OF KENNETH ALAN REED
                          MR. KENNETH ALAN REED
                          406 W. Fourth Street
                          Santa Ana, California  92701

I N D E X

WITNESSES                                              PAGE

MICHAEL KNIERIEM
        Direct Ms. Stokman  ..................... 1149
        Cross Mr. Reed ........................... 1164
        Cross Ms. Byrialsen ...................... 1169
        Cross Ms. Luem ........................... 1171

TROY CLOWERS
        Direct Ms. Stokman ....................... 1178
        Cross Mr. Villa  ......................... 1233
        Cross Mr. Reed ........................... 1275
        Cross Ms. Barrett ........................ 1293
        Redirect Ms. Stokman ..................... 1302

MIKE SMITH
        Direct Ms. Stokman ....................... 1308

GOVERNMENT EXHIBITS
        No. 1011 ................................. 1152
        No. 1005 ................................. 1153
        No. 1004 ................................. 1154
        No. 1007 ................................. 1154
        No. 1006 ................................. 1155
        No. 1016 ................................. 1156
        No. 1017 ................................. 1156
        No. 1012 ................................. 1157
        No. 1008 ................................. 1158
        No. 1010 ................................. 1158
        No. 1013 ................................. 1160
        No. 1002 ................................. 1160
        No. 1001 ................................. 1161
        No. 1009 ................................. 1161
        No. 1063 ................................. 1227
        No. 1138 through 1140 ................... 1312

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

FRESNO, CALIFORNIA, THURSDAY, JANUARY 23, 2025

--oOo--

(In open court outside the presence of the jury.)

THE CLERK:  Please remain seated.  Court is in session.

THE COURT:  We have everyone back.  Couple things I wanted to mention.  First, we have a new court reporter here today.  To assist her in knowing who's speaking before you speak, would you state your name so that she can be clear?  There's obviously a lot of you, and we want to make sure that the record is accurate.

Also, when you speak, please get that microphone up to your mouth so we don't miss what you're saying.  As you know, it's not that we can't hear you necessarily, but the recording will not necessarily pick you up if you're not on the microphone.

The other thing, too, is I did receive the police report we talked about late yesterday afternoon.  I looked at it and I have to agree there's no specificity as to what the photos are.  From what I understand from the Government, they requested the photos, they got what they got, and then realized after talking to the officer that there were more.

I've indicated I'm going to mark those exhibits that we talked about yesterday, but I think that -- a couple things: First, whether they're admitted or not is something that will

happen with the witness, but I'm not going to strike them from the exhibit list. I think that they're appropriately there now.

Also, when I look at the photos, they're not exculpatory, they just set the scene, which would be similar to what the officer would testify to anyway. I think it eases the review of the jurors to be able to have a picture of what the officer's talking about.

And the other thing I just wanted to say, too, is I haven't heard representation that the defense hasn't seen these photos. Is there that representation before they were produced to you by the Government?

No one has subpoenaed the LAPD for these records?

MS. LUEM: Your Honor, on behalf of Mr. Johnson -- this is Andrea Luem -- no, we did not. Mr. Johnson was not charged in that particular --

THE COURT: I understand he was not, but that's not the question. You're saying as to no defendant --

MS. LUEM: Mr. Johnson did not. I can't speak for other defendants.

THE COURT: Okay. And for Mr. Clement?

MS. FISHER-BYRIALSEN: Your Honor, I think we may have gotten a file on that case. I will have to ask the investigator when she gets back, I can't remember, but we did not have the photos.

THE COURT:  Okay.  Mr. Reed, you didn't --

MR. REED:  No.

THE COURT:  Okay.

Also, anything else, before we bring the jury members in?

MS. STOKMAN:  Nothing from the Government.

MS. LUEM:  Briefly -- this is Andrea Luem -- we did receive from the Government those audio clips last night.  They were downloaded by our trial director this morning.  I haven't had a chance to review them all, but I don't know when they intend to introduce those.  I've seen, so far, one objection that I plan to make, so I guess we can do that this afternoon, unless the Government plans to introduce those through one of the first witnesses that's coming on today.

MS. STOKMAN:  They probably won't be introduced until after next week at the very beginning -- or at the very earliest the end of next week, so we can address it today or at another point, but that's the Government's intention.

THE COURT:  Are there transcripts in addition?

MS. STOKMAN:  Yes.

THE COURT:  Are they marked?

MS. STOKMAN:  We did not mark the transcripts, but we have transcripts for the audio that we intend to admit.

THE COURT:  So, at a minimum, I think it would be easier for me to have copies of the transcripts, too.  We're

also, Ms. Luem and other defense counsel, if you have objections, if you could at least identify those transcripts or the sections so that I can get the transcripts so I could rule more easily.

MS. LUEM:  It looks like there's a rolling transcript with the audio clip that we were provided, so it seems to be part of the exhibit that we received, so I think --

THE COURT:  Right, but she says it hasn't been marked, which means I don't have it.  So I -- I guess I just need that then.

MS. STOKMAN:  So, Judge, I apologize because I wasn't aware of how they were produced, if they were just the audio clip, but if they're synced already to the transcript, then my understanding is that the audio that the Court also has now, which would be the clips that we would mark as the "Exhibit Number-1," they should be synced to that transcript already.

If that's how counsel received it, then that would be how the Court received it.  So if the Court does not have that, then we can give the synced clip, but I know that the audio was dropped off, I believe, this morning onto a flash drive for the Court's exhibit binder, yes.

THE COURT:  So we have a thumb drive, but do we have a paper transcript?

MS. STOKMAN:  Yes, I can get those as well.

THE COURT:  That would be great, thank you.

Let's go ahead and bring the jury members back in.

(In open court in the presence of the jury.)

THE COURT:  All right, good morning everyone.  We have our jury members back in their places.  You all can be seated.

Ladies and gentlemen, I know one of you had an emergency this morning and these things happen, sometimes that's going to happen during the next, you know, weeks that we're together.  When that does happen, you have the instructions as to what to do.

I just do want to mention to you every minute we're not in trial adds to the other end of this trial, so I'm going to encourage you all to try to do the best you can to be on time.  We're all going to do the same.

That doesn't mean it's not going to happen.  It very well may because things happen, but I just want you to understand the importance of that because we can't start unless we have everyone.

But thank you otherwise for being here again tonight -- this morning.

Is there -- I just want to inquire, did anyone review any media or have any contact with anyone about this case overnight?

No one has raised their hand.

Is the Government prepared to present its first witness?

MS. STOKMAN:  Yes.

THE COURT:  Let's go ahead and do that.

MS. STOKMAN:  The Government calls Mike Knieriem.

MICHAEL KNIERIEM, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

THE CLERK:  Go ahead and have a seat, and then please state your full name for the record and then spell your last.

THE WITNESS:  Michael Knieriem, last name is K-N-I-E-R-I-E-M.

BY MS. STOKMAN:

Q    Good morning.

A    Good morning.

Q    Can you tell us where you work?

A    I work for Los Angeles County Sheriff's Department.

Q    What do you do for the Los Angeles County Sheriff's Department?

A    I am a detective, work Major Crimes Bureau.

Q    What are some general duties you have as a detective?

A    Currently assigned to a prison gang unit.  We do investigations into prison gangs.

Q    How long have you had that position?

A    I started in the prison gang unit in about 2017.

Q    What did you do before that, if anything?

A    I was also a detective in Major Crimes.  I went to Major Crimes in 2008, and before that I was a detective at a station

level.

Q    Do you also have other functions that relate to any federal agencies?

A    Yes, I'm a task force officer with ATF.

Q    Describe what, generally, your duties are as a task force officer.

A    Help with federal investigations and assist the special agents with ATF.

Q    Is it fair to say that you act as a liaison between state and federal investigations at times?

A    Yes.

Q    Were you personally involved in an investigation into the Aryan Brotherhood that began around 2019?

A    Yes, I was.

Q    When did you get involved with that investigation?

A    We started I think it was December of 2019.

Q    Was that a state or a federal investigation?

A    Federal.

Q    Which federal agency was in charge of that investigation?

A    ATF.

Q    And who was the agent in charge of that investigation?

A    Special Agent Anthony Gonzales.

Q    Which office -- which ATF office was Agent Gonzales from?

A    He's out of the Fresno office.

Q    During the course of the investigation, did you become

familiar with individuals who were related to the investigations itself?

A    Yes.

Q    Had you encountered any of those individuals prior to the ATF investigation that we're talking about now?

A    Some of them I had, yes.

Q    How, generally, did you come to know these individuals that were involved in this investigation?

A    Some of them I talked to personally, some of them I've discussed with other agents or CDC personnel, different gang investigators and just through different investigations became aware of them.

Q    When you say "CDC," who are you referring to?

A    California Department of Corrections.

Q    Did you also have familiarity with some of these individuals through your work in the prison system?

A    Yes.

Q    I'm going to have you look in the binder that's labeled 1 of 2.

A    Okay.

Q    Exhibit 1011.

A    Okay.

Q    Do you recognize the individual photographed in that exhibit?

A    Yes.

Q   Who is that?

A   John Stinson.

Q   Do you know if John Stinson has a nickname?

A   Most recently I've heard him referred to as "Pops."  In the past it was "Youngster," but "Pops" is what I've heard people refer to him recently.

MS. STOKMAN:  I ask to admit Exhibit 1011 and publish to the jury.

THE COURT:  Any objections?

MR. REED:  No objection.

MS. FISHER-BYRIALSEN:  No objection.

MS. LUEM:  No objection.

THE COURT:  All right, that will be admitted.

(Government Exhibit 1011 admitted in evidence.)

BY MS. STOKMAN:

Q   Now, if you can look at Exhibit 1005.

A   Okay.

Q   Do you recognize the individual in this photograph?

A   Yes, I do.

Q   Who is that?

A   That would be Kenneth Johnson.

Q   Do you know if Kenneth Johnson has any nicknames or goes by any nicknames?

A   Yes.

Q   What is that?

A       "Kenwood."

MS. STOKMAN:  I ask that Exhibit 1005 be admitted into evidence and published to the jury.

THE COURT:  Any objections?

MS. LUEM:  No objection.

MS. FISHER-BYRIALSEN:  No objection.

MR. REED:  No objection.

THE COURT:  All right, that will be admitted.

(Government Exhibit 1005 admitted in evidence.)

BY MS. STOKMAN:

Q       Now turn to 1004.

MS. BARRETT:  Excuse me, Your Honor, our screen is not showing anything.

THE COURT:  Is something being published, I'm not seeing it either.

THE CLERK:  Right now I have everything.

THE COURT:  Yeah, there's nothing on right now.

THE CLERK:  I turned off the jurors'.  If you can bring up 1004; can you see it?

BY MS. STOKMAN:

Q       Do you recognize the individual in this photograph?

A       Yes, I do.

Q       Who is that?

A       Francis Clement.

Q       Do you know if Francis Clement goes by any other

nicknames?

A    "Frank."

          MS. STOKMAN:  I ask that Exhibit 1004 be admitted into evidence and published to the jury.

          THE COURT:  Any objections?

          MS. FISHER-BYRIALSEN:  No, Your Honor.

          THE COURT:  That will be admitted.

     (Government Exhibit 1004 admitted in evidence.)

BY MS. STOKMAN:

Q    Turn to now 1007, please.  Do you recognize the individual in that photograph?

A    Yes.

Q    Who is that?

A    Jayson Weaver.

Q    Do you know if Jayson Weaver goes by any nicknames?

A    "Beaver."

          MS. STOKMAN:  I would ask that Exhibit 1007 be admitted and published to the jury.

          THE COURT:  Any objections?

          MS. FISHER-BYRIALSEN:  No, Your Honor.

          MS. LUEM:  No.

          MR. REED:  No objection, Your Honor.

          THE COURT:  That will be admitted.

     (Government Exhibit 1007 admitted in evidence.)

Knieriem - Direct by Stokman

BY MS. STOKMAN:

Q    Now looking at 1006.  Do you recognize the individual in that photograph?

A    Yes.

Q    Who is that?

A    Waylon Pitchford.

Q    Do you know if Waylon Pitchford goes by any other nicknames?

A    I am not aware of any.

        MS. STOKMAN:  We ask that Exhibit 1006 be admitted and published to the jury.

        THE COURT:  Any objections?

        MS. FISHER-BYRIALSEN:  No objection.

        MS. LUEM:  No objection.

        MR. REED:  No objection, Your Honor.

        THE COURT:  That will be admitted.

    (Government Exhibit 1006 admitted in evidence.)

BY MS. STOKMAN:

Q    Now looking at 1016.  Do you recognize the individual in that photograph?

A    Yes.

Q    Who is that?

A    Todd Morgan.

Q    Are you aware of any nicknames that Todd Morgan goes by?

A    "Fox."

MS. STOKMAN:  I ask that 1016 be admitted and published to the jury.

THE COURT:  Any objections?

MS. FISHER-BYRIALSEN:  No objection.

MR. REED:  No objection.

MS. LUEM:  No.

THE COURT:  That will be admitted.

(Government Exhibit 1016 admitted in evidence.)

BY MS. STOKMAN:

Q    Now looking at 1017.  Do you recognize the individual in this photograph?

A    Yes, Daniel Rubin.

Q    Does Daniel Rubin goes by any nicknames that you're aware of?

A    "Nutty."

MS. STOKMAN:  We ask that Exhibit 1017 be admitted and published to the jury.

THE COURT:  Any objections?

MS. FISHER-BYRIALSEN:  No, Your Honor.

MS. LUEM:  No, Your Honor.

MR. REED:  No objection.

THE COURT:  That will be admitted.

(Government Exhibit 1017 admitted in evidence.)

BY MS. STOKMAN:

Q    Looking at 1012.  Do you recognize the individual in this

photograph?

A    Yes.

Q    Who is that?

A    Troy Clowers.

Q    Are you aware of any nicknames that Troy Clowers goes by?

A    I can't recall any right now.

         MS. STOKMAN:  We ask that Exhibit 1012 be admitted and published to the jury.

         THE COURT:  Any objections?

         MS. LUEM:  No, Your Honor.

         MS. FISHER-BYRIALSEN:  No, Your Honor.

         MR. REED:  No objection.

         THE COURT:  That will be admitted.

    (Government Exhibit 1012 admitted in evidence.)

BY MS. STOKMAN:

Q    Now looking at 1008.  Do you recognize the individual in that photograph?

A    Yes.

Q    Who is that?

A    Robert Eversole.

Q    Does Robert Eversole go by any nicknames?

A    "Rage."

         MS. STOKMAN:  We ask that 1008 be admitted and published to jury.

         THE COURT:  Any objections?

MS. FISHER-BYRIALSEN:  No, Your Honor.

MS. LUEM:  No objection.

MR. REED:  No objection.

THE COURT:  That will be admitted.

(Government Exhibit 1008 admitted in evidence.)

BY MS. STOKMAN:

Q    Looking at 1010.  Do you recognize the individual in that photograph?

A    Yes.

Q    Who is that?

A    Kenneth Bash.

Q    Does Kenneth Bash go by any nicknames?

A    Just "Bash."

MS. STOKMAN:  We ask that Exhibit 1010 be admitted and published to the jury.

THE COURT:  Any objections?

MS. FISHER-BYRIALSEN:  No, Your Honor.

MS. LUEM:  No.

MR. REED:  No objection.

THE COURT:  That will be admitted.

(Government Exhibit 1010 admitted in evidence.)

BY MS. STOKMAN:

Q    Looking at Exhibit 1003.  Do you recognize who's in that photograph?

A    Yes.

Q    Who is that?

A    James Field.

Q    Does James Field go by any nicknames that you're aware of?

A    "Suspect."

MS. STOKMAN:  I would ask that 1003 be admitted and published to the jury.

THE COURT:  Any objections?

MR. REED:  No objection.

MS. LUEM:  No objection.

MS. FISHER-BYRIALSEN:  Your Honor, just maybe to speed things up, I don't think we will have any objections to any of the photos that were shown on the demonstrative exhibit yesterday, which I think all of these are, so if the Government just stops at those, we don't have to continue like this.

THE COURT:  All right.  Ms. Luem, you agree?

MS. LUEM:  Agree.

THE COURT:  Mr. Reed?

MR. REED:  I agree.

MS. STOKMAN:  So what the Government will do is we'll just go through each one and then have it published to the jury, if that's okay.

THE COURT:  Just ask to admit it so I can do that.

MS. STOKMAN:  Yes.

BY MS. STOKMAN:

Q    Now looking at 1013.  Tell us if you recognize who that

Knieriem - Direct by Stokman

is.

A    Yes.

Q    Who is that?

A    I just drew a blank for a second here.  Andrew Collins.

Q    Does he have a nickname?

A    "Misfit."

        MS. STOKMAN:  We ask that this be admitted and published.

        THE COURT:  That will be admitted.

    (Government Exhibit 1013 admitted in evidence.)

BY MS. STOKMAN:

Q    Now 1002.  And if you recognize that individual, let us know who it is.

A    Yes, Brandon Bannick.

Q    Does he have any nicknames?

A    "Bam Bam."

        MS. STOKMAN:  We ask that this be admitted and published.

        THE COURT:  That will be admitted.

    (Government Exhibit 1002 admitted in evidence.)

BY MS. STOKMAN:

Q    1001, if you recognize this individual, let us know who it is.

A    Yes, Evan Perkins.

Q    Do you know if he has any nicknames?

A    "Soldier."

MS. STOKMAN:  We ask that 1001 be admitted and published.

THE COURT:  That will be admitted.

(Government Exhibit 1001 admitted in evidence.)

BY MS. STOKMAN:

Q    And then finally, 1009.  Tell us if you recognize who that is, and if so, what his name is.

A    Yes, Justin Gray.

Q    What is his nickname?

A    "Sidetrack."

MS. STOKMAN:  I ask that that be admitted and published?

THE COURT:  All right, that will be admitted.

(Government Exhibit 1009 admitted in evidence.)

BY MS. STOKMAN:

Q    At some point did you become aware of a wiretap that was conducted during the ATF investigation that we've been speaking of?

A    Yes.

Q    And when was that wiretap conducted?

A    I believe it was like September through November of 2020.

Q    At some point in time did you learn about a double homicide in Lomita, California that occurred around October 4, 2020?

A     Yes.

Q     And where is Lomita, California?

A     It's in Los Angeles County.

Q     Who's local jurisdiction as far as law enforcement is concerned is Lomita under?

A     It's the Los Angeles County Sheriff's Department, Lomita station.

Q     After learning of that double homicide, did you do anything with that information in relation to the ATF investigation we've been talking about?

A     Yes, I relayed some of the information to Special Agent Gonzales.

Q     Did there come a point in time where you learned about a homicide in Lancaster, California at the end of February 2022?

A     Yes.

Q     Where is Lancaster located?

A     It's in northern Los Angeles County, patrolled by L.A. County Sheriff's Department, Lancaster Sheriff's Station.

Q     Did you do anything with that information in relation to the federal investigation we've been speaking about?

A     Yes, I also passed that information along to Special Agent Gonzales.

Q     Did there come a point in time where you learned of another double homicide that occurred in March of 2022 in Pomona, California?

A    Yes.

Q    Where is Pomona?

A    It's also in Los Angeles County.

Q    Is that under the Los Angeles Sheriff jurisdiction?

A    No, it is patrolled by Pomona Police Department.

Q    And did you do anything with this information in relation to the federal ATF investigation?

A    Yes.  Again, I passed that information on to Special Agent Gonzales.

Q    At any point in time did you pick up evidence relating to the ATF investigation we've been speaking about?

A    Yes.

Q    What type of evidence did you pick up?

A    Some narcotics.

Q    Where did you pick those up from?

A    San Fernando Police Department.

Q    Was there a way that you linked the drugs you were picking up with a San Fernando Police Department case?

A    Yes.  I got their case number.

Q    Do you know that case number?

A    I believe, yes.

Q    And what is that?

A    22-468, I believe.

Q    What did you do with the drugs that you picked up?

A    I picked them up from the San Fernando Police Department

and transported them to the Glendale ATF office.

