IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff - Appellee,<br>v.<br>KENNETH JOHNSON,<br>    Defendant - Appellant. | No. 25-3645<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |
| UNITED STATES OF AMERICA,<br>    Plaintiff - Appellee,<br>v.<br>FRANCIS CLEMENT,<br>    Defendant - Appellant. | No. 25-3648<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |

On Appeal from the United States District Court
For the Eastern District of California
The Honorable Jennifer L. Thurston
D.C. No. 1:20-cr-00238-JLT-SKO

**EXCERPTS OF RECORD**
**VOLUME 5 OF 13**

Ryan J. Villa
The Law Office of Ryan J. Villa
5501 Eagle Rock Ave. NE Suite C2
Albuquerque, NM 87113
Ryan@rjvlawfirm.com

Andrea Lee Luem
Andrea Lee Luem, PHV
400 South Fourth Street, Ste 500
Las Vegas, NV 89101
andrea@luemlaw.com

Counsel for Defendant-Appellant
Kenneth Johnson

Jane Fisher-Byrialsen
Fisher & Byrialsen, PLLC
4600 S. Syracuse Street
Denver, CO 80137
jane@fblaw.org

Jean D. Barrett
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
jeanbarrett@ruhnkeandbarrett.com

Counsel for Defendant-Appellant
Francis Clement

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

UNITED STATES OF AMERICA,    ) Case No. 1:20-CR-00238-JLT-SKO
                             )
                             ) Fresno, California
               Plaintiff,    ) January 24, 2025, 7:52 a.m.
          v.                 )
                             )
KENNETH BASH, et al.         ) Re: Trial Day 6,
                             ) Page 1316 through Page 1520
               Defendant.    )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JENNIFER L. THURSTON
UNITED STATES DISTRICT JUDGE

APPEARANCES:
For the Plaintiff:        U.S. DEPARTMENT OF JUSTICE by
                          MS. STEPHANIE STOCKMAN,
                          ASSISTANT U.S. ATTORNEY
                          2500 Tulare Street, Room 4401
                          Fresno, California  93721

                          U.S. DEPARTMENT OF JUSTICE
                          VIOLENT CRIME & RACKETEERING SECTION by
                          MR. JARED ENGELKING,
                          U.S. TRIAL ATTORNEY
                          1301 New York Avenue, N.W.
                          Washington, D.C.  20005

                          U.S. DEPARTMENT OF JUSTICE by
                          MR. JAMES CONOLLY,
                          ASSISTANT U.S. ATTORNEY
                          501 I Street, Suite 10-100
                          Sacramento, California  93721

                 MARYANN VALENOTI, RMR, CRR
                  Official Court Reporter
                  501 I Street, Suite 4-200
                   Sacramento, CA 95814
                 mvalenotiRMRCRR@gmail.com
                    (916)930-4275

Proceedings reported via mechanical steno - transcript produced
via computer-aided transcription

(APPEARANCES CONTINUED)

For Defendant Johnson:    LAW OFFICES OF ANDREA LEUM by
                         MS. ANDREA LEE LUEM
                         400 South Fourth Street, Suite 500
                         Las Vegas, Nevada 89101

                         LAW OFFICES OF RYAN J. VILLA by
                         MR. RYAN J. VILLA
                         5501 Eagle Rock Avenue NE, Suite C2
                         Albuquerque, New Mexico  87104

For Defendant Clement:    FISHER & BYRIALSEN, PLLC by
                         MS. JANE FISHER-BYRIALSEN
                         99 Park Avenue
                         New York, New York  10016

                         RUHNKE & BARRETT by
                         MS. JEAN de SALLES BARRETT
                         29 Broadway, Suite 1412
                         New York, New York  10016

For Defendant Stinson:    LAW OFFICES OF KENNETH ALAN REED
                         MR. KENNETH ALAN REED
                         406 W. Fourth Street
                         Santa Ana, California  92701

I N D E X

WITNESSES                                            PAGE

STACEY KENAN
        Direct Mr. Conolly ...................... 1346

CHARLES GARCIA
        Direct Mr. Conolly ...................... 1388

DAVID ESTRADA
        Direct Mr. Conolly ...................... 1409

MICHAEL RODRIGUEZ
        Direct Mr. Conolly ...................... 1469

GINA EGUIA
        Direct Ms. Stokman ...................... 1492

GOVERNMENT EXHIBITS
        No. 1084 ............................... 1353
        No. 1085 ............................... 1357
        No. 1087 ............................... 1358
        No. 1088 ............................... 1359
        No. 1089 ............................... 1360
        No. 1090 ............................... 1361
        No. 1091 ............................... 1361
        No. 1092 ............................... 1362
        No. 1093 ............................... 1363
        No. 1094 ............................... 1364
        No. 1095 ............................... 1365
        No. 1096 ............................... 1365
        No. 1828 and 1837 ...................... 1370
        No. 1839 ............................... 1372
        No. 1064 ............................... 1374
        No. 1066 ............................... 1376
        No. 1069 ............................... 1377
        No. 1076 ............................... 1378
        No. 1083 ............................... 1379
        No. 1103 ............................... 1381
        No. 1104 ............................... 1382
        No. 1119 ............................... 1384
        No. 1126 ............................... 1385
        No. 1829 to 1836 ....................... 1396
        No. 1433 ............................... 1397
        No. 1141 ............................... 1454
        No. 1142 ............................... 1455
        No. 1144 ............................... 1455
        No. 1149 ............................... 1457

GOVERNMENT EXHIBITS CONTINUED
     No. 1150 ................................ 1459
     No. 1148 ................................ 1462
     No. 1155 ................................ 1463
     No. 1161 ................................ 1465
     No. 1163 ................................ 1466
     No. 1156 ................................ 1467
     No. 1160 ................................ 1468
     No. 1167, 1168, 1169, 1170, 1173, 1175.... 1497
     No. 1177, 1179, 1182, 1183, 1186, 1188 ... 1497
     No. 1189, 1192 and 1197 .................. 1497
     No. 1825 and 1826 ........................ 1506
     No. 1171 ................................ 1510
     No. 1199, 1201, 1202, 1203, 1205, 1208.... 1512
     No. 1210, 1211 and 1212 .................. 1512

FRESNO, CALIFORNIA, FRIDAY, JANUARY 24, 2025

--o0o--

(In open court outside the presence of the jury.)

THE COURT:  So, I was told, Mr. Engelking, that you wanted to talk about the issue from the other day.

MR. ENGELKING:  Yes, Your Honor.  As we sort of previewed for the Court the other day, we had reached out to defense counsel about trying to get stipulations to the authenticity of Facebook, T-Mobile, Google data and the 911 call, but we weren't able to reach an agreement on that.

So in the absence of a stipulation, we're just asking the Court to review the 902 certifications that accompanied that data and make a ruling that they meet the 902(11) requirement such that the Government does not need to call live witnesses for the purposes of authenticating that data.

THE COURT:  Was there written notice given about this in advance, and was the data, the declarations available, as well as the production available to the defense?

MR. ENGELKING:  Yes, Your Honor.  We reached out to the defense counsel in the weeks prior to trial.  I don't have that e-mail with me, and the 902s were produced, with the exception of two of the Facebook 902s, which we recently obtained, but they're the exact -- sorry, I'll back up.

It's four Facebook accounts, two of the 902s for those -- for two of the accounts were produced previously.  Two

were just recently obtained by the Government, but they're, you know, the exact same 902s.

THE COURT:  And the information produced in response to Facebook as to those two were also made available to the defense?

MR. ENGELKING:  Yes, Your Honor.

THE COURT:  We're talking about four accounts from Facebook, documents from T-Mobile, Google data, and the 911 call?

MR. ENGELKING:  Correct.

THE COURT:  All right.  Anyone from the defense want to be heard at this time?

MR. VILLA:  Yes, Judge.  With respect to Facebook, Google, those things that are created by a specific user, they can't be authenticated under 902(11) because essentially they could be created by a fictitious person, fictitious profile under any name, and simply saying that this is John Doe's Facebook account is not sufficient to establish that it's John Doe's Facebook account.

THE COURT:  Is that what's being said, or is what's being said is these are the documents that come under the account, whoever owns it, whoever created it, but these are the documents associated with that account?

MR. VILLA:  Your Honor, I don't have the certifications in front of me.  We can certainly look at them,

but I don't think that they self-authenticate the documents such that they can be admitted without testimony or evidence that prove that it was, in fact, this user who used the Facebook account.  So, you know, we're talking about Facebook messages, you know, things that the user of the -- whether it's Facebook or Google, is creating themselves.

THE COURT:  Mr. Villa, let me understand, because what I expect the Facebook custodian would say, Here's the account, here's what's associated with that account, but we can't bring a Facebook custodian of records in here to say who sent those messages, who set it up, anything about that.  So, I'm trying to just understand how you think bringing custodian of records to say these are the records associated with his account addresses any of the issues you're raising.

MR. VILLA:  So because of that, because these things are created, modified, altered by the user, they don't satisfy the kept-in-the-course-of-regular-conducted activity of the business, which is the 903(11).

So there's a case, Your Honor, that I point you to, *United States versus Weber*, 574 F.Supp.3d 791, out of the District of Montana that addressed an argument by the United States concerning Google, Facebook, Dropbox and other business records that were at issue.  That was essentially the finding of that District Court, that things made by the user are not the type of things that are relied upon by the business in the

performance of its functions.

You know, we're not talking about internal business records of these companies, but rather things that a user on the outside can change, modify, alter and influence, and I think that's the point of being able to cross-examine the records custodians is to establish the limits of what they know and don't know about the records and how they were created and authored by the individuals that did that.

THE COURT:  I guess, though -- I mean, you say you don't know what the declaration says, that's kind of where I guess we're going to need to start.  Because if the declaration says, This is just what we have associated with this account, that's all that is required for that point, that issue, because -- I mean, I don't disagree with you saying these are the authentic records from -- you know, T-Mobile, for example, doesn't say anything about who's using that phone, and, I mean, that's not a different scenario, right?

The fact -- because it's the same thing with the phone.  You don't have to prove who you are when you set up a phone account in a lot of situations.  So, the custodian could just simply say, Here's the account.  Here's the calls.  But I guess I'll have to consider exactly what the declaration says.  So since you don't recall what it says, you don't have it in front of you, I'm going to need to get it and look at it.

MR. VILLA:  Perhaps if we could all be looking at the

same thing, we can talk about it, but that's our concern. If it says, This is the Facebook account of John Doe, that's problematic in and of itself because it's ascribing the account to John Doe.

THE COURT: Didn't you all talk about this beforehand? So, you've seen the declaration. I think I'm the one at a loss here because I haven't.

MR. VILLA: I apologize, Your Honor, we looked at a lot of things in the lead up to trial, including discovery that we were getting every single day and are still getting. I need to look at it again.

THE COURT: But I just said that the other day, You all were going to meet and confer. You did not do that after I said that?

MR. VILLA: We received certifications several weeks ago from the Government, and we just said, you know, we're not willing to stipulate at this time. I just don't recall specifically the language.

THE COURT: Since we had this discussion the other day, you didn't look at it again? You guys haven't really conferred about this?

MR. VILLA: Not since then, Your Honor. I guess, it may have been a miscommunication, but I thought that perhaps the Government was going to provide the current form of certifications, but if the Government will provide them to me

today, I'll look at them today.

THE COURT:  I'm not sure I understand the current form.  Are you saying these declarations have somehow been modified since they were originally produced?

MR. VILLA:  No, Your Honor.

THE COURT:  So, Mr. Villa, you have them on your laptop somewhere?  I need a copy, and then I guess we can take another time to talk about this.

Any other defense want to speak to this issue?  I think Mr. Villa makes a valid point, but until I see those, I don't know exactly what they're saying.  And I guess I should clarify, are you talking specifically about Facebook or are you talking about the T-Mobile account, the Google data and the 911 call, too?

MR. VILLA:  I think the 911's different because we're talking about, you know, not something created by a user.  So if we're talking about the custodian saying this is the 911 call that we, you know, recorded, I think that's a separate issue from the Facebook, Google, social media accounts and those sorts of things.

THE COURT:  Okay.  So what is your position as to the 911 calls?

MR. VILLA:  As a general principle, I don't think we oppose the authenticity of the 911 calls.  The concern we had was the identification of users.  So if somebody says, you

know, This was so and so that made the 911 call, I think we're then entitled to cross-examine them about how they made that determination.  If it's somebody saying this is just the recording that we made a recording of, that's a different question.

I think that applied to -- there was a similar proposed stipulation on wiretaps, you know, and that's the same thing, ascribing who the person is.  Who's speaking on the phone is different than this is the phone number we tapped.

So that was our concern about the language for the wiretap, is it seemed to indicate, you know, this is John Doe and Jane Doe talking on the wiretaps, we're not going to stipulate to that, we're entitled to cross-examine the law enforcement officers.

THE COURT:  I agree with you about that. Mr. Engelking, as to the 911 call, exactly what is it that you are looking for?  Are you just wanting them to say, Yeah, this is the recording, but the details as to who's speaking, what they're talking about, is coming from a witness?

MR. ENGELKING:  One moment, Your Honor.

(Government counsel confers.)

MR. ENGELKING:  Your Honor, with regards to the 911 call, we do have the 902(11), which just basically says that it's what it purports to be, and that it was maintained in the regular course of business, and then we were going to play the

911 call with one of the detectives today.

THE COURT:  A detective that you call is going to say in advance, Yeah, I reviewed this, you know, from my experience this is who's speaking; how is this detective going to be talking about the recording?

MS. STOKMAN:  Judge, it's not -- they're not going to say who was speaking on it, that this was the call that came through dispatch and this is what prompted Pomona PD to respond.

The Ninth Circuit has ruled that 911s can be admitted into evidence as either public records under Rule 803(8)or business records under Rule 803(6).

THE COURT:  I'm sorry, I just was misunderstanding the context.  I thought were you attributing this to -- you're just saying this is why they -- they got the call and they responded.

MS. STOKMAN:  Correct, and that's why we've given the 902, because that is what is authenticating the 911 call as the business record, which the Ninth Circuit has said it can come in through.

THE COURT:  All right.  Comments.

MR. VILLA:  I'm sorry, I'm refreshing my recollection with my e-mails, and I think all we have is an e-mail from the Government with a list of items they sought our stipulation on, rather than a draft certification.  So I don't know that we've

seen the draft certifications.

With the 911 call, if we can look at that, we can probably resolve that today, if it's going to go on today.

THE COURT:  Mr. Engelking, can you cite them to some information that they can pull up to look at these, or do you have extra copies for them to look at them?

MR. ENGELKING:  I have one copy of the 911 call with me right now.  I can give it to them right now.  It's quite short.

MR. VILLA:  I'm happy to look at it right now.

MS. FISHER-BYRIALSEN:  Is there an exhibit number or Bates Number that we could pull up?

THE COURT:  That would be helpful.

Mr. Engelking, this is marked, I assume?

MS. STOKMAN:  There's not a Bates number on the copy we have.

THE COURT:  I need to understand.  You're talking about -- the call itself is marked, obviously?

MS. STOKMAN:  Yes.

THE COURT:  Are you trying to look at the call, Ms. Luem -- I'm sorry.

MS. LUEM:  Actually, that was Ms. Byrialsen.

I was trying to find the 902.  I cannot find them anywhere in our list of exhibits.

THE COURT:  Those are not marked, those were --

they're saying -- I think Mr. Engelking said you produced the declarations.  Can you help them out with when that happened so they can locate them?

MR. ENGELKING:  Yes, Your Honor.  Like I said, with the exemption of the two Facebooks, which I don't believe have been produced yet, I believe everything -- the other two have. But I believe everything else has, I have Bates on everything else.  I don't have the Bates on the 902.

So I don't want to say that that has been produced since I have not seen the Bates on that, but they're looking at it right now.

MS. LUEM:  If it was e-mailed, then maybe just direct us to the date of the e-mail, because I can't find it.

MS. STOKMAN:  I can give you the Bates of all of the ones that have been produced at this point.  We don't have it for the 911 call or the two new Facebooks, so those can be viewed by counsel as well.

But otherwise, he's going to read you the Bates for the other custodian 902s.

MR. VILLA:  With respect to the 911, at least on behalf of Mr. Johnson, and I've shown it to Ms. Fisher-Byrialsen, I don't have an objection to this certificate of authenticity because it just says, "Telephone recording related to incident number," and I assume that's a Pomona incident number.

But, you know, just because the Court admits it through this business record doesn't necessarily mean the detective can, you know, testify who's the caller without more foundation.

THE COURT:  Definitely right, you're right.  I don't think they're even going to try to establish that the detective knew who the caller was.

MS. STOKMAN:  That's correct.

THE COURT:  Now, let me understand -- and actually, I should inquire, Ms. Fisher-Byrialsen, are you also, or Ms. Barrett, are you agreeing that the 911 call's authentic?

MS. BARRETT:  Yes, Your Honor.

THE COURT:  And Mr. Reed.

MR. REED:  I don't have a dog in that fight.

THE COURT:  I think your mic is off.

And then what is Google data; what are we talking about there?

MR. ENGELKING:  Yes, this is the GPS data.

THE COURT:  Related to what?

MR. CONOLLY:  Your Honor, these are -- sorry, James Conolly speaking.  These are the 902(11)s related to account information from three different warrants served on Google. They relate to subscriber information, to location information and -- well, actually, I think two of them relate to location information.

We have produced those. I can read off the Bates numbers now. All these 902(11)s are saying, Your Honor, and the same as with the Facebook, is that these are accurate snapshots of the account as it was when we produced these returns. They are not vouching for anything the user had written or self created content.

They are simply saying, We host these services in the course of our business, and in the course of our business this is an accurate snapshot of the account as it existed at the time. That's all these 902(11)s are saying. That should be sufficient for authentication, and if a custodian were called, that is essentially what they would say.

THE COURT: All right. Let's get the Bates numbers for the defense.

MR. CONOLLY: For the three Google warrants, the Bates numbers are, and they all begin with "Bash_," they are 17494, 20035 and 46618.

MR. VILLA: These are the warrants or the certifications you drafted?

MR. CONOLLY: The certifications.

MR. VILLA: Okay. So the issue, Judge, with respect to Google, it's the same issue as Facebook, while this might satisfy part of the business records exception, these aren't necessarily business records, because they have to discuss or present evidence about who prepared it, you know, who created

the account, what was the information that the user put into the account, what were the modifications.  And we're entitled to cross-examine the custodian about that so that the jury's not left with the impression that, you know, Joe Smith is, in fact, the owner of this Google account.

THE COURT:  I think the issue is actually a little different, because you can ask the custodian, they're going to go, I don't know, I don't know, the custodian is going to say what the custodian says in the declaration.  Bringing somebody in to say, I don't know, I don't know how efficient that is.

It seems to me the issue is relevance, because while you're going to say, Okay, this is a snapshot of that account at that time, how does that bear on anything?  Until you have someone say, This relates somehow in some way, we're not going to just produce it to the jury because there's no context.  You need to have a witness talk about why you think this is what it is, and that addresses what Mr. Villa is talking about.

Telling me that this is what Google held on this, that is a prerequisite before the person can testify, you know, this is this other stuff that you're talking about.

So I'm not trying to deal with the entirety of the issue, but you have to have that before you can get to the next step.  And I guess I'm just trying to understand from the defense what would be the point of bringing a custodian in to say what they say in their declaration and say, I don't know

anything beyond that, because that seems to be what everybody agrees is going to be said by the custodian.

MR. VILLA:  Because it's critical that the jury understand that they don't know how the user is creating it. They don't take any steps to validate the identity of the person who says they are creating that, and I don't know that anyone else has that information.

So it's akin to -- I know it's a different issue -- but like the Melendez-Diaz/Bullcoming-type issues where you're talking about lab reports is who are all the people that helped create that record and what do they know about the information in the record.

It's the same thing with the Google account, you know. So it says Joe Smith is the owner, what does the company know or don't they know about.

THE COURT:  I guess the question, though -- you're making an assumption that I don't know.  I still haven't seen the 902s.  Those need to be sent to me so I can have them.  But did the -- were they seeking the records of Joe Smith or were they seeking Facebook account blah, blah, blah in the name of blah, blah, blah?  I don't know because you're assuming a fact that I don't know.  Do you have that so that we can talk about that or do we need to put this off a little bit?

Because you're saying it's critical that the custodian say, I don't know who did it, I'm not sure how, because what

I'm saying is they have to have another witness come in and say what is the pertinence of this information, what the relevance is before the jury is ever going to hear it.

So what you're wanting to do is introduce to the jury what it is before a witness ever even says what it is. Because if a custodian of record comes in, they're going to say, Here are these records, are these records produced at this time related to this account? They're going to say, Yeah.

I mean, I'm just trying to figure out from an efficiency standpoint is it critical or are you going to -- does that come more -- does it make more sense to come from a witness that actually is going to be able to say what they were trying to achieve with it?

MR. VILLA: I think the relevance foundation is essential. Hypothetically, if the owner of the Facebook account came in and said, Yeah, I created this, and then the Facebook authentication of records said, These are records that we hold, then I think they've met that, assuming it's relevant to the case.

THE COURT: I guess the question as to the relevance objection, then, there's not -- that can't be sustained at this point. I'd have to go -- you know, I can't do anything about that, because all this person is saying, I received a subpoena to produce this. I took a snapshot, here it is. Is it relevant? I don't know yet. How am I supposed to rule on

that?

MR. VILLA:  Our objection at this point is not relevancy.  Our objection at this point is we are entitled to cross-examine these custodians of record and that the certifications themselves did not meet the authentication requirements of 902(11) for social media user created things like Google, Facebook, et cetera.

THE COURT:  Did you find any circuit authority from any circuit addressing this, because as I -- and granted I haven't had a whole lot of time to look at what you produced to me, but it looks like this one is not exclusively 902(11) but also -- it was concerned also with 902(13).

So, I obviously need some time to look at this, but you've read through it.  Are you saying that you are representing to me that this is the authority, you haven't found anything other than a district court out of Montana?

MR. VILLA:  Yes, that's a 2021 case.  It also rejected the Government's theory under 902(13) for similar reasons.

THE COURT:  I guess -- aside from that, my question is, is there binding authority?  Is there, from any circuit or more ideally from the Ninth Circuit, on the topic?

MR. VILLA:  Not from the Ninth Circuit.

THE COURT:  From any circuit?

MR. VILLA:  Let me see.

THE COURT:  If there's not, there's not, and I'll take

a look at this and work backward, but obviously, I don't want to waste my time if there's something out there that you know about.  It would be more efficient for you just to tell me what it is.

MR. VILLA:  Ninth Circuit -- excuse me.

THE COURT:  If what you're telling me -- is this something that you've already reviewed, or are you just looking at headnotes?

MR. VILLA:  I'm looking at a memo.  It's an internal memo.

THE COURT:  Something that has been analyzed, okay, what is the cite?

MR. VILLA:  It is *United States versus Browne*, B-R-O-W-N-E, 834 F. 3d 403, from the Third Circuit, also rejecting the Government's argument that -- this had to do with Facebook chat logs.

THE COURT:  Any other authorities?

MR. VILLA:  Not at this time, Your Honor.

THE COURT:  The Government hasn't filed anything.  So at this point there's some agreement about the 911 call that it is authentic.  We're just going to have to come together and hear what else everybody has to say on this.  So we can't really do much more about it at this time.

MR. CONOLLY:  Your Honor, I would just also add that the Google and T-Mobile records, to the extent that they

produced content or they produced records that are not user created, such as call logs, toll records, GPS data, that is all generated by the companies themselves, and so a 902(11) there would be appropriate for them to say, again, This is a snapshot of the records that we were generating at the time.

THE COURT:  Comments from the defense as to T-Mobile records that are not user content created?

MR. VILLA:  That's the concern.  I think the actual records sought to be admitted have user names on them.  If the Government's going to sanitize that, but if we're just talking about a phone number, I think we can reach an agreement.  But if the records themselves say, This phone number is for John Doe, then again, I think we're entitled to cross-examine the custodian about how that name got into that record before it's admitted.

