IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff - Appellee,<br>v.<br>KENNETH JOHNSON,<br>    Defendant - Appellant. | No. 25-3645<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |
| UNITED STATES OF AMERICA,<br>    Plaintiff - Appellee,<br>v.<br>FRANCIS CLEMENT,<br>    Defendant - Appellant. | No. 25-3648<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |

On Appeal from the United States District Court
For the Eastern District of California
The Honorable Jennifer L. Thurston
D.C. No. 1:20-cr-00238-JLT-SKO

**EXCERPTS OF RECORD**
**VOLUME 6 OF 13**

Ryan J. Villa
The Law Office of Ryan J. Villa
5501 Eagle Rock Ave. NE Suite C2
Albuquerque, NM 87113
Ryan@rjvlawfirm.com

Andrea Lee Luem
Andrea Lee Luem, PHV
400 South Fourth Street, Ste 500
Las Vegas, NV 89101
andrea@luemlaw.com

Counsel for Defendant-Appellant
Kenneth Johnson

Jane Fisher-Byrialsen
Fisher & Byrialsen, PLLC
4600 S. Syracuse Street
Denver, CO 80137
jane@fblaw.org

Jean D. Barrett
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
jeanbarrett@ruhnkeandbarrett.com

Counsel for Defendant-Appellant
Francis Clement

1521

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. JENNIFER L. THURSTON

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>       Plaintiff, )<br>   vs. )<br> )<br>KENNETH BASH, et al. )<br>       Defendants. )<br> ) | ) 1:20-cr-00238-JLT-SKO<br>) Jury Trial, Day 7<br>) Volume 7<br>) Pgs. 1521 - 1718, inclusive |

Fresno, California                    Thursday, January 28, 2025

REPORTER'S TRANSCRIPT OF PROCEEDINGS

REPORTED BY:  RACHAEL LUNDY, CSR, RPR, Official Reporter

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

ER 850

1522

**APPEARANCES OF COUNSEL**:

| | |
|---|---|
| For the<br>Government: | **STEPHANIE STOKMAN**<br>Assistant U.S. Attorney<br>2500 Tulare Street, Rm. 4401<br>Fresno, California  93721 |
| | **JARED ENGELKING**<br>Department of Justice<br>1301 New York Avenue, N.W.<br>Washington, DC 20005 |
| | **JAMES ROBERT CONOLLY, GOVT**<br>U.S. Attorney's Office<br>501 I Street, Suite 10-100<br>Sacramento, CA 95814 |
| For Defendant<br>Johnson: | Law Offices of Andrea Luem<br>Attorneys at Law<br>400 South Forth Street, Suite 500<br>Las Vegas, Nevada  89101<br>BY:  **ANDREA LEE LEUM, ESQ**. |
| | Law Offices of Ryan J. Villa<br>5501 Eagle Rock Avenue NE<br>Suite C2<br>Albuquerque, NM 87104<br>BY:  **RYAN J. VILLA, ESQ**. |
| For Defendant<br>Clement: | Fisher & Byrialsen, PLLC<br>Attorneys at Law<br>99 Park Avenue<br>New York, NY 10016<br>BY:  **JANE FISHER-BYRIALSEN, PHV** |
| | Ruhnke And Barrett<br>29 Broadway, Suite 1412<br>New York City, NY 10006<br>BY:  **JEAN DE SALLES BARRETT, PHV** |
| For Defendant<br>Stinson: | Law Office of Kenneth Alan Reed<br>406 W 4th Street<br>Santa Ana, CA 92701-4505<br>BY:  **KENNETH ALAN REED, ESQ**. |

ER 851

1523

## INDEX

**GOVERNMENT'S WITNESSES:**

**TERRENCE PELL**
DIRECT EXAMINATION BY MR. ENGELKING                1547
CROSS-EXAMINATION BY MR. VILLA                     1554

**DR. PAUL GLINIECKI**
DIRECT EXAMINATION BY MS. STOKMAN                  1555

**KAYLEN CHANDLER**
DIRECT EXAMINATION BY MS. STOKMAN                  1607
CROSS-EXAMINATION BY MS. FISHER-BYRIALSEN          1621
REDIRECT EXAMINATION BY MS. STOKMAN                1649

**ERIC HALE**
DIRECT EXAMINATION BY MR. ENGELKING                1652

**OFFICER CHRISTOPHER RODRIGUEZ**
DIRECT EXAMINATION BY MR. ENGELKING                1669
CROSS-EXAMINATION BY MS. LUEM                       1684

**FRACIA MARTINEZ**
DIRECT EXAMINATION BY MR. CONOLLY                  1688

* * * * *

1524

## EXHIBITS

| GOVERNMENT'S | Received |
|---|---|
| 1213 | 1563 |
| 1214 | 1565 |
| 1216 | 1568 |
| 1218 | 1569 |
| 1219 | 1570 |
| 1221 | 1573 |
| 1229 | 1574 |
| 1226 | 1575 |
| 1231 | 1577 |
| 1239 | 1580 |
| 1240 | 1581 |
| 1248 | 1583 |
| 1249 | 1584 |
| 1270 | 1587 |
| 1273 | 1589 |
| 1274 | 1590 |
| 1278 | 1591 |
| 1252 | 1593 |
| 1255 | 1600 |
| 1263 | 1601 |
| 1269 | 1605 |
| 1435 to 1445 | 1657 |
| 1307, 1308, 1309, 1310, 1314, 1315, 1318, 1320, 1325 and 1328 | 1675 |
| 1858 | 1703 |
| 1342 | 1705 |
| 1856 | 1707 |
| 1340 | 1709 |

* * * * *

ER 853

1525

Tuesday, January, 28, 2025                    Fresno, California

8:05 a.m.                                      Jury Trial Day 7

(The following proceedings were held in open court:)

THE COURT:  All right.  We have everyone back in their places.  We are going to have to have IT come up and check out a monitor.  But in the meanwhile, I just wanted to address an issue.

Mr. Clement and Mr. Johnson, I understand that you are sick and that you didn't want to be here today.  You do not have to be here today.  And if you feel better going back and resting, that's perfectly fine.  It's just we have to be sure that that's what you want.  Because the government's concern is that being sick is not voluntarily absence; it is you just you have no -- you just feel so bad that you can't come.

So if you want to leave, that's perfectly fine.  I don't want you to be here and be miserable if you would rather not be.

MR. CLEMENT:  On court days --

THE COURT:  I'm sorry.  I can't hear you.

MR. JOHNSON:  On court days they wake us up at 2:30 in the morning.  So I mean, our day is already half done.  So that's --

MR. CLEMENT:  Then we have diarrhea.

MS. DE SALES BARRETT:  Shush.

ER 854

1526

MR. CLEMENT:  Why are you shushing me?

MR. JOHNSON:  It's already too late for that.  You know what I mean?  I'll push through.

THE COURT:  Okay.  All right.  Here's the -- in the future or if tomorrow you're just feeling, you know, bad, you don't want come to, or, you know, this evening you think, Yeah I need to rest tomorrow, let your attorneys know in advance. Because here's -- the trouble is, if we're to proceed today without you and you're like, Wait a minute.  I wanted to be there.  I just couldn't be there because of how bad I felt, we end up with a mistrial.

So what we need is for you to be able to communicate to your attorneys early enough that they can either -- that they can get your signature on something saying, you know, I -- I want you to proceed in my absence, and we'll do that.

Or I suppose I wouldn't really have a problem either if you were to sign something saying, I give my attorney the authority to represent to the Court when I'm not going to be there.  And -- and, you know, we can go through that too.

But what I don't want you is to feel like you have no choice.  Because, truly, anytime you say to the marshals or anybody, I'm not coming, you know, then I'm going to assume you are voluntarily not going to be here.

And truthfully, I don't -- I don't take any offense one way or the other.  It's your choice.  I don't -- will not

1527

force you to be here.  So that's a lot of me talking, but I don't know if that addresses your concerns or if -- it sounds like you both want to just stay here as long as you feel comfortable doing that.  But it's up to you.  Okay?  And that's -- Mr. Stinson, too, it's for the entire trial.

All right.  Any comments, then, from anyone about that or anything else?

MS. STOKMAN:  Judge, I'll just add that if there is to be any type of waiver, that the email that the government sent with the three criteria that needs to be addressed, that should be either in a written waiver or represented by counsel at that time.

I have nothing else on that matter, so -- but I do have something on another matter.  But if anyone else wanted to comment before we moved along.

MS. LUEM:  Just briefly, Judge.

I did email the court administrators suggesting that we could present an affidavit yesterday or -- waiving Mr. Johnson's appearance, and I was told that appearances would be made on the record.  So it didn't seem like yesterday that was an option.  But going forward, I will make sure that we have one signed and ready to go in the event that he's too unwell to come to court.

THE COURT:  Okay.  Perfect.  All right.

Anything else, then, on that topic?

1528

All right.  Ms. Stokman, you had a different issue?

MS. STOKMAN:  Yes.  I want to address a motion for disclosure that was filed on Sunday under Docket Number 1742.

The government has some pretty big concerns about the filing of that motion on the public docket.  It outright outs a cooperating witness who otherwise is under the *Jencks* protective order, is under a sealed exhibit -- witness list.

And I'm not saying that this was an intentional filing, but the safety of witnesses has been an issue for the government and a concern since the beginning of this case. This is a violation of the protective order by outright naming the witness as a cooperator in a publicly filed document.

There have also been some jail calls that Defendant Johnson has made to people on the street outright naming cooperators, and that is a violation of the protective order.

And so the government is just very concerned but also believes that the Court needs to address this issue so that it does not keep happening.

THE COURT:  Uh, let's see.  This was a filing by you, Ms. Byrialsen.  Your comments?

MS. FISHER-BYRIALSEN:  Your Honor, that is an error by me.

THE COURT:  All right.  I'm going to order 1742 to be sealed.  And that's not going to happen again.

1529

As to --

MS. FISHER-BYRIALSEN:  No, Your Honor.

THE COURT:  -- Mr. Johnson, Mr. Villa and Ms. Luem, what are your comments there?

MR. VILLA:  Judge, we haven't been provided with a copy of any of Mr. Johnson's phone calls, so we can't speak to that.

THE COURT:  Mr. Johnson doesn't know whether or not he's done that?

MR. VILLA:  Well, we just heard that information just a few seconds ago.

THE COURT:  Let me give you a moment to consult. Because if that has happened -- and I can get those calls -- we're going to deal with that.

MR. VILLA:  Your Honor, what Mr. Johnson is saying is that he thinks it's with respect to Mr. Bannick. Mr. Bannick's plea was public, and I think it was just an inference that we all drew when he entered that plea that that was what was going on.  So I think that's different than the list.

But again, without the calls, you know, which I think are --

THE COURT:  All right.

MR. VILLA:  -- clearly discoverable --

THE COURT:  Let's get those.  We'll just stop, then.

1530

I want those calls, then.

I hope it's not what I'm concerned about.

Anything else that we need to discuss?  We're going to have to still wait for IT, but is there anything else to discuss this morning?

MS. STOKMAN:  Judge, the government has the judicial notice regarding UTC that counsel has signed off on.  So we don't need that read until tomorrow morning, but I will hand that to the Court's deputy clerk at some point for the Court's review.

THE COURT:  Okay.  Anything, then, or just go off the record for a few minutes?

MR. VILLA:  Judge, we ordered the government to provide you the calls.  Are we getting the calls as well?

THE COURT:  No.  I'm going to get this first.  If there is something to discuss, we'll discuss it.

MR. VILLA:  I think under Rule 16 we would request disclosure of those.

THE COURT:  All right.  I don't care.  That's fine.  Anything else?

MS. DE SALES BARRETT:  Yes, Your Honor.  It is our understanding that the medical examiner will be testifying today, and as the government noted last night, there has been a reduced number of witness -- of photographs that they intend to offer.  We still have an objection to three of the

1531

photographs that they intend to offer.

THE COURT:  Okay.

MS. DE SALES BARRETT:  The first --

THE COURT:  Which ones are --

MS. DE SALES BARRETT:  I don't know whether the government is -- we haven't discussed whether or not the government agrees with our position.

Our position is that 1249 depicts the same injury as 1248; that 1263 is particularly gruesome in that it shows an injury that is not explained in the autopsy report, and it appears as if it is some kind of internal abdominal organ that has been pushed out but it is not explained in the autopsy report.

And then 1265 is a photograph of Mr. Ennis depicting trajectory sticks, about a half a dozen of them, protruding from the bullet wounds on his torso.  With regards to those trajectory sticks -- sticks, there's no issue with regard to trajectory of the bullets in this case.  And we have no objection to him testifying as to the direction the bullets came from, but the torso with the sticks in it is particularly gruesome and alarming, and I don't think we need to inflict that on the jury when there's no material issue at stake.

THE COURT:  All right.  Ms. Stokman, your comments.

MS. STOKMAN:  First, the government went through the photos in the entirety with the medical examiner, and these

1532

were the photos narrowed down based upon discussions of what was significant for his testimony.

Photos ending in -48 and -49, yes, depict an injury to the head; however, -48 is a more clearer picture of the bullet wound entry to the head.  The other photograph, -49, is important because it shows the close-range effect that that shot had to the victim's head.

THE COURT:  Stippling, is that what you're referring to?

MS. STOKMAN:  Yes.  And when discussed with the medical examiner if only one should be used, his view was that -48 shows the more clearer picture of the actual wound, but -49 is very important for his discussion of how close someone might have been when they made that shot.

-63, exhibit ending in -63, that wound that Ms. Barrett mentioned is an exit wound which is mentioned in the autopsy report.  That photo depicts one of the fatal shots to the victim in his chest.

And exhibit ending in -65 is a very clear way for the doctor to show entry-exit wounds because there's that trajectory stick -- stick -- excuse me -- that runs from one entrance or exit wound to the other.

THE COURT:  Why is that important?

MS. STOKMAN:  It's just part of his testimony.  If the Court is inclined to think that one in particular is too

1533

gruesome, he could point to the autopsy, the rendering of the drawing of the body, and show where the wounds are, but that was just a very easy way for him to explain that the wounds and what he does during the autopsy report -- and in order to show, one, that there were entry, exits; two, there were bullets found within the body, but, obviously, not all of them are there because some of them had exited the body. So there are various levels, but the government is open to the Court on that photograph.

THE COURT: In looking at 1265, it's -- I was expecting something else. It's not a pleasant picture. Although, I'm not quite sure of how, in Ms. Barrett's point that, unless there's some dispute in this case as to where people were standing when they were firing, I don't think this picture is necessary. I think he can rely upon his autopsy report and his diagram.

Ms. Barrett, do you have additional comments as to 1248, 1249, 1263?

MS. DE SALES BARRETT: Yes, Your Honor. With regard to the clarity between 1248 and 1249, if they -- the need is to show the stippling, then 1249 could be admitted. It just -- because -- it is -- there's no contest here. We have no anticipated cross-examination of this witness. So his -- we are not contesting anything that is shown in any of these pictures, and to have two of them of the same bullet wound

1534

just doesn't make any sense.

The -- with regard to the 1263, the government just said that's an exit wound, not an entry wound. And if the entry wound that they are talking about is -- is somewhere else on the body, it's not necessary to show that particular exit wound in such graphic detail. Again, the -- there are diagrams showing the direction of these bullets, and we have nothing to contest that -- that we do not intend to contest any of that.

THE COURT: Ms. Stokman, is there some other purpose for these photos related to some characteristic of the Aryan Brotherhood or anything else, or is this just simply here's where a bullet came out?

MS. STOKMAN: And let me clarify on the exhibit ending -63. There's an entry wound to the chest. That's one of the fatal wounds. The -- I -- the exit wound I was referring to was the stomach wound that Ms. Barrett said was not in the report. And --

THE COURT: Is the entry wound the one that's red right next to --

MS. STOKMAN: In his chest, yes.

THE COURT: Okay.

MS. STOKMAN: And, Judge, although there's not a particular tie through the medical examiner to any particular defendant or gang, we have narrowed down these photos

1535

significantly, and these were the ones that we believe are aiding the doctor's testimony.

As the Court and counsel both know, especially for Mr. Brizendine's autopsy, there were very gruesome photos that we had initially designated because of a bullet that was found within his skull. We took those out. We are trying to limit it as much as possible and this is what we have limited it to.

I will point out that it's a handful of photographs or less for each victim. And so we do not plan on lingering very long at all, but these were the photographs that, in conjunction with the doctor's report and how he believes it would aid his testimony, we pulled out.

THE COURT: All right. And looking at 1248, 1249 entries, they are not particularly startling. 1248 shows a clear -- I agree, shows a clear picture of that injury. 1249 shows a clear injury -- evidence -- clearer photo of the stippling. I don't see any reason 1248 and 1249 should not be introduced.

1263, I mean, I wouldn't -- I wouldn't call it particularly gruesome. I mean, it appears to have some of the victim's intestines popping through, which in description just saying the word sounds disgusting, but looking at the picture, it isn't particularly concerning to me, but, I mean, I guess, if we're looking at -- if you're more concerned about the entry wound, then the -- I think we could redact the exit

1536

wound.  If you're saying both of it is important, then I need to know a little bit more of why that's -- they are both important.

Because as I understand from the defense, they are not -- there's no dispute as to the injuries and doesn't appear to be any dispute as to the trajectory.  So, I guess, I need to know a little bit more why that exit wound is important.  Or actually -- I mean, the fact that the person suffered wounds, we're going to hear about it.  What I need to know is why do we need to see it.

MS. STOKMAN:  Judge, these photographs are aiding in the witness's testimony, and it shows the jury the real-life impact of the wounds versus a drawing of a human being on paper.

Again, I'll just say that we have narrowed these down significantly, and these were the ones that -- that we chose out of the others that existed that were far more gruesome than this.

THE COURT:  That's not really quite the test, but I don't know.

Any further comments about it?  I mean, really, Ms. Barrett, I'm looking at it.  I think all of us have seen photos that -- what I would describe as gruesome.  This really doesn't get me there.  I mean --

MS. DE SALES BARRETT:  Right.  Your Honor, I just

1537

wanted to clarify that what was not included in the autopsy report was an explanation of why -- of what happened there.

THE COURT:  She said there was an exit wound.  Is that not discussed?

MS. DE SALES BARRETT:  The exit wound is discussed. The fact that the intestines are protruding from his stomach was not, and so I would ask that that be part of the testimony, would be to explain.  If Your Honor let's that picture in, I think there needs to be an explanation of that.

THE COURT:  Okay.  All right.  I'm going to allow 26 -- or 1263 to come in assuming, you know, the doctor actually testifies about that and to clarify what we're looking at, I guess, to the extent that that's pertinent to what's he's doing.  If it's not pertinent, then I guess I'm going back to why are we using that photo.  And I guess we'll have to take that as it comes.

All right.  Anything else then at this time?

MS. STOKMAN:  Nothing from the government.

MS. FISHER-BYRIALSEN:  Nothing from Mr. Clement, Your Honor.

THE COURT:  I'm not prepared to address this in full, but I did want to raise the issue of the motion also filed over the weekend related to Mr. Gonzalez's notes.

And here's my concern:  I'm not quite sure what you're asking for because it starts out with the general

1538

proposition that the agent can't destroy notes.  That's what *Harris* says.  It talks about the duty to preserve.  It doesn't talk about production.

Then you cite to me a number of cases that deal with the obligation to produce the defendants' statements.  Now, unless I missed something, it's my understanding that neither Mr. Clement nor Mr. Johnson made statements to the government.

So are we talking about statements that the defense made or are we talking about something else?  The other day when it was raised, I was under the impression we were talking about witness interviews that had not been otherwise recorded, but I don't know what this motion is trying to get at.  So -- and I guess I'm back to kind of what I said the other day.  If the authorities cited don't address your issue, then it's very difficult for me to figure out what your issue is because it doesn't say.

So maybe I can get a little guidance on this before I waste any more time.

Ms. Byrialsen, what are you trying to get by this?

MS. FISHER-BYRIALSEN:  Your Honor, I -- what we had asked for was the notes to Timothy True and -- I'm blanking on the other person.  Who's the other one -- oh, I'm sorry, Your Honor.  Bannick, Mr. Bannick, and Mr. True, who were not video or audio recorded at their interviews.

THE COURT:  All right.  Is it fair to say then that

1539

cases that rule under Rule 16 related to defense -- defendants' statements really don't apply here?

MS. FISHER-BYRIALSEN:  Your Honor, we were using those as a parallel because we were not able to find one exactly on point that related to the statements of, in this case, what are now cooperators.

THE COURT:  But aren't there different standards? Because when we're talking about Rule 16, that's one thing. And I -- if the Government hasn't produced those, but I didn't think there were any.

And if we're talking about something under what I think maybe is *Giglio*, *Brady* maybe -- or maybe you're talking about *Jencks.*  It would be helpful to know what exactly -- you know, if you're just saying, Look, we need to know, we want to see the notes of these because we don't have any other documentation, I get it, but then there needs to be a little bit of analysis as to why it's produced under *Jencks*.

You mentioned *Jencks,* and I appreciate that's the issue.  But at least as I understand *Harris*, it says that I need to take a look at the notes at most.  There has to be some sort of -- you know, *Jencks* only applies if that's what the agent is going to testify about.

And otherwise, are you saying that these notes are some verbatim statement of the witness that the witness adopted or -- I don't know where you're going --

1540

MS. FISHER-BYRIALSEN:  I don't know either, Your Honor.  So perhaps an in-camera review would be useful since we don't know what they are at all.  But we know those witnesses have been interviewed.

THE COURT:  In the future going forward, it would be much more helpful if you just said that instead of giving me a bunch of stuff.  I'm going, Wait a minute.  Nobody told me the defendants made statements to the law enforcement.  Why are we talking about that now?

And, you know, as much as you guys may think that I have a lot of time, this isn't the only thing I do all day.  So I don't have a lot of extra time to waste on things that just don't bear on it.

MS. FISHER-BYRIALSEN:  Got it.

THE COURT:  All right.  I'm going to look at this a little bit further, but preliminarily I think, as we discussed the other day, if there are notes describing this that fall within *Brady*, *Giglio*, *Jencks*, then the notes need to be preserved.  And, I guess, at a minimum I need to see them, unless I hear something different from the government.

Obviously, the government hasn't filed any response yet, but is there a preliminary position of the government?

MS. STOKMAN:  Yes.  The government had the same concerns that Your Honor had but also did not find that the parameters of *Jencks* had been discussed or even met, as far as

1541

what's in the notes. And so they do not qualify as *Jencks* at this point.

The government will go through those notes again, but there -- like I said before, there is an extensive report written up on Bannick's interview. Those -- it's a ten-page report, and there was also a report based upon True's interview.

THE COURT: Right. But you appreciate the authorities that say, you know, We need to test that, because oftentimes reports are written from a perspective of the notes. And I think everything you're saying, though, doesn't say that the notes are not subject to production. And, of course, the defense can't say, We know the notes say something, because they haven't seen them.

So I guess I'm still kind of circling back to I need to see the notes, I guess.

MS. STOKMAN: We can get those.

THE COURT: All right. And the other issue, too, we haven't really talked about, is *Jencks* as to Mr. Gonzalez.

I assume Mr. Gonzalez is going to testify at some point, and there's, at least, case authority out there that says these notes could qualify as *Jencks*. I don't know because I don't know what they say, but there's that issue too.

All right. So when can you get me those notes?

1542

MS. STOKMAN:  We can have those to the Court at some point by the end of the day tomorrow, if not sooner.

THE COURT:  All right.  Then also just preliminarily, as to the production related to counsel for Mr. Bannick, I'm having trouble with that because what you're asking for is me to issue an order that counsel for Mr. Bannick must appear without -- I mean, I feel like we're saying, as previewing it here, it may be an issue.  We don't know if it's an issue, it may be an issue, it may not be an issue, which makes me hesitant to do anything with that.

Because I get it.  If we're -- if you get Mr. Gonzalez's notes about Mr. Bannick, you, obviously, are going to be in a different position.

But what I wasn't quite sure I was hearing you say was, Mr. Bannick is going to testify to something.  Do you know -- and then I got the sense maybe you know something that the attorney has said to the government.  I don't know if you know what that proffer was or if there's -- okay.  So all of this is speculation that the attorneys would know something different than what has been said.  I'm not sure exactly where that motion was going except for, Hey, this may be an issue.

