IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff - Appellee,<br>v.<br>KENNETH JOHNSON,<br>    Defendant - Appellant. | No. 25-3645<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |
| UNITED STATES OF AMERICA,<br>    Plaintiff - Appellee,<br>v.<br>FRANCIS CLEMENT,<br>    Defendant - Appellant. | No. 25-3648<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |

On Appeal from the United States District Court
For the Eastern District of California
The Honorable Jennifer L. Thurston
D.C. No. 1:20-cr-00238-JLT-SKO

**EXCERPTS OF RECORD
VOLUME 7 OF 13**

Ryan J. Villa
The Law Office of Ryan J. Villa
5501 Eagle Rock Ave. NE Suite C2
Albuquerque, NM 87113
Ryan@rjvlawfirm.com

Andrea Lee Luem
Andrea Lee Luem, PHV
400 South Fourth Street, Ste 500
Las Vegas, NV 89101
andrea@luemlaw.com

Counsel for Defendant-Appellant
Kenneth Johnson

Jane Fisher-Byrialsen
Fisher & Byrialsen, PLLC
4600 S. Syracuse Street
Denver, CO 80137
jane@fblaw.org

Jean D. Barrett
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
jeanbarrett@ruhnkeandbarrett.com

Counsel for Defendant-Appellant
Francis Clement

1719

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. JENNIFER L. THURSTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 1:20-cr-00238-JLT-SKO |
| Plaintiff, | ) | |
| | ) | Jury Trial, Day 8 |
| vs. | ) | |
| | ) | |
| KENNETH BASH, et al. | ) | |
| | ) | Volume 8 |
| Defendants. | ) | Pgs. 1719 - 1924, inclusive |
| | ) | |

Fresno, California                     Wednesday, January 29, 2025

REPORTER'S TRANSCRIPT OF PROCEEDINGS

REPORTED BY:  RACHAEL LUNDY, CSR, RPR, Official Reporter

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

ER 1049

1720

**APPEARANCES OF COUNSEL**:

For the
Government:

**STEPHANIE STOKMAN**
Assistant U.S. Attorney
2500 Tulare Street, Rm. 4401
Fresno, California  93721

**JARED ENGELKING**
Department of Justice
1301 New York Avenue, N.W.
Washington, DC 20005

**JAMES ROBERT CONOLLY, GOVT**
U.S. Attorney's Office
501 I Street, Suite 10-100
Sacramento, CA 95814

For Defendant
Johnson:

Law Offices of Andrea Luem
Attorneys at Law
400 South Forth Street, Suite 500
Las Vegas, Nevada  89101
BY:  **ANDREA LEE LEUM, ESQ**.

Law Offices of Ryan J. Villa
5501 Eagle Rock Avenue NE
Suite C2
Albuquerque, NM 87104
BY:  **RYAN J. VILLA, ESQ**.

For Defendant
Clement:

Fisher & Byrialsen, PLLC
Attorneys at Law
99 Park Avenue
New York, NY 10016
BY:  **JANE FISHER-BYRIALSEN, PHV**

Ruhnke And Barrett
29 Broadway, Suite 1412
New York City, NY 10006
BY:  **JEAN DE SALLES BARRETT, PHV**

For Defendant
Stinson:

Law Office of Kenneth Alan Reed
406 W 4th Street
Santa Ana, CA 92701-4505
BY:  **KENNETH ALAN REED, ESQ**.

1721

## INDEX

**GOVERNMENT'S WITNESSES:**

**JAMES FIELD**

DIRECT EXAMINATION BY MS. STOKMAN                1723
CROSS-EXAMINATION BY MS. FISHER-BYRIALSEN        1842
CROSS-EXAMINATION BY MS. LUEM                    1858
REDIRECT EXAMINATION BY MS. STOKMAN              1869

**MARIA MACIEL**

DIRECT EXAMINATION BY MR. ENGELKING              1882
CROSS-EXAMINATION BY MR. VILLA                   1900
REDIRECT EXAMINATION BY MR. ENGELKING            1914

\* \* \* \* \*

## EXHIBITS

| **GOVERNMENT'S** | **Received** |
|---|---|
| 1284 | 1752 |
| 1299 | 1772 |
| 1305, pages 19 through 28 | 1787 |
| 1014 | 1794 |
| 1838 | 1814 |
| 1303 | 1818 |
| 1304 | 1828 |
| 1349, 1350, 1352, 1356, 1367, 1371, 1376, and 1377 | 1887 |
| 1394 through 1408 | 1899 |

| **COURT'S** | **Marked** |
|---|---|
| Exhibit 1 | 1723 |

\* \* \* \* \*

ER 1051

1722

Wednesday, January 29, 2025                    Fresno, California

8:06 a.m.                                       Jury Trial Day 8

(The following proceedings were held in open court:)

THE COURT:  All right.  Let's go ahead and bring the jurors in.

MS. STOKMAN:  Actually, Judge, if we're bringing the jury in, we need to bring the witness in first.

THE COURT:  Okay.  Then let's do that.

MS. STOKMAN:  Oh, Judge, just one thing.  Before the witness testifies, if we can have the UTC -- that statement read, that would be great.

THE COURT:  Okay.

(Recess held.)

THE COURT:  All right.  We can bring in the jurors.

(Jury enters the courtroom at 8:17 a.m.)

THE COURT:  All right.  Thank you very much, ladies and gentlemen for returning this morning.

When we begin, I first have to take care of one matter.

The jury is advised that the Court takes judicial notice of Coordinated Universal Time, or UTC, with 7 hours ahead of Pacific Standard Time, or PST, in October of 2020. UTC was 8 hours ahead of PST in February and March of 2022.

Pursuant to the Federal Rule of Evidence 201(b)(1) and (b)(2), this fact is not subject to dispute because

DX - Field S

1723

generally known in the Eastern District of California it can be readily determined from accurate sources.  You, the jury, may or may not accept the noticed facts as conclusive.

All right.  I'm going to go ahead and mark this judicial notice as Court's Exhibit.

(Court's Exhibit 1 was marked for identification.)

THE COURT:  All right.  Next witness, please.

MS. STOKMAN:  Yes, the government calls James Field.

THE COURT:  All right.  Go ahead.

THE CLERK:  Mr. Field, can you please raise your right hand.

JAMES FIELD,

called as a witness on behalf of the Government, having been first duly sworn, testified as follows:

THE WITNESS:  I do.

THE CLERK:  Please state your full name for the record and spell your last name.

THE WITNESS:  James Field, F-i-e-l-d.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MS. STOKMAN:

Q.  Good morning.

A.  Good morning.

Q.  Tell us where you're from.  Where did you grow up?

A.  I grew up in Lakeside, San Diego County.

1724

Q.   And did you spend the majority of your life there?

A.   Yes.

Q.   How old were you when you were first incarcerated?

A.   14.

Q.   What was that for?

A.   Theft of a firearm.

Q.   Did you commit other crimes as a minor?

A.   Yes.

Q.   What types of crimes?

A.   GTA, grand theft auto, and car burglaries.

Q.   Did you also have a period of incarceration after you turned 18?

A.   Yes.

Q.   When was the first time you were incarcerated as an adult? How old were you?

A.   18.

Q.   And what was that for?

A.   Vehicle theft.

Q.   Did you go to prison at that point?

A.   Yes.

Q.   What prison did you go to?

A.   It was a Level 2 in Adelanto, California.

Q.   Before going into prison that time, did you have any affiliation with any street gangs?

A.   Yes.

1725

Q.  And which gang was that?

A.  Lakeside Gangsters.

Q.  Where is that based?

A.  Out of San Diego.

Q.  Did your gang affiliation change at any point?

A.  Yes.

Q.  What did it change to?

A.  To Supreme Power Skins.

Q.  And where is that?

A.  San Diego, California as well.

Q.  Does that sometimes go by SPS?

A.  Yes.

Q.  And does Lakeside Gangsters sometimes go as LSG?

A.  Yes.

Q.  Okay.  Have you served prison terms since that first time you went to prison as an adult?

A.  Yes.

Q.  And do you have felony convictions for possessing stolen vehicles?

A.  Yes.

Q.  For evading or leading cops on a pursuit?

A.  Yes.

Q.  What about felony conviction for assault with a knife causing injury?

A.  Yes.

DX - Field S

1726

Q. And possession of a firearm by a felon?

A. Yes.

Q. And also felony convictions for possession -- or a felony conviction of possession of drugs in prison; is that right?

A. Yes.

Q. Okay. And you're currently in custody as you sit here today, right?

A. Yeah.

Q. What -- are you serving a sentence at this time?

A. No.

Q. What are you in custody for?

A. RICO conspiracy and three homicides.

Q. When you say RICO conspiracy, do you mean conspiracy to commit a racketeering enter- -- to be a part of a racketeering enterprise?

A. Yes.

Q. What enterprise is that?

A. Aryan Brotherhood.

Q. Did you plead guilty to that crime?

A. Yes.

Q. And you also mentioned other murders. Did you plead guilty to those murders as well?

A. Yes.

Q. Are those related to what you're here to testify about today?

1727

A.  Yes.

Q.  Okay.  And just try to stay close to that microphone.
Thanks.

       Based on the guilty pleas that you just mentioned,
did you enter into a cooperate -- cooperation agreement with
the government in that case?

A.  Yes.

Q.  What benefits are you going to receive, if any?

A.  I believe a possible lighter sentence.

Q.  Do you know what the maximum -- or the sentence you were
facing, if there was a minimum or a maximum sentence you were
facing?

A.  I believe it was life in prison.

Q.  Okay.  Do you know how much time you're going to receive
pursuant to any cooperation?

A.  No.

Q.  And do you know who ultimately decides what that amount of
time is?

A.  I believe, the judge.

Q.  So you mentioned the Aryan Brotherhood.  Can you tell us
what that is?

A.  It's a white prison gang that controls all whites in
California state prison.

Q.  Have you ever been an associate of the Aryan Brotherhood?

A.  Yes.

1728

Q.  Does it also go by the AB?

A.  Yes, it does.

Q.  Okay.  Have you ever spoken with any AB members or made members?

A.  I have.

Q.  Are there other terms that you know of that refer to made members?

A.  "Brothers," "big homies," and "brand members."

Q.  Have you ever served a prison sentence where you were in close contact physically with an AB member?

A.  I have.

Q.  And during that time, were you able to speak with those members about the AB and how the AB is run?

A.  Yes.

Q.  Okay.  What AB members have you been in close contact within that situation that we just discussed?

A.  I've been in contact with Shawn Trippe, Kory Shaw, and Calvin Bell.

Q.  And during that time that you had close contact with those three brothers, were you able -- and your time in prison, were you able to learn the rules or codes of conduct of the AB?

A.  Yes.

Q.  Okay.  In your experience, does the AB have a position on talking to cops or law enforcement?

A.  Yeah.  It's not allowed.

ER 1058

1729

Q.   What can happen if you do?

A.   You can get killed.

Q.   In your experience, does the AB have a position on lying?

A.   Yes.

Q.   What is that?

A.   You're not supposed to lie.

Q.   What could happen if you do?

A.   You get killed.

Q.   In your experience, does the AB have a position on disobeying an order that comes from a brother?

A.   They do.

Q.   And what is that position?

A.   That you're supposed to obey whatever orders the brothers give you.

Q.   What happens if you disobey an order?

A.   It can be anything from being taxed to killed.

Q.   When you say "taxed," what do you mean by that?

A.   Charged a certain amount of money.

Q.   During your conversations with AB brothers, and your time in prison, did you learn whether the AB had an expectation to kill certain types of individuals?

A.   Yes.

Q.   What types of individuals are those?

A.   Child molesters, rapists, and informants.

Q.   Informants like cooperators?

DX Field S

1730

A.   Yes.

Q.   In your experience, when you were in prison, were there rules that you had to follow?

A.   Yeah.

Q.   And whose rules were those?

A.   They were set down by the Aryan Brotherhood.

Q.   Have you ever run a prison yard?

A.   Yes.

Q.   When was that?

A.   2014.

Q.   Was it a brief time period that you ran a yard?

A.   Yes.

Q.   And where -- what prison was that?

A.   That was Delano.

Q.   How -- who put you in charge of that yard?

A.   Shawn Trippe.

Q.   Do you know if he has a nickname?

A.   They call him "Thumper."

Q.   During the time that Trippe put you in charge of that yard, were you able -- or did he convey what the responsibilities you were supposed to have in running that yard?

A.   Yes.

Q.   What were those?

A.   They were to collect the third of any -- any illegal

1731

activities going on, drugs being brought in, phones, and make sure a third got sent to him so he could make sure it got to whoever was -- whoever had control of that yard at the time.

Q.  The last time you were in prison before 2022, where were you housed, what prison?

A.  Corcoran.

Q.  Were there any AB members at that prison?

A.  There was.

Q.  Who were they?

A.  "Cowboy," Calvin Bell, and "Kordless," Kory Shaw.

Q.  Are you aware in your discussions with Cowboy whether he had any gang affiliation prior to becoming a brother?

A.  Yes.

Q.  And did he?

A.  He did.

Q.  What gang was that?

A.  He was a Sacramaniac.

Q.  In your discussions with Kordless, did you learn of any gang affiliation that he had prior to becoming a brother?

A.  Yes.

Q.  And did he have a gang affiliation?

A.  He did.

Q.  Which gang was that?

A.  PENI.

Q.  Are you familiar with what PENI is?

1732

A.   Yes.

Q.   And where is that gang based -- mostly located, based out of?

A.   The Orange County and Long Beach areas.

Q.   Do you know the term "putting in work"?

A.   I do.

Q.   Can you tell us what that means?

A.   That means anything that the brothers ask you to do, whether it be committing assault, selling drugs, making.

Weapons.

Q.   Did you do anything while in Corcoran to put in work for the AB?

A.   Yes.  I made weapons.

Q.   And how were you able to make weapons while you were in prison?

A.   Uh, you get the black binder clips and break them and then cut lockers, metal, or get broken TVs and use the metal inside the TV.

Q.   So what material were you making weapons out of?

A.   Metal.

Q.   Were you released at some point during your, uh, imprisonment at Corcoran?

A.   I was.

Q.   And around when was that?

A.   December of '21.

1733

Q.   Do you know an individual named John Stinson?

A.   I know him by name.

Q.   And how do you know of him?

A.   Because of Cowboy and Kordless.

Q.   In discussions with them?

A.   Yes.

Q.   And do you know if John Stinson is affiliated with the Aryan Brotherhood?

A.   I do.

Q.   Is he?

A.   He is.

Q.   Do you know if he has any particular status within the Aryan Brotherhood?

A.   He's a council member.

Q.   And so is he a made member?

A.   He is.

Q.   Just briefly describe, you said council member, what that is?

A.   There's three of them, and they handle the inner workings of the Aryan Brotherhood when it comes to brothers getting -- brothers being killed or certain yards being put in the hat.

Q.   What does that mean, "put in the hat"?

A.   Green-lighted means you're not supposed to be there, you have to do anything you can to get off of it.

Q.   Or what happens?

1734

A.   Or you're -- you're in trouble.

Q.   Does the term "green-lighter, being in the hat" refer, in any way, to being up for assault or -- or to be killed?

A.   Yes.

Q.   How?

A.   That means that you're green-lighted from whoever put the green light on you.

Q.   And so if you knew of someone who had been green-lit and you came across them, did you have an expectation regarding that person?

A.   Yes.

Q.   What would that be?

A.   You were supposed to try to kill them.

Q.   Do you know an individual named Kenneth Johnson?

A.   I do.

Q.   How do you know him?

A.   Through other brothers and from talking to him myself.

Q.   When you spoke with him, how -- what means of communication would you use?

A.   Cell phone.

Q.   Do you know if during the time that you spoke with Mr. Johnson, was he incarcerated?

A.   He was.

Q.   Okay.  Do you know him to go by any nicknames?

A.   Yes.   Kenwood.

1735

Q.   Around what time frame did you have personal communication with Kenwood?

A.   Uh, end of February of '22, beginning of March '22.

Q.   And do you know if he has any affiliation with the AB?

A.   He's a made member.

Q.   Do you know an individual named Francis Clement?

A.   I do.

Q.   How do you know him?

A.   Through other brothers and from talking to him myself.

Q.   And again, when you spoke with him, what -- in what way were you communicating with him?

A.   Through cell phone.

Q.   And do you know if during that time if he was in prison?

A.   He was.

Q.   Does he go by a nickname?

A.   I just know him as Frank.

Q.   What time frame was it that you were in contact personally with Frank?

A.   February of '22 and March of '22.

Q.   Do you know if he has any affiliation to the AB?

A.   He's a made member.

Q.   Do you know an individual named Jason Weaver?

A.   I do.

Q.   And how do you know him?

A.   He's a -- he's a brother.  I know him from personal

1736

contact.

Q. And again, which way of personal contact were you able to communicate with him?

A. Through a cell phone.

Q. Do you know if he was incarcerated during that time?

A. He was.

Q. Does he have a nickname?

A. They call him Beaver.

Q. What time frame were you in communication personally with Beaver?

A. End of December '21, to March of '22.

Q. And what about an individual named Waylon Pitchford, have you ever heard of him?

A. Yes.

Q. How do you know him?

A. Through my personal communications with him and from other brothers.

Q. Do you -- again, how would you communicate with him?

A. Through a phone.  Cell phone.

Q. And during that time, do you know if he was incarcerated?

A. He was.

Q. Does he have a nickname?

A. He just goes by Waylon.

Q. What's his affiliation with the AB, if any?

A. He's a made member.

1737

Q.   And what time frame were you speaking personally with Waylon?

A.   The end of February of '22 and March of '22.

Q.   Were you, yourself, ever put up for membership to be a brother?

A.   I was.

Q.   And around when was that?

A.   February of '22.

Q.   And how did you know that you were up for membership?

A.   Waylon -- Weaver and Pitchford told me.

Q.   Do you know the term "sponsor" as it relates to being up for membership?

A.   I do.

Q.   What is that?

A.   It's the person that -- the brother that -- it has to be a brother that puts you up with a cosponsor as well.

Q.   Who were your sponsors?

A.   My main sponsor was Weaver and Pitchford was my cosigner.

Q.   So around the end of 2021, early 2022, you said you had been in contact with Beaver.

      What, if anything, was he asking you to do, as -- generally?  What types of things?

A.   Uh, he wanted me to -- at first, he wanted me to find somebody that had stolen some property from a different brother.

1738

Q.   And did you find that person for him?

A.   I did.

Q.   What other types of things was he asking you to do?

A.   Uh, robberies, sell drugs, and anything else I could to bring money to the brothers.

Q.   And did you, in fact, commit some of those crimes at his -- upon his orders?

A.   Yes.

Q.   Did you make money on any ventures that he asked you to do?

A.   Yes.

Q.   Did you -- what did you do with those proceeds?

A.   I sent them to him.

Q.   Is that part of that one-third or is it a different amount?

A.   It's whatever I decided to send to him.  It was expected to be one-third, but I would send more sometimes.

Q.   What would happen if you didn't send him that?

A.   I would be in trouble.

Q.   What does that mean to you, what kind of trouble?

A.   If I ever went back to prison or if he found somebody on the street that was willing to take care of me, then I would be killed.

Q.   Did there come a point in time in 2022 when you went to Lancaster, California?

1739

A.   Yes.

Q.   Around when was that?

A.   Around the second, third week of January.

Q.   And how long or so did you remain in Lancaster at that point?

A.   Till the beginning of February.

Q.   Did you go back to Lancaster at any point in February of 2022?

A.   I did.

Q.   And why did you go up there?

A.   I went up there to pick up a friend, yeah.

Q.   When you originally went to Lancaster, why did you go to that area?

A.   Weaver asked me to go up there to help him collect from some illegal gambling houses that he had up there.

Q.   Do you know the individual who was running those for Weaver at that time?

A.   Yes.

Q.   Who was that?

A.   His name is Ruckus.

Q.   Do you know his real name?

A.   Yes.

Q.   What is that?

A.   Josh Cornett.

Q.   Do you know an individual named Kaylen Chandler?

1740

A.   I do.

Q.   How do you know her?

A.   I met her through Weaver up there in Lancaster.

Q.   Did you know her in February of 2022?

A.   I did.

Q.   Did you ever stay at her house?

A.   Yes.

Q.   Did you know an individual named Michael Brizendine?

A.   I did.

Q.   How did you know him?

A.   He was Kaylen's boyfriend at the time.

Q.   Do you know if he went by any nickname?

A.   They called him Corn Fed.

Q.   So did you know Michael Brizendine in February of 2022?

A.   I did.

Q.   I'm going to direct your attention to around February 21st or so of 2022.  Around this time, did you go to Long Beach, California?

A.   I did.

Q.   Why did you go to Long Beach, California?

A.   Weaver and Frank asked me to go up there to meet up with a couple guys for a job.

Q.   What does that mean, "a job"?  Did they tell you what that was?

A.   When I got there, yeah.

DX-Field 6

1741

Q.   So before you left, you didn't know what that meant?

A.   No.

Q.   Okay.  And you said that it was Weaver and Frank.  What, if anything, did Frank tell you about going to Long Beach for this job?

A.   He said that he wanted me to go up there and meet with some guy named Ronnie from PENI and that we were going to talk when we got to Long Beach.

Q.   And did you get in touch with Ronnie?

A.   I did.

Q.   How were you able to do that?

A.   I got his number from Frank.

Q.   And when you spoke to Frank about this, was this through the telephone that you mentioned before?

A.   Yes.

Q.   Was it a call or something different?

A.   It was a call.

Q.   How did you know that it was Frank you were talking to?

A.   Because Weaver told me that Frank was going to be calling me and he introduced himself as Frank when he called.

Q.   Did you have hesitations heading over to Long Beach for this job?

A.   No.

Q.   Why not?

A.   Because they were -- the brothers were asking me to do it.

DX Field S

1742

Q. So where did you go when you went to Long Beach?

A. To a hotel.

Q. Do you recall what hotel that was?

A. I don't.

Q. You don't?

A. I don't.

Q. Did you go by yourself?

A. No.

Q. Who did you go with?

A. I went with a girlfriend of mine and Corn Fed and another friend of mine named Aaron.

Q. And what was your girlfriend's name?

A. Her name was Haily.

Q. Haily Chappell?

A. Haily Chappell.

Q. When you say "Aaron," are you referring to Aaron Fogle?

A. I am.

Q. So you went with Haily, Aaron, and Corn Fed -- Michael. They all went to the hotel with you?

A. Yes.

Q. When you arrived at the hotel, was anyone else there, or did anyone else show up once you got there?

A. Some people showed up after we had gotten the hotel room.

Q. And who was that?

A. Uh, Sabrina Beck showed up later, and Ronnie, and Jimbo

1743

from PENI showed up.

Q. Do you know Ronnie's full name?

A. Uh. Ronald Ennis, I believe?

Q. And do you know what Jimbo's name was?

A. James Yagle.

Q. So you met them at the hotel or the motel in Long Beach?

A. Yes.

Q. Was this the Ronnie that you had been speaking to on the phone?

A. It was.

Q. At any point in time, did anyone else arrive to that hotel in Long Beach?

A. The next morning.

Q. And who was that?

A. Uh, some guy named Nick that I knew from San Diego, and he brought some friend with him.

Q. And do you know Nick's last name?

A. I don't.

Q. Does he have a nickname?

A. Yes.

Q. And what is that?

A. "Scrappy."

Q. So when you went to Long Beach, what vehicle did you go in?

A. I went in Haily's Nissan.

DX Field 5

1744

Q.   And all those individuals that you mentioned who went with you, were they also in that car?

A.   No.

Q.   What were they in?

A.   Corn Fed was in a red Dodge 1500.

Q.   A truck?

A.   Yes.

Q.   Had you seen that truck before?

A.   I had.

Q.   Have you ever driven that truck?

A.   I had.

Q.   Can you tell us if anything of significance happened while you had driven that red truck?

A.   I was leaving the Lancaster area to take it back to San Diego for Weaver, and I ended up getting in a high-speed chase.

