IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff - Appellee,<br>v.<br>KENNETH JOHNSON,<br>    Defendant - Appellant. | No. 25-3645<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |
| UNITED STATES OF AMERICA,<br>    Plaintiff - Appellee,<br>v.<br>FRANCIS CLEMENT,<br>    Defendant - Appellant. | No. 25-3648<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |

On Appeal from the United States District Court
For the Eastern District of California
The Honorable Jennifer L. Thurston
D.C. No. 1:20-cr-00238-JLT-SKO

**EXCERPTS OF RECORD
VOLUME 8 OF 13**

Ryan J. Villa
The Law Office of Ryan J. Villa
5501 Eagle Rock Ave. NE Suite C2
Albuquerque, NM 87113
Ryan@rjvlawfirm.com

Andrea Lee Luem
Andrea Lee Luem, PHV
400 South Fourth Street, Ste 500
Las Vegas, NV 89101
andrea@luemlaw.com

Counsel for Defendant-Appellant
Kenneth Johnson

Jane Fisher-Byrialsen
Fisher & Byrialsen, PLLC
4600 S. Syracuse Street
Denver, CO 80137
jane@fblaw.org

Jean D. Barrett
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
jeanbarrett@ruhnkeandbarrett.com

Counsel for Defendant-Appellant
Francis Clement

1925

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. JENNIFER L. THURSTON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 1:20-cr-00238-JLT-SKO |
| Plaintiff, ) | |
| ) | Jury Trial, Day 9 |
| vs. ) | |
| ) | |
| KENNETH BASH, et al. ) | |
| ) | Volume 9 |
| Defendants. ) | Pgs. 1925 - 2138, inclusive |
| ) | |

Fresno, California                    Thursday, January 30, 2025

REPORTER'S TRANSCRIPT OF PROCEEDINGS

REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

1926

**APPEARANCES OF COUNSEL**:

| | |
|---|---|
| For the Government: | **STEPHANIE STOKMAN**<br>Assistant U.S. Attorney<br>2500 Tulare Street, Rm. 4401<br>Fresno, California  93721 |
| | **JARED ENGELKING**<br>Department of Justice<br>1301 New York Avenue, N.W.<br>Washington, DC 20005 |
| | **JAMES ROBERT CONOLLY, GOVT**<br>U.S. Attorney's Office<br>501 I Street, Suite 10-100<br>Sacramento, CA 95814 |
| For Defendant Johnson: | Law Offices of Andrea Luem<br>Attorneys at Law<br>400 South Forth Street, Suite 500<br>Las Vegas, Nevada  89101<br>BY:  **ANDREA LEE LEUM, ESQ**. |
| | Law Offices of Ryan J. Villa<br>5501 Eagle Rock Avenue NE<br>Suite C2<br>Albuquerque, NM 87104<br>BY:  **RYAN J. VILLA, ESQ**. |
| For Defendant Clement: | Fisher & Byrialsen, PLLC<br>Attorneys at Law<br>99 Park Avenue<br>New York, NY 10016<br>BY:  **JANE FISHER-BYRIALSEN, PHV** |
| | Ruhnke And Barrett<br>29 Broadway, Suite 1412<br>New York City, NY 10006<br>BY:  **JEAN DE SALLES BARRETT, PHV** |
| For Defendant Stinson: | Law Office of Kenneth Alan Reed<br>406 W 4th Street<br>Santa Ana, CA 92701-4505<br>BY:  **KENNETH ALAN REED, ESQ**. |

1927

### INDEX

**GOVERNMENT'S WITNESSES**:

**LANA HALEY**
DIRECT EXAMINATION BY MS. STOKMAN                    1942
CROSS-EXAMINATION BY MS. DE SALES BARRETT            1953
CROSS-EXAMINATION BY MS. LUEM                        1958
REDIRECT EXAMINATION BY MS. STOKMAN                  1962

**DANIELLE PONCE DE LEON**
DIRECT EXAMINATION  BY MR. CONOLLY                   1964
CROSS-EXAMINATION  BY MR. REED                       2041
CROSS-EXAMINATION  BY MR. VILLA                      2048
REDIRECT EXAMINATION  BY MR. CONOLLY                 2051
RECROSS-EXAMINATION BY MR. REED                      2053
RECROSS-EXAMINATION BY MR. VILLA                     2057

**ROBERT EVERSOLE**
DIRECT EXAMINATION BY MS. STOKMAN                    2060
DIRECT EXAMINATION RESUMED BY MS. STOKMAN            2119

**EXAMINATION OUTSIDE THE JURY'S PRESENCE**:

**ROBERT EVERSOLE**
DIRECT EXAMINATION BY MS. STOKMAN                     2098
CROSS-EXAMINATION  BY MR. REED                        2100
CROSS-EXAMINATION  BY MR. VILLA                       2100
EXAMINATION BY THE COURT                              2102
RECROSS-EXAMINATION  BY MR. VILLA                     2104

* * * * *

### EXHIBITS

**GOVERNMENT'S**                                    RECEIVED

1845                                                 1973
1432                                                 1977
1434                                                 1992
1850                                                 1995
1852                                                 1995
1847 AND 1849                                        2004

1928

Thursday, January, 30, 2025                    Fresno, California

8:00 a.m.                                       Jury Trial Day 9

(The following proceedings were held in open court:)

THE COURT:  All right.  We're back on the record. Anything to discuss before we bring in the jury?

MS. STOKMAN:  No.

MS. DE SALES BARRETT:  Yes, Your Honor.

THE COURT:  All right.

MS. DE SALES BARRETT:  Your Honor, it's our understanding the first witness will be Lana Haley, and we were notified last night that they anticipate bringing coconspirator testimony, or statements, through Lana Haley. Lana Haley is not an AB member or an associate, and we would object to her being considered a co-conspirator in this case.

THE COURT:  Ms. Stokman, your comments.

MS. STOKMAN:  I think when she says who the statement comes from, the Court will be very clear as to that person already being identified as either a defendant in this case or a coconspirator in the RICO.  And those statements are coming from those individuals, which is part of the ongoing activity of the enterprise as it relates to what Ms. Haley has to testify about.

MS. DE SALES BARRETT:  Your Honor, it is the rule that both participants in the conversation have to be members of the conspiracy in order for an out-of-court declarant's

1929

statements to be introduced under the coconspirator exception. So the government would have to show that Ms. Haley is also a member of the conspiracy; otherwise, it's not a statement between two coconspirators.

THE COURT:  I understand if she's saying she heard a defendant say something, then we're not -- that's not a problem.  But as a coconspirator, under 801(d)(2)(e), "Statement has to be made in furtherance of the conspiracy and it has to be" -- I mean, you seem to be taking the position that hasn't -- doesn't have to be made by a coconspirator.

MS. STOKMAN:  The statement is made by a coconspirator.

THE COURT:  A coconspirator who's not part of this trial says something to her and she's not a coconspirator, and she's now here to report on what would otherwise be a hearsay statement.

MS. STOKMAN:  Because the statement to her is in furtherance of activity under the enterprise, which is part of why this statement is being made.

THE COURT:  Do you have authority for this so I can look at it before we start going down this road?

MS. STOKMAN:  I wasn't aware that this was going to be a issue, Judge.  So I don't have anything right in front of me.

THE COURT:  Ms. Barrett, what are you relying on?

1930

MS. DE SALES BARRETT:  I'm relying on the language of 801(d)(2)(e), and it requires both participants in the conversation to be members of the conspiracy.  That's black letter law.

MS. STOKMAN:  Judge, I also believe that it's going to be clear that Ms. Haley was involved in activity that directly was falling under the Aryan Brotherhood enterprise. Hold on.

Judge, we're reading the rule now and it doesn't indicate that the witness has to be part of the conspiracy but that it was -- the statement was made by a coconspirator who was part of the conspiracy.

MR. REED:  That -- that may be the rule, but that's not the case law.  The case law requires a statement is in furtherance --

THE COURT:  Mr. Reed, can I get you to turn on your mic so that we can pick it up.

MR. REED:  The case law requires that the statement is made in furtherance of the conspiracy.  Counsel is using furtherance and activity as the same thing.  So other people deal drugs.  She's talking about dealing drugs, so, therefore, it's in furtherance of the activity.  It may be, but until the activity becomes the law, who cares?

The issue is in furtherance of the conspiracy and that conspiracy, not some other conspiracy.  She may deal dope

1931

with some other woman who has nothing to do with the AB, and they are talking about, When I deal dope, I do X, and when I deal dope, I do Y. If it has nothing to do with the AB, it doesn't come in. That's just the case law. That's the Ninth Circuit case law.

THE COURT: I don't know the context and you-all do. And so what you're saying is she's going to testify, Mr. Reed, that she deals drugs with another person.

MR. REED: I'm making statements in general because I don't have the actual facts, but I know what the case law is, and counsel -- or the government keeps using this furtherance and activity. That is not the -- that's not the state of law.

THE COURT: I think, though, what she's saying is maybe a little bit different. I think what Ms. Stokman is saying, and I'm happy to be corrected, is that a conspirator told her statements that were made in furtherance of the conspiracy and that conspirator is not coming in to testify; rather, this witness is going to come in and testify as to what the coconspirator said about the conspiracy, and that's as I understand it; is that right?

MS. STOKMAN: Yes. And that's why it's an exception of the coconspirator statement theory, because it's a statement against an interest that's made by a coconspirator; thus, it's under the rules of nonhearsay.

MR. REED: It's not that it's a statement against

1932

interest because that's a different exception.

Well, for one thing, the way the Court has couched it, the question then becomes, Is the statement -- is it objective or subjective?  The person made the statement, does he think that person -- that question or that statement is in furtherance of their conspiracy, or is it an objective thing that we can now look at and go, yeah, that must be in furtherance of the conspiracy.  I think it's the former and not the latter, because, otherwise, the whole conspiracy concept of why you're guilty because you do things with other people, you're guilty because you all have the same objective.

If it's something so nebulous as drug dealing, that's a little more difficult.  Murder is really easy to do.  If you guys agree that you're going to kill a guy and then somebody explains how that killing happened to a third party, that may well be you can argue that that's in furtherance because of the fear factor, because it's necessary to establish that we killed him.  But drug dealing is an entirely different thing, and it should be an entirely different thing.  Each conspiracy itself rises and falls on the facts of the conspiracy.

THE COURT:  I'm having trouble with what you said, Mr. Reed.  I was going with you until you then said the rules somehow are different, depending on the nature of the conspiracy.

What you were saying originally made sense to me, and

1933

then you said, but, you know, if it's drug dealing, then there's a whole different set of rules.  And what --

MR. REED:  Then just keep the good part that you like.

THE COURT:  But what you seem to be saying, though, is that there's a factual predicate that's easier to be shown in this set of facts as opposed to this other set of facts; otherwise, the rules have to be the same.

MR. REED:  I agree.  But when you establish the evidence -- this is one of the problems with this -- with the way this is done, at least the way the circuit explains it, is what defense attorneys want judges to do is to kind of make a mini-ruling on whether or not -- and most judges don't want to do that in the middle of a trial because it obviously takes time.

And appellate lawyers always make that argument, that the Court should have done this in a motion in limine and then it goes to the defense attorneys for not raising that motion. That is the reason why I think, when you interpret those cases, that's why that problem exists.

I believe homicides are easier because if you guys agree to commit a murder, you're pretty much on the hook for what happens in that murder.  If you -- there are people -- well, just dealing with this day and age, it appears that drug dealing in prison is kind of a thing that just happens all the

1934

time.

The funny thing I find with this is that everybody deals dope, not just the Aryan Brotherhood. There are people that deal dope in prison without the Aryan Brotherhood's permission, who get in trouble for it, but that person is still drug dealing.

And if they're dealing dope and agreeing with a Black person, in theory that could never be part of the conspiracy with the Aryan Brotherhood because they frown upon that and they would technically or theoretically kill you for it.

THE COURT: I don't know if I agree with that factually because I have sentenced people who have had that same exact scenario. So --

MR. REED: That's because their defense attorneys didn't make the argument that I couldn't have done that with the Aryan Brotherhood because brothers will come in and say, You cannot do business with Black people.

THE COURT: All right. Well --

MS. DE SALES BARRETT: Your Honor, may I be heard? Thank you. I just want to read --

MR. REED: Am I wrong?

MS. DE SALES BARRETT: (Inaudible.)

COURT REPORTER: I'm sorry, Ms. Barrett. I didn't pick that up --

MS. DE SALES BARRETT: Okay. All right. Back to

1935

where I started.

I'd like to read what the government proposes to elicit from this witness because I think this is really important.  It says:

"We anticipate, when Lana Haley testifies, she will talk about conversations with AB members and associates surrounding the Lomita murder."

She is not -- this is not in furtherance of the conspiracy if it's talking to a person who is not involved in the murder conspiracy.  It is because it would have to be in furtherance of that conspiracy.

And that's why under almost every circumstance that I've had where a co- -- where a person is not a member of the conspiracy, then the coconspirator's exception does not apply because it takes two to tango in terms of in furtherance of the conspiracy.

And if both parties are acting in furtherance of the conspiracy, then it's -- then the conversation is in furtherance of the conspiracy.  If one party is -- only one party is acting in furtherance of the conspiracy, then the conversation itself between those two individuals is not in furtherance of the conspiracy because the other person is not on board with that.

THE COURT:  I get that, but what you seem to be saying is if the representation from the government had been

1936

she will talk about conversations with AB members made in furtherance of the Lomita murder, we wouldn't be talking about this.  Is that what you're saying?

MS. DE SALES BARRETT:  No.  That's what -- that's what they propose to do.  She was not involved in the Lomita murder.

THE COURT:  Right.  I understand, I guess.

MS. DE SALES BARRETT:  Basically what she's going to say is that some other coconspirator told her that they did it.  And that is not in furtherance of the conspiracy.

THE COURT:  The statement "we did it" is a --

MS. DE SALES BARRETT:  No, no, I'm sorry, Your Honor.  When I said "they," I mean the speaker only, the declarant.

THE COURT:  So the speaker is going to say, I did it; and Ms. Haley is going to say that --

MS. DE SALES BARRETT:  I was told by the -- by the speaker that he did it.

THE COURT:  Yeah.  So as I understand it then, she's in a conversation with somebody who said, I did it, I murdered this person.

MS. DE SALES BARRETT:  Yeah, it's with Mr. Gray.

THE COURT:  She had a conversation with Mr. Gray and Mr. Gray said, I killed these people.

MS. DE SALES BARRETT:  Uh-huh.

THE COURT:  And he doesn't make any other statements

1937

about the AB.  Is that your understanding?

MS. DE SALES BARRETT:  Uh, I don't know what else they're going to elicit from her with regard to this.  We've had a very old interview of her from 2022.

THE COURT:  And so, Ms. Stokman, you're offering the statement to prove that Mr. Gray did it?

MS. STOKMAN:  Judge, my suggestion would be that when that starts to come up in the testimony, the foundation will have been laid as to how it relates to the AB enterprise and the conspiracy in Count 1, which encapsulates the Lomita murder as part of an ongoing -- and it's, you know, obviously part of the VICAR ongoing enterprise activity, but it will be clearer to the Court and counsel at that point how that statement relates back to the AB in the murder itself.

And I -- my suggestion would be, as we have done throughout every witness who has talked about coconspirator statements, is to wait until that statement comes up and then to decide.  Because I think that foundation will have been laid by that point.

THE COURT:  Does she have to be the first witness?

MS. STOKMAN:  Today?

THE COURT:  I guess my question is, can we take a longer break and preview her testimony, let her say it, and go from there?  Because then we'll just know and there won't be any dispute as to what she's going to say.

1938

MS. STOKMAN:  Just one second.

Judge, I'm sorry.  Is that suggestion that we put the witness on the stand without the jury here and have -- go through her testimony?

THE COURT:  Yes, under 104.

MS. STOKMAN:  Yeah, that is not something the government thinks is necessary.  So, if anything --

THE COURT:  Well, I know you don't think it's necessary, but that's what we're talking about here and I'm concerned it's necessary.

MS. STOKMAN:  Well, Judge, I'm -- what I'm suggesting is that we get to that place, and then if we need to, there's a sidebar.  Because it's pretty far through her testimony.  And I think at that point it will be clearer and the Court will be able to rule on this.

THE COURT:  So she has substance to say that's different than what you're talking about now?  She has a lot of testimony that has nothing to do with the issue we're talking about now?

MS. STOKMAN:  She has testimony that has to do with how that murder was part of the Aryan Brotherhood and how it -- the enterprise activity and why it's related to that and how Gray relates to the discussions before and after the murder, along with defendants in this trial.

THE COURT:  All right.  What we're going to do, then,

1939

we'll bring her in; she can start to testify.  And then if we have to, we'll have to take a long break, and I'll have to hear her testimony outside the presence of the jury if it's not tied up at that point.

All right.  Anything else before we --

MS. DE SALES BARRETT:  Just to be -- may I just have one last comment on that?

THE COURT:  Sure.

MS. DE SALES BARRETT:  Thank you.

The statement has to be in furtherance of the conspiracy.  The point that we're focusing on here is whether or not a statement made to a person who is not involved in the conspiracy has any -- how would that further the conspiracy.

THE COURT:  Well, I don't know the context, but if what she's going to say is, you know, Mr. Gray was having a conversation with somebody here, and he said, Hey, you know, what we need to do is throw that gun away that I used to kill whoever, then that would be a statement in furtherance of the conspiracy.

I don't know the context, so it's hard for me to know.

MS. DE SALES BARRETT:  That's not what -- that's not what's involved here.

THE COURT:  So you understand she's just having a conversation -- it's only she and Mr. Gray -- and Mr. Gray

1940

doesn't say, You know, I told them what we needed to do was get rid of the gun because the gun could tie -- see, that's the trouble.  I don't know what she's going to say.

And that's why we hear it, and then maybe we do have to take a break and so I can hear more clearly, before the jury does, what's happening.  Because it sounds like you don't even quite know either, do you?

MS. DE SALES BARRETT:  I don't know the details of what she's going to say because it's apparent throughout the course of this that more detail comes from the witness than is included in the discovery.

THE COURT:  Okay.  All right.  So I really don't want to have the jury sitting around while we do this, but if we have to do it, that's what we're going to do.

Ideally, this would have been something that we would have done yesterday afternoon, or it would be, you know, on a break.  But --

MS. DE SALES BARRETT:  Your Honor, we just got notice.

THE COURT:  No, I'm not criticizing.  I'm just saying the fact is if we have to make the jury sit and wait and do nothing, that's what we're going to have to do.

All right.

MR. VILLA:  Your Honor, just one more thing before -- I didn't mean to cut you off.

1941

THE COURT: Go ahead.

MR. VILLA: I was going to send you a case with copy to all counsel. It has to do with not this issue, so we can discuss it later, but I wanted you to have the case, whether a prosecutor statement is a statement of a party opponent.

This touches on an issue that came up with Mr. Clowers about what was said to him by Ms. Stokman. And I think it's going to come up again with -- not with Ms. Haley but with a witness that we could see today or tomorrow.

THE COURT: All right. Send me -- or just send me -- give me the cite if you have it.

MR. VILLA: I'm about to press send on it, Your Honor. It's *United States v. Mirabal*. It's a 2024 Ninth Circuit case, and it is 98 F.4th 981. And I'll send the email as well.

THE COURT: All right. Let's go ahead and call in the jury.

(Jury enters the courtroom at 8:24 a.m.)

THE COURT: All right. We have all of our jurors back in their places.

Your next witness, please.

MS. STOKMAN: The government calls Lana Haley.

THE CLERK: Please raise your right hand.

///

///

ER 1272

DX Haley S

1942

LANA HALEY,

called as a witness on behalf of the Government, having been first duly sworn, testified as follows:

THE WITNESS:  Yes.

THE CLERK:  Go ahead and have a seat, and then please state your name and spell your last name.

THE WITNESS:  Lana Marie Haley, H-a-l-e-y.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MS. STOKMAN:

Q.  Good morning.

A.  Good morning.

Q.  Can you tell us, where did you grow up?

A.  In Hermosa Beach.

Q.  And that's in the Los Angeles area of California?

A.  Yes, the South Bay.

Q.  How long did you live in Hermosa Beach?

A.  I lived there until I was -- until, like, 2020.

Q.  And then did you move somewhere else?

A.  I moved to Long Beach.

Q.  And that's in a very similar area, uh, of the Los Angeles area of California --

A.  Yes.

Q.  -- is that right?

Do you know an individual named Justin Gray?

DX Haley S

1943

A.   Yes.

Q.   How do you know him?

A.   We're mutual friends.

Q.   Do you know him to go by any nickname?

A.   Sidetrack.

Q.   Are you aware any gang affiliation that Justin may have?

A.   He was in, like, Baby Blue Wrecking Crew.

Q.   Where, if you know, is that gang based?

A.   Uh, South Bay.

Q.   Do you know an individual named Brandon Bannick?

A.   Yes.

Q.   How do you know him?

A.   We grew up together.

Q.   Do you know if he goes by a nickname?

A.   Bam Bam.

Q.   Are you aware of any gang affiliation that he had?

A.   He was in Baby Blue Wrecking Crew as well.

Q.   And did you know if he was ever part of a gang called PENI?

A.   Yes.

Q.   Was he?

A.   Yes.

Q.   Do you know an individual who goes by the nickname "Soldier"?

A.   Yes.

DX Haley S

1944

Q.  Do you know his real name?

A.  Evan.

Q.  And do you know if he's part of any gang?

A.  I don't know for sure.  I don't know.

Q.  How do you know him?

A.  Through Brandon.

Q.  Do you know an individual named Kenneth Johnson?

A.  Not personally.  I've spoke to him on the phone.

Q.  And do you know if he goes by any nickname?

A.  Uh, "Kenwood."

Q.  How -- who put you in touch with Kenwood when you said you spoke to him on the phone?

A.  Uh, either Brandon or Justin or -- or Evan, maybe.  I don't know.  I can't remember.

Q.  But one of those three?

A.  Yes.

Q.  Do you know if Kenwood has any gang affiliation?

A.  Uh --

        MS. LUEM:  Objection.  Foundation.

        THE WITNESS:  The Aryan Brotherhood.

        THE COURT:  I'm sorry.

        MS. LUEM:  Objection.  Foundation.

        THE COURT:  Sustained.

BY MS. STOKMAN:

Q.  At any point in time when you were speaking with Kenwood,

DX Haley S

1945

did he tell you whether he was part of any gang himself?

A.  Yes.

Q.  What did he say?

A.  The Aryan Brotherhood.

Q.  Do you know an individual named Francis Clement?

A.  Yes.  I've never met him, but I've spoke with him on the phone.

Q.  And how were you able to get in touch with him?

A.  Through Justin or Brandon.

Q.  What is his nickname, if he has one?

A.  Uh, "Frank."

Q.  And in speaking with Frank, did he ever tell you whether he had gang affiliation?

A.  Yes.

Q.  What did he say?

A.  That he's in the Aryan Brotherhood.

Q.  So you've mentioned the Aryan Brotherhood.  Uh, what is that to you?  What do you know that to be?

A.  A prison gang.

          MS. DE SALES BARRETT:  Objection, Your Honor.
Foundation.

          THE COURT:  Sustained.

BY MS. STOKMAN:

Q.  How have you learned about the Aryan Brotherhood?

A.  Just through, like, hearing about it through the streets

1946

and --

Q.   When you spoke with Kenwood, did he indicate to you anything about whether or not he was in prison?

A.   Yes.

Q.   And was he in prison?

A.   Yes.

Q.   What about Frank?  Did he ever indicate to you whether or not he was in prison?

A.   Yes.

Q.   And was he?

A.   Yes.

Q.   Okay.  Do you know an individual or did you know an individual named Allan Roshanski?

A.   Yes.

Q.   How did you know him?

A.   We were friends.  We met through mutual friends.

Q.   And at any point, did you have a relationship with Allan?

A.   Yeah.  A sexual, friends-with-benefits relationship.

Q.   When did you meet him?

A.   Uh, sometime in 20 -- earlier -- early 2020.

Q.   When you knew Allan, were you aware of any criminal activity that he was involved in --

A.   Yes.

Q.   -- in the time that you knew him?

A.   Yes.

1947

Q. And how did you know about this?

A. Uh, he did it in front of me.

Q. And what kind of criminal activity did you see him doing?

A. Uh, he did, like, a lot of fraud.

Q. Are you aware of what EDD fraud is?

A. Yes.

Q. And how do you know what that is?

A. Because when it was going on, a lot of the people that I was around was doing it.

Q. Did you ever see Allan doing any EDD fraud?

A. Yes.

Q. Did you know where Allan was from?

A. Yes.

Q. Where's that?

A. San Diego.

Q. Did you ever visit him in San Diego?

A. Yes.

Q. And when you visited him in San Diego, where was he living?

A. In hotels.

Q. Did there come a point in time in 2020 when you went out of the state, out of California with Allan?

A. Yes.

Q. Where did you go?

A. We went to Wisconsin.

1948

Q.   And how did you get there?

A.   In a rental car.

Q.   Was that a car that you rented?

A.   No, Allan's rental car.

Q.   For your -- what was your reason for going on that trip with Allan?

A.   I was just going for the ride there and possibly to visit my grandparents.

Q.   Where did your grandparents live?

A.   They lived in, like, east Illinois.

Q.   Was -- while you were in Wisconsin with Allan, did something of significance happen?

A.   Yes.

Q.   And what's that?

A.   I ended up taking everything that Allan had, his rental car, two pounds of meth, his helmet, a drone, everything that was in his car, and I took it and I left and went to my grandma's.

Q.   And where was Allan when you took all those items?

A.   He was asleep in the hotel room.

Q.   When you say helmet, what type of helmet was that?

A.   It was a motorcycle helmet.

Q.   Why did you take the car and those items?

A.   Because I was, like, struggling, homeless, and on drugs, and it's just something I decided to do to survive.

DX Haley S

1949

Q. Was this around August 25th of 2020?

A. Yes.

Q. After that, did something happen that caused you to get in contact with Justin Gray?

A. Yes.

Q. And after speaking with Justin, did you receive a call or were you put in touch with anybody from the Aryan Brotherhood?

A. Yes, with Frank.

Q. And how did that come about as far as who contacted who?

A. Uh, Frank called me.

Q. And what, if anything, did Frank say when he called you?

A. Uh, that basically, uh, the drugs that I took were -- belonged to the Aryan Brotherhood and that I owed them money for it.

