IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>        Plaintiff - Appellee,<br>v.<br>KENNETH JOHNSON,<br>        Defendant - Appellant. | No. 25-3645<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |
| UNITED STATES OF AMERICA,<br>        Plaintiff - Appellee,<br>v.<br>FRANCIS CLEMENT,<br>        Defendant - Appellant. | No. 25-3648<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |

On Appeal from the United States District Court
For the Eastern District of California
The Honorable Jennifer L. Thurston
D.C. No. 1:20-cr-00238-JLT-SKO

**EXCERPTS OF RECORD
VOLUME 9 OF 13**

Ryan J. Villa
The Law Office of Ryan J. Villa
5501 Eagle Rock Ave. NE Suite C2
Albuquerque, NM 87113
Ryan@rjvlawfirm.com

Andrea Lee Luem
Andrea Lee Luem, PHV
400 South Fourth Street, Ste 500
Las Vegas, NV 89101
andrea@luemlaw.com

Counsel for Defendant-Appellant
Kenneth Johnson

Jane Fisher-Byrialsen
Fisher & Byrialsen, PLLC
4600 S. Syracuse Street
Denver, CO 80137
jane@fblaw.org

Jean D. Barrett
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
jeanbarrett@ruhnkeandbarrett.com

Counsel for Defendant-Appellant
Francis Clement

2139

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. JENNIFER L. THURSTON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 1:20-cr-00238-JLT-SKO |
| Plaintiff, ) | |
| ) | Jury Trial, Day 10 |
| vs. ) | |
| ) | |
| KENNETH BASH, et al. ) | |
| ) | Volume 10 |
| Defendants. ) | Pgs. 2139 - 2351, inclusive |
| ) | |

Fresno, California                Friday, January 31, 2025

REPORTER'S TRANSCRIPT OF PROCEEDINGS

REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

ER 1471

2140

**APPEARANCES OF COUNSEL**:

| | |
|---|---|
| For the<br>Government: | **STEPHANIE STOKMAN**<br>Assistant U.S. Attorney<br>2500 Tulare Street, Rm. 4401<br>Fresno, California  93721 |
| | **JARED ENGELKING**<br>Department of Justice<br>1301 New York Avenue, N.W.<br>Washington, DC 20005 |
| | **JAMES ROBERT CONOLLY**, **GOVT**<br>U.S. Attorney's Office<br>501 I Street, Suite 10-100<br>Sacramento, CA 95814 |
| For Defendant<br>Johnson: | Law Offices of Andrea Luem<br>Attorneys at Law<br>400 South Forth Street, Suite 500<br>Las Vegas, Nevada  89101<br>BY:  **ANDREA LEE LEUM, ESQ**. |
| | Law Offices of Ryan J. Villa<br>5501 Eagle Rock Avenue NE<br>Suite C2<br>Albuquerque, NM 87104<br>BY:  **RYAN J. VILLA, ESQ**. |
| For Defendant<br>Clement: | Fisher & Byrialsen, PLLC<br>Attorneys at Law<br>99 Park Avenue<br>New York, NY 10016<br>BY:  **JANE FISHER-BYRIALSEN**, **PHV** |
| | Ruhnke And Barrett<br>29 Broadway, Suite 1412<br>New York City, NY 10006<br>BY:  **JEAN DE SALLES BARRETT**, **PHV** |
| For Defendant<br>Stinson: | Law Office of Kenneth Alan Reed<br>406 W 4th Street<br>Santa Ana, CA 92701-4505<br>BY:  **KENNETH ALAN REED, ESQ**. |

2141

INDEX

GOVERNMENT'S WITNESSES:

**ROBERT EVERSOLE**                                          2155
DIRECT EXAMINATION RESUMED BY MS. STOKMAN       2155
CROSS-EXAMINATION BY MR. VILLA                  2169
CROSS-EXAMINATION BY MS. DE SALES BARRETT       2272
CROSS-EXAMINATION BY MR. REED                   2278
REDIRECT EXAMINATION BY MS. STOKMAN             2302

**BRIAN JAMES RAPINOE**
DIRECT EXAMINATION BY MR. ENGELKING             2315

* * * * *

EXHIBITS

* * * * *

GOVERNMENT'S                                    Received

1421                                            2337
1409, 1410, and 1411                            2343
1800, 1801, and 1806                            2347

* * * * *

ER 1473

2142

Friday, January, 31, 2025                    Fresno, California

8:04 a.m.                                     Jury Trial Day 10

   (The following proceedings were held in open court:)

       THE COURT:  All right.  We have everyone back.  We're still waiting on one juror.

       I received the limiting instruction requested by Mr. Stinson and also reviewed the objection by the government. It appears to me that the instruction makes sense at this time.  I think a limiting instruction weeks into the future is not sufficiently timely in order to address the issues.  But does anyone have comments about this?

       MR. VILLA:  Which instruction would you intend to give, Your Honor?

       THE COURT:  The one submitted by Mr. Reed.

       MR. VILLA:  Okay.  I had objections to the government's but not to Mr. Stinson.

       THE COURT:  I'm sorry.  I'm not sure what you're talking about.

       MR. VILLA:  The government's proposed instruction appeared to be --

       THE COURT:  Oh, right.  No.  I'm talking about Mr. Reed's.

       MR. VILLA:  Okay.

       MS. STOKMAN:  Judge, the reason we're opposing that is because it misstates the law.  I think it's appropriate for

2143

the Court to give the general instruction as highlighted by the government's reply -- or response.  And it would apply -- a limiting instruction at this point would be appropriate in general to apply to all three defendants, given testimony that we've heard that hasn't included all three defendants, but it's in the context still of the RICO conspiracy.

So I think it's not legally sufficient, or the case law that says that something that could be argued as part of the enterprise cannot be looked at in another -- for another defendant who's charged in the racketeering conspiracy, but the more appropriate instruction is that evidence might have come in about, you know, only one defendant or whatever the Court proposes to do that.

Again, inform you that, you know, this is -- the government alleges this, but the evidence is to be looked at for each individual defendant, as the other instruction the Court gave preliminary -- as a preliminary instruction to the jury before we started the trial.

MR. REED:  Well, I guess I could have been more specific by saying --

THE CLERK:  Mic.  Mic.

MR. REED:  -- Mr. Stinson was not part of the case back when this occurred.  Mr. Stinson has no reason -- there's no reason at all that you can ascribe something happened to someone else between two other people or three people and

2144

apply that to Mr. Stinson.  But I thought the most general way to do it was the way I drafted it.  And that is consistent with the Supreme Court law because that is the way you deal with joinder issues.

You guys choose to join cases.  I know joinder is the preferred way of trying multiple defendant cases, especially these type of cases, and the price that you pay is limiting instructions.

MS. STOKMAN:  We're not arguing a limiting instruction is not appropriate.  The government believes it is appropriate.  It's the wording of the limiting instruction itself.

I think that specific instances are not appropriate in a limiting instruction, but absolutely saying that that should not be used or considered against a defendant who's in a RICO conspiracy that does span over the time frame that this occurred, I mean, we've had this issue in other testimony where counsel has got up on cross-examination and made clear that this didn't have to do with their client, and that's appropriate.

But the instruction from the Court should be that not specific incidents, but that they are to consider each defendant on their own, that -- that, you know, this is an allegation that might go towards conspiracy.

And that's why -- I mean, I think what you're

2145

pointing at is looking at codefendants in general and not necessarily coconspirators.

And so it's appropriate in that sense. But here, the limiting instruction would be more akin to what the government proposed, which has been used in other Ninth Circuit district courts that have had RICO with multiple defendants and this issue has come up.

MR. REED: Well, I think we're going to have the fight that you're talking about when we do the jury instructions. But my understanding of the RICO law is not as broad as yours. The limitation is it has to be knowledge, acquiescence, and then there's another thing that the defendant has to do.

How can John Stinson have knowledge of something that happened before he ever got here? How can he acquiesce to something he doesn't know about? There's no way to make him liable for something that occurred before he ever got in the case, because it's case related, and that you have not established that he has knowledge about.

The RICO -- or the limiting instruction is not cross-examination. The limiting instruction is the law down from high, i.e., the judge. It's not me cross-examining and making a point through cross-examination I have that power. This is the Court saying, I have told you. That's why the limiting instructions start the way they start. It makes it

2146

no longer a point to argue for the lawyers.  That's what its purpose is.

MS. STOKMAN:  But that's not exactly what that is. Like, what you just argued is an argument by an attorney.  The limiting instruction is to remind the jury of how to look at evidence.  Specific instances under a racketeering conspiracy are not part of that because there are multiple instances throughout the case or the course of the testimony here that this could apply to, which is why generally to include all three defendants, it would be more appropriate.

And the Court can give this instruction, the general construction that the government proposed, as often as the Court wishes throughout testimony, but it is more appropriate as a general instruction that applies to all three defendants rather than one defendant in one specific instance.

THE COURT:  All right.  Counsel, here's my concern, is this wasn't tied to the AB.  It was tied to two defendants. And there was no showing that they were not acting for themselves related to this.

The testimony -- I reviewed it again today -- relates to interview by investigator.  And there's no indication that this ties anything more than their individual interests.  So I do think this is appropriate.

And I appreciate the distinction that's being made, but I also think that there's a failure of proof at this time.

2147

If it's tied up at some other point, then I'm certainly happy to reinstruct, but at this point, it wasn't tied to the AB in general.

All right -- I will give this instruction. Is there anything else at this time?

MS. STOKMAN: Judge, I think we should address the case that Mr. Villa gave to the Court yesterday because that's probably going to come up this morning.

THE COURT: Right. In looking at that case, it does stand, basically, for the proposition that the government is a party opponent. Of course, the facts of that case have to do with a sworn statement by a government attorney, and then they attempt to step away from that sworn statement to substitute a different one.

In this case, my particular concern, as I said on the day this came up originally, is the relevance because, as I understood it, the questions -- I still don't see the relevance. I tried to go through it every way I could figure. If the indication was that the witness was somehow pressured to enter into this agreement, that was why I was saying he's got counsel sitting right there so I don't understand where that's coming from.

As I understand it, you were trying to say that the maximum possible punishment could be discussed. But I'll tell you, I'm still at a loss how we ever thought that that was the

ER 1479

2148

maximum possible punishment.

What I understood in that case, and I went back and looked, there was an enhancement to the guidelines recommended. That's not a maximum possible punishment. It's not even -- it's not a minimum possible punishment. What it is is an issue for the Court to consider related to guidelines.

So I'm just having trouble with the relevance of that as a way it was framed at this time.

MR. VILLA: So --

THE COURT: Otherwise, yes, the government's statements can be admitted as an exception to hearsay.

MR. VILLA: So Judge -- yes, and I mean I agree with that general statement, that the government seems to be admitting. Of course, the *Mirabal* case relies on an older case, *Van Griffin*, where they introduced the manual. So we're not talking about any sworn statements. So it's not limited just to that, as the Court has recognized.

I think the relevance in Mr. Eversole's case will become clear when we cross-examine him. And not related to maximum sentences, we don't have any intent to question him about maximum sentences, only mandatory minimums.

But there's two ways in which it will become relevant through the cross-examination, which is: One, statements by Ms. Stokman about the amount of reduction she would request in

2149

exchange for his cooperation; and then, two, in clarifying or asking him about Mr. Johnson's specific role in Lomita when he gave previous statements that Mr. Johnson -- or that didn't include Mr. Johnson having a role in Lomita.  So that is very relevant.

And I can lay the foundation as I cross-examine him about what his first set of statements were and then what his second set of statements were only after he was prompted on that by Ms. Stokman.

THE COURT:  Comments for the government?

MS. STOKMAN:  Judge, I think, first, to address that last comment, Counsel is -- there's an appropriate way to ask that question that doesn't get into hearsay.  So that's what the government is reminding Counsel should be done.

Any hearsay statement that was made that's not part of any type of formal signed statement is still hearsay.  The formal signed statement, additionally, in the case that was cited had to do with the factual basis of a plea agreement and a sentencing memorandum.  That's not the issue here.

Any formal signed statement in this case with relation to any type of sentencing, the government's position is still that that would include items that would be contrary to the Ninth Circuit prior opinions that say that the penalties should not be addressed, except for those narrow situations, which the Court has limited to.

2150

So I think Mr. Villa is trying to use this case in order to get to a hearsay statement that was not in a formal government document but more during the course of an interview. But there's a more appropriate way to ask the defendant about what he did or didn't say initially and then when, you know, he later brought it up.

THE COURT: I don't think a sworn statement is required for the hearsay exception. I mean, that's -- otherwise we wouldn't use that exception very often, even against -- I mean, you're a party opponent. It doesn't have to be sworn. It has to be said and there has to be a reason to -- for the Court to be able to find credibly that that occurred.

Mr. Villa, what I'm going to say is, I need to hear first the showing before you dive right in. Because we're going to just end up going, wait, what are you talking about, why are we talking about that. So I'm asking for the preliminary showing first and then the question.

But otherwise, I mean, I don't see that exception to required sworn statements. There would have to be another showing that was required by that, and that is, and I assume you're going to make it, an authorized statement, et cetera, as according to this case you cited to me.

MR. VILLA: Yes, Judge, and I will lay the foundation and demonstrate the relevance, and I'll let the Court tell me

2151

how to ask proper questions, not the government.

THE COURT: Well, I'm not going to do that either. I mean, you're a trained attorney.

But what I am concerned about is, I mean, I think what you're telling me is that you're going to make -- take the position that a particular government agent influenced his testimony in a way that causes it to be incredible to the jury.

MR. VILLA: Yes, and caused it to change from his previous statements.

THE COURT: All right.

MS. STOKMAN: And, Judge, I'll just point out again that that's -- *Mirabal* holds that statement of a party opponent by -- and the government's statement in that context only does apply to a formal signed statement made by a government attorney. That's what that case says.

THE COURT: I didn't read it in that way, making that particular holding. Maybe you can cite me to the specific page that we can look at it together.

MS. STOKMAN: Judge, on the printout that Mr. Villa -- or the PDF attachment sent, it's on page 4 of that document, starts there, under Section IV(A) of the decision --

THE COURT: May I have --

MS. STOKMAN: -- towards the end of the page where it

2152

lays out that that encompasses formal signed statements made by a government attorney in filings, is that would be the statement of a party opponent and the appropriate way to use that, when it has to do with the government and not a defendant.

MR. VILLA:  And, Your Honor, I would say it's -- what that paragraph says is that Van Griffin, the case that said a Department of Transportation manual, which was not a sworn statement, was a statement of a party opponent, encompasses sworn statements -- or signed statements, actually, is what the -- it says that:

"The logic of our decision in *Van Griffin* comfortably encompasses formal signed statements made by a government attorney in filings before a Court, such as plea agreements and the sentencing memoranda."

I mean, sentencing memoranda aren't sworn statements; they're just pleadings.

MS. STOKMAN:  They are filing on the court, which is why the Court viewed it that way; same as a plea agreement.

The government will just point out there's no case on point that says any type of oral statement by the government falls under that -- that exception.

MR. VILLA:  And when you hear the factual basis, Your Honor, and the statement itself that I'm referring to that -- that changes Mr. Eversole's first set of statements to

ER 1484

2153

his now trial testimony, it's also, you know, a question of going to the witness -- how it affected the listener, because it -- it's, I mean, it's not offered for the truth.  Under 801, it's not hearsay, but it's also -- it's twofold.  So, one, it's an admission by Ms. Stokman that his previous statements were different than -- that -- you know, that essentially that Mr. Johnson wasn't involved in Lomita; and then the effect on the listener, how it changes his first set of statements to the second set of statements from Mr. Johnson not being involved in Lomita to now he's involved.

And so it's -- it's got dual admissibility purposes but --

THE COURT:  I guess, my one point, my concern is now what you're saying is you're asking -- you're inviting the government's opinions, the government's attorneys' opinions to be introduced to the jury in an attempt to influence the jury as to how they should find.  That is a bigger concern, which I guess I didn't understand what you were going to be asking.

MR. VILLA:  It's not a statement of her opinion.

THE COURT:  Wait.  Let me tell you why I'm getting there, and that is -- because what you're saying is the government said, Ms. Stokman said, Hey, you didn't say this before and now you're saying this now.

MR. VILLA:  That's not how it went.

THE COURT:  Okay.  Well, I don't know, because I

2154

just -- I just heard what you said, was that --

MR. VILLA:  My request would be let me question the witness, Your Honor, and if there's a concern, you know, we can give a proffer but --

THE COURT:  So it's not going to be an admission by Ms. Stokman that his previous statements were different, because that's what I heard you say and that's what's coming up on my transcript here.  You're not going to ask that, then?

MR. VILLA:  No.  The questions were with respect to this issue:  Was Mr. Johnson involved in Lomita, have nothing to do with her opinion about his previous statements.

THE COURT:  Okay.  It was just a misstatement when you said you wanted admission by Ms. Stokman.

MR. VILLA:  Yes, Your Honor.  I mean, I think that -- that is correct.  I misstated.

THE COURT:  All right.  So with that understanding -- yeah, you can ask him, you know, if he -- if there's some indication that he's been guided in his testimony, that he's been instructed in his testimony, that's fair game.  For one thing, it was even asked of him, or maybe it hasn't been asked.

Does someone have a cell phone close to the mic?

All right.  All right.  Anything else at this time?

MS. STOKMAN:  Nothing --

MR. VILLA:  No, Your Honor.

2155

MS. STOKMAN:  -- from the government.

THE COURT:  All right.  Let's call the jury in and the witness.

(Jury enters the courtroom at 8:22 a.m.)

THE COURT:  All right.  Good morning, everyone. Before we begin, I do want to give you one instruction that will assist you at this time:

Some evidence may be admitted for a limited purpose. When I instruct you that an item of evidence has been admitted only for a limited purpose, you must consider it only for that limited purpose and for no other purpose.  The testimony you heard yesterday concerning Mr. Eversole and an interview that occurred in South Carolina may be considered only for the limited purpose of Mr. Eversole's receipt of the letter from the defendants in this case.  The testimony is not to be considered against Mr. Stinson in any way.

All right.  Thank you.  We have Mr. Eversole returning to the stand.

**ROBERT EVERSOLE**,

called as a witness on behalf of the Government, having been previously sworn, testified as follows:

DIRECT EXAMINATION RESUMED

BY MS. STOKMAN :

**Q.**  Good morning.

**A.**  Good morning.

ER 1487

2156

Q. I'll just remind you that you're still under oath as you were yesterday.

A. Yes, ma'am.

Q. Before we breaked yesterday, you had testified that, after you received the call from Kenwood about Roshanski's murder and then talked to Frank about it, you walked Justin Gray through how to effectively go about doing that murder, correct?

A. Yes, ma'am.

Q. After that conversation with Justin, did you hear back from him at any point later that evening or into the next morning?

A. Yes, ma'am. Approximately -- well, no. 1:00 or 2:00 in the morning. I was asleep when my phone went off. He messaged me and said it was done. So I called him and I asked him what happened.

And he told me -- well, I asked him, you know, did -- did you get the briefcase? Did you -- everything go okay?

He said, No. There were two guys that showed up, and he said that, I shot them both in the street.

I said, Well, did you get the briefcase? That's the whole point, like that's the -- important.

And he said, No. We just panicked. We just got out of there. It was in the middle of the street.

And I was, like, Well, like, you're going to be in

ER 1488

2157

trouble again.  Like, that was the whole point of all of this, you know.  And then I hung up on him.

And I believe -- because this is quite a few years ago -- I either messaged that night or messaged first thing in the morning to K and let him know that it was done.

Q.  When you spoke with Justin, did he indicate whether or not Bam had gone with him to the murder?

A.  Yes, ma'am.

Q.  And what did he say?

A.  He said that Bam went there but he didn't pull the trigger; that he had to shoot them both.

Q.  That Justin had to shoot both?

A.  Yes, ma'am.

Q.  Okay.  Yesterday you spoke of the fact that the briefcase was supposed to contain some EDD that Justin was supposed to pick up.  What is the incentive for Roshanski to have agreed to giving some of his EDD profits to the AB?

MR. VILLA:  Objection.  Lack of foundation.

THE COURT:  Sustained.

BY MS. STOKMAN:

Q.  What would happen, in your experience, if Roshanski had refused to agree to that deal, to give some of the EDD profits over?

A.  Then he would have had all of his stuff taken or killed or -- one way or another he was going to give up what --

2158

Q. And -- sorry, I didn't mean to cut you off.

A. -- what he was doing. Yes, ma'am.

Q. In your experience, what does, if anything, Roshanski gain by agreeing to that -- that deal?

A. Well --

MR. VILLA: Objection. Lack of foundation.

THE COURT: Overruled.

THE WITNESS: Well, once he does that, then no one else can approach him and try to take anything that he's doing because now he's paying for protection.

BY MS. STOKMAN:

Q. Protection, who is he paying for protection?

A. That would be the AB.

Q. Do you know an individual -- or did you know an individual named Brandon Lowrey?

A. Yes, ma'am.

Q. How did you know him?

A. Brandon lived in the cell next to me. My celly at the time and him were best friends. They grew up together on the -- on the street in Visalia. And, like, I just -- I associated with him every day in prison where I was at.

Q. Around what time frame was that?

A. Um, probably around 2013, '14.

Q. Did there come a point in time where you learned of Brandon Lowrey's death?

2159

MR. VILLA:  Objection.  Calls for hearsay.

THE COURT:  Sustained as phrased.

BY MS. STOKMAN:

Q.  Is Brandon Lowrey still alive?

A.  No, ma'am.

MR. VILLA:  Same objection.

THE COURT:  Overruled.

BY MS. STOKMAN:

Q.  After Brandon Lowrey died, did you speak with someone
related to his death?

A.  Yes, ma'am.

Q.  Who did you speak with?

A.  I talked to Thrasher.

Q.  The same Thrasher you mentioned before?

A.  Yes, ma'am.

Q.  And what, if anything, did Thrasher tell you about
Brandon Lowrey's death?

MR. VILLA:  Objection.  Hearsay.

THE COURT:  I think this is -- well, no.  I think
there's been enough foundation for this.  Overruled.

BY MS. STOKMAN:

Q.  What, if anything, did Thrasher tell you about
Brandon Lowrey's death?

A.  He told me -- well, I already knew he was the one that
killed him because he went to the SHU for killing him.

2160

He told me why he killed him, told me how he killed him.  He told me the circumstances leading up to it, the conversations that was had.

I was pretty upset about the whole thing because he was a good kid.

So he just explained to me, like, what happened, and he apologized to me.

Q.  Uh, what did he say -- or how did he say he killed Brandon?

MR. VILLA:  Objection.  Hearsay.

THE COURT:  Overruled.

THE WITNESS:  He said that he -- they got some moonshine, White Lightning, and he got him to drink.  And he said he was about half drunk, but he wasn't -- Thrasher wasn't, he didn't drink as much.

And they had someone come to the door and call him so that he was looking out the window talking to him, and he stabbed him through the back of the neck several times.

BY MS. STOKMAN:

Q.  Did Thrasher indicate whether or not he did this because he had a personal beef with Brandon?

MR. VILLA:  Objection.  Leading.

THE WITNESS:  No.

THE COURT:  Sustained.

///

2161

BY MS. STOKMAN:

**Q.**   Why did Thrasher tell you he killed Lowery?

**A.**   He was told to.

**Q.**   Did he tell you who told him to?

          MR. VILLA:  Objection.  Hearsay.

          THE COURT:  Overruled.

BY MS. STOKMAN:

**Q.**   You can answer.

**A.**   Yes, ma'am.  He said that Kenwood told him to do it.

**Q.**   And did Thrasher tell you what his opinion was of Brandon Lowrey?

**A.**   He actually like him.

          MR. VILLA:  Objection.  Relevance.

          THE COURT:  Overruled.

BY MS. STOKMAN:

**Q.**   Go ahead.  You can answer.

**A.**   He said that he like him, that he was a good kid, that he didn't want to kill him, but that, you know, it is what it is. Like, he was told to do it.

**Q.**   Yesterday you spoke of the fact that you entered into a cooperation with the government on the case that you pled guilty to in federal court.  What benefits did you receive through that cooperation agreement?

**A.**   What did I receive, or what did I ask for?

**Q.**   So let's start with what you asked for.  What did you ask

2162

for when you wanted -- when you made the decision to cooperate?

A.   So when I was indicted, it was a mass arrest.  They raided my home.  They arrested two of my daughters.  My wife was severely sick.  She just got out of the hospital.  She was on IVs and drips and drains.  So they didn't arrest her, but they came and questioned her.

They went through our house, searched our house. They found an illegal ghost gun that I had one of my daughters hide in the attic for me that my wife didn't know about.

And I asked for their charges to be dropped.

Q.   Whose charges?

A.   My wife and my daughters'.

Q.   Is your wife -- what is your wife's name, first wife?

A.   Well, she's my ex-wife.  Her name is Christine.

Q.   And what -- what is your daughter's name?

A.   My daughter Callie and my daughter Katie.

Q.   And is Katie your blood daughter?

A.   No, ma'am.  She's my stepdaughter.

Q.   Does Katie also have a sister named Karie?

A.   Yes, ma'am.

Q.   Was she potentially wrapped up in that investigation as well?

A.   Yes, ma'am.  She was wanted for questioning and -- but I still don't understand -- purportedly for a murder.  But she

ER 1494

2163

didn't really live with us.  She had her own life.

Q.  So when you were deciding to cooperate, you said you asked for a benefit for your family members?

A.  Yes, ma'am.

Q.  Are those the family members we just mentioned?

A.  Yes, ma'am.

Q.  As far as you knew at the time, what was Callie -- what was her charge?  What was she looking at?

A.  She was arrested for handing a gun over to a federal informant that I had made an arrangement with, a monetary arrangement, and I asked her to pick it up for me and just hand it to him.

