IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　Plaintiff - Appellee,<br>v.<br>KENNETH JOHNSON,<br>　　Defendant - Appellant. | No. 25-3645<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |
| UNITED STATES OF AMERICA,<br>　　Plaintiff - Appellee,<br>v.<br>FRANCIS CLEMENT,<br>　　Defendant - Appellant. | No. 25-3648<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |

On Appeal from the United States District Court
For the Eastern District of California
The Honorable Jennifer L. Thurston
D.C. No. 1:20-cr-00238-JLT-SKO

**EXCERPTS OF RECORD**
**VOLUME 11 OF 13**

Ryan J. Villa
The Law Office of Ryan J. Villa
5501 Eagle Rock Ave. NE Suite C2
Albuquerque, NM 87113
Ryan@rjvlawfirm.com

Andrea Lee Luem
Andrea Lee Luem, PHV
400 South Fourth Street, Ste 500
Las Vegas, NV 89101
andrea@luemlaw.com

Counsel for Defendant-Appellant
Kenneth Johnson

Jane Fisher-Byrialsen
Fisher & Byrialsen, PLLC
4600 S. Syracuse Street
Denver, CO 80137
jane@fblaw.org

Jean D. Barrett
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
jeanbarrett@ruhnkeandbarrett.com

Counsel for Defendant-Appellant
Francis Clement

2560

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. JENNIFER L. THURSTON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 1:20-cr-00238-JLT-SKO |
| Plaintiff, ) | |
| ) | Jury Trial, Day 12 |
| vs. ) | |
| ) | |
| KENNETH BASH, et al. ) | Volume 12 |
| ) | Pgs. 2560 - 2771, inclusive |
| Defendants. ) | |
| ) | |

Fresno, California                    Wednesday, February 5, 2025

REPORTER'S TRANSCRIPT OF PROCEEDINGS

REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

ER 1894

2561

**APPEARANCES OF COUNSEL**:

| | |
|---|---|
| For the Government: | **STEPHANIE STOKMAN**<br>Assistant U.S. Attorney<br>2500 Tulare Street, Rm. 4401<br>Fresno, California  93721<br><br>**JARED ENGELKING**<br>Department of Justice<br>1301 New York Avenue, N.W.<br>Washington, DC 20005<br><br>**JAMES ROBERT CONOLLY, GOVT**<br>U.S. Attorney's Office<br>501 I Street, Suite 10-100<br>Sacramento, CA 95814 |
| For Defendant Johnson: | Law Offices of Andrea Luem<br>Attorneys at Law<br>400 South Forth Street, Suite 500<br>Las Vegas, Nevada  89101<br>BY:  **ANDREA LEE LEUM, ESQ**.<br><br>Law Offices of Ryan J. Villa<br>5501 Eagle Rock Avenue NE<br>Suite C2<br>Albuquerque, NM 87104<br>BY:  **RYAN J. VILLA, ESQ**. |
| For Defendant Clement: | Fisher & Byrialsen, PLLC<br>Attorneys at Law<br>99 Park Avenue<br>New York, NY 10016<br>BY:  **JANE FISHER-BYRIALSEN, PHV**<br><br>Ruhnke And Barrett<br>29 Broadway, Suite 1412<br>New York City, NY 10006<br>BY:  **JEAN DE SALLES BARRETT, PHV** |
| For Defendant Stinson: | Law Office of Kenneth Alan Reed<br>406 W 4th Street<br>Santa Ana, CA 92701-4505<br>BY:  **KENNETH ALAN REED, ESQ**. |

ER 1895

2562

# INDEX

**GOVERNMENT'S WITNESSES:**

**DANIEL RUBIN**
DIRECT EXAMINATION BY MS. STOKMAN              2613
CROSS-EXAMINATION BY MS. LUEM                  2677
CROSS-EXAMINATION BY MR. REED                  2701
REDIRECT EXAMINATION BY MS. STOKMAN            2727
RECROSS-EXAMINATION BY MS. LUEM                2728

**BRIAN JAMES RAPINOE**
CROSS-EXAMINATION BY MR. REED                  2738

* * * * *

# EXHIBITS

**DEFENDANT'S**                                Marked

 A                                             2732

* * * * *

**GOVERNMENT'S**                               Received

 1809, 1810, 1811, and 1820                    2641

* * * * *

2563

Wednesday, February 5, 2025                    Fresno, California

8:05 a.m.                                       Jury Trial Day 12

(The following proceedings were held in open court:)

THE COURT:  All right.  Is there anything for the record before we begin today?

MR. REED:  Depending on how we are going to begin, if we're going to begin with Mr. Rapinoe, yes; if it's something else, then we can deal with that at the break.

THE COURT:  Okay.  What's the intention -- who's going to be the first witness?

MS. STOKMAN:  Judge, we would like to put him on the stand for cross-examination because he did rearrange his schedule, child care, work to stay here, and we would like to be able to get him out of here today.

MR. REED:  Obviously, we --

(Court reporter gains clarification.)

MR. REED:  If I may --

THE COURT:  Okay.  I appreciate that you -- you know, I realize he doesn't dictate, so I'm just -- but tell me what the issue is.

MR. REED:  What I think the issue is, and I -- I don't know the names of each one of the AUSAs over there, other than Ms. Stokman, but I got an email last night from one -- from someone in that team explaining to me that Mr. Rapinoe -- and I'm going to paraphrase just in case I

ER 1897

2564

don't get the exact nomenclature correct -- he was kicked out of the ATF witness, whatever it is they call it. Because in his state case, which is the only cases that he has, he had a violation of his conditional release.

I don't know the extent of that. The government didn't disclose the extent. When I asked them about it, they explained that that's what they know. I explained to the government, that San Diego County, which I am somewhat familiar with, the state court, they do not image those documents where I can pull them up remotely, because I pulled up his cases, but I can't get to what happened inside the case.

So as we sit here right now, I know that Mr. Rapinoe was kicked out of the program -- out of their program or the ATF program for doing something that was a violation of those rules, which, of course, assumes that somebody above the agent that's in this room made that decision, which means that was a writing. We don't know why he got kicked out. Long story short, I don't want to cross-examine him until I get the document that, it sounds like to me, is at least two years old and I should have already had.

So this isn't on Kenny Reed, but I -- I want that document. I will take efforts to get that document, but I have to send someone to San Diego to get that document.

THE COURT: Let me understand, because I got a little

2565

twisted around because you said supervised release, which is a federal issue.

MR. REED:  I used the wrong term.  They -- they call it conditional release, which is --

THE COURT:  Right.  So let me understand this.  So in his San Diego prosecution, he was placed on community supervision of some sort?

MR. REED:  I think, but I'm drawing from what the email told me.  I think that's what happened.  When I -- when I first got this case and first got his cases, I ran all the case numbers, as I want to do with defendants.  But I know San Diego, they always -- it has the same information -- in fact, the same information I sent to the AUSA to show them -- or to that team over there to show them what happens, when you bring the name up, it says "this image was not" -- or "this document was not imaged" or "this file is not imaged."

What that means is, for reasons I have never figured out, you got to go to San Diego, then they will print it out for you.  I think -- I think Fresno does that also, but I'm not used to that.  LA, Orange County, larger counties, they just -- you pay for it, they give it to you.

So I don't know what it is he did wrong, but I do know this, Your Honor, I know whatever it is he did wrong, they felt the need -- and I don't mean the prosecutor, that -- the ATF felt the need to take him off their program.

2566

Now, there's also an issue of another check that we didn't know about, I don't know how that happens, but I don't do my accounting so well either, so that can -- I'm okay with that part. I'm not okay with the fact that he got kicked out and I don't know why yet.

THE COURT: But let me understand. So you're -- well, let me turn to the government.

Mr. Engelking.

MS. STOKMAN: Judge, I can handle this and let the Court know the facts surrounding what happened and what we gave counsel last night.

So the witness was under ATF Gonzalez as a confidential informant in June of 2022. Then he was handed over to a San Diego agent and ATF Gonzalez was no longer his handler. At the time he was handed off to San Diego, he was still in good standing as an informant and that was the end of the Eastern District's, I guess, role. At that point, ATF Gonzalez even had no -- he was cut out of the informant file because he was no longer the handler.

There was a warrant that went out that was based on a violation of his supervised release because he missed a check-in with his supervising officer. And that warrant, because it hit the system, ATF is not required to deactivate an informant when a warrant pops up, but because they also were no longer going to use him, they deactivated him.

ER 1900

2567

ATF San Diego made that decision.

We were aware that he had been deactivated because he was no longer being used. And so yesterday, when we were able to check the file, because defense had requested and now we are able to see it, we saw that there was a drop-down for a warrant, as well as the fact that they were no longer going to use him because he was leaving the area.

So the supervision violation was based on missing a check-in with his supervising officer. And that was the extent of that. He is here to be cross-examined about that. There was a rap sheet that was provided of this witness back in November. The rap sheet absolutely has any types of arrests or incarcerations or any type of criminal dealings up through the time that this would have been happening, and so that has been provided to counsel since November.

It's the government's position that this is not something that warrants a continued delay, that he is here, he can be cross-examined. If counsel wishes him to be subject to recall, that's absolutely appropriate. If they find that they want to call his supervising officer, that's appropriate. But at this point, the violation that caused that warrant to go into place was not because he had lied to somebody or committed an offense that was -- criminal offense beyond violating the fact that he missed a check-in with his supervising officer.

2568

And the witness is absolutely up for cross-examination on the circumstances on that, what happened to that, and what may or may not have been done because of the nature of that violation.

But at this point they have that information, and it is not -- the government does not believe this warrants a further continuance when he's here to be cross-examined and that information has been provided.

MR. REED:  If the Court would allow --

THE COURT:  Wait, wait, wait, wait.

So you say the rap sheet was provided and had all this information.  Did it show that there was a warrant issued?

MS. STOKMAN:  Not -- I don't remember if a warrant was there, but there is an indication that he had a flash incarceration at the end of 2022.

And so there's an indication that he at least had gone into custody after the time frame that he was an informant.  I think our position is more based on the fact that, yes, this -- this was an error on my part for not checking this, because we believe that he was deactivated because he was no longer going to be used because he was leaving the area.

When we saw the file yesterday, it indicated that a warrant had also been issued for that violation, for not

2569

checking in with his PO. But that -- at that point, he was no longer involved in this matter. It was a decision made in another ATF office. And there was not -- based on what he's testifying here on his informant status with the Eastern District, all of that happened post -- post his time here with another ATF agency.

In any event, Judge, we found that yesterday, we turned that over. The question was asked what the nature of that violation was, and we told them it was a failure to check in with his supervising officer.

THE COURT: How did you know that?

MS. STOKMAN: How did we know that it was a failure to check in with his supervising officer?

THE COURT: Is there a report? Is there some documentation?

MS. STOKMAN: No. ATF Gonzalez was able to get in touch with the handler, who was able to provide more information.

THE COURT: And this is a handler in ATF in San Diego?

MS. STOKMAN: Correct.

THE COURT: And that's the information that the ATF officer in San Diego had. And again, we're talking about supervision out of the state system; is that right?

MS. STOKMAN: Yes.

2570

THE COURT:  And what was the reason for checking the file at this time?

MS. STOKMAN:  Because of the request from counsel yesterday, we were able to get access to the file. ATF Gonzalez actually had to get access through the San Diego agents, and we reviewed it because of the request now that was being made.

Because there was a question about his contract, we just wanted to cover all of our bases and make sure that we read that file and were able to provide any information that maybe, such as this, we were unaware of until we were able to see that.

THE COURT:  Mr. Reed, when you were talking about the document that you want to get that's not imaged, what document are we talking about?

MR. REED:  The entire file in San Diego is not imaged.  The fact that there is a case, I have.  Because the way San Diego lays it up, you can search by case number or you can search by name.

So when you search by name and you get Daniel [sic] James Rapinoe, you get cases from -- you get a list of case numbers from 2011 up to 2020.  If you then try to pull up the 2020 case or any one of the cases, you can't dig into the rest of the documents.

THE COURT:  Right.  I get that, because you knew

ER 1904

2571

about that.  You said you did that a long time ago.

MR. REED:  Yes.

THE COURT:  You looked at all -- so when you said that you were trying to pull up a document as a result of this information that you received last night, what document are we talking about?

MR. REED:  I was trying to find out if I could pull something from the 2020 case, which is what I assume he is on probation for, and find out what he got arrested for.

I don't just practice in federal court.  I practice in state court as well, as most defense attorneys do.

The statement that, You got in trouble for not reporting, that can be just that.  It can also be you got in trouble for not reporting on a testing day, which tells us that, we presume, you are testing positive for drugs.  This man is a heroin addict, or at least was for years.

I get -- I get the government's position from where they are sitting, but for a second, let me ask the Court to take you forward a year.  Can --

THE COURT:  Let me still understand this situation because what I'm trying to figure out is, I also know the dockets of state court, and you are hoping to find a minute order or something in court saying, "you failed to do this." If it's a flash incarceration, though, it's not going to have that.  We agree on that.

2572

MR. REED:  No, I don't agree with that.  You go into custody for any reason, when you come back, you have a hearing before a state court judge, and the state court judge makes a decision.

Short answer is, I don't know what it's going to say.  That's why I'm not pontificating on --

THE COURT:  When we keep saying "it," what -- we're talking about minutes from a hearing surrounding that date?  Is that what we're looking for?

MR. REED:  Yes.

THE COURT:  Okay.  So the easy situation would be is if we can get that Court to be willing to email us a copy of that, right?  Because you already knew about all the other stuff.  You could have gotten that file a long time ago.  So what we're just talking about is that.  And that could be done -- and I appreciate you're saying --

MR. REED:  Well, it's beyond my kin.

THE COURT:  No, no, no.  I know that.  I'm not getting that.  But I'm trying to understand -- trying to put these two arguments together.  Because what Ms. Stokman is saying is, Let's just do it, and if you have to come back with a file, then we do.  And you can bring back Mr. Rapinoe and confront him with this document.

MR. REED:  Here's the problem with that.

THE COURT:  Yeah.

2573

MR. REED:  And I -- I appreciate that we're under the time gun, but I didn't create this.  And the funny thing is the government's position yesterday -- and to the Court's, even, to a certain extent -- we have a half hour time left.  Why aren't you guys going forward?

THE COURT:  Yeah.  I -- I'm not worried about that.

MR. REED:  No, no.  But what I'm saying is, had we done that, I wouldn't be able to make this argument.  My problem right now is that there's some hotshot lawyer who's going to be doing an appeal on this case.  And when Kenneth Reed goes forward and cross-examines this man with the information I have, I'm going to hear that harmless error waiver stuff --

THE COURT:  Well, yes or no because --

MR. REED: -- because he didn't do his job.

THE COURT:  No one is saying that you don't get the opportunity.  I'm just trying to see what the prejudice would be in starting your cross-examination, getting whoever we can get from the government to contact that Court and go, Hey, can you just send us the copy of that minute order, and then -- and if -- it's the same situation we had yesterday.  We don't know what it says.

MR. REED:  True.

THE COURT:  So if it comes back and says something helpful to you, yeah, all day you're going to want to do that.

2574

But if it comes back and says, He missed a check-in with his probation officer, period, you're done.  It doesn't matter, right?

So what I'm trying to figure out, though, is attorneys don't want to proceed without knowing what the answer is before they ask the question.

MR. REED:  True.

THE COURT:  But for you, you got to establish this stuff before you can present that to him anyway, right, under 613(b).  You got to say, explain this for me, and then here's the document.

MR. REED:  That's the A part of the A/B argument.

THE COURT:  No, no.  You can do the A, you can do the A without the document.

MR. REED:  I -- I -- I want to apologize, because that's only part of what's in my head.

THE COURT:  Yeah.  I'm not trying to get you to have to say that out loud.

MR. REED:  I don't mind telling you.  I don't mind telling you because they are not dumb.  I am sure they figured it out.  I don't really care.  I want to know to lay the foundation for whatever it was, San Diego kicked him out of the program.  I don't care that it was another ATF office.  They still all work for the ATF.

THE COURT:  Yeah, I'm not -- I don't care about that

ER 1908

2575

either.  What I am trying to get down to is there's two issues, as I see it, and that is:  Is it exculpatory?  Is it a statement?  Is there some reason that the government was obligated to produce this before now?  I don't know that.  It doesn't sound like it.  But if it is, it is, and we need know that.

And then I'm trying to figure out what we can do to move the case forward efficiently without causing any problem for you.  And, I mean, it would be most efficient to be able to have all of this right now, ask him all the questions, and move on, but what I'm suggesting is, could we allow you to reserve the rest of your cross-examination, get that document, if possible, overnight, or how quickly we can get it, make him come back if necessary, but if the information comes back and you're satisfied, it doesn't matter, then what you have is an inference for the jury that is more valuable than nailing it down, isn't it?

MR. REED:  The problem is, I suspect that it goes to truth and veracity, which is what just about everything goes to for a witness like him.

THE COURT:  Right.

MR. REED:  And I don't know what -- I understand what you are asking me, but I tend to cross-examine thematically, so I'm a little concerned with ignoring that.

THE COURT:  I'm not asking you to ignore it.  Lay the

2576

foundation for it.  Because if you want to impeach him with extrinsic evidence, 613(b) says he has to have an opportunity to explain.

MR. REED:  Exactly.  And every defense attorney in the world, especially me or anybody else -- I mean, we do it, but we don't like to cross-examine without knowing what we're talking about.

THE COURT:  Uh-huh.

MR. REED:  And if I call him on it and he weasels out, and I call him on it and he kind of bobs and weaves and I can't pull him back because I don't have the document, I don't have what was said, and the government doesn't have it either, I don't like that at all.  In fact, I'm not even sure -- well, in Kenny Reed's world that's IAC, but I'm even sure that's IAC in this world, because a defense attorney's most effective tool is cross-examination.  And to give that up for something that isn't my fault, I mean absolutely zero my fault, is a problem for me.

THE COURT:  Well, I guess it would still kind of circle back to its IAC if there's something there.  If there's nothing there -- and we don't know that -- if there's nothing there, then it's not IAC because, if it's truly he just didn't check in, that's not even impeaching, it's -- is it?  I mean, I don't see how that could be impeachment.

MR. REED:  No.  In fact, just checking in is, you

2577

know, violating whatever rule they had, that he didn't -- you know, once he came to Jesus and said he was going to be a good boy, he still wasn't a good boy, maybe, but it's -- I mean, I can -- I'm fighting with myself because I don't know the answer, and that's the problem with giving you a coaching answer to your questions and your thing --

THE COURT:  Yeah.

MR. REED:  I do think, though, that I'm just not sure that the offended party needs to justify why we shouldn't go forward and --

THE COURT:  No, no, no.  I'm not expecting that, but I'm not quite sure you're offended either.  That's the trouble.  That's why I want to hear from both sides.

Ms. Stokman, I know that documents are produced.  Is there any way, anyone in your office who can contact that court, get that minute order, and resolve this?  Because I don't want an issue on appeal any more than anybody else does.

MS. STOKMAN:  No.  Neither does the government.  And, Judge, I've reached out to a DA in the San Diego office because they might have a quicker way to have access to that.  Usually the DA's office doesn't have to go through the hoops that other agencies do.  So I've asked for that to be gathered, if they're able to do that.  I just sent the email out now.

But the government's position is that we can proceed

2578

with cross. I think if the witness is asked, he either is going to tell what happened or he's not. And then we figure out if something is different, how we deal with it then. And there's potentially a stipulation the government would be willing to be -- to enter into if it's something different than what's testified to. But at this point, I think we -- we should proceed with him subject to recall and any other witness that defense thinks is appropriate in this regard to be able to be called.

THE COURT: Is there anyone in your office -- I guess what I'm thinking of maybe even Kim Sanchez, who could use her position to contact somebody in that office, to get that to happen. Because, you know, I know DAs, especially this time in the morning are not usually sitting at their desk. Usually they are in court doing something, which means we probably won't hear back for hours. So if we can get someone in that position to contact somebody in an equivalent position in the DA's office, that would be most effective.

MS. STOKMAN: Judge, I'll send an email.

THE COURT: All right. Who else can we do this morning without Mr. Rapinoe going first.

MS. FISHER-BYRIALSEN: Well, Your Honor, just so you know, Mr. Johnson and Mr. Clement's positions are that we filed a motion last night for a mistrial and dismissal.

THE COURT: Well, I looked at the docket this

2579

morning, I did not see that.  Let me pull it up.

What -- what's the basis?

MS. FISHER-BYRIALSEN:  Well, do you want to have a -- take a moment to read it?

THE COURT:  What's the -- oh, there it is.

As I understand, you're taking a position that there were -- that these additional payments should have been produced earlier.  Let me understand, was it unknown that Mr. Rapinoe was a paid informant?

MS. FISHER-BYRIALSEN:  Yes, to us.

MS. LUEM:  It was unknown.

MS. FISHER-BYRIALSEN:  And, Your Honor, I think part of --

THE COURT:  When he -- when he testified before the grand jury, did -- was that information not presented?

MS. FISHER-BYRIALSEN:  No, Your Honor.

MS. STOKMAN:  Judge, that was because he testified in the San Diego grand jury and wasn't yet a paid informant with ATF.

MS. FISHER-BYRIALSEN:  Your Honor, with all due respect to the government, it does not matter.

THE COURT:  Well, let's stick to the issue.

MS. FISHER-BYRIALSEN:  What matters here is that we have payment -- so if we had gone forward with cross-examine yesterday like they wanted, we wouldn't have gotten an email

2580

last night.

THE COURT:  I know.  I've already heard that.

MS. FISHER-BYRIALSEN:  Yes.  Well, so --

THE COURT:  Your motion doesn't raise that issue.  It raises the issue that you should have received these earlier.  And so that's what I want to talk about.  Mr. Reed has already made the point that you're making now.

MS. FISHER-BYRIALSEN:  I don't understand when you say my motion doesn't raise what issue.

THE COURT:  That had you gone forward yesterday, you wouldn't have been -- known this information.

MS. FISHER-BYRIALSEN:  It does.

THE COURT:  Well, but that's not really -- but you didn't.  So now we're here, let's hear argument based upon the factual circumstances now.

MS. FISHER-BYRIALSEN:  The argument is the government wanted us to go forward yesterday, and if we had gone forward they wouldn't have given us this because you have to take the misconduct in the context which it was in.

So if they had had us finish cross yesterday, we would have never ever been able to know that there was this -- there was -- this misconduct existed, and it includes payment reports that the agent in this case, his name is on them.  And so he knew this all along, and nobody thought to tell us that this is a paid informant who's getting paid, then we had to

ER 1914

2581

have a runaround to get that, as well as now we couldn't have the CI agreement, now we have it.

It's misconduct, Your Honor, and the only remedy that we are asking for is a mistrial.

THE COURT: All right. Any comments on behalf, Mr. Johnson?

MS. LUEM: Judge, I'd just like to reiterate the fact that we were, at no time, told that this was a paid informant. That came out during a direct examination. When I spoke to the Court yesterday about an issue that came up in a prior case, that's *United States v. Palafox* out of Nevada, and that case went to trial in 2019, 2020, I misspoke in part because we actually did receive, prior to trial, a very professional letter from the government outlining the benefits that each one of their cooperating witnesses received. We got that prior to the start of trial, so we were able to investigate that. The issue that came up mid trial was that they still, in fact, had the payment receipts, which we hadn't received, and those were then immediately produced to us.

What we have in this case, Judge, and what we've been dealing with since the inception of this case is ongoing violations of *Brady*, *Giglio*, *Jencks*, and a roll-out of discovery that should have been provided to us many, many months ago. We shouldn't be scrambling to send people down to the San Diego superior courthouse to pick up documents because

ER 1915

2582

they failed to disclose to us that this informant was being paid thousands and thousands of dollars and then violated his agreement somehow in a way that we don't really know.

So we are basically being sandbagged mid trial. The government is in court yesterday insisting that, no, their witness is not available, we must go forward, they can't understand why we would be even asking for these things, it's an outrage that we would request them.

This is a Sixth Amendment right, Judge, that we're dealing with here and we're being denied effective cross-examination of these witnesses. And, frankly, I don't know what we haven't received from the prior witnesses, what benefits they've received, because it's such a hide-the-ball situation happening here.

We have another witness coming forward, Rubin. And when I reviewed his statement last night, during one of the proffer sessions he agreed to provide handwritten notes to the agents. They sent an officer back to his cell to get those notes, those have never been provided to us.

So this isn't a fishing expedition, Judge. These are items of discovery that we need in order to effectively cross-examine witnesses that are known criminals, felons, liars, thieves, fraudsters. And -- and that's all right. This is the evidence against Mr. Johnson is coming from the mouths of -- of these witnesses, and we have a right to

2583

effective cross-examination.  We've been denied that this entire trial, and I don't see it stopping unless the Court puts an end to it.

THE COURT:  I see Mr. Rubin as a different issue because those documents were not within the possession of the government.  In fact, those were produced as a consequence of the subpoenas issued by the defense counsel in this case, conducted the in-camera review, and ordered the production of that document.

MS. LUEM:  I'm not talking about the autobiography, Judge.  I'm talking about notes that Mr. Rubin references that he kept --

THE COURT:  Where does he reference that?  I'm not following.

MS. LUEM:  It's during one of the debrief that -- proffer sessions with the government where he says, Oh, I wrote some notes about that.  That's back in my cell.

And then they say, Well, can -- Officer, can you go get his notebook out of the cell and bring it to us, because we'd like to see it.