Q    And what happened with the drugs from there?

A    With the assistance of Special Agent Castapian [phonetic], I butchered her last name.

Q    Could you spell --

A    I took those to her, she packaged them up and relabeled them with the ATF file number, and we shipped those off to the DA's lab for testing.

Q    You said you linked those drugs to the ATF file number, which file number is this?

A    Yes, that is going to be the one, the ATF number for Special Agent Anthony Gonzales's case, which was 786010-20-33.

        MS. STOKMAN:  I have no further questions for this witness.

        THE COURT:  All right.  Cross examination.

        MR. REED:  Just briefly, Your Honor.

                    CROSS-EXAMINATION

BY MR. REED:

Q    Good morning, sir.  I'm going to butcher your last name, would you say it again?

A    "Knieriem."

Q    "Knieriem."

     The 1011, you identified as a photograph of Mr. Stinson; is that correct?

A    I believe so, yes.

Q    And had you seen Mr. Stinson before?

A    Yes.

Q    And the nickname that you indicated, I think you said "Pops"?

A    Yes.

Q    How did you come to understand that nickname was Mr. Stinson?

A    I've heard that in different various trainings that I've had with the California Department of Corrections, and I've heard it on some jail telephone calls.

Q    Do you know when that happened?

A    When what happened?

Q    When you got that information.

     Let me back up for a second.  You've been around for a minute, right?

A    Yes.

Q    Mr. Stinson at one time had a different nickname; is that correct?

A    Yes.

Q    So from first nickname to new nickname, when did that happen?

A    You know, I became aware of him probably back in the late '90s when I was working in the jails.

Q    That wasn't my question.  I said first nickname to new nickname, when did that happen?

A     I learned of the old nickname of "Youngster" when I became aware of him when I was working the jails.  Lately, in the last four or five years, I've heard the new name.

Q     You would mean the prisons, Mr. Stinson wasn't in jail in Los Angeles?

A     He was at Los Angeles County Jail back in the '90s when I first came across him, but I've heard him through the prisons being referred to as "Pops," and also in some jail phone calls from Los Angeles County jails.

Q     Do you remember when that was?

A     Within the last four or five years.

Q     Okay.  I'm assuming you guys keep some sort of intelligence that you would change the nickname of a person or put a different A.K.A. at different times.

A     I haven't.

Q     No, not you personally, but you're not keeping this all in your head, right, you're reading something that your operation or an operation like yours keeps?

A     I've heard it through different trainings that I've attended.

Q     Again, you've heard this from someplace else or read it someplace else, right?

A     Correct.

Q     So there's no person that is the all-seeing wizard that you had a training with that guy, and he says John Stinson used

to be "Youngster" but now he is "Pops."  Do you guys keep track of that type of information; do you write it down somewhere, not you personally, but you know that that's how it's kept, would you agree?

A    I'm sure that there's some people that track that, correct.

Q    That's something called "Gang Intelligence," fair statement?

A    Yes.

Q    I don't remember the name of the computer anymore, and it's probably old data, but there used to be a central way to keep information like that when you guys do your job dealing with different types of gangs, fair statement?

A    In the past they have, yes.

Q    And I don't know if that grade system still exists, that's why I didn't want to use that, but there's something like that?

A    Those systems have gone away.  There are records that I'm sure they keep that in different jails and prisons that they -- if they do an interview with somebody and learn of monikers and that kind of stuff, they would keep track of them on a hard file if they were told of those.

Q    Are you saying there's no longer a central system that keeps all that information?

A    I'm not aware of any system that would keep all that information.

Q    What about the photographs of the particular individuals?

A    The photographs -- like we get photographs from CDC?

Q    The ones that, like, that have tattoos and the photographs of scars, identifying information.

A    I've seen, like, booking photos and those types of photos, yes.

Q    Are those photographs centrally located?

A    Different facilities, like our Los Angeles County has booking photos.  When they arrest individuals, they take those booking photos and they're kept in a database.

Q    I understand.  For the sake of argument, Mr. Stinson has never been -- or in the last five or 10 years has not been in Los Angeles County, hence he was never booked in Los Angeles County, hence Los Angeles County photos would not be the photos that you have.

So if another institution has Mr. Stinson's photo, how would you get to see it?

A    I would contact a IGI -- the gang investigator or somebody through CDC.

Q    So, you would get information from another person that's parallel to you or like you in another county?

A    Or the state facilities, correct.

Q    Or in a state facility, okay.

So the photograph that was just identified -- and for the sake of argument, I'm not fighting with you, that is

Mr. Stinson, do you know if that's a Los Angeles County booking photo?

A    I don't know where that photograph came from.

Q    The short answer is you know it's not a Los Angeles County booking photo?

A    I don't know where it came from.

Q    Do you have some information that Mr. Stinson was in Los Angeles County within the last five years?

A    No.

Q    Do you have information that he was not in Los Angeles County over the last five years?

A    Either way I don't have any personal knowledge that he was in Los Angeles County in the last five years.

Q    Do you know where the photograph came from?

A    I do not.

MR. REED:  I have no further questions, Your Honor.

THE COURT:  All right.  Further cross-examination?

MS. FISHER-BYRIALSEN:  Yes, please, Your Honor.

THE COURT:  All right.  Ms. Fisher-Byrialsen, thank you.

CROSS-EXAMINATION

BY MS. FISHER-BYRIALSEN:

Q    Good morning, sir.  Were you involved in the arrest of Brandon Bannick; is that right?

A    I'm trying to think, I don't remember when Brandon --

well, I talked to him.  I don't know -- I can't remember when he was arrested.

Q    If I say it was back in September of 2022, does that sound right?

A    I'm drawing a blank when he was arrested.  I was aware of him at the time.  I can't remember if I was there or not when he was arrested.

Q    So you don't remember if you were there when he was arrested in September of 2022 when he was brought from, I think it was Los Angeles up to Lubbock?

A    I remember transporting him up there, but I can't remember the arrest.

Q    Did you transport him to Lubbock?

A    I remember transporting him up to Special Agent Gonzales.

Q    Was that in Lubbock?

A    I believe so.

Q    When you transported him, who was in the car with you?

        MS. STOKMAN:  Objection, beyond the scope of direct.

        THE COURT:  Sustained.

BY MS. FISHER-BYRIALSEN:

Q    You were present -- or you were involved in the investigation of things that were alleged to have occurred in this case; is that right?

A    Could you repeat the question?

Q    You were involved in the investigation of things that are

alleged to have occurred in this case; is that right?

A     Yes.

Q     And as being part of that investigation, you were present at the interviews of Matt O'Day; do you remember that?

A     Yes.

Q     And the first interview of Mr. --

MS. STOKMAN:  Objection, beyond the scope of direct.

THE COURT:  Sustained.

MS. FISHER-BYRIALSEN:  Your Honor, may we have sidebar?

THE COURT:  Not at this time.

MS. FISHER-BYRIALSEN:  I have no further questions, then.

THE COURT:  Any questions for Mr. Johnson, Ms. Luem?

MS. LUEM:  Yes.

CROSS-EXAMINATION

BY MS. LUEM:

Q     Good morning, Detective.

A     Good morning.

Q     I just want to clarify one thing that you testified about on direct examination concerning wiretaps.  You said that there were wiretaps in this investigation that were ongoing between the dates of September and November of 2020; is that right?

A     I believe that I was not a part of the wire room or any part of that, but I was aware that there was one going on

around those dates.

Q    So you weren't in the wire room listening to calls?

A    No.

Q    Or anything like that, okay.

But you were aware and you knew through your involvement in the task force, that a wire was, I think you said "up," was the term, during those months?

A    I believe I knew that they were active on a wire case.

Q    Okay.  Can you just describe what you mean by a wire being "up" or a wire being "active"?

A    They were monitoring phone calls.

Q    And they were monitoring phone calls from within the prison; is that right?

A    I don't know exactly who the -- I think it was outside of the prisons.  I don't know what phones they were up on or anything like that, whether they were up on one that had to do with like Aryan Brotherhood activity.

Q    So it could have been inside and outside the prison that these wires --

A    Yeah, I'm not aware of what phone calls they were.

Q    So really you're just aware of the date range?

A    Correct.

Q    Okay.  And so September of 2020 through November of 2020, and that Lomita homicide, double homicide, happened when?

A    I believe it was sometime around October of 2020.

Knieriem - Cross by Luem

Q    October 4, 2020?

A    That sounds like it could be correct, yes.

Q    So right in the middle of that timeframe where those wires were up?

A    Yeah, I believe so.

        MS. LUEM:  Okay.  Thank you.  Nothing further.

        THE COURT:  Any redirect?

        MS. STOKMAN:  No.

        THE COURT:  May this witness be excused?

        MS. STOKMAN:  Yes.

        THE COURT:  All right, sir, you may step down.  Thank you.

    (Witness is excused.)

        THE COURT:  Your next witness is?

        MS. STOKMAN:  Government calls Troy Clowers.

        THE COURT:  Ladies and gentlemen, we're going to take a break.  Maybe about 10 minutes.  Let's say if you'll be prepared to return at 25 -- I'm sorry, 20 minutes after the hour.  Thank you very much.

    (In open court outside the presence of the jury.)

        MS. FISHER-BYRIALSEN:  Your Honor, may I state something for the record?

        THE COURT:  Go ahead.

        MS. FISHER-BYRIALSEN:  I think maybe this issue of outside the scope of the direct will come up again.  It may be

more efficient for the trial if we can discuss that and rethink it because there will be a lot of witnesses that we will then want to recall, and they will most likely have to travel from far away.  So I'm just putting that out there for Your Honor and the Government to consider.

THE COURT:  I have no problem with you working that out, but at this point I haven't even heard who Mr. O'Day is, and yet you started asking questions, so that was clearly beyond the scope, as well as the arrest of Mr. Bannick.  So I'm happy for you to work that out.  It would be more efficient.

But at this point, the objection, you know, it's --

MS. FISHER-BYRIALSEN:  I'm not challenging the objection, I understand the ruling, I'm just pointing that out.

THE COURT:  Yeah, I agree with you, and I'm sure -- to the extent that the Government does want to address that, that would be ideal, because although I expect that this officer is available to come back, but Ms. Stokman, have you given any thought to this issue?

MS. STOKMAN:  No, this is the first time that -- I mean, this is the first time it came up.

THE COURT:  All right.  So I'm going to ask you all to talk about it and figure out if that's something that you can agree to and if there are guardrails necessary on that, otherwise we will see duplicates.

We're going to bring the witness in.  Does anyone need

a break while we're doing this?

THE DEFENDANT:  I do.

THE COURT:  All right, we'll take a break.

(Recess taken 9:11 a.m. to 9:26 a.m.)

THE COURT:  All right, Mr. Villa, you had a comment?

MR. VILLA:  We would object to the demonstrative being up the entire time.  It can certainly be up when they're using it with the witness, but for it to be up the entire time, I object.

THE COURT:  I agree.  That will be when it's being used, but I agree there's no need for it to be up all the time.

MS. STOKMAN:  The Government intends then -- or requests that it be up during testimony of witnesses who are using a lot of these nicknames just to keep it clear for the jury, if they need it, but otherwise, like law enforcement or whatever, if they're not doing that where it's not confusing, then we'll take it down.

MR. VILLA:  And, Judge, if they're using it with the witness and asking them questions about it and laying the foundations, does this assist your testimony, sure, but otherwise it should be down.

THE COURT:  Really there's no point to it, because there's a lot of people here with a lot of nicknames, and it's hard to keep it straight.  On the other hand, Ms. Stokman, I don't know that a juror can see that, and so it just -- being

up doesn't really do what I just said, so I have to agree with Mr. Villa.

If there's someone to point out this is that person, this is who we're talking about, that makes sense, but just having it displayed when you can't read it and really can't make the features, so I agree with him, it doesn't --

MS. STOKMAN: Well, Judge, and maybe it's that it needs to go into a different location. We were unsure where to put it where it wasn't in the way, but our intention is to aid the jury when there's a lot of different names and nicknames being thrown out to remember who those belong to.

THE COURT: Then maybe you need to use the exhibit when that's happening so that the jurors can understand this is who this person is, this is who we're talking about.

Because otherwise, I don't know where you can put it, because there's so many jurors, where they're going to be able to see it. I have pretty good long distance vision, I can't -- I mean, I can pick out some people, but I can't read the words at all.

Maybe, given this, you could put it closer to the witness box, and then we're still going to have people at that end who can't see it, so, I mean, if you want to just bring it out and put it in front of them, you could do that, that's fine, but it can't stay up there all the time when other counsel are up there.

MR. VILLA:  Your Honor, I don't think it should be up right now when the jury walks in.  The foundation needs to be laid.  There's sort of a hierarchy at the top.  I believe what they're doing is putting the Aryan Brotherhood brothers that they claim and then below that associates.  There's no foundation that's been established yet for that.  So once it's been established and they're using it, we don't object, but it shouldn't just be up the whole time.

THE COURT:  Well, it's not up now, so we'll deal with it.  I don't know that that's what we're talking about, so yeah, we do need some additional information to see if there's significance as to where they're placed.  I assume some witness is going to do that.

So let's put it down for now, and when it becomes relevant, you can pull it back out.

Anything else for the record at this time?

Let's go ahead and bring in the jury members.

(In open court in the presence of the jury.)

THE COURT:  We have all of our jury members back.  I gave you the speech this morning about being on time, and as soon as you stepped out our technology failed.  They had to bring our IT people in and do a whole -- I don't know what, they probably flipped a switch, but we're back up for now, so thank you for your patience.

Ms. Stokman, you may begin.

THE CLERK:  Please raise your right hand.

TROY CLOWERS, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

THE CLERK:  Please state your full name for the record and spell your last name.

THE WITNESS:  Troy Clowers, C-L-O-W-E-R-S.

THE CLERK:  Thank you.

BY MS. STOKMAN:

Q   Good morning.

A   Good morning.

Q   There's a microphone in front of you, just make sure it's as close to you as you can get it.

A   Sure.

Q   Thanks.  Could you tell us where you grew up?

A   I grew up in Fresno, Fresno County.

Q   Did you spend most of your life in Fresno?

A   I spent all my life in Fresno.

Q   Did you get into trouble as a kid, as a minor?

A   Yes.

Q   What types of things were you in trouble for?

A   Burglary, assault, drugs.

Q   And how about once you became an adult, did there come a point in time where you served some time in prison?

A   Yes.

Q   How old were you when that first happened?

Clowers - Direct by Stokman

A    Well, I've been arrested prior to going to prison, but I first went to prison the beginning of 2006.

Q    How old were you?

A    Twenty-one.

Q    What prison did you go to?

A    My first prison was Wasco State Prison.

Q    Prior to going to that first prison term, had you had any affiliation with gangs?

A    Yes.

Q    Which gang?

A    I was a Fresno County Skinhead.

Q    And is that a race-based gang?

A    Yes.

Q    What race?

A    White race.

Q    And is it fair to say that was in Fresno?

A    Yes.

Q    What did you get convicted of that led to that first term in prison?

A    Assault with a deadly weapon, GBI, I think, and terrorist threat.

Q    Is GBI great bodily injury?

A    Yes.

Q    And explain what a "terrorist threat" is, that's the legal term, but explain what that is.

Clowers - Direct by Stokman

A    It's basically, from my understanding, a threat to do harm to somebody.

Q    After that first incarceration time, did you serve time in prison as you got older?

A    Yes.

Q    About how many years in your lifetime would you say you've been in the prison system?

A    Roughly 18 years, around there.

Q    Have you had felony convictions for drug sales?

A    Yes.

Q    Have you had felony convictions for the possession of stolen vehicles?

A    Yes.

Q    Have you had felony convictions that were firearm-related offenses and being a felon who had possession of a firearm?

A    Yes.

Q    Have you been convicted of a felony of evading or, you know, leading police on a chase?

A    Yes, I have.

Q    And have you also been convicted of felony fraud activity?

A    Yes.

Q    You're currently in custody, right?

A    Yes, I am.

Q    Are you serving a sentence right now?

A    Yes.

Q    What are you serving a sentence for?

A    I'm serving a federal sentence for distribution of meth, as well as a state sentence for assault with a firearm.

Q    Are you physically within the state system or the federal prison system?

A    I'm in the federal system.

Q    Did you enter into a cooperation agreement with the Government pertaining to that federal case?

A    Yes, I did.

Q    What were the benefits that you received or that you understood you were receiving when you entered into that agreement?

A    Potential time cut.

Q    So time off of your sentence?

A    Yes.

        MS. FISHER-BYRIALSEN:  Your Honor, will you ask the witness to move a little closer to the microphone, we're having trouble hearing.

        THE WITNESS:  Yes.

        THE COURT:  Thank you, sir.

BY MS. STOKMAN:

Q    Have you heard of the Aryan Brotherhood?

A    Yes, I have.

Q    What is it?

A    It's a white prison gang.

Clowers - Direct by Stokman

Q    Have you ever been an associate of the Aryan Brotherhood?

A    Yes, I have.

Q    Does it also go by AB?

A    Yes.

Q    Are there other terms that are used to describe the Aryan Brotherhood?

A    The Brand, tip, big homies, brothers.

Q    Big homies or brothers, who does that specifically refer to?

A    To members.

Q    Like made members?

A    Made men, yeah.

Q    Have you ever spoken with AB made members?

A    Yes.

Q    Have you ever shared a prison cell with an AB made member?

A    Yes, I have.

Q    Which members did you -- one or more than one?

A    More than one.

Q    Which AB members did you share a prison cell with?

A    Calvin Bell, who goes by "Cowboy"; Daryl Scarbrough, "Lil' Bro," and "Todd Morgan."

Q    When did you share a cell with Cowboy?

A    2015, '16.

Q    What prison was that in?

A    It was in Pelican Bay State Prison.

Clowers - Direct by Stokman

Q     What about Lil' Bro?

A     Lil' Bro, I celled with him at Pleasant Valley State Prison.

Q     Around what years?

A     '19 -- 2020, yeah.

Q     You said Todd Morgan, when did you share a cell with him?

A     2021.

Q     Where was that?

A     That was in Fresno County Jail.

Q     How did you become aware of who a made member was of the Aryan Brotherhood?

A     Well, in the white gang population in prison we know who's who by people that come and go from different prisons as well as kites and talking to them on phones, so pretty much just word of mouth or introduction.

Q     When you say "kite," explain what that is.

A     That's basically just a handwritten note, generally small in size and writing, it's easy for transport, but -- yeah, that would -- it's basically a note.

Q     Is there a purpose for those notes being written or being in the small size you described?

A     To transport, smuggle from place to place without the COs being aware.

Q     Is it fair to say this is to transport them within a prison?

Clowers - Direct by Stokman

A    Yes.

Q    Did you also, in the time that you spent speaking with AB brothers or celled with them, learn of who other AB brothers were?

A    Yes.

Q    Are you aware of an individual named John Stinson?

A    Yes.

Q    How do you know who that is?

A    I met him through Lil' Bro, and he was one of the sponsors that sponsored me to become a brother.

Q    So, what was Stinson's -- when you learned of Stinson, what is his role within the AB, if any?

A    He's high-ranking, would be on the Commission.

Q    Is he a made member?

A    Yes.

Q    Explain what a "Commission" is?

A    It consists of three men, they kind of oversee the other brothers, have a little more weight or power than them.

Q    Are they made -- is the Commission made of brothers as well?

A    Yes.

Q    Are you familiar with an individual named Kenneth Johnson?

A    Yes.

Q    How do you know him?

A    I know him through conversations on the phone through my

celly, Lil' Bro.

Q    Does he have any affiliation with the AB?

A    Yeah, he's a brother.

Q    I forgot to ask you, are you aware of any nicknames that John Stinson goes by?

A    We call him "J.S." or "Pops."

Q    What about Johnson?

A    We call him "Kenwood."

Q    Are you familiar with an individual named Francis Clement?

A    I know of him, but I've never spoken with him.

Q    How do you know of him?

A    He's well known in the white gang community or prison population.

Q    Have you ever been around another AB brother when they've spoken with Clement?