THE COURT:  I've never seen the Government do that, but maybe that is what the Government --

MR. ENGELKING:  Your Honor, I think we're -- we're talking about two different witnesses, right.  One of them, the custodian is just going to authenticate the data.  The witness that we actually used the data for and moved the data in through is the witness that's going to say, Yes, I identified this account as this person, et cetera, et cetera, and how they did that.

That is where Mr. Villa, you know, can ask his

questions as to how that happened and how you know this is this person's account, right.

But the custodian is just going to say exactly what's on the 902, and that's the whole purpose of 902(11), it says it right in the Federal Rules, it's to avoid having to call these custodians in situations like this.

THE COURT: All right. Go ahead and send me -- it sounds like T-Mobile, there's agreement, there's no dispute as to the authenticity of the records.

MR. VILLA: With respect to authenticity, but as to whether it's a business record, whether it meets the business record requirements is a different question because of the substance of the exhibit the Government intends to admit.

THE COURT: Let me just back you up. I don't know what you just said, because to come under 902(11) you have to meet the business record exception before you ever get to 902(11). So help me understand, I didn't follow what you were saying.

MR. VILLA: Sure. I think Step 1 is are these records that come from T-Mobile? Okay, that's Step 1.

Two, are they business records? And I suspect with respect to T-Mobile that they are, but if the records themselves have user information, we don't agree to the admission of those until the testimony comes from the other witness.

THE COURT:  Right.  We might be talking at cross purposes, because that's exactly what Mr. Engelking just said. They're not going to seek to admit them just because we say yeah, we don't need a custodian.  What he said is we're going to introduce the witness, the witness is going to come in and go, Here's why I think this, here's what, here's et cetera.

All we're talking about is not admissibility, we're talking about authenticity, and it just simply lays the foundation for the authenticity as to all these records.

I thought I was saying that, but I wasn't being clear, I think, but that's as I understand what the Government is saying.  And what I was trying to say with the whole relevance argument is we're not going to just introduce records because they're authentic.  There has to be a showing of how they're relevant to the issues, which can only come through a different witness.  If the custodian's not here -- even if the custodian's here, it doesn't demonstrate relevance.

So you still haven't seen those 902(11) representations, so -- you have seen the records, though, right?

MR. VILLA:  The T-Mobile records themselves, yes.

THE COURT:  So are they doing what you're concerned about.

MR. VILLA:  I'm sorry, Judge, let me get them in front of me.

MR. CONOLLY:  Just to clarify for the record, the government also produced the 902(11)s for the T-Mobile accounts.  The only 902(11)s that I believe we don't have Bates numbers on here are just two of the four Facebook accounts, but verbiage, they read exactly the same as the two Facebook accounts that we know that we produced the 902(11)s for.  But we have the Bates numbers on all the others.

MR. VILLA:  Your Honor, you can look at the 902(11) certificates.  You can hear the testimony --

THE COURT:  I can, but it's not going to address the issue you have, and that is -- because the declaration is just simply saying -- I'm assuming and I've seen them a million times, you know, this is who I am, this is what it is, this is when it was created, blah, blah, but it doesn't say -- it never says anything about anything beyond that.  And then the records are what the records are, but what I heard you say is something separate than that.  You're saying, well, if the records as a title say "Joe Smith," I want this custodian to say, I don't know how Joe Smith's name got on there.

MR. VILLA:  I think we're entitled to that cross-examination.

THE COURT:  Then it doesn't matter to you what the 902(11) says.  You want to go -- I mean, most custodians simply go and grab records.  They don't usually have a role beyond that.  You want to establish that the person who normally

doesn't have a role beyond that say, I don't have a role beyond that.

MR. VILLA:  I don't know what the records custodians will say precisely, but --

THE COURT:  Well, they're going to ask them what's on the declaration, as I understand it.

Is there a stipulation that the custodians, in all of these instances, will say, I don't know how their names got on these accounts?

MR. CONOLLY:  Your Honor, the stipulation that we had sought when we reached out to defense counsel was, you know, if a custodian were to come, would they say what is in the 902(11)?  And we sought that, as the Court has noted, in the interest of efficiency.

THE COURT:  Well, there's one step further, though, are they going to say -- would you stipulate that they also cannot speak to who created the accounts, for example, whether the person who created the accounts used their true name?

MR. CONOLLY:  Your Honor, I mean, that is not information a custodian would have.  It's why it's not in the 902(11).  These were in response to search warrants that identified by an account number.  An account identifier just said, Give us the records related to this one.

THE COURT:  So these records weren't sought for a particular person, Mr. Villa, is that your understanding?  It

was an account number?

MR. VILLA:  For Facebook?

THE COURT:  I think we're maybe talking cross-purposes, but, for example, T-Mobile.

MR. VILLA:  T-Mobile, I think, is a specific phone number, but within the records produced I think there are users.

THE COURT:  Okay.  But when law enforcement says, I'm not looking for a name, I'm looking for this number, and then the records are produced, you're still looking at, well, how did the name get on there?

MR. VILLA:  Yeah, and they ascribe an identity to that phone number and the user of that phone number.

THE COURT:  So then maybe the stipulation is the user name associated with the number is set forth by the person who establishes an account without proof of their identity; is that fair?

MR. CONOLLY:  Yes, Your Honor.  I mean, it is fair to say that the user created content is, in fact, created by the user and the custodian would not have any eyes on that.

In terms of the Google GPS data, the T-Mobile toll records, that's company-created content, so even though it's the user's behavior that is creating that, it's recorded as mechanical events.

In terms of user-created content, the truth of -- if

somebody says in their Facebook post, The sky is blue today, that is all subject to testimony from another witness, you know, further down the road, but in terms of these 902(11)s simply saying, We were asked for this account to produce records in this timeframe, you know, and in, you know, in these categories, and these are the records that we as a company have for those times and that account identifier, and beyond that they say nothing.

THE COURT:  All right.  I guess at this point -- the witness coming up, is that 911 call, so we can proceed without determining the rest of these issues, right?

MR. CONOLLY:  For the first two witnesses, yes, I think, Your Honor.

THE COURT:  Is there another witness today where this issue needs to be determined?

MR. CONOLLY:  Sorry.  For the 911 call -- I think we might have put that issue to bed -- but for the 911 call we do have a witness today.  I don't believe that --

MS. STOKMAN:  Judge, the witnesses here are going to lay the foundation as far as the relevance for some of this, but we're not actually going to be asking for -- our plan was to bring the custodian in, if that was what we needed to do subsequent to these witnesses, and then admit the data so that the witness who's going to discuss the analysis of the data or the Facebook accounts as far as going through contents would be

able to do so.

So for today, we are not planning on actually publishing any of the information that they're going to discuss. It will just be that they requested these records, and this is what they received back in order to give the Court and the counsel the relevance.

THE COURT: All right. So then the 911 call, I will accept the agreement that the 902(11) declaration is sufficient and that the call is authentic.

As to the other issues, Counsel, I need you to e-mail to the JLT orders the 902(11) declarations, and if there are other authorities, I'll be happy to look at them.

Then anything to discuss at this time, anything else?

MS. STOKMAN: Sorry, we need to set up the computer for the trial director, so we're just asking for a brief minute to be able to do that.

THE COURT: All right, let's go ahead and do that.

(Recess taken 8:28 a.m. to 8:35 a.m.)

THE COURT: We're back on the record. I had an opportunity to skim both *Weber* and *Browne*. I don't think they do, Mr. Villa, what you say they do. *Browne* specifically says that it's basically a multi-part step that in this case, in *Browne*, Facebook does have the ability to establish authenticity. In essence, specifically saying this is what was on the page at this -- they say, This is what took place on

this account, on this date, at a particular time.

But in *Browne* the Government failed to present a witness to talk about what we've been talking about here to say, Here's what it is, here's why we think it was this user, here's this, blah, blah, blah.

When I look at *Weber*, the same thing. The Government did not seek to simply say, This is what happened on this day at this account. They just said, Here's the declaration, let's admit it.

That's not what's happening here. This is a different situation in which they're saying, We want to simply recognize these documents, represent what was happening on the accounts at this point in time, and then we're going to bring in a witness to talk about that other stuff. So neither of these cases have that scenario.

So maybe I'm going to give you another chance to take some time and identify authorities that are on this particular situation where they're attempting to do this in a multi-part way, and that is authenticate simply what's produced from the provider and then have a witness authenticate the content based upon whatever.

MR. VILLA: Your Honor, I understand. The question of whether we'll stipulate is different than whether you'll overrule our objection.

THE COURT: Exactly. But what I'm saying is the

authorities you've given me don't support the position or the factual situation here, so if you want another opportunity, that's fine.  I'm not going to decide this today.  If you want to get on this and provide me something over the weekend, otherwise these authorities don't get you where I think you want to go.  So that's just all I'm trying to say.

Let's go ahead and bring in the jury.

(In open court in the presence of the jury.)

THE COURT:  All right, thank you, ladies and gentlemen, for your promptness.  I'm sorry to keep you waiting this morning.

Is the Government prepared to call its next witness?

MS. STOKMAN:  Yes, the Government calls Stacey Kenan.

STACEY KENAN, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

THE CLERK:  Go ahead and have a seat, and please state your full name and spell your last name for the record.

THE WITNESS:  First name is Stacey, last is Kenan, K-E-N-A-N.

THE CLERK:  Thank you.

BY MR. CONOLLY:

Q    Good morning, Ms. Kenan.

A    Good morning.

Q    Just before we get started, I would just ask that if I ask a question, I will try not to talk over your answer, and if you

Kenan - Direct by Conolly

could do the same in reverse.  I tend to be a bit of a fast talker sometimes and the court reporter is taking a record, so I will do my best to not talk over you, but if I do, I may have to repeat the questions.

So, first question I have is where do you work?

A     For the City of Pomona Police Department.

Q     How long have you been employed there?

A     Almost eight years.

Q     What is your title in your job?

A     I'm a senior crimes scene investigator.

Q     How long have you been in that role?

A     I have been a crime scene investigator for 13 years.

Q     Where were you working as an investigator then before Pomona PD?

A     Tustin Police Department.

Q     And, briefly, what are your main job responsibilities, what do you do as a crime scene investigator?

A     Basically, photographing, documenting, processing crime scenes, collecting evidence, processing evidence.

Q     And before you started that job, what sort of training did you receive?

A     I went to field evidence technician certification, and I continued my education with approximately 500 hours of advanced officer training in various crime scene investigation courses.

Q     Has that 500 hours been spread across your career?

A    My career, yes.

Q    Were you on shift or on call on the night of March 8 of 2022?

A    I was on call.

Q    And what does it mean to be "on call"?

A    I am subjected to being called out to crime scenes from home.

Q    And did that happen that night or in the early hours of the next morning?

A    Yes, it did.

Q    Approximately, what time do you recall getting that call?

A    12:30 in the morning.

Q    On March the 9?

A    March the 9, yes.

Q    And what was your understanding of what the call was for?

A    I was advised that there were two subjects shot and killed.

Q    Where was that, if you recall?

A    It was on Ridgeway, just north of Mt. Vernon.

Q    That's in the City of Pomona?

A    City of Pomona, yes.

Q    And what was your next -- what did you do next once you got that phone call?

A    I responded to the station.  I changed into my uniform, met with the detectives, and then we responded to the scene to

get an overall of what happened with the primary officer.

Q    Why do you go to the station first?

A    I need to get my unit that has all of my supplies and equipment.

Q    So it's standard operating procedure, then, to go first to the station?

A    Yes.

Q    You indicated that you take photographs at the scene, presumably photographs -- what would you be looking for to take pictures of when you get there?

A    So we take overall photographs to document or show what is there and what isn't there.  We'll start with a large perimeter and then work our way in closer towards more the crime scene, as well as documenting with placards what evidence we are going to be collecting.

Q    Typically, when you arrive at the scene, are you the first person there?

A    No.

Q    In a typical situation, who is usually there ahead of you?

A    Responding officers.

Q    And as you understand their duties as they work with you, what is their job to do there at the scene when they first arrive?

A    They're there to render it safe, just basically figure out what's going on, if they need to provide any medical or first

aid or call medics.  They will also document what they think is important at the time in case anything happens, like if fire personnel comes in and stampedes, because that happens.

Q    Understood.  Do they typically leave the scene as it is?

A    Yes.

Q    It's part of their job to, in fact, preserve the scene as best as possible?

A    Yes, it is.

Q    So when you arrive, for example, if there's a piece of evidence that might be, you know, sitting on the sidewalk, you generally presume it was there when you arrived?

A    Correct.

Q    And so for this scene, in the early hours of March 9, did you take photographs at the scene when you got there?

A    Yes, I did.

Q    And do you typically sort of -- sorry, when you arrive, do you immediately focus on certain areas or do you do an overall assessment of the scene?

A    Starting with overalls.

Q    I'd like you to take a look, please, in the binder, it's marked one of two in front of you.  I'm going to ask you to look at a series of photos, so if you could flip through them, starting with 1064.  If you could just page through 1096, and then once you've done that, I just have four loose photographs at the end too to mention.

A    Okay.

Q    If you could also look at 1103 and 1104.

A    Okay.

Q    And then 1119 and 1126.

So do you recognize all of those photographs?

A    Yes.

Q    And were those photographs taken at the scene that night?

A    Yes.

Q    And do they fairly and accurately capture the scene that night?

A    Yes.

MR. CONOLLY:  Your Honor, at this time I would move to admit Exhibits 1064 to 1096, 1103, 1104, 1119 and 1126.

MS. BARRETT:  Objection, Your Honor.  I believe the numbers that were provided earlier were much fewer pictures than that.

THE COURT:  Right, counsel can we talk about this.

MR. CONOLLY:  Yes.

(At sidebar on the record.)

MR. CONOLLY:  My apologies, Your Honor.  So that was meant for authentication purposes.  I did mean to go through and admit just the ones I'm going to ask about.  I meant to just say to leave it --

MS. BARRETT:  It was a slip of the tongue.

MR. CONOLLY:  It was more than a slip of the tongue,

it was enthusiasm, it's just sort of typically how I do it. But we will admit just the ones that we intend to -- the ones I'll ask her about.

THE COURT:  That's what I understood as 1064 to 1066, 1069, 1076, 1083 to 1085, 1087 to 1096, 1103, 1104, 1119 and 1126.

MR. CONOLLY:  Yeah.

MS. BARRETT:  I have fewer than that. I have 1064, skipping 1065, skipping 67 and 68, skipping 70 to 75, skipping 77 to --

THE COURT:  Right, I excluded.  I think we disagree, I heard 1064 to 1066.

MS. BARRETT:  I thought 1065 was not included under that.

MS. STOKMAN:  As far as you're admitting, you're correct.

THE COURT:  It's not 1064.

MR. CONOLLY:  No.

MS. STOKMAN:  He'll read the number again, I think just clarify it so that he has the ones we only wanted to admit, which is your list, exactly what you said.

MR. CONOLLY:  My apologies.  I meant to just authenticate them.  Auto pilot.

(End of sidebar discussion.)

Kenan - Direct by Conolly

BY MR. CONOLLY:

Q   So those photographs fairly and accurately capture what was at the scene that night?

A   Yes.

Q   If you could please -- before I go there, so did you -- do you recall gathering up or documenting any physical evidence at the scene?

A   Yes.

Q   And what physical evidence was there that you gathered up?

A   There were five 9-millimeter casings, two .40 caliber casings, one live round of 9-millimeter cartridge, and I believe it's a light that you use on top of a handgun.

Q   When you say "casing," is that the same as a bullet shell?

A   Yes, it's basically what gets ejected from the cartridge after the bullet gets fired.

Q   And I believe you said -- sorry, can you repeat what the caliber of the bullet casings were?

A   There were two .40 caliber casings and five 9-millimeter.

Q   Did you also happen to see victims at the scene?

A   Yes.

Q   Can you briefly describe, in just general terms, where the victims were in relation to each other?

A   One victim was lying face up closer towards Mt. Vernon, and then north of him in a grass, like planter area, was the second victim lying on his side.

MR. CONOLLY:  To just briefly go through some of the photographs, if I could have -- and this will be for admission, so if I could just have it on the witness's screen, please, Exhibit 1084.

THE CLERK:  Can you see it on the monitor?

THE WITNESS:  Yes, thank you.

BY MR. CONOLLY:

Q    Was this one of the photographs that you took that night?

A    Yes.

MR. CONOLLY:  Your Honor, I would move Exhibit 1084 into evidence.

MS. BARRETT:  No objection, Your Honor.

MR. CONOLLY:  And request to publish to the jury.

THE COURT:  Let me hear from other counsel.

MS. LEUM:  No objection.

MR. REED:  No objection.

THE COURT:  All right, they will be admitted.

(Government Exhibit 1084 admitted in evidence.)

MR. CONOLLY:  If we could publish that to the jury, Your Honor.

THE COURT:  Yes.

BY MR. CONOLLY:

Q    Can you describe what we are looking at in this photograph?

A    So we're looking northbound on Ridgeway, and I'm basically

showing the relationship between the victim and where my first set of markers are of evidence.

Q   And where, in relation to this victim, is the other one, as you described on -- if you can describe it on the photograph here?

A   So the victim is just north of where that RV is, slightly to the right.

Q   I believe you should be able to draw on the screen.  Can you circle roughly where the other victim was.

A   (Witness complies.)

MR. CONOLLY:  For the record, the witness has circled a spot on the grassy area just roughly in the middle of the photograph towards the top.

THE COURT:  Looks like between the power pole and a yellow support for the power pole.

MR. CONOLLY:  Yes.

BY MR. CONOLLY:

Q   And in terms of other evidence in this photograph that you documented, can you please tell us what you documented and how you know you documented it?

A   So those are the placards that I placed out there.  That is Number 1 going to be the Walter mounted light for the pistol -- or handgun, semi, yeah, sorry.

Q   That was my fault, I started talking over you as I said I was going to try not to do.

When you say the "placards," you mean the yellow number indicators there in the photograph?

A    That's correct.

Q    So Number 1, you indicated was the gun mounted flashlight?

A    Yes.

Q    And do you see -- besides 1 and 2, do you see other placards that you had put out at the scene at that time?

A    Yes, just further north.

Q    Can you circle those, please.

A    (Witness complies.)

        MR. CONOLLY:  And for the record, the witness has circled a group of small yellow dots in the road just above where it appears the victim's body is lying.

        THE COURT:  Thank you, I see that.

        MR. CONOLLY:  If we could have for the witness, please, Exhibit 1085.

BY MR. CONOLLY:

Q    Do you recognize this is a photograph you took that night?

A    Yes.

Q    Are these --

        MR. CONOLLY:  Well, Your Honor, I would move to admit Exhibit 1085.

        THE COURT:  Any objections?

        MS. BARRETT:  No, Your Honor.

        MS. LUEM:  No.

MR. REED:  No objection.

THE COURT:  That will be admitted.

(Government Exhibit 1085 admitted in evidence.)

MR. CONOLLY:  Can we publish that to the jury, please.

BY MR. CONOLLY:

Q    So what are we looking at in this photograph?

A    Placards 3 through 6.

Q    Are these the same placards that we just circled in the last photograph?

A    That's correct.

Q    And now that we are -- so is it fair to say we've moved slightly north on the road in this photograph?

A    Yes.

Q    And so I'll just ask you to do this one last time, if you recognize the body of one of the victims in this photograph, can you please circle it?

A    (Witness complies.)

Q    To get into slightly more detail under the physical evidence here, if you could please take a look at --

MR. CONOLLY:  If we could, please, have for the witness Exhibit 1087.

BY MR. CONOLLY:

Q    Is that also a photograph you took that night?

A    Yes.

Q    Of some of the evidence we've discussed already?

Kenan - Direct by Conolly

A    Yes.

MR. CONOLLY:  Your Honor, I would move to admit Exhibit 1087.

THE COURT:  Any objections?

MS. BARRETT:  No objection.

MR. REED:  No objection.

MS. LUEM:  No objection.

THE COURT:  Thank you, it will be admitted.

(Government Exhibit 1087 admitted in evidence.)

MR. CONOLLY:  Thank you.  If we could publish that to the jury, please.

Your Honor, if I could request once the exhibit is admitted, may we just publish it, or would you like me to --

THE COURT:  Once it's admitted it can be published.

MR. CONOLLY:  Thank you.

BY MR. CONOLLY:

Q    So what is in this photograph here?

A    It is the flashlight.

MR. CONOLLY:  If we could now have for the witness, please, Exhibit 1088.

BY MR. CONOLLY:

Q    Again, evidence that you documented that night?

A    Yes.

MR. CONOLLY:  Your Honor, we would move 1088 into evidence.

THE COURT:  Any objections?

MS. BARRETT:  No objection.

MS. LUEM:  No.

MR. REED:  No objection.

THE COURT:  All right, that will be admitted.

(Government Exhibit 1088 admitted in evidence.)

MR. CONOLLY:  If we could publish that, please.

BY MR. CONOLLY:

Q    Can you tell us what we're looking at in Exhibit 1088?

A    It appears to be a broken piece of the flashlight where the batteries were stored.

Q    Did it look like the batteries had been there for very long in the road?

A    It did not.

Q    That is Placard Number 2; is that correct?

A    Correct.

Q    For the written record.

MR. CONOLLY:  And if we could have now for the witness, please, Exhibit 1089.

BY MR. CONOLLY:

Q    Is this further evidence that you documented?

A    Yes.

MR. CONOLLY:  Your Honor, we'd like to move into evidence Exhibit 1089.

THE COURT:  Any objections?

MS. BARRETT:  No objection.

MR. REED:  No objection.

MS. LUEM:  No objection.

THE COURT:  It will be admitted.

(Government Exhibit 1089 admitted in evidence.)

BY MR. CONOLLY:

Q    Can you tell us, please, what we see in this photograph?

A    That's a casing.

Q    A bullet casing with Placard Number 3?

A    Correct.

Q    Here on the -- I'm circling on the screen -- can you tell us, please, what, on the placard, those markings denote?

A    That's called an L scale, shaped like the letter L, and basically it shows measurement to show the size of the casing or whatever the item is.

Q    So essentially a two sided ruler, then, would you say?

A    Correct.

MR. CONOLLY:  And 1090 for the witness, please.

BY MR. CONOLLY:

Q    Do you recognize this photograph as well?

A    Yes.

Q    Further evidence that you documented?

A    Yes.

MR. CONOLLY:  Your Honor, we would ask to move in Exhibit 1090.

MS. BARRETT:  No objection, Your Honor.

MS. LUEM:  No objection.

MR. REED:  No objection.

THE COURT:  That will be admitted.

(Government Exhibit 1090 admitted in evidence.)

MR. CONOLLY:  And published, please.

BY MR. CONOLLY:

Q    Again, what are we looking at and what are we seeing?

A    Placard Number 4, and it's another casing.

MR. CONOLLY:  If we could, please, move to Exhibit 1091 for the witness.

BY MR. CONOLLY:

Q    This is also a photograph that you took?

A    Yes.

Q    Of evidence at the scene?

A    Yes.

MR. CONOLLY:  Your Honor, I would ask to move into Exhibit -- move into evidence Exhibit 1091.

THE COURT:  Any objections?

MS. BARRETT:  No objection.

MS. LUEM:  No objection.

MR. REED:  No objection.

THE COURT:  It will be admitted.

(Government Exhibit 1091 admitted in evidence.)

BY MR. CONOLLY:

Q    So what is it that we are looking at in this photograph?

A    Placards Number 5 and 6.  Placard Number 5 was documenting some various cards that were found, and Placard Number 6 is documenting a live round.

Q    So that would be an unspent -- an unspent round, you said?

A    Correct.

Q    And when you said Exhibit or Placard Number 5 is denoting some cards, do you know what types of cards those were?

A    I would have to refer to my report.

        MR. CONOLLY:  And if we could have, please, Exhibit 1092 for the witness.

BY MR. CONOLLY:

Q    I'll go through the next exhibits fairly quickly.  The Exhibit 1092 on your screen there, that's additional evidence that you documented?

A    Yes.

        MR. CONOLLY:  Your Honor, I would move to admit.

        MS. BARRETT:  No objection.

        MS. LUEM:  No objection.

        MR. REED:  No objection.

        THE COURT:  That will be admitted.

      (Government Exhibit 1092 admitted in evidence.)

        MR. CONOLLY:  If we could publish that.

BY MR. CONOLLY:

Q   So can you tell us, please, what we're looking at?