MS. DE SALES BARRETT:  Your Honor, with regard to that, as a person who has participated in representing cooperating witnesses, in my -- many cooperating witnesses, in my experience, the attorneys initially make an attorney

1543

proffer to the government.

If that proffer -- sometimes that proffer ends up being inconsistent with what is eventually discussed at the proffer session; in other words, the government will come back to the attorney and say, No, no, no, our evidence shows this, and your client will not be allowed to cooperate unless it is consistent with what our evidence shows and not what he's telling you.

So our position is that that is an authorized admission by Mr. Bannick through his attorney to the government to tell them -- to give them some information through an attorney proffer.

And attorney proffers are not formal things.  They are telephone calls.  And they happen many more times than once prior to a person actually going in and having a proffer session.

So, you know, our position is that an initial proffer session between the government and a cooperating witness is a session that has been prescreened; and therefore, we should be entitled to the statements made on behalf of Mr. Bannick prior to that prescreening.

THE COURT:  And let me just make sure we're on the same page.  You're taking the position that it is subject to production under *Brady*.

MS. DE SALES BARRETT:  Under *Giglio* and under --

1544

under *Jencks* as well, but certainly under *Giglio*.

THE COURT:  Under *Jencks*?  Because as I understood it, what you were saying was you want the attorney to come in and testify.

MS. DE SALES BARRETT:  No.

THE COURT:  You don't want the attorney to testify?

MS. DE SALES BARRETT:  No.  We want --

THE COURT:  Oh, okay.

MS. DE SALES BARRETT:  We want what the government says the attorney told them.  We want the government's version of those events, not the defense attorney's.

THE COURT:  So under *Jencks,* it would depend on what Mr. Bannick says.

MS. DE SALES BARRETT:  But if it's -- if it's impeachment information, obviously we're entitled to it under -- under *Giglio*.  So -- and that's really the fundamental principle here.

THE COURT:  All right.  Ms. Stokman, are you intending to file something in response to 1742?

MS. STOKMAN:  We can if the Court prefers that.  I can also argue it now if the Court prefers that.

THE COURT:  I'll hear your comments if you think that's most effective in that way.

MS. STOKMAN:  First, I understand Ms. Barrett does not practice in this district, but the scenario that she just

1545

outlined is absolutely not how cooperating witnesses are handled in this district because it seems very problematic.

Furthermore, any type of proffer that might exist in any case would be a hearsay statement from defense counsel, which does not necessarily indicate that the facts coming from their client were accurate in their portrayal of that to the government.

However, in this situation, none of this material exists so there's nothing to produce in this regard.

THE COURT: So you're saying, as I understand it, there were no -- if there were prior communications between Mr. Bannick's attorney and the government, those communications were not documented.

MS. STOKMAN: There's no documented communications, but there was also never a proffer of information as to what Mr. Bannick would say.

THE COURT: Okay. Ms. Barrett, how does that --

MS. DE SALES BARRETT: Oh, Your Honor, with regard to the issue of hearsay, it's not hearsay.

THE COURT: Yeah, I'm not worried about that, but what about -- she's saying there was not a proffer by the attorney.

MS. DE SALES BARRETT: If there were notes taken during the conversations with the attorneys that reflect a statement different from the ultimate proffer session, then we

1546

are entitled to those notes.

THE COURT:  Ms. Stokman, am I understanding you that there were no such communications outside the actual proffer?

MS. STOKMAN:  Correct.

THE COURT:  Let's say this, if there were, those need to be produced.

MS. DE SALES BARRETT:  Yes, Your Honor.

THE COURT:  And I don't know -- I mean, maybe counsel for Bannick would say something else.  I don't know.

MS. DE SALES BARRETT:  Well, if I were in counsel for Bannick's position, I wouldn't be talking to me.

THE COURT:  Well, I'm just saying, you all were friendly at one point.  So -- all right.

(Discussion was had off the record.)

(Jury enters the courtroom at 8:48 a.m.)

THE COURT:  All right.  Thank you so much.  We have all of our jurors in their places.  As somebody mentioned the other day, we have this beautiful courtroom and we have this beautiful building and all this technology and it's great when it works.  There's, unfortunately, a monitor back there that IT has really tried to get going and it did not come back on.  On the break, they are going to rewire it so that that monitor will work after the break.  In the meanwhile, if you all can share with your neighbors, and truly, if you need more time, raise your hand, go over and look if you need to, but,

DX - Pell E

1547

otherwise, if you can see, okay.  Then we'll get that fixed on the next break.

All right.  Is the government prepared to call its next witness?

MS. STOKMAN:  Yes.

THE COURT:  All right.  Let's do that.

MR. ENGELKING:  The government calls Terry Pell.

THE CLERK:  Please raise your right hand.

TERRENCE PELL,
called as a witness on behalf of the Government, having been first duly sworn, testified as follows:

THE WITNESS:  I do.

THE CLERK:  Go ahead and have a seat.  And then please state your full name and spell your last name for the record.

THE WITNESS:  Terrence Pell, P-e-l-l.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. ENGELKING:

Q.  Good morning.

A.  Good morning.

Q.  Where do you work?

A.  I work for Penlink Limited.

Q.  And what's Penlink?

A.  Penlink is a technology company that produces law

1548

enforcement-related software, analytical software.

Q.   When did you first join Penlink?

A.   2009.

Q.   And what is your title or what's your position with Penlink?

A.   Currently, I'm the chief customer officer.

Q.   How long have you held that role?

A.   Since January.

Q.   And what are your duties and responsibilities in that position?

A.   I'm in charge of overseeing all customer and product-related support, implementations of our software, training.

Q.   Have you held any other positions in Penlink?

A.   Multiple.

Q.   Before becoming the chief customer officer, what position did you hold?

A.   I was the chief solutions officer.

Q.   And how long did you hold that position?

A.   I don't recall exactly.

Q.   What were your duties and responsibilities in that position?

A.   I was responsible for overseeing the same areas of product and customer support, customer success.  I also oversaw research and development.

1549

Q.   Before holding that position, did you hold any other positions at Penlink?

A.   Multiple positions in management of our implementation, support, and customer success of our products for our customers.

Q.   Did Penlink provide the technology used to record wire calls in this case?

A.   Yes.

Q.   And what system was used?

A.   A Penlink flagship product called PLX.

Q.   And what is that?

A.   It's a software package that provides for the collection, storage, and analysis of communications and intelligence data.

Q.   Are wireless telecommunications providers involved in that collections process?

A.   They can be, yes.

Q.   When we talk about wireless telecommunications providers, can you just give us an example of a few of those companies?

A.   AT&T, T-Mobile, Verizon.

Q.   And how are they involved in the collection process?

A.   They are served with a court order, once the legal foundation has been set, and their involvement entails configuring their network to intercept the communications of the subject of that court order or investigation.

Q.   So is it fair to say that providers transmit the

1550

communications that the Penlink platform then collects?

A.   Yes.   They then deliver that information to the law enforcement agency who served the court order.

Q.   Does Penlink operate PLX?

A.   No.

Q.   Who does?

A.   The law enforcement agency that we sell the product to.

Q.   And who was the law enforcement -- who was the system administrator in this case?

A.   The agency was the California Department of Justice.  The administrator I worked with was Brandon Coles.

Q.   What channels of data does Penlink collect from a wiretap?

A.   Channels of data refers to what the carrier or the provider then delivers to the law enforcement agency.  There is a textual information channel, typically the date, the time, details about the participants, such as their telephone or subscriber number, maybe any text messages if the court order was providing for that.

     And in the case of an audio phone call, the actual spoken content of the conversation.

Q.   What happens to the call data and the audio that is recorded?

A.   As our software receives those two channels of information, it correlates them or puts them together as a single communication, then securely stores it in our database,

1551

displays it in real time to someone who is monitoring the conversations for the law enforcement agency, and then secures that until such time as the information needs to be provided for court.

Q.   You said that the data is securely stored.  So is the data available to anybody?

A.   No.   There's a series of permissions that must be granted by the system administrator to which individuals in the organization are able to review that data.

Q.   Does the Penlink system allow agents to change, manipulate, or in any way modify the data that is collected?

A.   No.

Q.   Were you asked to validate wire calls in this case?

A.   Yes.

Q.   How did you obtain those wire calls?

A.   I received them on media via FedEx.

Q.   When you say "media," what type of media was it?

A.   Optical disk, DVD, I believe, or a CD-ROM.

Q.   Did each disk contain a separate call?

A.   Yes.

Q.   What was the date range of the files on the CDs that you received?

A.   The date range for the calls I reviewed was between -- including September 22, 2020, and November 13th, 2020.

Q.   Did you listen to the calls?

DX-Pell E

1552

A.   I do not listen to the calls.

Q.   Have you validated calls in other cases before?

A.   Yes.

Q.   How do you validate a call?

A.   For the disks I received, I generated what's called a cryptographic hash value, it's -- such as a digital fingerprint for each file, and then I compare that to the originals on the system in the position of the California Department of Justice.

Q.   So what's a cryptographic hash file?

A.   It's a mathematical algorithm which creates a digital fingerprint for a file.  It allows you to verify its authenticity.

Q.   How does -- how does this tell you if the calls are the same?

A.   At a digital bit level or a binary level, the two values, if they're identical, then the file is unaltered and is an exact digital duplicate of the original.

Q.   Does comparing cryptographic file hashes require specialized training?

A.   No.

Q.   So how do you know how to do it?

A.   Uh, was taught by a mentor in our agency and organization as well as self research.

          MR. ENGELKING:  May I approach, Your Honor?

1553

THE COURT:  Yes.

BY MR. ENGELKING:

Q.  So I've just handed you what's been marked Exhibits 1808 through 1824.  Could you please take a second to look at each one of those and just let me know when you're done.

A.  Okay.

Q.  Do you recognize those CDs?

A.  I do.

Q.  What are they?

A.  They are the CDs that I received via the FedEx package.

Q.  And what do they contain?

A.  Each disk contains an audio session from the investigation.

Q.  Are these the CDs that you validated?

A.  They are.

Q.  How do you know that?

A.  I placed my initials and the date I validated them onto each CD.

Q.  What did you find when you validated the calls on those CDs?

A.  For each of the disks that I received, I was able to verify that the audio file representing a call on each disk is an exact digital copy of the original that was collected and received at the California Department of Justice.

MR. ENGELKING:  No further questions, Your Honor.

ER 882

1554

THE COURT:  Any cross-examination?

MR. REED:  No questions, Your Honor.

MS. FISHER-BYRIALSEN:  No, Your Honor.

MR. VILLA:  Just briefly.

THE COURT:  All right.

CROSS-EXAMINATION

BY MR. VILLA:

Q.  Good morning, sir.

A.  Good morning.

Q.  I just want to verify the dates for the wiretap you said were September 22, 2020 to November 13, 2020?

A.  For the calls I reviewed, yes.

Q.  So included in that date would be October 4th, 2020?

A.  Yes.

MR. VILLA:  No further questions.

THE COURT:  All right.  Any further questions by this witness?

MS. STOKMAN:  No.

THE COURT:  Did I miss it?  Are you seeking to admit these, or are you just wanting to identity them?

MS. STOKMAN:  Not to admit at this time.

THE COURT:  All right.  Thank you.

May this witness be excused, then?

MS. STOKMAN:  Yes.

THE COURT:  All right.  Thank you, sir.  You may step

ER 883

1555

down.

THE WITNESS:  Thank you.

THE COURT:  Next witness, please.

MS. STOKMAN:  Government calls Dr. Paul Gliniecki.

Sorry for the delay, Your Honor.  He's in a room that we were not aware he was in, so he's being brought in.

THE COURT:  Sir, if you would come all the way up to the witness stand.

THE CLERK:  Please raise your right hand.

DR. PAUL GLINIECKI,

called as a witness on behalf of the Government, having been first duly sworn, testified as follows:

THE WITNESS:  Yes, I do.

THE CLERK:  Please state your full name and spell your last name.

THE WITNESS:  Paul Gliniecki, P-a-u-l, G-l-i-n-i-e-c-k-i.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MS. STOKMAN:

Q.  Morning.

A.  Good morning.

Q.  Can you tell us what your occupation is?

A.  I'm a deputy medical examiner of Los Angeles County.

Q.  And can you explain what that is?

1556

A.   Uh, basically I'm in charge of performing autopsies to determine the cause and manner of death for individuals from Los Angeles County.

Q.   And what is your educational background?

A.   University, medical school, residency training, and specialty training in forensic pathology.

Q.   Where did you go to medical school?

A.   University of Kansas.

Q.   And where did you participate in your residency program?

A.   I did one year of anesthesiology and internal medicine in Cleveland, Ohio.  After that, I did four years of anatomic and clinical pathology at the University of California, Irvine.

        Following that, I did a surgical pathology fellowship at Harbor-UCLA.  After completing that, I worked for one year as a pathologist in Artesia, California.

        Following that, I did a forensic pathology specialty training and have been working at the department of the coroner after that.

Q.   Where do you currently work?

A.   I work at several places.  My full-time job is Los Angeles County.  I also work in Riverside County and also in Kern County.  All similar duties.

Q.   And how long have you worked as a deputy medical examiner at the Los Angeles Medical Examiner's Office?

A.   About 26 years.

DX. Glimiecki S

1557

**Q.** Have you ever testified as an expert in forensic pathology?

**A.** Yes.

**Q.** Around how many times?

**A.** Never kept track, but probably once or twice each month. Maybe 400 times.

**Q.** Do you teach or lecture on topics related to your training and experience in forensic pathology?

**A.** Sometimes, yes.

**Q.** And just describe that briefly.

**A.** We're in charge of a residency program where medical students and residents pass through our department. And sometimes I'm in charge of the residents or students, to teach them.

**Q.** Do you have Board certifications for any medical disciplines?

**A.** Yes.

**Q.** And what are those?

**A.** I have the general medical license for California. I also have a Board certification in anatomic and clinical pathology. I also have Board certification in forensic pathology.

**Q.** And do you have a national certification as well?

**A.** Those are the anatomic and clinical pathology and forensic pathology. It's a national.

**Q.** Are you also required to participate in continuing

1558

Q.  training for your license?

A.  Yes.

Q.  Please briefly describe those trainings.

A.  Basically, in order to keep your license, you have to do medical training.  Each year I do a couple of different conferences.  And it's just -- in my case I can take a variety, but basically, I try to confine it to pathology or wilderness medicine or forensic pathology.

Q.  Are you part of any professional associations related to forensic examination or pathology?

A.  No.

Q.  Have you personally conducted autopsies?

A.  Yes.

Q.  Around how many throughout your career, approximately?

A.  I don't know.  Probably 4- or 5,000, maybe more.  I -- for the last 26 years, I've been doing maybe up to 300 or more autopsies.

        MS. STOKMAN:  The government would like to offer Dr. Gliniecki as an expert in forensic pathology.

        MS. DE SALES BARRETT:  No objection, Your Honor.

        MR. VILLA:  No objection.

        THE COURT:  Mr. Reed, any objections?

        MR. REED:  No objections, Your Honor.

        THE COURT:  All right.  I will accept him for that expertise.

1559

BY MS. STOKMAN:

Q.  Doctor, you said you currently -- one of the positions you currently hold is at the Los Angeles County Medical Examiner's Office.  Did you work there in 2020 and 2022?

A.  Yes.

Q.  Can you describe for the jury the autopsy process, generally what you do when you conduct an autopsy?

A.  So it depends on the type of case we're given.  We have different levels of cases.  Some we just do an external examination and make determination of cause of death, and on those cases we might do toxicology.

Another category is, like, a full autopsy, just a case that's not considered a high-level case, such as a natural or medical or therapeutic.  And those are considered, like, B autopsies, where we just do an external examination, note anything, open the body, and examine all the different organs and take weights or do histology or toxicology.

A higher level is -- such as these cases which I'm representing, those are A cases.  Those are easily homicides or baby deaths or things where it takes -- it's more complex. Typically, photographs are taken, X-rays or CTs taken, review any medical records, and perform a full autopsy and make notation of any of the injuries or abnormalities or natural disease processes found in the body, and then complete a report.

1560

And a last category is just kind of like a partial where we just open up the certain parts of the body, like the chest or abdomen or head, looking for a specific etiology for the cause of death, and a complex autopsy is not needed.

Q.   Ultimately, what are you trying to determine when you conduct an autopsy?

A.   Basically, we're just trying to determine how that person died, what the manner is; you know, is it a homicide death caused by somebody else, a suicide, natural, accident, such as being struck by a car or overdosing on medications.

So there's different categories.  We -- we try to determine and put it into those categories.  You know, that's what we do.

Q.   I'm going to now direct your attention to October 6, 2020. Was an autopsy conducted of a person named Allan Roshanski on that date?

A.   Correct.

Q.   Did you personally perform that autopsy?

A.   No, I did not.

Q.   Who did?

A.   Uh, I believe that would be Dr. Rogers.

Q.   Does Dr. Rogers still -- well, actually, let me ask you this first:  Do you know where that autopsy was conducted?

A.   Los Angeles County.

Q.   Does Dr. Rogers still work for the Los Angeles County

1561

Medical Examiner's Office?

A.   No.   He retired.

Q.   Have you testified as an expert regarding autopsies performed by other doctors?

A.   Yes.

Q.   How does that generally work when you do that?

A.   Typically, when that doctor's not available, I'm given the autopsy report and any other information I might need.   And I review it, look at the photographs, look at X-rays, and come to an independent decision.

Q.   Have you been trained in how to review reports in that way?

A.   No.

Q.   And would you be able to review reports based upon your own experience and knowledge of autopsy reports?

A.   Correct.

Q.   Is it part of your training and experience to read and review autopsy reports in general or to prepare them?

A.   Yes.

Q.   Approximately how many times in your career have you testified to autopsies performed by doctors other than yourself?

A.   Maybe 50 times.

Q.   Are there differences between performing a live autopsy and reading the report that are significant to the opinion

DX: Glimjecki.S

1562

regarding the cause of death?

A.   Yes.

Q.   And what are those?

A.   When I read a report, I'm not actually doing the autopsy. I'm not actually there seeing what's injured or what's not injured.  I have to rely on the photographs and documentation by that forensic pathologist.

So there are gaps.  I just have to -- from my knowledge and experience, I -- I can extrapolate and understand what's going on with the body and what may be present, such as injuries or not.

So I just try to make the best opinion I can, or decision, just reviewing what I have in front of me, which is limited, of course, because I'm not actually doing that autopsy.  And some things may be missing.

Q.   This autopsy of Allan Roshanski, did Dr. Rogers prepare a report of the autopsy he performed?

A.   Yes.

Q.   Is it a requirement to prepare a report when an autopsy is being conducted?

A.   Yes.

Q.   Are those reports performed -- prepared in all autopsies?

A.   Yes.

Q.   And are those reports prepared in the normal course of the duties as a forensic pathologist?

1563

A.  Yes.

Q.  Are the reports kept as records by, in this case, the LA County Medical Examiner's Office?

A.  Yes.

MS. STOKMAN:  At this point, we would like to show only the witness Exhibit 1213.

BY MS. STOKMAN:

Q.  Do you recognize what's on the screen in front of you?

A.  Yes.

Q.  What is this?

A.  It's an autopsy report, prepared by Dr. Rogers, of Roshanski.

Q.  And this is the report that you reviewed in preparation to testify?

A.  Yes.

MS. STOKMAN:  Ask that Exhibit 1213 be admitted.

THE COURT:  Any objection?

MS. DE SALES BARRETT:  No objection, Your Honor.

MR. VILLA:  One moment, Your Honor.  No objection.

THE COURT:  All right.  That will be admitted.

MS. STOKMAN:  We can publish to the jury, please.

(Government's Exhibit 1213 was received.)

BY MS. STOKMAN:

Q.  In reviewing the report Dr. Rogers prepared and the other items that you reviewed particular to this autopsy, were you

1564

able to determine if in conducting the Roshanski autopsy

whether Dr. Rogers followed the same process that you

generally described as followed through an autopsy?

A.  Yes.

Q.  And did he?

A.  Yes.

Q.  Okay.  Does Dr. Rogers' report contain his findings?

A.  Yes.

        MS. STOKMAN:  I'd now like to show just the witness

Exhibit 1214.

BY MS. STOKMAN:

Q.  Do you recognize this?

A.  Yes.

Q.  What is this a picture of?

A.  Of the -- the scene Dr. Rogers perform the autopsy on.

Q.  This is the autopsy from the report we just saw?

A.  Correct.

Q.  Okay.  Is this photograph part of Dr. Rogers' file as it

pertained to this autopsy?

A.  Yes.

        MS. STOKMAN:  We'd ask that this be admitted into

evidence and published to the jury as Exhibit 1214.

        THE COURT:  Any objections?

        MS. DE SALES BARRETT:  No, Your Honor.

        MR. VILLA:  No objection.

1565

THE COURT:  That will be admitted.

(Government's Exhibit 1214 was received.)

BY MS. STOKMAN:

**Q.**  Dr. Gliniecki, when Dr. Rogers examined Mr. Roshanski's body, what did he do to determine the cause of death?

**A.**  He reviewed the investigator's report, which is provided by the coroner's office from our investigators.  I'm just assuming this is what he did.  This is what I would do. Review that, see what the circumstances are, and what the findings at the scene were.

After that, I would review the CT or X-rays just to see if there's any abnormalities such as fractures or projectiles or knife fragments present in the body or any other abnormalities.  After that, I would review the scene photographs taken by the investigator.

And subsequently after that, I would externally examine the body, look for whatever I can find such as natural process or unnatural such as a knife wound or gunshot wound or blunt trauma and document those.  After that, I would perform an autopsy, depending on the case, look inside the head, inside the chest, look inside the abdomen, and examine any extremities for injuries or damages internally such as lacerations to the main organs, such as liver or heart and/or blood vessels.

Also, after that, collect any toxicology for

1566

examination to see if there's any drugs of abuse or any other drugs that might be present and may have contributed to his cause of death.  After all that is done, make diagrams and/or dictate a report or write a report, and wait for the toxicology to come back and finalize the report.

Q.  Does Dr. Rogers' report in Exhibit 1213 indicate whether he did an external examination?

A.  Yes, he did.

Q.  And does it indicate --

MS. DE SALES BARRETT:  I'm sorry, Your Honor.  I believe that's 1214 not -13.

MS. STOKMAN:  1213 is the report.

MS. DE SALES BARRETT:  Oh, the report.  Sorry.

BY MS. STOKMAN:

Q.  Uh-huh.  And you said it indicated he did?

A.  Yes.

Q.  Okay.  Did it indicate whether he did an internal examination?

A.  Yes, it does.

Q.  And did he?

A.  Yes, he did.

Q.  Okay.  Did Dr. Rogers find an injury or injuries to Roshanski's body?

A.  Yes, he did.

Q.  What type of jury?

DX, Glimjecki S

1567

A.   Head gunshot wound.

Q.   And how many gunshot wounds did Dr. Rogers find?

A.   Uh, he had one entry and one exit.

Q.   Was there anything --

MR. VILLA:   Your Honor, I apologize.   Do we still need to have the exhibit displayed to the jury?

THE COURT:   It's not displayed to the jury.

MR. VILLA:   I'm sorry.

BY MS. STOKMAN:

Q.   You said one entry and one exit?

A.   I believe so.

Q.   Was there anything significant about these wounds in terms of internal damage?

A.   Just the injury to the head and brain.

Q.   And why was that significant?

A.   That's what caused his death.

Q.   So that was a fatal injury?

A.   Correct.

Q.   Okay.

MS. STOKMAN:   If we can look at page 8 of Exhibit 1213.   And this is in evidence already.

BY MS. STOKMAN:

Q.   Does this page of the report indicate Dr. Rogers' findings as far as the wounds you just described?

A.   Yes.

DX: Glimjecki S

1568

Q.  Okay.

        MS. STOKMAN:  If we can show just the witness Exhibit 1216.