Q.   And was there any damage to the truck at any point?

A.   There was.

Q.   Where was that damage?

A.   The front driver headlight.

Q.   And -- but the truck was still running at this point?

A.   It was.

Q.   Okay.  So you arrive at the motel in Long Beach, and then Ronnie and Jimbo arrive.

         Did you know if they were affiliated to any gang?

1745

A.   Yes.

Q.   What gang?

A.   They were from PENI.

Q.   What happened once you-all were at the hotel room?

A.   Later -- later that night we got a conference call from four brothers.

Q.   Who were those brothers?

A.   Was it four or three?  I don't remember if it was four or three.  I think it was three.  It was Frank, Waylon, and Beaver.

Q.   And you say there was a conference call.  Can you explain what that was?

A.   It was a video call.

Q.   And how were you -- how were you on that video call?

A.   It was through Telegram.

Q.   What is that?

A.   It's an app on your phone.

Q.   Is it an encrypted app?

A.   It is.

Q.   Why would you use an app like that to communicate?

A.   Well, first, I was told by the brothers to use that or Signal because it encrypted our messages back and forth and made it harder for cops to break into it.

Q.   So you're on a conference -- a video call on a -- on the Telegram app.  Whose phone was being used?

1746

A.   Mine.

Q.   Before this, had you ever seen what Weaver looked like?

A.   Yes.

Q.   How?

A.   Through video calls.

Q.   And so you recognized the person that you had talked to prior as Weaver on this conference call?

A.   I did.

Q.   Have you ever, prior to that, seen what Frank looked like?

A.   No.

Q.   And so how did you know that Frank was one of the individuals on that call?

A.   Because I talked to him on the phone before, and it was the same guy that I had talked to, and Weaver told me it was Frank.

Q.   And then you mentioned that Waylon also was on that call. Had you ever seen Waylon before?

A.   No.

Q.   How did you know it was Waylon?

A.   Because Weaver told me that it was Waylon, and that's how Waylon introduced himself.

Q.   During that call, what happened?

A.   Uh --

Q.   Actually, hold on.  Before I ask you that, during that call, who was in the room with you?

1747

A. It was me, Aaron, Corn Fed, Ronnie, and Jimbo.

Q. Okay. And Haily and Sabrina, where had they gone?

A. They were told to leave the room.

Q. Who told them that?

A. I did.

Q. Why did you tell them that?

A. Because I was told that it was only supposed to be us guys, no women were supposed to be in the room.

Q. Who told you that?

A. Weaver.

Q. So what happened during the call?

A. Uh, they told us that they had a job. Frank and Waylon said they had a job in the Hollywood Hills area that they wanted us to go rob, because some guy there had burned Waylon for some drugs.

Q. Did they tell you what items were potentially in the house for you to take?

A. They just wanted me to empty the house out.

Q. Okay. Did they tell you where to go, what house it was?

A. Yes.

Q. During that call or sometime after?

A. It was the next morning.

Q. During that call, was there any discussion about how you were to carry out that home robbery?

A. Yes. I was -- Frank told us - told me to go to Home Depot

DX Field S

1748

and get hard hats and orange shirts so I could -- we would look like utility workers.

Q. What was the purpose of that?

A. So that when -- so that the person would open the door for us easier.

Q. After the call, what, if anything, was done to prepare for that robbery?

A. That night, nothing.

Q. Okay. At some point the next day, was something done?

A. Yes.

Q. What was that?

A. After Nick showed up, we -- me and him went to Home Depot and got the hard hats and some T-shirts.

Q. Do you know if any other steps were taken to prepare for that robbery?

A. I know that Corn Fed and Aaron went and got a U-Haul.

Q. What was the purpose of the U-Haul?

A. It was to empty the house out and put everything in the U-Haul so we could take it away.

Q. So this would have been around the morning of the 22nd of February?

A. I believe so.

Q. And had all of those people that you mentioned before remained at the motel?

A. Uh, at that time, yes -- no. Corn Fed had left earlier

1749

that morning to go back to Lancaster.

**Q.** And did he ultimately return?

**A.** He did.

**Q.** Okay.  Did Ronnie and Jimbo stay at the motel?

**A.** No, they left.

**Q.** Where did they go, if you know?

**A.** I don't -- I don't know.

**Q.** Do you know if they were supposed to come back to Long Beach?

**A.** They were supposed to meet us at the Hollywood address.

**Q.** And did they ever show up?

**A.** No.

**Q.** So that day, you had said that during the conference call that you didn't know what address to go to, but that the next day you did.  How did you learn of what house you were supposed to go to in Hollywood?

**A.** Frank sent me a screenshot off of Google Maps.

    MS. STOKMAN:  If we can pull up 1284 just for the witness, please.

BY MS. STOKMAN:

**Q.** Do you recognize this photograph?

**A.** I do.

**Q.** And what -- what is it?

**A.** It's the -- it's the picture that Frank had sent me, the screenshot that Frank sent me.

1750

**Q.** So that looks like the photo that you received from Frank that day?

**A.** Yes.

MS. STOKMAN:  Okay.  Ask that 1284 be admitted and published to the jury.

THE COURT:  Any objections?

MR. REED:  No objection.

MS. FISHER-BYRIALSEN:  One second, Your Honor.

Your Honor, can we have a sidebar for one minute?

THE COURT:  All right.

(Sidebar commences.)

MS. FISHER-BYRIALSEN:  My only issue is that I -- where did this "mother load," that writing come from, the yellow?  Like, was that already there?

MS. STOKMAN:  I can ask --

MS. FISHER-BYRIALSEN:  Is that something that was added?

MS. STOKMAN:  -- if he remembers the writing.

MS. FISHER-BYRIALSEN:  Because I don't think it's -- like that wouldn't have been like that, it would have been somewhere in the thing --

MS. STOKMAN:  He's saying that this --

MS. FISHER-BYRIALSEN:  Did you add this?

MS. STOKMAN:  No.

MS. FISHER-BYRIALSEN:  Oh.

1751

MS. STOKMAN:  He's saying that this looks like what he was sent.  That's what he just testified to.

MS. FISHER-BYRIALSEN:  No, I know that.  I'm just asking where that came from, if it's something that you added.

MS. STOKMAN:  No, we didn't add that there.

MS. FISHER-BYRIALSEN:  Okay.  Ms. Barrett has just informed me that, on your list this is identified as Pitchford's phone.

MS. STOKMAN:  As what?

MS. FISHER-BYRIALSEN:  As Mr. Pitchford --

MS. STOKMAN:  This picture came from Pitchford's phone, but he's saying that it is the picture that he remembers getting.  So he has laid the foundation that this picture represents the picture that he received.

MS. FISHER-BYRIALSEN:  Okay.  So --

MS. STOKMAN:  So he's not going -- from Frank, but obviously, it will come in on where this actually came from, from this other witness.

MS. FISHER-BYRIALSEN:  You should probably clarify that with him.

MS. STOKMAN:  Clarify what?

MS. FISHER-BYRIALSEN:  That this came from Pitchford's phone.

MS. STOKMAN:  He doesn't know that.  He's saying it -- it reflects -- this is an accurate representation of the

1752

photograph that he received from Frank that day and that's what he's testifying to.

MS. FISHER-BYRIALSEN:  Okay.

THE COURT:  All right.

(Sidebar ends.)

THE COURT:  All right.  So any objections as to 1284?

MS. FISHER-BYRIALSEN:  No, Your Honor.

THE COURT:  Mr. Reed?

MR. REED:  No objection.

THE COURT:  That will be admitted.

(Government's Exhibit 1284 was received.)

BY MS. STOKMAN:

Q.  James, the writing on the photo, do you recall the photo you received having writing on it?

A.  I don't remember.

Q.  But the photo itself looks like what you received from Frank?

A.  Correct.

Q.  Okay.  After receiving this, what, if anything, did you do?

A.  Uh --

MS. FISHER-BYRIALSEN:  Your Honor -- wait one moment.

Based on what the witness has just said, we would object to that photo.

THE COURT:  All right.  Objection is overruled.

1753

Go ahead.

BY MS. STOKMAN:

Q.   What did you do after you received the photograph?

A.   Uh, got in the car and went to, uh, Hollywood Hills.

Q.   Who, uh -- who went toward the vicinity of the house that you were going to?

A.   Me and Scrappy went in a Mercedes.  Haily drove her Nissan.  Corn Fed and Sabrina, I believe, drove the red truck. And Aaron and the guy that came with Nick drove the U-Haul.

Q.   The Mercedes that you were in, where did that come from?

A.   It came from the kid that came with Nick.

Q.   Okay.  I just want to take you back for a second.

When Nick showed up with that individual, do you remember that individual's name?

A.   I don't.

Q.   When Nick showed up with that individual who owned the Mercedes, what, if anything, happened to that individual who owned the Mercedes?

A.   Uh, after me and Nick came back from Home Depot, he asked me to borrow my gun, the gun -- the 9mm I had with me.

And when he walked in the motel room, he put it in the kid's face, walked him into the back bedroom, the kid was zip tied and told that we were going to take his car.

Q.   When you say "he" took -- asked for your gun, who was that?

1754

A.  Nick.

Q.  So while he was pushing -- "the kid," we'll call him since you don't remember his name, into the bathroom, what were you doing?

A.  I was right there with him.

Q.  And were you doing anything as it pertained to that kid?

A.  Just trying to intimidate him, back him into the bathroom.

Q.  When we say "kid," is that just something you're saying or was he very young?

A.  He looked young.

Q.  But --

A.  19, 20.

Q.  Okay.  And so you're in that Mercedes.  That kid is with Aaron in the U-Haul.  Do you know if he -- the kid was still zip tied?

A.  I don't know.

Q.  Okay.  So at some point did you go to the house that you were told to go to in Hollywood?

A.  Yes.

Q.  Who went to the house?

A.  It was me, Nick, and Corn Fed.

Q.  What were -- what happened once you got to the house?

A.  Uh, we walked in through one of the side gates, around to the front door, knocked on the door acting like utility workers trying to get in, nobody came to the door, so Corn Fed

1755

kicked the door in.

MS. STOKMAN:  If we can show 1435.  This has already been admitted.

BY MS. STOKMAN:

Q.  Do you recognize what's in this photograph?

A.  I do.

Q.  What is that?

A.  That's the house.

Q.  The house in Hollywood?

A.  The house in Hollywood.

Q.  So you said that Corn Fed kicked the door in?

A.  Yes.

Q.  What happened after that?

A.  Uh, me and Nick and Corn Fed went in and started clearing each room.  Uh, Corn Fed ended up going downstairs, and there's a little basement there.  While me and Nick took the upstairs, and we came across somebody in the house.

Q.  Did you have a gun with you?

A.  I did.

Q.  Do you know if Nick had a gun with him?

A.  I did -- he did.

Q.  And do you know if Corn Fed had a gun with him?

A.  He did also.

Q.  Okay.  So you go upstairs and you see this individual. What happens then?

1756

A.  We -- me and Nick went in through the door with our guns up, dude was on -- the guy was on the phone, and screamed, dropped his phone.  And we pulled him out of the room and walked him downstairs and zip tied him.

Q.  What happened next?

A.  We walked him to the security pad so he could -- we didn't know if there was a silent alarm on the house.  So we asked him to enter the code to disarm it.

Q.  And did he do that?

A.  He did.

Q.  Okay.  At any point in time did you receive any phone calls during the time when you were in the house?

A.  I made a phone call.

Q.  Okay.  Who did you call?

A.  I called Frank.

Q.  And what, if anything, did Frank say during that call?

A.  He told me to hurry up, empty the house out.  I asked him who -- if this was the right place, this was the right guy, because the guy seemed like he didn't know anything that was going on.

        I told him why we were there and what we were there for, and Frank said, Well, that's the house so clean it out.

Q.  And then what did you do?

A.  Uh, within a short period of time, the guy's phone started going off.  Like minutes after -- while I was still talking to

1757

Frank, the phone started going off.  And so I hung up with Frank and noticed that the person that he had been talking to said that they were calling the cops.

Q.  And so what did you do after seeing that message?

A.  We left.  Me, Nick, and Corn Fed left.

Q.  Was anything taken from the house when you left?

A.  I took two purses and Corn Fed took some DVR stuff from the surveillance cameras and Nick took a car.

Q.  A car that had been at the house?

A.  That belonged to the house.

Q.  What -- do you remember what type of vehicle that was?

A.  A Cadillac.

Q.  So when you left, what vehicle did you leave in?

A.  I left in the Mercedes.

Q.  And was anyone with you?

A.  Yes, Corn Fed was.

Q.  Okay.  At some point did you meet up again with Aaron or Haily or Sabrina?

A.  Yes.

Q.  And where was that?

A.  That was down the street at the gas station.

Q.  And did you switch -- or did individuals switch vehicles at that point?

A.  Yes.

Q.  Who was in what vehicle now?

ER 1087

DX Field C

1758

**A.**  Uh, Aaron and the kid were still in the U-Haul, Sabrina was in the red Dodge, Haily was in her car, and Corn Fed got out of the Mercedes into the red Dodge.

**Q.**  And where -- where did you go from there?

**A.**  We got right back on the freeway and started heading back towards Lancaster.

**Q.**  Were you -- you were still in the Mercedes?

**A.**  I was still in the Mercedes.

**Q.**  Were you by yourself or with someone else?

**A.**  I was by myself.

**Q.**  After you left that home in Hollywood, did you speak with any AB brothers?

**A.**  I did.

**Q.**  Who did you speak with?

**A.**  At first it was Frank, and then I got a call later from Weaver.

**Q.**  And when Frank -- when you spoke with Frank, what did he say?

**A.**  He was upset telling me, did you think you're just going to burn the brothers?  And I told him that's not what happened.

**Q.**  What did you take that to mean, "burn the brothers"?

**A.**  I took that to mean that he thought that I had emptied the house and just stopped answering his phone calls and was trying to cut him out of whatever was stolen from the house.

DX Field 5

1759

Q.   Was anything else discussed during this conversation?

A.   No.

Q.   You said then you received a call from Weaver.  What did Weaver say, if anything?

A.   He called me and he said, Check it out you little -- called me the N word.  What do you think, you're just going to burn us, burn the brothers.  And I told him, That's not what happened, bro, like that's not what happened.

     So he asked me what happened.  And I told him that dude -- said the dude that he was on the phone with called the cops.

Q.   And did you tell him about Corn Fed kicking the door in?

A.   I did.

Q.   And what was his response?

A.   He said that that's not how it was supposed to go down. You guys were supposed to -- it was supposed to be an easy entry, no noise.

Q.   Was anything discussed further in that call with Weaver?

A.   No.

Q.   Did you receive any other calls after that?

A.   I got a call from Frank right after that.

Q.   And what, if anything, did Frank say?

A.   He asked me what happened.

Q.   And did you tell him?

A.   I told him.

1760

Q.   Did you tell him about Corn Fed kicking the door in?

A.   I did.

Q.   And what, if anything, did Frank say in response?

A.   He told me that he -- that dude had fucked up, that that's not how it was supposed to go down.  That's the reason why we got the utility uniforms so it would -- we could get in there without making any noise.

Q.   And did he say anything else at that point?

A.   Yeah, he told me that dude had fucked up and that it -- I had to take care of it.

Q.   What did you -- what did you believe he meant when he said you had to take care of it?

A.   He --

         MS. FISHER-BYRIALSEN:  Objection.

         THE COURT:  What's the grounds for your objection?

         MS. FISHER-BYRIALSEN:  Speculation.

         THE COURT:  Sustained.

BY MS. STOKMAN:

Q.   What -- have you heard of the term "take care of it" in the context of orders from AB brothers before?

A.   Yes.

Q.   And in your experience, what does that order mean?

A.   That means to kill somebody.

         MS. FISHER-BYRIALSEN:  Objection.  Leading and speculation.

1761

THE COURT:  Overruled.

BY MS. STOKMAN:

Q.  Did Frank say anything else about Corn Fed during that call?

A.  He did.

Q.  What did he say?

A.  He told me that dude had already been fucking up because he had been keeping Kaylen hostage and had been raping her.

Q.  And when you heard that, what did that mean to you?

A.  That meant that dude was now a sex offender and now I had to kill him.

Q.  Did you hear again from Weaver?

A.  I did.

Q.  And what, if anything, did Weaver say?

A.  He asked me --

Q.  Go ahead.

A.  He asked me if I had talked to Frank and if I was okay with it.

Q.  And did he mention anything about killing Corn Fed?

A.  Yeah.  He told me that -- that he thought that I could take care of it.

Q.  Okay.  And you took that to mean the same thing?

A.  Yes.

Q.  At some point after this, after these phone calls, did it -- did you head towards Lancaster, California?

1762

A.   Yes.

Q.   And at some point was there a time when it was just you and Corn Fed going somewhere together?

A.   Yes.

Q.   And when was that in relation to the time of day?

A.   Night.

Q.   Were you in the same vehicle?

A.   No.

Q.   Tell us who was in what vehicle?

A.   He was still in the red Dodge truck, and I was still in the Mercedes.

Q.   Do you know what happened to Sabrina at that point?

A.   We -- Corn Fed had dropped her off at Ruckus' illegal gambling house.

Q.   So it's you and Corn Fed.  Where were you headed?

A.   We were taking the back roads from Rosamond, where Ruckus lived, to Lancaster.

Q.   Who was in the lead as far as the two cars?

A.   Corn Fed was in the lead.

Q.   And where -- did you know where you were going?

A.   Uh, at first I didn't.

Q.   And then at some point, did you end up somewhere in Lancaster?

A.   Yes.

Q.   Where was that?

1763

A.   At one of his ex-girlfriends' houses.

Q.   What happened when you got to the house?

A.   We pulled in.  He told me that he was going to go inside and take -- talk to somebody for a minute.  And I sat in the Mercedes out front.

        MS. STOKMAN:  If we could show 1170.  It's already admitted.

BY MS. STOKMAN:

Q.   Do you recognize what's in this photograph?

A.   Yes.

Q.   What is that?

A.   That's the house that we went to.

Q.   While Corn Fed was in that house, did you have any conversations with any AB brothers?

A.   Yes.

Q.   Who did you speak with?

A.   Weaver.

Q.   And tell us about that.

A.   He was asking me if I had taken care of it yet.  I told him no, that we stopped at somebody's house.  He was telling me to hurry up and take care of it.

Q.   And is there anything else that he said?

A.   No.

Q.   At some point, did Corn Fed come out of the residence?

A.   Yes.

1764

**Q.** What happened then?

**A.** He came out and walked around the back of the truck to the driver's side.

I was still on the phone with Weaver.  And I walked from, like, from the Mercedes back to the truck, the passenger side.  As he hopped in, I opened the passenger door.

**Q.** What was your plan at this point in time?

**A.** My plan was to take care of it right then and try to get out of there as fast as I could.

**Q.** So were you still on the phone at this point with Weaver?

**A.** I was.

**Q.** Tell us what happened when you opened the passenger side door?

**A.** Uh, I had Weaver on speaker and told Corn Fed that the brother wanted to talk to him.

**Q.** And what happened next?

**A.** I leaned in.  And when he leaned towards my phone, I pulled -- I had my gun behind my back.  And I pulled it around me, and I fired.

**Q.** And what direction did you fire in?

**A.** At his head.

**Q.** Did you fire your gun more than once?

**A.** I don't remember.  I think it was twice.

**Q.** But you know you fired it once?

**A.** I know for sure I fired it once.

1765

**Q.** Okay. Did you know at that point whether or not you had struck Corn Fed?

**A.** Uh, I believe so.

**Q.** And what did you do?

**A.** I took off towards my car and got in and drove away.

**Q.** Were you still on the telephone at this point with Weaver?

**A.** I was.

**Q.** What, if anything, was he saying to you?

**A.** As I pulled out and I was driving, he asked me what was going on.

I told him, "You didn't hear that? You didn't just hear me shoot him?"

And he said, "No." He said, "Turn around, go back, and take some pictures."

**Q.** Did you do that?

**A.** No.

**Q.** Why?

**A.** I was scared.

MS. STOKMAN: We can show 1179. This has already been admitted.

BY MS. STOKMAN:

**Q.** Do you recognize what's in this photograph?

**A.** I do.

**Q.** What is it?

**A.** It's the red Dodge truck.

DX Field S

1766

Q.   Is there anything significant about that headlight that we see on the truck's left side?

A.   Yes.

Q.   What is that?

A.   The headlight's ripped out.

Q.   Is that from the damage you said happened when you crashed that car?

A.   It is.

Q.   Is this the way that you left Corn Fed that night?

A.   It was.

        MS. STOKMAN:  Okay.  We can take that down.

        If we can pull up Exhibit 1826, which is already admitted.  And go to Time Stamp 53, around Minute 53.

    (Video played in open court.)

BY MS. STOKMAN:

Q.   Do you notice the vehicle that's coming into view in that video?

A.   I do.

Q.   What is that?

A.   That's the Mercedes that I was driving.

Q.   Okay.

        MS. STOKMAN:  We can take that down.  Thank you.

BY MS. STOKMAN:

Q.   When you left the residence, where did you go?

A.   Towards Palmdale.

1767

Q. What, if anything, did you do with the Mercedes?

A. That night I left it in Palmdale after Haily came and picked me up.

Q. At some point in time, did you go back for that Mercedes?

A. The next morning.

Q. And you retrieved it?

A. Aaron did.

Q. Okay. After you shot Corn Fed, did you tell anybody that you had done that?

A. Weaver.

Q. What did you tell him?

A. I told him that it was done. I took care of it.

Q. And what, if anything, did he tell you?

A. He told me, "Okay."

Q. Did you tell anybody else?

A. Uh, I don't remember if I told Aaron, but I alluded to what had happened.

Q. At any point in time -- at any point in time after this happened, did you tell Kaylen that you had killed Corn Fed?

A. Yes.

Q. Do you recall what words you said to her?

A. I don't.

Q. Okay. After this happened, did you speak with Frank about Corn Fed?

A. I did.

1768

Q. And what, if anything, did he say?

A. He told me that I had did a good job.

Q. What kind of gun did you have when you shot Corn Fed?

A. It was a 9mm.

Q. And what did you do with that gun?

A. I broke it down, took the barrel, and chopped it up.

Q. And did you give the pieces of that gun to anybody?

A. I gave them to Brandon Bannick.

Q. And do you know what he was going to do with it?

A. He was going to get rid of them.

Q. So at some point after this, did you return to the Long Beach area?

A. I did.

Q. How long after Corn Fed died did you return to Long Beach?

A. Uh, within a week.

Q. And why did you go back?

A. Frank had asked me to go up and help Ronnie collect the money from Soldier.

Q. Who is Soldier?

A. Evan Perkins.

Q. And did you -- before Frank had said that to you, did you know who Evan Perkins was?

A. Yes.

Q. How do you know him?

A. I had met him in prison.

DX Field S

1769

Q.   Do you know if he was part of any gang?

A.   Yes.  He was from PENI.

Q.   And what, if anything, did Frank tell you about going up to see Perkins?

A.   He said that Perkins had owed Kenwood money and that he needed my help going up there to collect it.

Q.   Did you know what kind of money Perkins owed Kenwood?

A.   I found out later.

Q.   Who told you?

A.   Perkins did.

Q.   What did he say?

A.   He said that he had given Kenwood and Frank some EDD information that they put in and they got no return from, so they had taxed him.

Q.   And so he owed money from that?

A.   He owed money from that.

Q.   Okay.  When you went up to Long Beach, how did you know where to go?

A.   Frank told me where to go.

Q.   And what was at the location that you were sent to?

A.   Soldier.

Q.   Was it his house?

A.   It was his house.

Q.   Okay.

          MS. STOKMAN:  If we could show 1141.  It's already

1770

been admitted.

BY MS. STOKMAN:

Q.  Do you recognize what's in this paragraph?

A.  I do.

Q.  What is it?

A.  That's Soldier's house.

        MS. STOKMAN:  And if we could show 1144, which has already been admitted.

BY MS. STOKMAN:

Q.  Do you recognize what's in this photograph?

A.  I do.

Q.  What is this?

A.  This is Soldier's kitchen and living room.

Q.  Is there anything in this photograph that's of significance to you?

A.  There is.

Q.  What is it?

A.  Uh, on the right of the Home Depot box in the back, it's a 3D printer.

Q.  Can you circle that on the screen?

A.  (Witness complies.)

Q.  So you're circling -- and I'll -- you circled an item that's in the Home Depot box on the left side of the photograph that looks like it has kind of like a light inside, like a glow from it; is that accurate?