Q. Did he tell you how much money you owed?

A. Like five grand.

Q. At some point -- well, how did that make you feel at that point?

A. I was really worried about it, really scared about it.

Q. Why?

A. Uh, because they're like a -- they're two -- they're men that are, you know, in a gang, and it was scary.

Q. At some point were you able to pay that money?

A. Yes.

Q. And who did you pay that money to?

DX Haley S

1950

A.   To Soldier.

Q.   Was Brandon ever part of that transaction as well?

A.   Yeah, he was with -- he picked me up and brought me to Soldier's house.

Q.   And that's where you paid the $5,000?

A.   Yes.

Q.   After you paid that money, did you have another conversation with Frank?

A.   Yes.

Q.   And what, if anything, did he say at that point?

A.   Uh, there were many conversations with Frank.

Q.   And did he mention anything about paying the money back after you had done so?

A.   Uh, after I had already paid it?

Q.   Yes.

A.   No.

Q.   Did he ever ask you to do anything that might have been unlawful?

A.   Yes.

Q.   What did he ask you to do?

A.   Uh, he asked me to go on Brandon's boat and take belongings of Brandon's.

Q.   At some point in time did you go to Brandon's boat?

A.   Yes.

Q.   And did you take items from that boat?

1951

A.   Yes.

Q.   What were some of those items?

A.   Uh, it was the helmet that I had sold -- Allan's helmet that I had sold to Brandon.  I took -- I stole that back.  And just a bunch of other random items.

Q.   So after you took the vehicle in Wisconsin, you said you went to see your grandparents in Illinois?

A.   Yes.

Q.   When you paid the money back, where were you physically?

A.   In LA.

Q.   And so around what time frame were you back in LA?

A.   It was probably a couple of weeks after the August 25th.

Q.   So in September at some point?

A.   Yes.

Q.   Okay.  And that's in 2020, right?

A.   Yes.

Q.   Okay.  At any point in time did you have a conversation with Frank about Allan in particular?

A.   Yeah.  They said -- he said that Allan -- they were going to kill Allan.

Q.   And did he tell you why?

A.   No.

Q.   At any point in time did you have a conversation with Justin about Allan?

A.   Yeah, he said that he had killed Allan.

1952

MS. DE SALES BARRETT:  Objection, Your Honor.

THE COURT:  One second.

MS. STOKMAN:  I'll move along.  I'll withdraw that question.

THE COURT:  All right.  One second.

The jury is to disregard whatever statement she made as to that question.

Go ahead.

BY MS. STOKMAN:

Q.  After you came back to LA and paid the money in around September of 2020, did you see Allan after that?

A.  No.

Q.  At some point did you learn that Allan had been shot?

A.  Yes.

Q.  After Allan was killed, did Frank ever say anything to you about Allan dying?

A.  He said -- he had once said that they took care of that situation.

Q.  And --

A.  I knew what he was talking about.

Q.  You have a felony conviction for possession of a stolen vehicle; is that right?

A.  Yes.

Q.  Are you getting any benefits to testify here today?

A.  No.

CX Haley DB

1953

Q. You said before that you were using drugs during the time that you took Allan's car. Are you currently using drugs?

A. No. I have two years clean on December 16th.

Q. And what made you decide to get clean?

A. Uh --

MS. DE SALES BARRETT: Objection, Your Honor. Relevance.

THE COURT: Sustained.

MS. STOKMAN: I have no further questions. Thank you.

THE COURT: Cross-examination?

MS. DE SALES BARRETT: Thank you, Your Honor. May I have a moment?

THE COURT: Sure.

CROSS-EXAMINATION

BY MS. DE SALES BARRETT:

Q. Ms. Haley, I'm Jean Barrett, and I represent Mr. Clement.

A. Okay.

Q. Congratulations on your sobriety.

A. Thank you.

Q. You never met the man you referred to as Francis Clement in person; is that right?

A. Correct.

Q. And you only spoke with a person on the phone who identified himself as Frank; is that right?

CX Haley DB

1954

A. Yes.

Q. And you spoke with him -- with this person who identified himself as Frank without ever hearing his last name, his first name --

A. Correct.

Q. -- the full name; is that right?

A. Correct.

Q. So when you testified that you knew Francis Clement, that wasn't really the case, correct?

A. Uh, well --

Q. It's a yes-or-no answer.

A. Yes. I do know him, but --

Q. You know a person on the phone who identified himself as Frank; is that correct?

A. At that time, yes.

Q. Yes.

Uh, you were interviewed about Allan Roshanski's murder for the first time -- or, rather, when you were arrested for burglary in Torrance on December 5th, 2021; is that right?

A. Yes.

Q. And was that a burglary of a house, a car, or what?

A. It was a car.

Q. You eventually pled guilty to stealing that car; is that right?

CX Haley DB

1955

A.   Yes.

Q.   And that's not the first or the last time that you were convicted of stealing cars; is that right?

A.   Yes.

Q.   Now, when you were interviewed that December and asked -- you were asked if you gave Allan Roshanski's number to -- to Sidetrack, meaning Mr. Gray --

A.   Yes.

Q.   -- is that right?

A.   Yes.

Q.   And you lied?  You told them you did not, in December?

A.   Yes.  That is true.

Q.   And also, before that interview, you were interviewed by Agent Gonzalez, I believe in -- over the summer of 2021; is that right?

A.   I can't remember who Gonzalez is.

Q.   Okay.  It's this --

A.   Oh, Anthony, yes.

Q.   Yes, Anthony.

        So when were you interviewed by Agent Gonzalez --

A.   Yes.

Q.   -- for the first time --

A.   Yes.

Q.   -- you were also asked about that --

A.   And -- yes.

1956

Q.  -- is that correct?

A.  Yes.

Q.  And you lied that time too; is that right?

A.  I don't remember that.

Q.  You don't remember lying about giving Allan Roshanski's number to Sidetrack?

A.  No.

Q.  But you remember when you lied to the people who arrested you in Torrance in December?

A.  Yes.

Q.  When you stole Allan's car, in that car was all of his stuff, right?

A.  Yes.

Q.  And you testified on direct examination that it was almost two pounds of meth and electronics; is that right?

A.  Yes.

Q.  And what did you do with that meth?

A.  I sold it.

Q.  What else?

A.  Probably did it.

Q.  Use -- meaning you used the meth?

A.  Yes.

Q.  And then you sold some of the meth and some of the electronics that you found in the car, right?

A.  Yes.

1957

Q.   And that was while you were in Illinois?

A.   Yes.

Q.   You also used a bunch of that meth yourself, and that was because you were a regular meth user then?

A.   Every day, yes.

Q.   Any other drugs during that period of time?

A.   Probably weed.

Q.   Okay.  How about DMT?

A.   Yes.

Q.   And what's DMT?

A.   It's a psychedelic drug.

Q.   And you were under the influence a lot of the time in that period of time, right?

A.   Yes.

Q.   And it makes you screwed up and twisted, I believe?

A.   It could, yeah.

Q.   Can cause hallucinations and paranoia; is that right?

A.   Paranoia.

Q.   Yeah?

A.   Yeah.

Q.   Hallucinations?

A.   Not for me, no.

Q.   Not for you?  DMT hallucinations?

A.   For like 10, 15 minutes.

Q.   Okay.  And -- but, of course, any drug affects your brain

ER 1288

1958

and your memory; is that right?

A.   I'm sure it does, yes.

Q.   During this time in 2020, you had no job, correct?

A.   Correct.

Q.   You bounced around because you were homeless, right?

A.   Correct.

Q.   And the only way to support yourself and your meth habit was committing fraud, theft, forgery, and the like; is that right?

A.   Yes.

Q.   And you bounced in and out of jail during that period of time; is that correct?

A.   Yeah.

        MS. DE SALES BARRETT:  Nothing further, Your Honor.

        THE COURT:  Further cross-examination?

        MS. LUEM:  Just briefly.

                    CROSS-EXAMINATION

BY MS. LUEM:

Q.   Hi, Ms. Haley.  I didn't think I was going to have any questions for you, but I just have a couple.

A.   Okay.

Q.   You said you were aware that Allan was involved in -- in different crimes, including fraud, right?

A.   Yes.

Q.   You were also aware that he was involved in pimping and

CX Haley

1959

sex trafficking?

A.  At the time I was not aware, no.

Q.  You found that out later?

A.  Yes.

MS. STOKMAN:  Objection.

MS. LUEM:  I'm sorry, Judge.  There was an objection. I don't know if the Court --

THE COURT:  Oh, I didn't hear anything.

Who spoke?

MS. STOKMAN:  I objected, but the answer came out.

THE COURT:  All right.

BY MS. LUEM:

Q.  So you did become aware that he was involved in sex trafficking?

A.  Through one of the lawyers, defense, or one of the lawyers that came up and talked to me.

MS. STOKMAN:  I'll object.  Calls for hearsay, and ask to strike all of her answers about his history.

THE COURT:  Sustained.  That will be stricken.

The jury is instructed to disregard that testimony.

BY MS. LUEM:

Q.  So at the time that you were with Allan, you were not aware of his pimping activity?

A.  No.

Q.  You said that, when you were with Allan in -- Wisconsin,

1960

right?

A.  Uh-huh.

Q.  Sorry.  You have to say "yes" or "no."

A.  Yes.

Q.  That you took his car and all of his belongings?

A.  Yes.

Q.  Okay.  You actually -- you stole everything that he had?

A.  Yes.

Q.  And you were never prosecuted for that, were you?

A.  No.

Q.  Uh, Ms. Barrett asked you about different meetings that you had with law enforcement.  Do you recall those questions?

A.  Uh, yes.

Q.  Okay.  So you met with, like, local, maybe Torrance police at one point, right?

A.  I think so.  Or Lomita.

Q.  Or Lomita.  Okay.

A.  Uh-huh.

Q.  And then possibly another local law enforcement agency, a state agency.  Do you recall that?

A.  Possibly.

Q.  Okay.  But eventually, you met with who you referred to as Anthony?

A.  Yes.

Q.  Okay.  And you gave a pretty lengthy statement to Anthony.

1961

Do you recall that?

A.  Yes.

Q.  Okay.  And nowhere in that statement to Anthony do you ever mention the name Kenneth Johnson?

A.  I don't remember if I did or not.  But if I didn't, then I didn't.

Q.  Okay.  Would you like to see a copy of the report?

A.  Not really.

Q.  Okay.  So you -- you never mentioned his name?

A.  Okay.  I don't know.

Q.  Well, I'll show you the report, if that would help refresh your recollection.

A.  Okay.

        MS. LUEM:  May I approach?

        THE COURT:  Yes.

BY MS. LUEM:

Q.  Having reviewed the report that was prepared by --

A.  Yes.

Q.  -- Anthony, you never mentioned the name Kenneth Johnson, did you?

A.  Not that I saw.

        MS. LUEM:  Thank you.  Nothing further.

        THE COURT:  Mr. Reed, any questions?

        MR. REED:  No, Your Honor.

        THE COURT:  Any redirect?

RDX-Haley S

1962

MS. STOKMAN:  Yes, just briefly.

REDIRECT EXAMINATION

BY MS. STOKMAN:

Q.  Ms. Haley, during your initial interview with state detectives that Ms. Barrett was referencing, what did -- what was the lie she was referencing about Allan's phone number? Do you know what she was referring to?

A.  Uh, I remember, when I spoke to the first set of police, that I just -- I didn't want to be, like, involved in anything at all, so I just denied anything, any involvement at all. But when I spoke with Anthony, I don't remember not telling him about me giving Allan's number.  I thought that I did.

Q.  And did you give Allan's number to Justin?

A.  Yes.

Q.  When you spoke with those initial state law enforcement, was that back in -- around 2021, early 2021?

A.  I do not remember.

Q.  When you spoke with Agent Gonzalez, was that at -- towards the end of 2022?  Like, it was a lot -- the question I think I'm asking you is, do you recall speaking with Agent Gonzalez much later in time than that initial --

A.  Yes.

Q.  -- interview?

Speaking of the drug use, did you hallucinate the calls -- about the calls you had with Frank?

RDX-Haley 5

1963

A.  No.

Q.  Did your drug use, then, affect your memory of the events as you are telling them --

A.  No.

Q.  -- on --

Okay.  I have no further questions, thank you.

THE COURT:  Recross.

MS. DE SALES BARRETT:  Nothing, Your Honor.  Thank you.

MS. LUEM:  No.

THE COURT:  All right.  May this witness be excused?

MS. STOKMAN:  Yes.

THE COURT:  All right.  Thank you.  You may step down.

THE WITNESS:  Okay.

THE COURT:  Next witness, please.

MS. STOKMAN:  The government calls Danielle Ponce de Leon.

THE CLERK:  Please raise your right hand.

DANIELLE PONCE DE LEON,

called as a witness on behalf of the Government, having been first duly sworn, testified as follows:

THE WITNESS:  I do.

THE CLERK:  Go ahead and have a seat, and then please state your full name for the record, and then spell your last

1964

name.

THE WITNESS:  My name is Danielle Ponce de Leon, P-o-n-c-e d-e L-e-o-n.

DIRECT EXAMINATION

BY MR. CONOLLY:

Q.  Good morning, Ms. Ponce de Leon.

A.  Hi.  Good morning.

Q.  Can you tell us, please, your current occupation?

A.  I am a crime analyst for the Los Angeles County Sheriff's Department, and I am assigned to homicide bureau.

Q.  And how -- I'm sorry.  Can you give me your job title one more time?

A.  I'm a crime analyst.

Q.  And how long have you been a crime analyst?

A.  I have been a crime analyst for 14 years and assigned to homicide bureau for the last 9.

Q.  Have all 14 years been with the LA County Sheriff's Department?

A.  Yes, that is correct.

Q.  Can you tell us, please, in brief what your duties are as a crime analyst for the homicide bureau?

A.  I provide investigative assistance to detectives for homicide cases or homicide investigations as well as missing person investigations and fugitive apprehension.  I assist them in locating witnesses, locating suspects, uh, identifying

1965

vehicles of interest or any sort of evidence that is related to an investigation.  I do this by using law enforcement databases, as well as social media and cell phone analysis as well.

Q.   And speaking of cell phone analysis, have you received specialized training in the field of historical cell phone activity analysis, cell site analysis and mapping, and location data analysis?

A.   Yes, I have.  I've received over 200 hours of formal classroom training provided to me by federal and state and local law enforcement agencies, as well as experts in the cellular analysis field, and as well from the cell phone carriers themselves.

I regularly attend conferences throughout the country that provide information on cell phone analysis and cloud data as well as -- uh, I continue my education every month listening to a webinar or something on the internet discussing cell phone analysis.

Q.   And on approximately how many cases have you done an analysis of cell phone records, cell site analysis and mapping, and location data analysis in mapping?

A.   Over the last nine years, it's been about 900 to a thousand cases, not only assisting agencies within the Los Angeles County Sheriff's Department, but also assisting others in the area as well, local law enforcement as well.

DX - Ponce de Leon G

1966

Q.   And have you testified before as an expert in this -- in these areas?

A.   Yes, I have.

Q.   Approximately how many times?

A.   41 times.

Q.   And do you teach or provide training in this area?

A.   I do.  I provide cell phone analysis training to crime analysts, detectives, and prosecutors as well.  I have an eight-hour training class that I provide on cell phone analysis, as well as an eight-hour training class that my partner and I teach on Google location data.  I also regularly teach at conferences, talking about Google location data as well as cell phone analysis.

Q.   And are you part of any professional organizations?

A.   I am.  I am a member of the Scientific Working Group of Digital Evidence.  This group is made up of experts in the digital forensic field, not only in law enforcement, but the members are also in the private sector and academia as well. And we provide or author consensus-based papers that are used in the digital forensic field, not only in America, but across the world.

Q.   And typically, what types of data -- and just in brief, what types of data or information can be derived from a typical cell phone?

A.   So on a cell phone you can get data from several different

DX Ponce de Leon G

1967

places.  There's data that you can receive from the cellular network.  Traditionally, that's going to be T-Mobile, Verizon, or AT&T.  So that's network usage, so you can see calls and text that are going back and forth and that are kept on the cell phone network.

You can also get from a cell phone cloud data, which is going to be information that is on a device that is then sent to a cloud service, like Google or like iCloud, so there's information that you can get from those cloud services.

You can also get information from a device itself or low -- data from the device itself.  So if you have the actual device, it can be acquired and data can actually be deemed -- or taken from the device itself.

Q.  And when -- those first two categories of data that you gave us, can those be acquired if you don't have the device itself?

A.  Yes, that is correct.

Q.  And because they are -- if I have this correct, they are acquired from the network where the carrier is at, correct?

A.  Yes, either the network or the carrier or the cloud service that has the data.

Q.  And what might you use location analysis for in a case, just briefly?

A.  It can be used to locate any persons of interest or any

1968

devices of interest that are associated to a case.

Q. And that would include not only suspects presumably, but also missing persons?

A. Yes. Missing persons is something that I use this kind of data for very often.

Q. And so based on your training and experience in this area, is -- is cellular telephone -- cellular telephone records analysis a reliable science?

A. Yes. They are reliable. They are kept by the cell phone companies for billing purposes. So it is reliable for their purposes to be able to bill their customers. But they are also mandated by the law to maintain and keep those records.

Q. And are these systems, by the way, also used to run as part of the 911 system?

A. Yes, that's correct.

Q. And so therefore time and accuracy would also be important there?

A. Yes, that's correct.

Q. And based on your training and experience, is typical GPS data, as relates to cell phones, is that reliable as well?

A. Uh, GPS data is reliable. It is what gets us from point A to point B in a fashion so that we don't get lost when we're going from point A to point B.

MR. CONOLLY: Your Honor, at this time the government would offer Analyst Danielle Ponce de Leon as an expert in

1969

cell phone activity analysis, cell site analysis and mapping, and location data analysis and mapping.

THE COURT:  Any objections?

MS. DE SALES BARRETT:  No, Your Honor.

MR. VILLA:  No, Your Honor.

MR. REED:  No objection, Your Honor.

THE COURT:  All right.  I'll accept her for those -- for her expertise in those areas.

Go ahead.

BY MR. CONOLLY:

Q.  So turning to this case, in 2020 were you asked to assist the LA County Sheriff's Department with the investigation of a double homicide in Lomita?

A.  Yes, that's correct.

Q.  And as part of that, did they ask you to do a cell site analysis for cell phones identified in that case?

A.  Yes.

Q.  So briefly please explain what historic cell phone activity analysis and cell site analysis and mapping are?

A.  So cell phone and cell site analysis is a historic look at a user's data or a user's account to see who a -- or what a device -- or who a device was in contact with at a certain time period, who are they calling back and forth.  And not only who they were calling, but what cell phone towers were being utilized during that time period.

DX Ponce de Leon G

1970

We are then able to estimate a device's location based off of those transactions and the cell sites that were used during that time period.

Q.  I think you've answered my next question.

Can you briefly explain how a cell phone -- you mentioned cell tower -- the cell towers used in the course of cell phone activity are logged as part of the call detail records; is that correct?

A.  Yes, that's correct.

Q.  So can you briefly explain how a cell phone engages a cell site or a cell tower -- and if you can explain the difference, that would be great -- when it makes and receives phone calls?

A.  So when a phone is turned on and connected to the cellular network, the device is always looking for which tower is the strongest, what cell site is the strongest, in case it needs to make or receive a phone call or a text message.

So when a cell phone is receiving that phone call, it knows to connect to the tower with the strongest signal. Generally speaking, that cell site is going to be the tower or the cell site that it's closest to, but not always necessarily is it the tower that -- or the cell site that it's closest to.

Sometimes there can be inferences that would -- that would make the phone use a cell site that is farther away from that, whether you have obstructions like a large building or you have terrain, if you're on top of a mountain, but in a --

1971

in a condensed urban area, it's more than likely going to be using a cell site that it's closest to.

Now, the difference between a cell site and a cell tower is going to be that the tower is where the antenna is going to be placed upon.

So if you have driven down the freeway and you've seen these large cell phone towers and all around them they're going to have these little antennas or little kind of triangle or rectangle boxes on them, those are going to the cell sites. So a device is going to be using that antennae to make and receive those transactions.

Q.   And do -- does the cellular network log these connections every time a call is made?

A.   Yes, they will -- they will log the first tower that is utilized during that connection.

Q.   And were you provided by the sheriff's department call detail records to do the analysis they were asking you to do?

A.   Yes.

Q.   For how many cell phones were you given the call detail records?

A.   Two.

Q.   And I believe you've already covered this, but just in very brief, the call detail records would include the time and date of the connection; is that the case?

A.   Yes, that's correct.

1972

Q.   The duration?

A.   The duration, yes.

Q.   The cell tower and cell site.

Anything else that I'm missing?

A.   And it is going to provide the -- who was calling.  So the back and forth, who was making the call, who was receiving the call.

You're also going to see the direction that that antenna is facing.  So not only are you going to see the tower that was being used and the antenna that was being used, but which direction that antenna is going to be facing.

MR. CONOLLY:  Your Honor, may I approach?

THE COURT:  Yes.

BY MR. CONOLLY:

Q.   I have just handed you a small group of CDs that we will go through throughout this, but in the immediate term, can you please look at CD marked Exhibit 1845.

A.   Yes.

Q.   Can you tell us, please, have you reviewed that CD?

A.   Yes, I have.

Q.   Can you tell us, please, what is -- is on it?

A.   These are going to be the call detail records for the phone number (424) 224-1216 and the phone number (442) 303-8888.

Q.   And those were the two phone numbers that you were asked

DX Ponce de Leon G

1973

to do an analysis for?

A.  Yes, that's correct.

Q.  And did you have a chance to sign and date that CD after you reviewed its contents?

A.  Yes, I did.

MR. CONOLLY:  Okay.  Your Honor, at this point we would move Exhibit 1845 into evidence.

THE COURT:  Any objections?

MS. DE SALES BARRETT:  No, Your Honor.

MR. VILLA:  No, Your Honor.

BY MR. CONOLLY:

Q.  So for your analysis, were you given --

THE COURT:  One second.  Mr. Conolly, I'm sorry, I didn't hear -- Mr. Reed, did you say --

MR. REED:  I said no objection, Your Honor, I'm sorry.

THE COURT:  All right.  That will be admitted.

MR. CONOLLY:  My apologies.

(Government's Exhibit 1845 was received.)

BY MR. CONOLLY:

Q.  Were you given a specific time window of call detail records and cell site activity to analyze?

A.  Yes.

Q.  What was that time and date?

A.  That was going to be October 3rd, at 6:00 p.m., of 2020 to

DX Ponce de Leon G

1974

October 4th of 2020.

Q.   Okay.  And were you also given certain relevant locations for your analysis?

A.   Yes, I was.

Q.   What were those?

A.   Those were going to be 2121 255th Street in the City of Lomita.

Q.   What was your understanding of what was the significance of that location?

A.   That was going to be the location of the double homicide in the City of Lomita.

Q.   And that was on -- on or about October 3rd, 2020?

A.   I believe it happened October 4th.

Q.   Okay.  Right.  So -- yes.

     So it was within the time that you were analyzing the --

A.   Yes, that's correct.

Q.   Okay.  And did you generate a report -- you generated a report from that, correct?

A.   Yes, that's correct.

Q.   And at high level, how do you use those call detail records to generate the actual report?

A.   So what I do is when I get the call detail records either from the cell phone companies themselves or I will be provided to them -- or provided with them by -- by the detectives, I

1975

look to make sure -- I review the records to make sure they are complete in order for me to be able to map these records in my mapping software.

So once I see that they are complete, I will then ingest them into my mapping software.  And what my mapping software does is it takes thousands and thousands of lines of Excel with latitude and longitudes and all kinds of data and it puts it into an illustration so that I can easily see what cell phones towers were being utilized at certain times and then who the transactions -- who those phone calls were to.

Q.   And as part of this, do you also have a map of the -- the actual cell phones towers from the cell phone provider as well?

A.   Yes.  So what I also am provided with is a cell site list, which is going to be all the cell phone towers by a specific carrier in the area, whether they were used in these records or not.

So I like to look at those to see which device -- or which cell phone towers are in the area as well.

Q.   And do you have a way of -- well, if you have any other ways of verifying where those towers or cell sites are, can you explain that?

A.   So what I will do is for every phone call or every tower that -- or cell site that is utilized during the time period that I look at, I will go onto Google Earth and look at about

DX Ponce de Leon G

1976

the time frame of the incident that I am reviewing or analyzing and verify to make sure that there is an actual cell cite at that location.

Unfortunately, I can't physically go to each location, but I can go to the street view or to the satellite view on Google Maps and look at the latitude and longitude provided and to verify that an actual cell site is at that location.

Q.  Can I please have you look -- and I believe it's in Binder 2 of 2 -- at Exhibit 1432.

A.  Can you say that one more time, what number?

Q.  1432.

A.  Sorry, there's a lot of pages in here.

Q.  My apologies for asking you to find an exhibit towards the back.

A.  That's okay.

Yes.

MR. CONOLLY:  So -- and can we have, for the witness, also on the screen, please, Exhibit 1432.  Sorry.  I should have asked for that earlier.

BY MR. CONOLLY:

Q.  Do you recognize what we're looking -- what you can see on your screen there?

A.  Yes.

Q.  Can you tell us, please, what it is?

1977

A.   That is the analysis that I created for the time period of October 3rd to October 4th of 2020 for the two phone numbers (442) 303-8888 and (424) 224-1216.

MR. CONOLLY:  Your Honor, I would, at this time, move Ms. Ponce de Leon's report in -- Exhibit 1432 into evidence.

THE COURT:  Any objections?

MS. DE SALES BARRETT:  No, Your Honor.

MR. REED:  No, Your Honor.

MR. VILLA:  No, Your Honor.

THE COURT:  It will be admitted.

(Government's Exhibit 1432 was received.)

MR. CONOLLY:  And if we could please have page 2.

And, Your Honor, I would just sort of make a blanket request to publish to the jury --

THE COURT:  Yes.

MR. CONOLLY:  -- the entire report.  Thank you.

BY MR. CONOLLY:

Q.   So I see at the top of this page it says "Cell Tower and Sector Illustration."  Can you please briefly explain what we are seeing here and what it means?

A.   So this is an illustration of what you're going to see in my report.  On the left-hand side is going to be an illustration of when a multi-cited cell phone tower is going to be looked like -- or when it's being used, what it will look like in my report.

1978

So what you're seeing at the bottom of that pie wedge -- I'm going to refer to it as a pie wedge -- at the bottom there there's going to be a little orange circle. That's going to be the cell phone tower that was being utilized at that time.  So that's going to be illustrated there with that little pie wedge.

The little diamond -- baseball diamond-shaped shaded area is going to simply be an illustration to demonstrate which direction that antenna was facing when that cell site was being used.

In no way is this indicative of any sort of coverage area.  It is simply an illustration to show that this is the direction that that antenna is facing.