Q.  And she was charged federally or on the state side?  Do you know?

A.  Federally, I believe.

Q.  You don't know for sure?

A.  I don't know.

Q.  Do you know what sentence she ultimately received based upon your request?

A.  Yeah.  She got a misdemeanor probation to a reduced charge.

Q.  Uh, did Christine ever get charged?

A.  No, ma'am.

Q.  What was she potentially looking at, as far as you know?

A.  EDD fraud, due to -- I had an EDD card in my name, and the

2164

gun that was found in the attic.

Q.   And do you know what charges Katie was facing?

A.   EDD fraud.

Q.   And are you aware of what sentence she ultimately received?

A.   I don't know.  They dropped her charges completely, but I know it -- it was misdemeanor probation or they dropped her charges.  I can't actually remember.

Q.   During the time that you asked for those benefits for your family members, were you aware of whether or not a district attorney was charging those crimes or involved in those discussions about any benefits?

A.   Well, initially my attorney brought it up to me.  I had been in jail for a little bit of time.  And I told him, you know, absolutely not.

And it was probably third or fourth time my attorney came to see me and talk to me that I actually told him that I wanted to find out what I could do for my family.

Q.   And when you say your attorney told you and you said absolutely not, what were you referring to?

A.   He told me that by law he had to tell me that the prosecution was offering a deal if I cooperated.

Q.   And so when you were contemplating cooperation, did you make any requests about your own sentence?

A.   No, ma'am.

2165

Q.  Why not?

A.  Because I didn't care.

Q.  Why did you request a benefit for your family instead?

A.  Uh, because it's my family.  Like, I had done everything I did.  I always accept my responsibility for what I do.  I don't make excuses for it.  But my family was, uh, peripherally involved in what I did because they were my family.

They didn't -- I don't really think that they understood what I was asking them to do, like the ramifications of it.

MR. VILLA:  Objection.  Speculations of what they understood.

THE COURT:  Sustained.

BY MS. STOKMAN:

Q.  And so did you feel a certain way about your family's involvement?

A.  Yeah.  I felt like a piece of crap, and I still do.

Q.  When you ultimately made the decision to cooperate, was that an easy decision to make?

A.  No.

Q.  Why?

A.  Because I am who I am.  These are my friends -- I consider my friends, and this was my life.  I choose this life, so -- and it's just not something you do.

2166

Q.  As you sit here today, do you have concerns for your safety based on the fact that you're testifying?

A.  I mean, I don't have concerns for my safety because I don't -- I'm not concerned with that.  I mean, like I know the potential of what could happen, like I understand that.

Q.  And is that a potential for something happening just to you?

A.  No.  I worry about my family.

Q.  When you -- so you were ultimately sentenced based on your cooperation; is that right?

A.  Yes, ma'am.

Q.  And do you know how much of a reduction off of your original sentence you received?

A.  I believe in the end, it was 50 percent.

Q.  And on the -- on your charges, is it true that you were facing a mandatory minimum of ten years?

A.  On one charge, yes, ma'am.

Q.  And a maximum of up to life on that charge, right?

A.  Yes, ma'am.

Q.  Okay.  When were you -- but you're out of prison now?

A.  Yes, ma'am.

Q.  When were you released from prison?

A.  Uh, I think at the end of July of last year.

Q.  2024?

A.  Yes, ma'am.

2167

Q.   Okay.   And was that federal prison or state prison?

A.   Federal prison.

Q.   And that was for the sentence that is related to that federal conviction that we're speaking of, right?

A.   Yes, ma'am.

Q.   While you were in prison, what, if anything, were you doing as it pertained to your length of sentence?

MR. VILLA:   Objection.   Relevance.

THE COURT:   Sustained.

BY MS. STOKMAN:

Q.   Was there anything -- to your knowledge, was there anything you could do to further reduce your sentence as far as being part of the Federal Bureau of Prisons?

A.   Yes, ma'am.

Q.   And did you do anything to further reduce your sentence through BOP?

MR. VILLA:   Objection.   Relevance.

THE COURT:   Overruled.

BY MS. STOKMAN:

Q.   You can answer.

A.   Yes, ma'am.   I took all the self-help classes that I could, anger management, everything they offered.   I worked for UNICOR, we made military tarps and MOLLE bags.   You get a percentage of your time off if you work in that factory.   I took a peer-mentor program.   Everything they offered, I did

2168

it.

Q.  Why did you -- why did you do those things?

        MR. VILLA:  Objection.  Relevance.

        THE COURT:  Overruled.

BY MS. STOKMAN:

Q.  Go ahead.

A.  Because, at that time, I had already made an agreement and I had cooperated, and I felt like I needed to -- if I was going to take that step, like I -- I had to go all the way.  I had to become someone other than who I am.

Q.  Uh --

A.  I was trying to do that.

Q.  Did -- at some point, the fact that you also got a sentence reduction, did you see that as a benefit for yourself?

A.  In what way?

Q.  Uh, I mean, you -- you also got a sentence reduction, not just for your family.  So did you view that as a benefit, ultimately, even though you hadn't sought that from the beginning?

A.  Truthfully, I don't know how I feel about it because I don't feel like I deserve to come home.  Uh, I'm thankful for it.  But I -- truthfully, I don't know how I feel about it. I'm happy to be home.  I was in prison for 20 years, watched family die, watched family be born.  Uh, so I'm thankful for

2169

it, but I'm still ambivalent about how I feel about being home because I don't feel like I deserve it.

Q.   Okay.  Thank you.  I have no further questions for you.

THE COURT:  Cross-examination?

MR. VILLA:  Yes, Judge.

CROSS-EXAMINATION

BY MR. VILLA:

Q.   Good morning, Mr. Eversole.

A.   Good morning.

Q.   So in your experience in prison, which it sounds like, as an adult, was approximately 20 years?

A.   Uh, on this case, yes.  I went to prison at 18.  I've probably been out maybe two years since I was 18.

Q.   So not talking about the federal sentence that you were released early from but your sentence in the California Department of Corrections, was, I think you testified yesterday, like 20 years?

A.   21 years, 8 months.

Q.   Thank you.  21 years, 8 months.

Essentially, you served that -- excuse me -- up until November 2020, when the federal government arrested you from state prison?

A.   Yes, sir.

Q.   And in your experience with the Aryan Brotherhood, you talked about made members.  Throughout that time, there's

2170

approximately only like 30 or so made members, correct?

A.   Maybe, yeah.

Q.   So, like, through the whole system, basically that's the number we're talking about?

A.   Yes, sir.

Q.   And in your experience, the Aryan Brotherhood is not about a racist thing like, say, the -- you know, the Ku Klux Klan or something like that, right?

A.   No, sir.

Q.   In prison, people get divided by race because that's just the way prison is?

A.   Yes, sir.

Q.   And so the people of Hispanic origin or that ethnicity, they stay in one group, yes?

A.   Several subgroups, but, yes, they have their own groups they are part of.

Q.   And people who are African-American, they stay in their own group?

A.   Yes, sir.

Q.   And people that are white stay together?

A.   Yes, sir.

Q.   And that's just the way prison is?

A.   Yes, sir.

Q.   Kind of like how the United States was a hundred -- a couple hundred years ago?

2171

A.   Uh, I don't know how that was, but --

Q.   All right.

A.   -- prison, yes.

Q.   Fair enough.

Then there's these different, as you call them, gangs or whatever that oversee the different ethnic groups?

A.   Yes, sir.

Q.   But it's not about -- the purpose isn't about because they are trying to advance, you know, white power or something like that.  It's just the way prison is?

A.   Yes, sir.

Q.   And in your estimation, you believe that the -- those gangs that oversee the various races are actually making the prison safer?

A.   Uh, I go back and forth about that.  In some ways, yes; in some ways, no.

Q.   All right.  Let me ask you about this letter, because I want to clear that up.  So you were in the Bureau of Prisons in South Carolina serving your federal sentence you got for your cooperation, and an investigator and an attorney with Mr. Johnson came to see you, correct?

A.   Yes, sir.

Q.   And they didn't know you were cooperating or you were necessarily a witness for the government, right?

MS. STOKMAN:  Objection.  Calls for speculation.

ER 1503

2172

THE COURT:  Sustained.

BY MR. VILLA:

Q.  They didn't tell you that they thought you were a witness for the government?

MS. STOKMAN:  Objection.  Calls for hearsay.

THE COURT:  Sustained.

BY MR. VILLA:

Q.  At that point in time, to your knowledge, your identity as a cooperator had not been disclosed to anybody for the defense?

MS. STOKMAN:  Objection.  Calls for speculation.

MR. VILLA:  To his knowledge.

THE COURT:  All right.  Overruled.

Go ahead, sir.

THE WITNESS:  No, sir.

BY MR. VILLA:

Q.  All right.  So it was still a secret, as far as you knew?

A.  I assumed.

Q.  Okay.  And the investigator came with -- under the guise of, Hey, we're asking questions about this case.  We're trying to figure out this case, who the witnesses are, that sort of thing, right?

A.  Yes, sir.

Q.  So it wasn't like a secret letter sent through some, you know, kite or back channel, but rather, investigators

2173

investigating the case?

A.   Uh, I think so, yes.

Q.   And they didn't threaten you?

A.   No, sir.

Q.   They were just asking questions about, you know, the case, trying to figure it out?

A.   Yes, sir.

Q.   And you didn't tell them, of course, that you were cooperating, right?

A.   No, sir.

Q.   And, in fact, sometime after that, investigators came back to ask more questions about the case, right?

A.   Yes, sir.

Q.   And still it didn't -- at that point in time, your identity, to your knowledge, had not been disclosed as a cooperator?

A.   For clarification, like, I assumed that some people were -- thought it.

Q.   That what?

A.   That they thought that --

Q.   Uh-huh.

A.   Because there had been rumors earlier on that I had heard from people that I talked to.  But I didn't -- I don't think anyone knew for sure, but I don't know.

       Obviously, I worried about it.

2174

Q.  Sure.  And as soon as you made the decision to cooperate, you were worried that somebody might find out, right?

A.  Uh-huh.

Q.  Yes?

A.  Yes, sir.

Q.  That's a natural thing to worry about when you cooperate for the government?

A.  Yes, sir.

Q.  But in those two meetings with investigators for Mr. Johnson, you were never threatened by anybody?

A.  No, sir.

Q.  And you were just asked questions about various aspects of the case and what you knew or didn't know?

A.  Yes, sir.

Q.  And including being asked about the Lomita homicide, right?

A.  Yes, sir.

Q.  Because they were trying to figure out what you may know or not know about that, right?

A.  Yes, sir.

Q.  And at the time you said you didn't know anything about it?

A.  Uh-huh.

Q.  Yes?

A.  Yes, sir.

2175

Q.   So let's go back through the timeline.

On -- you're arrested by the federal government for the federal charges on November 19, 2020?

A.   Yeah, about that time.  I don't remember the exact date.

Q.   Roughly in November 2020?

A.   Yes, sir.

Q.   At that point in time, you had about three years left on your state sentence, yes?

A.   Yes, sir.

Q.   So you would have been released from prison on that state sentence?

A.   Yes, sir.

Q.   And if the federal government didn't charge you with new charges, then you could have been released and be out on the street just like you are today?

A.   Yes, sir.

Q.   But the federal government arrested you, brought you over from the prison in Delano, right?

A.   Yes, sir.

Q.   And brought you here to Fresno to be -- to face federal charges, yes?

A.   Yes, sir.

Q.   And at the time you were arrested initially, you didn't know what those charges were, correct?

A.   No, sir.

2176

Q.  You ultimately learned that you were being charged with, as we heard yesterday, drugs and firearms trafficking?

A.  Yes, sir.

Q.  And you were also being threatened to be charged with racketeering, yes?

A.  Uh, I don't know that anyone -- I didn't even know what I was pleading to when I pled.  No one ever told me.  I sat in county for quite a long time just waiting to find out what I was actually signing.  So, no, no one told me it was going to be a RICO.

Q.  I mean, ultimately you pled guilty to RICO?

A.  Yes, sir.

Q.  And when we say RICO, we're talking about --

A.  Racketeering.

Q.  -- racketeering conspiracy.

A.  Yes, sir.

Q.  So at some point -- I mean, you didn't just walk into court and plead guilty to RICO.  At some point you knew that RICO was on the table?

A.  Well, I open pled originally.  That was one of the first things I did, I open pled, because I was not going to fight this because of my family.  This is before I cooperated.

Q.  Yeah, but I'm not talking about that.

        The plea agreement that you entered that you testified about yesterday, you told us you pled guilty to a

2177

racketeering charge?

A.  Yes, sir.

Q.  Okay.  And before that time, at some point, you learned that racketeering was on the table, yes?

A.  Yes, sir.

Q.  Which is, obviously, a little bit more serious than some other crimes, yes?

A.  Uh, I don't know, because the crime I was facing was a mandatory 10-to-life.  And the second one was a mandatory 5-to-40.  And the RICO, I don't know what it holds.  It's kind of open.

Q.  Okay.  We'll talk about that a little bit more.

But you also found out in November when you were arrested that your wife and daughters were going to be charged, or at least your daughters were arrested, and your wife was potentially facing charges, yes?

A.  Yes, sir.

Q.  Related to things that they did at your behest?

A.  Yes.

Q.  Including having an illegal ghost gun at your house?

A.  Yeah.  My -- my wife didn't know about that.  My daughter knew about that.

Q.  But your wife got charged for having that illegal firearm in the house, yeah?

A.  Yes, sir.

2178

Q. And your daughter did?

A. I don't think my daughter did because the house is in my wife's name. It's not in my daughter's name.

Q. Your daughter is Callie Eversole, yes?

A. Yeah. That was a separate gun charge.

Q. Okay. So she got charged for a different gun charge, also something she did at your behest, yes?

A. Yes, sir.

Q. You asked her to take a gun to somebody and deliver it to them, right?

A. Well, I asked her to meet someone at my house, and I unlocked my house from my cell phone, I turned off my alarm and unlocked my door and had her go in and get the gun from my garage and hand it to him in the driveway.

Q. But you knew that was an illegal transaction?

A. Yes, sir -- well, this is going to sound stupid, but I really didn't think it was. The gun wasn't stolen. I didn't understand federal law.

Q. All right. But ignorance of the law is not a defense, right?

A. Yeah. But I'm saying I -- truthfully, 100 percent truthfully, I didn't know that selling a legal firearm was illegal. I didn't know that. I'm a criminal. I don't understand those things.

Q. But I mean, you're not having her give a gun to some, you

2179

know, upstanding citizen for self-defense, were you?

A.  No, sir.

Q.  I mean, you were selling -- having that gun sold to somebody that was up to no good?

A.  Yeah, but that's his crime.  That's not --

Q.  All right.  But you had your daughter do that?

A.  Yes, sir, I did.

Q.  And she got charged for that?

A.  Yes, sir.

Q.  She got charged with a felony?

A.  Yes, sir.

Q.  And she had two -- twins at the time, right?

A.  She was pregnant with --

Q.  That was pregnant?

A.  -- twins.

Q.  And then eventually she had the twins, yes?

A.  Yes, sir.  Well, before -- when this happened was, like, a year before the indictment.  This was a prior thing that happened.  She wasn't pregnant at that time.  But she's still my daughter, yes, sir.

Q.  Okay.  But then when you get arrested in November 2020, she's pregnant.

And she needed to get Section 8 housing, yes?

A.  Uh, she was on drugs and running, but she wasn't -- I don't think any of that was even in her mind at that time.

2180

She was in a pretty messed up place.

Q. All right. So you don't know whether she was trying to get Section 8 housing?

A. No. I didn't talk to my daughter about things like that. Like, I'm not really intrusive when it comes to my kids.

Q. I'll talk to you about that a little bit more in a minute.

It was important to you, though, that she not be charged with a felony?

A. Yes, sir.

Q. And you wanted that as part of your cooperation before you would talk, yes?

A. Yes, sir.

Q. And you also wanted your wife and your other two stepdaughters, her children, right --

A. Yes, sir.

Q. -- to not have their charges?

A. Yes, sir.

Q. Okay. They were also charged, not just for the gun, but for crimes related to EDD, yes?

A. Yes, sir.

Q. EDD fraud?

A. Yes, sir.

Q. And that EDD fraud was done at your behest?

A. Yes, sir.

Q. So we're talking about the two Gunters, Karie and

2181

Katie Gunter?

**A.** No. Karie was never involved in anything at all. She didn't live in our house. She had her own life. Like, she was -- Katie lived at the house. Karie was not involved in anything. I didn't talk to her. She's older.

**Q.** But you were told she was arrested for EDD fraud?

**A.** No. I was told that she was wanted in questioning in a homicide.

**Q.** Well, let me ask you this: So on November 19, 2020, do you remember being taken for an interview with the ATF Agent Anthony Gonzalez and some others?

**A.** Yeah. Yes, sir.

**Q.** Okay. And that was right after you got arrested for the -- by the feds, yes?

**A.** Yes.

**Q.** And they asked you some questions and told you some things about what was going on, yes?

**A.** No, sir. I walked in, and they asked me if I knew what was going on, and I said no. And they told me what the indictment was for.

And I told them, Not to be disrespectful, but I'm not your guy. I have nothing to say.

And they took me back out. I was in there -- I don't even know -- maybe five minutes, ten minutes tops. I don't -- I really don't remember.

2182

Q.  If you looked at a transcript from that, would it refresh your memory of what you were told about your kids' charges?

MS. STOKMAN:  Objection.  Calls for hearsay.

THE COURT:  No.  She's [sic] just trying to refresh.

You can answer the question.

THE WITNESS:  Yeah.  I -- I -- it was so long ago. There's no way I'm going to remember.  All I remember was asking if my house was raided and my kids were arrested. Other than that, once I heard that, I didn't really have anything to say.

BY MR. VILLA:

Q.  Now I understand you don't remember it now because it was a long time ago, but my question is, if you look at a transcript from that interview, might that refresh your recollection?

A.  I will look.

MR. VILLA:  All right.  May I approach, Your Honor?

THE COURT:  Yes.

BY MR. VILLA:

Q.  There's actually two transcripts from that day, so here's the first one.  If you take a look, there's time stamps.  And on the first interview, look at -- starting time stamp 3:45 and just read until you get to that part.  And then you can stop.

A.  Okay.

ER 1514

2183

Q.   This is the second transcript from November 19th.  You can start reading at about 44 seconds.  And it should just be on that first page, but you can read until your memory is refreshed.

A.   All right.

Q.   Does that refresh your recollection?

A.   It does and it doesn't.  So --

Q.   Well, let me ask this.

You -- do you agree that these are transcripts of the interviews that took place with you and ATF Agent Gonzalez and another officer, yes?

A.   If that's what was said, then yes, sir.

Q.   Okay.  And to the best of your knowledge, these are accurate transcripts?

MS. STOKMAN:  Objection.  He asked if he -- if it refreshed his recollection and he said it does and it does not.

THE COURT:  Sustained.

BY MR. VILLA:

Q.   So does it refresh your recollection about what you were told about your children being arrested?

A.   Yes.

Q.   And were you told that both Katie and Karie were going to be charged with EDD fraud?

A.   I don't remember that part.

2184

Q. Okay. But that's what the transcript says?

A. Yes, sir.

MS. STOKMAN: Objection. He said -- improper refreshing of recollection.

MR. VILLA: It's a recorded recollection.

THE COURT: Well, it's not his and he doesn't recall. The objection is sustained.

MR. VILLA: Then, Your Honor, may I get my --

BY MR. VILLA:

Q. Okay. So you agree that you were told information about your children on November 19, 2020, yes?

A. Yes, sir.

Q. But you're saying now you can't remember it well enough to fully testify fully and accurately?

A. I'm saying I don't remember what was said.

Q. Okay.

A. I was nervous. There was a lot of people. It was -- I was shocked. Like, everything about that day is like a foggy memory to me.

Q. Sure.

A. I remember walking in. I remember them telling me that my family were going to be arrested. I remember all that. And all I remember thinking was, like, I can't believe this, you know, not my family. And, like, I did what I normally did, just said, I don't have nothing to say.

2185

Q.   Okay.  So you're saying you cannot recall it well enough to testify fully and accurately about it?

A.   No, sir.

Q.   And at the time though, it was fresh in your mind when they told it to you back then, right?

MS. STOKMAN:  Objection.  Again, it's not going to the witness' own statement that he made back then.

MR. VILLA:  Well, I'll get there, Your Honor, but this is the foundation for a recorded recollection under 803(5).

THE COURT:  Overruled.  Go ahead.

BY MR. VILLA:

Q.   So at the time you -- it was told to you, it was fresh in your mind?

A.   I would assume so, yes, sir.

Q.   Okay.  And you believed what they -- what were you being told?

A.   Yes, sir.

Q.   Okay.  And ultimately, as we heard, you acted on what you were told about what was going to happen to your children?

A.   I wouldn't say ultimately.  What was said that day and what did that day is not what made me do what I did.

Q.   Okay.  Well, let's -- we agreed just a second ago you told Ms. Stockman that you asked that charges against your family be dropped, right?

2186

A.   Yes, several months later.

Q.   And that was certainly part of your agreement to cooperate, right?

A.   Yes, sir.

Q.   You wanted that before you were going to cooperate?

A.   Yes, sir.

Q.   Okay.  So you adopted, essentially, what you were told, that your kids were going to be charged, and in exchange for cooperation, you wanted those charges dropped?

A.   Okay.

Q.   Right?

A.   Okay.

Q.   I mean, you don't need -- I mean, you tell me.

     You don't need to ask them to drop charges against your kids if you don't think your kids are really being charged, do you?

A.   No, I knew my children were being charged because my ex-wife was leaving me voicemails on my phone -- because you can leave voicemails in county jail -- haranguing me for being a piece of shit and ruining her family's life.

Q.   Okay.  But essentially, what the police told you on November 19, 2020, about your children being charged, you adopted as true?

A.   Yeah, I assumed it was true.  Yes, sir.

Q.   And that accurately reflects your knowledge today about

2187

what was going on back then?

A.   As far as -- I don't understand the question.

Q.   When the police told you that your children were all being charged, right, I know you don't fully remember it today, but now it accurately reflects your knowledge of what was going on back then?

A.   Yes.  Besides Karie.  Like, Karie was never charged.  I still --

Q.   Okay.

A.   -- don't understand why she was involved in any of this.

Q.   But the transcript I just showed you, you were told she was being charged?

A.   Yeah, but I don't remember that.  Like I --

Q.   Okay.

A.   If it's in the transcripts, it's true but, like, I don't recall exactly.  All I recall was being told that my family was being arrested for the crap that I was doing.

          MR. VILLA:  Your Honor, under 803(5), I'd like to read that portion to the jury.

          MS. STOKMAN:  Objection to relevance at this point.

          THE COURT:  Overruled.  Go ahead.

BY MR. VILLA:

Q.   So you asked the question -- I'm looking at the second transcript at 48 seconds:

          "Did you guys arrest the kids that were at the house

2188

with --

And the answer:

"Katie, Karie and what's" --

You said, "Chris."

The officer said "Christopher, yes, sir."

You said:  "They all got arrested for what?"

And the officer said:  "EDD fraud, bro.  They're all

doing fraud."

Did I read that right?

A.  I guess -- suppose, yes, sir.

Q.  Okay.  And whatever EDD fraud that they were being charged with, that was because of fraud that you were doing?

A.  Yes.

Q.  And EDD fraud is essentially filing false applications to the California employment department to get money for being out of work during COVID?

A.  Yes, sir.

Q.  So you were having your children and your wife help you defraud the State of California?

A.  Uh, I -- yeah.  Essentially, yes.

Q.  And getting money for that?

A.  Yes, sir.

Q.  As part of your cooperation agreement, how much of that money did you pay back?

A.  Uh, none.

2189

**Q.** Zero?

**A.** Yes, sir.

**Q.** But you always take accountability for your actions?

**A.** Yes, sir.

**Q.** That's what you told the jury.  Okay.

In addition to your children and your wife, the father of Callie's twins, Geoffrey Guess, also got in trouble for doing crime for you, yes?

**A.** Yes, sir.

MS. STOKMAN:  Objection.  Relevance.

THE COURT:  Is this related to this event, Mr. Villa?

MR. VILLA:  Yes, it's part of this indictment.

THE COURT:  All right.  Overruled.

BY MR. VILLA:

**Q.** Correct?

**A.** Yes, sir.

**Q.** And you know he got indicted in this case, right?

**A.** Yes, sir.

MS. STOKMAN:  Objection.  Misstates facts.

THE COURT:  I'm sorry.  Again, Mr. Villa, you're talking about the case for which he was arrested on November -- in November of 2020?

MR. VILLA:  I'm talking about this -- the present indictment.

THE COURT:  The one in this case?

2190

MR. VILLA:  Yes, Judge.

THE COURT:  One second.

Ms. Stokman, you're saying that he was not indicted in this case?

MS. STOKMAN:  Correct.  Under this case indictment, he was not indicted.

THE COURT:  Looking at it, it does not appear he was. The objection is sustained.

MR. VILLA:  I'm talking about the original document, not the third superseding.

THE COURT:  I'm looking at it.  Do you have it?

MR. VILLA:  One second, Judge.

My mistake.

BY MR. VILLA:

Q.  He was charged in the same indictment you were charged in?

A.  Yes, sir.

Q.  Okay.  For selling a gun at your behest?

A.  Yes, sir.

Q.  Now, during that November 19, 2020 meeting, you were asked if you wanted to talk and you said no?

A.  Yes, sir.

Q.  But you were told that you had an opportunity, if you wanted to, to cooperate?

A.  Yes, sir.

Q.  So after that, I think you heard -- we heard you say that,

2191

you know, your wife was very upset with you, and in fact, on December 12th, 2020, she filed for divorce, right?