I'm just giving you that as an example of something that we have not received that we should have received, including Officer Gonzalez's -- or Agent Gonzalez's notes from these debriefs, Judge, because these witnesses are contradicting themselves from the witness stand.  And I think

ER 1917

2584

those are all things that we're entitled to review prior to cross-examination.

We did receive a copy of that redacted autobiography, and I appreciate that. And I think we should get that for every one of these cooperating witnesses that went through that program.

THE COURT: So when I look at the email, the attachments to the email aren't there.

MS. FISHER-BYRIALSEN: Because they were --

THE COURT: Can -- can I finish?

So when I'm reading it, it looks like what it says is there were two additional payments, and I think you said yesterday there was one for $2,000.

MS. FISHER-BYRIALSEN: 2,200.

THE COURT: And now it's saying there was a $400 subsistence payment. And then there was, apparently, another payment of some amount to get to the total of $4,200.

The attachments, did that have all of those receipts or whatever they -- I mean, what -- what do the attachments look like?

MS. FISHER-BYRIALSEN: The attachment was the form that they were willing to show us yesterday, unsigned, the form -- the ATF CI form. Remember we got one -- a blank one yesterday because that was apparently all that was allowed, although the government represented that we could go see one,

2585

with some sort of person, up north.

We -- apparently those rules were no longer in effect at 6:00 p.m. last night, because we got the signed CI agreement for Mr. Rapinoe.  So that's one attachment.

THE COURT:  I haven't seen that, obviously.

MS. FISHER-BYRIALSEN:  The other attachment --

THE COURT:  Did that have any exculpatory information?

MS. FISHER-BYRIALSEN:  It has impeachment information and information we can ask him about.

THE COURT:  Let me -- let me stop.  Because the form I saw yesterday, is it the same form except now it's got the initials and the signature?

MS. FISHER-BYRIALSEN:  (Nods head.)

THE COURT:  Okay.  Now, what's the nature of the receipts that you received?

MS. FISHER-BYRIALSEN:  The receipt is for the $1,600 that makes up the difference from the 400 and the 2,200, also with Mr. Gonzalez's name on it.

THE COURT:  Okay.  Ms. Stokman, your comments?

MS. STOKMAN:  Yes.  On Friday, when the issue of the receipt came up, Agent Gonzalez went back to ATF and looked at the physical receipts that ATF had.  He had found the one receipt that we were able to produce on Friday night or Monday.  Whenever that was, we had gathered it Friday and put

ER 1919

2586

it through for discovery production.

Yesterday, when we were able to get access to the file, the $1,600 receipt popped up. That was not -- he had not seen that in the ATF physical receipts on Friday.

So as soon as we saw that, we, of course, gave that to counsel. The $400 receipt was not from Agent Gonzalez but from the San Diego ATF agent who was the handler that it was -- that Mr. Rapinoe was passed off to. That $400 receipt, we didn't, obviously, know about it. It had nothing to do with this investigation.

But we did provide that information. We -- on Friday there was a discussion here, as the Court recalls, about the fact that there were receipts for his, you know, informant. He had been a paid informant, and there were receipts for that.

Defense was on notice. We did provide those. The case that is cited in their motion is distinguishable here. In that case, the government failed to produce over 600 pages of documents, and the witness in that matter was unable to be recalled.

Here, it was an additional receipt, and they have that now, and this witness is still subject to cross-examination because that has not yet started.

It's the government's position that they absolutely have the opportunity now to cross-examine him on the fact that

2587

he was paid and that they have the receipts.  Because now that we've been able to see the file, that receipt was in there, and that was the totality of what he's been paid.

MS. FISHER-BYRIALSEN:  Your Honor, the overall --

THE COURT:  Let me -- let me ask my questions.

So I was told by Ms. Byrialsen or Ms. Luem that the receipts have Mr. Gonzalez's name on it.  I don't know what that means.  Was he cc'd on it?  Did he write the receipt?  What information did Agent Gonzalez have?

MS. STOKMAN:  Two of those receipts had his name on it.  The first one that was produced that he found on Friday -- because he actually was the handler of the informant when that -- when he was paid -- that $1,600 receipt also did because that was another payment that ATF Fresno made.

The $400 receipt did not come from Agent Gonzalez.  It was the San Diego agent.

And so the missed receipt was that $1,600 receipt, and we saw that once we got into the file yesterday.

THE COURT:  No.  What I'm trying to understand now is what notice Agent Gonzalez had about the payments.

MS. STOKMAN:  He was the one who signed the receipt when those payments were made to the witness back in June of 2022.

So Agent Gonzalez is the agent who signed over the two amounts of money.  And that's why his name is on those

2588

receipts, the 2,200 or the -- you know, the one that was produced that we found on Friday and then the one that was missed because it was in the -- in the file that we saw last night.

THE COURT: And this was within Agent Gonzalez's knowledge, obviously. If he was the one who's actually -- I don't know how it works, actually signing the receipt, actually getting the receipt. I don't know. But that's troubling to me because, I mean, I realize time has gone by, but it doesn't sound like it was all that difficult of a process to get into that file after all.

MS. STOKMAN: Judge, we -- I mean, there was a lot of -- Agent Gonzalez scrambled at every break yesterday to get in touch with -- the ATF counsel. And then after court ended, there were multiple calls that he had to make to get into that file. So, yes, in the end of the day, we did.

And, again, this is -- when he checked the receipts on Friday, it was not his recollection of how many times Mr. Rapinoe had been paid because he worked for ATF Fresno for a month.

And so, yes, this -- we missed this receipt, but we found it yesterday, it has been produced, and defense has known now since Friday at the very, I guess, earliest that this is a paid informant.

And so that information has been given over, and

2589

there still is an opportunity to cross-examine this witness. He is not unavailable, cross-examination has not concluded, it hasn't started yet, and so it's the government's position that, yes, this should have been caught and this was an error on our part for not knowing this; however, this is minimal in comparison to the *Chapman* case, and it's been given over prior to any cross-examination that's happening on this witness.

THE COURT:  Ms. Byrialsen, you had something else to add.

MS. FISHER-BYRIALSEN:  I mean, I think, Your Honor, what's most troubling to us sitting over here is that this is not the first time this happens in this case, and this makes it clear to us that the government does not understand their *Giglio* and *Kyle* obligations at all.  And so what else is out there in the universe that we haven't been given because they seem to think we have a duty to ask for things and find every single needle in the haystack to be able to effectively give our clients a defense that they deserve under the U.S. Constitution.

And so for the government to say today that, well, you know, they had it on Friday and we looked, and, oh, it's our bad, I just don't think that's sufficient, and that's why we're asking for the case be dismissed or, in the alternative, a mistrial.  Because, Your Honor, we're in a situation now where we have a witness whose already testified on direct and

ER 1923

2590

then, unlike any other witness in this case, now didn't get cross-examined. And the jurors are probably wondering why that's happening. I'm sure they are holding that against our clients. Then we are going to have to maybe do some cross-examination today and then some on another day or be responsible for recalling this witness that we did not cause this problem for. It is prejudicial to our clients, the whole optics of this, and a mistrial is the only remedy.

THE COURT: Well, I don't know. I mean, I've tried upwards of a hundred cases, and taking witnesses out of order happens all the time. I mean, I don't know if your experience is different from mine, but that happens all the time.

But the representation that you've made to me is somewhat just based upon what you think is in the jurors' minds, and I think that's not -- I don't think that there's anything to support that.

On the other hand, in looking at what ultimately we're talking about and that is, these receipts, and the -- well, let me ask again, Ms. Stokman, you said yesterday, and I didn't understand the context, that there was a documentation of some --

DEFENDANT CLEMENT: I just have to stand up. I'm sorry.

MS. FISHER-BYRIALSEN: He just needs to stand for a minute, Your Honor.

ER 1924

2591

THE COURT:  No, no, no.  It's fine.  I just thought if you need a break, we would stop and do that.

DEFENDANT CLEMENT:  I'm sorry.

THE COURT:  No, no, no.  It's fine.

So yesterday, Ms. Stokman, you made a comment that there was disclosure of a person being an informant and that, apparently, you could go through some steps and figure out who that was.  But I guess my question is, why was this so opaque to the defense that Mr. Rapinoe had been a paid informant?

MS. STOKMAN:  Judge, I'm not sure why it was.  I mean, we -- the information was given over.  There was no intent to hide anything.  We gave the reports over, we gave the recordings over, his rap sheet was handed over.  The grand jury testimony from Southern District was handed over.  There was some recorded conversations with ATF Agent Gonzalez that were made prior or, like, setting up his -- his informant status, and those were handed over.  We gave everything.  If there was -- if it was not known that he was a paid informant, then that is -- that was not the intention, to hide the ball on that, but that was something that did not come up until Friday.  And as soon as they asked for those receipts, we went to go grab them.

But none of that was an intentional, you know, attempt to hide, the fact that he was paid.  Generally, informants are paid or they are working off cases or both.

2592

THE COURT:  So what was -- what was produced, you're saying, is a recorded interview in which Agent Gonzalez was going through the informant contract and preliminary discussion or, is it, you know, this is the meeting where he was signed up as an informant?

MS. STOKMAN:  Sorry, Judge.  It was the meeting where he was signed up as an informant.  But apparently -- sorry -- the recordings -- the recordings were turned on because Mr. Clement was calling at that time and there was a recorded conversation.

But -- so I'm not sure if the actual contract in the discussion of that doesn't seem to be in that recording.  So that was my mistake, misspoke.

But all of that was turned over in the course of turning over the *Jencks* material for this witness.  The only thing that was not and, again, that's the government -- I understand and I, you know, this is -- we should have looked for those receipts and we -- that did not happen.  But they were given over and found as soon as that came up.

And, now, before cross-examination, it's known, at least since Friday, which now has been five days, that he was a paid informant.

THE COURT:  Let me go back.  You said you've given over this stuff, but as a person coming in, looking at this, not knowing he's an informant, what information is there that

2593

would say to me he's an informant, as opposed to just somebody who's, for whatever reason, going to testify?

MS. STOKMAN:  So the reports, as I indicated yesterday, when we produce discovery, we try to make them fit into folders that will identify either the crime that it relates to or the witness it relates to.  The file path in the spreadsheet that indicates what was being produced showed that this was Brian Rapinoe, and then it listed the documents under his name, which was this ROI that had the report that had the CI number in it, the recordings, his rap sheet, the recordings from that initial meeting, and the other -- the grand jury transcripts.

I mean, this was all under the file path of his name. He was on the witness list from the very beginning.  This -- there's not -- there was no indication that they were unaware of who this was, and so if that was the case, then the government just was not unaware of that, that there was a path that led to him being identified as the CI.  And there was no -- there was no reason to hide that information.  He was a witness on the government's witness list.

MS. LUEM:  Your Honor, may I respond?

THE COURT:  Yes.

MS. LUEM:  Your Honor, I've gone through this discovery pretty thoroughly, particularly with respect to Mr. Rapinoe and this issue.  There was -- there were two ROIs

2594

provided, which I sent to Your Honor's law clerk. The initial meeting with Agent Gonzalez was not recorded, there was no recording provided. The discussion is that Agent Gonzalez and a San Diego state detective were meeting with Mr. Rapinoe, referred to as CI number whatever in reference to his knowledge about Aryan Brotherhood activities, period. There's nothing in that ROI that suggests that he was going to be paid for cooperating with the government.

And a lot of these reports that we received throughout the case, various witnesses are referred to by their CI number. They are just given that to protect their identity. There's no correlation between the fact that he has a CI number and the fact that he's being paid. For example, another witness that the government chose not to call, Joseph Brunton, he's referred to by a CI number. He was never paid by the government.

So, sure, we can figure out pretty easily that CI number whatever it is is Brian Rapinoe, which we did, but there is no way for us to know that he's being paid for his cooperation and for these phone calls. We don't know -- we rely on the government to provide the information of the benefits that they are giving to witnesses. And immunity agreements, we didn't get that for Ms. Chandler, I think, until the day before she testified, but it sounds like it came late and was turned over, I guess, in time when it happened.

2595

So they are aware of their obligations, uh, to turn the benefits over.  And there was absolutely no way for us to know that he was being paid to make these phone calls.  And we don't know if he was working off a case, there's just -- and for us to simply speculate, I guess I could ask, you know, I would like to know every witness that's being paid, but then I think Your Honor's response would be, Ms. Luem, that's a fishing expedition, you can't just go fishing around for information that you don't know exists.  Well, there's nothing.

THE COURT:  No, I wouldn't say that, because, obviously, under Rule 16, you can make those types of requests to the government directly.  When you make them to me it's different, but yeah --

MS. LUEM:  And --

THE COURT:  -- you could have requested that, I get that.

MS. LUEM:  And we did from the very beginning, through discovery letters, through the government, through motions to the Court.  And now we're just being blindsided left and right, finding out benefits that people are receiving, that there's additional --

THE COURT:  Can I --

MS. LUEM:  -- proffers that were given that weren't turned over.  This is just an ongoing pattern from the

2596

government and its agent to not disclose what they know was relevant information.

There's -- I mean, Agent Gonzalez was this guy's handler, he knew he was getting paid, paid him thousands of dollars.  He wrote out the receipts and handed him the cash.  For them to not to tell us that is just inexcusable.

THE COURT:  When you say that there were reports provided and, you know, said, We're meeting with CI number whatever it was, are you saying that when they provided these reports, or when those reports were written, that the term "CI" was used in ways that were different than the term of art so that a CI -- somebody could be called a CI who was, in fact, not a CI, who was, in fact, a cooperator or was, you know, just a witness?  Was that term used strictly in the circumstance of a confidential informant?

MS. LUEM:  I think, yes, only when the -- the government was protecting the names of a lot of witnesses in this case for -- for reasons that the Court is aware.

And even beyond the *Jencks* production, some of the witnesses are still referred to by a CI number.  And we have to sort of figure out who it is.  And -- and we can do that; we're not idiots.  But that -- it didn't say, like, for example, an unpaid informant would be CI-123, and a paid informant, in this case Rapinoe, is CI-321.  I mean, there's no distinction from that number.

2597

THE COURT:  Right.  I guess I'm just trying to understand what exactly is known and what is not known.  So it sounds like you knew when somebody was a confidential informant, but what you didn't know was the benefits they were receiving a result of that role, whether it was being paid, whether they were, you know, seeking some reduction in sentence or something else.  That -- that's the nature --

MS. LUEM:  True.

THE COURT:  -- that's the nature of the dispute as I understand it now.

MS. LUEM:  And even in some cases, like with Mr. Brunton, he didn't receive any benefit.  He didn't want to talk to the government at all, he didn't want to be recorded by them, and I guess in an effort to protect his identity, they just put CI-blah, blah, blah, instead of his actual name.

THE COURT:  So this person you're referring to now did not provide confidential information?  They approached him and called him CI-whatever, but he didn't provide information?

MS. LUEM:  They approached him and tried to interview him about circumstances surrounding the Pomona murders.  He gave some information, but was not willing to cooperate with them beyond -- beyond that, and they referred to him as CI whatever number.

THE COURT:  Because he provide information that was confidential and giving him confidentiality?

2598

MS. LUEM:  I have no idea why they do it.  I guess it's just to protect his identity.

THE COURT:  All right.  But to your knowledge, he was receiving no benefit at all?

MS. LUEM:  Nope.  No benefits.

THE COURT:  All right.  Anyone else want to be heard on this issue?

MS. STOKMAN:  Judge, I just want to clarify that ATF never gave Mr. Brunton-Reale a CI number.  If that was listed somewhere else, then it was not an ATF.  He was never signed up as an informant.

MS. LUEM:  I didn't say that.  I said he's referred to in the reports as a CI number whatever.  He's not referred to in the pre-*Jencks* disclosures by his actual name, it's CI-something.  So I think we're getting off topic.  I was using that as an example of somebody else whose --

THE COURT:  I mean, it is off topic and it's not, because that if that term doesn't always apply to somebody who's a confidential informant -- and I guess they -- I mean, it's my understanding if you're going to call somebody a confidential informant and give them a number, they're signed up.

MS. STOKMAN:  Correct.  There's paperwork that's exactly like the one that we produced for Mr. Rapinoe.

THE COURT:  So somebody could be a confidential

ER 1932

2599

informant without a number, meaning they provided information confidentially but they are not signed up?

MS. STOKMAN: Correct.

THE COURT: Ms. Luem, is that your understanding as well?

MS. LUEM: I don't know. I'm a little bit confused by this now, because I -- frankly, I just -- I know that there's a lot of people referred to by CI, some kind of a number. Some of them are receiving benefits, some of them are not. I certainly didn't -- had no idea until he testified that Mr. Rapinoe was a paid informant.

THE COURT: Okay. Anything else from anyone on this topic?

MS. FISHER-BYRIALSEN: Your Honor, I would just like to add that the government's good or bad faith in doing this is not relevant to the due-process violation.

MS. LUEM: And, Judge, I just looked up the Brunton report and he's referenced as -- it says January 20, 2023, SA Gonzalez conducted an interview with CI-1 at the Avenal State Prison, so -- and that's a number.

MS. STOKMAN: That's not an informant number.

MS. LUEM: I'm not an ATF agent, I don't know that.

THE COURT: So CI-1 is not someone who signed up, but CI-12 is? How do you distinguish between who is signed up and who is not signed up?

2600

MS. STOKMAN:  Judge, anyone who is just speaking in the report is protecting their identity, they call a CI-1, but the other reports with actual confidential informants have a long number that references what their actual identification number is with that agency.

THE COURT:  So CI-1 is a generic term for anyone who gives confidential information when they're not signed up?

MS. STOKMAN:  Correct.

THE COURT:  Was that key to deciphering this provided to the --

MS. STOKMAN:  No.  And, Judge, I had no idea there was a confusion in this or that it was unknown who -- on the reports dealing with Mr. Rapinoe, that what was not -- they weren't aware of who he was.

Addition -- in the reports, they lay out the testimony that was given here about the contact with Mr. Clement during that drug transaction, and there were also those recorded conversations.  I'm not going to assume, but I'm -- you know, that once those were able to be discussed with defendants, they might have recognized the voice as well, but I -- the government had no idea that there was a confusion about who Mr. Rapinoe was or that he was an informant of some sort.

It sounds like the issue is that it was unknown that he was a paid informant.  And again, I'll just point to the

2601

fact that now it's been known for five days and he's still open to cross-examination.

THE COURT:  Anything else from anyone for the defense?

MS. FISHER-BYRIALSEN:  No.

THE COURT:  All right.  In looking at the issue, I mean, I'm just going to say right here, this is an issue for an appeal, for sure.  But when it comes down to it, when I look at the grounds for this, what we're talking about is that the receipts for how much this witness has been paid wasn't produced.  And what I haven't heard is -- I've heard a lot of argument about prejudice, but I haven't really heard nuts and bolts about where the prejudice lies.

It sounds like what you're saying is it's a violation and violation equals relief.  At this point, I'm going to deny the motion and the issue is preserved for purposes of appeal.

Now, moving to the issue of what to do with Mr. Rapinoe, I have to circle back to my question some time ago and that is:  Is there another witness we can do first?

MS. STOKMAN:  Yes.

THE COURT:  Is someone working on getting that minute order that I talked about?

MS. STOKMAN:  Yes, someone from my office and, hopefully, from the DA's office down there.

THE COURT:  All right.  So who is your next witness?

2602

MS. STOKMAN:  Daniel Rubin.

MS. LUEM:  And, Your Honor, before we call Mr. Rubin, I notified the government last night that we have an objection to an exhibit that they intend to introduce through Mr. Rubin. I don't know if the Court wants to take that up now or prior to the --

THE COURT:  Yeah, let's.  Which one is that?

MS. LUEM:  It's -- they informed us that they would be introducing Government's 1809 through Mr. Rubin.

THE COURT:  Is that audio or video?

MS. LUEM:  It's audio call between Mr. Johnson and Todd Morgan.  And there's two clips, I don't know if they intend to introduce both.

MS. DE SALES BARRETT:  We do, Your Honor.

MS. LUEM:  We're objecting to both.

MS. FISHER-BYRIALSEN:  Mr. Clement is just going to step back.  We can keep going, but he's just going to step back.

THE COURT:  Are you okay, sir?  Your face looks to be --

MS. FISHER-BYRIALSEN:  For a minute.

THE COURT:  -- discomfort.  Are you okay?  Do you need medical care?

DEFENDANT CLEMENT:  No.  I have a urinary tract infection.  They're not treating me and it's very painful.

2603

THE COURT:  Okay.  So you need to --

DEFENDANT CLEMENT:  I got to go use the restroom.

THE COURT:  Okay, sure.  And you -- it's okay for us to continue?

DEFENDANT CLEMENT:  Yeah, if you don't mind, please.

THE COURT:  Okay, yeah.

DEFENDANT CLEMENT:  I'm sorry, Your Honor.

THE COURT:  No, no, no.  It's perfectly fine.

I'm sorry, Mr. Luem, say it again.

MS. LUEM:  Thanks, Your Honor.  My first objection is foundation.

Mr. Rubin is not a party to this call.  If they're claiming that it's coconspirator statement, then my objection to 1809-1 is similar to the objection that Mr. Clement made on a -- on a previous exhibit that was introduced on a call. It's a 403 objection, Judge.

In the conversation, Mr. Morgan and Mr. Johnson start off by making some small talk, and Mr. Johnson asks Mr. Morgan whether or not he saw something in the news or got the article that he sent him about his people, some people that work for him, I believe, in the Santa Clarita area.  And I think -- I don't know if the Court has -- or sorry, Santa Maria.

He says -- Mr. Johnson says:

"Did you hear what happened over there with -- did you
    hear what happened there with my people over there,

ER 1937

2604

the ones that got busted?  Remember the ones that got busted, I sent you that.  I sent you a picture of that fucking, uh --"

And Morgan says, "Yeah, yeah, yeah."

And then Mr. Johnson says:

"Well, they, uh, busted him for murder, uh, a dismembered body on the golf course a couple years ago.  You know what I'm talking about?"

And Mr. Morgan says, "Yeah.  Fuck, yeah."

And Mr. Johnson says, "Huh?"

And then Mr. Morgan says, "Yeah.  Anyway --"

"And then Mr. Morgan says, "Somebody got smoked today."

So it's that initial portion that we're objecting to, Judge.  That has absolutely nothing to do with this case whatsoever.  That's a totally separate homicide that doesn't involve Mr. Johnson.  He was never charged.  He was never investigated.

Mr. Gonzalez, on the other hand, does know about that homicide and was there when those two individuals that committed that murder were arrested and raided their homes, and he's conducted follow-up interviews with people regarding that homicide.

It was not done on behalf of the AB.  It was not done at Mr. Johnson's direction.  In fact, it was a female by the

2605

name of Kim Machleit, who's now serving life in prison for that murder after having gone to trial and ran a self-defense claim.  She shot and killed an AB associate named Joey Govey in her home after Mr. Govey attacked either her or her boyfriend, Mr. Donald Anderson.

And after shooting Mr. Govey, Mr. Anderson and two other individuals apparently dismembered his body, took it to a golf course where one of the codefendants work, sunk the body into a lake there, and then for several years the body remained undetected.  At some point it floated up.  Somebody found it, and then ultimately charged Kim Machleit with that murder.

It has absolutely nothing to do with the enterprise, has nothing to do with RICO, and its prejudicial impact far outweighs any probative value.  And it just would cause confusion, the fact that Mr. Johnson is talking about his people and dismembered bodies.  And we'd ask it be stricken from that transcript and redacted and not played for the jury.

THE COURT:  Whose witness is Mr. Rubin?

MS. STOKMAN:  I'm handling him.

That portion -- we can absolutely move past that.  It was -- there's a part after that that it goes into, but if we can just do it silently and pause it and then go from there.

THE COURT:  All right.  So that motion is granted.

MS. LUEM:  With respect to 1809, too, Judge, again

2606

this is a 403 argument.  At the end of the conversation with Mr. Morgan, Mr. Johnson is asking Mr. Morgan to please download Signal on his phone because the sound is a lot clearer and they can talk with more clarity.  And at the very end, Mr. Johnson says something to the effect of "Finn" -- Finn McCool."

I don't know if the Court remembers from Mr. Field's testimony, but he was very clear that when he was communicating during the night of the Pomona murders, he was talking to somebody on Signal called Finn McCool.  I think this presents a danger of confusion for the jury because Mr. Johnson was not involved with or did he participate or is he charged with the Pomona homicides.

So I think that introducing that is irrelevant, for one; I think there's no foundation for it; and I think it's certainly going to cause confusion for the jury if they are led to believe that somehow the Finn McCool that's being discussed on this call with Todd Morgan years prior to the Pomona homicides is the same Finn McCool that is discussed later in this case.

And I will note for the record, Judge, that Finn McCool is like a famous Irish folklore figure who's pretty well-known.  He's some sort of, I guess, he-man type -- type of a person.

So I think that the risk of confusion to the jury is

2607

certainly there, and so I'd ask that that be removed as well.

THE COURT:  I'm sorry.  Go ahead, Ms. Stokman.

MS. STOKMAN:  Judge, the discussion of the use of Signal is important, as has been discussed in this case multiple times.  And actually, during the conversation, Morgan indicates to Defendant Johnson that he lost both Johnson's number and Clement's number.  Johnson gives him a number for Signal, and then when he says "Finn McCool," he says "my homeboy."