A    Yes, I have.

Q    Sorry, go ahead.

A    My cellmate, Lil' Bro.

Q    Are you aware of whether or not Clement has ties to the AB?

A    Yeah, he's a brother.

Q    Does he go by any nickname?

A    I've just heard him called "Frank."

Q    So you said that you've spoken with both John Stinson and Kenneth Johnson; is that correct?

Clowers - Direct by Stokman

A    Yes.

Q    But not with Clement?

A    Right.

Q    During this time -- let me just ask, around what years were you in contact with John Stinson?

        MR. REED:  Objection, Your Honor.

        THE WITNESS:  2020.

        MR. REED:  That misstates the witness's testimony.

        THE COURT:  Yes, sustained.

BY MS. STOKMAN:

Q    Around what years were you speaking with John Stinson?

        MR. REED:  Objection, that also misstates the witness's testimony.

        THE COURT:  I think it does, sustained.

BY MS. STOKMAN:

Q    Have you ever spoken with John Stinson?

A    Yes.

Q    Around what years was that?

A    2020, '21.

Q    Have you ever spoken with Kenwood?

A    Yes.

Q    Around what years were that -- were they?

A    First time I spoke to him was in 2018, and then after that was 2020.

Q    During the time you spoke with Stinson, were you aware of

Clowers - Direct by Stokman

whether or not he was in prison?

A    Yes.

Q    Was he?

A    Yes, he was, he was in Solano.

Q    And during the times that you mentioned you spoke with Johnson or Kenwood, were you aware of whether or not he was in prison?

A    Yes, he was.

Q    Do you know where he was located?

A    Kern Valley State Prison.

Q    Are you aware of the rules or codes of conduct of the AB?

A    Yes.

Q    How did you become aware of those?

A    Through several different AB members who were schooling me or grooming me towards becoming a member.

Q    Does the AB have a position on talking to cops or law enforcement?

A    Yes, they do.

Q    What is that?

A    Absolutely, you don't do it.

Q    What happens if you do?

A    You'll be killed.

Q    Does the AB have a position on lying to brothers?

A    Yes.

Q    What is that?

A    If you lie to a brother and you're found out, you could potentially get killed, but you definitely get some kind of violence towards you.

Q    Does the AB have a position about disobeying orders given by brothers?

A    Yes.

Q    What is that?

A    Generally, if you're working for a brother or you're a white gang member, you pretty much have to do what they say.

Q    What happens if you disobey an order?

A    You're going to -- you're going to get checked for it, disciplined for it and that could be a range of things.

Q    What is that range?

A    It could go from a simple battery to both.

Q    When you say "battery," do you mean like a physical assault?

A    Assault, yeah.

Q    Does the AB have a position on disrespecting a brother?

A    Yes.

Q    What is that?

A    You don't disrespect the brothers or else you'll fall in line for a discipline.

Q    Did you ever learn whether or not there was an expectation from the AB to kill certain individuals?

A    Yes.

Q    What types of individuals were those?

A    If you ever have a chance to get a sex offender, child abuser, dropouts or, you know, rat, cooperators, people like that.

Q    What was the expectation?

A    Kill them or do your best.

Q    You said "drop out," just explain briefly.

A    Somebody who is no longer participating in the gang or no longer in good standing with their gang.

Q    During the course of the time that you were exposed to other AB brothers, did you learn about whether or not there were common symbols that were associated with the AB?

A    Yes.

Q    What are those?

A    Three-leaf clover, shamrock, one two or AB, stuff like that.

Q    What does the one two signify?

A    The first and the second letter of the alphabet, which would be AB.

Q    What does the shamrock or the three-leaf clover signify?

A    It signifies that they're a made man, a member.

Q    Explain what that means, how would one display that?

A    Generally on a tattoo, tattoos.

Q    You said it would mean that someone was a brother.  Could non brothers have a three-leaf clover tattoo?

A    No.

Q    What would happen if they did?

A    It could go from a simple cover it up to they can potentially cut it off.

Q    Are you aware of whether every brother has a shamrock tattoo?

A    No, they don't.

Q    Not everyone does?

A    No.

Q    In general, what, if anything, happens to an active gang member when they go into the prison system?

A    When they're first going into the prison system they'll be approached by a representative of the AB.

MR. REED:  Your Honor, the answer is nonresponsive to the question, and I think it's -- I'm assuming it's limited to white people.  The way the question was asked, it doesn't do that.

THE COURT:  Right, it's not even limited to the AB.

The objection is sustained.

BY MS. STOKMAN:

Q    So let me ask you this:  What, if anything, happens to an active white gang member when they enter the prison system?

MR. VILLA:  Objection, lack of foundation.  For the whole prison system?

THE COURT:  Sustained.

BY MS. STOKMAN:

Q   Are you aware -- let me ask this:  When you first were incarcerated, you said you were part of a white gang, right?

A   Yes.

Q   What happened when you first entered the prison system as a white gang member?

A   I was approached by an individual and asked for my paperwork and given a set of rules to go over.

Q   "Paperwork," what does that mean?

A   It's basically my criminal history, transcripts so they can verify what I'm in there for and be in compliance with their expectations.

Q   Was this person who told you about these rules part of the prison system, like a guard or someone else?

A   No, he was a white gang member.

Q   And at that time did you learn the association of that individual, whether or not there was an association with the AB?

MR. VILLA:  Objection, hearsay.

THE COURT:  Ms. Stokman.

MS. STOKMAN:  I think it goes to the continuing enterprise and co-conspirator.

MR. VILLA:  Lack of foundation.

THE COURT:  Overruled.

Go ahead.

BY MS. STOKMAN:

Q    Do you want me to repeat the question?

A    Yes.

Q    Did you learn whether or not that white individual who approached you was affiliated with the AB?

A    Yes.

Q    How did you learn that?

A    I was told by him, as well as others on -- that were on the yard.

Q    What was the affiliation?

A    He was an associate.

Q    Who runs a prison yard?

         MR. VILLA:  Objection, lack of foundation.

         THE COURT:  Sustained.

BY MS. STOKMAN:

Q    For white inmates -- actually, let me go back.

     So you've been incarcerated?

A    Yes.

Q    Are you aware of what a prison yard is?

A    Yes.

Q    Explain what that is.

A    A prison yard is -- consists of -- it can consist of a number of buildings and that's basically the population of those buildings.

Q    And are those yards comprised of members from different

races?

A    Yes.

MR. VILLA:  Objection, lack of foundation, overbroad.

THE COURT:  You're talking about his experience?

MS. STOKMAN:  Yes.

THE COURT:  Overruled.

Go ahead.

BY MS. STOKMAN:

Q    In your experience, are those yards comprised of individuals of different races or of one race?

A    Different races.

Q    In your experience, do those races stick together or is there some other dynamic that exists?

A    On the GP side, the general population side, it's interracial.  They stick to their own race.

Q    In your experience, is there -- for white inmates on that type of yard, is there somebody who is in charge of that yard over the other white inmates?

A    Yes.

Q    And have you ever been in charge of a yard over other white inmates?

A    Yes, I have.

Q    What is your role when you're in charge of a yard over white inmates?

A    I would be responsible to check the white population's

Clowers - Direct by Stokman

paperwork, responsible for weapon stocking and acquiring weapons for -- if we need them.  I would be a communicator between the whites and the other races, as well as making roll calls, which consists of the names, affiliations of the whites on the yard to give to the brothers, and lastly, I would be responsible for the quarterly tax.

Q    So let's break that down a little bit.  You mentioned weapons.

A    Right.

Q    How are weapons obtained within prison, in your experience?

A    We get them from a number of places.  We cut them from the lockers, bunks, get them from different work, jobs, kitchen, stuff like that.

Q    When you say "cut," what do you mean by that?

A    I mean physically cut it out from the lockers or the beds, the bunks.

Q    What type of material usually is this?

A    It's metal.

Q    What is the purpose of, in your experience, when you ran the yard, having a weapon stock, as you said?

A    For when we do get those individuals that aren't in compliance with our rules or have, as we say, "bad" paperwork, sex offenses, child abuse, cooperators, stuff like that, so we have that stuff for when they come through.

Q   Do you also ever have that for protection?

A   Yes.

Q   Explain what the purpose of that would be.

A   Generally, every white gang member, usually the first thing they do is cut a knife when they get to a yard.

Q   Does that mean make a weapon?

A   Yes.

Q   You talked about communicating, and it was your role to communicate with other races.  What's the purpose of that?

A   It could be from if someone in my race disrespected someone of another race, I would go and communicate with them and tell them -- you know, we'll discipline ours rather than start a riot, or just give them the courtesy, like if we're going to stab somebody that afternoon, let them know that we're going to do something so they're not caught unaware.

Q   Is it fair to say those communications are to keep the peace?

A   Yes, I'm like the spokesman, I guess you could say.

Q   You mentioned the quarterly tax, explain what that is.

A   Basically a tribute from each yard.  Every quarter that goes to the brother that's assigned to that yard or has power over that yard.

Q   You said you have run prison yards or you have run a yard. Have you run more than one yard?

A   Yes.

Q    How many?

A    I would say four.

Q    Where were those?

A    Wasco, Pelican Bay and Pleasant Valley.

Q    So three?

A    But different times, yeah.

Q    So three locations, but four different yards?

A    Yes.

Q    Around when were you running the yard at Wasco?

A    2014.

Q    What about Pelican Bay?

A    2015, '16.

Q    What about Pleasant Valley?

A    Pleasant Valley, in '17 and then back in -- I went back in 2020.

Q    How did you know that you were in charge of the yards that you were running?

A    I was given -- I was given a blessing by a brother to -- that was coming through Wasco to run the yard I was on.  And in Pelican Bay, I was given the yard by two brothers to basically manage the yard for them.

Q    And what about Pleasant Valley?

A    Pleasant Valley, I was given a kite, we call it a "driver's license," basically, a note from a brother, I would go and show it to the people in Pleasant Valley and that gives

Clowers - Direct by Stokman

me the permission to take that yard over.

Q    What were your responsibilities, if there were any beyond what we've already discussed, when you ran the yard; did we miss anything?

A    That's generally it.

Q    When you were in prison, did you have access to cell phones?

A    Yes.

Q    Were those lawful cell phones, lawfully possessed?

A    No, they were contraband.

Q    How would you get cell phones if you were in prison?

A    You could get them a number of ways, through the cops, through other inmates, visitation, drones.

Q    So what would a drone -- how would you use a drone to get a cell phone?

A    Basically, we have somebody fly the drone and drop it on the yard and have the yard crew workers go pick it up.

Q    When you were obtaining it from within the prison, you said from other inmates, did you have to pay for the phone?

A    Yes.

Q    About how much was a cell phone?

A    The last cell phone I bought was during COVID, so it was expensive.  It was $5,000.

Q    And before that were they a little bit less expensive?

A    Yeah, between 1,500 to 2,500.

Clowers - Direct by Stokman

Q    What were those phones used for?

A    We would use them for communication with other whites on different yards, as well as making money and producing money on the street.

Q    At any point while you were in prison, did you learn different ways to get drugs into the prison?

A    Yes.

Q    What are some of those ways?

A    Drone, like I said, visitation, legal mail.  We would send it through the books, have someone become an Amazon vendor and send them through books, stuff like that.

Q    How would drugs come in through a visitation?

A    Generally pass from your visitor to you.

Q    What about the legal mail, explain how you would get drugs in through that?

A    Legal mail.  Oftentimes we'll saturate the paperwork, or sometimes we'll just flatten out the drugs and glue the pages together and send it in.

Q    What about the books, you mentioned a little bit, but how would you get drugs in through books?

A    Books, we would have them purchased on the street and have somebody delaminate the cover and drill a little canal in the spine and fill it with drugs and put the cover back on, shrinkwrap it and send it in to the inmate.

Q    Did you ever, while you were in prison, have individuals

working for you outside of the prison?

A    Yes.

Q    How did that work?

A    Basically, I would get ahold of homeboys or gang members on the street that I knew and put drugs in their hands to sell for the Brand.

Q    When you say "sell for the Brand," explain what that means.

A    Basically, at this time I'm describing, I was in the cell with a brother and I had a lot of pressure to produce money, so, you know, I would use his name or "the Brand" for access to the drugs and more influence to get them to sell it for us.

Q    Okay.  So if you were having people sell drugs on the outside of the prison, right, what were you doing with those profits?

A    With the profits, I would give a third to the brothers, and basically, I would use some to re-up and just stack my money.

Q    So when you say "re-up," what do you mean by that?

A    I mean buy more drugs.

Q    The third -- one-third of the profits you're talking about, was that standard or was that just what you were doing?

A    It's standard.  If you work for a brother, basically any enterprises you have going on there, they're entitled to a third of the profits.

Q    Is that something that's true within the prison system?

A    Yes.

MR. VILLA:  Objection, lack of foundation.

THE COURT:  Sustained.

BY MS. STOKMAN:

Q    In your experience, was that something that was true while you were within the prison system?

A    Yes.

Q    Did having a phone impact your ability to utilize people on the outside for those drug ventures?

A    Yes.

Q    Did it impact the way that you were able to deal the drugs within the prison?

A    Yes.

Q    How did it impact those ways?

A    Made it a lot easier to get the drugs in because I could set up the drone drops or I could walk people through the steps of getting the drugs to us.

Q    Were there other ways that you were making money while you were in prison?

A    Yes.

Q    Which ways were those?

A    Fraud, doing fraud, stuff like that.

Q    Were you making money from the fraud you were doing?

A    Yes.

Q    What was happening with the profits from that criminal activity?

A    I would take some and buy drugs.  We were buying weapons at the time and, you know, making a bigger drug cache to make more money.

Q    Did you have to give any of those profits to an AB brother?

A    I did.

Q    Is it the same amount, like you said, one-third?

A    With the fraud I was given a little more because we were making a lot, a lot more.

Q    Based on your experience, can it give an inmate more status to be cellmates with an AB brother?

A    Yes.

Q    Why?

A    Well, in my experience from being housed with a brother, I was given more liberties, more responsibilities and more influence because I was able to speak on his behalf, and I noticed that they were doing more -- more willing to be doing what I was saying.

Q    When you say "they," who do you mean?

A    Other white gang members.

Q    Are you talking about within the prison system?

A    Both.

Q    In and out?

Clowers - Direct by Stokman

A    Yeah.

Q    Can it give -- in your experience, can it give a white inmate more status to be successful at making money when they're in prison?

A    Yes.

Q    Why?

A    In my experience, I was great at making money, so that got the attention of the brothers and that gave me more opportunities to shine on their behalf, you know.

Q    Is that true, being successful at making money is beneficial, did you find that that was true at anytime that you were out of custody on the streets?

A    Yes.

Q    Was it true?

A    Yes.

Q    Between your successes in selling drugs and being connected with AB members that you were celled with, did you notice whether or not other white inmates treated you differently?

A    Yes.

Q    How so?

A    They treated me more -- with more respect.  They actually treated me kind of as a brother or above them.

Q    What about people, like white gang members on the street, did you notice if you were treated differently by them?

A     Yes.

Q     Why or how?

A     Well, they were more willing to do stuff for me based on who I had in my cell and who I was associating with.

Q     So you mentioned that you had been put up for membership. Can you explain what that means?

A     Basically, I was told that I would be on a two-year prospect starting in September 2020, and after that they would do a vote and I would get a rock.

Q     When you say "get a rock," what does that mean?

A     It means become a made man, get a shamrock, yup, yeah.

Q     So you mentioned you had a prospect period and then there would be a vote. Did you know what that vote meant; what does that mean there would be a vote?

A     Basically, the brothers would take a vote, and if the vote passed, I would become a member.

Q     Are there terms that you learned that relate to being up for membership, that you would use to describe that?

A     Yeah. "Up for the tip," "on the porch," "prospecting," "probate," "getting made," all that.

Q     Before -- let me ask this:  Were you ever made an AB member?

A     No.

Q     Before or while you were up for membership, did you fall under the rules of the AB?

A    Yes.

Q    And before you were up for membership, as a white inmate in the prison system, were you under the rules of the AB?

A    Yes, I was.

Q    When you were acting on the street as a white gang member, were you under the rules of the AB?

A    Yes.

Q    Do you know the term "doing work"?

A    Yes.

Q    What does that mean?

A    "Doing work" or "putting in work" means doing stuff as far as participating in actions that promote the betterment of whatever you got going on.

Q    Does that -- is that in reference to, like, moneymaking schemes we've been talking?

A    It could be -- putting in work on the street is different than in prison, but it could be violence or it could be making money.  It could be getting something into a prison.  It could be cutting knives, it could be a number of things.

Q    So you mentioned that it's different within the prison system on the outside.  So when you were -- in your experience when you were a white inmate, doing work would be the things we've described, the ways you were making money or other activity?

A    Every white inmate is expected to do some kind of violence

throughout their term. They're expected to at least put the yard down at least once.

Q    What does that mean, "put the yard down"?

A    Basically, assault somebody when the time comes.

Q    Who makes that determination?

A    Whoever's in charge of the yard. Usually the AB.

Q    So is it true, then, that white gang members do work or put in work on the outside of prison also?

A    Yes.

Q    And how is that, just generally, how does that differ from inside the prison?

A    Generally, on the street it's -- putting in work would be, you know, maybe you can go rob drug dealers, or putting in work would be based on getting something into prison, less geared towards violence than other aspects.

Q    Does that usually involve people who have gang affiliation on the outside?

A    Yes.

Q    Can it involve people who do not?

A    Yes.

Q    Are you aware of some of the white criminal street gangs that were putting in work for the AB on the outside?

A    Yes.

Q    What are some of those gangs?

A    SDSH, SPS, OCS, PEN1, ABS, Fresnecks, Sacramaniacs, Sick

Clowers - Direct by Stokman

Boys.

Q    Have you ever heard of the COORS Skins?

A    The COORS, yeah.

Q    So we talked about what is required or kind of what your -- when you were up for membership that you had the two-year prospect time, were there any expectations of you that were conveyed to you by AB members about what you needed to do during that time?

A    Basically, I was told stay in contact and communication with a number of brothers, kind of just tend to -- if they need anything done, make myself familiar with them, and I really didn't know what I could say no to, so I was really just doing everything that they asked me to.

Q    Who, they?

A    Other brothers.  I was told that if something came up as far as violence or anything like that, that I would be -- I would have to be ready and willing to do it.

Q    This information that was given to you about your expectations or the expectations of you, which AB brothers told you that, who gave you those expectations?

A    Lil' Bro, John.

Q    John Stinson?

A    Yeah.

Q    Are those two individuals significant at all as it pertains to you being up for membership?

Clowers - Direct by Stokman

A    Yes.

Q    Why?

A    Because they're my elders, they were my sponsors.

Q    So explain what a sponsor is, just very briefly.

A    The sponsor is the person who nominates you for membership.

Q    Is there usually a number of people who do it?

A    Two brothers.

Q    Two brothers?

A    Uh-huh.

Q    So you were told that you had an expectation to be in communicate with other brothers.  Were you told what the purpose of that was?

A    Basically, just to get --

MR. REED:  Objection, nonresponsive.

THE COURT:  Overruled.

Go ahead.

THE WITNESS:  Can you say that again?

BY MS. STOKMAN:

Q    Sure.  What was the purpose of you being in contact with other AB members?

A    Just to get them familiar with me and get them to see my character so they could see me as a brother.

Q    Did this have any significance to you as far as knowing there was a vote in the future about you?

Clowers - Direct by Stokman

A    Hundred percent.

Q    Why?

A    Because I want them to be comfortable with me as well as look at me as a potential brother so when it did come time to vote, they would agree.

Q    So did you start talking to AB brothers?

A    Yes.

Q    So we've mentioned a few.  Are there any brothers that we've mentioned or beyond the ones we've already named that you spoke to during this time?

A    Yes.

Q    Who were they?

A    Todd Morgan, Beaver, Misfit, Gap.

Q    Do you know Misfit's real name?

A    I don't.

Q    You just know him as Misfit?

A    Right.

Q    And do you know Gap's full name?