A   Placard Number 7, documenting a casing.

Q   And as we go through these casings, were they all in the same place?

A   In the general vicinity of one another.

MR. CONOLLY:  If we could have Exhibit 1093 for the witness, please.

BY MR. CONOLLY:

Q   Do you recognize this photograph as additional evidence that you documented?

A   Yes.

MR. CONOLLY:  Your Honor, I would move to admit 1093, please.

THE COURT:  Any objections?

MS. BARRETT:  No, Your Honor.

MR. REED:  No objection.

MS. LUEM:  No.

THE COURT:  It will be admitted.

(Government Exhibit 1093 admitted in evidence.)

BY MR. CONOLLY:

Q   Can you tell us, please, what we are looking at here?

A   Marker Number 8, and that is documenting a casing.

MR. CONOLLY:  And 1094, please.

BY MR. CONOLLY:

Q    After this I just have two more for you.

What's on your screen now is additional evidence that you documented that morning?

A    Yes.

MR. CONOLLY:  Your Honor, I would move to admit 1094.

THE COURT:  Any objections?

MS. BARRETT:  No, Your Honor.

MS. LUEM:  No.

MR. REED:  No objection.

THE COURT:  It will be admitted.

(Government Exhibit 1094 admitted in evidence.)

BY MR. CONOLLY:

Q    Now that's published to the jury, can you tell us please what we're looking at?

A    Marker Number 9, and that is a casing.

MR. CONOLLY:  And 1095.

BY MR. CONOLLY:

Q    Is this additional evidence that you documented that night?

A    Yes.

MR. CONOLLY:  Your Honor, I would move to admit Exhibit 1095.

THE COURT:  Any objections?

MS. BARRETT:  No.

MS. LUEM:  No.

MR. REED:  No objection.

THE COURT:  That will be admitted.

(Government Exhibit 1095 admitted in evidence.)

BY MR. CONOLLY:

Q    If you could briefly describe what we're looking at here?

A    It would be Placard Number 10 documenting a casing.

Q    And the final photograph I have to show you here --

MR. CONOLLY:  Exhibit 1096 for the witness, please.

BY MR. CONOLLY:

Q    This is a photograph you took that night?

A    Yes.

MR. CONOLLY:  Your Honor, I would move to admit 1096.

THE COURT:  Any objections?

MS. BARRETT:  No objection.

MS. LUEM:  No.

MR. REED:  No.

THE COURT:  It will be admitted.

(Government Exhibit 1096 admitted in evidence.)

MR. CONOLLY:  If we could publish that to the jury.

BY MR. CONOLLY:

Q    If you could tell us, please, what we are looking at here?

A    That is going to be Placard Number 11 documenting a casing.

MR. CONOLLY:  And if we could please go back to

Kenan - Direct by Conolly

Exhibit 1085.

BY MR. CONOLLY:

Q    We've just gone through a number of placards documenting casings and other evidence.  In this photograph here, 1085, I can read fairly clearly the Number 3 and Number 4 placards, but beyond that they get a little bit small.  Can you explain, roughly, where the placards that we've just spoken about, the numbers?

A    Yes, can I draw it on the screen?

Q    Yes, please.

A    It's just north of.

Q    So which number of placards were up there that you've just circled?

A    Seven through 11.

MR. CONOLLY:  I would just like the record to reflect the witness has circled a cluster of placards in the photograph just below what looks like a motor home RV.

BY MR. CONOLLY:

Q    And fair to say that -- just so we adjust for perspective here, where are those in relation to the body of the victim that you had noted earlier?

A    The victim's just to the right.

Q    So they're roughly on the same, for lack of a better word, level?

A    That's correct.

Q   Approximately the same distance from the camera?

A   Correct.

Q   And am I right that some of the placards are -- I believe you circled placards that are in the gutter in this photograph?

A   Yes, Number 8 was in the gutter.

Q   So those were photographs that you took at the scene of some of the physical evidence.  Were you asked to gather up any other type of evidence in the area?

A   Video surveillance.

Q   And how did you -- how did you identify or how was it identified what video surveillance would be available?

A   So we canvassed the street on the west side, which would be the left.  Those are all residential homes, and basically, we're looking at the backyards of them based off of this photo.

Q   You said we're looking --

A   In their backyard.

Q   In their backyards.  Were you able to identify any residences on that street that had cameras?

A   Yes, 324 Celia Street.

Q   Which way were the cameras pointing?

A   They were facing Ridgeway.

Q   This is Ridgeway --

A   This street right here that we're looking at is Ridgeway.

Q   If you could just wait until I finish the question and then respond and then I'll try not to talk over the answer.

So this is Ridgeway Street that we're looking at here, and which direction are we facing?

A   We're looking north.

Q   So you mentioned that a residence on the west side of the street there had a camera facing, then, towards Ridgeway Street?

A   Correct.

Q   Did you visit that residence?

A   Yes, I did.

Q   Were you able to speak to the occupants?

A   Yes.

Q   And were you able to access their camera system?

A   Yes.

Q   So they let you access their -- I'll ask it as a different question.

How did you go about trying to obtain video footage from their system?

A   Trying to or actually getting it?

Q   Did you succeed?

A   Yes, I did.

Q   And how did you do that?

A   I downloaded the footage myself from their DVR.

Q   And in your job, is downloading footage from DVRs on private home security systems something that you do?

A   On a regular basis, yes.

Q    And so how do you, and then I'll ask how in this case, but how do you identify what you want to download?

A    In this case the detectives requested a certain timeframe and so I went ahead and downloaded the timeframe that they wanted.

Q    And what was your understanding of where that timeframe came from; why was that of interest in this case?

A    The detectives requested it.

        MR. CONOLLY:  And, Your Honor, if I can approach the witness for the purpose of authenticating some exhibits?

        THE COURT:  Sure.

BY MR. CONOLLY:

Q    Ms. Kenan, I've handed you what have been marked as Exhibits 128 -- sorry, 1828, 1837 and 1839.  If you could take a look, please, at Exhibits 1828 and 1837.  Can you tell us, please, what those are that you have in front of you?

A    It would be the footage from Celia Street.

Q    And on those CDs that you're holding?

A    Yes.

Q    And have you reviewed the contents of those CDs?

A    Yes.

Q    How do you know that you have reviewed them?

A    How do I know?  I signed for it that I reviewed it.

Q    And is there a date on there as well?

A    Yes, it is, on the 21st of this year.

Q    So you have signed and dated those CDs?

A    Yes.

Q    After reviewing them?

A    Yes.

Q    Does the footage on them match the footage that you had copied from the DVR system at the residence at Celia Street?

A    Yes, it does.

Q    Does it accurately capture the view as that camera was pointed; does it accurately capture that view across Ridgeway Street?

A    Yes, it does.

          MR. CONOLLY:  Your Honor, at this time I would move to admit Exhibits 1828 and 1837.

          THE COURT:  Any objections?

          MS. BARRETT:  No, Your Honor.

          MR. REED:  No objection.

          MS. LUEM:  No.

          THE COURT:  All right, 1828 and 1837 will be admitted.

     (Government Exhibit 1828 and 1837 admitted in evidence.)

BY MR. CONOLLY:

Q    In addition to the video from Celia Street, were you able to obtain any other video surveillance footage?

A    Yes, just north of -- on Ridgeway and Valley, there was a market on the north -- southwest corner.

Q    Do you recall the name of that market?

Kenan - Direct by Conolly

A    Perez Market.

Q    What --

A    Perez.

Q    Thank you.

Did you then visit Perez Market?

A    Yes, with the detectives.

Q    And were you able to -- with the detectives were you able to, there in the store, review some of their video footage from the evening?

A    Yes.

Q    And in terms of where on the footage they were looking, did you direct them to a timeframe, or did somebody direct --

A    They requested a certain timeframe.

Q    They being?

A    The detectives.

Q    The detectives.

And you were able to see the monitor yourself?

A    Yes.

Q    At that time or sometime shortly after, were you able to download the video footage from that system?

A    Yes, I did.

Q    And how did you go about doing that?

A    I downloaded it directly from the DVR onto a USB.

Q    If you could please take a look at Exhibit 1839, which I believe is in front of you.  Can you tell us, please, what is

that?

A    It is the video surveillance from Perez Market.

Q    And you yourself have reviewed the contents of that CD?

A    Yes, I have.

Q    How do you know that?

A    I documented it with my signature and date.

Q    Also dated the same date as the last CD?

A    Correct.

Q    And after having reviewed it, does it -- is it a fair and accurate representation of the footage that you had seen that night at the Perez Market?

A    Yes.

Q    So you'd say it's an accurate copy?

A    Yes.

        MR. CONOLLY:  Your Honor, I would move to admit Exhibit 1839 at this time.

        THE COURT:  Any objections?

        MS. BARRETT:  No, Your Honor.

        MS. LUEM:  No.

        MR. REED:  No.

        THE COURT:  All right, admit 1839.

    (Government Exhibit 1839 admitted in evidence.)

        MR. CONOLLY:  One moment, please.

BY MR. CONOLLY:

Q    Ms. Kenan, we --

MR. CONOLLY:  Sorry, if I could have Exhibit 1085 on the screen again, please.

BY MR. CONOLLY:

Q    To help us orient, you said we're looking north in this photograph.  Can you tell us, please, where in relation to this photo Perez Market is?

A    You would need to continue northbound past the motor home.

Q    So it is somewhere at the top of that street?

A    Correct.

Q    Is Perez Market on the conner or middle of the block?

A    It's on the corner.

Q    For the residence at Celia Street, can you see that residence here, if you can tell?

A    I can't tell.

MR. CONOLLY:  If we could take that down, please.

For the purposes of admission, can we please have Exhibit 1064 for the witness.

BY MR. CONOLLY:

Q    Does this photograph accurately capture the scene as you saw it when you arrived?

A    Yes.

MR. CONOLLY:  Your Honor, I would move to admit Exhibit 1064.

THE COURT:  Objections?

MS. BARRETT:  No, Your Honor.

MS. LUEM:  No.

MR. REED:  No objection.

THE COURT:  It will be admitted.

(Government Exhibit 1064 admitted in evidence.)

MR. CONOLLY:  If we could publish that, please.

BY MR. CONOLLY:

Q    Now, in the last photograph we were just looking at, it looks like it's daylight, or at least the sky is brighter than it is in 1064 here, can you please explain what the scene looked like when you arrived?

A    It was dark.

Q    What time did you arrive at the scene?

A    Around 2:00ish.

Q    As you were working -- well, with your camera, are you able to adjust the light settings on it?

A    Yes.

Q    So is it fair to say the sky may appear brighter in certain photos if you've adjusted the settings?

A    Yes.

Q    But also, how long were you at the scene documenting evidence for?

A    Several hours.

Q    And so did the sun come up, also, while you were there?

A    Yes.

Q    So some of these photographs will appear to be nighttime

and some will appear to be daytime; is that fair to say?

A    Yes.

Q    So in 1064, can you please explain what we are looking at here?

A    That's one of the victims.

Q    I'm sorry, if you could explain where in the photo -- for the written record, if you could explain where in the photograph we see the victim.

A    He is laying on the street on the east curb line.

Q    And is this photograph also -- which direction are we facing here?

A    Northeast.

Q    And this is on Ridgeway Street?

A    Correct.

Q    Fair to say he's fairly close to the -- he's in the road but close to the side of the road?

A    Correct.

        MR. CONOLLY:  If we could take that down and provide for the witness, please, 1066.

BY MR. CONOLLY:

Q    Can you please explain what we are looking at in this photograph?

A    This is one of the victims lying face up in the street.

Q    And pardon me, yes.  Does that fairly and accurately capture what you saw that evening?

A    Yes.

Q    Or that morning, sorry.

          MR. CONOLLY:  Your Honor, I would move to admit Exhibit 1066.

          THE COURT:  Any objections?

          MS. BARRETT:  No, Your Honor.

          MS. LUEM:  No.

          MR. REED:  No.

          THE COURT:  That will be admitted.

          MR. CONOLLY:  If we could publish that.

     (Government Exhibit 1066 admitted in evidence.)

BY MR. CONOLLY:

Q    Could you, please, explain what we are looking at here and where this photograph was taken?

A    This is on Ridgeway.  That is the east curb line and it is the victim lying face up.

Q    Is this the same individual that we had seen in the last photograph?

A    Yes, it is.

          MR. CONOLLY:  If we could take that down, please.  If we could have Exhibit 1069 for the witness.

BY MR. CONOLLY:

Q    Do you recognize this as a photograph taken at the scene that night?

A    Yes.

Q   And, just briefly, what is it that we're looking at here?

A   This is going to be the right arm.

Q   Of?

A   Of the victim that we were just looking at.

MR. CONOLLY:  Your Honor, I would move to admit Exhibit 1069.

THE COURT:  Any objections?

MS. BARRETT:  No, Your Honor.

MS. LUEM:  No.

MR. CONOLLY:  Will you publish that, please?

THE COURT:  One second.  Mr. Conolly.

Mr. Reed, I didn't hear you.  Do you have any objections?

MR. REED:  No, I'm sorry.

THE COURT:  Yes, it will be admitted.

MR. CONOLLY:  My apologies, Your Honor.

(Government Exhibit 1069 admitted in evidence.)

BY MR. CONOLLY:

Q   If you could just describe what we are looking at in this photograph.

A   It is the right arm of the victim.

Q   Is he roughly in the same place that he was in in the last photograph?

A   He's in the exact same spot.

Q   He had not been moved?

A     No.

       MR. CONOLLY:  If we could take that down, please.  For the witness, please, Exhibit 1076.

BY MR. CONOLLY:

Q     Can you briefly describe what we're looking at here?

A     This would be the second victim, and he is in that green grass area lying face up.

Q     And does that accurately capture the state that he was in when you saw him?

A     Yes.

       MR. CONOLLY:  Your Honor, I would move to admit Exhibit 1076.

       THE COURT:  Any objections?

       MS. BARRETT:  No.

       MS. LUEM:  No.

       MR. REED:  No objection.

       THE COURT:  It will be admitted.

    (Government Exhibit 1076 admitted in evidence.)

       MR. CONOLLY:  If we could publish that.

BY MR. CONOLLY:

Q     To clarify, again, in the photographs we were looking at earlier of the street in what appeared to be sort of more daylight time, where was this individual in relation to that motor home?

A     Just south of.

Q    And just north of the other victim?

A    That's correct.

Q    And this was the individual that you had circled in the grassy area?

A    Yes.

         MR. CONOLLY:  If we could take that down, please.

         If we could have for the witness Exhibit 1083.

BY MR. CONOLLY:

Q    Do you recognize this as a photograph that was -- an accurate photograph of the scene?

A    Yes.

Q    Just in brief, what do we see in this photograph?

A    So we see the victim, and then just south of the victim, the placards, and then across the street, the police units in the motor home.

         MR. CONOLLY:  Your Honor, I would move to admit Exhibit 1083.

         THE COURT:  Any objections?

         MS. BARRETT:  Any objections.

         MS. LUEM:  No.

         MR. REED:  No objection.

         THE COURT:  That will be admitted.

     (Government Exhibit 1083 admitted in evidence.)

BY MR. CONOLLY:

Q    So, as you just described, we see one of the victims in

the grass.  Is it fair to say this is, perhaps, later in the investigation, just by the time of day?

A    Yes.

Q    And the RV or motor home in this picture, that's the one we saw the back of earlier?

A    Yes.

MR. CONOLLY:  If we could take that down, please.

BY MR. CONOLLY:

Q    At some point in the gathering of the evidence or at some point in your time at the scene, did individuals from the medical examiner's office arrive?

A    Yes.

Q    And is part of your responsibility in a scene like that also to photograph the evidence as they collect it as well?

A    What evidence are you referring to?

Q    Presumably -- not presumably, at some point when staff from the medical examiner's office arrived, did they examine the bodies at the scene?

A    Yes.

Q    And do you also photograph those examinations of the bodies?

A    I photograph when they remove the clothing and turn the body as well.

MR. CONOLLY:  If we could have for the witness, please, Exhibit 1103.

BY MR. CONOLLY:

Q   Can you briefly -- pardon me, was this a photograph you took that night?

A   Yes.

Q   Does it accurately capture what we are looking at in this photograph?

A   Yes, it does.

MR. CONOLLY:  Your Honor, I would move to admit Exhibit 1103.

THE COURT:  Any objections?

MS. BARRETT:  No, Your Honor.

MS. LUEM:  No.

MR. REED:  No objection.

THE COURT:  All right, that will be admitted.

(Government Exhibit 1103 admitted in evidence.)

BY MR. CONOLLY:

Q   So now that that's been published to the jury, can you please explain what it is that we are looking at in 1103?

A   It is the left wrist of Victim Number 1 in the all black clothing.

Q   This was the victim lying in the road; is that correct?

A   Yes.

Q   And is it fair to say we're looking at some tattoos that he has on his left arm?

A   Yes.

Q    Can you briefly describe the tattoos?

A    It looks like two lightning bolts, what appears to be a skull or a helmet with a swastika.

MR. CONOLLY:  If we could take that down, please.  For the witness, please, Exhibit 1104.

BY MR. CONOLLY:

Q    Does this photograph fairly and accurately capture one of the things that you photographed that night?

A    Yes.

MR. CONOLLY:  Your Honor, I would move to admit Exhibit 1104.

THE COURT:  Any objections?

MS. BARRETT:  No.

MS. LUEM:  No.

MR. REED:  No objection.

THE COURT:  That will be admitted.

(Government Exhibit 1104 admitted in evidence.)

MR. CONOLLY:  And publishing this to the jury.

BY MR. CONOLLY:

Q    Can you please describe what you see in this photograph?

A    This is the victim lying in the street in the all-black clothing.  That is the coroner's hands holding open the sweater, or the hood, documenting the tattoo on the neck.

Q    And earlier I had referred to the medical examiner, is it more correct to say the coroner's office?

A    The medical examiner is the one that does the autopsy. This is the coroner.  They are the ones that respond to just collect the body and document at the scene what's going on.

Q    So earlier when I was saying "medical examiner," I should have been saying "coroner"; is that correct?

A    Yes.

Q    My apologies.

MR. CONOLLY:  If we could take that down, please.

BY MR. CONOLLY:

Q    I just have two more photographs to show you.

MR. CONOLLY:  This is 1119 for the witness, please.

BY MR. CONOLLY:

Q    Before we publish this, can you just briefly explain -- well, is this a photograph that you took?

A    Yes.

Q    And it fairly and accurately captures what you were photographing?

A    Correct.

MR. CONOLLY:  Your Honor, I would move to admit Exhibit 1119.

THE COURT:  Any objections?

MS. BARRETT:  No, Your Honor.

MS. LUEM:  No.

MR. REED:  No objection.

THE COURT:  It will be admitted.

(Government Exhibit 1119 admitted in evidence.)

MR. CONOLLY:  If we could publish that to the jury.

BY MR. CONOLLY:

Q    Could you tell us, please, what we're looking at in this photograph?

A    This will be the second victim that was in the grass, and that is the coroner lifting the shirt up to document the chest and armpit area.

Q    What is it that you were recording with this photograph?

A    The blood.

Q    Does it appear he's wounded?

A    Yes.

Q    Were you able to make an assessment of what type of wound that is?

A    It's indicative of a gunshot wound.

MR. CONOLLY:  If we could take that down, please.  And then if we could have for the witness, please, Exhibit 1126.

BY MR. CONOLLY:

Q    So is 1126 a photograph you took of that victim you were just describing?

A    Yes.

MR. CONOLLY:  Your Honor, I would move into evidence 1126.

THE COURT:  Any objections?

MS. BARRETT:  No objection.

MR. REED:  No objection.

MS. LUEM:  I just renew my previous objection 403, it's cumulative.

THE COURT:  That objection's overruled.  That will be admitted.

(Government Exhibit 1126 admitted in evidence.)

MR. CONOLLY:  If we could publish that, please.

BY MR. CONOLLY:

Q   And can you, please, describe what we're looking at in this photograph?

A   That is the back side of the victim.

Q   The same victim we just saw with the chest wound?

A   Yes.

Q   And is it fair to say that he's got some tattoos on his back?

A   Yes.

Q   As I see it, most of his back is covered with tattoos; is that fair to say?

A   Yes.

MR. CONOLLY:  And if we could take that down, please.

One moment, Your Honor.

Thank you.  Your Honor.

And Ms. Kenan, those are all the questions I have for you at this time.

THE COURT:  I'm sorry, who's going to cross-examine

first -- any cross-examination, I guess I should ask?

MR. REED:  I have no questions, Your Honor.

MS. FISHER-BYRIALSEN:  No questions, Your Honor.

MS. LUEM:  No questions.

THE COURT:  All right.  May this witness be excused?

MS. BARRETT:  Yes, Your Honor.

MR. REED:  Yes, Your Honor.

MS. LUEM:  Yes, Your Honor.

THE COURT:  All right, thank you, ma'am.

(Witness is excused.)

THE COURT:  Next witness.

MR. CONOLLY:  Your Honor, the Government would call Charles Garcia.

THE COURT:  Before we start this witness.  Let's go ahead and take a break.  Let's plan on returning at 10 minutes to the hour.  All right, thank you.

(In open court outside the presence of the jury.)

THE COURT:  The jury members have stepped out.  Is there anything at this time for the record?

All right.  Thank you.  Let's take a break.

(Recess taken 9:31 a.m. to 9:50 a.m.)

THE COURT:  We have everyone back.  I just want to make sure I'm accommodating the needs for breaks.  I don't want to embarrass anyone but how often is a break needed?  That way I can kind of plan into it, because I think doing three

Kenan - Direct by Conolly

20-minute breaks is longer than I had intended.  Maybe we could break it up to a couple of short ones and maybe a longer one.

THE COURT: Mr. Clement, do you have a preferred schedule?

DEFENDANT CLEMENT:  I have no control over it.

THE COURT:  Oh, it just happens.

DEFENDANT CLEMENT:  What it does is --

MS. BARRETT:  You don't have to go into it.

DEFENDANT CLEMENT:  I wasn't going to say that. Excuse me.  It gets to the point where it's very painful.

THE COURT:  You just need to have a break.

DEFENDANT CLEMENT:  I'm sorry.  I try to stretch it out as long as I can.

THE COURT:  Don't apologize.

Probably what I'll do is try to break it up.  In that situation we'll just take maybe 10 minutes, and then I just want to plan now so that they have a little longer break if they want to go down and grab a snack.  I also don't want to lose a whole hour on break.  So that's what I'll just plan for. What's been happening is fine, just let me know.

DEFENDANT CLEMENT:  I just need time to go out.

THE COURT:  Is about 10 minutes going to do it?

DEFENDANT CLEMENT:  That's fine.  Thank you very much.

THE COURT:  All right.  No worries, anything for the record, then?

All right.  Let's go ahead and bring in the jury, and

Garcia - Direct by Conolly

then we can bring in Mr. Garcia.

(In open court in the presence of the jury.)

THE COURT:  We have the jury members back.  Let's go ahead and call the next witness in.

MR. CONOLLY:  Yes, Your Honor, the Government will call Charles Garcia.

CHARLES GARCIA, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

THE CLERK:  Go ahead and have a seat, and please state your full name for the record and then spell your last name.

THE WITNESS:  Sure.  Charles Robert Garcia, G-A-R-C-I-A.

THE CLERK:  Thank you.

BY MR. CONOLLY:

Q    Good morning, Mr. Garcia.  Can you tell us please where you work?

A    I work for the City of Pomona Police Department.

Q    And what is your title there?

A    I am a crime scene investigator.

Q    Approximately, how long have you been employed there?

A    About three years and eight months.

Q    What are your basic -- in basic terms, what are your duties and responsibilities?

A    My duties and responsibilities are to respond to crime scenes, to locate evidence, collect it, process it if needed,

book the evidence and then write reports to my actions.

Q   You said you've been there three years and eight months. Did you have a job -- have you had any other jobs in law enforcement before you came to work in that position at Pomona PD?

A   Yes.  I was a deputy sheriff with L.A. County Sheriff's Department for 25 years.  I was a district attorney senior investigator for another five to six years prior to coming up to Pomona PD.

Q   And before becoming a CSI with Pomona PD, can you briefly describe some of the training that you had?