BY MS. STOKMAN:

Q.  Do you recognize this?

A.  Yes.

Q.  What is it?

A.  The back of the decedent's upper torso and head.

Q.  Is this another photograph that was within Dr. Rogers' file on this autopsy?

A.  Correct.

        MS. STOKMAN:  I'd ask to admit and publish Exhibit 1216.

        THE COURT:  Any objections?

        MS. DE SALES BARRETT:  No, Your Honor.

        MR. VILLA:  No objections.

        THE COURT:  Mr. Reed, any objections?

        MR. REED:  No objections, Your Honor.

        THE COURT:  It will be admitted.

    (Government's Exhibit 1216 was received.)

        MS. STOKMAN:  Can we also pull up just for the witness Exhibit 1218.

BY MS. STOKMAN:

Q.  Do you recognize this?

A.  Yes.

ER 897

1569

Q.   And what is this?

A.   This is the closer-up view of the head.

Q.   And is this another photograph from Dr. Rogers' file in this autopsy?

A.   Correct.

        MS. STOKMAN:  Ask to admit and publish Exhibit 1218.

        THE COURT:  Any objections?

        MS. DE SALES BARRETT:  No, Your Honor.

        MR. VILLA:  No.

        MR. REED:  No objection.

        THE COURT:  All right.  That will be admitted.

     (Government's Exhibit 1218 was received.)

BY MS. STOKMAN:

Q.   Doctor, what does this photo depict?

A.   Well, it depicts a gunshot wound to the head.  There's an area behind the left ear and the skin is shaved or the scalp is shaved, demonstrating that entry point for the bullet.

        MS. STOKMAN:  If we can show the witness only Exhibit 1219, please.

BY MS. STOKMAN:

Q.   Do you recognize this?

A.   Yes.

Q.   Is this one of the photographs within Dr. Rogers' file on this autopsy?

A.   Correct, yes, it is.

DX Glimiecki S

1570

MS. STOKMAN:  I ask that Exhibit 1219 be admitted and published.

THE COURT:  Any objections?

MS. DE SALES BARRETT:  No, Your Honor.

MR. VILLA:  No objection.

MR. REED:  No objection.

THE COURT:  It will be admitted.

(Government's Exhibit 1219 was received.)

BY MS. STOKMAN:

Q.  What does this photograph show?

A.  So this is the right side of his head.  Just above the ear, you can see there's a defect of the skin.  That's where the bullet exited.

Q.  Ultimately, after reviewing Dr. Rogers' report and other items in his file, did you make it -- did Dr. Rogers determine the cause of death for Mr. Roshanski?

A.  Yes.

Q.  And after reviewing his report, did you come to a conclusion about the cause of death?

A.  Yes.

Q.  What was your conclusion?

A.  Gunshot wound to the head.

Q.  And was that the same as Dr. Rogers?

A.  Yes.

Q.  Now I'm going to direct your attention to an autopsy

1571

conducted on October 13th, 2020, on an individual named Ruslan -- I'm going to spell his last name.  It's M-A-G-O-M-E-D-G-A-D-Z-H-I-E-V.  Was an autopsy performed on that individual on that date I described?

A.  Yes.

Q.  Did you personally perform that autopsy?

A.  No.

Q.  Who did?

A.  Dr. Augustine.

Q.  Was it Dr. Augustine or Dr. Rogers?  And if you need to refresh your recollection, you can.

A.  Can I refresh?

Q.  Sure.  If you want to look at the binder -- 1220 is the tab.  I'm sorry, 1221.

       I'm sorry, you are correct.  My notes were wrong.  I just looked at it, but if you want to confirm that it was Dr. Augustine.  That's my error.  I apologize for that.

A.  No worries.  It is -- thank you -- Dr. Augustine.

Q.  Sorry.  So it was Dr. Augustine.

       Where was that autopsy performed?

A.  At the Los Angeles Medical Examiner's Office.

Q.  And is Dr. Augustine still with the Los Angeles County Medical Examiner's Office?

A.  No.  He left for Washington State.  He works as a chief medical examiner there.

DX: Glimiecki.S

1572

Q.   Did Dr. Augustine prepare a report of the autopsy he performed on -- I'm going to call the victim by his first name because I don't want to mispronounce his last name -- Ruslan. Did he prepare a report?

A.   Yes, he did.

Q.   And was that report prepared in the normal course of his duties as a medical pathologist?

A.   Yes.

        MS. STOKMAN:  If we can put up Exhibit 1221 for the witness.

BY MS. STOKMAN:

Q.   Do you recognize this?

A.   Yes, I do.

Q.   What is this?

A.   This is the autopsy report prepared by Dr. Augustine at the time of the autopsy.

Q.   And you reviewed this report?

A.   Correct.

        MS. STOKMAN:  Ask that Exhibit 1221 be admitted and published to the jury.

        THE COURT:  Any objections?

        MS. DE SALES BARRETT:  No, Your Honor.

        MR. REED:  No objection.

        MR. VILLA:  No objection.

        THE COURT:  That will be admitted.

1573

(Government's Exhibit 1221 was received.)

BY MS. STOKMAN:

Q.   Were you able to determine in reviewing the report and other items within Dr. Augustine's file on this autopsy whether he followed the same process that you've described regarding autopsies?

A.   Yes, he did.

Q.   And does the report he prepared here in this exhibit contain his findings?

A.   Yes, it does.

Q.   Was an external examination done on -- during this autopsy?

A.   Yes.

Q.   Was an internal examination done?

A.   Yes.

Q.   Did Dr. Augustine find any injury or injuries to Ruslan's body?

A.   Yes, he did.

Q.   What type of injury?

A.   He had a gunshot wound to the head.

Q.   And how many gunshot wounds?

A.   He had one entry and one exit from the same bullet.

MS. STOKMAN:   If we can show just the witness Exhibit 1229, please.

///

DX. Glimiecki S

1574

BY MS. STOKMAN:

Q.  Do you recognize this?

A.  Yes, I do.

Q.  Is this one of the photographs that was within Dr. Augustine's file on this autopsy?

A.  Yes, it was.

MS. STOKMAN:  Ask to admit 1229 and publish to the jury.

THE COURT:  Any objections?

MS. DE SALES BARRETT:  No, Your Honor.

MR. VILLA:  No objection.

MR. REED:  No objection.

THE COURT:  That will be admitted.

(Government's Exhibit 1229 was received.)

BY MS. STOKMAN:

Q.  Can you tell us what's depicted in this photo?

A.  So this is a picture of the decedent's -- of the face and neck and upper chest.  Basically what it's showing is there's a reddish curricular mark on the left forehead above the left eyebrow, and that's where the entry gunshot wound is located.

MS. STOKMAN:  If we can show just the witness Exhibit 1226, please.

BY MS. STOKMAN:

Q.  Do you recognize this?

A.  Yes, I do.

1575

Q.  Is this another photograph from Dr. Augustine's file?

A.  Yes, it is.

MS. STOKMAN:  Ask to admit and publish Exhibit 1226.

THE COURT:  Any objections?

MS. DE SALES BARRETT:  No, Your Honor.

MR. VILLA:  No, Your Honor.

MR. REED:  No objections.

THE COURT:  It will be admitted.

(Government's Exhibit 1226 was received.)

BY MS. STOKMAN:

Q.  What does this photograph depict?

A.  So this is the back of the descendant, showing his torso and the head -- top of his head.  And you can see there's a large shaved area of the scalp exposing a skin defect, which is red, and that's where the bullet exited from the body in the back of the head.

Q.  Was there anything significant about these wounds in terms of internal damage?

A.  Yes.

Q.  And what was that?

A.  It caused a lot of damage to the skull and brain resulting in a rapid death.

Q.  So it was a fatal injury?

A.  Yes.

Q.  Ultimately, did Dr. Augustine determine the cause of death

1576

for Ruslan?

A.   Yes, he did.

Q.   And after reviewing his report and the rest of his file, did you come to a conclusion about the cause of death?

A.   Yes.

Q.   What was that?

A.   Died of a gunshot wound to the head.

Q.   Was that the same conclusion Dr. Augustine came to?

A.   Yes.

Q.   I'm going to now direct your attention to February 28th, 2022.

        Was an autopsy conducted of a person named Michael Brizendine on that date?

A.   Yes.

Q.   Did you personally perform that autopsy?

A.   I believe so, but I'm not too sure if it's Dr. Augustine's or myself's.

        Can I refer to the autopsy report?

Q.   Yes.  It's under Exhibit Number 1231.

        Which we can also put up just for the witness at this point.

A.   I'm having a hard time finding that under 1231.  You said 1231, correct?

Q.   Yes.

A.   Because when I go to 1231, it flips to 2287.

DX. Glimiecki.S

1577

MS. STOKMAN:  May I approach the witness?

THE COURT:  Yes.

THE WITNESS:  And that would be Dr. Augustine.

BY MS. STOKMAN:

Q.  Did he prepare a report of the autopsy he conducted?

A.  Yes, he did.

Q.  And again, was that prepared in the normal course of his duties as a medical pathologist?

A.  Yes, it was.

Q.  Looking at 1231, what is that?

A.  It's the autopsy report Dr. Augustine prepared on February 28th, 2022.

MS. STOKMAN:  Ask to admit Exhibit 1231 and publish to the jury.

THE COURT:  Any objections?

MS. DE SALES BARRETT:  No, Your Honor.

MR. VILLA:  No, Your Honor.

MR. REED:  No objections.

THE COURT:  It will be admitted.

(Government's Exhibit 1231 was received.)

BY MS. STOKMAN:

Q.  Doctor, did you review this report in 1231?

A.  Yes, I did.

Q.  And where did this autopsy take place?  And I apologize if I asked you that already.

1578

A.  Los Angeles County Medical Examiner's Office, also priorly known as the coroner's office.

Q.  Did -- in reviewing this report, did Dr. Augustine follow the same procedures that we've been describing as it pertains to how autopsies are conducted?

A.  Yes, he did.

Q.  Does his report mention -- or does it contain the findings of the autopsy he performed?

A.  Yes.

Q.  When Dr. Augustine examined Mr. Brizendine's body, did he do an external examination?

A.  Yes, he did.

Q.  Did he also do an internal examination?

A.  Yes, he did.

Q.  Did Dr. Augustine find an injury or injuries to Mr. Brizendine's body?

A.  Yes, he did.

Q.  What type of injury did he find?

A.  He found that the body had two separate gunshot injuries, one to the head and one to the right upper shoulder or arm.

Q.  And was there anything significant about the wound that he found to the head in terms of internal damage?

A.  Internal damage, yes, just severe -- again, like the previously cases, just extensive damage to the head, the skull, the brain.  Basically, nonsurvivable injuries.  Maybe

DX. Glimiecki S

1579

occasionally those injuries might be survivable, but in this one, this one is more severe and considered, in my opinion, rapidly fatal.

Q. The second gunshot wound that was in Mr. Brizendine's arm, was that a fatal injury?

A. Not as rapidly as the one to the head.

MS. STOKMAN: If we can show pages 2 -- I'm sorry, page 2 first of this exhibit. And now page 3, please.

BY MS. STOKMAN:

Q. Do pages 2 and 3 of Exhibit 1231 contain the findings related to those two wounds?

A. Yes, they do.

MS. STOKMAN: If we can show the Exhibit 1239 just to the witness, please.

BY MS. STOKMAN:

Q. Do you recognize this?

A. Yes, I do.

Q. Is this one of the photographs included in Dr. Augustine's file on this autopsy?

A. Yes, it is.

MS. STOKMAN: If we can admit and publish 1239 to the jury, please.

THE COURT: Any objections?

MS. DE SALES BARRETT: No, Your Honor.

MR. VILLA: No.

1580

MR. REED:  No objection.

THE COURT:  All right.  That will be admitted.

(Government's Exhibit 1239 was received.)

THE COURT:  After this, Ms. Stokman, we do need to take a break.

MS. STOKMAN:  Okay.

BY MS. STOKMAN:

Q.  What are we looking at in this photograph?

A.  Uh, this is the decedent Brizendine.  I don't know if I'm mispronouncing, and I'm sorry.

Yes, this is just a picture of him for identification.  You can also see there's a little blue tag and that has that unique identifier and ruler.

THE COURT:  All right.  Ladies and gentlemen, let's go ahead and take a break.  We will be returning, let's say, at five minutes to 10:00.  Thank you very much.

(Jury exits the courtroom at 9:37 a.m.)

THE COURT:  All right.  Anything for the record at this time?

MS. STOKMAN:  Nothing from the government.

THE COURT:  All right.  Let's take go ahead and take our break.

(Recess held.)

THE COURT:  All right.  Is everyone ready?

All right.  Let's go ahead and call the jury back in.

1581

(Jury enters the courtroom at 9:55 a.m.)

THE COURT:  All right.  We have all of our jury members back.

Ms. Stokman, you may continue.

MS. STOKMAN:  Yes.  If we can show Exhibit 1240 to the witness only, please.

BY MS. STOKMAN:

Q.  If you can look in the binder while we're getting this set up for 1240 and just tell us if you recognize what 1240 is.

A.  1240.  Do you want me to start or --

Q.  Do you have it in front of you?  Do you recognize what that is?

A.  The photograph, yeah.  Yes, I do.

Q.  And is that one of the photographs within the full file for the autopsy we were speaking about before the break?

A.  Yes.

MS. STOKMAN:  Ask to admit and publish Exhibit 1240.

THE COURT:  Any objections?

MS. DE SALES BARRETT:  No, Your Honor.

MR. VILLA:  No, Your Honor.

MR. REED:  No objection, Your Honor.

THE COURT:  That will be admitted.

(Government's Exhibit 1240 was received.)

BY MS. STOKMAN:

Q.  What are we looking at in this photograph?

DX, Glimjecki S

1582

A.   This is the decedent.  And this just shows the right side of his body, right side of his face and the right arm -- upper arm and right chest area.

Q.   And are one of the injuries that we spoke of before, can you see one of those in this photograph?

A.   Yes.

Q.   And can you tell us what that injury is?

A.   So on a -- above that tattoo in that blue ID ruler, there's a curricular skin defect.  That's considered gunshot wound Number 2 to the arm.

It's not necessarily gunshot wound Number 2.  They're arbitrarily -- typically arbitrarily numbered from top to bottom.  So like the head would be Number 1 and this would be Number 2 just sequentially.  But that doesn't mean that was received in that order.  It could be 1 or it would be 2 of the order.

But anyway, this is a gunshot wound injury to the right arm.  You can see that defect just above that right -- that blue ruler or ID tag.

MS. STOKMAN:  Now if we can show just for the witness 1248, please.

BY MS. STOKMAN:

Q.   When this comes up, do you recognize this photograph?

A.   Yes.

Q.   Is this one of the photographs that was within

1583

Dr. Augustine's file in this autopsy?

A.  Yes.

        MS. STOKMAN:  Ask to admit and publish 1248.

        THE COURT:  Any objections?

        MS. DE SALES BARRETT:  No, Your Honor.

        MR. REED:  No objection.

        MR. VILLA:  No, Your Honor.

        THE COURT:  That will be admitted.

    (Government's Exhibit 1248 was received.)

BY MS. STOKMAN:

Q.  Can you tell us what we're seeing in this photograph?

A.  So this is basically a gunshot wound to the -- almost to the top of the head, kind of like near the border of the forehead and the top of the head.  Basically, it's a gunshot wound entry.

Q.  Was this the wound that we were talking about before that was the fatal injury?

A.  Yes.

        MS. STOKMAN:  Now if we can show for the witness only, please, 1249.

BY MS. STOKMAN:

Q.  When this pops up, can you tell us if you recognize this photograph?

A.  Yes, I can.

Q.  And is this a photograph within Dr. Augustine's file on

1584

this autopsy?

A.  Yes.

Q.  Can you -- I'm sorry.

MS. STOKMAN:  Ask to admit and publish 1249, please.

THE COURT:  Any objections?

MS. DE SALES BARRETT:  No, Your Honor.

MR. REED:  No objection, Your Honor.

MR. VILLA:  No, Your Honor.

THE COURT:  Okay.  Admitted.

(Government's Exhibit 1249 was received.)

BY MS. STOKMAN:

Q.  Doctor, is this the same injury that we were just looking at in the other photograph in 1248?

A.  Yes, this is the same gunshot wound to the head.

Q.  Is there something significant in this photograph that's -- that you can view more easily than the other photograph?

A.  Yes.

Q.  What is that?

A.  So if you look at that area of shaved skin, it exposes the gunshot wound.  And if you notice, there's some dark pigmentation surrounding that wound.  That's what, as a medical examiner, we would consider as soot, just meaning that the gun was in close proximity to the skin.

When a gun is fired, the powder burns.  Just like

1585

when you burn a piece of paper, you get that black residue. So when the gun is fired, the propellant burns up and produces that black residue.

So in order for it to be deposited on the skin, it has to be close, the end of the barrel has to be close to the skin.

MS. STOKMAN:  We can take that down.  Thank you.

BY MS. STOKMAN:

Q.  Did Dr. Augustine come to a determination as to the cause of death for Mr. Brizendine in his report?

A.  Yes, he did.

Q.  And after reviewing his report and his entire file on this autopsy, did you come to a conclusion about the cause of death?

A.  Yes.

Q.  What was that?

A.  I would say multiple gunshot wounds.

Q.  And was that the same as Dr. Augustine's conclusion?

A.  He said gunshot wound to the head.  But in my opinion, when you have a second gunshot wound, even though it doesn't sever any major organs, it's still, in my opinion, contributory to the cause of death.  So in my opinion, it would be multiple gunshots wounds.

Q.  Do you know whether or not Dr. Augustine recovered any bullets from Mr. Brizendine's body?

DX: Glinjecki.S

1586

A.   He recovered two different bullets.

Q.   Do you know, generally, where those were recovered?

A.   One from the -- near the back of the head, kind of near where the skull meets the neck or the cervical vertebrae.  The bullet kind of passed into that region towards the back, causing damage to the proximal cervical spinal cord and the proximal cervical vertebrae, which is just right underneath the skull itself and just kind of closely approximates.

     So that's where the bullet was discovered.

Q.   And the second one?

A.   Uh, that was recovered from near the scapula.  So that's what -- it fractured the scapula, so it's kind of from the back.

Q.   I'm now going to direct your attention to an autopsy performed on a person named James Yagle on March 10, 2022.  Are you aware of that autopsy?

A.   Yes.

Q.   And who conducted that autopsy?

A.   I did.

Q.   In conducting Mr. Yagle's autopsy, did you follow the same process that we've been describing, as far as autopsies, as you've described today?

A.   Yes.

Q.   After conducting the autopsy, did you create a report with your findings?

1587

A.   Yes.

Q.   And did you create this report in the normal course of your duties as a forensic pathologist?

A.   Yes.

MS. STOKMAN:  If we can show the witness Exhibit 1270, please.

BY MS. STOKMAN:

Q.   Do you recognize what's in Exhibit 1270?

A.   Yes.

Q.   What is that?

A.   This is an autopsy report I prepared after concluding my autopsy examination.

Q.   And that's of Mr. Yagle?

A.   Yes.

MS. STOKMAN:  Ask to admit 1270 and publish to the jury, please.

THE COURT:  Any objections?

MS. DE SALES BARRETT:  No, Your Honor.

MR. VILLA:  No, Your Honor.

MR. REED:  No objections.

THE COURT:  That will be admitted.

(Government's Exhibit 1270 was received.)

BY MS. STOKMAN:

Q.   When you examined Mr. Yagle's body, where did you conduct the autopsy?

DX. Glimjecki S

1588

A. Los Angeles County Medical Examiner's Office -- or Coroner's Office.

Q. When you examined Mr. Yagle's body, did you do an external examination?

A. Yes.

Q. And did you also do an internal examination?

A. Yes.

Q. Did you find any wounds on Mr. Yagle's body?

A. Yes.

Q. And what are those?

A. He had a gunshot wound to his chest, upper chest, right side.

        MS. STOKMAN:  If we can show just the witness, please, Exhibit 1273.

BY MS. STOKMAN:

Q. Do you recognize this photograph?

A. Yes, I do.

Q. And what -- what is this photograph?

A. Basically, this is a photograph of the decedent, right -- predominantly on the right side, showing his head and upper torso.

Q. Did you take this photograph?

A. No.  One of our criminal -- not criminalists, but one of our senior technicians took it.

Q. And was this photograph taken during the course of your

DX. Glimjecki S

1589

performance of the autopsy in this case?

A.  Yes.

MS. STOKMAN:  Ask to admit and publish 1273, please.

THE COURT:  Any objections?

MS. DE SALES BARRETT:  No, Your Honor.

MR. VILLA:  No, Your Honor.

MR. REED:  No, Your Honor.

THE COURT:  That will be admitted.

(Government's Exhibit 1273 was received.)

BY MS. STOKMAN:

Q.  Doctor, you mentioned that this is the right side of Mr. Yagle's body.  Is there something significant in the photograph pertaining to the injuries that you found?

A.  Yes.

Q.  What is that?

A.  On the right side of the body just above the right breast, you can see that there's a skin defect, kind of orange-red circular.  That's where the bullet entered into the body.

MS. STOKMAN:  And if we can show just for the witness, please, Exhibit 1274.

BY MS. STOKMAN:

Q.  Is this another photograph that was taken during your autopsy of Mr. Yagle?

A.  Yes.

MS. STOKMAN:  Ask to admit 1274 and publish to the

1590

jury, please.

THE COURT:  Any objections?

MS. DE SALES BARRETT:  No, Your Honor.

MR. VILLA:  No, Your Honor.

MR. REED:  No, Your Honor.

THE COURT:  That will be admitted.

(Government's Exhibit 1274 was received.)

BY MS. STOKMAN:

Q.  Dr. Gliniecki, is this just a closer view of that bullet entry injury?

A.  Yes.

Q.  Okay.

MS. STOKMAN:  And we can take that down, please.

BY MS. STOKMAN:

Q.  Is there any significance to this gunshot wound in terms of internal damage?

A.  Yes.

Q.  And what was that?

A.  This gunshot wound perforated the right lung, which would cause rapid blood loss into the chest cavity or outside into the environment through the entry wound, and hits the spinal column T4, which would cause probable paralysis of the lower extremities.

But the most fatal etiology is the perforation of the right lung, which is just caused massive blood loss and death

DX. Gliniecki.S

1591

in minutes.

Q.   During the course of your autopsy of Mr. Yagle, did you find any bullets within his body?

A.   Yes.

Q.   How many?

A.   One.

MS. STOKMAN:  If we can show just the witness, please, 1278.

BY MS. STOKMAN:

Q.   Do you recognize this photograph?

A.   Yes.

Q.   And was this photograph taken during the course of the performance of your autopsy on Mr. Yagle?

A.   Yes.

MS. STOKMAN:  Ask to admit and publish 1278.

THE COURT:  Any objections?

MS. DE SALES BARRETT:  No, Your Honor.

MR. VILLA:  No, Your Honor.

MR. REED:  No, Your Honor.

THE COURT:  That will be admitted.

(Government's Exhibit 1278 was received.)

BY MS. STOKMAN:

Q.   Dr. Gliniecki, what's portrayed in this photograph?

A.   So after the autopsy and recovery of the projectile, I typically photograph the bullet.  And this is just

DX: Glimiecki S.

1592

documentation to prove that I recovered a bullet and this is the bullet.

Q.   Ultimately, what was your determination about the cause of death for Mr. Yagle?

A.   He died of a gunshot wound to the chest.

Q.   Directing your attention now to your work as it relates to an autopsy performed on March 11, 2022, on a person named Ronnie Ennis, did you, in fact, perform that autopsy on that day?

A.   Yes.

Q.   And in conducting that autopsy, did you follow the same procedures that we've been speaking about here today, as far as autopsies are performed?

A.   Correct.

Q.   After conducting that autopsy, did you create a report with your findings?

A.   Yes.

Q.   And was that report prepared during the course of your duties as a medical pathologist?

A.   Yes.

       MS. STOKMAN:  If we can show 1252 to the witness, please.

BY MS. STOKMAN:

Q.   Is this your report for the Ennis autopsy?

A.   Yes, it is.

1593

MS. STOKMAN:  Ask to admit 1252 and publish to the jury.

THE COURT:  Any objections?

MS. DE SALES BARRETT:  No, Your Honor.