1771

A.   Yes.

Q.   Okay.  Why is that 3D printer significant to you?

A.   Because it's what Soldier was using to print lowers for firearms.

Q.   Okay.  At any point, did you receive a lower from that 3D printer?

A.   I received a firearm -- fully operable firearm from Soldier that he had used -- that he had made on that.

Q.   Okay.  So when you arrived at Soldier's house, who, if anyone else, was there?

A.   Uh, Bam was there and Ronnie and Jimbo.

Q.   And who's Bam?

A.   Brandon Bannick.

Q.   Had you met Bam before?

A.   Yes.

Q.   How did you know him?

A.   I met him in prison.

Q.   Okay.  So you knew both Bam and Soldier from prison?

A.   Yes.

Q.   Do you know if Bam was part of any gang?

A.   Yes.

Q.   What gang was that?

A.   PENI.

Q.   And Ronnie and Jimbo, are these the two individuals who you met in the motel before the robbery?

Case: 25-3648, 03/04/2026, DktEntry: 16.8, Page 55 of 207

Case 1:20-cr-00238-JLT-SKO    Document 1763    Filed 01/29/25    Page 54 of 206
DX Field S

1772

A.  Yes.

Q.  Okay.

MS. STOKMAN:  If we can bring up 1299 just for the witness.

BY MS. STOKMAN:

Q.  Do you recognize this photograph?

A.  I do.

Q.  How do you recognize it?

A.  It's -- I recognize it from, I believe, my Facebook.

Q.  Is this a photograph that you're in?

A.  Yes.

Q.  So you've seen this before?

A.  I have.

Q.  And is this photograph an accurate representation of what it's depicting from the day it was taken?

A.  Yes.

MS. STOKMAN:  Ask to admit and publish 1299.

THE COURT:  Any objections?

MR. REED:  No objection.

MS. FISHER-BYRIALSEN:  No.

MS. LUEM:  No.

THE COURT:  It will be admitted.

(Government's Exhibit 1299 was received.)

BY MS. STOKMAN:

Q.  Who's in the photograph -- or, actually, where are you in

DX Field S

1773

this photograph?

A.  Soldier's living room.

Q.  And are you the individual on the left-hand side with the hat on?  I'm sorry, you both have hats on.  With just the plain black shirt?

A.  Yes.

Q.  Who's standing next to you?

A.  Bam.

Q.  And that hand gesture that Bam is displaying in the photograph, do you know what that is?

A.  Yes.  It's a P.

Q.  Well, what does that represent?

A.  PENI.

Q.  Is there any other representation of PENI in this photograph as it pertains to Bam?

A.  Yes.

Q.  What is that?

A.  The Pirates symbol on his chest.

Q.  The P is a representation?

A.  Yes.

        MS. STOKMAN:  Okay.  We can take that down.

BY MS. STOKMAN:

Q.  So you arrived at Soldier's apartment.  Where was Bam when you arrived there?

A.  On the couch.

1774

Q.   And where was Soldier?

A.   On the couch.

Q.   And you said Ronnie and Jimbo were there.  Where were they?

A.   They were in Soldier's room.

Q.   Did you notice anything significant to Bam's appearance?

A.   Yes.  He had a black eye.

Q.   And did anyone tell you how you received it?

A.   Ronnie and Jimbo did.

Q.   They told you?

A.   Yeah.

Q.   What did they say?

A.   They said that Bam had been hanging out with Soldier and didn't tell them where he was, so Jimbo punched him.

Q.   Did you notice the state of Perkins' apartment?

A.   Yes.

Q.   Tell us about that.

A.   It looked like it had been ransacked.

Q.   So at that point, what did you do?

A.   I don't understand what you mean.

Q.   Sure.  You arrived at the apartment, you saw Bannick and Perkins on the couch.  What did you do at that point?

A.   I went into the back room with Ronnie.

Q.   Okay.  And at any point in time while you were in the apartment, did you speak with Frank?

1775

A.   I did.

Q.   And tell us about that conversation.

A.   It was after Soldier had asked me if -- what Ronnie was there for, because he was -- he felt like he was being punked. I -- and I told Soldier that he wasn't -- Ronnie wasn't a brother, so call Frank and ask him what's going on.

Q.   What do you mean when you say "he was being punked"?  What do you mean?

A.   He was being bullied.

Q.   So that's what prompted you to get on the phone with Frank?

A.   Yes.

Q.   Okay.  And so what did Frank say?

A.   Frank said that we were only there to help -- to collect the money from Soldier and that was it.

Q.   Was there any mention by Frank of anything that Ronnie and Jimbo were doing during that call, as far as what they were doing within the apartment?

A.   He said that they weren't supposed to be taking anything.

Q.   And had you observed them taking items?

A.   I observed Ronnie take a watch and a few other things.

Q.   While you were there, did you notice anything about the dynamics between Soldier and Ronnie?

A.   Uh, it was tense.

Q.   Did any incidents occur while you were at the apartment?

1776

A.   After Frank told us that Ronnie was only supposed to be there to collect money, he wasn't supposed to take anything, him and Soldier got in a fight.

Q.   After -- so at some point, did this seem to get resolved?

A.   Yes.

Q.   And did you remain in Long Beach?

A.   I did.

Q.   Did you hear from any AB brothers at this time?

A.   Just Frank wanting to know what was going on with the money.

Q.   And had you collected the money?

A.   We -- me, Soldier, his girlfriend Jamie and Haily had went to the post office to cash in some postal money orders, came out to about $6,000.  Uh, me and Haily went to 7-Eleven with Soldier, and Haily deposited in 500 into her Cash App and sent it to Frank.

Q.   Did there come a point in time where Frank mentioned to you whether or not that money had been fully paid?

A.   No.  He said that it had been cancelled on Haily's end and that he thought that she was stealing the money.

Q.   And what did you do when he said that?

A.   I told him that she wasn't.  And then he kept telling me that that's what happened, so I called Waylon.

Q.   Why did you call Waylon?

A.   Because Waylon was one of my sponsors and I couldn't get

1777

ahold of Weaver.

**Q.** What was the purpose of calling one of your sponsors in that situation?

**A.** To vouch for me.

**Q.** Why did you need them to vouch for you?

**A.** So Frank would stop being aggressive.

**Q.** Okay.  Is this still in the late February 2022, very early March 2022, time frame?

**A.** Yes.

**Q.** At any point around that time, did you talk to Waylon about something else?

**A.** Yes.

**Q.** And was there something that Waylon had asked you to do that was criminal in nature?

**A.** Yes.

**Q.** What was that?

**A.** He wanted me to go up to Bakersfield and pick up some fentanyl.

**Q.** Did he tell you what specifically you were picking up, besides just saying fentanyl?

**A.** Yes.

**Q.** What did he say?

**A.** I was supposed to pick up a thousand fentanyl pills and some -- a quarter-pound of brick fentanyl.

**Q.** Did he tell you -- did Waylon tell you what you were

1778

Q. supposed to do after you picked up the fentanyl?

A. Yes.

Q. What did he say?

A. Was supposed to drive the -- the brick fentanyl to San Fernando, and sell the fentanyl pills myself and send him money for it.

Q. Did he tell you where you were supposed to drop off the brick powdered fentanyl?

A. At his girlfriend's house.

Q. After that conversation, did you go to Bakersfield?

A. I did.

Q. Were you alone or with other people?

A. I was with other people -- with somebody else.

Q. Who did you go with?

A. Me and my friend Blaze went in the Mercedes, and Haily and Aaron were in her Nissan behind us.

Q. Did you end up picking up those drugs that Waylon had asked you to pick up?

A. No.

Q. Why not?

A. The next morning I was in Bakersfield and I got a message from Kaylen.

Q. And what did that message cause you to do?

A. It caused me to break my phone and so -- because I thought it was going to get traced, I thought she was going to tell

1779

the cops how to find me.  So I broke my phone and got rid of it.

Q.  Tell the cops about what?  What topic was that --

A.  She sent me a newsreel about what had happened to Corn Fed and said that, You guys want to play God, now I'm going to. So I thought that she was going to tell the cops that something had -- that I did it.

Q.  Okay.  And so you broke the phone, and how did that prevent you from going to pick up the drugs?

A.  I went to look for a phone store to get a new one and I got lost.

Q.  So did Waylon have a way to contact you?

A.  No.  I stopped at a gas station and called him.

Q.  And what, if anything, did he say?

A.  He told me that Haily and Aaron had already picked it up and that I was to meet them on the way to Long -- San Fernando.

Q.  And when you said "picked it up," what did -- what was he referring to?

A.  The drugs.

Q.  On March 2nd, 2022, did you meet up with Haily and Aaron?

A.  Yes.

Q.  Where?

A.  In San Fernando -- or, no, on the freeway towards San Fernando.

1780

Q. And what happened at that time that you met up with them?

A. I picked up the drugs from them, and Aaron got in the Mercedes with me.

Q. Were you still with Blaze?

A. Yes.

Q. Where did Blaze go, if --

A. He was in the -- in the car with me and Aaron.

Q. And did he stay in that car?

A. No. When we got to San Fernando, we stopped at a gas station and he ended up getting in Haily's Nissan.

Q. Okay. So at some point you stopped at a gas station in San Fernando. And now you were in the Mercedes with Aaron, and Blaze and Haily were in her car?

A. Yes.

Q. Okay. What, if anything, happened when you left that gas station in San Fernando?

A. We pulled out. And at the -- at the red light, a police SUV was stopped at the opposite light. And when we went -- when the green light popped up, I went and it hopped in right behind me and lit me up.

Q. What did you -- just explain what that means, "lit you up."

A. It's -- he did sirens.

Q. What did you do?

A. I tried to evade.

1781

Q.  So you didn't pull over?

A.  No.

Q.  Why didn't you pull over?

A.  Because I had a gun and drugs in the car with me.

Q.  What happened then?

A.  I ended up getting in a crash.

Q.  Did you have any injuries from that?

A.  I broke my ankle and got a big gash on the back of my head.

        MS. STOKMAN:  If we can show 1308, which has already been admitted.

BY MS. STOKMAN:

Q.  Do you recognize this photograph?

A.  I do.

Q.  Who is that?

A.  That's me.

Q.  Is this after the crash you just spoke of?

A.  It is.

        MS. STOKMAN:  If we can show 1310 that's been admitted already.

BY MS. STOKMAN:

Q.  Do you recognize what's in these photographs?

A.  I do.

Q.  What are they?

A.  It's the fentanyl pills, the fentanyl, and the firearm

1782

that I had on me.

Q.  So the pills are in the photograph on the left?

A.  Yeah, the blue -- the blue ones in the bag.

Q.  And where is the brick of fentanyl?

A.  It's on the -- on the right, right above the gun.

Q.  Here that I circled?

A.  Yes.

MS. STOKMAN:  And just for the record, that's in the right-hand photograph, near the cell phones above the gun.

If we can show 1315 that's been admitted already.

BY MS. STOKMAN:

Q.  Do you recognize what's in this, in these photographs?

A.  Yes.

Q.  What's in the photographs?

A.  The -- there's the car and then extended magazine for the 9mm I had.

Q.  Is that the car that you were driving when you crashed it?

A.  It was.

Q.  What did -- where did that Mercedes come from?

A.  That's the one that I had gotten from the kid that Nick brought with him to the hotel.

Q.  So this is the Mercedes that you were driving since the Hollywood robbery?

A.  Yes.

Q.  Okay.

1783

MS. STOKMAN:  If we can show 1320 which has already been admitted.

BY MS. STOKMAN:

Q.  The bottom photograph, does that show the damage to the vehicle, that Mercedes?

A.  Yes.

Q.  Okay.  Where did you go from there?

A.  To the hospital.

Q.  Did you ever get booked into custody?

A.  No.

Q.  And let me ask you, the 9mm that you had in that vehicle, was that the same gun that you used to shoot Michael Brizendine?

A.  No.

Q.  Had you already given Bam the pieces of that 9mm that you spoke of before?

A.  I had.

Q.  Okay.  And the phone that you used prior to -- or during the time that Michael was killed, was that phone one of the phones that was in that vehicle?

A.  No.

Q.  Had you already destroyed that phone, as you testified to?

A.  Yes.

Q.  Okay.  At some point in time were you released from the hospital?

DX Field S

1784

A.  Yes.

Q.  Do you recall around what date?

A.  Uh, I'm pretty sure it was March 5th.  Or no, March 4th.
It was the day before Haily's birthday.

Q.  So March 4th, 2022?

A.  '22.

Q.  Okay.  During this time were you in contact with Kenwood?

A.  Yes.

Q.  What ways were you contacting him, through what means?

A.  Through the Signal app on the new phone that I had bought
after I got out of the hospital.

Q.  I'm going to have you look at one of the binders up there,
at Exhibit 1305.

        MS. STOKMAN:  Actually, let's do this, this might be
easier.  If we can show just the witness 1305 but starting at
page 19 of the document.  It'll show up on your screen.

        And just for the record, this is page 19 of the
exhibit, but the page number on the actual page says 1201 --
I'm sorry, 1202.

BY MS. STOKMAN:

Q.  Do you recognize what's being displayed on the screen in
front of you?

A.  I do.

Q.  What is it?

A.  It's communications between me and Kenwood asking him if

DX - Field 6

1785

he knew where Blaze was.

Q.   How do you know that those are communications from you?

A.   Because that's my -- that was my phone number and my Gmail address.  And that was the Signal that Kenwood was using to contact me.

Q.   When you say the Signal that Kenwood was using, what do you mean by that?

A.   So with Signal you pick your own names.  So his was labeled K-dub [sic].

Q.   And what did you know K-dub to -- or KW to represent?

A.   Kenwood.

Q.   Okay.  And are these messages accurately depicting messages from around the time frame of March 9th, 2022 -- or March 8th, 2022?

A.   They are.

          MS. STOKMAN:  Ask that Exhibit 1305, but only page 19 and pages 25 through 28 be admitted.

          THE COURT:  Any objections?

          MR. REED:  No objections.

          THE COURT:  Any --

          MS. LUEM:  I'm not clear on why only particular pages are being entered at this time.  This isn't something that was discussed.

          MS. STOKMAN:  That's fine.  We can admit 19 on, that's not a problem.  I'm just going to go only to the pages

1786

25 through 28 after it's been admitted.

MS. LUEM:  That's fine.  I just -- I wanted to review those pages ahead of time before I agreed to the admission just so I know exactly what is being admitted.

THE COURT:  Okay.  So she's agreed she's going to seek 19 through 25.

Any objections to that?

MS. LUEM:  19 through 25, if I could just have a moment to review those pages.

MS. STOKMAN:  Judge, it was 19 to 28.

THE COURT:  I'm sorry.  And so is that -- can you give me the actual numbers on the page?  That's 1202 through what?

MS. STOKMAN:  1211.

THE COURT:  All right.

MS. LUEM:  I'm sorry, it was 1202 to 1211?

MS. STOKMAN:  Yes.

MS. LUEM:  I have no objection.

THE COURT:  Mr. Reed, any objections?  Mr. Reed, did you have objections?

MR. REED:  No, earlier I said.

THE COURT:  I'm sorry, I missed it.  Thank you.

Those will be admitted.  I'm going to say specifically it's pages 19 through 28 that are identified as 1202 to 1211 on the page itself.

1787

All right.  Go ahead.

(Government's Exhibit 1305, pages 19 through 28 was

received.)

MS. STOKMAN:  If we can go to page 25, please.

MS. LUEM:  I'm sorry, what page number is that on the

actual exhibit?

MS. STOKMAN:  1208.

BY MS. STOKMAN:

Q.  James, do you see the messages on this page of the

exhibit?  Who are those messages from?

A.  Uh, those are from Kenwood.

MS. STOKMAN:  If we can go to page 26, please.

BY MS. STOKMAN:

Q.  Around this time, had Kenwood asked you to do anything as

it pertained to unlawful activity for him?

A.  He had asked me and Blaze to go to IE Redlands, I believe,

to pick up some cars.

Q.  And were you doing that for him?

A.  Yes.

Q.  Was Blaze doing that for him as well?

A.  Yes.

Q.  Okay.  These messages from the page before this and

page 26 -- if we can go to page 27 as well -- you aren't

responding; is that right?

A.  Yes.

DX Field S

1788

Q.   What's going on in these messages based on your nonresponse?

A.   Kenwood's upset and threatening to put me and Blaze both in the hat.

Q.   In your experience, was this typical from an AB brother when you wouldn't be picking up the phone or responding?

MS. LUEM:  Objection.  Speculation.

THE COURT:  Sustained.

BY MS. STOKMAN:

Q.   So had this happened to you before?

A.   Yes.

Q.   And explain that to us.

A.   Uh, so when you're working for a brother, you're expected to be on call 24-7 whether you're asleep, eating.  In the middle of anything, you're supposed to drop whatever you're doing and answer your phone.

Q.   And what happens if you don't?

A.   Then you get in trouble.

Q.   Uh, and had that happened to you before?

A.   I had gotten in trouble from Weaver before, yes.

Q.   For not answering?

A.   For not answering.

Q.   Okay.

MS. STOKMAN:  We can take that down.

Judge, this might be a good time for a break if we're

DX Field C

1789

close to one.  If not, I can keep going but --

THE COURT:  All right.  Let's go ahead and take the break now.  Let's plan on returning at ten o'clock.

Thank you very much.

(Jury exits the courtroom at 9:37 a.m.)

THE COURT:  All right.  The jury members have stepped out.  Anything for the record at this time?

Doesn't sound like it.  Thank you.

MS. STOKMAN:  No.

THE COURT:  Let's go ahead and take a break.

(Recess held.)

THE COURT:  All right.  Anything at this time?

All right.  Let's go ahead and bring the jury back in.

(Jury enters the courtroom at 10:02 a.m.)

THE COURT:  All right.  We have all of our jury members back.

Ms. Stokman, you may continue.

MS. STOKMAN:  Thank you.

BY MS. STOKMAN:

Q.  James, before we move on, I just meant to ask you one question.

In the messages that we were looking at from Kenwood, how did you know in fact that you were speaking to Kenwood?

A.  Because he said it was Kenwood.

DX Field 5

1790

Q.  Had you also ever had a phone conversation with him through that app when he's using that, I guess, user name KW?

A.  I believe -- yeah.

Q.  And in that phone conversation, is that the person that you came to know as Kenwood?

A.  Yes.

Q.  Okay.  So I'm going to direct your attention to around March 8th of 2022.  At some point in time, did you return back to Long Beach around that date?

A.  Yes.

Q.  Why did you go to Long Beach?

A.  Frank told me he needed me to go to Soldier's house and help Soldier with something that had gone wrong there.

Q.  And were you told what had gone wrong?

A.  Yes.

Q.  Who told you?

A.  Frank did.

Q.  What did he say?

A.  He said that Ronnie and Jimbo had messed up, that him -- that Ronnie and Jimbo, Soldier and Bam had had two people held hostage at Soldier's house, Shifty from PENI and another -- he was a brother named Rick Rainey.

Q.  And did Frank tell what happened when those individuals were at Soldier's apartment?

A.  Yes.

1791

Q.   What did he say?

A.   He said that they had somehow escaped.

Q.   Who had escaped?

A.   Ronnie -- I mean, Jimbo -- no, not Jimbo.  Excuse me.
It was Rick Rainey and Shifty.

Q.   Okay.  And what, if anything, did Frank say about them escaping?

A.   He said that it was supposed to be Ronnie and Jimbo that were supposed to be watching them and they had left that -- I mean, that Ronnie and Jimbo had left and that somehow Rick Rainey and Shifty had gotten ahold of one of the guns that Bannick and Perkins had and had escaped.

Q.   Okay.  And did Frank express any anger about this situation?

A.   Yes.

Q.   What did he say, if anything, in particular?

A.   He said that they had messed up, that Ronnie -- this wasn't Ronnie's first time messing up and that after they had, Rick Rainey and Jimbo -- I mean Rick Rainey and Shifty had escaped, that Ronnie and Jimbo had taken the two duffle bags that they had collected stuff from Rick Rainey and Shifty and they had taken it and that stuff belonged to two of the brothers.

Q.   Okay.  So let's break this down a little bit.
So in this call with Frank, he let you know that

1792

Ronnie and Jimbo had messed up because they had left Soldier's apartment, and Rick Rainey and Shifty who were being held were able to escape?

A.  Correct.

Q.  Okay.  So did you go back to Soldier's apartment at that point?

A.  No.  I went and met Soldier at a hotel.

Q.  Okay.  Let's just go back to Soldier's apartment, the one that you identified in the photographs.  Is that actually located in Long Beach or in a different city?

A.  I believe it's Bellflower.

Q.  Okay.  Is that near Long Beach?

A.  Yes.

Q.  Okay.  So when you met up with Soldier at a hotel, where was that located?

A.  It was in Bellflower as well.

Q.  Do you know the name of that hotel?

A.  No.

Q.  And when you went there, did you go by yourself?

A.  No.

Q.  Who were you with?

A.  I was with Blaze and two female friends of ours.

Q.  And what happened when you arrived at the hotel?

A.  I met with Soldier.  He rented a room, and he left.

Q.  And at any point, did you end up by yourself in that hotel

1793

room?

A.  Yes.

Q.  So the two females you mentioned and Blaze had left?

A.  Correct.

Q.  Okay.  At some time on March 8th, 2022, did Soldier come back to that hotel room?

A.  Yes.

Q.  Was he alone?

A.  No.

Q.  Who was he with?

A.  He was with Bam and some kid named -- some guy named Matt.

Q.  Do you know Matt's name?

A.  Yeah.

Q.  What is it?

A.  It's Matthew O'Day.

Q.  Does he go by Matt?

A.  They called him "Matt Matt."

Q.  Do you know how those three individuals came, what they were transported in when they arrived at the hotel?

A.  They came in Soldier's Dodge Charger.

Q.  Okay.

        MS. STOKMAN:  If we can show just for the witness, please, 1014.

BY MR. STOKMAN:

Q.  Do you recognize the person in this photograph?

ER 1123

1794

A.  I do.

Q.  Who is that?

A.  That's Matt.

Q.  Matt O'Day, Matt Matt?

A.  Yes.

MS. STOKMAN:  Ask to admit and publish Exhibit 1014.

THE COURT:  Any objections?

MS. FISHER-BYRIALSEN:  No.

MS. LUEM:  No.

THE COURT:  That will be admitted.

(Government's Exhibit 1014 was received.)

BY MS. STOKMAN:

Q.  Had you met Matt Matt before that night?

A.  No.

Q.  Okay.  Do you know if he was a part of any gang?

A.  Uh, I believe he was with PENI as well.

MS. STOKMAN:  If now we can just show the witness, please, 1002.

BY MS. STOKMAN:

Q.  Do you recognize the individual in this photograph?

A.  I do.

Q.  Who is that?

A.  That is Bam Bam, Brandon Bannick.

MS. STOKMAN:  Ask to admit and publish 1002, please.

THE COURT:  Any objections?

1795

MS. DE SALES BARRETT:  It's already in evidence.

MS. STOKMAN:  Oh, I'm sorry.  This is in evidence.
Thank you.

BY MS. STOKMAN:

Q.  So this is -- this is Bam Bam, Bannick?

A.  Correct.

Q.  Okay.

MS. STOKMAN:  Is 1001 in evidence?  I believe it is.

MR. REED:  Yes.

MS. STOKMAN:  Okay.  So if we can show 1001, please.
Thank you.

BY MS. STOKMAN:

Q.  Who is that?

A.  That is Soldier, Evan Perkins.

Q.  So the --

MS. STOKMAN:  And you can take that down.  Thank you.

BY MS. STOKMAN:

Q.  So the four of you are in the hotel room.  What happens
while you're there?

A.  We get a call from Frank.

Q.  And what type of call is that?

A.  It was on Signal.

Q.  Whose phone did Frank call?

A.  Mine.

Q.  And what, if anything, did Frank say during that call?

1796

A.  He said that Ronnie had messed up, this was his second time, and that Jimbo had messed up as well, that he wanted us to take care of them.