You're also going to see that there -- it's kind of hard to see here, but there's little orange circles that surround that pie wedge.  Those orange circles are going to be the cell sites that are around the location that are not being utilized at that time.

In my presentation, those circles are going to be a little bit bigger, so they'll be easier to see, but that is something that you should be aware of in the presentation when I show that.  That's what that means.

Uh, on the right-hand side is going to be what is an omnidirectional tower, what it's going to look like in my presentation.  Now, what an omnidirectional tower is is it is

1979

a cell site that is providing signal for 360 degrees around.

So traditionally an antenna is only going to provide signal in a certain direction, and that signal is going to face outwards.  With an omnidirectional tower, that tower is going to be providing signal 360 degrees, so that's represented here by that circle.

Usually those towers are going to be like a fill-in tower where the company has -- sees that there are dropped calls or their customers are not getting service in a certain area.  So they'll place these smaller cell sites that provide that 360 degrees in that area to kind of fill in for those gaps of service.

Q.  And do these --

THE COURT:  Mr. Conolly, I'm sorry, let me go ahead and interrupt.  We're going to go ahead and take a break until 9:25.

Ladies and gentlemen, I haven't said this to you yet today, so please don't form any opinions about this case, please don't discuss the case, and please don't do any independent research.

Again, about ten -- a little bit more than ten minutes.

(Jury exits the courtroom at 9:14 a.m.)

THE COURT:  All right.  Let's go ahead and let everyone take a break.

1980

(Recess held.)

THE COURT:  All right.  Anything to discuss before we bring in the jury?

MR. VILLA:  No, Judge.

MS. DE SALES BARRETT:  No, Your Honor.

THE COURT:  All right.  Let's go ahead and do that.

(Jury enters the courtroom at 9:28 a.m.)

THE COURT:  All right.  We' have all the jurors back in their places.

Mr. Conolly, you may continue.

MR. CONOLLY:  So if we could please have up on the screen Exhibit 1432.  I believe we're on page 2.

BY MR. CONOLLY:

Q.  Just one last question about this page.  Can you tell from using call detail records and cell site analysis the actual distance from the tower to the device?

A.  Not with call detail records, no.

Q.  And so location is, then, you would -- you would approximate it from the towers that it is connecting to at a certain time?

Sorry.  Its approximate location, you would estimate that from tower -- towers it is connecting to at a -- at a certain time?

A.  Yes, that's correct.  I am able to provide a general location of a device based on those towers that were utilized

DX Ponce de Leon G

1981

at the time.

Q.  So turning to your analysis here --

MR. CONOLLY:  If we could please have page 3 on the screen.

BY MR. CONOLLY:

Q.  Okay.  So I see a phone number at the top.  Was that the -- that's the first number that you've analyzed in your report?

A.  Yes, that's correct.

Q.  That's the (442) 303-8888 number?

A.  Yes, that's correct.

Q.  And from your understanding, who did this -- who did this phone belong to?

A.  It was my understanding -- the detectives told me that this phone belonged to one of the victims, Roshanski.

Q.  And what -- so what does this slide show us?

A.  So what this slide is showing us is several cell phone calls that are occurring on October 3rd of 2020 for the time period of 7:49 to 8:01.  You'll see that information up at the top of this slide.

And you're going to see several phone calls in the callout box here at the bottom.  Phone calls that are -- that are occurring and then who the phone calls are to.

And then you're going to see the illustration of the cell phone tower that was utilized and the direction that that

DX Ponce de Leon G

1982

antenna was facing.

And on the photo, you're also -- or on the exhibit, you're going to see these orange circles.  Those are going to be the cell phone -- the cell sites in the area that were utilized during that time period -- or that were not utilized during that time period.

Q.  Using the touchscreen there, can you please circle one of the circles that you've just been referring to?

A.  (Witness complies.)  The orange circles there are going to be the cell sites that were not utilized.

And then here (indicating) is going to be the cell phone tower that was utilized -- or the cell site that was utilized when those four phone calls were made during that time period.

Q.  Okay.  And where does -- where does this show us on the map where -- where the device was connecting to a tower?

A.  Uh, the cell site is going to be located in the San Diego area.

Q.  And as your analysis progressed, did -- did that device appear to remain in the San Diego area?

A.  Yes.  The device, yes.

MR CONOLLY:  So if you could -- if we could please take a look at pages 4 -- well, page 4 we'll start with.

BY MR. CONOLLY:

Q.  So that was a call around 8:17 -- or at 8:17?

1983

A.  At 8:17, yes.

MR. CONOLLY:  And then page 5, please.

BY MR. CONOLLY:

Q.  All right.  So this is page 5.  I believe this is a call at 8:29 that shows it's still in the San Diego area; is that right?

A.  Yes, that's correct.

Q.  And then skipping ahead, according to your analysis, when was the last connection in the San Diego area?

A.  The last connection in the San Diego area is going to be at 9:16 p.m., on page 7.

MR. CONOLLY:  If we could have page 7, please.

BY MR. CONOLLY:

Q.  So that was a phone call made at 9:16, connects to a tower in the San Diego area?

A.  Yes, that's correct.

Q.  Okay.  And when is the next recorded connection?

A.  The next recorded connection is going to be at 11:20 p.m. when the device is utilizing a cell site in the Hollywood area.

MR. CONOLLY:  If we could have page 8, please.

BY MR. CONOLLY:

Q.  Is this the slide that shows that?

A.  Yes.  At 11:20 p.m., this is a phone call that is connecting to a cell site in the Hollywood area in the

1984

City of Los Angeles.

Q.  So the phone appears to have -- or the device appears to have moved from San Diego to LA?

A.  Yes, that's correct.

Q.  Is it likely that there was an attempted connection made from San Diego and it reached a tower all the way up in Los Angeles?

A.  No, that's not -- no.

Q.  And is that because there are many towers in between?

A.  Yes, that's correct.

        MR. CONOLLY:  So if we can also move on now to Slide 9 -- or page 9.

BY MR. CONOLLY:

Q.  This reflects a time stamp of 11:45 when it appears to have made a connection.  Can you tell us where this is?

A.  This is in the Downtown Los Angeles area.  So during this phone call, the device was using a cell site in the Downtown Los Angeles area.

Q.  And I see many of the orange dots that you described as towers that were not connecting to the device at that time. Fair to say there's -- it's a fairly densely covered area?

A.  Yes, that's correct.

Q.  And so after 11:45, where is the next -- where are the next connections made?

A.  The next connection is going to be made at 12:22 a.m. on

DX Ponce de Leon G

1985

October 4th of 2020.  And that device is utilizing a tower in the City of Lomita.

MR. CONOLLY:  Okay.  Could we have page 10 on the screen, please.

BY MR. CONOLLY:

Q.  Now, you had mentioned an address of interest that you were given as the homicide scene.  Do you see that on this slide here?

A.  Yes, I do.

Q.  Can you circle it, please?

A.  Yes.  (Witness complies.)

MR. CONOLLY:  So I'd like the record to reflect that the witness has circled a -- a red pin in the middle of the page denoting an address of 2121 255th Street in Lomita.

BY MR. CONOLLY:

Q.  Can you tell us, please, what this page is telling us about the location and call activity of that device?

A.  There are three outgoing phone calls that this device is making to the phone number (424) 224-1216.  And both -- during each three of those outgoing phone calls, the device is utilizing a tower in the area of 2121 255th Street, Lomita.

Q.  Now, does the inclusion of two towers, apparently, in this -- on this page, does it reflect movement?

A.  Uh, it could reflect movement, but because there are no other cell sites in between, uh, the two cell sites and

DX Ponce de Leon G

1986

2121 255th Street, it could be that the device is staying still as well.  It just depends.

Q.  And so between 12:20 and 12:50, the device makes three calls to (424) 224-1216; is that correct?

A.  Yes, that's correct.

Q.  What call activity did you see on this phone after 12:48?

A.  Uh, there is no other connection to the cell phone network again.  After 12:48, that's the last connection that this device has any transactions that connect to the cellular network.

Q.  So you had mentioned that you analyzed the cell phone records and cell phone activity of another phone in this case. Can you tell us, please, what was the phone number for that other device?

A.  It is (424) 224-1216.

Q.  So that's the phone number that the first device had tried to contact between the hours I mentioned, 12:20 and 12:50?

A.  Yes, that's correct.

Q.  And did you have a chance to review the subscriber records for this second phone number?

A.  Yes.

        MR. CONOLLY:  Can we have page 11 on the screen, please.

BY MR. CONOLLY:

Q.  And who does it indicate is the subscriber for this phone?

DX Ponce de Leon G

1987

A.   The subscriber name is Justin Gray.

Q.   And when you did your -- your analysis for this phone, what time frame did you look for?

A.   Uh, as far as how long the search warrant was written for, or what did I look --

Q.   What -- what did you incorporate into your report?

A.   I looked at the data from October 3rd of 2020, at 6:00 p.m., to October 4th, 2020.

Q.   Okay.  And what did you -- what did you find as far as where that device was connecting to towers?

A.   During that time period, October 3rd of 2020, at 6:00 p.m. -- or 6:01 p.m. to October 4th of 2021, at 12:24 a.m., the device was utilizing a tower in the City of Lomita.

        MR. CONOLLY:  And if we could have page 12 on the screen, please.

BY MR. CONOLLY:

Q.   So does this page show that tower in the City of Lomita?

A.   Yes, that's correct.

Q.   So for that time of 6:00 p.m. to 12:24 a.m., that is the only tower that the -- that that device connects to?

A.   Yes, that's correct.

Q.   And can you, please, also once again circle for us that address of 2121 255th Street?

A.   (Witness complies.)

Q.   Thank you.

DX - Ponce de Leon G

1988

MR. CONOLLY: I'd like the record to reflect that the witness has circled the address again.

BY MR. CONOLLY:

Q. In the callout box on the upper right of this page, do you see a log of phone calls from -- sorry. Do you see a log of phone calls?

A. Yes.

Q. Do you see in that -- in that box, calls from the number we were just discussing, the one belonging to the victim?

A. Yes.

Q. Can you just underline those, please, on the screen?

A. (Witness complies.) This call at 7:02 is an outgoing call, 7:02 p.m. 9:16 is another outgoing phone call. And then these are two incoming phone calls.

Q. Okay. Two incoming phone calls you mentioned at the end there with the time stamps 12:22 and 12:24, correct?

A. Yes, that's correct.

Q. And it says at the end of those two lines "VM." What does that indicate to you?

A. That indicates that the -- the call was routed to voicemail, so it was routing to a voicemail number, and that's indicative on the call detail records.

Q. And then the 702 and 916 phone numbers that you had indicated, I see a duration there of zero seconds. What does that tell you?

DX Ponce de Leon G

1989

A. That shows, to me, that there was no duration to that phone call.

Q. And for the last telephone number we had seen one more call at 12:48 to the second phone number. I don't see that here on this log. Why would it not be there?

A. Uh, the call at 12:48 a.m. did not connect to the network on the 1216 number, which means it went directly to voicemail, which means that the device was not on the cellular network. After 12:24 a.m., the device never connected with the cell phone network again.

Q. And that was -- this 1216 number we're looking at here was not on the cell phone network for that 12:48 call?

A. Yes, that is correct.

        MR. CONOLLY:  Thank you very much.

        Moving -- if we can take that down, please.

BY MR. CONOLLY:

Q. Turning your attention to a case that occurred in Pomona, at some point were you asked to do a location analysis for a double homicide in Pomona?

A. Yes, I was.

Q. Who asked you do that?

A. Detectives from the Pomona Police Department.

Q. What was your understanding of the case, in just very brief terms?

A. That there was a double homicide that had occurred on

1990

Ridgeway Street in the City of Pomona that was just south of -- of Valley Boulevard.

Q.   And were you given an estimated date and time that that had occurred?

A.   Yes, I was.

Q.   And were you given any locations of interest in that case to include in your analysis?

A.   Yes, I was.

Q.   And what -- what were those?

A.   Uh, 16206 Bellflower Boulevard in the City of Bellflower, and also 4662 Palo Verde Drive in the City of Lakewood.

Q.   Were you given any locations in the City of Pomona?

A.   Yes, I was.

Q.   And what were those?

A.   That was on Ridgeway Street just south of Valley but north of Mount Vernon Street in the City of Pomona.

Q.   And -- pardon me.  As part of this, were you asked to do location analysis for cellular devices?

A.   Yes, I was.

Q.   How many?

A.   Uh, two cellular devices.

Q.   And we'll get into this a little bit later, but did you also do a Google location history analysis?

A.   Yes, I did.

Q.   For how many Google accounts?

1991

A.  For two different Google accounts.

Q.  Now, in a moment I will get into those analyses, but in the meantime, did you generate a report from what we just discussed?

A.  Yes.

MR. CONOLLY:  If we can have, please, for the witness on the screen Exhibit 1434.

BY MR. CONOLLY:

Q.  Showing you a first page here, do you recognize this document?

A.  Yes, I do.

Q.  Can you tell us, please, what it is?

A.  Uh, this is a document that I had created for the two phone numbers, (310) 261-1091 and (747) 786-8909, and also for two Google accounts, lasleyshawn7@gmail.com and also monster14882316@gmail.com.

MR. CONOLLY:  Your Honor, at this time, I would seek to have Exhibit 1434 admitted into evidence and published for the jury.

THE COURT:  Any objections?

MS. DE SALES BARRETT:  No, Your Honor.

MR. VILLA:  No, Your Honor.

MR. REED:  No, Your Honor.

MR. CONOLLY:  If we can have that up on the screen, please.

1992

THE COURT:  That will be admitted.

(Government's Exhibit 1434 was received.)

BY MR. CONOLLY:

Q.  Can you tell us, please, for what date or what time window you did your analysis?

A.  I did the analysis on March 8th of 2022, from 6:00 p.m. that evening to 11:59 p.m. on March 8th of 2022.

Q.  And was that window based on the time window that the -- that the detectives from Pomona had given you?

A.  Yes, that is correct.

Q.  Okay.  In the analysis of the two cell phones, did you do a cell site analysis using call detail records like we just discussed with the incident in Lomita?

A.  Yes.

Q.  Did you also do a location analysis using another kind of data?

A.  Yes, I did.

Q.  What kind of data is that?

A.  That's going to be timing advance data.

Q.  Can you briefly explain to the jury, please, what timing advance data is?

A.  Timing advance data is going to be engineering data that the cell phone company collects on users or on a device in order to maintain or properly function their network.  This is not based off of actual phone calls or text messages.  Like

DX Ponce de Leon G

1993

the call detail records are going to be billable usage events, these are going to be engineering events. So what this is going to do is help them optimize their network, make sure there's no dropped calls in their -- for their network.

Q. And what is the practical effect of what this data is trying to find out?

A. So they are trying to find out how far the device is from a cell phone tower. The farther away a device is going to be from a cell phone tower, they need to send that signal faster to the device. So what they do is they send a signal from the phone to the device, then the device sends that signal back to the cell phone tower, and then they are then able to estimate how far away that device is going to be from the cell phone tower.

Q. Sorry, you said they send a signal from the phone to the device. You mean from the tower to the device?

A. I apologize, from the cell phone tower to the device and then the device back to the cell site.

Q. And are multiple towers doing this at the same time for any given device?

A. It could be. There could be one cell phone tower being utilized or there could be registers from several cell sites.

Q. And did you receive this sort of data from -- for these two phone numbers that we have mentioned?

A. Yes, I did.

ER 1324

DX Ponce de Leon G

1994

**Q.** If you could please -- and you received call detail records as well?

**A.** Yes, I did.

**Q.** If you could, please, look at Exhibits 1850 and 1852 in that stack of CDs that I had handed you earlier.

**A.** 1850, yes.

**Q.** Have you had a chance to review the contents of those CDs?

**A.** Yes, I have.

**Q.** And so for 1850, can you tell us -- and did you sign and date those CDs?

**A.** Yes, I did.

**Q.** Can you tell us, please, what is on Exhibit 1850?

**A.** These are going to the call detail records for the phone number (310) 261-1091.

**Q.** And does that include the timing advance data as well?

**A.** Yes, yes.

**Q.** Okay. And on 1852, please?

**A.** Uh, that's going to be the call detail records and timing advance records for the phone number (747) 786-8909.

MR. CONOLLY: Your Honor, at this time, the government would move Exhibits 1850 and 1852 into evidence.

THE COURT: Any objections?

MS. DE SALES BARRETT: No, Your Honor.

MR. VILLA: No, Your Honor.

MR. REED: No, Your Honor.

DX Ronce de Leon G

1995

THE COURT:  Those will be admitted.

(Government's Exhibits 1850 and 1852 were received.)

BY MR. CONOLLY:

Q.  So you indicated that timing advance data -- can you tell us, please, again -- I'm sorry -- what -- what information it captures?

A.  So what it's going to capture is the date and time of the register.  It's going to provide you the cell phone tower that was being utilized and the cell site that was being utilized as well.  But what it also is going to give you is the distance from tower estimate.  So they are going to tell you in miles if it's 1.12 miles away or .19 miles away, but that information is going to be in the timing advance records.

Q.  And if you have more than one tower interacting with a device, does that make it easier to, sort of, more closely pinpoint where the device might be?

A.  I can -- when you're having two registers from two different tours that are occurring within a relatively short period of time, yes, it can help or give a more precise location of where the device could be.

Q.  Perhaps a -- an illustration might be -- might be useful.

MR. CONOLLY:  If we can have, please, page 3 on the screen.  I'm sorry.  Page 4.

BY MR. CONOLLY:

Q.  So can you explain briefly how the timing advance data

1996

system works in terms of what we see here on the screen?

A.  So what you're going to see is the -- the tower that was utilized, that's going to be in the orange circle, and you're going to know from the timing advance records which direction that antenna was facing.  And then that distance arc is going to illustrate how far away that device is going to be from the tower.  So that is then illustrated by that large distance arc.

If you have registers from two different towers, you're going to see that as well.  You're going to see another tower and the direction that antenna is facing and the distance estimate.  If those two registers occur within a short period of time, uh, more than likely the device is going to be in the area where those two registers overlap.

Q.  And I'm circling on the screen an area where two arcs intersect.  Is that the area you were just talking about?

A.  Yes.  So it takes an area that is very large that the cell phone towers can be covering and it kind of narrows it down to a more precise location where it can be at, not an exact location but a more smaller general area where the device can be located.

MR. CONOLLY:  If we can please have page 9 up on the screen.

BY MR. CONOLLY:

Q.  I should ask, have you found this -- the timing advance

1997

data, as you've used it in your investigations, to be reliable?

A.   Yes, I have.

Q.   Okay.  And so here on page 9, is this the beginning of your timing advance analysis for this phone (310) 261-1091?

A.   Yes.

Q.   Okay.  Where does this -- where does your analysis indicate that the -- that device is here at 6:28 p.m.?

A.   It's going to be in the Inglewood area, the City of Inglewood.

        MR. CONOLLY:  And page 10, please.

BY MR. CONOLLY:

Q.   So from the time stamp on, it looks like we moved forward approximately an hour.  Where -- where is the data indicating the device is now?

A.   During this time period, the device is going to be in the area of 16206 Bellflower Boulevard.

Q.   And what is located there?

A.   That's going to be the Starlite Motel.

Q.   And approximately how long does that device stay in that area?

A.   That device stays in that area until -- 8:09 is the last register at that location, and then at 8:21 the device appears to move away from that location.

        MR. CONOLLY:  Okay.  If we can have page 11, please.

DX Ponce de Leon G

1998

BY MR. CONOLLY:

**Q.** And so based on this page of your report, can you tell us, please, where the device has moved to and when it's there?

**A.** Uh, the device then travels away from the City of Bellflower and then south on the 605 Freeway, towards the Lakewood area, towards the area of 4662 Palo Verde in the City of Lakewood.

**Q.** And that was one of those points of interest that you had been given by the detectives?

**A.** Yes, that's correct.

**Q.** And how long did the device appear to remain in that area?

**A.** Uh, that device remains in that area until 8:58 p.m.

MR. CONOLLY:  Okay.  If we could have page 12, please.

BY MR. CONOLLY:

**Q.** And is that what this slide represents?

**A.** Yes.

**Q.** So it appears to be staying in the same place or around the same area from 8:36 p.m. until 8:58 p.m.?

**A.** Yes, that's correct.

MR. CONOLLY:  And then Slide 13, please.

BY MR. CONOLLY:

**Q.** Where does this show us the device is now moved to?

**A.** The device then utilizes -- or at 9:25 p.m. then there are more timing advance registers back in this area of

1999

16206 Bellflower Boulevard by the Starlite Motel.

Q.  So the device appears to have moved back towards the area of the hotel?

A.  Yes.

Q.  Okay.  And are there -- is there any other information from the timing advance records after that point?

A.  No, there's not.  There is no more timing advance until March 9th of 2020 at 1:13 a.m.

Q.  And that's the following morning?

A.  That's the following morning, yes.

Q.  And so as far as timing advance data is concerned, the device is silent?  Or how would you describe that?

A.  There's just an absence of timing advance data.  Yeah, just an absence of timing advance data.

Q.  For approximately four hours; is that correct?

A.  Yes, that's correct.

Q.  So shifting gears one more time to Google location history, do you -- you do analyze data from other sources like Google location history?

A.  Yes, I do.

Q.  Can you please explain what Google location history is?

A.  Google location history is an account setting on a Google account, and what it does is it collects location data of a -- of a device for the timeline feature of a Google account.

          So this allows users of that specific Google account

2000

to be able to look back at where they have gone and routes that they have traveled.  Yes.

Q.   Okay.  And -- and you may have said this already, but typically, what information is provided by Google?

A.   So what Google will do, if there is Google location history within a user's device, when a search warrant is authored and provided to us, you're going to get a date and time of a certain register, you're going to get the latitude and longitude of that register, you're going to get what is called an accuracy radius in meters, and that's going to tell you that within three meters or within a hundred meters that this device could be located, and you are also going to get how this Google location data was sourced, which means this is how Google was able to estimate this device, was it based off of GPS, was it based off of Wi-Fis in the area, or cell sites -- or cellular service that are in the area.

You're also going to get which device was collecting this location history at that specific time.

Q.   And I believe I asked you this at the beginning, but do you -- do you find in your -- in your training and in your experience that this -- this data from Google is reliable?

A.   Yes, I have.

Q.   And do you use it regularly in your job?

A.   Yes, I do.

Q.   And were you provided Google location history in this

DX Ponce de Leon G

2001

case?

A.  Yes, I was.

Q.  And was that for the homicides in Pomona that we referred to earlier?

A.  Yes, that's correct.

Q.  And how do you identify which Google accounts you would like to request location information for?

A.  Uh --

Q.  Well, I'll back up.

In a case like this, how were you able to identify Google accounts to request location information?

A.  Uh, detectives initially -- Pomona detectives have written a Google geofence warrant for the location of their murder.

Q.  And in brief, can you explain what a geofence is and how it works?

A.  So what a Google geofence warrant is requesting -- or providing Google with a geographic location and a date and time period and requesting that they provide all devices that are collecting Google location history within that specific geographic area.

So they will provide us those results in an anonymized fashion and then -- and we get those results back.

Q.  And then at some point were you able to identify -- you said in an anonymized fashion.

At some point were you able to identify any Google

2002

accounts that matched the geofence criteria that you were -- that the detectives were using?

A.  Yes, I was able to identify two devices of interest that fit -- fit the fact pattern of this case.

Q.  So you used the fact pattern of the case to weed out Google accounts that might not be relevant to this case?

A.  Yes, that's correct.

Q.  And you did that here?

A.  Yes, I did.

Q.  And you narrowed it down to how many Google accounts?

A.  There were four devices that returned in the geofence warrant and I was able to narrow those down to two.

Q.  And so through warrants and Google returns to those warrants, did you receive location data for those two accounts?

A.  Yes, I did.

Q.  And how are typically Google accounts associated to devices or how are they connected to devices?

A.  Users can log into Google accounts.  If you have an Android device, a Google account is required to be able to use that smart phone or that Android device and able to use those services.  And so users have to log in with a Gmail account.

Gmail accounts or Google accounts cannot -- they're not associated just to one device.  Those Google accounts can be logged into several devices as well.

DX Ponce de Leon G

2003

Q.   So if a user has multiple devices, they can log into their single Gmail -- or, sorry, Google account from any number of devices?

A.   Yes, that's correct.

Q.   Okay.  So if someone has a burner phone, a phone that is not subscribed in their own name, can Google still collect location information from that device?

A.   They can if the user has logged in to that device using a Gmail account and also has opted in for Google to collect location history and also store it on their servers.

Q.   And you mentioned Android phones.  Is it required with Androids that you log in with a Google account?

A.   Yes, that's correct.

Q.   In those CDs that I handed you earlier are Exhibits 1847 and 1849.

A.   Yes, that's correct.

Q.   Do you recognize those CDs?

A.   Yes, I do.

Q.   Do you see your signature and date on both of them?

A.   I do.

Q.   Can you tell us, please, what is on those CDs?

A.   On Exhibit 1847 is going to be the Stage 1 of the Google geofence that I did my analysis on.  And on Exhibit 1849 is going to be the Google location data that I was provided by Pomona detectives to do my analysis with.

DX-Ponce de Leon-G

2004

**Q.**   And were you able to do your analysis with the information that you were returned?

**A.**   Yes.

MR. CONOLLY:  Your Honor, at this time the government would move into evidence Exhibits 1847 and 1849.

THE COURT:  Any objections?

MS. DE SALES BARRETT:  No, Your Honor.

MR. VILLA:  No, Your Honor.

MR. REED:  No objection, Your Honor.

THE COURT:  Those will be admitted.

(Government's Exhibits 1847 and 1849 were received.)

BY MR. CONOLLY:

**Q.**   And so then once you've received the Google location data, how do you use that to create your report?

**A.**   I then take the thousand -- well, they are provided to us by Google in Excel sheets.  There could be thousands and thousands of lines of data that returns on those search warrant returns.

They are then -- or I take those returns and ingest them into my mapping software.  And what the mapping software does is take that latitude and longitude and the accuracy radius and draws that accuracy radius on the map so that it can be reflected as where the device could be located.

**Q.**   And in brief, what causes the Google network and the device to exchange location information?

ER 1335

DX Ponce de Leon G

2005

A.  Uh, we don't really know what causes that to occur.  We don't really know.  They don't have to be using a Google account or any sort of Google product to be able -- or to create or generate those location hits.

It's just when the phone checks in with the network and then that sends the information to the Google servers.

Q.  And in terms of the data that you saw in this case, are those -- those events, those check-ins with the network, are they fairly regular?