A.  Yes, sir.

Q.  And so instead of being potentially released from prison, you yourself in three years, you have a federal charge, your children and your wife are charged, and your wife files for divorce, yes?

A.  Yes, sir.

Q.  All by December 12, 2020?

A.  Yes, sir.

Q.  So then you agree on January 31st, 2021, to meet with the -- Mr. Gonzalez from the ATF and Ms. Stokman from the U.S. Attorney's Office to discuss potential cooperation?

A.  Yes, sir.

Q.  And it was your belief if you cooperated that you could help your family get their charges dropped, yes?

A.  Yes, sir.

Q.  And you said just a minute ago on direct that you didn't necessarily want anything for yourself, initially you wanted your family's charges dropped, right?

A.  Yes, sir.

Q.  In fact, you were worried about the felony charge against your wife because she would lose her job?

A.  Yes, sir.

Q.  And in a career that she had been in for a long time?

2192

A.  Yes, sir.

Q.  And you didn't want that?

A.  No, sir.

Q.  And you were also worried at that time, in January, about Callie Eversole getting on Section 8 for her children, yes?

A.  I don't remember that being my concern.  I remember my concern being that she would be in jail when my grandchildren were born.

Q.  If you looked at the transcript from that January 31st meeting, would that refresh your memory about Callie and your concerns for Section 8?

A.  It won't refresh my memory because I just don't remember it, but if it's on the transcripts and I assume it was what was said, yes, sir.

Q.  Okay.  Well, let's take a look at it and see.

        MR. VILLA:  208, 44.

        May I approach, Your Honor?

        THE COURT:  Yes.

BY MR. VILLA:

Q.  So this is the transcript of the January 31st, 2021 interview, yes?

A.  Yes, sir.

Q.  You agree that was the date of the interview?

A.  Yes, if you say it is.

Q.  Okay.  Uh, I'm going to turn to 2 hours and 8 minutes, and

2193

if you'd start reading -- maybe it's 2 hours, 8 minutes, and 11 seconds.  You can read from there on to the second page until you get to that discussion.

A.   Okay.

Q.   Does that refresh your recollection?

A.   I mean, it doesn't refresh my recollection because it was a long interview.  I don't remember everything that was said.  But I assume that's what I said.

Q.   Well, let me ask you this:  You've given several interviews, yes?

A.   Yes, sir.

Q.   You've been given the opportunity before trial to review the statements you gave in those interviews?

A.   No, sir.

Q.   Nobody asked you to do that?

A.   No, sir.

Q.   But you agree that that interview took place?

A.   Yes, sir.

Q.   Yes?

         And at least at the time, it was -- that question about Section 8 housing was something that you knew about but now you can't recall it well enough to testify fully and accurately?

A.   I mean, it's such a minor detail, but I assume, yes, I worry about my kid.  She has -- she has issues, so --

2194

Q.  But you said it, right?

A.  That was --

Q.  You said it so you knew it at the time, yes?

A.  Okay.  Yes, sir.

Q.  At least at the time it reflected your knowledge about what you thought was going on with your daughter?

A.  Uh, I assume, yes, sir.

MR. VILLA:  Judge, based on that, I'd like to read it to the jury under 803(5).

THE COURT:  Any objections?

MS. STOKMAN:  Objection to just being cumulative at this point.  He's already testified to those facts.

THE COURT:  Overruled.

Go ahead.

MR. VILLA:  May I get it back from the witness?

THE COURT:  Sure.

BY MR. VILLA:

Q.  So I'm starting at 208, 44, and you say:

"Callie, she's a crumb.  Oh, my God.  She's the dumbest -- she's the dumbest smart people you've ever met.  Without her being able to get back on Section 8, and she just had them babies, she's not going to be able to support herself.  She's not dumb, she's not really lazy.  I just don't know what it is. She's a weird kid, you know."

2195

          Did I read that right?

A.   Yes, sir.

Q.   And your concern about Section 8 was if she had a felony, she couldn't get Section 8?

A.   I -- I believe that's my understanding, yes.

Q.   Section 8 being support for housing?

A.   Yes, sir.

Q.   So it was important to you to get that felony dropped?

A.   Yes, sir.

Q.   And so you were then essentially offered like, Hey, well, if you want to -- you want this to happen, then you got to tell us things.  You got to -- it's a give-and-take, right?

A.   Yeah.  Basically, what was told to me was if you want to get a cooperation deal, then you have to be completely honest in everything you were doing.

Q.   And they wanted to know some of the things you knew, yeah?

A.   Yes, sir.  I would assume.

Q.   And you believe that they were in communication with the state prosecutors, who had control over your children and your wife's cases, yes?

A.   Well, I didn't know.  I didn't -- I didn't know how that worked.  I had never did anything federal, I had never been in the system that way, so I didn't understand the federal laws.

Q.   But in the course of that interview, you understood that they had the ability to talk to the state and ask them to help

2196

your family?

A.  Yes, that's what I assumed.

Q.  Okay.  And so then you were told that they were interested in what you might know about the Lomita homicides?

A.  I don't -- I don't know that that was brought up then.  I don't -- I don't recall but, at some point, yes.

Q.  Well, as a point of fact, it was brought up then?

MS. STOKMAN:  Objection.  Misstates facts.

MR. VILLA:  Well, you said -- I'll rephrase the question.

BY MR. VILLA:

Q.  You don't remember if it was brought up then in the January 31st interview?

A.  Yeah, I don't -- I don't remember when exactly it was brought up.  No, sir.

Q.  If I showed you the transcript, might that refresh your recollection?

A.  It's not going to refresh my recollection, but if it's in the transcript, I assume it's true.

Q.  Okay.  Well, let's show it to you.

MR. VILLA:  I'm going to start at 2:16:17.

May I approach, Your Honor?

THE COURT:  Yes.

BY MR. VILLA:

Q.  So same transcript I showed you before, 2:16:17, just read

2197

it until you get there.

Go ahead and read through 2:17:53.

THE COURT:  Mr. Villa, has this been marked?

MR. VILLA:  No, Your Honor.  Would you like me to mark it?

THE COURT:  It's not that.  I was just going to open it up for a copy for myself.

MR. VILLA:  We can certainly provide the Court a copy.

BY MR. VILLA:

Q.  Are you finished?

A.  Yes, sir.

Q.  Okay.  And then let me ask you to read another portion of the transcript.

MR. VILLA:  May I approach, Your Honor?

THE COURT:  Yes.

BY MR. VILLA:

Q.  Starting at six minutes on to the second page until you get to ten minutes.

MS. STOKMAN:  I'm sorry, what transcript is this?

MR. VILLA:  January 31st.

MS. STOKMAN:  What time frame?

MR. VILLA:  Starting at six minutes.

MS. STOKMAN:  Judge, may we approach?

THE COURT:  All right.

2198

(Sidebar commences.)

MS. STOKMAN:  At this point, I mean, I don't know what direct question you're asking of him, but he's just reading through the transcript now with no question out there, so I'm not really sure what the purpose of this is, but it's definitely improper.

MR. VILLA:  To refresh his recollection about whether he was asked about Lomita in the January 31st interview.

THE COURT:  Is there a copy I can take a look at?

MS. STOKMAN:  He already said that it wouldn't refresh his mem- -- his --

THE COURT:  Right.  So now he's establishing that's a --

MR. VILLA:  Recorded recollection.

THE COURT:  -- recorded recollection.

MR. ENGELKING:  I think, Your Honor, according to my reading of the rules, we're supposed to be allowed an opportunity to examine the witness about his inability to recall before he's allowed to read it into the record.

THE COURT:  He has been doing that, though.

MR. ENGELKING:  I know, but going forward.

THE COURT:  He asked does it refresh --

MR. ENGELKING:  If they're going to keep going --

THE COURT:  He says --

MS. DE SALES BARRETT:  But that's only one.  I took

2199

all of my Post-its out.

THE COURT:  So where is the reference to --

MR. VILLA:  Well, so I had him read -- the first one is -- and I'm trying to get some word search help here because this is all jammed up and it's hard to find the --

Can you ask Helena to come over here?

So the first time -- sorry -- 1:21.  This one's got different time stamps.

MS. STOKMAN:  He's reading a different page right now, though, is the issue.

MR. VILLA:  Yeah, I think I -- I gave him the incorrect one.  That's my mistake.  Sorry, there it this. This is the one I need him to read.

THE COURT:  Let me take a look.

MR. VILLA:  Sure.  Then the one I had him read the first time is 2 hours and 16, I believe.

Helena, Helena, the next one, 2:16:57.

THE COURT:  So he's asked about it.  He says he knows about it, then he says, I don't want to talk about it.

MR. VILLA:  Correct.

THE COURT:  Does it go on and he does talk about it?

MS. STOKMAN:  No --

MR. VILLA:  So then he's asked again at 2:16:57.

MS. STOKMAN:  And then I'm also objecting because I don't think this is a proper use of recorded recollection

2200

since he hasn't adopted this.  This is not something he's written down.

THE COURT:  It's adopted or created at the time. There's no doubt this was created at the time.

MS. STOKMAN:  But that he has to adopt or it's just created in general?

THE COURT:  Well, created or adopt.  So here --

MS. STOKMAN:  Judge, we're looking at it as was made or adopted by the witness, which this was not.  The recording itself was not made or adopted by the witness.  So it would be a refreshing of a recollection, which he's saying he doesn't remember.

THE COURT:  What are your comments about that?

MR. VILLA:  Well, which part of the rule are you talking about?

MS. STOKMAN:  Section B.

MR. VILLA:  Okay.  So B is "was made or adopted by the witness when the matter was fresh in the witness's memory."

THE COURT:  Right.  So you're saying the "or" applies --

MR. VILLA:  So -- I'm sorry.

THE COURT:  You're saying that the "or" is -- means that it wasn't -- doesn't have to be made by the witness, and I'll tell you that had always been my understanding of this,

2201

but when you started reading, I'm like, well, okay.

MR. VILLA:  So his answer is, "I don't want to talk about that right now," which is saying he does know about it but doesn't want to talk about it.

THE COURT:  Well, he says, "I do."  I mean, they ask him, and he says he does know.

MR. VILLA:  Yeah, so he's adopting the statement.

THE COURT:  No, no.

MR. VILLA:  He --

THE COURT:  Wait.  You're asking to refresh his recollection, he looks at it, he says:  "I don't recall.  I look at this, I don't recall.  If you say it's there, it's there."

So then you want to establish it as a recorded recollection, and it was recorded at the time but not by him, and there's no showing that it was adopted by him is what the government is saying.

MR. VILLA:  Well, the question is, "Were you asked about the Lomita homicide on January 31st?"

"I don't remember."

And this --

THE COURT:  So then you say --

MR. VILLA:  He was asked and he says --

THE COURT:  Wait, wait.  But we're talking about an evidentiary issue.

2202

MR. VILLA:  Uh-huh.

THE COURT:  He says, I'm looking at it.  I don't remember that.  I mean, I assume that's what he's going to say, but that's what he said so far.

MR. VILLA:  Uh-huh.

THE COURT:  Maybe he does remember it now.  I don't know.  But if he says, I don't remember it, is there -- did he have the opportunity to review this?

MR. VILLA:  Well, so --

THE COURT:  He said no.

MR. VILLA:  Yeah.

THE COURT:  So he hasn't adopted it.  He's just -- I mean, what are your -- what are your thoughts on whether he's adopted it?

MR. VILLA:  Well, I think if he says that he did give this interview and that this is the answer that -- that he gave and --

THE COURT:  If he says, It refreshes my recollection, we don't need to go there.

MR. VILLA:  That's right.

THE COURT:  But if he's just saying, You're representing to me what this is, I can't dispute that, that's not adopting it, is it?

MR. VILLA:  Well, then I'd like to play the recording so he can hear his own voice.  Because it's his voice, and he

2203

can say whether he gave that answer or not --

MS. STOKMAN:  I don't think that --

MR. VILLA:  -- and then he can adopt it.

MS. STOKMAN:  I don't think that's the issue.  I think he's aware that he said these things, but he's saying he doesn't have independent recollection of this, which that would be the same issue with the audio.  And again, it doesn't mean he's adopting this.

Recorded recollection is not for situations like this.  It's for situations where a witness writes something down after that takes what his memory is at that time, records it, or someone else does the same and he's able to adopt it, which hasn't happened here.

THE COURT:  I guess I have to just kind of cut to it.  What difference does it make?  He says he's asked.  He says, I know about it.  I don't want to talk about it.

MR. VILLA:  Because then the next interview, he gets a cooperation agreement, and then he's willing to talk about it.

THE COURT:  Is that really subject to dispute, that that's what happened?

MS. STOKMAN:  I mean, you could ask questions around that.  I don't think -- the problem this is going to open up is that he has hours and hours and hours of interviews, and this can't be every single thing.

2204

MR. VILLA:  I'm just focused on Lomita.  I'm not asking about the other three hours of interview.

THE COURT:  Well, up to this point, I don't have a problem with you asking, Were they at, Did you ask about it? Did you know about it at that time?

Yes, I did.

Did you answer at that time?

No, I didn't.

MR. VILLA:  Okay.

THE COURT:  But we are going to have to look at this. If there's authority that it's created by the government or something at the time without him having seen it or adopted it, then we'll be okay.  But if you don't have that showing, then I don't think you're going to be able to get this in in this way going forward.  You know what I mean?

MR. VILLA:  I mean, I think recorded recollection does cover this situation.

THE COURT:  The situation of which he doesn't create it or adopt it?

MR. VILLA:  Well, I think he can adopt it if he hears his voice.  I mean --

THE COURT:  We're not going to --

MR. VILLA:  -- I think part of the problem is the transcript --

THE COURT:  But what you're doing -- you can't

2205

introduce that to the jury --

MR. VILLA:  No, no.  Just to him --

THE COURT:  -- in advance.

MR. VILLA:  -- outside the presence of the jury so he can say either, That was me saying that, or, That wasn't me.  That was some other guy.

THE COURT:  So you want him to adopt it now as opposed to at some point in the past?

MR. VILLA:  Well, I'm not a hundred percent clear what the government's argument is, but my --

THE COURT:  Their argument is there's no hearsay exception.

MR. VILLA:  Yes.  And I'm talking about --

MR. REED:  That's not true.

MR. VILLA:  -- (B).  I'm talking about 803(5)(B), which is, you know, what does it mean to say he adopted it or not.

And so if the issue is, I don't know that this is me talking, then we play the recording for him.

THE COURT:  But he doesn't say that.  He just -- you haven't refreshed his recollection.

MR. VILLA:  Well, I haven't had a chance.  They objected, we approached, so I haven't gotten to ask him.

THE COURT:  Right.  But what we're talking about is going forward.

2206

MR. VILLA:  Uh-huh.

THE COURT:  If it doesn't refresh his recollection, you properly move back to, okay, recorded recollection.  So now what we're trying to figure out is, is it enough that somebody else recorded it, and he hasn't adopted it, to introduce it in the way that you've done?

MR. VILLA:  When you say "he hasn't adopted it," what do you mean?

THE COURT:  Well, this is, apparently, the first time he's seen this recording, so he can't have adopted it before he's sitting right here.  So you can't introduce it in the way that you're doing.

MR. VILLA:  But I think if I play the recording and he adopts --

THE COURT:  We're not talking about that.  And if you need to do that, we'll have to do it in some other fashion.

MR. VILLA:  Sure.  I mean, I don't mind doing it outside the presence of the jury.

THE COURT:  If we have to do that, we'll take that one step at a time.  I guess what my concern is, if you can get at it a different way, why are we bothering?

MR. VILLA:  I will certainly try.  I don't know what his answer is going to be now that he's read it.

MS. STOKMAN:  Also, Judge, we'll just look at the rest of Section B that says, "was made or adopted by the

2207

witness when the matter was fresh in his memory," which is not right now.  So it would have had to be an adoption --

THE COURT:  But you can refresh a recollection with anything.

MS. STOKMAN:  Correct.

THE COURT:  And if the recording will do that, then we're not talking about recorded recollection.

MS. STOKMAN:  No.

MR. VILLA:  And, Judge, it's also impeachment.

THE COURT:  Well, it hasn't yet impeached him --

MR. VILLA:  Well, I have to --

THE COURT:  -- because he says, I don't recall.

MR. VILLA:  Well, I have to get to that step.

THE COURT:  Well, saying "you do recall" would be the impeachment.  He's never going to say, I do recall.  He may say, Oh, yeah, I remember now.  That's not impeachment.  So --

MR. REED:  Well, that's -- that's why -- I mean, no witness can ride on, I don't remember.  I don't want to listen to it, and just --

THE COURT:  No, no, no.  We're not saying that.  All I'm saying is this, the way he's doing it now, doesn't get him there.  If he's refreshed by a ham sandwich, we're going to go with a ham sandwich.

MR. REED:  I mean, there's a long way, but I know you're trying to get past that, but the long way is make him

2208

listen to his voice, and if he says, That's not my voice, then it's a whole different --

MS. STOKMAN:  That's not the issue, though.

THE COURT:  That's exactly --

MR. REED:  But impeachment is impeachment, whether you call it -- he can -- he will ultimately be impeached with something he previously said.  I don't know the way to get around that.

THE COURT:  I don't think so, because what he's going to have is maybe his recollection recorded -- I mean refreshed.

But when someone says, I don't remember, maybe they are lying.  If he -- if he then said something else that says, I'm going to say I don't remember that, but somebody who says they don't remember, that's why we have techniques to --

MR. REED:  Right.  And then you do what prosecutors do, you call the person who made the recording --

THE COURT:  Exactly.

MR. REED: -- you go through all the drama --

THE COURT:  But has that happened yet?

MR. REED:  No.  I agree.

THE COURT:  Okay.

MR. VILLA:  We can certainly call Agent Gonzalez, but at this point, I'm just trying to figure out if this --

THE COURT:  I know, but --

ER 1540

2209

MR. VILLA:  -- if he says it's him or not.

THE COURT:  Let's do it the way we're talking about. If he can't recall, you don't get to read this.  And maybe you want him -- make a list of the things that you want him to listen to on a break, and we'll go back.

MR. VILLA:  Sure.  Okay.

(Sidebar ends.)

BY MR. VILLA:

Q.  Okay.  So, Mr. Eversole, you read the transcript?

A.  Yes, sir.

Q.  And you were asked on January 31st if you knew about Lomita homicide, yes?

A.  That's what it says, yes, sir.

Q.  And you said you didn't want to talk about it at that time, right?

A.  Yes, sir.

Q.  I'm sorry.  A little bit louder.

A.  Yes, sir.

Q.  Because what you knew implicated you?

A.  Yeah, and other people.

Q.  Okay.  But I mean, you said you were worried about it implicating you, yes?

A.  Correct.

Q.  Now, also during that January 31st meeting, it was suggested to you by Agent Gonzalez that that Lomita homicide

2210

may have been ordered by Kenwood?

A.  Uh --

MS. STOKMAN:  Objection.  Calls for hearsay.

MR. VILLA:  It's not offered for the truth.  It's absolutely not true.

THE COURT:  There's two parts of this.  Which part are you saying isn't true, that Agent Gonzalez didn't ask this or the other part?  I assume you're referring only to the other part.

MR. VILLA:  To the other part.  And then the --

THE COURT:  You aren't asking for the original part to be -- to be offered for the truth?

MR. VILLA:  The original part is a question; it's not an assertion.

THE COURT:  All right.  Ladies and gentlemen, you're going to hear this response.  It is not to be accepted for the truth of the matter.

All right.  Go ahead.

BY MR. VILLA:

Q.  So Agent Gonzalez asked if the order might have -- if the Lomita homicide might have been ordered by Kenwood, didn't he?

A.  If it's on the transcript, it's in it, but I don't remember that.

Q.  Okay.  If it's on the transcript, you believe me?

A.  If it's --

2211

MS. STOKMAN:  Objection.  Improper form of the question.

THE COURT:  Sustained.

MS. STOKMAN:  Ask to strike.

BY MR. VILLA:

Q.  Do you need to read the transcript?

A.  Well, I'm not going to recall it.  I'm not trying to be rude, but, like, I -- this was a very long interview.  I don't remember every single thing that was said in the interview.  But if it was said, it's true.  That's all --

Q.  And certainly, the government didn't want you to read this transcript before your trial today, because you -- they didn't ask you to do that, did --

MS. STOKMAN:  Objection.  Calls for speculation.

THE COURT:  Sustained.

BY MR. VILLA:

Q.  The government didn't ask you to read this transcript before your testimony today?

A.  No, sir.

Q.  In any case, you didn't talk about the Lomita homicide in the January interview, right?

A.  Well, I don't remember.  I talked about it.  I know I talked about it.  I just don't remember exactly when.

Q.  Okay.  So on February 24, 2021, you had another interview with Agent Gonzalez and Ms. Stokman, yes?

ER 1543

2212

A.  Yes, sir.

Q.  And you were presented with a cooperation agreement, correct?

A.  I don't recall, but I'm -- I did at some point, yes, sir.

MR. VILLA:  Can we show just to the witness only his cooperation agreement, see if that refreshes his recollection about the date?  It's -- Your Honor, may I do that?

THE COURT:  Yeah.

MR. VILLA:  On the screen?  Okay.

THE COURT:  I'm sorry.  I didn't know you were talking to me.  I can't produce it.  I thought you were talking to your own --

MR. VILLA:  No, Your Honor.  I just wanted to make sure that was okay.

BY MR. VILLA:

Q.  Can you see on that screen there, Mr. Eversole, a document?

A.  Yes, sir.

Q.  Is that a cooperation agreement that you were presented on February 24th, 2021?

A.  Yes, sir.  That's the date on it, yes, sir.

MR. VILLA:  Can we see the last page, the signature page.

BY MR. VILLA:

Q.  Did you sign it?

2213

A.   Yes, sir.

Q.   That's your signature?

A.   Yes, sir.

Q.   And can we go back up to the beginning.

     And this -- part of this cooperation agreement was, in exchange for your cooperation, the United States government wouldn't prosecute your family, correct?

A.   Yes, sir.

Q.   That included your wife Christine?

A.   Yes, sir.

Q.   Your daughter Callie?

A.   Yes, sir.

Q.   And Katie and Karie Gunter, right?

A.   Yes, sir.

Q.   They were all specifically included on that cooperation agreement, correct?

A.   I don't see it on there, but, yeah, I know that was what I asked for, so --

Q.   I'll enhance --

A.   Yes, sir.

Q.   -- paragraph 1 and let you read it.

A.   Yes, that's what it says, yes, sir.

Q.   It includes all of them?

A.   Yes, sir.

Q.   And then it also said that essentially anything you tell

2214

them from that point forward won't be used against you?

A.  Yes, sir.

Q.  And won't be used to charge you with any crimes, right?

A.  Yes, sir.

MR. VILLA:  Thank you.  You can take that down.

BY MR. VILLA:

Q.  Now, at the time you were also told that Ms. Stokman was talking to the DA handling the state cases, yes?

A.  I believe so, yes, sir.

Q.  And that they were going to dismiss the charge against both Katie and Karie Gunter?

A.  Yes, sir.

Q.  On the state side?

A.  Yes, sir.

Q.  And that your wife Christine would also not be charged on the state side?

A.  I don't remember that, but I know that she wasn't going to be charged.  I don't remember if it was state or federal.

Q.  But do you remember being told that -- by Ms. Stokman that neither the federal government nor the state would charge her in exchange for your cooperation?

A.  Yes, sir.

Q.  And in fact, one of your stepdaughters had actually already pled to one of the charges, right?

A.  Yes, sir.

2215

Q.   And what they did was they still -- even though she had already pled no contest to it, they went back and dismissed it for your cooperation?

A.   I believe so, yes, sir.

Q.   And then also at the same time persuaded the state district attorney to drop Callie's felony to a misdemeanor?

          MS. STOKMAN:  Objection.  Calls for speculation.  Misstates testimony.

          THE COURT:  Sustained.

BY MR. VILLA:

Q.   Do you remember at the beginning of that interview being told that they can't drop the felony, they can just take the strike away for Callie?

A.   I remember them just telling me that they would do all that they could.  They couldn't make promises.

Q.   Okay.  So you have some memory of that interview?

A.   I remember it being said.  I don't remember the exact date or which interview it was at, but I do remember it being said, yes, sir.

Q.   And you remember Callie was facing a strike?

A.   Yes, sir.

Q.   And a strike means a felony that's eligible for the Three Strikes Law?

A.   Yes, a serious felony, yes, sir.

Q.   And that at the time they didn't think the state would

2216

drop it from a felony to a misdemeanor, but they would take the strike away?

A.  I vaguely remember that being said, yes, sir.

Q.  Okay.  But then a little bit later Ms. Stokman told you that she had just texted the DA and that he was going to drop it to a misdemeanor?

A.  Yes, sir.

THE COURT:  Mr. Villa, we're going to go ahead and take a break at this time.

MR. VILLA:  Yes, Judge.

THE COURT:  Ladies and gentlemen, if you would prepare to return in 20 minutes.  That will put us at ten minutes till.  Oops, I'm sorry, it will put us at ten o'clock.

(Jury exits the courtroom at 9:40 a.m.)

THE COURT:  The jury has stepped out.

Anything for the record at this time?

MR. VILLA:  No, Judge.  I think I just need to retrieve the rest of the transcript.

THE COURT:  Okay.

MS. STOKMAN:  Sorry, Judge, when are we coming back?

THE COURT:  Ten o'clock.

MS. STOKMAN:  Thank you.

(Recess held.)

THE COURT:  All right.  Let's go ahead and bring in the jury.

2217

(Jury enters the courtroom at 10:03 a.m.)

THE COURT:  All right.  Thank you.  We have our jury members back.

You may continue, Mr. Villa.

MR. VILLA:  Thank you, Your Honor.

BY MR. VILLA:

Q.  Mr. Eversole, before the break we talked about how in your -- in February of -- 24th, 2021, you signed a cooperation agreement and the government agreed not to prosecute your family, and also the state charges and how those were disposed of for your family.