So it does not indicate that it's him that he's speaking about, but, like, you know, presumably a friend or homeboy, which we've seen evidence in this case has been related to -- the only person who's used that handle has been Defendant Clement.

MS. LUEM:  And I guess I'd have to listen to it again, because the way I heard it "my homeboy" didn't -- wasn't modifying -- it was more like "my man" or, you know, Finn McCool, you know, bro.  Like, not, My homeboy's Signal handle is Finn McCool.

THE COURT:  What is the significance of this evidence, just to show that Mr. Morgan signed up for Signal or that Mr. Johnson knew about Signal --

MS. STOKMAN:  That Signal is something that is being used, and it's being discussed over a wiretap call that is not -- or the defendants and coconspirators are not aware that

2608

law enforcement's listening in.

MS. LUEM:  I think it's cumulative in that sense, Judge.  It's come up time and time again.  And frankly, what Mr. Johnson says is, Hey, use Signal so we can avoid detection from law enforcement.  He says, use Signal because it's got better quality, and I can hear you better.

THE COURT:  What -- can we just have that pulled up and let me hear it real quick, just that portion related to Signal app?

(Audio played in open court.)

THE COURT:  All right.  Any comments, Ms. Luem, now that you've heard it again?

MS. LUEM:  Yeah, Judge.  I just don't think it says what they say it says.  And I think that last part is confusing that -- who he's referring to, either as Mr. Morgan as my homeboy or somebody else is his homeboy.  It's not necessary.

If they want to include the lead-up part about Signal and losing the phones or whatever, I don't have any objection to that.  It's just this moniker handle, Finn McCool, it's very unclear who he's referencing there.

THE COURT:  Ms. Stokman, final comments?

MS. STOKMAN:  No, Judge.  I'll rely on the comments I made earlier.

THE COURT:  All right.  I'm going to overrule that

2609

objection.  It does tie directly into the testimony of other witnesses about who Finn McCool is in that use.

All right.  One other thing, then, is Juror 82, seated in Chair 9, apparently has brought up a concern and wants to have an updated time frame because they are -- that juror is having difficulty with car troubles.  And I think it may be something similar to what we heard yesterday, and that is.  They could make short-term arrangements but is concerned for the long term.

Obviously, we've delayed quite a bit today.  Are we still thinking we're going to be completed by next week?

MS. FISHER-BYRIALSEN:  Yes.

MS. STOKMAN:  Yes.

THE COURT:  All right.  Then I'm going to go -- when the jury comes back in, I'm going to tell them that.  As we know, jurors do not like to be misled on that topic.  They like it when it's shorter; they do not like it when it's longer.

So I -- I'll take the heat if I need to.  I'll tell them that it was some sort of court problem, but I don't really want to have to do that for any of us if that's not realistic.

MS. FISHER-BYRIALSEN:  I mean, it's realistic on our part, Your Honor, but, I mean, a lot of this depends on the government, not on us.  So --

ER 1943

2610

THE COURT:  All right.

MS. STOKMAN:  Judge, I'll just make a comment.  If we can get Mr. Rapinoe back on the stand today, then that would obviously speed things up.  If not, we might have to wait to get him back on Tuesday, because of his obligations that he already was rearranging.  But if he's on the stand today, we anticipate being finished with our witnesses by the end of tomorrow or very early on Friday.

THE COURT:  If -- well, I guess I have no control over that, because I'm not going to force them to cross-examine Mr. Rapinoe without that document.

And so the more pressure you-all can bring to get that, then that will determine that.

All right.  So at this point, let's go ahead and bring in the jury.

While we're still waiting, can I ask the marshals to please inquire as to Mr. Clement's treatment?  It seems like he should be able to get some sort of medication that would relieve his pain and allow him still to concentrate.  I know there's definitely treatment available for him.

MS. FISHER-BYRIALSEN:  Just to let the Court know, we have been emailing both Wellpath, who is the service provider for the Fresno Jail, as well.  And although they used to respond to us, we have not heard back in the last three weeks in regards to these urinary tract infections and also,

2611

frankly, treatment for both Mr. Johnson and Mr. Clement when Your Honor saw them sick last week. So we are --

THE COURT: Right.

MS. FISHER-BYRIALSEN: We are trying.

THE COURT: Right. So I figure it will be more effective coming from the marshal.

DEFENDANT CLEMENT: I filed -- I'm sorry, Your Honor.

THE COURT: You've sought a grievance?

DEFENDANT CLEMENT: Grievances, everything. They will not respond. Every day I have to struggle with them just to get my medical equipment. They don't want to give it to me.

THE COURT: All right.

DEFENDANT CLEMENT: I don't know why. They are not telling nobody nothing.

THE COURT: Okay.

DEFENDANT CLEMENT: It's been two weeks. It's in my kidneys and everything. I'm like, Come on, man.

THE COURT: Okay.

(Jury enters the courtroom at 9:14 a.m.)

THE COURT: All right. Ladies and gentlemen, thank you so much for your patience this morning. I do have news for you.

The bad news is, of course, I apologize for keeping you waiting. The good news is, I keep saying we're more ahead

2612

of schedule than we thought.  When you were brought in, we told you it was going to be up to three months.  Turns out we're probably going to be finished by the end of next week.

It could be -- before you book any hotel plans, vacation plans, it could go into the following week, but at this time, our best estimate is the end of next week.  Okay?

I know that some people may have some arrangements you've had to make to make this work, and I certainly appreciate it.  And I know there is one juror in particular who's got some transportation issues.  If there is an issue that we need to discuss, let me know that.  Otherwise, with that additional information, I'm hoping that that will resolve whatever concerns are out there.

All right.  So let's go ahead and call the next witness, please.

MS. STOKMAN:  The government calls Daniel Rubin.

THE CLERK:  Mr. Rubin, please raise your right hand.

**DANIEL RUBIN**,

called as a witness on behalf of the Government, having been first duly sworn, testified as follows:

THE WITNESS:  Yes, ma'am.

THE CLERK:  Go ahead and have a seat.  And then please state your full name for the record, and spell your last name.

THE WITNESS:  My name is -- excuse me --

2613

Daniel Christopher Rubin.

THE CLERK:  Thank you.

MS. STOKMAN:  And your last name is spelled R-u-b-i-n?

THE WITNESS:  Yes, ma'am.

DIRECT EXAMINATION

BY MS. STOKMAN:

Q.  Okay.  Good morning.

Can you tell us the area where you grew up?

A.  Los Angeles, California.

Q.  And how long did you live in the Los Angeles area?

A.  Uh, until recently.

Q.  Were you a part of any criminal street gang at any point in your life?

A.  Yes, ma'am.

Q.  What street gang?

A.  It's a white pride gang out of Palmdale.

Q.  Out of Palmdale?

A.  Uh-huh.

Q.  How old were you when you joined that gang?

A.  Thirteen.

Q.  Have you been to prison as an adult?

A.  Several times.

Q.  And how old were you the first time that you were incarcerated?

2614

A.    12, 13.

Q.    And was that for a juvenile crime?

A.    Yes, ma'am.

Q.    When were you first incarcerated as an adult?

A.    Eighteen.

Q.    What was that crime for?

A.    Assault with a firearm.

Q.    And was that a felony conviction for assault with a firearm on a person?

A.    Yes, ma'am.

Q.    Do you also have felony convictions for possessing controlled substances?

A.    Yes, ma'am.

Q.    And possessing firearms by a felon?

A.    Yes, ma'am.

Q.    Okay.  Do you know the Aryan Brotherhood?

A.    Yes, ma'am.

Q.    How do you know it?

A.    Because I was a part of it.

Q.    What is the Aryan Brotherhood?

A.    The white prison gang.

Q.    So you said you were a part of it.  Have you been an associate of the Aryan Brotherhood or the AB?

A.    Yes, ma'am.

Q.    Have you ever been up for membership to become a made

2615

member?

A.  Yes, ma'am.

Q.  At any point in time when you were in prison, did you interact personally with AB members?

A.  Yes, ma'am.

Q.  And did you have discussions with those made members about the Aryan Brotherhood and what it was about?

A.  Yes, ma'am.

Q.  When you're in prison -- let me ask you this:  You were part of the criminal street gang at a very young age.  Were you still an active gang member when you first went to prison?

A.  Yes, ma'am.

Q.  Did that affect where you were placed when you went to prison?

A.  No.

Q.  What do you mean by that?

A.  They put -- when you go to the -- I'm from Los Angeles County.  When you get arrested, they put you in with everybody, no matter what you are in for.

Q.  Did it matter if you were an active gang member?

A.  Yes.  For protection reasons.

Q.  Okay.  Did you, when you went to prison, starting the first time, did you have to follow certain rules when you were in prison?

A.  Of course.  Yes, ma'am.

2616

Q.   Whose rules were those?

A.   The ABs.

Q.   Did that continue throughout your time in prison?

A.   Yes, ma'am.

Q.   And just tell us, about how many years in your life have you spent incarcerated?

A.   18.

Q.   So during your time in prison and speaking with AB members, were you able to learn of the structure of the AB?

A.   Yes, ma'am.

Q.   Can you tell us about that structure?

A.   The structure of the AB, there's members and then there's a three-man commission.

Q.   And what is the three-man commission comprised of?

A.   Senior members to settle internal disputes.

Q.   And are those made members?

A.   Yes, ma'am.

Q.   So are there other terms for made AB members?

A.   Yeah.

Q.   What do you -- what terms do you use for them?

A.   "Brother," "Big Homie."

Q.   Have you ever heard of the term "the brand"?

A.   Yes, ma'am.

Q.   What does that refer to?

A.   It's a slang for the AB.

DX Rubin S

2617

Q.   And what about "the tip"?

A.   Same thing.

Q.   It refers to the AB?

A.   Yes, ma'am.

Q.   Okay.  During your time in prison, were you -- did you ever share a cell with an AB brother?

A.   Yes.

Q.   Once or more than once?

A.   More than once.

Q.   How many times?

A.   Four or five.

Q.   And in your time in prison, have you also interacted with other AB associates who were up for membership?

A.   Yes, ma'am.

Q.   Do you know an individual named John Stinson?

A.   Yes, ma'am.

Q.   How do you know him?

A.   Through -- he was a cellie of mine.  He's a senior of AB member Danny Troxell.

Q.   Say that again?

A.   Danny Troxell.

Q.   Who is Danny Troxell?

A.   A senior AB member.

Q.   Okay.  So tell us how does he relate to -- oh, you knew John Stinson through Troxell, you said?

DX Rubin S

2618

A.  Yes, yes, ma'am.

Q.  Sorry.  I heard that wrong.

And tell us, just generally, what you mean by that?

A.  Basically, Danny, he didn't use cell phones and he was very skittish and he was paranoid, so I communicated to everyone for him.

Q.  And so during the course of sharing a cell with Danny, that's when you communicated with John Stinson?

A.  Yes, ma'am.

Q.  And did that communication end there or did it continue throughout your time in prison?

A.  Continued.

Q.  And do you know -- actually, sorry.  Let me ask you this: When you were communicating with John Stinson, you said you were in prison using a phone.  Did you know if he was incarcerated?

A.  Yes, ma'am.

Q.  And was he?

A.  Yes, ma'am.

Q.  Okay.  Do you know an individual named Kenneth Johnson?

A.  Yes, ma'am.

Q.  And how do you know him?

A.  Same way.

Q.  Does he -- sorry.  Say -- same way as far as -- explain that to us.

DX Robin S

2619

A.   I communicated with him through -- for Danny Troxell.

Q.   And when you communicated with Mr. Johnson, do you know if he was incarcerated?

A.   Yes, ma'am.

Q.   And was he?

A.   Yes, ma'am.

Q.   Does he go by any nicknames?

A.   Yes, ma'am.

Q.   What is that?

A.   Kenwood.

Q.   Does he have any affiliation with the AB?

A.   Yes, ma'am.

Q.   What is that?

A.   He's a made member.

Q.   What about an individual named Francis Clement, do you know him?

A.   Yes, ma'am.

Q.   How do you know him?

A.   Through Danny.

Q.   Through Danny Troxell?

A.   Yeah.

Q.   And did you ever communicate with Mr. Clement?

A.   Yes.

Q.   And in what means would you use to communicate with him?

A.   Contraband cell phones.

2620

Q.   Do you know if he was incarcerated during your communication time?

A.   Yes, ma'am.

Q.   Was he?

A.   Yes, ma'am.

Q.   Does he go by any nickname?

A.   Big Frank.

Q.   Do you know what Frank's affiliation is with the AB, if any?

A.   Yes, he's a made member.

Q.   Okay.  What time frame was it that you were communicating with John Stinson?

A.   From 2017 until I dropped out in '23.

Q.   And what time frame were you communicating with Kenneth Johnson?

A.   Uh, the '17 through, like, through '20, around there, like --

Q.   Sorry.  I didn't mean to cut you off.

A.   I didn't -- I didn't continue communication with him.

Q.   What about communication with Francis Clement?

A.   On and off, yeah.

Q.   Same time frame?

A.   No.  It was up until recent.

Q.   Okay.

A.   Yeah.

DX Robin S

2621

Q.   Do you know what conference calls are?

A.   Yes, ma'am.

Q.   Can you tell us what that means?

A.   Conference calls is when, say, if a matter needs to be discussed, we all set up a time and we -- a conference call is like a three-ways, three-way calls, and if multiple people do it, the more people you could bundle together.

Q.   On the same call?

A.   Patch in, yes.

Q.   And so when you were involved with the AB, did you ever engage in conference calls?

A.   Yes, ma'am.

Q.   Did you engage in those calls with AB brothers?

A.   Yes, ma'am.

Q.   Would often those calls involve multiple AB brothers?

A.   Yes.

Q.   And also did you engage in calls where associates were -- AB associates were also involved?

A.   Yes.

Q.   You said you were up for membership.  Generally, how does one become a made member?

A.   It's an invitation only.  You can't ask, you have to be a standout.  You have to be very respected and you have to be asked to.

Q.   And what does -- what does that mean, to be a standout?

DX Rubin S

2622

A.   That means you -- you have to have a very good reputation. You have to be an earner, dangerous, and follow directions.

Q.   An earner of money?

A.   Yes.

Q.   And do you know what sponsors are?

A.   Yes, ma'am.

Q.   Can you explain what that is?

A.   A sponsor is a -- you have to have a -- you have to have two sponsors to get in.  I mean, one person could, like sponsor you, but they need a second to put you up all the way. And to be put up, your name has to be circulated.

Q.   Circulated through what?

A.   Through every brother.  If anyone says, Maybe, it's no.

Q.   So if any brother says, Uh, maybe or no, you can't become a member?

A.   It has to be unanimous.

Q.   Okay.  Who were your sponsors?

A.   Danny Troxell, Dale Bretches, and John Stinson.

Q.   So you mentioned that you had access to contraband cell phones in prison.  What were those phones used for?

A.   Business, conduct business, for the most part.

Q.   Whose business?

A.   The AB business.

Q.   And what type of business does that entail?

A.   Running crews on the street, drugs.  Communication with --

ER 1956

DX - Rubin S

2623

with other brothers is paramount.

Q.  Why is it paramount?

A.  Because the information, staying informed is big.  You have to be ahead of everything.

Q.  So what would happen without a phone as far as your ability to know what was going on within the AB itself?

A.  I mean, you wouldn't be -- if you're not in communication, everything is pretty much hearsay.

Q.  And why is that important?

A.  To know exactly what's going on in prison.

Q.  Yeah.

A.  It's a popularity contest with very dangerous people, so --

Q.  Are there ever times when conversations about individuals who might be an issue within the AB occur over the cell phones?

A.  Yes, ma'am.

Q.  And is that an important reason to have a cell phone?

A.  Yes.

Q.  Why is that?

A.  Discretion.

Q.  What do you mean?

A.  Being able to handle things behind the scenes.

Q.  And when you say "handle," what types -- what do you mean by that?

A.   Money, murder, whatever.

Q.   Okay.  Have you heard the term "put in work"?

A.   Yes, ma'am.

Q.   What does that mean?

A.   Stabbing, beating, making money.

Q.   And what is the purpose for putting in work, as it relates to the AB?

A.   To earn your reputation and show you're -- you belong.

Q.   Did you ever put in work for the AB?

A.   Yes, ma'am.

Q.   What types of things?

A.   Stabbings and beatings.  Money.

Q.   You made money?

A.   Yes, ma'am.

Q.   What types of things were you doing to make money?

A.   Selling narcotics.  And I got a piece of everything that was -- I got a piece of everything from anyone that was under me.

Q.   And we'll get to that in a second, the people who are under you.

     But you said you made money with drug sales.  Was that inside or outside of the prison?

A.   Both.

Q.   And did you ever make money based upon fraudulent activity?

DX - Robin S

2625

A.   Yes, ma'am.

Q.   When you were making money, both inside and outside of the prison, were you keeping all of the profits of that?

A.   No, ma'am.

Q.   What were you doing with some of those profits?

A.   I was -- I was kicking it upstairs to my sponsors.

Q.   To the sponsors that you mentioned, including John Stinson?

A.   Sometimes, mostly Dale and Danny.

Q.   Okay.  And at some point did some of that money go to John Stinson too?

A.   Yes, ma'am.

Q.   How much money were you kicking up of the proceeds you were making?

A.   You -- they're entitled to a third, but I give -- I split it in half.

Q.   Does that percentage -- is that percentage that you're giving to AB brothers ever dictated by whether or not they are personally involved in that venture?

A.   I mean, it depends.  If you're -- if you conduct any business on a prison yard, the Aryan Brotherhood is entitled to a third of whatever you have.  No questions asked.

Q.   And is there -- are there times when you're conducting business where other AB brothers are also part of that -- that venture?

DX Robin S

2626

A.  Yes, ma'am.

Q.  And does that change the amount of money that goes up to them?

A.  I mean, if there's -- if there's multiple people involved, there would be -- there would be splits, yes.

Q.  Okay.  Have you ever, during the course of your time putting in work for the AB, put the profits of criminal ventures into other criminal ventures?

A.  Every time.

Q.  And can you tell us the ways you would do that?

A.  Uh, you take the proceeds from -- say, I took the proceeds from the drugs I was selling on my yard, purchased a large amount of drugs on the street and send it out of state to double my money.

Q.  Did you ever use that money to purchase drones?

A.  Yes.

Q.  And what were you using drones for?

A.  Drops in prison.

Q.  Would that money ever go into -- or, actually, let me ask you this:  How much is the highest amount of money you've paid in order to facilitate a drone being used for that drop?

A.  The drone itself was roughly 4,500, but the jail break, because restricted air space, that -- that's what cost the most.  That was about 7,500.

Q.  Okay.  Did you ever use money from profits of those

2627

ventures to buy cell phones?

A.  Oh, yeah.

Q.  And was that purchasing them in or outside of prison?

A.  In prison.

Q.  About how much would you pay for cell phones?

A.  $5,000.

Q.  Did that change at times?

A.  It did.

Q.  That was the highest amount you paid?

A.  No.

Q.  What are the ranges of the amounts?

A.  The most that I've ever personally paid for a cell phone
is 8,500.  That was during the pandemic.

Q.  Like around 2020?

A.  2020.

Q.  Have you ever done work for the AB outside of prison
yourself?

A.  Outside of prison?

Q.  Uh-huh.

A.  Not on the -- yeah, I mean, on their behalf, but not,
like, murder or nothing like that.

Q.  No.  But have you made money or --

A.  Oh, yeah, for sure.

Q.  Okay.  And how does the AB affect criminals on the street?

A.  Control them.

2628

Q. Tell us about that.

A. Well, any -- any white man that's doing -- involved in crime on the street, narcotics, whatever, they -- if they are not with anybody, they're subject to be ripped off or persuaded to come in the fold.

Q. Uh, what do you mean by "persuaded to come in the fold"?

A. To pay.

Q. To pay part of their profits?

A. For protection, yeah.

Q. Okay. Who was the first made member that you ever shared a cell with?

A. Travis Burhop.

Q. And you said that you shared a cell with Danny Troxell. When was that? Was that --

A. Different times. Once was in 2016, and -- and that was at Lancaster. And then again in New Folsom in '22 to '23.

Q. And during the course of the time that you were in cells with AB members or in the prison system, did you learn about the rules or codes of conduct of the AB?

A. Yes, ma'am.

Q. What is the AB's policy on cooperating or speaking to law enforcement?

        MS. LUEM: Objection. Cumulative.

        THE COURT: Overruled.

///

2629

BY MS. STOKMAN:

Q.   You can answer.

A.   It's a death sentence.

Q.   I'm sorry, what?  A death sentence?

A.   Yes, ma'am.

Q.   And what is the AB's policy on lying to made members?

A.   Also a death sentence.

Q.   What is the AB's policy on disrespecting made members?

A.   It doesn't happen.  And if you do, you'll most likely die.

Q.   What happens if an order is -- from the AB is disobeyed?

A.   It's bad.

Q.   Is that -- what is the result -- what can it range from?

A.   From a beating to a murder.

Q.   Have you learned, in the course of your time in prison and speaking with AB members and associates, if any symbols are used to represent the AB?

A.   For sure.

Q.   And what are those?

A.   Shamrock, the three-leaf shamrock.  And a triple 6, 666.

Q.   And can anyone display those symbols?

A.   No.

Q.   What -- who is supposed to be able to display those only?

A.   Made members.

Q.   What happens if someone displays such a symbol and it's not a made member?

DX - Rubin S

2630

A.   They will be faced with a choice.

Q.   What's that choice?

A.   Cover it or get it burned off or just get it -- probably
get killed.

Q.   In your experience, does every made member have such a
tattoo or display of that symbol?

A.   No.

Q.   They don't?

A.   Not everyone, no.

Q.   Have you ever run a prison yard?

A.   Yes, ma'am.

Q.   Where did you run a prison yard?

A.   Lancaster, New Folsom, Calipatria.

Q.   So multiple yards?

A.   Yes, ma'am.

Q.   And when you were put in charge of those yards, who told
you that you were to run those?

A.   An AB member.

Q.   What were the expectations of you when you were running
those yards?

A.   To maintain order and keep the money flowing.

Q.   And how were you maintaining order?

A.   It's -- for the white population in prison, it's --
it's -- it's a very bold line that -- that you don't cross.
You don't cross lines and you don't disobey rules.

DX Robin S

2631

MS. DE SALES BARRETT:  Objection, Your Honor.  It's not responsive.

THE COURT:  Sustained.

MS. DE SALES BARRETT:  Move to strike, Your Honor.

THE COURT:  It will be stricken.

BY MS. STOKMAN:

Q.  So when you say, as far as those expectations, what was your role particularly in regard to other white inmates in your yard?

A.  I oversaw them.

Q.  And did you pass on orders to those individuals?

A.  Every day.

MS. DE SALES BARRETT:  Objection, Your Honor.  Leading.

THE COURT:  Overruled.

BY MS. STOKMAN:

Q.  Who makes those rules?

A.  The Aryan Brotherhood.

Q.  Did you run a yard before or after you were up for membership?

A.  Before.

Q.  Did you also run a yard after?

A.  Yes, ma'am.

Q.  Okay.  And did you notice a change in how other white inmates treated you once you were up for membership?

DX Rubin S

2632

A.   Yes, ma'am.

Q.   What was that?

A.   Complete and total respect.

Q.   Did you notice a change in how other AB brothers treated you once you were up for membership?

A.   Yes, ma'am.

Q.   And what was that?

A.   One of their own.

Q.   What were the expectations on you when you were up for membership?

A.   To perform.

Q.   What does that mean?

A.   That means maintain your reputation, no drug debts, and continue making money.

Q.   How does one maintain their reputation in that position?

A.   By keeping -- keeping a good -- keeping a good head, having your people in line, and making money.

Q.   Was there any expectation to commit violence?

A.   Yeah.  When -- when -- when times came, yeah.

Q.   Uh, did you want to be up for membership?

A.   Yes, ma'am.

Q.   Why?

A.   I -- it was -- it was attractive, and I looked up to the -- to the older guys, big time.

Q.   Do you know an individual named Andrew Collins?

DX Robin S

2633

A.   Yes, ma'am.

Q.   And who is that?

A.   Misfit.

Q.   That's his nickname?

A.   Yeah.

Q.   Does he have any affiliation with the AB?

A.   Yes, ma'am.

Q.   And what is that?

A.   He's a made member.

Q.   Around when did he become a made member?

A.   August 2nd, '19 -- 2019.

Q.   2019?

A.   (Nods head.)

Q.   Have you ever shared a cell with Misfit?

A.   Several of them, yeah.

Q.   Have you shared a cell with him before or after he was a made member?

A.   Both.

Q.   Do you -- in the course of sharing a cell with him, did you have discussions with him about his being up for membership at any point?

A.   Yes, ma'am.

Q.   And in those discussions, did he tell you who his sponsors were?

A.   Yes, ma'am.

DX - Robin S

2634

Q.   And who were they?

A.   John Stinson and Pat Brady.

Q.   So when you were celled with Misfit before he became a brother, where -- what prison was that in?

A.   Lancaster.

Q.   Did there come a point in time where you were celled with him in another prison?

A.   Yes, ma'am.

Q.   And where was that?

A.   Donovan.

Q.   At that point, had he become a member yet?

A.   Yes, ma'am.

Q.   Okay.  And when were you sharing a cell with him around that time in Donovan?

A.   It was early '20.

Q.   2020?

A.   Yes, ma'am.

Q.   When you shared a cell with Misfit, did he ever speak with John Stinson?

A.   Yes, ma'am.

Q.   And how did you know that he was speaking with John Stinson?

A.   Because I also spoke to him.

Q.   Was it, like, on a speakerphone?

A.   Most of the time, yeah.

DX Rubin S

2635

Q. And about how often around that time did Misfit speak with John Stinson?

A. Every day.

Q. And how often did you speak with John Stinson?

A. A couple times a week, probably.

Q. Around the time where you were sharing a cell with Misfit when he was a member, was there an instance when drugs were found in the cell?