A    No.

Q    You just know him as Gap?

A    Right.

Q    And you said Weaver?

A    Yeah.

Q    What's his nickname?

A    Beaver.

Clowers - Direct by Stokman

Q    And I'm sorry, who is the other person?

A    Todd Morgan.

Q    And do you know if he has a nickname?

A    Some people call him "Fox," but...

Q    Did you ever?

A    He generally goes by "Todd."

Q    So can you notice in talking to the brothers that you've mentioned you communicated with, whether some had different communication styles?

A    Yes.

Q    What was John Stinson's communication style?

A    Calm, clear communicating.

Q    And what was Kenwood's communication style?

A    Kenwood would be more threatening, violent.

Q    In your experience, did you find that it was common for AB members to be closer to some brothers over others?

A    Yes.

Q    And how, generally, did you observe that working?

A    Generally, brothers that are on the same yard together are more closer, or sometimes from their street locations, where they're from, but most of the time the one -- brothers that are on the yard together tend to be more closer.

Q    Of the brothers that we've mentioned, did any of them tend to be closer to other brothers -- some other brothers than others?

Clowers - Direct by Stokman

MR. VILLA:  Objection, lack of foundation.

THE COURT:  Sustained.

BY MS. STOKMAN:

Q   Were you aware of whether or not John Stinson was close to any other AB brothers?

A   Yes.

Q   How do you know that?

A   I knew that from my cellmate at the time, Lil' Bro.

Q   Who was Stinson close to?

MR. REED:  Objection, lack of foundation.

THE COURT:  Overruled.

BY MS. STOKMAN:

Q   Who was he close to?

A   Frank.

Q   Stinson?

A   Yes.

Q   John Stinson was?

A   Stinson, Misfit and Lil' Bro.

Q   Did you know whether or not Kenwood was close to a brother or more than one brothers over other brothers?

MR. VILLA:  Objection, lack of foundation.

THE COURT:  Overruled.

BY MS. STOKMAN:

Q   Did you know whether he was close to one or more brothers over others, Kenwood?

A    I knew that he was close with Frank.

Q    How did you know that?

A    Through Lil' Bro, through hearing him talk to Lil' Bro on the phone.  Lil' Bro would have the phone on speaker, so it would kind of be like a group chat type thing, you know.

            MR. VILLA:  Objection, hearsay, move to strike.

            THE COURT:  Ms. Stokman.

            MS. STOKMAN:  Coconspirator statement.

            THE COURT:  Overruled.

BY MS. STOKMAN:

Q    Did you ever, in your conversations with Kenwood, learn that he was closer to Frank than other brothers?

A    Yes.

Q    And how did you learn that?

A    He would talk about him.

Q    About Frank?

A    Yes.

Q    Do you know whether or not Kenwood and Frank ever were on the same yard together?

A    Yes.

            MR. VILLA:  Objection, lack of foundation.

            THE COURT:  He says yes, let's follow up with how.

BY MS. STOKMAN:

Q    How did you know that?

A    I knew that they were in Kern Valley on the same yard

Clowers - Direct by Stokman

together.

Q    How?

A    Through other inmates, through my celly that talked to him more than I did.

Q    So --

        MR. VILLA:  Objection, hearsay, move to strike.

        THE COURT:  Overruled.

BY MS. STOKMAN:

Q    What about Jayson Weaver, Beaver, were you aware of whether he had affiliation or close ties with one or two brothers over others?

A    Yeah, Beaver is always with Waylon.

Q    Waylon Pitchford?

A    Yes.

Q    So you've mentioned you've spoken with Kenwood.  How would you communicate with him?

A    Originally, I communicated with him through one of his cellies at the time, which was Sean Chapman.  That was the first time I talked to him, and a couple years later I talked to him through my cellmate Lil' Bro.

Q    And did you ever speak with him directly without someone, like a third-party involved?

A    Yeah.

Q    What ways would you communicate, like how would you do that?

A    Through the cell phone.

Q    Those contraband cell phones we're talking about?

A    Yes.

Q    And would you use the normal cell phone function or something else?

A    Yeah, normal cell phone.

Q    Were there ever any apps that you would use to communicate with AB members?

A    Signal, Signal app, WhatsApp.

Q    What was the purpose of communicating with those apps?

A    They're supposed to be encrypted.

Q    What does that mean, what does that mean to you?

A    It means that they can't be hacked or listened on, from my understanding.

Q    Do you know whether or not you used those apps as a means to communicate with Kenneth Johnson?

A    I don't.

Q    You don't remember?

A    I don't remember.

Q    What about John Stinson?

A    No.

Q    You did not?

A    No.

Q    During the conversations you had with Kenwood, did he ever ask you to put in work for him?

Clowers - Direct by Stokman

A     Yes.

Q     What did he ask you to do?

A     I sent him drugs through the Access quarterly page catalogs.  I sent some meth to him on Kern Valley.

Q     So you sent it through like the -- into the prison?

A     Yeah, I sent it -- I got the quarterly package catalogs on the street and then just made it look like it was coming from the company and sent it into a different inmate, not actually him.

Q     It was intended for him, Kenwood?

A     For Kenwood.

Q     Did he ever ask you to do anything else?

A     Yeah, he got on the phone with me and Lil' Bro and he showed us how to do the EDD, him and his celly explained how to do -- to file for EDD.

Q     Can you briefly tell us what that -- like what is that EDD, what you're talking about?

A     EDD is unemployment claims.

Q     How does that work?

A     Basically, you just -- you could get anybody's profile and just make an online claim that you're out of work during COVID, and they were giving you money for it.

Q     When you say "profile," what type of information are you referring to?

A     A name, a date of birth and a social.

Q    How did it work, you said that the two brothers that sponsored you were Lil' Bro and John Stinson, how did it work, if at all, as far as putting in work, how did putting in work relate to those two?

A    Basically, everything I did I gave the proceeds to Lil' Bro and Stinson.

Q    Does this include -- what types of ways were you making money when you were up for membership, giving those two individual's proceeds?

A    I was selling drugs, doing fraud and sending drugs into prisons.

Q    You mentioned EDD, were you involved yourself in committing that fraud?

A    Yes.

Q    Beyond what we've talked about already, are you committing fraud for the benefit of other AB brothers?

A    Yes.

Q    Which ones?

A    Since Kenwood showed us how to do it, I did one for him and one for Frank, and Lil' Bro gave me an address and I sent the cards to the address.

Q    And are there any other brothers that you've done EDD for?

A    I did one for Misfit.

Q    Where did that money go -- just to be clear, when you would go through with that EDD fraud and get the money on the

card, where would that money go?

A     For them?

Q     Yeah, would it go to them?

A     Well basically, what I did was -- say I did 20 -- 20 profiles, I gave a certain amount to Lil' Bro and I kept the rest for myself.

Q     Would that be true some of the proceeds would go to the AB brother that you would be doing that fraud for?

A     Right.

Q     During your early prison years or before you were up for membership, were you sending money to various AB brothers?

A     I was working for brothers and I would give them proceeds, yeah.

Q     Once you were up for membership, did that change?

A     Once I was up for membership, I exclusively sent the money to Lil' Bro and Stinson.

          THE COURT:  Ms. Stokman, we're going to take a break.

          Ladies and gentlemen, if you will be prepared to return at 20 minutes to 11:00.  Thank you very much.

     (In open court outside the presence of the jury.)

          THE COURT:  Anything for the record at this time?

          MR. VILLA:  No, Your Honor.

          MS. FISHER-BYRIALSEN:  No, Your Honor.

          THE COURT:  Go ahead and take a break.

     (Recess taken 10:21 a.m. to 10:41 a.m.)

THE CLERK:  Court is in session.

THE COURT:  Anything for the record at this time?

MS. STOKMAN:  Nothing from the Government.

MR. REED:  No.

MR. VILLA:  No, Judge.

THE COURT:  Let's go ahead and bring in the jury.

(In open court in the presence of the jury.)

THE COURT:  We have all of our jury members back in their places.

Ms. Stokman, you may continue.

BY MS. STOKMAN:

Q    Troy, have you ever committed violent acts on behalf of the AB?

A    Yes.

Q    What types of things?

A    Assault, stabbings.

Q    Did you commit those inside of prison?

A    Both.

Q    Inside and out?

A    Yes.

Q    Have you ever ordered violence on behalf of the AB?

A    Yes.

Q    What types of things have you ordered?

A    Stabbings, assaults, kidnappings, stuff like that.

Q    Were those orders for -- on the inside of the prison

system or on the inside and the outside?

A    Both, in and out.

Q    What is the purpose of issuing orders of violence?

A    In some of the circumstances it was because people had broke the rules in custody and other stuff, was just disobeying rules and not doing what they're supposed to do.

Q    Whose rules were being broken in those situations?

A    The brand's, AB's.

Q    What -- do you know the term "checking"?

A    Yes.

Q    What does that refer to?

A    Checking is basically something that takes place when you break the rules or disobey an order or something.  Rather than, you know, stabbing you or killing you or being done with you, checking is basically you take your checking, like your assault, assault or whatever it is, and then you'll be back in good standing with the wood pile.

        MS. FISHER-BYRIALSEN:  Your Honor, we're still having a little trouble hearing.

        THE WITNESS:  I'll speak up.

        THE COURT:  Move up a little closer.  Thank you, sir.

        THE WITNESS:  Right, uh-huh.

BY MS. STOKMAN:

Q    In your experience, does the use of violence correlate in any way with control?

Clowers - Direct by Stokman

A     Yes.

Q     How so?

A     Well, you know, that if you're told to do something or you're expected to do something, that if you don't perform those acts, that's what's going to happen.

Q     What is the purpose of that control?

A     Basically, to get them to know that you're going to fall in line and do what they ask you to do.

Q     Is that particularly important to you when you are giving those orders from inside the prison to people who are outside the prison?

A     Yes.

Q     Why?

A     Basically, if they don't do what you tell them to do and you're in custody and they're out and then you lose control, basically the money stops and everything you got going grinds to a halt.

Q     As far as the money making?

A     Right.

Q     In your experience, are you aware of different territories within California outside of the prison system that are run by or controlled by AB brothers?

A     Yes.

Q     How does that work?

A     Generally, a AB brother could be from a certain county or

part of the state and they would be in control of it, and sometimes they're in control of spots that they're not from.

Q    And what does that mean for you if you're a white gang member on the street as far as why that territory kind of is important?

A    Basically, if I know somebody's in control of a county, I'm not going to go there and, you know, break the law as far as -- I'm not going to go rob somebody or do some kind of work there without at least acknowledging them or asking permission.

Q    And when we say "them," who do you refer to?

A    AB.

Q    The brothers?

A    Yes.

Q    Is this general idea of territories true for the prison system itself?

A    In prison usually if a brother's on the yard, they have control of that yard, but if a brother isn't on the yard, there's a brother that is in contact with it and has responsibility for it.

Q    So in your experience, in every prison that you went to were you aware of a AB brother who ran that prison?

A    Yeah, either physically or someone that we reported to.

Q    And did you ever hold the role of the person the other white inmates reported to?

A    Yes.

Q    Is that when you were saying you were in charge of yards?

A    Right.

Q    Were you aware -- in 2020 when you were up for membership, were you aware of other associates of the AB who were also up for membership around that time?

A    Yes.

Q    And who are some of those individuals?

A    Kenneth Bash and Rage, Robert Eversole.

Q    Do you personally know Rage and Bash?

A    Yes.

Q    How do you know them?

A    I've known Rage since I was 17 and I grew up with Kenny Bash.

Q    And have you ever been incarcerated with either of them?

A    Yes.

Q    Which one?

A    Both.

Q    Around when were you incarcerated with Bash?

A    I was incarcerated with Bash several times from 2010 off and on until 2020.

Q    And what about Rage?

A    Rage, 2021 -- or 2020 I was in the county jail with him.

Q    So when you were aware that they were up for membership, how did you become aware of that information?

A    I was told by other brothers to recognize them as brothers

because they're up for the tip.

Q   Is there a rule about portraying yourself as a brother if you're not a brother?

A   Yeah.

Q   What is that?

A   You don't do it, but if you're up -- if you're up for membership, a lot of times they tell you to treat him as a brother because he's up for it.  Or if -- in a lot of circumstances I've asked, Hey, can I use your name or can I use the Brand's name to get influence, to get people to do stuff while I'm in custody and they're on the street.

Q   And what is the general response that you've had when you've asked those questions?

A   If it benefits them, yeah.  But if you're doing it without permission, then you're going to get in trouble.

Q   Okay.  What kind of things could happen?

A   You're going to get killed, more than likely.

Q   Did you ever have discussions with Bash about being up for membership -- him being up for membership?

A   Yes.

Q   Did he ever tell you who his sponsors were?

A   I believe Morgan and Beaver.

Q   Beaver and Morgan?

A   Yeah.

Q   And did you ever speak with Rage about being up for

Clowers - Direct by Stokman

membership?

A     Yes.

Q     Did he ever tell you who his sponsors were?

A     I know Kenwood was one of them.

Q     Do you know who the other one was?

A     Not for sure.

Q     Okay.  Do you know what kind of work that Bash was doing for the AB?

A     I know he was selling drugs.

Q     How do you know that?

A     Because I talked to him a lot about it, and he told me a lot of what he had going on.

Q     What about Rage, do you know whether or not or what kind of work he was doing for the AB?

A     He was selling drugs as well.

Q     And how do you know that?

A     Through conversations with him.

Q     So let's go to the year of 2020.  You mentioned that during that time you were incarcerated and you were celled with Lil' Bro, right?

A     Yes.

Q     And who was the AB member in charge of that prison during that time in 2020?

A     The prison I was at?

Q     Yes.

A    Lil' Bro.

Q    And is that when you were running the yard at that prison?

A    Yes.

Q    In November of 2020, did a significant event occur for you?

A    Yes, it did.

Q    What happened?

A    I was taken from prison and brought to the county jail for a state indictment.

Q    What County was that?

A    Fresno County.

Q    When you were housed in Fresno County jail, what kind of population were you housed with?

A    White gang members, AB.

Q    Was somebody -- or let me ask you this:  Were there any other people that we've mentioned also housed at the Fresno County jail at that time?

A    Todd Morgan and Kenny Bash were housed in the same housing as me.

Q    And was anyone else housed at the Fresno County jail that we've mentioned?

A    Yeah, Rage, Bobby Eversole, was brought with us to the county jail but separated as soon as we got there.

Q    Are you aware of whether or not at that time Rage was in good standing with the AB?

A    At that time he wasn't.

Q    He was not?

A    No.

Q    So is it fair to say that when you were housed with Morgan and Bash, you had a contact with them?

A    Yes, Morgan was my celly.

Q    He was your cellmate?

A    Yes.

Q    Was there an expectation of you or other, you know -- you personally, but of white inmates in the jail when it comes to how to act within the population you're being housed with?

        MR. VILLA:  Objection, compound question.

        MS. STOKMAN:  Yeah, sorry, let me rephrase that because that was confusing.

        THE COURT:  All right.

BY MS. STOKMAN:

Q    Is there, to your knowledge and with your experience, is there an expectation of white jail inmates when it comes to prison yard rules?

A    It's the same rules.

Q    As the -- the rules that we've been talking about before?

A    Yes, same rules.

Q    So did you answer to someone when you were at the Fresno County jail?

A    Yeah, Todd Morgan.

Q    Why would you have to listen to Morgan if at that time he was not one of your two AB member sponsors?

A    He was the actual brother.

Q    Explain that a little bit.

A    He was more powerful than me.  He had a rock.  He was actually a made man.

Q    So you mean he was an actual brother that was with you where you were housed?

A    Right.

        MS. STOKMAN:  Okay.  May I approach the witness?

        THE COURT:  All right.

        MR. VILLA:  What exhibit number?

        MS. STOKMAN:  Sorry, it's 1063.

BY MS. STOKMAN:

Q    Troy, I've handed you what's been marked as Exhibit 1063.  Do you recognize what that is?

A    Yeah, it's a kite from Todd Morgan to me.

Q    So it's a kite that you received from Todd Morgan?

A    Yes.

Q    Are those the actual kites you received?

A    They look like it, yeah.

        MS. STOKMAN:  I would ask that Exhibit 1063 be admitted, and there's a copy that can be published to the jury.

        THE COURT:  Any objections?

        MR. VILLA:  No, Your Honor.

MS. FISHER-BYRIALSEN:  No, Your Honor.

MR. REED:  No, Your Honor.

THE COURT:  All right, that will be admitted.

(Government Exhibit 1063 admitted in evidence.)

BY MS. STOKMAN:

Q    What is the significance, if any, of the information that are within these kites that Todd gave you?

A    Basically, Todd Morgan gave me the -- to be in charge of the county jails in Fresno County, and along with that there's a list of people who are not to be in any position of power as well as I guess you could say a hit list or a bad news list.

Q    So what are the expectations -- or were you aware of the expectations for yourself regarding the people who are on this list that you just mentioned?

A    Yes.

Q    What were those expectations?

A    I was to have them hit, killed, whatever, or do it myself, one of the two.

MS. STOKMAN:  Can we just zoom in on the first page, and there are multiple, but we'll just go through.

BY MS. STOKMAN:

Q    The first page of Exhibit 1063, is there something significant in that that explains what you just said to us?

A    Basically, it's saying, For all white men to -- this is to inform you that Troy Clowers will be in charge of the white

program here in Fresno County jail.  Given directly from the AB.

Q    On the list that's within these kites, the members -- or the names that you mentioned that were on this bad news list, of anyone we mentioned, were they on that list?

A    Yes, Bobby Eversole, Rage, and I believe Bash.

Q    In your experience, does Morgan need a justification to put somebody on that list?

A    A non brother, no.

Q    Why not?

A    Because he makes the rules, he's the bro, he's more powerful.

Q    Are these kites similar, in just structure, to the kites that you mentioned before that get passed around prison systems?

A    Yes.

Q    How or what did you do with these kites when you received them?

A    I held onto them.

Q    And did these kites tell -- give you orders to carry this out yourself?

A    I took it as both either -- I'm responsible to have it done or if I get a chance to carry it out, to do so.

Q    What happens if you ignore this order?

A    Then I'm going to be on the list as well.

Q    Did you ignore this order?

A    Yes.

Q    Why?

A    Because at that time I had already decided that I wasn't going to be a part of this, that lifestyle anymore.

Q    Were you already in the cooperation that we've mentioned before with the Government?

A    I was in the beginning stages of cooperating.

Q    And do you -- how did you carry these kites, if you carried them to law enforcement at any point?

A    I brought them -- I rolled them up how I got them, which was in a little tiny scroll, and then I wrapped a couple layers of Saran Wrap around them and hid it in my mouth until I got over here.

Q    So at some point before you received these kites, but after you had been celled with Morgan -- so let me ask you this:  When you received these were you celled with him?

A    No.

Q    Between the time that you got to Fresno County jail and were celled with Morgan and you received these, did you get out of the Fresno County jail, out of custody?

A    Yes, I bailed out.

Q    And while you were out of custody, did you get arrested again?

A    Yes.

Clowers - Direct by Stokman

Q    What charges were you arrested on?

A    I was arrested on, as originally an attempted murder.  I pled to assault with a firearm with a gang enhancement.

Q    And when you -- after you had been arrested again, did there come a point in time where you were charged with the federal drug offense that you're serving a sentence for today?

A    Right, later on after my original arrest I was federally indicted.

Q    When we talked about the benefits you received on the federal case, you said that you believed you would receive a benefit of a reduction in time?

A    Right.

Q    Your sentence?

A    Yes.

Q    And have you received a reduction in your sentence?

A    No.

Q    And as far as the reduction in sentence goes, were you aware of what that could look like, like how much could be reduced?

A    Up to 50 percent, from zero percent to 50 percent.

Q    Do you know who ultimately determines how much or what your sentence is going to be if you're re-sentenced?

A    Yes.

Q    Who is that?

A    The judge.

Clowers - Direct by Stokman

Q    How did your cooperation affect the state charges that you were charged with?