A   Sure.  I was a crime scene investigator with L.A. County Sheriff's Department for 15 years.  I completed the field evidence technician course through Cal State Long Beach.  I completed a two-year, in-house CSI certification process through L.A. County Sheriff's Department, and I've had continuous education, professional education, in the field of crime scene investigation at numerous colleges throughout the country.

Q   Were you working for Pomona PD in the earlier part of March of 2022?

A   Yes.

Q   And do you recall being called out to assist with a double homicide in Pomona roughly in that time period, the first third of March?

A    Yes, I was.

Q    Do you recall the date that you were first contacted about this case?

A    I believe it was March 10.

Q    If you know, when was your understanding of when the homicide had happened?

A    It had happened on March 8, and I was asked to do a follow-up, which is common, to return to the general area of where the crime had happened to search for possible video surveillance.

Q    And did you do that?

A    Yes, I did.

Q    And can you tell us, please, where you went to look for that?

A    I went to the general area of Mt. Vernon Avenue and Ridgeway, and specifically, I went to Pearson's Sales Company, which is located at 2303 Mt. Vernon Avenue.

Q    And why did you go to Pearson's?

A    That's a large commercial food distribution center, and they have numerous cameras outside of their building that kind of face the direction of where the crime scene had occurred.

Q    So somebody had indicated to you, or you had learned that -- where the crime had occurred, approximately?

A    That's correct.

Q    And so when you went to the area and you mentioned Pearson

Garcia - Direct by Conolly

Sales, were you able to locate cameras that you thought would be useful?

A    Yes, I did.

Q    And pardon me, which directions were you looking for for the cameras pointing?

A    In relation to where Pearson Sales is located and where the crime was to reportedly have occurred would have been west of Pearson Sales Company.  So I looked at any cameras that were facing west or south, which would be the two streets near the crime scene.

Q    Okay.  Is this an area that you are fairly familiar with?

A    I am.

Q    And you've lived in Pomona for a while?

A    I don't live in Pomona, I work in Pomona.

Q    Sorry.  You've worked in Pomona for a while?

A    That's correct.

Q    And approximately how many years have you worked in the City of Pomona?

A    About three years, eight months.

Q    And when you were there investigating the -- this crime, you were able to -- did you -- you used the word "canvas," what does that mean?

A    Canvas is basically just searching a general area for any surveillance footage that might be helpful in solving a crime.

Q    And so in doing that, did you have to become fairly

familiar with the immediate surroundings of that area?

A    Typically, what I do is I'll go to wherever a crime scene -- the actual crime scene occurred, and then I'll start panning the area looking for any possible residences, businesses, any building that may have surveillance cameras that are mounted, and then just start knocking on doors and trying to see if I can find anything.

Q    And with regard to Pearson Sales, were you able to find anything?

A    Yes.

Q    So who -- how did you go about doing that?

A    So typically what happens is you walk into a building, you identify yourself, you're in uniform so they can see who you are, and then you just tell them what your purpose is there -- what your purpose for you being there is.

In this case, I talked to a representative, K. Pock, and I told her I was looking for any surveillance footage they might have of the outside of the building that faced Mt. Vernon or Ridgeway Court.  And from there, the individual will either say, Yes, here's my security system over here in this room, help yourself, or they'll say, Let me show you what I have and point to the cameras that you want me to download for you and the timeframe, the date; they'll download it onto USB, hand it over to me, goes back to the Pomona Police Department and gets booked into evidence.

Q    Which of those situations happened here?

A    The latter.  So basically, the monitors at this location are sitting right on top of the desk of where the person in charge works.  We looked at the cameras together.  I told her, I'll take such and such cameras, if I could have copies of footage from this date, from this timeframe, and that's basically it.

Q    Do you recall, roughly, what date and timeframe you had asked for?

A    Yes, I had asked for March 8 from approximately 21:45 to 22:15 hours, 9:45 to 10:15 p.m.

Q    And why that specific date and time?

A    That was the timeframe when the 911 calls were made, allegedly, and that's when the crime would have happened, around that time.

Q    And so you sat with this person and you watched the scenes.  So were you able there to actually see that time and date in the footage, or were you there just looking for the -- where the cameras were pointed?

A    You look at the time and date just to make sure we're looking at the right time and date that we're interested in, and then from that point we just make sure that we capture, again, whatever specific times we're talking.

Q    And then how was that video footage provided to you?

A    On a USB.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Garcia - Direct by Conolly

Q    And that's a thumb drive?

A    Right.

Q    Also known as a flash drive?

A    Right.

Q    And after you received it, did you have a chance to review it, to make sure you had -- did you have a chance to review it?

A    Actually, if I could go back to the previous question.  I believe sometimes these businesses will send us a link with any footage we requested attached to that link and they're downloaded onto a USB, put into our evidence database.  So honestly, I don't recall if this was a link or they were actually on a USB thumb drive, but -- and I'm sorry, your question again.

Q    Well, so somehow the data of the video footage was -- Pearson -- the person from Pearson Sales sent it to you in some form?

A    Right.

Q    And after you received it, did you have a chance to review it?

A    I did.  In my unit, CSI, we don't dig deep into the footage.  We make sure we have the time frames and dates that were requested, and then the detectives are the ones that really piece it together.

Q    And so did you check it -- when you received the video footage, did you check it for the date?

A    I checked the date, and I did check the actual footage was downloaded, and I did look at the footage, yes.

Q    Did it appear to be the same cameras that you had asked for?

A    That is correct.

MR. CONOLLY:  Your Honor, may I approach the witness?

THE COURT:  Yes.

BY MR. CONOLLY:

Q    Now, Mr. Garcia, I have handed you a stack of -- well, pardon me.  I've handed you what had been marked as Exhibits 1829 to 1836.  Do you recognize these exhibits?

A    I do.

Q    Can you tell us, please, what they are?

A    These are CDs that contain clips of video.

Q    And are these the claims of the video that you had requested from Pearson Sales?

A    Yes.

Q    And they appear to be accurate to what you had asked for?

A    Yes.

Q    And have you reviewed all of those CDs in front of you?

A    Yes, I have.

Q    How do you know that you have reviewed those CDs?

A    My initials and date are on each CD.

MR. CONOLLY:  Your Honor, at this time, I would seek to admit Exhibits 1829 to 1836 and all in between.

Garcia - Direct by Conolly

THE COURT:  Any objections?

MR. REED:  No objection.

MS. LUEM:  No objection.

THE COURT:  Did you have an objection, Ms. Barrett?

MS. BARRETT:  No objection, Your Honor.

THE COURT:  All right, thank you.

Admitted.

(Government Exhibits 1829 to 1836 admitted in evidence.)

BY MR. CONOLLY:

Q    You said you canvased this area, you spent some time in this area, have you also looked at maps of this area?

A    Yes, I have.

Q    Would you be able to recognize a map of the area if you saw one, then?

A    Yes.

Q    You also went to Pearson Sales.  Are you also familiar with Perez Market in the area?

A    Yes, I am.

Q    Do you know where it is in relation to Pearson Sales?

A    Yes, it's northwest of Pearson Sales on the corner of Ridgeway and Valley Boulevard on the southwest corner.

MR. CONOLLY:  And if we could have, please, for the witness Exhibit 1433.

BY MR. CONOLLY:

Q    Briefly, can you tell us, generally, what we are -- first

of all, do you recognize what's on the screen in front of you?

A     I do.

Q     And can you tell us briefly what it is?

A     That's an overview satellite shot of the area of Ridgeway Street and Mt. Vernon Avenue.  Pearson Sales appears to be towards the center of this picture, the bottom.

Q     We'll get into describing in just a moment, but this is a map you're familiar with?

A     Yes.

          MR. CONOLLY:  Your Honor, at this time I would seek to admit Exhibit 1433.

          THE COURT:  Any objections?

          MS. BARRETT:  No, Your Honor.

          MS. LUEM:  No.

          MR. REED:  No objection.

          THE COURT:  That will be admitted.

     (Government Exhibit 1433 admitted in evidence.)

          MR. CONOLLY:  If we could publish that to the jury, please.

BY MR. CONOLLY:

Q     So now I will ask you the questions which you had predicted.  So can you -- and if it's easier to, you can draw on the screen with your finger, can you point out what you were just describing in terms of landmarks?

A     Sure.  This is a satellite overview of the area of

Ridgeway Street and Mt. Vernon.  I'll go backwards --

Q    I can clear that, it will clear both.

A    Okay.  So Ridgeway here, Mt. Vernon Avenue here.  Pearson Sales company is here.  North would be up in this top area, south being on the bottom, west over on this side, and this is east, so that's basically that area.

Q    Can you circle Perez Market, please.

A    Sure.

Q    If you could also put a circle around Pearson Sales, please.

A    (Witness complies.)

Q    So when you were asking for footage from the Pearson Sales' cameras, I know we spoke about it in terms of compass directions, but now we have a picture in front of us, can you explain which directions you looked for cameras facing?

A    Sure.  It would be any cameras on the west side of the building here facing this direction, any cameras facing southwest, any cameras facing directly south, any cameras facing southeast.

Q    And what was your understanding of approximately where the crime had occurred?

A    I was told that the crime scene had occurred somewhere over here on Ridgeway, kind of in the center between Valley Boulevard and Mt. Vernon.

Q    Can you point out where Valley Boulevard is here?

Garcia - Direct by Conolly

A    Sure.  Valley Boulevard is up here on the top.

Q    I'm going to clear what you did thus far.  So have you been able to review the videos -- well, we've covered that. You were able to review videos that --

A    Yes.

Q    -- that Pearson sent you.

Did anything in the videos particularly capture your attention?

A    Yes, there were some vehicles that were observed in the clips that were sent to me, some movement of vehicles.

Q    And you mentioned that the timeframe of the videos that you asked for was from approximately 9:45 p.m. to 10:15 a.m. [sic]; is that correct?

A    That's correct.

Q    And during that time, did you see a lot of traffic on the roads -- well, I'll specifically say on Ridgeway and Mt. Vernon, did you see a lot of traffic in that timeframe?

A    No.  This is a industrial area and at night it's pretty dark in that area.  There's not much movement at all.  That's pretty much how this whole general area is at night.

Q    And you mentioned the word "cars" plural, how many cars in particular caught your attention?

A    There were two vehicles observed in the clip that were collected.

Q    Were they both visible at the same time?

Garcia - Direct by Conolly

A    Yes.

Q    Did it appear that they were -- well, was there anything notable about the way that they were traveling?

A    I would see them on the video clip traveling -- can I draw on the screen?

Q    Yes, absolutely.

A    So you first see the vehicle -- you catch the vehicles from the cameras over here on the west side pointing this direction.  You see headlights.  The headlights continue down Ridgeway, cross over to Mt. Vernon, and then out of view at some point.

Then within a minute or two, not long, you see them traveling back, and then they seem to pause about here, and then that's out of view.

Q    For the record, the witness has drawn a path of travel that goes south along Ridgeway Street, turns left at Mt. Vernon Avenue, comes back along Mt. Vernon Avenue after the vehicles have turned around and back up north on Ridgeway Street.

And the area that you've indicated they paused, is it fair to say that's sort of due west of Pearson's Sales?

A    Correct.

Q    Approximately?

A    Yes.

Q    Now, was there anything that you saw about this area that might have indicated why they turned around?

A    Yes.  At the very end of Mt. Vernon is a cul-de-sac right here and you can't go any further.  This is a one-way street, Humane Way that dumps onto Mt. Vernon from the north downward south, yeah.

MR. CONOLLY:  And so for the record, the witness has circled a cul-de-sac in the lower right corner of Exhibit 1433.

So it may be helpful, actually, to play a couple of these videos at this time.  Having been already admitted, Your Honor, I would seek to publish these to the jury.

THE COURT:  All right.

MR. CONOLLY:  If we could, please, have Exhibit 1829, please, starting at about 38 seconds in.

(Media is presented.)

BY MR. CONOLLY:

Q    So as this is playing, what are we seeing that caught your attention?

A    There were headlights -- what appear to be headlights, two vehicles heading south.  Now, as we are looking at it, it's traveling east on Mt. Vernon, both vehicles.

Q    Is it fair to say they appear to be traveling in tandem?

A    Yes.

(Media is presented.)

BY MR. CONOLLY:

Q    At this point they're out of sight, they left the field of view traveling eastbound on Mt. Vernon?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

ER 729

A    That's correct.

      (Media is presented.)

BY MR. CONOLLY:

Q    Now it appears two vehicles come back into the screen.
They appear to be the same two vehicles to you?

A    Yes.

Q    At this point, about 1 minute 50 into the videos, is that
the spot where they appear to slow down?

A    Yes.

Q    After that were you able to see anything with regard to
the cars?

A    That was it.

      MR. CONOLLY:  If we could take that down, please.  If
we could have 1433 back on the screen, please.

BY MR. CONOLLY:

Q    If you recall, approximately -- you were able to look at
the cameras when were you at Pearson Sales?

A    Yes.

Q    Do you recall which direction that camera was facing?
Feel free to draw on 1433.

A    Yes, that camera was mounted here and the field of view
was from here to there.

      MR. CONOLLY:  For the record, the witness has drawn a
triangular field of view -- an angled field of view from --
incorporating -- if you could put 1433 back up, thank you --

Garcia - Direct by Conolly

incorporating the lower part of Ridgeway and then the corner as it turns into Mt. Vernon Avenue.  Thank you.

And if we could have, please, 1833, starting at five seconds in, please.

(Media is presented.)

MR. CONOLLY:  If you could pause that, please.

BY MR. CONOLLY:

Q    So what is this field of view here?

A    This field of view is of the south parking lot of Pearson Sales Company.  This right here is Mt. Vernon, and we're looking southwest.  Ridgeway would be over here around the corner, and this is the entrance driveway to Pearson Sales.

MR. CONOLLY:  For the record, when the witness referenced "Mt. Vernon," he drew a yellow line across the road which is at the top of the frame, with the corner of -- rounding to Ridgeway at the top right of the screen.

If you could just hit "play," please.

(Media is presented.)

BY MR. CONOLLY:

Q    So we've just witnessed two vehicles drive through the shot.  Those appear to be the same vehicles, to the best you can tell, as to what you saw earlier?

A    Yes.

Q    And did the timestamps on these videos roughly line up?

A    Yes, they do.

Q    And in your experience, is it possible that sometimes there's a -- even within the same security system at a company, you'll get some discrepancy between the timestamps?

A    That is correct.

Q    But these were more or less together?

A    Yes.

Q    Now we see the two vehicles going back from left to right across the screen on Mt. Vernon, those appear to be the same vehicles as we've previously seen?

A    Yes, that's correct.

        MR. CONOLLY:  And if we could take that down, please.

BY MR. CONOLLY:

Q    I'm just going to show you two more clips, Mr. Garcia.

        MR. CONOLLY:  If we could have 1835, when you can.

BY MR. CONOLLY:

Q    Before we play this video, what direction are we looking here?

A    We are looking southeast.  This is the south wall of Pearson Sales.  Over here is Mt. Vernon, and we're looking southeast.

Q    So is it fair to say that from the angle we were looking at in the last shot, would he have now turned left?

A    That's correct.

Q    So we're looking further east along Mt. Vernon in this shot?

Garcia - Direct by Conolly

A    Yes.

Q    I will clear this.

MR. CONOLLY:  If we could play that clip, please.

(Media is presented.)

BY MR. CONOLLY:

Q    They're driving down to the end of Mt. Vernon, it appears. Is that the cul-de-sac you had referenced earlier?

A    Yes.

(Media is presented.)

BY MR. CONOLLY:

Q    Now they've come back into frame driving, is that west on Mt. Vernon?

A    Correct.

Q    And gone out of view, and those appear, again, to be the same two vehicles we've been discussing?

A    Yes.

MR. CONOLLY:  And then the last clip I'll show is 1836, please.

(Media is presented.)

MR. CONOLLY:  If we could pause that, please, and back up to 20 seconds in, please.

BY MR. CONOLLY:

Q    Before we hit "play," can you tell us, please, what camera angle we're looking at here?

A    Sure.  We're at the extreme west end of Pearson Sales, and

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

this is the camera -- again, this is Mt. Vernon right here. The camera is facing southeast.

Q    Okay.

MR. CONOLLY:  For the record, the witness has labeled Mt. Vernon Avenue in the top right corner of the screen.

If we could hit "play," please.

(Media is presented.)

BY MR. CONOLLY:

Q    So these two vehicles that we see driving through here at timestamp 29:30, roughly, these are, again, the same two vehicles we've been discussing?

A    Yes.

Q    I'm going to guess we'll see them come back again; is that correct?

A    Yes.

(Media is presented.)

BY MR. CONOLLY:

Q    These are the same two vehicles that we see on the screen now here at roughly 55 seconds?

A    Yes.

MR. CONOLLY:  Then if we could take that down, please, and put 1433 back up.

BY MR. CONOLLY:

Q    So for those last couple of exhibits we just watched, those last couple of videos, can you point to roughly where the

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

cameras were and the directions they were pointing?

A    Sure.  I want to blow the picture up -- oh, it doesn't do it.

Q    I believe we can zoom in.  Hold on one moment, please.

MR. CONOLLY:  If we could zoom in on this area here, please.  Okay.

BY MR. CONOLLY:

Q    We've now zoomed in on the corner of Ridgeway and Mt. Vernon with Pearson Sales in view.  Could you show us where these cameras are and which way they were pointed?

A    Sure.  So from my recollection of everything we just saw, the cameras would have been here, here, here and over here.

Q    Those last two videos we saw were the last two arrows that you drew here?

A    There's actually -- I believe there might have been -- yes, no, that is correct, yeah.

MR. CONOLLY:  All right.  Thank you very much. Mr. Garcia, those are all the questions I have for you.

Your Honor, those are all the questions I have for this witness.

THE COURT:  Any cross-examination?

MR. REED:  No questions by the Stinson defense, Your Honor.

MS. FISHER-BYRIALSEN:  No, Your Honor.

MS. BARRETT:  No, Your Honor.

THE COURT:  May this witness be excused?

MR. CONOLLY:  Yes, Your Honor.

THE COURT:  All right, thank you.

Next witness, please.

(Witness is excused.)

MR. CONOLLY:  Your Honor, at this time the Government would call Detective David Estrada.

THE CLERK:  Mr. Estrada, go ahead and go up.  Please raise your right hand.

DAVID ESTRADA, GOVERNMENT WITNESS, SWORN

MR. CONOLLY:  Your Honor, may I approach the witness box just to retrieve the exhibits?

THE COURT:  Sure.

MS. BARRETT:  Mr. Conolly, can we have the series of numbers again that were played, I think I missed one?

MR. CONOLLY:  Pardon me, what was the question?

MS. BARRETT:  I didn't write down one of the numbers. Can you just read the numbers in the series that we played?

MR. CONOLLY:  Yes.  I believe it was 1829, 1833.

MS. BARRETT:  That's what I missed.

MR. CONOLLY:  1835 and 36.

MS. BARRETT:  All right, thank you.

THE CLERK:  Go ahead and have a seat, and please state and spell your last name for the record.

THE WITNESS:  David Estrada, E-S-T-R-A-D-A.

DIRECT EXAMINATION

BY MR. CONOLLY:

Q    Good morning, Mr. Estrada.  Can you tell us, please, for whom you work?

A    Good morning.  I work for the City of Pomona Police Department as a homicide detective.

Q    Pardon me, it's Detective Estrada?

A    Yes.

Q    How long have you been a detective with the Pomona Police Department?

A    I've been a detective approximately 11 years, just over 20 years total law enforcement experience.

Q    You said a detective for how long again?

A    Approximately 11 years.

Q    And a homicide detective for how much of that time?

A    Ten years.

Q    In what unit were you a detective prior to that?

A    I was originally in -- working fraud investigations about the first year, and in the past 10 years I've been a homicide investigator or a detective.

Q    You mentioned -- you said you've been in law enforcement for 21 years?

A    Twenty-eight, just over 28, I'm into my 29th year now.

Q    My apologies.  Can you briefly tell us, please, where you started in law enforcement?

A    On September of 1996 I started with the Los Angeles Police Department.  I worked there just over four years.  2000, I left to the Montebello Police Department for about three and a half years.  In 2004, I left and went to Pomona Police Department.

Q    And with the LAPD and Montebello PD, what was your job title?

A    Police officer.

Q    And then when you came to Pomona, what did you start there as?

A    Initially, I was a patrolman police officer, worked in the field and eventually promoted to detective where I'm at today.

Q    During your time with the Pomona PD, between -- being a patrol officer and promoting to detective, were you assigned to any squads or task forces within the police department?

A    My first year in Pomona, I was assigned to patrol, which was field duties.  From there I left and went to our major crimes task force, which was street level narcotics and gangs. I did that for about two years and then I went to major narcotics, which I was a deputized task force officer assigned to the Drug Enforcement Administration.  I did that for about eight years or so, and then ultimately promoted to detective.

Q    What is a task force officer?

A    It's a local law enforcement officer, which is deputized as a federal agent to perform federal duties.

Q    You did that with the DEA?

Estrada - Direct by Conolly

A     Yes.

Q     Can you briefly outline the training that you went through -- well, initially in your police career?

A     I went to the Los Angeles Police Academy, which was approximately seven months long, where you study a range of police-related activities such as law, tactics, shooting, plethora of training.  From there I continued to attend schooling on investigative techniques, tactics as well, just current trends within the law, a lot of different training that I continue to do.

Q     And also in that -- is part of that training also interacting with members of the community at large?

A     Yes.

Q     And familiarizing yourself with your patrol neighborhoods and that kind of thing?

A     Yes.

Q     Then when you promoted to detective, what training came with that promotion?

A     I initially attended the basic detective school or investigative school, which was two weeks long, and then subsequently went to homicide school, which was a week long.

Q     And you said you had been a homicide detective for, you said, 10 years?

A     Yes, January of 2015 is when I went to homicide.

Q     If you can, would you be able to give us an estimate as to

Estrada - Direct by Conolly

how many homicides you've investigated as a detective?

A    I was a lead detective over the 10 years, approximately 40 to 50 homicides, and then I've assisted in probably the same, if not more, with the other investigators as well.

Q    As a detective?

A    As a detective.

Q    But then also as a patrol officer, were you ever part of homicide investigations?

A    Yes, initially responding to the investigation itself, yes.

Q    So turning to this case, were you on duty on March 8 and 9 of 2022?

A    I was on call, yes.

Q    What does it mean to be on call?

A    My normal work hours are Tuesday through Friday, 6:30 a.m. to 4:30 p.m.  When on call, still quasi on duty, however, I'm at my residence or wherever it may be, I'm available subject to callouts in the event of a homicide.

Q    So you are expected to be reachable presumably by telephone at all hours during that time?

A    Correct.

Q    And that includes the middle of the night?

A    Yes.

Q    So do you recall on March 8 or 9, and if you can specify a date, that would be helpful, but if you were on call at that

Estrada - Direct by Conolly

time do you recall getting a call for service on one of those dates?

A    Yes, on March 9.

Q    When on March 9 did that call come through?

A    It was approximately 12:30 a.m.

Q    What was your understanding of why you were being called?

A    I was notified that a double homicide occurred in Pomona and I needed to respond to investigate it.

Q    And is the entire city of Pomona your area of responsibility?

A    Yes.

Q    So you could be called for a homicide anywhere in the City?

A    Correct.

Q    So when you received this call, what did you do next -- rather, what did you do first, I should say?

A    I was in bed.  I showered, got dressed.  Responded to the station where I met my partner, which was Detective Rodriguez. From there, we met with our supervisor and our CSI investigator and ultimately responded out to the scene.

Q    Who was your CSI investigator?

A    Stacey Kenan.

Q    Now, why did you go to the station first?

A    Initially, it's just to get any paperwork that's needed in order to investigate, whatever belongings I need, flashlights,

patrol vehicle, radio, just necessities to investigate the incident.

Q    Did you do any preliminary investigation while you were at the station?

A    Yes, by the time we get to the station, we hope to have names of a victim and/or victims, try and do a quick workup on who the subject or decedent may be.  In this case I didn't have any information at the time.

Q    When you say you didn't have any of that information, what information did you not have?

A    Who the decedents were in this investigation.

Q    Did you have any of the names of the suspects?

A    No.

Q    Had you had the names of the victims or the suspects, what would you typically do?