MR. VILLA:  No, Your Honor.

MR. REED:  No, Your Honor.

THE COURT:  That will be admitted.

(Government's Exhibit 1252 was received.)

BY MS. STOKMAN:

Q.  Doctor, when you examined Mr. Ennis's body, where did you conduct that autopsy?

A.  At the Los Angeles County Medical Examiner's Office, or Coroner's Office.

Q.  When you examined Mr. Ennis' body, did you do an external examination of the body?

A.  Yes.

Q.  Did you also perform an internal examination of the body?

A.  Yes.

Q.  Did you find any wounds on Mr. Ennis's body?

A.  Yes.

Q.  What kind of wounds did you find?

A.  He had multiple gunshot wounds and --

Q.  Do you recall how many?

A.  He had ten entry wounds.

Q.  Were those wounds located on different areas of

DX. Glimiecki.S

1594

Mr. Ennis's body?

A.   That is correct, on the torso and upper and lower extremities.

Q.   So --

     MS. DE SALES BARRETT:  Sorry.  Your Honor, I couldn't hear the last answer.

     THE WITNESS:  Oh, to the torso and upper and lower extremities.

     MS. DE SALES BARRETT:  Thank you.

     MS. STOKMAN:  If we can go to page 13, please, of this Exhibit 1252.

BY MS. STOKMAN:

Q.   This -- your report labels a Gunshot Wound Number 1.  Can you tell us what that was?

A.   What -- with --

Q.   Where that was -- yes.  Sorry.

A.   Yes.  So he had a gunshot wound to the left upper chest. And basically that's where the entry wound -- there was no exit wound.

Q.   Is there anything significant regarding this wound to internal damage?

A.   Uh, yes.  This one caused a lot of damage to the internal organs, to the left lung, resulting in blood loss.

Q.   So would you consider this a fatal injury?

A.   Correct.

ER 923

DX- Glimiecki S

1595

MS. STOKMAN:  And let's look at page 14, please, of the same exhibit.

BY MS. STOKMAN:

Q.   This you have labeled Gunshot Wound Number 2.  Can you tell us if there's anything significant about this wound as far as where it was on the body and any internal damage?

A.   So this was on the right upper chest and exited on the left lateral chest.  This bullet is considered contributory to the cause of death.  I would have to refer to the report to see what actual damage happened along the path of the bullet, if that's okay.

Q.   Yeah, that's okay, if that would refresh your recollection.

A.   So this entered the right lung, also the heart, and the left lung.  This would, again, cause rapid blood loss and rapid death.

MS. STOKMAN:  Now, if we can look at page 16 of Exhibit 1252, please.

BY MS. STOKMAN:

Q.   And, I'm sorry, on the actual exhibit, this would be under Bates Number 21795.

Doctor, this is what you described as Gunshot Wound Number 3.  Was there any significance to where this wound was on the body and any internal damage?

A.   This is to the upper back left where your scapula is,

1596

where the bone at the back, upper back is.  This wound penetrated through the body and exited.  This one just caused major damage to the left lung and small bowel and colon.  Small bowel and colon are less fatal than the injury to the left lung.

With immediate medical intervention, it's -- if this was the only gunshot wound, it might possibly survive if -- if it's just -- but this one, again, just caused rapid blood loss.

Q.  And now looking at page 17 of Exhibit 1252, you labeled this as Gunshot Wound Number 4.  Was there anything significant about where this wound was on the body to any internal damage?

A.  This one is on the right lateral upper chest and exits on the right axillary region.  This wound is not considered as rapidly fatal as the other ones I just described.  This one just goes through soft tissue and bone, but, in my opinion, it's still contributory just because, the more holes you put into a body, the more it bleeds and the more rapidly you're going to succumb to that blood loss.

MS. STOKMAN:  Now, if we can go to page 18 please, of 1252.

BY MS. STOKMAN:

Q.  Here you document a Gunshot Wound Number 5.  Can you tell us where this was located on the body and if there was any

1597

significance to internal damage?

A.   So this one was on the right biceps.  This is basically skin and muscle and smaller blood vessels.  Again, this one exited on the inner biceps.

In my opinion, this is contributory, same reason I just spoke of before, just you put more holes in a body, the more bleeding is going to happen and lead to death, but in itself and by itself, it's probably not that fatal, but I still list it as a contributory injury but not rapidly fatal.

MS. STOKMAN:  Now, if we can look at page 19 of Exhibit 1252.

BY MS. STOKMAN:

Q.   In this you document a Gunshot Number 6.  Was there anything significant as far as internal damage or where this was located on the body?

A.   This was on the left arm, the forearm, and then the bullet is -- it reenters and reexits and reenters, and a bullet is recovered from the left arm.  Again, this is just an injury to soft tissue and muscle.  This is probably one of the least injurious gunshot wounds because it just does soft tissue and muscle and it's not considered a rapidly fatal wound.

MS. STOKMAN:  If we can go to page 20, please, of 1252.

BY MS. STOKMAN:

Q.   Here you -- in your report you document Gunshot Wound

ER 926

DX: Glimjecki, S

1598

Number 7.  Can you tell us about this wound?

A.  This is on the left medial forearm.  Again, there's no exit wound.  The bullet's recovered.  This is, again, not as deleterious or harmful as the other gunshot wounds previously described, but, still, it's one of the contributing injuries.

Q.  And also on the same page is Gunshot Wound Number 8.  Can you explain that to us, please?

A.  This one's located on the left wrist and exits on the mid-wrist.  Again, this one is just going through soft tissue and muscle and is not that rapidly fatal.

Q.  Looking at page 21 of 1252, this is where you document Gunshot Wound Number 9.  Can you tell us about that wound?

A.  This one is located on the right leg, just above the knee, and exits on the -- around the inner knee region.  This bullet just passes through soft tissue and muscle and is not considered a rapidly fatal wound.  Similar to the ones I just described, it's just muscle and soft tissue, not a rapidly fatal wound.

MS. STOKMAN:  And, lastly, please, can we go to page 22 of Exhibit 1252.

BY MS. STOKMAN:

Q.  This is where you describe Gunshot Wound Number 10.  Can you tell us about this?

A.  This one enters into the posterior right leg.  This one just entered soft tissue and muscle and is not considered a

ER 927

1599

rapidly fatal wound.

Q.  And, again, you had mentioned this in a previous autopsy, but the numbering value of how you designate Gunshot Wound Number 1 through 10, that does not have any significance as far as what wound Mr. Ennis actually received first or last; is that correct?

A.  That is correct.

Q.  Okay.  Did you determine whether there were any other external injuries on this body?

A.  He had some abrasions to his head and a laceration, top of his head.  There's some minor injuries associated with the gunshot wounds.  But other than that, there's not a whole lot of other significant traumatic injuries.

        MS. STOKMAN:  If we can show just for the witness, please, 1255.

BY MS. STOKMAN:

Q.  Do you recognize this photograph?

A.  Yes, I do.

Q.  Is this a photograph taken during the performance of your autopsy on Mr. Ennis?

A.  Yes.

        MS. STOKMAN:  Ask to admit 1255 and publish to the jury.

        THE COURT:  Any objections?

        MS. DE SALES BARRETT:  No, Your Honor.

1600

MR. VILLA:  No, Your Honor.

MR. REED:  No, Your Honor.

THE COURT:  That will be admitted.

(Government's Exhibit 1255 was received.)

BY MS. STOKMAN:

Q.  Can you show us or tell us in this photograph if any of the fatal wounds or significant wounds that you just discussed are located within the photograph?

A.  Yes.  Near the midline.  You can see that there's some defects there.

Q.  And you can actually draw a circle around that on the screen.

A.  Okay.

Q.  So you're circling what appears to be a reddish dot in the middle of photograph on the victim's back; is that correct?

A.  Correct.

Q.  Okay.

MS. STOKMAN:  If we can now look at, just for the witness, Exhibit 1263, please.

BY MS. STOKMAN:

Q.  Do you recognize this photograph as one taken during the performance of your autopsy of Mr. Ennis?

A.  Yes.

MS. STOKMAN:  Ask to admit and publish 1263.

THE COURT:  Any objections?

1601

MS. DE SALES BARRETT:  No, Your Honor.

MR. VILLA:  No, Your Honor.

MR. REED:  No, Your Honor.

THE COURT:  That will be admitted.

(Government's Exhibit 1263 was received.)

BY MS. STOKMAN:

Q.  Doctor, as far as any of the fatal or significant wounds that you mentioned, are any of those represented in this photograph?

A.  Yes, they are.

Q.  And can you circle that, please?  And what is that wound?

A.  An exit wound.

Q.  And what you circled, is that part of the victim's internal organ?

A.  Yes.  The injury to the abdomen when the bullet exited, it caused a defect in the abdominal skin.  So the pressure of the abdominal content is it is being pushed out.  It's typical. So that's just -- it looks like part of the bowel protruding, but that's just something that happens when you have an injury to the -- it's like a hernia, it just kind of pushes out.

Q.  Was there another wound in this photograph that's significant?

A.  Yes.  Here and here.

Q.  So you've circled two wounds at the upper right-hand location of the photograph that appeared to be on the victim's

DX: Glimiecki-S

1602

left chest area; is that correct?

A.   That is correct.

Q.   Can you tell us what those wounds indicate?

A.   Uh, the top wound is a Gunshot Wound Number 1 entry and the exit of Gunshot Wound Number 2 below the left nipple.  And also there's injuries to the arm.  This is the one that I said exited and reentered and exited to the left arm.

Q.   And you're circling the injuries that are above that blue placard, correct?

A.   Correct.

Q.   Okay.

     MS. STOKMAN:  If we can take that down and just show on Exhibit 1252, which has already been admitted and published, at page 38, please.

BY MS. STOKMAN:

Q.   What does this diagram from your autopsy report depict?

A.   So after conclusion of the autopsy, I tried to make sense of it, just try and draw out where the different gunshot wounds entered and exited, not so much for myself, but just for people that would be investigating the case, so they can see how the relationship of those different gunshot wounds are.

     So I just, to the best of my ability, I just try to diagram where the bullets are passing, where they are exiting, and also, on the top, you can see that scribble, which is just

ER 931

1603

my mentioning of the direction of those wound paths.

Q. In this photograph, can you tell where any exit wounds would have occurred?

A. Yes.

Q. Can you show us where those are?

A. Sure.

The ones with the arrows at the ends, those would be the exits. So it would be like this one.

Q. And is there just --

A. Sorry.

Q. -- you're circling the arrows that are pointing outward --

A. Yeah, I know. Could you erase that?

Q. Yeah.

A. Sorry. My finger is not that good.

Okay. So this is an exit here. Sorry.

Q. No, that's okay.

A. And then exit here. Exit here and exit here. I'm sorry. I'm terrible at this.

Q. So just for the record, you're circling the arrows like you indicated that are pointing away from the body?

A. Correct.

Q. Is there any way in this diagram to see what corresponding entry wounds are associated with those?

A. Yes. Do I use a different color or is it --

Q. If you want to just explain how we would match those up,

DX. Glimiecki.S

1604

maybe that would be easy at first?

A.   Okay.  Sure.

So like Gunshot Wound Number 1 to the upper chest, that is just an entry.  Neck and below is the exit, but that -- yeah, let me start over.

So on the left upper chest, you can see there's a wider arrow.  That's where the bullet enters, so that's the entry.

Over on the right chest, you can see where there's an entry, like a triangle, coming into the chest.  If you follow it out, it exits on -- where I -- near where that yellow circle is.  So that's what that is.

Gunshot Wound Number 3 you can see is to the back, left upper back, and you can see this is a dotted line, so that just represents passing through the body and it stops. So that's where bullet 3 covered because there's no arrow exiting.

Gunshot Wound Number 5 enters in the arm and exits through the inner biceps.

Number 9 enters at the back of right leg and it exits.  Number 9 you can see entering into the body and exiting, and Number 10 enters into the back of the leg.  It doesn't go anywhere, no bullet's recovered, it probably fell out.

And this right here just represents where a

1605

projectile is recovered.  It's just this asterisks, it just
represents where bullet's recovered.

Q.  And those are asterisks -- sorry -- that you indicated on
the body itself, correct?

A.  Right.

Q.  Okay.  So it's fair to say that you found bullets within
Mr. Ennis's body during the course of your autopsy?

A.  Correct.

        MS. STOKMAN:  If we can show just the witness
Exhibit 1269, please.

BY MS. STOKMAN:

Q.  Do you recognize this photograph?

A.  Yes.

Q.  And was this photograph taken during the course of
autopsy?

A.  Correct.

        MS. STOKMAN:  Ask to admit 1269 and publish for the
jury.

        THE COURT:  Any objections?

        MS. DE SALES BARRETT:  No, Your Honor.

        MR. VILLA:  No, Your Honor.

        MR. REED:  No objection.

        THE COURT:  That will be admitted.

    (Government's Exhibit 1269 was received.)

BY MS. STOKMAN:

DX: Glimiecki S

1606

**Q.** Doctor, are these bullet fragments or the bullets that you obtained from Mr. Ennis's body?

**A.** Yes.

**Q.** Approximately how many did you find?

**A.** Four bullets.

**Q.** At the end of your autopsy, did you come to a determination about the cause of death for Mr. Ennis?

**A.** Multiple gunshot wounds.

MS. STOKMAN:  Thank you.  I have no further questions.

THE COURT:  Any cross-examination?

MS. DE SALES BARRETT:  No, Your Honor.

MR. REED:  No questions, Your Honor.

THE COURT:  All right.  May this witness be excused?

MR. VILLA:  No questions, Your Honor.

MS. STOKMAN:  Yes, Your Honor.

MS. DE SALES BARRETT:  Yes, Your Honor.

MR. VILLA:  Yes.

MR. REED:  Yes, Your Honor.

THE COURT:  All right.  Thank you, Doctor, you may step down.

THE WITNESS:  All right.  Thank you.

THE COURT:  Next witness.

MS. STOKMAN:  Government calls Kaylen Chandler.

THE WITNESS:  Do you want me to leave these up here

1607

or --

MS. STOKMAN:  I'll take that from you.

THE CLERK:  Please raise your right hand.

KAYLEN CHANDLER,

called as a witness on behalf of the Government, having been

first duly sworn, testified as follows:

THE WITNESS:  Yes, ma'am.

THE CLERK:  Go ahead and take a seat, and then please

state your full name for the record and spell your last name.

THE WITNESS:  Kaylen Chandler, C-h-a-n-d-l-e-r.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MS. STOKMAN:

Q.  Good morning.

A.  Good morning.

Q.  Where are you originally from?

A.  Lancaster, California.

Q.  And is that within the LA area of California?

A.  Yes.

Q.  How long have -- did you live in Lancaster?

A.  Uh, 35 years.

Q.  Did you know an individual named Michael Brizendine?

A.  I did.

Q.  How did you know him?

A.  He was my boyfriend.

DX Chandler-S

1608

Q. Around when did you meet him?

A. Middle of '21. We did go to school together, but we weren't -- like, I knew of him, but that was it. We reconnected and starting hanging out more in '21, middle of '21.

Q. And that's 2021, right?

A. Yes.

Q. Okay. Around February 2022, did you -- were you dating him then?

A. Yes.

Q. Kaylen, do you know what the Aryan Brotherhood is?

A. Yes.

Q. What is that?

A. It is a white supremacist gang, prison gang.

Q. Have you ever spoken with anyone who's associated with the Aryan Brotherhood, or the AB?

A. Yes.

Q. And who have you spoken to that has AB affiliation?

A. Daniel Rubin.

Q. And does he have a nickname?

A. Yes.

Q. What is that?

A. Nutty.

Q. Who else, if anyone?

A. Yes.

ER 937

1609

Q.   Who?

A.   Dale, uh, Jayson, Frank, and Waylon.

Q.   Do you know Dale's last name?

A.   Bridges.

Q.   And do you know Jayson's last name or --

A.   Weaver.

Q.   -- nickname?

Sorry?

A.   Beaver.

Q.   Do you know if he goes by any nicknames?

A.   Beaver.

Q.   What about Frank, do you know his name?

A.   I just know Frank.

Q.   And Waylon?

A.   Just Waylon.

Q.   Of those individuals, are any of them AB members as far as you know?

A.   Yes.

Q.   Which ones?

A.   Weaver, Frank, Waylon, and Dale.

Q.   And is -- Ruben, what would you consider him as far as it relates to the AB?

A.   A very -- I'm --

Q.   Let me ask it this way:  Would you consider him an AB associate?

DX Chandler-S

1610

A.   Yes.

Q.   Did you know -- and how long have you known Nutty?

A.   Uh, well, a few years, like five.

Q.   So -- I'm sorry.

A.   About five.

Q.   All of these people that you've mentioned you said that you've spoken with, was there anyone outside of these or within these five names that you were not speaking with around February or March of 2022?

A.   Dale.

Q.   Okay.  When had you spoken with Dale besides that time?

A.   It had been a while.  I'm not exactly sure how long.

Q.   So prior to 2022?

A.   Yeah, just about.

Q.   Okay.  Do you know an individual named James Field?

A.   Yes.

Q.   Do you know if he goes by any nicknames?

A.   Suspect.

Q.   Did you know James Field in February of 2022?

A.   Yes.

Q.   Have you ever committed crimes on behalf of the AB?

A.   No.

Q.   Have you ever committed crimes that benefitted the AB in some way?

A.   Uh, I mean, no.

DX Chandler S

1611

**Q.** So when you kind of hesitate, why don't you tell us, have you ever committed crimes around the time period of early 2022?

**A.** Yes.

MR. REED: Relevance.

THE COURT: I'm not sure what the relevance is at this point, Ms. Stokman.

MS. STOKMAN: I'll rephrase the question.

THE COURT: Okay.

BY MS. STOKMAN:

**Q.** Had Daniel Rubin, or Nutty, ever asked you to do anything unlawful?

**A.** Yes.

**Q.** What did he ask you to do?

**A.** Uh, to basically hook some of the people that have came out of prison with drugs.

**Q.** And did you do that for him?

**A.** Yes.

**Q.** When you did that, did you receive any profits?

**A.** No.

**Q.** Did Jason Weaver, or Beaver, ever ask you to do anything unlawful?

**A.** Yes.

**Q.** What did he ask you to do?

**A.** He had told me at one point he had profiles for me to look

DX Chandler S

1612

at and work with.

Q.   And can you explain, what is a profile?

A.   Fraud.

Q.   So committing fraud with someone else's identify?

A.   Yes, yes.

Q.   And did you do that for him?

A.   Nothing came of it, no.

Q.   And Frank, did he ever ask you to do anything unlawful?

A.   Yes.

Q.   What did he ask you to do?

A.   Profiles.

Q.   And did you do anything with those?

A.   No.

Q.   You, yourself have some felony convictions in your past, right?

A.   Yes.

Q.   Do you have felony convictions for possessing drugs and possessing drugs for sale?

A.   Yes.

Q.   And for forgery?

A.   Yes.

Q.   Do you also have a felony conviction for fraudulently using credit cards or identification cards?

A.   Yes.

Q.   And what about for felony theft?

1613

A.  Yes.

Q.  As you sit here today, are you here with a letter of immunity?

A.  Yes.

Q.  And what does that mean to you?

A.  That anything I say cannot incriminate me.

Q.  As you testify here today?

A.  Yes.

Q.  Okay.  I'm going to direct your attention now to the time frame around February 20, 2022.

A.  Okay.

Q.  Did you see James Field around this time?

A.  Yes.

Q.  What were the circumstances of that?

A.  He was at my house.

Q.  And do you recall around what dates he was at your house specifically?

A.  He had been there for a few days prior to leaving. Probably a week about, give or take.

Q.  And at some point around February 20th, did he leave your house?

A.  Yes.

Q.  And do you remember what day he left?  What date?

A.  It was probably the 20th, the night of the 20th.

Q.  Did he --

1614

A.   Or the 21st, I'm sorry.

Q.   The night of the 20th or 21st?

A.   Yeah, one of those nights.  I'm not -- it was one of those nights.

Q.   When he left your house on one of -- the 20th or 21st, did he leave -- did anyone else go with him when he left?

A.   Yes.

Q.   Who?

A.   Michael.

Q.   Does Michael have a nickname that you're aware of?

A.   I mean, Bam Bam -- or, I'm sorry, Corn Fed, yes.

Q.   After Michael left with James Field around February 20th or 21st, did you see Michael again after that day?

A.   Yes.

Q.   When did you see him again?

A.   The next night.

Q.   And was there a particular reason why he came back to your house that night?

A.   Because we were fighting.

Q.   And did he eventually leave your house?

A.   Yes.

Q.   Do you recall when he left after --

A.   The morning of the 22nd.

Q.   Okay.  Was -- did you see Michael ever after he left your house the morning of the 22nd?

1615

A.   Yes.

Q.   And when you say "yes," can you tell us -- well, let me ask it this way:  Did he ever come back to your house?

A.   No.

Q.   When you left your house on the 22nd, do you know where he was headed?

A.   To Long Beach.

Q.   And do you know -- actually, let me ask you this.

On the night of February 22nd -- so you said he left that morning -- on that night, did you speak with Michael?

A.   Uh, a couple times, yes.  Like, evening, like around 5:00, 6:00, evening.

Q.   What way did you communicate with him when you spoke with him?

A.   Over the phone.

Q.   Do you know where he was while you were speaking to him that night?

A.   One time was he was coming through the canyons or the mountains on his way home.  The other time, I have no idea.

Q.   But did he ever make it home when he said he was on his way?

A.   No.

Q.   During that night, February 22, 2022, did you attempt to contact Michael beyond what you just told us?

A.   Yes.

1616

Q. And were you able to get ahold of him?

A. No.

Q. At some point, did you learn where Michael was?

A. Yes.

Q. And around when did you learn that?

A. Probably around five o'clock in the morning the next morning.

Q. The 23rd?

A. Yes.

Q. Okay. And how did you learn where he was?

A. Uh, he had one of my phones, so I was able to get into the email, and I was able to do the Google location and track my phone to where he was.

Q. Was there a particular reason why you tracked where he was?

A. I was mad at him.

Q. Okay.

A. Yeah.

Q. And did you think he was doing something that you weren't going to be happy about?

A. Absolutely. I thought he was cheating.

Q. So you located his location because he was using your phone, you said. Did you recognize where that location was showing up?

A. Yes.

DX Chandler-S

1617

Q.  And what was that location?

A.  A female's house.

Q.  Did you know that person?

A.  I did.

Q.  At any point, did you yourself go out to that location?

A.  I did.

Q.  Was that around the early morning hours of the 23rd that you mentioned?

A.  Yes.

Q.  Had you been to that house before?

A.  Yes.

Q.  What, if anything, did you see when you arrived at the location?

A.  Normal things:  cars out front, cars in the driveway, the truck sitting out front.

Q.  When you say "the truck," what truck do you mean?

A.  The red truck.

Q.  Whose truck was that?

A.  Michael's.  The one Michael was driving.

Q.  Okay.  And what, if anything, did you do when you saw that truck in front of the house?

A.  Threw my car -- threw my e-brake on, got out of my car, and threw open the passenger side door of the truck.

Q.  Were you upset at this point?

A.  Absolutely.

DX Chandler S

1618

Q.   What, if anything, were you doing that showed you were upset?

A.   I started yelling.

Q.   And then what, if anything, did you observe?

A.   No movement.

Q.   So he wasn't moving?

A.   No.

Q.   Okay.  Did you recognize or know what had happened to him at that point?

A.   No.

Q.   What did you do?

A.   I touched him.  Nothing.  Freaked out for a second and ran back to the house and started banging on the windows and the doors.

Q.   Did somebody answer?

A.   Yes.

Q.   Did you end up remaining at that house for much longer?

A.   No.

Q.   Why not?

A.   I had active warrants for my arrest.

Q.   And at that point, how was it significant, the fact that you had warrants?

A.   I would go to jail.  And I had a lot --

Q.   Let me --

A.   Well, I guess you don't really have a lot to lose, but I

DX Chandler S

1619

mean, I had a house with animals and, you know, just -- I just was -- didn't want to go to jail.  Let me say that.