Q.  And again, it was the same language, "take care of them"?

A.  Correct.

Q.  Okay.  When you were on that call, was it just you on the phone?

A.  No.  I was -- it was on speaker.

Q.  Okay.  How far away were you from everyone else in the room?

A.  We were all around the same bed.

Q.  Okay.  When Frank said you need to take care of them, in your experience, is that something that you can ignore?

A.  No.

Q.  Why?

A.  Because it's coming from a brother.

Q.  That night were you in possession of a gun?

A.  I was.

Q.  What type of gun?

A.  When I first got to the hotel, I was in possession of a 22.

Q.  Do you know if Bannick had a -- had a gun?

A.  He -- when he showed up, he did.

Q.  What kind of gun was it?

A.  He had two:  He had a 1911 .45 that he gave to me and a

1797

9mm.

Q.  Do you know if Soldier had a gun?

A.  Yes.

Q.  What kind did he have?

A.  He had a compact .40.

Q.  And are you aware whether or not Matt O'Day had a gun?

A.  Not at that time.

Q.  Not -- you weren't aware or he did not?

A.  I don't think he -- I don't believe he did.

Q.  Okay.

        MS. STOKMAN:  Just for counsel's purpose, we're going to ask to display 1429 as a demonstrative.

        MS. FISHER-BYRIALSEN:  Is that the board?

        MS. STOKMAN:  Yes.

BY MS. STOKMAN:

Q.  Can you see that from where you sit?

A.  I can.

        MS. FISHER-BYRIALSEN:  Your Honor, can we have a sidebar, please?  I am -- objection.  Your Honor, we can --

        THE COURT:  No, not at this time.

        Go ahead.

BY MS. STOKMAN:

Q.  And do you see yourself depicted on that board?

A.  It's -- it's hard to see behind her, but --

        MS. FISHER-BYRIALSEN:  Your Honor, we object.  This

1798

was not the exhibit that was admitted, I don't believe.

THE COURT:  This hasn't been admitted at all.  It's just a demonstrative.

Mr. Conolly, maybe you can hold that up higher.

THE WITNESS:  Yes.

BY MS. STOKMAN:

Q.  And it says "Suspect" under your name.  Is that a moniker you go by?

A.  Yes.

Q.  Okay.  And those are the individuals that you've been speaking about, right, Bannick, Perkins, O'Day, and Frank?

A.  Correct.

Q.  Okay.

MS. STOKMAN:  I think we can -- thank you.

BY MS. STOKMAN:

Q.  At some point in time, did you leave the hotel?

A.  Yes.

Q.  Were you alone?

A.  No.

Q.  Who left?

A.  Me, Bam, Soldier, and Matt Matt.

Q.  What car did you leave in?

A.  We left in Soldier's Dodge.

Q.  Did everyone go in the same car?

A.  Yes.

1799

MS. STOKMAN:  If we can show 1161, which has already been admitted.

BY MS. STOKMAN:

Q.  Do you recognize what's in that photograph?

A.  I do.

Q.  What is that?

A.  That's Soldier's Dodge Charger.

Q.  Is that the vehicle that you just described?

A.  It is.

MS. FISHER-BYRIALSEN:  Your Honor, I don't think we have a need for that demonstrative exhibit anymore.  It's not being used for this line of questioning.

THE COURT:  Let's go ahead and take that down at this time.

BY MS. STOKMAN:

Q.  So you left the hotel in Soldier's car.  Where did you go?

A.  Over to Jimbo's.

Q.  Jimbo's house?

A.  Yes.

Q.  Do you know what area that was located?

A.  I believe it's in the Long Beach area as well.

Q.  Had you been there before?

A.  Yes.

Q.  Do you recall any streets or landmarks or any, like, more specific area of where that was located?

1800

A.   No.  I just remember -- I remember his house was on the -- on a corner where two streets connect.  And there was a -- a separate garage in the back of his house with a driveway right there leading to the garage as well.

Q.   Who else was at the -- at Jimbo's house when you arrived?

A.   Ronnie was there, and I believe Jimbo's girlfriend was there.

Q.   What happened when you arrived at the house?

A.   Bam and Soldier went in to grab the duffle bags that Frank wanted us to collect.  And I -- I got another phone call from Frank telling me that he wanted Jimbo and Ronnie to get in the cars with us -- to get in the car with us, that I was to get into Jimbo's SUV and to leave.

Q.   Sorry.  So you were supposed to get into Jimbo's SUV.  Did you get into Jimbo's SUV?

A.   No.

Q.   Why not?

A.   It was taking Jimbo longer than expected to come back out of his house.  At this point, Frank had told me that he just wanted us to take care of it right then and there.  He told us to "Just smoke them dudes right now."

Q.   What does "smoke them" mean?

A.   Kill them.

Q.   What did you do with that information?

A.   I told Soldier.

DX Field S

1801

Q. And did he have a response?

A. He said that his old lady and, I believe, his kids -- Jimbo's kids were in the house so it wasn't a good idea.

Q. When you say "old lady," Jimbo's "old lady," who does that refer to?

A. His girlfriend.

Q. Okay. And so you said that Bam had gone to go get the duffle bags with Soldier. Did they retrieve those duffle bags?

A. They did.

Q. And where did those duffle bags go?

A. In the back of Soldier's Dodge, in his trunk.

Q. After Soldier -- you discussed with Soldier that it wasn't a good idea to kill anybody at that house, what happened?

A. Uh, at this time, Jimbo came back out, and Frank told me to -- that he wanted Ronnie in the Dodge with -- he wanted them separated and two of us to go with each of them.

Q. When you say "them," who are you referring to being separated?

A. Ronnie and Jimbo.

Q. Okay. So Frank told you that he wanted Ronnie and Jimbo separated and for each of you to go with one of them?

A. Right, that he wanted two of us -- because there was four of us there. He wanted two of us to go with one person.

Q. Okay. And did that happen?

DX Field S

1802

A.  It did.

Q.  So tell us about that.

A.  So Ronnie got in the Dodge with Bam and Soldier.  And Jimbo, instead of getting in his SUV, we ended up getting in a white Mercedes that was parked out front with me and Matt.

Q.  So you got into the Mercedes with Jimbo?

A.  Yes.

Q.  And Matt?

A.  And Matt.

Q.  Who was driving?

A.  Jimbo was.

Q.  Okay.  Before everyone got into these vehicles, did Ronnie give you anything?

A.  Yes.

Q.  What did he give you?

A.  I gave me a 9mm.

Q.  Did he say anything to you when he gave it to you?

A.  He told me that he -- he trusted to give it to me, because he thought he was going to get beat up again and he was showing that he was willing to take it.

Q.  Take what?

A.  Take whatever punishment that the brothers had issued.

Q.  What kind of firearm did he give you?

A.  A 9mm.

Q.  Okay.  I'm sorry if you said that, but I -- I didn't

1803

remember.

Okay. So at this part -- at this point in time, you-all get into two separate vehicles, and do you leave Jimbo's house?

A. Yes.

Q. Who is in front, as far as the two vehicles?

A. Soldier's driving, leading the -- in the Dodge, and Jimbo, me, and Matt are in the Mercedes behind him.

Q. Did you know where you were going?

A. I -- I didn't know the area.

Q. And had you been given any instructions on where to go?

A. Uh, Frank had told us to go somewhere out in the hills towards the Pomona area, I -- but I'm not from there, so I don't really know the area.

Q. Okay. So you were following Soldier?

A. Correct.

Q. At this point in time, you're communicating with Frank. Are you communicating with anyone else?

A. Soldier.

Q. And how were you communicating with him?

A. Through signal.

Q. So while you're in the car, did you communicate any further with Frank?

A. Yes.

Q. And tell us about that.

1804

A.   Frank called and told me to put him on speaker because he wanted to talk to Jimbo.

Q.   And when you say put him -- he said "put him on speaker," who are you speaking about?

A.   Frank said to put Frank on speaker, he wanted to be on speaker so he could communicate to Jimbo.

Q.   Got you.  And so did you do that?

A.   I did.

Q.   Did you hear the conversation on the phone at this point?

A.   I did.

Q.   And what, if anything, did Frank say?

A.   Frank told Jimbo, Look, I'm going to give you one chance to tell me the truth or you're done.

Q.   And did Jimbo respond?

A.   He told him that he would be honest.

Q.   And what, if anything, did Frank say next?

A.   Frank asked why him and Ronnie left Soldier's the night that they were supposed to be watching Shifty and Rick Rainey.

Q.   And what did Jimbo say in response?

A.   He said that he had gotten permission from BJ and that's as far as he got.

Q.   Do you know the BJ he was referring to -- Jimbo was referring to?

A.   Yes.

Q.   Who is that?

1805

A.  He's another brother.

Q.  And do you know if he's incarcerated?

A.  I do.

Q.  Is he incarcerated?

A.  He is.

Q.  So you said that Jimbo started to say he had permission from BJ, but then that's as far as he got.  Tell us what that means.

A.  That means Frank told him, Hold on, that's a lie right there, BJ told me that he didn't give you guys permission to leave.

Q.  And then what happened?

A.  And then we ended the phone call.

Q.  Did you hear from Frank again while in the car after that conversation?

A.  Through messages.

Q.  And did -- what kind of communication do you recall receiving from Frank?

A.  He had asked me to ask Soldier if Soldier was willing to take care of Ronnie.

Q.  And did you?

A.  I did, I asked Soldier.

Q.  And did you have any discussions with Frank about killing Jimbo at this point?

A.  I believe so.

1806

Q.  What do you remember Frank saying about killing Jimbo?

A.  He wanted -- he wanted both Ronnie and Jimbo killed.

Q.  Okay.  So what did you do next?

A.  Uh, I -- we drove towards Pomona, we pulled off the freeway.  Soldier pulled off, and Frank was telling us to take care of it.  So I got out of the car, told Soldier what Frank said.  And we hopped back in the car, got back on the freeway.  And Frank sent me another message saying that he wanted us to pull over right now and take care of it, just pull on some dark road and take care of it.

Q.  And then what happened after that?

A.  We pulled off some dark road, went down it, turned back around.  At this time I told Jimbo I -- mind you I had a broken leg at the time and Jimbo is twice my size.

Q.  So let me stop you right there.

So the two vehicles now have gotten off on a dark road, but do you know where you were?

A.  In Pomona somewhere.

Q.  And you said you went down a street and then turned around and came back?

A.  No.  We turned down a street and turned facing back towards the way we came.

Q.  I see.  Okay.  And did the vehicle stop at that point?

A.  Yes.

MS. STOKMAN:  If we can pull up Exhibit 1837 -- it's

1807

been admitted -- and play around the 25-second mark.

(Video played in open court.)

BY MS. STOKMAN:

Q.  Do you recognize two vehicles that are driving past that area?

A.  I do.

Q.  What are those vehicles?

A.  The first one was Soldier's Dodge and the second one was the Mercedes.

MS. STOKMAN:  Okay.  We can take that down.  Thank you.

BY MS. STOKMAN:

Q.  So when the vehicles parked, what did you do at that point?

A.  I had told Jimbo that he was going to take care of Ronnie.

Q.  Why did you tell him that?

A.  Because I wanted him to think that he had a chance.  He's twice my size, I had a broken leg, so I wanted the upper hand.

Q.  And so what did you do after you said that to Jimbo?

A.  I handed him the .45 that I had and we all got out of the car.

Q.  Did you have another gun in your possession at this point?

A.  Yes.  I had -- I actually had two.  I had given the .22 I had to Matt, and I had Ronnie's 9mm.

Q.  Okay.  So what happens when you got out of the vehicle?

1808

A.   We stepped off the road into, like, a grassy area, and Jimbo was coming around.  I lifted up the 9mm and I pulled the trigger.

Q.   And what happened?

A.   It -- it didn't go off.  So I crouched down, racked another round in the chamber and fired again.

Q.   And who were you firing at?

A.   At Jimbo.

Q.   Do you know if it hit him?

A.   Yes.

Q.   How do you know that?

A.   Because he fell.

Q.   Did you shoot at all after that point?

A.   No.

Q.   What happened next?

A.   Ronnie had taken off running.  And I looked at Soldier and Bam and told them, What are you guys doing?  So they took off chasing him while I bent down to pick up the .45 that Jimbo had.

Q.   The gun that you had given him?

A.   Yes.

Q.   Did you find that gun?

A.   Yes.

Q.   Okay.  And then what happened?

A.   Matt had came running up to me right as I picked up the

1809

.45 and handed me the .22, saying that it wasn't working, he needed another gun.  So I gave him the .45.

Q.  At this point, had you heard shots being fired that weren't coming from your gun?

A.  Yes.

Q.  How many shots did you hear?

A.  I can't remember.

Q.  Was it more than one?

A.  Yes.

Q.  And what else did you hear at that point?

A.  That point, I -- I had gotten another phone call from Frank, and Ronnie was screaming.

Q.  And you could hear Ronnie screaming?

A.  I could hear Ronnie screaming.

Q.  Okay.  What, if anything, did Frank say?

A.  Frank asked me, What the hell is that?

Q.  And did you --

A.  So I told him it was Ronnie screaming.  He says, It sounds like a bitch is screaming.

Q.  And what, if anything, did he say after that?

A.  Nothing.

Q.  Okay.  Did you hear any more shots around that time?

A.  No.

(Court Reporter gains clarification.)

Q.  Okay.  Did you, at any time, see who shot Ronnie?

1810

A.  No.

Q.  What did you do after that?

A.  I got back in the Mercedes -- yeah, the Mercedes, and we took off.

Q.  Were you in the Mercedes by yourself?

A.  No.  Matt had jumped back in the Mercedes with me.

Q.  And where were Bannick and Perkins at that point?

A.  They were already back in the Dodge.

Q.  And so were they also leaving the area?

A.  Yes.

Q.  Did you, at any point, see anyone shoot from that -- from Soldier's vehicle?

A.  No.

Q.  Did you see anyone shoot from your vehicle?

A.  No.

Q.  Okay.  At any point in time, were you able to see whether or not Matt shoot -- shot Ronnie or Jimbo?

A.  No.

Q.  You weren't able to see?

A.  I wasn't able to see.

        MS. STOKMAN:  Can we show Exhibit 1087, please?  It's already been admitted.

BY MS. STOKMAN:

Q.  Do you recognize what's in that photograph?

A.  Yes.

1811

Q.   What is that?

A.   It's a flashlight that was connected to the 9mm that I had.

Q.   The one that you used to shoot Jimbo?

A.   Correct.

Q.   When you left the scene, did you leave that flashlight behind?

A.   I didn't know it at that time, but when I got back to the hotel I realized that it was off.

Q.   It was off of the gun?

A.   Yes.

         MS. STOKMAN:  Okay.  We can take that down.  Thank you.

         If we can bring up Exhibit 1839, which has also been admitted.  If we can go to 13:50 or around.

BY MS. STOKMAN:

Q.   Do you recognize that vehicle that's coming up on the screen?

A.   I do.

Q.   And what vehicle is that?

A.   That's Soldier's Dodge.

Q.   Okay.  Do you recognize the vehicle that's following behind it?

A.   I do.

Q.   What is that?

1812

A.   That's the Mercedes that I was driving.

        MS. STOKMAN:  Okay.  We can take that down.  Thank you.

BY MS. STOKMAN:

Q.   After you shot Jimbo, you said that he dropped.  Do you know whether or not he was moving at that point?

A.   He wasn't.

Q.   He wasn't?

A.   He was not.

Q.   At some point in time, did Ronnie stop screaming?

A.   Yes.

Q.   Okay.  So after you left in the Mercedes with Matt, and Soldier and Bam left in the Dodge that Soldier was driving, where did you go?

A.   Uh, we went up back onto the freeway up a couple exits and pulled off.

Q.   And do you remember at some point after you left the location of where you shot Jimbo stopping to get gas?

A.   I do.

Q.   Do you remember the type of gas station you stopped at?

A.   I believe it was an ARCO.

Q.   Okay.

        MS. STOKMAN:  May I approach the witness?

        THE COURT:  Yes.

///

DX Field S

1813

BY MS. STOKMAN:

Q.   I've handed you a disk.  Do you recognize what I've handed you?

A.   Yes.

Q.   How do you recognize it?

A.   By my signature, my initials.

Q.   Uh, at a day prior then -- prior to today, were you able to view what's on that disk?

A.   Yes.

Q.   And then you made that initial or signature?

A.   Yes.

Q.   Okay.  And what is the video that's on the disk showing?

A.   It's showing me stopping at a gas station with Matt.

Q.   Is this the gas station that you just said you stopped at at some point after the murders?

A.   Yes.

Q.   And when you saw the video depicted on that disk, did that accurately show the way that the vehicle you were driving, and Matt, looked the night of the murder?

A.   Yes.

        MS. STOKMAN:  Ask to admit 1838 and publish to the jury.

        THE COURT:  Any objections?

        MR. REED:  No objection.

        MS. FISHER-BYRIALSEN:  No.

1814

MS. LUEM:  No.

THE COURT:  That will be admitted.

(Government's Exhibit 1838 was received.)

MS. STOKMAN:  And if we can play there.  It's around the 2-minute, 42-second slot.

(Video played in open court.)

BY MS. STOKMAN:

Q.  Do you see a vehicle coming in from the top of the screen?

A.  I do.

Q.  Do you recognize that vehicle?

A.  Yes.  That's the Mercedes that I was driving.

Q.  Someone just got out of the car.  Do you know who that was?

A.  Yes, that was Matt Matt.

Q.  Okay.

MS. STOKMAN:  Can we skip ahead to around minute 4.

(Video played in open court.)

BY MS. STOKMAN:

Q.  It looks like the vehicle turned around.

Did you turn the vehicle around?

A.  Yes.

Q.  Why did you do that?

A.  Because the gas tank was on the opposite side.

Q.  Okay.  And when you stopped to get gas, did you get out of the vehicle?

1815

**A.** No.

**Q.** Who pumped the gas?

**A.** Matt.

**Q.** Okay. And he -- is that the individual at the lower right-hand corner of the video right now?

**A.** It is.

MS. STOKMAN: Okay. If we can skip to 5:18 or around, please.

(Video played in open court.)

BY MS. STOKMAN:

**Q.** So around here there was an individual who got into the passenger side of the vehicle. Who was that?

**A.** That was Matt.

**Q.** And now you're driving away?

**A.** Correct.

**Q.** Where did you go after this?

**A.** Back to the hotel.

**Q.** Okay. Thank you.

When you arrived back at the hotel, was anyone else there?

**A.** Matt -- I mean Bannick and Soldier were there when we came up the stairs.

**Q.** And what, if anything, happened when you were in the hotel?

**A.** We went in and sat down and Frank called.

1816

Q.   And what, if anything, did Frank say?

A.   I had him on speaker and he said, What -- what happened with Jimbo?  Why did Jimbo get shot?

Q.   And did you respond?

A.   I told him, Yeah, you told me that if he had lied that you wanted him taken care of.

Q.   And what, if anything, did Frank say?

A.   He said, All right, it's good, you did the right thing.

Q.   Okay.  Was there anything odd about that conversation in your mind?

A.   Yeah.

Q.   What?

A.   Because the whole night he was telling me to do this, and it sounded like he didn't know what the hell was going on.

Q.   Okay.  Were you aware of Jimbo's status within PENI?

A.   Yes.

Q.   And from your experience, was he -- what was the general impression of Jimbo as a member of PENI?

A.   He was a pretty high-ranking member of PENI.

Q.   Did he seem to be liked or disliked?

A.   He seemed to be loved.

        MS. STOKMAN:  Okay.  If we can show just for the witness, please, Exhibit 1303, starting at page 2, page 2 of the exhibit.

BY MS. STOKMAN:

1817

Q.   Do you recognize what's being displayed on the screen?

A.   I do.

Q.   And what is that?

A.   It's messages from me and Frank.

Q.   And these are messages through what means?

A.   Through Signal.

Q.   Okay.  And how do you recognize those as messages between you and Frank?

A.   Because the 747 phone number was mine, and he -- when he first contacted me, he said this was Frank.

Q.   Okay.  Had you -- during the course of what we've been talking about on the night of March 8th, did you use Signal to speak with Frank in the times that he was calling you?

A.   Yes.

Q.   And was that the same account that Frank was using during those calls?

A.   It was.

Q.   Okay.  And this -- did these accurately reflect the messages between your phone and Frank around the time frame of the murders that we just spoke of?

A.   Yes.

        MS. STOKMAN:  Ask to admit 1303 and to publish to the jury.

        THE COURT:  Any objections?

        MR. REED:  No objection, Your Honor.

1818

MS. FISHER-BYRIALSEN:  No.

MS. LUEM:  No.

THE COURT:  All right.

MS. DE SALES BARRETT:  Is this the single page?

MS. STOKMAN:  No, it's the exhibit.

MS. DE SALES BARRETT:  Okay.  The entire 1303?

MS. STOKMAN:  Yes.

MS. DE SALES BARRETT:  Okay.

THE COURT:  All right.  That will be admitted.

(Government's Exhibit 1303 was received.)

BY MS. STOKMAN:

Q.  So we're looking at page 2 of Exhibit 1303, which is page 1112 on the actual document.

That first blue box at the very top left-hand corner, what is that box -- is that the box you were -- or that message you were referring to when you said that Frank told you who it was that -- that, you know, that was contacting you?

A.  Yes.

MS. STOKMAN:  Okay.  If we could go to page 3, please, which is on the actual exhibit reflected as page 1113.

BY MS. STOKMAN:

Q.  These are messages that were sent between and you Frank prior to the night of March 8th; is that correct?

A.  Yes.

DX-Field 5

1819

**Q.** Okay.

MS. STOKMAN:  If we can go to page 5, this first blue message.

BY MS. STOKMAN:

**Q.** And let me just ask you:  In these messages, what are the green -- what does that color green reflect?

**A.** That reflects my messages.

**Q.** And what does blue reflect?

**A.** The messages from Frank.

**Q.** The first blue message on here that talks about -- the Frank saying, "Good news, bro, it was a Shifty and Double R," who is he referring to?

**A.** He's referring to Shifty from PENI and Rick Rainey.

MS. STOKMAN:  Okay.  And actually, I'm sorry, can we go back to page 2 real quick.  Sorry, that was my error. Forget page -- I meant page 3.

BY MS. STOKMAN:

**Q.** That first message on this page from Frank that talks about, they were -- "they did escape work or let them loose because of the two, they had a shootout," what is this message referring to?

**A.** The incident at Soldier's house with Rick Rainey and Shifty.

MS. STOKMAN:  Okay.  If we can go to page 15, please, which is reflected on the exhibit as 1125.

1820

BY MS. STOKMAN:

Q.   The message -- the third one down in the middle of the page from Frank, this is -- with the conversion of UTC time that Judge Thurston read into the record before, this would be around the morning or so of the 8th of March; is that correct, if we're looking at 8 hours back?

A.   I believe so.

Q.   And he says:  "How are you doing today?  Ready?  We'll have some fun.  I think I need you to dome somebody for me."

        What does that mean, "dome somebody"?

A.   That means kill somebody.

Q.   Okay.  Going to page 20, these are messages from Frank from also March 8, 2022; is that correct?

A.   Yes.

        MS. STOKMAN:  Okay.  And going to page 21.  Actually, I'm sorry, go back to that.  So the second message from Frank on this, if we can blow that up, please.  There we go.

BY MS. STOKMAN:

Q.   What is -- what is Frank telling you when he's saying:  "Make sure you load a shotgun up with dimes and get it done. Jimbo's got a gun, Ronnie's got a gun"?

        What does this mean to you, this message?

A.   It's telling me to be careful because Ronnie and Jimbo are both armed and to be ready when I get there.

        MS. STOKMAN:  If we can go now to page 21.  And

1821

page 23.

BY MS. STOKMAN:

Q.  In the top two boxes, that -- in the green that you're sending the message, you say that Bam just pulled up and Matt and Soldier.  What are you referring to?