A.  Yes.

Q.  Can you have sometimes multiple in a minute?

A.  Yes.

Q.  And so when you use this data and you put it into your mapping software, what sort of product is created?

A.  It is a Google map that is going to show the latitude and longitude and that accuracy radius of that specific hit at that time.

Q.  And you had mentioned accuracy radiuses earlier from fairly large to fairly small.  As a general statement in this case, what were the -- what was the range of the accuracy -- the accuracy of?

A.  Generally speaking, there are a lot of one- to three-meter hits during this time period.  They do fluctuate in size, but there are a lot of location history registers that are one- to three-meters.

ER 1336

2006

Q.   And so that would be somewhere approximately around three to ten feet, to put it in feet?

A.   Yes, that's correct.

Q.   And are -- is the -- is the precision, those -- the size of those circles on the maps that you generate, did those indicate that level of accuracy?

A.   Yes.

Q.   So a smaller circle would mean more precise?

A.   Yes, that's -- that information is just taken from the actual records themselves and put into the mapping software.

         MR. CONOLLY:  Can we turn to page 41, please.

BY MR. CONOLLY:

Q.   Is this page -- this is the beginning of your location history analysis?

A.   Yes, that's correct.

Q.   And so can you tell us, please, again, what -- what were the names of the two Google accounts that you received information for?

A.   The names were going to be lasleyshawn7@gmail.com and monster14882316@gmail.com.

         MR. CONOLLY:  Can we please have page 42 on the screen.

         MS. DE SALES BARRETT:  I'm sorry, Mr. Conolly, can you remind us what -- which exhibit we're looking at now?

         MR. CONOLLY:  1434.

DX Ponce de Leon G

2007

MS. DE SALES BARRETT:  Thank you very much.

BY MR. CONOLLY:

Q.  Can you tell us, please, what is here on the screen?  It says "Google subscriber information."  But just in brief, can you explain what this information is and where it comes from?

A.  This is going to be from the search warrant return.  It is the subscriber information for this specific account.  It gives you names -- the name of the account, or the names provided by the user, and when the device was created, the birthday, date of year, several other information here.

Q.  Okay.  And is that information -- is -- is some of that information input by the user themselves?

A.  Yes.  Some of it is input by the user and some is generated by the Google network.

Q.  So drawing your attention to some information that appears to input in a box lower on the screen, it says, "Recovery SMS," and is followed by what appears to be a phone number. What is a Recovery SMS?

A.  That's going to be if you get logged out of your account or you forget what your password is, the user will input a telephone number into the -- into the Google system so that if they get logged out, Google will then send a -- a link or some sort of recovery message to that phone number in order for them to change their password.

Q.  Okay.  And can you read off that phone number for us,

DX - Ponce de Leon G

2008

please?

A.   Uh, that phone number is going to be (747) 786-8909.

Q.   And if I recall, that's the same phone number for which you had received cell site data that we just talked about a few minutes ago; is that correct?

A.   Yes.

Q.   And then below it in another box right below the recovery SMS, there's a box, "user phone number," that's -- that appears to be the same phone number; is that -- is that correct?

A.   Yes, that's correct.

Q.   We had talked about having multiple devices that could connect to the same -- that could be connected to the same Google account.

     How many devices did you find that were associated with the monster14882316 Gmail account?

A.   Just one device.

Q.   And so at the beginning of your analysis --

     MR. CONOLLY:   If we could have page 43 up on the screen, please.

BY MR. CONOLLY:

Q.   I see a time stamp here for the monster14882316 Google account of March 8th beginning at 5:01.

     Can you tell us -- can you explain, please, what we're seeing on this -- on this graphic?

2009

A.   Now, this is going to be 90 Google history location -- or location history registers that are occurring from 5:01 p.m. to 8:17 p.m.  And you'll see that all of them are in the area of that Starlite Motel in Bellflower.

Q.   And so in that three hours and 15, 16 minutes, you said there were 90 registers?

A.   Yes, that's correct.

Q.   Meaning the Google network identified that as the location of the phone 90 times during that time; is that fair to say?

A.   Yes, that's correct.

Q.   Okay.  And did it -- did it move after this 8:17 time stamp?

A.   Yes, it did.

        MR. CONOLLY:  If we could have page 44 on the screen, please.

BY MR. CONOLLY:

Q.   And so what -- what is page 44 showing us here?

A.   This is going to show the device traveling away from the Starlite Motel in Bellflower to the area of 4662 Palo Verde Avenue in the City of Lakewood.

Q.   And can you please explain what appear to be the boxes with time stamps in them?

A.   You're going to see the circle.  That is going to be the Google location registry -- register.  And you're going to see the callout boxes, and those callout boxes are going to be the

ER 1340

DX Ponce de Leon G

2010

times of those registers.

Sometimes I put them on all of them, and sometimes I will do a couple so you can see the direction of travel that the device is moving.

Q.  So, for example, we see at the top of the screen a time stamp of 8:19 and 41 seconds, and then down towards the bottom, the very last on the screen, appears to be 8:40 and 13 seconds.  Those are the time stamps you're referring to?

A.  Yes, that's correct.

Q.  So we can infer from this that that is the direction of travel, with the earlier time being up at the Starlite Motel and the later time there being at 4662 Palo Verde Avenue; is that correct?

A.  Yes, that's correct.

Q.  Now, I notice just above the Palo Verde address is a box that indicates a time range of 8:25 to 8:33.  Can you explain that, please?

A.  So those are going to be registers that are occurring during a specific time period.  Actually, at that time period, there's going to be five registers, and they are all at the same location.

So there's going to be five different registers that occur from 8:25 p.m. to 8:33 p.m.  And those are all just shown there by the time frame.

Q.  So the device here appears to stop or pause for about

DX Ponce de Leon G

2011

eight minutes at that location before proceeding to 4662 Palo Verde?

A.  Yes, that's correct.

MR. CONOLLY:  Okay.  If we could have page 45, please.

BY MR. CONOLLY:

Q.  Now, this page picks up at the time that the last one left off, 8:40 p.m.  Can you tell us, please, what information this -- this page gives us?

A.  There's going to be 13 registers, or Google location history registers, that occur at this time period from 8:40 to 9:06.  And you can see that at 9:06 p.m. the device appears to travel away from this location.

Q.  So fair to say that the device seems to stay at that location for about 25, 26 minutes?

A.  In the area of that -- yes, of that location.

Q.  And the overlapping nature of the circles, does that indicate fairly limited movement within that -- within that area?

A.  Yes, that's correct.

MR. CONOLLY:  Okay.  If we could have page 46 on the screen, please.

BY MR. CONOLLY:

Q.  And so here on page 46, where does it appear that the device then goes?

2012

A.   The device then leaves the area of the Lakewood and then travels north back to the City of Bellflower in the area of the Starlite Motel at 9:17 p.m.

MR. CONOLLY:   If we could have page 47 up, please.

BY MR. CONOLLY:

Q.   Page 47 has a time range of 9:17 to 9:40.  What is it telling us about the location of the device in this slide?

A.   There's going to be several Google location history hits at the Starlite Motel, and at 9:40 the device appears to travel away from the Starlite Motel.

Q.   Okay.  And looking at page 48, can you tell which -- where it goes?

A.   Yes.  I can tell that the device travels east along Alondra Boulevard and then travels north on the 605 Freeway.

Q.   Now, I notice on this slide there appear to be dots that are the registers, is that correct, moving up the freeway?

A.   Yes, that's correct.

Q.   And you've labeled some of them with times; is that -- like what you mentioned earlier, you label some of them, but not all of them?

A.   Not all of them.  There are several locations there, and it would -- it was just too much to label every single one. But it shows that the device then travels north in a northern direction on the 605 Freeway.

Q.   And I'm noticing also that these -- these dots that

DX-Ponce de Leon-G

2013

indicate the registers, they're fairly small.

What -- what sort of accuracy or precision was registering at this time?

A.   Uh, the accuracy radius for these registers are going to be a one-meter accuracy radius.

Q.   Okay.  If you could please look through pages -- beginning on 48 and looking through pages 48 through 51.  Can you some summarize the path of travel across those pages?

A.   The device is going to continue north on the 605 Freeway where it's going to exit Los Angeles Street.  It's going to continue east on Los Angeles Street when it then goes south to the 10 Freeway.  And on the 10 Freeway, the device is then going to continue to travel east along the 10 Freeway where it then exits Campus Drive or South Campus Drive in the City of Pomona.

MR. CONOLLY:  If we could please have page 50 on the screen.

BY MR. CONOLLY:

Q.   So you had mentioned it traveled north on the 605, got off on Los Angeles Street, and then went down to the 10 East?

A.   Yes.

Q.   I'm tracing on the screen a path of travel.  Is that -- is that roughly parallel to the path you just described?

A.   Yes, that's correct.

Q.   And all those dots along it are the location registers?

DX Ponce de Leon G

2014

A.  Yes, that's correct.

Q.  And they look fairly small.  Were they -- were they fairly tight circles at that point?

A.  Yes.  The accuracy radius for this time period are going to be between one and three meters.

MR. CONOLLY:  And if we could have, please, on the screen page 51.

BY MR. CONOLLY:

Q.  You had mentioned that it -- that the device appears to exit the freeway at -- can you remind us where?

A.  It's going to be South Campus Drive in the City of Pomona.

Q.  And you appear to have labeled a particular location on this -- this slide.  Can you -- can you circle that, please, and tell us what it is.

A.  (Witness complies.)  That is going to be the location on Ridgeway Street in the City of Pomona where Pomona detectives told me that the double murder had occurred.

Q.  And you said that the exiting the freeway at Campus Drive was at approximately -- well, can you read the time off there?

A.  The device exited Campus Drive at 10:16 and 33 seconds p.m.

MR. CONOLLY:  Okay.  And if we could have page 52 on the screen, please.

BY MR. CONOLLY:

Q.  Can you point to, please, the first time stamp that you

have on Slide 52?

A.  Do you want me to --

Q.  Yeah.

A.  Would you like me to --

Q.  Yes, please.

A.  -- circle the time or the dot?

Q.  If you would circle the time, please.

A.  Okay.  (Witness complies.)

Q.  And that time stamp is in the upper-left corner of 10:17 and 20 seconds, and that appears to be pointing to a very small dot on Ridgeway; is that fair to say?

A.  Yes, that's correct.

Q.  And can you see if there's any -- any landmarks there, approximately, at that location?

A.  That's going to be in the area of the Perez Market.

Q.  And from this page, can you please describe the -- well, can you tell the direction of travel?

A.  Yes, I can.

Q.  Can you please describe that for us?

A.  The device is going to travel south on Ridgeway Street and then continue east onto Mount Vernon where it gets to the end of the cul-de-sac.

    The device then turns back around and travels west along that -- on Mount Vernon and then will travel north on Ridgeway Street, where it -- where the device appears to stop.

2016

Q.  Can you -- can you circle, please, where the device appears to stop?

A.  (Witness complies.)  It's this location here with this time frame, between 10:18 p.m. and 10:22 p.m.

MR. CONOLLY:  And so the record will reflect that the witness has circled a location and time range at the bottom middle of the screen, 10:18 and 50 seconds p.m. to 10:22:35 p.m.

BY MR. CONOLLY:

Q.  So it appears then to stop for approximately how long?

A.  I believe it's about three and a half minutes.

Q.  And then where does it -- where does it appear to go after that?

A.  The device then appears to travel north along Ridgeway Street and then will travel east along Valley Boulevard.

Q.  And so just to summarize, the path of travel is initially south on Ridgeway Street, you said?

A.  Yes, that's correct.

Q.  And then along Mount Vernon?

A.  Yes, that's correct.

Q.  At the cul-de-sac where it turns around?

A.  Yes, that's correct.

Q.  Travels back to Ridgeway Street where it stops there at the southern end of Ridgeway?

2017

A.  Yes, that's correct.

Q.  And then proceeds -- after a few minutes proceeds north?

A.  Yes, that's correct.

Q.  Okay.  If you could -- if you could please take a look at pages 53 and 54.

A.  Yes.

Q.  Can you tell us, please, where the device goes from there?

A.  The device then enters the 71 Freeway traveling south and will then exit Mission Boulevard.

The device then travels east along Mission Boulevard, where it stays for a few minutes off of Hamilton Boulevard, and then travels back west on Mission Boulevard, uh, and where it travels north on Humane Way and stops at the ARCO gas station on 2207 Valley Boulevard in Pomona.

MS. DE SALES BARRETT:  I believe we're stuck on page 52 here.

MR. CONOLLY:  Yes.  I have not --

MS. DE SALES BARRETT:  Oh.

MR. CONOLLY:  I was about to move on, yes.  I was merely asking the witness for the summary.

If we could please have page 53.

BY MR. CONOLLY:

Q.  So this is that path of travel that you were just describing?

A.  Yes, that's correct.

DX Ponce de Leon G

2018

Q.   Okay.  And where did you say that it -- it ended up?

A.   The device -- oh, it --

Q.   In this time frame.

A.   In this time frame, the device ends back in the -- or traveling, then, north on Humane Way in the City of Pomona.

Q.   So if I understand, it went down the freeway, exited Mission Boulevard; is that correct?

A.   Yes, that's correct.

Q.   And then at some point it came back the other direction?

A.   Yeah.  It will go a little bit farther, it stays there, and then it goes back on Mission Boulevard, travels west and then north of Humane Way.

Q.   And you said it ended up at the ARCO station up here?

A.   Yes, that is correct.

Q.   In the top left-hand corner with the time stamp of 10:23?

A.   And that's reflected on page 54.

          MR. CONOLLY:  If we can have page 54, please.

BY MR. CONOLLY:

Q.   If you could circle the ARCO station.  If you can circle Perez Market, please.

A.   (Witness complies.)

Q.   So the ARCO station is there in the top middle of the screen, and Perez Market is in this sort of upper-left corner of the screen.  Is that fair to say?

A.   Yes, that is correct.

2019

Q. So if you could now, please take a look at pages 55 to 61 in your report.

A. Yes.

Q. Can you summarize the -- the path of travel of the device across those pages, please?

A. At 10:20 -- or at 10:36 p.m., the device then enters back on the 71 Freeway, traveling south, where it enters the 60 Freeway going east. The device then exits the Archibald exit in the City of Ontario where it stays for a few minutes. The device is located at a Shell gas station at the corner of Philadelphia and Archibald. And then the device then gets back onto the 60 Freeway, traveling east, when it then turns back around and starts traveling west on the 60 Freeway, where it travels along the 60 Freeway to the 605 Freeway, where then it travels south on the 605, exits Alondra Boulevard back to the area of Bellflower.

Q. So we'll just see those briefly.

MR. CONOLLY: If we can have page 55.

BY MR. CONOLLY:

Q. That would show the -- heading south on 71, I believe you said?

A. Yes, south on the 71 and then east on the 60 Freeway.

Q. And page 56. The -- this was the Archibald exit that you mentioned where they went to the gas station?

A. Yes, that is correct.

2020

Q.   Okay.  And then they got back on the freeway.

MR. CONOLLY:  Could we have page 57, please.

BY MR. CONOLLY:

Q.   Does this reflect the stretch of freeway where they eventually turned around?

A.   Yes, that is correct.

Q.   And that 10:55 time stamp all the way at the right, is that where they turned around?

A.   Yes, that's where the device turns around and then travels west along the 60 Freeway.

MR. CONOLLY:  Okay.  If we can have page 58.

BY MR. CONOLLY:

Q.   Does page 58 show us that westbound continued travel?

A.   Yes, that is correct.

Q.   Okay.  And skip ahead to page 60.

You had mentioned that the device traveled west on the 10 -- is that what you said?

A.   The 60 Freeway.

Q.   On the 60, my apologies.  And is what we're looking at here on page 60, then, is that where it intersects with the 605?

A.   Yes.  And then you can see that the device then travels south along the 605 Freeway.

MR. CONOLLY:  Okay.  If we can have page 60, please.

BY MR. CONOLLY:

DX-Ponce de Leon-G

2021

Q.   Again, all these tiny dots along the 605 indicate the path of travel?

A.   Yes.  The path of travel along the southbound of 605 Freeway where it then exits the Alondra Boulevard exit.

MR. CONOLLY:  If we can have page 62, please.

BY MR. CONOLLY:

Q.   So we've been advancing in time here.  And we're now -- this is -- page 62 has a time frame of 11:30 to 11:47.  Can you tell us, please, what the device does during this time?

A.   The device is then traveling west along Alondra Boulevard, when it travels north on Bellflower Boulevard away from the Starlite Motel, and the device goes to the area of 14607 Leahy Avenue in the City of Bellflower, where it stays for approximately ten minutes -- or nine and a half minutes, and there's 43 Google location registers that occur at that location.

Q.   43 location registers you said?

A.   Yes.

Q.   I've circled at the top of the screen a location and a time stamp box of 11:34 to 11:43.  Is that the location you were just discussing?

A.   Yes.  I drew a callout or I created a callout box that shows where that device was in the satellite version so you can actually see which location it was in front of.

Q.   I'm circling a dot on the callout box.  Is that the

DX Ponce de Leon G

2022

location register?

A.  Yes, that is correct.

Q.  And given it's size, approximately what level of accuracy are we looking at?

A.  They are between one- and three-meter accuracy radiuses.

Q.  So after that stop on Leahy, where does the -- where does the device go?

A.  The device then travels south on Leahy back to the area of the Starlite Motel.

          MR. CONOLLY:  If we can have page 63, please.

BY MR. CONOLLY:

Q.  And can you tell us, please, what we're looking at on page 63?

A.  These are Google location registers from 11:47 to 11:58. The device is then back at the Starlite Motel.  After 11:58, there are no more Google location history registers for this Gmail account.

Q.  Is that because the search warrant did not include them or simply because the device itself and Google no longer interacted in terms of relaying location data?

A.  There was no location data that was collected.  The search warrant did ask for that time period, but it was not collected.

Q.  It was not collected by Google?

A.  By Google, yes.

DX Ponce de Leon G

2023

Q.   Thank you.

Turning to that phone number that was associated with this account, that 747 telephone number?

A.   Yes.

Q.   Were you able to look at the timing advance data for that cell phone account?

A.   Yes, I was.

Q.   And were you able to chart the approximate locations using that -- using that data?

A.   Yes.  I was able to take the time and advance data with the distance arcs and map those, yes.

MR. CONOLLY:  If we could have page 23 on the screen, please.

BY MR. CONOLLY:

Q.   Ms. Ponce de Leon, I won't run you through the entirety of all of these -- the slides, but as a -- as a general question, were you able to chart a path of travel for this device --

A.   Yes, I was.

Q.   -- this cell phone device associated with the phone number (747) 786-8909?

A.   Yes, that is correct.

Q.   Can you describe -- well, can you describe briefly the path of travel that it took during the time window that you were analyzing?

A.   Uh, the device stays at the Starlite Motel until it leaves

ER 1354

DX - Ponce de Leon, C

2024

that area.  It travels to the area of 4662 Palo Verde Avenue in the City of Lakewood where then it stays for a while, and then travels back to the area of the Starlite Motel.

Until it -- that device leaves that location at about 9:40, and then travels north on the 605 Freeway, and then south to the 10 east, and then travels to the location of Ridgecrest Way in Pomona.

Q.   So you said -- do you mean Ridgeway Street?

A.   Ridgeway Street, yes.  Sorry.

Q.   The site of the homicides?

A.   Yeah, where the site of the homicides.  It stays at that location and then follows the device back north to the -- or I'm sorry -- south along the 71 where it exits Mission, and then goes to the area of the ampm, and then --

Q.   The ampm being the ARCO station?

A.   The ARCO station.  I'm sorry.

Q.   I'll just ask you sort of the ultimate question here:  Is this -- after that, the path of travel it takes, is that the same as the path of travel of the Google location history that we've just seen for the monster Gmail account?

A.   Yes, it is.

Q.   Now, the information for the timing analysis -- or sorry -- the timing advance data, the analysis for that, where does that data come from?

A.   That data comes from the cell phone company.  So this is

2025

coming from T-Mobile.  It's that engineering data that's coming from T-Mobile.

Q.   And that's a separate company from -- from the Google that provides the data?

A.   Yes, that is correct.

Q.   So we have two separate companies providing data that provide a path of travel that matches?

A.   Yes, that is correct.

Q.   It also indicates at the end of your --

        MR. CONOLLY:  If we can have just page 40 on the screen, please.

BY MR. CONOLLY:

Q.   This page 40 has a time range of 11:47 p.m. until 11:59 p.m. on March 8th.  What does this page tell us?

A.   This pages shows me that the device then travels back to the area of the Starlite Motel during this time period.

Q.   Does it appear to remain there for the remainder of the time that you analyzed?

A.   Yes.

Q.   You also mention that you had collected call detail or, rather, you had reviewed call detail records for this phone number and that other phone number ending in 1091?

A.   Yes, that is correct.

Q.   Were you able to compare the call logs on those two phones?

2026

A.  Yes, I was.

Q.  Did it appear that on the evening that you analyzed here, March 8th, that they were in touch with each other?

A.  Yes.  Both devices were making incoming and outgoing phone calls to the other.

Q.  So I'm --

MR. CONOLLY:  If we could have page 15, please.

BY MR. CONOLLY:

Q.  Now, this is a slide from part of your report.  Am I correct in thinking this is part of the call detail analysis?

A.  Yes, that is correct.

Q.  Okay.  And on the left, there's a list of calls.  Can you tell us, please, how many times in that list do you see the other phone number we've been discussing, that (310) 261-1091?

A.  There are five different phone calls to that phone number, to and from that phone number.

Q.  And were you able to compare that against the call detail records for that -- that device that has that other phone number?

A.  Yes, that is correct.

Q.  And do they match?

A.  Yes, they do.

Q.  So turning now to that second Google account that you had mentioned, lasleyshawn7@gmail.com, how many devices did you find were associated with that Gmail account?

ER 1357

DX - Ponce de Leon C

2027

A.   There were several different devices that returned from that Gmail account that were collecting location history.  But during the time frame that I was asked to analyze the data, there were only two devices that were collecting location history during this time period.

Q.   So it's a single Google account but it appears to have two devices connecting to it?

A.   Yes, that is correct.

Q.   For the time --

A.   Or -- collecting -- collecting location data during that time period.

Q.   Thank you.  Yes.

A.   Yes.

        MR. CONOLLY:  So if we can have page 64 on the screen, please.

BY MR. CONOLLY:

Q.   So this was the subscriber information that you received from Google?

A.   Yes.

        MR. CONOLLY:  And if we could have page -- sorry. Yes, 65 now on the screen.

        If I said 65 for the last one, I had meant 64, but yes.  Yes, 65.

BY MR. CONOLLY:

Q.   So -- this -- this page underneath -- sorry -- going to

the top of the page, I see the Google account name lasleyshawn7@gmail.com. Right below that, is says device -- there's a number that follows that. What is that -- what is that number?

A. That's going to be the number that Google associates with this certain device. I'm not sure what device it is, but Google knows that this device is collecting, and they give that -- that device a number. And so that number is associated to this account.

Q. And so where does -- at the beginning of your analysis here, it says 5:47 p.m. Where does that -- where does that device start off?

A. The device is in the area of 9831 Park Street in the City of Bellflower.

Q. And where -- after 7:05, do we see it go anywhere?

A. Yes. The device then leaves the area of -- of that area on Park Street and then travels to the area of the Starlite Motel in the City of Bellflower.

MR. CONOLLY: If we could have page 66 on the screen.

BY MR. CONOLLY:

Q. So can you indicate where on the screen we see the Starlite Motel and the time associated with the devices being there?

A. Starlite Motel is here, and this is the Google location register with the time of that register of being 7:22 and

2029

52 seconds p.m.

MR. CONOLLY:  Okay.  And if we can have page 67, please.

BY MR. CONOLLY:

Q.  This appears to be a satellite view that is a more zoomed-in view than the last slide.  What do we see in this Slide 67 here?

A.  This is going to be Google location registers of the device.  There's 13 registers of the device at the Starlite Motel during that time period.

Q.  So it looks like a time period of approximately 50, 5-0, minutes; is that correct?

A.  Yes, that's correct.

Q.  And you said it had how many registers at that location?

A.  13 registers.

Q.  And what -- if you can sort of estimate an average, what is the average accuracy radius looking like there?

A.  These ones are going to be a little bit bigger.  I'm not sure.  I don't have that data with me here.  But they're probably about 10, 15, 20 meters.

Q.  But they all remain, it looks like, fairly stacked on top of each other there?

A.  Yes, it was -- yes.

Q.  So it appears that the phone is staying within roughly -- or sorry, whatever device it is, it appears to be staying in

DX Ponce de Leon C

2030

this same location?

**A.** Yes. That's correct.

**Q.** Okay. And if you could take a look, please, at pages 68 to 72.

**A.** Okay.

**Q.** Can you describe -- can you summarize, please, the path of travel that we see?

**A.** Uh, the device leaves the area of the Starlite Motel at 8:19 p.m., and then travels south along the 605 Freeway where the device exits the Del Amo Boulevard exit where it stays for a few minutes, I think it's 3 minutes here, and there's 14 registers during that time frame.

Then it travels to the area of 4662 Palo Verde Avenue in the City of Lakewood where it stays until 9:06 p.m. The device then travels back north along the 605 Freeway -- or travels to the area of Bellflower at the Starlite Motel.

And then at 9:40, approximately 9:40, 9:42, the device then leaves the area of the Starlite Motel and travels along Alondra Boulevard to go north on the 605 Freeway where it travels north on the 605 Freeway and it exits that Los Angeles Street and then travels south to the 10 Freeway going east.

MR. CONOLLY: Okay. So just to briefly go through those, if we could have page 68, please.

///

DX - Ponce de Leon, C

2031

BY MR. CONOLLY:

Q.  So this slide depicts, as you said, the -- am I correct, the movement of the device from the Starlite Motel here and then south on the 605 where it exits.

And what do we see in this time box here that I have circled in the lower right?

A.  You're going to see that time frame, 8:26 p.m. to 8:32 p.m., and there were 14 registers that occurred at that same location.

Q.  So the device appears to pause there?

A.  Yes.

Q.  And then you mention it went to the area of 4662 Palo Verde, which I have circled the location pin at 8:46.  And what sort of accuracy are we talking about there?

A.  These are going to be smaller accuracies.  Some are a little bit bigger.  They range -- I'm not sure exactly of the -- all the accuracies here, but there are about -- anywhere from, like, three to -- a couple of them are a little bit bigger.  I don't have that information.

Q.  Totally fine.

MR. CONOLLY:  And then if we could have page 69, please.