But in addition to that, at that February 24th meeting, you were also told that you could get a sentence reduction in the federal case for your cooperation, yes?

A.  Yes, sir.

Q.  Potentially up to a 50 percent reduction, yes?

A.  Yes, sir.

Q.  And that was told to you by Ms. Stokman?

A.  I'm not sure who was told, but it was said to me, yes, sir.

Q.  She was there?

A.  Yes, sir.

Q.  Yes.  And after she said that, she told you that, we're going to ask you questions --

MS. STOKMAN:  Objection.  Calls for hearsay.

2218

MR. VILLA:  801(d), Your Honor.

THE COURT:  Overruled.

BY MR. VILLA:

Q.  She told --

THE COURT:  Wait, I'm sorry, no.  Sustained.  Because of the form of the question, it's sustained.

BY MR. VILLA:

Q.  So did Ms. Stokman tell you the questions that they were going to ask you about?

A.  I don't remember exactly, but I was told that we're going to talk about things that happened, yes, sir.

Q.  And including the people that they were interested in knowing about?

A.  Uh, I don't know if they asked me about certain people they were interested in.  They asked me what I knew, like --

Q.  Okay.  Well, you're saying you don't remember being asked about what -- you're going to be asked questions about specific people?

A.  Yeah, I'm sure that if you say this was said that's what was said.  I don't remember the exact wording.  I know what we were going to talk about, yes, sir.

Q.  And not with respect to the exact wording, but you were told about specific people that Ms. Stokman was interested in?

A.  I don't know if it was, like, said in this way, but okay.

MR. VILLA:  May I approach, Your Honor?

2219

THE COURT:  All right.

MR. VILLA:  This is February 24, 2021, starting at 19:23.

MS. STOKMAN:  May I see it?

BY MR. VILLA:

Q.  Now we have your February interview, right?  Yes?

A.  Yes, sir.

Q.  Okay.  And 19:23, if you read here, this statement to you by Ms. Stokman.

A.  Okay.

Q.  So after telling you that you could get a 50 percent reduction on your sentence, you were told by Ms. Stokman that you were going to be asked questions --

MS. STOKMAN:  Objection.  Improper question.

He's refreshing the witness's recollection.  That's a different question.

BY MR. VILLA:

Q.  Is your recollection refreshed?

A.  Uh, I suppose.

Q.  Okay.  So you were told by Ms. Stokman --

MS. STOKMAN:  Objection.  It's unclear.

THE COURT:  Sir, do you recall that -- the statement or not?

THE WITNESS:  I recall this happening.  I mean, I don't remember the wording, I'm sorry.  I'm not trying to

2220

prevaricate; I just don't remember.  It was a lot and it was a long time ago.  But I know all of this was said at some point, yes, sir.

BY MR. VILLA:

Q.  So you know this is true and it was said to you?

A.  Uh, it's on transcript, so I would assume, yes, sir.

THE COURT:  That's not the quite the same thing.

Mr. Villa, why don't you just ask it a different way.

MR. VILLA:  I'm not sure what's wrong with the form of the question.

THE COURT:  Well, what he said was he doesn't know if the transcript is true.  He's saying -- he's relying upon your representation of that and you're not a witness.

BY MR. VILLA:

Q.  So if you listen to the actual recording and hear Ms. Stokman's voice and your voice and read this transcript, would that help?

A.  I would believe it to be true, yes, sir.

Q.  Okay.  Because you could recognize your own voice?

A.  Well, yeah, I would assume, yes, sir.

Q.  And Ms. Stokman's voice?

A.  Yes, sir.

Q.  Okay.  And you could read along with the transcript as you listened?

A.  Yes, sir.

2221

MR. VILLA:  Well, then, Judge, I request an opportunity to do that.

THE COURT:  Does that have to happen now?

MR. VILLA:  Well, if he can't answer my question, I suppose it does.

THE COURT:  All right.  Ladies and gentlemen, I'm going to ask you to step out and we will call for you in just a few minutes.

(Jury exits the courtroom at 10:09 a.m.)

MR. VILLA:  May I approach so he can hear my laptop, Your Honor?

THE COURT:  No, let's put it up to the microphone because we all need to hear it.

MR. VILLA:  Okay.

THE COURT:  Unless you can connect it to the system, which would be better.

MR. VILLA:  I don't know.  I don't think that's working right now, Judge.

THE COURT:  All right.  Then let's just get it up to the microphone.

(Audio played in open court.)

THE COURT:  I don't think this is loud enough for the reporter to take this down.  But I can -- I'm having trouble. Is that as loud as it goes?

And do you want this in the record, Mr. Villa?

2222

MR. VILLA:  I just was going to play it and see if the witness recognizes his voice.

MS. STOKMAN:  Judge, I'm not sure what the purpose of this is.

THE COURT:  Refreshing his recollection, but I can't hear it.  So --

MR. VILLA:  Okay.  Let me give him the transcript so he can read long.  19:23.

THE WITNESS:  Can I ask a question, Your Honor?

THE COURT:  Not right now, sir, sorry.

(Audio played in open court.)

THE COURT:  Can we stop for a second.

Sir, could you hear a response to that question?

THE WITNESS:  Yes, ma'am.

THE COURT:  Did you recognize that voice?

THE WITNESS:  Yes, ma'am.

THE COURT:  Was that you?

THE WITNESS:  Yes, ma'am.

THE COURT:  All right.

BY MR. VILLA:

Q.  Is that transcript accurate?

A.  It sounds like it, yes, sir.

Q.  Okay.  And so you believe that was your voice and Ms. Stokman's voice?

A.  Yes, sir.

2223

THE COURT:  As to this topic, are there other topics, Mr. Villa?

MR. VILLA:  I mean, with respect to the same transcript, Your Honor, but I don't know whether he'll remember it or not as we go along.  I mean, if you want me to skip to -- ahead to those, I'm happy to.

THE COURT:  I don't want to make you do anything you're not prepared to do at this time, but --

MR. VILLA:  Well --

THE COURT:  I just --

MR. VILLA:  -- can I ask a few questions of the witness?

THE COURT:  If you would like.  I'm just trying to make -- point that what he's identified as what he's reading and hearing but not beyond that.  I think we agree on that.

MR. VILLA:  Yes, Your Honor.

THE COURT:  All right.  If you have additional questions, that's fine.

BY MR. VILLA:

Q.  So later on in the interview, you're asked questions about the Lomita homicide, yes?

A.  I believe so, yes, sir.

Q.  Okay.  And if you flip to -- look at 21:42.

MS. STOKMAN:  I'm objecting -- objection to this.  I mean, we're looking at refreshing a recollection, which I'm

2224

not sure if that question has even been established again. It's --

MR. VILLA:  I'm just trying to save time so we don't have to keep doing this with the jury.

THE COURT:  Right.  But you can't refresh a recollection if he doesn't recall.

MR. VILLA:  Okay.  I mean, I can do my whole examination if that's what the objection is.

THE COURT:  No, that's not what the objection is.  If you want to refresh his recollection, you first have to establish he doesn't recall.

MR. VILLA:  Okay.

THE COURT:  And like I said, you don't have to do this now if you don't want to.  If you do, though, you do have to find out if he doesn't recall first.

MR. VILLA:  Okay.  I mean, I think I'm going to get into some questions in a few minutes that he may say, I don't remember if I said it here.

THE COURT:  Okay.

MR. VILLA:  And so I can do that now or we can keep doing this dance with the jury.

THE COURT:  Well, I'm not sure what you're referring to, but if you do want to refresh his recollection now, you first have to find out if he doesn't recall.

MR. VILLA:  Okay.

2225

BY MR. VILLA:

Q.  Do you remember being asked shortly after you just heard yourself by detective -- or excuse me -- Agent Gonzalez that:

"We started to talk about the Lomita murders last time and -- but you didn't want to because you didn't want to implicate yourself, but we aren't trying to implicate you, we just want to solve crimes"?

A.  Yes, I remember that being said.  Yes, sir.

Q.  Okay.  So you remember that one.

And then later you're asked, What do you know about Lomita?

And you say, I know everything about it.

A.  Yes, sir.

Q.  You remember that.  And you remember discussing everything that you knew about it?

A.  Yes, sir.

Q.  In this interview?

A.  Uh, I'm pretty sure I did at this one.

MR. VILLA:  Okay.  So I think we won't have a further problem, then, Judge.

THE COURT:  Okay.  Let's go ahead and bring the jury back in.

(Jury enters the courtroom at 10:20 a.m.)

THE COURT:  Our jury members are back.

You may continue.

2226

BY MR. VILLA:

Q.   Okay.  Mr. Eversole, so I was asking you if you were asked questions about specific people that they wanted to know about and you said you didn't remember.  And you looked at the transcript, and then now you just had an opportunity to listen to the recording and you heard that it was your voice, right?

A.   Yes, sir.

Q.   And Ms. Stokman asking you questions, yes?

A.   Yes, sir.

Q.   And you got to follow along with the transcript you have there, and you -- it was accurate?

A.   Yes, sir.

Q.   Okay.  So -- and you now remember that you were asked questions about -- that you -- that they told you they wanted to know about specific people, including Kenwood, yes?

A.   Well, I don't remember specifically what was said, but I believe that that's what was said, yes, sir.

Q.   And you just heard it on the recording?

A.   Yes, sir.

Q.   Okay.  So you know that was said?

A.   Yes, sir.

Q.   And your response was, As long as my family is covered, I'll talk about whatever?

A.   Yes, sir.

Q.   So then Agent Gonzalez said to you, We started to talk

2227

about --

MS. STOKMAN: Objection. Hearsay.

MR. VILLA: It's offered for the effect on the listener, Your Honor. It's -- it's for impeachment purposes.

THE COURT: All right. I'm going hold off on ruling until we hear -- I'm not sure what the impeachment is yet, but until I hear, go ahead.

BY MR. VILLA:

Q. We started to talk to you about the Lomita murders last time and you said you didn't want to talk about them because they would implicate you?

A. Yes, sir.

Q. But you had an agreement that you signed that said what you told them wouldn't implicate you, yes?

A. I believe after that, I'm not quite sure, but, yes, at some point, yes, sir.

Q. And after you signed that agreement, then you talked about the Lomita homicides that day, yes?

A. Yes, sir.

Q. And talked about your specific role in the homicides?

A. Yes, sir.

Q. Including that you essentially directed -- what'd you say -- you directed Justin Gray on how to commit the homicides and how to try to get away with them, yes?

A. Yes, sir.

2228

Q.   So you were an accomplice to a murder?

A.   Yes, sir.

Q.   And you didn't have to plead guilty to that murder, did you?

A.   No, sir.

Q.   So as part of your agreement, you only had to plead guilty to racketeering and a drug charge, right?

A.   I don't understand the question.  I never pled guilty to anything to do with that murder, no, sir.

Q.   Okay.  And as you said yesterday and earlier today, your plea agreement was to plead guilty to racketeering, conspiracy, and a drug charge, yes?

A.   Yes, sir.

Q.   And ultimately, your initial sentence was 120 months or ten years, correct?

A.   Yes, sir.

Q.   And then you got an additional 50 percent off because the government asked for it, right?

A.   Yes, sir.

Q.   So that took it down to five years?

A.   Thereabouts, yes, sir.

Q.   Okay.  You got released from prison July of 2024, yes? And so from November --

A.   Yes, sir.

Q.   Sorry about that.

2229

So from the time you got arrested, November 19, 2020, to released from the Bureau of Prisons, July 2024, it's a little less than four -- four and a half years?

A.   Thereabouts, yes, sir.

Q.   Okay.  Even though you were a party to a murder, according to your own statement?

A.   Yes, sir.

Q.   Now, even though you were told specifically that you wanted to know -- they wanted to know things about Kenwood in this February interview when you told the story of what you say happened, you didn't say that it was Kenwood that asked you to do it, did you?

A.   Uh, I don't recall whether I did or not.  If you say that that's what was said in the transcripts, I agree with you. I'm not going to remember exactly what was said, but I believe you.

Q.   Now that we've established that this transcript is the transcript between you and Ms. Stokman and Agent Gonzalez -- you still have it in front of you there, correct?

A.   Yes, sir.

Q.   Can you turn to 2:08:35, which should be page 50.

A.   Yes, sir.

Q.   I'm sorry.  Start at 2:08:15.  You're asked the question: "I'm going to skip briefly from the Central Coast area and ask you about the Lomita, the Lomita stuff."

2230

Right?  You see that question being asked of you?

A.  Yes, sir.

Q.  You said, "I know everything about it," right?

A.  Uh-huh.

Q.  Yes?

A.  Yes, sir.

Q.  Okay.  Now, we have to skip a few pages -- excuse me -- a few sentences and go to --

A.  Excuse me.  There's something in that part, like it says that -- that I said my wife was there and I know absolutely for a fact that that was not said.  So I don't know why that's in this transcript.

Q.  Okay.  But you go in there and you talk about the person --

MS. STOKMAN:  Objection to the form of the question.

THE COURT:  Sustained.

MR. VILLA:  This is impeachment, Judge.

THE COURT:  I don't know what question you're trying to impeach him with.

MR. VILLA:  Okay.  So --

THE COURT:  He doesn't recall.

MR. VILLA:  So hang on a second.

BY MR. VILLA:

Q.  All right.  So you're asked the question, "I want to talk about the Lomita stuff" --

2231

MS. STOKMAN:  Objection.  Calls for hearsay.

MR. VILLA:  That's a question.

THE COURT:  Let's talk at sidebar, Mr. Villa.

(Sidebar commences.)

THE COURT:  So he can refresh his recollection, but you're just reading the transcript.

MR. VILLA:  Okay.  I'll -- I'll do it that way.

THE COURT:  If you want him to read it quietly to himself, that's fine.

MR. VILLA:  Sure.  Okay.

(Sidebar ends.)

BY MR. VILLA:

Q.  So why don't you read to yourself from 2:08:15 through to 2:17.

A.  Okay.

Q.  Did you read all the way there?

A.  Yes, sir.

Q.  And knowing that this recording that took place was your voice, does this refresh your recollection?

A.  Yes, I remember all these.

Q.  Okay.  So it's true, when you recounted at that time how the Lomita murder went down, you didn't say that it was Kenny that ordered it?

A.  Uh, I mentioned in all throughout that whole transcript it was that Frank and K -- everything I said was F and K.

2232

Q.   You mentioned that Kenny knew about the EDD fraud and the EDD deal, but you didn't mention that it was Kenny that called you and said, "We're going to smoke these fools" like you testified yesterday?

A.   So --

Q.   Well, let me do it this way.  Let me ask you this question:  You agree that your testimony yesterday was that Kenny called you and said, "We're going to smoke these fools because they disrespected Frank," yes?

A.   Uh-huh.

Q.   Is that a "yes"?

A.   Yes, sir.

Q.   Okay.  So now go to 2:12:56 --

        MS. STOKMAN:  Objection.  What's the question?

        THE COURT:  Well, let's let him do that first.

        What is the question, Mr. Villa?  Go ahead.

BY MR. VILLA:

Q.   On page 52, and there in the second sentence, you said, "And he tells me, 'Okay.  Well, we're smoking that fool.'"

        And you didn't say Kenny told you that, right?

A.   Okay.  So page 51 --

Q.   Hang on a second.  My question is about 2:12:56 on page 52 about who called you and told you, "We're smoking that fool."

        MS. STOKMAN:  Judge, if he's asking him to refresh his recollection with this and the witness finds areas around

2233

the places he's asked to read that refresh his recollection, I think it's fair to allow him to testify to those.

MR. VILLA:  His recollection has been refreshed.  Now I'm asking him a specific question that impeaches his trial testimony yesterday.

THE COURT:  All right.  Ms. Stokman, you can have an opportunity to address this on redirect.

Go ahead, Mr. Villa.

BY MR. VILLA:

Q.  So at 2:12:56 when you say who called you and said "We're smoking that fool," you didn't say it was Kenny that called you, right?

A.  Well, at 2:12:20 it's --

Q.  Answer my question.

A.  -- what I'm referring to --

Q.  But you used a specific name on 2:12:56 that called you and said -- he told you, "We're smoking that fool," right?

A.  That was after this part telling me --

Q.  Okay.

A.  -- saying that K told me to call Frank about this, and we discussed it.

Q.  Let me ask you this question.

A.  Okay.

Q.  Okay.  2:12:56 --

A.  Yes, sir.

2234

Q. -- it doesn't say, Kenny tells me, We're smoking that fool, right?

A. 2:12:56. Okay. Yes, sir, that was after that.

Q. Okay. So that's what it said?

A. Uh-huh.

Q. And you didn't say Kenny called you and told you "We're smoking the fool" in that statement?

A. Not in this very statement, no, sir.

Q. Okay. So let's go back to the other statement. All right? We're getting there one at a time.

So now let's go to 2:11:38. That's on page 51, right?

A. 2:11:38, yes, sir.

Q. And let me back up. So your testimony yesterday was that you and Kenny talked almost every day, right?

A. Yes, sir.

Q. You were friends?

A. Yes, sir.

Q. So you talked on a daily basis, right?

A. Yes sir.

Q. But sometimes -- but you didn't have that same relationship with Frank, right?

A. No, sir, not always.

Q. Okay. In fact, what you said was -- on 2:11:38, you see the third line down where it starts "and"?

2235

MS. STOKMAN:  Objection.  Is there a question for refreshing his recollection?

MR. VILLA:  It's not refreshing.  It's impeachment.  He's refreshed his recollection already.

MS. STOKMAN:  There's been no question regarding an impeachment matter.

THE COURT:  I haven't heard a question for impeachment, but he's just saying, Do you see the line?  His answer is he does or he doesn't.

BY MR. VILLA:

Q.  Do you see the line?

A.  Okay.  Yes, sir.

Q.  Okay.  And it says there that, "I hadn't been talking to Frank.  Frank was mad at me," right?  Yes?

A.  Yes, sir.

Q.  "He's mad at me all the time."  Huh?

A.  Yes, sir.

Q.  "Blocks me, I'm not talking to you no more, you're not my friend, whatever."

A.  Uh-huh.

Q.  Yes?

A.  Yes, sir.

Q.  And you're like, "Okay.  I told K," and he's, like, "You know Frank.  He'll get over it," right?

A.  Yes, sir.

2236

Q. And then you said, "Then he messaged me on the blue, 'Hey call me.' And I called him," right?

A. Uh-huh.

Q. Yes?

A. Yes, sir.

Q. "And I was like, What's up, bro? And he's like, 'Yeah, I need you to know he said, you know, the Russian thing,'" yeah?

Did I read that right?

A. Yes, sir.

Q. And that, you're talking -- you're not talking about Kenny?

A. Huh-uh. I believe --

Q. Correct?

A. -- that's when I -- when I said "out of the blue," I don't mean like someone hadn't talked to me for a year out of the blue. I mean this incident is out of the blue for me because I had nothing to do with it.

Q. So you're -- so you're saying when he messaged me out of blue after you said Frank had blocked you, you're talking about Kenny, not Frank?

A. Yeah. Well --

Q. Okay. I got your answer.

A. I believe --

Q. We'll explore that a little more.

A. He can --

2237

THE COURT:  We're going to need one person to talk at a time.  Okay?

Go ahead.  Next question.

BY MR. VILLA:

Q.  Now, then you call -- you said you claim you have a conversation with Frank, and then you call Sidetrack, Justin Gray, yes?

A.  Yes, sir.

Q.  And explain -- and discuss with him, you know, this -- how to do this murder?

A.  Yes, sir.

Q.  Okay.  And afterwards you said he called you back and told you what happened and told you that he didn't get the briefcase, right?

A.  Yes, sir.

Q.  Okay.  And you said, Well, like, that's a problem because the whole point was to get the briefcase, right?

A.  Well, I mean, that was the bigger picture, yes, sir.

Q.  Okay.  So now I want you to look at 2:17:38 on page 53 --

MS. STOKMAN:  Objection.  Improper impeachment.

THE COURT:  Mr. Villa, does he not recall this yet?

MR. VILLA:  I think he already read through this part and said he recalled it.  I had him read all the way through 220 and change.

THE COURT:  So you're just going to ask him some

2238

questions now?

MR. VILLA:  Yes.

THE COURT:  Let's hear the questions.

MR. VILLA:  I'm sorry?

THE COURT:  Next question, please, then.

MR. VILLA:  Yes, Judge.

BY MR. VILLA:

Q.  So at 2:17:38, you're talking about what Mr. Gray told you --

A.  Yes, sir.

Q.  -- after the fact, right?

A.  Yes, sir.

Q.  And you were like --

MS. STOKMAN:  Objection.

THE COURT:  Mr. Villa, he's refreshed -- you said his recollection is refreshed, so let's ask him from his recollection.

MR. VILLA:  Okay.  But I'm not refreshing his recollection.  Now I'm impeaching him with this transcript that's different than his testimony.

THE COURT:  You're cross-examining him, but I haven't heard on what topic you're seeking to impeach him.

MR. VILLA:  On the topic of who he said was responsible for ordering the Lomita hit.

THE COURT:  All right.  Go ahead.

2239

BY MR. VILLA:

Q.  And you said --

        MS. STOKMAN:  Objection.  Improper impeachment.

        THE COURT:  Can I have a copy of the transcript? Because I don't know what we're talking about.  Can somebody email it to me, please, or give me a hard copy?  And then maybe we can talk about this.

    (Pause in proceedings.)

        MR. VILLA:  So we can move this along a little bit, I'll -- I'll -- let me ask a few more questions.

BY MR. VILLA:

Q.  So in your discussions with Mr. Gray about how it went down and how he didn't get the briefcase, you were concerned that that was a problem for Mr. Gray, right?

A.  Yes, sir.

Q.  That -- that he didn't do the job right --

A.  Yes, sir.

Q.  -- right?

        And that -- then you asked him about what Bam did?

A.  Yes, sir.

Q.  Bam being Brandon Bannick?

A.  Yes, sir.

Q.  And he said, "You know, he froze.  He didn't do anything. I had to shoot them both."  Do you remember that?

A.  Yes, sir.

2240

Q.  Okay.  You also talked earlier -- sorry.  I meant to ask this earlier.

When you first talked to Justin Gray to told [sic] him how to do it, you said that in the course of that conversation you learned that he was talking to you on speakerphone, yes?

A.  Yes, sir.

Q.  And you were mad because you didn't want to talk to him about this on the speakerphone, right?

A.  Yes, sir.

Q.  So you hung up?

A.  Yes, sir.

Q.  He called you back and said, All right.  I'm not on speakerphone now, right?

A.  Yes, sir.

Q.  And discussed with him how to do the murder?

A.  Yes, sir.

Q.  Asked him, Who else was going to go with you?

He said Bam, right?

A.  Yes, sir.

Q.  And you -- you didn't like that idea of Bam going?

A.  No, sir.

Q.  But then come to find out while you're talking to Mr. Gray about this, Bam is there with him listening, right?

A.  No.  So you're talking about before the incident?

2241

Q.   Before, when you're giving the discussion to Mr. Gray, you're saying you didn't -- Mr. Bannick was not there?

A.   No.  He was in the room when I was initially talking to him and I realized he had me on speakerphone.  He was in that room with --

Q.   Okay.

A.   -- a group of people.

Q.   So then when he called you back and told you that Bam was going with him, it's your testimony that Bam wasn't there on the phone listening?

A.   Yeah.  I would assume not, because I wouldn't have talked about it.

Q.   All right.  You testified at the grand jury in this case, yes?

A.   Yes, sir.

Q.   And you testified about the Lomita homicide, correct?

A.   Yes, sir.

Q.   And in the grand jury testimony transcript page 38, 23 to 24, didn't you say, "When he said Bam was going with him, Bam piped in, 'Hey, bro,' from the background.  And I was like, oh God.  Are you kidding me?"

A.   Yeah.  That --

Q.   Did you say that?

A.   -- was we were on speakerphone, yes, sir.

Q.   Okay.  So Bam heard that part?

2242

A.   Yes, sir.

Q.   That -- that Bam was going with him?

A.   Well, I assume.  I don't know what he heard, because I wasn't there.

Q.   Okay.

A.   But that was what was said.

Q.   But he piped in and said "Hey, bro" from the background?

A.   Yes, sir.

     MR. VILLA:  Okay.  Judge, do you have the transcript now?

     THE COURT:  I do not.  I think Ms. Barrett has a highlighted copy, if that's not a problem.  If it's not a problem for Ms. Barrett, I'll take a look at that to speed it along, and then we can get a clean copy in a moment.

BY MR. VILLA:

Q.   You didn't get a chance to review this transcript before your testimony?

A.   No, sir.

Q.   When we took a break just a minute ago, did you get a chance to speak with the government about your testimony?

A.   Yes.  The stuff that you showed me, yes, sir, and --

Q.   Okay.

A.   -- pointed to me.

Q.   You talked to them about that on the break?

A.   Talked to?

2243

**Q.** The government.

**A.** Oh, no.  No, sir.

**Q.** Okay.

**A.** They just put me in a room during the break by myself and they just kind of stand over there.

**Q.** All right.  I got it.

So --

THE COURT:  And what was your reference?  I have it now.

BY MR. VILLA:

**Q.** Okay.  So in the February interview, there's a discussion starting on 2:16 and we'll go through 2:19.  Well, you don't have to read the whole thing but this is where you discuss the same things we're talking about, what happened with Lomita, how you talked to Mr. Gray, how he called you back and told you what happened, right?

**A.** Yes, sir.

**Q.** Okay.  So then if we flip over to 2:20:09 on page 54.  Let me know when you get there.

MS. STOKMAN:  I'm going to object again.  I don't know -- is this refreshing his recollection?  There's no question pending in front of him.

MR. VILLA:  I just asked him to flip to the page.