A. Yes, ma'am.

Q. And who did the drugs belong to?

A. Misfit.

Q. Who took the blame for those drugs?

A. I did.

Q. And why did you do that?

A. Because he had just got made.

Q. And so what's the significance of that?

A. Significance was I was going to take it because I had ambitions, too, so I was going to take one for the team and be rewarded for it.

Q. Is there a significance to what happens if an AB member is caught with something in their cell?

A. Yeah.  It -- most -- most brothers have -- have cellies in that capacity just to take the blame for certain things.

Q. Why?

A. So they don't lose their visits or get jammed up in any

DX Robin S

2636

way.

Q.  So after you took the blame for those drugs, did you speak with John Stinson about that?

A.  Yeah, when I -- when I got to New Folsom.

Q.  And did he say anything to you about what you did?

A.  They were all proud of me, yeah.

Q.  Okay.  And John told you that?

A.  Yeah.

Q.  Did you notice at that time whether you were treated differently by any of the brothers after that?

A.  I've -- I had known them for years at this point, so it was -- we were fairly close.

Q.  Okay.  So you said that at this time or soon after that you went to New Folsom; is that correct?

A.  Yeah.  When I finished my SHU term, yeah.

Q.  And were you running a yard at any point while you were at New Folsom?

A.  Yes, ma'am.  Not right away, though.

Q.  Okay.  But at some point later?

A.  When Bobby Stockton went to the hole, yes.

Q.  What's "the hole"?

A.  Ad seg.

Q.  So is that like a separation from other --

A.  Administration segregation is where you go when you -- you get in trouble.

DX Robin S

2637

Q.   Around the time that you were running a yard in New Folsom, did you know who was part of the three-man council?

A.   Yes, ma'am.

Q.   Who was it?

A.   It was Dave Chance, John Stinson, and Chunky.

Q.   Chunky is another AB brother?

A.   Yes, ma'am.

Q.   And how did you form that conclusion?

A.   Because I dealt directly with John.

Q.   And he spoke of it in conversation?

A.   It's not a -- it wasn't a secret.  Only if you're in the circle, you know.

MR. REED:  Objection.  Nonresponsive answer to her question.

THE COURT:  Sustained.

MR. REED:  Move to strike the answer.

THE COURT:  That will be stricken.

BY MS. STOKMAN:

Q.   Around 2020, where were you housed?

A.   Uh, I got to New Folsom February 27th of 2020.

Q.   Okay.  And did you have contact with AB brothers besides John Stinson at that time?

A.   Yes, ma'am.

Q.   Who else?

2638

A.  Misfit, Danny Troxell, several others.

Q.  Do you know an individual named Dale Bretches?

A.  Yes, ma'am.

Q.  Who's that?

A.  He was my sponsor.

Q.  And he was a member?

A.  Yes, ma'am.

Q.  And did you have contact with Dale around 2020 as well?

A.  Daily.

Q.  You said that you spoke to Kenwood over the phone and Frank over the phone.  Do you know today an individual named Todd Morgan?

A.  Yes, ma'am.

Q.  And who is that?

A.  He's a made member.

Q.  Did you ever have communication with Todd Morgan?

A.  Yes, ma'am.

Q.  Through what means?

A.  Contraband cell phones.

        MS. STOKMAN:  Okay.  If we can -- if I can approach the witness, please.

BY MS. STOKMAN:

Q.  I've handed you four discs.  Do you recognize those discs?

A.  Yes, ma'am.

Q.  How do you recognize them?

DX Robin S

2639

A.   I -- I listened and -- I listened to them, and I identified the voices on them.

Q.   And did you, after you listened to them, initial it so that you would recognize which discs they were?

A.   Yes, I did.

Q.   Okay.  And looking at disc that has the number 1809 on it --

A.   Yes, ma'am.

Q.   -- did you recognize the voices on the audio that was on that disc?

A.   Yes, ma'am.

Q.   And whose voices were on that -- that audio?

A.   Todd Morgan and Kenwood.

Q.   Kenwood?

A.   Yeah.

Q.   And looking at 1810, did you recognize the voices on the audio contained on that disc?

A.   Yes, ma'am.

Q.   And whose voices were those?

A.   It was John Stinson, Todd Morgan, and Misfit.

Q.   Andrew Collins?

A.   Andrew Collins.

Q.   And looking at 1811, did you recognize the voices on the audio on that disc?

A.   Yes, ma'am.

2640

**Q.** Whose voices were on that?

**A.** Todd Morgan and Andrew Collins.

**Q.** And finally, on 1820, did you recognize the voices on that disc?

**A.** Yes, ma'am.

**Q.** And whose voices were on -- on that?

**A.** Also Todd Morgan and Andrew Collins.

**Q.** Generally, as -- not specifically to each disc, but generally, when you listened to the audio on those discs, what was the general discussion?  Was there, like, general theme to the discussion on those -- on those calls?

MS. DE SALES BARRETT:  Objection.  Vague.

THE COURT:  Sustained.

BY MS. STOKMAN:

**Q.** When you listened to those discs, you were able to identify those AB members that you just identified for us now; is that right?

**A.** I was.

MS. STOKMAN:  Okay.  I ask to admit 1809, 1810, 1811, and 1820 by clip only.

THE COURT:  With the clarifications we had earlier, is there any objection?

MR. LUEM:  Not in addition to those.  Thank you.

MR. REED:  No objection.

THE COURT:  All right.  Those will be admitted.

ER 1974

DX Robin S

2641

(Government's Exhibit 1809, 1810, 1811, and 1820 were

received.)

MS. STOKMAN:  So if we can, then, show 1809, please,

and have these published as we go along.

(Audio played in open court.)

BY MS. STOKMAN:

Q.  In your experience with the AB, is there a significance to

what we heard in that call with Morgan wanting to verify if

someone worked for Kenwood?

MS. LUEM:  Objection.  Vague.

THE COURT:  Sustained.

BY MS. STOKMAN:

Q.  In what we heard, is there a significance with your

knowledge of the AB as to an AB brother asking another

AB brother if someone on the street worked for them?

A.  It's customary.

Q.  And why is that?

A.  To know if people are really in the fold like that.

Because anyone could say anything, but you've got to check to

make sure.

Q.  Okay.

A.  Because people that work for -- for the brothers, they --

they can't be touched.

MS. STOKMAN:  So if we can play the second clip,

please.

2642

THE COURT:  Actually, before we do that, ladies and gentlemen, I know you just came in.  I've been sitting here doing other work since eight o'clock, and my hind quarters is going numb, so I need to take a break.

Let's go ahead and take a break until five minutes after ten.  Thank you very much.

(Jury exits the courtroom at 9:49 a.m.)

THE COURT:  All right.  Let's go ahead and take a break.

MS. FISHER-BYRIALSEN:  Your Honor, may I just make -- when the jurors come back, do you mind instructing them that Mr. Clement has a medical issue that's causing him to stand up?

THE COURT:  Yeah.  I'll just -- yeah, I'll deal with that.

DEFENDANT CLEMENT:  I'm really sorry, Your Honor.

THE COURT:  No, no, no.  It's fine.  Okay.

MS. DE SALES BARRETT:  Your Honor, I'm sorry, is there any way that we could get him an antibiotic?

THE COURT:  Well, that's what I asked the marshals to check into, but we just don't have a pharmacy on site.

DEFENDANT CLEMENT:  I'm sorry, Your Honor.

THE COURT:  No, no, I want you to get what you need, but I just don't have the ability.

(Recess held.)

2643

THE COURT:  All right.  We have everyone back.

Anything before the jury -- before we begin?

MS. STOKMAN:  I just wanted to update the Court and counsel that we're looking into the issue that we were speaking about with the other witness.  And according to people in that area, there were no -- there was never a court filing on this incident.  It wasn't actually something that he ever appeared in court for.

MR. REED:  So he went into custody, and then the people that arrested him just said, Okay, we'll let you out?

MS. STOKMAN:  I'm just reporting back that there's no court documents for it.

MR. REED:  Normally when you go into custody, you need either potential release, if you have something like -- there's something stating the judge released you.

MS. STOKMAN:  I mean, it -- maybe it was just a release, but I don't know.  But we're being told that they are still looking, but they are telling us that there's no court document for it.

MR. REED:  What I'm not coming to, it just, Gonzalez wasn't there, and this happens in San Diego means somebody wrote something.  So there's something in writing that precipitated this whole conversation.  So if there's no court document, there is something in writing that got all this moving, because Gonzalez didn't make this up.  He talked to

2644

someone from the ATF, who also just didn't have it in his head.  It was written down.

MS. STOKMAN:  Oh, there's no writings from ATF.  I was confused about what you were asking for.  I thought we were asking for court documents.  I'm just updating everybody on what that is looking like, and we're still having people dig into other documents that might be through probation or whatever, but there's no ATF documents on this.

MR. REED:  I got that part.  But, like I said, people don't miracle themselves out of custody; they don't miracle themselves into custody.  There's documents that resolve those issues.

THE COURT:  Mr. Reed, I know you're making some statements that may not be picked up by the record.  It's my experience, in supervising different programs in which flash incarceration is a potential, yeah, they get out without having a hearing, and, in fact, they get in without having a hearing.  But usually, somebody signs something.  But doesn't mean there has to be a court hearing.  So I think I have to disagree, at least to my limited experience here in federal court, that you can go into custody without an order; you can come out without an order.

MR. REED:  I understand that happens in federal court.  It happens in Central District as well, but county court, that is a little bit different in that it's -- just

2645

play it through.  Defense Attorney Kenneth Reed then comes and represents him and they make a representation that he was arrested at some previous time, which I dispute, that's why we write everything down, so that my dispute can be -- has no value.  This is known, this shows that this happened, Mr. Reed, as opposed to the PO says it happened, we don't know that it happened, the PO doesn't have anything in writing that says it happened, Mr. Reed.  We don't know -- that's not how it works.

THE COURT:  I'm not disputing what you are saying. All I am saying is -- because you're saying there had to be a court proceeding.  There didn't have to be.  There definitely would be what you're saying, a PO would make note, because there would be some documentation of some sort of failure.  I agree with you.  I disagree with you on the other topic.  In fact, you could be arrested on the street, brought into custody, and bailed out without a judge ever seeing you, according to a bail schedule.

So I know what you're saying.  Of course, in that instance, there's a document, but what we started out earlier saying is that you wanted somebody to go down to the courthouse, so at least that avenue has been resolved.  And it sounds like Ms. Stokman is, I hope, desperately trying to get in touch with the probation officer to find out what the documentation is as to that circumstance.  Does that make

2646

sense?

MR. REED:  Yes, it does.  Of course, and I'm not blaming her personally, I'm not blaming the agent personally, but had I known about this, I would have done it myself, and I would have done it the way I would do it, which is to check everything, and I don't have the interest in -- I'm not going say not finding everything because I don't think that's their interest, but I do think expediency is their interest, and that would not have been my interest.

My interest is getting to the answer and just asking this guy -- I mean, let's just face it, he -- you know, I get it, just because you've been convicted and just because you stole $750,000 from the State of California over a long period of time doesn't mean that you would lie, but it does get you on the team of lying.  So cross-examining somebody without a document with that background is tantamount, in any opinion, to IAC, and I don't want to do that.

And the only reason I know that this happened is because the government told me so.  And the government agents that have told me so, the people that work for the government that have told me so, have to have read it somewhere, and I just need the document that got us there, to what they decided they had to disclose to me yesterday.

THE COURT:  Okay.  Thank you.

MR. REED:  Thank you, Your Honor.

2647

THE COURT:  Anything else at this time?

MS. STOKMAN:  No.

THE COURT:  Let's go ahead and bring in the jury.

MS. FISHER-BYRIALSEN:  Just a reminder, Your Honor.

THE COURT:  I will.

(Jury enters the courtroom at 10:13 a.m.)

THE COURT:  All right.  Ladies and gentlemen, everyone is back.  As I mentioned when we started in jury selection, I hope you all remember it too, if you-all need to stand up for comfort or whatever reason, medical condition, go ahead and do that.  You may see one or more of us doing this over here.  It's exactly for the same reason, comfort or some medical condition.  All right.  You aren't to read anything into it otherwise.

All right.  Ms. Stokman, you may continue.

MS. STOKMAN:  Yes, if we can play the second clip of 1809, please.

(Audio played in open court.)

BY MS. STOKMAN:

Q.  In that clip of the call, there was a mention of Signal. Do you know what Signal is?

A.  Yes, ma'am.

Q.  What is that?

A.  It's an encrypted app for messaging and video calls.

Q.  And in your experience in communicating with other

DX Rubin S

2648

AB members and associates, did you ever use an encrypted app?

A.  Yes, ma'am.

Q.  Was it Signal or something else?

A.  Signal and Telegram.

Q.  Why was it -- why was it that you were using encrypted apps?

A.  Because I was instructed to download those and to only call, like, for conferences and, like, serious matters and just, you know, just general discussions on encrypted apps.

Q.  Were you told why that was important?

A.  Yes.

Q.  Why?

A.  So law enforcement couldn't -- we were under the impression that law enforcement couldn't tap in.

Q.  Who gave you those instructions, to download Signal or Telegram, and to use those?

A.  Dale and John.

Q.  If you were initiating a conference call, could you control the way that other people who had been patched in were using their phone?  Like, could you tell if they were using an encrypted app or not?

A.  Yeah.  But on Signal and Telegram, once you have the app, you have a contact in that app.

Q.  So if someone had been patched in using their normal phone number and you didn't add that person --

DX - Rubin S

2649

A.   It's happened.  But it's -- it's -- not a lot.

MS. STOKMAN:  Okay.  If we can go to the clip from 1810, please.  The first clip.

(Audio played in open court.)

MS. STOKMAN:  Sorry.  We paused it because the transcript for some reason was jumping.

(Audio played in open court.)

By MS. STOKMAN:

Q.   The reference to "Little Man," do you know who that is?

A.   Yes, ma'am.

Q.   Who is that?

A.   Mike Schuler.

Q.   Do you know in 2020 who Mike Schuler was celled with?

A.   Dale Bretches.

MS. STOKMAN:  If we can go to the second clip of that call, 1810, please.

MR. REED:  Your Honor, before we do that, I apologize ahead of time, I have an objection, but I think I need to do at sidebar, if the Court would allow it.

THE COURT:  All right.

(Sidebar commences.)

MR. REED:  So I think I'm slow to the pitch here.  As I understand it, he's not on these calls because that's not him talking, right?

MS. STOKMAN:  Right.

2650

MR. REED:  Okay.  So that sounds like then he's testifying as an expert, which, so far, you have not laid a foundation for him being.  If he's not an expert, who cares what his opinion or what he was told that guy's roommate is.  That's not part of the call.

The other part of my objection is more of a not objection part, just something we need to let the jury know, because the evidence is not that trial director.  The evidence is what he's listening to.  And you can't hear the call, but you can read what trial director says the call says.  That's going to be a problem going forward when the jury wants to have that call played back.  They don't get trial director unless we all agree to it, because trial director is not evidence.

THE COURT:  We can run it back and pop up the volume.

MR. REED:  That's -- but that's more -- that's a different issue, but I didn't think about it while it was playing until watching the sound go in and out.

Also, trial director says whose speaking.  If that's the transcript he read before he testified --

MS. STOKMAN:  He didn't.

MR. REED:  Can --

MS. STOKMAN:  I can ask him that.

MR. REED:  That's why -- that's why I didn't want to go through all of this and object in front of the jury.

2651

MS. STOKMAN:  Yeah, yeah.

MR. REED:  But that needs to be established because this guy is taking a clip and then running with it like a dog with a ball, and we don't get to do that.  He gets -- he's an eyeball witness that testifies to what he smelled, what he heard, what he listened to, and what he saw.  He doesn't get the tell the jury his expertise on being a yardbird gangbanger on who's talking and who he was celled with.

THE COURT:  You don't have to be an expert to recognize someone's voice.

MR. REED:  True --

THE COURT:  That is within a lay opinion.

MR. REED:  That's a different part.  I'm okay with that.

THE COURT:  Well, he hasn't been asked anything other than --

MR. REED:  No.  He was asked who the cellmate of this guy is, what prison, when?

THE COURT:  He said, who was Little Man, and he said Mike Schuler.

MR. REED:  And who was his cellmate?

THE COURT:  And then he said -- he said he celled with Dale Bretches.

MR. REED:  When?  When?

THE COURT:  I -- I don't know that but that was the

DX Rubin S

2652

response --

MR. REED:  I don't understand -- that's -- that's the reasons I'm stepping up now, because I'm about to start objecting to things that are not -- if he was on the call, I wouldn't care what he said, because I'm stuck with that.  He's not on a call; he's listening to these calls.

THE COURT:  So is there an objection right now, then?

MR. REED:  Yes.  Lack of -- he's not an expert.  He is testifying as an expert to some of the things.  And I'll start making expert objections, but --

THE COURT:  Okay.  I haven't heard anything expert yet.  I heard him identify voices, which is not expert.  He testified about this cellie situation, which, you know, there's a foundation issue or there may be going forward.  There wasn't an objection so far, so that's what I see now.

MR. REED:  I prefaced it by saying I may be slow to pitch.

THE COURT:  Maybe I'm missing what you're seeing as expert.

MR. REED:  Because I think we are about to step into him explaining why the AB does X, Y, and Z.  Because that's --

THE COURT:  He can certainly testify as to his experience in that regard.

MR. REED:  Limited to his experience, but conversations between brothers --

DX - Rubin S

2653

THE COURT:  Yeah.

MR. REED:  -- He and the brother never made it there.

THE COURT:  Right.

MR. REED:  Okay.  Thank you.

THE COURT:  Okay.  Do we want to run that back, that clip?

MR. REED:  No.  I'd just like her to fix it ahead of time.  Fix it now so I don't have to do it.

    (Sidebar ends.)

    (Audio played in open court.)

BY MS. STOKMAN:

Q.  Mr. Rubin, so far in the calls that we've heard, when you listen to the calls that you referenced on the discs that were labeled 1809, 1810, 1811, 1820, were you reading a transcript during the time that you listened to that or just listening to the audio?

A.  On this?

Q.  On these calls when you listened to them prior to coming in to testify today.

A.  Oh, no, I listened to them.

Q.  No transcript?

A.  No.

Q.  And the voices you identified on the previous 1809 and now 1810, are those associated with the names that are popping up now in the transcript?

DX Robin S

2654

A.   Yes, ma'am.

Q.   And they are the same people you associated with those voices when you heard the audio?

A.   Yes, ma'am.

Q.   Okay.  And if that changes going forward, just let us know.

A.   Okay.

        MS. STOKMAN:  If we can listen to the second clip, please, of 1810.

    (Audio played in open court.)

        MR. REED:  Objection to relevance to this particular clip.

        MS. STOKMAN:  If we can pause it.

        THE COURT:  One second.  Can we stop it?

        This has already been admitted, Mr. Reed.

        MR. REED:  Okay.

        THE COURT:  All right.  Go ahead.  You can continue.

    (Audio continued to be played in open court.)

BY MS. STOKMAN:

Q.   In your experience, in conversations with AB brothers, did you ever talk about what was happening in other prisons?

A.   Yes, ma'am.

Q.   And did you ever have discussions about what was happening with white inmates in other prisons?

A.   Yes, ma'am.

2655

Q.   What was the purpose of those discussions?

A.   Basically, when we -- every, like, from 5:00 to 7:00 every night we --

MR. REED:  Objection.  Lack of foundation.  The preface was AB brothers, which he admitted he was not.  So I would object to his opinion with regard to conversations between AB brothers.

THE COURT:  Sustained.

MR. REED:  Move to strike his answer.

THE COURT:  That will be stricken.

BY MS. STOKMAN:

Q.   So let me make sure, because I misunderstood, then.

So in your conversations personally with AB brothers, did you talk about what was happening on other -- in other prisons?

A.   Yes, ma'am.

Q.   And during those conversations, did you talk about what was happening to other white inmates in those prisons?

A.   Yes, ma'am.

Q.   And what was the purpose of those conversations, in your experience?

A.   We just talk and see what's going on.  Especially with the person I communicated with, Dale, was at the same prison with me, so we talked about every day about what was happening on his yard and on my yard.

ER 1989

2656

MR. REED:  Objection.  Nonresponsive as to what he and Dale discussed.  That's not what this clip was about. Move to strike his answer.

THE COURT:  Sustained.  It will be stricken.

BY MS. STOKMAN:

Q.   In your experience, was it important to know when white inmates were kind of stepping up and -- and following rules and expectations of the AB?

A.   Yes, ma'am.

Q.   And why is that?

A.   Because we have a certain standard.

Q.   What -- how does that affect other people, like other white inmates stepping up and -- and meeting those standards?

A.   I mean, it's a rare occasion, because the yards that we're on are Level 4 yards and there's a no-hand policy, so there's no riot situations going on.  If there's an issue, someone gets stabbed.

Q.   And are there other yards where there's less kind of violent people on them?

A.   Yes, ma'am.

Q.   And in your experience, is it important to know if people on those yards are doing anything that the AB -- would fall in line with their expectation?

A.   That's why there was communication, to see if there was tension and -- like at other prisons, because it could bleed

2657

on the whole system if something happened.

MS. STOKMAN:  Okay.  If we could go to the clip on 1810, please.

(Audio played in open court.)

BY MS. STOKMAN:

Q.  Sorry, that was a long one.  I'm going to ask you some questions.

There was a mention in there of an individual named Beaver.  Do you know who Beaver is?

A.  Yes, ma'am.

Q.  What is Beaver's full name?

A.  Jason Weaver.

Q.  And does he have any affiliation with the AB?

A.  Yes, ma'am.

Q.  And what is his affiliation?

A.  He's a made member.

Q.  You had mentioned before the name Bobby Stockton.  Did you hear that name again in this call?

A.  I did.

Q.  And does he have -- in your experience and your knowledge of AB associates, did Bobby Stockton have any affiliation with the AB?

A.  Very lightly.

Q.  Was he a white inmate or something else?

A.  No, he was white.

DX - Rubin S

2658

Q.   And from what you know, was he in charge of a yard ever?

A.   Yes.

Q.   And when around was that, if you know?

A.   It was 2020.

Q.   In your experience, during calls you've had with other AB brothers, have you ever discussed people who were potentially cooperating or talking to law enforcement?

A.   Yes, ma'am.

        MR. REED:  Objection.  Relevance.

        THE COURT:  Ms. Stokman, is this just going to his overall knowledge?

        MS. STOKMAN:  Yes.  And his experience, and I'm going to ask a follow-up question about the conversations.

        MR. REED:  Again, objection.  Relevance.

        THE COURT:  All right.  Let's talk at sidebar.

     (Sidebar commences)

        THE COURT:  So talking about the cooperators, what does that bear on?  Just -- well, I'm not going to put words in your mouth, but what does it bear on?

        MS. STOKMAN:  So we've heard multiple times in this trial that cooperation is not something that is acceptable, and AB business involves figuring out who those cooperators are or are talking about who might be.  And so it's part of the enterprise evidence as far as his conversations -- not specific people, but in general who might be cooperating and

2659

the purpose of having those conversations.  It goes to what everyone has talked about, about the position on cooperators.

MR. REED:  Common knowledge; i.e., doesn't need an expert.  Number two, and more importantly in this particular case, that call, everybody on there is a brother.  He's not a brother.  Who cares what his opinion is.

MS. STOKMAN:  I'm asking him about his personal experience.

MR. REED:  Again, his personal experience not being a brother, talking about something with somebody else who is not a brother, or even if he's --

THE COURT:  Actually, the question was has he talked with brothers about cooperators.

MR. REED:  But then this -- but this is a conversation between brothers.  And --

THE COURT:  Yeah, she's not asking about that conversation.  We listened to a whole lot of stuff that doesn't sound like any questions are going to be asked about that.  Now, if she's just asking in your experience when you've talked to brothers, have they talked about cooperators.

MR. REED:  Okay.  I understand what the Court's saying and that ship's already sailed as far as the call coming in, and I'm okay with that, but when you preface the conversation, We had a lot of stuff and let me ask you some questions about it, we're talking about his interpretation of

ER 1993

2660

what he's listening to.

THE COURT:  It better not be.

MR. REED:  Okay.

THE COURT:  For one thing, I agree with you, the transcript is not evidence.  What they heard is what's --

MR. REED:  Right.

THE COURT:  -- what's admitted.  So whatever that is, is what it is.  But, yeah, he can't -- he can say who these people are because he recognizes their voices, but -- you know, and he can talk about his experience, but he can't talk about what they're talking about.

MS. STOKMAN:  No.

MS. LUEM:  And, Judge, I object to asked and answered.  He was asked earlier on, What is the AB's position on cooperating with law enforcement?  And he says, You get killed for it.  So we've already gone through this.

THE COURT:  We've gone through that, but she's asking something different; and that is:  Have you ever talked about other AB members about cooperators?  It is the same topic, it's not the same question.

So it's not asked and answered.  The objection on that ground is overruled.