A    They ran my state charges concurrent with my federal charges.

Q    When you first made the decision to cooperate, was it a clearcut choice for you?

A    No.

Q    Why not?

A    On one side I've been a gang member and I've been in this lifestyle more than half my life, and the other part of it is after this I'm going to be wanted for -- they're going to want to kill me, they're going to want to hurt my family.  There are a lot of variables to the decision.

Q    Why did you ultimately come to the decision that you made?

A    Basically, I wanted to try something new with my life, and my family's getting old.  I got kids.  I want to get out of the lifestyle.

Q    Were you facing a significant amount of time on the state charges?

A    Yes.

Q    What about the federal charges?

A    Yes.

Q    So we talked a little bit, but tell us again if the AB has rules about cooperating with law enforcement.

A    Yeah, they do.

MR. VILLA:  Asked and answered.

THE COURT:  Sustained.

BY MS. STOKMAN:

Q    So given what you've told us before, and you said you could be killed for sitting here today, correct?

A    Correct.

MR. VILLA:  Objection, leading.

THE COURT:  Sustained.

BY MS. STOKMAN:

Q    Given what you told us, is your safety something that you are concerned with?

A    Yes, it is.

MR. VILLA:  Objection, asked and answered.

THE COURT:  Overruled.

BY MS. STOKMAN:

Q    Who decides if a cooperator could be killed -- or should be killed?

A    AB members.

MS. STOKMAN:  I have no further questions for this witness.

THE COURT:  Mr. Reed, are you up first?

MR. REED:  I am not up first.

THE COURT:  Mr. Villa?

MR. VILLA:  I am.

MS. STOKMAN:  May I approach just to grab the exhibit?

THE COURT:  Yes.

CROSS-EXAMINATION

BY MR. VILLA:

Q    Good morning, sir.

A    Good morning.

Q    My name is Ryan Villa, I represent Kenneth Johnson.

Just a second ago you said you're expecting a sentence reduction which you haven't got one yet, correct?

A    Right.

Q    That's not actually the whole story, though, is it?

A    I don't understand.

Q    Well, just -- you agreed with Ms. Stokman that you are facing a lot of state time when you made the decision to testify, right?

A    Yes.

Q    In fact, you were facing life in the state, weren't you?

A    Potentially.

Q    Potentially, because, as you explained to the jury, when you made bail after you decided you weren't going to carry out the orders you say came from Todd Morgan, when you made bail you went out and committed more crimes, right?

A    Yes.

Q    Including the attempted murder?

A    Right.

Q    And a drug trafficking crime?

A     Uh-huh, yes.

Q     Yes, and fraud?

A     Yes.

Q     So you were facing a state charge of attempted murder, which if you were convicted, because of your criminal record, could result in a life sentence, right?

A     Yeah.

Q     Under the three strikes law?

A     Sure.

Q     I'm sorry?

A     Sure.  I don't have two strikes, but yeah, I was facing a lot of time.

Q     In the federal case, before your agreement with the government, you were told you were facing potentially 25 years in federal prison, right?

A     I was facing a mandatory minimum of 10 years.

Q     Mandatory minimum of 10 years, but potentially you were facing 25 years given the fact that you were caught with methamphetamine and because of your prior record?

A     Yeah.  I don't know.  I don't know the extent of how much I was facing, but I know it was a mandatory minimum of 10 years.

Q     And you understand that that's just the minimum, you were facing potentially a lot more time if you didn't cooperate, yes?

Clowers - Cross by Villa

A    I guess so.

Q    So the life in the state, more than 10 years in the federal system, and we'll talk more about that, and ultimately your federal sentence right now was 10 years, yes?

A    Yes.

Q    Hundred and twenty months, they go by months in the federal system, yeah?

A    Yeah, 120 months.

Q    So instead of getting life in the state, instead of getting more than 10 years in the federal system, you got 10 years period, yes?

A    I got 10 years, and I believe six years, eight months in the state, ran concurrent.

Q    That's right, so ran concurrent, meaning the sentences run together at the same time, yes?

A    Yes.

Q    Because what could have happened, you could have got a state sentence and a federal sentence and had to do one and then the other after that, right?

A    Potentially.

Q    That's what's called a consecutive sentence?

A    Right.

Q    Rather than a concurrent sentence, which you've got because you were willing to say what the Government wanted you to say, yes?

Clowers - Cross by Villa

A    No.

Q    You got that because of your cooperation agreement, yes?

A    Right.

Q    So the six years in the state is covered by the time you're doing now in the federal prison, yes?

A    Should be.

Q    And the federal time, as we said, is 10 years, but after your testimony in this trial, you're hoping to get an additional 50 percent reduction, correct?

A    Whatever they give me, yeah.

Q    I mean, you just said a minute ago it could be up to 50 percent?

A    Yeah, up to 50 percent, yes.

Q    So that would cut it down to five years?

A    Right.

Q    And currently, you're projected release date is 2029, yes?

A    Yes.

Q    So if you got five years off, you'd be out?

A    Close.

Q    And you wouldn't have to go to state prison because your time is running with the federal time, right?

A    Yes.

Q    And you would get out of federal prison, you would be back here in the community in Fresno?

A    Yes.

Clowers - Cross by Villa

Q    And that's what you're hoping happens after your testimony here today, yes?

A    Yeah, I'm hoping to get a reduction, yes.

Q    I want to talk a little bit more about your testimony.

So you were talking about someone named Rage.  Rage is Robert Eversole, yes?

A    Yes.

Q    You said you had known Robert Eversole since you were 17-years old?

A    Yeah, that's when I met him.

Q    You met him in the course of essentially the criminal lifestyle that you were leading up until -- well, I don't know when, but throughout your life, yes?

A    I met him on the street.

Q    And he was involved in criminal activity; wasn't he?

A    I'm sure he was.

Q    How old are you now?

A    Forty.

Q    So 17, that's 23 years ago, roughly?

A    Yes.

Q    So as long as you've known Robert Eversole, from that time, at least until 2021, he was a criminal, too?

A    I guess.

Q    He's from Fresno, right?

A    Yeah.

Q    And you claimed that he was involved with the Aryan Brotherhood, yes?

A    Yes.

Q    And you claim to have a lot of knowledge about what goes on with the Aryan Brotherhood, right?

A    Yes.

Q    So then you know that Robert Eversole is -- been a criminal essentially as long as you've known him?

        MS. STOKMAN:  Objection.

        THE WITNESS:  I've never done crimes with him, so I don't know.

        THE COURT:  Ms. Stokman, are you still asserting that objection?

        MS. STOKMAN:  If the line of questioning continues, yes.

        THE COURT:  We'll wait and see.

        All right, go ahead.

BY MR. VILLA:

Q    However, what you're saying is the note, which is Government's Exhibit 1066, the kite, was --

        THE COURT:  It's actually 63, I think.

BY MR. VILLA:

Q    I'm sorry, 1063, you said that was written by Todd Morgan?

A    Yes.

Q    Who you claim is an Aryan Brotherhood member?

Clowers - Cross by Villa

A    Yes.

Q    But though you were celled with him, he didn't give it to you in the cell?

A    This is months apart, maybe almost two years apart.

Q    So when did you receive this kite that you claimed he wrote?

A    I think the summer, July, summertime 2021.

Q    Were you in Fresno County jail at the time?

A    Yes.

Q    And you received it from who, according to you?

A    I received it from Todd Morgan.

Q    He gave it to you directly?

A    No, it was passed to me.

Q    By who?

A    By another white inmate.

Q    And that person told you it came from Todd Morgan?

A    Well, I was able to communicate with Todd, we just couldn't, you know, touch each other, so he had to pass it through somebody else.

Q    I noticed when I looked at the exhibit, and we can pull it up again, it's not signed by anybody, right?

A    I don't remember.

        MR. VILLA:  Your Honor, can we pull back up 1063.

        THE COURT:  Sure.

Clowers - Cross by Villa

BY MR. VILLA:

Q   We'll just see if we can rotate it.

    Are you able to see it there to tell whether or not it's got a signature on it?

A   My screen's not on.

        MR. VILLA:  May I have the exhibit, please.

        May I approach, Your Honor?

        THE COURT:  Sure.

BY MR. VILLA:

Q   Can you see that well enough?

A   Yes.

Q   Do you agree with me that the same kite that is displayed or that is, excuse me, Exhibit 1063, doesn't have anyone's signature on it?

A   No, I don't see a signature on it.

Q   So what you're saying is that the person that gave it to you said it was from Todd Morgan?

A   I know that's from Todd Morgan.

Q   And you know that because what you're saying is you then later communicated with Todd Morgan?

A   I knew this was coming, but -- I know his handwriting, I know everything that we were talking about.  I sent him a phone number.  He tried to call my girl.  It didn't -- he wasn't able to get through.  Everything that he said was knowledge pertained between me and him.

Q    All right.  So you say that this is Todd Morgan's handwriting rather than, like, your own handwriting, right?

A    Right.

Q    And what Mr. Morgan, according to you, is saying is that Robert Eversole is on the bad news list, he's not to be trusted?

A    Right.

Q    Now, let me ask a little bit about some of what you were talking about in the prison life.  Some of the things that you hear about certain people, you know, who's a brother, who's not a brother, who's an associate, who's a prospect, those sorts of things, it's just discussions that take place on the yard?

A    They take place on the yard, as well as nowadays everybody has cell phones, so we could just call and back-check anybody's story.

Q    So it's kind of like word of mouth, right?

A    I guess you could say that.

Q    People talk to people and then you talk to somebody else, and, you know -- I mean, there's not like a written list that you can go check that says this person is --

A    You could check with the people that would know.

Q    Okay.  But let me ask this question:  There's not like a document that you can go look up and say, This person's a made member, this person's a prospect, this person's an associate; it all comes from word of mouth, right?

Clowers - Cross by Villa

A    Yeah, if there's a list, I don't know.

Q    You've never seen such a list?

A    Of a list of brothers?

Q    Or prospects or associates?

A    No.

Q    No?

A    No.

Q    So what you're saying is if you want to check, you go ask somebody else, right?

A    Right.

Q    There's not -- I mean, you can't go online to the dark web and look up a list of everybody that's a brother, right?

A    I've never checked.

Q    Or these rules that you talked about that you learned through the prison, those aren't written rules, those are rules that you learned through word of mouth, right?

A    Some of them are written.  Some of them are written rules and regulations that you get when you walk onto a prison yard, so you can't say that you didn't know them.

Q    So you're saying there's a document that gets passed around?

A    Sometimes.

Q    In the course of your cooperation with the Government, you didn't turn over any such document; did you?

A    No.

Q    But it's fair to say -- I mean, so that the jury understands, it's fair to say that the majority of what you know about who's involved with Aryan Brotherhood, what the rules are, those sorts of things, you learn from other people telling you, yes?

A    Associates and members, yes.

Q    And those other people are people you're in prison with or maybe they're out of prison, but they're criminals, too, right?

A    Yeah.

Q    I mean, it's not like the cops.  When you said the "cops" earlier, you were talking about getting cell phones and sometimes you get them from the cops, you're talking about the corrections officers, right?

A    Yes.

Q    When you get to prison, it's not like the corrections officers sit you down and say, This guy's a brother and that guy's a brother and this guy's a prospect and these are the rules; they don't do that, right?

A    No.

Q    The prison doesn't give you a handbook that says, This guy's a brother, that guy's a brother, these are the rules; that doesn't happen, right?

A    No.

Q    So it's all primarily word of mouth; is that fair?

A    Yeah, I mean, it's got to be like that to evade the

authorities, you know.

Q    I understand.  But one person's interpretation of a rule might be different than another's, right?

A    Sure.

Q    One person's suggestion that someone's a prospect might be different than another's, right?

A    I don't know about that because it's going to get found out.  You know, you can't walk around and say that this person's a prospect or that person's a brother, because there's consequences to it.

Q    But it takes time because it has to go through the word of mouth process to figure out if somebody is saying accurate information or inaccurate information?

A    If you walk on a prison yard and say you're a brother, we're going to get on the cell phone right when we going to the building and run a make on you, and we're going to know within minutes if you're who you say you are.

Q    You said that you had conversations with Kenneth Johnson, correct?

A    Yes.

Q    Over a cell phone?

A    Yeah.

Q    Never in person, correct?

A    No, I never met him in person.

Q    Never been in the same prison as Kenneth Johnson?

A    Not that I know of.

Q    When you said that you were in charge of yards, that you were sort of under the umbrella of another AB brother, correct?

A    Yes.

Q    But you were never being directed or supervised or anything by Kenneth Johnson, correct?

A    No.  I did one thing for him, I sent him some drugs in one time, but I didn't work for him.  I didn't want to.

Q    Okay.  Let me ask you about that.  You said that you sent drugs through the catalog?

A    Yeah, access catalog, the quarterly package catalogs.

Q    Explain to the jury what that is.

A    Once every three months you can order a catalog as an inmate to buy hygiene, clothing, different stuff like that. Basically, we wrote the company, e-mailed them, they sent us the catalogs on the street and we laced them with drugs and sent them in to the inmates.

Q    You're saying you did that from prison?

A    No, I was on the street.

Q    You did it from the street?

A    Yes.

Q    You said you sent it to Kenneth Johnson?

A    I sent it to an inmate on his yard for him.

Q    By the mail?

A    Yes.

Q    And I assume that mail has to go through the prison officials first, right?

A    Well, it was going straight to the program office, so I don't even know if they went through it.

Q    Now, you have, in the course of working with the Government, made several statements to them about your alleged involvement in the Aryan Brotherhood, right?

A    Right.

Q    So I'll talk about the timeline, but essentially starting in July of 2021, you started talking to the Government, yes?

A    Yes, around there.

Q    Including Special Agent -- well, he's not here today, or not here at the moment, but Special Agent Anthony Gonzales from the ATF?

A    Yes.

Q    And Ms. Stokman, she was present for a lot of those meetings?

A    Yes.

Q    There was also a lawyer for yourself, right?

A    Yes.

Q    Someone from the District Attorney's Office of California?

A    No -- I don't know if he works for the District Attorney's Office.

Q    All right, but there was -- you had conversations in the course of your cooperation with the person from the state who

could help you with your state charges if you cooperated, right?

A   You're talking about my state attorney, he was private.

Q   Private state attorney, but I mean, they had to deal with the District Attorney for them to get you a deal on your state charges, right?

A   Right.

Q   So you didn't have to do life in prison, right?

A   So I got a less sentence, yeah.

Q   And in the course of these conversations you told the Government what you claimed you knew, right?

A   Right.

Q   You also testified before the grand jury in this case, right?

A   Yes.

Q   And it's true, isn't it, in all these conversations with the Government and at the grand jury, you never mentioned once that you had sent drugs to Kenny Johnson from the street?

A   They never asked anything about Ken Johnson.

Q   So it's the first time, is what you're saying, today is the first time that we're hearing you did this, you sent drugs to Kenny Johnson?

A   It wasn't something that I felt pertained.  I've done so many things for the AB, I could tell you a million things I've done for them.

Clowers - Cross by Villa

Q    But you didn't feel like it needed to come up during all your conversations with the Government or the grand jury, but you thought it was important to tell the jury today, is what you're saying?

A    They never asked at the grand jury.

Q    That was not my question, if you were asked.  My question is, today was the first time you said such a thing about Kenny Johnson since you decided to cooperate?

A    I believe so.

Q    I want to get into a little bit more of this timeline.  So November 2020 you're in prison, yes?

A    Yes.

Q    Where are you in prison?

A    Pleasant Valley State Prison.

Q    You're doing time for what felony conviction?

A    I believe drug sales.

Q    Drug trafficking?

A    I think so.

Q    So you're in Pleasant Valley.  Where's Pleasant Valley?

A    It's in Coalinga.

Q    What part of the state is that?

A    Central Valley.

Q    So you get brought over to Fresno County jail because you've been charged by the State of California, correct?

A    Yes.

Q   You were charged with a lot of other people for essentially fraud and forgery, right?

A   Those are my charges, yeah.

Q   Having to do with the employment, the EDD fraud, yes?

A   Right.

Q   And in addition to that, your girlfriend, Fawn Dehmel; is that how you say her last name?

A   When I was arrested, I never dated her.  I dated her after that.

Q   Is there somebody -- how do you say her last name?

A   You said it right.

Q   So Fawn Dehmel was also charged along with you in that EDD case, right?

A   Right.

Q   But you say you didn't start dating until later?

A   I started dating her after that.

Q   Those charges were filed on November 20, 2020?

A   Yeah.

Q   Then you said you made bail.  In fact, you made bail in January?

A   Yeah.

Q   The reason you're able to bail out is because your prison sentence had finished, right?

A   Right.

Q   Now, before you made bail, that was January 2021, you had

Q   already received the kites?

A   No.

Q   You got them after?

A   Yeah.

Q   At that point in time, in January 2021 when you made bail, had you made the decision that you didn't want to be involved in the lifestyle anymore?

A   No.

Q   Not yet?

A   Yes.

Q   Okay.  So you make bail, you get on the streets and you started dating Fawn, right?

A   Right.

Q   And that's January 2021, yes?

A   Yes.

Q   So then three months later -- four months later, I guess in April, you do -- you're charged with attempted murder, correct?

A   Yes.

Q   For shooting somebody?

A   Uh-huh.

Q   Yes?

A   Yes.

Q   Shooting somebody in the chest?

A   Yes.

MS. STOKMAN:  Objection, improper use of facts of that conviction.

MR. VILLA:  It goes to the nature of the cooperation he got -- the agreement he got.

THE COURT:  Overruled.

BY MR. VILLA:

Q    So the charge is based on the fact that you shot someone in the chest, right?

A    Right.

Q    And Fawn got charged along with you in that shooting case, right?

A    Yes, she got like an accessory after the fact or something like that.

Q    For helping you get away or hide out or something like that?

A    She was with me when I got arrested.

Q    And also when you got arrested, you had a significant amount of methamphetamine on you?

A    Yes.

Q    About half a pound or a pound?

A    I don't know the exact amount.

Q    That's what you ultimately pled guilty to, with Ms. Stokman with the federal Government, was for that methamphetamine, right?

A    Right.

Q    And it was enough amount that you pled guilty to possession with intent to distribute?

A    Yeah, I think it was possession, intent to distribute 50 grams or more or something like that, so it was more than 50 grams.

Q    So it wasn't for you to use, it was for you to distribute, to sell?

A    That's what I pled to.  I mean, I was using it.

Q    Okay.  But, I mean, you intended to sell it, right?

A    I guess.

Q    I don't want you to guess.  I mean, you came into Court and pled guilty to it, right?

A    I had the drugs, you know.  As I use it, I guess I sell some here and there.

Q    I mean, you came into Court, in this courthouse, and you pled guilty to possession of those drugs with intent to distribute, right?

A    Right.

Q    Under oath you said, I did that --

A    Yeah.

Q    -- right?

And I suppose you want this jury to believe that you're okay with the oath you took today, right?

A    Yeah.

Q    Because that's the same oath you took when you pled

guilty?

A    Uh-huh.

Q    Yes?

A    Yes.

Q    So you were arrested in April of 2021 by the Clovis Police Department for the attempted murder case, right?

A    Yes.

Q    And when you're over there at the police station when you get arrested, or shortly thereafter, ATF Agent Gonzales, who's back now, he came to see you, didn't he?

A    Yeah.

Q    And he wanted to know if you wanted to --

         MS. STOKMAN:  Objection, calls for hearsay.

         MR. VILLA:  It's all for effect on the listener.

         THE COURT:  From the way you started, it doesn't sound like it, Mr. Villa.

         MR. VILLA:  Can we sidebar, Your Honor.

    (At sidebar on the record.)

         MR. VILLA:  The question I was intending to ask is did Agent Gonzales want to know if he wanted to talk to him and cooperate.  So it's offered for the effect that it had on Mr. Clowers, who three months later then began the cooperation process.

         THE COURT:  You're shaking your head no, Ms. Stokman.

         MS. STOKMAN:  I don't think that is trying to prove

the truth of that statement, not just his effect on the listener.  He's already testified to the fact that he did enter a cooperation agreement.