A    I would check the criminal record, see if the City of Pomona has had any contacts with the subject, just basic information.

Q    Would that research -- you said the criminal record, would that retrieve their criminal record?

A    I'm sorry.

Q    Sorry.  The preliminary investigation that you would do, you mentioned investigating whether or not City of Pomona had interactions.  What other information might you retrieve?

A    Their criminal history, which isn't just Pomona specific,

Estrada - Direct by Conolly

it's state, and I believe it's just throughout the United States criminal record.

Q    Would this investigation also include possibly probation records?

A    Yes.

Q    And would it possibly include documentation of gang activity?

A    Possible, yes.

Q    And without that information in this case, that part of the investigation was a nonstarter, because you didn't have any names?

A    Correct.

Q    So after you had met with the individuals you mentioned at the station, where did you go after that?

A    To the scene.

Q    And do you remember, approximately, what time you got there?

A    I don't recall off the top of my head, no.

Q    I believe -- well, sorry.  Was it after midnight on the morning of March 9?

A    Yes.

Q    So when you first arrive at a crime scene, what are your initial tasks as a homicide detective?

A    So once getting on the scene, basically just survey the scene itself, look for any apparent items of evidence, take a

look at the decedents or the decedent, look for any cameras, if there's any witnesses.  Each case is different, but in regard to all cases that's pretty much the initial observations.

Q    When you say "cameras," what sort of cameras do you mean?

A    Surveillance-type cameras.

Q    And those would be -- where do you often find those?

A    Residences, commercial buildings, there's some at intersections.

Q    So when you arrived at this scene, were police personnel already on scene?

A    Yes.

Q    Having been a patrol officer and now being a homicide detective, what's your understanding of what the initial police presence is there to do at the scene?

A    Secure the scene, keeping pedestrian traffic, vehicle traffic away from there to preserve any evidence.

Q    And at this particular location -- first of all, can you tell us where this was?

A    It was the 200 block of Ridgeway in Pomona.

Q    At the time you arrived, was there much in the way of pedestrian traffic?

A    No, there was none.

Q    And how about road traffic?

A    It was cordoned off, there was no road traffic at all.

Q    Do you know this area fairly well yourself?

A    Yes.

Q    It's part of your area of patrol and responsibility?

A    Yes.

Q    How would you describe the area?

A    It's quasi residential and commercial, I would say somewhat more commercial.  It's a north/south street, and along the east side of Ridgeway is a large commercial complex.  As you continue south on Ridgeway, the street bends to, it would be your left or easterly direction, which is still commercial. Along the west side of Ridgeway is residential homes and the backyards face Ridgeway.

Q    So those homes don't have front doors along Ridgeway?

A    No.

Q    And so at this time of night, you mentioned it's a commercial area.  Is it fair to say it's a quiet area?

A    Yes.

Q    Not a lot of people around?

A    No.

Q    And so in terms of investigating, actually, the evidence at the scene here, do you recall what you first looked at?

A    I remember approaching the first victim, who was deceased in the street, and as I worked north I observed numerous shell casings -- or cartridge casings on the ground that were initially identified by the patrol officers.  I observed maybe gift cards or something like that on the ground as well.  I saw

what appeared to be a weapon or gun mounted flashlight that was broken in the gutter.  I saw a live 9-millimeter bullet that was on the ground, and ultimately made my way to the second decedent that was in a grassy sidewalk area.

Q    You mentioned that patrol had marked some of the items of evidence on the ground.  Is it your understanding that your investigator, Stacey Kenan, also does her own marking of exhibits?

A    She does, yes.

Q    With her own placards?

A    Correct.

Q    Okay.  If you know, do you recall approximately how many bullet casings were found at the scene?

A    There was five 9-millimeter cartridge casings, two 40-millimeter cartridge casings and one live 9-millimeter bullet.

Q    And in an investigation like this, at a scene like this, do you typically recover all of the casings?

A    That are visible, yes.

Q    And then is it also possible that there are casings at the scene that you simply don't find?

A    Yes.

Q    And so at that point how many victims had you identified?

A    There was no identification on them.

Q    I'm sorry, how many victims did there appear to be?

A     Two victims.

Q     And actually, that leads me to my next question.  You had mentioned that you didn't have any victim names when you had gone to the station.  Had they acquired any victim names by the time you arrived at the scene?

A     No.

Q     Were you able to look for any identification?

A     I did, and there was no identification on either of the decedents.

Q     Did the decedents have any -- well, did you have any way of identifying them at all?

A     At the time, no.

Q     Did they have any cell phones on them?

A     No.

Q     Did that strike you as odd?

A     Yes.

          MS. LUEM:  Objection, relevance.

          THE COURT:  Sustained.

BY MR. CONOLLY:

Q     Why would it be notable that they don't have any cell phones on them?

          MS. LUEM:  Same objection.

          THE COURT:  I think the question is is it.  Objection sustained.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

BY MR. CONOLLY:

Q    Is it notable that they didn't have any cell phones on them?

A    Yes.

Q    And why is that?

        MS. LUEM:  Objection, foundation.

        THE WITNESS:  Sustained.

BY MR. CONOLLY:

Q    Did they have any cell phones on them?

A    No.

        MS. LUEM:  Objection, asked and answered.

        THE COURT:  Sustained.

        MR. CONOLLY:  Your Honor, that was the foundation.

        THE COURT:  You're asking him about some experience that you haven't established yet.

BY MR. CONOLLY:

Q    Were you able to examine the bodies at the scene?

A    Yes.

Q    Did they have any identification on them?

A    No.

        MS. LUEM:  Objection, asked and answered.

        THE COURT:  Sustained.

BY MR. CONOLLY:

Q    Did they have any cell phones on them after you examined them?

MS. LUEM:  Asked and answered.

THE COURT:  Yeah, that's been asked, sustained.

BY MR. CONOLLY:

Q   So at the time and place that you found the bodies, what was -- as a detective, what was notable about the victims as they were there?

MS. LUEM:  Objection, leading.

THE COURT:  I think that's preliminary.  The objection's overruled.

Go ahead, sir.  You may answer.

THE WITNESS:  Upon discovering the first victim, I discovered that he had a single gunshot wound to the chest.  It was further examined, I noticed some tattoos on his body, one specifically was a swastika on his chin and the words, I believe it was "death squad" above his -- "death" above, I believe it's the right eyebrow and "squad" above the left.

The second victim, same thing, another male Caucasian with numerous tattoos.  And working in Pomona, knowing the demographics, they didn't appear to be from the area, just based on what I observed.

Pomona is predominantly 70 percent Hispanic or so, large black population, and these two males with the tattoos didn't quite fit the demographics of the city.

BY MR. CONOLLY:

Q   Was there any indication as to how they had arrived there?

Estrada - Direct by Conolly

A    No.

Q    You mentioned it's a commercial area.  Is this an area that people hang out in?

A    No.

Q    Especially at night, fair to say?

A    Yes.

Q    So in your early examination of the bodies, you mentioned one gunshot wound to one of the victims.  Were you able to look at both bodies and preliminarily make a guess as to the cause of death?

A    Yes.

Q    And what was that?

A    Gunshot wound by both.

Q    And approximately how many -- sorry, you mentioned one gunshot wound with the first victim.  The second victim, same?

A    Numerous.  I can't tell you exactly how many but he was shot multiple times.

Q    You mentioned that you had found bullet casings at the scene.  So what did that tell you about where the murders had occurred?

A    In that general vicinity.

Q    So I'm going to walk you through some of the photographs from the scene.

MR. CONOLLY:  And, Your Honor, these are photographs that investigator Kenan has authenticated and have been

admitted.

THE COURT:  All right.

MR. CONOLLY:  If we could have for the witness, please, Exhibit 1064 on the screen, and if we could publish that to the jury, please.

BY MR. CONOLLY:

Q    Do you recognize what you see in front of you marked as Exhibit 1064?

A    I do.

Q    Tell us, please, what we're looking at here.

A    The camera's toward the southern portion of Ridgeway facing a northerly direction, and in the forefront is the initial first victim which was later identified as Mr. Yagle.

Q    Your understanding was that was where his body was first found?

A    Correct.

Q    You mentioned -- we discussed a second victim.

MR. CONOLLY:  If we could take that down, please. Before we get there, can we please have Exhibit 1066 on the screen.  If we could publish that as well.

BY MR. CONOLLY:

Q    If you can describe what we're looking at here?

A    That's the first victim once again, Mr. Yagle, and that's how his body was upon my arrival.

Q    You mentioned some tattoos earlier, were any of the

tattoos you mentioned earlier on Mr. Yagle, that you noticed?

A    I'm sorry, could you repeat that?

Q    You had mentioned tattoos on the victims, you mentioned some specific ones.  Do you recall noticing any tattoos on Mr. Yagle when you first found the body?

A    Yes.

Q    Where was that?

A    On his chin is where the swastika was and then above his eyebrows were the -- where "death squad" was tattooed.

Q    Where, in relation to this victim, did you find the other body?

A    It was approximately 30 yards north of this victim here.

MR. CONOLLY:  If we could take that down, please.  If we can have up Exhibit 1076, please.

BY MR. CONOLLY:

Q    So what's been marked as Exhibit 1076, can you please tell us what we're looking at here?

A    This is the second victim that was located in the grass area upon our arrival.  This is how he appeared to be.

MR. CONOLLY:  And exhibit -- if we could take that down, please, and have Exhibit 1083 published.

BY MR. CONOLLY:

Q    This is that same victim in the grass.  Where is that first victim in relation to him as we're looking at this photograph?

A     It would be to the left off the picture itself.

MR. CONOLLY:  And if we could have -- one moment, please.  If we can have Exhibit 1084, please.

BY MR. CONOLLY:

Q     Can you explain what we're looking at in this photograph?

A     Off to the left is the first victim, where he's laying, the camera's facing in a north direction.  And toward the back of the photo, off to the right in the grass area, is where the second victim was located and some items of evidence are marked as well.

Q     If you recall, do you recall what those items of evidence were there?

A     I believe Marker 1 was a part of the weapon mounted flashlight that I described earlier.  And 2, I believe, was the batteries that were contained inside that light.

Q     Those placards further up the street, do you recall what those were?

A     Those were the cartridge casings, I believe the gift card, live bullet.

Q     After you've been at the scene for a while -- did you, at anytime, acquire, while you were on the scene, identification on either of the victims -- at the scene?

A     You're asking if --

Q     Were you able to identify the victims at all while you were at the scene?

A    No, I wasn't.

Q    We spoke earlier about security cameras in the area, were you able to identify any?

A    Yes.

Q    Do you recall where those were?

A    There was cameras fixed in one of the residents on Celia Street, which is -- the backyard faces Ridgeway, and there was cameras at the Perez Market, which is north of where this incident occurred, it's at the intersection of Valley and Ridgeway.

MR. CONOLLY:  Actually, this may be easier, can we please have Exhibit 1433 on the screen.

BY MR. CONOLLY:

Q    So we're showing you what's been marked as Exhibit 1433. Do you recognize this area?

A    I do.

Q    Is that the area where -- roughly, where the homicide occurred?

A    It is.

Q    Can you point on the map, and you can draw on the screen, it's a touch screen, to roughly where the bodies that we've been discussing were found?

A    Just use a finger?

Q    Yes.

A    (Witness complies.)

Estrada - Direct by Conolly

Roughly where the first victim was located, and two would be roughly where the second victim was.

Q    That first victim was the one in the road, is that the one you're referring to?

A    Yes.

Q    And the second one was the person in the grass?

A    Yes.

Q    And so you mentioned a residence on Celia Street, can you indicate to us where Celia Street is?

A    It's just west or to the left of Ridgeway, the residential street, which is --

Q    That was the street that you indicated that the houses back up onto Ridgeway; is that right?

A    That's correct.

Q    If you could please circle the Perez Market that you mentioned.

A    (Witness complies.)

Q    And also -- and where else did you find cameras, or identify cameras?

A    The residence on the 300 block of Celia Street.

Q    Yes, and any other businesses or residences that you --

A    Yes.  There was video obtained from the business just to the right of Ridgeway, it would be east, which is documented here as W. R. Meadows, and also from Pearson Sales Company as well.

Q    Could you circle Pearson Sales for us, please.

A    (Witness complies.)

Q    And did you have a chance to -- by the way, are you familiar with the Perez Market before this investigation?

A    Yes.

Q    And how is that?

A    Couple years prior to this investigation I had another double murder that occurred in that parking lot that I investigated.

Q    And during that investigation had you acquired security camera footage from them?

A    Yes.

Q    So have you had a chance to review the videos that you gathered from Perez Market?

A    I did.

Q    And before we put them up on the screen, can you explain roughly what -- roughly what those videos show that was of interest to this case?

A    The cameras specifically points in a northeasterly direction, which would cover Valley and -- the intersection of Valley and Ridgeway.  It covers any vehicle or pedestrian or any traffic that comes north or south on Ridgeway or east and west through the intersection of Valley and Ridgeway.

MR. CONOLLY:  Could we please play -- Your Honor, this is Exhibit 1839-1, which Investigator Kenan had authenticated

and was admitted through her.

THE COURT:  You said 1839?

MR. CONOLLY:  1839-1, yes.

Pardon me, it is a clip of Exhibit 1839, which she authenticated and admitted.

THE COURT:  Do you have 1839?  Is it 1839 or 1829?

MR. CONOLLY:  It's 1839.  Could we please play Exhibit 1839-1.

(Media is presented.)

MR. CONOLLY:  And you can pause it, actually.  Sorry, I ambushed you with that, I apologize.

BY MR. CONOLLY:

Q    So could you just briefly describe what we're looking at here?

A    This is the camera that's affixed to the Perez Market. It's facing a northeasterly direction.  The street to the front is Ridgeway, that runs from left to right, and it intersects with Valley, which is the top street that proceeds further away from the camera view.

Q    I'm going to draw on the screen here from left to right at the top of the screen.  I'm drawing a line along that road. Which street is that?

A    That's Valley, going east on Valley.

Q    And then I'm drawing from, again, left to right on the screen downward.  As you're looking at the screen, what road is

that?

A    That's Ridgeway.

Q    And that is the road on which the bodies were found?

A    Correct.

         MR. CONOLLY:  And if we could play that clip, please.

         (Media is presented.)

BY MR. CONOLLY:

Q    Of interest to this case, what have we just seen in this video?

A    There's two vehicles that proceed southbound on Ridgeway through the intersection of Valley following one another. One's a Dodge Charger and a silver Mercedes Benz.  They continue south on Ridgeway out of view.

Q    And how were you -- in terms of Dodge Charger, how were you able to identify that make and model of car?

A    Through the camera itself, specifically the rear taillights was noticeable.

         MR. CONOLLY:  Would we be able to play that and pause it at, I believe it's 10 seconds in, or 18, I can't recall.

BY MR. CONOLLY:

Q    While we're queuing that up, are you familiar with Dodge Chargers as a model?

A    Yes.

Q    How is that?

A    We have patrol vehicles that are Dodge Chargers.

Q    Is that taillight array fairly distinctive?

A    It is.

Q    Fairly unique, would that be fair to say?

A    Yes.

(Media is presented.)

MR. CONOLLY:  Not to worry, our next clip will make this easier.  If we could play Exhibit 1839-2, please.

(Media is presented.)

BY MR. CONOLLY:

Q    Of interest to this case, what are we seeing here in video 1839-2?

A    The same vehicles I previously described now going northbound on Ridgeway and making a right eastbound turn onto Valley.

Q    And as we're looking at this photograph, we've paused -- sorry, not photograph, video, we've paused the video.  The car in front, is that the one you're referring to as the Dodge Charger?

A    Yes.

Q    And that sort of bar-like taillights, are those the taillights that you're referring to as well?

A    Yes.

Q    And that's what indicated to you that it was a Dodge Charger?

A    Yes.

Q    And the car behind it, the silver one, I believe you indicated it was a Mercedes.  Is this a clear enough -- was this video sufficiently clear to be able to guess as to the make and model?

A    Not a hundred percent.  I believe it to be a Mercedes but at this point I wasn't a hundred percent sure.

        MR. CONOLLY:  If you could just play that out.

        (Media is presented.)

BY MR. CONOLLY:

Q    We see the cars make a right on Valley; is that correct?

A    That's correct.

Q    By the way, there's a third car that seems to follow them, had you seen that car -- when they initially crossed that intersection, had you seen that car with them?

A    No.

Q    If you recall, approximately, what was the time difference between when they first crossed that intersection we were just viewing to when they came back?

A    I don't recall offhand.

        MR. CONOLLY:  I'll tell you what, why don't we pull up the first video, 1839-1.

        (Media is presented.)

        MR. CONOLLY:  If we pause it, please.

BY MR. CONOLLY:

Q    So down on the bottom right, there appears to be a time

and date stamp.  It says approximately 10:32 p.m. and 26 seconds, it's written in 24-hour time.  Have I captured that correctly?

A    Yes.

MR. CONOLLY:  And if we could go to the beginning of the second video, please.

(Media is presented.)

BY MR. CONOLLY:

Q    Here we see a timestamp of approximately 10:38 and one second p.m.  Is that fair to say that's approximately five to six minutes?

A    Yes.

Q    So at some point, were you able to identify -- at some point after this late evening, early morning, were you able to describe -- able to identify the victims?

A    Yes.

Q    How were you able to identify them?

A    Later on on the 9th, I received a call from a deputy detective from the Los Angeles County Sheriff's Department, Mike Knieriem, who informed me that one of the victims, who turned out to be the first one I described, was, in fact, James Yagle.

The second victim, I did not know who that was at the time I received that phonecall.

Q    How did you find out who the second victim was?

A    Notified by the coroner's office of both of the decedents' identities.

Q    When was that?

A    That was on the 10th, the following day.

Q    So on March 10 it was the medical examiner's office that informed you of the -- of both victims' names?

A    Yes.  Actually, she e-mailed Detective Rodriguez who informed me as well.

Q    Did you then run any background investigation on those two names?

A    I did.

Q    And what did those -- of interest to you at the time, what did those background investigations indicate?

A    Initially discovered there was a lengthy criminal history amongst both of the victims.  They both were documented PEN1 or Public Enemy Number 1 gang members.

Q    Sorry, can you say that first -- what was the name of the gang again?

A    Public Enemy Number 1, and apparently they go by PEN1.

Q    So criminal history gang membership, did you have any other substantive leads at that time?

A    At that time, no.

Q    So in the days that followed, were you able to generate or develop any leads?

A    Yes, I believe two days later after the initial incident,

I received a Crime Stopper anonymous tip.

THE COURT:  Is your microphone on?

MS. LUEM:  Yes, it is.

THE COURT:  Your objection.

MS. LUEM:  The question was vague.  He said, Did you develop any other leads?  Leads as to what?  And in my subsequent objection, based on what I hear his answer, after my objection, would be hearsay.

THE COURT:  The hearsay objection is overruled.

As to the initial objection, can you clarify, Mr. Conolly, the objection is sustained.

MR. CONOLLY:  Absolutely.

BY MR. CONOLLY:

Q    In the days that followed, were you able to generate any information as to who the suspects might be?

A    There was a Crime Stopper's anonymous tip that was submitted in this investigation indicating one suspect.

MS. FISHER-BYRIALSEN:  Objection, hearsay.

MR. CONOLLY:  I believe Your Honor had overruled that objection.

THE COURT:  Officer, does this direct what you did next?

THE WITNESS:  I'm sorry?

THE COURT:  Does this information direct your investigation after?

THE WITNESS:  Yes.

THE COURT:  Objection's overruled.

BY MR. CONOLLY:

Q    You may continue.  Begin again with the information you received.

A    Once again, it was a Crime Stoppers anonymous tip that was submitted indicating that the suspect -- or one of the suspects involved in this homicide was Brandon Bannick who goes by "Bam Bam," I believe.

Q    Could you say that name again?

A    Brandon Bannick.

Q    And he goes by what name?

A    "Bam Bam" or "Bam."

Q    Is that B-A-M?

A    Yes.

Q    Did it specifically link him with these two murders that we've been discussing?

A    Yes.

Q    So based on this information, did you do any further investigation on Mr. Bannick?

A    Yes.

Q    And what did you find out?

A    I looked into his criminal history as well, discovered he has a lengthy criminal history.  He was on active probation. He was also a documented Public Enemy Number 1 gang member.

Estrada - Direct by Conolly

Q    You said he was on active probation.  Were you able to see any of his -- any of the information that he had lodged with probation?

A    Yes.

Q    Did you find out any contact information at that time?

A    Yes, the phone number.

Q    The phone number, okay.  With that phone number did you take any investigative steps, based on now having a phone number?

A    Yes.  I obtained a search warrant to get the subscriber and toll records for that number.

Q    Briefly, what are the toll records?

A    It's -- initially, it's the subscriber, so whoever opened up the account for the phone is contained in that.  Then it's the -- the calls or texts, times and dates that a call is made or a text is made, incoming and outgoing.  At times it provides cell tower location, where those interactions took place, and you can also obtain actual GPS coordinates of that information as well.

Q    So you said cell tower information, how do you mean cell tower information, what information is that?

A    When the phone is used, it hits off -- it uses a cell tower within the general vicinity of where that phone call or text or whatever it may be is being used.  It doesn't pinpoint exactly where that device is but gives you a general location.

Q    And that was the information that you had requested with the search warrant?

A    Correct.

Q    And in addition to the tip mentioning Mr. Bannick, did you receive any other tips from the public about anybody else who might be a suspect in this case?

A    There was quite a bit of information that was relayed, specifically the dates following the murder I received a phone call from a detective from San Diego Police Department.  It indicated that he had a source or arrestee.

Q    I was going to say before that, if we can confine it just to the information that you might have received from a anonymous or public tips.

A    Yes.  There was phone calls that were received, anonymous calls left that -- identifying possible other suspects who were involved in this investigation as well.

Q    What names do you recall coming in through those means?

        MS. FISHER-BYRIALSEN:  Objection, hearsay.

        MR. CONOLLY:  Again, Your Honor, this would go to investigative steps.

        THE COURT:  The objection's sustained until you ask that type of information.

BY MR. CONOLLY:

Q    So I'll just ask again, so you received some tips from the public after the Bannick one?

Estrada - Direct by Conolly

A    Correct.

Q    Did you use those tips to take further investigative steps?

A    Yes.

Q    And so what information came in that allowed you to take those further investigative steps?

MS. FISHER-BYRIALSEN:  Objection, hearsay.

THE COURT:  Overruled.  We're going to go ahead and take -- let's take about -- let's take a quick 10-minute break and we'll come back at 25 minutes after the hour.

Anything for the record at this time?

MS. STOKMAN:  Judge, are we going to have another break today?

THE COURT:  Yeah.

All right, thank you.

(Recess taken 11:16 a.m. to 11:25 a.m.)

MS. FISHER-BYRIALSEN:  Your Honor, we would like to make a record before the witness continues, before the jury's brought back in.

THE COURT:  All right, we're back on the record.

MS. FISHER-BYRIALSEN:  Your Honor, the Government can correct me if I'm wrong, but based on the discovery we received, I anticipate that this next bit of testimony may be about another anonymous tip where the tip is that Yagle and Ennis, who are the two victims that you see on the screen, were

killed at the direction of the Aryan Brotherhood members Kenneth Johnson and Francis Clement.  So we would object to that on hearsay grounds.

I think the witness can say that he gained information without saying what the information is and what steps he then took.

THE COURT:  Can I just interrupt you for a minute.

Can I ask you to step outside, thank you.

(Witness steps outside.)

THE COURT:  Thank you.

MS. FISHER-BYRIALSEN:  Your Honor, I also think that we run into Sixth Amendment issues here and confrontation clause problems with this because extremely incriminating information would come in that we can't unring that bell and we can't cross-examine a confidential -- an unknown source who gave this information.

MS. LUEM:  Sorry, just to add on behalf of Mr. Johnson.  Mr. Johnson is not charged in this Pomona homicide.  This anonymous tipster is providing information, I mean, this is two levels of hearsay to this detective that he is somehow responsible for something that he was never -- hasn't even been charged with and is not on trial for, so it's additionally problematic.

THE COURT:  You're going to stand on a hearsay objection in this context?