Q.  Uh --

A.  I didn't want to go.

Q.  -- did you believe that the police were going to come?

A.  Yes.

Q.  At that time, did you have children?

A.  Yes.

Q.  Were those Michael's children?

A.  No.

Q.  Were you pregnant?

A.  Yes.

Q.  And who was the father of the baby you were pregnant with?

A.  Michael.

Q.  Did you end up having that baby?

A.  Yes.

Q.  What did you have?

A.  A boy.

Q.  At some point after Michael died, did you have any conversations with James Field about Michael's death?

A.  Yes.

Q.  And do you remember what he said to you, if anything, as it pertained to Michael's death?

A.  The first time, I don't know what you're talking about. Just denying everything.

DX-Chandler-S

1620

The second time it was, Michael's is the only one that haunts him.

Q. The only one that haunts him?

A. Yes.

Q. When he said that, was that close in time to when Michael died?

A. It was about a few weeks after, yes.

Q. Okay. Did you speak with any AB members about Michael after this happened?

A. Yes.

Q. Who did you speak with?

A. Uh, Frank.

Q. And what did Frank say?

A. At first he had said --

MS. FISHER-BYRIALSEN: Objection, Your Honor.

THE COURT: What's the grounds?

MS. FISHER-BYRIALSEN: Hearsay.

THE COURT: Overruled.

BY MS. STOKMAN:

Q. What did he say to you?

A. He got on the phone and said, I'm sorry. No female should ever have to endure that -- those types of things.

Q. Did -- did you know what he was referring to?

A. I did not.

MS. STOKMAN: I have no further questions.

1621

THE COURT:  Any cross-examination?

MR. REED:  I have no questions, Your Honor.

CROSS-EXAMINATION

BY MS. FISHER-BYRIALSEN:

Q.  Good morning.

A.  Good morning.

Q.  The government asked you a little bit on direct about your criminal history.

A.  Yes.

Q.  So you've basically been involved in a life of crime for the -- since you were a --

A.  Yes.

Q.  -- young kid, right?

A.  Yes.

Q.  You've been arrested a bunch of times?

A.  Yes.

Q.  How many?

A.  I couldn't tell you.  Too many to count.

Q.  You've been arrested and charged with burglary, right?

MS. STOKMAN:  Objection.

THE COURT:  What's the grounds?

MS. STOKMAN:  Improper impeachment.

THE COURT:  Do these -- are these convictions you're asking about, Ms. Byrialsen?

MS. FISHER-BYRIALSEN:  I believe so, Your Honor.

CX Chandler-FB

1622

THE COURT:  Then maybe you need to reformat your question.  Objection is sustained at this point.

BY MS. FISHER-BYRIALSEN:

Q.  Have you been convicted of burglary?

A.  I couldn't tell you all my convictions.

Q.  You can't remember if you've ever been convicted of burglary?

A.  I probably have, yes.

Q.  And check fraud?

A.  Yes.

Q.  And theft?

A.  Yes.

Q.  And you've been convicted several times of drugs, right?

A.  Yes.

Q.  Both possessions and selling?

A.  Yes.

Q.  How long in total have you served in prison?  Years?

A.  Yes.

Q.  And you've also been convicted of fraud for having other people's IDs, right?

A.  Yes.

Q.  And that's the stuff you've been caught for, right?

A.  Correct.

Q.  You did a bunch of other stuff you never got caught for, right?

ER 951

1623

MS. STOKMAN:  Objection.

THE COURT:  Sustained.

MS. FISHER-BYRIALSEN:  Your Honor, may we have a sidebar?

THE COURT:  Yup.

(Sidebar commences.)

MS. FISHER-BYRIALSEN:  Your Honor, she's --

THE COURT:  One second.

MS. FISHER-BYRIALSEN:  She's testified to basically doing, on direct, a bunch of stuff for the AB.  So I'm allowed -- it's proper impeachment to go into all the stuff that she's done.

THE COURT:  Actually, she said she had not done anything for the AB, and she did not think she had done anything.

In furtherance, what she said was she looked at -- Frank asked her to look at some profiles, and somebody asked -- also asked her to look for some profiles.  And she said she didn't do what Frank asked and that nothing came of it.  She didn't say anything else about any acts related to the AB.

MS. FISHER-BYRIALSEN:  But any criminal activity she's been involved in is impeachment.

THE COURT:  How so?

MS. FISHER-BYRIALSEN:  Because it impunes her

1624

credibility.

THE COURT:  Under what authority are you relying upon?  Is there an evidence code you're referring to?

MS. FISHER-BYRIALSEN:  Your Honor, I just -- it's proper impeachment to ask her all the crimes that she's done.

THE COURT:  So for your clients as well we're going to bring everything they've been charged or arrested for or we are only talking about witnesses?

MS. FISHER-BYRIALSEN:  They are not testifying.

THE COURT:  But you're saying if they were to testify, everything comes in, even the nolo pleas and all that that I ruled on in motions in limine?

MS. FISHER-BYRIALSEN:  I think it's different for a witness --

THE COURT:  How so?

MS. FISHER-BYRIALSEN:  Because she's someone who's involved in a lot of criminal activity, and she's just testified that in 20 years of her life she's been a criminal. It impunes her credibility.  It's --

THE COURT:  Is there an evidence code you're referring to that allows this --

MS. FISHER-BYRIALSEN:  I'm happy to look that up.  I mean --

THE COURT:  I mean, what I think you're talking about is admission of felony convictions or convictions that bear on

1625

credibility.  You're just saying, Have you ever stolen a lawn mower, have you ever broken a window, I don't know what you're asking.  If you're saying all of that, no, that's not admissible.

MS. FISHER-BYRIALSEN:  She has smuggled drugs for Daniel Rubin -- I have a bunch of examples to ask her for -- who is also a member she just mentioned.

THE COURT:  All right, Counsel, do you have any comments about this?

MS. STOKMAN:  She did talk about drugs for Rubin.  I think if it's directly related to an AB member or associate, then -- but otherwise --

THE COURT:  I don't know who this Daniel Rubin AB associate --

MS. STOKMAN:  Yeah, and that's what she said.

THE COURT:  All right.

MS. STOKMAN:  Because otherwise it's limited.  I agree with the Court, that it's improper impeachment.

THE COURT:  Mr. Reed, your comments.

MR. REED:  Yeah, the objection that the Court sustained -- or that I objected to as being irrelevant and the prosecutor moved on is doing things for the AB.  So she hasn't testified to anything about the AB.  In fact, she denied that that she did.

THE COURT:  All right.  So what I think Ms. Stokman

1626

is now saying is, Well, she opened the door as to other things, so she's saying, yeah, okay, as to the things she opened the door on, fine, but what she's also saying is we're not talking about anything beyond what she opened the door to.

MR. REED:  To the extent that that's opening the door, it opens the door as to people she did things for.  Her statement, in her mind said, I have done nothing to the AB.  That's the part that I care about.  The rest of it is --

THE COURT:  That seems fair too, but that's not how the questions have about couched.

MR. REED:  I get that and I'm dancing because I have to but --

THE COURT:  All right.

MR. REED:  I don't like to dance.

THE COURT:  But what's available, then, is --

MS. FISHER-BYRIALSEN:  Well, 608 allows you to ask her anything about her prior convictions or -- prior acts that involve credibility.

THE COURT:  And which of those things do, according to case authority, other than what Ms. Stokman has talked about?  Because credibility is not every single arrest or every conviction no matter what -- what it is, right?

MS. FISHER-BYRIALSEN:  But it's ones -- if she's done things involving fraud or dishonesty, it is.

THE COURT:  You've asked her those, and she's

1627

answered those.

MS. FISHER-BYRIALSEN:  There's more.

THE COURT:  But that's not what you're asking her. What did she --

MS. FISHER-BYRIALSEN:  The fact that she's not been caught for it --

THE COURT:  Do you need me to go grab the last question, or you are going to rephrase it to do that?

MS. FISHER-BYRIALSEN:  I'll rephrase it.

THE COURT:  Okay.

MS. FISHER-BYRIALSEN:  So --

MS. STOKMAN:  If it's acts she's not caught for, that's a different situation.  If it pertains directly to the people she's already mentioned, that's one thing, but if it's just generally acts, that's improper impeachment.

THE COURT:  Was there something else?  Yeah, if she's already testified, I don't have a problem with that.  But what I'm saying --

MS. DE SALES BARRETT:  If she's already told the government in proffers that she has committed other bad acts, i.e., 404(b) acts, then that should be available for cross-examination.  If she --

THE COURT:  Okay.  Let's -- I understand what you're saying.  I don't know what those acts may be.  Tell me what authority you're relying upon for that proposition?

CX Chandler-FB

1628

MS. DE SALES BARRETT:  I'm relying on the fact that if she has admitted a bad act, it's an impeachment, and we have a right to cross-examine her underneath the confrontation clause of the Sixth Amendment because it -- particularly if it shows fraud or deceit.

THE COURT:  We already talked about fraud, deceit. We already talked about that.  I'm not talking about that.  I said that's fine.  What we're talking about is something else, and I need you to cabinet in terms of what's at issue, because what I'm hearing is just generally, you know, did you kick your neighbor's dog when you were five?  We're not going to talk about that.

MS. DE SALES BARRETT:  If we have independent proof basically from the word of the witness, it's the functional equivalent of a conviction; therefore, it is not something that is unproven.  It is something that she has admitted to in the past, and she should be able to be cross-examined because the reason you cross-examine with a conviction --

THE COURT:  Can we just make sure that we're talking about the same thing.

MS. DE SALES BARRETT:  Yes.

THE COURT:  Are you talking about kicking your neighbor's dog or are we talking about something else?

MS. DE SALES BARRETT:  No.  No.  We're talking about drug dealing, we're talking about --

CX Chandler-FB

1629

THE COURT:  Which we said it's fine because that's been opened, the door.

MS. FISHER-BYRIALSEN:  That's what I have.

MS. DE SALES BARRETT:  Okay.  That's all we have.

THE COURT:  All right.

(Sidebar ends.)

BY MS. FISHER-BYRIALSEN:

Q.  I'm back.

You were smuggling drugs into prisons for Daniel Rubin, right?

A.  Absolutely not.

Q.  No?

A.  No.

Q.  Do you remember testifying in the grand jury in this case?

A.  Yes.

Q.  Okay.  Do you remember testifying about Daniel Rubin in the grand jury?

A.  Yes.

Q.  Do you remember testifying that you were smuggling drugs into prison for Daniel Rubin?

A.  I never said I was smuggling drugs.

Q.  What were you doing for Daniel Rubin?

A.  Just like I said, I was helping out with drugs with people that were getting out.  Yes, I was connecting people with drugs.

1630

Q.  But you weren't smuggling them into prison?

A.  No.

Q.  Do you know who Sabrina Beck is?

        MS. STOKMAN:  Objection.  Relevance.

        THE COURT:  What's the relevance of this, Ms. Byrialsen?

        MS. FISHER-BYRIALSEN:  I think you want me to tell you over there.

        THE COURT:  I'm not sure where you're going with it. Maybe you can ask a preliminary question to get us there, because I'm not sure where you're going with this.

        MS. FISHER-BYRIALSEN:  I can't ask if she knows who that is?

        THE COURT:  If she's somehow pertinent to this case.

        MS. FISHER-BYRIALSEN:  She is.

        THE COURT:  You're making that representation to the Court?

        MS. FISHER-BYRIALSEN:  Yeah.

        THE COURT:  All right.  Go ahead.

        THE WITNESS:  Yes.

BY MS. FISHER-BYRIALSEN:

Q.  Who is she?

A.  Somebody that I met with James Field.

Q.  And to your knowledge, was she with Corn Fed, or Michael, on the days or night before he was killed?

ER 959

CX Chandler-FB

1631

A.  I don't know.

Q.  You don't know that?

A.  That's hearsay.  I can't say yes or no.

Q.  I think that's up to the Judge to rule if it's hearsay.

A.  Okay.  Well, sorry.

Q.  Do you know if she was with him on the night before he was killed or the days leading up to that?

A.  I was told, yes.

Q.  Okay.  And you were actually furious at Michael, right, because he was sleeping with her, right?

A.  Not that I know of.  Did I accuse, yes, but I had no proof.

Q.  So you accused him of sleeping with her but you had no proof of that?

A.  Correct.  That's why we were fighting, and he came back home.

Q.  Why did you accuse him if you had --

A.  Because he has a history of cheating.

Q.  So you just assumed that he was cheating with you -- on -- with her on you that night?

A.  I don't know if it was that night.  I -- if you want to get technical, I said, "I don't know what female you're with, but I hope you're enjoying her."  I don't know who he was with.

Q.  Who's Cole?

ER 960

CX Chandler-FB

1632

A.  Who?

Q.  Cole.

A.  I have no idea who that is.

Q.  Do you know who Lorana Mueller is?

A.  I do.

Q.  Whose that?

A.  An ex-friend of mine.

Q.  And where does she live?

A.  In Lancaster.

Q.  She lives in the house where Michael was killed in front of, right?

A.  Yes.

Q.  And that's also someone Michael was sleeping with, right?

A.  In the past they have.  I don't know about present.

Q.  That's why you don't talk to her anymore, right?

A.  No, it's not --

        MS. STOKMAN:  Objection.  Relevance.

        THE COURT:  Sustained.

BY MS. FISHER-BYRIALSEN:

Q.  You ran over to that house because you were furious that you thought he was sleeping with her, right?

A.  Yes.

Q.  What's the name of her sons?

        MS. STOKMAN:  Objection.  Relevance.

        THE COURT:  I'm not sure.  What are the names?

CX Chandler-FB

1633

Go ahead, ma'am.

THE WITNESS:  Seth, and that's the only one I can think of right now.  I know she has three.

BY MS. FISHER-BYRIALSEN:

Q.  And one of them is Cole, right?

A.  No.

Q.  No?  Okay.

A.  If you're referring to Cole, it's her boyfriend.

Q.  Oh, okay.  So you do know who it is?

A.  If you would have said the last name, yes.

Q.  What is his last name?

A.  Milby.

Q.  So Cole and Lorana live in the house where Michael was killed, right?

A.  Yes.

Q.  And you went there, and you found Michael outside, right?

A.  Yes.

Q.  And they were there, right?

A.  Yes.

Q.  And you ran up, and you're banging on the doors, and you want them to get your phone and your gun out of his truck, right?

A.  No.

Q.  You hadn't left a gun in his red truck?

A.  No.

1634

Q.  But you left before the cops came, right, because you got warrants for your arrest?

A.  Yes.

Q.  And what are those for?

A.  For fraud.

Q.  And at some point, Cole sent you a message, right, about --

        MS. STOKMAN:  Objection.

        MS. FISHER-BYRIALSEN:  -- Michael's death?

        MS. STOKMAN:  Hearsay -- I'm sorry, not yet.

        THE COURT:  You can answer that.

        THE WITNESS:  Yes.

BY MS. FISHER-BYRIALSEN:

Q.  And it was a thumbs-up emoji, right?

        MS. STOKMAN:  Objection.  Calls for hearsay.

        MS. FISHER-BYRIALSEN:  It's not for the truth of the matter, Your Honor.

        THE COURT:  Overruled.

BY MS. FISHER-BYRIALSEN:

Q.  It was a thumbs-up emoji, right?

A.  I don't remember.

Q.  You don't remember getting super angry at Cole about those messages?

A.  I probably did.

Q.  Why?

1635

A.   Because they left my boyfriend for eight hours in front of their house dead, so, yes, anything that they said would piss me off.

Q.   And he also wrote you that whoever --

         MS. STOKMAN:  Objection --

         MS. FISHER-BYRIALSEN:  -- followed Corn Fed was the person --

         MS. STOKMAN:  Objection --

         MS. FISHER-BYRIALSEN:  -- no, not for the --

         THE COURT:  Let me hear the rest of the question first.

BY MS. FISHER-BYRIALSEN:

Q.   He also wrote you that whoever Corn Fed -- whoever followed Corn Fed was the person that killed him, right?

         MS. STOKMAN:  Objection.  Hearsay.

         THE COURT:  Sustained.

BY MS. FISHER-BYRIALSEN:

Q.   And Cole ended up blocking you on Messenger, right?

         MS. STOKMAN:  Objection --

         THE WITNESS:  Probably.

         MS. STOKMAN:  -- relevance.

         THE COURT:  Sustained.

BY MS. FISHER-BYRIALSEN:

Q.   You actually thought Lorana and Cole had something to do with the murder, right?

CX Chandler-FB

1636

A.  Absolutely.

Q.  Why?

A.  Because how do you not know someone is dead in front of your house for 8 hours when you have security cameras all around your house.

Q.  Before Michael died, he got into it with Field, right?

A.  I don't know.

Q.  And you don't remember telling Agent Gonzalez that --

        MS. STOKMAN:  Objection.

        MS. FISHER-BYRIALSEN:  It's not for the truth of the matter, Your Honor.

        THE COURT:  What's it for?

        MS. FISHER-BYRIALSEN:  For the effect on the listener.

        THE COURT:  For the effect on Agent Gonzalez.

        MS. FISHER-BYRIALSEN:  Yes.

        THE COURT:  All right.  Go ahead.

BY MS. FISHER-BYRIALSEN:

Q.  You told Agent Gonzalez --

        MS. STOKMAN:  Objection to relevance.

        COURT REPORTER:  One at a --

BY MS. FISHER-BYRIALSEN:

Q.  -- "Fucking got at suspect foul as fuck from my understanding"?

        THE COURT:  Okay, one second.  The objection --

ER 965

CX Chandler-FB

1637

THE WITNESS:  Yes, that's what I was told.

BY MS. FISHER-BYRIALSEN:

Q.  So somebody --

THE COURT:  One second.  I need to rule before there's a response.

At this point, do you still have an objection, Ms. Stokman?

MS. STOKMAN:  I didn't hear all of that, but it would be to relevance on the effect of the listener who is not testifying.

THE COURT:  Are you going to take the position, Ms. Byrialsen, that what she told Agent Gonzalez directed him in some way after?

MS. FISHER-BYRIALSEN:  I would believe so, Your Honor, and if --

THE COURT:  Do you have a good faith basis that it did?  Is there some documentation to that effect?

MS. FISHER-BYRIALSEN:  His entire investigation, Your Honor, in this case.

THE COURT:  I guess we need to step out --

MS. FISHER-BYRIALSEN:  And if they --

THE COURT:  One second.  We're going to need to step over and you're going to show that to me then.

We'll take a sidebar.

(Sidebar commences.)

1638

MS. STOKMAN:  I didn't hear the quote.

MS. FISHER-BYRIALSEN:  So it's from --

MS. STOKMAN:  What did she say?

MS. FISHER-BYRIALSEN:  -- going to audio review where she is interviewed by Gonzalez and she says, Well, who is investigating the death, right?

MS. STOKMAN:  What did she say that you said that I didn't hear?

MS. FISHER-BYRIALSEN:  "Fucking got at Suspect foul as fuck from my understanding."  So --

THE COURT:  Wait, now.  What?

MS. FISHER-BYRIALSEN:  This is her -- what she's telling Gonzalez.  So that's what I read to her.

THE COURT:  And you're saying this then -- as a result of this information Agent Gonzalez did something?

MS. FISHER-BYRIALSEN:  Well, he is investigating this case and he is --

THE COURT:  Right.  What I'm asking now is where does it -- where is documentation that he took this information and did something?  That's what I'm trying to find out.

MS. FISHER-BYRIALSEN:  I don't think I need to show you that.

THE COURT:  You said the hearsay exception was to show --

MS. FISHER-BYRIALSEN:  It's his entire --

ER 967

1639

THE COURT:  One at a time.  Let me finish.

You said that after she told him this, it had an effect on him and he took some action as the exception to the hearsay.  Now you're saying, no, just in general, he continued to investigate?

MS. FISHER-BYRIALSEN:  He goes out and follows up and finds Field.  Field gets arrested, Field gets charged.

THE COURT:  Is this referring to Field or is this referring Cole and the woman --

MS. FISHER-BYRIALSEN:  No, this is --

THE COURT:  Let me -- the question was what related to this then?

MS. FISHER-BYRIALSEN:  Did she know that sus- -- before Michael died, he got into it with Field, right?

She says, I don't know that.

And then she said, Yes, he did, when I read her this quote.

So that's all I'm following up on asking her.

MS. STOKMAN:  That's offering it for the truth of the matter and it's for her own -- it's nothing on Agent Gonzalez.

THE COURT:  I'm having trouble again with -- you're saying then Agent Gonzalez got this information, he went out and got Field.

What I was trying to find out is, where's the documentation about that that indicates that this is the

CX Chandler-FB

1640

conduct, this is the action that Agent Gonzalez took as a result of this?

MS. FISHER-BYRIALSEN:  I don't think I have to show -- I mean, it's the entire case, Your Honor, that --

THE COURT:  Well, you're saying there's a hearsay objection -- exception.

MS. FISHER-BYRIALSEN:  Uh-huh.

THE COURT:  And that is, when Agent Gonzalez heard this, he took subsequent action.  And you're saying now, no, no, he just continued whatever investigation he did as a whole.

MS. FISHER-BYRIALSEN:  I will just move on from this.

THE COURT:  Then I'm going to strike that.

MS. FISHER-BYRIALSEN:  So I can't ask her why -- that Suspect and Field --

THE COURT:  Listen.

MS. FISHER-BYRIALSEN:  -- had a problem?

THE COURT:  What I need you to do, if you have a hearsay objection and you're saying it's -- here's your exception, I need to hear what the elements are.

You're telling me you don't have them after I already allowed you to ask it.  Now you're saying you don't really have it and so that's why it's being stricken.

If you have an exception, fine.  But you can't say -- you're telling me right now you can't show me that

1641

Agent Gonzalez took any action as a result of this information.  You're just saying he had an investigation going.  That's not the same thing.

MS. STOKMAN:  Judge, I'm sorry, can -- this has happened before.  But when there's an objection, can we just stop all -- instead of getting the entire thing out, to stop the line of questioning until Your Honor is able to discuss that further?

THE COURT:  I have to hear the question before I can rule on the objection.  So each -- the answer shouldn't be given, but I've now made the witness know that.  But beyond that, I have to hear the question.

MS. FISHER-BYRIALSEN:  So I'm going to ask her why she -- why Brizendine or Corn Fed got at Suspect --

THE COURT:  Did what?

MS. FISHER-BYRIALSEN:  -- got at Suspect, foul as fuck, I'm asking her.

THE COURT:  You're going to -- I don't -- she said something about somebody getting at somebody?

MS. FISHER-BYRIALSEN:  Yes.

THE COURT:  And she said this in her taped interview at -- something she observed, something she has personal knowledge of?

MS. FISHER-BYRIALSEN:  She said that -- apparently they were together because apparently he and fucking got at

1642

Suspect foul as fuck, from my understanding, talking about Corn Fed and what he did.

THE COURT:  So she's saying that -- well, I don't actually even know what she's saying, but something to do with she heard -- Corn Fed told her something about Field, told her that she was -- he was with Field.  I'm not -- I don't have the context to understand what she said.  Is that your understanding?

MS. FISHER-BYRIALSEN:  Yes.

THE COURT:  And you're saying that she knows this because Corn Fed told her this.  Is that what you're saying?

MS. FISHER-BYRIALSEN:  I don't know how she knows it.  She's telling the agent this.  I have no idea how she knows it.

THE COURT:  Okay.  So we're going to get right back around to a hearsay exception -- or hearsay objection.  How are you going to deal with that?  Or you want to just take it one step at a time?

MS. FISHER-BYRIALSEN:  Yes, that's fine.

THE COURT:  Okay.  So at this point I don't hear an exception to it, but maybe you'll think of one when it's pertinent.

(Sidebar ends.)

THE COURT:  All right.  The objection is sustained.

Ladies and gentlemen, you are to disregard the

1643

witness's prior statement, her last answer.

All right.  Go ahead.

BY MS. FISHER-BYRIALSEN:

Q.  As far as you're aware, before he died, Corn Fed was really angry at Suspect, right?

A.  I wasn't there.  I don't know.

Q.  So you have no idea about anything related to Corn Fed being angry at Suspect?

A.  I was --

MS. STOKMAN:  Objection.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  I was told that they had gotten into an argument.