A.  I'm referring to them showing up at the hotel.

Q.  Prior to going to pick up Jimbo and Ronnie?

A.  Yes.

Q.  When you say "I got the 11 right here," what do you mean?

A.  That's the 1911 -- the .45 that Bannick gave me.

MS. STOKMAN:  Go to page 24, please.  Now we can blow the whole thing up.  Thank you.

BY MS. STOKMAN:

Q.  So these look like calls from Frank around the evening of March 8th, 2022, with that time difference.

Were there points in time where you were missing calls from Frank or were you answering these calls?

A.  Uh, I don't remember.

Q.  But these might reflect -- or let me say this.

During the time that you told us you were at the motel and headed to Jimbo's and then headed out to where Jimbo and Ronnie were killed, you were constantly on calls with Frank.  Is that what you testified to?

A.  Yes.

MS. STOKMAN:  Okay.  If we can go to page 25.  And

1822

page 26, please.

BY MS. STOKMAN:

Q.   The first message at the top in green where you say:  "I think Jimmy is more scared, but Ronnie is afraid for something he did," what are you referring to?

A.   I'm referring to their behavior.

Q.   And what did you mean by that?

A.   I meant that they looked like they were scared because they thought they were in trouble.

Q.   There's the third blue message down from Frank.  He asked you:  "If there's two of you on each of them, make sure you guys have your gun pulled and put a seat belt on in case he tries to do some funny maneuvers," what is he referring to here?

A.   He's referring to when he asked me to separate --

          MS. FISHER-BYRIALSEN:  Objection.

          THE WITNESS:  -- Ronnie and --

          THE COURT:  I'm sorry.  Your basis?

          MS. FISHER-BYRIALSEN:  Calls for speculation of what my client is thinking.

          THE COURT:  Sustained.

BY MS. STOKMAN:

Q.   What did you -- what did you do after this?  What is this -- how was this significant to you?

A.   This is the moment when I separated -- when Ronnie and

1823

Jimbo were separated.

Q.  Into the two vehicles?

A.  Into the two vehicles.

Q.  Okay.

MS. STOKMAN:  If we can go to page 28, please.

BY MS. STOKMAN:

Q.  The first message that you send in the green:

"I got them.  Believe Jimmy is doing Ronnie because I
feel they're looking for ways not to do it.  I'll do
Jim first and have one of them do Ronnie."

What are you meaning by that?

A.  I was meaning that it seemed like Bam and Soldier and Matt were scared and that I had Jimbo believing that he was going to shoot Ronnie.

Q.  Okay.

MS. STOKMAN:  If we can -- yes.  Thank you.  And then go to the next page, page 29, please.

BY MS. STOKMAN:

Q.  When you say, "Him and I have our burner phones," in that first green box, what are you referring to?

A.  Me and Soldier.

Q.  And what does that mean?

A.  That we have phones that were not -- were not traceable.

Q.  Okay.  What does that mean to you, not traceable?

A.  That it's harder for -- it's -- they're throwaways.  So

1824

when we're done with them, we're supposed to get rid of them.

Q.  But somehow you're communicating through the Signal app, correct?

A.  Right.

Q.  And does that -- when you have to register for this -- for, like, a username under the Signal app, do you associate it with some sort of email address or something else?

A.  Yes.

Q.  And did you associate that in your phone?

A.  I did.

Q.  What was the email address you used for that?

A.  It was monstersuspect14882316.

Q.  And the "suspect," what does that refer to?

A.  That's my -- my moniker.

Q.  What does "monster" refer to?

A.  That's Haily's.

Q.  She has a moniker of "monster"?

A.  She does.

Q.  Okay.  And so that monstersuspect email is what was correlating to the 747 number that you're using here?

A.  Yes.

Q.  Okay.  And just to clarify, when you said that -- when we were talking about Kenwood's messages between your phone -- that the user picks their own, kind of, handle, that user name --

1825

A.   Right.

Q.   -- and he had picked KW, Frank -- this "Finn McCool" that's being listed on Frank's messages, did you pick that?

A.   No.

Q.   So that was part of the profile that this Signal number had that you were associating with Frank?

A.   Yes.

Q.   Okay.

        MS. STOKMAN:  Let's go to page 30, please.

BY MS STOKMAN:

Q.   The first message that you send at the very top of the right-hand side, you say:  "Do you want to be live?"  What did you mean by that?

A.   I meant did he want to be on FaceTime when this happened.

Q.   Why did you ask that?

A.   Because that's normally what the brothers ask.

Q.   What do they ask?

A.   To be -- when we're out doing something for them, they want to be -- they want to be able to see everything.

Q.   Has any AB brothers told you why they want to be on, like, a live FaceTime or otherwise video while you're doing things?

A.   Yes.

Q.   What have they told you?

A.   They said because they want to make sure that it was done correctly.

1826

MR. REED:  Objection.  Lack of foundation the way the question and answer is written.  If there's a "they," then "they" spoke.  But if there's not a "they," I think they have to stay with which --

MS. STOKMAN:  I can clarify.

THE COURT:  Go ahead.

BY MS. STOKMAN:

Q.  Which AB brothers have told you that?

A.  Weaver and Frank.

Q.  And why do they want you on a live video?

A.  Because they want to make sure that what we're doing is up to their standards.

Q.  Okay.  But as far as you remember, you did not have Frank on a live video when you were out and you shot Jimbo; is that correct?

A.  That's correct.

Q.  Okay.  So it says here on the second green message that you made a call to Frank.  And that is around 6:19 a.m. UTC time.

Around 6:44 UTC time on March 9th -- so going backwards, this would be the evening of March 8th -- Frank responds:  "You're okay, bud.  Are both of you okay?  Head back to the motel."

When in time was this message being sent to you?

A.  I believe it was right after.

1827

**Q.** After?

**A.** The homicides.

MS. STOKMAN:  Then we can go, please, to page 31.

BY MS. STOKMAN:

**Q.** Here on this it looks like Frank is trying to get in touch with you, but you're not responding.  Was this during the time that you were heading back to the hotel?

**A.** Yes.

**Q.** And at the end of this message, he says to you, "Proud of you guys," right?

**A.** Correct.

**Q.** Okay.

MS. STOKMAN:  If we can go to page 32, please.

BY MS. STOKMAN:

**Q.** And then you tell him in these messages:  "We're good. We're heading back to the room now."

What room were you referring to?

**A.** The hotel room.

**Q.** Where you and Matt went back to meet up with Bam and Perkins?

**A.** Correct.

**Q.** Okay.

MS. STOKMAN:  We can take that down.  Thank you.

If we can bring up 1304 just for the witness, please.

BY MS. STOKMAN:

ER 1157

1828

Q.  Do you recognize this?

A.  Yes.

Q.  And what -- what do you recognize this to be?

A.  This is messages from my phone and Soldier.

Q.  How do you know that this is Soldier that you're -- you're speaking to?

A.  Because it's -- it was logged in as Soldier on his Signal account.

Q.  Okay.  And does this accurately reflect the messages that were sent between your phone and Soldier's phone around the time period that's listed there?

A.  Yes.

Q.  Okay.

        MS. STOKMAN:  Ask to admit 1304 and to publish to the jury.

        THE COURT:  Any objections?

        MS. FISHER-BYRIALSEN:  No.

        MR. REED:  No objection.

        MS. LUEM:  No.

        THE COURT:  That will be admitted.

    (Government's Exhibit 1304 was received.)

BY MS. STOKMAN:

Q.  So this number that Soldier is using, it's a (562) number that ends in -257.  Does that look right?

A.  Yes.

DX - Field 5

1829

Q.  Okay.  Just one second.

        MS. STOKMAN:  We can take that down.  Thank you.

BY MS. STOKMAN:

Q.  The 9mm that you used to shoot Jimbo, what did you do with that?

A.  I broke the barrel down and gave the barrel to Bannick.

Q.  And do you know whether or not Bannick got rid of that gun?

A.  He told me he would.

Q.  Did you have any personal issues with Ronnie?

A.  No.

Q.  Did you have any personal issues with Jimbo?

A.  No.

Q.  What happened to the Mercedes that you were driving out -- to leave the night that Jimbo and Ronnie were shot?

A.  I got a flat tire coming off the Downtown LA exit.

Q.  And what happened?

A.  Blaze had to come pick me up.  And he went back to the car to pick up my hat and gave the keys to some random people.

Q.  Okay.  Before you shot Corn Fed, had you killed anybody?

A.  No.

Q.  Why did you do that?

A.  Because the brothers told me to.

Q.  And why did you kill Jimbo?

A.  Because Frank told me to.

1830

Q. What would happen if you refused an order from Weaver or Frank?

A. I could get killed myself.

Q. But you still had a personal choice in both of those -- in both of those shootings, right?

A. I did.

Q. But you still chose to follow the order?

A. I did.

Q. Why did you do that? Why did you still make that choice?

And was there another reason beyond the fact that if you didn't follow that order, you could be hurt or killed?

A. Because I was trying to become a brother.

Q. Why was it important for you to become a brother?

A. I've grown up in the California prison system my whole life, and those dudes are considered gods in that world.

Q. And so was there any expectation that you would one day return to the prison system?

A. Yes.

Q. And what was that based on?

A. My life. Just -- I've been in and out of prison my whole life.

Q. If you were in bad standing with the AB and you went back to the prison system, how would that affect you?

A. I would get killed.

Q. So when you wanted to be a brother, was it because you

1831

believed you would one day be back in that system?

A.  Yes.

Q.  In 2023, were you arrested for the murders that you've told us that you committed today?

A.  I was.

Q.  Sorry.  Let me just clarify that.

Today you've told us that you committed murders.  In 2023, were you arrested for those murders?

A.  I was.

Q.  And where were you housed when you were arrested for the crimes that you pled guilty to?

A.  The Fresno County Jail.

Q.  When you arrived at the Fresno County Jail, who, if anyone, was housed with you?

A.  Frank was there, Kenwood was there, Soldier was there, and Sidetrack was there.

Q.  Do you know Sidetrack's real name?

A.  Justin Gray.

Q.  Had you met him before?

A.  No.

Q.  Had you heard of him before?

A.  Yes.

Q.  Through anyone in particular?

A.  Just a couple guys in LA County.

Q.  At some point in time when you were in the Fresno County

1832

Jail, did any other AB brothers show up to that same area
where you were being celled?

A.  Yes.

Q.  Who was that?

A.  Weaver and Pitchford.

Q.  Did there come a point in time when you were removed from
that cell?

A.  Yes.

Q.  Did you ask for that?

A.  I did.

Q.  What happened to cause you to do that?

A.  It was a couple things.

Q.  And so can you tell us one of those things?

A.  Uh, I was going to get stabbed.

Q.  And why did you believe you were going to get stabbed?

A.  Uh, for two reasons.

Q.  Uh-huh.  Tell us those.

A.  The first was -- I had -- I was -- when Weaver showed up,
I had told him about an incident that had happened in
San Diego, where I was placed in a cell with another guy that
I thought was just some regular guy.  And I started talking
about some of the stuff that happened in Lancaster.  And the
guy turned out to be a -- I don't know if he was a cop or some
kind of informant, but I told Weaver about it.

Q.  Why did you tell Weaver about that?

DX-Field 5

1833

A.   Because there -- the brothers tell us that we're supposed to be honest about everything.

Q.   And what, if anything, happened after you told Weaver about that?

A.   They started acting funny -- the brothers started acting funny towards me.  Sidetrack and Soldier started acting funny.

Q.   Let me stop you for a second.  When you say "the brothers," are you referring to the ones you just mentioned you were housed with at the Fresno County Jail?

A.   Yes.

Q.   And how -- when you say "acting funny," what does that mean?  Describe that.

A.   That means avoiding my cell.  Frank was telling me one thing and Weaver was telling me another.

Q.   And did this cause you concern?

A.   Yes.

Q.   Why?

A.   Because it's not normal.

Q.   Before that, they had been acting a different way?

A.   Yes.

Q.   How'd they been acting before?

A.   Like I was one of the fellas.

Q.   And so what, if anything, else happened?

A.   One night I had heard Gray rigging his door to where it could pop when another door is opened.

1834

Q.   And what -- how is that significant?  Explain that.

A.   So in the Fresno County Jail where we were housed, they have it to where only one door can open at time and only one -- that cell is out at that time.

Q.   What do you mean -- when you say "that cell is out," does that mean that -- what do you mean by that?

A.   Whoever's in whatever door's open, that -- that person that's in that cell has their dayroom time.

Q.   Okay.  And so what is the significance of that sound you heard about popping the door?

A.   It -- it -- so when somebody else's door is open, they can pop their door to pop at the same time when it's not supposed to.

Q.   What happens when you pop a door?

A.   It opens.

Q.   Okay.  And so you heard that going on where?

A.   Down at Gray's cell.

Q.   And tell us why that was significant to you.

A.   Because Weaver came by my cell later that day, and he had told me I needed to have more respect for "the tip," that he hated to have me bashed over this stuff, and that I needed not to be talking about brothers' business.

Q.   What is "the tip"?

A.   "The tip" is the Aryan Brotherhood.

Q.   And did something happen after Weaver told you that -- or

1835

what did -- sorry. Let me ask you this first.

What -- what does that mean when he said "have you bashed"?

A.  Uh, stabbed.

Q.  Okay. And did something happen after that that caused you concern?

A.  He went back down to Gray's cell on his way to his door.

Q.  Weaver did?

A.  Weaver did.

Q.  Uh-huh?

A.  And told Gray, Remember, dude's a friend.

Q.  And did Gray say something in response?

A.  Gray told Weaver, Well, Jimbo was my friend.

Q.  And what did you take -- what did you believe was going to happen after that?

A.  I believed that Sidetrack was still upset about what happened with Jimbo, so he wanted to retaliate.

Q.  And did you believe at that point that you might just be stabbed?

A.  No, I thought I was going to get killed.

Q.  Okay. And you said there were -- that was -- is that one of the reasons that you mentioned you -- that caused you to ask to leave that cell?

A.  Yes.

Q.  Was there another one?

1836

A.   Uh, when I came out that night to dayroom, I had heard -- I was down at Weaver's cell and I had heard Sidetrack trying to open his door.  I sat out there for my three hours, ready to take it because that's what you're supposed do in this life, accept your punishment.  I went back to my cell that night and thought to myself, like, This is what's it's come to, everything I've done for these guys?  I mean, what would happen if I was to die and my -- with my mom, the families that I've hurt.  I was just done.

Q.   So fair to say that you were in a much more reflective mood that night?

A.   Yes.

Q.   Okay.  You mentioned previously the AB's policy on owing money or not paying up taxes or the third of profits.  Can you remind us what the stance is on anybody who owes money to the AB?

A.   If they don't pay, they'll get killed.

Q.   During your time at the Fresno County Jail when you were -- and let me just back up real quick.

When you were removed from that cell area, was that around September of 2023?

A.   Yes.

Q.   So prior to that time frame, were you around any brothers who were talking about individuals who owed the AB money?

A.   Yes.

1837

Q.  Which brothers were those?

A.  It was Frank and Weaver.

Q.  And did you hear discussions about a potential use of violence about the person who owed money?

A.  Yes.

Q.  And tell us, what was that -- what was that discussion?

A.  Weaver had asked me to ask Frank if we had action at this person that owed the money.  He told them, The only time we have action is in the courtroom.

Q.  What do you mean by that?

A.  The only way we can get -- that you can get your hands on somebody is at court.

Q.  And so then what happened?

A.  They were talking -- Weaver was talking about how he was going to take it upon himself to get Bash if he had to.

Q.  So the person they were speaking about who owed money was Bash?

A.  Yes.

Q.  What's his full name, do you know?

A.  I don't.

Q.  Okay.  And so what did Weaver say?

A.  He said that if it had to come down to it, that him and Pitchford would take care of it themselves at court.

Q.  And did Weaver discuss any ways which they would be able to do that in court?

ER 1167

1838

**A.** He showed me handcuff keys that had been made.

**Q.** And do you know who had made those handcuff keys?

**A.** Sidetrack.

**Q.** In the Fresno County Jail cells, were you aware of whether there was any access to metal that could be used as weapons?

**A.** Yes.

**Q.** And were -- was there access?

**A.** Yes.  Yes, there was access.

**Q.** Based upon your knowledge that there was access to metal, were you aware if anyone was actually making weapons?

**A.** Not -- not -- I had never seen actually a weapon.

**Q.** But did you believe that weapons were being made?

**A.** Yes.

MS. FISHER-BYRIALSEN:  Objection.

BY MS. STOKMAN:

**Q.** Why?

THE COURT:  What's the basis for the objection?

MS. FISHER-BYRIALSEN:  It calls for speculation, and he just said he didn't know.

THE COURT:  He said he hadn't seen one.  And now the question is, Why did you think so.  Is your objection to the last question or the question before that?

MS. FISHER-BYRIALSEN:  To both.

THE COURT:  I'm sorry.  I couldn't hear you.

MS. FISHER-BYRIALSEN:  The last one, Your Honor.

DX-Field 5

1839

THE COURT:  Overruled.  Go ahead.

BY MS. STOKMAN:

Q.  Why did you believe weapons might have been being made in those cells?

A.  Because the way Weaver was talking about taking care of Bash.

Q.  The fact that you had sat outside your cell and the incident you just described to us, where you believed that Sidetrack was potentially coming to kill you, did your belief of potential weapons being present have anything do with you thinking you would die?

A.  Yes.

Q.  How or why did it factor in?

A.  Because getting stabbed with a piece of metal sharpened up is likely to kill you.

Q.  Okay.  From your experience with the AB and knowing that policy that we just spoke about, about owing money to the AB, was Weaver's conversation with Frank consistent with AB policies on individuals who owe money?

A.  Yes.

Q.  During the time that we've been talking about all of these incidents, February of 2022, March of 2022, were you using drugs?

A.  Yes.

Q.  Were you using a significant amount of drugs?

DX-Field S

1840

A.   At some times, sometimes not.

Q.   But it was kind of consistent?

A.   Yes.

Q.   Okay.  Are you using drugs now?

A.   No.

Q.   Did the use of drugs back then affect any way that you're remembering anything?

A.   No.

Q.   So we spoke a little bit about the fact that you're here because you decided to cooperate with the government in your case.  Why did you make that decision?

A.   Because I was done.  I didn't want to be a part of this anymore, these -- they say that we're supposed to be honest.  And when we're honest, we still get reprimands.  Like, it's all garbage.  Everything they've preached since I was little in coming up in the prison system is a lie.

Q.   And did you -- when you said you were in that reflective state that night before you asked to leave the cell, you mentioned that you had thought about people whose lives you had affected.  Can you tell us about that?

        MS. LUEM:  Objection, relevance.

        MS. STOKMAN:  Let me ask it a different way.

BY MS. STOKMAN:

Q.   Did that have something to do with your decision to cooperate?

1841

A.  Yes.

Q.  Why?

A.  Because I could -- I could imagine what it would have done to my mom, so I know how it affects the families.  And I felt bad.

Q.  Given what you've said about the rules of the AB, about informants or cooperators, are you concerned about your safety in any way now?

A.  Yes.

Q.  Why?

A.  Because I'm marked for death now.

Q.  And does your concern for your safety, is that a concern that you have just for yourself?

A.  No.

Q.  Who else are you concerned about?

A.  My family.

Q.  But -- but you're still sitting here in front of us today, despite that?

A.  Yeah.

        MS. STOKMAN:  Okay.  I have no further questions for this witness.

        THE COURT:  Cross-examination?

        MR. REED:  I have no questions for this witness, Your Honor.

        THE COURT:  All right.

1842

MS. FISHER-BYRIALSEN:  Sorry.  My turn, Your Honor, or is Mr. Reed --

THE COURT:  Mr. Reed has no questions.

CROSS-EXAMINATION

BY MS. FISHER-BYRIALSEN:

Q.  Good morning, Mr. Fields.

A.  Good morning.

Q.  You talked a little bit about your past on direct examination.  You're a convicted felon, right?

A.  I am.

Q.  Multiple times?

A.  Yes.

Q.  You've spent the majority of your life in prison?

A.  Correct.

Q.  You did about 16 months for stealing cars and a hit-and-run?

A.  Yes.

Q.  Whose cars were you stealing?

A.  Just random people.

Q.  Then you assaulted somebody with a deadly weapon?

A.  Yes.

Q.  Who did you assault?

MS. STOKMAN:  Objection.  Improper impeachment.

THE COURT:  Sustained.

BY MS. FISHER-BYRIALSEN:

CX-Fjeld FB

1843

Q.  Was that part of a street gang crime, that assault?

A.  I had took my shirt off to show my street gang tattoos to intimidate, yes.

Q.  And you got six years for that, right?

A.  I did.

Q.  And then you got 64 months later on in 2016 for burglary, right?

        MS. STOKMAN:  Objection to the amount of time.

        THE COURT:  Sustained.

        Otherwise, sir, you can answer that.

        THE WITNESS:  I don't know if it was 64 months.  I don't -- I'm not sure.

BY MS. FISHER-BYRIALSEN:

Q.  Were you convicted of a burglary?

A.  Not a -- I was convicted of -- in 2016, it was another car theft.

Q.  And you ran from the police in that one too?

A.  Yes.

Q.  Now, in 2022 is what -- you testified about here in this case a lot of things that happened in early 2022.  How old were you then?

A.  I was 35.

Q.  And you testified that you had been using drugs a lot during that period of time, right?

A.  Yes.

1844

Q.   What kind of drugs?

A.   Heroin mostly.

Q.   And how were you taking that?

A.   Uh, IV.

Q.   And so while you were committing a lot of these crimes you've talked about, you were on drugs, right?

A.   Yes.

Q.   Uh, so during the time leading up to when you killed Michael Brizendine, you were on drugs?

A.   Yes.

Q.   But not sleeping much, right?

A.   No, I was getting regular sleep.

Q.   You were?  You weren't staying up for days?

A.   Two at a time maybe, yeah.

Q.   You would stay awake for two days at a time?

A.   Yeah.

Q.   And the same thing in the period when you were killing Jimbo, you were on drugs?

A.   Yes.

Q.   You know who is Sabrina Beck?

A.   I do.

Q.   And you met her right after you got out of prison the last time, right?

A.   I did.

Q.   And she was your girlfriend?

ER 1174

1845

A.  She was.

Q.  You testified that the night -- the night that you guys met at the hotel before the Hollywood Hills robbery she was there, right?

A.  Yes.

Q.  And isn't it right that Corn Fed raped her that night?

A.  I didn't see that.

Q.  Did you hear about that?

A.  I heard about it the next day, but that's not what happened.

Q.  What happened?

A.  They had consensual sex.

Q.  How do you know that?

A.  Because Sabrina tried to wake me up to join them.

Q.  But Sabrina said that she had been raped by Corn Fed, right?

A.  She didn't tell me that.

Q.  And there were rumors that Corn Fed had raped Kaylen too, right?

A.  Yes.

        MS. STOKMAN:  Objection.  Calls for speculation and hearsay, rumors.

        THE COURT:  Sustained as to the rumors.

BY MS. FISHER-BYRIALSEN:

Q.  Is it your understanding that the -- that Kaylen had been

CX-Field FB

1846

held hostage and raped by Corn Fed?

A.    Yes.

Q.    So according to you, you get a call about this home invasion in Hollywood Hills sometime in February of 2022, right?

A.    Right.

Q.    And that home did not belong to the Heinz Ketchup family, right?

A.    Not that I know of.

Q.    You weren't told to go rob the heir of the Heinz Ketchup family, right?

A.    Not that I'm aware of.

Q.    And the house that you ended up breaking into was the wrong house, right?

A.    I didn't -- I don't know that.

Q.    Now, according to you, Frank is the one who made part of the plan to do that home invasion, right?

A.    Correct.

Q.    But you had never met him before?

A.    I had talked to him on the phone.

Q.    Before the night that you were in the hotel in Hollywood Hills?

A.    Yes.

Q.    You had spoken to him before?

A.    Yes.

1847

Q.  How many times?

A.  Uh, three or four.

Q.  We'll talk more about your cooperation deal later, but the reason you're here today is to testify against Frank and Kenny and John, right?