BY MR. CONOLLY:

Q.  The overlapping circles that we see here in page 69, that indicates that the device stayed there for a while.

DX - Ponce de Leon, C

2032

**A.** Yes. There are seven registers in that area of 4662 Palo Verde Avenue in the City of Lakewood.

**Q.** And that's between 8:46 and 9:06 p.m.?

**A.** Yes, that's correct.

**Q.** Okay. And then you mentioned that the device leaves there and ends up traveling north on the 605?

**A.** Actually, there is no data between -- or there's no Google location history between 9:06 p.m. and 9:36 p.m. So we do know that at 9:36 p.m. -- so I don't know where this device actually traveled, but I do know at 9:36 p.m. the device is back in the area of the Starlite Motel in the City of Bellflower.

**Q.** And then after that, where did it go?

**A.** The device then travels along Alondra Boulevard and then north on the 605 Freeway.

MR. CONOLLY: If we could please have page 71.

BY MR. CONOLLY:

**Q.** And so here at 9:50 p.m., our time stamp on page 71, we have that northbound travel on the 605; is that correct?

**A.** Yes, that's correct.

MR. CONOLLY: And then page 72, please.

BY MR. CONOLLY:

**Q.** And you mentioned the device appears to leave the 605 Freeway on Los Angeles Street. Is that the street I'm underlining here on the page?

DX Ponce de Leon C

2033

A. Yes.

Q. And then south, you said, to the 10 East?

A. Yes, that's correct.

Q. And that was the -- precisely the same path of travel we saw with the monster14882316 Gmail account?

A. Yes, that's correct.

Q. And so I believe you said it continued east.

MR. CONOLLY: If we could have page 73 on the screen, please.

BY MR. CONOLLY:

Q. And this slide has a time frame of 10:11 to 10:15 p.m. Can you tell us, please, what the device appears to do during this time?

A. The device then travels -- continues to travel east along the 10 Freeway where it exits South Campus Drive and then appears to travel south along Ridgeway Street, in the City of Pomona.

Q. And I'm circling the location you have labeled on the right-hand side of the page. That is the Ridgeway Street location?

A. Yes, that's correct.

Q. The site of the homicides?

A. Yes, that's correct.

MR. CONOLLY: If we could have page 74, please.

///

2034

BY MR. CONOLLY:

Q.   And like we did with the last one, can you please explain the path of travel on this screen.

A.   So the device is then traveling south along Ridgeway Street where it then travels east along Mount Vernon.

Q.   Sorry to interrupt you.  Could you possibly trace that on the screen as you say it?

A.   Yes, no problem.  The device -- (witness complies.)

      The device travels south along the -- Ridgeway and then east along Mount Vernon to the end of this cul-de-sac here.  The device then continues to travel west on Mount Vernon and then north on Ridgeway where it stops at 10:17 p.m.  And there's 21 registers between 10:17 and 39 seconds.  And 10:21 and 18 seconds.

Q.   And then after that.

A.   Oh.  And then the device continues to travel north up Ridgeway, and you could see this Google location register at 10:21, and then travels east on Valley Boulevard.

Q.   And if we could leave 74 up on the screen.  But Ms. Ponce de Leon, if you could take a look in your report, please, at page 52.

A.   Yes.

Q.   Now, this page 52 is the -- is the satellite image like this one in 74, correct?

A.   Yes, that's correct.

2035

Q.   But for the mapping of the monster14882316 Google account; is that correct?

A.   Yes, that's correct.

Q.   Can you take a look, please, at the time stamps and compare them against 74, and what do you notice about them? So, for example, in the upper-left corner near the Perez Market, we see a time stamp here for the lasleyshawn Google account at 10:16.  What is the -- is there a time stamp near that same location on page 52?

A.   Yes.  The time stamp on 52 for the same general location of Valley and Ridgeway is going to be 10:17 and 20 seconds p.m.  So it's about a minute difference.

Q.   Okay.  And then fast forwarding to the -- the cul-de-sac in the lower right, can you -- on the screen, we've got a time stamp of 10:16 and 58 seconds, so 10:17.  Can you tell us the corresponding time stamp for the monster device?

A.   There is a time stamp right at the end of that cul-de-sac for the monster device at 10:18 and 10 seconds p.m.

Q.   So they appear to be about a minute off each other?

A.   Yes, that's correct.

Q.   But they arrive at the -- fair to say they arrive within a short time of each other at that time location where you indicated that they had stopped on northbound Ridgeway?

A.   Yes, that's correct.

Q.   So after it leaves -- getting back to the page 74 here,

2036

the lasleyshawn Google account, you indicated it went north on Ridgeway and then right on Valley Boulevard. Where does it go after that?

A. The device continues to travel east on Valley where it enters East 71 South. It takes the -- or the device travels to 71 South where it exits on Mission Boulevard, then travels east on Mission Boulevard. Then turns around at some point and travels west on Mission Boulevard and then travels north on the 71 Freeway and gets onto the 10 Freeway on 10:27 and 4 seconds p.m.

Q. And then what happens after that?

A. After -- at -- after 10:27 p.m., there is no Google location history registers for this device.

MR. CONOLLY: And if we could just have page 75 on the screen, please.

BY MR. CONOLLY:

Q. And I'm circling the top left corner, the time stamp and location for -- of 10:27.

You indicated that the device had traveled up the 71 and then got on the 10 headed west, you said?

A. Yes. The device travels north on the 71 Freeway and then appears to enter the 10 -- this is the 10 Freeway here -- traveling west.

Q. And after that, there's no more location data?

A. No more location data, yes.

DX Ponce de Leon C

2037

Q.  I have just a few more questions for you and they relate to that other device that you said was associated with the lasleyshawn7 Google account.

MR. CONOLLY:  If we could have page 76 on the screen, please.

BY MR. CONOLLY:

Q.  All right.  Now, this has -- we've now gone back in time to 5:03 p.m. what is -- what do we see here on page 76 for this device that is numbered 383-234-837?

A.  This is going to show Google location -- or Google location history registers in the area of 9831 Park Street in the City of Bellflower.

Q.  And is that approximately the -- or is that the same location that you had testified to where the other lashley device was identified as being earlier in your testimony?

A.  Yes, that's correct.

Q.  At around the same time?

A.  Around the same time, yes.

Q.  Okay.  And that was on page 65, I believe, beginning at 5:47.

So -- so it -- it's at that location on page 76.

Where does it -- where does it go from there?

A.  The device then leaves that location and travels to the area of the Starlite Motel where there's a Google location history register at 7:24 p.m. near the area of the

2038

Starlite Motel.

MR. CONOLLY:  If we could have page 77 up on the screen.

BY MR. CONOLLY:

Q.  And does page 77 reflect what you've just explained to us?

A.  Yes, that's correct.

MR. CONOLLY:  And page 78.

BY MR. CONOLLY:

Q.  So on page 78, there's a time frame of 7:26 to 8:16 p.m. And again, we appear to be looking down on the Starlite Motel with many overlapping circles.  How -- do you know how many registers were during this time?

A.  13 registers during this time period.

Q.  From -- for those 50 minutes from 7:26 to 8:16 p.m.?

A.  Yes, that's correct.

Q.  Where does the device go from there?

A.  The device then leaves that location to -- and travels south on the 605 Freeway and, again, also goes to the area of Del Amo just east of the -- or, I'm sorry, west of the 605 Freeway where it stays for six minutes -- there are three registers -- and then continues to the area of 4662 Palo Verde Avenue in Lakewood.

MR. CONOLLY:  Okay.  If we could have page 79 on the screen, please.

///

2039

BY MR. CONOLLY:

Q.  And does this page capture what you've just explained to us?

A.  Yes, that's correct.

Q.  So just underlining on the screen in -- so it goes from the Starlite hotel at 8:21 and appears to travel south on the 605 where it gets off the freeway, as you said, at Del Amo Boulevard there.  At 8:25 it lingers for a few minutes before reaching 4662 Palo Verde at 8:41?

A.  Yes, that's correct.

Q.  Does the device stay at that location for a little while?

A.  Yes, it does.

        MR. CONOLLY:  If we could have, please, page 80.

BY MR. CONOLLY:

Q.  So how long does it appear to stay there?

A.  The device appears to stay there for 24 minutes, and there are ten Google location registers in that area of 4662 Palo Verde Avenue, Lakewood.

Q.  And then where does the device go after that?

A.  The device then travels back north on the 605 Freeway to the area of the Starlite Motel in Bellflower.

        MR. CONOLLY:  Page 81 on the screen, please.

BY MR. CONOLLY:

Q.  So it ends up at 9:21 back here at the Starlite Motel; is that correct?

DX   Ponce de Leon, C

2040

A.   Yes, that's correct.

Q.   Okay.  And how long -- how long is it there, or how long do you have information that it's there?

A.   There are five Google location history registers that occur from 9:21 to 9:30 p.m., and the device is in that area of the Starlite Motel.

     And then after 9:30 p.m., there are no more Google location registers collected for the day of March 8th of 2022.

Q.   So there's no more location data for that day?

A.   No, not for -- not Google location data for that device.

     MR. CONOLLY:  Just one moment, please, Your Honor.

     THE COURT:  Sure.

     MR. CONOLLY:  Ms. Ponce de Leon, those are all the questions I have for you at this time.  Thank you very much.

     THE WITNESS:  Thank you.

     THE COURT:  Ladies and gentlemen, we're going to go ahead and take a 20-minute break.  See you back in 20 minutes.  Thank you.

     (Jury exits the courtroom at 10:55 a.m.)

     THE COURT:  All right.  Anything for the record at this time?  All right.

     MS. DE SALES BARRETT:  No, Your Honor.

     MR. VILLA:  No, Your Honor.

     (Recess held.)

     THE COURT:  All right.  Anything before we bring the

CX Ponce de Leon R

2041

jury back in?

Okay.  Let's go ahead and do that.

(Jury enters the courtroom at 11:18 a.m.)

THE COURT:  All right.  We have our jury members back in their places.

Is there cross-examination?

MR. REED:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. REED:

Q.  Ms. Ponce de Leon, if I made a general statement that cell phones have a footprint, that sounds like what we went through the last hour or so; is that about right?

A.  You -- I don't know that I heard a statement --

Q.  Oh, I'm making that statement.

A.  Oh, okay.  Go ahead.

Q.  Cell phones have a footprint.

A.  Yes.

Q.  Okay.  So -- but before you get the cell phone information, do you need the actual phones to do the work or you just need the data that comes from the cell phone company?

A.  I get the -- the data from the cell phone companies or from a cloud service like Google.

Q.  But before you got there, at least -- and correct me if I'm wrong -- police officers or somebody in the government either executed a search warrant or they had the phones

CX - Ponce de Leena R

2042

themselves?

A.   Yes, that's correct.  They executed a search warrant.

Q.   And if they didn't have a search warrant -- or actually, they had to get one at some point anyway.

A.   Yes.

Q.   But even if they had the search warrant -- let me back up.

     If they had the phone itself, there's something that they do to download information from a phone onto some type of database; is that right?

A.   If a phone is in custody, there is a way that you could possibly get information from a device, yes.

Q.   Okay.  And there is a program -- I think it's called Cellebrite or something like that.  You're familiar with that?

A.   Yes, I am.

Q.   And that is something that you have heard throughout your 14-some-odd years doing what it is that you do?

A.   Yes, that's correct.

Q.   So would it be fair to say that the use of cell phone data in this day and age has become rather ubiquitous?

A.   Uh --

Q.   Talking about you guys doing your jobs.

A.   Yes.

Q.   And by "you guys," I mean people who work for the cops.

A.   Yes.

Q.   Okay.  So -- hum, let me think of an easy way to do this.

CX Ponze de Leon R

2043

I've done something that I shouldn't be doing, and part of that -- part of what I've done has to do with, say, me talking to Mr. Villa over there.  Okay?

And the police officers or someone like Detective -- or Agent Rodriguez behind me -- or, excuse me, Gonzalez behind me, takes my phone.

A.  Okay.

Q.  Okay.  Now, if I'm in Los Angeles and he takes my phone in LA, I have a local Orange County area code number, does that mean that's where my phone is?

A.  I don't -- if he took your phone, it's where he is.

Q.  Okay.  But when you download the phone and look at calls that I make to Mr. Villa, he lives in some other state, one of the ways is to look at my phone number and his phone number, and that's how you would know that I spoke to him?

A.  Uh, yes.  That would -- I would not from the actual device itself, but writing a search warrant to the cell phone companies, that would be who I would -- how I would get that information about those two calls that occurred.

Q.  So you could take my phone that was seized by the agent --

A.  Okay.

Q.  -- and that, in theory, for a given period of time, has all of the attempted phone calls and phone calls that I made.  Fair statement?

A.  It would have the phone calls unless they were deleted by

2044

a user.  That could happen.

Q.  Okay.  That's on the phone?

A.  That's on the phone, yes.

Q.  But let's say I was smart enough to do that.  They would be able to get around that by getting the information from, say, T-Mobile?

A.  Yes, that's correct.

Q.  Okay.  So if I did delete it all --

A.  Uh-huh.

Q.  -- a T-Mobile search warrant would have those things that I tried to delete?

A.  It would have record that a phone call was created and the duration of that call in which cell phone tower was being used for that phone call.

Q.  And even in the world of cell phones, area codes still have some use, correct?

A.  Yes.

Q.  So my local 714 number, which is Orange County -- and I don't know what New Mexico is, but if I was calling in New Mexico, whatever that area code would be, that's how you'd know that I made a phone call, attempted to make a phone call, or actually had a completed call to New Mexico.  Because it would show on my phone.  And, in theory, if they got a warrant as to his phone, it would show those two things at -- I think you guys do something with the time that makes it so it works

CX - Ponce de Leon, R

2045

together, right?

A. Yeah. The time conversion, yes.

Q. Okay. So --

A. But that would be on the cellular network, yes.

Q. Okay. And -- but you're talking about -- what you've been doing for the last hour or so, that's the next step, which is mapping the phone itself and where the phone went to?

A. What I'm mapping is the information from the cell phone companies, the information that they give us in Excel sheets, and I'm taking that and mapping it, illustrating that, and putting it in an exhibit.

Q. Okay. But at an irreducible minimum, if they took my phone or my phones, okay, and I said, On X day I called the White House, and I full-on talked to whoever was in that White House when I made the call -- so I don't know, George -- or Joe Biden, okay -- it would show on my phone that I called a 202 area code, and, in theory, it would show the time I made that call; is that correct?

A. It -- it could, yes, unless you had deleted that transaction.

Q. Again, say for the sake of argument I did do that --

A. Uh-huh.

Q. -- because I'm a criminal, and criminals sometimes do bad things. And I decide, Hey, I'm going to delete that off my phone. When they've got my AT&T records, it would still show

2046

my 714 number and a 202 call --

A.   Yes.

Q.   -- at a certain time?

A.   Yes.

Q.   And maybe even the length of time?

A.   Yes.  It should show you the length of time.

Q.   Okay.  So that would be something that could be used, and it sounds like it is used, to either, not so much confirm or deny what I'm saying, but to independently verify the occurrence and, in your case, even the area in which those calls are made?

A.   Yes, that's correct.

Q.   And you rely on that on a daily basis?

A.   Yes, that's correct.

Q.   Now, what if I don't know or if I don't want to tell you Mr. --  Mr. Villa's number but I still say I called in that area, they would still be able to use the area code of New Mexico to attempt to match my phone to an New Mexico area code call, right?

A.   If you wrote call detail records for your phone number, it would give a log of all the phone calls that you made during a certain time period.

        So it doesn't just show a specific area code; it's going to show all the phone calls that you've made during that time period --

2047

Q.   And --

A.   -- whatever the search warrant requests.

Q.   And within those calls would be that New Mexico call that I maybe wanted to hide from you?

A.   Yes, that's correct.

Q.   Okay.  Uh, what if Mr. Villa -- who, like me, is also a criminal in my scenario -- he uses a burner phone?  How would -- how would you be able to figure out that I made a burner phone call, a call to him on a burner phone?

A.   Burner only means -- a burner call or a burner phone only means that there's no subscriber information, but that doesn't mean that there's no call detail records that are occurring during that time period.

So I can still see all of those transactions that had occurred.  But commonly a burner just means that there's no subscriber.  It means that you as the user are not on -- labeled as the subscriber or the person responsible for that phone.  But all those transactions that are occurring are still billable events, and the cell phone companies don't care if there's no subscriber on it or not, they're keeping track.  Because by law, they have to keep track of all transactions that occur on that device as far as cell phone calls and text messages.

Q.   So back to my original statement that I started with, this premise, try as I might to hide it, it sounds like my cell

CX - Ponce de Lena V

2048

phones calls have a footprint?

A.  Yes, they do.

Q.  Date, time, and maybe even location?

A.  Yes.

Q.  Thank you.

A.  Thank you.

THE COURT:  Any further cross-examination?

MR. VILLA:  Yes, Your Honor.

THE COURT:  Okay.

CROSS-EXAMINATION

BY MR. VILLA:

Q.  Good morning.

A.  Hi.  Good morning.

Q.  So you looked at call detail records from two phones, correct?

A.  Uh, on which?  I looked --

Q.  Excuse me.  I should -- yeah.  Thank you.

A.  That's --

Q.  I'm talking about the Lomita analysis for the Lomita homicides?

A.  Yes, that is correct.

Q.  And you looked at two phones, one for one of the victims, Mr. Roshanski?  Yes?

A.  Yes.

Q.  And another you were told belonged to a subscriber

2049

Justin Gray?

A.  I was able to verify that the subscriber from T-Mobile is Justin Gray.

MR. VILLA:  Okay.  And so, yeah, let's look at that.

Can we pull up Exhibit 1432, which was already admitted and I believe it's page 11.

BY MR. VILLA:

Q.  This is what you're talking about, yes?

A.  Yes, that is correct.

Q.  And it has the subscriber name?

A.  Yes, that is correct.

Q.  Okay.  So for Mr. Gray, you were never asked, were you, to analyze whether he received a phone call or had cell phone communication with Robert Eversole?

A.  I don't know anything about what number -- I'm usually provided phone numbers and not names to be able to look at this.  So I don't know what number that would be.

Q.  Okay.  I mean, but -- so the detectives in the case provided you the two numbers that you were given, correct?

A.  Yes, that is correct.

Q.  And you weren't given a third number by anybody that they said to you might be associated with a Robert Eversole?

A.  No, or not that I'm aware of.

MR. VILLA:  Thank you.  You can take that down.

///

CX Ponce de Leon V

2050

BY MR. VILLA:

Q.  You didn't conduct any analysis of any phone that was alleged to be associated with Kenneth Johnson?

A.  I don't know.

Q.  You talked about for the Pomona homicides that timing advance data?

A.  Yes, that is correct.

Q.  You didn't look at that for those Lomita homicides, correct?

A.  Unfortunately, we were not able to get the time and advance data for the Lomita murder.  Because of the time frame, we were not able get that information from them.

Q.  You mean it was -- it was too late?

A.  Yeah, it was too late to get that information.

Q.  Okay.  And with respect to the call data records that you looked at for the two phone numbers for Lomita, you looked specifically at the time frame of October 3rd to October 4th, 2020, yes?

A.  Yes, that is correct.

Q.  And we know from some testimony the jury's already heard, and I assume you were told as well, that the Lomita murder occurred shortly after 1:00 a.m. on October 4, 2020?

A.  Yes, that is correct.

Q.  So any phone calls Mr. Gray may have received from before that time through October 3rd are captured in those call

RDX Ponce de Leon C

2051

detail records that you reviewed?

A.   Yes --

        MR. CONOLLY:  Objection.  Compound and vague.

        THE COURT:  I think you said October 3rd but you meant through October 4th, I think?

        MR. VILLA:  Yes.  So I'll ask a better question. Sorry about that.

BY MR. VILLA:

Q.   So from the time frame that you had those records, the call detail records for Mr. Gray's phone, would have been -- if we just looked at the time, 1:00 a.m., October 4th, 2020, and went backwards into October 3rd, you -- and it captures all of the calls that that phone made, correct?

A.   Yes, that is correct.

        MR. VILLA:  That's all the questions I have.

        THE COURT:  Any other cross-examination?

        Redirect?

        MR. CONOLLY:  Just briefly, Your Honor.

                    REDIRECT EXAMINATION

BY MR. CONOLLY:

Q.   So, Ms. Ponce de Leon, does your -- pardon me.

        Does your analysis that you've testified here today, does that tell you precisely when any of those homicides happened?

A.   No.

2052

Q.   That information was -- was given to you by detectives?

A.   Yes, that is correct.

Q.   You were also asked if cell phone calls have a footprint. Are there ways to make calls from phones that don't go out over the cellular network?

A.   Yes.

Q.   There are certain applications that you can make voice phone calls with?

A.   Yes.

Q.   And also video phone calls with?

A.   Yes.

Q.   Would those show up in the call detail records?

A.   No, they do not.

Q.   And why not?

A.   Because those transactions are -- are using the data network and not using the cellular network.  Only call -- only the call detail records, if you make a traditional phone call from phone call -- or from phone to phone, are you going to see that register.  But when you're dealing with applications, it's using the internet or the data to make those transactions.

So we can see that there could be data sessions or timing advance during those time periods, but we can't associate that to a certain activity on an application.

Q.   So it could, for example, be somebody searching the web as

RCX Ponce de Leon R

2053

opposed to making a call?

A.  Yeah.  We don't -- we don't know what is occurring during that time.

Q.  And is that sort of a functionality available on apps like WhatsApp or Signal or Telegram?

A.  Yes.

Q.  On all three of them as far as you know?

A.  Yes, that is correct.

Q.  Okay.

MR. CONOLLY:  Thank you, Your Honor.  Those are all the questions that I have.

THE COURT:  Any recross?

MR. REED:  Yes, please.

RECROSS-EXAMINATION

BY MR. REED:

Q.  So I made a mistake because you just didn't get my phone, you got my computer.

A.  Okay.

Q.  Okay.  On my computer I have those apps.  You can still check what I did on my computer if you have my computer; isn't that correct?

A.  If the information is available for us to actually look at.  At times, some of those programs can be encrypted, and so we're not able to get that data from your computer unless you've provided us with the logon information and we have

2054

access to it.

Q.   Okay.  Well, here's what I know.  And I don't know positive because I've never met you before, but you look like a pretty diligent employee.  And my mindset would be that if that happened, you would have written a report that said that.

MR. CONOLLY:  Objection, Your Honor.

BY MR. REED:

Q.   In our hypothetical, if you couldn't find the information that was submitted to you because of any of the things you just said, you would write a report that said that, right?

A.   Uh, my -- my job here in the analysis portion is to just take the data that is provided to me and provide reports to my detectives.  I'm not the one that, if something is missing, I go look further and further.

I can provide investigative insight to detective, but it's then on them to make those -- those leaps to do those sorts of things.

Q.   I don't want to be rude.  That's not what I said.

A.   Okay.

Q.   You just said, I write a report to my detectives, and that's what I'm talking about.

A.   Okay.

Q.   You would write a report to someone because, otherwise, when you get your evaluation later on down the year, I mean, you need to be able to explain why you didn't do those things

2055

because you are going to get smarter each time, you learn from things that don't work, right?

**A.** Okay.

**Q.** And you get better at it, yes?

**A.** But if I don't know that it doesn't exist, then I wouldn't know to tell them to look for it.

**Q.** Okay. So if I told you to look for a Signal app, look for line, or look for those things on the computer, you would do that, correct?

MR. CONOLLY: Objection. It mischaracterizes testimony. Lacks foundation.

MR. REED: Well, it's in the hypothetical that counsel just produced.

MR. CONOLLY: Mischaracterizes testimony and lacks foundation.

MR. REED: It wasn't testimony; it was questioning --

THE COURT: One at time. I'm lost. What we're now talking about, the hypothetical in which you are the criminal and you have the laptop, or the hypothetical when you are the police officer and you've told her to do something?

MR. REED: Well, I added the laptop to the hypothetical, but the prosecutor, when he asked questions, he -- it appears as though he wanted to lay a reason as to why those things wouldn't be on a cell phone by adding these apps that clearly the witness knows about.

2056

My position or my question is, if those apps were present, would she write a report about that?  If those apps were not present, would she indicate that in a report?  All I'm saying is that it's not something that's going to be a question mark on her part.  She's going to either say yes or no.

THE COURT:  And your question, though, I assume is that she's got the phone or she's got --

MR. REED:  My question assumes that she has five phones and a laptop computer.

THE COURT:  Okay.  With that clarification, can you answer that question?

THE WITNESS:  I am still very confused as to the question that's being asked.

BY MR. REED:

Q.  Sure.  So I tell you about phone calls being made, for whatever reason that's what I think it is, the phone call.

And you say, No, Mr. Reed.  I don't see any phone calls here.

And then I go back, I talk to somebody else, and I come back and say, Well, what about these apps that they use that don't use the cellular network, can you check and see if that's on the computer that I gave you?

A.  You could -- if I was -- if it was available to look at, the computer, then I would look and see if I can see that that

ER 1387

2057

application is downloaded, yes.

Q.  Right.

A.  If I was requested to do that, yes.

Q.  Therein is my point, but you and I are never going to get to that.  That's somebody else later on.

If you couldn't get into a computer, you would write down that you couldn't get in; right?

A.  Uh, I -- it's not my job to download computers.  I don't -- I don't do that.

Q.  Okay.  You just get the data that comes from it?

A.  I just get the data that comes from it, yes.

Q.  So your report would say, I don't have any data consistent with what you asked for, Mr. Reed?

A.  I don't write reports.  I would just verbally tell the detective and say, Hey, I didn't find that information.  But I don't write an actual report for the detectives.

Q.  When you said "report," you just meant talking?

A.  Yes.

Q.  I understand.

MR. REED:  Thank you.  No further questions.

MR. VILLA:  Just briefly.

THE COURT:  All right.

RECROSS-EXAMINATION

BY MR. VILLA:

Q.  Back to our Lomita time frame, October 3rd through

2058

October 4th.  You said if somebody called or claimed that they called Mr. Gray on an application like WhatsApp or Signal or something, that that would access data but not the cellular network, correct?

A.  Yes, that is correct.

Q.  But you could still see that the phone is accessing data?

A.  Uh, not in these reports.  In the search warrant that we wrote, data sessions were not provided.  It was just the call detail records and the subscriber sheet.

Q.  A search warrant could be drafted to ask for the data sessions, yes?

A.  I don't know if in 2020 that T-Mobile was providing data sessions at that time via a search warrant.  I don't believe so.

Q.  Did they have the data available at that time, do you know?

A.  I don't know.  I don't know.  Even if they did, I don't believe in 2020 that they were providing a return for data sessions to us.  I don't know when that started.  They do it now.  I think it's only within the last year or two that they were providing us data reports, but back in 2020, they did not provide us data reports.