THE COURT:  Right.  And you're not going to ask him to read that page, you're just asking him to --

2244

MR. VILLA:  Not at this point in time.

THE COURT:  All right.

BY MR. VILLA:

Q.  So do you recall after you had this discussion Ms. Stokman making a statement on 2:20:09 -- you don't have to read it out loud, just read that statement to yourself -- do you recall that statement?

A.  I don't recall, but if that was said, then yes, sir.

Q.  And that refreshes your memory because you know that this was you and her talking because you heard the recording?

MS. STOKMAN:  Objection.  Asked and answered, refresh.  He said his memory was not refreshed.  He's just relying on the transcript.

MR. VILLA:  Well, then I'd like to play it.  It's a statement of a party opponent, Your Honor, and it's also impeachment.

MS. STOKMAN:  Objection.

THE COURT:  All right.  Ladies and gentlemen, I'm going to have to ask you to step out for a couple more minutes.  Thank you very much.

(Jury exits the courtroom at 10:45 a.m.)

THE COURT:  Mr. Villa, I think what you're saying is at some point the witness identifies a different person as the one who ordered the murder.

MR. VILLA:  Yes, Judge.

2245

THE COURT:  Where in the transcript are you directing him to because I'm not -- I see a statement of Ms. Stokman and then I see something Mr. Eversole says that I don't understand.

So is this -- am I in the right place at 2:20?

MR. VILLA:  I'm sorry, Judge, I didn't hear that last question.

THE COURT:  Am I in the correct place at 2 hours, 20 minutes?

MR. VILLA:  Right, this is Ms. Stokman's statement after Mr. Eversole explains what happened.

THE COURT:  All right.  Let's go ahead and play that.

(Audio played in open court.)

MR. VILLA:  Judge, I think the -- so it's my position that it's inconsistent with his trial testimony.

THE COURT:  All right.  Looking at the transcript, I understand where you're going now.  It does appear that it is.

MR. VILLA:  Okay.

THE COURT:  And there can be redirect on this, but at least this seems to be assuming -- I mean, it appears to be impeachment to me.

Let's go ahead and call the jury back in.

(Jury enters the courtroom at 10:53 a.m.)

THE COURT:  All right.  We have the jury members back.

2246

        Mr. Villa, your question.

BY MR. VILLA:

Q.  So Mr. Eversole, you had a chance to listen now to the --
more of the February 2021 interview?

A.  Yes, sir.

Q.  And heard your voice?

A.  Yes, sir.

Q.  And the questions you were being asked by Ms. Stokman,
yes?

A.  Yes, sir.

Q.  And the answers you gave?

A.  Yes, sir.

Q.  And she was asking you questions in response to what you
told her about who sanctioned the murder, who it was coming
from, those sorts of things, right?

A.  Yes, sir.

Q.  And in that series of questions that we listened to, the
person who -- she was asking who sanctioned and who it was
coming from was not Kenny, correct?

A.  Not at that part of it, no, sir.

Q.  All right.  Then you gave another interview in March 23rd,
2021, about a month later, yes?

A.  Uh-huh.

Q.  Is that a "yes"?

A.  Yes, sir.

2247

Q.   Sorry, it's because she's taking down what you're saying.

A.   It's fine.

Q.   And at that interview, in addition to Ms. Stokman and Mr. Gonzalez, they had some detectives there from LA County Sheriff's, correct?

A.   Yes, sir.

Q.   And they were telling you they were there to investigate the Lomita homicide, right?

A.   Yes, sir.

Q.   And in that interview, you also talked about what happened, correct?

A.   Yes, sir.

MR. VILLA:  May I approach, Your Honor?

THE COURT:  Yes.

MR. VILLA:  And I have an extra copy for the Court in case this comes up.

THE COURT:  Thank you.

MR. VILLA:  I'm looking at 15:05 on page 8 and on to the next page.

May I approach?

THE COURT:  Yes.

BY MR. VILLA:

Q.   So I want you to read this with me -- oh, sorry, March 23rd, 2021 interview, yes?

A.   Sure.

2248

Q.  I just need an answer.

A.  Yes, sir.

Q.  With you?

A.  That's what it says, yes, sir.

Q.  Okay.  At 15:05, it says:

"Okay.  So let me walk you through this chronologically and then we'll backtrack as we have to.  So October 4th is when our murder happened.  It happened in the middle of the night" --

MS. STOKMAN:  Objection to this form -- are we impeaching or are we refreshing his recollection?  There was no question prior to him just having the witness read the transcript.

MR. VILLA:  It's impeachment.  I'm just getting the context.

THE COURT:  Right.  So let's ask him questions, and if he doesn't remember, you can refresh.

MR. VILLA:  Okay.

BY MR. VILLA:

Q.  So were you told by the Lomita detective, Let me walk you through this chronologically, the October 4 homicide?

A.  Yes, sir.

Q.  And that's the Lomita homicide?

A.  Yes, sir.

Q.  And it says:

2249

"At some point" --

MS. STOKMAN:  Objection.  Improper form of the question.

MR. VILLA:  I'm just reading the question he was asked so that I can read his answer which is different than his trial testimony.

MS. STOKMAN:  It's improper impeachment.

THE COURT:  I see what he's saying.  I think there's enough.

Go ahead.

MR. VILLA:  Okay.

BY MR. VILLA:

Q.  Just read along with me:

"At some point we were told you got a phone call from someone to facilitate this, okay.  And who was that?"

That was the question you were asked, yes?

A.  Yes, sir.

Q.  And the answer was:  "Who was asking me?"  Right?

A.  Uh-huh.

Q.  "Yes"?

A.  Yes, sir.

Q.  And the question was:  "Who called you?"  Yes?

A.  Yes, sir.

Q.  And you gave an answer of who called you, right?

A.  Yes, sir.

2250

Q.  And they clarified that person name's, right?

A.  Yes, sir.

Q.  And you said, "yeah," right?

A.  Yes, sir.

Q.  And that name you gave was not Kenny's, was it?

A.  Uh --

Q.  That's not Kenny's --

A.  -- to that question --

Q.  -- name, correct?

A.  No, sir.

Q.  Okay.  And in fact, nowhere in here, in this entire discussion you had with the Lomita detectives, did you ever say that Kenny called you and told you to call Frank, correct?

A.  I do not know if it says that because I don't have that transcript.  In the last transcript it did say that.

Q.  Okay.  I'm talking about this transcript.

A.  Yes, sir.

Q.  Okay.

A.  The one after the last one.

Q.  So in the interview with the Lomita detectives, you never told them that Kenny called you first, correct?

A.  I don't remember.  If it's in there, then --

Q.  Okay.  I mean, the incident happened October 4, 2020, yes?

A.  Yes, sir.

Q.  And yesterday you seemed to remember the details of the

2251

incident pretty clearly?

A.   Yeah, it was strongly in any mind.

Q.   Okay.  Vividly remembered?

A.   Yes, sir.

Q.   But you don't remember what you said on March 23, 2021; is that what you're saying?

A.   It's a different context.  It was something that -- it was emotional for me so it stuck in my mind.  I remember it clearly, so -- these are generic questionings that I can't remember because I was asked so much stuff.  And all I did was sat there kind of emotionlessly just saying what I knew.

Q.   Okay.  So let me ask --

         MR. VILLA:  May I approach again, Your Honor?  Now I'm on page 10, this is also for impeachment purposes, starting at 16:36.

         THE COURT:  All right.

         MS. STOKMAN:  Objection again to improper impeachment.

         MR. VILLA:  Also inconsistent with his trial testimony.

         MS. STOKMAN:  Judge, may we approach?

         THE COURT:  All right.

   (Sidebar commences.)

         MS. STOKMAN:  The form of impeachment is improper here.  He has to ask a question about a prior statement, have

2252

the witness deny that he said that, and then allow him to be impeached by the prior statement.

Rule 613 also says that the statement -- the extrinsic evidence of a statement need not be put into evidence in any way, but it's the statement itself can be elicited in order to show credibility, not the truth of the prior statement.

But that's not what happening here.  It's just reading through a transcript without a question asked about, Didn't you say this prior, or that line of questioning that's more of a proper impeachment question.

THE COURT:  Mr. Villa, your comments?

MR. VILLA:  Judge, I don't have to ask him if he's -- if he denies saying this.  I've already established his trial testimony is that Kenwood ordered it.  This is inconsistent with that.  And so I'm allowed to read the question and answers he gave to elicit the inconsistent statement.

And it can be read to the jury under the hearsay rules because it's an inconsistent statement.

MS. STOKMAN:  Only if he expressly denies ever saying that statement.

MR. VILLA:  He doesn't have to deny saying this statement.

THE COURT:  Here's the trouble.  He said something about -- apparently you're now talking about Lomita still or

2253

are you talking --

MR. VILLA:  Yes.  So --

THE COURT:  -- about something else?

MR. VILLA:  So, Judge, if I can read it.

He's asked by the homicide detective:  "And he called you about what time it happened on Saturday night/Sunday morning?"

Mr. Eversole said:

"I remember.  I vividly remember.  It's just time, like I'm in my cell.  I don't have -- I have calls coming in and out, and now like literally he messaged me.  He's like, 'Hey, call me.'"

So this person he's talking about is not Kenny, it's Frank.  And so that's inconsistent with his trial testimony.

THE COURT:  Well, did he testify that -- that -- I mean, you're impeaching him on who messaged him that morning?

MR. VILLA:  Correct.

THE COURT:  I don't -- and you're saying in his trial testimony he said that --

MR. VILLA:  I have his message --

THE COURT:  -- Mr. Johnson messaged him.

MS. STOKMAN:  And that he also spoke with Frank.

MR. VILLA:  And what this says is -- is the opposite, is that he was just messaged by Frank and that he called Frank.  He doesn't say, I was messaged by Kenny --

2254

THE COURT:  Right.  Here, I don't know that he's talking about any other messaging.  He just says he was messaged by --

MR. VILLA:  By him.

THE COURT:  -- him, which --

MR. VILLA:  It's just Frank in this statement.

THE COURT:  But he doesn't say he wasn't messaged any other time, right?  He's just saying right here he was messaged by Frank.  He's talking about this.

MR. VILLA:  That is right.  And later on he never says, Kenny messaged me first, in this statement.

THE COURT:  Why aren't we just asking him these questions?

MR. VILLA:  Because he says, If you say it's in there, then I believe you, I don't know, I don't remember.

THE COURT:  Here's the trouble, though.  You don't have to say that, You said this on the this date.  All you have to say is, Frank messaged you or somebody else messaged you.  It wasn't Kenny, right?  Then if he says, No, then you go, Look, right here.

MR. VILLA:  Okay.  I'm happy to do it that way.

THE COURT:  Because the trouble is it's not important -- I mean, if you're telling me you're trying to impeach his trial testimony, then let's do that.

MR. VILLA:  I'm happy to.

2255

THE COURT:  But what you're -- but we're taking a lot of time with you reading this statement that he hasn't adopted, he's recognized the one part, and then another part, and he hasn't recognized this part, but if you say it and he adopts it, then you're good.

MR. VILLA:  Okay.

THE COURT:  All right.

MR. CONOLLY:  Also, Your Honor, we would object to the characterization by counsel before you ask questions saying it's inconsistent with the trial testimony.

MR. VILLA:  How many lawyers get to argue this?

MR. CONOLLY:  That is an argument --

MR. VILLA:  I thought it was just two lawyers.  That was what your order said.

THE COURT:  I haven't heard an objection on that, but yeah --

MR. VILLA:  I object to counsel jumping in.  This is Ms. Stokman's --

THE COURT:  I'm not talking about him right now.

MR. VILLA:  Okay.  I'm sorry.

THE COURT:  When I hear an argument of an objection, if it's argument, I am going to sustain it.  If it's not, then I'm not.  But, yeah, there is one attorney per witness.

Yes?

MS. FISHER-BYRIALSEN:  I have something unrelated to

2256

this, but since we are here, before Ms. Barrett crosses Mr. Eversole, I think we need a break to talk to Frank. I think that's in everybody's best interest, to have this continue smoothly, but I need to talk to him for five minutes.

THE COURT: Sure.

MS. FISHER-BYRIALSEN: I don't know if we can just have --

THE COURT: How much more do you have?

MS. FISHER-BYRIALSEN: -- to go --

MR. VILLA: I mean, we'll see, Judge, but maybe 15, 20 minutes.

THE COURT: All right. We can take a break. That's fine.

MS. FISHER-BYRIALSEN: But we don't have to do it now. Just so you know --

THE COURT: No. No. I mean, that's fine at that time.

(Sidebar ends.)

BY MR. VILLA:

Q. Mr. Eversole, when you were talking to these Lomita detectives on March 23rd, 2021, didn't you tell them that you vividly remember being messaged in the night when you were in your cell?

A. Uh, which time?

Q. When you were speaking with the Lomita detectives on

2257

March 23rd, 2021, that you said on the night of -- that right before you called Justin Gray, that you vividly remember being messaged on your cell phone that night?

A.  Uh, in reference to what?  Like -- I don't understand the question.

Q.  That you were messaged to call somebody?

A.  Oh, yes, sir.

Q.  And you were messaged to call someone you claim is a member of the Aryan Brotherhood?

A.  Uh, yes.

Q.  And that person was not Kenny?

A.  No.  So -- are you asking me what happened that night?

Q.  No.  I'm asking you --

A.  On the transcript --

Q.  -- when you told the Lomita detectives on March 23rd, 2021, that you vividly remember being messaged, the person you told them who messaged you was not Kenny?

A.  Yeah, I got a --

Q.  Was that a "yes"?

A.  Yes.

Q.  Okay.  Just take it a step at a time.  Okay?

And then Ms. Stokman will have a chance to ask you more questions later about this -- about this conversation.

And then you never told them later in this interview, ever, that Kenny ever contacted you, messaged you, or called

2258

you before you then called Justin Gray?  In this interview, you never told them that?

A.  Okay.

Q.  Yes?

A.  I don't know.  If you say I didn't, then I did not.

Q.  You believe me?

A.  If it's in the transcripts, then, of course.

Q.  Okay.  We don't have to walk through the whole transcript and listen to your recording?

A.  No, sir.

Q.  All right.  I'm sure, if it's in there, Ms. Stokman will point it out.

The phones that you said this took place on, the phone that you had, right, that you were communicating with Mr. Gray and all that sort of thing, what became of that phone?

A.  Uh, I'm not sure if that was the very last phone I had, because I went through phones a lot.  The last two phones I had before I was indicted the officers got the phones.  The very last phone I had I just bought.  I had it about three days, and I know they did not get that phone because I didn't have it in my cell when they came and got me.

Q.  Okay.  But when they came and got you in November 2020, you had a couple of phones?

A.  No.  I had one phone I had just purchased.

2259

Q.   Okay.  The other phones you say the officers got?

A.   Yes.  The two before that, the officers got those phones.

Q.   Like they caught you with them and took them --

A.   They didn't catch me.  They caught other inmates with those phones.

Q.   I understand.  So the -- potentially, the phone that you had these communications on fell into the hands of law enforcement?

A.   Yes, sir.

Q.   Later, you gave another interview May 21st, 2021, correct?

A.   Uh, okay.  Yes, sir.

Q.   Just with Agent Gonzalez?

A.   I don't remember who with, but --

Q.   And there was a little bit of follow-up.  So when you were talking to the Lomita detectives, they wanted to know -- the person who messaged you, that wasn't Kenny.  They wanted to know what that person's name was on the phone, like on the Signal app, right?

A.   Yeah.

Q.   You couldn't remember exactly how they put their name or what the logo was, that sort of thing, right?

A.   No, because we switched quite often.  We changed phones, changed the app, updated it.

Q.   Changed your name?

A.   Change the email, yes, sir.

2260

Q.  Okay.  So in May 21st, 2021, you remembered the name on the phone from the person that messaged you about Lomita, right?

A.  Uh, I don't recall that, but --

Q.  Let me show you the transcript.

A.  Just tell me.  Like, it would be easier.

Q.  Okay.  Did you say that you remembered the name was Abigail Brooks?

A.  I remember that name, yes, sir.

Q.  Okay.  And when they -- you -- you were asked about it, you said, "The LA people asked me about a phone, a name on a phone last time and it was Abigail Brooks"?

A.  Uh-huh.

Q.  Yes?

A.  Okay, yes, sir.

Q.  And you were clarified, so Abigail Brooks was the phone for a person who contacted you about the Lomita homicides, the Aryan Brotherhood member, right?

A.  Yes, sir.

Q.  And that person who you said was not Kenny, correct?

A.  No, sir.

Q.  And you said that person who wasn't Kenny was the one that called to give you the order?

A.  Yes, sir.

Q.  And you never clarified at all during that May hearing

2261

that Kenny called you to tell you to call Frank?

A.  I don't remember if I said it at that time or not.  I'm --

Q.  You trust me on that transcript, or shall we go through it?

A.  Yes, sir, I trust you.

Q.  Okay.  I'm sure the government will bring it up if I'm wrong.

So now I want to turn to May 9th, 2022.  That was right before you entered your plea agreement, which you entered on May 17th, 2022, correct?

A.  Okay.  Yes, sir.

Q.  Would you agree with me on that date?

A.  Sure.

Q.  On May 9th, just before you entered that plea agreement, you had another interview with Ms. Stokman, right?

A.  Yes, sir.

Q.  And she asked you more questions about the Lomita murder, correct?

A.  Yes, sir.

Q.  And she made a statement about what was said last time you guys talked, correct?

A.  Okay.

Q.  And the statement that she said was:

"When we talked to you about this, we talked to you --

I think we were just trying to get specifics enough

2262

and kind of figure out the players, and you gave us a lot of information on Frank.  It seems to us, knowing kind of how Kenwood also operates, that this was probably a Frank and K decision.  Was there any indication to you or did you have conversations with K about the Lomita murder to indicate that he had also, like, you know, him and Frank were both kind of putting this directive out?"

Do you remember that question?

A.  Vaguely, yes, sir.

Q.  Okay.  So on May 9, 2022, Ms. Stokman is saying that, essentially, you never told us that K was involved, and she's asking is K involved.

A.  Okay.

Q.  Do you agree?

A.  Yes, sir.

Q.  And that was the very first time that you finally claimed that Kenny was involved in Lomita; isn't that true?

A.  That's not true.

Q.  Okay.  Well, let's go now to another interview. March 2nd, 2023.

After the investigators came to see you from Mr. Johnson, with that letter we talked about, in South Carolina.  Then Ms. Stokman and Mr. Gonzalez came out to talk to you in South Carolina, right?

2263

A.   Yes, sir.

Q.   Because they wanted to know what you said, right?

A.   Yes, sir.

Q.   Okay.  And in that interview, they also sought clarification from you because they weren't clear about whether Kenny was involved; isn't that true?

A.   Uh, I don't know if that's why they were there, but if it was asked, then it's in the transcript, yes, sir.

Q.   Okay.

        MS. STOKMAN:  I'm going to object to speculation at this point or the characteristics of what the government did or did not believe.  That misrepresents facts already in this case.

        THE COURT:  As to speculation, it's sustained.

BY MR. VILLA:

Q.   But you were asked a question -- you don't know what they were thinking, but you were asked the question?

A.   I don't remember it.  But I agree, if it's in the transcripts, that, yes, sir, it was asked.

Q.   Now, you're not in prison anymore?  You're out on the streets?

A.   Yes, sir.

Q.   Released July 2024?

A.   Yes, sir.

Q.   Still under the supervision of the federal government?

2264

A.   Yes, sir.

Q.   For how much longer?

A.   It was five years.  I don't know how long it lasts.

Q.   Five years is, like, probation, what they call "supervised release"?

A.   Yes, sir.

Q.   All right.  So for everything that you described -- you told us yesterday about doing violent acts for the Aryan Brotherhood.  You're talking about other violent acts, not Lomita.  There was other things too, right?

A.   Yes, sir.

Q.   And you were talking about selling drugs, EDD fraud, gun trafficking.

     All that stuff from when they caught you November 19, 2020, just five years ago, you're now out on the streets?

A.   Yes, sir.

Q.   Because of your cooperation?

A.   And the things I did while I was down, yes, sir.

Q.   And your family didn't have to answer for any of the crimes you had them do?

A.   No, sir.

     MR. VILLA:  May I have just a moment, Your Honor.

     THE COURT:  Sure.

BY MR. VILLA:

2265

Q.  Before trial, this trial started, how many times did you meet with the government to prepare for your testimony?

A.  Twice.

Q.  Twice?  When was that?

A.  Probably approximately two weeks ago maybe, and then a week ago at -- thereabouts.  Within the last two weeks, I would say, two or three weeks.

Q.  How long was -- was each meeting?

A.  A couple hours, I would say.

Q.  And in none of those meetings were you given an opportunity to look through these transcripts?

A.  No, sir.

Q.  Or asked questions about the transcripts?

A.  I don't believe any questions were asked about the transcripts, but I don't remember that.  It was more of, like, the questions that I was going to be asked.

Q.  Like the question of wasn't May 2022 the first time you ever said Kenny was involved in Lomita?  You aren't -- that wasn't discussed?

A.  No, sir.

Q.  All right.

MR. VILLA:  No further questions.  I just have one transcript to retrieve.

THE COURT:  All right.

Ladies and gentlemen, let's go ahead and take about a

2266

15-minute break to 11:30.

(Jury exits the courtroom at 11:16 a.m.)

THE COURT:  All right.  The jury has stepped out. Let's take our break.

(Recess held.)

MR. ENGELKING:  Your Honor, before we bring in the jury, I just want to flag for the Court that counsel for Mr. Clement and the government have a disagreement about an evidentiary issue with regards to the next witness.  And so I just wanted to flag that for the Court.  I'm not sure when you would want to address that.

THE COURT:  Is there an estimate for finishing Mr. Eversole?  I guess I'm trying to figure out, are we going to get to this next witness today?

MR. ENGELKING:  Potentially.  I'm not sure how much more cross defense counsel has for this witness.

MS. DE SALES BARRETT:  I have minimal cross.  It really depends on the redirect.

THE COURT:  And how long is the redirect?

MS. STOKMAN:  I'm hoping to keep it to a minimal, but I'm not sure.  I'm not going to take a terribly long time.

THE COURT:  All right.  Should we ask -- I guess the nature of this, is this something that Mr. Eversole should step out for, or is it something we can discuss with Mr. Eversole sitting here?

2267

MR. ENGELKING:  I believe he can be here.

MS. DE SALES BARRETT:  I don't think it's a problem.

THE COURT:  All right.  What is the nature of the dispute?

MS. DE SALES BARRETT:  Your Honor, it's with regard to -- I'm making a 403 motion with regard to a portion of the transcripts that are going to be -- the tape recordings that are going to be played through the next witness.  And I have a copy of the transcript that I'm objecting to.

THE COURT:  Okay.

MS. DE SALES BARRETT:  And just for your -- I marked the spots with a Post-it in here.  It's starts on page 7 and goes for two pages to page 9.

THE COURT:  Okay.  All right.  I've read it.

Obviously, I have no context for what we're talking about here, who we're talking about, or who the next witness is going to be, so it's a little difficult for me to understand.

MS. DE SALES BARRETT:  Yes, Your Honor.  Your Honor, it is my understanding that the next witness will be playing -- was a confidential informant who will be -- was taping conversations with Mr. Clement.

The gist of the conversations and the point of this witness is to prove that Mr. Clement was involved in methamphetamine distribution, as is charged in -- in the

ER 1599

2268

indictment.

And we submit, Your Honor, that the probative value of this particular section of that tape recording -- and by the way, the beginnings of the tape recording are not being introduced.  This is a clip that's going to be introduced.

And, Your Honor, from the tape recorded conversation, it's obvious that the actual relevant information does not begin until the end of this particular portion of the conversation.

And we submit that the probative -- even if it were minimally probative of anything that's in this indictment, the probative value is far outweighed by the prejudicial nature of this particular conversation.

THE COURT:  All right.  Mr. Engelking, I've read it now a couple times.  I'm still not sure what exactly is being discussed here.  It sounds like there's a couple things.  One has to do with a particular person, and then -- then there's a reference to "they."  And I'm not sure what's going on.

MR. ENGELKING:  Yes, Your Honor.  So at a high level, this was a confidential informant.  And he had multiple recorded calls with Mr. Clement on which they discussed committing various crimes, this being one of them.  And it pertains to Mr. Clement asking him to extort -- or conduct some type of fraud, and then Mr. Clement talks about murdering those individuals.

2269

So as you know, the indictment does charge murder, murder conspiracies, and various frauds as a part of the pattern of racketeering.  And so we do submit that this is certainly relevant evidence.

We would also submit that it is not substantially outweighed by the danger of unfair prejudice.  It's -- yes, it is a somewhat vulgar discussion, but it doesn't meet the exclusion standard here.  It's no more prejudicial than the photos or any of the other discussions that multiple witnesses have testified to so far about killing various people.

MS. DE SALES BARRETT:  I would just say in response, Your Honor, that there is nothing in this conversation that ever occurred.  There is no charge related to this particular conversation.  It's a lot of trash talk and -- which is unrelated to the major goal of this confidential informant, and that was to participate in a drug distribution conspiracy with Mr. Clement.

THE COURT:  Is this witness going to be talking about a dispensary otherwise?

MS. DE SALES BARRETT:  No, Your Honor.

THE COURT:  Okay.  So is it true we're talking about starting at line 21 of page 7?

MS. DE SALES BARRETT:  Yes, Your Honor.  Line 21 on page 7 to line 14 on page 9.

THE COURT:  So it kind of seems like initially

2270

there's some discussion about maybe -- I'm not sure, but maybe robbing a dispensary and then some person in particular where there seems to be some sort of a problem with.

How does all of this have to do with what you've told me about, Mr. Engelking? Because this seems like it doesn't have really much to do with it except to say that, like you say, there's, you know, some talk about violence and the dispensary.