All right.  Go ahead.

(Sidebar ends.)

MS. STOKMAN:  May I, Judge?

2661

THE COURT:  Yes, go ahead.

BY MS. STOKMAN:

Q.  So in your experience, in the calls that you said you've spoken with other AB brothers about cooperators, or people who might be speaking to law enforcement, what was the purpose of having those conversations?

MR. REED:  I hate to be picky.  Not in the calls, in conversations.  There's no evidence that there were calls that he did.  Because there's no evidence of calls.

MS. STOKMAN:  I can reword that.

BY MS. STOKMAN:

Q.  I believe I asked you this, but if I didn't ask it this way, did you ever engage in calls with other AB brothers where you spoke about potential cooperators or people who were speaking to law enforcement?

A.  Yes, ma'am.

Q.  And in those conversations, why was it -- why were you speaking about potential people who might be speaking with law enforcement?

A.  Because I had a direct communication with someone that was a brother that gave some pertinent information.

Q.  So let me figure out, and maybe ask this a different way.

In your experience, if you knew of someone who might be speaking with law enforcement, is that something that you, in your position throughout the time in prison, would want to

2662

know?

**A.**  Absolutely.

**Q.**  Why?

**A.**  Because you're a threat then.

**Q.**  Who's a threat?

**A.**  The person that's cooperating.

**Q.**  There was a name mentioned, Pat and Jake.  Do you know any AB brothers whose name is Pat?

**A.**  Yes, I do.

**Q.**  Whose that?

**A.**  Pat Brady.

**Q.**  And do you know of any AB brothers whose -- who go buy Jake?

**A.**  Yes, I do.

**Q.**  Who's that?

**A.**  Jason Corbett.

**Q.**  Do you know -- have you heard of the phrase "put down a real one"?

**A.**  Yeah.

**Q.**  What does that mean?

**A.**  That means kill somebody.

**Q.**  Have you -- do you know an individual who goes by the name -- the nickname Trigger?

**A.**  Yes, I do.

**Q.**  And who's that?

2663

A.   Chad Studebaker.

Q.   And what is his affiliation, if any, with the AB?

A.   He's a -- he's a made man.

Q.   Do you know when he became a made member?

A.   2020, roughly.

Q.   And do you know the term "getting your rock" or "earning your rock"?

A.   Yes, I do.

Q.   What does that mean?

A.   When you get your rock, it means you're -- you got made. You -- a rock is a shamrock.

Q.   So you became a made member?

A.   It means you got straightened out, yeah.

        MS. STOKMAN:  Okay.  If we can now go to the clip from Exhibit 1811, please.

    (Audio played in open court.)

BY MS. STOKMAN:

Q.   In 2020, were you -- you said before that you were still in contact with Andrew Collins, "Misfit"; is that right?

A.   Yes, ma'am.

Q.   And in those conversations you had with Misfit, were you aware of any ways that he was making money at that time?

A.   Yes, ma'am.

Q.   And was there ever a discussion between you and Misfit about EDD fraud?

DX Rubin 5

2664

A.   Yes, ma'am.

Q.   Okay.  And was he doing EDD fraud?

A.   Yes, ma'am.

Q.   And were you, yourself, doing EDD fraud?

A.   With him, yes.

        MS. STOKMAN:  Okay.  And we'll get back to that, but if we can play 1820, please.  This is the last call.

    (Audio was played in open court.)

BY MS. STOKMAN:

Q.   So let me ask you this:  We've been asking -- I've been asking you about a lot of people associated with the AB and their nicknames.  Did you have a nickname?

A.   Yes, ma'am.

Q.   And what is that?

A.   Nutty.

Q.   And the DT that is being referenced in this call, who's that?

A.   Danny Troxell.

Q.   And Popeye, who's that?

A.   Don Mazza.

Q.   And did Mazza have any ties to the AB?

A.   Yes, ma'am.

Q.   What was his affiliation?

A.   He was a made man.

Q.   And in 2020, did you become aware of any problems with DT

2665

and Popeye?

A.  Uh, yes.

Q.  And what's that?

A.  That DT reached out -- because he was incarcerated in Sacramento County Jail.  And he reached out through my ex, Trisha, and let her know -- told her the message to give to me and for me to pass it on.

Q.  And did you pass the message on?

A.  Yes, I did.

Q.  And to who did you pass that?

A.  Misfit and John --

Q.  Uh --

A.  -- and Dale.

Q.  And without going into details, did that message have to do with people who are potentially cooperating?

A.  Yes, ma'am.

Q.  During 2020, were you putting in work for the AB at this time?

A.  Early 2020, yes.

Q.  And in the course of 2020, were you putting in work or ordering others to put in work for the AB?

A.  Ordering others.

Q.  Okay.  What kind of things were you doing in 2020 to make money for the AB?

A.  Well, I had -- I had a route in the prison I was at, so I

2666

sent narcotics to Dale's yard plus mine.  And I had two out-of-state narcotics operations, which I had partners in.

Q.  And where were the out-of-state narcotics -- and actually, before I ask you that, how did that work, an out-of-state narcotic venture?

A.  Well, during -- during the pandemic, everything -- like, everyone had money all of a sudden because the EDD money, so the prices for drugs were, like -- say, if you have crystal meth, it went from, like, 4,000 a pound to 2,500 to 2,000.

So there's no money in it on the streets of our own neighborhood, so we send it out to -- out of state to double, triple our money.

Q.  And so what states were you personally involved in sending or having people send drugs to in that time frame?

A.  Oklahoma and Tennessee.

Q.  And you said you had partners.  Who were your partners in -- in those ventures?

A.  Oklahoma was me, my ex, Trisha, and Misfit.  And Tennessee was myself, John Stinson, and Misfit.

Q.  So when you say "partner," does that mean what you said before about the profits being split or somehow divvied up equally?

A.  Yes, ma'am.

Q.  Okay.  So during the time that you were involved in the drug trafficking into Tennessee, did you have conversations

2667

with John Stinson about that activity?

A.   Extensive ones.

Q.   And during those conversations, did he indicate that he knew what was going on as far as the drugs going to other places and making money from it?

A.   Yes, ma'am.

Q.   And did he receive any profits from those drug sales at any point?

A.   Yes, ma'am.

Q.   Now, we talked about you speaking with Misfit about EDD and you doing some EDD with him.  What, if anything, did Misfit tell you about the EDD that he was doing?

A.   He was bragging about the money he was bringing in, plus he was asking me for profiles all the time.

Q.   What is a profile?

A.   Profile is someone's -- is someone's pretty much life history, to take over their identity.

Q.   And how do you use that to commit EDD fraud?

A.   Well, a profile is someone's name, social security number, date of birth, maiden names, all that.  Like, a profile is complete history of somebody.

Q.   And are you using that information to fraudulently obtain money that doesn't belong to you?

A.   Yes, ma'am.

Q.   And when Misfit spoke with you about this, did he tell you

2668

how he was able to run his EDD?

A. Yes, ma'am.

Q. What did he say?

A. He had people that were -- basically, you get the profile, and you have to have an address to send the card to. Once you get the card -- in the beginning, you can only pull 500 off a day, and then it went to a thousand.

So we'd have different people go to different ATM machines, like, throughout -- like, say if we had 15 cards, you'd spread them out, you know, throughout the city or different cities, and you'd pull off as much money as you can before the card gets turned off.

Q. And did Misfit ever tell you whether or not he was using people on the outside to help him with this?

A. Yes, ma'am.

Q. And was he?

A. Yes.

Q. Did he tell you how he was obtaining some of the profiles that he obtained?

A. Yes, ma'am.

Q. And how did he do that?

A. Off his yard and corresponding with other brothers and his people on the street.

Q. Did you ever speak during this time with John Stinson about the EDD fraud Misfit was -- and yourself, what you were

DX - Rubin 5

2669

doing?

A.  A little -- yeah, a little bit.

Q.  And are you aware of whether or not Stinson knew that EDD was being committed by Misfit and yourself?

A.  Absolutely, yes.

Q.  He did?

A.  Yeah.

Q.  And are you aware of whether or not John had his own profile out there for EDD?

A.  I know he was collecting money from it.

MR. REED:  Objection.  Lack of foundation.  Let me back up.

Objection.  Nonresponsive.  Move to strike the answer.

THE COURT:  Sustained.

BY MS. STOKMAN:

Q.  Do you know whether or not John Stinson was collecting money from EDD?

A.  Yes.

Q.  How do you know that?

A.  Because I talked to him.

Q.  And he told you?

A.  Yes.

Q.  Have you ever committed violence on behalf of the AB?

A.  Yes, ma'am.

DX-Rubin 5

2670

Q.   What types of things?

A.   Stabbings and -- and, like, in-cell beatings.

Q.   And when you committed those violent acts, was that because you chose to do that on your own?

A.   Yeah.  I raised my hand.

Q.   What does that mean, raise your hand?

A.   It means you -- there's two types -- when someone gets attacked in prison, it's because either someone raises their hand to -- to build a reputation or just be -- get in good graces or they're asked to do it.  And you can't really say no, so --

Q.   So when you said you raised your hand, does that mean you volunteered to commit this violence?

A.   It does.

Q.   Why did you do that?

A.   Because I had aspirations and ambitions.

Q.   To do what?

A.   To become a brother.

Q.   Have you ever ordered violence on behalf of the AB?

A.   Yes, ma'am.

Q.   And why did you order those -- those violent acts when you did so?

A.   I was following directions.

Q.   From who?

A.   From an AB member.

DX-Rubin 5

2671

Q.  What happens if a white inmate commits violence against another white inmate and doesn't have permission to do so?

A.  They will -- they will get attacked and probably killed.

Q.  Uh, so in your experience -- well, let me ask you this: Have you ever committed an assault or something else without permission of an AB brother?

A.  On the yard?

Q.  Yeah.

A.  One time.

Q.  One time.

And did you get in trouble for that?

A.  I did, but it was a personal issue, so I was able to figure it out with a -- with a brother.

Q.  Okay.  And so you were able to explain yourself away?

A.  Yes, ma'am.

Q.  Okay.  Do you know an individual named Ronnie or Ronald Yandell?

A.  Yes, I do.

Q.  Who is that?

A.  He's a -- he was a -- he's a high-ranking brother.  And he was on the commission when he got indicted.

Q.  And were you ever given an order regarding Yandell?

A.  Yes, ma'am.

Q.  And who gave you that order?

A.  Dale and John Stinson.

2672

Q.   What did they -- what order was it?

A.   When he got out of the hole in Folsom, I was supposed to murder him.

Q.   And what happens if you decide not to follow that order?

A.   It would -- I would die.

Q.   Are there rules or understandings that you're aware of about killing a made AB member?

A.   Yes.

Q.   What are those rules?

A.   It has to be sanctioned by the commission.

Q.   So when you were given that order, uh, did you have concerns about what was being ordered?

A.   No.

Q.   Why not?

A.   Because of who -- who I was talking to.

Q.   Were the people who gave you that order, as far as you knew, part of the three-man commission?

A.   Absolutely.

Q.   Did you ultimately end up killing Yandell?

A.   No.  Him and -- he never came out.  Safety concerns.

Q.   Is that -- have you ever been given an order or have you ever -- let me ask you this:  Have you ever been a part of conversations with AB brothers about killing Misfit?

A.   Yes.

Q.   And which AB brothers were you speaking to about that?

2673

A.   John Stinson, Misfit.  Pretty much everybody after we found out about him.

Q.   And in your conversations with John Stinson, what did he tell you needed to happen to Misfit?

A.   He -- we talked, and he inquired who we had at Calipatria who could potentially put him down and there was nobody.

Q.   What does "put him down" mean?

A.   Kill him.

Q.   And so what is the result of having nobody who could do that?

A.   I believe there was negotiations with the Mexican Mafia to see if they can take care of the problem.

Q.   Were you told who was negotiating that?

A.   The -- the mobster that was there was Spider, so yeah.

Q.   I mean, who from the AB side was negotiating that?  Were you told?

A.   John.

Q.   And who told you that?  Who told you that John was the one in those negotiations?

A.   Dale.

Q.   Dale Bretches?

A.   Yes, ma'am.

Q.   At any point, did you do anything to try to effectuate Misfit being killed?

A.   Yes.

2674

Q.   What did you do?

A.   I inquired and -- see who -- who we had available.

Q.   In his yard?

A.   Yeah.

Q.   Okay.  When you just told us that no one was there, was that something you found out in that inquiry?

A.   Yes, ma'am.

Q.   Did you report that back to anybody?

A.   Yes.

Q.   Who did you report it back to?

A.   Dale and John.

Q.   Okay.  Are you still a part of the AB?

A.   No.

Q.   When did you make that decision?

A.   April of '23.

Q.   2023?

A.   Yes, ma'am.

Q.   What led up to it, like what caused you to make that decision?

A.   Well, it's -- I chose my family, I chose my family. I -- the more I stuck around and the closer I got to getting made, it was -- it was apparent that it wasn't about comradery or brotherhood.  It was about money and what have you done for me lately.

So I went to ad seg, and while I was there, Jake and

DX-Rubin 5

2675

Pat Brady, they -- they liked the -- the revenue from my narcotics operations, and they decided they wanted to keep me in the hole.  So I was asked to commit -- commit a murder to get my rock when I got out of the hole.

Q.  And how did that -- how did you feel about that request?

A.  I was flabbergasted and I refused.

Q.  Why?

A.  Because I was going home in a year and we already had plans.  I was going to do something when I got out.

Q.  And so how did that request cause you or did it have something to do with your decision not to be a part of the AB?

A.  It had everything to do with it.

Q.  Why?

A.  Because that's not what was discussed and I could see that they didn't have the same value in me as I did them.

Q.  Have you ever had to kill or order to be killed people that you were friends with?

A.  Yes, ma'am.

Q.  And why did you do that?  Why did you either kill someone who is your friend or order someone who is your friend to be killed?

A.  AB politics.

Q.  Were those under orders?

A.  Yes, ma'am.

Q.  You're not in custody right now; is that correct?

2676

A.   That is correct.

Q.   When did you get released?

A.   December 6th, last year, a month ago, a month and a half ago.

Q.   Did you get released because of any cooperation agreement or any agreement you made with the federal government?

A.   Not at all.

Q.   Did you get released because of any agreement you made with the state government?

A.   No.

Q.   Why were you released?

A.   Because I maxed -- I did every day of my 12-year term.

Q.   Are you receiving any benefits from testifying here today?

A.   No, I'm not.

Q.   So why are you here?

A.   I'm doing this because my -- for my family.

        MS. LUEM:  Objection.  He's here under subpoena. Otherwise, irrelevant.

        THE COURT:  Overruled.  Overruled.

        Go ahead.

BY MS. STOKMAN:

Q.   So you -- why -- why are you here?

A.   Why am I here?

Q.   Uh-huh.  Why are you testifying if you're not receiving anything from this?

CX - Rubin

2677

A.  Because I chose my family and to do the right thing.

Q.  We discussed before the policy that the AB has about people who -- who testify or talk to law enforcement.  Uh, are you concerned with your safety because you're testifying here?

A.  Yeah, for sure.

Q.  Are you concerned about anyone else's safety besides your own?

A.  Yeah.

Q.  Who?

A.  My family.

MS. STOKMAN:  I have no further questions.  Thank you.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MS. LUEM:

Q.  Hi, Mr. Rubin.  Ms. Stokman just asked you whether or not you were in custody and you said "no," right?

A.  Correct.

Q.  So you came in here a free man?

A.  Yes.

Q.  But you are on parole, right?

A.  Yes.

Q.  Okay.  So while you did all your time, you still have somebody supervising you while you're out; is that right?

A.  Yes.

CX-Rubin 1

2678

Q. And you have to check in with that person, correct?

A. Yes.

Q. And do you have to maintain employment and follow the orders of your parole officer?

A. Of course.

Q. Okay. And you said you paroled in December of last year, on December 6th, right?

A. Yes, ma'am.

Q. And that's from Corcoran, correct?

A. Yes, ma'am.

Q. And you were in the THU in Corcoran; is that right?

A. For 13 months.

Q. Okay. That's a -- can you tell the jury what THU is?

A. It's a transitional housing unit.

Q. And what does that mean?

A. That means you -- you're transitioning away from a -- from gang life, in a different direction.

Q. So basically you approach law enforcement and said, Hey, I don't want to be a part of this anymore. I want to -- for lack of a better word -- drop out of this gang that I'm in, right?

A. It's not really how it happened, but that's -- essentially, yes.

Q. Okay. So you approach somebody and say, I am done with this. I want to -- I want to walk?

2679

A.  No.

Q.  Okay.  What -- well, tell me what you did.

A.  Well, the IGI and New Folsom snatched me up and they took me to the hole for safety concerns.

Q.  And so once you realized that your life was in danger, you decided, I don't want to be a part of this lifestyle anymore?

A.  No.  My choice put my life in danger.  I knew what was happening.

Q.  So when you were locked up, that's when you made the decision, correct?

A.  Yup.

Q.  And you entered this program with the government, correct?

A.  Correct.

Q.  Okay.  And that -- you said that debrief process you started in April of '23?

A.  Yes, ma'am.

Q.  Is that right?

        And part of that process is -- it's a pretty lengthy process, right?

A.  Yes.

Q.  Okay.  And you have multiple meetings with IGI investigators; is that right?

A.  Yes.

Q.  Okay.  Do you have a particular one that's assigned to you?

ER 2013

2680

A.  Do I have one now?

Q.  Did you?

A.  Uh at Folsom?

Q.  Yes.

A.  I believe it's Hart.

Q.  Okay.  And I don't care who it is.  I was just asking if you had one.

A.  Yeah, I did.

Q.  And in that initial debriefing interview that you did with them, they record that, don't they?

A.  I'm sure they do, yeah.

Q.  Okay.  In fact, they record almost every conversation that they have with you, right?

A.  I assume they do, yeah.

Q.  Part of that process is that they essentially hand you a packet.  It's called "The Autobiography."  Are you familiar with that?

A.  Yes, I am.

Q.  And that comes with some very specific instructions, right?

A.  Right.

Q.  And part of those instructions are that you tell the officers and the investigators everything you know about the gang, right?

A.  Right.

CX-Rubin

2681

Q.   Uh, and they give you some time to do that, don't they?

A.   Right.

Q.   Like, as much time as you need?

A.   Yeah.

Q.   All right.  And you write down basically every -- every crime you ever committed?

A.   No.

Q.   You don't have to write down every crime you've ever committed?

A.   In prison?

Q.   Every crime you've ever committed in prison?

A.   In prison.

Q.   Okay.  So do they provide also a -- basically a chronology of all the prisons you've been in --

A.   Yeah.

Q.   -- when they gave you that packet?

A.   Yes, ma'am.

Q.   And that's so you know you -- it kind of helps jog your memory of where you've been at what times, right?

A.   Yes.

Q.   Because for somebody like you, who's in and out of prison most of their life, you can kind of lose track where you are when, right?

A.   That is correct.

Q.   So that chronology is a guide for you to write this

CX-Rubin 1

2682

autobiography that you then turn over to your investigator, right?

A.  Yes.

Q.  Okay.  And then they review it, and if they have questions, they'll come back and ask you more questions about it, right?

A.  More so it's -- it's the final step in getting into the program.

Q.  Okay.  So that was my question.

A.  Yes, they do.

Q.  They'll review what you provided and then come back --

A.  Yes, they do.

Q.  -- and if they have more questions, they will ask you more questions?

A.  They do.

Q.  Okay.  And you are expected to disclose to them everybody that you dealt with on a criminal level while incarcerated and every crime you've committed; is that right?

A.  I mean, more or less.

Q.  More or less?

A.  More or less.

Q.  Okay.  To the best of your ability, right?

A.  There's no way you could -- you could underline or illustrate every transaction and every meeting you had.  It was just the big stuff.

2683

Q.  Okay.  So you're saying you are only required to disclose the big stuff?

A.  No.  I mean, it's -- listen.  When you do that, there's no way you could outline your whole life.  So I outlined -- like when it said time on parole and all that stuff, I just -- I didn't -- I didn't write nothing, only prison.

Q.  So specifically, the debrief process that you were involved with, the investigators were interested in your association with the Aryan Brotherhood, correct?

A.  Yeah.

Q.  Primarily the Aryan Brotherhood, right?

A.  Only.

Q.  And so they're -- they're asking you questions about members that you knew or associated with from the Aryan Brotherhood, right?

A.  Right.

Q.  Okay.  And -- and you told them about every, what you call, made member that -- that you were associated -- knew or associated with, right?

A.  Correct.

Q.  Okay.  And you discussed things like your sponsorship to be a brother, right?

A.  Correct.

Q.  And that was -- I believe you said Dale was one of your sponsors?

2684

A.   He was.

Q.   Okay.  In that debriefing process, and I think you testified on the stand, you disclosed to them that you ordered violence, right?

A.   Yes, ma'am.

Q.   Multiple times?

A.   Multiple times.

Q.   That you were involved in drone drops, right?

A.   Yes, ma'am.

Q.   And drug dealing, right?

A.   Yes, ma'am.

Q.   And assaults?

A.   Yes, ma'am.

Q.   And stabbings?

A.   Yeah.

Q.   And all of that will be contained in that autobiography that you provided to the investigators, right?

A.   Yeah.

Q.   Okay.  During the time that you were involved in this debrief process, you agreed to cooperate with the government, right?

A.   Yes, I did.

Q.   Okay.  And, in fact, you testified for a grand jury in this case, didn't you?

A.   Yes, ma'am.

2685

Q.   And you did that twice?

A.   I did.

Q.   Okay.  You also met with the government on multiple occasions, right?

A.   Yeah.

Q.   And that's -- I just want to make sure the jury is clear, that's sort of separate from your debrief process with the prison, correct?

A.   Yes.

Q.   Okay.  So that the investigators that are working on your autobiography and your, you know, debrief, they work for CDCR, right?

A.   Yeah.

Q.   Okay.  And when I'm talking about the government, I'm talking about the people that are sitting behind me, right?

A.   Yes.

Q.   Okay.  And that would include ATF Agent Gonzalez; correct?

A.   It would.

Q.   Okay.  So you met with the people from CDC and then you also met with these people, right?

A.   Yeah.

Q.   How many times did you meet with these people?

A.   Four, maybe.

Q.   Okay.  And to your knowledge, were all four of those interviews recorded?

2686

A.   No.  I couldn't tell you for sure either way.

Q.   Okay.  Did they give you an opportunity to review any of your recordings before you testified today?

A.   I never -- never asked.

Q.   Did they offer?

A.   No.

Q.   Did you get an opportunity to review any of the transcripts in those interviews at any point?

A.   Never seen them.

Q.   Okay.  Did they offer to show those to you before you testified?

A.   Never.

Q.   Okay.  Did you have an opportunity to review either of the grand jury transcripts before you testified?

A.   No.

Q.   Did they ever offer to show those to you before?

A.   They did not.

Q.   When was the last time you met with government counsel in this case?

A.   The day I paroled.

Q.   That was the very last time you met with them?

A.   Yeah.  I got picked up.

Q.   On December 6?

A.   December 6.

Q.   So prior to your testimony today, like in the last couple

CX-Rubin

2687

weeks or days, you didn't meet with anybody from the government?

A.  Since I came here, yeah.

Q.  Okay.

A.  Since I came from -- yeah.

Q.  Yeah, that's what I'm talking about.

A.  Fresno, yeah.

Q.  Okay.  And how many times did you meet with the government to prepare for your testimony?

A.  Just once.

Q.  How long did that last?

A.  An hour.

Q.  Who was there?

A.  Both of them.

Q.  Who is "them"?

A.  People behind you Stephanie and -- and Agent Gonzalez.

Q.  Okay.  And did they record that?

A.  I don't know.

Q.  Were they taking notes?

A.  I don't know.

Q.  You didn't see them taking notes?

A.  That's not what I was worried about at the time.

Q.  What were you worried about?

A.  Doing what I was supposed to do.

Q.  During an interview that you had with Agent Gonzalez and

2688

Ms. Stokman on December 10th, 2024 -- so that would have been right after you were paroled -- do you remember that interview?

A.  Can you repeat that?

Q.  You met with them on December 24, 2024 [sic]; do you recall that?

A.  I met with them?

Q.  Correct.

THE COURT:  Ms. Luem, did you mean December 10?  You said December 24.

MS. LUEM:  Oh, I'm sorry, yes.  December 10, 2024.  I beg your pardon.

BY MS. LUEM

Q.  Do you recall that meeting?

A.  At Corcoran?

Q.  You know what, actually, that might be the date that it was transcribed.  It looks like it was November 28th, 2023.  I apologize.  That would have been at Corcoran, right?

A.  No.  It would have been at New Folsom.

Q.  Do you remember meeting with them at Folsom?

A.  Yes, I do.

Q.  Okay.  And then you met with them another time that was also in Corcoran in 2023?

A.  I wasn't at Corcoran in 2023.

Q.  You were -- where were you, then?  I'm sorry.

CX-Rubin

2689

**A.**  Wait.  No, I did -- I did get there in October.  The end of October 2023, yeah, I did.

**Q.**  Okay.  Just want to make sure that I've got the dates of these right.

So on direct examination you -- you talked about -- well, before I get there.

You -- you heard some -- a recording, right, of what purports to be Mr. Johnson speaking to Todd Morgan, right?