THE COURT:  Your question to him is going to be he wanted you to cooperate; is that what you're going to say?

MR. VILLA:  Or talk to him.

THE COURT:  He wanted you to talk to him.  Is this the same question or --

MR. VILLA:  That's what I was going to say.  He wanted to know if he wanted to talk with him essentially to cooperate.

THE COURT:  Why not ask him, "Did you talk with him?"

MR. VILLA:  I mean, I can, but, you know, sometimes police come to talk to you to interrogate you, and that wasn't the purpose of the Agent Gonzales coming to talk.

THE COURT:  Then we're going a different route with that, right?  You're going in to determine what Agent Gonzales was trying to do, not what this guy wants to do.

MR. VILLA:  Just the fact that Gonzales was extending an invitation rather than trying to interrogate.

THE COURT:  That's not the same thing as to what the effect is.  You're trying to get what's in Officer Gonzales's head.  The objection is sustained.

(End of sidebar discussion.)

BY MR. VILLA:

Q    So, Mr. Clowers, when Agent Gonzales came, you had a

Clowers - Cross by Villa

conversation with him, correct?

A    Yes.

Q    That was at the police station in Clovis around
April 2021?

A    Yeah.

Q    And subsequently three months later, in July, you had the
first meeting with Agent Gonzales, Ms. Stokman, your lawyer,
and individuals from the DA's office, correct?

A    Yeah, somewhere around there.

Q    During that first meeting, the first thing you said to
them was that you weren't going to give information --

          MS. STOKMAN:  Objection, calls for hearsay.

          THE COURT:  Is this impeachment, Mr. Villa?

          MR. VILLA:  Your Honor, it goes to his state of mind.

          THE COURT:  How is his state of mind pertinent?

          MR. VILLA:  Because he's beginning to negotiate an
agreement.

          MS. STOKMAN:  Improper form of the question, I'll add.

          THE COURT:  Mr. Villa, I'm going to let you ask the
question completely because I didn't hear it all, and then I'll
rule at this time, and I'm going to trust you what you're
saying you're going to do, otherwise I'm going to have to go
back and we'll handle this differently, but go ahead.

BY MR. VILLA:

Q    So first of all, this first meeting was July 23, 2021?

A     I don't remember the date, but around there.

Q     Approximately, okay.  And you said that you weren't going to give out any information for free, right?

MS. STOKMAN:  Objection, calls for hearsay, ask to be stricken.

THE COURT:  Overruled.

THE WITNESS:  I don't remember that.

BY MR. VILLA:

Q     Have you had an opportunity to listen to that statement before your testimony today?

A     I don't remember saying that.

Q     That wasn't my question.  Have you had an opportunity to listen to that statement before your testimony today?

A     I didn't listen to it.

Q     If you heard your statement, would that refresh your memory?

A     I mean, yeah, it would, but if you say that's what I said, then.

Q     I don't want you to take my word for it, let's see if this refreshes your recollection.

MR. VILLA:  Your Honor, can we play that statement for Mr. Clowers to refresh his recollection?

THE COURT:  Refreshing recollection doesn't happen, you don't admit it, right?

MR. VILLA:  No, we're not seeking to admit it, just so

he can listen to it.

THE COURT:  What we'll do then is we'll hear it on the break and evaluate that and move from there.

MR. VILLA:  Yes, Your Honor.

BY MR. VILLA:

Q   All right.  Well, in the course of this communication with the Government you all were essentially starting to negotiate cooperation, yes?

A   Right.

Q   And it was important to you, as part of that cooperation, that Fawn didn't go to prison, right?

A   Yeah, I didn't want her to get in trouble for something she didn't do.

Q   I mean, she was charged in the EDD case that you were charged in, right?

A   No, she was charged with accessory after the fact, and I felt like they were just trumping charges on her because she really didn't -- she didn't do anything.  So I definitely wanted to make sure that she didn't get in trouble for something that she didn't do.

Q   But you agreed she was charged in that accessory after the fact for the shooting, and she was also charged in the EDD case that got you brought over to Fresno, right?

A   I don't know.  I wasn't with her.

Q   A minute ago you told me that you agreed she was charged?

A    I know she was involved in the case, but I don't know why. I don't know what her exact charges were.

Q    I'm not asking what her exact charges were, I'm just asking about the fact that she --

A    Yeah, she was a co-defendant.

Q    As a co-defendant she was charged along with you in this EDD fraud case, right?

A    Right.

Q    You agree?

A    Yeah, and she was a co-defendant of mine.

Q    And so knowing that she had those charges, you wanted her, as part of your cooperation with them, you wanted the state to give her probation, correct?

A    Yeah.

Q    Before you told them anything, right?

A    Right.

Q    And you also wanted to make a deal for yourself, correct?

A    Yeah, I definitely wanted to try to get time off or something if I'm going to cooperate.

Q    In fact, as we talked about, we agreed that you were facing potentially life in the state, right?

A    Right.

Q    And isn't it true that in that meeting in July, Ms. Stokman told you you were facing --

        MS. STOKMAN:  Objection, calls for hearsay.

THE COURT:  Sustained.

MR. VILLA:  Your Honor, it's offered for effect on the listener.  It's not offered for the truth.

THE COURT:  Let's talk about it on sidebar.

(At sidebar on the record.)

THE COURT:  So as to the prior issue, is there a transcript, something we can look at?  My concern is you're not telling me it's impeachment, you're telling me you want him to refresh his recollection.  If you want to do that, you don't publish it first.  You let him have an opportunity to refresh his recollection.  If it does so, then he can testify.

As to this, this is not the first time you seem to want to introduce the Government as a witness.  Whether it's Ms. Stokman or not -- why do we keep saying Ms. Stokman, that's my trouble, you're trying to make her a witness in this case.

MR. VILLA:  No, Your Honor, his statements to him in the interview was that he was facing 25 years.  So she tells him that and as an inducement to get him to agree and then ultimately he does agree and he gets a 10-year sentence.

THE COURT:  Which is what you already established at the beginning of his testimony.

MR. VILLA:  Well, not that he was facing 25 years, he was confused about that.

THE COURT:  You said at least -- he said a mandatory minimum 10, you said 25.  He said, I don't recall, but you're

saying Ms. Stokman said it doesn't do anything more except for him to say, I don't know, I know it was 10 years.

MR. VILLA:  I think when the United States Attorney tells you you're facing 25 years, that's relevant to his decision to cooperate and provide information.

THE COURT:  Except that he has already said he doesn't recall.

MR. VILLA:  So I can refresh his memory.

THE COURT:  Exactly, but what you're doing isn't refreshing his recollection, what you're doing is introducing a hearsay statement of Ms. Stokman, which may or may not impeach him, but I'm not sure how that refreshes the recollection and why we're doing it in front of the jury.

MR. VILLA:  Well, I'm not sure.  He said he doesn't remember Ms. Stokman saying that because there was no objection.

THE COURT:  You didn't ask him about that, but you asked him, Were you told it was 25 years?  He said, I don't know, it was at least 10, it was a lot of time, I don't know.

MR. VILLA:  So I could refresh his recollection with the transcript.

THE COURT:  Let's do that then.

MR. VILLA:  How is he going to trust the transcript if he's not listened to the recording, I don't know if this is me or not.

THE COURT:  He said, If you have something I could look at, but the point you're making is this ground has been plowed and we're doing it again, just now this time we're going to bring Ms. Stokman's name into it.  I don't know why we think we're going to get to a different result, except now -- I mean, I think what you're saying is, This is a terrible witness and Ms. Stokman is part of this terrible witness, which is fine, I suppose, but you got to do it in a different way.

MR. VILLA:  I guess I don't understand why stating verbatim what Ms. Stokman said to him is not -- it's not a statement offered for the truth, it's offered to show the effect on Mr. Clowers.

THE COURT:  It's not, because you already asked him this and he already said, I don't know.  You're just now saying Ms. Stokman told you that.  You can ask him, Did anyone say at this meeting, Did you have any information of what they had told you, and he's going to say, I don't know, I don't remember, because that's what he said.

MR. VILLA:  I'll do it that way.

MS. STOKMAN:  Also, Judge, I want to make another objection on this line of topic.  I have a case that I can cite to the Court when we're on a break that says that as long as the mandatory minimum is acknowledged and established, then we shouldn't go into what potential sentences were in cooperation agreements, and I can cite it.

THE COURT:  I have to take a look at that, because that doesn't seem --

MR. VILLA:  This is different.  I'm not asking what potential sentences, I'm asking what he was told right before he decided to agree to cooperate.

THE COURT:  But that's what she's saying.  She's saying there's case authority that says, You don't get to do that because it doesn't matter what the maximum is, it matters about an understanding of mandatory minimum.  I don't know, I haven't seen that case, I don't know, have you?

MR. REED:  This is the state prosecutor talking about -- they were kind of tag teaming.

THE COURT:  He didn't ask about the state prosecutor, he's asking Ms. Stokman.

MR. VILLA:  I'll get to the state prosecutor, I'll ask that, too.

THE COURT:  He's asked -- he's acknowledged life in prison.

MR. VILLA:  But he goes on to have a conversation with the prosecutor who guarantees him that Fawn is going to get probation.  So I haven't gotten there yet, but I'm going to get there.  If you have something to refresh his recollection, let's do that.

(End of sidebar discussion.)

BY MR. VILLA:

Q    Mr. Clowers, have you ever seen a transcript from the July 2021 meeting you had with the government?

A    No.

Q    What you're saying today is that you don't recall what you said?

A    No, not specifics.

Q    All right.

MR. VILLA:  Your Honor, may I approach with the copy of the transcript?

THE COURT:  Yes.

BY MR. VILLA:

Q    I'm going to show you with my laptop here, and the first part I want you to just read is this line there, just to yourself.  You can keep reading until you recognize it.

A    Yes, I recognize it.

Q    That's the --

A    Yeah.

Q    So with respect to the first question I asked you earlier about your statement that you don't want to give free information, you remember saying that?

A    Yeah.  I never cooperated before, so I didn't know -- I don't know, you know, what I should say or what I shouldn't, so I didn't want to just sit there and spout off information without knowing what I was getting into.

Q    You didn't want to cooperate for free either, right?

A    Right.

Q    I mean, you were facing state charges, federal charges, and you wanted to not go to prison for the rest of your life, right?

A    Right.

MR. VILLA:  So now let me show you another part, Your Honor.  May I approach?

THE COURT:  Sure.

BY MR. VILLA:

Q    So it starts here with you talking, and then you can just read --

A    Right here?

Q    -- to yourself.

Yeah.

A    Okay.

Q    So does that refresh your recollection about the fact that you were told you were looking at 25 years?

A    Yes.

MS. STOKMAN:  Objection, calls for hearsay.

THE COURT:  Overruled.

BY MR. VILLA:

Q    Yes, it does?

A    Yes.

Q    That was scary to you, I imagine?

A     Not ideal, yeah.

Q     You didn't want to do 25 years for the feds or life for the state, did you?

A     No.

Q     So after that July meeting, nothing was necessarily decided yet.  A few months went by and you had another meeting in October of 2021, correct?

A     Yes.

Q     And in your mind, whether you cooperated hinged on what kind of benefit that you could get for your cooperation, right?

A     I don't want to put a target on my back for nothing, so yes.

Q     And the benefit, what I mean by that, is the reduction of a prison sentence?

A     Me not doing life, sure.

Q     At that meeting there was a discussion, was there not, with Ms. Stokman about the amount of time you faced?

        MS. STOKMAN:  Calls for hearsay.

        MR. VILLA:  It's the same ruling, Your Honor, with respect to the 25 minimum.

        MS. STOKMAN:  Improper form of the question.

        THE COURT:  This is a different question than you just asked, Mr. Villa.

        MR. VILLA:  It's a different debrief at a different time and a different statement.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

THE COURT: Let's ask him if he remembers this context first.

BY MR. VILLA:

Q   Do you remember being told by Ms. Stokman the amount of months you faced in prison without cooperation?

A   I don't remember the exact amount, but I know it was more than 10 years.

Q   All right, fair enough. So you remember being told you were facing more than 10 years without cooperation?

A   Yes.

Q   And at that October meeting there was, in fact, somebody there from the District Attorney's Office who spoke to you about Fawn's charges, right?

A   Yes.

Q   And he committed to you that if you cooperated, Fawn would get probation?

A   Right.

Q   And you told him, If you lock that in, then I'll cooperate?

A   Yes.

Q   And then ultimately, I think it was December 15, 2021, that you then gave a more involved statement about things that you knew, or claimed that you knew, about the Aryan Brotherhood, right?

A   Yes.

Q    Okay.  I asked you a minute ago, during that statement about not mentioning about the quarterly catalog, but isn't it true that you told the Government when you met with them that you were told, Don't work for Kenny?

A    Yes.

Q    Somebody told you that, like --

A    Yeah, stay away from him because you don't last long.

Q    So ultimately, then, after that December 2021, you entered a plea in this Court on April 27, 2022?

A    Yes.

Q    And in that federal Plea Agreement, the Government agreed to recommend a sentence of 120 months?

A    Yes.

Q    So the absolute minimum at the time?

A    Yes.

Q    That was certainly less than the 25 years you were originally told you could get, yes?

A    Yes.

Q    Less than what you were told you could get at the October meeting, too, right?

A    Yes.

Q    Then on top of that, in the Plea Agreement or attached to the Plea Agreement, there was this additional agreement by the Government that if you testified at the grand jury or here at trial, they could recommend an additional 50 percent?

A    Correct.

Q    That's the one you're hoping to get after this trial, yes?

A    Correct.

MR. VILLA:  May I have just a moment, Your Honor?

THE COURT:  Yes.

MR. VILLA:  I'll pass the witness.

THE COURT:  All right, Mr. Reed -- actually, Mr. Reed, I'm sorry, I was going to have us take a break in about five or 10 minutes, do you want to start or wait?

MR. REED:  I'd rather wait.

THE COURT:  Let's go ahead and take a break now. We're going to come back at 10 minutes after 12:00, and then we're going to go through until the end of the day.

(In open court outside the presence of the jury.)

THE COURT:  All right, anything at this time?

MS. STOKMAN:  Nothing from the Government.

MR. REED:  No.

THE COURT:  All right, we'll take our break.  Thank you.

Actually, Ms. Stokman, before you leave, do you have that cite for me?

MS. STOKMAN:  Judge, unless it's going to come up more today, we can file something with the Court, a memorandum, but I have case citations in the meantime.

THE COURT:  Let me have the citations, please.

Clowers - Cross by Villa

MS. REPORTER:  Judge, are we still on the record?

THE COURT:  You don't have to be.

(Recess taken 11:51 a.m. to 12:11 p.m.)

THE CLERK:  Court is now in session.

THE COURT:  All right, Counsel, over the break I did review the citation.  The cases cited by the Government, the Ninth Circuit says that mandatory maximum penalties are relevant, but maximum possible punishment for cooperating witnesses is not.

The rationale is -- and if you did any sentencing or been involved in any sentencings, they say because maximum penalty is almost never imposed.  So while you can talk about mandatory minimums, you can talk about statutory maximums -- I'm sorry, statutory mandatories, that otherwise it isn't relevant, especially in the circumstances that I understand this where he was represented by counsel.  In that event it's not simply you're in a room with a flashlight in your eyes and the Government's threatening you with life in prison, because you've got an attorney sitting there going, Well, you know, here's the reality, and it is in federal court you almost never get the maximum possible punishment.

That's what the Ninth Circuit says.  I'm sure you all have done this research, because I can't imagine you didn't come here expecting this issue.  I, unfortunately, had not seen this issue.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

MR. VILLA:  The case doesn't speak to a direct threat, if you will, from the U.S. Attorney to the cooperating witness, right.  I mean, it's more of you have a charge, what's the max you're facing and what's the minimum you're facing.  That's how I interpret those cases versus a direct threat from, say, a case agent or a U.S. Attorney saying, you know, you're facing 25 years, you're facing -- we didn't get into the exact numbers because Mr. Clowers agreed that it was more, but she specifically --

THE COURT:  No, no, you mentioned the years multiple times.

MR. VILLA:  I'm saying it's different when it's coming directly from the prosecutor to the witness to induce them to cooperate.

THE COURT:  Well, that's your characterization.  I haven't seen it, but I haven't heard even what you said Ms. Stokman said.  I don't necessarily construe that as a threat because, in fact, that was the maximum possible punishment, correct?  Did it follow up with, If you don't cooperate, you're going to go to jail for 25 years?

MR. VILLA:  No, it said 25-year minimum, and then in the second debrief it was the discussion of the guideline range, which is like 17 and a half to 22 years without cooperation.  And I was satisfied with Mr. Clowers' answer that it was more than 10 years.  And I do think the guideline range

is relevant when the U.S. Attorney is telling you that's your guideline range.

THE COURT:  What's more, the Ninth Circuit says the guideline range is relevant, but we didn't talk about guideline ranges.  In fact, I think you'd be hard pressed to have a witness go, Yeah, my guideline range is.  I think most educated attorneys don't know how to calculate a guideline range.

MR. VILLA:  Yeah, I mean, in this case he was specifically told by Ms. Stokman.  I passed the witness, so I'm moving on.

THE COURT:  Right, but this isn't the last time we're going to come up against this issue.  So what I was going to say now is we're not going to talk about maximum possible punishment with this witness.  If you want to brief that issue, I'd be happy to see the briefs, but today we're going to move on.  The evidence is what it is before the jury, but we're not going to keep doing that because the Ninth Circuit says that's error.

MR. VILLA:  Is it the Court's ruling that, let's say for the next witness, if the U.S. Attorney or Agent Gonzales says you are facing 17 and a half years, even though the mandatory minimum is 10, that I can't ask the question, Were you told you're facing 17 and a half years?

THE COURT:  I guess the trouble is, what is the purpose of it?  You're saying it's the effect on the hearer.

Clowers - Cross by Villa

MR. VILLA:  They decide to cooperate.

THE COURT:  Right, but what you've done, though, and I said it at sidebar, is, you're not saying, Did you understand there was a maximum here of 25 years or whatever it was?  You said, Didn't Ms. Stokman say to you, If you don't cooperate, you're going to be looking at 25 years?

That's the chunk that I don't understand what the point of that is, because -- again, he testified, he's got counsel sitting right next to him, and that's the point of counsel, so that you can't be threatened so that you know what your rights are.

And unless you're saying his attorney was also doing that, or there's something else going on there that I'm not aware of, if that was a legal accuracy what the maximum possible punishment was, if this witness is going to say, That's why I did it, then that's one thing.  I suppose you could say what were all the reasons you did -- and I'm not talking about Mr. Clowers now, but any witness, Why did you choose to do it?

MR. VILLA:  Judge, just to be clear, I don't think I'm violating precedent, it was not the max.  The specific statement was minimum, 25-year minimum, and that has to do with enhancements that he was facing under 851 and other things, which I didn't get into, but I never asked him about the max and Ms. Stokman never talked with him about the max either.

THE COURT:  Well, I can go back and look at the transcript, but my recollection is you did say, Were you facing a maximum of 25 years in prison.

MR. VILLA:  I could be corrected, but I don't remember using the word "max."

MS. BARRETT:  If I may, Your Honor, Jean Barrett, for the benefit of the court reporter.

Your Honor, it's my intention, when I asked the question, is to clear up this area with regard to not only that, but also the issue of the guidelines.  And I only intend to discuss mandatory minimum, not maximum sentence.  I want to clarify that in the record that that's the situation.

THE COURT:  I'm not sure I understand what you're going to ask about guidelines.  I mean, if you say, Your guideline range is blah, blah, I guess --

MS. BARRETT:  Well, he was eligible to be a career offender in the probation report.

THE COURT:  Does he know that?  Can he testify --

MS. BARRETT:  I don't know.  I'm going to ask him, and then I'm going to refresh his recollection with regard to his Plea Agreement and with his Sentencing Memorandum by the Government.

THE COURT:  And so your point is if you are a career offender, you're looking at a different guideline range, is that what you're going to say or a different --

MS. BARRETT:  You're looking at a Level 37 and a Criminal History VI, which is 360 to life.