MS. LUEM:  I'm going to stand on a Sixth Amendment Confrontation objection.  Hearsay --

THE COURT:  Hearsay --

MS. LUEM:  -- relevance objection.  I think prejudicial versus probative objection are pretty much every objection that there is.  There's no basis under which this can or should come in through this witness.

MS. FISHER-BYRIALSEN:  Your Honor, I think that they can ask what things he's done and what investigation he's done based on information he's gathered, but I don't think it's proper for them to elicit what that information is.  The information is from the anonymous source.

THE COURT:  Anything else for the Government?

MR. CONOLLY:  Well, Your Honor, we would just say that any sort of tips and things like that coming in from the outside, we're planning to ask about in relation to why they took the next steps that they took.  With that said, I don't want to conflate the "confidential informant" with an "anonymous tip."  I wanted to keep them separate, which is why when he started to talking about stuff from a confidential informant, I wanted to cabin that in to talk about the anonymous tips because that was the next part in the investigation.

But with that said, any information that's coming in from the outside is being used to give a steppingstone so the

jury understands why they did what they did.

THE COURT:  I hear that.  You seem to be addressing hearsay, you're not addressing confrontation.

MR. CONOLLY:  I'm sorry, Your Honor, I'm not sure I understood the confrontation argument.

THE COURT:  What they're saying is you want to introduce evidence from people that they haven't had the opportunity to cross-examine here at trial, so their argument is that they should have that opportunity.  And you're just talking about the hearsay issue.

The hearsay issue doesn't concern me because obviously this is an exception.  What I'm concerned about is the confrontation issue.

MR. CONOLLY:  I guess I'm having just a bit of difficulty parsing those two, because, you know, a hearsay statement, of course, is an out-of-court statement.  There's already -- it's already an out-of-court statement.  The confrontation clause is -- but, again, here these are not being admitted for the truth, they're being admitted for the next steps in the investigation.

In terms of the confrontation clause, I mean --

THE COURT:  Let me just cut to it.  Is one or more witness, an unidentified anonymous tipster, going to say that it's one of these defendants that ordered these crimes?

MR. CONOLLY:  If I recall from the discovery, there is

some mention of the defendants, but --

THE COURT:  I understand, though, that you're going to ask questions.  Is that evidence you're going to elicit?

MR. CONOLLY:  Your Honor, it was not my intention to elicit that.

MS. FISHER-BYRIALSEN:  Your Honor, I think there's an easy solution.

THE COURT:  Wait, wait, wait.  We're going to let him finish before you speak again.  Mr. Conolly, you're saying you're not going to introduce that?

MR. CONOLLY:  That was not my intention.  That is why when he started to talk about the San Diego detectives, that is why I put the brakes on.  I was limiting it to other --

THE COURT:  But you are wanting him to -- I mean, I understood the last questions to be related to anonymous tipsters, information he got, and that this bore on his next steps.  What's the nature of that evidence?

MR. CONOLLY:  The nature of that evidence was further names that they then investigated to springboard to the next steps of the investigation.

THE COURT:  So what do these names have to do with anything?  Just simply you said, Joe, we went and talked to Joe and Joe said Steve?

MR. CONOLLY:  The names given were then used -- the names given were potential suspects, people who had actually

Estrada - Direct by Conolly

committed the murders.

THE COURT:  I'm trying to figure out, not that he can't say, We received some names of some potential suspects, we investigated, they didn't pan out.  To the extent that's necessary, are we interested in this or are we interested in, you know, Then we took some other investigation and we got to who we actually finally thought were suspects?  What are you trying to do here?

MR. CONOLLY:  Your Honor, I would be happy to jump to the question of, Did you start investigating Evan Perkins, but to get there, you know --

THE COURT:  I mean, I'm not going to design your questions for you.  I mean, ultimately, did they come to a conclusion about a suspect?  That's a yes or no.  How did you get there?  What steps did you take to get there, right?

MR. CONOLLY:  Right.

THE COURT:  So this anonymous tipster stuff, you're not going to go into anymore?

MR. CONOLLY:  Just simply the names that they were given.

THE COURT:  What do those names have to do with anything, is what I'm trying to figure out?  What names are we talking about?

MR. CONOLLY:  Specifically the monikers "Soldier," "Suspect,"  "Youngster" and "Joe Dirt," who were later

correlated to, respectively, Perkins, James Field, David Fry and then this person, Joe.  Of interest here is Mr. Perkins.

THE COURT:  Which is "Soldier."

MR. CONOLLY:  "Soldier," yes.

THE COURT:  So he got some tips, names, he did some additional investigation and that led him to focus more in on one person?

MR. CONOLLY:  Yes.

THE COURT:  Anything further from the defense?

MS. FISHER-BYRIALSEN:  Your Honor, I've been following along with the discovery while this witness has been testifying, which is not the issue.  I understand he's reviewed his reports and he's testifying in accordance with the reports, but the next thing that is coming up in his report would be the accusation that Mr. Clement and Mr. Johnson ordered this hit from the anonymous source or informant.  So we would just ask that the Government instruct the witness that that is not what they're eliciting before he gets in here so we don't all of a sudden have him saying that and we can't undo that.

We would ask for an instruction, if that happened, that it wasn't for the truth of the matter asserted, but I don't think those ever truly work.

THE COURT:  I understood that you weren't going to be asking anything more than questions that are going to lead to that information; is that true, Mr. Conolly?

MR. CONOLLY:  Yeah, with that report specifically that she's talking about --

THE COURT:  Let's have you come to the microphone.

So we're talking about the San Diego call.

MR. CONOLLY:  Correct.  I mean, I can leave that alone.

THE COURT:  Let's inform the officer that we're not going to talk about that, all right.  Anything else?

MS. FISHER-BYRIALSEN:  No.

THE COURT:  All right, let's go ahead and bring him back in.

(Witness returns.)

MR. CONOLLY:  Your Honor, we had a word with the witness simply to indicate that we will not be asking about the phone call that defense counsel has referred to.

MS. LUEM:  Just to clarify, that's information that implicates Mr. Johnson in the Pomona murders.

THE COURT:  That's what I understood.

MS. LUEM:  And, Mr. Clement, I'm sorry.

THE COURT:  Let's bring the jury back in.

(In open court in the presence of the jury.)

THE COURT:  We have all of our jury members back in our places.

Mr. Conolly, you may continue.

MR. CONOLLY:  Thank you, Your Honor.

BY MR. CONOLLY:

Q   After Mr. Bannick, were there any other suspects that you investigated after that?

A   Yes.

Q   And can you tell me, please, who that was?

A   Evan Perkins.

Q   And what were the next steps that you then took in regard to Mr. Perkins?

A   Once again, checked his criminal history, checked some databases that we had access to, at which time I discovered that he had been previously contacted by other law enforcement agencies while driving a 2018 gray Dodge Charger.

Q   And were you able to retrieve a license plate from those reports?

A   I did.

Q   And did that also include a home address for Mr. Perkins?

A   It did.

Q   And what -- where did he live, roughly?

A   I will believe it was 9831 Park Street in Bellflower.

Q   Is Bellflower near Pomona -- or rather, how far is Bellflower from Pomona?

A   It's within Los Angeles County, and it's, depending on traffic, roughly an hour away, west.

Q   And so you've got a description of a car, a gray Dodge Charger and a license plate, what did you do with that

information in the next investigative step?

A    With that license plate, entered into the Flock system, which is a license plate reader system, that are located at certain intersections throughout cities.  Upon entering that license plate in, I discovered that the vehicle was captured by the license plate reader in the City of West Covina on March 8 at approximately, I believe, it was 10:00 p.m.

And subsequently behind that, there was another vehicle that was captured, which turned out to be a Mercedes Benz. Those vehicles appear to be the same vehicles that we observed in the Perez Market video.

Q    You said in the City of West Covina, where is that in relation to Pomona?

A    It's west of Pomona, approximately 10 miles west, 10 to 15-minute drive depending on traffic.

Q    And you said that the Flock system captured the Dodge Charger and the Mercedes.  Were they captured in the same -- how were they captured together?

A    I believe -- I don't understand, I'm sorry.

Q    Were they in the same photograph?

A    Yes.

Q    Okay.  Same photograph or were they in the same intersection?  I mean -- I'm sorry, I'm confusing you.  It would be a lot easier if I just put these up on the screen.

MR. CONOLLY:  What had been marked as Exhibit 1138, if

I could have that up on the screen.  Your Honor, this was admitted into evidence yesterday.

BY MR. CONOLLY:

Q    It's a little difficult photo to see.  Can you explain what we're looking at in 1138?

A    It is a snapshot of the Charger proceeding through the intersection in the City of West Covina.

Q    How do you know that, how do you know which car it is?

A    The license plate.

Q    And I see faintly above that, is that the matching taillight array that you had mentioned earlier?

A    Yes.

Q    And the timestamp, time and date stamp on this photograph, I believe that's on the bottom right, could you read that to us, please?

A    March 8, 2022 at 22:05:47.

Q    And if we could have -- that's the only car in this photograph, as far as you can see, correct?

A    Correct.

        MR. CONOLLY:  And then if we have 1139 on the screen, please.

BY MR. CONOLLY:

Q    This one is somewhat more difficult to see, but I assume you've seen a clearer version of this photograph?

A    Yes.

Estrada - Direct by Conolly

Q    Were you able to identify the license plate on that as well?

A    Correct.

Q    And what is the timestamp on this photograph?

A    22:05:49 seconds.

Q    So, if I'm doing my math correctly, that's approximately two seconds after the last photograph?

A    Yes.

Q    And did you have a chance to investigate the license plate on the car that we see here?

A    Yes.

Q    What information did it retrieve?

A    The registered owner for this Mercedes Benz was registered to a David Frey.

Q    And both of these photographs, in the bottom left hand there's an indication of location.  Can you read us what that says, please?

A    It says, "West Covina, California, PD, 01," and, "Southbound," it looks like, "West Pacific at Bromley."

Q    That was the same as the other photo we saw, 1138, the one right before this?

A    Correct.

Q    Once then again, approximately how far was this -- were these photographs taken from the crime scene?

A    Approximately 10 miles west of Pomona.

Q    So at this point in the investigation you've done a background check on Evan Perkins as well.  Where did -- sorry, I've already asked you those questions.  I believe also you may have looked at one other -- sorry.  Did you run a query then for the Mercedes license plate in the Flock system as well?

A    Yes.

Q    And did you see that location hit for that on another LPR?

A    Yes, in the City of Ontario.

MR. CONOLLY:  Could we have 1140 on the screen, please.

BY MR. CONOLLY:

Q    I believe you said it already, but if you can read off the location from the bottom left corner of 1140.

A    "Ontario, California PD 53, Westbound Philadelphia at Grove."

Q    As far as you know, is that an intersection?

A    Yes.

Q    Could you read us, please, the time and date from the bottom right?

A    March 8, 2022, 22:46:25.

Q    And so again, if I have my math correct, this is approximately 40-some minutes from the original two photographs we just looked at?  And we can put those back up, if that would help?

A    Correct.

Q    You said that was in the City of Ontario.  Where is the City of Ontario in relation to the crime scene?

A    It's approximately two cities east of Pomona in the County of San Bernardino.

Q    So the opposite direction from where West Covina would be?

A    Correct.

Q    That was just the Mercedes?

A    Yes.

Q    Did you have any LPR hits for the Dodge Charger out in Ontario?

A    No.

Q    At some point did you obtain a search warrant for Evans Perkins' apartment?

A    I did.

Q    Were you part of the team that executed that search warrant?

A    I was present, yes.

Q    Approximately, when was this search?

A    I believe it was in May.  I don't have the exact date, I could be wrong.

Q    That's May of 2022?

A    Yes.

Q    And so approximately two months later?

A    Yes.

Q    You were present for that search; is that what you said?

A    Yes.

Q    What I would like to you do, please, is if you could take a look in the binder, Binder 1 of 2 at Exhibits 1141 to 1155.

A    Okay.

Q    Looking at those photographs, do they accurately capture the scene of the search of Mr. Perkins' apartment on the day that you searched it?

A    Yes.

Q    And with whom did you search the apartment?

A    There was quite a few individuals.  We used our special investigation unit along with myself, Detective Rodriguez --

Q    Approximately, how many of you were there?

A    Eight to 10.

MR. CONOLLY:  If we could please show the witness Exhibit 1141.

BY MR. CONOLLY:

Q    Do you recognize this photograph?

A    I do.

Q    What is that of?

A    That's the residence where the search warrant was executed.

MR. CONOLLY:  Your Honor, I would move to admit Exhibit 1141, please.

THE COURT:  Any objections?

MS. FISHER-BYRIALSEN:  No.

MS. LUEM:  No objection.

MR. REED:  No.

THE COURT:  It will be admitted.

(Government Exhibit 1141 admitted in evidence.)

MR. CONOLLY:  If we could publish that, please.

BY MR. CONOLLY:

Q    I see stairs going up.  Can you show us where the -- the door to the residence, please, because it looks like there may be two?

A    The door that's open.  Do you want me to circle?

Q    Yes, please.

A    (Witness complies.)

MR. CONOLLY:  If you could take that down.  If we could have, please, for the witness Exhibit 1142.

BY MR. CONOLLY:

Q    Do you recognize this photograph?

A    I do.

Q    What are we looking at here?

A    It's a closeup from the previous photo looking into the residence where the search warrant was executed.

MR. CONOLLY:  Your Honor, at this time I would move 1142 into evidence.

MS. FISHER-BYRIALSEN:  No objection.

MS. LUEM:  No objection.

MR. REED:  No objection.

THE COURT:  All right, that will be admitted.

(Government Exhibit 1142 admitted in evidence.)

MR. CONOLLY:  If we could publish that, please.

BY MR. CONOLLY:

Q    So this is the front entranceway into the apartment?

A    Yes.

MR. CONOLLY:  If we could take that down and have Exhibit 1144, please.

BY MR. CONOLLY:

Q    If you could tell us what we're looking at in this photograph, just in general terms?

A    This is a photo from just entering into the residence. Off to the right was a TV, appeared to be being used as a computer screen.  On the screen was like a blank template of a California driver's license or ID card.

MR. CONOLLY:  Your Honor, at this time I would move 1144 into evidence, please.

THE COURT:  Any objections?

MR. REED:  No objection.

MS. FISHER-BYRIALSEN:  No objection.

MS. LUEM:  No.

THE COURT:  That will be admitted.

(Government Exhibit 1144 admitted in evidence.)

MR. CONOLLY:  If we could publish and zoom in on the photograph itself, please.

BY MR. CONOLLY:

Q   So here we have it a little bit larger.  You started to describe what was in the photograph.  Could you start that over again, please.  What do we see here in the photograph?

A   The screen I previously described, the TV off to the far right.  The bottom of the picture appears to be some sort of maybe etching-type equipment for metal, some sort of laser-type printer, maybe.

Q   I'm circling a machine in the bottom middle of the photograph; is that the one you're referring to?

A   It is.

Q   Please carry on.

A   There's also a couple different type of printers off to the right of the screen.  If you go further back, it looks like a workbench area, miscellaneous tools, drill press.  Just a plethora of, like I said, tools.  There's a 3D printer at the bottom of that workbench.

Q   The television screen that you mentioned, can you tell us, please, again, what is on it?

A   It appears to be just a blank template used to manufacture a California driver's license and/or a ID card.

Q   And I believe you said it's being used as a monitor?

A   It appeared to be, yes.

Q   So it's hooked up to a computer of some sort?

A   Correct.

Q    It's not actually being used as a television; is that fair to say?

A    Correct.

MR. CONOLLY:  If we could take that down, please.  If we could show the witness, please, Exhibit 1149.

BY MR. CONOLLY:

Q    If could you take a look at Exhibit 1149, Detective.  Is that a photo you recognize?

A    Yes.

Q    And just in very general terms, what do we see here?

A    It's a closeup of the previous one I described, that -- some sort of printer or laser etcher, whatever it may be, at the bottom of the photograph, and above it or to -- some sort of -- I don't know if they're card embossers or some sort of a printer of some sort.

MR. CONOLLY:  Your Honor, if we could -- the Government would move to admit Exhibit 1149, please.

THE COURT:  Any objections?

MR. REED:  No objection.

MS. FISHER-BYRIALSEN:  No.

MS. LUEM:  No.

THE COURT:  That would be admitted.

(Government Exhibit 1149 admitted in evidence.)

MR. CONOLLY:  If we could zoom in on the photograph itself, please.

Estrada - Direct by Conolly

BY MR. CONOLLY:

Q   So if you could describe, again, please, the machines you were just describing, and feel free to circle them on the screen or note them in some way.

A   The bottom here is the one that I described as the laser printer or etcher or something to that effect.  On top here are the two other, some sort of card printers.  I don't know the term for them, but that's what those appear to be.

MR. CONOLLY:  If we could take that down please, and show the witness Exhibit 1150.

BY MR. CONOLLY:

Q   Very brief, and in very general terms, before we publish to the jury, is this a photograph you recognize?

A   It is.

Q   Generally and very briefly, what is in it?

A   It's another angle of -- closeup of the workbench area. Off to the right is one of the printers that I described, and on the bench itself it looks like a regular paper printer as well.

MR. CONOLLY:  Your Honor, we would seek to admit Exhibit 1150 at this time.

THE COURT:  Any objections?

MS. FISHER-BYRIALSEN:  No.

MS. LUEM:  No.

THE COURT:  Mr. Reed?

Estrada - Direct by Conolly

MR. REED:  No objection.

THE COURT:  It will be admitted.

(Government Exhibit 1150 admitted in evidence.)

BY MR. CONOLLY:

Q    If you could just briefly describe some of the things you just mentioned as we see them here, and again, feel free to circle them.

A    There's the one printer that was seen in multiple previous photos, just circled now.  On the right appears to be a regular paper printer, and everything else is the workstation with the tools that can be seen.

Here would be the -- appears to be a 3D printer and then a drill press and a vice.

Q    Did you find -- did you find filament for that 3D printer?

A    Yes.

Q    I'm sorry, what is filament for a 3D printer?

A    From what I know, it's the material that's used in order to make or create whatever is being printed.

Q    In addition to these machines, did you find anything else in the apartment that you thought was relevant to your investigation -- sorry, relevant to any investigation of criminal activity you were doing there?

A    Yes.

Q    What was that?

A    There was a large quantity of, it looked like maybe gift

cards or some sort of store -- I would say gift cards.  There was a lot of identification cards in other names, miscellaneous paperwork with names of other individuals.  There was two firearms that were recovered from the residence, a little bit of narcotics was recovered.

Q    When you say "a lot of gift cards," would you be able to estimate; was it 5, 10, 20?

A    No, I would say upwards of probably a hundred or so, if not more.

Q    And how about forms of identification?

A    Different states, different names, there was a lot.

Q    And not in Mr. Perkins' name?

A    No.

Q    And when you said "paperwork," what sort of paperwork or documents did you find?

A    There was mail for other individuals with different addresses that wasn't at that property.

Q    Did you find any bank documents?

A    Yes, I believe so.

Q    And any other types of documents that you would regard as sensitive?

A    I don't recall exactly what else was recovered, but yes, there was quite a bit of documents.

Q    And I recall that you mentioned that you had -- you had some experience as a detective investigating fraud.  With that

background, did you make any assessment as to perhaps what criminal activity was going on in this apartment?

A    I believe the individuals were committing fraud, creating false identifications or taking on the identity of others for the purposes of financial gain or any other services that could be rendered because of obtaining someone else's identity.

MR. CONOLLY:  If we could take that down, please.

BY MR. CONOLLY:

Q    I just have a couple more photos to show you from the apartment.

MR. CONOLLY:  Could we please show the witness Exhibit 1148, please.

BY MR. CONOLLY:

Q    Do you recognize this as a photograph that was taken that day?

A    Yes.

Q    During the search?

A    Correct.

MR. CONOLLY:  Your Honor, I would move to admit Exhibit 1148 into evidence.

THE COURT:  Any objections?

MS. FISHER-BYRIALSEN:  No.

MS. LUEM:  No.

THE COURT:  Mr. Reed, any objections?

MR. REED:  No objection.

THE COURT: It will be admitted.

(Government Exhibit 1148 admitted in evidence.)

MR. CONOLLY: If we could zoom in on that part, please.

BY MR. CONOLLY:

Q   Why was this photograph of interest, why were these captured?

A   For the purpose of the "P," it's on the hat itself.

Q   What does that mean to you?

A   Well, it's often seen used in identifying gang membership, and specifically during this one, I believe it was for the purposes of identifying PEN1 membership.

Q   So at the time you believe that Mr. Perkins might have been affiliated with that gang?

A   Yes.

MR. CONOLLY: If we could take that down, please. Exhibit 1155 for the witness, please.

BY MR. CONOLLY:

Q   Do you recall seeing this -- what this photograph was taken of the day of the search?

A   Yes, Mr. Perkins' bed.

MR. CONOLLY: Your Honor, I would seek to admit Exhibit 1155, please.

THE COURT: Any objections?

MS. FISHER-BYRIALSEN: No.

MR. REED:  No.

MS. LUEM:  No.

THE COURT:  It will be admitted.

(Government Exhibit 1155 admitted in evidence.)

MR. CONOLLY:  We could publish.  I don't think we need to zoom in on this one.

BY MR. CONOLLY:

Q   Again, it's the same question as to what was the significance in this photograph?

A   Once again, the "P" on the blanket on the bed.

MR. CONOLLY:  Thank you, you can take that down, please.

BY MR. CONOLLY:

Q   Now, at the time that you came into the apartment, was Mr. Perkins home?

A   No.

Q   Where was he at that time, if you know?

A   I believe he was at a 7-Eleven down the road.  He left the residence and was subsequently traffic stopped by officers, and he was taken into custody.

Q   And if you know, what kind of car was he driving at the time?

A   It was a gray Dodge Charger.

Q   If you know, what happened to the Charger after Mr. Perkins was arrested?

A    It was towed back to Pomona by our official police storage, and it was towed for evidence and placed into a secured evidence building.

Q    At some point were you able to search -- to search that car?

A    Yes.

Q    Do you recall approximately when?

A    I believe it might have been the day after, two days after it was recovered or stored.

Q    And in between when Mr. Perkins was arrested and when you searched it, it had remained in a secured storage facility?

A    Yes, up until it was -- once we had an opportunity to search it, then it was taken out of the secured location.

Q    If you could please turn in the binder and take a look through Exhibits 1156 to 1166.  I will not be asking you about all of these, but if you could let me know if you recognize them, I would appreciate it.

A    I'm good.

Q    Do you recognize all those photographs?

A    I do.

Q    Do they accurately capture photographs that were taken during your search of the Dodge Charger?

A    Yes.

        MR. CONOLLY:  If we could please have on the screen Exhibit 1161.

Estrada - Direct by Conolly

BY MR. CONOLLY:

Q    Is this a photograph of the car in question?

A    Yes.

        MR. CONOLLY:  Your Honor, I would move to admit Exhibit 1161.

        THE COURT:  Any objections?

        MS. FISHER-BYRIALSEN:  No.

        MR. REED:  No objection.

        MS. LUEM:  No.

        THE COURT:  That will be admitted.

    (Government Exhibit 1161 admitted in evidence.)

        MR. CONOLLY:  If we could publish that to the jury, please.

BY MR. CONOLLY:

Q    I believe what we're looking at is a gray Dodge Charger.

A    Correct.

Q    And this is the car that you searched that day?

A    Yes.

        MR. CONOLLY:  If we could take that down, please, and show the witness Exhibit 1163.

BY MR. CONOLLY:

Q    Is this another photograph of the same car?

A    Yes.

        MR. CONOLLY:  And if we could move to admit and then publish Exhibit 1163, Your Honor.

THE COURT:  Any objections?

MS. FISHER-BYRIALSEN:  No.

MS. LUEM:  No.

MR. REED:  No objection.

THE COURT:  It will be admitted.

(Government Exhibit 1163 admitted in evidence.)

MR. CONOLLY:  If we could zoom in on the photograph itself, please.

BY MR. CONOLLY:

Q    We spent a lot of time talking about the taillights on the Dodge Charger.  This is -- what we're looking at here, is that consistent with the taillights you saw on the security video that we watched earlier?

A    Yes.

Q    Thank you.

MR. CONOLLY:  If we could take that down, please.