MS. STOKMAN:  Objection.  Calls for hearsay.

THE COURT:  Sustained.

MS. STOKMAN:  Ask to be stricken.

THE COURT:  It will be stricken.

BY MS. FISHER-BYRIALSEN:

Q.  You were interviewed numerous times by the government, right, in this case?

A.  I'm sorry?

Q.  You were interviewed numerous times by the government in this case, right?

A.  No.  Oh, by state?

Q.  Uh-huh.

Case: 25-3648, 03/04/2026, DktEntry: 16.7, Page 125 of 199
Case 1:20-cr-00238-JLT-SKO    Document 1757    Filed 01/28/25    Page 124 of 198

CX Chandler-FB

1644

A.  Yes.

Q.  You were interviewed in February right after Corn Fed died, right, in 2022?

A.  Yes.

Q.  And again in March of 2022?

A.  Yes.

Q.  And when you were first interviewed by them, you lied to them, right?

A.  I did.

Q.  You lied to them about Michael not being involved in any criminal activity, right?

A.  I did.

Q.  Because the truth was that you actually saw Michael assault somebody in a Walmart parking lot before, right?

        MS. STOKMAN:  Objection.  Relevance.

        THE COURT:  Sustained.

BY MS. FISHER-BYRIALSEN:

Q.  You even lied to them about what Michael was doing leading up to when he died, right?

A.  Yes.

Q.  You told them he went to LA to help a friend move, right?

A.  Correct.

Q.  But that was a lie?

A.  Correct.

Q.  And it was your understanding that when Michael left on

CX Chandler-FB

1645

February 22, 2022, he was going to do a heist in LA, right?

A.   A job, yes.

Q.   And he -- he was going to steal $4 million from the Heinz Ketchup family, right?

A.   I didn't know the exact amount.  I just knew -- very little details.

Q.   From the Heinz Ketchup family?

A.   Yes.

Q.   And when you were first interviewed by law enforcement, you also lied about all your own criminal activity, right?

A.   No.

Q.   No?  You told them in the interviews with the state law enforcement all the criminal activity you had been up to?

A.   The law -- the state law enforcement knew the whole reason why I ran was because I had active warrants and I didn't want to go to jail.

Q.   What about all the other stuff you were involved in?

A.   As far as --

Q.   Did you tell the truth about that?

A.   As far as what?

Q.   For example, your fraud with the rental cars?

A.   They did know about that.

Q.   They did?

A.   Because the car that he passed away in was a rental, and they knew about that, yes.

1646

Q.   And all the stuff you testified about today, you didn't tell law enforcement that in February and March, right --

A.   I did not.

Q.   -- of 2022?

A.   I did not.

Q.   So let's talk about that red truck Michael was found in.

A.   Okay.

Q.   Do you remember you testified in the grand jury and you were asked whose truck it was?

A.   Yes.

Q.   And you answered:

     "That was our truck.  It was a rental that we got."

A.   Correct.

Q.   And when you testified there, you were under oath, right?

A.   Correct.

Q.   Just like you are today?

A.   Correct.

Q.   But that wasn't the whole truth about the truck, right?

A.   Yes, it was.

Q.   That it was just a rental?

A.   Correct.

Q.   That's the whole truth?

A.   Yes.

Q.   It was a rental you got in some fake name, right?

A.   Correct.

1647

Q.  And you ripped the GPS out of it, right?

A.  Did I?  No.

Q.  Well, someone did, right?

A.  Probably.

Q.  Well, yes or no?

A.  If they did, I wasn't there for that.

Q.  But you know it was ripped out, right?

A.  I'm sure it was.

Q.  Because that's why the rental company never came back and got it when you didn't return it, right?

        MS. STOKMAN:  Objection.  Calls for speculation.

        THE COURT:  Sustained.

BY MS. FISHER-BYRIALSEN:

Q.  You never returned that rental car, right?

A.  I did not.

Q.  So it's actually a stolen car, right?

A.  Yes.

Q.  And you never met Frank Clement before, right?

A.  Correct.

Q.  And you only spoke to him twice, right?

A.  Correct.

Q.  And you've never been charged with any of the criminal activity you've told the government about in your meetings, right?

A.  No.

CX Chandler-FB

1648

Q.  In fact, they've given you immunity for everything you're testifying for, right?

A.  Yes.

Q.  And do you remember Agent Gonzalez telling you --

MS. STOKMAN:  Objection.  Calls for hearsay.

BY MS. FISHER-BYRIALSEN:

Q.  -- "We are the Feds.  We print the money"?

THE COURT:  Sustained.

MS. FISHER-BYRIALSEN:  Your Honor, it's for the effect on the listener.  I have a follow-up question.

MS. STOKMAN:  Ask to strike.

THE COURT:  That was sustained.  Sorry.  It's sustained.

BY MS. FISHER-BYRIALSEN:

Q.  You -- as a benefit from your cooperation in this case, you've been relocated, right?

MS. STOKMAN:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I mean, to be technical, I wouldn't say it's a benefit, but yes.

BY MS. FISHER-BYRIALSEN:

Q.  In the interviews you had with law enforcement in February of 2022 and March of 2022, right after this happened, you never mentioned Francis Clement, right?

A.  He was never brought up, no.

1649

Q.   You also never mentioned it, right?

A.   Correct.

Q.   And this immunity you're getting, your free pass, you don't get that if you don't testify, right?

A.   Uh, I would do it regardless.

        MS. FISHER-BYRIALSEN:  No further questions, Your Honor.

        THE COURT:  Any other cross-examination?

        MR. REED:  I have no questions, Your Honor.

        THE COURT:  All right.  For Mr. Johnson?

        MS. LUEM:  No.  Thank you.

        THE COURT:  Any redirect?

        MS. STOKMAN:  Yes.

                    REDIRECT EXAMINATION

BY MS. STOKMAN:

Q.   Kaylen, when you first spoke to law enforcement, was that Detective Gina Eguia and her partner?

A.   Yes.

Q.   Why did you lie about Michael's potential criminal involvement?

A.   I'm a criminal myself.  You know, I was doing my -- I was actively doing crimes.  What do you -- what do you want me to do?  You know, I'm -- at that time, what do you -- of course I'm going to lie.

Q.   And you say "of course."  Were you worried about something

RDX Chandler, S

1650

if you told them the truth?

A. Yes.

Q. What was that?

A. Repercussions.

Q. From who?

A. AB.

Q. You -- just now relocation got brought up.

A. Yes.

Q. Was that something you asked for?

A. No.

Q. Why -- why were you relocated?

A. Because there was a threat on my life.

Q. Who made that threat?

A. Frank.

Q. And did you hear that threat from Frank?

A. Yes.

Q. What did he say?

A. "I'll kill that bitch and Nutty too."

Q. Uh, and how did you overhear that?

A. He was on a phone call with Field.

Q. And was that on speakerphone?

A. Yes.

Q. And you were there, so you heard it?

A. Yes.

Q. Okay.

1651

MS. STOKMAN:  I have no further questions -- actually, I'm sorry, one last thing.

BY MS. STOCKMAN:

Q.  Why didn't you mention Frank in the first interviews?

A.  I don't even think we had spoke at that time.  And if we did, I didn't -- I mean, I didn't tell them a lot of things.

Q.  Had that threat occurred yet?

A.  No.

MS. STOKMAN:  Okay.  No further questions.

THE COURT:  Any recross?

All right.  May this witness be excused?

MS. STOKMAN:  Yes.

THE COURT:  You're excused.

Next.  All right.  Next witness.

MR. ENGELKING:  Yes, Your Honor.  The government calls Officer Eric Hale.

THE COURT:  Sir, if you'll come all the way up to the witness stand up here and be sworn.

Mr. Engelking, just for your information, we're going to take a break in about ten minutes.

MR. ENGELKING:  Very good.

THE CLERK:  Please raise your right hand.

ERIC HALE,

called as a witness on behalf of the Government, having been first duly sworn, testified as follows:

1652

THE WITNESS:  Yes.

THE CLERK:  Go ahead and have a seat.  And then please state your full name for the record and spell your last name.

THE WITNESS:  Eric Hale.  Last name H-a-l-e.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. ENGELKING:

Q.  Officer Hale, where do you work?

A.  The Los Angeles Police Department.

Q.  And what's your title?

A.  Police Officer II.

Q.  What are your job responsibilities as a Police Officer II?

A.  Currently, I'm a youth service officer, so I work with kids, police cadets, basically making them into better citizens.

Q.  Prior to working with kids, did you have any other responsibilities with the LAPD?

A.  Yeah.  Prior to that -- I've done that for about the last two years.

Prior to that, I was a patrol officer.  I would handle radio calls mostly.

Q.  In February 2022, what were your responsibilities?

A.  I was a patrol officer at that point, handling radio calls, doing officer work.

ER 981

DX-Hale F.

1653

Q.  How long have you worked for the LAPD?

A.  For a little over ten years.

Q.  What did you do before joining the LAPD?

A.  I was a teacher.

Q.  Working on February 22, 2022?

A.  Yes.

Q.  And were you called out to respond to a robbery at 1850 Outpost Drive?

A.  Yes, I was.

Q.  What type of neighborhood is that?

A.  Single-family, nicer homes, older, like 1930s, '40s homes.

Q.  At what time were you called out to this robbery?

A.  At approximately 3:30 in the afternoon.

Q.  And where were you when you received that call?

A.  At our police station.

Q.  What did you do when you first arrived at the residence?

A.  Uh, upon arrival, we got out of the car, and we witnessed a gentleman standing on the sidewalk.  We asked him if he was involved.  He said that he was staying at the house.

        MS. DE SALES BARRETT:  Objection, Your Honor.  Hearsay.

        THE COURT:  Mr. Engelking, I'm going to ask you to ask another question at this point.

BY MR. ENGELKING:

Q.  Uh, did you see anyone when you approached the house?

1654

A.   Yes.

Q.   Who was that person?

A.   He was a gentleman who identified himself as staying at the house in question.

        MS. DE SALES BARRETT:  Objection, Your Honor. Hearsay.

        THE COURT:  At this point, it is.  You need to lay some foundation.

BY MR. ENGELKING:

Q.   Was the person the homeowner?

A.   He did not own the home.

Q.   How -- how did that person --

        MS. DE SALES BARRETT:  Your Honor, objection. Foundation.

        THE COURT:  Sustained.

BY MR. ENGELKING:

Q.   How did that person appear to you?

A.   They appeared upset.

Q.   Did you observe his physical appearance?

A.   Yes.

Q.   Could you describe what you observed?

A.   Uh, appeared kind of flustered; like I said, upset; his pants appeared to have a big rip in the back of them.

Q.   Did you go into the house?

A.   Not initially, but eventually I did.

DX-Hale E.

1655

Q. Okay. So initially, what happened?

A. So initially, I made contact with him, tried to start the investigation, figure out what had happened. And then my partners, they did a search of the house.

Q. Did you go into the house after your partners had searched it?

A. Yes.

Q. And what did you see when you entered the house?

A. Upon walking in the front door, I noticed that the door had been -- appeared to be kicked in. The doorjamb was broken, kind of splintered into large pieces. There's a footprint on the front door near the handle. And then the house appeared to be ransacked, at least quite a few of the rooms were ransacked.

Q. Did you observe the kitchen?

A. Yes.

Q. What did you observe?

A. A lot of the drawers were open, a lot of stuff on the floor. Things appeared to be out of place.

Q. What did you observe on the floor of the kitchen?

A. Some of the stuff was -- it would appear to be the, like, home security panel and some zip ties.

Q. Did you go into the basement of the house?

A. Yes, I did.

Q. What did you -- what, if anything, did you observe in the

DX Hale E

1656

basement?

A.  So the basement we were directed down there to look for the security footage on the home security cameras.  There's a giant panel with numerous electronics for the house that a lot of those items were kind of ripped off of that console.

Q.  Were crime scene investigators called to the residence?

A.  Yes.  We had our print people and our photos people come out.

Q.  And did the photos people take photos?

A.  Yes.

Q.  Could you please look at Exhibits 1435 through 1445 in the binder in front of you, and then just please let me know when you've glanced at those.

A.  Okay.

Q.  What are those?

A.  Those are pictures of the residence and photos from inside the residence.

Q.  And do they accurately capture the house as you saw it that day?

A.  Yes.

        MR. ENGELKING:  Your Honor, we move Exhibits 1435 to 1445 into evidence and ask to publish to the jury as we go on.

        THE COURT:  Any objections?

        MS. DE SALES BARRETT:  No, Your Honor.

        MS. LUEM:  No.

1657

THE COURT:  Those will be admitted.

(Government's Exhibits 1435 to 1445 were received.)

MR. ENGELKING:  Let's look at Exhibit 1435.

BY MR. ENGELKING:

Q.  And what are we looking at here, Officer?

A.  This is the front of the residence from Outpost Drive.

MR. ENGELKING:  Let's pull up 1436.

BY MR. ENGELKING:

Q.  And what does this picture show?

A.  This is the front of the residence from the yard inside the -- has a fence around it.

Q.  And do you see two tall bushes in the middle of the picture?

A.  Yes.

Q.  What's between those?

A.  The front entrance, front door.

MR. ENGELKING:  Let's go to Exhibit 1438.

BY MR. ENGELKING:

Q.  What are we looking at here?

A.  This is the front door from the inside of the house, the door jamb that has clearly been destroyed by being kicked in.

MR. ENGELKING:  Let's go to 1445, please.

BY MR. ENGELKING:

Q.  And what does this picture show?

A.  So this is the front door.  It is a shoe or boot print

1658

near the handle, and then there's a ruler placed by our photo person basically to measure scale.

Q.   Circling something in the middle of the picture there, could you describe what that is?

A.   Yeah.  It's a shoe or a boot print.

MR. ENGELKING:  Uh, for the record, Your Honor, I circled the apparent boot print in the middle of photo of the L ruler.

THE COURT:  All right.

MR. ENGELKING:  Let's go to 1439.

BY MR. ENGELKING:

Q.   And what are we looking at here?

A.   This is the kitchen area of the house.  Uh, the panel and the zip tie you can see on the ground, kind of in the center.

Q.   Could you circle those on the screen, please?

A.   Do I have to press any buttons on this?

Q.   No.  Just touch it with your finger.

A.   (Witness complies.)

Q.   Okay.  Looking at the first circle of the white object in the -- roughly the middle of the picture on that black tile, what is that?

A.   So appears to be a panel for, like, a home alarm system.

Q.   And the circle that you made on the white tile just above the panel we just spoke of, what is that?

A.   A black zip tie.  I think there's another one too that's

1659

kind of hidden in the black.

MR. ENGELKING:  Let the record reflect the witness also circled the black tile just to the -- just to the left of the white tile he previously circled.

THE COURT:  All right.

MR. ENGELKING:  Let's go to 1440.

BY MR. ENGELKING:

Q.  And what are we looking at here?

A.  So these are the zip ties that -- that the victim said he had to cut off his hands.

MS. DE SALES BARRETT:  Objection, Your Honor.

THE COURT:  Your -- your grounds?

MS. DE SALES BARRETT:  Hearsay.

THE COURT:  Sustained.

BY MR. ENGELKING:

Q.  Did the -- did you observe any cameras in the house?

A.  Yes.

Q.  Were you able to obtain any surveillance footage that day?

A.  No.

Q.  And why was that?

A.  The -- I guess computer aspect of that was taken.

Q.  Okay.

MR. ENGELKING:  Let's go to 1441, please.

BY MR. ENGELKING:

Q.  What are we looking at here?

1660

A.   So this is like the console that -- in the basement that housed a lot of the electronics for the house.

MR. ENGELKING:  Let's go to 1442, please.

BY MR. ENGELKING:

Q.   Again, what does this picture show?

A.   This is the, I guess, office in the front, just to the left of the front door when you walk in.

Q.   Did you notice anything of significance in this room?

A.   Yeah.  It appeared a little -- in the little bit of disarray.  You can see there's, like, a surfboard on the ground, a chair knocked over, and there was some paintings taken off the wall.

MR. ENGELKING:  Let's go to 1443, please.

BY MR. ENGELKING:

Q.   What are we looking at here?

A.   So this was like a, I guess, part of the wall where there was a painting.

MR. ENGELKING:  And 1444, please.

BY MR. ENGELKING:

Q.   And what's this?

A.   This is the painting or picture that was in that previous spot that was taken down and just sat right underneath of it.

Q.   Were you involved in the investigation after the initial response?

A.   I was there for a few hours investigating.

1661

Q.  Well, did you do any follow-up investigation?

A.  No.

MR. ENGELKING:  No further questions, Your Honor.

THE COURT:  Cross-examination?

MS. DE SALES BARRETT:  No questions, Your Honor.

MR. REED:  No questions, Your Honor.

MS. LUEM:  No.

THE COURT:  May this witness be excused?

MR. ENGELKING:  Yes, Your Honor.

THE COURT:  All right.  Thank you, sir.

THE WITNESS:  Thank you.

THE COURT:  Let's go ahead and take our second break of the day.  Let's go ahead and plan to return in, let's say, a quarter till.

(Jury exits the courtroom at 11:26 a.m.)

THE COURT:  All right.  The jury has stepped away. Is there anything for the record?

MS. DE SALES BARRETT:  No, Your Honor.

MS. STOKMAN:  No.

MS. LUEM:  I do actually have one quick thing and maybe we can talk about it.  One of the witnesses, I believe, that's slated for today, or soon, is a chemist that tested some fentanyl that was taken from Field's vehicle; is that right?  Is she coming up next or --

MS. STOKMAN:  She's on hopefully today.

1662

MS. LUEM:  We need to make a record about -- about that witness' testimony before.

THE COURT:  Okay.  Go ahead.

MS. LUEM:  Do you want me to do it now?

THE COURT:  Sure.

MS. LUEM:  Well, Judge, based on the Court's ruling on January 8th and the order that was issued regarding predicate acts, the Court instructed the government to file a motion indicating which predicate acts they were not going to pursue in this case, and the government had stated on January 6th on the record that they didn't intend to present predicate acts that were not related to any of the defendants in this case, and that's reflected in this Court's order.

Ms. Stokman sent the -- an email rather than a filing to counsel laying out the predicate acts that she did not intend to introduce.  The Court in it's order noted Predicate Act Q because that's related to -- only to Waylon Pitchford.  However, that didn't appear in Ms. Stokman's email to us.  We did ask her if she -- if we could take that email as the same as the court filing, and we, you know, believe her representations that those were the predicate acts that she did not plan to introduce.  However, Q is the sale or possession of fentanyl, which I think this chemist is going to testify about, coming up, that Ms. Byrialsen and myself went and saw late last week at the

1663

ATF office.  It has nothing to do with any of the defendants on trial at this time.

THE COURT:  This --

MS. LUEM:  We would object to that testimony.

THE COURT:  I think you said on the onset that this was fentanyl that was taken from James Field.  Is that what you said?

MS. LUEM:  Yes.  I believe it was after a car stop with Mr. Field and Mr. Fogle in San Fernando Valley.  It was in their possession, I think, a couple pills of fentanyl and powdered fentanyl as well, and that's, again, Predicate Act Q.

THE COURT:  And then you're saying you received an email from Ms. Stokman in which she indicated that -- I think I got lost -- that she was also not going to pursue this or that -- something to do with Pitchford.  I wasn't quite sure.

MS. LUEM:  No, Your Honor.  In the Court's order --

THE COURT:  Right.  I --

MS. LUEM:  -- on page 46.

THE COURT:  You're saying the email was different than the Court's order?

MS. LUEM:  Right.  The email we received did not include Q.  That was omitted from the email.  It said, "Predicates that will not be proven up are A, C, E, F, G, H, I, K, L, M."

THE COURT:  So Q, is this something different than

1664

when we're talking about the fentanyl and the chemist coming up?

MS. STOKMAN:  Q is that predicate offense.  This is the offense that Q is portraying.  And the government did not indicate that Q was of predicate we were going to omit, because we are not going to omit that.  That was the Court's order, to give a list of the predicates we were not going to prove up.  Predicate Q is not on that list because we intended to prove it up.  It is an act under the RICO conspiracy, and it directly relates to witnesses that are testifying and incidents that are being proven up in this matter.

And so there's a reason why we did not indicate that we were not proving it up on the email because we intended to prove it up.

MS. LUEM:  Right.  And in the Court's order --

THE COURT:  Right.  The email that you sent was on what day?  It was -- the email is on the 6th of January and the Court's ruling was on the 8th of January?

MS. LUEM:  No, Your Honor.  The email was on the 10th of January.  The Court's ruling was on the 8th of January.  And in the order, Your Honor states at page 46:

"At the motion in limine hearing, the government informed the Court" --

THE COURT:  I remember --

MS. LUEM:  -- "did not offer proof" --

ER 993

1665

THE COURT:  -- you don't have to read it to me.

MS. LUEM:  -- "as to predicate acts, none of the four defendants on trial" --

THE COURT:  I wrote it so I remember it.

MS. LUEM:  Yeah.

THE COURT:  I'm just trying to cut through this a little bit.

MS. LUEM:  Right.

THE COURT:  Ms. Stokman, when we had that hearing, I was under the impression that you were in agreement that you were not going to produce -- were not going to prove predicates that were unrelated to these defendants.

MS. STOKMAN:  And Judge, if I said all, then I -- I do not believe I would have ever said "all" because this has always been a predicate that we intended to prove here.

When the Court asked for examples, I gave examples of other predicate acts that are charged against defendants who are no longer in this trial.  But the Court had then asked that we provide the list of the predicate acts that we did not intend to prove up, which is why that list was provided by email.

Q was not on that list.  It is part of the RICO conspiracy, it is part of the ongoing conduct of the enterprise.  It is the government's position that any of those acts are -- we are able to prove up at trial.  We were

1666

alerting counsel and the Court to ones we were not going to prove up to save time and in the interest of preparation.

And again, that Q was not on the list of the ones that we were not going to prove up.

THE COURT: All right. On the break, I'm going to take a look at the transcript from that hearing and we can talk about it when I get back.

MS. LUEM: Thank you.

THE COURT: Anything else at this time?

MS. LUEM: No.

(Recess held.)

THE COURT: All right. We have everyone back.

I took the break to review the transcript from the motion in limine hearing, and at that hearing I talked about the predicate acts and whether it would -- whether there would be proof as to any acts that did involve the defendants.

Ms. Stokman said, I don't have the indictment in front of me but there is going to be some overlap.

I said, okay. You need to alert the defendants by Friday, which is what occurred. So apparently, my order was in error. That's how -- that's what happened.

And what I'm told now is she did alert the defense by that deadline and told them of the predicate acts.

Ms. Luem, am I missing something else here?

MS. LUEM: No, I don't think you're missing anything.

1667

It's just -- the point is that the representation as I understood it from Ms. Stokman and the Court's order was that she was not going to be presenting evidence unrelated to the defendants on trial.

And Q is unrelated to the defendants on trial. I think it's extremely prejudicial. I'd ask for, perhaps, a limiting order or some sort of explanation to the jury because this is pretty large quantities of drugs being driven around by a cooperator in this case who is working for somebody whose not on trial.

And there's no evidence whatsoever that any of these gentlemen had anything to do with that particular drug transaction. So I would just stand on our objections.

THE COURT: All right. Well, in looking at the transcript, because there was not clarity at the time, although I was under the clear impression that it was going to be only defendants present, Ms. Stokman says she doesn't have the indictment before her and that there would be some overlap, which is why I ordered her to, and I say: So why don't you tell them at least the ones you know you're not going to introduce evidence on. And let's have you do that by Friday. And she said okay, and then she did that.

So the objection is overruled.

As to the limiting instruction, I guess I'm not quite clear on what you're requesting because, as I understand this

1668

evidence, it goes to Count 1.  So what exactly did you have in mind, Ms. Luem?

MS. LUEM:  Well, I guess just something that that particular drug -- those particular drugs or that drug transaction didn't involve the defendants on trial.  Or least be allowed to cross-examine the witness that that drug transaction was not on behalf of any of the defendants on trial or at least on behalf of Mr. Johnson.

THE COURT:  I'm not sure -- as I understand it, the witness today is a chemist.  I don't think the chemist can speak to --

MS. LUEM:  I mean the witness.  I assume it's going to be coming in through James Field who was the cooperating witness who was arrested while in possession of those narcotics.