A.  Yes.

Q.  And that's what your deal requires, right?

A.  I believe so.

Q.  You also talked about the San Fernando car crash with Aaron Fogle where he got pinned in the car, right?

A.  Correct.

Q.  "Yes"?

A.  Yes.

Q.  And somehow you get released from the hospital in that car and you aren't charged with anything for that, right?

A.  Right.

Q.  Now, the plea you took in this case was with a cooperation agreement, right?

A.  Right.

Q.  And by showing up here and testifying, you believe that you're going to get a sentence reduction, right?

A.  I believe so.

Q.  Yeah.  And not a couple days or months, it's going to be significant, right?

A.  I don't know.

1848

Q.  But that's what you believe?

A.  I -- I mean that's what I hope, but I don't know.

Q.  So you're hoping that this will shave a lot of time off your sentence?

A.  Again, I don't know.

Q.  You're getting yourself out of life in prison, essentially, right?

A.  Again, I'm new to the federal system so I don't really know how that all works.

Q.  Well, do you think since you cooperated here and testified you're still going to do life in prison?  Is that what you believe?

A.  I believe that I can still do life in prison.

Q.  You sure hope you don't, right?

A.  Of course.

Q.  Right.  That's why you're here, so you don't do life in prison, right?

A.  No, that's not why I'm here.

Q.  Why are you here?

A.  I'm here because I'm trying to do the right thing.

Q.  When you got -- you say you're here because you're trying to do the right thing.  Well, you didn't do the right thing until you got a cooperation agreement, right?

A.  No, I think I talked to the prosecutor before my agreement.

1849

Q.  Well, you didn't talk to the prosecutor right after you did the home invasion in Hollywood Hills and zip tied the resident in that home, right?

A.  You're right.

Q.  And you didn't talk to the government or cooperate after you killed Jimbo, right?

A.  No.

Q.  And you didn't talk to the government after you killed Corn Fed, right?

A.  No.

Q.  You didn't talk to them until you were in trouble, right?

A.  No.  I think it was a significant time after I had been charged.

Q.  Yeah, after you had been charged is when you decided to talk to them, right?

A.  No, it was after I overheard my co-defendants wanting to kill me.

Q.  But it was still after you were charged, right?

A.  Right.

Q.  You weren't in the streets anymore?

A.  Correct.

Q.  And if you had been able to run that day when you crashed in Lakeside -- right, your ankle was broken, you couldn't run?

A.  Yeah, I didn't crash, but yeah.

Q.  But if you had been able to run, you might not be sitting

1850

here today, right?

A.  No, I probably would still be sitting here.

Q.  You -- you said that the night you guys were planning that Hollywood Hills robbery, Nick brought some guy with him, right?

A.  It was the next morning.

Q.  The next morning.

And this guy was kind of a square, right, is that how you referred to him?

A.  Yeah.

Q.  Yeah.  And you guys zip tied that guy to the toilet, right?

A.  I don't think it was to the toilet, but he was zip tied, yes.

Q.  And you pistol whipped him?

A.  No.

Q.  Nobody hit him?

A.  I didn't.

Q.  Did you see other people hit him?

A.  No.

Q.  Now, you said that guy who was zip tied in there, that silver Mercedes belonged to him, right?

A.  Correct.

Q.  And you had stole that car from him?

A.  Correct.

1851

Q.   And you guys also stole all his credit cards and money, right?

A.   I didn't.

Q.   Aaron did?

A.   I don't know.

Q.   You have no idea about that?

A.   No.

Q.   Now, when Ronnie and Jimbo -- you were called to Soldier's house and Ronnie and Jimbo were there.  Do you remember that?

A.   Yes.

Q.   And you came in and you said Bam had a black eye?

A.   Yes.

Q.   And that's because Ronnie assaulted him, right?

A.   No, that was because Jimbo had punched him.

Q.   Jimbo had punched -- not Ronnie, Jimbo punched Bam?

A.   Yes.

Q.   Okay.  And then after that, Ronnie and Jimbo were taking Soldier's stuff, right?

A.   Right.

Q.   And they weren't supposed to, right?

A.   Correct.

Q.   And so Soldier and Ronnie had a massive fight, right?

A.   They did.

Q.   And then you said on direct examination that got resolved, right?

1852

A.   Yes.

Q.   But it got resolved because you put a gun to Soldier's head, right, because he was really beating the crap out of Jimbo?

A.   Correct.

Q.   I mean, I'm sorry, I think he was beating the crap out of Ronnie.

A.   Yeah, he was beating Ronnie.

Q.   Sorry about that.

Now, you talked a lot about being told to take care of them, right?

A.   Right.

Q.   And you said that means killing somebody, right?

A.   Yes.

Q.   But it also means beating them up, right?

A.   No.  In these instances, it meant --

Q.   I'm not asking in these instances.  I'm asking when somebody says "Take care of them," it doesn't necessarily mean killing them, right?

A.   It could vary, yes.

Q.   So it could also mean to just beat them up?

A.   It could.

MS. FISHER-BYRIALSEN:  I have nothing further, Your Honor.

THE COURT:  All right.  Ms. Luem, I was going to take

1853

a break in about five minutes.  Do you want to just wait until after?

MS. LUEM:  Sure.  I can wait.

THE COURT:  All right.  Let's go ahead and take our next break.  Let's plan to return at, let's say, ten till.

(Jury exits the courtroom at 11:22 a.m.)

THE COURT:  All right.  So the jury has stepped away.

I have reviewed the notes from Agent Gonzalez.  It appears to me that there's additional information included in the notes that are not included in the report.

Ms. Stokman, your comments?

MS. STOKMAN:  It --

THE COURT:  It doesn't appear inconsistent.  It's just more details, the way I read it.

MS. STOKMAN:  I know there was at least one place that, I think, we saw that.  So, yes, I think there's at least one instance where something was notated but not put in the report.

THE COURT:  All right.  I'm going to order that the notes as to Mr. True and Mr. Bannick be produced to the defense.

Can those be sent electronically, or do you want -- I guess we could send them on, but I would it prefer it come from the government.

MS. STOKMAN:  Yes.  We should Bates stamp them and

1854

send them.

THE COURT:  Let's have that happen this afternoon.

All right.  Anything else, then, before we take our break?

All right.  Let's go ahead and do that.

(Recess held.)

THE COURT:  All right.  Anything for the record at this time?

MR. ENGELKING:  Yes, Your Honor.  It looks like we're going to get to Detective Maciel today, and so I wanted to give you the photos that we intend to introduce into evidence that contain pictures of the bodies.

THE COURT:  All right.

MR. ENGELKING:  It's going to be 1349, 1350, 1356, 1357, 1367, and 1376.

MS. DE SALES BARRETT:  Your Honor, we just got these. We're reviewing them now.

THE COURT:  Okay.  Mr. Engelking, can you explain -- it looks like 1357, 1367, 1376 looks to me to be pretty much the same thing.  1376 looks like maybe there's more light, but otherwise it looks like it's nearly the same photo as 1357.

Why are -- why do we need three of the same view?

MS. DE SALES BARRETT:  Your Honor, also, I think that at least in one of the pictures it appears that it is not at the scene.  It's after the body has been turned over.

1855

THE COURT:  Which one are you referring to?

MS. DE SALES BARRETT:  1376.

THE COURT:  1376?  No.  You're saying it's after the body's been turned over?

MS. DE SALES BARRETT:  One of the -- neither of them was on his back.

THE COURT:  There's one decedent shown on sort of the side, but I think that's -- it looks to me like that's how the decedent fell.

Maybe you can just point me to the specific picture you're thinking of.

MS. DE SALES BARRETT:  I'm thinking of -76 where he is -- where one of the victims is turned over.

THE COURT:  I don't think you mean 1376, because 1376 appears to be one victim shot in the head with a blood --

MS. DE SALES BARRETT:  Uh-huh.

THE COURT:  -- spatter behind.

Who are you saying is on their side?

MS. DE SALES BARRETT:  No, Your Honor.  That -- I believe that that -- the one that you're talking about is -- -76 is what I was objecting to, Your Honor.

THE COURT:  Okay.  I guess I misunderstood, then.  Your objection is something about somebody being on their side, or did I just make that up?

MS. DE SALES BARRETT:  No.  I believe that -- that

1856

the individual was turned over before the picture was taken. In other words, it's not as -- I believe --

THE COURT:  When I look at 1357, for example, it looks -- the body looks to be in the same position.

MS. DE SALES BARRETT:  Oh, yeah.  I'm -- I'm looking at the wrong one, Your Honor.  Sorry.

THE COURT:  Okay.  All right.  Mr. Engelking.

MR. ENGELKING:  Yeah.  So your question was with regards to which exhibits, Your Honor?

THE COURT:  1357.

MR. ENGELKING:  -57 and -76?  Because -67's a different body.

THE COURT:  You're right.

MR. ENGELKING:  It's a different victim.

THE COURT: -57, -76 look the same -- well --

MR. ENGELKING:  Yeah.  They are similar, but in -57 you can't really see the bag that's on the victim's left shoulder.  And it's a better depiction in -76.

And I'm going to ask the detective about whether she searched that bag.  And so it's just a little bit clearer in -76.

MR. VILLA:  Your Honor, I would add that -56 shows that same victim in a very similar position.  It's just a broader view.  So we have three -- three photos.

MR. ENGELKING:  Yeah.  -56, I mean, shows their

1857

orientation relative to the house, which is going to be --

well, the detective is going to testify to that -- about that.

And it also -- -56 also shows the house in the

doorbell camera there.

And again, I mean, we -- this is six photos of two

bodies, you know, which we significantly narrowed down

already, so --

THE COURT:  Yeah.  I think I was looking at the wrong

photo.  So 1357 and 1376 -- nope.  So you're saying --

MS. DE SALES BARRETT:  Your Honor, I suggest the

government pick one of those.  I mean, if the government has

something to offer about the -- about the individual picture

and it's depicted better in one picture than another, it would

seem to me that one would be all that was necessary.

THE COURT:  Yeah.  I think I was looking at another

picture, so I thought that 1376 was repeated.  But it looks to

me -- you're saying 1356 shows the camera, the Ring camera or

whatever, the doorbell camera.  Is that the light we're seeing

by the door?

MR. ENGELKING:  Yeah.  Yes.

THE COURT:  And then you're saying the value of 1376

separate from that is that you can see a bag.

MR. ENGELKING:  Correct.

MS. DE SALES BARRETT:  I believe the two that are

depicting the same situation with the bag are -57 and -76.

CX-Field

1858

THE COURT:  Right.

MS. DE SALES BARRETT:  So I'm suggesting --

MR. VILLA:  I'd say -67.

MS. DE SALES BARRETT:  -57.

THE COURT:  Yeah.  That's what I was looking at, -57 and -76.  That's what I was --

MS. DE SALES BARRETT:  Yeah.

THE COURT:  Those look exactly the same except --

MR. ENGELKING:  All right.  I'll take out -57, then. We can consolidate them.

THE COURT:  Okay.  Thank you.

MR. ENGELKING:  Sure.

THE COURT:  All right.  Anything before we bring the jurors in?

All right.  Let's go ahead and bring the jury in.

(Jury enters the courtroom at 11:59 a.m.)

THE COURT:  All right.  The jury members are back.

Ms. Luem, you may begin.

MS. LUEM:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. LUEM:

Q.  Good afternoon.

Mr. Fields, I wanted to talk to you a little bit about your cooperation agreement in this case.

You testified that you pled guilty to the murders of

1859

Ronnie, Jimbo, and Michael; is that right?

**A.** (No audible response.)

**Q.** I'm sorry. I cannot hear you.

**A.** Correct.

**Q.** Okay. And each of those carries a mandatory life sentence, correct?

**A.** I believe so.

**Q.** Okay. And when you were first arrested on this case, the one that you're now cooperating in, you were facing the death penalty, weren't you?

            MS. STOKMAN: Objection.

            THE COURT: Sustained.

            MS. STOKMAN: Ask to be stricken.

            THE COURT: That will be stricken.

BY MS. LUEM:

**Q.** As of right now, you're facing three mandatory life sentences, right?

**A.** Correct.

**Q.** All right. And whether or not you receive a life sentence depends on the government's filing of a 5K with the Court, correct?

**A.** I believe so.

**Q.** You believe so or you know so?

**A.** I know so.

**Q.** Okay. And you know so because you were represented by

1860

counsel in this case, were you not?

A.   Correct.

Q.   Okay.  And you were represented by competent counsel, right?

A.   Correct.

Q.   And your attorney is, in fact, in the courtroom here with us today, right?

A.   Correct.

Q.   Okay.  So she worked out a deal between the government and you that you would plead guilty to killing three people and potentially get out of spending life in prison?

        MS. STOKMAN:  Objection.  Calls for speculation. Asked and answered.

        THE COURT:  Overruled.

BY MS. LUEM:

Q.   That is right?

A.   Can you ask me that again, please?

Q.   Your attorney and the government and you worked out a deal where you would plead guilty to killing three people and potentially get out of spending life in prison; is that right?

A.   If I told the truth, correct.

Q.   If you testify in court and the government provides that 5K, then you could get out of mandatory life, right?

A.   If I tell the truth, I believe so.

Q.   Okay.  Initially you had testified, I believe, that the

1861

sentence was up to the judge.  Do you remember that?

A.  Right.

Q.  But that's not entirely true, right?  It's also partially up to the government?

A.  No.  I think they can recommend, but I believe it's up to the judge to accept it or not to accept it.

Q.  Okay.  Do you have any reason to believe that the government's not going to recommend a reduction in sentence for you?

MS. STOKMAN:  Objection.  Calls for speculation.

THE COURT:  Sustained.

BY MS. LUEM:

Q.  I want to talk to you a little bit about your physical appearance today.

The last time I saw you in court you looked a lot different, didn't you?

A.  Correct.

Q.  You weighed a lot less?

A.  Yes.

MS. STOKMAN:  Objection.  Relevance.

THE COURT:  Sustained.

MS. LUEM:  Judge, it goes to the witness's demeanor, his manner while testifying, I think the jury has a right to know what's different.

THE COURT:  Ms. Luem, the objection is sustained.

1862

BY MS. LUEM:

Q.   You grew your hair out; is that right?

        MS. STOKMAN:  Objection.  Relevance.

        THE COURT:  I think his weight is not relevant.  His appearance and otherwise may be.

        Go ahead.  The objection is overruled.

BY MS. LUEM:

Q.   Okay.  Back to the weight issue, and I apologize.  Let me ask it a different way.

        You were on drugs when you got arrested, right?

A.   Yes.

Q.   And you're not on drugs now?

A.   Correct.

Q.   And in the photograph that the government showed you on that big poster board, your head was shaved on the sides, right?

A.   Yes, it was.

Q.   And you have tattoos on the sides of your head?

A.   I have tattoos on all my head.

Q.   Okay.  And you've grown a beard, right?

A.   Yes.

Q.   And that beard is covering tattoos that you have across your mouth?

A.   Correct.

Q.   What are those tattoos?

1863

A. Stitches.

Q. Stitches?

A. Yes.

Q. And what does that represent?

A. Uh, not talking.

Q. What do you mean "not talking"?

A. Not cooperating, not being an informant.

Q. Okay.  But you are an informant?

A. I'm up here telling the truth at this trial, yeah.

Q. You're an informant, right?

A. I guess.

Q. Okay.  And the tattoos that you have on the sides of your head, what are those?

A. 1488, and skin.

Q. What does 1488 stand for?

A. It's the "Fourteen Words" and the "88 Precepts" of David Lane.

Q. And can you explain to the jury what that means?

A. David Lane was a white separatist -- white supremist [phonetic] in the 1980s that wrote some rules, 88 of them, and it had a 14-word saying.

Q. And that's something that you believed in, right?

A. That's something that I believed in, yes.

Q. And when did you get those tattoos on your head?

A. Uh, I was 25.

1864

Q.   Wait.  So that was before you had any contact with anybody in this courtroom, right?

A.   Correct.

Q.   Ms. Stokman asked you about making personal choices.  Do you remember those questions?

A.   I believe so.

Q.   Okay.  So that was a personal choice to get those tattoos on your face and your head, right?

A.   Right.

Q.   And you made a personal choice as a 14 year old to start committing crimes?

A.   Right.

Q.   And you made a personal choice after the age of 18 to continue committing crimes, right?

A.   Correct.

Q.   And you -- what was your answer to that?

A.   Correct.

Q.   Okay.  And you made a personal choice to join a street gang, right?

A.   I did.

Q.   Multiple street gangs, right?

A.   I did.

Q.   And you made a personal choice to join white supremacist street gangs, right?

A.   Yes.

CX-Field

1865

Q.   And that was all well before you met any of the gentlemen in this room, right?

A.   Correct.

Q.   The government talked to you a little bit about -- well, let me back up, actually.

You discussed being in a hotel room in Long Beach, and you were on a conference call concerning a robbery that was going to take place in Hollywood.  Do you recall that?

A.   Yes.

Q.   Okay.  Mr. Johnson was not on that call?

A.   No.

Q.   You testified about killing your friend, Mike Brizendine, in Lancaster.  Do you remember that?

A.   I remember, yeah.

Q.   Okay.  And at no time did you have any conversations with Mr. Johnson about killing Mike Brizendine, did you?

A.   No.

Q.   The government showed you exhibit -- their Exhibit 1305, at pages, I believe it's -- I'd like to just call it pages 24 and 25 that were previously admitted, for the witness and the jury.

Did you get a chance to review these messages before you testified?

A.   Yes, I did.

Q.   Okay.  And there's referencing in those messages to

1866

somebody named Blaze that you've testified about today, right?

A.  Right.

Q.  Okay.  And Blaze was a friend of yours?

A.  Yes.

Q.  Okay.  In these communications with what appears to be the name KW, who you're saying is Kenwood, right?

A.  Correct.

Q.  He's communicating about something he wants Blaze to do, right?

A.  I believe so.

Q.  Okay.  And it's something about going to the Inland Empire to pick up a car or truck, something along those lines, right?

A.  Correct.

Q.  Is that correct?

A.  Correct.

Q.  And there was nothing in those messages about -- even though it coincides with the date of Jimbo and Ronnie's murder, nothing about Pomona in those messages, right?

A.  No.

Q.  And isn't it true that Blaze did not have a telephone?

A.  Right.

Q.  Okay.  And so that's part of the reason why Kenny was communicating with you was to try to get ahold of Blaze?

A.  Correct.

Q.  Okay.  Is that because the two of you were often together?

1867

A.  At that time, yes.

Q.  Okay.  But Blaze was not with you at Pomona, right?

A.  No.

Q.  He was off doing something else, possibly for Kenwood, but he just wasn't with you?

A.  Right.

Q.  Okay.  And the government asked you about not responding to these messages from -- from Kenny.  Do you recall that line of questioning?

A.  Yeah.

Q.  And part of the reason you weren't responding to those messages from Kenny is because you were busy killing Ronnie and Jimbo, right?

A.  Possibly.

Q.  And at one point they -- they asked you about the message where Kenny said something like, You're going to get put in the hat for not responding to my messages or something like that?

A.  Right.

Q.  To your knowledge, did you get put in the hat for not responding to those text messages?

A.  No, because I was asleep.

Q.  Okay.  So were you asleep or were you busy killing Ronnie and Jimbo?

A.  I don't know exactly at that time.

1868

Q.   Okay.   But what you told Kenny is that you didn't respond because were you asleep?

A.   Right.

Q.   Okay.   I think the government also suggested in their direct examination that you had first started communicating with Kenny in February of 2022.   The messages on this Signal -- I'm sorry.   Let me let you answer that.

Is that your recollection?

A.   Right.

Q.   Okay.   The messages on this particular Signal app only go back to -- to early March; is that right?

A.   Correct.

Q.   Okay.   So would prior contacts have been a phone call?

A.   It would have been in my other phone.

Q.   Okay.   I got you.   And in terms of Signal, I think you discussed something about a handle or a name that the person -- the user choses their own name, right?

A.   Correct.

Q.   Okay.   And can the user change that name?

A.   I believe so.

MS. LUEM:   Okay.   I have nothing else, thank you.

THE COURT:   Any redirect?

MS. STOKMAN:   Yes.

If we can bring up Exhibit 1303, please.   Page 20.

///

RDX Fields

1869

REDIRECT EXAMINATION

BY MS. STOKMAN:

Q.  We talked about this before.  But I'm going to point you again to the second message from Frank where he mentions loading up a shotgun and making sure you're ready because Ronnie and Jimbo have guns.

        Later down in the messages, at the end of this page, Frank also says:  "But don't shoot nobody if you don't have to.  BJ won't be too happy.  Love you, bro."

        Were you -- did these messages indicate to you that you were supposed to go commit an assault against anybody?

A.  No.

Q.  What did they indicate?

A.  They indicated that if -- after he talked to Jimbo, that he wanted me to wait until after he had talked to Jimbo to actually follow through.

Q.  With what?

A.  Killing him.

        MS. STOKMAN:  If we can go to page 29, please.  At the end of the page --

        MS. FISHER-BYRIALSEN:  Your Honor, we object to this.  It's outside the scope of the cross.

        THE COURT:  Where are you referring, Ms. Stokman?  Which -- which communication, if you'll just identify it for me.

1870

MS. STOKMAN:  Yes, I was just about to go through the last two messages.

THE COURT:  All right.  Overruled.  Go ahead.

BY MS. STOKMAN:

Q.  The last message in blue that Frank sent you, it says: "Find a dark quiet place now."  Is that correct?

A.  Correct.

Q.  And you responded:  "I'm going to use Ronnie's for Jim." What did you mean by that?

A.  I meant that I was going to use the 9mm that Ronnie gave me on Jimbo.

Q.  Did you mean that you were going to hit him with the gun?

A.  No.

Q.  What did you mean?

A.  I meant that I was going to shoot him.

MS. STOKMAN:  Okay.  And lastly on page 34, please.

BY MS. STOKMAN:

Q.  The top message, where Frank mentions:  "Tell everybody to get rid of their phones, the phones they had on them at that time," what was he meaning by that?

MS. FISHER-BYRIALSEN:  Objection.

THE COURT:  What grounds?

MS. FISHER-BYRIALSEN:  Again it's --

MS. STOKMAN:  Sorry.

MS. FISHER-BYRIALSEN:  -- asking what my client is

1871

thinking.

MS. STOKMAN:  I can ask it a different way.

THE COURT:  It's really hard to hear you.  I just was asking for the grounds, and I don't know that I heard what that was.

MS. FISHER-BYRIALSEN:  The grounds were that it's, again, a question that asks --

THE COURT:  Right.  So is it speculation?  Is it hearsay?  I don't need a colloquy, I just need the objection.

MS. FISHER-BYRIALSEN:  Speculation and outside the scope of the cross.

THE COURT:  Sustained as to speculation.

BY MS. STOKMAN:

Q.  What phones -- do you know what phones this was in reference to?

A.  It was in reference to the phones that me and Soldier and Bam had on us.

Q.  During when?

A.  During the homicides.

Q.  Okay.  What's the significance of getting rid of phones that you were carrying during the homicides?

A.  It's so that they can't be recovered.  None of the information, these communications right here, nothing can be traced to anybody.

Q.  Did you, in fact, get rid of your phone?

RDX Fields

1872

A. No.

Q. Ms. Byrialsen asked you if you were here to testify against the defendants. Does your cooperation agreement mention anything about who specifically your -- you have to testify against?

A. No.

Q. Does the cooperation agreement mention anything about potential testimony, as far as you remember?

A. No. Just that I have to tell the truth.

Q. If you're called to testify?

A. If I'm called to testify.

Q. And in any place in your agreement do you recall a statement about what you were supposed to testify to if you were called to testify?

A. No.

Q. Did anyone ever ask you to say anything in particular?

A. No.

Q. So you said that you were under an agreement that you are obligated to tell the truth. What does that mean to you, "truth"?

A. The truth about the events that happened pertaining to my involvement.

Q. The truth from whose perspective?

A. Mine.

Q. Let's talk about the fact that you had mentioned and then

1873

were asked about it again on cross, that you were using a lot of drugs back when these events that you testified about were happening. When did that drug use change? Do you know in time when you went from using those drugs to where you are now?