Q.  As you sit here today, though, you can't say for certain whether it was available in 2020 or not?

A.  No, I can't.

2059

Q.  If you had either phone that somebody claimed they called Mr. Gray on using one of those such apps, it's -- you may be able to get that data from the phone if it hadn't been deleted?

A.  If it hadn't been deleted, there's a lot of things that go into what you can get from a device and what you cannot get from a device.  The data may be there but the program -- the software may not be able to read that it's there.

So in the viewer, you may not be able to see that there were Signal applications.  I know going to some trainings that Cellebrite says that prior to they were not able to parse out Signal data or Telegram data so that you as a user can be able to see that data.

But I don't know because that's not really my job.  I know of it because I get all the analysis from Cellebrite reports -- not in this case, but in my job I do that.  But it could be possible that it's there, or it could be possible that it's not.  There's lots of variations that depend on what you can get from a cellular device.

Q.  And the only way to know is if you have the phone, try to extract the data and see what you get?

A.  Yes, exactly.

MR. VILLA:  That's all, Your Honor.

THE COURT:  Any other recross?

Any other redirect?

DX Eversole S

2060

MR. CONOLLY:  No, Your Honor.  Thank you.

THE COURT:  May this witness be excused?

MR. CONOLLY:  Yes.

MR. VILLA:  Judge, yes.

THE COURT:  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Next witness, please.

MS. STOKMAN:  The government calls Robert Eversole.

THE CLERK:  Please raise your right hand.

ROBERT EVERSOLE,

called as a witness on behalf of the Government, having been first duly sworn, testified as follows:

THE WITNESS:  Yes, ma'am.

THE CLERK:  Go ahead and have a seat and please state your full name for the record and spell your last name.

THE WITNESS:  My full name is Robert Vincent Eversole, last name E-v-e-r-s-o-l-e.

THE CLERK:  Thank you.

THE WITNESS:  Yes, ma'am.

DIRECT EXAMINATION

BY MS. STOKMAN:

Q.  Good morning.

A.  Good morning.

Q.  Can you tell us where you're from?

A.  I'm from Alabama.

DX - Eversole S

2061

Q.   And what areas did you grow up around?

A.   I grew up predominantly in California, but I moved a lot as a child.

Q.   And at some point did you end up in the Fresno area?

A.   Yes, ma'am.

Q.   When was that?

A.   I came here, the first time, I was about five years old; and then we left and came back several times throughout my childhood until I was 16.

Q.   When was the first time that you were arrested?  How old were you?

A.   Mm, the first time I had police contact, I was probably 7 or 8.

Q.   And what types of things were you doing at that young of age?

A.   I was shoplifting.

Q.   Did you continue to get in trouble as a minor?

A.   Yes, ma'am.

Q.   What types of things?

A.   Uh, I went from shoplifting, I started breaking into cars, I started breaking into houses.  I went from stealing bicycles to stealing cars.  As I got older, I progressed.

Q.   And at some point you were arrested and went to prison as an adult; is that right?

A.   Yes, ma'am.

DX Eversole S

2062

**Q.** Do you have the following felony convictions:  Felony conviction for possessing stolen property or cars?

**A.** Yes, ma'am.

**Q.** What about for resisting arrest?

**A.** Yes, ma'am.

**Q.** How old were you upon that arrest?

**A.** Uh, I think I was 20.

**Q.** Do you have a felony conviction for possession of a gun by a firearm -- I mean, sorry, by a felon?

**A.** Yes, ma'am.

**Q.** And what about felony conviction --

THE COURT:  I'm sorry, I can't hear what you said.

MR. VILLA:  I can't -- I can't hear the witness.

THE WITNESS:  Yes, ma'am.

BY MR. STOKMAN:

**Q.** What about felony convictions for drugs -- possession?

**A.** Yes, ma'am.

**Q.** And robbery using a firearm?

**A.** Yes, ma'am.

**Q.** Was that a lengthy sentence that you served for that conviction?

**A.** Which one?

**Q.** The robbery with a firearm.

**A.** Yes, ma'am.  I got 21 years, 8 months.

**Q.** When were you convicted on that offense?  Around -- yeah,

DX Eversole; S

2063

sorry, go ahead.

A.    I was arrested in 2004.  I was convicted in 2005.

Q.    In 2020, were you still serving that sentence that came from the robbery?

A.    Yes, ma'am.

Q.    What prison were you in?

A.    I believe I was in North Kern.

Q.    In 2020?

A.    Yes, ma'am.

Q.    Do you recall when you arrived at North Kern, around what year?

A.    Mm, I believe at the end of 2018 or sometime in the beginning of 2019.

Q.    And is North Kern located in the Bakersfield area of California?

A.    Yes, ma'am, in Delano.

Q.    Where in relation to Kern Valley State Prison is North Kern?

A.    Mm, it's basically across the street.  They're on the same grounds, it's considered the same prison grounds, but it's two separate prisons.

Q.    In November of 2020, did a significant event happen for you?

A.    Yes, ma'am.

Q.    What was that?

ER 1394

2064

A.   At approximately 5:30 in the morning, the gang squad ran into my cell, cuffed me up, took me to the gang office, dressed me out, and brought me back to Fresno County.

Q.   And were you charged with firearm trafficking and drug trafficking offenses?

A.   Yes, ma'am.

Q.   Were those state charges or federal charges?

A.   Federal.

Q.   Since you had been in prison during that time, how was it that you were able to traffic in firearms and drugs?

A.   I used a cell phone.

Q.   While you were in prison?

A.   Yes, ma'am.

Q.   Did at some point you plead guilty in that federal case?

A.   Yes, ma'am.

Q.   What did you plead guilty to?

A.   I believe I pled to either trafficking meth -- I can't remember the exact charge, but it was for five pounds of meth and for a RICO violation.

Q.   And when you say RICO, do you mean conspiracy to participate in a racketeering enterprise?

A.   Yes, ma'am.

Q.   What enterprise was that?

A.   That was the Aryan Brotherhood.

Q.   That RICO conspiracy, was pleading guilty to that part of

2065

your cooperation agreement in that case?

A.   Yes, ma'am.

Q.   And had you been charged with that offense prior to pleading guilty to it?

A.   No, ma'am, I believe that it was sales of heroin, the meth -- the five pounds of meth, and selling guns illegally.

Q.   Those were the only charges you had coming in?

A.   Yes, ma'am.

Q.   Okay.  And so you entered into a cooperation agreement in that case, right?

A.   Yes, ma'am.

Q.   Are you familiar then with the Aryan Brotherhood?

A.   Yes, ma'am.

Q.   What is that?

A.   It is an organization within the California prison system that runs the -- anyone that runs white in prison, basically they create the rules for them.

Q.   When you say "they," who do you mean?

A.   The AB.

Q.   Have you ever been an associate of the AB?

A.   Yes, ma'am.

Q.   When did you first come to know of the AB?

A.   Mm, I've kind of always known about them since I was a child because of my background.  My family were either in some type of way in a criminal enterprise always.  You know, I grew

DX Eversole S

2066

up in a biker family, a Hells Angel family.  And when I was a child, there was a lot more AB members, so they were around.  It was just something you knew about.

Q.  And during the years that you spent in prison, were you exposed to the AB during that time as well?

A.  During -- I mean, rule-wise, yes.  Getting kites from the back, which is in the SHU where they were all from, slammed in the SHU.  But not direct contact with them until the latter part of, I think, like '15 or '16.  I can't remember.

Q.  And when you say getting kites from them or direct contact with them, who are you referring to?

A.  The AB.

Q.  And does that include just AB made members?

A.  Well, you don't always know.  So you get -- they call them kites.  They're little notes that we always transfer from one prison to another, basically with instructions or with rules or with lists of names of people that are in trouble.

Uh, you don't always know who they're coming from, so you just assume, because you're not allowed to do that on your own.  So you assume it's from somebody that's either a made member or an associate.

Q.  Of the AB itself?

A.  Yes, ma'am.

Q.  So it sounds like -- well, let me ask you this.

You mentioned having contact with AB members after

2067

they were released from the SHU.

Can you tell us briefly what you mean by that?

A.   Well, at that time, they started being on the main line yards with us, with us being the main line inmates, white inmates.  So either you would come in contact with them if you were on the yard or through cell phone.  We would call them.

Q.   Can you tell the members of the jury what the SHU is?

A.   The SHU -- the SHU is the Security Housing Unit.  So if you violate a rule in prison that's serious, you go to ad seg, Administration Segregation.  They investigate what it was.  It could be possession of drugs or assaulting another inmate. There's numerous reasons why you would go back there.

If you're found not guilty, you go back to the yard. If you're found guilty, you're given a length of time that you have to go do in disciplinary, and that's where you go to to do that time is in the SHU.

Q.   Prior to 2015, how -- what was the relation with the SHU to the Aryan Brotherhood members that you were saying you didn't have contact with?

A.   Well, so, normally, when you go to the SHU, you get a finite amount of time, whether it's two years, five years, six years.  And as long as you don't violate any more rules at that time, then you get to come back to main line.

But they also have a thing called indeterminate.  So an indeterminate time is they don't have a specific time.  So

DX - Eversole S

2068

at that time, if you were a validated AB, AMA, different gangs that the prison system had, designated as a validated, they would put you back there indefinitely.

So a lot of guys have been back there 20 years, 25 years.  So we didn't have direct access to them.  They had them separated into their own area.

Q.  And around 2015, is that when you said that changed?

A.  Yeah, it was around about that time.  I don't remember the exact year.  I was down a very long time so everything kind of blends.  But we had a huge hunger strike in the California prison system asking for certain changes, and one of the changes was to stop the indeterminate SHU process.

Q.  So in your time in prison, at any point were you able to speak directly with AB members, made members?

A.  Directly as in face-to-face?

Q.  Or in any way that wasn't through a kite?

A.  Yes, ma'am.

Q.  And are there other terms for made members that you're aware of?

A.  Uh, we call them big homies, brothers, made.  I mean, there's just a bunch of generic terms.

Q.  Have you ever heard of the term "the brand"?

A.  Yes, ma'am.

Q.  What does that refer to?

A.  That's the AB.

2069

Q.   And have you ever heard of the term "the tip"?

A.   Yes, ma'am.

Q.   What is that?

A.   So basically, the whole white population is considered a sphere.  You know, we're all part of one whole.  And the AB are the tip; they're the front line.  They're the ones that are there, you know, basically in front of us all.

Q.   And does that "tip" refer to made members?

A.   Yes, ma'am.

Q.   And when you say "all the whites," does that mean within the prison system or --

A.   Originally it was in the prison system, but it's overflowed to the streets as well.

Q.   Okay.  Through your exposure to AB members and the kites that you mentioned, have you been able to learn about the structure of the AB?

A.   Yes, ma'am.

Q.   And what is that?  Can you tell us what the structure is?

A.   Well, I would say the formal structure is just the AB itself, so that's made members, period.  That's -- they are their structure.

Then they have a three-man council that kind of adjudicates, I don't know, arguments or different rules. Like, sometimes they change policies.  We have rules and policies that we abide by within our own -- within the prison

DX - Eversole - S

2070

system.  It's made up by us, by the AB.

And sometimes they change that policy because times change, and you have to kind of float with the times.  So if they're going to change something new, then usually it's the council that will give the deciding vote on that.

Q.  Have you ever been on a prison yard with a made member?

A.  Yes, ma'am.

Q.  Have you ever run a prison yard yourself?

A.  Yes, ma'am.

Q.  What -- around what year was the first time that you ran a prison yard?

A.  Uh, the full yard, having a whole yard -- because I've ran buildings.  I've ran, like, little -- so I would say maybe 2011-ish was probably the first time.

Q.  What prison was that in?

A.  That was in Kern Valley.

Q.  And did you run yards after that?

A.  Yes, ma'am.

Q.  Post-2015, what yards did you run, in what prisons?

A.  I had the yard that I was at in Salinas Valley.  I had Calipatria.  After the brother left that yard, I ran that yard.

I went from Calipatria to Salinas; that's the yard I had after that one.  And then I went to North Kern, and I had that yard.

2071

Q.  Generally, every time you ran a yard, who put you in charge of that yard?

A.  Prior to 2015 -- you don't really know.  Like I said, when you're given orders, you don't know exactly where they come from because you don't have access to those people.  So you just assume -- because it -- I don't know how to explain.

Like, it's just a -- like, it's just something you know.  Like, if you run a traffic light, you know you're probably going to get a ticket.  No one has probably ever told you that, but you know that.

So, like, if you do something wrong, if you do something that's not from someone that was designated, you're going to get stabbed for it.

So, like, when you get orders, you know they are coming from someone that's designated to give those orders.  It's not something that's, like -- I don't -- I can't explain it.  It's not just told to you.  You just know it.

Q.  So you're talking in the context of pre-2015, when there was little to no direct communication with AB brothers; is that right?

A.  Yes, ma'am.

Q.  And so generally when you were running yards after 2015, who -- what was the type of person that was putting you in charge of those yards?

A.  That was your -- from an AB member.

DX Eversole, S

2072

Q. And when you were put in charge of yards in the prison system, were you given expectations of how to run the yard?

A. Yes, ma'am.  You have a set of rules.

Q. And who gave you those rules?

A. The AB.

Q. And what were they?

A. Well, there's several rules.  I mean, you have your basic rules, which is drug debt rules, your interactions with staff, your interactions with other races.  Kind of what you are allowed to do and not do as part of the white prison population, it's called "the woodpile."

     And then you -- you're expected to make a certain amount of money.  That's, like, always bottom line is you're going to produce money so that you can kick up money.

Q. When you say "kick up money," explain what that means?

A. When you're kicking up money, it's like a tithe.  You know, if you make a thousand dollars on the yard, illegally, then a third of that money goes to whatever member owns that yard that that's his yard, or it just goes up to their general funds.

Q. Were there rules about drug debts owed by white inmates?

A. Yes, ma'am.

Q. And what are those rules?

A. Well, it --

Q. Or generally, if you can --

ER 1403

DX - Eversole S

2073

A.  Generally -- because it changes.  Like I said, sometimes a policy will be this this month and the next month it will change depending on what's going on.

So generally, rule of thumb is a $200 debt limit. Like, you're not allowed to be in debt over $200 for drugs.

Q.  Otherwise what happens?

A.  You're going to get killed.

Q.  What was your position when you ran the prison yards as it pertains to other white inmates within that yard?

A.  What do you mean?

Q.  Did you have a position of control over them, or was there a hierarchy when you were running the yard yourself?

A.  Well, there's always a hierarchy.  It's kind of like a high school.  You know, there's a popularity contest kind of thing where you stand on the yard.  You have the same exact type of people as in high school, you know, different groups that hang out together.

But the bottom line is whoever has the keys, that person sets the rules for the yard, and that is the end of the hierarchy.

Q.  When you say "have the key," do you mean, like, runs the prison yard?

A.  Yes, ma'am.

Q.  Okay.  Before you ran a yard, were you free to do what you wanted as a white inmate?

2074

A.    No.   You're never free to do what you want.

Q.    Why not?

A.    Because we have rules, and you have to answer for them. Because it's kind of like what's always been said -- what we always said amongst ourselves is this isn't your prison; this is the AB's prison.  So you're here for them.  Like, they let you come on their yard.  They let you be on their yard, so you follow the rules.

Q.    How did that change, if at all, once you started running prison yards.  Did that change the fact that you couldn't really do what you wanted?

A.    Uh, I mean not per se.  Like, you still had to report, and if -- I mean, within reason, you have authority over the yard, but if it's something serious, then you obviously are going to contact whoever that you're under and ask for permission.

Q.    At one point were you up for membership to be an AB made member?

A.    Yes, ma'am.

Q.    When was that?  Around when?

A.    I would say 2018 maybe.

Q.    Do you -- are you aware of the term "sponsors"?

A.    Yes, ma'am.

Q.    What does that mean?

A.    So to become a made member, AB made member, you have to have two people that are willing to sponsor you that are made

2075

members.

**Q.**   And who were your sponsors?

**A.**   Billy Sylvester and DT, Danny Troxell.

**Q.**   During the course of the time that you were in contact with AB members or receiving kites or generally learning about the AB, did you also learn of rules or codes of conduct that the AB expected you to follow?

**A.**   Yes, ma'am.

**Q.**   Did the AB have a position on talking to law enforcement?

**A.**   Yeah, you don't.

**Q.**   Otherwise what happens?

**A.**   You'll get killed.

**Q.**   Are there symbols that you would associate -- or that you learned to be associated with the AB?

**A.**   Yeah.  The shamrock, which is a three-leaf clover, 666, it could be a 1-2.  Those are, like, basically what you -- if a member -- if you see someone with that on them, you know they are a member because you are not allowed to put that on you if you're not.

**Q.**   Are you referring to all of those or just the shamrock?

**A.**   It could be any one of those.  They are very zealous about protecting what's theirs.  Like, you can't -- you can't go around, like, purporting to be that if you're not.  Even if you're not outright saying it, you're kind of projecting yourself to be that, so they frown upon that.

2076

Q.   And when you say "that," you mean projecting yourself to be an AB members?

A.   Yes, ma'am.

Q.   Okay.  Do you know an individual named Kenneth Johnson?

A.   Yes, ma'am.

Q.   How do you know him?

A.   I knew him by reputation for a long time.  And then at one point or another, I started talking to him, and he became one of my friends.

Q.   And in what ways were you having communications with him?

A.   Talked to him on a cell phone.

Q.   Was this when you were in prison?

A.   Yes, ma'am.

Q.   Do you know if during that time he was incarcerated?

A.   Yes, ma'am.

Q.   Was he?

A.   Yes, ma'am.

Q.   Do you know what prison he was in?

A.   He was in Kern Valley.

Q.   Does he go by any nickname?

A.   They call him "K" or "Kenwood."

Q.   What about an individual named Francis Clement?  Do you know him?

A.   Yes, ma'am.

Q.   How do you know him?

2077

A.  The same way.

Q.  Because you started communicating with him at some point?

A.  Yes, ma'am.

Q.  And does he go by a nickname?

A.  Everyone calls him "Frank" or "F."

Q.  When you were communicating with Frank, was that during the same time period that you said you were communicating with Kenwood?

A.  Yes, ma'am.

Q.  And do you know if Frank was incarcerated around that time?

A.  Yes, ma'am.

Q.  And was he?

A.  Yes, ma'am.

Q.  Does Kenneth Johnson have any affiliation with the AB?

A.  He's an AB member.

Q.  What about Francis Clement?

A.  Yes, ma'am.  He's an AB member.

Q.  Do you know an individual named John Stinson?

A.  Yes, ma'am.

Q.  How do you know him?

A.  The same thing, by representation.  Like, you just -- you just know who he is because he's talked about.  He's an AB member.

Q.  Have you ever spoken with Stinson at any point during your

ER 1408

2078

time in prison?

A.  Yes, ma'am.

Q.  And in what ways were you communicating with him?

A.  Cell phone.

Q.  And do you know during those periods whether or not Stinson was incarcerated?

A.  Yes, ma'am, he was.

Q.  Do you know what prison he was in?

A.  I believe at that time that he was in -- I'm sorry.  I'm, like, really bad with names.

Q.  That's okay.

A.  Soledad, maybe Soledad.

Q.  Okay.  And can you just clarify around what time frame you would have had contact with John Stinson?

A.  It would have been about 2018, 2019.

Q.  Have you heard the term -- or does this -- do you know what it means to "appear before the council"?

A.  Yes, ma'am.

Q.  What does that mean?

A.  So normally -- normally, if you get in trouble and you're, like, kind of have no influence or you're not anyone, like an AB member will just deal with it or the person that has a yard, but if you're in any way associated with members of the AB and it's something serious that's going to affect everyone, then normally it will go in front the council to adjudicate

2079

whatever it is that's going on.

Q.  And do you know of any particular role that John Stinson had within the AB?

A.  I believe, and this is -- I don't know for a fact, but I believe that he --

MR. REED:  Objection.  Lacks foundation by definition.

THE COURT:  Sustained.

BY MS. STOKMAN:

Q.  Have you ever had to appear before the council?

A.  Yes, ma'am.

Q.  And tell us, what does that mean?  You physically go in front of them, or how does that work?

A.  Normally, you get on a conference call, and there will be several members on there or anyone that's involved in whatever the dispute is, because they are going to ask questions, "they" being the council, and they want to know both sides of the story of whatever is going on.  And then they will tell you what's going to happen or they will talk among themselves and then you're going to find out.

Q.  Around what time period did you have to appear before the council?

A.  Uh, it happened to me a few times, but the last time was in 2020, I believe.

Q.  And when you were on this call, are you aware of whether

2080

or not John Stinson was on that call?

A.   Yes, ma'am.

Q.   And are you -- during that call, were you asked any questions about the incident by John Stinson?

A.   I can't say that for sure.  Because there was so many people talking, it was only at the end, after everything was said and done, he called me and told me what was going to be done or what had been done.

Q.   Uh, you mean what the council decision was?

A.   Yes, ma'am.

Q.   Okay.  Do you know an individual who goes by the moniker "Misfit"?

A.   Yes, ma'am.

Q.   How do you know him?

A.   He's an AB member.

Q.   Do you know an individual named Jayson Weaver?

A.   Yes, ma'am.

Q.   And how do you know him?

A.   He's an AB member.

Q.   Does he have a nickname?

A.   Yeah.  That's Beaver.

Q.   What about Waylon Pitchford, do you know him?

A.   Yes, ma'am.

Q.   How?

A.   He's an AB member.

DX Eversole S

2081

Q.  And does he have a nickname?

A.  Yeah.  He goes by Waylon.

Q.  And Todd Morgan, do you know that individual?

A.  Yes, ma'am.

Q.  How do you know him?

A.  He's an AB member.

Q.  Do you know an individual that goes by the nickname "Bam" or "Bam Bam"?

A.  Yes, ma'am.

Q.  Do you know his full name?

A.  No, ma'am.

Q.  And how do you know him?

A.  He's what I would say a little homey.  He's like one of the guys that we would use to do stuff for us on the streets.

Q.  Do you know if he had any association with a street gang?

A.  Yeah.  He joined -- he became a member of PENI.

Q.  Do you know around when that was?

A.  I would say in 2020.

Q.  And did you know - or in your conversations with Kenwood, did you ever -- did he ever tell you whether or not Bam was doing work for him?

A.  Oh, yes, ma'am.

Q.  And can you tell us about that?

A.  I talked to K daily, multiple times a day, unless one of us lost a phone.  So a lot of what I did, most of what I did

2082

was wrapped up with K and what he had going on.  We did a lot of stuff together and I did a lot of stuff for him.  So we talked about Bam as one of the people that was given orders to do stuff.  So we would talk about him, and then one or the other of us would call him and have him go do whatever it was.

Q.   Do you know an individual named Justin Gray?

A.   Yes, ma'am.

Q.   How do you know him?

A.   Originally, I knew him by reputation, and then he was in Calipatria with me, on the yard with me, he worked with me in the kitchen, he worked out with me, he was my workout partner.

Q.   Does he have any nickname?

A.   Yeah.  Sidetrack.

Q.   And do you know if he had any gang affiliation?

A.   Yeah.  He was part of the Baby Blue Wrecking Crew from the South Bay.

Q.   And through speaking with either Justin Gray or Kenneth Johnson, did you know whether or not he was ever doing any work for Kenwood?

A.   Yes, ma'am.

Q.   And what was he doing?

A.   He did various things, he ran drugs out of state, committed violence, delivered things, picked up money.

Q.   What about an individual who goes by the moniker "Soldier," do you know that person?

ER 1413

2083

A.   Yes, ma'am.

Q.   How do you know him?

A.   He's a PENI gang member.

Q.   And as far as you know, with conversations that you've had with Kenneth Johnson, was he ever doing any work for Johnson?

A.   Yes, ma'am.

Q.   What was he doing?

A.   Uh, Soldier did mostly fraud.  He did a lot of different kinds of fraud, whether it be IDs, making checks, doing credit card fraud, doing EDD fraud.

Q.   And do you know where the proceeds of that fraud were going?

A.   Uh, some of it would go to the brothers, you know, different people.  I didn't know everything he did because he's not someone I talked to a lot.  I'm more talked to him, I've had conversations with him, because Bam, that was his sponsor, Bam's sponsor to become a PENI, so Bam hung out with Soldier.

Q.   And that's how you knew him?

A.   Yes, ma'am.

Q.   Do you know an individual named Kenneth Bash?

A.   Yes, ma'am.

Q.   How do you know him?

A.   Uh, Bash has been my celly off and on maybe five times while in prison, at different prisons.

DX-Eversole-S

2084

Q.   Do you know if he has any association with the AB?

A.   Yes, ma'am.

Q.   And what is that?

A.   He was working for different brothers.

Q.   Which ones?

A.   Beaver, Waylon and Todd.

Q.   Todd Morgan?

A.   Yes, ma'am.

Q.   Do you know an individual who goes by the moniker "Nutty."

A.   Yes, ma'am.

Q.   How do you know him?

A.   Same thing.  We've been on the same prison yard together. We were in ad seg together.  I actually think he was my celly in ad seg at one time, and then -- like, I know his family. Like, I've talked to his family.

Q.   Going back to when you were using cell phones in prison, were those cell phones lawfully obtained cell phones?

A.   No, ma'am.

Q.   What would you call them?

A.   Uh, as far as --

Q.   "Contraband phones," would that be a term?

A.   Oh, yes, ma'am.

Q.   Okay.  And what were those phones generally used for?

A.   Uh, I mean, I would say individually, as dumb as it sounds, I played Candy Crush on mine, I'd FaceTime with -- I

2085

would use it to FaceTime with my grandkids and my family. And, uh, every illegal activity, like, that you use it, you have access to the world through your phone.

Q.   And so, at any point in time, did you learn about different ways to bring drugs into the prison?

A.   Yes, ma'am.  I knew about that before we were getting cell phones, but it made it easier when cell phones started coming into the prisons.

Q.   And why was it easier, just generally?

A.   Because it's just easier to coordinate.  You could talk to the different people that were involved in it and make sure that things moved along the way they were supposed to.

Q.   Did you, at any point in time, have individuals working for you who were outside of the prison system?

A.   Yes, ma'am.

Q.   And did cell phones facilitate that at all?

A.   Oh, yes, ma'am.

Q.   How so?

A.   Well, if you don't have direct contact, then you can't really keep track of what people are doing.  So if you send someone to go do something, you don't know if they are actually on their way to do it or not because you can't keep track of them.  So having a cell phone, what I would do was make them download a tracking app, and then I could keep track of where they were so that, if something happened, it would,

2086

you know, I could check their whereabouts and send help or make sure they were going to where they were supposed to be going.