MR. ENGELKING: Yes, Your Honor. We'd submit that it's basically enterprise evidence. I mean, it's a brother asking an associate out on the street to, you know, commit this -- this robbery.

No, it's not, you know, a predicate act, but the government, you know, legally doesn't even have to allege any predicate acts in indictments. So the fact that, you know, it's not alleged as a predicate act doesn't mean the government is precluded from using it as enterprise evidence.

THE COURT: Some of it does suggest there's some sort of personal problem with this person as opposed to something AB. What's the -- what's the -- what I see is that they call somebody a "bro," which I assume is just simply colloquialism as opposed to -- well, maybe it's not. I don't know.

But I'm not -- what's the tie to the AB? Is there a tie as opposed to it simply being when the defendant's speaking?

2271

MR. ENGELKING:  Well, yes.  I mean the tie is that it's a brother asking an associate out on the street to commit a crime for him.

THE COURT:  I don't know.  Where does it say, I want you to do this?  It says that -- you know, it sounds like a lot of venting.  Where does it say, This is what you're going to -- I mean, it's talking about taking this person's money away, et cetera.

MS. DE SALES BARRETT:  And, Your Honor, I would say -- and I think that you will hear this in the tape recording when it's played without this piece is that the conversation immediately switches to a discussion of drug distribution and -- where the informant says he's going up to Redding, and then they talk about what can be -- what can be done in Redding.

THE COURT:  All right.  So it's fair to say this has nothing to do with the drug -- the drug issue.  It's just basically as -- I see it as some really bad talk about bad conduct.  I'm not sure how this advances your cause, Mr. Engelking.

I mean, it just feels like it's something somebody said, and it's not nice, but what does it have to do with a drug conspiracy?  I don't see that it does.

MR. ENGELKING:  With a drug conspiracy -- with regards to the meth distribution drug conspiracy, no.  I mean,

2272

it's enterprise evidence.

THE COURT:  I don't think it's there.  I'm going to sustain the objection.  All right.

MR. ENGELKING:  Apologies, Your Honor.  Just for clarification, with regards to that particular section of the call or the entire call?

THE COURT:  Just the section, the section we were talking about.

MR. ENGELKING:  Okay.  Thank you.

THE COURT:  All right.  Let's call the jury back in.

(Jury enters the courtroom 11:51 a.m.)

THE COURT:  All right, thank you.  Our jury members are back.

Further cross-examination.

MS. DE SALES BARRETT:  Yes, Your Honor.  Thank you.

CROSS-EXAMINATION

BY MS. DE SALES BARRETT:

Q.  I checked and it's, good morning.

A.  Yes, ma'am, thank you.

Q.  You have spent most of your adult life as a criminal; is that right?

A.  Yes, ma'am.

Q.  And the -- you even first went -- got in trouble before you became an adult, true?

A.  Yes, ma'am.

2273

Q.   And how old were you when you first went to prison?

A.   18.

Q.   How -- how much over 18 were you?

A.   Uh, I don't know exactly how much.  I mean, I was in jail first and then I got sentenced to prison, so it was thereabouts, 18.

Q.   Okay.  And over the course of your adult life, you've committed crimes like drug distribution; is that right?

A.   Yes, ma'am.

Q.   And you've committed burglaries; is that right?

A.   Yes, ma'am.

Q.   And you've committed armed robbery with a firearm; is that right?

A.   Yes, ma'am.

Q.   And are those the only crimes you've committed in your life?

A.   No, ma'am.

Q.   So you've -- there were other drugs deals; is that correct?

A.   Yes, ma'am.

Q.   And robberies?

A.   Yes, ma'am.

Q.   And burglaries?

A.   Yes, ma'am.

Q.   And how about fraud?

2274

A.   Yes, ma'am.

Q.   Okay.  And that would include the EDD fraud that you were discussing before; is that right?

A.   Yes, ma'am.

Q.   Now, when you were in prison, did you arrange for drone drops of contraband into the yard in the prison?

A.   Yes, ma'am.

Q.   How many times did you do that?

A.   I don't even know.  It was a lot in different prisons.

Q.   Okay.  Over the course, a lot.  It's so many you can't remember how many?

A.   Yes, ma'am.

Q.   And that -- part of that purpose was to sell that contraband to other prisoners; is that right?

A.   Yes, ma'am.

Q.   And when you were at North Kern, you had the keys to the yard; is that right?

A.   Yes, ma'am.

Q.   And that means that you were in charge of the yard, correct?

A.   Yes, ma'am.

Q.   And as a person who is in charge of the yard, uh, how many prisoners were there under your supervision, shall we say?

A.   Mm, when I got there, there was in the 70s.  When I left, there was in the 30s.

2275

Q.   Okay.  And you -- over the course of the time that you were in prison and had some authority over other prisoners, you ordered prisoners to assault other prisoners; is that right?

A.   Yes, ma'am.

Q.   And you had prisoners stabbed.  You ordered those stabbings; is that right?

A.   Yes, ma'am.

Q.   And Sidetrack was one of the people that you ordered to do things like that; is that right?

A.   Yes, ma'am.

Q.   And you sent Sidetrack to Calipatria to kill a man -- another prisoner; is that right?

A.   Yes, we were in Calipatria at that time.

Q.   You were both in Calipatria?

A.   Yes, ma'am.

Q.   And you sent him to kill another prisoner; is that right?

A.   Yes, ma'am.

Q.   And as you described it, they stabbed the shit out of them; is that right?

A.   Yes, ma'am.

Q.   Did the prisoner die?

A.   No, ma'am.

Q.   Fortunate.

A.   Yes, ma'am.

2276

Q.   Have any other prisoners that you've ordered attacked died?

A.   Mm, I don't believe so, no.

Q.   Did you also tell Sidetrack to kill Bam?

A.   Yes, ma'am, I did.

Q.   And you told him to kill Bam because you thought that Bam was weak and he might cooperate; is that right?

A.   Yes, ma'am.

Q.   Now, I just want to briefly review your benefits here because -- and I know it's been gone over, but I am going to be very brief on this.

A.   Yes, ma'am.

Q.   So for your cooperation, your wife, two stepdaughters will not be prosecuted federally; is that right?

A.   Yes, ma'am.

Q.   And any active cases against them were dismissed in state and federal court; is that right?

A.   Yes, ma'am.

Q.   So they, as a result of that, despite the fact that they were, according to the government, involved in EDD fraud, they have a clean slate in their lives; is that right?

A.   Yes, ma'am.

Q.   And the prosecutors intervened with state authorities to dismiss those state charges; is that right?

A.   Yes, ma'am.

2277

Q.   And they also intervened in state authority -- with state authorities to reduce the charges against your daughter; is that right?

A.   Yes, ma'am.

Q.   Callie?

A.   Yes, ma'am.

Q.   And the charges were firearms charges?

A.   Yes, a firearm, yes, ma'am.

Q.   Yeah.  What kind of firearm?

A.   It was a shotgun.

Q.   It was a shotgun?  It wasn't an AR-15?  No?

A.   No, ma'am.

Q.   Okay.  And she was charged because you involved her in that crime; is that right?

A.   Yes, ma'am.

Q.   And you pled to conspiracy and offenses of -- and avoided facing life imprisonment; is that right?

A.   Yes, ma'am.

Q.   And you have been released despite the fact that you have admitted involvement in a double homicide; is that right?

A.   That is right.

          MS. DE SALES BARRETT:  I have nothing further.

          THE COURT:  Mr. Reed, questions?

          MR. REED:  One or two of them.

///

2278

CROSS-EXAMINATION

BY MR. REED:

Q.  Mr. Eversole, are you still on supervised release?

A.  Yes, ma'am -- yes, sir.  Yes, sir.

Q.  You called me ma'am yesterday.

A.  I know, I just -- it's a response.  I apologize.  I'm from the South.  I just say it and it pops out, and --

Q.  I'm a man from the South too.

A.  -- nothing against you.  Yes, sir.

Q.  Okay.

A.  A very handsome man too.

Q.  All right.  I'll leave that alone.

A.  Okay.

Q.  Okay.  So my recollection about people that plead guilty in this building --

A.  Yes.

Q.  -- and they get supervised release, they have a bunch of things that they're required to do.

A.  Yes, sir.

Q.  Like don't use drugs, live in a certain place.  I don't want to know where you live.

        They also require them to have a job --

A.  Uh-huh.

Q.  -- or seek employment.

        Have you done that?

2279

A.  I go to college full time.

Q.  Okay.  So how do you pay the bills?

A.  Uh --

MS. STOKMAN:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I get money from going to school and I get public aid.

BY MR. REED:

Q.  Well, you mean a federal grant?  Because those went away two days ago.

A.  Well, I mean, they already paid -- I already got my money for this semester.

Q.  All right.

A.  And they've already given it to me.  And they paid for my classes.

Q.  You mean the people that -- let me ask you this.

You get your money from the federal government?

A.  Yes, through the Pell Grant.

Q.  Through the Pell Grant.  Okay.

That's for school though?

A.  Yes, sir.

Q.  What about food and stuff like that?

A.  I get EBT, which is food stamps, and I have Medi-Cal.

Q.  Mm.  My recollection, correct me if I'm wrong, when you plead guilty to a federal crime, EBT is one of the things that

2280

goes out the window?

A.   Uh-huh.  I don't believe that that's correct.  I believe that with EBT it's some type of drug offense and it's timed out depending on when you were sentenced.

So if you were sentenced three years ago, I believe it's a three-years, and then after that, it's timed out.

Q.   And EBT might be state money, maybe you get that.  Do you know?

A.   I don't know where it comes from, sir.

Q.   You don't know where the check comes from?

A.   It's a card.

Q.   Yeah.

A.   It just -- it goes on there every month.

Q.   That is state money.  That's okay.  All right.  I just wanted to get past that.

But you don't get money from the -- directly from -- well, you wouldn't get it from the prosecutors anyway, but you don't get the money -- you don't get any money from somebody from -- on this case --

A.   Oh, no, sir.

Q.   -- the prosecution?

You understand what I'm talking about?

A.   Yeah, no, sir.

Q.   Okay.  So we don't need to go through your crimes again, but for the sake of argument, we can agree that you've been in

2281

and out of prison since you were a youngster?

A.   Yes, sir.

Q.   And the way prison works, as I understand it, is one of the things that happens when you're in jail, or prison, you have a count, they always know where you are; is that right?

A.   Yes, sir.

Q.   You have a reg number?

A.   Yes, sir.

Q.   No matter what prison you go to, that reg number follows you, correct?

A.   Yes, sir.

Q.   And I think until you went to either -- one of the Carolinas, you were always in the State of California --

A.   Yes, sir.

Q.   -- is that right?

     So I don't care about the content of what you wrote, but do you remember when you debriefed and you wrote out the information about what you had done in your life?

A.   Well, I don't remember writing anything out at all.

Q.   You never did that?

A.   No, sir.

Q.   Okay.  That's fine.

     Do you recall every prison that you've been to?

A.   Yes, sir.

Q.   Okay.  Was there any time that you had to write that

2282

information down?

A.  No, never.

Q.  Okay.  And that's kind of -- you're not the only person that has that.  Every person that's gone to prison has a reg number; is that correct?

A.  Yes, sir.

Q.  And if I'm not mistaken, that number doesn't ever change; is that right?

A.  Unless you discharge parole and then they -- and you catch a new case, they give you a new number.

Q.  Discharge of parole probably is a rarity.  So --

A.  Yeah.

Q.  -- it's usually you guys go in and come back long before you're discharged, right?

A.  Yes, sir.

Q.  Okay.  And in your case, if I am not mistaken, you may have discharged once or twice, but generally --

A.  I've never discharged.

Q.  Even worse, then.  You keep the same number.  It's like your birth date?

A.  Yes, sir.

Q.  And somewhere in California records, they would know every prison you've gone to and how long you were there?

A.  I would assume that.

Q.  Even which bunk you're in?

2283

A.   Yes, sir.

Q.   And definitely what yard you're in?

A.   Yes, sir.

Q.   Because, I mean, let's face it, you're a convicted felon and we like to know where those people are when they are in jail?

         MS. STOKMAN:   Objection.   Argumentative.

         THE COURT:   Sustained.

BY MR. REED:

Q.   Okay.   What I'm trying to get at is, you said that you met or that you first spoke to Mr. Stinson -- you remember that?

A.   Yes, sir.

Q.   And you said he was in Soledad.

A.   I said I thought.   I couldn't remember the name of the prison.   Like, I know what he was doing on the yard.   I just don't remember the name of the prisons.   They are Northern California prisons, and I don't know a lot of those prisons because I've never been up there.   They are older prisons, you know, I just -- the prisons I've been to, I know the names of those.

Q.   Okay.   Well, you know, when I say, I think I'm this, I think I'm that, that means I'm putting that number out there and I'm putting that name out there.   You didn't say that you weren't sure.   You said I thought he was Soledad.

A.   No.   I said that I think that he was in Soledad.   I don't

2284

rightly remember exactly the prison that he was at. I wasn't at the prison with him, but, like, I know where he was at.

Q. It's not a big deal. We can fix it right now.

You don't know where he was when you talked to him?

A. No, sir.

Q. That's the correct answer, right?

A. Well, I do know where he was because everyone talked about it. What I'm telling you is I personally, like as a remembering a name of a prison, I can't even remember the names of most my homeboys, and I remember nicknames. I just -- it's not something I retained.

Q. You want to stay with Soledad or you want to back off of that name?

A. No. I mean, I'm not going to give any name. Soledad is the one I thought that it was the name of the prison.

Q. But you're not sure?

A. No.

Q. And when you talked to him, he didn't tell you he was in Soledad, correct?

A. No. We never talked about that.

Q. Okay. Well, then, how did you think he was there if you didn't talk to him about it?

A. It's not that I thought that he was there, is I knew he was in prison and I thought that it was named -- it may have been Solano, which is another Northern prison that's old

2285

that's by Soledad.  I just know that he dropped down to a Level 3 Yard.

Q.  Okay.  So I think you testified that he was -- I don't know if you said he was out of commission.  Is that what you said?

A.  Yes, sir, that's what I believe.

Q.  Okay.  I'm good with that.  For the sake of our conversation, I'm good with that.

And the commission is made up of three -- three men?

A.  Yes, sir.

Q.  And then there are other brothers, yes?

A.  Yes, sir.

Q.  And then if you use the vernacular of the mafia on the East Coast, there's a bunch of soldiers?

A.  Yes, sir.

Q.  Guys that are not brothers?

A.  Yes.

Q.  Guys that are not made?

A.  Yes, sir.

Q.  Okay.  Guys that -- I can't do my normal hypothetical since I can't be a brother, for obvious reasons, but let's say, for the sake of argument, and we'll just use Kern, which is the only prison I know about, but when I drive down the 99, there's a bunch of them, but let's just go with Kern for now. Okay?

2286

A.   Okay.

Q.   If you're on Kern on whatever yard and there's a brother who's in that same prison and in that yard, that's the brother that you report to, right?

A.   Yes, sir.

Q.   Because that's the brother that, in theory, you're working for, right?

A.   Well, I mean, if you're on the yard with him, you're under his orders, but it doesn't mean you're working for him. You're just under his orders because those are -- that's his yard.

     The way it works is, like, if you work for a certain brother, they don't really poach on you that much, but they may ask if you'll do something for them. And, of course, you're going to because they are a brother, but it doesn't mean you particularly work for that brother.

Q.   Okay. Yeah. And you can't speculate as to what they think, but let's go here.

     So make me white. I don't know what that's like, but for now make me white.

A.   It's not that great.

Q.   All right. And I'm a brother, and I control the yard.

A.   Yes, sir.

Q.   Okay. There may be another yard and there's another brother next door, but I control that yard.

2287

A.   Yes, sir.

Q.   And that's the yard you're on, okay.  And you're kicking up to me.  Okay?  Some other brother in another prison for whatever reason decides to reach out to you.  I don't know how that works, but let's say, for the sake of argument, that happens, and he wants you to kick up to him.  Does that happen?

A.   I mean, it -- it overlaps sometimes, but it's not something they do because it's something they would establish amongst themselves.  It's not something I would know about.

Q.   That's -- that's -- yeah, they -- there's drama if that happens, right?

A.   Yeah, it happens.

Q.   And you've been around for a long time?

A.   Yes, sir.

Q.   Would you agree with me, without going into specifics, there has been drama between brothers on a regular over things like that?

A.   Yes, sir.

Q.   Okay.  And by drama, your drama resolves -- or actually, your drama involves one or two things:  stabbing, and then ultimately maybe killing, but stabbing is definitely there?

A.   Yes, sir.

Q.   There's no zip guns, and you guys, for reasons I don't know, don't ever go from the shoulder.  Fair statement?

2288

A.  Yes, sir.

Q.  And you and I are talking about the same thing, but since I'm not allowed to testify, what does "going from the shoulder" mean?

A.  It means of -- fighting.  We have a no-hands policy, because the policy is if you're -- if it's not serious enough for you to stab them and kill them, let it go.

Q.  Okay.  So can we agree that the workings of the Aryan Brotherhood are not as smooth as you may have implied during your direct examination with the government?  By that I mean there's dissension among the men over things like money making?

A.  Yes, sir.

Q.  Okay.  And the most direct way to resolve that issue is, if you're on a yard, there's a brother on that yard, that's who you report to.

A.  Yes, sir.

Q.  Okay.  Can we agree that you and John Stinson have never been in the same prison?

A.  Yeah, definitely.

Q.  Since that's true, can we agree that you and John Stinson have never been on the same yard?

A.  Yes, sir.

Q.  And I'm sure you've seen a picture of him, so I'm not going to ask you what he looks like, but can we agree that

2289

you've never ever said hi to each other face-to-face?

A.   Never face-to-face, no, sir.

Q.   Okay.  But your understanding is that John Stinson was a commissioner?

A.   Yes, sir.

Q.   Okay.

A.   Just to clarify, it's not something anyone has every said to me.  It's just an implied by decisions that were made that led me to believe that's what I believe.

Q.   Now you've complicated things.  I'm not going to fight you about that for now.

Okay.  But we can agree that, as to your testimony and John Stinson being a commissioner, no one has ever told you that, you've just come to that conclusion?

A.   Yes, sir.

Q.   From talking to other people?

A.   Yes, sir.

Q.   Okay.  And you may have heard things inconsistent with that, but you believe he was a commissioner?

A.   Yes, sir.

Q.   Because there are things that are inconsistent with that at different times, right?

A.   Well, I don't know what you mean by that.

Q.   I'm not going to go any farther than that.  Another question for you, now, to state the obvious, prison is made up

of up people who have committed crimes -- well, get rid of the guards, get rid of other people that work there, but all the people that are living there with numbers are criminals. Would you agree?

A.  Reportedly, yes, sir.

Q.  No, not reportedly.  They -- they got convicted.

A.  There's a lot of people that sit -- claim that they're innocent, but I get what you are saying.  Yes, we have all been convicted of a crime.

Q.  Yeah, well, innocence is a different issue.  I'm not talking about that.  I'm talking about the guy that got the number and went through the showers and went through the whole thing.  Now he's got a number and he's got a bed; he's a convicted felon.  If he is innocent later, that's another issue.  Do you agree?

A.  Yes, sir.

Q.  And by definition, convicted felons are people who have committed felonies?

A.  Yes, sir.

Q.  You're past the county jail part now.  You're at state prison, right?

A.  Uh-huh, yes, sir.

Q.  Okay.  Guys trying to do shortcuts, that's kind of how that works.  I don't want to do it the regular way.  I want to make my money the fast way.

2291

A.   Yes, sir.

Q.   Robbing banks, doing fraud, things like that.

During the -- during the EDD times, is it a true statement that EDD fraud was not the exclusive domain of white boys?

A.   No, not even a little bit.

Q.   Not even close, right?

A.   No.

Q.   Everybody and -- I was going to say everybody and their mother but mothers weren't there.

All the guys in prison were doing some kind of EDD fraud, not every person, but it was done by all the groups?

A.   Yes, sir.

Q.   In fact, the AB isn't even all the white groups; is that correct?

A.   Well, I don't know what you mean by that.  Like, if you're in -- in prison, you're under the AB's umbrella, so it doesn't matter what group you are.

Q.   Not the Russians?

A.   If they run white.  They would be -- there's Russians that run other than they -- they hang out with the people --

Q.   Yeah, I know.

A.   And then there's Russians that run white, so --

Q.   With -- there's Russians, there's Romanians, there's those Eastern Bloc white guys that sometimes think they are Black,

2292

but they are not, and they also commit fraud crimes, right?

A.   I would assume, yes, sir.

Q.   Well, you knew about the Russians because you talked about it at the grand jury.  I wouldn't bring it up --

A.   Yeah, well, they were Russians on the streets.  They weren't Russians that were in prison.  I actually don't know if I've ever ran into more than maybe one Russian in prison.

Q.   Okay.  So there are Black people, Hispanic people, White people that are not the AB, and AB, and I left out Asians, but they are also in prison.

EDD fraud was ubiquitous in the prison system.  Would you agree with that?

A.   Yes, sir.

Q.   Okay.  So a white guy doing EBT fraud -- I'm not going to do that.  That'd cause you to make a conclusion you can't do.  Strike that question.  I'm sorry.

In preparation for your testimony -- because you knew you were going to be a testifying witness --

A.   Yes, sir.

Q.   -- some time ago, right?

A.   Yes, sir.

Q.   You're saying that you only met with the government -- I don't mean the lawyers.  Anybody in the government, you only met them a week before -- or two weeks before and then a week before today?

2293

A.  To go over testimony, yes, sir.

Q.  And did they ever give you any of your previous testimony?

A.  Uh, not that I can remember.  I don't think so.

Q.  Did they ever show you photographs of people?

A.  No.

Q.  Okay.  And I'm trying hard not to deal with your security situation.

So was there ever a time after you agreed to cooperate that you were in -- I'm not going to say a cell, so a section of a jail with another witness or another person who also was in the same situation as you were?

MS. STOKMAN:  Objection.  Relevance.

MR. REED:  If we can approach, Your Honor.

THE COURT:  All right.

(Sidebar commences.)

MR. REED:  So number one, I tried to be as benign as possible because I understand the security situation.
However, cooperating witnesses generally, in the regular sense, not a prison, they are never with each other.

These guys are all living in the same room.  This is why this statement of his is, Well my understanding is that John Stinson is that.  If he's talked to other people and the people that he's talked to are their witnesses, it is absolutely relevant.

If he -- the answer -- I didn't accuse him.  I just

2294

asked him.  He can say no, and the game's over.  But if he says yes, that's a different issue.

THE COURT:  And we're talking about cooperators in this case?

MR. REED:  Yes.

THE COURT:  Because your question needs to be tightened up.  You just said other cooperators.

MR. REED:  Yeah, I was trying to -- I was trying not to say names.  And believe me, I understand.

THE COURT:  Yeah.  I think if he gets information from other cooperators and that's what he's testifying to, that's fair.  What --

MS. STOKMAN:  Are you going to name the people?

MR. REED:  No.  I know how not to do that.

MS. STOKMAN:  How is he going to know who the cooperator is?

MR. REED:  Come on.  Are you serious?

MS. STOKMAN:  Yeah.

MR. REED:  They know a lot more than you think they do.

THE COURT:  As I understand his situation, at least, he was in Fresno County Jail.  He's moved out at some point.

That's after he becomes a cooperator?

MS. STOKMAN:  Yeah.

THE COURT:  Was he housed at Fresno County Jail while

2295

a cooperator?

MS. STOKMAN:  Yes, but with no one who's a cooperating testifying witness in this case.

MR. REED:  I'll be clear, and I'll be more direct.  I didn't want to deal with this at this point.

He and Rubin are tight.  Mr. Rubin is a witness in this case.  He actually talks about how tight they were.  I don't know if they were ever together, but I like to cross-examine my way, which is to work my way to that point.

THE COURT:  Is Rubin a cooperator?

MS. STOKMAN:  Yeah, he'll be testifying.  You can directly ask if he's --

MR. REED:  Yeah, I can, but I want to do it my way.

THE COURT:  Okay.  So that's fine.  Let's tighten it up.  And you're just going to ask if they were housed with a cooperator that he believes was a cooperator in this case?

MR. REED:  Right.

THE COURT:  And then you're going to go to, Did you share information?

MR. REED:  And the other thing, you don't have to be -- I mean, you don't have to be a witness in the case.  It's when you debriefed and if you --

THE COURT:  No, no, no.  I get it.  But what your question, though, suggests, it could have been, like, with some case and somebody is in South Carolina.

2296

MR. REED:  True.  True.  And I don't care about that.

MS. STOKMAN:  I'm just tying to be very careful because there's no testifying cooperator that he was housed with.  There was discussions about cooperation with one of his cellmates at the Fresno County Jail, and he didn't end up cooperating.  So I don't want that person's name to end up coming out because that's very sticky.

MR. REED:  Okay.  Well, I will never ask the name, but the fact is relevant.  I will never ask the name.

MS. STOKMAN:  But it's not someone who's testifying in this case, so that's what I'm --

MR. REED:  That doesn't make any difference.

THE COURT:  But your question -- you think he was housed at some point with Rubin.

MR. REED:  Well, there's an indication.  First of all, the first time they did this in 2002, they did it on the regular.  I don't think the U.S Attorney's Office does that anymore because it was such a big deal.  They put them all in the same place.

And logically, I understand why they would do that, because there're security risks.  They don't want anybody to hurt them.  So they decided, Hey, we'll put them all in the same unit.

They start talking.  So I think they don't do that anymore, but I'm not positive.

ER 1628

2297

And I know from what he said about Mr. Rubin and things I've read about Mr. Rubin, the two of them were very close. If they -- I don't know when he agreed to cooperate. I don't know exactly when Rubin did. I have a general idea it was when he went to Corcoran. If that overlapped, I just want to know the timing. That's why I'm asking where they were.