**A.**  Correct.

**Q.**  And you said you did -- you actually did review that call, right?

**A.**  You talking about the first one?  The first recording they read?

**Q.**  The only one that had Mr. Johnson on it, yeah.

**A.**  Right.

**Q.**  So did you review all those calls before you testified?

**A.**  I mean, yeah, not -- I didn't hear them all the way through, but I -- I identified voices.

**Q.**  Okay.  So you listened to clips of those calls?

**A.**  I did.

**Q.**  Okay.  About how long of each call did you actually listen to?

**A.**  Until I identified the voice.

**Q.**  So maybe a couple seconds?

**A.**  No.  It was about 30 seconds, probably.  Like, enough

CX-Rubin

2690

time.

Q.   Okay.  So you -- so you were reviewing to see if you recognized voices, not for the content or information contained in those calls?

A.   Right.

Q.   And how many calls did you review?

A.   Was there five discs?  What, five -- five of them, four or five.

Q.   Five calls?

A.   About that.

Q.   Okay.  And on the call between Mr. Morgan and Mr. Johnson, there's a reference to -- well, first, there's a phone number that's given from what purports to be Mr. Johnson to the person who you're claiming is Mr. Morgan.

      Do you -- do you recall hearing that?

A.   That number -- the number?

Q.   Yes.

A.   No.

Q.   On the call that we just listened to, do you remember --

A.   Oh, yeah, yeah, I do.

Q.   Do you know whose phone number that is?

A.   I didn't look at it.

Q.   Did you listen to it while you were on the stand?

A.   I did, but with smart phones you don't -- you don't have numbers no more.  You punch them in your phone and that's it.

2691

Q.   So maybe you can answer "yes" or "no."  Do you know whose phone number that is?

A.   No.

Q.   And you -- you heard somebody make a reference to Finn McCool.  Do you recall that?

A.   I do.

Q.   Who's Finn McCool?

A.   No idea.

Q.   Have you heard that name before?

A.   Finn McCool?

Q.   Yes.

A.   Like a cartoon character.

Q.   Okay.  What kind of a cartoon, do you recall -- I mean, do you know?

A.   No.

          MS. STOKMAN:  Objection.  Relevance.

          THE COURT:  Overruled.  Go ahead.

BY MS. LUEM:

Q.   You, on direct examination, were asked about a number of conference calls and conference calling from the prisons; do you remember that?

A.   I do.

Q.   Okay.  And you said that you were on some conference calls, right?

A.   Yes.

CX-Rubin +

2692

Q.   Okay.  And I think you testified that you had communications with -- or you were in communication with Mr. Johnson sometime in 2019 or 2020, something along those lines?

A.   Yeah.  Yes, I did.

Q.   Okay.

A.   For -- for Danny Troxell.  When he -- when Danny was out of the way, there was no reason for us to speak, and I didn't like him to begin with.

Q.   Okay.  So when Danny was out of the way, you said that you -- you talked to Mr. Johnson?

A.   That is not what I said.

Q.   Okay.  Let me ask this question:  Did you testify that you had communication with Mr. Johnson around 2019?

A.   2017, yes.

Q.   Oh, 2017?

A.   Yes.

Q.   Okay.  Continuing until when?

A.   About 2019, till when I left Lancaster.

Q.   Okay.  And you told the government about different conference calls with different brothers, right?

A.   Right.

Q.   And you told them that -- that you never got busted with phones; is that right?

     MS. STOKMAN:  Objection as to when this was told, and

CX-Rubin

2693

vague.

BY MS. LUEM:

Q.   Well, during that -- that interview that we just spoke about on December 10th, 2024, that Ms. Stokman and Mr. Gonzalez were present for, you told them that you never got busted with phones?

A.   I mean, I have been busted with phones, but I didn't get -- like, I didn't get busted with them, no.  I've been caught with, what, two, three phones in 12 years.

Q.   Okay.  That's pretty good odds, right?

A.   Yeah.

Q.   All right.  And you said that, "Every day at 9:30, I'm on the deal.  Boom."

        MS. STOKMAN:  Objection.

        MS. LUEM:  And --

        MS. STOKMAN:  Calls for hearsay.  And at this point is it impeachment?  There hasn't been a statement prior to that.

BY MS. LUEM:

Q.   Well, you're having a conversation with them about being on cell phones, right, just like you testified today --

A.   Right.

Q.   -- correct?

        THE COURT:  Ms. Luem, the objection is 613(b), that's as I understood it.

2694

MS. STOKMAN:  That's correct.

THE COURT:  On that basis, the objection is sustained.

MS. LUEM:  I'm going to lay the foundation for the question, if that's possible.

THE COURT:  You have to do that first before you get to the other under 613(b).  You know what I'm talking about?

MS. LUEM:  Yeah.

THE COURT:  Okay.

BY MS. LUEM:

**Q.**  All right.  So did you have cell phones in prison?

**A.**  Yes.

**Q.**  And did you talk to people on those cell phones in prison?

**A.**  Every day.

**Q.**  And specifically, every day and 9:30 p.m., right?

**A.**  Me personally, yes.

**Q.**  Okay.  Until 10:30 every night, right?

**A.**  It -- usually it depends on how much I had to do and what was going on.

**Q.**  Okay.  You told the government that you would be on the phone until 10:30 every night.

**A.**  With someone specific.

**Q.**  Okay.  And you also were involved in conference calls. You testified to that on direct examination, right?

**A.**  Yeah.

CX - Rubin

2695

Q.   And you testified on direct examination that you were on conference calls with different -- different brothers, right?

A.   Yeah.

Q.   Okay.  But you were never on a conference call with Kenwood?

A.   Was I?  No.

Q.   And -- and, in fact, that's because you don't like Kenwood, right?

A.   In -- look, in 2017 to '18 --

Q.   I'm just asking you that question.  It's because -- partly because you don't like him, right?

A.   No, but then I was on conference calls with him, but nothing after pertaining to certain business.

Q.   So when you told the government you were never on conference calls with Kenwood, that would not be true?

A.   I mean, yeah, it's true.

Q.   Okay.  And no one likes Kenwood, according to you, right?

A.   I don't.

Q.   But according to you, no one likes him?

A.   That's also true.

Q.   That he's a grouch?

A.   Big time.

Q.   Okay.

A.   A bully.

Q.   You are good friends with somebody named Robert Eversole,

2696

right?

A.  Yes, I am.

Q.  Okay.  Are you still friends with Robert Eversole?

A.  There's no love loss.  I haven't talked to him in a long time, but, yeah, I consider him my friend.

Q.  And at some point in time, you were actually housed with Robert Eversole, right?

A.  A couple times.

Q.  Okay.  You refer to him as "Bobby"?

A.  Bobby.

Q.  Okay.  And just to be clear, you were never on the same yard with Kenneth Johnson, were you?

A.  No.

Q.  And you were never in the same cell with Kenneth Johnson, right?

A.  No, I wasn't.

Q.  Robert Eversole, he kind of -- kind of groomed you in a way, didn't he?

A.  Yeah, in a way.

Q.  And he taught you to be charismatic?

A.  You can't teach that.  Either you are or you're not.

Q.  Okay.  Well, if you said that in your autobiography, that lengthy autobiography that you spent a lot of time with, would that be wrong?

A.  What would be wrong?  That someone taught me how to be

2697

charismatic?

Q.   That you, Daniel Rubin, learned from Eversole to be a leader --

A.   Yeah, a leader.

Q.   -- and that you have to have likable qualities and charisma.

A.   Right.

Q.   So he taught you those things, right?

A.   Yes.

Q.   And you wanted to be a leader?

A.   Yeah.

Q.   And you thought Robert Eversole was a good leader?

A.   Still do.

Q.   Now, you mentioned on direct examination that if you refused a direct order from a brother, you would be -- you could be killed, right?

A.   Yes.

Q.   You did that, though, right?

A.   Yes.

Q.   On a few occasions, correct?

A.   No, but -- flat-out refusal, no.

Q.   Well, you were ordered by somebody, not Mr. Johnson, to commit a murder, were you not?

A.   I was.

Q.   And you said you weren't going to do that, right?

2698

A.   I did.

Q.   Okay.  And as a result of that, that person who was your sponsor withdrew his sponsorship for you?

A.   Yes.

Q.   But you weren't killed?

A.   No, because I was -- I was taken to -- I was taken to the hole for safety concerns, what, five days after.

Q.   You weren't killed in those five days, though?

A.   No, I wasn't.

Q.   And you testified on direct examination you were ordered to assault somebody -- or I'm sorry, that you assaulted somebody without permission, right?

A.   Yes, I did.

Q.   And that according to you, a consequence of doing an assault without permission is -- could be death?

A.   Not what I did.  What I did was a --

Q.   I'm not asking what you did.

You testified that a consequence of not following a direct order could be death, correct?

A.   It's 100 percent true.

Q.   Okay.  And you did not -- you assaulted somebody without getting permission, correct?

A.   Yeah.

Q.   And you were not killed?

A.   Obviously.

ER 2032

CX-Rubin-1

2699

Q. You were not assaulted for that?

A. No.

Q. Because you said you had a good explanation, right?

A. Personal reason, yeah.

Q. You know somebody named Kaylen Chandler?

A. I do.

Q. Is she a good friend of yours?

A. Yes, she is.

Q. Was she your girlfriend at one point?

A. No.

Q. Were you sending drugs to Kaylen or having Kaylen Chandler pick up drugs for people on the outside?

A. Yes, I was.

Q. Okay.  And that was to provide drugs to people who'd gotten out of prison?

A. Say it again.

Q. Well, you were sending Kaylen Chandler to pick up drugs and deliver them to people who had recently been released from prison?

A. No.

Q. That's not true?

A. That's -- no.  She did everything for me.  That was just one of the things she did.

Q. So she did a bunch of crimes for you?

A. Well, obviously, yeah.

CX-Rubin

2700

Q.   I mean, I don't think I understand what you mean by "obviously."

A.   She -- look, I trusted no men in my area.  Everything that came through my area went through her.

Q.   Okay.  So she was committing crimes on your behalf?

A.   Yes, she was.

Q.   Okay.  Including picking up drugs and delivering them to people who'd been recently released from prison?

A.   I don't know where you're going with that.  But --

Q.   If she said that, would that be true?

A.   I mean, I'm sure it happened once or twice when someone was released from prison, but I'm not, like, the delivery guy for newly released people.

Q.   Were you making money off of the things that she was doing for you?

A.   Yeah.

          MS. LUEM:  One moment, Your Honor.

          Nothing else.  Thanks.

          THE COURT:  All right.  Ladies and gentlemen, we're going to go ahead and take our last break of the day.  Let's go ahead and break until -- let's say ten minutes to 12:00.

          And again, I'm reminding you of the same admonition I've been giving you every time.  I'd ask you to follow that.  Thank you.

          JUROR 2:  We unplugged one of the computers by

CX-Rubin R.

2701

accident.

JUROR 3:  I tripped.

(Jury exits the courtroom at 11:36 a.m.)

THE COURT:  All right.  The jury members have stepped out.  Let's go ahead and take a break.

(Recess held.)

THE COURT:  Everyone ready?  All right.  We're going to go ahead and bring the jury in.

(Jury enters the courtroom at 11:54 a.m.)

THE COURT:  All right.  Cross-examination, Mr. Reed.

CROSS-EXAMINATION

BY MR. REED:

Q.  Mr. Rubin, while you -- when you testified on direct, at one point you were referencing or listening to an exhibit that was, I think, 1820.  You may not remember it that way, but there were a number of calls that you listened to; fair statement?

A.  Yes, sir.

Q.  Okay.  And prior to listening to those calls, at some point prior, you read those calls in a transcript in written form; is that correct?

A.  No.

Q.  Never?

A.  Never.

Q.  Okay.  But today you saw them in written form?

CX-Rubin R

2702

A.   On that.

Q.   Exactly.

So I'm going to ask the government to replay that in a second.  But while they are doing that, I'm going to ask you some other stuff.

A.   Sure.

Q.   Now, you may not remember when you had all your phones taken, but you remember where you were when they were taken?

A.   Oh, yeah.

Q.   Okay.  So the last phone that was seized from you, where -- where were you?

A.   New Folsom.

Q.   Okay.  And orientate me in time.  So Folsom came after you took the rap for Misfit's drugs --

A.   Right.

Q.   -- is that right?

A.   Yes, sir.

Q.   So what year was that?

A.   That was -- I got to New Folsom about February -- end of February 2020.

Q.   Okay.  And I think about two years later is when you locked it up, I think you guys call it, right?

A.   Yeah.  I dropped out.

Q.   Or rolled it up, yeah.

A.   I dropped out.

2703

Q.   Okay.  So do you remember when you got your phone taken?

A.   '21.  The last one, '21.  I only lost one phone at -- no, two.  Two, because I have the little one, so two phones, '20 --

Q.   I was reading your SOMS, that S-O-M-S thing.  I thought you had four phones taken.  So is it just one or just two phones?

A.   Two of them were my cellie's.

Q.   Okay.  But they were phones you used?

A.   No.

Q.   Whatever --

A.   Yeah, I had my own phone, though.

Q.   Yeah.  I got that, but, I mean, cellies use each other's phones, right?

A.   But understand something, when you get -- it's called constructive possession.  If you're in a cell with someone that has a phone, they give you both a write-up.

Q.   You're telling me about constructive possession.  I know the legal concept.

A.   Okay.

Q.   I'm not talking about that.  I'm talking about guys.

A.   Right.

Q.   I'm assuming you guys only cell up with people you want to cell up with.  Like you and I could not be cellies.  White guys don't cell up with black guys.

CX-Rubin R

2704

A. Not in California they don't.

Q. Okay. Well, this is where we are, right?

A. Right.

Q. So you're going to be in there with somebody else of a like mind, maybe also some kind of AB associate. Fair statement?

A. Fair statement.

Q. Okay. On occasion, that guy's phone is a phone you may use. Fair statement?

A. Fair statement.

Q. So you got two of your real phones, your actual phones taken.

A. Yeah.

Q. And then two of the other phones that were taken were cellies' phones?

A. Right, which I had access to.

Q. Got that. And that's what I was trying to get to.

A. Right.

Q. Took me about five questions, but that's okay.

So do you understand or what is your understanding of what happens when a phone of yours gets taken, or anybody's, for that matter?

A. Absolutely, yes.

Q. What happens?

A. If you're someone like -- like I was, it's going to be

CX-Rubin R

2705

sent to the Office of Correctional Safety, and they're going to try to dissect it, if IGI didn't do it already.

Q.   And --

A.   They extract -- they extract information off them.

Q.   Right.  And there's a program they use to do that.

A.   Of course.

Q.   Plug it up, download it.

A.   Right.

Q.   And, of course, while you're still adhering to the prison code, you're not going to talk to them, correct?

A.   Right.

Q.   Okay.  Because that's -- that's not a good thing, right?

A.   No.  But that's only for smart phones.  They only can get from a -- from a regular phone like a -- like a talk and text or a flip is contact and numbers.

Q.   I didn't mean that part.  That's my fault for not asking the question correctly.

        When they seize your phone --

A.   Right.

Q.   And for now, we'll talk about smart phones.

A.   Okay.

Q.   They use a program.  I don't know if you know what Cellebrite is, but they use a program they plug it up to and they download the contents of the phone.

A.   They do.

CX Rubin R

2706

MS. STOKMAN:  Object --

BY MR. REED:

Q.  That is correct, right?

A.  I mean, I don't know what it's called, but I know they do it.

Q.  Right.  And if they seize your phone while you're still being -- I'm just going to use the term "a righteous inmate," and I'm not judging that, but while you are no longer -- while you are not a cooperator, you're saying, Okay, well, that's my phone but I don't know anything about what's in there. Something to that case, right?

A.  You -- no.  You just make no comment at the hearing and you know what it is.  It's --

Q.  As -- as I recall when I read the documentation in your case, you admitted the phone was yours but you wouldn't say anything else about it?

A.  Yeah.

Q.  All right.

A.  If -- if it's mine, I'll always take it but depending on who my cellie is.

Q.  Okay.  And the last time this happened was Folsom?

A.  Yes.

Q.  Okay.  New or old?

A.  Never been old.

Q.  Okay.  So only new, yes?

CX-Rubin R.

2707

A.   Yeah, I was on a 180, yeah.

Q.   Okay.  And during the time of your debrief, which was extensive, fair amount of time, right, doesn't just take one day?

A.   No.

Q.   Did they ever talk to you about the contents of your phones?

A.   No.

Q.   No?  But you knew they had already seized your phone?

A.   When I got snatched up --

      MS. STOKMAN:  Objection.

      THE WITNESS:  -- there was no phone taken.  I didn't lose a phone.  I didn't lose a phone.

BY MR. REED:

Q.   From Folsom?

A.   I've lost phones at Folsom, but when I got -- when I got locked up on this, when I dropped out, they didn't take a phone from me.

Q.   Okay.  I get that.  You got a phone taken at Folsom after the situation with Misfit?

A.   It's very well-known I lost phones.

Q.   And I'm with that.  You've got to walk -- just follow me, just listen to what I'm saying.

      Your phone got taken.  After your phone got taken, not directly after, but eventually you dropped off, yes?

CX-Rubin R

2708

A.   Years, yeah.

Q.   Did somebody talk to you about -- no.  Let me do this another way.

A.   No, they didn't.

Q.   What am I about to ask?  You don't know.  Let me finish the question, please.

       During the time of your debrief, were you ever asked about phone calls that you made to AB brothers or other AB associates?

A.   Asked about phone calls?

Q.   Yes.

A.   Yeah.

Q.   All right.  Were you asked about when those phone calls were made?

A.   Yes.

Q.   Okay.  And did you give them that information?

A.   After I debrief -- after I --

Q.   Yes.

A.   Of course.

Q.   Yes.

A.   I cooperated, yeah.

Q.   Okay.  One of the ways to corroborate things that you said would be to go back and pull that last phone that you had taken from you?

       MS. STOKMAN:  Objection.  Argumentative.

CX-Rubin R

2709

BY MR. REED:

Q.  Would you agree with that?

        THE COURT:  Sustained.

        THE WITNESS:  Honestly, you're talking circles around --

        THE COURT:  Sir, you can --

        THE WITNESS:  -- I don't even know what you're talking about.  All right.

BY MR. REED:

Q.  You had a phone taken while you were in Folsom.  You cooperated about a year and a half later; is that right?

A.  Something like that, yeah.

Q.  Okay.  While you were not cooperating, you were making phones calls with your phone; is that right?

A.  Yeah, with the phone that I may have had at the time, yeah.

Q.  Well, a phone that you admitted having; isn't that right?

A.  I mean, obviously.

Q.  Okay.  Well, you say "may have had."

A.  Going to spend five grand on a phone and not use it?

Q.  Hmm?

A.  You're going to spend five grand on a phone and not use it?

Q.  That makes sense.

A.  Right.

2710

Q.   You would've used it.  And that would be -- is that the phone that you used when you contacted other people that you've testified to about this case so far?

A.   Every phone I had I talked to those people.

Q.   Okay.

A.   No matter the year, I was involved and I talked to those people.

Q.   Okay.  And when you contacted those people, you would dial a phone number or you would accept an incoming call?

A.   I would -- yeah.  We have dummy contacts.

Q.   I'm good with all that.  It may take some work, but long story short, it's going to be one phone talking to another phone?

A.   Right.

Q.   Okay.  And we agree with each other -- can we agree with each other that for the most part, when one phone calls another phone, there is a line somewhere in the history of the phone that indicates those two conversations happened.  Maybe not the content but the existence.  Would you agree with that?

A.   Yeah.

Q.   Okay.

A.   For sure.

Q.   If I seized your phone or if your phone was seized, it would have that number that your phone is and then some other number that that phone connected to?

CX - Rubin R

2711

**A.** Okay.

**Q.** Is that a fair statement?

**A.** Fair statement.

**Q.** Now, to state the obvious, IGI does not like you guys having phones, also correct?

MS. STOKMAN:  Objection.  Calls for speculation.

THE COURT:  Sustained.

BY MR. REED:

**Q.** Would you agree with me that being an inmate in a prison where you are a convicted felon, convicted felons having phones and talking to other convicted felons might be something that would be against the rules at a state prison?

**A.** Yes.

**Q.** In fact, you were informed somewhere along the line during the time that you were in a prison that being a convicted felon and having a phone and talking to some other convicted felon is something you would get in trouble for, yes?

**A.** Yes.

**Q.** In fact, if I'm not mistaken, somewhere in your history you have lost -- I don't know if it's -- there's some kind of way they punish you.  Is it family time?  Days, it says.  What does that mean?

**A.** No.  The first -- when you first offense for a phone, it's one year without family visits.  They suspended your family visits for a year, and the second one, it's five years.  And

ER 2045

CX-Rubin R.

2712

it just keeps going up.

Q.  Okay.  So this is the thing --

A.  Right.

Q.  -- having a phone is --

A.  Plus you take six months.

Q.  -- something they are going to do something to you.

A.  Oh, you're going to get dinged, yeah.

Q.  Okay.  There we go.  Given the fact that that's the rule --

A.  Right.

Q.  -- if you have a phone, you prefer not to get caught with it?

A.  Yes.

Q.  Okay.  Given the fact that that's the rule, if you make calls to other inmates or receive calls from other inmates, you try to do that without getting caught; is that also correct?

A.  It is correct.

Q.  All right.  But once you cooperate, you're past all that; is that also correct?

A.  Yes.

Q.  And like you did today, you can say, I made those calls, I talked to John Stinson, things like that, right?

A.  (Nods head.)

Q.  Okay.  When you were debriefed, whatever the person from

2713

IGI that debriefed you, did you disclose to him these conversations that you allegedly had with John Stinson?

A.  I did.

Q.  Okay.  Did that person in IGI ask you when those calls occurred?

A.  Yeah.  I'm sure he did, around about, but, I mean, I could only guess, you know, unless it was absolutely recent, you know.

Q.  I get that.  I get that.  However, people in your situation have a unique thing that most people don't have. You know what prison you're in when you're in that prison?

A.  Right.

Q.  So if I'm not mistaken, the chronological history is actually headed by what prisons you are in, and you write down what happened while you were in that prison?

A.  Right.

Q.  And I think a couple of times you would just write "layover"; is that correct?

A.  Yeah.

Q.  And I'm assuming that that means the common term, which is you were only in that prison for a minute?

A.  No, just to spend the night.  Transportation, yeah.

Q.  Minute, hour, you were just there for a hot second, right?

A.  A cup of coffee.

Q.  All right.  So these -- and let me back up a second and

ER 2047

2714

ask it so we can lay the groundwork.  You've never been in the same prison as John Stinson --

A.  No.

Q.  -- in your entire life?

A.  No.

Q.  And you probably know what he looks like from something else, but you never actually looked at each other, face-to-face; Hey, John; Hey, Daniel, nothing like that?

A.  Video.

Q.  Video?

A.  Yeah.

Q.  Oh, okay.  Well, that's different.

When you were in Folsom, John Stinson was in a different prison?

A.  Solano.

Q.  Solano.  When you were in every other prison you've been in, John Stinson has always been in a different prison?

A.  Yeah.

Q.  Okay.  The only way for the two of you to contact each other, is to use the phones?

A.  Correct.

Q.  All right.  Using that device that marks one phone, contact another phone, and it shows the date and time?

A.  Right.

Q.  And it's your testimony that IGI -- and I may get the

CX Rubin R

2715

agent -- part of the agency wrong, they seized your phone while you were at Folsom?

A.   They seized several phones when I was at Folsom, and I got another one the same day.

Q.   Not the point, but that's good to hear too.

So they seize the phone that you used while you were at Folsom, did whatever it is they do with it.  And you never saw that phone again; is that right?

A.   That's right.

Q.   And is -- is it also a correct statement that nobody at IGI talked to you and tried to match up phone calls from your phone with your testimony or with your statement about, When I talked to John Stinson and when I didn't; is that right?

A.   Yeah.  At least, I'm under the impression it is.  I don't know.

Q.   Well, you would know whether or not they talked to you about it.  That's firsthand.

A.   Oh, for sure, but if they actually did -- but the thing is, the phones they have, I had other phones.  Like, there was always phones.  Always.  So -- which I understand what you're trying to do, you're trying to match things up, but it -- there's nothing to match up here, sir.

Q.   Well, you don't know that.

A.   Okay.

Q.   You don't have the original phone.

CX - Rubin R.

2716

A.    Cool.

Q.    And that -- that's their job?

A.    Right.

Q.    Okay.  If -- and I'll probably get an objection before we get through this question, but if they do match it up to a phone and they say -- or you say, That's not on that phone; you go, Well, you got the wrong phone.  I was using a different phone by then.  But you never had that conversation because nobody approached you about it; is that right?

      That was a question.

A.    About one specific conversation with John Stinson?

Q.    No.  No, about that phone that got seized at Folsom.

A.    If you're talking about the phone that was seized at Folsom, according to you, I lost four of them.  What phone are you referring to, sir?

Q.    One that was seized at Folsom.

A.    There was more than one seized at Folsom.  I --

Q.    From you?

A.    Right.

Q.    How many phones did you lose at Folsom?

A.    I lost two personally.

Q.    Okay.  When was it that you think that Mr. Collins was in the hat?

A.    When do I think he was in the hat?

Q.    Uh-huh.  Yes.

2717

A.   Are we asking, like, a time frame or, like -- I don't understand your question.

Q.   Yeah, I'm asking about a time frame.

A.   Okay.  It was late '22, early '23.  There was speculation coming out, he was incommunicado, and there was a lot of things going on.