THE COURT:  Right, but I guess the criminal history, I don't know.  Was that also set forth in his -- in the negotiation?

MS. BARRETT:  Your Honor, it was in the Sentencing Memorandum by the Government that they were waiving --

MS. STOKMAN:  Sorry to interrupt, but the witness is still sitting on the stand, and I'm going to just reiterate that the Government is objecting to any line of questioning of any type of guideline range because case law does not -- as far as what his actual range was or where he was looking or any discussion of that.

THE COURT:  I think all counsel are entitled to explore bias.  If you want to explore something that was learned after the decision to cooperate, something that was filed with the Court at some point after that ship had sailed, I don't see that we're going to do that.

MS. BARRETT:  Your Honor, I can refresh his recollection with this.  It doesn't necessarily mean --

THE COURT:  Then how does that go to bias if that was a basis for the decision?

MS. BARRETT:  Well, he's testifying here.

THE COURT:  No, no, I know.

MS. BARRETT:  This is not simply about cooperation,

this is about his testimony here and the truthfulness of his testimony here.  What he tells the Government is not what's relevant.  What's relevant is what's coming from the witness stand, and he has that information now.

THE COURT:  Maybe.  All right.  Again, though, I'm just going to tell you, these cases I read, you're welcome to file your briefs, say maximum possible punishments is not relevant.  What is relevant is what the mandatory minimums are, and I'm not saying I'm an absolute because I can anticipate circumstances when maybe that other issue does come in, but at this point with the evidence that's come in so far, it's not.

MS. BARRETT:  I'm not asking about the maximum.

THE COURT:  All right.  Let's call in the jury.

(In open court in the presence of the jury.)

THE COURT:  Thank you.  The jurors are back.

Mr. Reed, you may begin.

CROSS-EXAMINATION

BY MR. REED:

Q    Mr. Clowers, would it be a fair statement that, roughly, you spent 18 years in and out of the juvenile, county and state prison system?

A    Yes, around that.

Q    And you would commit a crime, either you were convicted or pled to one, you would commit a crime, go to jail, sometimes violate, commit a new crime, just kind of lumping along in your

Clowers - Cross by Reed

life in that way; is that correct?

A    Yes.

Q    Now, this attempted murder that you were facing, the alleged victim on that case was a relative of yours; is that correct?

A    Yes.

Q    And correct me if I'm wrong, can I assume that there was no AB member that told you to shoot your brother-in-law?

A    No.  My sister was being abused.  I went to help her.

Q    Again, there's no AB that told you to shoot your brother-in-law?

A    No, sir.

Q    Since you got charged with a crime, can we agree that shooting at your brother-in-law is probably not a good thing to do?

A    Yes.

Q    And that was all on you?

A    Yes, sir.

Q    It had nothing to do with the Aryan Brotherhood?

A    Correct.

Q    You pulling out a gun, shooting your brother-in-law in the chest was you, Troy Clowers, deciding I want to shoot my brother-in-law for whatever reason, right?

A    Yes, sir.

Q    And you were talking about your sister, protection of

Clowers - Cross by Reed

others is a defense, but that didn't work in this case; is that right?

A    Right.

Q    Now, I wanted to come up with -- I wanted to mention a couple of things to try and save us some time as opposed from taking it from beginning to end.  You mentioned a couple different times about cell phones in the jail.  Now, to state the obvious, it's contraband, you can't have them --

A    Right.

Q    -- right.  And that's on both sides, if the other person you're talking to is also in jail --

A    Yes.

Q    -- correct?

Now, I don't know, but my gut feeling would be that unlike my phone where I keep everybody on my speed dial and they all have names and pictures, since having the phone is against the law, it probably is not a good idea for me to have all of my criminal friends on speed dial; would you agree?

A    Yeah, we don't keep contacts.  I didn't store contacts.  If I did, it wasn't under their name.

Q    But you've been around -- and I'll quote a prison guy to explain to me, you guys basically have 18 hours a day thinking up ways to get around rules that the CDCR sets; is that right?

        MS. STOKMAN:  Objection.

        THE WITNESS:  Pretty much.

BY MR. REED:

Q    Not actually 18, but you spend a lot of time trying to figure out ways around the rules?

A    Yes.

Q    And you understand this system -- or you've heard of Cellebrite where they download your phone, and the investigation people use that information to trace back to other friends of yours?

A    Yes.

Q    Whatever you call it, you know that such a thing exists, right?

A    Yes.

Q    There was a point where you talked about making a call to 12 different people over some incidents that occurred.  I don't remember the incident, I don't even care about that.  I more care about the 12.  So you have an identic memory, you can keep that stuff in your head at all times?

A    I think I -- I don't know if it was an exact 12, but a group chat or a conference call is what I was referring to.

Q    I know what it means, but that means you got to dial 10 numbers, right, and area codes.  Well, area codes including -- well, seven numbers plus an area code is 10; fair statement?

A    Yeah.

Q    Now, when you're calling that other dude, he's got the same problem you do.  He also has a phone that he's not

supposed to be using, right?

A    Right.

Q    We get in trouble in here if I let my phone go off, or anybody else in the courtroom for that matter, so my phone's always on silent, okay.

A    Okay.

Q    I think, I don't know for sure, I've never been to prison, but I suspect you also don't want your cell phone to ring in the prison?

A    We're all locked down at the same times, though.

Q    But the guards are walking back and forth doing guard stuff?

A    No, it's not like that.  We put a curtain up, they walk right by.  They walk hourly, bihourly, sometimes they don't walk at all.  But generally, on Level IVs, on maxes and stuff like that or there's -- it's the same count times, the same time -- I'm in the cell, everybody else is in the cell.

Q    In your prison?

A    No.  In CDC, there's mandatory count times and stuff where everybody's locked down at the same time.  And then after a certain time, 8:30, 9:30, we're all in the cell until the morning.

Q    So basically, what you're telling me is that if I was a CDC official, all I would have to do is realize that you're all locked down at the same time, that means you're all going to be

using your phones at the same time, and if I really want to know what all of you guys are doing over the State of California, all the prisons up and down the 99, all I have to do is monitor the phones when all of you are on the phone at the same time?

MS. STOKMAN:  Objection, calls for speculation.

THE COURT:  Sustained.

BY MR. REED:

Q    The short answer is it's not that easy to communicate with another person who's in prison; isn't that correct?

A    Well, it's not as easy as if they were on the street, but it's not hard.  You can text him and say, Hey, I'm going to call you and him, him, him, him at 4:30 count, and everybody's right there waiting for their phones.  It's really not hard.

Q    What happens when they seize your phone?

A    When they seize it?

Q    Yeah, when they take your phone I can't call that number anymore, right?

A    No.  Yeah, right, correct.

Q    That's correct.  It's going to take me a minute to find out that your phone got seized, right?

A    Probably not.  If I get my phone taken, I can tell my friend right down the tier, Hey, let me use your phone or text this number and let him know that my phone got hit.

Q    So you can text all the other guys up and down the state

to let them know that your phone got seized?

A    I'm not saying that, but I'm saying if someone's expecting a call from me or somebody I talk to daily, I can alert them the same day.

Q    You didn't talk to John Stinson daily, sir; isn't that correct?

A    No.

Q    It's not correct?

A    No, I didn't.

Q    All right.  In fact, we'll get to that in a second, but you didn't know who Mr. Stinson was when you were being interviewed in July 2021, you didn't know what his nickname was; isn't that right?

A    I mean, the only thing --

Q    Let me save you some time before we go down this road. When you talked to the Government, for the most part, they record everything.

A    Yeah.

Q    And what they record I get a copy of.

A    Okay.

Q    And either they or I or somebody on the lawyering side of this table, they make a transcript.

MS. STOKMAN:  Objection, is there a question?

MR. REED:  Yes, I'm getting there.

THE COURT:  Let's got to the question, Mr. Reed.

Clowers - Cross by Reed

BY MR. REED:

Q    There is a transcript of your conversation on the 21st -- excuse me, July 21, 2021 wherein one of the investigators asked you about John Stinson, called him "Pops," you had Pops question mark, you didn't know who he was; isn't that correct, sir?

A    I didn't know if he was known by that by the whole community or just my celly and me calling him that or what.

Q    Hold that right here.  Let's go to this side.  When you first started talking to the Government that day, on the first line, there's something about you signing --

         MS. STOKMAN:  Objection, calls for hearsay.

         MR. REED:  Well, I'll get there, and if the Court will -- actually, I'd like to finish the question.

         THE COURT:  Yeah, I don't know what the question is.

BY MR. REED:

Q    When you first got there, first line, first conversation, there was a form that they wanted you to sign; do you remember that?

A    I remember signing forms.

Q    Do you remember the first time?

A    I don't.

Q    Do you remember what the form was about?

A    No.

Q    Was there anything on that date, on the 21st, in July of

2021, wherein they told you that you had to be truthful with them at all times?

A     Yes.

Q     Wasn't that part of the form?

A     Yes.

Q     You had already realized that you were in trouble by that first conversation and you had already realized that you wanted to cooperate, correct?

A     I had decided to cooperate by the first interview, yeah.

Q     And you had decided that you were not going to cooperate without some benefit to you, correct?

A     Well, yeah, I definitely didn't want to put a target on my back and become enemies of all these people for nothing.

Q     This wasn't a "Come to Jesus" situation.  This was you negotiating, trying to do something that was going to help you, and you were trying to get the Government to help you out?

A     I made an agreement with them.

Q     Okay.  I mean, if I said something like, Man, I'm going to do my time either like a king or a zero with no benefits, I don't want to be a zero, that's consistent with the way you were thinking at that time, right?

A     I don't know, I don't follow.

Q     Sure.

          MR. REED:  May I approach, Your Honor?

          THE COURT:  Yeah.

BY MR. REED:

Q   Did you say that you did not want to be a zero, that you wanted to go to jail like a king?

A   Referring to being an active gang member?

Q   I'm not the one that said it, so I don't know.  What did you say when you said that; what did you mean when you said that?

A   I think, you know, referring to my status in the gang rather than dropping out and, you know, being a zero.

Q   I don't think -- again, I'm not sure, correct me if I'm wrong, because you did 18 years in that world, I don't think being a cooperator ever gets you to king status in any gang?

A   I'm talking if I cooperated, I would be a zero and I'd be an enemy of everybody I knew.

Q   Which you were agreeing to do?

A   Right.

Q   So where is the king part?

A   It's not an easy decision.  I've been one way my whole life.  For me to decide to try to get out of the gang lifestyle and give myself a chance at life is a hard decision to do.

Q   So you decided you didn't want to be a king anymore, you were going to be a zero because you were going to cooperate?

A   I guess.

Q   Yes?

A   Yes.

Q    But a zero doing an awfully lot less time than what you had done had you got convicted at trial or had you pled guilty?

A    Right.

Q    Without the benefit, right?

A    Right.

Q    So you came there to negotiate, to get yourself a deal?

A    I've never cooperated, so I don't know the process.  I didn't want to give what I had as -- held valuable to them away without --

Q    To quote your own words you didn't want to "do it for free"?

A    Right.

Q    They don't pay money, right?

A    Right.

Q    They don't give cars to your family, right?

A    I was referring to time cut.

Q    I know exactly what you're talking about, time is the currency of prison.

A    Right.

Q    So you wanted time cut.  So you wanted this thing that says you can't lie.  One of the things that letter said is that you need to be honest; is that correct?

A    Right.

Q    When you talked to them on the 21st, in year 2021, did you lie to the -- was it three lawyers there and at least two types

of agents?

A    Not that I know of.

Q    You'd be the only one that would know if you lied or not?

A    About what?

Q    Anything.

A    No.

Q    The letter doesn't say not lie about big things.  It doesn't say not lie about small things.  It just says you can't lie.

A    I didn't lie.

Q    So everything you said was true?

A    Right.

Q    Do you remember, in response to a question that was asked of you, "Stinson, question mark, I mean" --

MR. REED:  Your Honor, can I use the actual word, or do I need to sanitize it if it's what we would consider a bad word?

THE COURT:  You can just use the words, Mr. Reed.

BY MR. REED:

Q    "Stinson, I mean, he don't do shit like that."

MS. STOKMAN:  Hearsay.

THE COURT:  Are you asking him a question, Mr. Reed?

MR. REED:  Yes, I'm asking did he say it, and then I'm going to ask what he meant by it.

THE COURT:  All right, go ahead.  Overruled.

Clowers - Cross by Reed

BY MR. REED:

Q   "Stinson, I mean, he doesn't do shit like that.  Pops," right?

A   What was I answering the question to?  I don't remember the question.

Q   So you're saying you may have said it, you just don't remember right now?

A   I don't remember.  It was a long interview, and it was a long time.

Q   This is lawyer's talk.  If you say that, then I can come up, and I can't do that unless you agree that you may have said it.

You need your recollection refreshed, right?

A   Sure.

MR. REED:  Can I approach, Your Honor?

THE COURT:  Yeah.

MS. STOKMAN:  Can I see it?

MR. REED:  I'm sorry.

MS. STOKMAN:  Can I see it?

MR. REED:  Sure.  This is the highlighted portion, but you can scroll up and down to get to the context.

THE WITNESS:  I got to find the question.

MS. STOKMAN:  Objection to this.  He's not refreshing the recollection.  They're scrolling through the conversation.

THE COURT:  Mr. Reed, it's my understanding that the

witness wasn't sure of context.  Are you just trying to let him know --

MR. REED:  Exactly.

THE WITNESS:  What's the question?

THE COURT:  Could you maybe direct him to where the question is he's responding to?

THE WITNESS:  Are you taking orders direct --

MR. REED:  No, no, you can't do that part.  You got to read it to yourself.

BY MR. REED:

Q    Do you understand the context now?

A    Yeah, so --

Q    Wait a second.

Okay.  Go ahead.

A    I didn't know --

MS. STOKMAN:  Sorry, is there a question?

BY MR. REED:

Q    Do you understand the context now?  First of all, did you make the statement that I just read to you?

A    Yes.  He was asking -- he was inquiring about who I was taking orders from, and he asked Kenwood, Pops, and I said "Pops" and a question mark because I didn't know that generally everyone calls him "Pops."

Q    That's the -- okay.

MR. REED:  Let me approach again.  Your Honor, may I

approach again?  I'm sorry.

THE COURT:  All right.

THE WITNESS:  Okay, yeah, I said that.

BY MR. REED:

Q    Would you agree that what you said is, "Stinson, I mean, he, he doesn't do shit like that.  Pops," right?

A    Yes.

Q    There's no question pending.

A    He's asking me who I'm taking orders from.

Q    I know what it means, but there's no question pending. You only get to answer questions.

A    Okay.

Q    Did you ever -- or is it a true statement that those older -- well, let me backup a second.  What's an older guy to you?

THE COURT:  Mr. Reed, do you mean now or at the time of this event or something else?

THE WITNESS:  What do you mean age, age-wise?

BY MR. REED:

Q    I wasn't the one saying it, but the answer to the Court's question, I think it's two years ago or was it four years ago?

A    An older person?  Say it again.

Q    Unfortunately, we can't do it the way we're doing if we're just talking.  I have to ask what you meant by "those older guys," obviously in the context of the prison world?

A    I was referring to, yeah, like Stinson, with Dale Bretches, people in there.

Q    Would it be a fair statement if I were to say to you that those older guys, they were out of the way?

A    Some of them.

Q    Would it be a fair statement that with regard to John Stinson, he would be considered an older guy by you?

A    Yes.

Q    In the context of this statement, would it be a fair statement to say that John Stinson was an older guy who was out of the way?

A    To me, yes.

Q    Now, with regard to those EDD crimes, this was going on during COVID, fair statement?

A    Yes.

Q    I don't know if you know, so I'm just going to ask you a general statement.  That was kind of going on all over the prison, as far as people doing the EDD stuff, right?

A    It was going all over where?

Q    The prison.

A    Yes.

Q    Everywhere?

A    Yes.

Q    I mean, you guys were racking in money left and right, all prisoners?

Clowers - Cross by Reed

A    Yes.

Q    Mexicans, blacks, Asians and whites?

         MS. STOKMAN:  Objection, calls for speculation.

         THE WITNESS:  Yeah, I don't know.

         THE COURT:  Sustained.

         THE WITNESS:  I don't know about what the other races were doing.  I know as far as the whites, yes, we were doing it.

BY MR. REED:

Q    When you went to the Fresno County Jail, that was in 2020, the last time you went?

A    Yes.

Q    And I took some cryptic notes here, so let me see if I can work through this.  You were worried about -- you had already decided to be a cooperator, which you guys used the vernacular "snitch," right, yes?

A    At what time?

Q    By 2020.

A    No.

Q    Early 2021?

A    2021, yeah, middle of 2021.

Q    And had you already basically PC'd up?

A    They had me -- I was in GP.

Q    Was there a point when you PC'd up?

A    When I got to federal -- to the BOP, yeah, I PC'd up.

Q    So the whole time you were in the state nobody knew that you were cooperating?

A    In county jail?

Q    Yes.

A    No, nobody knew.

Q    So you weren't worried about being a snitch at that point because you weren't?

A    Not yet at that point, I hadn't actually got up on the stand, no.

Q    Well, it doesn't take that, right?

A    No, it doesn't, but I knew it wasn't going to come out until now.

Q    Excuse me?

A    I knew that it wouldn't be common knowledge until now.

Q    Until now?

A    Right.

Q    Well, you agree, testifying is not the only way to become a snitch in your world?

A    No, you're right.

Q    Getting debriefed by the Government would do that, right?

A    Definitely.

Q    If you went out and told them you did it?

A    Yes.

Q    Yes?

A    Yeah, it would.

Q    Now, you stated that you didn't use any apps to communicate with Mr. Stinson?

A    Not that I remember.

Q    You're the only one on the stand, so if you don't remember and you said no, then no's the answer, right?

         MS. STOKMAN:  Objection, argumentative.

         THE COURT:  Sustained.

         MR. REED:  I'll pass the witness, Your Honor.  Thank you.

         THE COURT:  Ms. Barrett.

         MS. BARRETT:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MS. BARRETT:

Q    Good afternoon, I think.

A    Good afternoon.

Q    I'm Jean Barrett, and I represent Frank Clement.

     What I'd like to do here is just to clarify some stuff about the federal charges, and I left the document on counsel table.

         MS. BARRETT:  If you'll excuse me, Your Honor.

BY MS. BARRETT:

Q    When you testified and answered to Mr. Villa's questions, you were talking about what you understood during the course of your interview in July of 2021; do you remember that?

A    Yes.

Q    And you were shown a transcript of your testimony -- not of your testimony, of your interview at that time; is that right?

A    Yes.

Q    And do you recall that that transcript reflected that you were told that you faced a --

MS. STOKMAN:  Objection.

MS. BARRETT:  -- 25 year mandatory minimum?

THE WITNESS:  No, I don't remember -- I don't think it was mandatory minimum.  I honestly don't even remember the 25 years until I read it.

BY MS. BARRETT:

Q    Can I refresh your recollection on that?

A    Sure.

MS. STOKMAN:  Objection, and I think he answered the question.

THE COURT:  Sustained.

BY MS. BARRETT:

Q    So do you have two prior felony drug convictions?

A    Yes.

Q    As a result of those two felony drug convictions, you could get additional time in the federal system; is that right?

A    I don't know the rules to the federal system.  I've been in state my whole life.

Q    Did you have a federal attorney to represent you during

your discussions in your Plea Agreement?

A    Yes.

Q    And you signed Plea Agreements; did you?

A    Yeah.

Q    And you also reviewed your Presentence Investigation Report, correct?

A    I received one.  I didn't read it all, but I received one.

Q    Well, wasn't it a fact that the Presentence Investigation Report said that your guidelines sentence --

MS. STOKMAN:  Objection, hearsay.

THE COURT:  Sustained.

BY MS. BARRETT:

Q    You didn't read the presentence report?

A    I mean, I read through it, but I lived through the interview.  It's basically the interview that the probation lady did with me.  It's the same exact thing.