BY MR. CONOLLY:

Q    Now, in your search of the car, did you find any evidence of criminal activity?

A    Yes.

Q    What did you find?

A    The firearm that was recovered from behind the air conditioning control panel.

Q    From where, sorry?

A    Behind the air conditioning control knob panel.

Q    Is that -- is it fair to say that's a hidden compartment?

A    Yes.

MR. CONOLLY:  If we can have Exhibit 1156 for the witness, please.

BY MR. CONOLLY:

Q    Do you recognize that as the photo of the compartment?

A    Yes.

MR. CONOLLY:  Your Honor, I would move to admit and publish Exhibit 1156, please.

THE COURT:  Any objections?

MS. FISHER-BYRIALSEN:  No.

MS. LUEM:  No.

MR. REED:  No objection.

THE COURT:  It will be admitted.

(Government Exhibit 1156 admitted in evidence.)

BY MR. CONOLLY:

Q    You said that was behind the air conditioning controls?

A    Correct.

Q    And what type of firearm was it that you found?

A    It was a black Taurus 9-millimeter.

MR. CONOLLY:  And if we could take down this photo, please, and show the witness Exhibit 1160.

BY MR. CONOLLY:

Q    Do you recognize that as the firearm you found?

A    Yes.

MR. CONOLLY:  Your Honor, I move to admit Exhibit 1160.

THE COURT:  Any objections?

MS. FISHER-BYRIALSEN:  No.

MS. LUEM:  No.

MR. REED:  No objection.

THE COURT:  It will be admitted.

(Government Exhibit 1160 admitted in evidence.)

BY MR. CONOLLY:

Q    So, in this photograph we see the firearm with the magazine removed and what appears to be a round sitting outside the gun.  Is this the state that you found the gun?

A    No.

Q    How was it when you found it?

A    The magazine was in the magazine well and the single bullet that's top of the picture was in the chamber of the firearm.

Q    So it was a loaded firearm when you found it?

A    Correct.

MR. CONOLLY:  One moment, please.

(Government counsel confer.)

MR. CONOLLY:  Thank you, Detective.  Those are all the questions I have for you at this time.

THE COURT:  Cross-examination?

MR. REED:  No questions.

MS. FISHER-BYRIALSEN:  No questions.

MS. LUEM:  No questions.

THE COURT:  May this witness be excused?

MR. CONOLLY:  Yes, Your Honor.

THE COURT:  All right.  Thank you, sir, you may be excused.

MS. FISHER-BYRIALSEN:  Subject to recall.

THE COURT:  Okay, not excused.

Okay, thank you, sir.

(Witness excused subject to recall.)

THE COURT:  Next witness, please.

MR. CONOLLY:  Yes, Your Honor, the Government would call Detective Michael Rodriguez.

MICHAEL RODRIGUEZ, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

THE CLERK:  Go ahead and have a seat and spell your last name for the record.

THE WITNESS:  Michael Rodriguez, R-O-D-R-I-G-U-E-Z.

THE CLERK:  Thank you.

BY MR. CONOLLY:

Q    Good afternoon, Detective Rodriguez.

A    Good afternoon.

Q    Tell us, please, who you work for?

A    I work for the Pomona Police Department.

Q    How long have you worked there?

Rodriguez - Direct by Conolly

A    I've worked there approximately 18 years.

Q    In brief, can you give us your professional history while with the Pomona Police Department?

A    I've been there for approximately 18 years.  I've worked patrol.  Been a field training officer.  Worked several different units which include our narcotics unit.  I was promoted to the rank of detective five years ago, approximately five to six years ago.  There I worked burglary, crimes against persons, and I've been a homicide investigator for the past four and a half years.

Q    Briefly, what was the training you went through to become a patrol officer initially?

A    I attended a six-month Police Academy.

Q    When you were promoted to detective, did you go through additional detective training?

A    That's correct.

Q    Could you tell us briefly what that entails?

A    It's investigator school, which consists of two weeks of investigative training, and then also -- which also included homicide school, which is another two weeks of specified training for homicide investigations.

Q    In your time as a homicide detective, how many homicides have you investigated either as the lead detective or assisting?

A    I would say between 20 and 25 homicides.

Rodriguez - Direct by Conolly

Q    So turning to this case, were you on call on March 8 or 9 of 2022?

A    Yes, I was.

Q    And do you recall getting called out either late the night of March 8 or early in the morning of March 9?

A    Yes, I do.

Q    And do you remember approximately when that was?

A    It was about 12:30 a.m. on the 9th.

Q    What was your understanding of why you were being called?

A    I was notified that there was a homicide within city limits and to respond to the station to investigate the incident.

Q    So did you do that; did you respond to the station?

A    Yes, I did.

Q    Were you able to conduct much investigation at that time?

A    Yes.

Q    What did you do?

A    Our initial response to the station is we meet with our on-call partner, which was Detective Estrada, our on-call sergeant at the time, which was Sergeant Miller.  We grabbed initial paperwork that we have at the time, which was very preliminary at that time, we respond to the scene all together and meet with the on-scene officers.

Q    At that time, did you have the names of any suspects or victims?

Rodriguez - Direct by Conolly

A     No, we did not.

Q     So when you got to the scene, what were your initial observations at the scene, what did you find?

A     Once we arrived, the area, which was the 200 block of Ridgeway within the City of Pomona, was cordoned off by caution tape.  There were several police officers that blocked several streets, and within that a crime scene were two deceased individuals.

Q     Can you describe, briefly -- you said "deceased individuals," men, women, young?

A     Two males had sustained gunshot wounds and were deceased at the scene.

Q     And at the scene of murders, typically, and actually more specifically with this one, what evidence did you canvas the area for?

A     We canvassed the area for surveillance footage.  We were told there was no suspect information, no witnesses.  We noticed shell casings on the ground.

Q     So as far as you're aware, was anyone able to collect surveillance footage from the area?

A     Yes.

Q     And do you know where it was taken from?

A     It was taken from several locations within that area; one being a liquor store, next being a residential home, and there was also an industrial building just east of the murder scene

Rodriguez - Direct by Conolly

where surveillance was obtained.

Q    And have you had a chance to review those videos yourself?

A    Yes, I have.

Q    So you mentioned a residential video, which I'll show you now.

What's your understanding of what that captured?

A    So that captures Ridgeway.  This home's backyard backs up to Ridgeway and the cameras were facing east towards Ridgeway and captures a portion of Ridgeway Street.

Q    And did you notice anything of interest in that video?

A    Yes, we noticed two vehicles traveling southbound on Ridgeway.  Several minutes later, we see the same two vehicles traveling northbound on Ridgeway.

MR. CONOLLY:  So can we, please, play Exhibit 1837, and, Your Honor, this was a video that was admitted through CSI Kenan.

THE COURT:  Thank you.

(Media is presented.)

MR. CONOLLY:  You can pause that, please.

BY MR. CONOLLY:

Q    What is on the screen and published to the jury was an exhibit that was admitted earlier.  Can you tell us, please, what we're looking at?

A    So you're looking at the back fence of this residence, which looks like cinderblock.  Just past that, you see the

street, asphalt, which is Ridgeway, and then east of that, you'll see will grass, trees and shrubs.

Q    Is that the same grass stretch that runs along -- does that grass stretch run all along Ridgeway?

A    Yes, it does.

Q    Is that the same grassy stretch in which one of the victims was found?

A    That's correct.

Q    Could you identify the timestamp?  I believe it's on the upper right corner.

A    It has a date of 3/8/2022, 10:16:55 p.m.

        MR. CONOLLY:  If we could please play that for the jury.

        (Media is presented.)

        MR. CONOLLY:  I apologize, I should have asked to start further into the video.  But I believe we'll see the relevant information in just a moment.

        (Media is presented.)

BY MR. CONOLLY:

Q    While this is playing, we've gone for a minute and 20 second here with no other cars; is it your understanding that this is a fairly low traffic area at night?

A    Yes.

        (Media is presented.)

        MR. CONOLLY:  One moment, please, Your Honor.

All right, if we could move, then, to Exhibit 1828, please.

(Media is presented.)

BY MR. CONOLLY:

Q   Detective, if you could just note the -- well, this is the same date on this video as well?

A   That's correct.

Q   And I see a timestamp of 10:22:16, so that's approximately five, six minutes later?

A   That's correct.

THE COURT:  Mr. Conolly, it doesn't appear to me that that the video is advancing at all.  The timestamp isn't moving.

MR. CONOLLY:  Yeah, Your Honor, my apologies, I may have identified the wrong exhibits.

BY MR. CONOLLY:

Q   In any event, Detective, do you recognize that camera angle as the video that captured Celia Street?

And do you recall seeing the video of the cars driving in tandem one direction and then a few minutes later coming back the other direction?

A   That's correct.

MR. CONOLLY:  If we also could, please, have Exhibit 1433 up on the screen.

BY MR. CONOLLY:

Q    This is an exhibit we've seen earlier.  If you could identify for us, please, where Celia Street is on this map.

A    Yes.  Do you want me to touch the screen?

Q    Yes, you can draw it.

A    It's going to be mid block, this area.

Q    And with the cameras then facing across Ridgeway Street?

A    That's correct.

        MR. CONOLLY:  Thank you, if you could take that down.

BY MR. CONOLLY:

Q    So in that video -- well, we'll get to it in another one.

     Did you have a chance to review the security camera footage that was taken from a company called Pearson Sales?

A    Yes.

Q    I'm going to show you a couple of those clips, briefly.

        MR. CONOLLY:  If you could, please, play Exhibit 1831 starting at 40 seconds in.

     (Media is presented.)

BY MR. CONOLLY:

Q    Here at about 40 seconds in, what do we see?

A    You could see the headlights of two vehicles traveling southbound, Ridgeway.

Q    What do you recall from watching this video before, what happened; what do the cars do next?

A    They will continue -- Ridgeway turns into or curves into

Mt. Vernon.  They go east, which turns into cul-de-sac, and they come back around the way they came and ultimately back northbound to Ridgeway.

Q    As far as you recall, do they continue up Ridgeway or do they stop at any point?

A    They stop, I would say, mid block on Ridgeway.

Q    So now here at 1:35 in the video, are these the same two cars coming back?

A    That's correct.

Q    And here at approximately 1:48, we see them appear to stop; is that fair to say?

A    That's correct.

Q    Is there some significance to that location where they stop?

A    That's where the bodies were located.

MR. CONOLLY:  And if we could have -- if you could take that down, please.  If we could just briefly also have the map at 1433, please.

BY MR. CONOLLY:

Q    Can you indicate on the map of -- approximately, if you could estimate where the cars had stopped?

A    Yes.

Q    That was roughly where you found the bodies?

A    That's correct.

MR. CONOLLY:  If you could take that down, please.

BY MR. CONOLLY:

Q    I realize there were a lot of videos from Pearson Sales, so I won't run through all of them.

MR. CONOLLY:  But if we could have Exhibit 1833 on the screen, please -- pardon me, 1835.  If we could play that. Thank you.

(Media is presented.)

BY MR. CONOLLY:

Q    Do you recognize this video?

A    Yes.

Q    And are those the same two cars that we see here at about 13, 14 seconds driving through?

A    Yes.

Q    Were you able to later identify the makes and models of those cars?

A    Yes.

Q    What were they?

A    The Dodge Charger and a Mercedes Benz.

Q    And you had mentioned that they turned around.  I believe you said there was a cul-de-sac at the end of the street that they were on?

A    That's correct.

Q    So here at 39, 40 seconds, are these the same two cars then coming back?

A    Yes.

MR. CONOLLY:  Thank you, we can take that down now.

BY MR. CONOLLY:

Q    So at some point after you had first gone to visit the scene of the crime, did you receive any communication identifying the victims?

A    At the scene we did not.  They had no identification on them, and the coroner investigator was not able to identify on scene.  I believe the following day I was notified by the coroner investigator of the identity of both victims.

Q    And who were they?

A    Greg [sic] Ennis and James Yagle.

Q    James Yagle, you said?

A    Yes.

Q    What was the other name?

A    Greg Ennis, I believe.

Q    Ennis, you said?

A    Ennis.

Q    And so -- and at that time did you have any suspects?

A    We did not, not initially, no.

Q    To skip ahead, at some point did you receive information that an individual named Brandon Bannick might have been involved?

A    Yes.

Q    If you are aware, did you or one of your team issue a search warrant for his -- related to his cell phone?

A    Yes.

Q    What information was that search warrant aimed at -- aimed at getting?

A    We would want to see his communication, which included phone calls and also GPS locations.

Q    When you say it included "phone calls," how do you mean?

A    Meaning it would identify the phone numbers that's calling him or vice versa that he's calling.

Q    Are those what would be referred to as toll records?

A    That's correct.

Q    Were you able to -- sorry, did you get information back in response to that search warrant?

A    Yes.

Q    And was that from the cell phone provider?

A    That's correct.

Q    Did you have a chance to review the returns from that warrant?

A    Yes.

THE COURT:  At this time we're going to go ahead and take another break.

Ladies and gentlemen, I should just tell you that one of the people involved here has a medical condition that we need to accommodate.  We're probably going to have more breaks than I originally had anticipated.  What I intend to do going forward is having a short break, then a little longer break

around the noon hour, and then a short break, but I got off schedule today.

We're going to take a break now of about 10 minutes. We're going to keep it short, come back and then finish out the day.

Thank you very much.

(In open court outside the presence of the jury.)

THE COURT:  All right.  The jury members have went out.  Let's go ahead and take our break.

(Recess taken 12:31 p.m. to 12:42 p.m.)

MS. STOKMAN:  Judge, just real quick, sorry, I think everybody is here.  We expect to put on one last witness after this.  It will be fairly quick, but I wanted to narrow down the Lancaster crime scene photos before that happened.

So as far as the photos that we'll be asked to be admitted for that, it's going to be 1167, 1168, 1169, 1170, 1173, 1175, 1177, 1179, 1182, 1183, 1186, 1188, 1189, 1192 and 1197, and I believe only three or four depict the victim, the rest are scene photographs.

THE COURT:  All right.  Let's give counsel a second to take a look.

DEFENDANT CLEMENT:  I'm sorry, I don't mean to be in a rush, I really can't help it.

THE COURT:  I understand.  Are you all looking at the photos, or do you need time for that?

MS. LUEM:  I am looking at them right now.  I have to pull them up one at a time.

THE COURT:  It looks like I'm missing 1173.

MS. STOKMAN:  Is it not in the binder?

THE COURT:  No, I don't have it.  I'm seeing only two photos of the victim.

MS. STOKMAN:  Judge, this is 1173.

THE COURT:  The last two are the victims, 1192 and 1197.

All right, anything at this time?

MS. FISHER-BYRIALSEN:  No, Your Honor.

MS. LUEM:  No.

THE COURT:  Mr. Reed?

MR. REED:  No.

THE COURT:  All right.  Thank you.

Let's bring the jury in.

(In open court in the presence of the jury.)

THE COURT:  We have our jury members back in their places.

Mr. Conolly, you may begin -- or continue.

MR. CONOLLY:  Okay.  Yes, Your Honor.

Your Honor, may approach the witness?

THE COURT:  Yes.

MR. CONOLLY:  Okay.  Your Honor, I've handed a stack of CDs to the witness, and I've indicated that I will be

Rodriguez - Direct by Conolly

inquiring from him about them.

THE COURT:  Okay.

BY MR. CONOLLY:

Q    To clear up one detail, when I asked you the names of the victims, I believe you said it is a "Greg Ennis," was it a "Ronnie Ennis"?

A    That's correct, my mistake.

Q    So I was asking you also about the warrant that had been issued for Mr. Bannick's phone.  I believe you had indicated it was for subscriber records, call detail records, toll records and location records as well.

A    Correct.

Q    And did you receive the information back from the provider with those records?

A    Yes, I did.

Q    Have you had a chance to review those records?

A    Yes.

Q    Can you please, in the stack of CDs I've just given you, find the one numbered 1850, 5-0.

A    Okay.

Q    Have you reviewed the contents that CD?

A    Yes.

Q    Are those cell phone records that we've just discussed, are they on that CD?

A    That's correct.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Q    And how do you know that that CD contains that information?

A    I reviewed it.

Q    And how do you know you reviewed it; are your initials on there?

A    Yes.

Q    And the date as well?

A    That's correct.

Q    What date was that?

A    1/21/25.

Q    And in addition to reviewing those records yourself, did you send them off for further analysis?

A    I did.

Q    Who did you send them to?

A    To Analyst Danielle Ponce de Leon for the Los Angeles Sheriff's Department.

Q    In the realm of further warrants, did you issue any search warrants to Google?

A    Yes, I did.

Q    What was the first warrant that you sent to Google?

A    The initial warrant is -- it's called a Google geofence warrant, and we identified locations within the crime scene that we believe the suspects may have crossed through.  So my first warrant identifies these locations within the crime scene.

Q    Did you receive information in response from Google to that warrant?

A    Yes.

Q    Did you have a chance to review that information when it came back?

A    Yes.

Q    And if you could look, please, at the exhibit numbered 1847.

A    Okay.

Q    Are those records on that CD?

A    Yes, they are.

Q    You've had a chance to review them?

A    Yes.

Q    Did you also sign and date that CD?

A    Yes.

Q    And did you -- what did you do with the data that that CD contains?

A    This data was sent over to Danielle Ponce de Leon for analysis.

Q    And we won't get into her exact response, but with the response she gave you after analyzing that information, did you then order or then author a second warrant to Google?

A    That's correct.

Q    And what was that -- what was that warrant seeking from Google?

A    It was seeking, ultimately, subscriber information.

Q    That would be subscriber information connected to specific accounts?

A    That's correct.

Q    And had those specific accounts been identified from the information from the previous warrant?

A    That's correct.

Q    And so -- and did you receive information from Google in response to that second warrant for subscriber information?

A    Yes.

Q    If you could please look at Exhibit 1848 in the CDs in front of you.

A    Yes.

Q    Have you had a chance to review the contents of that CD?

A    Yes.

Q    Did you also initial and date that CD after reviewing it?

A    Yes, I did.

Q    And does that CD contain the information that you had sought from Google in terms of subscriber information?

A    Yes.

Q    And what did you do with that data after you received it?

A    I believe it was also sent to Danielle for further analysis.  We also analyzed it ourselves in a way we could get subscriber information from it.

Q    Did you identify any phone numbers or e-mails belonging to

the subscriber information?

A    Yes.

Q    Can you tell us, please, what those were?

A    The one was subscriber information of Shawn Lasley, which had three cell phone numbers associated to it.  The second device was subscribed to a name by the name of Suspect/Monster, and also had a Monster gmail address to it, and that had one phone number associated with it.

Q    Do you happen to recall what those cell phone numbers were, what area codes they were from?

A    I believe 710 was associated with -- 710 area code was associated with Monster.  I'm not certain.

Q    We'll get to that in just a moment.  So you were able to identify certain e-mail addresses and certain phone numbers.

Did you then send a third warrant to Google after that?

A    I believe -- that was the final step.  Once we get the subscriber information, we're done with Google.

Q    Okay.  So if you could look, please, at Exhibit 1849.

A    Okay.

Q    Is that a CD you have also reviewed?

A    That's correct.

Q    What information was it that you retrieved that is on that CD?

A    GPS locations.

Q    Is that information that you had issued a warrant to

Google for?

A     That's correct.

Q     And what did you do with that information once you received it?

A     This was also sent to Danielle for further analysis.

Q     Did you also -- at some point you or one of your -- at some point, either you or one of your team, obtain Facebook records for any of the suspects in the investigation?

A     Yes.

Q     Did you do that for Mr. Perkins?

A     Yes, we did.

Q     And did you do that for Mr. Bannick?

A     Yes.

Q     And how were you able -- were you able to review the information that was returned for those warrants?

A     Yes.

Q     For Mr. Bannick, how were you able to determine that that was his Facebook account?

A     Through photographs.  We had already looked at several booking photographs for him and other photographs related to the investigation and it matched.

Q     Same question for Mr. Perkins?

A     Same, we were already familiar with his photograph from booking photographs and other photographs throughout the investigation, and it matched him as well.

Q    In May of 2022, were you part of the team that searched Mr. Perkins' apartment?

A    Yes.

Q    Can you tell us, please, just briefly and in general, what you found in the apartment that was of interest to your criminal investigation?

A    Yes.  We located many fake IDs, many credit cards.  We located a 3D printing machine.  We located a couple firearms as well.  Of interest to us was we located paperwork with Shawn Lasley's name on it, which matched the subscriber information that Google provided to us.

Q    The name Shawn Lasley matched the subscriber information, you said?

A    That's correct.

Q    Going back, Shawn Lasley was connected to a subscriber information.  So paperwork in Perkins' apartment had the name Shawn Lasley on it?

A    That's correct.

Q    And that was the same name as in the e-mail of the geofence warrants?

A    That's correct.

Q    Rather an e-mail address in the subscriber information in the geofence warrants?

A    Correct.

Q    And did you write -- you said the warrants had identified

a few phone numbers in the subscriber information.  You said you wrote warrants for some of those numbers?

A    That's correct.

Q    And did you receive information back from all of those phone numbers?

A    I believe so, yes.

Q    If you could take a look, please, at Exhibit 1852.

A    Okay.

Q    Can you tell us, please, is that information that was retrieved in response to one of those warrants?

A    That's correct.

Q    Was that for one of the phone numbers?

A    Correct?

Q    And do you recall what that phone number started with?

A    Area code 747.

Q    747?

A    Yes.

Q    Okay, thank you.

And you've had a chance to review that CD?

A    Correct.

Q    And did you sign and date that one as well?

A    Yes, I did.

MR. CONOLLY:  One moment, Your Honor, if I might approach?

THE COURT:  All right.

Rodriguez - Direct by Conolly

BY MR. CONOLLY:

Q    I'm sorry, I've been blowing through these questions rather quickly, if I could just slow down for a second.  That last CD that I asked you to authenticate, can you tell me again, that was related to one of the phone numbers, you said?

A    Related to one of the e-mail addresses that we received back from Google.

Q    The one from the 747 phone number you just mentioned?

A    Yes.

Q    So that was for the 747 phone number?

A    Correct.

Q    And was that the same or similar information to what you had requested for Mr. Bannick's cell phone as in the subscriber records, call detail records, tolls and location information?

A    That's correct.

        MR. CONOLLY:  One moment, please, Your Honor.

BY MR. CONOLLY:

Q    You had also mentioned an e-mail address with the name of Monster in it.  Was that connected to any of the phone numbers?

A    The 747 number.

        MR. CONOLLY:  Your Honor, those are all the questions I have for Detective Rodriguez at this time.

        THE COURT:  Any cross-examination?

        MS. FISHER-BYRIALSEN:  No, Your Honor.

        MS. LUEM:  No.

Eguia - Direct by Stokman

THE COURT:  Mr. Reed, any questions?

MR. REED:  No, Your Honor.

THE COURT:  May this witness be excused?

MR. CONOLLY:  Yes, Your Honor.

THE COURT:  All right.  Thank you, sir.  You are excused.

(Witness is excused.)

MS. STOKMAN:  The Government calls Gina Eguia.

GINA EGUIA, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

THE CLERK:  Go ahead and please take a seat and state your full name and then spell your last name, please.

THE WITNESS:  Gina Eguia, and last name is E-G-U-I-A.

BY MS. STOKMAN:

Q    Good afternoon.

A    Good afternoon.

Q    What do you do for work?

A    I'm a deputy sheriff with the Los Angeles County Sheriff's Department.

Q    How long have you been with the Los Angeles Sheriff's Department?

A    This year is my 24th year.

Q    What is your title?

A    I'm a sergeant.  I currently am responsible for homicides at the homicide investigation.

Eguia - Direct by Stokman

Q    How long have you worked as a sergeant in the homicide -- on homicide investigations, excuse me?

A    In April it will be nine years.

Q    What did you do before you were with the homicide division?

A    I was assigned to Industry Sheriff's Station, which is a patrol-related function, and I was a sergeant, a field sergeant.

Q    And prior to that, what is your law enforcement experience?

A    Prior to that, I worked eight years with the gang unit, and I was stationed at East Los Angeles Sheriff's Station and Compton Sheriff's Station.

Q    Before February of 2022, roughly how many homicide investigations had you been involved in?

A    I have been involved in 61 homicide investigations.