THE COURT:  I think that's fair game.  The government is indicating that they believe it's a predicate act related to RICO.  They're certainly entitled to say, Mr. Field, you were doing this for purposes unrelated to the Aryan Brotherhood.

All right.  Anything else before we call in the jury?

All right.  Let's go ahead and bring in the jury.

MS. STOKMAN:  Oh, Judge --

(Jury enters the courtroom at 12:02 p.m.)

THE COURT:  All right.  Thank you.  We have our jury

1669

members back in their places.

Mr. Engelking, your next witness.

MR. ENGELKING:  Yes, Your Honor, the government calls Officer Christopher Rodriguez.

THE COURT:  All right.  Sir, if you'll come all the way up to the witness stand here in the front and raise your right hand to be sworn, please.

OFFICER CHRISTOPHER RODRIGUEZ, called as a witness on behalf of the Government, having been first duly sworn, testified as follows:

THE WITNESS:  Yes.

THE CLERK:  Go ahead and take a seat.  And then please state your full name for the record and spell your last name.

THE WITNESS:  Christopher Rodriguez, C-h-r-i-s-t-o-p-h-e-r, Rodriguez, R-o-d-r-i-g-u-e-z.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. ENGELKING:

Q.  Good afternoon, Officer.

A.  Good afternoon.

Q.  Where do you work?

A.  I work for the San Fernando Police Department.

Q.  And how long have you worked there?

A.  Four years.

ER 998

1670

Q.   What's your title?

A.   I am a police officer and a field training officer.

Q.   What does a field training officer do?

A.   For a field training officer, I'm in charge of training new hire police officers until they're able to be solo police officers.

Q.   And what are your duties as a regular police officer?

A.   As a patrol officer, I handle calls for service and as well as proactive police work.

Q.   Directing your attention to March 2nd, 2022, were you working that day?

A.   Yes.

Q.   And did there come a time that day when you became involved in a pursuit of a Mercedes?

A.   Yes.

Q.   What were you doing when you first encountered that vehicle?

A.   I was conducting surveillance at 1753 Truman, which is an ARCO gas station.

Q.   Is there any particular reason why you were surveilling that station?

A.   Yes.  It's a known crime area for narcotic and gang activity.

Q.   What did you observe when you were surveilling that gas station?

1671

A.   I saw two vehicles.  One was a gold Mercedes, the second vehicle was a gray Nissan Altima.  In the Mercedes I saw a thin white male and a heavy-built male with a beanie pumping gas.

And in the Altima, I saw a heavy-built white male with no shirt in the passenger seat and a female with red hair pumping gas into that vehicle.

Q.   Did you observe anybody get out of those vehicles?

A.   Yes.  The thin white male entered the ARCO.  And the female was outside of the vehicle pumping gas.  And the other male was pumping gas into the Mercedes.

MS. DE SALES BARRETT:  Sorry.  Your Honor, could you ask the witness to go -- get closer to the microphone?

THE WITNESS:  Yes.  Sorry.

MS. DE SALES BARRETT:  It's difficult to hear.

BY MR. ENGELKING:

Q.   Just to make sure everybody heard you, so you saw -- you said you saw one male get out of the Mercedes and go into the store; is that right?

A.   Yes.

Q.   Okay.  And the other -- what did the other male in the Mercedes do?

A.   Was pumping gas into the Mercedes.

Q.   Okay.  And how about the two people you observed in the Altima?

DX Rodriguez E

1672

A.   In the passenger seat was a -- he was sitting in the passenger seat and the female was pumping gas into the Altima.

Q.   Did you observe the male pumping gas into the Mercedes do anything else after he finished pumping gas?

A.   Yes.  He leaned into the Mercedes, grabbed an unknown item, and then he looked around, sort of paranoid, and after that, he made his way to the driver's side of the gray Altima, reached in, and some kind of exchange occurred.

Q.   Okay.  Did you later identify that male who got out of the Mercedes and went to the Altima?

A.   Yes, that was Aaron Fogle.

Q.   And did you later identify the male who got out of the Mercedes and went into the store?

A.   Yes, that's was James Field.

Q.   Okay.  So what happened after you observed Mr. Fogle leaning into the Altima?

A.   There was some kind of exchange right after.  He went back to the Mercedes, entered the passenger seat.

Q.   Did you observe Mr. Fogle to be carrying anything?

A.   He was wearing a black bag strapped along his chest back area.

Q.   Did the Mercedes eventually leave the gas station?

A.   Yes.

Q.   And what happened next?

A.   When the Mercedes left, it made a few Vehicle Code

DX Rodriguez-E

1673

violations so my partner and I began to initiate a traffic stop.

Q.   And what traffic violations did you observe?

A.   We had no front plate, we had -- which is 5200(a) VC from the California Vehicle Code, we had tinted front windows, and the driver also did not have his seat belt on.

Q.   Did you attempt to pull the Mercedes over?

A.   Yes.

Q.   What happened?

A.   When we activated our lights and sirens, the vehicle -- the Mercedes accelerated to a high rate of speed so we initiated a vehicle pursuit.

Q.   How long did the pursuit last?

A.   The pursuit was about three to four blocks.

Q.   What happened?

A.   When the Mercedes reached the intersection of Hubbard and Aztec, a gray pickup truck traveled westbound and a broadside collision occurred.

Q.   Were Field and Fogle arrested after the crash?

A.   Yes.

Q.   Were they searched?

A.   Yes.

Q.   Was the car searched?

A.   Yes.

Q.   Was anything of evidentiary value recovered from those

1674

searches?

A.   Yes.

Q.   Were photos taken of those items?

A.   Yes.

Q.   Were photos taken of the crash?

A.   Yes.

Q.   There are two binders in front of you.  Could you please look at Exhibits 1307 through 1339.  And please let me know when you've finished.

A.   1309, correct?

Q.   1307 through 1339.

A.   -39, thank you.

Q.   Do you recognize those photos?

A.   Yes.

Q.   Have you seen them before?

A.   Yes.

Q.   What are they?

A.   They are photos of the traffic collision as well as the evidence that was recovered.

Q.   And do those photos accurately depict the crash and the items that you recovered as you encountered them?

A.   Yes.

     MR. ENGELKING:  At this time, Your Honor, we move to admit Exhibits 1307, -08, -09, -10, -14, -15, -18, -20, -25, and -28.

DX Rodriguez E

1675

THE COURT:  Any objections?

MS. DE SALES BARRETT:  No.

MR. REED:  No objection.

MS. LUEM:  I stand on my previous objection.

THE COURT:  All right.  That objection is overruled.  Those will be admitted.

(Government's Exhibits 1307, 1308, 1309, 1310, 1314, 1315, 1318, 1320, 1325 and 1328 were received.)

MR. ENGELKING:  Your Honor, we also ask to publish as we go along.

THE COURT:  All right.

MR. ENGELKING:  Can we please pull up Exhibit 1325, please.

BY MR. ENGELKING:

Q.  Starting with the picture on the left, what are we looking at?

A.  The left is the gold Mercedes with the fire department attempting to extract Fogle, who was handcuffed through the sunroof.

Q.  Could you circle the hands in the sunroof for us, please?

A.  (Witness complies.)

Q.  Okay.  And who -- who's that putting his hands through the sunroof?

A.  The passenger, Fogle, Aaron Fogle.

Q.  So after these two vehicles crashed, what did you do?

1676

A.   We -- after we were able to safely extract Aaron Fogle, we searched the vehicle, Officer Lopez and I.

Q.   Okay.  Were you able to observe the condition of Mr. Field?

A.   Yes.

Q.   Were you able to observe the condition of Mr. Fogle?

A.   Yes.

Q.   What was Mr. Field's condition when you encountered him?

A.   Mr. Field had a large laceration on his face, and he also had a broken ankle.

     MR. ENGELKING:  Could we please pull up Exhibit 1308.

BY MR. ENGELKING:

Q.   And what are we looking at in these two pictures?

A.   This is Mr. Field.

Q.   And do these pictures accurately depict the condition of Mr. Field when you encountered him?

A.   Yes.

Q.   What was Mr. Fogle's condition when you encountered him?

A.   Mr. Fogle was stuck inside the vehicle through the collision damage, and he had a broken femur.

     MR. ENGELKING:  Could we please pull up Exhibit 1307, please.

BY MR. ENGELKING:

Q.   Starting with the picture on the left, what are we looking at?

DX Rodriguez E

1677

A.   That's the injuries to his femur due to the collision.

Q.   And how about the picture on the right?

A.   That's his hang -- hands through the sunroof, handcuffed, after he had informed us there was a firearm in the vehicle.

MR. ENGELKING:  Could we please pull up Exhibit 1318.

BY MR. ENGELKING:

Q.   Starting with the picture on the left, what are we looking at?

A.   It's the same Mercedes with traffic collision damage, and the fire department, as well as our officers attempting to get Fogle out of the vehicle safely.

Q.   Then the picture on the right?

A.   That's where he was seated after he was extracted from the vehicle, that passenger seat.

Q.   Now, you had just mentioned a firearm.  Was there a firearm found in the vehicle?

A.   Yes.

Q.   What was Mr. Fogle wearing?

A.   Mr. Fogle was wearing a Champion bag across his chest when he was being extracted.

Q.   Was that bag searched?

A.   Yes.

Q.   Did you search the bag?

A.   Officer Lopez searched it, and I was present.

Q.   Did you observe the contents of the bag?

DX Rodriguez-E

1678

A.  Yes.

Q.  Did you see anything of significance?

A.  Yes.  I saw a tightly wrapped brick with brown tape.

Q.  And did you or your partner find anything of significance on the driver's side floorboard of the car?

A.  Yes.  On the driver's side floorboard, we located a firearm.

Q.  And did you see that firearm?

A.  Yes.

        MR. ENGELKING:  Let's pull up Exhibit 1309.

BY MR. ENGELKING:

Q.  Starting with the photo on the left, what are we looking at?

A.  That is a firearm that was retrieved from the vehicle.

Q.  Could you please circle the firearm on your screen?

A.  (Witness complies.)

        MR. ENGELKING:  For the record, Your Honor, the witness circled a black item next to the foot pedals in the picture on the left.

        THE COURT:  All right.

BY MR. ENGELKING:

Q.  And you said that was the gun?

A.  Yes.

Q.  Okay.  And then the picture on the right, what are we looking at there?

DX Rodriguez E

1679

A.   It's the same firearm.  Once it was rendered safe, we have a high-capacity magazine, as well as a magazine that was removed from the firearm, the black bag that Fogle was wearing with the tightly wrapped brick that was inside that bag.

Q.   And could you circle the brick, please?

A.   Yes.  (Witness complies.)

        MR. ENGELKING:  And for the record, Your Honor, the witness circled the brown package to the right of the black bag in the photo on the right.

        THE COURT:  All right.  I see that.

BY MR. ENGELKING:

Q.   And is that black bag the same bag that you observed Fogle wearing at the gas station?

A.   Yes.

Q.   Did you attempt to determine what was in that brick?

A.   Yes.

Q.   How did you do that?

A.   We used a knife to cut through the packaging.

Q.   And what was in it?

A.   There was a white powdery substance believed to be drugs.

        MR. ENGELKING:  Could we look at Exhibit 1320, please.

BY MR. ENGELKING:

Q.   Starting with the picture on the top, could you explain to us what we're looking at?

DX Rodriguez-E

1680

A.   Yes.  So that's after we cut the packaging, the white powder is what was found inside.

Q.   And how about, what are we looking at on the picture on the bottom?

A.   It's the same Mercedes with Mr. Fogle still inside the vehicle.

Q.   When you encounter a substance that you believe to be drugs, how do you determine what the substance actually is?

A.   We send it out to the lab.

Q.   And did you submit this package to the lab for testing?

A.   Yes.

Q.   What was the case number that you booked the drugs under?

A.   22-0468.

Q.   Did you weigh the package before sending it out to the lab?

A.   Yes.

Q.   Roughly, how much did it weigh?

A.   Approximately 1 pound.

Q.   When we looked at Exhibit 1309, you had mentioned that there was a magazine in the photo.  Where did that come from?

A.   That magazine was between the center console and the driver's seat.

     MR. ENGELKING:  Could we please pull up Exhibit 1315.

BY MR. ENGELKING:

Q.   Looking at the photo on the right, what are we looking at

DX Rodriguez E

1681

there?

A.   That's the high-capacity magazine that was located.

Q.   It looks like it's on the seat here.  Why is that?

A.   That, we removed it, and then we put it on the seat and then photographed it.

Q.   Did you find anything else of significance in the car?

A.   Yes.

Q.   And what did you find?

A.   On the driver's seat, we located a McDonald's bag.

Q.   And what did the bag have in it?

A.   Inside the bag, there's a clear Ziploc bag containing a large amount of blue pills.

Q.   Did you locate any electronic devices in the car?

A.   Yes.

Q.   Tell -- could you tell me about that?

A.   There's about ten cell phones inside the vehicle, as well as two laptops.

     MR. ENGELKING:  Okay.  Let's pull up Exhibit 1328, please.

BY MR. ENGELKING:

Q.   Starting with the photo on the top, what are we looking at?

A.   That's the vehicle that the Mercedes collided into.

Q.   And the photo at the bottom?

A.   That's the inside of the McDonald's bag.

DX Rodriguez E

1682

MR. ENGELKING:  Let's look at Exhibit 1310.

BY MR. ENGELKING:

Q.  Starting with the photo on the left, what are we looking at there?

A.  That's the Ziploc bag that was located inside the McDonald's bag with -- contained a large amount of blue pills.

Q.  And what type of bags are those pills in?

A.  It's a Ziploc bag.

Q.  Okay.  What about the picture on the right?

A.  That is the cell phones we located, along with the firearm, two magazines, and the brick of -- the brick of -- that we located.

Q.  The brick in this picture appears to be in another bag; is that right?

A.  Yes, that is correct.

Q.  And why -- why is it in a different bag?

A.  We package it in that way to send it out to the lab.

MR. ENGELKING:  Let's look at Exhibit 13, 14, please.

BY MR. ENGELKING:

Q.  Starting with the picture on the left, what are we looking at?

A.  That's going to be the -- in the background, it's the firearm that was located.  The rounds to the front are going to be the rounds removed from the magazine that was inside the firearm, and the rounds that -- just a little bag is going to

ER 1011

DX Rodriguez/E

1683

be the round located inside the chamber.

Q.  How about the photo on the right?

A.  The photo on the right is the packaged blue pills, counted to be 519.

Q.  So they appear to be in a different bag than they were in the last photo.  Why is that?

A.  We package them in this way so we can send that out to the lab.

Q.  Did you count the pills?

A.  Yes.

Q.  Roughly, how many were there?

A.  It's about 519.

Q.  Did you inspect these pills?

A.  Yes.

Q.  Did they have anything stamped on them?

A.  Yes.  They had an "M" and a "30."

Q.  And did you submit the pills to the lab for testing to determine what they were?

A.  Yes.

Q.  And under what case number?

A.  22-0468.

        MR. ENGELKING:  Brief indulgence, Your Honor.

        THE COURT:  Sure.

        MR. ENGELKING:  No further questions, Your Honor.

        THE COURT:  Cross-examination?

1684

MS. DE SALES BARRETT:  No, Your Honor.

MR. REED:  No questions, Your Honor.

THE COURT:  All right.  May this witness be excused?

MR. ENGELKING:  Yes, Your Honor.

THE COURT:  Thank you, sir.  You may step down.

THE WITNESS:  Thank you, Your Honor.

MS. LUEM:  Actually, Your Honor, I think we have a couple questions for this witness.

THE COURT:  All right.

I'm sorry, sir, if you'll take a seat again.

CROSS-EXAMINATION

BY MS. LUEM:

Q.  I got lost in the shuffle there.

Just very briefly, when you were observing the Mercedes, the Altima initially, it was at a gas station?

A.  Yes.

Q.  And you said there was a woman with red hair that was driving that Nissan Altima, correct?

A.  Yes.

Q.  And a passenger from the Mercedes got into the Altima at one point?

A.  No.

Q.  Did they -- was there an interaction that you described?

A.  Yes.  He reached in from the driver's side window.

Q.  And in your experience -- based on your training and

1685

experience, did this appear to be a drug transaction to you?

A.   Yes.

Q.   Was there any contact made with the woman with red hair?

A.   Unfortunately not.

Q.   And when you -- when you came in contact with Mr. Field and Mr. Fogle and they have this -- these guns and drugs and phones, in your training and experience, did it appear to you that they had -- were dealing drugs?

A.   Yes.

Q.   And is it also true that they were under the influence of drugs?

     MR. ENGELKING:  Objection, Your Honor.

BY MS. LUEM:

Q.   In your training and experience, did it appear to you that they were under the influence of drugs?

     MR. ENGELKING:  Objection, Your Honor.

     MS. LUEM:  What's the objection?

     THE COURT:  I'll take care of that.

     Mr. Engelking?

     MR. ENGELKING:  It was outside the scope.

     THE COURT:  Overruled.

     Go ahead.

     THE WITNESS:  Due to their medical condition at the time and their -- them being transported, I wasn't able to determine that.

CX Rodriguez, L

1686

BY MS. LUEM:

Q.  You drafted a report in this case, right?

A.  Yes.

Q.  And you discussed, as a part of your investigation, follow-up with the EMTs that you had, correct?

A.  Yes.

Q.  And -- and the EMTs had interaction with Mr. Field and Mr. Fogle, right?

A.  That is correct.

Q.  And ultimately, you charged, I believe, Mr. Field with driving under the influence of -- or driving under the influence, correct?

A.  He was -- if I could look at my report to refresh, but I believe it was a -- we were going to file after the fact, based on his statement to the EMT.

Q.  Okay.  So you were going to file based on his statements, but you're not sure whether that charge was actually filed or not?

A.  I'm not sure.

Q.  Okay.  Because in the grand scheme of things, that was a little minor compared to everything else that he was doing out there, right?

A.  Just really.

Q.  And just briefly, were there injuries to the other party involved in the car accident?

CX Rodriguez/L

1687

A.  He complained of chest pain.

Q.  And that's it?

A.  Yes.

Q.  Okay.  Thank you.  Nothing further.

THE COURT:  Anyone else with cross-examination?

Mr. Engelking, any redirect?

MR. ENGELKING:  No, Your Honor.

THE COURT:  All right.  May this witness be excused?

MR. ENGELKING:  Yes, Your Honor.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Next witness, please.

MR. CONOLLY:  Your Honor, the government would call Fracia Martinez.

THE CLERK:  Please raise your right hand.

FRACIA MARTINEZ,

called as a witness on behalf of the Government, having been first duly sworn, testified as follows:

THE WITNESS:  I do.

THE CLERK:  Go ahead and have a seat, and then please state your name and spell your last name.

THE WITNESS:  Fracia Santos Martinez, M-a-r-t-i-n-e-z.

THE CLERK:  Thank you.

///

///

1688

DIRECT EXAMINATION

BY MR. CONOLLY:

Q.  Good afternoon, Ms. Martinez.  Can you tell us, please, where you work?

A.  I work with the Drug Enforcement Administration at the Southwest Laboratory.

Q.  And where is that?

A.  In Vista, California.

Q.  And what is your position at the Southwest Lab?

A.  I'm a senior forensic chemist.

Q.  And how long have you been in that position?

A.  Uh, since 2007.

Q.  And did you work for the same lab before 2007?

A.  Yes.

Q.  What was your position then?

A.  I was a forensic chemist.

Q.  How long had you done that job for?

A.  Since 1997.

Q.  So fair to say you've been at the same lab since 1997?

A.  That is correct.

Q.  First as a forensic chemist, now as a senior forensic chemist.

A.  That's correct.

Q.  And what -- where did you work before you went to work for the DEA lab?

1689

A.   I worked for a private industry, Quantum Materials.

Q.   What did you do there?

A.   I was a quality control chemist.

Q.   And what degrees do you hold?

A.   I have a bachelor of science degree in chemistry.

Q.   Where's that from?

A.   University of California, Riverside.

Q.   And so turning to your work as a forensic chemist, what are your primary duties?

A.   My primary responsibilities is analysis of evidence or the presence or absence of controlled substances, to testify in court, and also to assist our field agents.

Q.   Can you provide a rough estimate of how many exhibits you've analyzed for the presence or absence of controlled substances in your time at the DEA?

A.   Approximately 9,000 times.

Q.   Does it ever happen that you analyze a suspected drug sample and it turns out that it's not a controlled substance?

A.   Yes.

Q.   What do you do in those cases?

A.   I still proceed with my analysis.

Q.   Do you generate a report afterwards?

A.   Yes.

Q.   What specialized training did you receive to become a forensic chemist when you were first hired by the DEA?

DX - Martinez C

1690

A.   I did a basic forensic chemist at the Southwest Laboratory and also at Leesburg, Virginia.

Q.   Approximately how many months was that?

A.   Approximately, Leesburg about two weeks, and then the rest was at Southwest Lab.

Q.   How long was that training?

A.   Ten months.

Q.   And what did you learn during that training, just briefly?

A.   Uh, we did drug analysis, drug identification, instrumentation, and also testifying in court.

Q.   Were you also taught about chain of custody handling?

A.   Yes.

Q.   And you said that most of that training was at the DEA labs?

A.   Yes.

Q.   So it was on-site training?

A.   That is correct.

Q.   In your job, do you have ongoing education and training requirements?

A.   Yes.

Q.   Can you tell us, please, what those are?

A.   We are required about 16 hours of technical training, including seminar, conference, or instrumentation.

Q.   Do you have periodic testing on your proficiency?

A.   Yes.  Annually.

1691

Q.   And how is the proficiency testing done?

A.   It's an unknown sample that's given to a chemist, and you need to pass that.

Q.   And then somebody reviews your work?

A.   Yes.

Q.   And they will determine whether or not you did it proficiently?

A.   Correct.

Q.   It's fair to say there's a significant amount of training you have to go through before you can begin work as a DEA forensic chemist.  Is that fair to say?

A.   Yes.

Q.   Would you say that you are at this point proficient in the analysis of controlled substances?

A.   Yes.

Q.   Do you -- do you also train other law enforcement?

A.   Yes, I do.

Q.   What do you train them in?

A.   Manufacturing of controlled substances and also identification of drug substances.

Q.   And is the purpose of that to help them with their narcotics investigations?

A.   Yes.

Q.   So in addition to then working in a lab, do you assist agents in the field as well?

1692

A.   Yes.

Q.   And how do you -- how does that happen?

A.   Either doing a sampling or also doing a clandestine laboratory.

Q.   What is a clandestine laboratory?

A.   Illegal manufacturing of controlled substances.

Q.   Have you previously testified as an expert witness in the analysis of controlled substance?

A.   Yes.

Q.   Can you give me a rough estimate of how many times?

A.   Approximately 60 times.

Q.   So turning specifically to the controlled substance commonly known as fentanyl, in the course of your duties, do you perform tests to detect the presence of fentanyl?

A.   Yes.

Q.   What tests do you commonly use to test for fentanyl?

A.   I use a gas chromatograph mass spectrometry, also a gas chromatograph, and also immunoassay test.

Q.   Could you say that last one again slowly, please.

A.   Immunoassay test.

Q.   So in very basic terms, can you give us an explanation of what you do when you test a substance using the gas chromatograph mass spectrometry?

A.   Gas chromatograph mass spectrometry is used so they can use to separate and confirm the identities of individual

ER 1021

DX - Martinez - C

1693

components in a mixture.

Q.   And the gas chromatograph part of that, what does that test do?

A.   It's a separation technique.  Basically detects the components in a mixture.

Q.   Then what does the mass spectrometry do?

A.   It basically breaks down the molecules.

Q.   And is that -- when you said "confirm," is that what you used to confirm what the molecules are?

A.   Yes.

Q.   And once you have what the molecules is, do you compare it against a known sample?

A.   Yes, a known standard.

Q.   Okay.  Do you have a library of these known standards or a database of them to compare controlled substances to?

A.   Yes.

Q.   And can you provide a basic explanation as to how the immunoassay test works?

A.   The immunoassay detects fentanyl or fentanyl-related compounds.  It's kind of like a COVID test strip.  So you just dip it into water and it gives you a positive or negative substance.