A. Uh, right after the incident in Fresno County Jail.

Q. The one that we talked about where you said you wanted to get out of the cell at that time?

A. Right.

Q. And was that a voluntarily choice to stop using drugs?

A. Yes.

Q. Why did you make that choice?

A. Because I didn't like the way it made me.

Q. Explain that a little bit to us.

A. Uh, I've done a lot of bad things in my life that I'm not proud of and it's all linked to my drug addiction.

Q. And so what did your choice to not use drugs anymore mean to you?

A. It meant that I had a clearer head and I could actually think for myself.

Q. The tattoos that you were asked about, particularly the stitches on your lips, when you got that tattoo, why did you get it?

A. Because I was in -- really committed to this -- to that life.

1874

Q.   What did that mean to you, getting that particular tattoo?

A.   That meant that I would never cooperate with the police.

Q.   Before you actually did become a cooperator, how did you feel about cooperators?

A.   Uh, poorly.

Q.   And did that -- did that fact, that you had this belief, cause you any hesitation in your decision to cooperate?

A.   It's been a long road.

Q.   Can you tell us a little bit about that?

A.   I've been brainwashed for a long time about prison politics and how all this comes first.  This whole life, violence, drug use, the white supremist stuff, it's all part of this garbage.

Q.   And so in covering your tattoos with growing your hair out or other ways, was that a purposeful decision?

A.   My beard, at first it wasn't.  LA -- I mean Fresno County Jail, they don't have razors that you can shave.  So I started growing this out before I left Fresno County Jail.

Q.   And at any point were you growing out hair to cover the tattoos?

A.   No.

Q.   So it's just coincidental that that happened?

A.   Yes.

Q.   And speaking of the white supremacist gangs, such as the ones that you were a part of in San Diego, in your experience,

RDX Field

1875

where do those gangs rank among -- or where does the AB rank among those street gangs?

A.  Above.

Q.  So a higher position?

A.  Yes.

Q.  Okay.  As you sit here today, you talked before about being remorseful, but how has your life changed since you made the decision to cooperate?

MS. LUEM:  Objection.  Relevance.  Outside the scope of cross.

THE COURT:  Sustained.

BY MS. STOKMAN:

Q.  Has your life changed since you've decided to cooperate?

MS. LUEM:  Same objection.

THE COURT:  Sustained.

MS. STOKMAN:  I have no further questions.  Thank you.

THE COURT:  Any other recross?

MS. FISHER-BYRIALSEN:  No, Your Honor.

MS. LUEM:  No.

THE COURT:  May Mr. Field be excused?

MS. STOKMAN:  Yes.

THE COURT:  All right.  Ladies and gentlemen, if you would just step out for about -- we'll say until 12:30.  We'll get started again and then finish through the rest of the

1876

afternoon.

(Jury exits the courtroom at 12:21 p.m.)

THE COURT:  All right.  We'll go ahead and let Mr. Field step down.

If Mr. Clement or Mr. Johnson wants to use the restroom, now is the opportunity.

DEFENDANT CLEMENT:  Can I stand up for a moment?

THE COURT:  Sure.

All right.  We'll go ahead and bring in our jury back -- or, actually, I'm sorry, we've got five more minutes. Okay.

(Recess held.)

MS. STOKMAN:  Judge, in the few minutes we have, if everyone is here, we can take up another issue.

THE COURT:  All right.

MS. STOKMAN:  Now that Mr. Field has testified about making of the handcuff keys and the fact that weapons were likely being made within the Fresno County Jail cells and those were specifically to get at either himself who was seen as a liar or Bash who was owing money to the AB, the government is renewing its request to allow in the information about the cell searches that found those items.

It was -- the cell search itself was later in time in November of '23.  Those discussions that he testified about were had prior to September of 2023 because that's when he was

1877

moved out of that cell.  And the indictment lists an on or about and continuing through March 2023, I think maybe end of March or so.

It's the government's position that this was still ongoing enterprise activity and therefore it's relevant as part of the enterprise and not as a 404(b).

THE COURT:  All right.  For the defense?

MS. DE SALES BARRETT:  Yes, Your Honor.

Your Honor, I don't believe it is in part of the enterprise in time, first of all.

Secondly, the fact that Mr. Field testified to that does not open the door to this kind of stuff because it was two months -- the cell searches were conducted two months later.

Furthermore, the items that were found were found in a -- in the cell of a defendant who is not here on trial.  And there is no -- there is no connection, no testimony that any of those items were found in the cells of the gentlemen who are on trial in this case.

MR. VILLA:  And Your Honor, just to add to that on behalf of Mr. Johnson, I mean, we oppose -- Mr. Fields' testimony was more that he believed there might be shanks being made or metal, but it was more speculation than anything based on statements that were made to him by Weaver that were sort of, you know, him drawing from inferences.

1878

So while his testimony is in, that doesn't mean the metal itself gets in because there's a lack of connection.

THE COURT:  Mr. Reed, your comments?

MR. REED:  This is one of those dancing on a head of a pin argument.

THE COURT:  I'm sorry, I couldn't quite hear you.

MR. REED:  This is one of the those dancing on the head of a pin arguments for me.  I try not to separate myself from the other defendants.  And I don't want to do that now, except in order for the government to get this motion granted, I think they would have to specifically say Mr. Stinson was not there.

Because if the argument is connecting the other defendants to something that somebody else had in their cell, Mr. Stinson is one step removed from that.  And if Kenny Reed was by himself, I might make a more vociferous argument on this issue, but I do think there is absolutely no way to make this anything more -- anything less than more prejudicial than probative as to John Stinson.

THE COURT:  Ms. Stokman, I think the point related to Mr. Stinson is pretty good.  What's your thought?

MS. STOKMAN:  Yes.  And we'll ask the Fresno County deputies who would testify about the cell searches, make it clear that Mr. Stinson was not in the -- those cells, he wasn't at the Fresno County Jail at that time.  I think that

1879

came out in testimony as well, that only -- the only members who were in that area were defendants Johnson, Clement, Weaver, Pitchford, Gray and Perkins at that time.

And again, just to remind the Court, the Court had wanted to see the foundation of how this was ongoing enterprise activity in order to make the ruling on the Fresno County Jail witnesses who were on the list to talk about this.

So this was that foundation that we were trying to lay for that.

THE COURT:  That's what's trouble, though, is -- the point is, he talks about thinking something is happening two months before.  And then there are these items found later.

And so I'm not sure that what was found later has something to do with what he was talking about at that time. Because, I mean, at least the way he was testifying, you don't really -- well, it sounds like once you use a weapon, you get rid of it.

I don't know, I didn't get the sense that he was -- he didn't talk about how long they will keep weapons.  And so, yeah, I mean, he said that they created weapons, he said he did that while in custody.  I don't think that gets you here, so I have to agree at this point.

While I think the fact that the indictment talks about, you know, ongoing enterprise, I don't doubt that.

1880

That's not really what's troubling to me.  It's more the issue of I don't think what he said got you any further than where you were before.

MS. STOKMAN:  Judge, if it's significant, the handcuff keys that he said were being made by Justin Gray were found in Justin Gray's cell and he believed Justin Gray was the person who was potentially going to come and stab him, and those weapons were found, I believe, in Gray's cell as well.

But the facts as far as why that was an ongoing part of the enterprise activity are established because it's establishing what is being done in order to potentially use against cooperators or people who still owe the AB even though they're incarcerated here on this case.

And just to add, Judge, every cooperator has come up and said that there's a safety concern that exists with them. I think this goes very much to that issue as well.

THE COURT:  I think it goes more to that issue than the other, because, like I said, I don't think you're really farther ahead on the enterprise issue.

On the other hand, the two witnesses so far who were cooperators have -- well, three have testified fear for their safety, that by doing this, you know, they're at risk.

Defense has argued -- has asked questions causing them to admit there are other benefits.  I guess the trouble is there's no one saying those weapons at that time were

1881

created to come in and -- and attack anyone.  There was testimony that Weaver said, you know, we're going to -- the only time we can get people is at court.  But there's no context for the jury at this time.

I don't think there's enough yet.  I think that's the better argument, but I don't think there's enough context yet.

Anybody else wanting to say anything about this?  I mean, so what I'm saying is -- I hope what -- you're hearing what I'm saying.  If somebody else does do this, we're going to be talking about this again.  This issue is ongoing at least at this point.

MR. VILLA:  And, Judge, I would just add that the only testimony was about alleged statements made by Mr. Weaver and then a statement made by Mr. Gray.  There was nothing about Mr. Johnson.  Or Mr. Clement, frankly.

THE COURT:  Right.  But the testimony from the witnesses were that the risks to their safety came from the AB in general, but I get your point, that's correct.

All right.  Let's bring the jury in.

(Jury enters the courtroom at 12:37 p.m.)

THE COURT:  All right.  The jury members are back.

Mr. Engelking, if you will call your next witness.

MR. ENGELKING:  The government calls detective Maria Maciel.

THE CLERK:  If you'll go all the way up to the

1882

witness stand.

THE WITNESS:  Thank you.

THE CLERK:  Yeah, go ahead and go up.  Please raise your right hand.

MARIA MACIEL,

called as a witness on behalf of the Government, having been first duly sworn, testified as follows:

THE WITNESS:  I do.

THE CLERK:  Go ahead and have a seat.  And then please state your full name for the record and spell your last name.

THE WITNESS:  Maria Maciel, M-a-c-i-e-l.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. ENGELKING:

Q.  Good afternoon.

A.  Hello.

Q.  Where do you work?

A.  I am a detective with the LA County Sheriff's Department assigned to Homicide Bureau.

Q.  How long have you been a homicide detective?

A.  Homicide, five years.

Q.  And what are your job responsibilities as a homicide detective?

A.  So I investigate murders, suicides, child deaths,

1883

accidental deaths, officer-involved shootings, and deputy-involved shootings.

Q.   Are there any types of deaths that you're not involved in investigating?

A.   Overdoses.

Q.   Did you hold any other positions with the LA Sheriff's Department prior to becoming a detective?

A.   Yes.  Prior to being a homicide detective, I was a Special Victims detective.

Q.   And what do they do?

A.   I investigated physical abuse of children, sexual abuse, rapes, also physical abuse that led to the death of the child, which was later -- the case was later transferred to homicide.

Q.   Prior to that, did you hold any other positions with the Sheriff's Department?

A.   I did.  I was a patrol deputy at the East Los Angeles Sheriff's station.

Q.   So in total, how many years have you worked for the LA Sheriff's?

A.   25 years.

Q.   Have you had any formal trainings in homicide investigations?

A.   Yes.  Once promoted to homicide, I attended a 80-hour homicide school and -- which is a POST-certified training, which means it's recognized by our Peace Officers Standards

DX Maciel F

1884

and Training.

I also attend a yearly conference that is about 32 hours.  And it's a conference where homicide detectives present their cases.  We learn on new technology, science.  We also learn on what to do, what not to do.

Q.  Who attends that?

A.  So homicide detectives from all over the country can attend.  And it's held by our sheriff's department.

Q.  Okay.  As a homicide detective, roughly, how many homicides have you investigated?

A.  So now I've investigated approximately 150.

Q.  Directing your attention to the early morning of October 4th, 2020, were you called in to a double homicide that morning?

A.  Yes.

Q.  Where were you?

A.  I was home.

Q.  Where was that homicide?

A.  That was in the city of Lomita.

Q.  Were you called to any particular address?

A.  Yes.  It was at 2121 255th Street, Lomita.

Q.  What type of neighborhood is that?

A.  That's a single-home residential area.

Q.  What did you do after you got the call?

A.  So after I got -- I received the call, I responded to the

1885

location.  Once there, I met with the handling deputy, which was Deputy Christian Ramirez.

He briefed me and my partner on the -- regarding the incident.

Q.  Did you observe the crime scene when you got there?

A.  I did.

Q.  And generally, what did -- what did you see?

A.  I saw that there was a male lying on the grass of the front yard of the location.  Uh, he had blood on his face and had -- his head was in a puddle of blood.  I also observed a bullet hole to the back of his left ear.

There was a second male on the sidewalk.  This male was on his back faced up.  And he also had blood on his face and head, and his head was in a puddle of blood.  He also had a bullet hole to the center of his forehead.

Q.  Okay.  Did somebody take photos of the crime scene?

A.  Yes.  So we have our forensic identification specialist respond from our crime lab, and they photograph the scene.

Q.  In the binder in front of you, could you please take a look at Exhibits 1348 through 1393?  And then just let me know when you're done glancing at those.

A.  Any specific --

Q.  I think it should be Binder 2 of 2.

A.  And may you repeat the pages, please?

Q.  Sure.  1348 through 1393.

1886

**A.** 1398, correct?

**Q.** -3, -93.  Okay.

Have you seen those photos before?

**A.** Yes.

**Q.** Okay.  And what are they?

**A.** These are the scene photos from that night.

**Q.** And do they truly and accurately represent the crime scene as you encountered it?

**A.** Yes.

MR. ENGELKING:  Your Honor, we move Exhibits 1349, 1350, 1352, 1356, 1367, 1371, 1376, and 1377 into evidence and ask for permission to publish as we go along.

MR. VILLA:  One moment, Your Honor.

MS. DE SALES BARRETT:  -77?

MR. ENGELKING:  Correct.  Yup, -77.

MR. VILLA:  Just a few others than what we discussed earlier.

MS. DE SALES BARRETT:  Your Honor, I think that we previewed only one, two, three, four, five photographs.

THE COURT:  All right.  Let me give you a minute to take a look at 1352, 1371, and 1377.

I think those are the new ones, right, Mr. Engelking?

MR. ENGELKING:  Yeah.  Those shouldn't be photos of the bodies, though.

DX Maciel F

1887

MS. DE SALES BARRETT:  I -- we couldn't hear you.

MR. ENGELKING:  I don't believe those are photos of the bodies, though.

THE COURT:  All right.  Any objections to those exhibits being admitted?

MS. DE SALES BARRETT:  I'm trying to bring them up, Your Honor.

THE COURT:  Oh, sorry.

MS. DE SALES BARRETT:  Yes, Your Honor, we have now had an opportunity to review them.  We have no objection.

MR. VILLA:  No objection.

MR. REED:  No objection, Your Honor.

THE COURT:  Those will be admitted.

(Government's Exhibits 1349, 1350, 1352, 1356, 1367, 1371, 1376, and 1377 were received.)

MR. ENGELKING:  Can we please pull up Exhibit 1356, please.

BY MR. ENGELKING:

Q.  Do you recognize this photo?

A.  I do.

Q.  What are we looking at?

A.  Those are the two males found dead in that front residence.

Q.  Was that the residence that you responded to?

A.  Yes.

1888

Q.  And did you look at the -- you said you examined the victims when you got to the crime scene; is that right?

A.  Yes.

Q.  Did you physically touch the bodies or not?

A.  No.

Q.  Who, if anybody, does that?

A.  Only the coroner investigator.  When they respond, they do that.

Q.  Did you learn the identity of the victims?

A.  Later that night I did.

Q.  What are the victims' names?

A.  So the victim laying on the grass is Allan Roshanski.  The victim laying on the sidewalk is Ruslan Magomedgadzhiev.

          MR. ENGELKING:  Can we please pull up Exhibit 1376?

BY MR. ENGELKING:

Q.  Okay.  And what are we looking at here?

A.  That is Victim Ruslan.

Q.  Was Ruslan wearing anything of significance to your investigation?

A.  That fanny pack that is across his chest.

Q.  Did anybody search that bag?

A.  The coroner investigator did.

Q.  Were you present for that search?

A.  Yes.

Q.  What, if anything, was found in that bag?

1889

A.   A handgun.

          MR. ENGELKING:  Could we please look at Exhibit 1377.

BY MR. ENGELKING:

Q.   What are we looking at?

A.   That is the fanny pack, and there's two zippers open to that fanny pack.  The one above is the one where the gun is shown.

Q.   So the screen in front of you is a touchscreen.  Could you just please circle the gun if you see it on here?

A.   (Witness complies.)

          MR. ENGELKING:  Let the --

          THE WITNESS:  I think I went too far.

BY MR. ENGELKING:

Q.   You can try it again.  There you go.

A.   (Witness complies.)

Q.   Okay.

          MR. ENGELKING:  For the record, the witness has circled the black object that's just to the left of a pack of Camel cigarettes in the bag.

          THE COURT:  All right.

BY MR. ENGELKING:

Q.   Did you -- did you examine the body of the other victim, Allan?

A.   Yes.

          MR. ENGELKING:  Can we please pull up Exhibit 13 --

DX Maciel-F

1890

excuse me -- 1367.

BY MR. ENGELKING:

Q.  And what are we looking at here?

A.  That is Victim Allan.

Q.  Where was Allan located relative to Ruslan?

A.  Just inches apart.

Q.  Did the coroner search Allan?

A.  Yes.

Q.  And were you present for that search?

A.  Yes.

Q.  What, if anything, was found?

A.  He had a cell phone in the front pocket of his hooded
sweater.  He also had 12 credit cards on him.

Q.  And did you look at those credit cards?

A.  Yes.

Q.  Who did they belong to?

A.  They mostly belonged to Allan, except for maybe three of
them.

        MR. ENGELKING:  Will you take that picture down.
Thank you.

BY MR. ENGELKING:

Q.  You mentioned the victims were shot in the head.  Did you
collect any shell casings?

A.  Yes.  We found one shell casing just east of Victim Allan
on the grass.

1891

Q.  Did you examine that shell casing?

A.  Yes.

Q.  And based on your training and experience, were you able to determine the caliber?

A.  It was a 9mm Luger caliber.

MR. ENGELKING:  Can we please pull up Exhibit 1371.

BY MR. ENGELKING:

Q.  What are we looking at here?

A.  That is the casing found.

Q.  And again on your monitor, could you please just circle the shell casing if you see it on here?

A.  Yes.  (Witness complies.)

MR. ENGELKING:  For the record, the witness circled the shell casing just to the left of the Number 1 evidence placard.

BY MR. ENGELKING:

Q.  Did you do any -- any testing on that shell casing?

A.  I requested our department crime lab to check for DNA and prints.

Q.  Was anything found?

A.  No.

Q.  Did you look for surveillance cameras in the area?

A.  I directed deputies to go canvas the area and search for cameras.

Q.  Okay.  What was found, if anything?

1892

A.   There was a Ring camera found just west of the front door of the location.  And there was another camera found down the street.

Q.   Let's start with the camera down the street that you mentioned.  Were you able to recover any footage from that camera?

A.   No.

Q.   Was the camera -- what address was the Ring doorbell camera at?

A.   2121 255th Street.

Q.   And was the Ring camera working?

A.   Yes.

MR. ENGELKING:  Could we please pull up Exhibit 1349.

BY MR. ENGELKING:

Q.   What are we looking at here?

A.   That's the location where the incident occurred.  And besides the two deceased men in the front yard, there is -- the camera that I'm talking about is just west of the front door.

Q.   Could you please circle it on your monitor?

A.   (Witness complies.)

MR. ENGELKING:  For the record, the witness circled the light to the left of the front door of the residence.

BY MR. ENGELKING:

Q.   Did you attempt to speak to the resident -- well, first of

1893

all, was there somebody in that house?

A.  Yes.

Q.  And did you attempt to speak to that person?

A.  There was a female that I briefly met.

Q.  Did you ask that person to show you the Ring video?

A.  Yes.

Q.  Did she show you the Ring video?

A.  Yes.

Q.  What did you see on the video?

A.  So that Ring camera was a motion-activated camera.  When she showed me the video, it only -- it showed the victims' vehicle -- the victims' vehicle driving up.  And then there was, like, another clip that showed the two victims on the -- on the ground, and it was either firemen or police that were present.

Q.  Did the video capture the shooting?

A.  No.

Q.  Did you collect that video?

A.  I did not.

Q.  Was that night the only time that you saw that video?

A.  Yes.

Q.  Now, you mentioned the video showed the victims arriving. Were you able to identify the vehicle that they arrived in?

A.  Yes.

Q.  And what vehicle was that?

1894

A.   It was a four-door black Volkswagen Passat, California license plate 8DXR, I believe 137 -- or 367, I'm sorry.

Q.   Were you able to determine who that vehicle was registered to?

A.   It was registered to Allan.

Q.   And that's Allan the victim?

A.   Victim Allan Roshanski, yes.

Q.   Were you able to locate that vehicle?

A.   Yes.

Q.   Where was it?

A.   It was exactly where the video showed that it stopped.

Q.   So was that in front of the residence?

A.   Yes.

        MR. ENGELKING:  Can we please up pull up Exhibit 1350.

BY MR. ENGELKING:

Q.   What are we looking at here?

A.   That is the victim's vehicle.

Q.   And which -- which direction is this facing?

A.   It's parked on the north side of the street, facing west.

        MR. ENGELKING:  Let's pull Exhibit 1352, please.

BY MR. ENGELKING:

Q.   What is this?

A.   That is a same vehicle.

Q.   What happened to this vehicle?

1895

A.   I requested a deputy to have it towed to Frank Scotto Towing in Torrance for later processing.

Q.   What does "for later processing" mean?

A.   We go to the yard -- the tow yard and we better process the vehicle by searching it, retrieving evidence from it.

Q.   Okay.  Was this vehicle searched?

A.   Yes.

Q.   We'll come back to that.

     Did you try to find any witnesses to the murders?

A.   Yes.

Q.   How?

A.   I asked deputies to canvas the area for any witnesses.

Q.   Were you able to find anyone who witnessed the shooting?

A.   That witnessed shooting, no.

Q.   Did the victims have cell phones on them?

A.   Victim Allan had a cell phone on him in his front pocket of his pullover sweater.

Q.   Did you obtain Allan's cell phone number?

A.   Yes.

Q.   What was his number?

A.   Victim Allan's phone number was (442) 303-8888.

Q.   What, if anything, did you do after obtaining that cell phone information?

A.   We wrote a search warrant for call detail records.

Q.   Okay.  What are call detail records?

1896

A.   They are historic records of any incoming and outgoing calls.

Q.   So when you say "historic records," do they -- do the records include recordings of the calls?

A.   No.

Q.   So is it just outgoing and incoming calls?

A.   Phone calls, yes.

Q.   Okay.  When you do a search warrant for call detail records, in your experience, how long does it take to typically get those records back?

A.   It actually depends on the provider.

Q.   In this case.

A.   In this case, it was fairly soon, I think it was -- might have been within the same month.

Q.   While you were waiting for the call detail records from the victim's phone, did you develop any suspects?

A.   Yes.

Q.   Who was that?

A.   Justin Gray.

Q.   And when did you -- when did you develop him as a suspect?

A.   November 10th.

Q.   What did you do when you first learned of Justin Gray?

A.   I checked for his criminal history, and where I found that there was a certain phone number he had provided his probation officer for him to be contacted.

1897

Q.   What phone number was that?

A.   Justin Gray's phone number was (424) 224-1216.

Q.   Did you develop any other evidence linking Gray to the murders?

A.   We had a --

        MR. VILLA:  Objection, calls for a narrative.

        THE COURT:  Overruled.

        THE WITNESS:  We had a -- we actually received an anonymous letter.

        MR. VILLA:  Objection, calls for hearsay.  Move to strike.

        THE COURT:  I think the question was, Did you develop any other evidence.  Let's answer that question before you move on.  The objection at this time is sustained.

BY MR. ENGELKING:

Q.   Did you develop -- yes or no, did you develop any other evidence linking Gray to the murders?

        MR. VILLA:  Objection, calls for hearsay.

        THE COURT:  I think you need the preliminary question, Mr. Engelking.  Sustained.

        MR. ENGELKING:  I'll just move on.

BY MR. ENGELKING

Q.   Earlier you mentioned that the victim Roshanski -- Allan Roshanski's vehicle was towed; is that right?

A.   Yes.

1898

Q.   Were you in -- was that vehicle searched?

A.   Yes.

Q.   Were you present for that search?

A.   Yes.

Q.   Did you review the items that were found in his car?

A.   Yes.

Q.   And was anything significant to your investigation found in the car?

A.   There was another cell phone, uh, there was a small amount of methamphetamine, and there was a -- several document -- EDD documents that did not belong to Allan.