Q.   The people who were working for you outside of prison, were they making money for you?

A.   Yes, ma'am.

Q.   In what ways?

A.   Uh, we were sending drugs out of state, we were selling drugs within the state, we were bringing drugs from Mexico. We were buying guns from other states and bringing them back to California and selling them here in California.

Q.   And what, if anything, would you do with the proceeds from that activity?

A.   Some of it would be mine and some of it I would kick up.

Q.   Back to the AB brothers?

A.   Yes, ma'am.

Q.   You said that Sylvester and Troxell are your sponsors.  At some point in time, did you have like de facto sponsors instead?

A.   I don't know that it's a de facto sponsor because you can't -- I don't think that the sponsors can be changed.  I don't know.  I truthfully really don't know how that works because I was not a member.

        But you kind of always have someone that has your back.  You call it an umbrella, you know, to protect you from

2087

the rain.  So you have an umbrella, someone that looks out for you that's a big homey, that's helping guide you through all the process and kind of keep you out of trouble.

Q.  So did yours at some point switch from Sylvester and Troxell to someone else?

A.  Yeah, I would say K and Frank, but they were my friends too.  You know, I talked to them all the time.  I did stuff with them.  And they always went to bat for me.

Q.  What were the circumstances, just very briefly, about why Sylvester and Troxell could not really fully act as your sponsor?

A.  They were under a different indictment.  That had happened a year prior through our indictment.

Q.  Okay.  So at some point in 2020 or 2019, 2020, when you were making money, did you ever send that money up to AB brothers who were not Sylvester and Troxell?

A.  Yes, ma'am.

Q.  And who were you sending money to at that time?

A.  Uh, well, I sent money to all the brothers that were in Kern Valley.  There was five of them, I think, at the time. So I was sending money to all of them off of everything I made at the yard I was on on North Kern.  At the time, we were bringing phones and drugs into the yard through the kitchen. So I was making quite a bit of money.

        And then I would kick up money to what's called the

2088

general fund.  It's for all the brothers, like if they need it, if they are in -- going to court or different reasons. It's just a general fund, so I would kick up money to that.

Q.  Who were the brothers at Kern Valley during that time?

A.  Uh, I believe Mikey, K, Frank, Dave, and Thrasher.

Q.  And who do you mean when you say Thrasher?  Do you know his full name?

A.  No, ma'am.

Q.  Was he a -- so he was a made member by 2019, 2020?

A.  Yes, ma'am.

Q.  Okay.  Before you were up for membership, did you fall under the rules of AB?

A.  Yes, ma'am.

Q.  Did you fall under the control of the AB?

A.  Yes, ma'am.

Q.  And was that still true while you were up for membership?

A.  Yes, ma'am.

Q.  Do people -- you said that you would -- well, you would qualify yourself as an AB associate.

In your experience, are associates only White inmates in the prison system?

A.  Well, they're only White inmates, but you -- some members do get out and they are members on the streets.

Q.  And are there associates on the streets as well?

A.  Yes, ma'am.

2089

Q.   Have you ever committed violence for the AB?

A.   Yes, ma'am.

Q.   Inside of prison or outside?

A.   Both.

Q.   What types of things?

A.   I have had people stabbed.  I've stabbed people.  I've had people shot.

Q.   And so have you ordered violence for the AB as well?

A.   Yes, ma'am.

Q.   Inside the prison or outside?

A.   Both.

Q.   Why -- when you gave those orders, why were you giving those orders?

A.   Because I was told to.

Q.   By who?

A.   By AB members.

Q.   When you were committing that violence, why were you doing that?

A.   Because it was my job.

Q.   As what?  Explain that to us?

A.   As being up for membership in the AB.  It's kind of like a -- I don't know, it's like an interview, a three-year interview process.  And you're expected to do things to prove that you have what it takes to become an AB member.

Q.   What, in your experience, is the purpose of using violence

ER 1420

DX - Eversole S

2090

against people?

A.   Intimidation.  You don't have direct contact with people so I can't reach out and physically attack someone if they don't do what I'm asking them to do.  So you use violence to let people know that it can happen whether you're there or not.  So it's a control tool.

Q.   If -- in your experience, if an -- a white inmate in the prison system wants to kill another white inmate, could they just make that decision on their own?

A.   I mean, they could just do it.  There'd be consequences for it if they just decided to do it.  I mean, you might feel passionately enough that you just do it and you don't ask for permission, but you will get in trouble for that.

        But generally speaking, no, you have to have permission by the person that's running the yard to do something like that.

Q.   When you ordered violence, what would happen if someone failed to follow your order?

A.   I would have had someone else commit violence to them.

Q.   You've mentioned that the AB has a policy against speaking with law enforcement.  Is that also a policy against being a cooperator?

A.   Yes, ma'am.

Q.   And in your experience, what happens when someone is suspected of cooperating with law enforcement?

2091

A.   They would be killed.

Q.   In your experience, how would you find out if someone is cooperating?

A.   I mean, there's various ways.  Uh, normally you can tell right away if they're acting out of character.  I mean, that's a pretty good -- if they're in any type of trouble and they start acting out of character, meaning they're not in the contact that they're normally in or they're acting nervous, I mean, that's a tell.

     And then you start investigating.  You can ask their friends that they associate with what's going on with them.  There's ways to check court documentation on if someone took a deal.  And if you -- you get a deal outside of the amount of time that your crime holds, then it's a pretty good indication that they took a deal and cooperated.

Q.   In your experience, have you ever been asked by a brother about potential cooperators?

A.   Yes, ma'am.

Q.   And tell us about that.

A.   I was in prison in South Carolina, in federal prison.  I had already tooken [sic] my deal and was doing my time.  I chose a prison in South Carolina just to kind of get away from everything that was going on out here.  And I --

     MR. VILLA:  Objection, Your Honor.  Can we sidebar?

     THE COURT:  All right.

ER 1422

2092

MR. VILLA:  Well, I guess relevance because it's after the time in which he was sentenced and cooperated.

THE COURT:  I think we probably have to have that sidebar.

(Sidebar commences.)

MR. VILLA:  So, Judge, first, with respect to the relevance, he's talking about when he got sentenced in this case he went to South Carolina to the BOP so it's after the time when essentially he's out of the racketeering conspiracy.

And then second, I don't know what he's about to talk about, if there was some defense investigation in this case where we interviewed Mr. Eversole in South Carolina, I'm not sure if he's going to bring that up or not, I don't know if that's where we're going, but that would be a separate objection, I guess.

THE COURT:  So your concern about -- what I understand he was going to talk about is the fact that the AB will do investigation to identify cooperators.

Is that time frame dependant, or are you saying that this process changed before he pled as to after?

MR. VILLA:  Well, so the first step is it sounds like he's talking about some investigation that went down in South Carolina.  So it's when he's no longer a member of the racketeering conspiracy that we're -- that's on trial.  So I think it would not be relevant.

2093

If it's something specific to him, you know, some sort of retaliation or whatever, okay, maybe that's fair game. But if he's talking about, like, defense investigation where we go in and interview witnesses, you know, then I think, you know, we're getting into a whole different area.  But I don't know what he's about to talk about.

THE COURT:  Can you tighten up your question because is he trying to just tell us generally what they do or is he talking about a specific experience?  And we truly don't want to know what counsel is doing.

MS. STOKMAN:  No, he's going to talk about a specific request by defendants in this case.

THE COURT:  The defendants, not their counsel?

MS. STOKMAN:  Yes.

THE COURT:  Okay.

MR. REED:  Well, I guess the question would be how would he know that and how can he testify to that if he's --

MS. STOKMAN:  He'll lay that foundation down.

MR. VILLA:  And I mean --

MS. DE SALES BARRETT:  What's the foundation?

MR. VILLA:  And maybe there's -- maybe I missed it, but I've not seen such a report or statement from him produced by the government.  Is this --

MS. STOKMAN:  There's a statement --

MR. VILLA:  Is this included in Jencks?

ER 1424

2094

MS. STOKMAN: -- it was a recorded statement. It was included in Jencks.

MR. VILLA: So you're talking about when you guys talked -- went to talk to him in South Carolina?

MS. STOKMAN: Uh-huh.

MR. VILLA: Okay. So that -- they went to talk to him in South Carolina about an investigation, which myself and an investigator went and interviewed him about this case. But there was no such request made by us from -- you know, I mean, if he's going to say Mr. Johnson's attorney and Mr. Clement's investigator, because that's who went, came to interview him, I mean, that's just normal defense investigation. If it's -- if he's something else, that wasn't in that -- that interview.

MS. STOKMAN: It was.

THE COURT: What's this something else?

MS. STOKMAN: A letter he received from the defendants.

MR. VILLA: Okay. That letter was presented to him by the defense investigator.

THE COURT: You're saying he had not received it but they brought a letter to him from your clients? Is that what you're saying?

MR. VILLA: That said nothing of the sort that he's alluding to. It said, you know, these are my investigators, they're working for me on this case, please talk to them.

2095

THE COURT:  Did you --

MR. VILLA:  And that's all it said.

THE COURT:  It didn't ask him to share information with you, directed him to do that?

MR. VILLA:  Just said you can talk to them because they represent me in this indictment.

THE COURT:  And you asked him who cooperators were?

MR. VILLA:  No, no.  We asked him about the case, about the events in the -- in the RICO case, we asked him if he knew anything about Lomita, we asked him all kinds of questions.  But the letter was just designed to say, because he would recognize Mr. Johnson's handwriting, that these aren't, you know -- these are people who are the -- who they say they are, right, you can talk to them.

THE COURT:  I don't know what that means --

MR. VILLA:  Just --

THE COURT:  -- you can talk to them, except for what I'm afraid that means.

MR. VILLA:  No, it only means -- because a lot of the people we go talk to in prison say, I don't want to talk to you, I don't believe who you are -- you are who you say you are.  You know, I don't know if you're a cop, I don't know if you're a fed, I don't know if you're lying to me that you're Mr. Johnson's lawyer.  So --

THE COURT:  So I just want to understand.  The letter

ER 1426

2096

said, This is my lawyer, from Ken Johnson?

MR. VILLA:  Yeah.  And, you know --

THE COURT:  What else?

MR. VILLA:  -- you can talk to them.

THE COURT:  What else?

MR. VILLA:  That's it.

THE COURT:  This is my lawyer, from Ken Johnson, you can talk to them; that's disturbing to me.  I'd like to see this letter.

MR. VILLA:  There -- I mean, I don't have the letter anymore, Your Honor, but it's just so that he would be allayed that, you know, any concerns he had that we not -- we aren't who we say we are.

THE COURT:  It sounds --

MR. VILLA:  I mean, when I walk in, I say, I represent Mr. Johnson, but that doesn't mean he's going to believe me.

THE COURT:  It sounds like -- and I don't want to be reading into this, but it sounds like this came with the imprimatur of the AB.

MR. VILLA:  It's not.  It just said, This is my lawyer.

THE COURT:  And it was signed by Ken Johnson?

MR. VILLA:  I think so, yeah.  Yeah.

MS. LUEM:  He was -- we didn't know him to be a

2097

cooperator at that time.

MR. VILLA:  We had no idea.

MS. LUEM:  He was just a witness.

THE COURT:  Right.  That's what my worry is.

MS. LUEM:  Yeah, when we're interviewing witnesses, a lot of times we go into prisons -- and because they're criminals, and because they're, you know, they're guarded and they don't know who we are, and if we are who we say we are -- most the time the prisons won't even let us take a business card in, they won't let us take any identification in.

So if we have a letter from a client who's friends with him saying:  This is my lawyer, this is my investigator, you know, it's okay to talk to them and discuss the --

THE COURT:  Okay.  I got it.

So you're going to ask him about this situation?

MS. STOKMAN:  The letter.

THE COURT:  The letter says something other than what I've heard?

MS. STOKMAN:  Yes.

MR. REED:  So --

THE COURT:  This is what we're going to do.  We're going to take a break right now.  I'm going to hear this.  I'm going to see the letter.  We're going to go from that.  Okay -- outside the presence of the jury.

MR. VILLA:  Yes, Judge.

2098

(Sidebar ends.)

THE COURT:  All right.  Ladies and gentlemen, we're going to go ahead and take a break.  Why don't you plan on taking about a 20-minute break.  When you come back, we'll finish out the day.

Thank you very much.

(Jury exits the courtroom at 12:29 p.m.)

(The following proceedings were held outside the presence of the Jury:)

THE COURT:  All right.  The jury members have stepped back.

Ms. Stokman, you may continue.

Sorry, I said "stepped back."  I meant stepped out.

Go ahead.

DIRECT EXAMINATION

BY MS. STOKMAN:

Q.  So you mentioned that you've been asked by an AB brother about potential cooperators.  Which brother or brothers asked you about that, in the incident you were talking about?

A.  I got pulled out of my yard by what I was told was investigators for Kenwood and Frank and handed a letter, approximately five-page letter, introducing who the two people were that were coming there and that it was okay to talk to them.  And it was kind of questions about who I thought was cooperating and who I thought would cooperate.

DX Eversole / No Jury Present

2099

Q. And did the letter list specific names of people that might be cooperators?

A. Yes, ma'am.

Q. Around how many?

A. Uh, I don't remember, but I would say less or around ten, right around there.

Q. And how did you -- or who was that letter from? Who had written it?

A. That was from K.

Q. How did you know it was from him?

A. Because I knew his handwriting, and he introduced himself in the -- in the letter saying who he was.

Q. In any part of that letter, did you recognize handwriting from Frank?

A. Yes, ma'am.

Q. And in general, the nature of that letter, how did that seem to you?

A. Uh, I mean, I don't know. I was conflicted by it because, obviously, I didn't want anyone to know that I was cooperating.

Beyond the fear of it, I guess it was the embarrassment of it -- because I am embarrassed by it. But, I don't know, it was kind of like -- and by love letter, I don't mean, like, from, you know, two people that are in love with each other, but I mean, like a letter from a bro saying, We're

2100

still here, but at the same time, like, We're still here.

Q. Did you find that to be intimidating in any nature?

A. Yes, ma'am.

MS. STOKMAN: That's the extent of the questions on that.

THE COURT: Counsel, do you have questions?

CROSS-EXAMINATION

BY MR. REED:

Q. Mr. Eversole, do you remember when you got this letter?

A. Yeah. Well, not to pinpoint. So this is -- I got out 2024, so I would say that it was in 2023 maybe.

Q. Do you know when the third superseding indictment was brought down?

A. No, ma'am -- no, sir. I'm sorry.

Q. You meant --

A. Yeah, sorry. I apologize.

MR. REED: Your Honor, I think this predated my client, so I have a different objection. And I don't think I need to go any further explaining it, but --

THE COURT: Yeah. I got it.

MR. REED: Thank you.

THE COURT: Mr. Villa. Okay.

CROSS-EXAMINATION

BY MR. VILLA:

Q. Mr. Eversole, the letter didn't say, you know, we want to

ER 1431

CX Eversole / No Jury Present

2101

find these people so that we can hurt them, correct?

A.  No, sir.

Q.  And the questions that we were asking you were to try to figure out who the witnesses were against our client so we could investigate our case?

A.  Yes, sir.

        MR. VILLA:  That's all.

        THE COURT:  Anything for Mr. Clement?

        MS. DE SALES BARRETT:  No, Your Honor.

        THE COURT:  Mr. Eversole, in this meeting, was a letter brought to you, or was it sent to you in advance?

        THE WITNESS:  It was brought to me.  It was handed to me.

        THE COURT:  By whom?

        THE WITNESS:  By one of the two investigators, what I thought was investigators.

        THE COURT:  And is Mr. Villa, the one who just asked you a question, one of those people?

        THE WITNESS:  Yes, ma'am.

        THE COURT:  Who else was it?  A man or a lady?

        THE WITNESS:  It was a female.

        THE COURT:  When you had the conversations, were you asked specifically, you know, who do you think witnesses are, or were you asked something else about cooperators?

        THE WITNESS:  Yes, I was asked who I thought was

2102

cooperating, who I had heard was cooperating, what I thought each person would or wouldn't say, what I thought they maybe knew.

THE COURT: Did you have -- were you told about anything about where that information would go to or if it would go beyond the people you were talking to?

THE WITNESS: No, ma'am.

THE COURT: When you were interviewed in that context, did you tell them the truth or --

THE WITNESS: Yes, ma'am.

THE COURT: So when you were shown a list of people who were potential cooperators, did you say, I -- you know, That one is, that one isn't? Or what did you say in that regard?

THE WITNESS: I said everything that I knew or thought that I knew. I gave my opinion on each one of the names.

THE COURT: Do you remember today who those were?

THE WITNESS: I remember some of them. But some of the names I didn't recognize, and I said that at the time, that I didn't know who that person was. And then some of them I did know.

THE COURT: And did you only talk about the people who were on the list that was in the letter that you received?

THE WITNESS: Yes, ma'am.

2103

THE COURT:  And of those, who do you recall being on the list?

THE WITNESS:  Bash; Sidetrack; Bam; Stephanie Madsen, I think that's her last name; Soldier.  I can't remember.  There was a few other names that I vaguely remember, but I can't pinpoint them.

THE COURT:  Do you remember any names that you said were not cooperators, to your knowledge?

THE WITNESS:  I didn't know for sure if any of them were cooperating.  I just gave my opinion and then what I had heard through other inmates and, you know, calling home and things like that.

THE COURT:  So of these that you named, did you identify any of these as cooperators?

THE WITNESS:  I -- I gave my opinion of who I thought would -- if they were not, that they would eventually, yes, ma'am.

THE COURT:  Who were they?

THE WITNESS:  I assumed that Stephanie Madsen would for sure.  I assumed that Bam would for sure.  I didn't think Sidetrack would.  I wasn't sure about Bash and what he was doing.  And Soldier, I didn't know enough about him to know either way.

THE COURT:  All right.  Any other questions?

MR. VILLA:  Briefly.

2104

RECROSS-EXAMINATION

BY MR. VILLA:

Q.  You said the questions are about, you know, what -- what might they say if they were cooperating with respect to the indictment in this case; is that correct?

A.  I'm assuming in this case.  I didn't -- at that time I wasn't sure exactly.  And maybe it was -- maybe they had been -- yeah, they were in county.  It's been a long time.

I not trying to prevaricate.  I just literally --

Q.  For instance, you were asked about the Lomita homicides, right?

A.  Yeah.  And I don't remember exactly -- you're talking about in that letter?

Q.  No, no, by the -- by myself and the investigator.  We asked about who you think might be, you know, providing information about the Lomita homicides.

A.  Yeah, and about a couple other homicides.

And at the time I said I wasn't sure.  Like, I didn't have knowledge about it.

Q.  Sure.  But the questions were directed at the allegations in the indictment?

A.  Uh --

Q.  I mean, you were told about the indictment?

A.  Yes, sir.

Q.  And that that's why we were there?

ER 1435

2105

A.  Yes, sir.

Q.  To find out information about the crimes?

A.  Yes, sir.

THE COURT:  Anything -- any other questions by anyone?  All right.

Mr. Eversole, can I ask you to step outside for a few minutes?

THE WITNESS:  Yes, ma'am.

THE COURT:  You can take a break.  Yeah, sure.

THE WITNESS:  All right.

THE COURT:  All right.  Mr. Villa, your objections, let me hear those now.

MR. VILLA:  So, Your Honor, this is just standard defense investigation trying to determine who the witnesses are and what they would say.  There's nothing improper about that.

THE COURT:  Well --

MR. VILLA:  But I don't think it's related --

THE COURT:  Let me stop you right there.

Was there any -- my experience, when people are in custody, they are not entitled to communicate with other people in custody without permission.

And what concerns me about what I've heard so far is that it sounds like you and someone from Mr. Clement's team circumvented that and brought communication from Mr. Clement

2106

and Mr. Johnson without permission.

Is that what occurred?

MR. VILLA:  No.

THE COURT:  What permission did you have to bring that letter into that facility?

MR. VILLA:  I mean, we were searched completely.  We showed them everything that we had.

THE COURT:  That's not what I'm referring to.

Was there advance permission given by the authorities that that communication could occur?

MR. VILLA:  I mean, the only information we were provided is not to give anything to Mr. Eversole to keep.

THE COURT:  I'm not talking about what your instructions were.  I'm talking about the permission given to Mr. Clement or Mr. Johnson to communicate with someone else who was in custody.

MR. VILLA:  Well, Your Honor, as his attorneys, we're his agents.  We communicate to Mr. Eversole related to the criminal investigation of the case.

THE COURT:  I understand that, but that's not what I heard.  What I heard was -- from Mr. Eversole is he was given a letter, five-page letter, which clearly said more than what you represented to me.  And --

MR. VILLA:  So --

THE COURT:  -- it said, Here are some people who may

2107

be cooperators.  Tell us if you think they are cooperators.

He then went through and did his best, he said, told the truth, gave his impressions about these people as cooperators, and now this is where we are.

MR. VILLA:  Judge, and I -- I don't recall the letter being five pages.  We did show him the indictment, which had -- or told him who was on the indictment that, you know, identified the defendants and the -- you know, the potential witnesses and asked him what he knew about those folks.

THE COURT:  All right.  Anything else on behalf of your client, Mr. Villa?

MR. VILLA:  No, Your Honor.

THE COURT:  Behalf of Mr. Clement, any comments?

MS. FISHER-BYRIALSEN:  No, Your Honor.

THE COURT:  Mr. Reed, let me hear your comments.

MR. REED:  I don't know how the Court's going to rule, but --

THE COURT:  Well, I'll tell you -- I just might as well say it.  I don't think it involves Mr. Stinson.

MR. REED:  I don't either.

THE COURT:  It doesn't seem like there's any implication whatsoever that it does.  And I'm not sure the question, Has the -- Does the AB try to identify cooperators, gets us here.

Certainly whether the defendants have, that's a

2108

different question.  That doesn't include Mr. Stinson.

MR. REED:  I'm concerned with how you would draft or how would you fashion a limiting instruction, should the Court decide how the Court is going to rule on that.

THE COURT:  Well, I think any questions in this regard have to be limited to Mr. Johnson and Mr. Clement, because it did not appear to involve Mr. Stinson.

MR. REED:  I agree.  And I'm not going to hold the prosecutor to the way she argued in front of the Court at sidebar, but I didn't get the impression that that was their position in the beginning, but --

THE COURT:  I don't think so either.

MR. REED:  Yeah.  Okay.

THE COURT:  But -- I mean, I can go back and look at the exact question but I think it was AB, it was not --

MR. REED:  That's my understanding as well.

MS. STOKMAN:  And, Judge, just to be clear, and for Mr. Reed's sake, we -- that was the brief beginning of a foundational question that was going to go into the letter being only from two defendants in this case, nobody else.

THE COURT:  So a couple things.  We're not going to talk about Mr. Villa taking that letter.  We're not going to talk about Mr. Clement's investigator.  What we're going to talk about is he received a letter.  It asked him about cooperators, he shared the information, but I truly do not

2109

want to go into discussing counsel's role in that presentation of letters.  Does that make sense?

MS. STOKMAN:  Yes.

THE COURT:  Any comments otherwise?

MR. VILLA:  And, Judge, I would continue my objection that since that part of normal defense investigation --

THE COURT:  Wow, it really should not be.  Really should not be.  Because if you want just a letter of introduction, that can occur, but when you bring a letter from an incarcerated inmate to another incarcerated inmate without prior permission from those prisons and then you're going to -- it specifically asked the person to identify cooperators, I've got an ethical issue with that.  So I appreciate what you're saying, but if you're saying that's typical, then I've got a problem with a lot of people, then.

MR. VILLA:  And, Judge --

DEFENDANT JOHNSON:  -- Not what I said.

MR. VILLA:  Ken, just let me talk.

Judge --

THE COURT:  Mr. Johnson, I'm going to ask you to take a breath.

DEFENDANT JOHNSON:  I don't receive --

THE COURT:  I know you disagree --

DEFENDANT JOHNSON:  -- only here here --

THE COURT:  I heard the testimony --

2110

DEFENDANT JOHNSON:  But I only heard something was done but making me look like shit.

THE COURT:  Sir, do you need to step out?  Are you okay or --

DEFENDANT JOHNSON:  I shoot straight, not crooked.

THE COURT:  Do you need -- do you need to step out or can you get ahold of yourself?

DEFENDANT JOHNSON:  Can you --

THE COURT:  Mr. Johnson needs to step out for a minute.

DEFENDANT JOHNSON:  Man, whatever.

MR. VILLA:  And, Judge, just to be clear, my recollection of the letter is it did not ask to identify cooperators.  We asked him in our questioning to identify people who he thought were witnesses, including those that may have -- because he was part of the original indictment, and we didn't know he was a cooperator, so we thought he might know in the course of his defense investigation who those folks were.  So those were questions of him, absolutely.

But that's not what was contained in the letter.  I mean, if he's going to testify to that, that's fine, but I -- I mean, I -- you know, I can't testify against him.  I'm an attorney, but I just think that it's inadmissible.  I think it's because it's not part of a, you know, some plot by the AB to get him, which that might be fair game.  This is just

2111

defense investigation.

THE COURT:  Where's the letter?

MS. STOKMAN:  Mr. Villa took it back.

THE COURT:  Mr. Villa, where's the letter?

MR. VILLA:  Judge, I don't have the letter.  I mean, you know, we didn't keep it.

THE COURT:  You didn't keep the letter?

MR. VILLA:  No.  Like I said --

THE COURT:  You don't have it scanned anywhere, photo of it, anything?

MR. VILLA:  I mean, I can double-check, Judge, but I don't believe we have it.

THE COURT:  All right.  So this is what's going to happen.  What I said.  His testimony was he was asked about cooperators.  I appreciate that it said that -- this is a different time frame.  On the other hand, he is now a cooperator and, unless you-all are going to tell me you're not going to ask about benefits or any sort of bias he might have -- whether he's got a reasonable fear, he's talked about that already.  This goes to that, I think.

Uh, any other -- and, again, it's going to be limited away for Mr. Stinson.  Anything else at this time?

MR. VILLA:  Judge, I mean, I think he's already testified and I'm sure he's going to testify, like the other witnesses have, that he's in fear for his life because he's

2112

testified and he's cooperated and he's in fear, because that's one of the rules, and fear for his family, but, you know, just because we come and interview him and ask him questions, sure, that might be intimidating, but it's also our job, and that's why it shouldn't be part of the trial testimony.

THE COURT:  If that were all it was, that you went and asked him some questions, I wouldn't have a problem with it.  Because what the evidence in this case, at least up to this point, is that when an AB member asks you to do something, tells you to do something, you're going to do it. You bring a letter to him saying, This is who I am, this is what I'm doing, here is a list of people he identified, at least in his mind, as cooperators, he's expected to respond, and I guess he could have said no, but that probably would have outed him.