In federal court -- or in federal prisons it's easy because inmate movement records are something that they disclose. For reasons I don't know -- I do know, but I understand why the state won't give that information up. It's not her fault. It's just they don't want to give it up.

THE COURT: Uh-huh.

MR. REED: So I'm doing it this way. And I'm not going to just run right in and ask, Did you talk to Rubin?

That's stupid. I know how to cross.

THE COURT: Okay.

MR. REED: Thank you.

(Sidebar ends.)

BY MR. REED:

Q. So I want to come at this a different way.

There was a time in your life when you decided, I don't want to do this anymore, and by that I mean be with The Brand, right?

A. Uh, I don't -- I don't think that was my decision.

Q. Okay. Well, yeah, I mean, it kind of was.

2298

A.   Well, I decided that I was going to try to protect my family, and I just went.

Q.   Okay.  I understand.  Still, you -- I don't remember who it was that you had ordered to get stabbed because you guys thought he had turned rat, but you know what that means, correct?

A.   I don't know which --

Q.   When someone decides that they are no longer going to follow the rules.

A.   Yeah, I understand that.  I don't understand the question that you're asking me.

     Did I order someone, or are you talking about the incident in Calipat?  That's not why that guy got stabbed.

Q.   I'm not talking about any of those things.

A.   Okay.

Q.   What I'm talking about -- and I think you guys used the phrase "no good."  There's a time when a guy is okay, and there's a time when he's no good anymore, right?

A.   Yes, sir.

Q.   Black people call it "catching the chain."  And Mexicans have a different word for it.  But generally it means you're going PC, agree?

     There's general population, which means you can walk the yard?

A.   Yes, sir.

2299

Q.   And then there's the other guys that can't walk the yard?

A.   Yes, sir.

Q.   All right.  Now, you didn't get out of prison the moment that you decided you didn't want to do this anymore.  You spent some time in jail.

A.   Yes, sir.

Q.   Were you ever in a section of a jail with any of the cooperating witnesses in this case?

A.   No, sir.

Q.   Okay.  And again, your jail records, like everybody else's, are always written down someplace on some computer?

A.   Yes, sir.

Q.   All right.  I don't want to do anything that compromises your security, so I'm going to ask this question really generally.

     Do you know exactly the day that you -- if you were looking at you, not as the you are right now, but as the you you were before you did all this, do you remember the day that you decided that you were no longer going to be walking the yard, like you were going to be PC?

A.   I never went PC.

Q.   I understand.  But I'm talking about the mental concept of not -- I'm not going to be a good guy anymore, what they call a good guy.

A.   You mean the -- I don't understand the question.

2300

The time that I -- I signed a deal to testify against who I thought were my friends, that I consider my friends, I felt like I was no good no more, in my mind, because I did such a shitty thing, and that is shitty in my mind.

Q. Okay. And that was the -- so it was that day?

A. Yes --

Q. The day you signed the paper?

A. -- sir.

Q. But the day before you were still good?

A. I mean, I had made the decision, so in my mind, I suppose, not really.

Q. Okay. When you signed, were you still in custody?

A. Yes, sir.

Q. Okay. That's what I'm talking about.

A. Uh-huh.

Q. So I don't know what -- I don't know what jail you were in. Okay? But there's a place to where you can go and you can walk the tier and everything's okay. Got a roommate. Everything's good.

And then there's a point when you don't have that anymore and you can't do that anymore.

A. That didn't happen.

Q. Do you remember when that day happened?

A. That never happened for me.

So the day we all came from -- from the indictment,

2301

we all got raided.  They brought 108 people.  A lot of us were in prison, some they brought from the streets, and everyone involved in this case.

I had been trying to have someone assaulted for a very long time.  They had it -- I did a three-way call from prison to county jail through a third party.  They had a recording of me telling them to assault this man.

They put that man and several other people that I had had issues with and they had been stabbed in the past, they put them in general population and separated me for their safety.

They told me directly, like, We don't trust you being amongst them that you're not going to assault someone.  And they put me in keep away by myself.

Q.  Okay.  And there was never a point when you were not in keep away?

A.  No, sir.  We only have one tank that the white -- a certain type of white inmate can go to, and everyone from my case was in that tank.  And all those people that I had beefed with, that I've done things to or had things, they were all in that same tank.  I couldn't go to that tank.

I can't go to any other tank because we're at war with the Bulldogs.  So anywhere they would put me, they have a classification system, and they keep us away from certain groups of inmates because we all fight.

2302

Q.   You're talking about the Fresno County Jail?

A.   Yes, sir.

Q.   Okay.  Is that where all this happened for you?  You never left Fresno County Jail?

A.   I left to prison, to federal prison, yes, sir.

Q.   Okay.  So you went from federal -- you went from the Fresno County Jail to the BOP?

A.   Yes, sir.

Q.   All right.  And you pled guilty early on in that procedure of your case?

A.   Yes, sir.

        MR. REED:  Okay.  I have no further questions.

        THE WITNESS:  Yes, sir.

        THE COURT:  Any redirect?

        MS. STOKMAN:  Yes.

                    REDIRECT EXAMINATION

BY MS. STOKMAN:

Q.   Just briefly want to touch upon a couple things.

        The drone drops that Mr. Barrett was asking you about where you were selling the contraband for those inside the prison system, who was receiving a portion of those profits?

A.   Uh, the AB.  But I wasn't personally selling them.  I would do drone drops when I was asked at prisons for brothers.

Q.   Who asked you?

A.   Brothers.

2303

Q. And the stabbings in prison that you ordered, were those your personal orders?

A. It -- it depends. Uh, there -- there's a set of rules that are automatic, like kick-in rules. Like, if this happens, you do this. So, like, those stabbings are -- like, it can be any innocuous thing. It's a very odd place to be.

But if it was, like, for specific violence, like you're intending to kill this person, I had to get orders for that.

Q. From who?

A. From the AB.

Q. The rules you were talking about in the other situation, who made those rules?

A. They were general rules that the AB had long established. They were -- ever since I came to prison, they've always been the same.

Q. The type of person that Sidetrack stabbed in Calipatria, what type of person was that, what type of inmate?

A. He had a sex crime.

MS. DE SALES BARRETT: Relevance.

THE COURT: Overruled.

BY MS. STOKMAN:

Q. He had a sex crime, you said?

A. Yes, ma'am.

Q. Is there a rule that the AB has about inmates with sex

ER 1635

2304

crimes?

A.   Yeah, you kill them.

Q.   You were asked about how you knew that John -- or how -- why you believe that John Stinson was part of the three-man commission, and Mr. Reed asked you if that was because you talked to other people.  Was it also based upon your own experiences dealing with John Stinson?

A.   Well, it was yes, there was something that had happened and a conversation we had, but it was a sense of -- like when someone makes a call, like there's certain calls that can only come from them.  And, like, if his name came up in that, that's why I thought that was like, oh, that's weird.

Q.   And that was based on your personal experience?

A.   Yes, ma'am.

Q.   So let's go back to the Lomita murder.  Who sanctioned that murder?

A.   Who told me to --

Q.   Yes.

A.   -- get it done?

     It was Frank.

Q.   And Mr. Villa was kind of walking right up to the name of the person that he kept saying you referenced in prior interviews that you spoke with about the murders, but not saying who that person was.  Do you know who he was referring to?

2305

A.  And as far as who told me to do it?

Q.  Yes.

A.  Yes.  Yes, ma'am.

Q.  And who was that?

A.  That was Frank.

Q.  It was Frank?

A.  Yes, ma'am.

Q.  Is Frank the only person you spoke with about the Lomita murders prior to them happening?

A.  No, ma'am.

Q.  Who else did you speak with?

A.  I talked to K about it.

Q.  You had read through a lot of transcripts and also listened to some of those interviews.  You were asked some pretty limited portions of the transcripts.  Did you read anything or hear anything in the other areas of the transcript you were asked about that refreshed your recollection about your discussions with law enforcement about the Lomita murder and the victim of that murder besides what you were asked about specifically?

THE COURT:  I have to say I'm kind of lost on what --

MS. STOKMAN:  Yeah, let me -- I'll just break it down.

BY MS. STOKMAN:

Q.  So when you were being asked about by Mr. Villa to read

2306

through transcripts, you were reading through quite a lot a bit of those prior interview transcripts, right?

A.   Yes, ma'am.

Q.   But then you were only asked about small portions of them?

A.   Yes, ma'am.

Q.   In your reading of the rest of those transcripts, were you able to see other places that you had talked about the Lomita murder or the victim of that murder?

A.   Yes, ma'am.

Q.   And in those discussions, were you able to remember and see in the transcript that you had mentioned Kenwood?

A.   Yes, ma'am.

Q.   And can you tell us a little bit more about that, those mentions of Kenwood?

A.   Well, so it's kind of taken out of context because it was a lot of things that was talked about.  So, like, as a sense when you're having a conversation with several people and you've been talking about a group of people, then you all kind of know who you're talking about.

          And in the transcripts, it says that I was talking to this person about it and then I called because I was asked, I was messaged, and then I called K and was like, Hey, this person messaged me.

          Like, what's up?

          Why?

ER 1638

2307

Because he's not talking to me.

And he's like, Well, this is what's going on.

I was like, Oh, wow, okay.

Like, Well why?

And then I was, like, Okay.  I was told to call him because he wanted me to do this.  So I called him -- being Frank, because K told me to call him.

Q.  And you -- in prior interviews that you were looking through transcripts today, is it your recollection in those interviews that you had mentioned that in the course of discussing the Lomita victim, that K and Frank were always involved together?

A.  Yes, ma'am.

Q.  And when Mr. Villa was asking you about a question that I had posed about Kenwood's involvement, do you recall seeing in the next line that you responded that, "K was the one who told me to call Frank and that Frank had instructions for me" --

MS. DE SALES BARRETT:  Objection.

THE COURT:  The objection was what?  I'm sorry, I couldn't hear you.

MS. DE SALES BARRETT:  Pardon me, Your Honor?

THE COURT:  I didn't hear your --

MS. DE SALES BARRETT:  I said leading.

THE COURT:  Sustained.

///

2308

BY MS. STOKMAN:

Q.  Do you recall anything else about the transcripts you read where you were asked a question and then you weren't able to give a full answer to it?

A.  Yes, ma'am.

Q.  Can you tell us about those?

A.  Uh, I was asked -- like skipped over from one paragraph to the next, and the paragraph in between was F and K, F and K. Because in my mind, as I talked, it's always Kenwood and Frank.  They're friends.  If one is doing something, the other one is involved.  It's just the way it is.

Q.  Was it your understanding that your cooperation agreement was dependant upon the information you gave regarding the Lomita homicides?  Was that your understanding, that it was dependant upon the information you gave about the Lomita homicides specifically?

         MR. VILLA:  Objection.  Leading.

         THE COURT:  No.  The objection is overruled.

BY MS. STOKMAN:

Q.  Let me repeat that.

         Was it your understanding that your cooperation depended upon how you responded about the Lomita homicides?

A.  No, ma'am.  My understanding was my cooperation depended on the truth of what I said.  I was specifically told, if you're caught in a lie, then the cooperation agreement is

2309

void.

Q. And in reviewing those transcripts, you were pointed to the first few instances of the discussion of Lomita. Do you recall that being hours -- within hours of the discussions you had already been having with law enforcement?

A. Yeah, I don't remember the direct line of it. I remember going in there the first time because, truthfully, I was conflicted. I was having mental issues over the whole thing. I was really upset by it. And so I don't remember everything.

I remember telling what I knew, what I was doing, I was forthcoming. And then I think I was asked about if I knew anything about Lomita. And I told -- and I said that I didn't want to talk about that. I don't feel like I'm ready to talk about this.

And then I like -- I think I had an aside with my attorney, and I explained to him why. And he went back and forth with me and then -- I don't know if it was that first time or the second time. I don't remember exactly which time it was.

Q. That it came up?

A. It was a lot of interviews.

Q. Yes. Hours of interviews, right?

A. Yes, ma'am.

Q. And is it fair to say that there were hours of interviews about other things besides Lomita?

2310

A.  Yes, ma'am.

Q.  And during the course of those hours of interviews with law enforcement, was it typical for subjects to come up multiple times?

A.  Yes, ma'am.

        MR. VILLA:  Objection.  Leading.

        THE COURT:  Sustained.

BY MS. STOKMAN:

Q.  Did you ever discuss topics only on one occasion?

A.  No, ma'am.

Q.  And tell us about how many times you believe you were asked about particular topics of conversation if you spoke with them -- about them more than once?

A.  I really don't know.  A lot of times it was -- I was just speaking like, this is what I know, this is what I was doing. And sometimes, it would be an aside like, hey, I want to -- let's talk more about that.  And then sometimes the next interview it would be prison officials that wanted to know about what I knew about what was going on in the gang life inside of prison, who was who, names, did I know what status they were.

        It could be -- I remember, like, I think San Luis Obispo maybe, someone being from there, and someone being from LA.  Like, I don't really remember because it was so much and it was a lot of questions and people would ask me.

2311

And sometimes I didn't know, and I told them "I don't know that."

Q.    And about that, were you asked about other murders besides the Lomita murders when you spoke with law enforcement?

A.    Yes, ma'am.

Q.    Do you recall how many other murders you were asked about?

A.    Mm, I would say maybe three or four other ones.

Q.    And did you implicate Kenwood in any of those?

A.    No, ma'am.

Q.    Why not?

A.    Because I didn't know if he was involved in it.  I didn't know about them.

Q.    At any point in time, were you fed or given the information by anyone from law enforcement about what you were supposed to testify about?

        MR. VILLA:  Objection.  Leading.

        THE COURT:  Sustained.

BY MS. STOKMAN:

Q.    Has anyone ever told you what your testimony should be?

A.    Just the truth.

Q.    And what is the truth as you know it?  What does that mean to you?

A.    Anything that I have direct knowledge of.

Q.    From your perspective?

A.    Yes, ma'am.

2312

Q.  Do you have personal issues with Frank?

A.  No, ma'am.

Q.  What about Kenwood?

A.  No, ma'am.

Q.  Let's go back real quick to the South Carolina visit where you were given the letter that you said Kenwood had written and Frank had written portions of.

     Why during that interview did you say that you didn't know about the Lomita murder?

A.  I think it was -- overall, it was a sense of feeling that I had, like -- like, that I was going to be implicated in these things.  So I didn't want to talk to someone that's defending someone for a murder and implicate myself so they can be like, huh, this guy did it.

     So that's how I felt.  Like you're asking me questions -- you don't talk to people about that stuff.

Q.  At some point were you shown the indictment that Kenwood and Frank were charged in during that meeting?

A.  Uh-huh.  Like, I believe I was shown documents.  I don't remember exactly what I was shown, though, no.

Q.  Do you know whether or not, at that time, they had already been charged with the Lomita murder?

A.  I'm assuming they were because that was their counsel, their investigators.

Q.  The letter that we spoke about yesterday that Kenwood

2313

wrote to you, you said there were names of people on that who you were asked about whether or not they were cooperating.

What were some of the names of the people that were -- you were asked about?

MR. VILLA:  Objection.  Outside the scope.

THE COURT:  Sustained.

BY MS. STOKMAN:

Q.  Do you recall whether those people were part of the case that Kenwood and Frank were on?

MR. VILLA:  Outside the scope.

THE COURT:  Sustained.

BY MS. STOKMAN:

Q.  When it comes to your cooperation, who made the ultimate decision to cooperate?

A.  Me.

Q.  Was it a voluntary decision?

MR. VILLA:  Leading.

THE COURT:  Overruled.

BY MS. STOKMAN:

Q.  You said yes?

A.  Yes, ma'am.

Q.  Okay.  You were asked about how your wife at the time, Christine, reacted when everybody was arrested back in 2020. What's the status of your relationship with her today?

A.  I don't know how to outright describe it.

2314

Q.  Is it better than it was back then?

A.  Yes, ma'am.

MS. STOKMAN:  Okay.  I have no further questions.

THE COURT:  Any recross, Mr. Villa?

MR. VILLA:  No, Your Honor.

THE COURT:  Ms. Barrett?

MS. DE SALES BARRETT:  No, Your Honor.

THE COURT:  Mr. Reed?

MR. REED:  No, Your Honor.

THE COURT:  May this witness be excused?

MS. STOKMAN:  Yes.

MR. VILLA:  Yes, Judge.

THE COURT:  Thank you.  You may be excused.

THE WITNESS:  Yes, ma'am.  Thank you.

THE COURT:  Next witness.

MR. ENGELKING:  The government calls Brian Rapinoe.

THE CLERK:  Please raise your right hand.

BRIAN JAMES RAPINOE,

called as a witness on behalf of the Government, having been

first duly sworn, testified as follows:

THE WITNESS:  I do.

THE CLERK:  Go ahead and have a seat, and then please

state your full name and spell your last name for the record.

///

///

2315

THE WITNESS:  My name is Brian James Rapinoe, R-a-p-i-n-o-e.

DIRECT EXAMINATION

BY MR. ENGELKING:

Q.  Good afternoon.

A.  Good afternoon.

Q.  Where did you grow up?

A.  Northern California, Redding.

Q.  Did you get in trouble as a kid?

A.  I started getting in trouble at age 16 is -- was introduced to the justice system.

Q.  What types of things were you doing?

A.  I've been involved in drugs sales, fraud, stealing cars, residential burglaries, manufacturing weapons inside a prison, introducing drugs into prison, and different conspiracies.

Q.  Did there come a time when you started hanging out with people who were affiliated with gangs?

A.  From the moment you step into the California prison system you're affiliated and under the tutelage of --

MR. REED:  Objection.  Nonresponsive.

THE COURT:  Sustained.

MR. REED:  Move to strike his answer.

THE COURT:  All right.  That will be stricken.

BY MR. ENGELKING:

Q.  So just yes or no, did there come a time when you started

2316

hanging out with people who are affiliated with gangs?

A.   Yes.

Q.   When was -- roughly, when was that?

A.   1998.

Q.   And roughly, how old were you at that point?

A.   18.

Q.   Why did you start associating with people who were in gangs?

A.   It is expected when you step into the prison system in California.

Q.   Is the prison system in California segregated?

A.   Yes.

Q.   So what gangs did you start associating with?

A.   Uh, Peckerwoods and Skinheads, associates to the NLR, associates to the Aryan Brotherhood, members of the NLR, and members of the Aryan Brotherhood.

Q.   What's the NLR?

A.   Nazi Low Riders.

Q.   And who are the Nazi Low Riders?

A.   There a group that started in the 1970s in California Youth Authority and now moved into the prison system.  They are a white gang in California.

Q.   When did you start associating with them?

A.   Closer to around 2003.

Q.   Did you eventually become a member of the Nazi Low Riders?

2317

A.    Member and a validated associate.

Q.    And what did you do to obtain that status?

A.    Uh, I've drawn blood in different knife altercations, manufactured weapons, and gave my -- gave my time and my effort to them.

Q.    When you say "drawn blood," does that mean stabbed?

A.    Yes.

Q.    Who was the founder of the Nazi Low Riders?

A.    I believe one of them is John Stinson.

Q.    Are you still a member of that gang?

A.    No longer.

Q.    When did you stop being involved in that life?

A.    November 13th of 2020, during the beginning of -- arrest, I walked away from that lifestyle.

Q.    While you were still a gang member, were you using drugs?

A.    I was.

Q.    Which drugs?

A.    Heroin and methamphetamines specifically.

Q.    And how often?

A.    Daily, from the time I was 18 until the time I was 40, unless I was incarcerated.

Q.    Are you still using drugs?

A.    No, not no more.

Q.    How long have you been clean?

A.    November 13th of 2020.

2318

Q.   Congratulations.

A.   Thank you.

Q.   Have you been -- well, you told us about your time in prison, so I assume you've been convicted of crimes; is that right?

A.   Yes.

Q.   What crimes?

A.   Uh, fraud and possession of ten or more IDs, manufacturing weapons, conspiracies, selling drugs, distribution of drugs, transportation of drugs, introducing drugs in a -- facilities, uh, residential burglaries in the first degree, burglaries, stealing cars, and DUIs.

Q.   How about unemployment fraud?

A.   Unemployment fraud would be the in excess of ten or more people's IDs.

Q.   Is that commonly referred to as EDD fraud?

A.   Yes.

Q.   Okay.  You said you started going to prison as a child, and you were arrested in November -- on November 13th, 2020. So is it fair to say you've sort of spent most of your adult life in and out of prison in that time frame?

A.   Yes.

Q.   Have you ever been convicted of any crimes since November 2020?

A.   No.

2319

Q.   Now, you mentioned you were a member of Nazi Low Riders.
Do they answer to anybody?

A.   They do.

Q.   And who is that?

A.   The Aryan Brotherhood.

Q.   So are you familiar with the Aryan Brotherhood?

A.   I am.

Q.   And how is that?

A.   Their rules and dictates, uh, have dictated my life since
I stepped into the prison system in 1998.

Q.   Were you ever Aryan Brotherhood associate?

A.   Yes.

Q.   And what does "associate" mean to you?

A.   That you associate with them in their plans and schemes to
generate money for the benefit of the gang.

Q.   Did you generate money for the benefit of the gang?

A.   I did.

Q.   As an associate, did you work for any brothers?

A.   I did.

Q.   Which brothers?

A.   I've worked for Misfit, Andy Collins, and John Stinson.

Q.   Did you ever commit any crimes for the benefit of the
Aryan Brotherhood?

A.   I did.

Q.   What crimes were those?

2320

A.   Introducing narcotics into a facility, EDD fraud, and forgery.

Q.   Did you yourself ever try to become a brother?

A.   Uh, no.  It's -- it's always -- the stars were always put in people's eyes as though they may have a shot, but that is just a manipulation tactic.

         MR. REED:  Objection.  Nonresponsive after the answer "no."

         THE COURT:  Sustained.

         MR. REED:  I'd move to strike the answer.

         THE COURT:  We'll strike everything after "no."

BY MR. ENGELKING:

Q.   You mentioned you had committed crimes for John Stinson before.  Who is John Stinson?

A.   John Stinson is a high-ranking member of the Aryan Brotherhood.

Q.   How do you know that?

A.   Uh, I've known that probably for 20 years.  It's just a known --

         MR. REED:  Objection.  Move to strike. Nonresponsive.

         THE COURT:  So the question is how, not how long.  So that -- that will be stricken.

BY MR. ENGELKING:

Q.   Okay.  How do you know John Stinson is a member --

2321

high-ranking member of the Aryan Brotherhood?

A.   It's known throughout --

        MR. REED:  Objection.  Nonresponsive.

        THE COURT:  You're saying other people told you?

        THE WITNESS:  It's -- it's commonly known he's a member of the Aryan Brotherhood because --

        MR. REED:  Objection.  Lack foundation, what's commonly known.

        THE COURT:  Sustained.  We need some more questions.

BY MR. ENGELKING:

Q.   Have you had personal conversations with him?

A.   Yes.

Q.   When was that?

A.   In 2020, March, April, May, time period.

Q.   Do you know someone named Francis Clement?

A.   I do.

Q.   And who is he?

A.   He's a member of the Aryan Brotherhood.

Q.   How do you know him?

A.   I was put in contact with him.  He believes that I stole EDD money from him.

Q.   Have you had personal conversations with him?

A.   I have.

Q.   Was that on the telephone?

A.   It was.

2322

Q.   Do you know someone named Kenneth Johnson?

A.   I do.

Q.   Who is he?

A.   Another member of the Aryan Brotherhood.

Q.   Now, you've mentioned doing EDD fraud for the Aryan Brotherhood.  When were you committing this EDD fraud?

A.   March of 2020 through November 13th of 2020.

Q.   At a high level, could you walk us through the steps that you took to commitment EDD fraud?

A.   Uh, I would call a member inside a prison, get names, social security number and birth date sent back to me.  I would make a fake email using Proton Mail.  I would set up a thing on my computer to where they couldn't tell where the email was coming from.

I would do the application.  I would wait back for a couple days to see if the application went through.  If the application went through, I would call and say that the application went through to my connect in prison, let them know when the card would arrive.

As soon as the card would arrive, if the card was for them, I would take the card, open it, put all relevant information that needs the card to be activated and to continue the certification process after it's been given away.

I would take the card down to the bank, take a thousand dollars out, put all that except for the thousand

2323

dollars back into the card, take it down to Imperial Beach, and drop it off with Misfit's girlfriend, would who then let them know that their money had arrived.

Q. Okay.

MR. REED: Objection, Your Honor. Objection. Hearsay as to what Misfits's girlfriend did.

THE COURT: Sustained.

MR. REED: Move to strike that answer.

THE COURT: That portion will be stricken.

BY MR. ENGELKING:

Q. Who did you give the EDD cards to?

A. Misfit's girlfriend.

Q. So let's unpack that a little bit.

So, I guess, the first step in the process was obtaining names and personal identifying information to then submit the applications for; is that right?

A. Correct.

Q. Okay. And then you would log on to the EDD portal online?

A. Uh-huh.

Q. And fill out the application?

A. Yes.

Q. All right. Okay.

Did all the applications hit?

A. No, they did not.

Q. So some were accepted, some were rejected?

2324

A.  Yes.

Q.  For the ones that were accepted, then you said you got a card in the mail?

A.  Yes.

Q.  What was on that card?

A.  The back payment from the time that the person said that they stopped working until the time that they had filed their thing would receive $1500 every other week.

MR. REED:  Objection.  Nonresponsive to the question.

THE COURT:  Sustained.

MR. REED:  Move to strike the answer.

THE COURT:  That will be stricken.

BY MR. ENGELKING:

Q.  So there was money loaded on the card; is that right?

A.  Yes.

MR. REED:  Objection.  Leading.

THE COURT:  Sustained.

MR. REED:  Move to strike the answer.