Q.   When did you begin to cooperate?

A.   April 26, '23, I believe.

Q.   So at '22, you were still -- you were still with these guys?

A.   Oh, yeah.

Q.   And you got to Folsom when?

A.   February 27th, 2020.

Q.   Okay.  And your first Folsom phone was taken when?

A.   I couldn't tell you that.

Q.   But it was before you agreed to cooperate?

A.   Yeah.

Q.   And it was after you had already arrived at Folsom?

A.   I was in ad seg after I cooperated, there was no -- I didn't have a phone after that.

Q.   Okay.  So using that as a time marker, when you cooperated, and using the other time marker as when you got to Folsom, both phones were seized while you were at Folsom, but before you cooperated; is that correct?

A.   Yes.

CX-Rubin R.

2718

Q.   All right.  Now, even if you don't know the exact date the phones were seized, would you agree with me that in your -- your history in that SOMS thing, it says when your phone was seized and what happened to you about it?

     MS. STOKMAN:  Objection.  Calls for speculation as to what SOMS says.

     THE COURT:  Sustained.

BY MR. REED:

Q.   Okay.  One step too far.  Forget about SOMS.  Would you agree with me that when your phones were taken, somebody at CDCR wrote a report about your phones being taken?

A.   100 percent.

     MS. STOKMAN:  Objection.  Calls for speculation.

     THE COURT:  Sustained.

BY MR. REED:

Q.   When your phones were taken, they took them from you, you got in trouble for it, and something happened.  Is that right?

A.   Yes.

Q.   You were punished in some way, shape, or form?

A.   I was given a rules violation report.

Q.   How does that happen?

A.   Hmm?

Q.   How does that happen?

A.   Well, when you lose a phone, it's customarily through a cell search, right?

CX Rubin R

2719

Q. Yes.

A. So they come in -- especially if it's someone like me, they just don't come over and tell you to step out of the cell. They rush you in the middle of the night, early in the morning, you know. So that -- that way of, like, it's -- that's how that happens, you know.

Q. Okay. So let's just take that event and I'll break it down and do it the slow way.

A. Okay.

Q. You're sleeping, they rush in your cell?

A. Right.

Q. That's not something you're going to forget, fair statement?

A. No. But the thing is, when they find the phone, right?

Q. Right.

A. They take a picture of it.

Q. Right.

A. They document it.

Q. Well --

A. You get a 115 for it.

Q. Back up. I don't want to speculate.

A. There's no speculation.

Q. Me. I don't want to speculate.

So when you say "they document it," that's because you know that's what happens? You saw them do that?

ER 2053

CX-Rubin R.

2720

A.   When you get a -- when you lose a phone, you get a 115.
It's a packet -- it's a rules violation report.  It says what
happened, and there's pictures of the evidence they found.

Q.   And you saw the 115 on your phone case?

A.   Yeah.

Q.   Okay.

A.   Every phone I ever lost.  Like, you can't -- you can't
just tell them, Just keep it, you know, like they give it to
you.

Q.   Right.  Not to mention you were there when it was taken?
Well, you had been there sleeping before they walked in and
took it out of your cell?

A.   Right.

Q.   Because when they start doing that search, they bust in
there, I don't know how many guys, but they pull you out, then
they tear your place apart; is that right?

A.   Yeah.

Q.   Okay.  And then at the end of that, if they find a phone,
there's a 115?

A.   Yes.

Q.   So back to my original question.  Somebody documents the
fact that they took your phone?

A.   Yes.

Q.   Okay.  And that ends up on your criminal history thing or
your -- your jail records?

2721

**A.** Yeah.

**Q.** Okay. This isn't me just making that up. We both agree with that, right?

**A.** Every infraction is in your C file.

**Q.** Exactly.

So the two times that your phone was taken while you were at Folsom, both times it's written down somewhere and put on the -- the Daniel Rubin CDCR criminal history program with a -- fair statement?

**A.** Yeah, it's documented.

**Q.** All right. And we -- we both agree -- well, maybe this is speculation on my part. You were in custody for, what, 18 years?

**A.** Altogether, I did 12 flat on this last one.

**Q.** Okay. But -- and you can correct me if I'm wrong or if there's something that you don't know, sir, but would you agree with me that there are phone records on phones and that those things have a to and a from, and a date and a time?

**A.** Yeah --

MS. STOKMAN: Objection, vague.

THE WITNESS: -- I would agree with that.

MR. REED: Is there still an objection?

THE COURT: Overruled. He answered.

MR. REED: Thank you.

All right. Can you put the 1820 thing up, please.

CX-Rubin R.

2722

Scroll down to the bottom, please.

Oh, can I do that myself?  No.

AUSA LEGAL ASSISTANT:  I'm going to hit play right now.

(Audio played in open court.)

MR. REED:  Stop right there.

BY MR. REED:

Q.  I think you said that Ronnie Yandell had gotten himself in some trouble.  Right?

A.  (Nods head.)

Q.  And that this is Mr. Collins, also known as Misfit, talking on this -- on this line, right?

A.  Right.

Q.  Talking to, I think, Mr. Morgan; is that right?

A.  (Nods head.)

Q.  And you said that your girlfriend -- did you say wife or girlfriend?

A.  Girlfriend.

Q.  Okay.  Your girlfriend got that information and then gave it to you, and then you gave that information to Collins and John Stinson?

A.  Right.

MR. REED:  Okay.  Can you keep playing, please.

(Audio continued to be played in open court.)

///

2723

BY MR. REED:

Q.  Let me stop for a second.  On line -- well, you can see it here.  You didn't hear it that way when you first heard it, but line 12, that Pops is Popeye; is that a fair statement?

A.  Yes.

Q.  Later on you learned, during one of your interviews, that Pops is a nickname for Mr. Stinson?

MS. STOKMAN:  Objection as to learning or foundation of knowledge.

THE COURT:  Sustained.

MR. REED:  I'll do that another way.

BY MR. REED:

Q.  Is Pops the only Popeye that -- or, excuse me.

Is Popeye the only person that you know that has a nickname of Pops?

A.  I mean, technically, yes, but people that are close with John did -- like, especially Misfit called him that, called him Pops.

Q.  All right.  So I haven't said anything out of school?

A.  You what now?

Q.  I haven't said anything out of school about this Pops thing, right?

A.  I mean, look, you have a valid point, but that's not who he's talking about.

Q.  I understand.

2724

A.  Okay.

Q.  I understand.

     MR. REED:  Would you keep going, please.

    (The audio was played in open court.)

     MR. REED:  Let's stop for a second.

BY MR. REED:

Q.  Now, this is -- this is Mr. Collins telling Mr. Morgan that he needs to get ahold of other people --

A.  Right.

Q.  -- to disclose or -- disclose this gossip that happened up in Sacramento trial?

A.  Yeah.

Q.  Because that's where that happened, right?

A.  Yes.

Q.  Okay.  And Mr. Collins wants to get ahold of John Stinson to tell John Stinson; is that right?

A.  Correct.

Q.  But you testified before the break that you had called Collins and told Collins and Stinson.

A.  Not at the same time.

Q.  There --

A.  There were different conversations the same day.

Q.  You didn't say not at the same time.  You said Collins and Stinson.

A.  I'm the one that informed them what happened.

CX-Rubin R

2725

Q.  Okay.  If you informed them what happened --

A.  Right.

Q.  And in the world of time, the way we do things, time is a linear thing, so it's starts out at 12 -- at 12:01 in the morning, and it ends at 11:59 at night, always, every day, all the time.  Do you agree?

A.  Yes.

Q.  Okay.  If you had called Mr. Collins and told him, right, and then you talked to Mr. Stinson -- when? -- same day, right?

A.  Right.

Q.  Okay.  Why is Collins saying, I got to get ahold of John, if you had already told him?

        MS. STOKMAN:  Objection.  Calls for speculation.

        THE COURT:  Sustained.

BY MR. REED:

Q.  Isn't it true that you did not talk to John Stinson?

A.  That is not true, no.

Q.  And when you talked to John Stinson, what phone did you use to do that?

A.  A cell phone.

Q.  Which cell phone?

A.  What do you mean what cell phone?

Q.  Which cell phone?  Was it one of the ones that was seized?

A.  No.

2726

Q.  Another cell phone?

A.  Right.

Q.  But the other calls that you had with Mr. Stinson was on a cell phone that was seized?

A.  Any phone that I had had calls from John Stinson.

Q.  Okay.  So the cell phones that you -- that got seized or the cell phones that were seized that are now, or at least at one time, in the custody of the people that sit on this side of the courtroom --

        MS. STOKMAN:  Objection.  Calls for speculation and facts that are not in evidence.

        THE COURT:  Sustained.

BY MR. REED:

Q.  Your cell phone that was seized is no longer in your position; is that correct?

A.  That's what seized means.

Q.  Right.  Your cell phone was not seized by me; is that correct?

A.  That is right.

Q.  Your cell phone was seized by somebody who works for the State Department of Corrections; is that also correct?

A.  What's correct is I lost cell phones.

Q.  Well, they were taken by who, the CDCR?

A.  Yes, they were.

Q.  They are the people that run the prison; fair statement?

RDX Rubin 5

2727

**A.** They do.

**Q.** Okay.

MR. REED:  I have no further questions.

THE WITNESS:  Thank God.

MR. REED:  I'm sorry?  Did you say something?

THE WITNESS:  No, I didn't.

MR. REED:  Something you want me to ask you?

THE WITNESS:  No, no.  Thank you, sir.

MR. REED:  You're welcome.

THE COURT:  All right.  Any further cross-examination?

MS. DE SALES BARRETT:  No, Your Honor.

THE COURT:  Any further redirect?

MS. STOKMAN:  Just briefly.

THE COURT:  All right.

REDIRECT EXAMINATION

BY MS. STOKMAN:

**Q.**  Mr. Rubin, you mentioned before when Ms. Luem was talking to you about cooperating with both CDCR and the government, what -- did you mean a formal cooperation agreement or something else?

**A.**  I've never been given a formal cooperation agreement.  I have no agreement in place.

**Q.**  So does that -- when you use the term "cooperate," are you just saying that you were willing to answer questions?

RDX Rubin 5

2728

A.   I was willing to testify, yeah.

Q.   And you mentioned before that when you met to prep about what might come up in testimony, that you were worried about something you were supposed to do.  But has anyone ever told you what you should say when you testify?

A.   Never.

MS. STOKMAN:  Okay.  I have no further questions. Thank you.

THE COURT:  Any recross?

MS. LUEM:  Briefly.

RECROSS-EXAMINATION

BY MS. LUEM:

Q.   Mr. Rubin, when you participated in the debrief process and filled out your autobiography, you disclosed a number of crimes that you were involved with, correct?

A.   Yeah.

Q.   And some of those crimes you were charged with, right?

A.   In the past, yeah.

Q.   Yeah.  And some of the crimes that you disclosed in there you were not charged with, correct?

A.   Correct.

Q.   Okay.  And you disclosed in there things that you did personally, right?

A.   Right.

Q.   And things that you directed other people to do, correct?

2729

A. Correct.

Q. Including violence, right?

A. Correct.

Q. Assault, things like that?

A. Yes, ma'am.

Q. Stabbings?

A. Right.

Q. And, uh, you have not been prosecuted by these people for any of those things in there that you disclosed that they didn't know about before you told them, right?

A. Correct.

Q. Okay. You don't expect to be, do you?

A. I hope not.

        MS. LUEM:  Okay.  Nothing further.

        THE COURT:  Anything else?

        All right.  Sir, you may step down.  Thank you very much.

        Next witness.

        MS. STOKMAN:  Judge, may we have a brief break, just very briefly?

        THE COURT:  All right.  Ladies and gentlemen, let's take about ten minutes.

    (Jury exits the courtroom at 12:26 p.m.)

        THE COURT:  All right.  What's going on?

        MS. STOKMAN:  Judge, I sent over the probation

ER 2063

2730

department warrant relating to Mr. Rapinoe. I've sent that to all counsel and the Court. These were the documents that were able to be obtained from probation or supervised PRCS. And it lists that -- it has a very short paragraph about what happened.

So I'm hoping that counsel can look at this, and since we do have time, we can put Mr. Rapinoe on the stand.

THE COURT: All right. Let's go ahead and take a break. Thank you.

(Recess held.)

THE COURT: All right. We have everyone back.

It's my understanding that you're going to call Mr. Rapinoe back to the stand?

MS. STOKMAN: Yes, for his cross-examination.

THE COURT: All right. Anything additional counsel wants to add at this time?

MR. REED: Yes. Uh, just to be clear, Your Honor --

THE COURT: If we want to be clear, let's get that microphone turned on.

MR. REED: Just -- just -- just to be clear, Your Honor, and I don't -- I don't want the -- the people in this courtroom to have to do something that they can't personally do, but is the representation that this one piece of paper is the entirety of this incident? And I don't know that they can actually represent that, but I kind of need to

2731

know that.

THE COURT:  Ms. Stokman, what can you say in that regard?

MS. STOKMAN:  Judge, I know that this was what the law enforcement officer that was sent down to the probation office or the courts was able -- I don't know where he retrieved it.  I'm assuming probation.  But this is where he was able to -- what he was able to get.

This is the actual petition or warrant that would -- what would lay out why there was a violation.  We also did learn that it was a flash incarceration, that Mr. Rapinoe went into custody for about four to six hours and then was released, so he never went in front of the Court.  Both the DA's Office and law enforcement confirmed that.

MR. REED:  The reason I ask is because from what I'm looking at, this is a warrant issued by a judge, Judge Laura Parsky, in Department -- or whatever courtroom that is, 602.  This is a San Diego Superior Court judge.

And a little bit different from what the government is representing -- and -- and I'm not holding them to anything that they've said because they were told by other people, but the two boxes that they've checked were:  The offender has absconded, and his or her whereabouts are unknown, the offender violated the following supervision.  And they go through this -- has the Court already read this?

2732

THE COURT:  Yeah.  I have it right here.  If you want, we can mark it so it can become --

MR. REED:  Yeah.  I would like to mark it.

(Defendant's Exhibit A was marked for identification.)

THE COURT:  Okay.

MR. REED:  The thing that causes me to be somewhat concerned with the representation -- again, I'm not holding the people in this room, but I've done this for a long time. This statement -- the offender -- long story short, that second to the last paragraph, the probation officer called him.  The call was disconnected.  Then DPO Nunez attempted to call him back.  There was no answer and -- and/or ability to leave a voice message.

As of the writing of this report, the offender was yet to report to probation, and there was no reasonable expectation that he would do so.  That was probably the reason for the abscond.

It just sounds like it's a little bit more than what's being said here.  And if this is a written warrant, I've never heard of there not being a document that says he's no longer at warrant, because that's how you know later on. When you get pulled over three weeks later and they see this warrant, they also have to see the thing that makes the warrant clear, otherwise you get rearrested.

The idea that there's not another piece of paper,

2733

i.e., where that -- when the warrant was recalled and whatever findings were made, I just find to be illogical and not within my understanding of the way the superior courthouse works.

So I can cross just on this if this is all there is, but I'm not sure that's correct. And the reason I'm not sure is because my history tells me that that can't be.

THE COURT: Okay. Got it.

Anybody else want to say anything else?

MS. FISHER-BYRIALSEN: Yes, Your Honor. For Mr. Johnson and Clement, we renew our motion to dismiss or, in the alternative, have a mistrial. Your Honor mentioned earlier that there was no articulation of prejudice, which I don't agree with, but I can further articulate it in that we, this morning, have now heard back from our investigators who are scrambling to help us solve this problem, which we don't believe is our duty, but we're doing it anyway, to attempt to render effective assistance of counsel, which does not seem to be successful at this time.

We have served a subpoena on the San Diego Sheriff's Office and also the San Diego Probation Department in the hopes of getting more records that could shine a light on what was actually happening here. So we have heard back that those subpoenas can't be complied with for at least five days from the -- today when they were served for the sheriff's department.

2734

And the archives is where it would be for the probation department, and they have asked us to narrow the subpoena, which we can't because we don't know what is there. So our investigators are working with that department to find out what in the universe of information they have so that we can then get back to them with the more narrow request. And so none of those things have happened now where we're being forced to go forward with the cross. And so we renew the motion.

THE COURT: All right. Ms. Luem, did you have comments too or was she speaking for both of you?

MS. LUEM: I join in those comments.

THE COURT: All right. Any comments by the government?

MS. STOKMAN: Judge, I'll only point out again, and if the Court wants to see Mr. Rapinoe's rap sheet, the rap sheet was provided to all counsel at the very first *Jencks* production deadline, and on page 32 of 33, it does have a marking under Cycle 65 for October 10th, 2022, and it lists that there was a flash incarceration under Penal Code Section 3454.

So, at the very minimum, this flash incarceration, whether it was related to any deactivation of an informant or not, is coming after the time that he was an informant, it was on his record, and the follow-up from that could have been

2735

done months ago but it was not -- was not until now, and the government believes there's sufficient information to proceed in this line of questioning.

MS. DE SALES BARRETT:  Your Honor, we actually attempted to get records from San Diego last week.  And we received records which have no information on them whatsoever.

THE COURT:  Who did you attempt to get them from?

MS. DE SALES BARRETT:  From --

THE COURT:  How is that different from what I just heard?

MS. DE SALES BARRETT:  From the court.

THE COURT:  And so the court said they have no record.

MS. DE SALES BARRETT:  We know -- we received documents that have no information other than a list of a case number, is my understanding.

THE COURT:  Okay.  So going to the court wouldn't have helped us at all.  All right.

MR. REED:  Well, what I think they got was what you get when you go online.  If you --

THE COURT:  You said they issued a subpoena to the court?

MS. DE SALES BARRETT:  No, we did not.  The subpoena is not returned yet.  We -- we got the documents last week online.  And the documents online provided no information for

2736

us.  We issued a subpoena, the subpoena has been served, and you know the information from Ms. Byrialsen.

THE COURT:  All right.  Once again, this issue I think has been fully set forth on the record.

I look at this probation report.  It seems, to me, to be a big nothing burger, really nothing there.  Use it however you like, to the extent that you can.  If it turns out you discover something different, come back to me.  We can seriously talk about consequences at that time.  But -- and, of course, I certainly will not dismiss Mr. Rapinoe.  He will be subject to recall, but that is how we're going to proceed.

Let's go ahead and bring him in.

MR. REED:  Your Honor, can I add one more thing?  I apologize ahead of time.

THE COURT:  Yeah.

MR. REED:  And I can only tell you -- testify to what -- and I'll print it out for the Court, but the documentation that I got when I looked this up last night shows all of Mr. Rapinoe's priors.  Counsel is correct.  What it does not show is Case Number CPR-220519, which is the case number of this document.

THE COURT:  That doesn't appear to be the case number.  That appears to be a --

MR. REED:  A court number, excuse me.  A court number.  And I don't know what a court number means, but I

2737

generally think that that has to do with the case file.  I don't know for sure.

THE COURT:  Okay.  We're going to mark it.  It can be part of the record -- well -- I've been handed what appears to be his rap sheet.  And we're looking for 220519.

MR. REED:  But the 28 -- the 288201 is on that document.

THE COURT:  Yes, it's on page 32 of 33.

MR. REED:  Right.

THE COURT:  It's dated 10-10-2022.  It references what appears to be an underlying criminal case, and then also CPR-220519.

In any event, let's go ahead and bring in Mr. Rapinoe.

Let's also go ahead and bring in the jury.

(Jury enters the courtroom at 12:50 p.m.)

THE COURT:  All right.  Thank you, ladies and gentlemen.

Mr. Rapinoe, I just want to remind you that you were sworn the other day and you're still under oath today.

THE WITNESS:  Yes, ma'am.

THE COURT:  All right.  Thank you.

Cross-examination, please.

MR. REED:  Thank you, Your Honor.

///

CX Rapinoe R

2738

**BRIAN JAMES RAPINOE**,

called as a witness on behalf of the Government, having been

previously sworn, testified as follows:

CROSS-EXAMINATION

BY MR. REED:

Q.  Good afternoon, Mr. Rapinoe.

A.  Good afternoon.

Q.  At or near the time that you got arrested, do you remember

roughly what day that was?  And I mean arrested the last time.

Well, not the last time.  The time that you got arrested with

the -- with the cards and --

A.  In this case?

Q.  Right, for this case.

A.  November 13th of 2020.

Q.  Okay.  When you got arrested you had cards that were not

in your name, and I'm -- I'm using -- I'm saying cards, but

I'm talking about ATM cards, I think, right?

A.  EDD.

Q.  EDD cards.

A.  Debit cards, correct.

Q.  Okay.  Those cards can be used at a bank?

A.  Correct.

Q.  And you could draw money out of them?

A.  Correct.

Q.  Did you do that?

CX Rapinoe R

2739

A.  I did.

Q.  Did you draw money out from those cards?

A.  I did.

Q.  Okay.  On the cards that you had in your possession?

MS. FISHER-BYRIALSEN:  Your Honor, we can't hear the witness.

THE COURT:  What did you say?

MS. DE SALES BARRETT:  We can't hear the witness, Your Honor.

THE COURT:  Sir, can you get up there a little closer.

THE WITNESS:  I did.

BY MR. REED:

Q.  And the cards that you drew money on, none of them said "Brian James Rapinoe"; is that correct?

A.  Uh, no.  I had a personal one that I was actually -- my personal EDD was allowed.

Q.  Okay.

A.  I was eligible under the guidelines to -- to apply for it.

Q.  Okay.  Excluding that card, because that sounds like that one is legit?

A.  Right.

Q.  Did you draw money from other cards --

A.  I did.

Q.  -- that had other names on them that were not

2740

Brian James Rapinoe?

**A.** I did.

**Q.** Okay. Did you do that on that day?

**A.** Uh, I didn't, but somebody did while I was in custody.

**Q.** Okay. I'm talking about when you're on the street.

**A.** Uh-huh.

**Q.** Do you remember when you were last in custody prior to your arrest of November 13th, 2020?

**A.** Uh, that would be right around the beginning of -- September 1st.

**Q.** Okay. So about a month and a half?

**A.** That is correct.

**Q.** Sounds about right?

**A.** I was in jail for about 17 days and I was out for about 30 days.

**Q.** Okay. During that 30 days, you got some ATM cards that were part of the ATM fraud that you were doing?

**A.** I did.

**Q.** Those cards were in other people's names?

**A.** I did.

**Q.** You went to a bank and drew money on those cards?

**A.** I did.

**Q.** And do you know off the top of your head how many cards that you drew money on during that period that were not issued to Brian James Rapinoe?

2741

A.   Uh, about six.

Q.   Okay.  When you got arrested, had you just come from the bank?

A.   No.

Q.   Did you get arrested at the bank?

A.   I did not.

Q.   Okay.  When you say "arrested," you mean the common definition of that, handcuffs, sitting in the back of the car, they take all the things that you have, put it in a bag, or however that works out, correct?

A.   That is correct.

Q.   Okay.  In addition to the cards, did they also seize telephones from you?

A.   They did.

Q.   Do you remember how many phones they seized from you?

A.   Uh, approximately two, with three laptops, probably four laptops, might be more.

Q.   Did you ever say five any -- during the -- do you remember saying five phones were taken?

A.   Five devices, two phones, three laptops.

Q.   Oh, okay.  That makes sense.

       So the phones that you used, were those the phones that you used to communicate with other people involved in the fraud?

A.   Yes.

2742

Q.   Okay.  How long had you had those phones?

A.   Hmm, I had had the numbers for well over a year, at least. The phones were in a constant rotation.  I was arrested multiple times that year and would lose the phones, but I still had the cloud access and the phone number.

Q.   So --

A.   So over a year.

Q.   So you were using an Apple phone, then?

A.   No.

Q.   No.  But it sounds as though the device, you can plug that phone number and use it with the various devices, yes?

A.   Yes.

Q.   So that phone number that you had, that phone number you were using for how long now?

A.   I was using it at the time for -- that one at least a year.

Q.   Okay.  So that takes you back to 2022?

A.   Right.

Q.   Is that right?

     You got arrested in November 2013 -- or excuse me --

A.   2020.

Q.   Oh, wait a minute.  I got my dates wrong.  I wrote something bad here.

     I wrote something incorrect.  You got arrested in November 13th --

2743

A.   13th.

Q.   -- of --

A.   2020.

Q.   -- 2020, okay.

Was that still during COVID?

A.   It was at the beginning of COVID, during that time, yup. A year into it.

Q.   So you had the phones back to 2020?

A.   2019.

Q.   '21.  What?  2019.

A.   Correct.

Q.   Before COVID started?

A.   Uh-huh.

Q.   Okay.  Is that "yes"?

A.   Yes.

Q.   And you had two cell phones and three laptops?

A.   Correct.

Q.   Were the laptops the same laptops that you used to fill out the applications and do your part of this fraud scam?

A.   Correct.

Q.   All three laptops?

A.   I think two of them, and two phones were all used specifically for -- one was brand-new and hadn't been used yet.

Q.   Okay.  So when I say seized, and assuming for the sake of

CX - Rapino R

2744

argument that the person -- the people that took your information told you who they were, who is it that seized your phone? What agency?

A. San Diego Police Department.

Q. Okay.

A. And -- yeah, San Diego Police Department.

Q. Was there anyone else from any other agency that interviewed you after or as a result of you being arrested that day?

A. There was another arrest prior to that where I was -- where HSI, I believe, was involved, and they took my devices, and booked and released me.