Q    Was there not a sentencing recommendation in there?

MS. STOKMAN:  Objection, calls for hearsay.

THE COURT:  Sustained.

BY MS. BARRETT:

Q    So you have no recollection about your presentence report and what you faced; is that right?

A    I know I faced a mandatory minimum of 10 years.

Q    Not 25?

A    I don't know how the guidelines work.  I know that with my

criminal history and stuff, yeah, probably a little more than 10 years.

Q     A lot more than 10 years, right?

THE COURT:  Ms. Barrett, let's talk about this at sidebar.

(At sidebar on the record.)

THE COURT:  I thought we weren't talking about mandatory minimums anymore because there is no mandatory minimum.  A guideline is not a mandatory anything.  It is guidance.  It's not mandatory, clearly.  So what are you asking him about?  What are we talking about?

MS. BARRETT:  I'm asking him if he was aware that he faced a mandatory minimum sentence of 25 years if he didn't plea.

THE COURT:  But he wasn't.  That's not the law.  Where are you saying that he has a 25-year mandatory minimum?

MS. BARRETT:  If he has a -- if he pleads guilty to an 841(b)(1)(A) on methamphetamine with actual meth, and he has two strikes, basically two prior drug convictions, the sentence under the statute is 25 years to life, mandatory minimum 25 years.  It increases with every single prior drug conviction.

THE COURT:  What are you asking him about because his presentence report, by that point he wasn't looking at that.

MS. BARRETT:  He was looking at the guidelines.  He says he didn't remember it.

Clowers - Cross by Barrett

THE COURT:  Let me finish what I was going to say.

MS. BARRETT:  Sure.  Sorry.

THE COURT:  I'm not sure what you're asking him about there.  Are you asking that the probation officer noted in there that otherwise this would be the sentence?

MS. BARRETT:  That otherwise he was a career offender.

THE COURT:  But at this point when the presentence report was prepared and filed, that wasn't what he was looking at, right, because there had already been other things that occurred.  He wasn't looking it at that time.

MS. BARRETT:  It was in the presentence report.

THE COURT:  I understand that, but what you're asking him to say is, What did the probation officer write in the report?

And he's going to say -- I mean, he could read it and he can tell us all, but how does that bear on his bias; how does that bear on the issues before the Court now?

MS. BARRETT:  Because the next thing that happened was that the Government wrote in the Sentencing Memorandum to the Court that they were not seeking a career offender status and that the defendant did not expect it.  And I want to know whether or not he understood what that meant.

THE COURT:  By this point he had counsel, they had gone through it, they had a cooperation agreement, they knew what the Government was recommending, they had seen the

confidential memoranda.  I'm not sure where you're going.  What difference does it make?  He wasn't facing that on that day.

MS. BARRETT:  It was a benefit.

THE COURT:  You can ask him about benefits, but to say to him, On that day weren't you facing 25 years to life or 25 years mandatory?  That's not true, he wasn't.

MS. BARRETT:  I didn't say "on that day."

THE COURT:  But that's the only source of that information is on that day.

MS. BARRETT:  I'll move on from the 25 years.

THE COURT:  If I'm missing something, I want to know it, but what I'm hearing you to say it was in the report but he knew by the time he got that report.

MS. BARRETT:  "Twenty-five years" wasn't in the report, Your Honor.

THE COURT:  The 25 years, we're still not talking about what Ms. Stokman said?

MS. BARRETT:  No.

THE COURT:  Where does that come from?

MS. BARRETT:  It wasn't in the report.  In the report was the career offender sentence.

THE COURT:  What is his source of knowledge; what is your good faith basis that he has this knowledge?

MS. BARRETT:  Of the career offender status?

THE COURT:  Yeah.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

MS. BARRETT:  That it was in the presentence report.

THE COURT:  And that's -- by that point he already knew that wasn't going to apply to him.

MS. BARRETT:  Well, he knew that the Government wasn't seeking career offender and that they told the Court that they weren't seeking career offender at the time that he -- at the time of the sentencing memorandum.  That it was obviously discussions because it says in the Sentencing Memorandum that neither the defense nor the Government is seeking and expects a career offender sentence.  That's a big deal.

THE COURT:  I guess I'm still not -- are you saying that because that was the status at that time, that bears on what he says today?

MS. BARRETT:  Yes.

THE COURT:  Help me to understand how.  Are you saying that --

MS. BARRETT:  It's a benefit that he received for his cooperation.  He received that benefit as a result of his cooperation.

THE COURT:  All right.  Why don't we just ask him that.  Did you receive a benefit of not being called a career offender and the sentencing consequences that came with that, because he said he doesn't know this.  And you can't introduce the presentence report for that proposition.  So to the extent what he knows, yeah, let's do it all day, but I heard what you

were saying is you wanted to introduce what the probation officer knew, and I'm not sure how --

MS. BARRETT:  No.

THE COURT:  Okay.

(End of sidebar discussion.)

BY MS. BARRETT:

Q    Do you know what a career offender is, Mr. Clowers?

A    Yes.

Q    Do you know what happens if you're designated a career offender in the federal system?

A    No, I don't.

Q    Well, you don't know that it increases your sentence exposure?

A    Yes, yes, I do.

Q    That it not only increases your sentence exposure, it increases it almost triple of what you would really -- what your guideline sentence would be; is that right?

MS. STOKMAN:  Objection, misstates facts.

MS. BARRETT:  I asked a question, he hasn't answered.

THE COURT:  Overruled.

THE WITNESS:  I don't know the exact.

BY MS. BARRETT:

Q    I'm not exact -- I'm just saying approximately.

A    I know of it enhances the base term, yeah.

Q    Significantly?

Clowers - Cross by Barrett

A     Yeah.

Q     Yes.  Now, you are expecting additional consideration from the prosecutors after your testimony; is that true?

A     That's what I was told.

Q     And you could get up to 50 percent off your sentence -- they could make a motion for you to get up to 50 percent off your sentence, correct?

A     Correct.

Q     And in addition to that, they could make a motion under what's called Rule 35 for you to get even more time off your sentence; is that right?

A     I'm not sure.  I don't know about the Rule 35.

Q     Well, does your Plea Agreement say that after you get your 50 percent off, that you could still get more time off?

          MS. STOKMAN:  Objection, misstates the facts.

          THE COURT:  Ms. Barrett, do you have a good faith basis that the Plea Agreement says this?

          MS. BARRETT:  Yes.

          THE COURT:  Do you have that with you?

          MS. BARRETT:  Plea Agreement, please.  I received some assistance.

BY MS. BARRETT:

Q     Do you remember signing the Plea Agreement?

A     Yes.

Q     Do you remember when you signed the Plea Agreement, that

the Plea Agreement provided that if the Government determined that you had provided further cooperation within a year, that the Government could move for further reduction of your sentence?

A    Yes.

Q    So we are down to 50 percent possibly, which is five years.  How long have you been incarcerated?

A    Almost four years.

Q    And so after all is said and done, with good time, you have a shot at being a free man within this year, correct?

A    Eventually.

Q    You would agree with me, wouldn't you not, that that is a very fine deal indeed?

A    I feel blessed.

          MS. BARRETT:  Thank you very much.

          THE COURT:  Any further redirect?

          MS. STOKMAN:  Yes.

                    REDIRECT EXAMINATION

BY MS. STOKMAN:

Q    The Cooperation Agreement that we've been speaking about, did that -- did the terms of that agreement lay out what was expected of you if you cooperated?

A    Yes.

Q    And do you -- beyond the benefits that you received, what is your understanding of what you were required to do in

Clowers - Redirect by Stokman

return?

A    Tell the truth.

Q    And what does that mean to you?

A    That means just to tell what happened, answer the questions truthfully.

Q    Has anyone from the Government told you what to say?

A    No.

Q    Have you been told by the Government what that truth entails?

A    No.

Q    So what is that truth, as far as you know it to be, what you're required?

MR. VILLA:  Objection, calls for a narrative.

THE COURT:  I guess I'm just not quite sure what the question is.

MS. STOKMAN:  Yeah, I think we touched upon it anyway. I'll move along.

BY MS. STOKMAN:

Q    Is the testimony here that you've given based upon what you know or something else?

A    Everything I said is what I know.

Q    So during your time when you were in prison and you said you were under the control of the AB, the rules that we spoke about, were you personally following those rules as well?

A    Yes.

Q    Were you expected to follow those rules?

A    Yes.

          MR. VILLA:  Objection, leading.

          THE COURT:  Sustained.

BY MS. STOKMAN:

Q    Was there an expectation about how you related to those rules?

A    I don't understand.

Q    Were you -- actually, I'll move along.

     So it's fair to say that you've spent a significant time incarcerated, we've established, right?

A    Yes.

Q    And when was the first time in your life that you knew of the AB?

A    I would say 2005, '06.

Q    How old were you?

A    Twenty, 21.

Q    When you initially met with law enforcement to discuss potentially cooperating, were you solid about that decision at that point?

A    No.

Q    Tell us about that.

A    Basically, to make the decision to cooperate is to put myself and my family in danger, so it was hard for me to make that decision.

Q    Why was it important for you to know what you would receive in return?

A    Because I wanted to make sure that my risks -- I could at least get home and see my family potentially sooner than I would otherwise.

Q    And why was it important for you to know how much time you were looking at?

A    Because my family's old.  I want to know what I'm getting into.

Q    You said you're serving the state sentence concurrent to the federal time?

A    Yes.

Q    What would happen if you at this point went back to state custody?

A    I would be a target.

        MR. VILLA:  Objection, speculation.

        THE COURT:  Overruled.

BY MS. STOKMAN:

Q    Was that a factor when you were making your decision?

A    Yes.

Q    You said that you were hesitant to make this decision, but who ultimately made that decision to cooperate?

A    I did.

Q    When you were on the conference calls that Mr. Reed discussed with you, are you calling all of those people that

are on that call?

A    No.

Q    How did that work, if there were multiple people on a call?

A    They just get merged into the call.

Q    So when you were in the cell with Lil' Bro, did you ever engage in conference calls then?

A    That's when I engaged in them.

Q    And how would that work, as far as how many cell phones were being used?

A    Basically, you could just call one person and they could merge in that someone and they could merge in someone.  You don't have to dial all of the numbers.

Q    You mentioned that someone told you to stay away from Kenwood, who was that?

A    That was Bash, Lil' Bro.

Q    Did John Stinson ever tell you that?

A    No.

Q    Did they give you reasons, Bash and Lil' Bro, to stay away from Kenwood?

         MR. VILLA:  Objection, hearsay.

         MS. STOKMAN:  Coconspirator.

         THE COURT:  Overruled.

         Go ahead.

Clowers - Redirect by Stokman

BY MS. STOKMAN:

Q    Did they give you reasons why to stay away from him?

          MR. VILLA:  Objection, 404.

          THE COURT:  Overruled.

BY MS. STOKMAN:

Q    You can answer.

A    Yeah, anybody who deals with Kenwood or works for him, they're not in good standing for long.

Q    And did you, in fact, have limited contact with him after hearing that information?

A    Yes.

          MS. STOKMAN:  Just one second.

          No further questions.

          THE COURT:  Mr. Reed, any further cross-examination?

          MR. REED:  No, Your Honor.

          THE COURT:  Mr. Villa, any further questions?

          MR. VILLA:  No, Judge.  We would reserve this witness, however.

          THE COURT:  Ms. Barrett?

          MS. BARRETT:  No.  Thank you, Your Honor.

          THE COURT:  All right.  Ladies and gentlemen, we're going to ask you to step out just for about five minutes, quick break and then we'll bring you right back in.  Thank you.

     (In open court outside the presence of the jury.)

          THE COURT:  Ms. Stokman, do you have a next witness?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

MS. STOKMAN:  Yes.

THE COURT:  Is this a person in custody or out?

MS. STOKMAN:  Out.

THE COURT:  All right, let's go ahead and bring the jury back in.

(In open court in the presence of the jury.)

THE COURT:  All right.  We have all jurors back in their places.

Ms. Stokman, your next witness.

MS. STOKMAN:  Yes, the Government calls Mark Smith.

MARK SMITH, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

THE CLERK:  Go ahead and have a seat and please state your full name for the record and spell your last name, please.

THE WITNESS:  Mark Antonio Smith, S-M-I-T-H.

BY MS. STOKMAN:

Q    Good afternoon.

A    Good afternoon.

Q    What do you do for work?

A    I work for a company called Flock Safety, and I'm their general counsel.

Q    Are you familiar with the Flock Safety system?

A    Yes, I am.

Q    And what is that?

A    So Flock Safety is a company that runs a public safety

Smith - Direct by Stokman

operating platform, and in that platform we create

evidence-gathering devices, and our main product is called

Falcon, which is a completely wireless, license plate capturing

camera that captures images of vehicles as it passes it, and

the cameras capture the images of the vehicle from behind.

Q    So how does that Falcon camera work?

A    Sure.  So it uses passive infrared motion detection.  So

any time an object passes the camera, it captures an image of

that object.  Then it captures it on the camera.  It transmits

it encrypted and secure to our cloud instance where then it's

maintained for indexing and storage.

Q    And is the use of that Falcon camera only for law

enforcement?

A    No -- well, our primary customer base is law enforcement,

however, we have customers that are both commercial clients as

well as HOAs in neighborhoods.  Those clients and customers can

actually share their data with law enforcement so that law

enforcement has all the data they need to pursue what they're

pursuing.

Q    Okay.  We're going to show you some images that should pop

up on your screen.  The first is Exhibit 1138.

MS. STOKMAN:  I'm just going to use the physical.  I'm

going to approach.  May I approach?

THE COURT:  Yes.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

BY MS. STOKMAN:

Q    I'll hand you Exhibit 1138 through 1140.  Are you familiar with the images in Exhibit 1138, 1139 and 1140?

A    Yes, I am.

Q    Can you tell us what they are?

A    These appear to be images captured by Flock's -- by our Falcon cameras.

Q    Regarding the cameras -- and actually, let me ask you this first:  Those three images, were they captured by the same camera or different cameras?

A    It appears that two of the images were captured by one camera, and then that would be Exhibits 1138 and 1139 and Exhibit 1140 was captured by a separate camera.

Q    Were you able to review those images prior to testifying today?

A    Yes, I was.

Q    Regarding the cameras in question, who installed these cameras and where were they located?  And you can go from -- you can just mention the exhibit number, and then answer that question for the two cameras.

A    So all of our cameras are installed by employees of Flock. We have install techs that are out in the field and install them in various jurisdictions.  Those cameras are installed at the direction of our customer base, particularly from law enforcement because they're more knowledgeable as to where they

Smith - Direct by Stokman

should be located.

With respect to where these are located, I can tell just from the cameras, because it's distinctive at the bottom of the camera on the very left, the name of the camera typically has the location associated with it, so from the Exhibits 1138 and 1139, it seems like it's in West Covina, which is near intersection of West Pacific and Bromley, and that would be for Exhibits 1138 and 1139.

And then for Exhibit 1140, that is in Ontario, California, and that appears to be on the westbound side of the intersection of Philadelphia and Grove.

Q   Are those images that you're looking at in those three exhibits generated by the Flock system?

A   Yes, they are.

Q   And regarding the camera for Exhibits 1138 and 1139, was it working at the time portrayed on the photographs that were captured?

A   Yes.  And I think I should probably say that with respect to our cameras, our system we have -- we have a software engineering group and we have cloud software that maintains and runs a suite of health checks to make sure the cameras are operating functionally and fully at all times of the day.  If they go down, we're notified, and we can usually correct those errors either remotely, or if it's something from a physical perspective, we can dispatch and install tech to fix it.

Smith - Direct by Stokman

With respect to these images in question, I was able to run the health checks for the images on all three exhibits, and the cameras were fully operational and functioning at the time that they were captured.

Q    Are there timestamps on each of those images?

A    Yes, there are.

Q    And are you able to determine if the timestamps on the device that printed out that image are accurate?

A    Yes, our cameras work very similar to our mobile phones, and so they're hooked up to the LTE Systems, so just like your mobile phone syncs with that clock, our cameras sync with that clock.  So if a camera were to go down and when it comes back up, it syncs again with that clock to make sure that that time is accurate.

MS. STOKMAN:  I'll ask to admit Exhibit 1138, 1139 and 1140.

THE COURT:  Any objections?

MR. REED:  No objection.

MS. LUEM:  No objection.

MS. FISHER-BYRIALSEN:  No objection.

(Government Exhibits 1138 through 1140 admitted in evidence.)

BY MS. STOKMAN:

Q    Mr. Smith, could you tell us how the --

THE COURT:  I didn't say it, those are going to be

Smith - Direct by Stokman

admitted.

MS. STOKMAN:  I'm sorry, Judge.

THE COURT:  Go ahead.

BY MS. STOKMAN:

Q    Can you tell us how the license plate reading system works, the technology?

A    Sure.  It's a machine-learning algorithm.  We have a team of in-house, machine-learning engineers who have device software that runs against large data sets.  So what they do is they run large data sets of vehicles constantly against the program that they have coded to ensure that when our cameras go out and capture images, that the images that they're capturing are correct and accurate and in line with the best industry standards.

Q    Is there security around this system?

A    Yes.

Q    How does that work?

A    The system is secure -- the whole life cycle is secure from the moment that an image is captured to the time that it's uploaded into our cloud instance.  So when the image is captured, it's secure on the camera.  It stays within the camera for a period of up to seven days.

Then it's securely transmitted into our cloud instance, and our cloud instance is with Amazon web services.  So Amazon web services is encrypted -- it's 86256 encryption with Amazon

Smith - Direct by Stokman

web services, which is a very high level encryption to ensure that any data that's stored is secured.  And then when it's stored in Amazon, it's secured -- it's also encrypted at rest. While everything while it's being transmitted is secured, it's also secured when it sits in that instance.

Q    And then law enforcement or other individuals are able to use the system in order to find license plates that might have been captured by the cameras that Flock and Falcon have in place; is that correct?

A    That is correct.

MS. STOKMAN:  I have no further questions for this witness.

THE COURT:  Mr. Reed, do you have questions?

MR. REED:  No questions, Your Honor.

MS. FISHER-BYRIALSEN:  No, thank you.

THE COURT:  Ms. Luem?

MS. LUEM:  No questions.

THE COURT:  All right.  Thank you, sir.  You can step down.

(Witness is excused.)

THE COURT:  All right.  We are now at about 1:25. We're going to take our evening break, ladies and gentlemen. Thank you for your attention today.  We'll see you back tomorrow at 8 o'clock.  Again, please don't discuss this case with anyone.  Please don't form any opinions on this case.

Case: 25-3648, 03/04/2026, DktEntry: 16.5, Page 176 of 177

1315

Case 1:20-cr-00238-JLT-SKO   Document 1751   Filed 01/27/25   Page 175 of 176

Please don't do any independent research and please do not search anything on the Internet or watch any media reports about this case.

Thank you very much.

(In open court outside the presence of the jury.)

THE COURT:  The jury members have stepped out.  Is there anything for the record at this time?

MS. FISHER-BYRIALSEN:  Your Honor, we would just like to know the list of witnesses for tomorrow.

THE COURT:  Has the Government not provided those yet?

Ms. Stokman, who are you calling tomorrow?

MS. STOKMAN:  We believe it will be Stacey Kenan, Carlos Garcia, David Estrada and Michael Rodriguez from Pomona PD.

THE COURT:  All right.  Anything else for the record at this time?

MS. STOKMAN:  Nothing from the Government.

THE COURT:  All right.  Thank you.

MS. BARRETT:  No, Your Honor.

MR. VILLA:  No, Judge.

(Proceedings adjourned at 1:24 p.m.)

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

ER 641

C E R T I F I C A T E


I certify that the foregoing is a true and correct

transcript of the proceedings in the above-entitled matter.


_____          January 23, 2025
MARYANN VALENOTI, RMR, CRR                    DATE
Official Court Reporter
CA CSR #11266

MARYANN VALENOTI - U.S. DISTRICT COURT -   (916)930-4275

ER 642