Q    Was that as the lead investigator?

A    Yes.

Q    And were you ever involved in investigations where you were not a lead investigator as they pertain to homicides?

A    Yes.

Q    Around how many would that have been?

A    Twelve.

Q    In February 2022, were you assigned a homicide that occurred in Lancaster, California?

A     Yes.

Q     And were you the lead investigator on that?

A     Yes.

Q     When did that homicide occur?

A     That was February 23, 2022.

Q     What was the first thing you did once you were assigned to that?

A     Upon responding to the scene in Lancaster, I and my partner at this time, I was mentoring a new investigator, we responded to the scene, and we contacted the patrol deputy that was there containing the location.

Q     Around what time did you arrive at the scene?

A     Approximately 11:30 a.m.

Q     Were you aware of what time the homicide potentially occurred?

A     Yes, I did learn of the time that we believed the homicide occurred.

Q     And when was that?

A     It was on the 22nd at approximately 8:30 p.m.

Q     What did you do upon arriving at the scene?

A     Upon arriving at the scene, my partner and I talked to our field investigative specialist, who is the person who takes all the photographs and collects all the evidence.  We walked the scene and just reviewed all of the potential evidence and just did a walk-through of the location.

Q    What is the purpose of doing a scene walk-through?

A    It's just to kind of get a layout of any potential evidence to see if we're going to need additional investigators or different forensic, like firearms or criminalists for any type of blood.  In this case we had a trace evidence investigator that was requested for tire tracks.

Q    The property where -- or the location of the scene, can you describe what type of property that was?

A    Yes.  It was a residence in a desolate area in Lancaster, and the residence was made out of brick, and like -- it was like a brick and mortar, not a wood type home.

Q    What did you do after the scene walk-through?

A    After the scene we started the photography documentation of the scene, the field identification specialist did.  At her direction we collected evidence.

Q    Did you personally take photographs of the scene?

A    No.

Q    Were you with the crime scene specialist who would have been taking photographs?

A    Yes.

Q    Did you have a role as it pertained to that individual when it came to taking photographs?

A    Yes.

Q    What was that?

A    I'm kind of like the supervisor or the director, I

basically tell her this is what I'm trying to capture.  I would like you to take photographs of this, this and this, and basically give her a detailed description of what it is that I'm trying to capture.

Q    There's a binder in front of you, I think it's 1 of 2.

A    Yes.

Q    If you could look through a range of photographs in there from 1167 to 1198.

A    Okay.

Q    Have you looked through that range of photographs?

A    I'm sorry, 1167 through --

Q    1198.

A    Yes.

Q    Do you recognize what's depicted in those photographs?

A    Yes.

Q    What is it?

A    This is the scene location.

Q    Of the homicide?

A    Yes.

Q    Do those photographs accurately depict the scene as you saw it on February 23, 2022?

A    Yes, they do.

          MS. STOKMAN:  At this time, the Government asks to admit the following exhibits:  1167, 1168, 1169, 1170, 1173, 1175, 1177, 1179, 1182, 1183, 1186, 1188, 1189, 1192 and 1197.

THE COURT:  Any objections?

MS. FISHER-BYRIALSEN:  No, Your Honor.

MR. REED:  No.

MS. LUEM:  No.

THE COURT:  All right, those will be admitted.

(Government Exhibits 1167, 1168, 1169, 1170, 1173, 1175, 1177, 1179, 1182, 1183, 1186, 1188, 1189, 1192 and 1197 admitted in evidence.)

MS. STOKMAN:  Judge, permission to publish as we go through each one.

THE COURT:  Yes.

MS. STOKMAN:  Please bring up 1167.

BY MS. STOKMAN:

Q    Can you tell us what's depicted here?

A    Yes.  This is Avenue I West, and that is looking west -- in a westward direction.

Q    Is there anything significant to the residence where the homicide occurred in this photograph?

A    Yes.

Q    What is that?

A    That's the mailbox there that is depicted on the right with the -- the black mailbox.

MS. STOKMAN:  Now we can go to 1168, please.

BY MS. STOKMAN:

Q    What is this?

A    That's the same street, Avenue I West, and that is looking in a northward direction.

Q    Where that mailbox is, kind of in the middle of the photograph, there looks to be -- it's kind of a dirt road to the right of it; is there significance to that?

A    Yes, that is the unpaved road of 48th Street West.

Q    And does that lead to the residence?

A    Yes, it does.

        MS. STOKMAN:  If we can look at 1169, please.

BY MS. STOKMAN:

Q    What is this?

A    That is the same road, 48th Street West, just maybe a hundred or so feet up, but that is looking at the residence.

        MS. STOKMAN:  And 1170, please.

BY MS. STOKMAN:

Q    Tell us what this is.

A    That is, again, on 48th Street West, looking western direction and that is the residence and that is the entrance -- how to gain entrance to the property.

Q    So the building that's on the right-hand side in the middle of the property, is that the residence?

A    Correct, yes.

        MS. STOKMAN:  Please bring up 1173.

BY MS. STOKMAN:

Q    Tell us what this is.

Eguia - Direct by Stokman

A     That is a close-up of the entrance onto -- the scene location and that is the residence.

MS. STOKMAN:  And 1175.

BY MS. STOKMAN:

Q     What does this depict?

A     That is the same residence, but that is the north side of the property.

MS. STOKMAN:  1177, please.

BY MS. STOKMAN:

Q     Go ahead.

A     That is the residence, and this is the west side of the property, but I am looking east on this photo.

Q     Is there anything in this photograph that's significant to the investigation?

A     Yes.

Q     Tell us what that is.

A     The Dodge red pickup truck.

Q     Is that the red truck that's in the middle of the photograph?

A     Yes.

MS. STOKMAN:  If we can bring up 1179.

BY MS. STOKMAN:

Q     Tell us what this is.

A     That's a closer photo of the Dodge pickup truck depicting the victim who is seated in the front driver's seat with his

Eguia - Direct by Stokman

head slumped down, downward.

MS. STOKMAN:  And 1182, please.

BY MS. STOKMAN:

Q    Tell us what this is.

A    So this is the -- this is -- if I was on the property facing south, this is the west side of the residence, and it also captures the red Dodge Ram truck.

Q    You can circle on the scene with your finger, can you just circle where that truck is?

A    Yes.  (Witness Complies.)

Q    So you circled in the middle of the photograph a little close to the right-hand side, but right of center?

A    Correct.

MS. STOKMAN:  The next one is 1183, please.

BY MS. STOKMAN:

Q    Tell us what this is.

A    This is the same Dodge Ram pickup truck that we've been discussing, but this is looking at the passenger's side.

Q    Is there anything in the bed of the truck?

A    Yes.

Q    What is that?

A    That is a -- it was a Yamaha RS motorcycle.

MS. STOKMAN:  Please go to 1186.

BY MS. STOKMAN:

Q    This looks like another view of the Dodge Ram?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

ER 828

A     Yes.

Q     Is there anything else in this photograph that is significant to the investigation?

A     Yes.

Q     Can you tell us what that is?

A     What is of significance is the markers, yellow tag markers 1 and 2.  One is the Dodge Ram, which is an item that we mark when we're going to seize it as evidence.

      And on the ground outside of the passenger side door is Number 2, which we located a fired cartridge case.

      MS. STOKMAN:  Can we go please to 1188.

BY MS. STOKMAN:

Q     This says 2 on it, is that the same placard that you just referenced, Number 2?

A     Yes.

Q     And you said that there was a cartridge case recovered, is that what's depicted in this photograph?

A     Yes.

Q     Were you able to determine the caliber of that case as far as what type of weapon might have extracted that?

A     Yes.

Q     What was that?

A     It was a 9-millimeter.

      MS. STOKMAN:  Now, looking at 1189.

Eguia - Direct by Stokman

BY MS. STOKMAN:

Q    Is this the back of that red truck that we've been seeing in other photographs?

A    Yes, it is.

        MS. STOKMAN:  How about 1192, please.

BY MS. STOKMAN:

Q    Tell us what this depicts.

A    So this is the driver's side, open, of the Dodge Ram, and it depicts the victim as he's seated in the driver's seat.

Q    And that is where, when you arrived, he was located; is that right?

A    That's correct.

        MS. STOKMAN:  Going to 1197.

BY MS. STOKMAN:

Q    Tell us what is significant in this photograph?

A    So in this photograph the victim had been removed by the coroner's office from the vehicle, and in this photo it depicts his injuries, which is a gunshot wound to the top right of his head.

Q    Did you later determine the name of this individual?

A    Yes.

Q    What was his name?

A    Michael James Brizendine.

        MS. STOKMAN:  You can take that down.  Thank you.

BY MR. CONOLLY:

Q    Did there come a time when you spoke with anyone associated with the residence at that location?

A    Yes.

Q    How many people lived at the residence at that point?

A    There was five.

Q    Did you speak with any of those individuals?

A    Yes.

Q    After speaking with those individuals, did you have any leads as to suspects in this case?

A    No.

Q    Did you recover any items of evidence from the home?

A    Yes.

Q    What was that?

A    Recovered a DVR system that was for the surveillance cameras that were affixed to the residence.

Q    How many cameras, approximately -- or let me ask you this: Did you view cameras outside on the residence?

A    Yes.

Q    Approximately how many were there out there?

A    There were at least eight.

Q    Were all of them recording as far as what you saw from the DVR system?

A    No, they were not.

Q    How many recorded?

A     Three were recording.

Q     And the three that were recording, were you able to observe where those cameras were located on the residence itself?

A     Yes.

Q     Where were the cameras that were working?

A     There was a camera that was inside of -- and it's not depicted on these photos, but there's like a, I guess it would be an enclosed yard area that was used for, I think they had their dogs and some other car parts in there, that one was a live camera.  It did not depict any of the outside of the residence.

     Another camera was affixed to the north side of the property.  It would be on the residence, it would be the northwest corner facing east.

     The second -- or the third camera would have -- was the -- it was also facing east and it was on the southeast corner of the residence.

Q     When you viewed the DVR system, were you able to determine if what the DVR was capturing was what the angle of the cameras that you just mentioned would show?

A     Yes.

Q     And were those capturings accurate depictions of what the angle of the cameras were actually showing?

A     Yes, they were.

Eguia - Direct by Stokman

Q    Were you able to observe the footage from the two cameras that you mentioned that were working outside of the house?

A    Yes.

Q    And did you observe if there was a timestamp on that footage?

A    Yes.

Q    Was that timestamp accurate to realtime?

A    It was, yes.

Q    Did either of those cameras capture any footage relative to your investigation?

A    Yes, it did.

Q    Both cameras or just one?

A    Both cameras.

        MS. STOKMAN:  Okay.  Give me one second.

        May I approach the witness?

        THE COURT:  Yes.

BY MR. CONOLLY:

Q    Sergeant, I've handed you Exhibits 1825 and 1826.  Do you recognize what I've handed you?

A    Yes.

Q    How do you recognize those?

A    These are -- I viewed these yesterday.

Q    And did you initial and date that footage?

A    Yes, I did.

Q    So what is in 1825?

A     1825 is footage from the surveillance camera on the north side of the property, and it depicts a vehicle leaving.

Q     And what is 1826?

A     That is a camera -- it's video footage that captures the entrance of the property and it captures two vehicles entering the property.

Q     And does 1825 and 1826, do those contain the footage that we've been discussing that you viewed on February 23 of 2022?

A     Yes.

        MS. STOKMAN:  We'd like to admit 1825 and 1826.

        THE COURT:  Any objections?

        MR. REED:  No objection.

        THE COURT:  Any objections?

        MS. FISHER-BYRIALSEN:  No.

        MS. LUEM:  No.

        THE COURT:  Those will be admitted.

    (Government Exhibit 1825 and 1826 admitted in evidence.)

        MS. STOKMAN:  If we could pull up 1825, please, and if we can go to around timestamp 36:55.  Oh, this is a clip. Okay.

        (Media is presented.)

BY MS. STOKMAN:

Q     Right now, at around 8:52 p.m., what's being depicted in this video?

A     This is a sedan that is driving east around the residence,

Eguia - Direct by Stokman

in an eastward direction, which is towards the entrance to the location.

Q    Prior to this time in the video, did you observe anything of significance from this camera footage that relates to this incident?

A    Yes.

Q    And what was that?

A    There was two vehicles that entered the property.

Q    And from this camera angle -- actually, let me take that down real quick.

        MS. STOKMAN:  Can you put up 1175.

BY MS. STOKMAN:

Q    Does this photograph show where the camera was located that we just saw footage from?

A    Yes.

Q    And can you circle that on the screen?

A    (Witness complies.)  Whoops, can I erase?

Q    Yeah.  So you've circled the right-hand corner of the roof area of the residence?

A    Correct.

Q    And now, if we --

        MS. STOKMAN:  Do we have that, 1825 again.  If you can go to timestamp 36:55, oh, you're at that, and push "play." Thank you.

        (Media is presented.)

BY MS. STOKMAN:

Q    Around 8:36 p.m., there were some lights that just occurred in the middle of that video.  Did you see that?

A    Yes.

Q    What is the significance, if any, of those lights?

A    So the significance of those lights -- I formed the opinion that there was two vehicles based on one section of lights, and then knowing what I learned later after viewing the second video was one turned in and then the second one turned in behind it.

Q    So the car that we just saw leaving, would that be the angle that a vehicle would leave the residence, or the property the residence was on?

A    Yes.

        MS. STOKMAN:  If we can bring up 1826, please, and go to timestamp 35:45.

        (Media is presented.)

BY MS. STOKMAN:

Q    Let us know, Sergeant Eguia, if something pops up that is significant.

A    On this section here, I do see two vehicles that are traveling one in front of the other, that is on Avenue I West.

Q    And how does that lead into the residence?

A    That's the only direction that you can take.  That's the only road that you can take to get onto 48th Street West.

MS. STOKMAN:  Now please go to timestamp 52:53.

BY MS. STOKMAN:

Q    And let us know when something pops up significant to your investigation.

(Media is presented.)

THE WITNESS:  So here at 8:53, I see a sedan leaving the property.

MS. STOKMAN:  Can we pull up 1171, please.

(Media is presented.)

BY MS. STOKMAN:

Q    Does this depict where the camera might be of the footage that we just viewed?

A    Yes.

Q    Can you circle that for us?

A    There's a camera on this corner of the property.

Q    So again, it's at the far right roof area of the property?

A    Correct.

Q    After viewing those videos and the footage from both of those cameras, did you have any -- did you come to any conclusions about what potentially happened as far as Michael Brizendine's' murder?

A    After viewing the video?

Q    Yes.

A    After viewing the video, I believe that Mr. Brizendine entered the property, I'm not sure if he was drinking at that

Eguia - Direct by Stokman

time, but he did park and there was another vehicle that was following.  So the two vehicles were coming together kind of like one was leading the other.

Q    And then what's the significance, if any, of the one vehicle leaving?

MS. FISHER-BYRIALSEN:  Objection, also to the prior question, but the objection is to this one, too.

THE COURT:  Your basis for your objection, please?

MS. FISHER-BYRIALSEN:  There was no foundation for the prior one or this one.

THE COURT:  Sustained.

Ms. Stokman, just -- also, 1171 hasn't been admitted, so it hasn't been published.

MS. STOKMAN:  I'm sorry, that was my mistake.  We'd ask to admit 1171 as well.  Thank you.

THE COURT:  Any objections to 1171?

MS. FISHER-BYRIALSEN:  No.

MR. REED:  No objection.

MS. LUEM:  No objection.

THE COURT:  It will be admitted.

(Government Exhibit 1171 admitted in evidence.)

BY MS. STOKMAN:

Q    What, if anything, did you determine after viewing those videos?

A    That two vehicles entered the property together and that

Eguia - Direct by Stokman

one left.

Q    After you processed the scene, what did you do next?

A    After processing the scene, then we departed the scene and continued our investigation on a later date.

Q    At some point in time, were you present when the red Dodge truck was processed?

A    Yes.

Q    When was that?

A    That was on March 3, 2022.

Q    I'm going to have you look at 1199 through 1212, and tell me if you recognize what's in those photographs.

A    Yes.

Q    And what do those depict?

A    These photos depict the date and evidence of items that we collected from the vehicle on March 3.

Q    Do they accurately show what you viewed the vehicle to be that day and the items that were recovered from it?

A    Correct.

        MS. STOKMAN:  We'd ask to admit 1199, 1201, 1202, 1203, 1205, 1208, 1210, 1211 and 1212.

        THE COURT:  Any objections?

        MS. FISHER-BYRIALSEN:  One moment, Your Honor.

        THE COURT:  Sure.

        MS. FISHER-BYRIALSEN:  No, Your Honor.

        MS. LUEM:  No.

Eguia - Direct by Stokman

THE COURT:  Mr. Reed?  Mr. Reed, do you have any objections?  Mr. Reed, do you have any objections?

MR. REED:  No objection, Your Honor.

THE COURT:  Those will be admitted.

(Government Exhibit 1199, 1201, 1202, 1203, 1205, 1208, 1210, 1211 and 1212 admitted in evidence.)

MS. STOKMAN:  We'll pull up 1199 and ask to publish as we go.

THE COURT:  Ms. Stokman --

MS. STOKMAN:  We're almost done, Judge, if that's all right.  We'll just run through these quickly.

BY MS. STOKMAN:

Q    Is there anything significant in this photograph?

A    Yes.

Q    Can you tell us what that is?

A    That's the photo depicting the open door of the passenger side of the truck.

MS. STOKMAN:  Can we go to 1201, please.

BY MS. STOKMAN:

Q    What is that?

A    That is a photo of a fired cartridge case that was located underneath the front passenger seat.

Q    And were you able to determine what type of weapon might have been used, or what type of firearm?

A    Yes.

Eguia - Direct by Stokman

Q    What was that?

A    A 9-millimeter.

         MS. STOKMAN:  1202, please.

BY MS. STOKMAN:

Q    What is this?

A    That is a photo of crumbled receipts that was located in the front passenger side door pocket.

Q    And 1203?

A    That is a photograph of the receipts that have been opened up for photography.

Q    Was there anything significant in those receipts to your investigation?

A    Yes.

Q    Tell us what that is.

A    So one of the receipts was -- the Walgreens was a receipt from the 21st of February, and that was in the City of Long Beach.  And the CVS receipt was for a receipt on the 16th of February in the City of Lancaster.

         MS. STOKMAN:  Can we go to 1205, please.

BY MS. STOKMAN:

Q    What, if anything, is significant here?

A    In this photo it depicts a cartridge case that is seated in the front passenger pocket, door pocket.

         MS. STOKMAN:  And 1210 -- I'm sorry, 1208.

BY MS. STOKMAN:

Q    What is this?

A    That is a backpack that was recovered from the rear cargo area inside the crew cab of the Ford pickup truck.

MS. STOKMAN:  And 1210, please.

THE WITNESS:  I'm sorry, it's a Dodge, not Ford, sorry.

BY MS. STOKMAN:

Q    What is this showing?

A    That is showing a receipt in that cargo area of a Marshall's receipt on top of like a plastic bag.

MS. STOKMAN:  And, please, 1211.

BY MS. STOKMAN:

Q    Is that the receipt you just mentioned?

A    Yes, it is.

Q    Was there anything significant to your investigation in that?

A    That one also was a receipt, and that one was from Marshall's, and that was on the 22nd.

MS. STOKMAN:  Go to 1212, please.

BY MS. STOKMAN:

Q    Is there any significance to this?

A    Yes.

Q    What is it?

A    That is a Hotel Current, like a sleeve, and to the left is

Eguia - Direct by Stokman

a room card and hotel -- it's a hotel that's in the City of Long Beach.

Q    Did you do anything after viewing these items?

A    Yes.

Q    What was that?

A    My partner and I, we went to the Hotel Current.

Q    And did you obtain any information that was significant to your investigation?

A    Yes.

Q    What was that?

A    I spoke to the hotel manager and learned that Mr. Brizendine had checked into the hotel with a female on the 21st with a checkout of the 22nd.

Q    Of February?

A    Yes.

Q    During the course of your investigation, did you receive any tips of potential leads?

A    Yes.

Q    Did any of those relate to other incidents?

A    Yes.

Q    And can you tell us what other incidents those related to, very briefly?

A    Yes, I learned of an incident of a home invasion robbery that occurred in the LAPD Hollywood division, and I also learned of a vehicle pursuit where there was a crash at the end

of the pursuit, and a large amount of narcotics and a firearm was recovered in San Fernando Valley.

Q    Just to go back, the casing that was found in the passenger door pocket of the truck, what type of casing was that?

A    That was also a 9-millimeter.

Q    Did, at any point, you identify a potential suspect in the shooting of Michael Brizendine?

A    Yes.

Q    Who was that?

A    James Barry Field.

Q    At some point in time did you have contact with any federal agents regarding your investigation?

A    Yes.

Q    Who would that be?

A    Special Agent Anthony Gonzales.

Q    At some point was this investigation adopted federally?

A    Yes, it was.

        MS. STOKMAN:  I have no further questions.  Thank you.

        THE COURT:  Any cross-examination?

        MR. REED:  I have no questions, Your Honor.

        MS. FISHER-BYRIALSEN:  Can we have a sidebar for a minute?

        THE COURT:  All right.

        (At sidebar on the record.)

MS. LUEM:  So based on our prior conversations about inquiring outside the scope -- I mean, this detective investigated a number of things besides just the scene of this particular crime, so there's a number of areas that we could potentially go into -- or into with her, but if we're not going to be allowed to do that based on beyond the scope of direct examination, we'll have to bring her back.  Personally, I would have her come back on Monday.

THE COURT:  I asked you all to meet and confer about that.

MS. LUEM:  She said she wouldn't agree to it.

MS. STOKMAN:  I said if I could be aware what those topics of conversation were or testimony/questions were, then we would consider that.

MS. LUEM:  She just raised that she was aware of the Hollywood robbery, that she was involved with interviewing a number of other witnesses.

THE COURT:  In any event, it's not going to happen. We could talk further if we need to, but we're not going to have the jury wait.

MS. LUEM:  Sure.

(End of sidebar discussion.)

THE COURT:  All right, ladies and gentlemen, we're going to be taking our weekend break.  Thank you for your attention the last few days.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

ER 845

Again, please don't discuss this case.  Please don't allow anyone to discuss it with you.  Please don't form any opinions about this case.  Please don't do any independent research, and that includes reviewing anything on the media about this, media of any sort.

All right.  Thank you so much.  Have a good weekend. We'll see you on Tuesday at 8 a.m.

(In open court outside the presence of the jury.)

THE COURT:  All right.  The jury members have stepped out.  It sounds like there's not agreement to exceed the scope at this time.  So are you wanting to cross-examine as to these issues next week?

MS. FISHER-BYRIALSEN:  Your Honor, I think we might as well just have her recalled.  I'll just say you might take away from my conferral with Ms. Stokman was that I asked her if she was willing to let us go beyond the scope so that we wouldn't have to call these witnesses who then have to travel back from L.A.

My understanding of what her response was to me was that we had to tell her what the entire cross was to see if it was outside of the direct, and I said it was easier if we knew what the direct was and then do it in that order.

But we did confer, Your Honor, is what I'm telling you, and that's what I took away from that.  So we can easily recall all these witnesses, it just seems very inefficient.

THE COURT: Unfortunately, efficiency hasn't been the test so far. So if there's going to be an objection as to exceed the scope, I'm going to have to sustain it at this point. There's no agreement.

All right. Thank you very much.

Anything else for the record at this time?

MS. STOKMAN: No.

MS. LUEM: We would like to know what witnesses the government --

MS. REPORTER: I can't hear Ms. Luem.

THE COURT: She said she wants to know who the witnesses are next week, so that's something that's supposed to occur. I don't think we need to do this on the record.

Anything else for the record?

MS. STOKMAN: Nothing from the Government.

MS. LUEM: We'd just like for them to do it sooner, if that's possible.

THE COURT: There was an order related to that. I expect that's going to be complied with.

All right, thank you.

(Proceedings adjourned at 1:39 p.m.)

C E R T I F I C A T E


     I certify that the foregoing is a true and correct

transcript of the proceedings in the above-entitled matter.


_____                    January 24, 2025
MARYANN VALENOTI, RMR, CRR                          DATE
Official Court Reporter
CA CSR #11266