Q.   When you say "positive," you mean like positive for fentanyl?

A.   Yes.

1694

Q.   To indicate that fentanyl is present?

A.   Correct.

Q.   Does that work for other opioids as well?

A.   Only for fentanyl-related compounds.

Q.   And?

A.   Fentanyl-related compounds.

Q.   Fentanyl-related compounds?

A.   Yes.

Q.   Thank you.

     When you are given a sample, how many tests do you run on each sample that you analyze?

A.   I perform two tests and two samplings for each exhibit.

Q.   And these tests that you've just described to us, are they generally accepted within the scientific community?

A.   Yes.

Q.   And did you receive specialized training in how to conduct these tests when you were becoming a forensic chemist?

A.   Yes, I did.

     MR. CONOLLY:  Your Honor, at this time, the government would move to qualify Ms. Martinez as an expert in the analysis of controlled substances, specifically in this case, fentanyl.

     THE COURT:  Any objections?

     MR. REED:  No objection.

     MS. LUEM:  No.

1695

MS. STOKMAN:  No, Your Honor.

MS. DE SALES BARRETT:  No, Your Honor.

MR. VILLA:  No, Your Honor.

THE COURT:  I will accept her on those topics.  Thank you.

BY MR. CONOLLY:

Q.  So before we turn to the specific drugs in this case, can you please describe the process at the DEA lab for receiving drug exhibits, keeping them secure, and then processing them?

A.  Uh, there's several ways you can do it.  You can hand deliver by special agent or registered mail with a receipt, and also a common carrier like UPS or FedEx.

Q.  And if an agent were to bring the drug sample to the lab, does that come with a form?

A.  Yes, the DEA 7 form.

Q.  DEA 7 form?

A.  That's correct.

Q.  And once received at the lab, what happens to the drug evidence then?

A.  So it's inputted into our system and stored in our main vault.

Q.  Is it assigned an internal laboratory number?

A.  Yes.

Q.  And then how -- how then do the drugs get to a chemist for testing?

1696

A.   It's actually assigned to a chemist randomly.  At this point I was assigned to an exhibit or a case, and then I would pick it up in our system.

Q.   Okay.  When you say "pick it up," you mean from the vault that you mentioned earlier?

A.   That's correct.

Q.   Okay.  Is there a process for signing -- signing out the drugs from the vault?

A.   Yes.  Every chemist has their own individual password to log it in or to take it out.

Q.   So it is known with each drug exhibit which chemist has signed it out?

A.   That's correct.

Q.   And what do you do with the exhibit once you have -- what's the first thing you do once you have signed it out?

A.   I double-check to make sure that it matches the DEA 7, has the case number, exhibit number, and also the LIMS number.

        COURT REPORTER:  What was that last word, LIMS number?

        THE WITNESS:  Yes.

        COURT REPORTER:  As in L-I-M-S?

        THE WITNESS:  Yes.

BY MR. CONOLLY:

Q.   Can you tell us please what the LIMS number is?

A.   The LIMS number is a laboratory information management.

DX - Martinez C

1697

It's a unique identifier for each piece of evidence.

Q.  So that is the lab's internal number for tracking each exhibit; is that fair to say?

A.  That's correct.

Q.  And then skipping the part where you actually analyze the drug, after you have analyzed it, what do you do with it when you've finished analyzing it?

A.  I kept it in my possession.  I put it -- I stored it the in-process vault, which is the chemist vault, until the report is completed.

Q.  So, I'm sorry, you said you keep it in your in-process vault?

A.  That is correct.

Q.  And is that your own personal vault?

A.  Yes.

Q.  Okay.  Do you repackage it as well?

A.  I put it in the same packages, yes.

Q.  And is there a process for sealing those packages?

A.  I would put my evidence sticker on it.

Q.  What do you put on the evidence sticker?

A.  The case number, the date I completed it, and also my signature.

Q.  And then you said it goes into the in-process locker until the report is -- did you say signed off on?

A.  Yes, or reviewed.

1698

Q.   Okay.  And once that has happened, what happens to the drug evidence then?

A.   It goes back to the main vault for storage.

Q.   So at the time you received the evidence in this case, you were working at the DEA lab still in Vista, correct?

A.   That is correct.

Q.   And is that a secure facility?

A.   Yes, it is.

Q.   Do you have to have special -- special clearance to access it?

A.   Yes.

Q.   Would that also be true that you have to have special clearance to access the laboratory area?

A.   Yes.

Q.   And your workspace in the lab, is it generally kept as a sterile area?

A.   Yes.

Q.   And how do you keep that sterile?

A.   I clean it every time I analyze a piece of evidence.

Q.   Do you have special materials that you clean it with?

A.   I wipe it with a sponge or Clorox.

Q.   And other cleaning -- so, sorry, you said Clorox.

     Cleaning solutions?

A.   Cleaning solutions, I'm sorry.

Q.   Yes.

1699

And why do you clean your workspace after every -- well, how often do you clean it?

A.  Every time I process a new evidence.

Q.  And why do you do that?

A.  I don't want any cross-contamination.

Q.  Do you also make sure that your machines or lab instrumentalities are clean as well?

A.  Yes, I do.

Q.  Okay.  How do you do that?

A.  I would run a methanol blank.

Q.  Say that again?

A.  A methanol blank, I would run it.

Q.  And do you perform periodic performance checks on your instrumentalities?

A.  Yes, monthly.

Q.  And how do you do that?

A.  We have a performance check every month to make sure that the system -- or the instrumentation is properly working.

Q.  And do you have verified samples that you run through the instrumentalities to make sure they're returning the right results?

A.  Yes.

Q.  So turning to the analysis process, once you've received the drug evidence from the lab, what are your -- what do you do with a drug exhibit when you first -- when you first

DX - Martinez-C

1700

receive it?

A.   Once I receive it, I make sure to double-check the case number, exhibit number and LIMS number, and then I obtain a gross weight.  A gross weight is the weight of the entire package before opening it.  And then I open it.

Q.   And what happens after you open it?

A.   Once I open it, I obtain the net weight.  The net weight is the weight of the sample itself without the packaging.

Q.   And then what is your next step after you've --

A.   Then I perform my analysis or my testing.

Q.   And then after you've finished the analysis, do you weigh it again?

A.   Yes, I do.

Q.   And what is the name for that weight?

A.   It's called a reserve weight.  It's after I'm done with my analysis.

Q.   And at that point you repackage it?

A.   Yes, I repackage it.

Q.   And do you weigh it again?

A.   Yes.  It's called gross weight after analysis being everything's back into the same bag.

Q.   And in this case, did you check the evidentiary seals and the condition of the exhibits before you tested them?

A.   Yes, I did.

Q.   And if the seals had been tampered with in any way, what

1701

would you have done?

A.  I would never accepted the evidence.

Q.  So in this case, how many exhibits did you receive for testing?

A.  Two.

Q.  And is it fair to say one of those exhibits was in a powder form and the other one was in a tablet form?

A.  Yes.

Q.  One moment, please.

MR. CONOLLY:  Your Honor, may I approach?

THE COURT:  Yes.

BY MR. CONOLLY:

Q.  Okay.  Now, Ms. Martinez, I have handed you what has been marked as the Government's Exhibit 1858.

Do you recognize it?

A.  Yes, I do.

Q.  Okay.  What is it?

A.  It's the evidence that I analyzed.

Q.  Okay.  And how do you recognize this exhibit?

A.  It has my signature, the case number, and also the date when I completed it.

Q.  Okay.  And do you call -- do you recall when you first saw this exhibit?

A.  Yes, I do.

Q.  Can you tell me please when that was?

1702

A.   January 13, 2025.

Q.   And this is the exhibit that is in powder form; is that correct?

A.   That's correct.

Q.   And when you received this exhibit, were there any signs that it had been tampered with?

A.   No.

Q.   Is that -- and that is your signature and seal on the evidence stickers?

A.   Yes.

Q.   And is it still in the same condition as it was when you completed your analysis?

A.   Yes, it was.

Q.   And what did you do with it once you had finished your analysis?

A.   Once I completed my analysis, I kept it until the report is completed or reviewed and then I return it back to the main vault.

        MR. CONOLLY:  Your Honor, at this time I would move to admit Exhibit 1858 into evidence.

        THE COURT:  Any objections?

        MS. DE SALES BARRETT:  No, Your Honor.

        MR. REED:  No objection.

        MR. VILLA:  Stand on our original objection, Your Honor.

1703

THE COURT:  All right.  That's overruled.  The exhibit will be admitted.

(Government's Exhibit 1858 was received.)

BY MR. CONOLLY:

Q.  And so when you received this exhibit, what tests did you use to analyze it?

A.  I did two tests.  I did a gas chromatograph mass spectrometry and also a gas chromatograph.

Q.  After running those tests, did you form an opinion about the material that you had tested and whether it contained a controlled substance?

A.  Yes.

Q.  And what was your conclusion?

A.  They contained fentanyl and Tramadol.

Q.  And what is Tramadol?

A.  Tramadol is a Schedule 4 controlled substance.  It's a pain reliever.

Q.  Is it -- to the best of your knowledge, is it also an opioid?

A.  Yes.

Q.  And fentanyl, you said it contained also, that's a Schedule 2 controlled substance?

A.  Yes, it is.

Q.  And at the end of this analysis, did you generate a lab report?

DX - Martinez-C

1704

A.  Yes, I did.

        MR. CONOLLY:  Your Honor, may I approach again?

        THE COURT:  Yes.

        MR. CONOLLY:  Okay.

BY MR. CONOLLY:

Q.  In the binder in front you, I believe it's Binder 2 of 2.

        MR. CONOLLY:  Or, actually, just for the witness,
please, could we have Exhibit 1342.

BY MR. CONOLLY:

Q.  Do you recognize what is on your screen?

A.  Yes.

Q.  Is this the report that you generated?

A.  Yes.

Q.  And to confirm, is that -- is that your name in the lower
left-hand corner?

A.  Yes, it is.

Q.  Okay.  And the date of completion of the analysis, is that
the date we see in the lower right-hand corner?

A.  Yes.

        MR. CONOLLY:  Your Honor, I would ask to move
Exhibit 1342 into evidence and to publish to the jury.

        THE COURT:  Any objections?

        MR. VILLA:  Same objection.

        THE COURT:  Objection is overruled.  That will be
admitted.

1705

(Government's Exhibit 1342 was received.)

BY MR. CONOLLY:

Q.   And this report indicates that you confirmed that the substance you tested in this sample contained fentanyl and Tramadol?

A.   That's correct.

Q.   Can you please circle on the screen where you include that information, the identity of the drugs?

A.   (Witness complies.)

MR. CONOLLY:  So for the record, the witness has circled towards the upper left-hand corner in the column of the table marked "Substances Identified."

BY MR. CONOLLY:

Q.   Now, right before the word "fentanyl," which I'm underlining here -- oops, sorry.  You know what?  Right before the word "fentanyl," there's a very long name.  Can you tell us, please, what that name is?

A.   It's a scientific name for fentanyl.

Q.   I won't make you pronounce it, but that's what commonly known as fentanyl?

A.   Correct.

Q.   Okay.  And you weighed the sample, as well?

A.   I did.  Yes, I did.

Q.   Okay.  And how much did it weigh?

A.   496.9 grams.

DX Martinez C

1706

Q.   Thank you.

          MR. CONOLLY:  And, Your Honor, may I approach again?

          THE COURT:  Yes.

BY MR. CONOLLY:

Q.   Okay.  Ms. Martinez, I've handed you what has been marked as Government's Exhibit 1856.  Do you recognize this exhibit?

A.   Yes, I do.

Q.   What is it?

A.   It's the evidence that I analyzed.

Q.   Okay.  And how do you recognize it?

A.   It has my signature, also the case number.

Q.   Do you recall when you first saw this exhibit?

A.   Yes.

Q.   When was that?

A.   September 21, 2023.

Q.   And this exhibit, fair to say that this is in tablet form, correct?

A.   That's correct.

Q.   So tablet, also in other -- also described as pills; is that correct?

A.   That's correct.

Q.   And when you received this exhibit, were there any signs that it had been tampered with since you had analyzed it?

A.   No.

Q.   And is that your signature and seal at the bottom of the

1707

bag?

A.  Yes.

Q.  And is it -- it's still in the same condition as when you -- as when you had completed your analysis?

A.  Yes.

Q.  And what did you do with -- with this exhibit when you had completed your analysis?

A.  Uh, it stayed with me until the report is completed.

MR. CONOLLY:  Your Honor, at this time, I would move Exhibit 1856 into evidence.

THE COURT:  Any objections?

MS. FISHER-BYRIALSEN:  No.

MR. REED:  No objection.

MR. VILLA:  Same objection.

THE COURT:  It will be overruled.  That exhibit will be admitted.

(Government's Exhibit 1856 was received.)

BY MR. CONOLLY:

Q.  So when you received this exhibit, what tests did you use to analyze it?

A.  I performed a gas chromatograph mass spectrometry and also immunoassay test.

Q.  And after running both of those tests, did you form an opinion about the material you tested and whether or not it contained a controlled substance?

1708

A.   Yes.

Q.   And what did you conclude?

A.   Contains fentanyl and acetaminophen.

Q.   Is acetaminophen commonly known by another name?

A.   Yes.

Q.   What is that?

A.   Tylenol.

Q.   Tylenol?

A.   Tylenol.

Q.   And as far as you know, is Tylenol a controlled substance?

A.   No, it's not.

Q.   But it also contains fentanyl, correct?

A.   Correct.

Q.   And that is a Schedule 2 controlled substance?

A.   That's correct.

Q.   And at the end of this analysis, did you generate a lab report for this exhibit?

A.   Yes, I did.

        MR. CONOLLY:  Could we please have for the witness Exhibit 1340.

BY MR. CONOLLY:

Q.   Do you recognize what is on the screen in front of you?

A.   Yes, I do.

Q.   What is it?

A.   It's my lab -- it's my report.

1709

Q.  With your name in the lower-left corner?

A.  Yes.

Q.  Date of completion in the lower-right corner?

A.  Correct.

Q.  Okay.

MR. CONOLLY:  Your Honor, at this time I would move Exhibit 1340 into evidence and request permission to publish it to the jury.

THE COURT:  Any objections?

MS. FISHER-BYRIALSEN:  Nope.

MR. VILLA:  Same objection.

MR. REED:  No objection.

THE COURT:  Objection is overruled.  That will be admitted.

(Government's Exhibit 1340 was received.)

BY MR. CONOLLY:

Q.  So -- yes.  So -- and this report indicates that you confirmed that the substance you tested in this sample contained fentanyl and acetaminophen; is that correct?

A.  That's correct.

Q.  Approximately how many pills were in this exhibit?

A.  520.

Q.  And all together, how much did they weigh?

A.  56.4 grams.

MR. CONOLLY:  Your Honor, if I might approach one

1710

last time?

THE COURT:  All right.

BY MR. CONOLLY:

Q.  On your lab report, there's a -- there's a number that says "case number."  There's a -- yes -- called -- sorry. Pardon me.

On the lab report, it indicates a case number.  What is that number?

A.  It's a case number given by the agents.

Q.  Okay.  And then in the left column of the table where it gives the results, that's the exhibit -- exhibit number over there?

A.  Yes.

Q.  Okay.  Also, we had mentioned the LIMS number.  So just for the benefit of the jury, is that this number here under the case number?

A.  Yes, it is.

Q.  I've circled the case number and the LIMS number in the upper-right portion of the lab report.

MR. CONOLLY:  One moment, please, Your Honor.

Thank you, Ms. Martinez.

And, Your Honor, I have no further questions at this time.

THE COURT:  Any cross-examination?

MR. REED:  No questions, Your Honor.

1711

MS. FISHER-BYRIALSEN:  No.  Thank you.

MR. VILLA:  No, Your Honor.

THE COURT:  May this witness be excused?

MS. STOKMAN:  Yes.

THE COURT:  All right.  Thank you, ma'am.  You may step down.

THE WITNESS:  Thank you.

THE COURT:  Next witness.

MS. STOKMAN:  Judge, may we approach?

THE COURT:  All right.

(Sidebar commences.)

MS. STOKMAN:  We're a little early.  The next witness is an in-custody, and because of transportation, he won't be here until tomorrow.  So we're asking --

THE COURT:  You have no witnesses?

MS. STOKMAN:  No.

And also, just so the Court knows, and counsel, we're going ahead of schedule, in our minds.  So hopefully that, and the fact that everyone is kind of sick, is going to be okay for the half hour.

MR. VILLA:  Which witness is that?

MS. STOKMAN:  Field tomorrow.

MR. VILLA:  And in terms of scheduling, so we can plan defense witnesses, any idea yet?

MS. STOKMAN:  Sorry, what?

ER 1040

1712

MR. VILLA:  You just said you were ahead of schedule.

MS. STOKMAN:  When we're going to --

THE COURT:  -- finish your evidence.

MS. STOKMAN:  Oh.  I think that, best-case scenario, by the end of next week, but the week after for sure.

MR. VILLA:  Thank you.

MS. DE SALES BARRETT:  Do we have --

MS. STOKMAN:  Yeah, it's quicker.

MS. DE SALES BARRETT:  Do we have more witnesses for tomorrow besides Mr. Field?

THE COURT:  Let's do this in a minute.

MS. DE SALES BARRETT:  Sure, Judge.  Thanks.

    (Sidebar ends.)

THE COURT:  All right.  Ladies and gentlemen, I'm sorry to tell you that we have to finish early today.  I hope that's good news for you.  And I will tell you that we're much more ahead of schedule than it may feel like.

But otherwise, as a reminder, please don't discuss the case or allow anyone to discuss it with you.  Please don't form any opinions about this case.  Please don't do any independent research on your own, including consulting the internet, doing any sort of research whatsoever.  And please don't view anything about this case in the media.

All right.  Otherwise, we will see you tomorrow at eight o'clock.  If you'll just leave your notebooks in the

1713

room.  We'll see you in the morning.

(Jury exits the courtroom at 12:54 p.m.)

THE COURT:  All right.  So I think there was an inquiry about the witnesses for tomorrow.

MS. STOKMAN:  Yes.  Uh, I mean, we're prepared to have witnesses continue, since it's only Wednesday tomorrow, if we finish up with the witness who will be called at eight o'clock tomorrow morning.

THE COURT:  All right.  So I need you to share with the defense counsel who you've got coming up tomorrow so they can be prepared.

The other thing, Mr. Clement and Mr. Field, I just don't -- I'm sorry, Mr. Clement and Mr. Johnson, I don't know, you don't seem like you feel very well today, but do you want to be transported tomorrow?

MR. VILLA:  Mr. Johnson says yes.

THE COURT:  Okay.

DEFENDANT CLEMENT:  Me too, Your Honor.

THE COURT:  Okay.  All right.  Then we'll see you in the morning.

Okay.  All right.  Also, to the extent that the defense has witnesses that they need to coordinated with the Marshals Service, I didn't realize we were as close to the end of the government's case as that.  So you need to coordinate that with the Marshals Service so that you get your witnesses,

1714

if you have any that you need here, with the Marshals Service.

MR. VILLA:  We'll let them know the current estimate, Your Honor.

THE COURT:  Perfect.  Thank you.

Anything else, then, for the record right now?

MS. STOKMAN:  Nothing from the government.

MR. VILLA:  No, Judge.

THE COURT:  All right.  Thank you.  We'll see you in the morning.

(Discussion off the record.)

THE COURT:  Just to be clear, you all are supposed to tell me who your witnesses are coming up.  It would be more than just, you know, you hope it's one.  So the defense need to know everybody who's coming tomorrow.  I'm just saying you need to know everybody who's coming tomorrow.

When you're going to talk --

MR. VILLA:  I just asked who's next after Mr. Field, and we get no answers, and that's the problem we've been having.  We get a whole week of witness in alphabetical order but not any day when.

THE COURT:  Who's going to be here tomorrow, Mr. Field and who else?

MS. STOKMAN:  We believe we'll be going into Lomita witnesses; however, we have also given -- on Friday, as the Court ordered, we give every witness we anticipate potentially

1715

being able to come.  Due to scheduling issues, that changes around.  We believe we would go into Lomita, but there are other witnesses unrelated to that that, if they are available and we're finished, depending on what time, they would be called.  However, at this point, we would -- if it's tomorrow, we would go into the Lomita witnesses.

THE COURT:  What does that mean?  I don't know what "Lomita witnesses" mean?  Who do you anticipate in that part that may testify tomorrow?

MS. STOKMAN:  Uh, the detective, Maria Maciel.  I don't know if we'll get further than that tomorrow.

THE COURT:  If you do, who will it be?

MS. STOKMAN:  Judge, I would have to look at my witness list that I sent out.

Judge, at this point, it might be other out-of-custody cooperators, and due to safety concerns for their movements, I'm not willing to give that at this point, but in the morning, I'm happy to give that information over.

THE COURT:  All right.  So when you come in the morning, tell the defense who you anticipate, but we know, at least at this point, Mr. Field and maybe an officer related to the Lomita and then out-of-custody cooperators.

But, in any event, Mr. Villa, you at least know the entirety of the list for the week; is that right?  So you know who the possible out-of-custody cooperators are?

ER 1044

1716

MR. VILLA:  I mean, we have a list for the week, it's a very long list, Your Honor, and I don't know that we're going to get through all of them this week, but we can certainly live with an order that Ms. Stokman just tells us and we don't tell our clients, because we need to prepare for these witnesses.  I mean, we can't just prepare for all --

THE COURT:  How many have been disclosed for the rest of the week?

MR. VILLA:  I can look at the email, Judge.

THE COURT:  Okay.

MS. LUEM:  I think 17 or something.

THE COURT:  Okay.

MR. REED:  21, but, yeah, 21.  But we carved through a few of them today, so I think it's up to 20, like 19 left.

THE COURT:  All right.  Ms. Stokman.

MR. VILLA:  -- minus the three today.  Sorry.

MS DE SALES BARRETT:  (Inaudible.)

THE COURT:  I don't know what counsel is saying.  I can't hear that.

But, Ms. Stokman, I appreciate your concerns for their safety, but I think, in fairness, the defense needs to know who the witnesses are going to be.  That was my order early on.  So that information will be shared with counsel this afternoon.  And, counsel, you are not to discuss this with your clients and no one on your team is to do that.  I

1717

don't want any hint that this information has been passed along to any other witness, to any defendant, to anyone.  Does that make sense.

MS. DE SALES BARRETT:  Yes, Your Honor.

MS. FISHER-BYRIALSEN:  Yes, Your Honor.

MR. VILLA:  Yes, Judge.

MS. FISHER-BYRIALSEN:  With one -- just one thing I want to put on the record.  Mr. Johnson and Clement know that Mr. Field is coming tomorrow, and we're planning on discussing that with Mr. Clement today, just that person.

THE COURT:  Okay.  And they will know, you will instruct them that they are not to discuss that with anyone by telephone, by email, by word of mouth, by written communication, period.  They are not to mention that to anyone or send that information out.  I mean, they clearly know they are being monitored.  So if they do it, I'm going to know it.

On that topic, when am I going to get those phone calls we talked about earlier?

MS. STOKMAN:  Judge, we can have them downloaded by the end of the day.  So if the Court wants them -- if they can be emailed, I'll email.  If not, I'll bring in a disc tomorrow morning.

THE COURT:  If they can't be emailed, we can put it up to box?

MS. STOKMAN:  Yes.

1718

THE COURT:  Okay.  All right.  Anything else now?

MR. VILLA:  We would just ask for simultaneous disclosure.

THE COURT:  Right.

MS. STOKMAN:  And, Judge, just to clarify, it's one call and a text.

THE COURT:  Okay.

MS. STOKMAN:  So it should hopefully be emailable.

THE COURT:  Okay.  Thank you.

     (Proceedings were adjourned at 1:01 p.m.)


     I, RACHAEL LUNDY, Official Reporter, do hereby certify the foregoing transcript as true and correct.


Dated:  January 28, 2025           /s/ Rachael Lundy_____
                                   RACHAEL LUNDY, CSR-RMR
                                   CSR No.  13815