Q.   Were photos taken of those items?

A.   Yes.

Q.   Could you please, in the binder in front of you, that same binder that you were looking at, could you please look at Exhibits 1394 through 1408.  Do you recognize those?

A.   Yes.

Q.   What are they?

A.   These are the items found in the victim Allan's vehicle.

Q.   Specifically what items?

A.   The EDD documents.

Q.   And do they fairly and accurately represent the documents that were found in the car?

A.   Yes.

        MR. ENGELKING:  Your Honor, we move to admit 1394 to

1899

1408, and ask to publish as we go along.

THE COURT:  Any objections?

MR. VILLA:  Just one moment, Your Honor, please.

No objection.

MR. REED:  No objection, Your Honor.

MS. DE SALES BARRETT:  No objection, Your Honor.

THE COURT:  Those will be admitted.

(Government's Exhibits 1394 through 1408 were received.)

MR. ENGELKING:  So we're not going to look at all of these, but can we please pull up Exhibit 1397.

BY MR. ENGELKING:

Q.  What are we looking at here?

A.  Those are one of the EDD documents found in the vehicle.

Q.  And whose name is on this paperwork?  If you can't read it, we can zoom in.

A.  Yeah, can we zoom in on this, please?

MR. ENGELKING:  Can we zoom in on this portion right here?

BY MR. ENGELKING:

Q.  Is that better?

A.  Yes, thank you.  Mark Madamba.

MR. ENGELKING:  Let's pull up Exhibit 1399, please.

BY MR. ENGELKING:

Q.  And what are we looking at here?

A.  Another -- other documents that were in the victim's

CX-Magiel-V

1900

vehicle.  EDD documents.

MR. ENGELKING:  And could we please zoom in on that portion there?

BY MR. ENGELKING:

Q.   Whose name is on this paperwork?

A.   Lay Saechao.

Q.   Thank you.  At some point was your investigation handed over to ATF?

A.   Yes.

Q.   Around when was that?

A.   That was in March.

MR. ENGELKING:  No further questions, Your Honor.

THE COURT:  Cross-examination?

MR. REED:  I have no questions, Your Honor.

MR. VILLA:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. VILLA:

Q.   Good afternoon, Detective.

A.   Hello.

Q.   So you said you handed over the investigation in March to the ATF.  That was March of 2023?

A.   I believe it was earlier than that.  2021.

Q.   Oh, okay.  So March of 2021, excuse me.  I misstated it.

The night that you got called out is October 2020, right?

CX Maciel V

1901

A. Yes.

Q. October 4th.  And then you handed it over March 2021?

A. Yes.

Q. Do you remember the date in March?

A. No, I don't.

Q. That's six months, basically, then, that you investigated the offense?

A. Approximately.

Q. And it was yourself and another detective, I think you said you had a partner, correct?

A. Yes.

Q. Detective Aguilera?

A. Yes.

Q. So before the investigate was handed over, you testified about some of the information you got.  You said you got Mr. Roshanski's phone?

A. Yes.

Q. Did you yourself examine the phone to see who had communicated with Mr. Roshanski?

A. No.

Q. Did somebody under your charge do that during the course of your investigation?

A. Our crime analysis reviewed the CDRs.

Q. The call detail records?

A. Yes.

CX - Magiel V

1902

Q.   And those are the records you get from the phone company?

A.   Yes.

Q.   To see who may have been communicating with Mr. Roshanski, correct?

A.   Yes.

Q.   And were you made aware of the results of those CDRs?

A.   Yes.

Q.   Because that was important for you to look into and follow up on?

A.   Yes.

Q.   And there weren't any phone calls that you ever saw that you identified coming from Mr. Johnson, correct?

A.   I mean, from whom?

Q.   Mr. Kenneth Johnson.  That -- that's my client, that's who I represent.

A.   No.

Q.   No calls on there.

     Now, what about -- did the call detail records get you anything else besides phone numbers?  I mean, do you get, you know, texts or messages on messaging applications?

A.   Not that I recall.

Q.   Did you get that information in another way from Mr. Roshanski's phone?

A.   You're talking about messages?

Q.   Correct.

CX Magiel - V

1903

A.  If we downloaded his phone, I don't remember if we were able to extract any messages.

Q.  When you say "downloaded his phone," you mean extract the data from the phone?

A.  Yes.

Q.  And that's something you do with a program called Cellebrite?

A.  I don't know what program is being used.  It's a different unit that does that for us.

Q.  Did you review any report from any download of the data on Mr. Roshanski's phone?

A.  Just that it was downloaded.  Just basic information.

Q.  Any messages that he might have received either from a regular text message or some sort of messaging application might have been important to your investigation, correct?

A.  Yes.

Q.  And you think somebody in your department did download the information that was available from the phone?

A.  Yes.

Q.  And you reviewed that information as part of your follow-up on the case?

A.  For our victims' phones, yes.

Q.  And you didn't find any messages that you believe came from Mr. Johnson, correct?

A.  No.

1904

Q.   In the course of your investigation you said you developed a suspect named Mr. Gray, correct?

A.   Yes.

Q.   Did you investigate any other potential suspects who would have been the person that pulled the trigger?

A.   Not at that time, no.

Q.   And -- okay.  So did you do any, like, background investigation on the two victims to see if that would lead you to a potential suspect?

A.   Yes.

Q.   And so what I mean by that is, like, looking into their -- if they have criminal history or who they associate with, who they could have gotten crossways with along the way, did you look into that?

A.   Yes.

Q.   Okay.  And because, as you just testified a minute ago, you've said that there was information in the vehicle that appeared to you to not belong to them, right?

A.   Yes.

Q.   And that indicated to you that they might be involved in crime?

A.   Possibility.

Q.   And in the course of your other background investigation of these two, did you make a determination if they were involved in any other criminal activity?

1905

A.   No.

Q.   You did not do that?

A.   What, find if they were involved in any other --

Q.   Criminal activity.

A.   -- criminal activity?

Q.   Besides from the EDD paperwork we just looked at?

A.   No.  But obviously having that many documents -- EDD documents is extremely strange -- would make me believe that maybe it was some type of -- I guess them receiving money that wasn't supposed to be for them.

Q.   You also testified that he had credit cards in his pocket, three of which were not his?

A.   Yes.

Q.   Were those individuals that you thought -- well, did you believe that he had those three credit cards in connection with some sort of criminal activity?

A.   No.

Q.   You thought they were maybe just like his friends' credit cards or family members?

A.   At the time.  We weren't sure.  I wasn't sure.

Q.   But I mean, if they're -- either one of these two individuals were involved in some criminal activity aside from EDD, that might be something you'd want to look into, correct?

A.   Yes.

Q.   Because it could lead you to a potential suspect?

1906

A.  Yes.

Q.  And if I understand your testimony, you didn't do that?

A.  Didn't do what?

Q.  Look into other potential suspects that popped up in his criminal background?

A.  No.

Q.  Either of the two victims?

A.  No.

Q.  I want to ask you about the Ring video that we saw on the door.

        MR. VILLA:  So if we could pull up, please, Exhibit 1356 again.

BY MR. VILLA:

Q.  So you had circled it earlier.  It's this doorbell Ring camera, correct?

A.  Yes.

Q.  Do you know how the doorbell Ring camera works?

A.  I know that camera was a motion-activated camera and the female that showed us the video, she showed it to us off her phone.

Q.  That female being the resident of the house?

A.  Yes.

Q.  And so Ring has an application that you can put on your phone so you can see the video that comes from that doorbell camera?

1907

A.  Yes.

Q.  And you were able to watch it?

A.  Yes.

Q.  You testified that you saw the vehicle pulling up, correct?

A.  Yes.

MR. VILLA:  Can we please pull up Exhibit 1350.

BY MR. VILLA:

Q.  So in the center of Exhibit 1350, there's a vehicle black in color.  That's the Volkswagon vehicle?

A.  Yes.

Q.  That you ultimately determined was registered to Mr. Roshanski, one of the victims?

A.  Yes.

Q.  That's the vehicle you could see pulling up on the Ring camera that the resident of the home showed you?

A.  Yes.

Q.  So it appears anyway, from what you saw, that the motion activation can capture vehicle movement on the street, correct?

A.  Yes.

Q.  And the location of the two victims, which is to the right by this electrical pole here, that's where they were when you arrived on the scene, yes?

A.  Yes.

1908

Q.   And you didn't have any indication that after they had been shot they were moved, did you?

A.   No.

Q.   You believed they had been shot right there where they were found?

A.   Yes, because they had head shots.

Q.   So what you're saying is the Ring video didn't capture somebody coming up to them and shooting them in the head?

A.   No.

Q.   You then said, when you testified on direct, that afterwards, you saw the vehicle pull up, this vehicle here pulled up, and then you could see in the Ring video the two individuals -- victims on the ground and, like, fire trucks and emergency vehicles and things like that, right?

A.   Yes.

Q.   So what you're saying is it captured the vehicle pulling up to the house and it captured afterwards, after they had been shot, but didn't capture the in-between?

A.   Yes.

Q.   And that was based on what the resident of the home showed you from her phone?

A.   Yes.

Q.   You didn't ask her to send you that video?

A.   No.

Q.   But did she send it to your partner, Detective Aguilera?

1909

A.   I later found out that she did.

Q.   Did you contact Ring to determine if you were able to find from their information video from in between the car pulling up and then seeing the emergency vehicles after the shooting?

A.   We did not.

Q.   You didn't write up a search warrant to try to access that information?

A.   No.

Q.   Why not?

A.   Uh, the female had told us that she didn't have, like, an email attached to it or there wasn't a reason why we were going to be able to write that search warrant and retrieve that information.

Q.   I mean, did you contact Ring to say, Hey, how do I look at the videos on this doorbell at this particular residence if the resident, you know, video doesn't show me everything?

A.   No.

Q.   You didn't do that?

A.   No.

Q.   Nobody on your department tried to do that?

A.   No.

Q.   And you would agree with me that if it -- the motion activation shows the car coming up and then shows, like, fire trucks and things, that it could have shown the shooter -- the shooting happen?

1910

A.   Yes.  I was extremely disappointed.

Q.   Okay.  But no follow-up done with Ring?

A.   No.

Q.   After the investigation was handed over to ATF, did you continue working on the case?

A.   No.

Q.   You didn't participate in any further investigation?

A.   No.

Q.   Or interviews of witnesses, things like that?

A.   I believe there was one interview.

Q.   And who was -- who was interviewed?

A.   Lana Haley.

Q.   Okay.  You didn't participate in any interviews of Robert Eversole?

A.   I didn't interview that person, no.

Q.   Or were you present when he was interviewed?

A.   What's that?  Oh, I'm thinking.

        I don't remember.

        MR. VILLA:  Let me pull up Exhibit 1377, please.

BY MR. VILLA:

Q.   This is the fanny pack that was found on the victim Mr. Roshanski, correct?

A.   Yes.

Q.   And in there you showed the jury on direct that that's where a firearm was found?

CX Magiel V

1911

A.  Yes.

Q.  And did you do any investigation of that handgun to determine, you know, a trace of the handgun to see if it had been used before in another crime?

A.  I don't remember if I did.

Q.  A trace might be a bad word, but you can look in databases to see if perhaps a shell casing from another crime scene may have matched this firearm, right?

A.  Yes.

Q.  And you don't remember if you did that?

A.  I don't remember if I requested it or not.  I usually do, but I can't for sure say whether I did.

Q.  And you can't -- as you sit here, can't say what the results of that were?

A.  No.

Q.  Did you try to determine where that handgun came from? And what I mean by that is, where was it purchased?

A.  No.

Q.  That is something you can do using law enforcement databases if the firearm was legally purchased?

A.  Yes.

Q.  But you didn't do that?

A.  I don't recall doing that.

Q.  Did you use law enforcement databases to determine if the handgun was stolen or was lawfully possessed by the victim?

1912

A.   I don't -- I don't remember.

          MR. VILLA:  Can we pull up Exhibit 1371, please.

BY MR. VILLA:

Q.   71, you showed the jury during your direct, is the shell
casing you found.  This is in the grass in front of the
residence?

A.   Yes.

Q.   And you believe that shell casing was expelled when one of
the two victims was shot?

A.   Yes.

Q.   But you didn't find another shell casing, right?

A.   No.

Q.   Did you ever identify a firearm from which this handgun --
or this shell casing came from?

A.   No.

Q.   You said in the car you found another cell phone.  This is
the car, being the Volkswagen --

          MR. VILLA:  We can take that exhibit down.  Thank
you.

BY MR. VILLA:

Q.   -- the Volkswagen that belonged to Mr. Roshanski, the
victim.  You found another cell phone, you said
methamphetamine, and those other documents?

A.   Yes.  Some -- those were some of the items.

Q.   Was there also a drone found in the back of the car?

CX Maciel V

1913

A.  A drone?

Q.  A drone.

A.  I don't remember that.

Q.  Or a computer?

A.  I don't remember that.

Q.  So you're not saying that they weren't found.  You're just saying you don't -- as you sit here today, you don't remember?

A.  Exactly.

Q.  Do you remember doing any investigation on those items that were found in the car that we didn't talk about, like investigating where the drone came from or where the laptop came from, that sort of thing?

A.  No.

        MR. VILLA:  May I have just a moment, Your Honor?

        THE COURT:  Sure.

BY MR. VILLA:

Q.  One of the three credit cards that didn't belong to Mr. Roshanski that was in his pocket was in the name of a Marina Lambert [phonetic], correct?

A.  Yes.

Q.  Did you investigate Ms. Lambert?

A.  No.

Q.  Did you speak to her?

A.  No.

Q.  Or determine if that credit card was used to purchase

ER 1243

1914

anything by Mr. Roshanski?

**A.** No.

MR. VILLA: That's all the questions I have.

THE COURT: Any further redirect?

MR. ENGELKING: Briefly.

THE COURT: I'm sorry. Any other cross-examination by any other counsel?

MS. DE SALES BARRETT: No, Your Honor.

MR. REED: No, Your Honor.

THE COURT: Any redirect?

REDIRECT EXAMINATION

BY MR. ENGELKING:

**Q.** When you -- in your experience, when you investigate homicides, are you trying to find the person who committed the crimes?

**A.** Yes.

**Q.** So you're not necessarily investigating the victims?

**A.** No.

**Q.** Did you believe the Ring video was significant?

**A.** No, because it didn't show the incident.

**Q.** And in your experience, when you respond to a crime scene where the victims have apparently been shot, do you always find all the shell casings?

**A.** No.

MR. ENGELKING: No further questions.

ER 1244

1915

THE COURT:  Any further recross?

MR. REED:  No questions, Your Honor.

MR. VILLA:  No, Your Honor.

MS. DE SALES BARRETT:  No, Your Honor.

THE COURT:  May this witness be excused?

MR. ENGELKING:  Yes, Your Honor.

MR. VILLA:  Yes, Your Honor.

MS. DE SALES BARRETT:  Yes, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, we're going to be taking our evening break.  Thank you so much for your attention today.

Overnight, please don't discuss this case with anyone; don't let anyone discuss it with you.  Please don't form any opinions about this case.  Please don't do any independent research on your own, and please don't review any media reports about this case.

All right.  Thank you, everyone.

(Jury exits the courtroom at 1:30 p.m.)

THE COURT:  All right.  The jury members have stepped out.

Is there anything for the record?

MS. DE SALES BARRETT:  Yes, Your Honor.

THE COURT:  All right.

MS. DE SALES BARRETT:  We'd like to know who's coming tomorrow.

1916

THE COURT:  Before we do that, is there anything that I need to be a part of first, because I do have something to discuss.

Ms. Stokman?

MS. STOKMAN:  Judge, I was just curious if the Court had the availability to listen to the call and read the text message that the government sent.

THE COURT:  That's what I was going to talk about.

Mr. Villa, Ms. Luem, did you have comments about that?  I did review that last night.

MR. VILLA:  No comments, Your Honor.

MS. LUEM:  Nothing to add, Judge.

THE COURT:  I would just note in listening to the audio, it was apparent that Mr. Johnson -- it wasn't simply a situation which he knew that Mr. Bannick had pled guilty, because he says specifically that Mr. Bannick is listed on the witness list.  Then he speaks to the one person, calls Mr. Bannick "rat," and then texts some -- another person and says the same thing.

That type of conduct can't occur.  Mr. Johnson, you are not to identify any cooperators to anyone outside of this case.  Do you understand that?

So what I mean is, you can speak to your lawyers, of course.

DEFENDANT JOHNSON:  I understand you admonish me.  I

1917

thought it was a well-known fact already.  You know what I mean?  It's in the newspapers, for crying out loud.  The guy is a rat.  You know what I mean?

THE COURT:  Well, I haven't seen that in the paper, that he's intending to cooperate.  But it sounded to me like the person you were talking to didn't have that information.  And there's no indication the person you texted had that information.

DEFENDANT JOHNSON:  Understood.

THE COURT:  So I mean, I don't want to belabor the point but --

DEFENDANT JOHNSON:  I understand.

THE COURT:  All right.  So that's not going to happen.

DEFENDANT JOHNSON:  No.

THE COURT:  Anything else, Ms. Stokman?

MS. STOKMAN:  No.

MR. VILLA:  Judge, just because we've had such trouble getting the next day's witnesses, we're fine -- you know, we only know one more witness who's coming after this one.  We're fine getting that from the government and not sharing it with our clients, but we really need it to prepare.

THE COURT:  Okay.

MR. VILLA:  And it would be -- I mean, it would be nice if we could get it now, because I'm sure the government

1918

knows.  I think the next witness isn't going to take, you know, very long.  Maybe a couple hours.  I might be wrong.

THE COURT:  Okay.  Let's, then, let Mr. Johnson, Mr. Clement, and Mr. Stinson make their way back, and we can talk about this in a moment, then.

(All defendants exit courtroom.)

THE COURT:  Ms. Stokman, so your first witness tomorrow is who?

MS. STOKMAN:  Judge, I let counsel know that after Detective Maciel it would be Lana Haley.  And I just want to clarify with the Court, the original order said that the government needed to provide the witness list every Friday for the week coming.  And this week it seems like it's been a daily request.  And so I'm just clarifying that because that was not the original order from this Court.

MR. VILLA:  And the reason that's a problem is we're only getting an alphabetical order, not a chronological order. So if it was chronological, then we'd know who's next, but we don't get that.

THE COURT:  So tomorrow we have Lana Haley.  How long is her estimate?

MS. STOKMAN:  She should not take very long.

THE COURT:  And then after Ms. Haley?

MS. STOKMAN:  Probably Robert Eversole.

THE COURT:  What's your estimate for him?

1919

MS. STOKMAN:  Oh, I'm sorry.  We have the expert, Danielle Ponce de Leon, coming in after Ms. Haley, and then it would be Mr. Eversole.

THE COURT:  All right.  And you think that's going to take up tomorrow?

MS. STOKMAN:  Probably.

THE COURT:  Okay.

MS. STOKMAN:  And then just because we've had some scheduling issues with witnesses, and five of the witnesses that we had on the list for this week were the Fresno County deputies from the Fresno County Jail searches just in case, we intend to potentially put on the Brian Rapano [phonetic] and Megan Garza on Friday because of some scheduling issues that have come up with other witness.  So I'm letting counsel know that now.

THE COURT:  All right.

MS. FISHER-BYRIALSEN:  The second one, Your Honor?

THE COURT:  Megan Garza.

All right.  So the list that -- the witness list that was provided last Friday, how many of those people will be left after these?  Are there anyone left on that list that you provided on Friday?

MS. STOKMAN:  That we believe will come this week, no.

THE COURT:  Okay.  So it's not a matter of the

1920

government telling you people who aren't testifying in the week.  You just want to know day by day who it's going to be.  And I guess I need to understand what you're willing to do in exchange, because, I mean, that was the order, you know, let people know a week in advance.  And I guess, then, it's going to have to be -- if they are going to tell you more than that, then you're going to do the same.  So it's --

MS. FISHER-BYRIALSEN:  Sure.  We would be happy to do that.

MS. DE SALES BARRETT:  Your Honor, just --

MS. LUEM:  Sure.

MS. FISHER-BYRIALSEN:  I --

MS. DE SALES BARRETT:  I would like to say that we have been -- when we get the witness list, we have been providing the government the information as to whether or not we intend to cross-examine.

THE COURT:  Thank you.  That's very courteous.  I appreciate that.

MS. DE SALES BARRETT:  And as a result of that -- so that they can better plan and fill the court day.  And we've been doing that all along, and we've basically asked them to provide us the information.  And finally, we got some as a result of that.

MS. FISHER-BYRIALSEN:  Your Honor, if I may just add, part of the problem is also that we get a list, for example,

1921

for this week of 21 or 22 people.  And if we don't -- it seems from the week before and this week that numerous people on those lists aren't being called, so we're going after court and doing prep work that we're obviously billing for that's unnecessary because those witnesses are not being called. We're going back and re-reviewing their case files, writing crosses that are not getting used.  So --

THE COURT:  I think what I heard Ms. Stokman say was five witnesses aren't being called because of my ruling.

So I guess she could anticipate that.  Are you saying there's other than those five?  What other ones aren't being called?

MS. FISHER-BYRIALSEN:  For example, last week I think Brianne Briles was on the list and wasn't called.
Frank Alvarado was on last week's list and not called.

THE COURT:  You got that list the week before when we were still in jury selection?

MS. FISHER-BYRIALSEN:  I just -- I'm -- what I'm saying is those are witnesses that I don't think they are calling at all.

THE COURT:  Is that true, Ms. Stokman?

MS. STOKMAN:  Frank Alvarado and who else was the other question?

MS. FISHER-BYRIALSEN:  Brianne Briles.

MS. STOKMAN:  Yes, that is correct.

1922

MS. FISHER-BYRIALSEN:  And Mr. Slimp.

MS. DE SALES BARRETT:  Sergeant Slimp.

MS. STOKMAN:  Sergeant Slimp is on this week's list too.  But we're going through the scheduling, and he's local, and so he has some scheduling issues.  We have had him on the list because we have not made a determination as far as in line when he comes with witnesses.  And scheduling priorities take precedent over his schedule, which also fluctuates.  So he is still on the list.

THE COURT:  All right.  So what we'll do is on the Friday before the next week, whoever is up is going to give a list for the following week, and then the night before when court finishes at 1:30, we're going to tell our opponent what the -- who the witnesses are going to be.

MS. FISHER-BYRIALSEN:  Your Honor, just add, the same seems to be happening for Matt O'Day and Aaron Fogle.

THE COURT:  All right.  Well, now we know what's going to happen going forward.  That way we won't have this problem and everybody can use their time more efficiently; although, I imagine you're still going to have to do some of that anyway because you just still don't know.

MR. VILLA:  And, Your Honor, I would ask that you make the order to be the government's best good faith chronological order, rather than alphabetical.

THE COURT:  No, I'm not going to do that.  I'm not

1923

going to do that, because it's hard to know. And, I mean, you-all have tried cases before, it's hard to know. It just doesn't work that way. Sometimes a witness says something that changes your entire -- entire decision-making. And so if you get the list of the witnesses that are going to be for next week and then you have a day to prepare for them, I think that is sufficient. Because I don't want witnesses called simply because they've been identified. And I also don't want to put you in the position where you have no flexibility.

So I just think trying cases doesn't work that way. To the best of -- and I think what you're getting now is sufficient for your preparation, because these are not people who are unknown to you, and even 20 witnesses isn't -- especially when I hear at least five of them are deputies who are going to talk about a cell search, I don't know how much that took.

So that's what we're going to do going forward. If that doesn't work, then let me hear about it again, but I think at this point that should address the issues.

Anything else to discuss at this time?

MS. STOKMAN: Nothing from the government.

MS. DE SALES BARRETT: No, Your Honor.

MR. VILLA: No, Judge.

THE COURT: All right. I'll see you in the morning, then.

1924

(Proceedings were adjourned at 1:41 p.m.)


I, RACHAEL LUNDY, Official Reporter, do hereby certify the foregoing transcript as true and correct.


Dated:  January 29, 2025          /s/ Rachael Lundy_____
                                  RACHAEL LUNDY, CSR-RMR
                                  CSR No. 13815