So it's a little bit different than just, I'm an investigator, I'm a lawyer, and I talked to a prospective witness.  It came with the indication that he would comply, at least that's a reasonable inference of that evidence.

MR. VILLA:  I mean, he could say the same thing if he said, you know, the attorney for Mr. Johnson said I represent Mr. Johnson, so I felt like I had to respond to his questions.

And, again, the list that was provided to him was the indictment and the list that we created of people that we thought identified as witnesses.

2113

THE COURT:  You're saying that this list was in your handwriting?  Because he's -- he's saying he saw a list and handwriting, as I understood it, from Mr. Johnson and Mr. Clement.  Are you now saying you gave him a list that was independent of that letter?

MR. VILLA:  I mean, I'm saying, Judge, from my recollection, we had the indictment, we had our internal work product lists of witnesses that we had identified, but at that point, it was really earlier in the investigation.  We primarily just had the -- all of the indicted defendants in his case, in our case, and in some of the related spin-off cases.

THE COURT:  Sounded to me like it was 2023.  That's what he said.

MR. VILLA:  I mean, it may have been, Your Honor, but we didn't bring -- you know, other than publicly filed pleadings, we didn't bring, you know, discovery.

THE COURT:  All right.  You're not really changing my mind because I'm -- unfortunately, it doesn't sound like you have much of a recollection about it, because he's -- he's describing a list that he saw and handwriting and you're saying, I don't remember if there was or not.  When I asked you, Did you write it, did somebody else write it, then you don't seem to have a memory about that.  He does have a memory about that.

2114

MR. VILLA:  And I am saying -- you know, he -- certainly, his memory is his memory, but the question is, you know, is this a, you know, hunt by the AB to identify cooperators for retaliation or is it defense investigation. Now, I mean, whatever happens after this case, we can't control what the AB will or won't do, but our job is to identify witnesses and investigate them.

THE COURT:  And, yet, I think you would agree, as a reasonable inference of -- a reasonable inference from that evidence is one that the jury can draw, and it may be contrary to what you're saying.

MR. VILLA:  I mean, sure.  Investigators and lawyers coming to talk to him in --

THE COURT:  Well, he's not going to know that unless -- he's not going to know that it was brought by lawyers.  He's going to -- what they are going to hear is that he received a letter that required him to respond as to certain people identified as cooperators.

All right.  Let's go ahead and take our break.

(Recess held.)

THE COURT:  All right.  Mr. Villa, you had additional comments.

MR. VILLA:  Yes, Judge.  I'm sorry that I'm using my phone because I'm having Wi-Fi trouble.  With respect to the allegation that there was some violation of the Bureau of

2115

Prisons rules, Section 540.17 from the BOP talks about correspondence between confined inmates, and there's an exception for when one party is a witness in a legal action in which both inmates are involved.

And also the prohibition is from federal BOP inmate to a federal BOP inmate.  So --

THE COURT:  And Mr. Eversole you're saying is involved in this litigation?

MR. VILLA:  Well, as a witness, yeah.

THE COURT:  At that time?

MR. VILLA:  Yeah, absolutely.

THE COURT:  Is that all you have to say, Mr. Villa? Was there something else?

MR. VILLA:  Yes, with respect to the limitation that -- how he received the letter, I mean, I think we continue to object, but if the Court's going to allow it, which it sounds like you are, I think it's proper that he say he got it from a lawyer or an investigator rather than the inference that it somehow came through some sort of other means, like through the mail or was a kite or, you know, that sort of thing.

THE COURT:  Comments, Ms. Stokman?

MS. STOKMAN:  I think that opens us up to the entire problem the Court is trying to avoid.

THE COURT:  My concern, Mr. Villa, is -- I mean, we

2116

can say he received the letter -- I mean, I -- I don't have any desire to misstate it.  I don't want it to sound like he got it from a kite.  It's fine to say, I suppose, that it came from an investigator or a lawyer.  I don't have a problem with that as long as it stops there.  Because I don't want Ms. Stokman to come in and now ask, you know, what you said, what were you doing, what were you trying to do, what was Mr. Villa talking about, because, if that's the case, then we've got another problem with you becoming a witness in this case, and it's pretty far in for that to happen.

MR. VILLA:  Judge, there was an investigator present, and that's why the investigator is there, so I don't have to be a witness.  But I think if the jury is going to hear about this, which, again, we don't think they should, but if they are, they should know the context, that it was in the course of a defense investigation as opposed to, you know, some other nefarious way, like a kite or snuck in or whatever, and, you know, Mr. Eversole can testify how it makes him feel, if the Court allows such a question, but they should know the context.

THE COURT:  You know, I will go there, but we're not going to bring in another witness, we're not going to bring in the investigator, and you're not going to testify, Mr. Villa.

MR. VILLA:  I'm not asking to.  That's why we bring investigators.

2117

THE COURT:  I'm not going to let the investigator testify as to this either because this person -- witnesses have been excluded.  And has this person also been excluded?

MR. VILLA:  What do you mean "excluded"?

THE COURT:  From the courtroom.

MR. VILLA:  Yes, they have been excluded the whole time.  I mean, they would testify if there's some sort of, like, impeachment, but we wouldn't call the witness otherwise.

MS. FISHER-BYRIALSEN:  Your Honor, it's not an investigator that's in the room.  It was the one that was on the case earlier and went on maternity leave.

THE COURT:  So you're saying what, Mr. Villa, as to this investigator?

MR. VILLA:  I mean, I'm not saying anything.  I'm just saying the -- the reason we bring investigators to these interviews is so the lawyer doesn't become a witness.

THE COURT:  Right.  I understood that.  What I'm saying is what is your intention related to calling that witness?

MR. VILLA:  At this point, I don't have any such intention because I don't know whether Mr. Eversole will testify to something different than what actually happened. If he gives an inconsistent statement at trial than what he gave to the investigator, we may call the investigator for that purpose, but we're not there yet.  It's not ripe.

2118

THE COURT:  Right.  Because you've already heard what he's going to stay on this topic, right?

MR. VILLA:  Yeah.  But there's -- there's a whole lot more to his testimony that might.

THE COURT:  On this topic?

MR. VILLA:  Not on the topic of the letter, on things he told us about what he did or didn't do, what he knew or didn't know.

THE COURT:  All right.  So I don't have a problem with him saying it came from the lawyer.

MR. VILLA:  Your Honor, I can just cross-examine him about it, Your Honor, about that part of it.

THE COURT:  No, because he hasn't testified yet about this.

MR. VILLA:  Yes.

THE COURT:  And I don't know how Ms. Stokman is going to create her question.

All right.  Anything else at this time?

MR. VILLA:  No, Judge.

THE COURT:  All right.  Let's go ahead and bring the jury back in.

(Jury enters the courtroom at 1:06 p.m.)

THE COURT:  All right.  We have our jury members back.

Mr. Stokman, you may continue.

DX Resumed - Eversole S

2119

DIRECT EXAMINATION RESUMED

BY MS. STOKMAN:

Q.  So before we braked, I had asked you if you had ever been asked by a brother about potential cooperators and you had said yes.  You had started to mention an incident that happened when you were in prison in South Carolina.

That incident that you were going to speak about, were you provided with a letter from an AB brother or brothers?

A.  Yes, ma'am.

Q.  And which brother or brothers was that letter from?

A.  The letter was mostly from K with a small few sentences embedded in the middle of it from Frank.

Q.  How did you know it was from K and Frank?

A.  Because the intro was saying that it was from -- This is me, and it was explaining that it was okay to talk to the investigators, and I recognized the handwriting.

Q.  So in that letter -- was that the letter -- well, what was the contents of the letter as it pertained to potential cooperators?

A.  It was a list of names with questions about who I thought was cooperating, if I knew anyone was cooperating, or what type of information I thought they might have to disclose if they were cooperating.

Q.  Did you give that information?

2120

A.   Yes, ma'am.

Q.   Why did you do that?

A.   Uh, because at that time, uh, no one knew that I was cooperating myself, so I kind of didn't want anyone to know that, obviously, some fear for my family.  And I just -- I don't know, I just told the truth.  Like I naturally just try to do that.  And I felt like it would be weird if I was -- if I said something that they knew was not true, then it would show that, hey, I'm lying to them for a reason.

Q.   Beyond that request for naming potential cooperators, was there any other substance of the letter that caused you a little concern?

A.   I mean, I don't know that it was a concern.  It was just a lot of about my feelings with anything is based on experience and, you know, things that have happened in the past and trends.  So I felt like it was a little bit of intimidation, like, hey, we're still here.  We can still reach out to you.  And it was a little of, like, controlling, like, hey, we're still here, we're still your friends, you know.  So they weren't quite sure where I stood, is kind of what I got from it; but that was the sense of it, was finding out where I stood on all of this.

Q.   Around what time period was this?

A.   I believe in 2023.  Could have been -- yeah, maybe around 2023.

2121

Q.   At the beginning part of 2023?

A.   Yes, ma'am.

Q.   Okay.  So let's go back to the 2019, 2020 time period.

You mentioned that when you were charged federally,
you were charged with firearm and drug trafficking.  You
mentioned a little bit about how that worked, the gun
trafficking and firearm trafficking, but can you give us some
specifics about how you were -- I'm sorry -- I keep saying
firearm and gun but I mean firearm and drug -- how -- what you
were doing with drugs in relation to firearms when it came to
other states?

A.   So basically we would buy drugs, uh, from Mexico at a very
cheap price.  I was getting a really cheap price because I had
been dealing with these people for quite a while.  We would
send these drugs to different states.  I mean, I can't even
think of them all, but we were sending them four, five states.
Then we would use the proceeds from the drug sales in those
states to buy guns cheap because they are cheaper in those
states and they are legal.  And then we would bring those guns
back to California and then sell those guns on the streets of
California to make even more profit.

Q.   And during this time period, were you doing other things
besides that to make money on the streets?

A.   Yes, ma'am.  I was buying kilos of cocaine and selling
them in San Francisco.  I was intimidating people that were

2122

doing illegal things to make them give us money so that we didn't do something to them.  Taxed people.  I mean, we were doing everything.

Q.  When you say "us" and "them" -- or "we," "us" and "we," who are you referring to?

A.  The AB.

Q.  So during this time, how did what you were doing on the outside impact Kenneth Johnson at all, if at all?

A.  I mean, it gave him money, it gave him expanded influence.

Q.  What about -- how did what you were doing on the outside impact Frank, if at all?

A.  The same thing, not -- not as much as K, but the same exact reasons.

Q.  Have you ever had issues with drugs outside the prison being stolen?

A.  Yes, ma'am.

Q.  And what's the impact of that, when the drugs are stolen?

A.  In what way?

Q.  If it -- if there's an impact financially as far as what you -- proceeds that you need to give to the AB.

A.  Well, it doesn't impact them at all.  Like, I'm still going to pay them no matter what.  Like that's -- that's just understood, that they are not going to take a loss.  You're going to cover that loss.

Q.  So you would cover it through other means?

DX Resumed Eversole S.

2123

A.   Yes, ma'am.

Q.   And when drugs were stolen, the person who was stealing those drugs, who were they stealing from?

A.   If they were stealing drugs from something that I was doing, then they were stealing drugs from the AB.

Q.   Now, when you were making money on the outside of prison and you were giving proceeds to AB brothers, like Kenneth Johnson and Francis Clement, was that still the one-third amount that you had spoken of before or was it different?

A.   It's different.  Uh, anything you do in prison is automatically -- that's a third goes up because the prison is their -- it's their house.  That's what we call their house, and we're just visiting it.

         On the streets you're expected to kick up, but there's not a set amount.  It's more like you're showing respect to these people by giving them proceeds.

Q.   So you said that you were able to speak with Kenwood and Frank through the telephone.  Was it just through calls or were there other means of communication?

A.   Oh, we FaceTimed, we messaged, and we called.

Q.   And would you do that through the normal cellular functions of a phone or something different?

A.   No, we would use encryption apps.

Q.   What's the purpose of those apps?

DX Resumed - Eversole S.

2124

A.  Uh, Signal app, for example, has end-to-end encryption so if someone is potentially listening in on the call, it scrambles the call if you're not --

MR. VILLA:  Objection.  Lack of foundation.

THE COURT:  Sustained.

BY MS. STOKMAN:

Q.  As far as in your experience, what was your -- why did you use those apps?  Was it in general to avoid law enforcement?

A.  Yes, ma'am.

Q.  Okay.  Has Kenwood ever spoke with you about other people making money for him on the outside besides the people that we've mentioned before, Bam, Soldier, Gray at times?  Did he speak freely with you about those people?

A.  Yes, ma'am.

Q.  And what types of ways were people making money for him?

A.  Uh, fraud, selling drugs, uh, collecting money.  I mean, various ways, basically the same thing that we did.  He had his own things going on too.

Q.  And did Frank talk to you about that same conduct with people on the outside making money for him?

A.  Yeah, not to the extent that K did, but yes, ma'am.

Q.  In your experience, do certain brothers align themselves with other brothers in particular, like one or two other brothers instead of, like, the whole -- like, do they have like friendships or alignments?

2125

A.   Yes, ma'am.

Q.   Yes.  And is there any particular alignment that you knew that Kenwood had?

A.   Yeah, K -- K did.  I would -- not everything, but most things with Frank.  And Todd was involved a lot, sometimes yes, sometimes no.

Q.   Todd Morgan?

A.   Yes, ma'am.

Q.   And so what about Frank in that same vein, that same question?

A.   I don't know all of Frank -- I talked to K a lot.  Like I said, he was my friend.  We talked quite often throughout the day.  We just talked about life in general as well as the other stuff.  But I knew that he had alliances, but most of his alliances were with K that I know about.

Q.   I'm going to direct your attention now to October 4th of 2020.  Were you aware of an individual named Allan Roshanski?

A.   Uh, aware in what way?

Q.   Uh, did you know of that name?  Or did an individual who later you learned was named Allan Roshanski?

A.   Yes, ma'am.

Q.   And how did you become aware of that individual?

A.   I think the first time the name came up it was in reference to, like, finding out who he was, who he was affiliated with, kind of background that he was doing, making

2126

a lot of money doing fraud.  So who was he affiliated because he had Russian mob-style tattoos on him.

Q.  Was there someone in particular who asked you or who had that discussion with you about what Roshanski's affiliation might be?

A.  Yeah.  I'm pretty positive it was K.  I don't know if I talked to Frank about it at that time.  But I know I talked to K about it.

Q.  And did you become aware of any criminal activity that Roshanski was committing?

A.  Yes, ma'am.  When I called to find and check on him -- like, normally, we'll hear a name of someone doing something and I'll call around to people that I knew from prison that lived in that area.  And then they'll start asking around in the criminal little arena of who that person is and what they're doing and who they're affiliated with.

And I did that with him and found out that he was doing fraud but, at that time, doing a lot of EDD fraud and making quite a bit of money off of it.

Q.  Did you ever have a discussion with Kenwood about Roshanski doing EDD fraud?

A.  Yes, ma'am.

Q.  And what about Frank, did you have a conversation about EDD fraud with Frank?

A.  Yes, ma'am.

2127

Q.   At any point in time, did you become aware of whether or not Justin Gray somehow knew Allan Roshanski?

A.   Uh, he -- I know he didn't know him, like on a personal level.

        MR. VILLA:  Objection.  Lack of foundation.

BY MS. STOKMAN:

Q.   So you --

        MS. STOKMAN:  I can fix that.

        THE COURT:  All right.  Sustained.  Go ahead.

BY MS. STOKMAN:

Q.   So I think the question was -- and you can answer yes or no to it again -- did you become aware of whether or not Justin Gray knew Allan Roshanski?

A.   No, not early on, he did not.

Q.   And at some point you learned that he did?

        MR. VILLA:  Objection.  Lack of foundation.

        THE COURT:  Sustained.

BY MS. STOKMAN:

Q.   So when you were having conversations with Kenwood about Roshanski, you -- did you talk about potential gang affiliation that Roshanski was -- what you had just mentioned, that there was some question as to whether or not he was affiliate with a gang?

A.   Yes, ma'am.

Q.   And what was the nature of that conversation or those

2128

conversations?

A.  Well, it was -- because he's white, so we wanted to know if he was associated with a gang.  Because if he was doing something illegal and you're associated with a gang, then that's your protection, that's the gang that you're working for or with.

But if you're not working for, if you're not associated with a gang, then you're kind of open game, like we can come and take what you're doing or make you work for us or make you kick in a percentage of your profits, so that we don't do anything to you.

Q.  And when you say "we" and "us," again, are you referring to the AB?

A.  Yes, ma'am.

Q.  And so it sounds like what you're saying is if someone's not affiliated with a gang but they're making money through some sort of -- would it only be criminal venture or any type of money?

A.  I mean, it's predominantly criminal ventures.  I mean, there's fringe stuff that goes on too.

Q.  So criminal ventures, if you are not affiliated with a gang and you're making money, that that person is falling under the AB, and so the AB needs to be able to get profits from that criminal proceed?  Is that what you're trying to say?

2129

MR. VILLA:  Objection.  Leading.

THE COURT:  Overruled.

BY MS. STOKMAN:

Q.  You can answer.

A.  That's the hope.

Q.  Okay.  And so did you at any point learn whether or not Roshanski did have gang affiliation?

A.  Yeah.  I -- I asked around and could not find anything, in and of itself.  There was just various things.  So I kind of just -- that's when I told him, like, I'm not sure what the guy is.  You know, I asked the Armenians that I knew.  And I reached out through them, and they asked, and the Russians said, No.

And then I just let it go because that's all I had to do with it.

Q.  Who did you tell this information to?

A.  K.

Q.  At any point in time after you told Kenwood about Roshanski not having a gang affiliation, did there -- did you have another conversation with Kenwood about the EDD money that Roshanski was making?

A.  Yes, ma'am, in -- in just, like, regular conversations.  Because a lot of EDD fraud was going on at the time.  So it was a big thing.  A lot of money was being made by a lot of different people, so we kind of, like, talked about who was

DX Resumed/Eversole S.

2130

doing what and, you know, a little braggady- -- bragging, you know, like, Hey, I'm getting these from this person, or, I'm doing this on my own. And we talked about how big of profits this guy was actually making.

Q. And was there any discussion with Kenwood at the time about what needed to happen with those profits.

A. Not like -- not outright per se. Like, it was just more like, Hey, can you believe that this is what's going on? And it was more -- like, my sense of it was that it was an ongoing thing, like no one quite knew what was going on.

Q. At any point in time, did you have a conversation with Kenwood about Roshanski needing to provide some of that EDD profit to the AB?

A. Yes, ma'am. Again, timeline, I'm not sure. Like, it was within -- like, so much things were going on at the time. But it -- it would -- just brought up -- periodically it would -- something would be said about him. And at that time, they're like, Yeah, he's nonaffiliated. The Russians said it's not -- he's not a Russian mob member. We're not sure what he is. He wasn't supposed to have those tattoos, so he's going to have to kick in.

Q. Did you have a conversation like that with Frank at any point?

A. Yeah, vaguely, but not, like, in depth like I talked to K. Because me and Frank would talk off and on. Like, he would

DX Resumed/Eversole S

2131

get mad at me, and he wouldn't talk to me.  So I wouldn't talk to him like that.

Q.  Around October 4th, 2020, did you learn about a plan about -- with Roshanski to meet up with Justin Gray?  And you can just say "yes" or "no" at this point.

A.  Yes, ma'am.

Q.  And who told you about that plan initially?

A.  I don't think that it was so much, like, telling me about a plan.  It was more in line with, Hey --

        MS. DE SALES BARRETT:  Your Honor, that's not an answer to the question that was proposed.

        THE COURT:  Sustained.

BY MS. STOKMAN:

Q.  Who told you about that?

A.  K.

Q.  And what did he say?

A.  He told me that, uh, Sidetrack, Justin, was supposed to meet up with this guy, Roshanski, and he was going to bring EDD cards that were activated and give "x" amount.  And I can't remember.  At the time it was 10 or 15 of them that were already ready to pull money off of, and he was supposed to meet up and hand those over.

Q.  Roshanski was supposed to hand those to Gray?

A.  Yes, ma'am.

Q.  At some point in time, did you learn that that plan had

2132

changed?

A.  Yes, ma'am.

Q.  And just let me ask you the next question first.

A.  Yes, ma'am.

Q.  Who told you that that plan had changed?

A.  K reached out to me.  And I called him and talked to him briefly, and he told me that the guy, Roshanski, had disrespected Frank, and we were going to smoke him.  And he told me that Frank needed me to reach out and tell Justin.

Like, it was weird.  Like, I'm -- I don't remember the exact conversation because it was such an odd conversation for me, because I didn't understand why I was involved in it.  But it was basically that; like, he had disrespected Frank.  We're smoking his ass and taking all of the cards.  You need to call Frank.

Q.  What does -- did that mean -- what does that mean, the term "we're going to smoke him"?

A.  We're going to kill him.

Q.  And after that conversation, did you speak with Frank?

A.  Yes, ma'am.

Q.  And tell us about that.

A.  It was a brief conversation because Frank wasn't really talking to me at the time.  And it was like, I need you to reach out to Sidetrack and tell him how to do this.

And I said, Like, what do you mean?

ER 1463

2133

He said, Well, explain to him, like, what he needs to go do, how he needs to kill this guy, make sure he does it right.

Q.  Uh, what, if anything, did you say in return?

A.  "Yes, sir."

Q.  Did you, during that conversation with Frank or another conversation with Frank, discuss any reasons why Sidetrack was being asked to do that?

A.  Uh, I asked Sidetrack himself why he was being asked to do that, because my understanding was he was finished.  Like, he was backing away and trying to live his own life.

MS. DE SALES BARRETT:  Objection.

THE COURT:  What's the objection?

MS. DE SALES BARRETT:  Objection to the witness's understanding and the potential hearsay.

THE COURT:  I think as to his understanding, uh, I think we need foundation on that.  But as to the hearsay it's overruled.

Go ahead.

BY MS. STOKMAN:

Q.  Sorry.  You can -- you can answer.  You said you spoke to Justin at some point, and you learned why he was asked to do this.

A.  Yes, ma'am.

Q.  What did he tell you?

2134

A.  He told me because his brother Bobby got in trouble again, and they were going to kill him.  So he was going to do it to get him out of trouble again.

Q.  Did you know whether or not at that time Justin himself was indebted to the AB?

A.  I don't know at that time.  Because he -- he had been in trouble previously a couple times, actually, and I had helped him get out of it.  I had given up my own profits and helped him get himself and his brother out of trouble.

Q.  So after the call with Frank where he told you to walk Justin through the murder, did you, in fact, speak with Justin?

A.  Yes, ma'am.

Q.  And tell us about that conversation?

A.  Uh, I don't know if I texted him first or if I just called him outright.  But I got him on the phone.  And I was like -- the first thing was like, What the fuck's wrong with you? Like, Why are you doing this?

       And, uh -- sorry I'm a little emotional.

Q.  Why are you emotional?

A.  He's -- he's kind of like my little brother, and, like, I know his mom.  I FaceTime with his kids.  Like -- like, he's like family to me.

       And he had a plan -- excuse me.  He had a plan.  I was moving him to Fresno with his mom and his kids and helping

DX Resumed - Eversole

2135

him get a job.  And --

Q.  How would this affect that plan?

          MR. VILLA:  Objection.  Relevance.

          THE COURT:  Sustained.

BY MS. STOKMAN:

Q.  So tell us, you ask Gray why he was doing this.  He explained to you about his brother.  And did you have a conversation with him about the actual meeting with Roshanski?

A.  Yes, ma'am.  So I -- I was talking to him about that.  And I was like, Well -- like, Well, how -- Who's going with you?  That was my first question.

          And he told me, Bam.

          And I was like, Bro, what are you doing?  Like, You can't take this kid with you.  Like, He's going to tell.  He's going to tell.

          And I heard someone laugh in the background.  And I was like, what the F.  You got me on speaker phone, like, we're talking about killing someone on speaker.  And I hung up on him.

          And he messaged me back.  And he's like, Hey, bro, like, I'm outside.  Just call me back.

          So I called him back, and I chewed him out about that.  And I found out that there was, like, eight people in the room while we were talking about it on speaker.

          And I was like -- you know, I was mad at that point.

DX Resumed/Eversole

2136

Because now, like, you've -- not only am I doing something that I'm not involved in, but you've implicated me in front of a bunch people.  So now I'm mad about this.

So I was like, Look, bro, this is what you need to do.  And I walked him through it, like the murder, how to murder him, what he was supposed to do, what he was supposed to do at the end of it, everything.

Q.  What was your purpose in walking him through that?  Besides being asked by Frank, did you have another reason why you did that?

A.  Yeah.  I wanted him to get away with it, if at all possible, and, like, lessen his -- like, what was going to happen to him.

Q.  This call and the messaging that you had, was that through one of the encrypted apps you mentioned before?

A.  Yes, ma'am, through Signal.

Q.  And you -- while you were having those discussions with Justin, where were you located?

A.  I was in my cell in North Kern.

Q.  So from that conversation, what was the plan for Justin in meeting up with Roshanski?

A.  He was supposed to meet up with him, shoot him, make sure he's dead, and take the briefcase that he was supposed to be carrying with the EDD cards in it.

Q.  Did you give him specifics?  Like, you said how to get

2137

away with it.  What were those specifics you gave him?

A.  I told him to walk up, shoot him, throw the gun on his body, grab the briefcase, and leave.

Q.  Did you at any point tell him to wipe the gun?

A.  Well, I told him that before.  Like, obviously, like, wipe it down before he even uses the gun.

THE COURT:  Ms. Stokman, we're right after 1:30.

MS. STOKMAN:  That's fine.  We can break here.

THE COURT:  All right.  Ladies and gentlemen, thank you for your attention today.

Again, overnight please don't discuss this case; please don't form any opinions about this case; please don't do any independent research; and to the extent there is any media coverage, which I don't know that there would be, but please don't look at any media coverage about this case.

Otherwise, we'll see you in the morning at 8:00. Thank you.

(Jury exits the courtroom at 1:32 p.m.)

THE COURT:  Anything for the record at this time?

MS. STOKMAN:  Nothing from the government.

MR. VILLA:  No.

THE COURT:  All right.  Thank you.

(Proceedings were adjourned at 1:32 p.m.)

///

2138

    I, RACHAEL LUNDY, Official Reporter, do hereby certify the

foregoing transcript as true and correct.


Dated:  January 30, 2025         /s/ Rachael Lundy_____
                                 RACHAEL LUNDY, CSR-RMR
                                 CSR No. 13815