THE COURT:  That will be stricken.

BY MR. ENGELKING:

Q.  What was on the card?

A.  Money would be on the card.

Q.  How often would money be loaded on the card?

A.  Every two weeks.

Q.  Now, you had mentioned giving cards to Misfit's

2325

girlfriend.

A.  Correct.

Q.  Which brothers were you committing EDD fraud for?

A.  Misfit.

MR. REED:  Objection.  Assumes facts.

THE COURT:  Overruled.

BY MR. ENGELKING

Q.  Go ahead.

A.  John Stinson, Eddie Burnett, is the cards that hit with money.

Q.  Let's start with Misfit.  How long have you known Misfit?

A.  Since 2010.

Q.  When did you first meet Misfit?

A.  In the county jail in San Diego while he was fighting his case.

Q.  Were you two close?

A.  We became close after that while we were in reception together.

Q.  Why were you committing EDD fraud for Misfit?

A.  To make money for them, make money for myself.

MR. REED:  Objection.  Lack of foundation. Speculation as to who "them" is.

THE COURT:  The question is, Why were you committing fraud for Misfit?

MR. REED:  Exactly.  His answer is "them."  Who's

2326

"them"?

THE COURT:  All right.  Yeah, we can get some clarification on that.

BY MR. ENGELKING:

Q.  Who's "them"?

A.  Misfit -- "them" is Misfit and John.

MR. REED:  Objection.  Lack of foundation as to whether or not Misfit is John, you can't just say it.

THE COURT:  We need some foundation.  Sustained.

BY MR. ENGELKING:

Q.  Just sticking with Misfit so far, so you said you were committing fraud for Misfit.  Why was that?

A.  To help them make money.

Q.  Help Misfit make money?

A.  To help them make money for the gang.

Q.  Okay.  Now, you also said you were committing fraud for John Stinson; is that right?

A.  I was.

Q.  Okay.  When was that?

A.  Same time period, March -- probably April or May of 2020.

Q.  Did you have conversations with John Stinson about this fraud?

A.  I did.

Q.  How did those -- via what medium did those conversations take place?

2327

**A.** On a cell phone on a three-way call that Misfit would connect me to John with.

**Q.** Okay. And what did John ask you to do for him?

**A.** Do his EDD, as well, and to give the information in the same way that I had done Misfit's and his girlfriend's and -- and provide -- do the exact same thing that I had did with theirs.

**Q.** Did John ever ask you to fill out applications for other brothers?

**A.** Uh, Misfit did. John did not.

**Q.** Okay. So who did Misfit ask you to fill out applications for?

**A.** From Misfit at two different occasions, I received 10 names and 40 names. At one point there was Kenneth Johnson, Francis Clement.

**Q.** Okay. Did Frank give you the information, or did Misfit give you the information?

**A.** Misfit gave me the information.

**Q.** Okay. So you never talked with Frank personally about doing EDD fraud?

**A.** Not at that time, no.

**Q.** Okay. How about Kenwood?

**A.** Not at that time, no.

**Q.** Okay. Did you fill out an application -- an EDD fraud application for Frank?

2328

A.  I did.

Q.  All right.  In the binder in front of you labeled 2 of 2, could you please turn to Exhibit 1419?

A.  Okay.

Q.  Do you recognize this document?

A.  I do.

Q.  What is it?

A.  It's an address screen change.

Q.  I'm sorry, 1419.

A.  I apologize.  It's an online application for unemployment with the EDD department.

Q.  Okay.  Did you fill this application out?

A.  I did.

Q.  And is it an accurate copy of the application you filled out?

A.  It is.

MR. ENGELKING:  Your Honor, we move 1419 into evidence and ask to publish to the jury.

MS. DE SALES BARRETT:  Objection, Your Honor.

THE COURT:  All right.  The grounds?

MS. DE SALES BARRETT:  That it's not sufficiently identified, Your Honor.  We could approach sidebar and --

THE COURT:  All right.  Any other objections?

That objection is sustained.

MR. REED:  We don't have an objection to it.

2329

THE COURT:  Go ahead.  It needs more foundation.

BY MR. ENGELKING:

Q.  I'm sorry.  You said you recognize this document?

A.  I do.

Q.  And what is it?

A.  It's an online EDD application.

Q.  And you filled it out?

A.  I did.

Q.  And it's a true and accurate copy of the application you filled out?

A.  It is.

MR. ENGELKING:  Okay.  Again, Your Honor, we'd move to enter this into evidence.

THE COURT:  Objections?

MS. DE SALES BARRETT:  Yes, Your Honor.

THE COURT:  Your objection, is it based --

MS. DE SALES BARRETT:  The basis of the objection is that the document is not verified.  He has not said anything to verify the nature of the document and the information on that document.

THE COURT:  Can we talk about this, then, at sidebar?

(Sidebar commences.)

THE COURT:  Are we talking about the form, or are you talking about the information that he says is fake?

MS. DE SALES BARRETT:  The information that he says

2330

is fake, because he's attributing it to my client.

THE COURT:  Oh, okay.  I didn't see that.

MS. LUEM:  Number -- I'm sorry.  What exhibit number is it?  It's not coming up on our screen.

MR. ENGELKING:  Yeah, no, because we haven't got it in evidence yet.

MS. LUEM:  Yeah, but usually when you preview it --

MS. DE SALES BARRETT:  No, but it's supposed to be on our screen.

MR. ENGELKING:  Oh, I'm sorry.  It's --

THE COURT:  1419.  I don't think it's -- I just have it in the book.  Let me grab it.  I'm sorry.  You're right. It does --

MS. DE SALES BARRETT:  Yeah.

THE COURT:  So your objection is?

MS. DE SALES BARRETT:  My objection is it's being filled out in the name.  He has no authorization from anybody to use that name.

MR. ENGELKING:  That's what he testified to.  It's fraud -- fraudulent application that he did on behalf of Frank.

THE COURT:  He did say Misfit gave him a list that included Mr. Clement --

MR. ENGELKING:  Right.

THE COURT:  -- and he applied in Mr. Clement's name.

2331

MR. ENGELKING:  Exactly.

THE COURT:  He hasn't said he has authorization.  I think he's saying to the contrary, it's fraud.

MS. DE SALES BARRETT:  Uh-huh.

MR. ENGELKING:  And I specifically drew that out on direct that Frank did not ask him to do this.  He said he got the name from Misfit.

THE COURT:  So --

MS. DE SALES BARRETT:  So how is it relevant, then, to offer a document --

MR. ENGELKING:  He's talking about --

MS. DE SALES BARRETT:  -- that's fraudulent --

THE COURT:  Well, that's --

MS. DE SALES BARRETT:  -- about this particular defendant when there are a whole bunch of other EDD fraud documents that could be offered that are fraudulent?

THE COURT:  I don't think he's -- at least I don't hear this going to Mr. Clement.  I hear this as fraud for Misfit.

MS. DE SALES BARRETT:  Uh-huh.

THE COURT:  I suppose what's lacking maybe is showing Misfit's affiliation of the AB, but I think that's been established.

MR. ENGELKING:  He said he's a brother.

THE COURT:  So I mean, as I understood it, this is

2332

just simply enterprise, but I don't see it does anything to show Mr. Clement's involvement.

MS. DE SALES BARRETT:  Well, it has his name on it.

THE COURT:  Right.  We can clear that up that he had -- he had no authorization from Mr. Clement to write his name there, right?

MR. ENGELKING:  I'm sorry.  Repeat that, Judge.

THE COURT:  He didn't have authorization from Mr. Clement to file this?

MR. ENGELKING:  Right.

THE COURT:  So let's ask him that question.

MS. DE SALES BARRETT:  Uh --

THE COURT:  There's no doubt it's fraud.  He said it's fraud.

MS. DE SALES BARRETT:  Right.  And it's in Mr. Clement's name.

MS. FISHER-BYRIALSEN:  He didn't tell him to do it.

MS. DE SALES BARRETT:  Yup, he didn't tell him to do it.

THE COURT:  Yeah, he said Misfit told him.  He didn't -- he said Clement didn't, so --

MS. DE SALES BARRETT:  Right.  But so why is it not 403 to throw that into -- his name into this document when it's clearly a fraud committed by Misfit and the witness?

THE COURT:  Well, he did already testify

2333

Mr. Clement's name was given to him by Misfit to fill this application.

MS. DE SALES BARRETT:  Along with dozens of names, dozens.

THE COURT:  50, yeah.

MS. DE SALES BARRETT:  50, yeah.

MR. ENGELKING:  Your Honor, this document -- well, the fraud -- the EDD fraud for Frank will also come up later on in his testimony when he explains as to why he was in contact with Frank about the drug deal.

And that was on the recorded calls that Your Honor is --

THE COURT:  You're not going to tie this at all to Mr. Clement?

MR. ENGELKING:  Well, they do discuss -- part of the reason why he started communicating with Frank was -- he'll testify that Frank believed that he didn't properly get the EDD fraud money.

MS. DE SALES BARRETT:  But he's not talking about money that was in his name.

THE COURT:  You're saying that --

MS. DE SALES BARRETT:  It's an address in San Diego. It's not going to Frank.

MR. ENGELKING:  I know.  I was going to ask him to explain the address.

2334

MS. DE SALES BARRETT:  Oh.

THE COURT:  Well, here he said he gets the cards and he gives them to Misfit.

MS. DE SALES BARRETT:  Right.

THE COURT:  And what he does beyond that we don't know.

MS. DE SALES BARRETT:  Correct.

THE COURT:  So I guess -- and then there's the issue that Frank thought he stole money -- EDD money.

Are you talking about this or are we talking about something else?

MR. ENGELKING:  He'll testify that he believes Frank thought he messed up the EDD application for him.

THE COURT:  He said -- he testified --

MS. DE SALES BARRETT:  For him?

THE COURT:  He testified that he thought Mr. Clement -- that he had stolen from the AB.

Is it this application or is it something else?

MR. ENGELKING:  I'm sorry, can you repeat that?

THE COURT:  He testified that Mr. Clement thought that this witness had stolen from the AB.  Is it related to this application?

MR. ENGELKING:  Yes.  Well, he hasn't testified to that yet.  I'm saying he --

THE COURT:  Right.

ER 1666

2335

MR. ENGELKING: -- will testify to that when he explains why he started working for Frank to arrange this drug deal.

THE COURT: We need to work backward then because --

MR. ENGELKING: Okay.

THE COURT: -- I have to agree at least at this point I'm not hearing that Mr. Clement's involved in this. There's nothing that says he is except for his name.

MR. ENGELKING: Okay. I'll -- okay. I'll waive that.

(Sidebar ends.)

BY MR. ENGELKING:

**Q.** Now, you had mentioned that you submitted EDD fraud -- or, excuse me, that you gave the successful EDD fraud applications when they sent the debit card to Misfit's girlfriend; is that right?

**A.** Yes.

**Q.** Okay. How many of the applications roughly were successful?

**A.** 12 out of about 50.

**Q.** Were you keeping a portion of the fraud money?

**A.** For the ones that I did for them, for Misfit and John, I kept a thousand dollars off each card.

**Q.** Did you ever ask for more than that?

**A.** I did.

2336

Q.  What did you ask for?

A.  For every three cards that they got, that Misfit would buy me a Glock that I could -- a P80 Glock that I could then assemble.

Q.  Was that request granted?

A.  Denied.

Q.  The fraudulent EDD application that you did for John, was that one successful?

A.  That one was.

Q.  In the same binder you were just looking at, could you please turn to Exhibit 1421.

A.  Okay.

Q.  I believe it's behind -- yeah, there you go.

        Do you recognize that document?

A.  I do.

Q.  And what is it?

A.  It's an EDD online application for John Stinson.

Q.  Did you fill that out?

A.  I did.

Q.  And it is an accurate copy of the application you filled out?

A.  It is.

        MR. ENGELKING:  Your Honor, we move 1421 into evidence.

        THE COURT:  Any objections?

2337

MR. REED:  No objection.

MR. ENGELKING:  Ask to publish to the jury.

THE COURT:  That will be admitted.

(Government's Exhibit 1421 was received.)

BY MR. ENGELKING:

Q.  So looking at the top of the application, who's the claimant?

A.  John Stinson.

Q.  And you -- you wrote his name on this application, right?

A.  I did.

Q.  Okay.  And this address -- the mailing address right here in the middle of the page, whose address was that?

A.  That is my address.  That was my address while I lived in San Diego at the time.

Q.  Why did you put that address on there?

A.  It was in a trailer park and I could control multiple mailboxes so I could have multiple online applications sent to those addresses.

Q.  So when John's application was accepted, did you receive his debit card?

A.  His debit card came in the mail to that address.

Q.  It was mailed to this Morena address?

A.  Yeah.

Q.  What did you do with it?

A.  I activated it -- well, I contacted Misfit, informed him

2338

that it had arrived.  I activated it.  I put the corresponding info that's needed to run the card afterwards onto the envelope.

I took it down to the bank, pulled my thousand dollars out.  And then drove the card with the envelope and information down to Misfit's girlfriend in Imperial Beach.

Q.  At some point did you have John's card stopped?

A.  I did.

Q.  How did you do that?

A.  I was arrested and I was having a hard time posting bail. When I got out, I felt like I didn't have any help so I shut off that card and had it resent back to the address so then I could continue to use the money on it.

Q.  Did you have a falling out with John and Misfit?

A.  I did with Misfit, yes.

Q.  How did that come about?

A.  They believed that I was stealing money --

MR. REED:  Objection.  Foundation.

THE COURT:  Sustained.

THE WITNESS:  Misfit believes --

MR. REED:  As to "they."

THE COURT:  All right.  Sustained.

THE WITNESS:  Misfit believes I was stealing money from him and John.

MS. DE SALES BARRETT:  Objection to what Misfit

2339

believes --

MR. REED:  Objection --

COURT REPORTER:  Wait a second.  One at a time. Ms. Barrett, I believe you were finishing up with your objection.

MS. DE SALES BARRETT:  Uh-huh, thank you.

Objection to what someone else believes.

COURT REPORTER:  And your objection, Mr. Reed?

MR. REED:  That will be the same objection.

THE COURT:  Sustained.

BY MR. ENGELKING:

Q.  What was your understanding from the falling out?

A.  That I was stealing from them.

Q.  Now, you had -- you've mentioned a few times now that you were arrested on November 13, 2020?

A.  Correct.

Q.  Were you charged with a crime when you were arrested?

A.  I was.

Q.  Did you plead guilty to that?

A.  I did.

Q.  And what -- what crime is that?

A.  In possession of ten or more IDs or credit cards and fraud.

Q.  When you were arrested, did you have any EDD cards on you?

A.  I did.

2340

Q.  Whose?

A.  Uh, I had John's and I think a guy named Robert McCullough and one other one at that time.

Q.  Did that cause any issues in your relationship with Misfit?

A.  Yeah, they were wondering how I got that.

        MR. REED:  Objection.  Lack of foundation again as to "they."

        THE COURT:  Sustained.

        MR. REED:  Move to strike the answer.

        THE COURT:  That will be stricken.

BY MR. ENGELKING:

Q.  Just yes or no, did that cause any issues in your relationship with Misfit?

A.  Yes.

Q.  After you were arrested in November 2020, did you subsequently become an ATF informant?

A.  I did.

Q.  And what does an informant do?

A.  Uh --

        MS. DE SALES BARRETT:  Objection --

BY MR. ENGELKING:

Q.  What did you do as an informant?

A.  Provide information, uh, about conversations I was having with various members of the Aryan Brotherhood.

2341

Q.   Were you -- were you being paid?

A.   I was.

Q.   Are you still working as an informant?

A.   No.

Q.   During your time working as an ATF informant, were you in contact with Frank Clement?

A.   I was.

Q.   And when was this?

A.   Starting around April, May of 2022.

Q.   How were you communicating with him?

A.   Via Signal with his cell phone.  Signal is a discreet app.

Q.   So Signal -- did you talk on the phone with him?

A.   I did.

Q.   How about FaceTime?

A.   I did.

Q.   Did those conversations involve arranging a drug deal?

A.   They did.

Q.   How about fraud?

A.   Yes.

Q.   Were any of those phone calls recorded?

A.   Yes.

Q.   Did you record them?

A.   I did.

Q.   How did you do that?

A.   With a recording device.

2342

Q.   Now, you had mentioned you also communicated on Signal. Were those -- were any of those messages preserved?

A.   I believe so.

Q.   In the binder in front of you, could you please turn to Exhibits 1409, 1410 and 1411.  And just let me know when you've looked at those.

A.   Okay, yes, I recognize these.

Q.   Do you recognize those exhibits?

A.   I do.

Q.   Generally, what are they?

A.   Conversations between me and --

        MS. DE SALES BARRETT:  Your Honor, I'm sorry.  We don't have this on our screen.

        THE COURT:  Would the government be able to display that.

BY MR. ENGELKING:

Q.   So go ahead.

        Generally, what do they show?

A.   Conversations between me and Frank discussing a purchase of methamphetamine and the prices.

Q.   And how do you know this was Frank?

A.   Because I've FaceTimed with him.  That's his Signal handle and that's the phone that he uses to call me on.

Q.   So do these exhibits accurately depict your Signal conversation?

2343

A.   Yes.

          MR. ENGELKING:  Your Honor, I'd move 1409, -10, and -11 and ask to publish to the jury.

          MS. DE SALES BARRETT:  I'm sorry, Your Honor, we only have 1409 on the screen.

          THE COURT:  Can we scroll through all those, please.

          MS. DE SALES BARRETT:  I don't know about anybody else, but I can move on to -- oh.  If we have ten, yeah.

          THE COURT:  Yeah.  All right.

          MS. DE SALES BARRETT:  Thank you.

          THE COURT:  Any objection -- any objection to 1409, -10, and -11?

          MS. DE SALES BARRETT:  No, Your Honor.

          MS. LUEM:  No.

          THE COURT:  Mr. Reed, any objections?

          MR. REED:  No.

          THE COURT:  Those will be admitted.

     (Government's Exhibit 1409, 1410, and 1411 were received.)

          MR. ENGELKING:  Can we please publish 1409 to the jury.

BY MR. ENGELKING:

Q.  Could you please explain what we're looking at here?

A.  It's methamphetamine, and he's showing me what it looks like.  He's giving me a price, and I'm concurring that I agree to it and that I would take five of them.

2344

Q.  So I'm circling -- whoops -- the 750.  What is it -- was that the price?

A.  It was.

Q.  And you -- it looks like you responded with 13 -- or excuse me -- 3750.  What -- what did that mean?

A.  It's five times 750.

Q.  How much meth were you agreeing to purchase?

A.  Five pounds.

MR. ENGELKING:  Could we please pull up 1410.

BY MR. ENGELKING:

Q.  And what are we looking at here?

A.  The continues of the conversation, talking about that, and we were also talking about some checks or some cards that he might have that might have some money on them.

Q.  Were you arranging a meetup?

A.  I was.

MR. ENGELKING:  And let's go to 1411.

BY MR. ENGELKING:

Q.  And what are we looking at here?

A.  Continue conversation about that drug deal, the meetup, and our continue desire to make money.

Q.  Now, did you actually have any intention of selling this meth?

A.  No.

Q.  Was this a controlled purchase?

ER 1676

2345

A.  It was.

Q.  So this was something you were doing in coordination with ATF?

A.  I was.

Q.  After this Signal conversation that we just looked at, did you continue to arrange this drug deal with Frank?

A.  I tried to.

Q.  So what happened after this?

A.  It -- it never really went through.  Other things started being discussed, but the deal never actually went through.  It fell through.

Q.  How did the deal fall through?

A.  Uh, they weren't able to provide the methamphetamine to me.  They were never able to meet up with me.

Q.  Did you attempt to meet up with somebody to get the meth?

A.  I did.

Q.  Now, you mentioned you also had phone calls with Frank and that those calls were recorded, correct?

A.  Yes, yes.

Q.  Did you provide those calls to law enforcement?

A.  I did.

        MR. ENGELKING:  May I approach, Your Honor.

        THE COURT:  Yes.

BY MR. ENGELKING:

Q.  Just handed you 3 CDs that are marked 1800, 1801, and

2346

1806.  Do you recognize those CDs?

A.  I do.

Q.  And what are they?

A.  They are CDs of my conversations with Francis Clement.

Q.  Are those the calls that you recorded?

A.  It is.

Q.  Have you listened to those calls before?

A.  I have.

Q.  And were you able to identify the voices on those calls?

A.  I was.

Q.  Whose voices are on those calls?

A.  Mine and Frank Clement's.

Q.  Do those calls accurately capture your conversations with Frank?

A.  They do.

        MR. ENGELKING:  Your Honor, we move 1800, 1801, and 1806 into evidence, subject to the exclusion that we discussed earlier.

        THE COURT:  Any objections?

        MS. DE SALES BARRETT:  No, Your Honor, subject to that -- the Court's previously ruling.

        MR. REED:  No objection, Your Honor.

        THE COURT:  All right.  Those will be admitted with the exception of the one clip.

        Go ahead.

2347

(Government's Exhibits 1800, 1801, and 1806 were received.)

MR. ENGELKING:  Could we please play Exhibit 1800 starting at 3 minutes, 28 seconds, please.

(Audio played in open court.)

MR. ENGELKING:  Please pause it right there.

MS. DE SALES BARRETT:  Sorry, Your Honor.

MR. ENGELKING:  Yeah --

MS. DE SALES BARRETT:  I'm sorry, Your Honor.

MR. ENGELKING:  I said starting at 3 minutes, 28 seconds, please.

MS. DE SALES BARRETT:  Can we take that down, please.

MR. ENGELKING:  Yeah.

THE COURT:  I already said that, yeah.

THE CLERK:  For the jury it's off.

MR. ENGELKING:  Brief indulgence, Your Honor.

All right.  Now we can publish.

Okay.  Go ahead.  Playing from 4:02.

(Audio played in open court.)

BY MR. ENGELKING:

Q.  So what -- what was going on there?

A.  Me and Frank discussing possible drug deals that would take place in Mexico.

MR. ENGELKING:  Could we go to Exhibit 1801, please.

For the record, we're starting at 12:36.

2348

(Audio played in open court.)

BY MR. ENGELKING:

Q.  So what was going on in that short portion that we just heard?

A.  He was explaining to me that the price was not going to be 700; it was going to be 750 for the five pounds that I was attempting to procure from him.

MR. ENGELKING:  Okay.  Could we please play it.

(Audio played in open court.)

MR. ENGELKING:  If you would please pause it right there.

BY MR. ENGELKING:

Q.  Who -- who did Frank mention there?

A.  Kenwood.

Q.  And what was your understanding of his involvement in this?

A.  It was Kenwood's connect and Kenwood's runners on the street that I was dealing with.

MR. ENGELKING:  Okay.  Could you please play it.

(Audio played in open court.)

MR. ENGELKING:  We can pause it there.

BY MR. ENGELKING:

Q.  What was happening in the later half of that clip we just listened to?

A.  We were just ironing out the details and he was reassuring

2349

me of the price and telling me that it would be in LA if I came up there and got it, and it would be a good deal.

THE COURT: All right. Mr. Engelking, we're a couple minutes past 1:30 now. I think we need to go ahead and take our break.

MR. ENGELKING: Sure.

THE COURT: All right. Ladies and gentlemen, as a reminder, please, don't allow yourself to being exposed to any form of media about this case. Please don't communicate about this case with anyone. Please don't form any opinions about this case, and please don't do any research on your own. Otherwise, we'll see you on Tuesday on eight o'clock.

(Jury exits the courtroom at 1:33 p.m.)

THE COURT: All right. Anything for the record at this time?

MS. FISHER-BYRIALSEN: No, Your Honor.

MR. VILLA: Your Honor, just briefly, you don't necessarily have to address it today, but we sent to the United States Attorney's Office before trial a Touhy letter for Agent Gonzalez's testimony. We also sent it to counsel for the ATF, and we've not received any response regarding that.

And so we just want to alert the Court in case it becomes an issue if we need to call him in our case.

THE COURT: Is there an issue with that, Ms. Stokman?

2350

MS. STOKMAN:  With what?

THE COURT:  With what Mr. Villa just asked?

MS. STOKMAN:  I'm not sure on what he's asking for from the government right now.

MR. VILLA:  The -- the regulations require the response from the government and so does our letter.

MS. STOKMAN:  From ATF, not the U.S. Attorney's Office.

MR. VILLA:  It's actually both, but we can all study the regulations over the weekend.

MS. STOKMAN:  Then I'll -- then there was nothing in the file, so I can alert counsel to that.

THE COURT:  All right.  Anything else for the record at this time?

MS. STOKMAN:  Nothing from the government.

THE COURT:  All right.  We'll take our break.

MR. VILLA:  Your Honor, there was one other thing. Ms. Luem's got a cough drop in her mouth, so I'm going to speak for her.

The payments that Mr. Rapinoe testified that he received as an informant, we've not received those records. We've got like a spreadsheet, but we haven't got the receipts or the amounts that he's been paid, and that's clearly a benefit that needs to be produced so we can cross-examine him.

THE COURT:  Those need to be produced.  Let's get on

2351

that and get that to counsel by Monday.

All right.  Anything else?

MS. FISHER-BYRIALSEN:  Your Honor, I think you -- you had issued an order that we had to within two days.  May we have one more day to do that so that we can all confer and perhaps give you a --

THE COURT:  All right.  So --

MS. FISHER-BYRIALSEN:  Tomorrow?

THE COURT:  Okay.

MS. FISHER-BYRIALSEN:  Okay.  Thank you.

(Proceedings were adjourned at 1:35 p.m.)

I, RACHAEL LUNDY, Official Reporter, do hereby certify the foregoing transcript as true and correct.

Dated:  February 1, 2025          /s/ Rachael Lundy_____
                                  RACHAEL LUNDY, CSR-RMR
                                  CSR No. 13815