Q. Do you remember when that happened?

A. Prior to November 13th, in between September 1st.

Q. So HSI came. When they -- when they took your device and they released you, did they give you your devices back?

A. They did not.

Q. Makes sense.

And the devices that they took then were what type?

A. They were being used to commit fraud. But along with the devices was also a skimmer that's used to transfer credit card numbers.

Q. Okay. That was my fault, I asked that badly.

What type of device was it that they seized, besides the skimmer?

2745

A. A phone and a laptop.

Q. So in addition to the phones that were seized later, the first phones [sic] that were seized was one phone, one laptop, and then a skimmer, yes?

A. Yeah.

Q. Okay. And that phone, while it was in service, was that also the phone that you used with the cloud number that you later on would transfer to another phone?

A. Correct.

Q. So you consistently used the same phone during that time to communicate with the people that were involved in what you were doing?

A. Yes.

Q. And that would include your friend Mr. Collins?

A. Yes.

Q. Using that same phone?

A. Correct.

Q. And when you were doing that, Mr. Collins was in prison; is that correct?

A. Correct.

Q. So he would call you or you would call him?

A. Both.

Q. Okay. But all during that time, you knew Mr. Collins was in prison?

A. Correct.

2746

Q.   Okay.  On the November 13, 2020 arrest, did that arrest result in you talking to the people that arrested you?

A.   It did.

Q.   Okay.  Is that when you decided, I need to -- I need to work myself out of this, I need to speak to the people that got me?

A.   Yes.

Q.   Okay.  So to use the general term, that's when you began cooperating?

A.   Correct.

Q.   Now, correct me if I'm wrong, but once you mentally get to that spot, in addition to maybe trying to do the right thing, but you're also attempting to, I need to explain what I'm doing, I need them to think there's somebody more important than me, and I need to tell them everything they want to know; is that right?

A.   No, I don't think I looked at it like that.

Q.   How did you look at it?

A.   I owned up to what I did, what I was involved in, and the things that I no longer wanted to be a part of.

Q.   Okay.  So you were going to go on a straight and narrow after that?

A.   I am on the straight and narrow.

Q.   I got that.  I'm talking about back then.

A.   Yes.

2747

Q.   I know you are now --

A.   Yes.

Q.   Well, I don't know, but --

A.   Well, I was -- I was attempting then, but after years of this life, it's -- it's not easy to just up and start making good decisions, it takes a lot.  So I'm consistently trying to make different decisions now than what I've ever made in my life before.

Q.   I understand.  But back then, the first step to that sounds like cooperating on this case?

A.   Correct.

Q.   And is it a true statement that the people that interviewed you as a result of the November 13, 2020 arrest was San Diego -- was some type of San Diego sheriff or police department?

A.   It was a police department fraud gang division, and then also HSI, I believe, because of the multiple arrests before that that had to do with the EDD cards.

Q.   Okay.  And the fraud gang division, is that because of your Nazi Lowrider thing?

A.   I believe so.  And there was also weapons that were involved, and so they were just -- yeah, they came pretty hard, but it was multiple agencies that arrested me that morning.

Q.   That's kind of what I'm trying get to, but before you get

2748

to that, hold that in your hand for a second.  You said there were also weapons.  Did you have the two phones and the three laptops and guns?

A.  There was an unmailed-out AR-15 that was given back to me because the lower receiver was not mailed out.  The law allowed for the loophole at the time.  It was placed back into my car, my girlfriend drove it away, and I went to jail that day.

Q.  So the gun issue was neutralized because they gave it back to you?

A.  They used it as information to then raid my house in the subsequent weeks.  They said, you know, they used that for, like, basis for the continued investigation and the heightened nature of it.

Q.  Getting a search warrant?

A.  Right.

Q.  And then you weren't there because you were in custody, sounds like?

A.  No, they got me on the street.  I bailed out from that arrest and then I was out on the street.  And then they actually took me down in the middle of a street in San Diego at a four-way stop.  Uh-huh, it was wild.

Q.  I don't know what that means.

A.  I was paused at a stop and my car got all crowded in, and I got taken out of the car at four-way stoplight.

2749

Q.   This was on the 13th of November?

A.   Yes.

Q.   All right.  Then they take you down to -- I don't know, San Diego PD, San Diego sheriff, some agency place?

A.   Correct.

Q.   And you said there were multiple agencies that were there?

A.   Well, throughout this whole process there's been multiple agencies involved.  So I don't -- I don't ask each officer which agency he's involved, but I've heard all the names of the multiple agencies during this process, yes.

Q.   I got that, but I want to baby step this, because I wasn't there and no one in this room was there when you were arrested.

On November 13, 2020, did other agencies identify themselves, besides the two agencies that generally handle things in San Diego, which would be the police department and the sheriff's department?

A.   And parole.  I would say for positive it would be parole, police, yeah.

Q.   And then you said HSI?

A.   Then because of the information in the prior arrest just the week before, they contacted each other and then they came down, as well, while I was at the police station.

Q.   And then somebody from the gang unit, correct?

A.   Correct.

2750

Q.   Okay.  Now, that could have been San Diego sheriff or the police department?

A.   Police department.

Q.   But they were from the gang unit?

A.   Yes.

Q.   And was this only as to Nazi Lowrider -- your Nazi Lowrider history, or did this also include your prison connections?

A.   It -- it includes the white -- the racially motivated gangs in the San Diego area.  All of them, white -- all white gangs.

Q.   Okay.  And by this time, you had already done state prison time at least once in your life; is that correct?

A.   Many, many times, yes.

Q.   Do you remember off the top of your head how long that interrogation was?

A.   Three hours, maybe.  Two, three hours.

Q.   Now, in some respects, cops are like lawyers when they ask questions, they make open-ended questions, they just want you to talk.  So did someone say, Hey, walk me through how you did this fraud?

A.   Yes.

Q.   And they wanted to know step by step?

A.   Correct.

Q.   Wanted to know what computers you used to do what, right?

CX Rapino R

2751

A.    (Nods head.)

Q.    Okay.  So, I mean, there's a cop sitting in a room, he has your -- he's got your two phones, he's got your three computers, and somewhere along the line, one of them opened up the laptop and said, Well, what do you do with this laptop, and explain to me how this works?

A.    No, that doesn't happen.  They have computer scientists that analyze the laptops.  And after I was arrested, I was never given access to my laptops or my phones ever again.

Q.    Okay.  I didn't --

A.    To play with them or --

Q.    I didn't mean access.  I meant asking you, Is this your phone?  How do you use it?  Is this your laptop?  What do you do with it?

A.    Correct.

Q.    They did ask you those things?

A.    They did.

Q.    Did you ever communicate to them that you had, like, contact with a person in state prison named -- that you have known forever or for a long time by the name of Michael Collins -- I don't know if that's his first name, now that I think about it, but I'll just say Misfit?

A.    Yes, I did.

Q.    Okay.  And they said, Who's Misfit and where is he?  Something like that?

2752

**A.** Correct.

**Q.** And, of course, you told him what prison he was in?

**A.** Right.

**Q.** And whether they did it seriously or they did it as a joke, they would have said, How do you talk to somebody in prison? They asked you that question, right?

**A.** Right.

**Q.** And they asked you, What phone do you use to do that? Did they do that too?

**A.** Yeah.

**Q.** All right. And you pointed out to the telephone?

**A.** Right.

**Q.** Is that correct?

Now, they don't mess with the phones in front of you, but you know that those were your phones and you didn't see them again; is that right?

**A.** Uh, yeah, I haven't, like, been able to hold them or anything. I've seen them in boxes or whatever, but not --

**Q.** What I mean is no one gave them back to you?

**A.** No.

**Q.** But on those phones, by your testimony, they would have those Collins calls. Not -- not the -- not the content, but the fact that you called or received a call from whatever number he was using?

**A.** Not using Signal. We -- we take efforts to mitigate that.

2753

We keep a clean trace as much as we can.  So there's not going to be a trace of me calling people.

Q.  It's your understanding that Signal doesn't have an ability to trace a number?

A.  It does, but you have an ability to turn it off.

Q.  And you're saying you did that every time?

A.  I - I did that, yes.

Q.  Okay.  Now, when you were doing this -- I'm sorry for bringing up a sad subject -- but you were also using heroin?

A.  Yes.

Q.  Is that correct?

A.  I had been.  I was, yes.

Q.  And correct me if I'm wrong, because you lived that life, I have not, but that is one of the things that kind of gets you caught, when you're high, you tend to slip up a bit?

A.  Yeah.

Q.  Okay.  And I'm not the one that personally knows that, cops do that for a living.  Were you high at the time that they pulled you over?

A.  I was.

Q.  Do you remember the last time you had gotten high before they pulled you over?

A.  The night before.

Q.  Okay.  So when used the way it's designed, Signal can defeat the normal trailing things that they show on phones?

2754

A.  Correct.

Q.  Okay.  What about your laptops?  Did they have the program, whatever program you used, to assist you in the information that you were getting and then put on the applications?

A.  It became really prevalent to us in the beginning of it that we could do everything from our phones.  So, yes, we went out and bought laptops and had them, but most of the information, everything was pretty much done on a phone -- on those phones.

Q.  So when you do a "we" --

A.  I mean, yeah, me and the people that I was working with.

But we would do the applications, the emails, the Signal, the Proton Mail, everything from the phone pretty much.

Q.  Okay.  Well, the going out and buying laptops part -- and when I say something I'm not sure about, I'm always going to say "correct me if I'm wrong."  But my knowledge, and you can correct me, that Mr. Collins was not able to get out and go buy laptops in whatever place you bought them.  He was in prison?

A.  Right.  He had a smartphone.

Q.  Okay.  But he couldn't go out and buy other computers?

A.  No.

Q.  He had a phone, and that's the phone he had?

2755

A.   Right.

Q.   And that phone was the phone that you used to communicate with him back and forth?

A.   Correct.

Q.   Now, the information you got through your laptops or the things you did with your laptops, did that come across by email?

A.   What do you mean?  Like -- yes, I mean -- you know, replies would be sent back through emails, but the email would be hooked up to the laptop and the phone, so -- but, yes, we would get info to the emails on the laptop.

Q.   Okay.  And the information that you would use to put input into the applications, such as social security number, name, birth date, things like that, that came to you through email?

A.   No.  No.  The -- how I got the information was usually on a picture from prison with people's name, social, and birth date.  That would be sent to me via picture.  I would have a picture of it, and then I would use that information to fill out the application.

Q.   So it would be a picture of a list?

A.   Yes.

Q.   I don't know how to ask this, so if it's something that you can't answer, I'm okay with that.

Were all the names that you saw consistent with Anglos?

2756

Do you know what I mean when I'm --

A.  No.

Q.  -- asking that question?

The answer is no, they were not?

A.  Yes.  Yes.

Q.  Okay.  So there were other names that were not consistent with an Anglo ethnicity; is that right?

A.  Correct.

Q.  Okay.  Were any of the names that you got a -- caused a presumption in your mind that you were dealing with someone or the name had to do with someone who was Asian?

A.  No.

Q.  The names would be consistent with someone who was Latino?

A.  Uh, there was a couple that would be of Spanish descent.

Q.  Of course, last names don't have a color, so you wouldn't know whether or not the people were white or black by just looking at the names?

A.  Correct.

Q.  Were you ever in Solano prison?

A.  Uh, maybe on a overnight, but never as a general population inmate there doing time or anything.

Q.  Did you ever meet John Stinson face to face?

A.  No.

Q.  If you were in Solano prison overnight, were you ever in Solano prison when Mr. Stinson was in Solano prison?

2757

A.   2017, '18, '19, I believe so.

Q.   You were there at the same time?

A.   I was en route during that time.  So in those three years, I was doing a prison term.  And I went up there, came back down to court, and went back up.  So I had three overnights at Solano prison during that time.

Q.   When you're overnight, you don't go on the yard, though? You stay --

A.   No, no.  You just stay in there, so --

Q.   Whatever they call that thing where you're waiting to get on another bus?

A.   Yup.

Q.   So can I assume that during those three years and those times that you were doing overnights, that you did not see Mr. Stinson?

A.   I did not.

Q.   And you did not speak to Mr. Stinson during that time?

A.   No, I did not.

Q.   Now, I've never had the prison experience, but my gut feeling would be that when you are riding on the bus with your handcuffs on and the Martin chains around your waist, that you probably do not have access to a cell phone --

A.   No.

Q.   -- is that correct?

A.   Correct.

Case 1:20-cr-00238-JLT-SKO    Document 1793    Filed 02/05/25    Page 199 of 212

2758

Q. All right. After November 13, 2020, after you got out of custody on that case, was there a time when you began -- when your cooperation took a step past the point where all you were doing was telling them what you did on the November -- November 13th, 2020, situation?

A. When I was released in '22, yes.

Q. Okay. So in 2022, that's a couple years later; is that right?

A. It was 16 months. It was the jail sentence I did.

Q. And you did that in what prison?

A. It was San Diego County Jail. I ran out my entire prison sentence in the county jail, so I didn't have to actually go to prison. I did it all right there in the ad seg.

Q. And you had less than two years. So you can -- I forget, 1170(d), whatever, there's a number that covers that. So you did it all local?

A. Yeah.

Q. All right. And you walked out of San Diego County Jail, and did you get in trouble again?

A. No. There's a big target on my back.

Q. What does that mean?

A. Uh, I was in the hat and believed to have stolen money from the Aryan Brotherhood. And I was no longer using, so I wasn't associating with those type of people. I didn't have family down there. I didn't have support. And so, yeah, it

2759

was a hard time.

Q. Okay. And then you were contacted by someone from an agency to assist them?

A. First I was in contact with Frank and --

Q. I'm not talking about that.

A. Okay.

Q. I'm talking about --

A. Okay.

Q. I meant an agency. When I say "agency," I'm not talking about Frank. I'm talking about one of the -- whatever agency has the letters that we're going to get to.

You worked for an agency for a while?

A. Right.

Q. You had an agreement with them, right?

A. Right.

Q. I know what their first name is. But what agency was that?

A. FBI and HS -- HHS -- or HSI.

Q. Oh.

A. And --

Q. Okay. There were more than one agency?

A. Well, I think that's the same one. I don't know. It's -- but it's San Diego Police Department and the FBI.

Q. Did anyone ever use the phrase "task force" to you --

A. No.

2760

Q.   -- when it came to that, the multiple agencies that you were cooperating with?

A.   No.  I didn't hear "task force."

Q.   Okay.  So did the term -- did the letters ATF come to your mind?

A.   No.  Not at the beginning, no.

Q.   Okay.  Did you at some point start working for the ATF?

A.   I did.

Q.   Prior to working for the ATF, did you work for the FBI?

A.   I did.

Q.   Huh.

A.   No, not the FBI.  I worked for the ATF in the San Diego Police Department.  The FBI was the people that were on that case, so I was still in contact with them, but I never did anything with them outside of the original case.

Q.   You mean the EDD case --

A.   Right.

Q.   -- that was --

A.   Right.

Q.   -- over that case?

A.   Yeah.

Q.   And then HSI, which is the state -- basically, that's part of a state investigation.

A.   Right.

Q.   You mentioned HSI at some point.

CX Rapino R

2761

A.   Yeah.  I mean, at one -- I mean, I've been -- there's a -- there's -- you know, I don't -- I don't know the names of all the agencies and, you know, how they were cooperating.  I do know I was working for the San Diego Police Department and I was working for the ATF.

Q.   Okay.  So I'll get past the vagaries and try to step into the other part.

     At some point somebody paid you; is that right?

A.   Correct.

Q.   Okay.  So for now, we'll deal with the group that paid you.  So do you remember who that was?

A.   ATF.

Q.   All right.  Was that farther down the line with regard to the agencies that you dealt with?  Because you did your 16 months?

A.   Right.

Q.   And that's the case the FBI was on, right?

A.   Right.

Q.   Yes?

A.   Yes.

Q.   Okay.  And that 16 months was also the part of the case that San Diego PD was on, right?

A.   Right.

Q.   So when you got out of custody, you didn't -- I mean, you've never been on parole, but you were done with your time;

CX Papino R

2762

is that right?

A.  Yes.

Q.  And did you approach the ATF or the ATF approached you?

A.  I approached the ATF.  I approached San Diego Police Department, and then I was in contact with them.

Q.  Okay.  In your agreement with the ATF, were you -- did they want you to do some gun-related things, some type of assistance on trafficking or -- excuse me, helping them deal with the gun problem in the United States?

A.  Ghost guns or dope.

Q.  Okay.  At some point -- well, let me ask you this:  Did you get -- after -- after you did your 16, after you agreed to start working for the ATF, at some point did you get arrested for something else?

A.  I was not arrested.  There was a warrant put out for me. I was having a medical emergency in San Diego.  This was towards the end of my time living there.

My family wanted to get me out of San Diego as soon as possible.  My 77-year-old grandfather who's elderly flew down here, got me on a plane, and flew me back.

My parole officer with parole knew at the time they were in the process of switching me over to the PRCS because my last case wasn't violent.  So that had taken some time.

The day that I had the plane ticket, the next day I was supposed to see parole -- probation to start the new

CX - Rapino R

2763

probation process.  And I was having a serious medical problem.

I flew to Redding.  I got in contact with everybody. I had a juvenile court case going on at the same time, and everybody got together, realized that it was a miscommunication.

I was brought back down -- I came back down to San Diego, went to probation, cleared up my warrant, and then continued on with my court custody case, was not given a violation because I was then eligible for six months early discharge from PRCS, which I maintained.  And I've been off parole and probation for over a year now.

Q.  I'll take a minute to unpack that.  Sounds like you were prepared for my question.

A.  Well --

Q.  You kind of knew this was coming.

A.  What?

Q.  That I was going to ask you about that, about getting re-arrested?

A.  I wasn't re-arrested is the thing.  Is -- is there was a warrant and there was a miscommunication, but I was never actually put in handcuffs.

Q.  Okay.

A.  Or anything.  So -- and it was --

Q.  Let's back up and we'll do it my way.  I'll ask the

2764

question.  Okay?

You've been in and out of jail for a better part of your life -- your younger life, right?

A.  Yes.

Q.  In your experience, when you don't show up to court and you're supposed to be there, they issue a warrant for your arrest?

A.  Correct.

Q.  Okay.  Would you agree with me, regardless of whatever else happened, you had a warrant for your arrest --

A.  Right.

Q.  -- out of San Diego, after you got out of the county jail, after you started working for the ATF; is that right?

A.  Yeah.

Q.  All right.  We'll deal with all the other stuff in a second.

Those are hard facts.  Do we agree with that?  You had a warrant for your arrest?

A.  Yeah.

Q.  All right.  Your medical emergency, was that -- and if it's something particularly sensitive, let me know.  I don't want to put your dirty laundry out on the table, but was that something drug related?

A.  No.

Q.  Okay.  After -- well, you say you didn't get arrested, but

2765

did you end up having to speak to your PO again?

A. Yes.

Q. Okay. Did you end up having to speak to the ATF again?

A. Well -- what do you mean? By that time, I had already left San Diego and was no longer working with them. So when -- when the warrant was -- was placed, I was living in Redding. I was no longer working with them. That was in September. I was working with them all the way back in April and May.

Q. So before you left to go to Redding, it was your impression that you no longer had any obligations to comply with what the court orders were in San Diego?

A. Oh, no. I knew that. I was in a medical emergency. My family felt that, you know, the course of action that we took was the right one. After it was explained, it seemed like it was because I didn't do a day in jail.

Q. One doesn't have to do anything with the other. It doesn't have to, though, right? Your family decided that you didn't need to be in San Diego?

A. We -- we decided that the medical emergency trumped my meeting with my PRCS parole -- probation agent.

Q. So you and the Rapinoe clan decided that you didn't need to follow the instructions of the San Diego Superior Court and report as ordered?

A. Yes, during a medical emergency --

CX Rapino R

2766

Q.  I got that --

A.  Yeah.

Q.  I just want to get the fact that you thought it was more important for your family -- you guys decided --

A.  My medical health was more important, yes.

Q.  Let me --

A.  My medical health was more important, yes.

Q.  Let me finish so we can be clear.

    You guys decided on your own to not comply with the order to do whatever it is that they wanted you to do?

A.  No, I did not not comply with the other people.  I contacted parole, I contacted Bobby at the San Diego Police Department, and I explained the situation.  So before I left, I wasn't just going blind.  I had people that I was talking to that were in positions, and this was something that was bounced around, not just between me and my family.

Q.  Okay.  Again, you've been through the criminal justice system for a while in your life.

A.  Uh-huh.

Q.  And you would agree with me that judges issue warrants either for not showing up or for in violation of something that you're ordered to do, yes?

A.  Right.

Q.  And it says that you knew you had a warrant.  That this general -- whatever you guys decide, it generated a warrant.

2767

A.  Correct.

Q.  You knew that; is that correct?

A.  Yes.

Q.  All right.  Now, you said that you had decided to stop working for ATF before the medical emergency; is that correct?

A.  No.  I didn't stop working for them.  We just had not been doing anything and --

Q.  Okay.

A.  -- and by the time I left, we just hadn't been -- all this had been done, and that was all the way back in April and May, that I was being -- that I was working with the ATF.

Q.  Okay.  And by the way, I didn't mention where you live and I don't have any interest in raising that point, where you live now.  Okay?  So I want to deal with the stuff in San Diego.

But short answer is you left the jurisdiction of San Diego County?

A.  Yes.

Q.  Okay.

MR. REED:  Your Honor, I'm not going to finish by 1:30, but I'm at the Court's pleasure.  You want me to keep going, then I'll do so.

THE COURT:  Do you have an estimate, Mr. Reed?

MR. REED:  Well, I'm the first of three.

THE COURT:  Yes, just for you, what -- what is your

2768

estimate?

MR. REED:  Oh, maybe ten more minutes, probably less than that.  Since I know the clock is behind me, it will make me move a little faster.

THE COURT:  All right.  Ladies and gentlemen I promised you 1:30.  Is there anyone -- well, are you willing to stay longer today?  If so -- if you're not willing -- okay. I'm seeing heads shaking no.  Okay.  We're going to have to go ahead and take our evening break.

Ladies and gentlemen, thank you so much for your attention and your patience.  I am going to advise you, please don't discuss this case, please don't form any opinions about this case, please don't consult any media about this case, and please don't do any independent investigation.  Thank you so much, and we'll see you in the morning.

(Jury exits the courtroom at 1:29 p.m.)

THE COURT:  All right.  Anything at this time?

MS. STOKMAN:  Judge, I just -- I know the witness is having a lot of hardships with child care and his job and --

THE WITNESS:  You don't know that I have hardships.

MS. STOKMAN:  -- to be here, so I just wanted to address that since he didn't finish up today.

THE COURT:  Yeah.  Mr. Rapinoe, I can only tell you how sorry I am for the situation.

THE WITNESS:  I don't see that at all.

2769

THE COURT: Well, I wish I had control over it for you, I just don't. Sir, you can go ahead and step down now.

THE WITNESS: Thank you.

MS. STOKMAN: Judge, I just want to -- for the Court to indicate that he has to be back here tomorrow, or if not, another day.

THE COURT: Yeah. Mr. Rapinoe is not relieved of his obligations under the warrant at this time.

Anything else at this time?

MS. STOKMAN: No.

THE COURT: All right. Let's take our break.

MS. FISHER-BYRIALSEN: Well, Your Honor, I think maybe we should just briefly talk about the scheduling and when the government anticipates being done, maybe also talk about when we will have a charging conference and what our timing looks like, just so that we have a little bit of a plan going forward would, I think, be helpful to everyone.

THE COURT: Ms. Stokman, do you have a closer estimate as to when you will finish up?

MS. STOKMAN: Hopefully tomorrow or Friday. But if it would be Friday, it would be probably in the morning on Friday.

THE COURT: Okay. What I will do is provide you a draft set of instructions and verdict form. We'll get those to you ideally tomorrow, but no later than Friday, and we'll

2770

go from there.  I don't usually hold a charging conference.  I do spend time with you to find out what your feelings are on -- on what's set forth in the verdict form and the instructions, and go from there.

MS. FISHER-BYRIALSEN:  So just so Your Honor is aware, we have been speaking with the marshals about, you know, our subpoenas that they have for us, but if we put on witnesses, it would probably not be able to happen on Friday, because we need a day or two to have the ones that are in custody transported here is my understanding.

THE COURT:  All right.

MS. FISHER-BYRIALSEN:  Just so that the Court is aware of we've been trying to navigate it, but it's not an immediate possibility is what I mean.

THE COURT:  All right.  I will talk with the marshals about what can be done for Friday.  They know who you want by Friday, if you can get somebody by Friday?  Because we talked about this, and I assume that you've had conversations, it sounds like you have, with the marshals about --

MS. FISHER-BYRIALSEN:  Yes.

THE COURT:  -- who you need, when you need them, that kind of thing?

MS. FISHER-BYRIALSEN:  (Nods head.)

THE COURT:  Okay.  All right.  Anything else?

MS. FISHER-BYRIALSEN:  No, not for Mr. Clement.

2771

THE COURT:  Oh, yeah, also, the courtroom is going to be used this evening, so you do need to take everything with you.

All right.  Thank you.

(Proceedings were adjourned at 1:32 p.m.)

I, RACHAEL LUNDY, Official Reporter, do hereby certify the foregoing transcript as true and correct.

Dated:  February 5, 2025          /s/ Rachael Lundy_____
                                  RACHAEL LUNDY, CSR-RMR
                                  CSR No. 13815