IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff - Appellee,<br>v.<br>KENNETH JOHNSON,<br>    Defendant - Appellant. | No. 25-3645<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |
| UNITED STATES OF AMERICA,<br>    Plaintiff - Appellee,<br>v.<br>FRANCIS CLEMENT,<br>    Defendant - Appellant. | No. 25-3648<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |

On Appeal from the United States District Court
For the Eastern District of California
The Honorable Jennifer L. Thurston
D.C. No. 1:20-cr-00238-JLT-SKO

**EXCERPTS OF RECORD**
**VOLUME 12 OF 13**

Ryan J. Villa
The Law Office of Ryan J. Villa
5501 Eagle Rock Ave. NE Suite C2
Albuquerque, NM 87113
Ryan@rjvlawfirm.com

Andrea Lee Luem
Andrea Lee Luem, PHV
400 South Fourth Street, Ste 500
Las Vegas, NV 89101
andrea@luemlaw.com

Counsel for Defendant-Appellant
Kenneth Johnson

Jane Fisher-Byrialsen
Fisher & Byrialsen, PLLC
4600 S. Syracuse Street
Denver, CO 80137
jane@fblaw.org

Jean D. Barrett
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
jeanbarrett@ruhnkeandbarrett.com

Counsel for Defendant-Appellant
Francis Clement

**2772**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. JENNIFER L. THURSTON

UNITED STATES OF AMERICA,       )
                                ) 1:20-cr-00238-JLT-SKO
            Plaintiff,          )
                                ) Jury Trial, Day 13
      vs.                       )
                                )
KENNETH BASH, et al.            )
                                ) Volume 13
            Defendants.         ) Pgs. 2772 - 2947, inclusive
                                )

Fresno, California              Thursday, February 6, 2025

REPORTER'S TRANSCRIPT OF PROCEEDINGS

REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

**2773**

**APPEARANCES OF COUNSEL**:

| | |
|---|---|
| For the Government: | **STEPHANIE STOKMAN**<br>Assistant U.S. Attorney<br>2500 Tulare Street, Rm. 4401<br>Fresno, California  93721<br><br>**JARED ENGELKING**<br>Department of Justice<br>1301 New York Avenue, N.W.<br>Washington, DC 20005<br><br>**JAMES ROBERT CONOLLY, GOVT**<br>U.S. Attorney's Office<br>501 I Street, Suite 10-100<br>Sacramento, CA 95814 |
| For Defendant Johnson: | Law Offices of Andrea Luem<br>Attorneys at Law<br>400 South Forth Street, Suite 500<br>Las Vegas, Nevada  89101<br>BY:  **ANDREA LEE LEUM, ESQ**.<br><br>Law Offices of Ryan J. Villa<br>5501 Eagle Rock Avenue NE<br>Suite C2<br>Albuquerque, NM 87104<br>BY:  **RYAN J. VILLA, ESQ**. |
| For Defendant Clement: | Fisher & Byrialsen, PLLC<br>Attorneys at Law<br>99 Park Avenue<br>New York, NY 10016<br>BY:  **JANE FISHER-BYRIALSEN, PHV**<br><br>Ruhnke And Barrett<br>29 Broadway, Suite 1412<br>New York City, NY 10006<br>BY:  **JEAN DE SALLES BARRETT, PHV** |
| For Defendant Stinson: | Law Office of Kenneth Alan Reed<br>406 W 4th Street<br>Santa Ana, CA 92701-4505<br>BY:  **KENNETH ALAN REED, ESQ**. |

2774

# INDEX

**GOVERNMENT'S WITNESSES:**

**BRIAN JAMES RAPINOE**                                 2779
CROSS-EXAMINATION RESUMED BY MR. REED                   2779
CROSS-EXAMINATION BY MS. DE SALES BARRETT               2805
CROSS-EXAMINATION BY MS. LUEM                           2816
REDIRECT EXAMINATION BY MR. ENGELKING                   2824
RECROSS-EXAMINATION BY MR. REED                         2827
RECROSS-EXAMINATION BY MS. LUEM                         2828


**BENJAMIN MENDOZA**
DIRECT EXAMINATION BY MS. STOKMAN                       2829
CROSS-EXAMINATION BY MR. REED                           2843
CROSS-EXAMINATION BY MR. VILLA                          2851


**ETHAN MEDLEY**
DIRECT EXAMINATION BY MR. ENGELKING                     2856
CROSS-EXAMINATION BY MR. VILLA                          2863
REDIRECT EXAMINATION BY MR. ENGELKING                   2867


**TIMOTHY TRUE**
DIRECT EXAMINATION BY MS. STOKMAN                       2869
CROSS-EXAMINATION BY MS. FISHER-BYRIALSEN               2895
CROSS-EXAMINATION BY MR. VILLA                          2903
CROSS-EXAMINATION BY MR. REED                           2917
REDIRECT EXAMINATION BY MS. STOKMAN                     2919


**DR. EUGENE CARPENTER**
DIRECT EXAMINATION BY MS. STOKMAN                       2921
CROSS-EXAMINATION BY MR. VILLA                          2932

\* \* \* \* \*

# EXHIBITS

**GOVERNMENT'S**                                        **RECEIVED**

 1413 pages 5 through 39                                2926

**DEFENDANT'S**

 6000                                                   2845

2775

Thursday, February 6, 2025                    Fresno, California

8:06 a.m.                                      Jury Trial Day 13

(The following proceedings were held in open court:)

MR. REED:  Your Honor, I did have a small issue that I wanted to raise prior to the witness taking the stand.

THE COURT:  All right.  Go ahead.

MR. REED:  I have one exhibit which, consistent with the Court's order, is Exhibit 6000, which is the beginning of my numbers.  It is a map of California's correctional institutes, basically, for lack of a better word.  It's a map of all the prisons.

I would like to go over that exhibit, or at least the parts that are relevant to his testimony, with Mr. Rapinoe. For the sake of argument, he admitted -- or testified that he had a layover in Solano prison, and I'd like to just establish where Solano prison is on the list of California state prisons.

THE COURT:  So you're going to establish -- my mic isn't really on.

MR. REED:  I can't hear you, Your Honor.

THE COURT:  My mic isn't going on.

THE CLERK:  Oh, hold on.  There.

THE COURT:  So you're going to lay some foundation for this, you're going to ask him about it, and then use it in that way?

2776

MR. REED:  Yes.  Well, I think the foundation is his previous testimony yesterday.  He did admit that he had been in Solano prison.  I guess in theory he could say, Yeah, I see this.  This looks like a map of California.  I don't know where Solano is.

THE COURT:  Yeah.

MR. REED:  But I mean, he could theoretically do that.  Then I would do what you're asking if he takes -- if he makes me do that, but --

THE COURT:  Well, I mean, I don't know.

Ms. Stokman, do you have any comments?

MS. STOKMAN:  The government's not objecting to Mr. Reed adding that as a potential exhibit, which is what I think the Court's order required.  At this point, we'll wait and see how that testimony comes out to see if we're objecting to the exhibit being admitted.

THE COURT:  All right.

MR. REED:  Well, I appreciate the government's position on that.  Since there are a number of -- at least one or two other people that have been to prison and are going to testify in this case, I can chase that dog with anybody that's going to get on the witness stand who's been to the joint. So --

THE COURT:  Yeah.

MR. REED:  -- at some point --

2777

THE COURT:  I get your point.  But at least in my experience with the CDCR, you don't, like, go the most efficient route, necessarily.  So I get what you're saying, so I see where you may be going.  I don't know if it gets you there, but, yeah, I don't have any problem with you doing that.

MR. REED:  It has absolutely nothing to do with distance because they have phones now.  It just has to do with the fact that there is a prison that is Solano, that is not Corcoran, that is not Kern, that is not other prisons.

THE COURT:  Yeah.  I think you said that yesterday, right?

MR. REED:  Well, I didn't ask him that question.

THE COURT:  Well, he said --

MR. REED:  He said that he had a layover in Solano.

THE COURT:  Right.  That he thought at the time Mr. Stinson was there at the same time, but he never saw him, never spoke to him, and he was on his way someplace else.

MR. REED:  Exactly.  But the fact that Mr. Stinson was in Solano -- actually, he and Eversole and Rubin all testified to that -- that is the purpose, to establish that Solano was the prison that Mr. Stinson was in, that Solano is a prison in the State of California.

THE COURT:  There's no dispute as to that, though, right?

2778

MR. REED:  Shouldn't be, but that's why I asked to do it ahead of time.

MS. STOKMAN:  No, but if that's the theory for the map, then the government will object under relevancy.  I don't think the map shows that Mr. Stinson was actually in Solano.  The map is just showing where the prisons are.

THE COURT:  Let me just cut to it.  Would there be a stipulation that Mr. Stinson was in Solano prison at a period of time you're interested in, Mr. Reed, or is there something else that I'm missing on this?

MR. REED:  Your Honor, my position is just the opposite, which is that Mr. Stinson was in Solano prison for the entire time of this matter.

THE COURT:  If that's what we're doing, I don't really care.  It doesn't add anything, doesn't take anything away.  We'll take it as it comes.

Is this the Court's copy, Mr. Reed, or are you just showing it to me at this point?

MR. REED:  That's the Court's copy.  I have another folder for, I think, the witness to put on the witness stand.

THE COURT:  Okay.

MR. REED:  I want to ask the Court's permission to do all of these things.  That's all.

THE COURT:  Sure.  Or you could just -- you don't have to actually have to have it in a binder.  If you want to

just set it up there and --

MR. REED:  I paid for these.  I want to use it.

THE COURT:  Technically, probably, I paid for it, but okay.

MR. REED:  Well, you can reimburse me at some point, maybe.

THE COURT:  All right.

MR. REED:  CJA doesn't always agree.

THE COURT:  All right.  Go ahead and bring in the jury.

(Prospective Jurors enter the courtroom.)

THE COURT:  All right.  Thank you.

We have Mr. Rapinoe back on the stand.

Mr. Reed, you may continue.

And, of course, Mr. Rapinoe, you recall you're still under oath.

THE WITNESS:  Yes.  Yes.

THE COURT:  Thank you.  All right.

**BRIAN JAMES RAPINOE**,

called as a witness on behalf of the Government, having been previously sworn, testified as follows:

CROSS-EXAMINATION RESUMED

BY MR. REED:

Q.  Mr. Rapinoe, after the Court recessed this matter and you left the courtroom, did you speak to anyone from the

2780

government prior to testifying again this morning?

A.   No.

Q.   Okay.  Your -- the medical situation that you spoke of that occurred, I think in November 13th of -- was that 2020?

A.   Yeah.

Q.   Okay.

A.   No, that was when I was arrested.  The medical emergency would have been in, uh, August, end of August '22.

Q.   Okay.  And your family came down to Southern California and they took you back up to Northern California where you were from?

A.   Correct.

Q.   Since you didn't say my mom or my dad, you said "my family," does that mean there was more than one family member that came down to come get you?

A.   One family member came down.  I have family members in San Diego, too, that then linked up with them, got what we had to get done.

Q.   Did you go into rehab after that?

A.   No, I did not.

Q.   Were you still using heroin --

A.   No, I was not.

Q.   I'm not there.

        -- in November of 2020?

A.   November 13th of 2020 is the last day I used heroin.

2781

Q.   But all of -- of the other ten months of 2020 you were using heroin?

A.   Correct.

Q.   And the months of 2019 you were using heroin?

A.   Correct.

Q.   2018?

A.   No.

Q.   You stopped then?

A.   I was in custody 2017, 2018, 2019.  I was clean.  I paroled to a program from custody in 2019, remained clean until the end of 2019 when I was released from the program and I relapsed approximately September of 2019.

Q.   So we're on the same page, you're not saying because you were in custody you were not using heroin?

A.   I was not using heroin during that period of my incarceration.

Q.   There's a drug that they give you in prison in place of heroin for people that have such an addiction; isn't that correct?

A.   Correct.

Q.   Were you using that drug?

A.   No, I was not.

Q.   Okay.  All right.  While you were out on the street, and living in the Southern California area, which I'm going to say San Diego, were you interacting with a person whose nickname

2782

is "Ghost"?

A.  Yes.

Q.  I can probably search out what that first name is, but I don't know what it is, but you know Ghost by his regular given name; is that correct?

A.  Yes.

Q.  Okay.  Did you also have interactions with a guy by the name -- whose last name was Trippe?

A.  Yes.

Q.  Okay.  You understood Mr. Trippe also to be out of custody; is that correct?

A.  Yes.

Q.  Okay.  And Mr. Trippe, for lack of a better word, was extorting Ghost; is that correct?

A.  Yes.

Q.  Ghost was a friend of yours; is that correct?

A.  Yes.

Q.  Okay.  Mr. Trippe is not a person that you got along with; is that correct?

A.  Mr. Trippe did not like me is what I'm told.

Q.  And Mr. Trippe wanted you to pay him; is that correct?

A.  Correct.

Q.  Because you were -- well, let me back up.  I should have done some other things first.

        While you were out of custody during this time of the

2783

Ghost/Trippe situation, use that, go in back in your mind's eye and take a look at that time. That was a time when you were dealing heroin; is that right?

A. Correct.

Q. And you were transporting dope from Mexico; is that correct?

A. Correct, but this is all before 2019.

Q. Yeah, I understand.

A. Okay.

Q. I'm not talking about dates yet.

A. Okay.

Q. Right now I want to establish that it happened.

A. Uh-huh.

Q. Prior to 2019, you were dealing heroin that you got from Mexico?

A. Correct.

Q. Okay. And so we can go slowly, you knew at the time that dealing heroin is against the law?

A. Correct.

Q. And I'm assuming you knew at the time, correct me if I'm wrong, that you knew that dealing heroin from Mexico is against federal law, yes?

A. Correct.

Q. All right. And you would take that heroin from Mexico, which is the border, one of the -- I mean San Diego is a

CX Rapinoe R

**2784**

border city that's right on the border between Mexico and the United States, right?

**A.**  Correct.

**Q.**  Okay.  Then you would take or deal that heroin in other states such as Utah and Virginia?

MR. ENGELKING:  Objection, Your Honor.  Scope.

MR. REED:  If we can approach.

THE COURT:  Yeah.

(Sidebar commences.)

MR. ENGELKING:  On direct he testified to using drugs and he's admitted on cross, but he never testified to trafficking drugs.  The scope of his direct was limited to the EDD fraud.

THE COURT:  Let me -- one moment.

Let's see, he testified first on -- luckily we have transcripts from every day.

MR. REED:  If the Court could look up the words "benefits."

THE COURT:  Benefits?

MR. REED:  Yeah, what his benefits were.  The fact that the government didn't raise the violation of federal law and not being prosecuted as a benefit does not mean that I can't get into it.  In fact, that's the opening of cross-examination.  He said he was prosecuted by the state. He says during the -- during my first part of cross yesterday

CX Rapinoe R

2785

is that there were feds there when he got arrested; he said the FBI, he says the ATF.

We're eventually going to get into the fact that this man admitted, in a grand jury, that he was dealing drugs from Mexico, selling them or causing them to be sold in Virginia and Utah.  I may be wrong about Virginia, but it's one of those states over there, and then he is going to say that he was selling AR-15s.

So all of those things, the fact that you are not prosecuted for those federal crimes can be a benefit.  I can definitely argue that, but I have to lay the foundation to do that.  This all comes from his grand jury testimony.  This is not a surprise.  How does this --

THE COURT:  Mr. Reed, maybe I can make a comment.

MR. REED:  Yes, Your Honor.

THE COURT:  That I get what you're saying but I think the more direct issue is this is impeachment, right?  These are crimes of moral turpitude, crimes that impact his credibility.

MR. REED:  Yeah, that too.

THE COURT:  Isn't that sort of the easier issue?

MR. REED:  Well, Judge, I don't go easy.  I just -- I understand your point.

THE COURT:  So I don't think scope is the issue right now.

2786

MR. ENGELKING:  So is he impeaching a prior bad acts that he wasn't convicted of?

THE COURT:  Yes.

MR. ENGELKING:  Is that --

THE COURT:  Are we talking about --

MR. ENGELKING:  There's no conviction.

THE COURT:  Right.  These are prior acts under 613, right, aren't they?  What are you --

MR. ENGELKING:  Judge, the problem with crossing that -- with opening that way --

THE COURT:  And didn't you ask him questions about arrests or did you limit it?

MR. ENGELKING:  I asked him about his convictions.

MR. REED:  Your Honor, I don't --

MR. ENGELKING:  He told us about those, but we didn't get into his prior --

THE COURT:  608.  Isn't that 608(b)?

MR. REED:  Yeah, but it's the way you open whenever they do any witness -- they just -- I mean, I would never -- I never talk about the notes.  You don't get to do that.

MS. DE SALES BARRETT:  Right, I know.

MR. REED:  But they do it.

MR. ENGELKING:  You may be right.  Uh, but it certainly wasn't a benefit.  I mean, that was a different case.

2787

MR. REED:  I'm not saying it's --

MR. ENGELKING:  So your argument is a benefit in this case?

MR. REED:  I'm not arguing bad faith at all.

THE COURT:  He's not saying bad faith.  He said "benefit."

MR. REED:  Oh, benefit?

MR. ENGELKING:  Yeah.

MR. REED:  You mean not being prosecuted in federal court is not a benefit?  The fact that --

THE COURT:  I think this --

MR. REED:  This case is a separate --

THE COURT:  -- this horse is dead, isn't it?  I mean --

Mr. Conolly, you have some document of relevance?

MR. CONOLLY:  Well, I was just reviewing some -- these are just the Rules of Evidence.

THE COURT:  So 608?  608(b), impeachment of other acts, other than convictions?

MR. CONOLLY:  So except for convictions under Rule 609 extrinsic evidence and conduct is not admissible to attack or support the witness' character --

THE COURT:  So what that means is, if he just denies, he's stuck with the answer.  It means he can't come in and bring something else, but -- but he can ask the question,

2788

right?

MR. CONOLLY:  Well, the Court may allow inquiry on cross-examination if probative or truthfulness or untruthfulness of the witness or another witness whose character of the witness being cross-examined has testified about.

THE COURT:  So drug trafficking, weapons charges, I think there's case authority that says that that bears on credibility, right?

MR. CONOLLY:  That, I couldn't speak to off the top of my head.  I mean, I don't --

THE COURT:  And on the other hand, I think Mr. Reed's point about it being possibly a benefit, I don't know at what point.  And I don't know that it necessarily has to do with this case and you're probably going to get slapped around with that later, but, you know, if you want to open that door, we'll drive through it.

MR. REED:  I'm fine with that.

THE COURT:  Okay.  Let's go.

MR. REED:  Something else?

(Sidebar ends.)

THE COURT:  All right.  Mr. Reed, you may continue. I'm hoping we're going to keep this --

MR. REED:  Tight.

THE COURT:  Tight.

2789

MR. REED:  I will.  Except, I don't remember the last question because there was an objection.

THE COURT:  All right.

MR. REED:  So I think we're at the place where the witness responds and the Court says overruled.  Or the other way around, the Court says overruled and the witness responds.

THE COURT:  Thank you for that --

MR. REED:  I apologize, Your Honor.

THE COURT:  -- education on the courtroom procedure.

I'm trying to get back to that last question.  Okay.

So the question is:  And then you would take or deal that heroin in other states such as Utah and Virginia?

The objection is overruled.

Go ahead.  Sir, you can answer that.

THE WITNESS:  I have never taken drugs out of state to Virginia.

BY MR. REED:

Q.  Okay.  Not you personally.  Well, let me back up a second before we start this thing we are about to do.

You recall, that on July 21st through 23rd, excuse me, January 7, 2022, down in San Diego you testified before the federal grand jury.  Do you remember that?

A.  Yes.

Q.  Okay.  Were you honest with them?

A.  Yes.

2790

Q.  Okay.  Because you have to be, correct?

A.  Right.

Q.  All right.  So is it your testimony today that you did not say "transporting drugs from Mexico over to here and then sending them to different states, Utah and Virginia"?

A.  I don't believe I was saying that I was involved in that. I believe that other people may have been involved in that that I knew something about, but I was not doing it personally.

Q.  Do you remember saying that you used to sell drugs to Ghost?

A.  Yes.

Q.  In that, you, Ghost, and whatever group, were those drugs that you sold to Ghost, did they end up in Utah and Virginia?

A.  No, they did not.  At that time, I was selling drugs to Ghost.  As the relationship progressed, that switched.

Q.  Okay.  Well, let's put drugs on the left hand for now.

A.  Okay.

Q.  Let's go with the right hand.

        Did you manufacture AR-15s?

A.  I attempted to.

Q.  Back in January 7th of 2022, did you use the word "attempted" or did you testify that -- let me get the word right -- "We also manufacture AR-15.  We manufacture Glocks and Glock-style handguns"?

CX Rapinoe R

2791

A.   I've manufactured, personally, Glocks.  I have attempted to manufacture AR-15s.  And when I was arrested, I was arrested with all the manufacturing equipment.

Q.   Okay.  I'll even give you the word "attempt."

     Would you agree with me that attempting to put together AR-15s is against the law?

A.   Yes.

Q.   Okay.  So if you testified that you manufactured -- maybe you fudged it a bit, but you're saying today, I attempted to manufacture AR-15s?

A.   Yes.

Q.   All right.  And you were a cooperating witness -- or a contract undercover, was it?  You were a contract cooperator for the ATF; is that correct?

A.   Yes.

Q.   And you know what ATF stands for, right?

A.   Yes.

Q.   What is that?

A.   Alcohol, Tobacco, and Firearms.

Q.   Would you agree that an AR-15 is a firearm?

A.   Yes.

Q.   Would you agree that a Glock is a firearm?

A.   Yes.

Q.   Would you agree that Glock-style handguns are firearms?

A.   Yes.

2792

Q.   Are we talking about ghost guns when we mention those three in this case?

A.   Yes.

Q.   Okay.  So you were putting together ghost guns?

A.   Yes.

Q.   Would you agree that the ATF has an issue with ghost guns?

A.   Yes.

Q.   And that is a crime?

A.   Yes.

Q.   All right.  Can we agree, as we sit here today, February of 2025, in your list of things you have been convicted for, none of that has to do -- or none of that is a prior federal offense of manufacturing or attempting to manufacture ghost guns, AR-15s, what is it, Glocks or Glock-style weapons?

A.   No.

Q.   Okay.  We would agree that you didn't get those charges?

A.   No.

Q.   You don't have a federal case for that?

A.   No.

Q.   All right.  And between the time that you testified in front of the grand jury that you did those things and today, you have never been charged in federal court; is that correct?

A.   No.

Q.   That's not, correct?

A.   I've never been charged.

CX Rapinoe R

2793

Q.   Then the answer is yes, that is correct.

A.   Yes, that is correct.

Q.   All right.  And you were involved in all these things with Ghost, right?

A.   Yes.

Q.   All right.  Now, Mr. Trippe, you said, didn't like you. For the sake of argument, I don't know how you knew that, but you've also testified to that in the past, right?

A.   Correct.

Q.   Okay.  And your understanding was that Mr. Trippe was a member of the Aryan Brotherhood?

A.   Yes.

Q.   Okay.  But he was on the street in San Diego?

A.   Yes.

Q.   Okay.  And you were a little annoyed because your mindset -- or at least you told people that you were kicking up to John Stinson?

A.   Uh-huh.

Q.   So Mr. Trippe should have left you alone; is that right?

A.   Right.

Q.   And that was your whole premise with the Trippe/Ghost situation.  But you never spoke to, directly -- face to face with John Stinson; isn't that correct?

A.   No.

Q.   And you -- that's not, correct?

2794

A.  No.  I never spoke to him, that is correct.

Q.  Okay.

A.  I never spoke to John face to face, yes, that's --

Q.  That's my fault for asking questions in a negative.

It's a true statement that you never spoke to John Stinson face to face?

A.  Yes, that's a true statement.

Q.  Is it a true statement that you never spoke to John Stinson at all?

A.  That's a false statement.  I have talked to John Stinson.

Q.  And that's on the -- one of the many phones that was seized from you when you got arrested in November of -- was it 2020 -- 2020, right?

A.  Yes.

Q.  All right.  And in November of 2020, up until that day, you were still using drugs?

A.  Yes.

Q.  So the time that you spoke to John Stinson would have preceded that day; is that correct?

A.  Right.

Q.  So before November 13th of 2020, can I say -- and you correct me if I'm wrong -- that you were still a heroin addict using heroin?

A.  Yes.

Q.  All right.  So you were a heroin addict for a number of

CX Rapinoe R

2795

years; is that right?

A.  Yes.

Q.  If I make the statement that lying and being an addict kind of go hand in hand, wouldn't that be correct?

MR. ENGELKING:  Objection.  Argumentative.

THE COURT:  Sustained.

MR. ENGELKING:  Move to strike.

THE COURT:  It will be stricken.

BY MR. REED:

Q.  While you were a heroin addict, did you lie?

A.  Yes.

Q.  Did you lie a lot of times?

A.  Yes.

Q.  After November 13th, 2020, but prior to January 7th, 2022 -- so on one hand, I'm using your arrest date; on the other hand, I'm using the time you go before the grand jury.

A.  Uh-huh.

Q.  During that period, were you interviewed by members of the federal authorities?

A.  Yes.

Q.  Okay.  Did you discuss your drug dealing between Mexico and United States?

A.  Yes.

Q.  Did you discuss your weapons -- attempted weapons manufacture during that time?

2796

A.  Yes.

Q.  When you did that, were there ATF agents there?

A.  I believe so, yes.

Q.  Do you know --

A.  Actually, I don't believe there was.

Q.  Were there other federal agents there?

A.  Yes.

Q.  Federal -- members of the FBI?

A.  Yes, I think so.

Q.  Members of the DEA?

A.  I think so.

Q.  But your contract ultimately was not with the FBI or the DEA; it was with the ATF; is that right?

A.  Uh, and the San Diego Police Department, yes.

Q.  Okay.  I'm talking about the feds, because we're in a federal courthouse.

A.  Okay.

Q.  Prior to you having a contract with the ATF, did you have occasion to be interviewed by the ATF?

A.  Hmm, I really can't remember.

Q.  Okay.

A.  At some point we had an interview and they --

Q.  Right.  But you've been around?

A.  Yeah.

Q.  In trouble in the past, yes?

CX Rapinoe R

2797

A.   Uh-huh.

Q.   She's turning around because she wants you to use real words and so do I.

A.   Yes.

Q.   All right.  And during that time, would you agree with me that the federal government -- or actually, forget the federal government -- that police officers in general, we'll use San Diego and we'll use the agents that you spoke to, do not present you with deals until they know what you have to sell?

        MR. ENGELKING:  Objection.  Speculation.

        THE COURT:  Sustained.

BY MR. REED:

Q.   Isn't it true, sir, you did not get a deal with the ATF until after you spoke to the ATF -- ATF?

        MR. ENGELKING:  Objection.  Argumentative.

        THE COURT:  Sustained.

BY MR. REED:

Q.   All right.  Did you sign a deal with the ATF?

A.   I did.

Q.   Do you know when that was?

A.   Uh, April of '22 to May of '22 is when I worked for them.

Q.   That wasn't my question.

        Did you sign a deal with the ATF?

A.   I don't believe I signed a deal with the ATF.

Q.   Really?

2798

A.  I mean, I -- I don't -- I don't know.

MR. ENGELKING:  Objection.  Argumentative.

THE COURT:  Sustained.

BY MR. REED:

Q.  Your testimony before the grand jury was January 7th of 2022; is that correct?

A.  Yes.

Q.  Prior to testifying, had you already signed a deal with the ATF?

MR. ENGELKING:  Objection.  Argumentative.

THE COURT:  Sustained.

Maybe you can define your terms, Mr. Reed.

MR. REED:  I was trying to figure out how the -- how we were getting to that.

BY MR. REED:

Q.  So was there a point when you took an ink pen to paper and signed a piece of paper that made you a cooperating witness with the ATF?

A.  Yes, April of '22.

Q.  Okay.  And that would be after you testified before the grand jury?

A.  Correct.

MR. REED:  Okay.  I'm sorry, Your Honor.  We do need to approach one more time.

THE COURT:  All right.

CX Rapinoe R

**2799**

(Sidebar commences.)

THE COURT:  Go ahead.

MR. REED:  Before you -- and I'll explain to you where my problem is.

Experience has taught me that people do not testify before the grand jury and admit to crimes without having first been immunized in some way, shape, or form.  But I don't want to ask that without talking to you ahead of time.  And I don't know how that happens, I've never heard it in my life.

THE COURT:  He did have, remember, an agreement with the state.

MR. REED:  That doesn't immunize you for federal crimes.  I apologize.  I apologize.

THE COURT:  And yet you keep characterizing it in an argumentative fashion.  So I'm not going to write your questions for you, but you're calling it a deal, he's clearly talking about his informant contract.

MR. REED:  Yes.

THE COURT:  If you want to ask him if he signed something else, be sure to do that.  It's up to you, but --

MR. REED:  Well, my problem is I usually don't like to do that unless I think -- unless I have that document.

THE COURT:  Yeah.

MR. REED:  My experience is, and I'm sure yours is consistent with mine, is that you testify before the grand

2800

jury that you sold -- that you dealt drugs from Mexico into the United States and then sent those drugs off to other states, more likely than not, me being a defense attorney, I probably would red flag that and I'd make my client sign something.

THE COURT:  And yet he hasn't said that and the representation --

MR. REED:  No, he has said that.

THE COURT:  He did not say that he signed a --

MR. REED:  Oh, that part.

THE COURT:  -- cooperation agreement before he testified on the grand jury.

MR. REED:  Right.

THE COURT:  So what you're saying is --

MR. REED:  Because I don't know if he did or not.

THE COURT:  Exactly.  So I don't know what to tell you.  I don't know any different than what you do.  So --

MR. REED:  Well --

THE COURT:  -- if you want to walk that line, you can.

MR. REED:  I'm going to walk that line.  The reason is because I'm walking into attorney-client things that I don't know the answer to, and I just -- like I said, I don't normally ask permission but this is one of those areas.

THE COURT:  If you're saying you're going to ask him

**2801**

what his attorney told you --

MR. REED:  No, because I don't know he had an attorney.

THE COURT:  I don't know that either, so I'm not sure the attorney-client issue, but if you are saying did you sign a cooperation agreement before, then I think you can get an answer.  The trouble is calling it a deal.

MR. REED:  Okay.

THE COURT:  We're talking about different things.

MR. REED:  It's early in the morning.  I used the wrong word.  I'll agree with that.

THE COURT:  On the other hand, a lot of this, the ground has been plowed, but this is new ground, so that's fine.  But let's try to not repeat from yesterday.

MR. REED:  I'm doing that.  And, in fact -- I'm almost done.

THE COURT:  Well, we've nailed down, without a doubt, the guy used drugs for a long time.  When it was, when he stopped.  We've heard that a couple of times now.

MR. REED:  I suspect that the Court knows that that's not what I care about.  But I --

THE COURT:  Well, then you're spending a whole lot of time on something --

MR. REED:  No, you've got to lay the foundation so I can argue.  But that's the difficulty --

2802

THE COURT:  Because yesterday I heard 10 minutes and now we're significantly past 10 minutes.

MR. REED:  That is the mistake that happens.

THE COURT:  That's a mistake when we take a break.

MR. REED:  Yeah, but that's not my fault.  I don't know.  I've never heard of defense, they say, Mr. Reed, so you had overnight and you could have done these other things but you chose not to do it because you're supposed to end your brain and not do any more research at night?  I'm not supposed to read any more.

THE COURT:  No, but when you represent in front of the jury you have ten minutes, I just -- I'm afraid for how you look.  But it's up to you.

MR. REED:  I can live with that.  Thank you.

(Sidebar ends.)

BY MR. REED:

Q.  Okay.  You signed a contract with the ATF in June of 2022; is that correct?

A.  I believe May or June, yup.

Q.  Okay.  That's fine.

Prior to that contract, did you sign any other document with regard to the crimes that you were admitting?

A.  Yes.

Q.  Okay.  Who did you sign that document with?

A.  Plea agreement.

CX - Rapinoe R

**2803**

Q. Okay. So by the time you testified before the grand jury in January, you had already signed a plea agreement?

A. Uh, I think I -- I think I signed that directly after that.

Q. So are you testifying that you testified in January of 2022 about drug dealing and attempted manufacture of weapons without ever signing any documents?

A. Uh, I might have signed. I mean, it was a long time ago during a very stressful time during COVID in jail, so all the things that were happening were, I mean, heightened tenfold. I spent the whole entire 16 months in administrative segregation, no outside. You know, court was very different. So, yeah, I can't remember the exact order of the documents I signed, but yes, I signed them in the correct order that they were supposed to be signed in.

Q. You would agree that COVID did not suspend the Fifth Amendment right to remain silent and not implicate yourself in --

A. Right.

Q. -- criminal acts?

      MR. ENGELKING: Objection, Your Honor.

      THE COURT: Legal basis?

      MR. ENGELKING: Speculative.

      THE COURT: Sustained. I think it might be. I don't know that he has that -- that expertise, but go ahead,

CX - Rapinoe R

2804

Mr. Reed.

BY MR. REED:

Q. Prior to testifying before the grand jury, you were out of custody back in January of 2022; is that right?

A. No, I was in custody.

Q. Okay. So you testified down in San Diego before the grand jury at the courthouse that's downtown?

A. Yes.

Q. Is that right? You know the court I'm talking about?

A. Yes, yes.

Q. Big federal complex, right?

A. Yes.

Q. Somebody transported you from across the street -- I mean, it's two streets over but that's where --

        MR. ENGELKING: Objection, Your Honor. Relevance.

        THE COURT: Sustained.

BY MR. REED:

Q. You were brought to the -- from the state facility that you were doing time in to the federal courthouse; is that right?

A. Yes.

Q. Who brought you that?

A. The sheriffs.

Q. Prior to getting on a witness stand, did you have a lawyer?

A.   I don't believe I did.

Q.   Okay.  Prior -- so you don't believe you had an attorney. You testified before the grand jury with a prosecutor asking you questions and you admitted to dealing drugs from Mexico that ultimately went to Utah and Virginia, and to making firearms?

        MR. ENGELKING:  Objection.  Asked and answered.

        THE COURT:  Sustained.

        MR. REED:  I have no further questions.

        THE COURT:  Cross-examination, Ms. Barrett?  All right.

                    CROSS-EXAMINATION

BY MS. DE SALES BARRETT:

Q.   Good morning, Mr. Rapinoe.

A.   Good morning.

Q.   Mr. Rapinoe, I know you've testified to this, that you were 17 years in prison for various crimes, including fraud and theft, and forgery and distribution of guns and drugs, correct?

A.   Correct.

Q.   And while you were in prison, you have admitted in the past to committing acts of violence, including multiple stabbings; is that right?

A.   Yes.

Q.   In -- you were arrested in, you said -- obviously 11 --

**2806**

many times -- on November 13th.  And that was for EDD cards
and firearms; is that right?

A.  Yes.

Q.  And in the course of conducting that EDD fraud, you filled
out an application for yourself, yes?

A.  Yes.

Q.  And you received funds from the State of California
directly in your own name; is that right?

A.  Yes.

Q.  And when was the last employment that you held before
COVID?

A.  The -- uh, the eligibility for COVID relief funds was not
tied to employment.  It was tied to school.  And I was in
school in 2019.

Q.  What school?

A.  San Diego Community College.

Q.  And what were you studying?

A.  I think at that time I was just -- it was English, and I
was doing my prerequisites, but yes.

Q.  Do you have a degree?

A.  I'm currently in the process.

Q.  No, no, no.  Do you have a degree --

A.  No, I don't.

Q.  -- as a result of that schooling?

A.  I don't.

2807

Q. And during that period of time was a time when you were using heroin on a regular basis; is that right?

A. 2019 at the end is when I relapsed on heroin. I was clean for the majority of 2019 in school and in a program.

Q. In January of 2022, you were released from custody; is that right?

A. Yes, I think towards the end.

Q. Yes.

A. Uh-huh.

Q. After you testified before the grand jury for the second time.

And you pled guilty as a result of a plea agreement, correct?

A. Correct.

Q. And in doing that plea agreement, you had counsel, yes?

A. Yes.

Q. And counsel explained the plea agreement to you; is that right?

A. Correct.

Q. And part of that plea agreement included that you wouldn't get any strikes as a result of the plea agreement, correct?

A. No. There was no strikes on the case.

Q. There was no strikes on the case? You sure?

A. Oh, actually, I do believe there was a terrorist threats or criminal threats on the case, yes.

**2808**

Q.   And you -- and that was removed as a result of your plea agreement, correct?

A.   Yes.

Q.   And you got a substantially lower sentence than you would ordinarily get, correct?

A.   Correct.

Q.   And that was because you were already cooperating with the state, correct?

A.   Correct.

Q.   And you were already cooperating with the federal government, correct?

A.   Correct.

Q.   When did you start cooperating with the state?

A.   November 13th of 2020.

Q.   You reached out on that very day?

A.   The very day I was arrested, yes.

Q.   And to whom?

A.   The officers that arrested me is where the process started.

Q.   Okay.  So you started negotiating with your situation -- your situation immediately upon your arrest, correct?

A.   I was arrested by a task force that had been investigating me and already --

Q.   That's not the question, sir.

A.   All right.

CX Rapinoe DB

2809

Q.   The question is, you started negotiating with the officers who arrested you?

A.   I started telling the truth because --

Q.   Excuse me.  It's a yes-or-no question.

A.   Okay.

Q.   Did you start talking to them about the possibility of cooperation immediately upon your arrest in November of --

A.   Yes.

Q.   -- 2020?

        Did you sign a cooperation agreement with the state authorities?

A.   Yes, I believe I did.

Q.   When was that?

A.   Maybe six months later or sometime later.

Q.   Before or after your testimony before the grand jury?

A.   Before, I believe.

Q.   Okay.  So your first testimony before the grand jury was December of 2021.  How much earlier did you sign that cooperation agreement with the state?

A.   Uh, at least six months or -- within that time period from when I was arrested, yeah.

Q.   And then how did you come in contact with federal authorities?

A.   I had -- there was federal investigations into the EDD fraud I was doing.  I had already been arrested, and the feds

had came down when the local officers arrested me and took over the situation.

They ended up releasing me that day, but they took all my devices.  And then November 13th was, like, a month later, and I was arrested again.

So I think -- I almost think that they were there on the arrest, if I remember correctly.  It might have just been parole, but there was a lot --

Q.  Well, when did you start proffering -- you know what a proffer session is?

A.  A pre-offer?  Yeah.

Q.  Yeah.  This is a conversation that you have prior to doing any testimony and prior to engage- -- getting a cooperation agreement, correct?

A.  Right.

Q.  When did you -- and these situations usually involve signing documents that say that what you say in that proffer session can't be used against you, right?

A.  Right.

Q.  When was your first proffer session?

A.  Sometime between November 13th and when I testified.  I mean, it was -- you know, somewhere in there I had a meeting. Six months after, three months after.

Q.  Okay.  You're not sure?

A.  I'm not sure of the exact time.

CX Rapinoe DB

**2811**

Q.  How many meetings did you have before you testified in the grand -- in the federal grand jury?

A.  Uh, I believe two or three.

Q.  How many of those meetings were with federal authorities?

A.  I believe all of them.

Q.  Now, when you testified before the grand jury, you told the grand jurors that because of your cooperation, you would not be charged federally, didn't you?

A.  Uh, maybe.  Yeah, I'm not sure if I said that verbatim.

Q.  Okay.

A.  I was never charged federally from the start, ever, so --

Q.  I understand that.  That was not my question.

A.  Okay.

Q.  My question was that when you testified before the grand jury on May 20th, 2022, did you say the following: "Because my cooperation, I wasn't -- I'm not being charged federally"?  Did you testify to that?

A.  Yes.

Q.  When did you first meet Agent Gonzalez?

A.  Uh, I believe April of '22.

Q.  Did you sign an agreement at that point to work with Agent Gonzalez as a confidential informant?

A.  I did.

Q.  That -- you actually signed an agreement then?

A.  Yes.

**2812**

Q.   Did you also later sign an informal agreement with regard to your confidential informant status so you could be paid?

A.   Yes.

Q.   And when you signed the agreement with Agent Gonzalez in April, did you understand that you were going to be paid as an informant?

A.   Yes.

Q.   And when you signed your informant agreement to get paid later on, that agreement was signed in June of 2022, correct?

A.   Correct.

Q.   And that was after you made the recordings that were played in this courtroom which were made at the end of May?

A.   Okay.

Q.   Okay.  Do you have any problem with that -- that scenario?

A.   I don't believe I do.

Q.   Okay.  And over the course of the time that you spent, you were paid $4,200; is that right?

A.   Yes.

Q.   I believe 1,600 and -- one of the payments was for subsistence, right, $400 or something?  And then there was a $1,600 payment and another one that was over 2,000; is that right?

A.   Correct.

Q.   And again, those funds were all paid after you made the recordings, correct?

**2813**

A.  Correct.

Q.  Now, while you were out on bond, out -- released in January -- in January you were on parole or some kind of probation release as --

A.  I was on parole at first -- because I was on parole before I had gotten arrested -- then six months later, I switched over to community probation, uh, PRCS.

Q.  And when was -- six months later, meaning around the same time that you were making these recordings?

A.  No.  Probably about July is when I was switched from parole to probation.

Q.  Okay.  And at some point later that summer, you -- a warrant issued because you failed to report to a program that probation had assigned you to; is that right?

A.  Correct.

Q.  And when the probation officer called you to remind you to report to the program, you told him you were leaving the county for treatment; is that right?

A.  I told him I was having a medical emergency.

Q.  Did you tell him you were leaving the county?

A.  Yes.

Q.  Thank you.

A.  You're welcome.

Q.  And he said you need permission to leave the county, didn't he?

CX Rapinoe DB

**2814**

A.  Correct.

Q.  And then the call mysteriously ended, and you never called him back, correct --

MR. ENGELKING:  Objection.  Argumentative.

THE COURT:  Sustained.

BY DE SALES BARRETT:

Q.  The probation officer then, after your -- after your terminated conversation, went to court and got a warrant for your arrest, correct?

A.  Correct.

Q.  And because the terms of your release required you to submit for permission to leave the county, that's why that warrant was issued?

A.  Correct.

Q.  And so you turned to your law enforcement buddies to help you out of that jam, correct?

MR. ENGELKING:  Objection.

THE WITNESS:  No.

MR. ENGELKING:  Well --

BY MS. DE SALES BARRETT:

Q.  Did you contact the handlers that you were in touch with in San Diego to assist you in clearing up your status as a result of that warrant?

A.  Yeah.

Q.  Who did you contact?

**2815**

A.  I contacted my probation officer and my parole officer.

Q.  And when did you contact them?

A.  Those days.

Q.  Which days?

A.  Those days that all that was happening.

Q.  The same day?

A.  Yeah.

Q.  After the warrant was issued?

A.  Yeah.

Q.  The warrant wasn't issued on the day that you terminated your conversation with the probation officer.

A.  I believe it was issued a couple days later.

Q.  Right.

A.  Right.

Q.  And you contacted them and you clarified all of this?

A.  Yes.

Q.  And straightened it all out?

A.  I did.

Q.  But nevertheless, you left the county knowing that you could not, correct?

        MR. ENGELKING:  Objection.  Asked and answered.

        THE COURT:  Not by her.  The objection is overruled.

        THE WITNESS:  Yes.

        MS. DE SALES BARRETT:  Thank you.

        THE WITNESS:  You're welcome.

CX Rapinoe J.

**2816**

THE COURT:  Cross-examination, Ms. Luem.

CROSS-EXAMINATION

BY MS. LUEM:

Q.  Mr. Rapinoe, I'm not going to take up too much of your time.  I know you've already been inconvenienced.

A.  (Inaudible.)

Q.  And I don't want to repeat what other people have said, but I just want to clarify a couple of things in terms of this timeline.  You were arrested November 13, 2020, correct?

A.  Correct.

Q.  And that was a -- arrested by state law enforcement, but you think perhaps the federal government was also involved, correct?

A.  Yes.

Q.  And you think maybe it was some sort of a task force, right?

If you know.  If you don't know --

A.  I don't know.

Q.  Okay.  And that's because of your prior contact where they came to your house and took some items related to EDD fraud, right?

A.  I was on the street.  I wasn't at my house when that happened.

Q.  Okay.  But your partner --

Okay.  So starting in November 2020 you were in

CX Rapinoe J.

**2817**

custody San Diego, right?

A.   Correct.

Q.   Okay.  And you said you immediately reached out to cooperate with law enforcement, correct?

A.   I started telling the truth that day, yes.

Q.   Okay.  So, uh, as soon as you were arrested you asked to meet with law enforcement or they met with you and you said, Hey, I want to provide information?

A.   When I was arrested, they were there.

Q.   Okay.  And at some point in time after November of 2020 and before you testified in December of 2021, you came to an agreement with the federal government in San Diego, correct?

A.   Yes.

Q.   The U.S Attorney's Office down there?

A.   Yes.

Q.   And you signed some sort of agreement, cooperation agreement, right?

A.   Yes.

Q.   Okay.  And did you also sign a cooperation agreement with the state?

A.   Yes.

Q.   Okay.

A.   I believe I did.

Q.   Do you recall the names of any of the attorneys for the government that you worked with down there?

2818

A.  I do not.

Q.  Fair enough.

So you testified then in a federal grand jury in December of 2021, pursuant to that federal cooperation agreement, right?

A.  Correct.

Q.  And then again in May of 2022, you testified for the federal government in a case down in San Diego, correct?

A.  Yes.

Q.  In federal court?

A.  Yes.

Q.  Did you ever testify in any state court proceedings?

A.  No, I didn't.

Q.  Uh, when you testified in May of 2022 you were actually -- you actually had been released at that point, right?  From custody?

A.  Yes.

Q.  Okay.  So you got out in, I think it was January of 2021, right?

A.  Two.

Q.  I'm sorry, 2022, right?

A.  (Nods head.)

Q.  And when you were released in January of 2022, part of your agreement was that you remain in contact with the U.S. Attorney's Office, right?

CX Rapinoe

**2819**

A.  Yes.

Q.  Did you have a handler at that time or somebody that you reported to from --

A.  Yes.

Q.  Who was that?

A.  I don't have his name right now, but --

Q.  Was it a federal officer or a state officer?

A.  Federal.

Q.  And do you think it was from the federal prosecutor's office or from a federal agency like --

A.  An agency.

Q.  And you don't know, but you don't know if it was ATF, FBI, HSI?

A.  Yeah, I can't remember.

Q.  That's okay.  And you did that.  You remained in contact with them, correct?

A.  Yes.

Q.  And you at some point did testify that you were cooperating for both the state and the federal government, right?

A.  Yes.

Q.  Okay.  Did you provide information to state authorities as well?

A.  Yes.

Q.  You just never were asked to testify?

**2820**

A.   No.

Q.   Okay.  Excuse me.  You said you met with Agent Gonzalez sometime around April of '22 and you were out of custody at that time?

A.   Yes.

Q.   And he, at that point in time, became what's known as your handler, right?

A.   Yes, I walked with him for -- yeah.

Q.   Okay.  I mean, it's kind of a term of art, right?  But can you tell the jury what a handler is?

A.   He was my contact that I contacted within the ATF.

Q.   Okay.  And he provided you with a recording device, right?

A.   No.

Q.   Who did that?

A.   I did.

Q.   Okay.  So you provided your own -- you had your own recording device?

A.   I did.

Q.   But sometimes when you were making calls you were actually making them in the presence of Agent Gonzalez?

A.   Correct.

Q.   Okay.  And you did all of that pursuant to your cooperation agreement that you signed down in San Diego with the U.S. Attorney's Office?

A.   No.

Q.   Did you sign a new cooperation agreement?

A.   No.

Q.   You signed what is called an "informant agreement"?

A.   Yeah.

Q.   All right.  And there's rules that you have to abide by on that agreement, right?

A.   Yes.

Q.   And one of those is not to commit any crimes --

A.   Yes.

Q.   -- unless specifically asked to, right, by the --

A.   Right.

Q.   -- ATF?  Okay.

      So in other words, if they ask you to go buy five pounds of methamphetamine, you do that, but it's at their request, right?

A.   Correct.

Q.   Okay.  So you're not going to get charged for something that they ask you to do, obviously?

A.   I don't get to keep the drugs or anything.

Q.   Right, right.  But that never actually happened in this case, right?

A.   No.

Q.   In fact, all that happened was you made a number of phone calls, right, or received phone calls?

A.   Correct.

CX Rapinoe J.

**2822**

Q.  And recorded them?

A.  Yeah.

Q.  Okay.  So you didn't actually participate in any drug transactions, right?

A.  At that time, drug transaction did not take place.

Q.  Okay.  And you didn't -- did you end up even meeting up with anybody for a drug transaction?

A.  No.

Q.  Okay.  So, in essence, your work with Agent Gonzalez consisted of recording telephone conversations?

A.  Providing info.

Q.  And recording telephone conversations?

A.  Yeah.

Q.  All right.  And in exchange for that you were paid over $4,000?

A.  Yes.

Q.  And who came up with that amount of money?

A.  It was $200 a day for 11 days, I believe.

Q.  Okay.  And did you get a receipt for every day that you worked, or just receipts for when you got the lump sum?

A.  I can't remember.

Q.  And they paid you in cash?

A.  I believe so, yes.

Q.  And who handed you that money?

A.  An agent with the ATF.

CX - Rapinoe

**2823**

Q.  Was it Agent Gonzalez?

A.  I can't recall specifically.

Q.  Was there a conversation at some point that you would no longer be working with them, or was it just understood that once they handed you the $4,000 in cash your work was done and that was it?

A.  No, I believe at some point I went back down to San Diego for a court appearance and I signed a piece of paper that ended whatever was -- you know.  But, I mean, I signed something that from somebody later on after all this, after I had been moved away, I came back down for court and finalized a signature somewhere with somebody.

Q.  Okay.  And that would have been state court for your -- for your --

A.  No, that was -- it was feds.

Q.  Oh.  So did you have a federal case?

A.  No.

Q.  So you just went to federal court to sign that document?

A.  Some -- somebody met up with me when I was in San Diego and had me sign a release of me working with them anymore.

Q.  I see.  Okay.  And that was somebody from San Diego, not from Fresno or from up here?

A.  No.

Q.  Okay.

A.  No.

**2824**

Q.  And just to clarify, you were never prosecuted for any federal crimes?

A.  No.

MS. LUEM:  I have nothing else.  Thank you.

THE COURT:  Redirect?

REDIRECT EXAMINATION

BY MR. ENGELKING:

Q.  Uh, on cross you had mentioned "Ghost."  Who's Ghost?

A.  Ghost was a friend of mine, we were just good, good friends in the mix in San Diego together.  He ended up getting involved in a lot of the stuff I was involved in.

Q.  Was Ghost affiliated with the AB?

A.  Yes.

Q.  So when you were working with Ghost, was that work on behalf of the AB?

A.  Uh, no.  That was prior.  Mine and his stuff was prior.

Uh, later on, when he started doing business with them, I was no longer -- uh, I wasn't in with that group that -- that he was working with.

Q.  Okay.  There was a lot of mention about various agreements on cross.  I just want to be clear.  You signed one agreement, one confidential informant agreement with the ATF; is that right?

A.  Yes.

Q.  And in that agreement, it contained some language about

2825

being paid, right?

A.  Yes.

Q.  There was no other agreement with the ATF, right?

A.  No.

Q.  Okay.  And then there's been a lot of testimony about a grand jury in San Diego.  That was a completely separate case, right?

A.  Correct.

Q.  Did that case have anything to do with this case?

MR. REED:  Objection.

MR. ENGELKING:  Objection.

THE COURT:  I can't hear everybody at once. Mr. Reed, I need your mic.

MR. REED:  I said --

THE COURT:  I need your mic.  I couldn't hear what you --

MR. REED:  I just turned it on.

THE COURT:  And your objection was what?

MR. REED:  I made the objection, he started talking, I'm withdrawing the objection.

THE COURT:  Okay.  And Ms. Barrett, I think you said something?

MS. DE SALES BARRETT:  I can't remember now.

MS. LUEM:  I'm objecting to the question which is that this --

**2826**

THE COURT:  Let me just hear the legal basis.

MS. LUEM:  Relevance.

THE COURT:  Overruled.  Go ahead.

BY MR. ENGELKING:

Q.  That was a completely separate case, right?

A.  Yes.

MR. ENGELKING:  Okay.  Brief indulgence, Your Honor.

BY MR. ENGELKING:

Q.  Your -- when did your cooperation agreement end?  With ATF, I'm sorry.  Is that September 2022?

MS. DE SALES BARRETT:  Objection, Your Honor. Leading.

THE COURT:  Sustained.

THE WITNESS:  Uh --

THE COURT:  You need to rephrase that, Mr. Engelking.

MR. ENGELKING:  Sure.

BY MR. ENGELKING:

Q.  Did your cooperation -- or excuse me, did your confidential informant agreement with ATF end prior to 2023?

A.  Yeah.

Q.  So you're not under a cooperation agreement today?

A.  No.

Q.  And you're not being paid to testify today?

A.  No.

MR. ENGELKING:  Okay.  No further questions.

**2827**

THE COURT:  Recross, Mr. Reed?

                    RECROSS-EXAMINATION

BY MR. REED:

**Q.**  Your grand jury testimony in San Diego was a completely separate case, correct?

**A.**  It -- I -- it was never my case.  So --

**Q.**  That's not what I asked.

**A.**  Yes, it's a completely separate case.

**Q.**  Okay.  You were testifying before the grand jury?

**A.**  Yes.

**Q.**  You swore to tell the truth?

**A.**  Yes.

**Q.**  The whole truth?

**A.**  Yes.

**Q.**  And nothing but the truth?

**A.**  Yes.

**Q.**  Did you lie to the grand jury in San Diego?

**A.**  I do not believe so.

**Q.**  You don't believe you lied?

**A.**  No, I did not.

**Q.**  Okay.  There we go.

            MR. REED:  I have no further questions.  Thank you.

            THE COURT:  Any cross, Ms. Barrett?

            MS. DE SALES BARRETT:  No, Your Honor.

            THE COURT:  Ms. Luem?

2828

MS. LUEM:  Just one or two.

RECROSS-EXAMINATION

BY MS. LUEM:

Q.  The grand juries that you testified at in San Diego, in December of '21 and May of '22, those had to do with the Aryan Brotherhood, right?

A.  Yes.

Q.  And the members of the Aryan Brotherhood?

A.  Yes.

Q.  And crimes committed by the Aryan Brotherhood?

A.  Yes.

Q.  And in fact, it had to do with EDD fraud, right?

A.  Yes.

Q.  And drug sales?

A.  Yes.

Q.  By the Aryan Brotherhood?

A.  Yes.

Q.  Okay.  So it was a different case number, right?

A.  No, separate cases in San Diego.  They --

Q.  Yeah, separate case, different defendants, right?

A.  Yes.

Q.  But the subject matter was essentially the same?

A.  Yes.

Q.  Thanks.

THE COURT:  Any redirect?

**2829**

MR. ENGELKING:  No, Your Honor.

THE COURT:  All right.  Thank you, sir.  You may be excused.

Next witness.

MS. STOKMAN:  Government calls Benjamin Mendoza.

THE CLERK:  Please raise your right hand, Mr. Mendoza.

**BENJAMIN MENDOZA**,

called as a witness on behalf of the Government, having been first duly sworn, testified as follows:

THE WITNESS:  Yes.

THE CLERK:  Please go ahead and state your name and spell your last name.

THE WITNESS:  Benjamin Mendoza, M-e-n-d-o-z-a.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MS. STOKMAN:

Q.  Good morning.

A.  Good morning.

Q.  Can you tell us where you are currently employed?

A.  The California Department of Corrections and Rehabilitation.

Q.  Is that often called CDCR?

A.  Yes.

Q.  Okay.  And how long have you worked with CDCR?

DX Mendoza S

2830

A.   A little over 22 years.

Q.   What is your current assignment?

A.   I'm a special agent assigned to our digital forensic team.

Q.   And what are some of the duties that you have in that assignment?

A.   Uh, I oversee the day-to-day functions of that lab.  It's a -- it's a pretty extensive operation where we support all of our prisons as well as our field agents in the community, where we conduct forensic examinations on cell phones, computers, laptops, anything that -- mass storage devices, anything that contains data, correct.

Q.   How long have you been a part of the digital forensic team?

A.   Uh, right around five years.

Q.   Did you have prior duties or assignments before that in law enforcement?

A.   Within CDCR, yes.

Q.   What were those?

A.   Uh, notably, I was a member of the Investigative Services Unit at the California Medical Facility State Prison in Vacaville for four years, 2008 to 2012.

       I was also a member of the Investigative Services Unit at California State Prison, Sacramento, for a little over a year.  And then, with our -- the Office of Correctional Safety, that's kind of the banner, the division I'm under now.

2831

I know it can kind of be a little bit confusing, right?  You're like, What?

So the Office of Correctional Safety has a Gang Intelligence Unit, and that's how I kind of got my foot in the door with -- with the division I'm in now is, I was a subject matter expert specifically on the Mexican Mafia.

And then I moved, I promoted and -- to being a lieutenant over the Analytical Unit, and then they moved my lieutenant job into the forensic lab.  And then I stayed in there and then promoted when a special agent vacancy became available.

Q.  Would you describe part of your role in your current assignment as a forensic examiner?  To be a forensic examiner, would that be a very -- would that be a term you would use for what you do?

A.  Yes.

Q.  Okay.  And you mentioned the types of devices that the digital forensic team analyzes, but those devices include cell phones; is that right?

A.  A large amount.  Primarily, yes.

Q.  Do you have training and certifications related to forensic examinations of cell phones and other devices?

A.  Yes.

Q.  And what are those?

A.  With Cellebrite, specifically, my CDCR Office of

2832

Correctional Safety will not let you conduct forensic examinations unless you're -- you go to the week-long training with Cellebrite and pass their -- their courses, yes.

Q.  And do you have other trainings for forensics examinations beyond Cellebrite?

A.  Yes.  Magnet Axiom, which is like a computer-based kind of a program.  You can download cell phones with Magnet Axiom, but also, there's another forensic tool that they utilize. It's Graykey.  And -- and that's another tool that we use a lot of.

I also attended drone -- Unmanned Aerial Vehicle training thorough -- oh gosh, Spyder Forensics, yes.  So, yes.

Q.  So you mentioned Cellebrite.  Can you tell us what that is?

A.  Yeah.  It's a -- a software that will -- when you have a device, the -- the Cellebrite program, what it will do if -- typically, in a correctional setting the devices are all going to be locked, they are not going to be unlocked.  And so you have to unlock the phone to get -- to obtain any kind of data off of the phone or to see what's being -- that phone is being utilized for, and that program will either allow to you bypass the lock, it will -- there's a term that's called "brute force," the passcode.

You'll plug it -- you'll load the program, the Cellebrite program onto the device.  And it could take

DX Mendoza S

**2833**

anywhere from one to five days for the passcode to reveal itself, depending upon the complexity of the passcode.  And then once you get the passcode revealed, you can successfully unlock the phone.

And then the Cellebrite program, it's -- which has been working on the phone already, will pull the data off the device and then it will -- you can export it into kind of what we call readable format, yeah.

Q.  So have you become certified as a Cellebrite analyst?

A.  Yes.

Q.  Is that the week-long course that you mentioned before?

A.  Yes.

Q.  And do you have to take additional training to retain that certification?

A.  Yes.  Those certificates expire and then when they are set to expire again, to maintain that position in that forensic lab I have to -- if it's going to be up in April, I need to start taking the classes in -- in February or so, so there's no lapse in the certification.

Q.  Approximately, how many times have you used the Cellebrite Universal Forensic Extraction Device, also sometimes called UFED, a UFED tool, or what we're calling Cellebrite, to acquire and examine information from phones?  About approximately how many times?

A.  Uh, our lab is a high-frequency lab, so we get anywhere

DX Mendoza S

2834

from 250 to 300 devices a month.  And I'm the guy for our department that extracts those.  So there -- sometimes I don't leave that room.  I go to work that morning, and I go in that room and that's all I'm doing is extracting devices and extracting.  So I -- I do it for a living, yes.

Q.  So would you say --

A.  Literally.

Q.  Sorry.

A.  Yeah.

Q.  Would you say that you've extracted, then, over a -- like thousands of phones using Cellebrite?

A.  Yes.

Q.  Okay.  And have you provided training to other law enforcement officers relating to electronic evidence?

A.  Yes.

MS. STOKMAN:  I'd like to now qualify Mr. Mendoza as an expert in forensic examination of phones using Cellebrite?

THE COURT:  Any objections?

MR. VILLA:  No objection.

MS. DE SALES BARRETT:  No, Your Honor.

MR. REED:  No objection.

THE COURT:  All right.  I will accept him as an expert in Cellebrite.

BY MS. STOKMAN:

Q.  Did you use the Cellebrite tool to acquire and analyze

**2835**

information from a cell phone in this case, and in this investigation?

A.  Yes.

MS. STOKMAN:  May I approach the witness?

THE COURT:  Yes.

BY MS. STOKMAN:

Q.  I've handed you what's been marked as Exhibit 1855.  Do you recognize that disc that I handed you?

A.  Yes.

Q.  How do you recognize it?

A.  Because I was shown the contents of the disc.

Q.  Are your initials on that disc?

A.  They are.

Q.  And when you viewed the contents of that disc, did you recognize what was -- what was on it?

A.  It was -- it was an extraction, a Cellebrite extraction. And on that were -- that includes images, text messages.  It could include web searches, audio, you know, all kinds of things.  Photographs, yeah.

Q.  So on that particular disc, was it the Cellebrite extraction that you did on one phone pertaining to this case?

A.  Uh-huh, yes.

Q.  Okay.  And during the course of review of that Cellebrite extraction, did you come to determine whose phone it belonged to?

2836

A.  Yes.

Q.  And who was that?

A.  Uh, that's Waylon Pitchford.

Q.  Are you familiar with Mr. Pitchford?

A.  Yes.

Q.  How are you familiar with him?

A.  I'm familiar with Mr. Pitchford prior to my digital forensic time when I was tracking the Mexican Mafia, because I know that there was some affiliation with the Mexican Mafia, so I was very well aware of who Waylon was.

And also, my colleagues who I worked with on our gang unit that tracked the Aryan Brotherhood, I was very close with those individuals.  And, yes, so I'm very well aware of who he is.

Q.  Okay.  And are you aware through that experience if he has any affiliation with the Aryan Brotherhood?

A.  Yes.

Q.  And does he?

A.  Yes.

Q.  Is Cellebrite regularly used by law enforcement?

A.  Yes.

Q.  And do you know whether evidence from Cellebrite has been admitted in -- in other courts?

A.  Yes.

Q.  Has it?

2837

A.   Yes.

Q.   Do you know whether the accuracy and effectiveness of Cellebrite has been independently tested?

A.   Yes.

Q.   And has it?

A.   Yes.

Q.   So when you do a Cellebrite extraction, what type of information generally does Cellebrite extract from a phone?

A.   So it can vary depending upon if -- if you get a full extraction or what we call a "partial extraction" where if you -- if you get a full extraction, you're going to -- you're going to get everything, so to speak, which is going to include your photographs, images, attachments that are in photographs that are sent as attachments, social media activity, like, electronic money transfers, Cash App, things like that.  You're going to get text messaging, Short Message -- SMS messaging, short messaging system, audio files potentially.  That's on a full extraction.

        If you get a partial extraction, like if the program cannot reveal the passcode, it's a complex passcode, you may not get all of those.  You may get just a lot of factory data and a few maybe text messages here and there, but really in the law enforcement realm, it's not really a lot of usable data.

        But in this particular case, it was a full

DX Mendoza S

2838

extraction, and it revealed full contents of the phone.

Q.   From what it was able to pull; is that fair?

A.   Yes, yes.

Q.   Is it fair to say that Cellebrite does not capture
everything that might be on a phone?

A.   Correct.

Q.   And even during a full extraction, are there sometimes
programs that it won't capture?

A.   That's correct.

Q.   And what types of programs or applications would those be?

A.   That I've seen is the encrypted apps, such as, like, for
example, for the jury, it would be like Signal app or Telegram
or some of these ones where they're -- you know, xPal, they
are in the encryption where you can see that the program is on
the phone if the phone's unlocked, but the Cellebrite software
won't pull that data, if that makes sense, right?  You'll see
it's on the phone, but it just won't grab it.  The next phone,
it will.

          And it's -- it's kind of like one plus one equals
three.  Sometimes it works, and sometimes it -- it just --
there's no rhyme or reason to that.  It just is.

Q.   And that ability for Cellebrite to capture encrypted apps,
like the content on an encrypted app, is that, in your
experience, a more recent ability, or has it always been the
case?

**2839**

A.   The -- the -- you can tell that the Cellebrite engineers are making efforts to get better at that, so to speak, yes. And it has improved, I'd say, over the last two years or so, yeah.

Q.   So back in 2020 and 2021, was it still -- there was still, would you say, a lot of limitations as to what Cellebrite could pick up in those encrypted apps extracted from a phone?

A.   Yes.

Q.   So just briefly, can you tell us how you go about using Cellebrite to extract data from a cell phone?

A.   So obviously our lab gets a lot of phones.  So I'll get a phone, and -- and, uh, I will, you know, ensure that the phone is charged, right, you know, so you can -- you can extract it. And then so I'll plug the phone into the Cellebrite program.

I know if it's locked or unlocked already, so it depends on which kind of mode you want to go into with the program.  You plug it into the program, and then I allow the program to -- to detect -- you know, it will tell me -- even though I know it's locked or not, it will say, The device is locked.  Do you want to -- it's called "brute force."  Do you want to force the program to make the phone reveal the passcode?  Yes.

And then, again, as soon as that program -- and that takes a little while, maybe 20 minutes or so for it to kind of do its thing.  And then once it's loaded completely on the

DX Mendoza S

2840

phone, you could turn around and look, and sometimes you're like, Oh, I got the passcode.  Or it could take anywhere up to four days or so.  It just depends on the complexity of the passcode.

And then once I do achieve the passcode, I'll plug the phone back in.  And during this whole process, that device does not leave -- it does not leave the secure area of our lab.  The whole lab is a secure area.  So it doesn't leave that -- that area.

I'll plug it back in, and then the program will -- will resume where it left off.  It will say, Oh, here's the passcode.  Go ahead and reboot the phone.  I put the passcode in.  The phone's unlocked.

You open the developer options up to, you know, open the phone wide open, and then you hit extract.  And then it will do -- it will -- it will give you options.  Do you want a full file extraction, which is typically the most common you're going to get these days, and, uh -- or you want a partial extraction?  Well, nobody wants a partial extraction. You want to get a full extraction.

So you hit full extraction, and then it will -- depending on how much data is on that phone, it could take a couple hours to download it to up to, like, five or so hours.

And then at that point, because we have so many devices coming through our lab, is that I will assign that --

DX - Mendoza - S

2841

those devices, typically, to one of our contract staff.  And then they will go -- go ahead and do the analysis of those devices, yes.

Q.  And is that -- that -- that procedure you just mentioned, is that subject to the limitations that we've already discussed from the Cellebrite extraction itself?

A.  Uh-huh, yes.

Q.  In your experience, have you found that by the time sometimes Cellebrite can get into a phone, content has been somehow wiped out or remotely cleaned out somehow and you're not able to get content as well?

A.  Typically, that -- if that -- and that does happen. That -- that usually happens from the point of seizure at the prison or the -- the residence in the community to the point where it gets to our lab.  Because that's part of our triage process is I'll make sure the SIM card is -- I apologize, I missed that part -- is I remove the SIM card, if the agent that seized the device hadn't, to cut it off from the network, right, make sure that the phone is in airplane mode and pull the SIM card out.

So that typically -- that wiping mechanism, which folks tend -- tend to have that mechanism set up, that will happen before it gets to our place.  I -- I haven't -- uh, actually, one time that happened in front of me, but that's not very common.

2842

Q.  But it has happened?

A.  Yes.

Q.  When -- did you look through the contents of this cell phone that's in Exhibit 1855?

A.  I did.

        MS. STOKMAN:  And if we could display 1284.  It's already been admitted into evidence.

BY MS. STOKMAN:

Q.  Do you recognize this photograph in Exhibit 1284?

A.  Yes.

Q.  Did this photograph come from the phone that we've been talking about in Exhibit 1855?

A.  Yes.

        MS. STOKMAN:  Thank you.  I have no further questions -- oh, sorry, I have one question.

BY MS. STOKMAN:

Q.  Were you able to determine if Cellebrite extracted any content from the Signal application on this phone?

A.  No.  There was no Signal application.

Q.  So it didn't download anything from Signal?

A.  No.

        MS. STOKMAN:  Okay.  I have no further questions. Thank you.

        THE COURT:  Cross-examination.

///

CX Mendoza R

2843

CROSS-EXAMINATION

BY MR. REED:

Q.  Good morning, Special Agent Mendoza.

A.  Good morning.

Q.  So during your 22 years with the CDCR, you were with the -- a bunch of different alphabets of the different things broken down; is that a fair statement?

A.  Yes.

Q.  Okay.  One of which was the Office of Correctional Safety; that's right?

A.  Yes.

Q.  And the criminal intelligence analysis unit, what's that?

A.  Yes.  That's -- I know, it's a -- yeah, it's a -- the Office of Correctional Safety is a big organization where we have our fugitive teams, our special services unit teams, and -- and then we have our criminal intelligence analysis unit.

        And that -- that is an analytical unit that supports our field agents, supports our prisons.  My part of the pie of that criminal intelligence analysis unit is providing support -- forensic support to our field agents and to our prisons.

Q.  During the 22 years that you've worked for the CDCR, have you been to most of the prisons that are in the State of California?

CX - Mendoza - R

2844

A.  Yes.  Yes.

Q.  Are you familiar with the prison that's -- I don't know if that's the name of the prison, but a prison in Solano?

A.  There are -- so are you -- there's two prisons in Vacaville, California.

Q.  Yes.

A.  One's California State Prison Solano, and the other one is California Medical Facility, yes.

Q.  Okay.  And one has people that are ill, and one has people that are not ill; is that a fair statement?

     Or that's -- that's too general, but the medical facility is for people that have conditions that are beyond, say, the prison hospital; is that a fair statement?  You don't know for sure?

A.  I don't -- I don't --

Q.  It's okay.  I was -- we don't need that answer anyway.

     Let's do this part:  There is a state prison that's in Vacaville called "Solano"?

A.  Correct.

Q.  Okay.  There is a state prison -- or more than one, I think -- that is in Corcoran?

A.  Correct.

Q.  Okay.  When you roll up and down the 99 and down the 5, there are prisons up and down the state; is that a fair statement?

CX Mendoza R

2845

A.   Uh-huh, correct.

Q.   Now, I have an exhibit there in the black -- or the blue book that's off to your left -- your right-left -- your right. I can't do left-right if I'm looking at you.  There we go.

Can you identify what it is that you're looking at, sir?

A.   Yeah.  It's a -- it's a map of California's Correctional and Rehabilitation institutions.

Q.   Does that appear to be accurate to you, the prisons that are in the State of California?

A.   Yes.

MR. REED:  Your Honor, can I ask that be marked for identification?  It's Exhibit 6000.

THE COURT:  Yes.

MR. REED:  Can I ask that that be admitted into evidence, please?

THE COURT:  Any objections?

MS. STOKMAN:  No.

THE COURT:  That will be admitted.

(Defendants' Exhibit 6000 was received.)

BY MR. REED:

Q.   Okay.  Now, there's another thing called the "Correctional Intelligence Task Force."  That was something that you -- actually, you're currently with that; is that correct?

A.   Yes.

Q.   Is that where your lieutenantship -- they kind of -- you were lieutenant of something else and then this thing became the new thing and then now you're lieutenant in that?

A.   No.  I've been a part of our criminal intelligence analysis unit, we are just in partnership with the FBI and the Federal Bureau of Prisons.  So they are autonomous of each other, but yet we work together, if that makes sense.

Q.   Ah.  That makes sense, because they are STGs -- well, let me back up.  What's an STG?

MS. STOKMAN:  Objection.  Beyond the scope.  Irrelevant.

THE COURT:  Overruled.

BY MR. REED:

Q.   What's an STG?

A.   Security threat group.

Q.   Commonly referred as a gang?

A.   That's what we used to call them, but yes.

Q.   We have a new name now?

A.   Yes.

Q.   Okay.  The CITF, because gangs can cross from between the BOP and the CDCR, you guys also follow that, and so you end up kind of merging, and at least have some work, a joint partnership between the FBI, the BOP, and the CDCR.  Is that a fair statement?

A.   Yes.

Q.   Okay.  And that's also what your CV says?

A.   Correct.

Q.   Okay.  When it comes to the Cellebrite situation, you get phones and sometimes those phones are downloaded and you guys do what you do to try to break in and find out what the phones say or what's in there; is that correct?

A.   Correct.

Q.   Okay.  Even if there is a program that is designed or tries to hide that information, it sounds as though you sometimes have programs that can get past that program?

          MS. STOKMAN:  Objection.  Vague.

          THE COURT:  Sustained.

BY MR. REED:

Q.   Yeah, I'm not sure I can be specific in the world of tech.  So I guess what I'm asking you is, Cellebrite is a constantly evolving operation, that particular program and what it does.  Is that a fair statement?  You're giving me that look like maybe no?

A.   I'm just trying to -- could you restate the question again?

Q.   Sure.  Okay.  At its core, it's -- it's a program that helps you get in to see what's inside of a phone, calls that were made, maybe even texts, definitely photos, things of that nature.  Fair statement?

A.   Correct.

CX Mendoza R

2848

Q.   Sometimes there are programs that are designed outside of Cellebrite, outside of the way that phone was built that you can -- that a person can download to try and defeat a program like Cellebrite; is that correct?

A.   Oh, yeah.

Q.   Okay.  There we go.  Because you know that that happens, there are also upgrades to Cellebrite to try to combat the people that are trying to keep the things from being disclosed, right?

A.   Yes.

Q.   And this is an ongoing thing, and unless our world changes it will always be an ongoing thing.  Fair statement?

A.   It's a definite ebb and flow, yes.

Q.   That's pretty much what I wanted to get at.

Now, and at its core, the information inside of a cell phone is just that.  It's information as to calls that were made, calls that were received, and in some cases content of those phones; is that correct?

A.   The information that Cellebrite gleans from a device is actual -- it's actually on that device.  Nobody put that there other than the device's user.

Q.   So instead of information, how about if I use the word "history."  Is that more descriptive?  It's a history of what's in that phone?

A.   It's a history of what's in the phone, but it's a history

CX - Mendoza, R

2849

also, too, of what the user utilized that phone for.  Like there's a saying in forensics, if I want to learn about you, give me your phone.  And if you want to learn about me, give me your phone, because it's a -- it's kind of a picture of who you are as an individual.  It shows the things that are important to you.  It shows, you know, your images.  It shows all those things, right, the things that you value.  Yes.

Q.  So in my case, I might lie about what phone calls I made and what information I made, but if you really want to know about me you grab my phone, you dump it on Cellebrite, and if you want to know about me, use my phone.  Is that what you are saying?

A.  It definitely paints a pretty clear picture of the user, yes.

Q.  And in the world of, what is it, criminal intelligence analysis, in the world of correctional intelligence task force, it sounds like this is a tool that is ubiquitous and it's used on a regular; is that right?

A.  I didn't catch that.

Q.  I added a big word and I shouldn't have done that.

A.  Yeah.

Q.  In the world of correctional intelligence task force work, the use of the Cellebrite -- Cellebrite program is very important; is that right?

A.  Law enforcement, as a whole, yes.

2850

Q.   Okay.  And this isn't some new thing that law enforcement just came out today; is that right?

A.   No.

Q.   And you guys have known that you have this and known that it is part of one of the tools that one can use to get into a telephone that has been seized; is that correct?

A.   Yes.

Q.   To confirm or deny what someone may have said about what they did or did not do; is that a fair statement also or --

A.   Correct --

        MS. STOKMAN:  Objection.

        THE WITNESS:  Oh, sorry.

        MS. STOKMAN:  Calls for speculation.

        MR. REED:  He's an expert, Your Honor.

        THE COURT:  Overruled.

BY MR. REED:

Q.   I think you said, Yes, that is correct?

A.   Correct.

        MR. REED:  Thank you.  No further questions.

        THE COURT:  All right.  Let's go ahead and take our first break of the day.  Let's be back, let's say five minutes after 10:00.

    (Jury exits the courtroom at 9:43 a.m.)

        THE COURT:  All right.  Let's go ahead and take a break.

(Recess held.)

THE COURT:  All right.  We have everyone back in their places.  Let's go ahead and bring the jury back.

(Jury enters the courtroom at 10:06 a.m.)

THE COURT:  All right.  Further cross-examination?

MR. VILLA:  Yes.

CROSS-EXAMINATION

BY MR. VILLA:

Q.  Good morning, sir.

A.  Hello.

Q.  The phones that you discuss that you analyzed were phones seized within the prison walls, correct?

A.  Both.  Inside the prisons walls and also we support our field agents, and so outside the walls as well.

Q.  Field agents being those from the CDCR?

A.  Correct.  And various law enforcement agencies too.  Kind of on a smaller scale, but yeah.  We -- pretty much anybody who's law enforcement we provide services to.

Q.  Is there a specific policy within CDCR that when a phone is taken from an inmate it must be examined with Cellebrite?

A.  There -- there is no "shall" or "must."  So it's up to the local institution to determine if they send it out for extraction or not.  My lab has no bearing on that or say-so on that matter, yeah.

Q.  It's just up to the particular law enforcement officer

that took the phone whether it should be sent to you to be evaluated?

A.  Or their supervisor or however they deal with that locally.  I'm not sure exactly, there's what, 30-plus prisons and various field agents, supervisors and staff.  So I can't really give you a straight answer on what determines what comes to us and doesn't.  Yeah.

Q.  The phone you -- Exhibit 1855, which is the Cellebrite you did on a phone that you testified you believed was Waylon Pitchford's phone, how did that phone get to you?

A.  That phone came to my lab via Salinas Valley State Prison.

Q.  Was there instructions from the officers or their supervisors who took the phones to say, Help us figure out whose this phone is or what do they tell you?

A.  Uh, they typically -- they'll send a request form with the device and who their -- who the phone -- they determine that already.  There's a small amount of phones that we get that are called "uncontrolled," which means the staff are unable to determine whose device it is, maybe based on where it was found, maybe in a day room-type setting or an area -- under a trash can maybe or something.  But no, that will come with a request form.  But in addition, in this particular case, there's images on the phone of Waylon Pitchford, I guess we commonly know those as selfies, lots and lots of selfies.  And it's very easy to determine that it was his device.

Q.   Before you did the Cellebrite and made that determination, were you told by the folks from Salinas Valley, We think this is Waylon's phone and we took this from Waylon?  What information were you given?

A.   They send -- they send in a request form to our lab, and they -- yeah, it had Waylon's name on it.  And so, yeah, I conducted the extraction on it thinking, Okay, it's probably -- probably Mr. Pitchford's phone.  And then after doing the -- gaining a full extraction off the device and looking at the images of the device, it's very clear that they were correct.  It was his phone.

Q.   Understood.  The date that you received that phone and were asked to do that examination, when was that?

A.   I believe it was -- it was late '22.  It was --

Q.   2022?

A.   Yes.

Q.   That's sufficient.  When you say "late," we're talking about the latter half of the year?

A.   Yeah.

Q.   Were you asked to examine any phones from the 2020 time frame for this case?

A.   Not that I recall off the top of my head.  I may have, but, I mean, you know, processing 250 to 300 phones a month, that's a lot to keep track of, you know.

Q.   A lot of phones.  Got you.

**2854**

A.   I wish I was that -- I wish I was that good.

Q.   I'll ask some more questions about that, but I forgot to ask, you testified on direct that there wasn't Signal text messages or Signal communications on this phone or I didn't catch that whole part.  Was there Signal on this phone?

A.   Not that I saw, no.

Q.   Does that mean that the Signal application was not downloaded on the phone or you just didn't see any communications?

A.   I didn't see any communications, yes.

Q.   It is possible, though, to, in some instances when the phone has the Signal application to see communications made on Signal through the Cellebrite system?

A.   Sometimes, yes; sometimes no.

Q.   Hit or miss?

A.   Yes.

Q.   Sorry, yes?

A.   Yes, sir.

Q.   Thank you.  So you don't have a specific recollection in this case of examining a phone that anybody told you was taken from a Robert Eversole?

A.   I know the name, but off the top of my head, again I -- I can't say yes to that, yeah -- yeah.

Q.   Same question.  You don't have a specific recollection of examining a phone that somebody told you was taken from

CX Mendoza V

**2855**

Kenneth Johnson, correct?

**A.**  I'm aware of who Mr. Johnson and, again, off the top of my head, yeah, I -- shooting from the hip I can't give you a "yes" answer to that.

**Q.**  From doing Cellebrite examinations on phones that do have the Signal application, you know that the Signal application can be used to exchange messages similar to text messages, SMS messages, correct?

**A.**  Yes.

**Q.**  It can also be used to make phone calls, right?

**A.**  I believe so.

**Q.**  And the phone calls are done using internet data, right? Like -- like a FaceTime type of function?

**A.**  I assume so.

**Q.**  But you don't know; is that right?

**A.**  Yeah.

MR. VILLA:  May I have a moment, Your Honor?

THE COURT:  Sure.

MR. VILLA:  I'll pass the witness.

THE COURT:  Any further redirect?

MS. DE SALES BARRETT:  No.  Do I get to say no questions, Judge?

THE COURT:  I'm sorry, did I not give you that chance?

Ms. Barrett, do you have any cross-examination?

2856

MS. DE SALES BARRETT:  No, thank you.

THE COURT:  All right.  So nothing further from the government.

Thank you, sir, you may be excused.

Next witness.

MR. ENGELKING:  The government calls Ethan Medley.

THE COURT:  Sir, if you'll just come all the way up to the witness stand here.

THE CLERK:  Please raise your right hand.

ETHAN MEDLEY,

called as a witness on behalf of the Government Plaintiffs,

having been first duly sworn, testified as follows:

THE WITNESS:  I do.

THE CLERK:  Go ahead and have a seat and state your full name for the record and spell your last name.

THE WITNESS:  It's Ethan Medley, E-T-H-A-N, M-E-D-L-E-Y.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. ENGELKING:

Q.  Where do you work?

A.  At Kern Valley State Prison.

Q.  And what is your title?

A.  I'm a correctional officer.

Q.  How long have you been a correctional officer?

2857

A.   19 years.

Q.   And generally, what are your responsibilities as a correctional officer?

A.   Uh, well, right now it's working and hiring in the watch office.

Q.   How about in 2016?

A.   I was a building officer.

Q.   And what does -- what does the building officer do?

A.   Making sure the inmates get what they need, and keep it secured.

Q.   And what facility were you working in in 2016?

A.   Uh, Bravo yard.

Q.   Bravo yard of what facility?

A.   Oh, Kern Valley State Prison.

Q.   And when you say "Bravo yard," what does that mean?

A.   That means there's four yards, so there's an Alpha, Bravo, Charlie, and Delta, and that's how they distinguish which side to work on.

Q.   So drawing your attention to the night of January 24, 2016, were you working that night?

A.   The 24th, yes.

Q.   And that was in Kern Valley?

A.   Correct.

Q.   When -- do you remember when your shift started that night?

2858

A.   Uh.

Q.   Or that day?

A.   It was in the afternoon.

Q.   And roughly when did it end?

A.   It -- it's supposed to be at ten o'clock.

Q.   Okay.  Are you familiar with the way the housing units on Bravo yard were operated at that time?

A.   As far as I know, yes.

Q.   Well, when inmates are -- were in their cells, are the doors opened or closed?

A.   They are closed.

Q.   And how are those cell doors opened?

A.   Uh, by the control cop.

Q.   What is -- what is the control cop?

A.   Okay.  He's the control officer that opens and closes the doors automatically.

Q.   So the doors are -- are they electronically controlled?

A.   They are, electronically.

Q.   Okay.  So I want to draw your attention to that night, around 8:00, eight o'clock, 8:22 that night.  Were you working with any other officers at that time?

A.   Yes.

Q.   Okay.  And what were you doing around that time?

A.   We were escorting the nurse that was handing out the meds for that night.

2859

Q.   And did you pass by cell 128?

A.   Yes, I did.

Q.   And what, if anything, occurred when you passed by that cell?

A.   Uh, an inmate knocked on the window to get my attention, finished walking, came back to his cell, and he goes -- he stated, uh, he's dead.  I looked in and saw Inmate Lowrey laying underneath the bunk.

Q.   Okay.  So were you familiar with the inmates in that cell?

A.   Yes.

Q.   And who -- you mentioned one was Lowrey?  Who --

A.   Holmeyer.

Q.   Holmeyer was the other inmate?

A.   Yes, sir.

Q.   Were there only two inmates in that cell?

A.   Yes.

Q.   Which inmate did you say -- which inmate said "he's dead"?

A.   Holmeyer.

Q.   After you observed the -- Lowrey on the floor, what did you do next?

A.   Uh, I turned around and immediately told my control cop to hit his alarm.

Q.   And what, if anything, did you observe when you looked in and saw Inmate Lowrey on the floor?

A.   Just lying there unresponsive.

2860

Q. Did you notice anything else about his condition?

A. No.

Q. Okay. So then what did you -- what did you do next?

A. I instructed Holmeyer to turn around and to submit to cuffs.

Q. And how -- how does an inmate in the cell submit to cuffs?

A. Okay. So we have a food port. So there's a port that slides back and forth. After we unlock it, we have to manually unlock it and then lift up and it slides back and forth, okay. And then when he does that, he usually sticks his arms out, and then we usually cuff him.

Q. So is the port essentially just a hole in the door?

A. Pretty much, yes.

Q. And did Inmate Holmeyer comply with your directions?

A. Yes, he did.

Q. So he stuck his hands out of the -- out of the port?

A. Yes.

Q. And did you cuff him?

A. Yes.

Q. What did you do after you cuffed Inmate Holmeyer?

A. The responding staff, uh, which was my other -- Officer Meyer responded "over," and then the rest of the other staff -- I told my sergeant that I had put him in handcuffs, and he instructed the door opened. And Officer Meyer took and escorted him out of the building.

2861

Q.   Uh, did you return to the cell at any point after Holmeyer was removed?

A.   Yes.  I was instructed to go get the gurney.  So I went and got the gurney.  As I came back, they were pulling him out and doing CPR.

Q.   Do you know if the CPR efforts were successful?

A.   As far as I know, they were doing CPR and they took him off.  So I have no idea what his condition was when he left.

Q.   Did Inmate Holmeyer say anything else to you?

A.   No.

        MS. FISHER-BYRIALSEN:  Objection.  Calls for hearsay.

        THE COURT:  The response, Mr. Engelking?

        MR. ENGELKING:  Coconspirator statement.

        THE COURT:  Overruled.  Go ahead.

BY MR. ENGELKING:

Q.   You can answer.

A.   Oh, sorry.  No, no.

        MS. FISHER-BYRIALSEN:  Your Honor, we need to have a sidebar.

        THE COURT:  All right.

   (Sidebar commences.)

        MS. FISHER-BYRIALSEN:  I don't think Mr. Holmeyer is a coconspirator in this conspiracy.

        THE COURT:  Okay.  So you're going to examine on that?  I mean, I appreciate you don't think so.  It's been

2862

alleged that this was a murder in connection with the enterprise, right?  So help me out with what you want me to do.

What's -- I mean, I hear you're saying he's not; government is saying that he is.

MS. FISHER-BYRIALSEN:  That's our position, he's not a coconspirator.

THE COURT:  Okay.

MR. VILLA:  They certainly haven't laid the foundation at this point in time that Mr. Holmeyer was part of any conspiracy or that the death was related in conspiracy.

THE COURT:  So the objection is foundation.

All right.

MR. ENGELKING:  You said no, okay.

(Sidebar ends.)

THE COURT:  All right.  Mr. Villa's objection is sustained.

Next question, please.

BY MR. ENGELKING:

Q.  Did you have any other involvement in this case after -- after the victim was removed and Inmate Holmeyer was removed?

A.  No.

MR. ENGELKING:  No further questions, Your Honor.

THE COURT:  All right.  Cross-examination?

MR. REED:  No questions, Your Honor.

**2863**

MR. VILLA:  Yes, Judge.

CROSS-EXAMINATION

BY MR. VILLA:

Q.  Good morning, Officer.

A.  Good morning.

Q.  What is hooch or moonshine?

A.  I don't know what you mean.

Q.  Well, let me ask you this, you've been a corrections officer for 19 years?

A.  Uh-huh.

Q.  Is that "yes"?

A.  Yes, sir.

Q.  Do inmates sometimes make alcohol inside their cells to drink?

A.  Yes.

MR. ENGELKING:  Objection.  Scope.

THE WITNESS:  Manufactured --

THE COURT:  One second.  Beyond the scope is the objection?

MR. ENGELKING:  Yes.

THE COURT:  I think we need some foundation, Mr. Villa, as to how this relates.

MR. VILLA:  Your Honor, it goes to testimony from Mr. Eversole about his statement he said Thrasher Holmeyer made to him.

CX Mendoza V

2864

THE COURT:  All right.  Overruled.

Go ahead, sir.

THE WITNESS:  Okay.  It's -- they call it "pruno."

BY MR. VILLA:

Q.  Pruno.  What is pruno?

A.  It is fermented fruit.

Q.  And explain that to the jury, if you will, what inmates do with fermented fruit?

A.  They usually put it in a bag, ferment it, maybe put some sugars in it, and it creates an alcohol basis.

Q.  And then it's drunk by the inmate?  Yes?

A.  Yes, yes.

Q.  Did you see any pruno in the cell when you were in there where inmate Lowrey was found?

A.  As I recall, no.

Q.  Did you -- in your -- in the course of your 19 years as a corrections officer, have you learned the signs that an inmate might be consuming pruno or there might be pruno in the cell?

A.  Yes.

Q.  What are those signs?

A.  Usually the odor is so strong it permeates outside the doors.  And usually, the red eyes.  Usually, incoherent sometimes.  Drunken state.

Q.  Similar to when you see somebody drunk out in public?

A.  Yes.

Q.   You did not see indications that Mr. Holmeyer was drunk, correct?

A.   Correct.

Q.   You said that you can smell the odor.  It's so strong you can smell it outside the door?

A.   Uh-huh.

Q.   You mean outside the door of the cell?

A.   Correct.

Q.   If I understood your testimony correct, you walked by the cell first because you were with the nurse that was handing out meds?

A.   Correct.

Q.   And there was a knock on the door, and you kept going to finish that task, and then you came back, right?

A.   Uh-huh, yes.

Q.   So the first time you walked by, and you didn't smell any alcohol odor?

A.   No.

Q.   Then when you went back after you finished escorting the nurse, when there was discussion, I guess, with Mr. Holmeyer, you didn't smell any alcohol then?

A.   No.

Q.   Once Mr. Holmeyer submitted and you handcuffed him, I take it then the door was opened and he was escorted away?

A.   Correct.

Q.   And when the door was open, you didn't smell any alcohol?

A.   No.

Q.   I think you then said you went to get a gurney, and Mr. Lowrey was ultimately put on that gurney and taken away as life-saving measures were conducted, yes?

A.   Correct.

Q.   And during that time, you didn't smell any alcohol?

A.   No.

Q.   So the jury heard in this trial from a Robert Eversole --

         MR. ENGELKING:  Objection, Your Honor.  He's testifying.

         THE COURT:  Mr. Villa, is your intention to offer a hypothetical of some sort?

         MR. VILLA:  No, Your Honor.  I'm just talking about evidence that's been admitted in court.

         THE COURT:  I hear that, but this witness doesn't have foundation for that, and you're just telling him what you've heard, so --

         MR. VILLA:  Oh, yes.  I mean, it would be -- ultimately, the question would be a hypothetical to this -- the end question, yes, is a hypothetical to this officer.

         THE COURT:  He's not an expert.  He just can tell you what he heard, saw, and smelled.

         MR. VILLA:  Sure, Judge.  It would just be a lay opinion.

RDX Mendoza-5

2867

THE COURT: It's sustained. Move on, please.

BY MR. VILLA:

Q. Based on everything you heard, saw, and smelled in the cell, you didn't see any indications that alcohol had been consumed recently?

A. No.

MR. VILLA: Just a moment, Your Honor.

No further questions.

THE COURT: Any other cross-examination?

MS. FISHER-BYRIALSEN: No, thank you.

THE COURT: Mr. Reed, anything?

MR. REED: No, Your Honor. Thank you very much.

THE COURT: Redirect?

REDIRECT EXAMINATION

BY MR. ENGELKING:

Q. Do you know how long Inmate Lowery had been laying there before you encountered him?

A. No.

MR. ENGELKING: No further questions.

THE COURT: Any recross?

MR. REED: No, Your Honor. Thank you very much.

THE COURT: All right. Thank you, sir. You're excused.

Next witness, please.

MS. STOKMAN: Judge, we'll need to take a brief

2868

recess to bring the next witness in.

THE COURT:  All right.  Ladies and gentlemen, if you will take about ten minutes, and we'll bring you right back in.

(Jury exits the courtroom at 10:30 a.m.)

THE COURT:  All right.  Who's the next witness?

MS. STOKMAN:  Timothy True.

THE COURT:  Let's go ahead and bring him in.  Yeah, we weren't really having a break.  We're just bringing a witness in.

MR. VILLA:  Your Honor, you indicated ten minutes.  I was just going to take two.

THE COURT:  If you need to hit the bathroom, go ahead, yeah.  Please be timely back, though.

MR. VILLA:  Yes, Judge.

THE COURT:  If someone else needs to take a quick restroom break, sure, go ahead and do that, but please be timely.

(Recess held.)

THE COURT:  All right.  Let's go ahead and bring the jury members in.

(Jury enters the courtroom at 10:43 a.m.)

THE COURT:  All right.  Thank you.  We have everyone back.

Ms. Stokman, your next witness.

**2869**

MS. STOKMAN:  Yes, the government calls Timothy True.

THE CLERK:  Please raise your right hand.

**TIMOTHY TRUE**,

called as a witness on behalf of the Government, having been first duly sworn, testified as follows:

THE WITNESS:  Yes.

THE CLERK:  Go ahead and please state your full name for the record and spell your last name.

THE WITNESS:  Timothy Aaron True, T-r-u-e.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MS. STOKMAN:

Q.  Good morning.

A.  Good morning.

Q.  Can you tell us where you're from, where you grew up?

A.  I grew up in Southern California in Lake Elsinore.

Q.  And how long did you live in that part of California?

A.  From when I was born until when I got arrested at 20 years old.

Q.  And when you were arrested at age 20, did you go to prison for that?

A.  Yes.

Q.  What crime did you commit to go to prison?

A.  Premeditated attempted murder, criminal street gang activity, and burglary.

2870

Q.   Is that -- you're currently incarcerated, right?

A.   Yes, ma'am.

Q.   Have you been incarcerated since you committed that crime?

A.   Yes, 2008.

Q.   And you said that crime was part of activity with a criminal street gang.  Were you a part of a gang?

A.   Yes, ma'am.

Q.   What gang?

A.   COORS Family Skins.

Q.   And is that C-O-O-R-S?

A.   Yes.

Q.   So is it fair to say that when you committed that attempted murder, that you were committing it on behalf of that criminal street gang at the time?

A.   Yes.

Q.   Have you also had felony convictions since you've been incarcerated?

A.   Yes, ma'am.

Q.   And what are those?

A.   I have criminal street gang activity while housed in the county jail, and then I had a battery on a peace officer while housed in the state prison.

Q.   What prison were you in when that occurred?

A.   North Kern State Prison.

Q.   What year was that?

A.   2011.

Q.   So when you went to prison, did the fact that you were an active criminal street gang member affect where you were housed?

A.   Yeah.  As an active gang member, I was housed with other active White inmates.

Q.   And are you aware or do you know of the Aryan Brotherhood?

A.   Yes.

Q.   What is that?

A.   The Aryan Brotherhood is a -- is a prison gang in California prisons.

Q.   And when were you first exposed to the Aryan Brotherhood?

A.   I was first personally exposed to the Aryan Brotherhood in 2015.

Q.   What prison were you in then?

A.   I was in Kern Valley State Prison.

Q.   And when I -- when you say "first exposed," do you mean, like, a first time you interacted with an AB member?

A.   Yeah.  That was my first time having a personal interaction with the Aryan Brotherhood members.

Q.   Prior to that year, were you under any rules at the prisons from the time you went into the prison up to 2015?

A.   Yeah.  As a -- as an active white inmate, you fall under the rules of Aryan Brotherhood.  As soon as you are in custody and you run with the active whites, you fall under the rules

2872

of the Aryan Brotherhood.

Q.  So is it fair to say that throughout this entire time of your prison -- prison term and through your interactions with Aryan Brotherhood members, that you've learned about the rules and the codes of conduct of the Aryan Brotherhood or the AB?

A.  Yeah.  So as I said, my first personal interaction with them was in 2015.  But growing up as a gang member -- you know, I became a skinhead at 12 years old.  So from that point on, I became familiar with the Aryan Brotherhood, with their ideologies and stuff like that.

Q.  And did you -- in that time, have you learned whether or not the Aryan Brotherhood has a policy about cooperation or speaking to law enforcement?

A.  Yes.

        MR. VILLA:  Objection.  Cumulative.

        THE COURT:  Overruled.

BY MS. STOKMAN:

Q.  You can answer.

A.  Yes.  If you cooperate with law enforcement, you'll be marked for murder.

Q.  Have you learned whether or not the AB has a policy about disobeying orders given from AB brothers?

        MR. VILLA:  Objection.  Cumulative.

        THE COURT:  Overruled.

BY MS. STOKMAN:

**2873**

Q. You can answer.

A. Yeah. If you're given an order by an Aryan Brotherhood member, you have to obey it or you will be murdered.

Q. And have you learned about whether or not the Aryan Brotherhood has a policy about disrespecting made members or brothers?

A. Yeah. It's absolutely against the rule. Anyone that disrespects a made member of the Aryan Brotherhood has to be murdered.

Q. Uh, the course of time that you were -- you were aware of the Aryan Brotherhood, did you come to learn who various made members of the AB were?

A. Yeah. So when I was housed in Kern Valley State Prison, the first member that came to that yard was Gary Littrell, and then shortly after he showed up, David Chance arrived, and then shortly after he arrived, Kenneth Johnson and Francis Clement arrived as well.

Q. And so Kenneth -- all those people that you just mentioned, are they affiliated with the AB?

A. They're all members of the Aryan Brotherhood.

Q. And are you aware of an individual named John Stinson?

A. I'm -- I'm aware of him through my associations with Francis Clement and Kenneth Johnson.

Q. And tell us what -- how you're aware of him through them?

A. So in 2015, while I was housed at Kern Valley State

Prison, I was put up for membership into the Aryan Brotherhood, and I moved into the cell with Francis Clement.

And while we were in the cell, we communicated with John Stinson on a cellular phone while he was housed in Centinela State Prison.

Q. And during that time, were you able to learn whether or not John Stinson was part of the AB?

A. Yes. John Stinson was a member of the Aryan Brotherhood.

Q. So let's talk about, real quick, Kenneth Johnson. So have you had personal interactions with him?

A. Yes. While I was housed in Kern Valley, I had personal interactions with him in the dayroom and also on the recreation yards.

Q. And what about Francis Clement? Have you had personal interactions with him?

A. Yeah, same, in the housing units and the recreation yard, and we were also cellmates for some time.

Q. Sorry. You did say that. I should have clarified beyond that.

Does Francis Clement go by any nickname that you're aware of?

A. Just Frank or Big Frank.

Q. And what about Kenneth Johnson?

A. Kenwood.

Q.   So let's go back a little bit.

Where were you housed in late 2014?

A.   Uh, in late 2014, I was transferred from Tehachapi State Prison, the segregated housing unit, over to Kern Valley State Prison.  On B yard.

Q.   And so at Kern Valley State Prison, were there different yards -- you mentioned B yard -- were there different yards beyond B yard?

A.   Yeah, so Kern Valley State Prison had four yards.  It had A yard, B yard, C yard, and D yard.  A yard and B yard were both active yards, where they had -- all the inmates were all active gang members.  And then yards C and D were sensitive needs yards, for dropouts.

Q.   When you say "dropouts," do you mean people who have left whatever gang affiliation they had?

A.   Yeah, by "dropouts" it means you've left the gang affiliation, whether you've just decided to change your life, or you've become a cooperator, or anything that puts you in bad standings with the active gangs.

Q.   Uh, so those yards that you mention, particularly the A yard and the B yard, would you categorize those as an upper yard and a lower yard as well, or how does that work?

A.   Yeah, so on B yard they have eight buildings.  So Buildings 1 through 4, the lower numbers were considered the lower yard.  And then there was a large brick wall separating

DX True S

**2876**

that -- the one -- Buildings 1 through 4 from Buildings 5 through 8.  And Buildings 5 through 8 were considered the upper yard.

Q.   And were you in the upper or the lower yard?

A.   I was in the lower yard.

Q.   Have you ever run a prison yard?

A.   Yes.

Q.   When was that?

A.   Uh, I ran Kern Valley State Prison B yard from the beginning of 2016, until I dropped out in April of 2016.

Q.   And who put you in charge of that yard?

A.   Uh, Francis Clement and Kenneth Johnson.

Q.   Were they -- when you were put in charge of that yard, were you given expectations about running the yard, what you were supposed to be doing?

A.   Yeah.  So at the time, like I stated previously, I was up for membership in the Aryan Brotherhood.  So it was my expectation -- their expectation of me to run the yard like I was an active member.  I was to collect money if -- for the kitty from the white inmates if they were selling drugs or if they were cooking alcohol, I was to collect the money from them.  I was to make sure that everyone was behaving according to the rules and the standards that we had set for them.  And if they weren't, then I was -- basically made to handle that situation.

2877

Q. How were you supposed to handle situations?

A. Depending on the offense, that whatever inmate committed would depend on the type of violence or whether they just had a exercise discipline or violence discipline.

Q. And did that violence ever rise to murder?

A. Not while I was -- not during that period, but shortly before then it often does lead to violence, yes.

Q. And you said that you were put in charge of the money that was being made from the yard. Were you keeping the proceeds of the money made from that yard?

A. No. I was not keeping the proceeds.

Q. Where were some of the -- or all of the proceeds going?

A. So at the time when myself and Francis Clement and Kenneth Johnson were housed on Kern Valley State Prison B yard, there was another individual named Matthew Hall, he was a member of PENI Death Squad, he was on the streets and him and his wife were keeping all the money in a bank account for them on the streets.

Q. When you say "for them," who are you speaking about?

A. Francis Clement, Kenneth Johnson, and David Chance.

Q. So you mention ways in which you were supposed to be kind of keeping the yard under control for the white inmates.

Where were you receiving the orders that you were enforcing on other white inmates?

A. I was receiving the orders directly from Francis Clement

DX True S

2878

and Kenneth Johnson.

Q.  So do you recall around when it was that Kenwood, Frank, David Chance, they arrived at Kern Valley?

A.  Yes.

Q.  When was that?

A.  So David -- well, out of those three, David Chance arrived first, and I believe it was middle -- early to middle of 2015, and then within a week or two, Kenneth Johnson and Francis Clement showed up as well.

Q.  Did you notice changes to the yard once those three AB members came over to Kern Valley?

A.  Yeah, so as soon as the Aryan Brotherhood members landed on the yard, there was a change in the white inmates. Obviously, there was a fear among them, because when there is a made member on the yard, anything they say goes.  So the yard was running kind of loosely before they arrived, so people were afraid that there was going to be reprimands for that.

Q.  Do you know an individual named Thrasher Holmeyer?

A.  Yes.

Q.  And how do you know that person?

A.  I know Thrasher Holmeyer from being housed in Kern Valley State Prison.

Q.  And so is it fair to say that Thrasher was also housed at Kern Valley at some point?

2879

A.   Yes.  He was housed at Kern Valley at -- he was there when I arrived at the end of 2014 and he was there when I left.  He was housed on the upper yard of B yard.

Q.   So were you able to have personal interactions with him while you were at the same facility?

A.   Yes.  So while I was housed there, I was employed as a yard crew worker and -- for the lower yard.  And he was also a yard crew worker for the upper yard.

And every morning we would collect the trash in the trash carts from the buildings and push them from the lower yard up to the upper yard through a door and I would interact with him at that point.  And also, we had Odinist religious services weekly where we would go from -- all the whites from the lower yard and the upper yard would go weekly and meet in the chapel.

Q.   So did you have interactions with Thrasher Holmeyer during the end of 2015 and early 2016?

A.   Yes.

Q.   Are you familiar with the death of Inmate Brandon Lowrey?

A.   Yes.

Q.   How are you familiar with that?

A.   So at the time, like I stated previously, I was up for membership in the Aryan Brotherhood, and at that time, from middle of 2015 towards the end of 2015, I was basically told just to watch and learn.  So any time we had a meeting, or

ER 2214

2880

there was Aryan Brotherhood talks going on the yard, I was there to be present and to listen and pay attention and learn how to become a Aryan Brotherhood member.

Q.   Who told you to do that?

A.   Francis Clement, Kenneth Johnson, and David Chance.

Q.   So when you speak of Aryan Brotherhood meetings, who was involved in those meetings that you were part of?

A.   So, at the very least, it would be Francis Clement, Kenneth Johnson, David Chance, and myself.  And then on the days that Mikey Stanford could come down from the upper yard he was there as well, and then Matthew Nather, who was put up for membership at the same time I was, was also involved.

Q.   Mikey Stanford, what was his affiliation with the AB, if any?

A.   At that time he was just an associate.

Q.   So just to back up real quick, when you were put up for membership, who were your sponsors for membership?

A.   My sponsors for membership were Francis Clement and Kenneth Johnson.

Q.   So you said were you familiar with Inmate Brandon Lowrey's death.  Were you personally involved in discussions about -- or that led up to his death?

A.   Yes.

Q.   Uh, and are you aware of why he died?

A.   Yes.

Q.   Did you have discussions with or were you around when these discussions were being had, AB -- with AB members who discussed events leading up to Lowrey's death?

A.   Yes.

Q.   And who -- actually, can you tell us how that first started?  What discussions did you engage in that first started the interactions that led to Lowrey's death?

A.   Yeah.  So when the Aryan Brotherhood members first came to the yard, there were a lot of White inmates who were in drug debts to other races.

At the time we had a $200 limit on drug debts, but everyone was over those limits.  And Francis Clement and Kenneth Johnson were upset that so many whites owed so much money to the blacks and the Mexicans.  So they wanted to get together a list of who all owed debts so they could make an example out of one of the whites so that none of the other whites would get in debt any longer.

Q.   So are you aware of who was tasked with compiling the list of whites that owed drug debts?

A.   So at that time, they had Mikey Stanford running the yard for them.  So they had him collect all the debts for the upper yard.  And then Kenneth Johnson and Frank Clement personally spoke with the -- the shot callers for the blacks and the Mexicans to collect the rest of the debts.

Q.   And did a list get compiled, as far as you know?

2882

A.   Yes.

Q.   And what, if any, discussions were had with AB members about that list?

A.   So once they compiled that list of drug debts, there was two names that stood out as owing more money than everyone else.  There was Brandon Lowrey and another man named Rookie. They asked me what I knew about those two guys and I didn't know Brandon Lowrey, personally, so I just said I didn't know anything about him; but that I knew Rookie, and that he was an okay guy, that he just had a drug problem.

Q.   When you say "they asked," who are you referring to?

A.   Uh, Francis Clement and Kenneth Johnson.

Q.   Was Dave Chance ever part of these discussions as well?

A.   Yes.  He was always a part of these discussions.

Q.   So you said that prior to this list being compiled, and the AB brothers showing up at Kern Valley, that the drug debt generally was a limit of $200?

A.   That was the general rule was that you could not be in debt more than $200 to another race, but the guy who was running the yard was a drug addict, so he didn't really enforce that rule.

Q.   And generally, before the AB brothers showed up, what would happen if someone did have a drug debt that was enforced?

A.   So if -- the general rule for white inmates that if you

DX - True - S

2883

were over the $200 limit, or you had not paid your debt in a timely manner you would be stabbed and then the debt would be paid.

Q. If a white inmate wanted to kill another inmate, could they make that decision on their own?

A. No.

Q. Why not?

A. Because whites -- general whites are not allowed to prey on other white inmates for no reason. So there had to be approval by an Aryan Brotherhood member or a good reason to commit the murder.

Q. So you mentioned that Brandon Lowrey's name came up in a list of people who owed drug debts. Do you recall how much money he owed?

A. I believe it was $500.

Q. And do you recall how much money the other individual you mentioned owed?

A. I believe it was the same. They both owed about $500.

Q. Okay. So once that list was compiled, did any AB brothers say what needed to happen now that they knew the individuals who owed money?

A. Yes. So Mr. Clement, Johnson, and Chance said that an example needed to be made so that the rest of the whites would know that they weren't playing and that the other races knew that if there was an issue that they would handle business.

2884

So they decided that Brandon Lowrey needed to be murdered.

Q.  And that was the example that the AB brothers wanted to make?

A.  Yes.

Q.  Do you know where Brandon Lowrey was housed at that point?

A.  He was housed on the upper yard.  And I believe, at that time, he was in Building 6, but that -- it's been nine years, ten years almost now.  So I believe it was Building 6.

Q.  And after the initial conversation about Lowrey's debt and the fact that he needed to be made an example of, were there other conversations about how to go about doing that?

A.  Yeah, so Mr. Clement, Johnson, and Chance, had originally stated that another inmate, I believe his name was Spencer Fox, should commit the murder.  Because he had just arrived from another prison, SATF prison, where he had got into trouble with another Aryan Brotherhood member named Butch.  And in order for him to clean up that issue, he was going to be the one to be tasked with the murder.  However, they didn't want him to be approached too aggressively because they didn't want him to drop out and, you know, give up the information on it, so they tasked Mikey Stanford with going and approaching him and asking if he would be willing to commit the murder to clean up his issue with the other Aryan Brotherhood member.

Q.  And as far as you know, did Stanford go do that?

A.   Yeah.  So after that meeting, Stanford left and went back to the upper yard and he came back either the next day or a couple days after.  And he stated that he approached -- him and Thrasher Holmeyer approached Spencer Fox and asked him if he would commit the murder and he got kind of scared and backpedaled and said he didn't want to do it.

Q.   And who was present when Stanford reported this information back?

A.   Uh, myself, uh, Stanford, Francis Clement, uh, Kenneth Johnson and David Chance.

Q.   Was there further discussion about, then, who should commit the murder against Brandon Lowrey?

A.   Yeah.  So when Mikey Stanford relayed that message, he had also stated that Thrasher Holmeyer had volunteered to commit the murder.

Q.   And was there any discussion with the AB brothers after that information was conveyed to them?

A.   Uh, they had stated that, well, if he's going to volunteer to do it, then just let him do it, that way they don't have to deal with trying to get somebody else to commit the murder.

Q.   And when you say "they" who are you referring to?

A.   Francis Clement, David Chance, and Kenneth Johnson.

Q.   Did Stanford give a reason why Holmeyer volunteered to commit this murder?

A.   Mikey Stanford give a reason?

**Q.** Yes.

**A.** No, Mikey Stanford didn't give a reason that I recall. Just that he had volunteered to do it.

**Q.** And after that volunteer information was conveyed to the AB brothers, what, if anything, happened next?

**A.** So, they told -- Francis Clement, David Chance and Kenneth Johnson told Mikey Stanford to go and tell him, Okay, if he is volunteering for the murder, then tell him he can do it. Just to make sure that if he goes in there to do it, that he had to be killed.

**Q.** When they said "he had to be killed," who were they referencing?

**A.** Brandon Lowrey.

**Q.** And so did there come a point in time where Mikey Stanford came back with information from Thrasher Holmeyer about whether or not he would, in fact, commit the murder?

**A.** Yeah, I think, because Mikey Stanford would come back and forth daily because he was on the executive body for the inmates, so he could travel from the lower to the upper yard.

So within a day or two he came back and said, Okay, Thrasher is going to do it.

**Q.** Did you yourself ever speak with Thrasher Holmeyer about his volunteering to commit this murder?

**A.** Yeah. So not too long after we had this meeting, on a morning when we were doing our yard crew duties, I was pushing

the trash up to the upper yard and I met him at the fire door to push the carts through. And he told me that he was going to -- he was going to commit the murder and put the IE on the map.

Q. What's the IE?

A. IE is the Inland Empire, which is the area that we're both from, where we grew up.

Q. And did he tell you anything about how he planned to do this, how he planned to kill Brandon Lowrey?

A. No, he just said that he was going to move in with him and murder him. He didn't tell me specifically how he was going to do it.

Q. What does that mean, "move in with him"?

A. So they lived in different buildings at the time. So you can put in for bed moves with the police officers, and they will move you into the cell with whoever you want to move in with.

Q. Did you have further conversations with Thrasher Holmeyer after that conversation you just mentioned?

A. I'm sure I did, but not that I can recall --

Q. Uh --

A. -- any specifics.

Q. So nothing more about the murder of Brandon Lowrey?

A. No, after I had told him that he needs to keep his mouth shut and not be saying that to other people, he didn't bring

2888

it up again.

Q.   And do you know whether Lowrey was, in fact, killed?

A.   Yes.

Q.   And was he?

A.   Yes, he was murdered in Kern Valley.

Q.   When he was killed, who was your cellmate?

A.   My cellmate at that time was Francis Clement.

Q.   And did you have any discussions with Francis Clement about Lowrey's death after you learned that it had happened.

A.   So at that time, we were on a modified lockdown program because the southern Mexicans and blacks were rioting with each other.  So it was only the whites who were programming with the others.

And I believe it was the next day an officer told us that a white inmate had been murdered.  And then, shortly thereafter Mikey Stanford came -- was allowed to come down from the upper and told us that Thrasher Holmeyer had killed Brandon Lowrey.

Q.   And what, if anything, did Frank say to you about that?

A.   Specifically, I can't really recall but they laughed about it.  They thought it was funny that Thrasher did it.

Q.   Who is "they"?

A.   Francis Clement and Kenneth Johnson.

Q.   After Brandon Lowrey was killed, did you observe a difference in behavior by the white inmates in the -- in your

**2889**

yard?

**A.** Yes.  Absolutely.

**Q.** And what was that?

**A.** Uh, there was an immediate fear, everyone tightened up, wanted to pay their debts so they didn't become the next victim.

**Q.** So let's go back, just briefly.  When you were put up for membership, did you initially want to become an AB member?

**A.** No.

**Q.** Why not?

**A.** So when I was first approached on the yard by Francis Clement and Kenneth Johnson, they asked me what my aspirations were and I told them that I had -- I had none, and they asked me if I wanted -- was interested in becoming a member of the Aryan Brotherhood.  And at first I said no, because at the time I was a skinhead and I didn't feel that my beliefs as a skinhead meshed with the beliefs of the Aryan Brotherhood.

**Q.** They're just different ideologies?

**A.** They're different ideologies, yes.

**Q.** And did you ultimately agree to being put up for membership?

**A.** Yeah.  So, I mean, as a active white gang member who's been involved in the gang for a long time, I already knew that once an Aryan Brotherhood member asks you something, you don't

tell him no more than once.  So very shortly after that they came and approached me again and asked me again if I would be willing to become a member and I said yes.

Q.   During that conversation or other conversations about becoming a member, did Kenneth Johnson say anything to you about why it was important to become an AB member?

A.   Yeah, so they had -- Kenneth Johnson and Francis Clement, they were -- I mean, it was obvious that I was hesitant to become because I was already a member of COORS skinhead gang. And they had told me that as a member of the Aryan Brotherhood that I could still keep my membership in COORS Family Skins, however, I would put the Aryan Brotherhood first.

And also, that with becoming an Aryan Brotherhood member would come the power and, you know, the authority to do whatever I wanted on the yard.  And have that -- pretty much that clout, I guess you could say.

Q.   Did -- was there ever any mention about the power you would have over other White inmates?

A.   Yeah.  So, on one of our days in the yard, I was walking laps with Kenneth Johnson and he pretty much explained to me that other whites were simply to be treated as tools to accomplish whatever means we wanted to accomplish as members of the Aryan Brotherhood.

Q.   Are you still affiliated with the AB?

A.   No.

2891

Q.   How did that come about?

A.   Uh, in, I believe it was April 1st of 2016, I dropped out.

Q.   And why did you do that?

A.   I had already been wanting to drop out for some time. When I was approached the second time for membership, I already knew that this -- that wasn't the choice that I wanted to make with my life, and I had feelings of dropping out.

And on April 1st, the IGI gang unit for our prison conducted a mass search of our yard and our building, and they found a piece of weapon stock, so they were taking myself and Francis Clement to the hole.  And while we were in the cages, I took the opportunity, I saw my chance to drop out and I took it.

Q.   At that point, were you moved to one of those dropout yards that you mentioned before?

A.   Yeah.  So from that day, I was taken to ad seg and I spent about a month and a half in ad seg where I had to conduct a debriefing process where I had to share with the gang unit my entire criminal history, my gang membership as a kid and then all of my interactions in gang politics in prison.  And then after I completed that, then I was moved to the sensitive needs yard at Kern Valley.

Q.   And at that -- was that decision at the time, knowing the policies of the AB against dropouts, was there a security concern or a safety concern for you when you made that

DX True S

2892

decision?

A.   Oh yeah, absolutely.  It was a -- it was a traumatic experience having to work up the courage to do that.  It was a very emotional process.

Q.   Why was there a concern?

A.   Because I knew once I made that decision that any opportunity given they would try to murder me.

Q.   Have you received any benefits for testifying here today?

A.   No.  I was told that I would receive a letter stating my cooperation from yourself and the ATF, that would go on my C-file, that I would then possibly be able to use whenever I go to parole board.

Q.   And was that letter something you requested from the government?

A.   Yes.

Q.   And is that the only benefit that you -- that you are going to receive for testifying?

A.   Yes.

Q.   And that letter, are those letters that you mentioned, when is the first time that you'll be able to use those in front of the parole board?

A.   The first time I'm eligible for parole is 2048.

Q.   Is there a reason why you're testifying here if you're not receiving a sentence reduction or anything of the like?

A.   So when I dropped out I made the decision that I was going

2893

to change my life, and I've worked hard this last nine years, a little over nine years, to do that.  And I committed a lot of bad things in my past, so when, you know, I was asked to do this, this is -- I kind of considered this making amends for all the past wrong I've done.

Q.   Thank you.  I have no further questions.

A.   Yes.

          THE COURT:  Cross-examination.

          MR. REED:  I have no questions, Your Honor.

          THE COURT:  All right.  Ms. Byrialsen?

          MS. FISHER-BYRIALSEN:  Yes, Your Honor.

          Your Honor, can we sidebar real quick?

          THE COURT:  All right.

     (Sidebar commences.)

          MR. VILLA:  Your Honor, based on the testimony we just heard, it sounds like he completed an autobiography like we heard described the other day by Mr. Rubin.  We have not received a copy of that autobiography.

          THE COURT:  Is he listed on your subpoenas?

          MR. VILLA:  The subpoenas to CDCR?

          MR. REED:  Was he part of that list --

          MR. VILLA:  Yes.  Yes, judge.

          THE COURT:  I see it was attached.  CDCR did not produce any records for Mr. True.

          MR. VILLA:  To you; is that what you're saying?

THE COURT:  To me.

MR. VILLA:  Okay.  Well, Judge, I think, then, an order to show cause to CDCR is warranted for not doing that.

THE COURT:  Okay.

MR. VILLA:  And I think that's information that we need to -- in order to effectively cross-examine Mr. True.

THE COURT:  You guys don't have it redacted or anything?

MS. STOKMAN:  No, we don't have it.

THE COURT:  Uh, let's see if I can -- we can get that, but I didn't see one for Mr. True.

MR. VILLA:  What was the last thing you said?

THE COURT:  I said I didn't see anything for Mr. True.

MR. VILLA:  Okay.  That would be our request, Judge.

THE COURT:  I'm sorry, you said you want to see the CDCR, and the other thing you said after that?

MR. VILLA:  That we would need that to complete our cross-examination of Mr. True.

THE COURT:  Okay.  So you can start and, if necessary, we'll bring him back.  And in the meanwhile, we'll have contact with the CDCR.

MR. VILLA:  Yes, Judge.

MS. FISHER-BYRIALSEN:  Okay.

(Sidebar ends.)

CX True FB

**2895**

CROSS-EXAMINATION

BY MS. FISHER-BYRIALSEN:

Q.  Hi.

A.  Good morning.

Q.  You talked a little bit on your direct about being a gang member of a gang called COORS Family Skins, right?

A.  Yes.

Q.  And does the COORS stand for something?

A.  COORS stands for Comrades of our Racial Struggle or Children of our Race Skins.

Q.  What does that mean?

A.  It's a neo-Nazi skinhead gang.

Q.  Okay.  And you've been a member of that almost your whole life, right?

A.  I became a member when I was 18 years old until I dropped out in 2016.

Q.  And what does COORS Family Skins believe in?

A.  Neo-Nazi skinhead ideologies.

Q.  And what is that?

A.  Just racist, White power-belief stuff.

Q.  And you had said when you entered prison and you were asked to be an AB member, you didn't think that aligned with your skinhead values, right?

A.  Yes.

Q.  Because the AB is not a White supremacist, racist

2896

organization, right?

**A.**   They are a White supremacist, racist organization, but their everyday beliefs are much different.  They believe in using drugs, selling drugs, victimizing white people, murdering white people.  Anything that they can do to benefit the Aryan Brotherhood, it doesn't matter, they believe in it.

Whereas, when I was a skinhead, we believed in preserving white people.  Drugs -- we're not allowed to use drugs.  We're not allowed to steal from people.  We weren't allowed to do anything liking that.

**Q.**   But you have used drugs, right?

**A.**   I have used drugs, yes.

**Q.**   Even though you believe that that's not right?

**A.**   Yes.

**Q.**   You also talked on direct a little bit about your convictions.  I think -- help me understand this, because did you have a burglary conviction or a -- in 2008?

**A.**   Yes.

**Q.**   And that was a separate case from the robbery and attempted murder case?

**A.**   No.

**Q.**   They were all one thing?

**A.**   One -- yes, one crime.

**Q.**   One event?

**A.**   One event.

Q. So other than -- that's the only felony conviction you've had?

A. No.

Q. What are the others?

A. I've had two felony convictions as a juvenile, and then that case, and then criminal street gang activity in the county jail, and then battery on a peace officer in prison.

Q. And all of those crimes, they had nothing do with the Aryan Brotherhood, right?

A. Yes, they did.

Q. Those crimes did? The ones that -- out on the streets?

A. The two -- the two crimes that I committed in custody, I did because of policies that were put in place by the Aryan Brotherhood.

Q. Okay. But what year was that?

A. 2010, 2011.

Q. And you didn't meet Mr. Clement or Mr. Johnson until 2015, right?

A. Personally, no.

Q. They didn't tell you to commit those crimes in prison, right?

A. Personally, no.

Q. Is it fair for me to say you're serving a sentence of 30 years to life; is that about right?

A. I'm serving a sentence of 74 years to life.

CX True FB

2898

**Q.** Where were you before you got to Kern?

**A.** Before I got to Kern Valley State Prison, I was in Tehachapi.

**Q.** So when you get to Kern, you have a lot of time from crimes you've committed on the street, and you were also prosecuted for your inside-the-prison crimes on the street -- like, in the street court, right?

**A.** Uh, can you rephrase that?

**Q.** Yeah.  That was a bad -- I asked that really poorly.

You -- the crimes you committed in prison, you got street charges for that, right?

Do you know what I mean by "street charges"?

**A.** For the one case, I guess, it would -- it was a criminal street gang activity charge.  And the other charge was a prison charge.  It was a battery on a non-prisoner, felony committed by a lifer inmate.

**Q.** And just so the jury understands -- because maybe you and I know the lingo and they don't -- but street charges, do you agree that that means you were charged in a court instead of it just being, like, violation of prison rules, right?

**A.** Well, I have more than -- those are just charges that I was brought and tried for, yes.

**Q.** Tried for in street --

**A.** In a -- in a court of law like this.

**Q.** Okay.  Yes.

2899

A.   Yeah.

Q.   Now, you testified in a state prosecution, not this one, but in a state prosecution regarding the murder of Mr. Lowrey, right?

A.   Yes.

Q.   And you testified against Mr. Johnson and Mr. Clement, right?

A.   Yes.

Q.   And that was in 2017; is that right?

A.   I believe the trial -- I mean, we didn't go to trial.  We had preliminary testimony.  I believe that was in 2019, I think.

Q.   You --

A.   '18 or '19.

Q.   And that was at -- like a grand jury, right?

A.   It was a courtroom just like this but without a jury.

Q.   And in exchange for that testimony, you wanted a resentencing of your prior prison assault case, right?

A.   No.

Q.   What did you want in exchange for that?

A.   All I -- all -- the only thing they did for me is they wrote me a support letter, and they gave me the option of state protection.

Q.   Do you remember -- you had a lawyer then, right?

A.   I had a lawyer, yes.

2900

Q.  Do you remember that lawyer wrote letters to -- on your behalf to the prosecutors sort of enumerating things that you would have liked to have, whether you got them or not?

A.  Oh, well, I would have liked to be resentenced, absolutely.  But, yeah, no, they emphatically stated at that time for that state case that resentencing was absolutely not an option.

And this was -- when I talked to them, this was very soon after I dropped out, very soon into my journey of changing my life.

Q.  But you made those requests to them, right?

A.  Oh, yeah, I did.

Q.  And then you didn't get those things, but you got a letter that you could use to your benefit in prison, right?

A.  Uh, I could use it to my benefit in 2048.

Q.  For your parole board?

A.  Yeah.

Q.  And you also -- strike that, Your Honor.

You also testified on direct that you knew Thrasher Holmeyer, right?

A.  Yes.

Q.  And he's the person that actually stabbed Brandon Lowrey, right?

A.  He's the person that murdered Brandon Lowrey.

Q.  And you know that Thrasher Holmeyer had personal issues

**2901**

with Brandon Lowrey, right, that's why he killed him?

A.   No.

Q.   You were not on good terms with Holmeyer in 2016, right?

A.   I was on good terms.  I didn't personally like him, but I was not on bad terms, no.

Q.   You and Holmeyer had an issue at one of the -- you described, also, on direct those Odin ceremonies that happened at the prison, right?

A.   We had an issue at them?

Q.   Yeah.

A.   No.

Q.   Did you get in a fight with him at one of those?

A.   No.

Q.   And you got caught with that shank in your cell on April -- did you say 1st, 2016, when they tossed your cells?

A.   Yeah.  So I was holding a piece of weapon stock at the direction of Francis Clement.

Q.   But you pled to that, right?

A.   No.

Q.   You --

A.   I was dismissed.

Q.   That was dismissed for you?

A.   Yeah.

Q.   And that's when you, what's called, "PC'd up," right?

A.   Yes.

CX True FB

**2902**

Q.  And then you were moved to another prison?

A.  No, I was not moved to another prison.

Q.  Where were you moved to?

A.  I was moved to another yard at the same prison.

Q.  But now you're at another prison?

A.  Yes.

Q.  And was that nine years ago?

A.  Yes.

Q.  And in this case, you actually reached out to the government, right?

A.  No.

Q.  How did you come to be here today then?

A.  They reached out to me and asked if I would be willing to cooperate.

Q.  And you said, Sure, no problem.  I've already done it before, right?

A.  I was a little apprehensive at first, but I ultimately agreed to do it.

Q.  Okay.  And so you're hoping to get something out of this, right?  You're hoping to use the letter that they are going to give you after you've testified to lower -- or increase your chances of getting out on parole, right?

A.  Well, yeah.  This -- the letter will just show -- be a paper trail of what I've been doing with my life since I decided to drop out.

2903

Q.  But you're hoping it's going to benefit you in your parole hearing, right?

A.  Oh, absolutely.

Q.  Otherwise, why would you have done it?

A.  Yeah.  I mean, I would have done it without the letter. It wasn't a hard "yes" or "no."  I asked, and they said "yes." If they would have said "no," I would have still done it.

MS. FISHER-BYRIALSEN:  No further questions, Your Honor.

THE COURT:  All right.  Further cross-examination?

CROSS-EXAMINATION

BY MR. VILLA:

Q.  Good morning, Mr. True.

A.  Good morning.

Q.  You said you dropped out April 1st, 2016, after your cell was searched by IGI, correct?

A.  Yes.

Q.  IGI stands for what?

A.  I'm not exactly sure.  It's gang investigator unit of prisons.  They have IGI and ISU.  We just call them IGI because that's the gang unit in the prison.  Whenever there's gang issues or they come to search, they -- they're different from regular correctional officers.

Q.  They found a piece of metal in your cell that could have been used as a weapon?

CX True V

**2904**

**A.**   Yes.

**Q.**   You were concerned that you'd get charges for that?

**A.**   No, I wasn't concerned about charges.  I'm serving three life sentences.

**Q.**   Well, I'll ask you about your sentences in a minute.  But if you're found with a weapon in your cell, the prison, for violating its rules, can punish you, correct?

**A.**   Yes, the prison can punish you.

**Q.**   They can put you in administrative segregation?

**A.**   They can put you in administration segregation, yes.

**Q.**   Which is like solitary confinement, basically?

**A.**   You have a cellmate.  So it's not technically solitary, and you go to yard with other inmates, just in cages.

**Q.**   I see.  So it's much more restrictive than the yard you were on before that raid, correct?

**A.**   Not much more, but somewhat -- I was on a level -- I was on the highest level, Level 4 yard, that you can be in.  Lower than ad seg.

**Q.**   You were there because of your -- placed there, as far as you understood, because of your affiliation with the COORS skinheads?

**A.**   I was placed there because of my case factors, so my age of my arrest, my length of sentence, the types of crimes I committed.

**Q.**   How old were you when you were arrested?

CX True

**2905**

A.   I had just turned 20 years old.

Q.   How old are you now?

A.   I'm 36.

Q.   Thirty-six.

When you dropped out, you talked about on direct examination how you had to go through a process, sort of like a debriefing process with the gang folks?

A.   Yes.

Q.   Included in that was writing down everything you had done, all the crimes you had committed while you were in prison?

A.   Yeah, so they wanted me to start, as far as -- it's basically a life story on me to start back as far as back as I can recall, how I became a skinhead, how I became a gang member, and then everything up until prison.

Q.   They call that an autobiography?

A.   Yes.

Q.   And you admitted in there to crimes that you had committed, correct?

A.   Yes.

Q.   And some of those crimes you admitted to you've never been prosecuted for, right?

A.   Yes.

Q.   The United States government, these folks here, they haven't prosecuted you for anything that you've admitted to in that autobiography, right?

2906

A.   No.

Q.   They haven't prosecuted you for anything related to Mr. Lowrey's death?

A.   No.

Q.   And certainly you hope that in testifying you won't get prosecuted by them for anything related to Mr. Lowrey's death?

A.   I mean, yeah, I would hope.  But it wouldn't really affect my situation in prison really.

Q.   Well, I mean, you were -- hoped to apply for parole in 2048, yes?

A.   Yes.

Q.   How old will you be in 2048?

A.   I will be -- that will be for elderly parole on my 60th birthday.  My actual parole date is not 'til 2057.

Q.   Can't you apply for elderly parole when you turn 50?

A.   No, because I am a multiple lifer with three strikes.  I'm not eligible until my 60th birthday.

Q.   But on your 60th birthday you hope to parole?

A.   I would hope to.  That would be incarcerated 40 years at that time, so I would hope to parole at that time.

Q.   But if the federal government prosecuted for Mr. Lowrey's death, you could be facing a mandatory life sentence in federal prison, right?

A.   Uh, I'm not sure how that would affect.  I -- my -- I'm serving three life sentences and that doesn't affect my

CX True V

**2907**

elderly parole date.  No matter what my sentence is, I still go to elderly parole.

Q.  Unless the federal government prosecutes you and puts you in federal prison, which has no say over state prison, right?

A.  That's above my knowledge.

Q.  Okay.  You -- so you dropped out in April 2016.  You then testified in a -- I think was a preliminary hearing, in state charges about Mr. Lowrey's death.  You testified about that in 2019, yes?

A.  Yes, somewhere around there.  Yeah.

Q.  You testified on direct that, you know, there is this sort of rule against people who cooperate or testify against other inmates, right?

A.  Yes.

Q.  That's not just an AB rule, I mean, that's an anybody rule who's in prison.  You know, if you cooperate with law enforcement, you could get hurt or killed, right?

A.  Uh, it is an AB rule, it is also a general rule for the Mexican Mafia, it's a general rule for the BGF.  It's a general rule for a skinhead.  It's a general rule for any gang or criminal act.  But yes, it is a rule of the Aryan Brotherhood.

Q.  And it's, of course, a skinhead rule too, yeah?

A.  Yes.

Q.  And since dropping out in April of 2016, and testifying in

CX - True V

**2908**

2019, you haven't been attacked, as far as you know, related to your cooperation or testimony?

A.   No, I am in state protective custody where they don't have access to me.

Q.   Understood.  Now you testified on direct about some of the circumstances of how you say this went down with Mr. Lowrey, and you testified that there was this supposed information gathering about who among the inmates had debts, correct?

A.   Yes.

Q.   Drug debts?

A.   Yes.

Q.   Yes.

     And according to you, this was at the Aryan Brotherhood's behest, they wanted to know what white inmates had debts to other races, yes?

A.   Yes.

Q.   And you testified on direct examination that according to you, anyway, it was Mr. Clement and Mr. Johnson that discussed directly with, you said shot callers for the blacks and the Mexicans about debts, right?

A.   On the lower yard.

Q.   Okay.

A.   That's what I recall, yes.

Q.   Okay.  So a shot caller for the blacks and Mexicans would be somebody like higher up in the black or Mexican prison

gangs, yes?

A.   Yes.   So for the Mexicans it was a member of the Mexican Mafia, and then for the blacks it was a member of the BGF.

Q.   And the blacks -- or excuse me, another word for shot caller would be a rep?

A.   Yes.

Q.   Like a representative?

A.   Yeah.

Q.   Is that fair?

A.   I mean, yes, but no.   Because you could be a representative and not be allowed to make -- call the shots for the entire car.

Q.   Well, do you agree that when you testified about this in 2019, in state court, you testified that you were the one that talked to the Hispanics and the blacks about debts in your building?

A.   I don't recall.   I may have, because I was a part of everything that Clement and Johnson and Chance were doing.

Q.   Well, but timeout.   In your direct testimony today it was your understanding that they, Mr. Johnson and Mr. Clement, talked to the reps.   But I am asking you, did you testify in 2019 that it was you that talked to the reps?

A.   I don't recall 2019.

Q.   If I showed you the transcript, would that refresh your

CX True V

**2910**

recollection?

A.   Absolutely.

         MR. VILLA:  May I approach, Your Honor?

         THE COURT:  Yes.

         MR. VILLA:  I just have it on the laptop.

         THE WITNESS:  Yeah.

BY MR. VILLA:

Q.   This is the preliminary hearing, July 29th, 2019, in the state court.  Do you see that there?

A.   Yes.

Q.   And there's a question here and an answer by you.  Just read that to yourself, if you would.

A.   Okay.

Q.   Do you remember that testimony?

A.   Yes.

Q.   And in fact, you testified that it was you that talked to the reps from the Mexicans and the blacks?

A.   Well, what that states there is that I talked to the whites in the buildings.  And so I must have talked to the white inmates on the upper yard through Stanford.  And then on the lower yard in our building, they -- I'm sure that I probably talked to the Hispanics and blacks in our building, yes.

Q.   So it was you that did that?

A.   Yes.

**2911**

Q.   According to this testimony, which was six years ago, yes?

A.   Yes.

Q.   Certainly much closer in time to Mr. Lowrey's death than today, yes?

A.   It's closer to Lowrey's death than today, yeah.

Q.   Okay.

          MR. VILLA:  May I have just a moment, Your Honor?

          THE COURT:  Yes.

BY MR. VILLA:

Q.   Are you still a member of the COORS skinheads?

A.   No.

Q.   So the ideology you testified about, you no longer subscribe to that?

A.   No.

Q.   You're suddenly not racist, is that what you're saying?

A.   It's not suddenly.  You know, I had to address a lot of self-issues over the years to, you know, heal from that and move on from that.

Q.   Are you in a gang now?

A.   No.

Q.   What do the tattoos on your neck mean?

A.   The tattoos on my neck are Nordic runes and it spells out COORS.

Q.   So you still have the COORS name on your neck, yes?

A.   Yeah, tattoos are permanent.

Q.  Understood.

MR. VILLA:  Your Honor, may we briefly sidebar?

THE COURT:  All right.

(Sidebar commences.)

MR. VILLA:  I don't know if Mr. Reed had any questions, but before I pass the witness, I just didn't want to --

THE COURT:  Yeah.  You don't have to pass.

MR. VILLA:  Okay.  So I don't have any further questions as of now.

THE COURT:  At this time -- okay.

MR. VILLA:  And then we'll wait and see what happens with this Order to Show Cause.

MS. STOKMAN:  We're going to object to the delay in this.  I mean, I'm not sure that an autobiography is necessary, especially when it has to do with crimes he hasn't been convicted of.

THE COURT:  It's just really hard to say.  The representation -- I went back and looked and the CDCR was -- the CDCR had no documents.  And that clearly is not the case. So I -- what else do you have after this witness?

MS. STOKMAN:  The medical examiner.

THE COURT:  Okay.  I hope they will respond right away, but I don't know.

MS. STOKMAN:  I mean, all I'm saying is maybe they

2913

should ask those questions, just of his other crimes if that's applicable, in case these autobiographies aren't coming back for weeks.

THE COURT:  That's not a bad idea.

Well, the autobiographies I'm sure will come back quickly.  But, I mean, if it turns out they come back and you're like, Yeah, no, no good.  Do you have anything else that -- I don't want you to save anything that the autobiographies won't address is what I'm trying to say.

MR. VILLA:  I mean, I think with respect to other crimes, probably not, I mean, unless he commits -- you know, confesses to some extraordinary federal crime that he's not being prosecuted for.  But he -- we anticipate that he would have to discuss this crime, the Lowrey homicide.  So to the extent that he says something in that autobiography that's different than his trial testimony, there would be impeachment.

You know, if CDCR comes back and says, No, we really don't have anything, you know, then we may need to call their records custodian to impeach his testimony that he did fill out an autobiography because CDCR is apparently saying he didn't.  So, you know, until we get the answers to those questions, we can't say.

MS. STOKMAN:  Can we make him subject to recall?

THE COURT:  Yeah, although --

2914

MS. STOKMAN:  Because there might be ways to address anything that may or may not come up.

THE COURT:  The other issue, though, is, leaving it on cross the way it is and moving on, uh, means that, you know, everybody else has an opportunity to step in on cross, including the government.

But, I mean, CDCR representation was absolutely there's nothing.  So I'm like I need to understand what's happening there.

And I don't know, maybe he comes in and says in his autobiography that Thrasher Holmeyer said the guy was sleeping with his wife.  I don't know that.  And that would be quite an important piece of information.

MS. STOKMAN:  Yeah.

THE COURT:  So we need to see that.

I guess from your perspective, it sounds like they have one more witness and they would rest subject to completing this cross-examination, or one more witness and they would rest subject to this witness being recalled.  How do you prefer to handle that?

MR. VILLA:  One moment, Your Honor.

Okay.  I guess one question is how much longer the government has.  There's -- we have a lack of clarity about who else is left on the government's case.

MS. STOKMAN:  Because I think, once we get through

the doctor, unless something has changed and we'll discuss it, we were planning on resting.

THE COURT: So that's just a --

MS. FISHER-BYRIALSEN: Just so we understand, subject to recall, do we have to take any practical steps to bring him back here?

THE COURT: No, he would just be on the same -- you know, he's coming back on whatever got him here originally.

MS. FISHER-BYRIALSEN: Okay.

MR. VILLA: So we don't have to do a new writ or something?

MS. STOKMAN: No.

THE COURT: He's continued from day to day, so --

MR. VILLA: I mean, I think we can live with recalling him --

THE COURT: I think we will get it back overnight, because I quickly responded to who sent me the records, that person is on vacation, I sent it to the contact, I haven't heard back, but I also know someone else in the AG who can probably work on that to get it for us. If we can get it overnight, that would be ideal.

MR. VILLA: Yeah. I mean, I've been in communication with an attorney from CDCR, but --

THE COURT: Who's that?

MR. VILLA: A Mr. Heness [phonetic].

2916

THE COURT:  Yeah.

MR. VILLA:  I think he's on -- the one on vacation starting yesterday maybe.

THE COURT:  I don't know.  I just got the return.

MR. VILLA:  Yeah, I think that's -- so hopefully, he has a colleague or something.

THE COURT:  He listed his supervisor and so I ordered, but I'm sure she's just like, What is this?  Let me check and see, so --

MR. REED:  I could have a question or two.

THE COURT:  Yeah.

MR. REED:  But it's not based on the government, it's based on what the other defense attorney, counsel asked there.

THE COURT:  You know, I just realized what time it is.  Do you have more -- do you have cross on this?

MR. REED:  Yes, that's what I meant.

THE COURT:  Okay.  Go ahead.

MR. REED:  It will be fast.  Just a couple questions for me.

THE COURT:  Do you want to do it before the break?

MS. FISHER-BYRIALSEN:  Sure.

THE COURT:  Okay.  All right.

MR. VILLA:  Judge, two more questions.

THE COURT:  Okay.

MR. VILLA:  If I have -- could have some leeway, that

CX True R

**2917**

I forgot to ask --

THE COURT:  Okay.

MR. VILLA:  -- on cross.

THE COURT:  Okay.

(Sidebar ends.)

BY MR. VILLA:

Q.  Mr. True, on the subject of your neck tattoos, you said the tattoos are permanent.  Tattoos can be blocked -- blacked out, correct?

A.  Yes.

Q.  And in fact, CDCR does offer tattoo removal, don't they?

A.  Yes, they offer tattoo removal if you are within two years of release.

Q.  That's your understanding, only two years of release?

A.  That's what I was told and I appealed it and I was shot down under that ruling.

MR. VILLA:  That's all, Your Honor, for now.

THE COURT:  Okay.  Cross-examination, Mr. Reed.

MR. REED:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. REED:

Q.  Mr. True, was it or is it your testimony that you didn't want to join the AB because, in short, they victimize other whites.  Is that what you mean?

A.  I think that's an overly vague summation of what I said.

CX-True-R

**2918**

Q.   Okay.  Well, then what did you say?

A.   I said that their ideologies are different from skinhead ideologies.  They do anything to further their Aryan Brotherhood.  They victimize whites, for any reason, women, men.  They sell drugs.  They extort people.  They murder people for no reason, for $500.  They do a lot of -- a lot of things I didn't agree with at that time.

Q.   And one of the problems would be them victimizing whites?  I mean, you just mentioned it again.

A.   Yeah.

Q.   Okay.  And your -- that guy Mr. Smith, the one that you and Lemeur almost beat to death, he's white?

A.   Yes, sir.

Q.   Isn't that you victimizing whites?

A.   Yes.  At that time in my life, I was gang member and he was another skinhead gang member.  And, you know, I attempted to murder him for my gang.

Q.   Because he didn't want to join your gang?

A.   No.  Not because he didn't want to join our gang.

Q.   Okay.  But for whatever reason, you and your other skinhead friend beat up some other white guy, and you and I both agree that he was white, and you guys victimized him.

A.   Yes.  So let me clarify what I mean by --

Q.   No, you don't need to do that.

A.   -- victimizing whites.

**2919**

Q.  I'm asking you a simple question.  You beat up another white guy, put him in a coma; isn't that true?

A.  Yes.

MR. REED:  I have no further questions.

THE COURT:  Any further redirect?

MS. STOKMAN:  Just briefly.

REDIRECT EXAMINATION

BY MS. STOKMAN:

Q.  You were just going to explain what you meant by "the victimize."  Can you do that?

A.  Yeah.  So what I meant by the victimizing of whites, I meant the victimizing of whites who weren't involved in gang activity, who were just regular citizens.

MS. STOKMAN:  Okay.  Thank you.  I have no further questions.

THE COURT:  Anything -- any other cross-examination?

MS. FISHER-BYRIALSEN:  No, Your Honor.

THE COURT:  Subject to what we discussed at sidebar.

MS. FISHER-BYRIALSEN:  Correct.

MR. VILLA:  No, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, let's go ahead and take our break at this time.  If you would all be prepared to return at 10 minutes after.  And then hopefully we'll just go all the way through the end of the day.

(Jury exits the courtroom at 11:47 a.m.)

2920

THE COURT:  All right.  Thank you, sir.  You're finished for today.

And anything -- well, let's just go ahead and take our break and we'll come back.  Thank you.

(Recess held.)

THE COURT:  All right.  Is everyone ready?  Go ahead and bring the jury in.

(Jury enters the courtroom at 12:10 p.m.)

THE COURT:  All right.  Ms. Stokman, your next witness.

We have all of our jury members back.

MS. STOKMAN:  Yes, the government calls Dr. Eugene Carpenter.

THE COURT:  Sir, if you'll come all the way to the witness stand.  Thank you, sir.

THE CLERK:  Would you please raise your right hand.

DR. EUGENE CARPENTER

called as a witness on behalf of the Government, having been first duly sworn, testified as follows:

THE WITNESS:  I do.

THE CLERK:  Go ahead and have a seat and then please state and spell your last name.

THE WITNESS:  Yes, ma'am.

THE CLERK:  Thank you.

THE WITNESS:  Eugene Carpenter, Jr.

DX Carpenter S

2921

C-a-r-p-e-n-t-e-r.

DIRECT EXAMINATION

BY MS. STOKMAN:

Q.   Please tell us what you do.  What is your occupation?

A.   I'm a contract pathologist, forensic pathologist for the Kern County Sheriff in Bakersfield.

Q.   What is a forensic pathologist?

A.   So a pathologist who has sub-specialized in doing autopsies in order to determine the cause and the manner of death in cases that might result in a criminal court case.

Q.   And are you a medical doctor?

A.   Yes.

Q.   What is your educational background?

A.   I was trained first year as a Fellow at LA County Coroner. Before that, I was trained at Long Beach Memorial Medical Center, and VA Hospital at Long Beach.

        I did -- I did a clinical rotating internship at LA County USC Medical Center, after being graduated from Tulane School of Medicine in 1972.  I was licensed to practice surgery in medicine here in California in 1973.

        I am certified in forensic anatomic and also clinical pathology by the American Board of Pathologists.

Q.   And how long have you worked with the Kern Valley Sheriff or Medical Examiner's Office?

A.   11 years.

DX Carpenter S

**2922**

Q.   Have you testified before as an expert in forensic pathology?

A.   Yes, at a minimum of 600 times.

Q.   Do you teach or lecture on topics related to your training and experience in forensic pathology?

A.   Yes.  I was at LA County for 23 years.  I was one of three senior forensic pathologists.  And one of my duties was to give lectures and to attend the educational conferences at LA County Coroner's Office.

Q.   You also have Board certifications.  What medical disciplines are those in?

A.   Pathology.  It's a forensic pathology, which we've already described; anatomic pathology, which is the study of tissues that come out at surgery mainly; and then clinical pathology, which is the study mainly of fluids, like blood and urine, chemistry and blood banking.  So I'm certified in all three of the certifiable pathological subspecialties.

Q.   And do you have a national certification in that?

A.   Yes.

Q.   Are you also required to participate in continuing training for your license?

A.   Yes.

Q.   And describe some of those trainings.

A.   Well, before, it was -- we had our own educational training every Thursday afternoon at LA County, which I

participated in for 23 years.

And then at Kern, there's no formal training.  I take a course material under an online program where one reviews and is tested on general medical topics, such as the proper use of narcotics, uh, the palliation medicine.

Very few courses are offered in forensic in general for continuing medical education, but I take the courses that are most pertinent, like child abuse courses, elder abuse courses, domestic violence.  So there are plenty of courses to take that are more pertinent to what I do.

Q.  Are you part of any professional associations related to forensic examination?

A.  No longer.

Q.  But you were in the past?

A.  I was for a few years when I was young and bushy-tailed, I was a member of the NAME, which is the National Association of Medical Examiners.

After I found out we were so busy at LA that I couldn't go to any of the meetings, I resigned.

Q.  And have you personally conducted autopsies?

A.  Yes, I've done, at a minimum, 10,000.  And at LA, I supervised about 10,000 for the residents who were in training from the various major medical centers.

MS. STOKMAN:  At this time, I'd like to offer Dr. Carpenter as expert in forensic pathology.

THE COURT:  Any objections?

MR. REED:  No objection.

MS. DE SALES BARRETT:  No, Your Honor.

MR. VILLA:  No objection.

THE COURT:  We'll accept him on those topics.  Thank you.

BY MS. STOKMAN:

Q.  Doctor, you said you currently work at Kern Valley in the Medical Examiner's Office.  Is that also where you worked in 2016?

A.  Yes.

Q.  And can you please briefly describe the autopsy process to members of the jury.

A.  Yes.  On the serious cases, that may very well be homicides or that are -- most are clearly homicides, I'm called to the service area.  We open the body bag together. The body is photographed as it is in the bag.  It's photographed again after the clothing is taken off. Photographed again of all wounds as they are.  Then it's photographed again of all the wounds after they have been washed and cleaned to get optimum photographs.

Then I will diagram carefully all of the external wounds that I can detect, even the tiny ones, because it's the external examination of injuries is what we focus on.

After that is done, I will look inside the body at

**2925**

the abdomen, the head, the chest, and the throat.

I make diagrams right there at the autopsy table. I recover any evidence that might be there and transfer it immediately to the law enforcement officials.

I then dictate into a machine the findings. And then that is transcribed. I review it and sign it in two weeks.

Q. And now I'm going to direct your attention to January 28, 2016. Did you conduct an autopsy of a person named Brandon Lowrey on that date?

A. Yes.

Q. And in conducting the autopsy of Brandon Lowrey, did you follow the same process that you just described?

A. Yes. Yes, it's a -- it's a routine, done the same way every -- every time we do it.

Q. During and after conducting the autopsy, did you create a report with your findings?

A. Yes.

Q. And is that report created in the general course of doing your duties as a medical examiner?

A. Yes.

Q. And does Kern County Medical Examiner's Office keep a copy of that report as part of the normal course of business?

A. Yes.

Q. I'd like you to look at Exhibit 1413 for the witness only, please. It will appear on that screen in front of you.

2926

Doctor, this is starting at page 5 of Exhibit 1413. Is this an autopsy report that you created during and after the course of your autopsy of Brandon Lowrey?

A.   Yes.

MS. STOKMAN:  Ask to admit Exhibit 1413, starting at page 5, and publish to the jury.

THE COURT:  Any objections?

MR. VILLA:  Your Honor, my copy is a total of 39 pages.  Is it going to be 5 through 39?

MS. STOKMAN:  Yes, unless there are objections to any pages at the end.

MR. VILLA:  No objection.

MS. DE SALES BARRETT:  No objection, Your Honor.

THE COURT:  Mr. Reed?

MR. REED:  No objection.

THE COURT:  All right.  That will be admitted, 5 through the end.

(Government's Exhibit 1413, pages 5 through 39, were
    received.)

BY MS. STOKMAN:

Q.   When you examined Brandon Lowrey's body, where did you conduct that autopsy?

A.   In the service floor area at the old Kern County Coroner's Office on Flower Street.

Q.   When you examined Mr. Lowrey's body, did you conduct an

external examination of his body?

A.   Yes.

Q.   Did you also conduct an internal examination of the body?

A.   Yes.

Q.   And what, generally, are you looking for during an external examination?

A.   Looking for injuries to the body consisting -- we search for gunshot wounds, stab wounds, and blunt force injuries, which are abrasions, bruises, skin tears.  And we will also look for puncture marks that aren't related to any kind of therapeutic process, so any and all areas of entry to the skin.

Q.   And when you conducted the autopsy of Brandon Lowrey, did you find any wounds externally on the body?

A.   Yes.

Q.   What types of wounds did you find?

A.   There's a tight cluster of ten stab wounds to the neck/throat area, mostly on the right side and right front throat, but also several on the front left side of the throat.

Q.   And if we can go to page -- I believe it's 13.  Sorry, it will be 12, then.

        My numbers are different than the actual exhibit, so give me a second.

        I think it should be 16, actually.  Yes.

        Doctor, do you see page 16 of Exhibit 1413, which is

2928

on your screen?

A.   Yes.

Q.   What is this?

A.   This is a diagram of the group of stab wounds that I made at the autopsy table, looking at the body and with my left hand making the drawings and my right hand, uh, as part of the process of examining the wounds in detail.

Q.   So does this diagram show where the wounds were found on his body?

A.   Yes.

Q.   And approximately how many stab wounds did you find?  Or if you -- sorry, the specific amount, if you have that?

A.   Ten.

Q.   In total?

A.   Uh, ten classic stab wounds, three small nick-like stab wounds to the right side of the chin, uh, and nine of the stab wounds with serious and significant penetration into vulnerable areas of the body, with one of the ten really not going anywhere near a vessel.

Q.   So can you -- from the wounds that you observed, did you do an internal examination to determine anything significant about how those outside wounds affected internal parts of the body?

A.   Yes.

Q.   And is there anything significant in that finding?

2929

A.   Yes.

Q.   Can you tell us about that.

A.   The most significant wound is arbitrarily labeled "E." All the labelling is just from top to bottom, and I was using letters of the alphabet.

Uh, Stab Wound E is unique and significant and is the immediately lethal wound causing death by two mechanisms. One, it actually goes for about two inches into the upper cervical spine just underneath the skull, penetrates through the spine and severs the spinal cord about one inch just below the area regulating heartbeat, and it severs the cord in the area that regulates breathing.

Other eight stab wounds are very precisely found to be in the direction of up towards the back and mostly to the right, most of them going into the vital vessels of the right high upper throat underneath the skull, with a few going into the vessels on the right side of the throat.  This would be the vein and artery -- the artery called the right carotid artery and the left carotid artery.  They are the main blood supply to most of the -- the brain.

So it's this one stab wound that goes into the cord and would allow -- because it causes paralysis, it would allow for the other eight stab wounds or other nine stab wounds to be precisely placed into the vital areas of the throat, mostly on the right side, but also somewhat into the left side, with

all of the stab wounds being similar in size -- about three-quarters inches, occasionally an inch -- across the skin, traveling an inch or so underneath the skin into the vessels, with stab wound number -- labeled E going about two inches into the cord.

Q.  So of those stab wounds, would you -- did you find that at least one of them was a fatal wound?

A.  Yes.  Basically, all except stab wound labeled N would be of the lethal type, but stab wound arbitrarily labeled E is by far and beyond all the others the lethal stab wound causing paralysis and causing cessation of breathing and causing bleeding.

Q.  And from what you've said, does Stab Wound E, which is located here, correct, under the right ear on the diagram -- is that -- is that, what I'm circling, correctly --

A.  Yes.

Q.  -- Stab Wound E?

And from what you said, is it fair to say that that wound caused Mr. Lowrey to be immobilized?

A.  Yes.

Q.  During the course of your time with the Kern Valley Medical Examiner's Office, have you had the occasion to do autopsies of people who were injured or killed in prison?

A.  Yes.

Q.  Approximately how many autopsies would you say have come

DX - Carpenter, S

2931

from prison?

A.  I've been there going on 11 years.  I've probably seen 20 to 30 cases.  Majority are accidental overdose deaths, but they are -- I've seen probably six to eight neck compression deaths, or strangulation deaths, and then probably four or five multiple stab wound-type cases.

Q.  And in your experience, have you become aware of the types of weapons that are used in the stabbings that you've seen?

A.  Yes.

MS. DE SALES BARRETT:  Objection.  Foundation, Your Honor.

THE COURT:  Overruled.

BY MS. STOKMAN:

Q.  And tell us about that.

A.  The typical stabbing case is many stab wounds to the body scattered over the whole body, very few having any real effect.  And then there'll be one or maybe two that get into the heart, or mostly into the vessels of the throat, which finally cause significant damage.

So it's like the pattern of stab wounds is just a whole bunch, 8, 10, 11 stab wounds, and then one or two of the stab wounds hit a major vessel, and that is the cause of death.

Q.  Ultimately, after you concluded your autopsy, did you make a determination about the cause of death for Mr. Lowrey?

2932

A.  Yes.

Q.  And what was that?

A.  Death is caused by multiple stab wounds.

Q.  And those would be the ones that we viewed in this page of your report?

A.  Yes.

        MS. STOKMAN:  Thank you.  I have no further questions.

        THE COURT:  Cross-examination.

        THE WITNESS:  You're welcome.

        MR. REED:  No questions, Your Honor.

        THE COURT:  Mr. Villa, you have questions?

        MR. VILLA:  Yes, please.

                        CROSS-EXAMINATION

BY MR. VILLA:

Q.  Dr. Carpenter, good afternoon.

        As part of the autopsy of Mr. Lowrey, you ordered a toxicology screen, correct?

A.  Yes.

Q.  And that's to determine what drugs may or may not be in Mr. Lowrey's blood?

A.  Yes.  We get the -- what is called the "expanded screen" on in-custody deaths, which is basically our most extensive drug screening test.

Q.  And that screen -- that screening test also would

CX Carpenter V

2933

determine if the presence of alcohol is in the blood?

A.  Yes.

Q.  Like alcohol that had been consumed by Mr. Lowrey before his death?

A.  Yes.

MR. VILLA:  Can we pull up Exhibit 1413, please, and go to page 24?

BY MR. VILLA:

Q.  Can you see on your screen there, Doctor, the toxicology report?

A.  Yes.

Q.  And this was the report that was ordered by you on Mr. Lowrey, yes?

A.  Yes.

Q.  You see his name up here at the top, correct?

A.  Yes.

Q.  And it indicates the results, the positive findings here.

MR. VILLA:  If we could blow that part up, please, for Dr. Carpenter.

BY MR. VILLA:

Q.  These positive findings tell us what was found in his blood, correct?

A.  Yes.

Q.  So there's "caffeine," and it says it's positive, yes?

A.  Yes.

CX Carpenter V

2934

Q.   And it says it comes from the femoral blood?

A.   Yes.

Q.   What is that?

A.   That is the major artery and veins that supply and retrieve blood from the legs.

Q.   Is that what you did for Mr. Lowrey?

A.   Yes.  We got a blood sample there, which is routine.

Q.   And then you sent it to the laboratory which then came back with these results?

A.   Yes.

Q.   And then it says here "morphine free," and it has a result of -- what does that tell us, this "morphine free" result?

A.   It's the amount of morphine found in the blood of the decedent, that it's not bound to protein, and is therefore our most accurate test for morphine.

Q.   If Mr. Lowrey before his death had consumed any alcohol, would you expect to see a positive finding in the blood result?

A.   It would have to be a sufficient amount to trigger the test.  If the alcohol falls to a -- a fairly low amount, the test would not be sensitive enough to pick it up.

        So there'll be a certain amount of alcohol in the blood that the test is not designed to detect.

Q.   Do you know what that amount is?

A.   No.  It would be given by the toxicologist on this

paperwork here.  If -- if one -- if there had been ethanol or drinking alcohol discovered, there would have been a paragraph talking about how -- how sensitive the test was.

Q.  If it's an amount that's enough to make somebody drunk, in the layman's terms, would you expect to find ethanol in the blood?

A.  Oh, definitely, yeah.  The test will probably be sensitive -- it's sensitive enough even to detect any ethanol that stood not to consuming ethanol, but to decomposition of a body even in the early stages.  The test is that sensitive.

So by not having ethanol here, then there's either very little in the blood not detected by a sensitive test or there's no ethanol in the blood.

Q.  But if a witness said that the decedent was drunk --

MS. STOKMAN:  Objection.

THE COURT:  Overruled.  This is an expert.  Go ahead.

BY MR. VILLA:

Q.  If a witness said that the decedent was drunk before he was killed, you're saying you would expect there to be ethanol in this blood test?

A.  Oh, I would expect there would be a substance in the blood that is associated with making someone look like they are drunk.

Q.  And does that include ethanol?

A.  It would include ethanol, but we have the elephant in the

**2936**

kitchen here with morphine.

Q.  And morphine can -- can make someone intoxicated?

A.  Yes.

Q.  Okay.

A.  They -- they it -- people are affected differently, depending on how tolerant they may be or have become to the substance.  But if they are not naive to it, those smaller amounts can make them look quite intoxicated.  So to say someone looks drunk is the same as saying someone looks like they are intoxicated on something.

Q.  But if somebody says that the decedent consumed moonshine, with -- you know, that we commonly understand is alcohol, you're saying that this test could detect that alcohol in the decedent's blood?

A.  It should, yes.  The testing here would allow one to have a good reason for being skeptical that any alcohol was consumed.

Q.  So you'd be skeptical if a witness said the decedent consumed alcohol before being killed?

A.  Right.  I would not be skeptical with a statement that the person appeared to have, but I would be skeptical that any alcohol was consumed.  It would be -- it would be a very tiny amount.

Q.  And how is it that alcohol stays in the blood such that it would show up on a test like this after death?

2937

A.   Uh, it -- this brings up a good point I should mention now before we go further.  If the person just finished drinking a large of amount of alcohol, and then died, one has to consider that there may not have been absorbed into the blood.

So with that, which I've never run into before, but with that possibility listed, now please repeat your question, because I want to --

Q.   Sure.

A.   -- I want to remember --

Q.   Just understanding the biology of it, I guess, if somebody did say, you know, that Mr. Lowrey was given moonshine alcohol to get drunk so that he could then be killed, and he was, in fact, drunk from the moonshine alcohol, how does that show up on a test after the person is dead?

A.   They drink it.  It's absorbed rapidly by the stomach lining, depending whether or not the stomach is empty or with food, and within a few minutes it's starting to appear in the blood.

Q.   And it doesn't disappear after the person is killed?

A.   No, it does not.  Ethanol is one of those substances that stays around.  And unlike some other substances that are attacked by enzymes in the body and degraded so that we don't see them after a while, the ethanol will stay in the dead body and be detectable, will not disappear, and it even will increase.

2938

Q.  Did you find any other indication that Mr. Lowrey may have consumed alcohol prior to his death outside of the negative blood test?

A.  No.  I would remain skeptical that there was any alcohol consumed.  All I can state is a very sensitive test fails to reveal any ethanol in the blood properly taken from the most highly recommended source, the femoral artery, to be tested. So I'm not really able to answer to the mystery of how the person could have been seen to drink alcohol but not have it in the blood.  One double checks to make sure you're dealing with this -- the right decedent's and you haven't got somebody else's test, which we don't.  But after that, I don't know what else to say.

Q.  So we've got the right decedent, Mr. Lowrey, yes?

A.  Yes.

Q.  And the test results are negative for ethanol or alcohol that would be drunk by Mr. Lowrey before death?

A.  That is correct.

Q.  So if somebody said that he was given moonshine alcohol to get drunk so that he could be killed, you would be skeptical of that statement?

A.  I would be skeptical.  He might be given something that they called moonshine, but was really something with, say, morphine in it, for example, in order to accomplish the same project or purpose.  It would have -- it's -- it's a --

**2939**

it's -- it's a downer.  Alcohol is an upper at first for the first, like, 15 minutes or so it's a stimulant, then it becomes a downer.  Morphine is a downer very quickly.

Q.  And after alcohol is consumed, how long would it stay in the blood such that might be detectable following death?

A.  It just stays there.  It doesn't -- like -- unlike other substances that fall apart and are no longer detectable after 20 days in the cold storage, this doesn't happen to ethanol. Ethanol is stable.

Q.  Stable after death?

A.  Yes.

MR. VILLA:  No further questions, Your Honor.

THE COURT:  Any other cross-examination?

MS. DE SALES BARRETT:  No, Your Honor.

THE COURT:  All right.  Any redirect?

MS. STOKMAN:  No nothing further.

THE COURT:  All right.  Thank you, Doctor.  You can step down.

Next witness.

MS. STOKMAN:  Your Honor, at this time the government rests.

THE COURT:  All right.  Mr. Reed, your opening statement?

Thank you, sir, you can -- you are excused.

MR. REED:  The Defendant Stinson will waive opening.

CX Carpenter V

2940

THE COURT:  Okay.  Thank you, Doctor, you're excused.

THE WITNESS:  Okay.  You're welcome, Your Honor.

THE COURT:  All right.  At this time does the defense have witnesses?

MR. VILLA:  Your Honor, before that time we would -- can we sidebar?

THE COURT:  Yes.

(Sidebar commences.)

MR. VILLA:  Judge, before we move on to witnesses, we'd like an opportunity to present a motion under Rule 29 for judgment for acquittal.

MS. STOKMAN:  Are we going to have witnesses today? Because we can do this in open court without the jury here.

THE COURT:  Sure.

MR. VILLA:  I mean, we can let the jurors go --

THE COURT:  Do you have a witness, because the Rule 29 motion can be take up after --

MR. VILLA:  I see.  May we have a moment to confer?

THE COURT:  Yeah.

MR. VILLA:  I think we're ready, Your Honor.

So Judge, the first issue is with respect to the Rule 29 motion we intend to make, I think that the case law that we've identified with our specific issues says that if we present evidence, we could be waiving if you deny the Rule 29 motion.  And so I think we need to get a ruling from the Court

CX Carpenter V

**2941**

on the Rule 29 before we present evidence.

The other thing is --

THE COURT:  I don't think that's consistent with the rule.  But --

MR. VILLA:  It's --

THE COURT:  -- the practical matter, though, are you prepared with a witness today?

MR. VILLA:  Well, I mean, there's one potential witness that we could call today, but -- but, again, if the Court were -- depending on how the Court rules, we may opt not to do that to preserve our appellate rights.

The other thing is, given the government's representation that they would be done, you know, today or Friday morning, the in-custody witnesses that we wanted to call aren't here today.

THE COURT:  Yeah.

MR. VILLA:  So we may need to get them brought tomorrow to put them on.

THE COURT:  As I said yesterday, I did speak with the Marshals.  They'll have both of your witnesses tomorrow here.

MR. VILLA:  Okay.  And so I think that also depends on how you rule on the motion because of the specific issue we intend to raise.  So I think the best thing to do would be to let the jury go, take up the motion, and then, depending on the Court's ruling, we can decide if we're going to call

2942

witnesses.

THE COURT:  All right.

(Sidebar ends.)

THE COURT:  All right.  Ladies and gentlemen, I hate to give you this news, we're going to break earlier today.  I actually like to give you that news.  Thank you so much for your attention today.  Please don't discuss this case.  Please don't allow anyone to discuss it with you.  Please don't form any opinions about this case.  And please don't do any investigation on your own, including consulting any media about this case.  Otherwise, we'll see you tomorrow morning at eight o'clock.  Thank you.

(Jury exits the courtroom at 12:49 p.m.)

THE COURT:  All right.  The jury has stepped out.

I understand the defense has a motion, who's speaking first?  Mr. Villa?

MR. VILLA:  Thank you, Judge.

So for Mr. Johnson, Your Honor, we move for a judgment of acquittal with respect to Counts 1, 2 and 3, those are the three counts he's charged with.  And as to each element, we submit the government has failed to provide evidence from which a reasonable juror could find beyond a reasonable doubt Mr. Johnson's guilt.

I want to focus specifically on one issue.  By doing so I'm not waiving on any of the other elements, that we make

CX Carpenter V

2943

a general motion as to all other elements and we'd be happy to address those.  But the specific issue I want to identify -- or discuss is identification.

There has been no witness that has come to court to say that the individual sitting at counsel is table is Kenneth Johnson.

The only evidence that's in, I think, with respect to identification of the defendant, which is an essential element of all three counts that the government must prove, that the defendant is Kenneth Johnson, the same person they say committed those crimes in Counts 1 through 3.

Sorry, Your Honor.

So identification is an essential element.  No witness came to court throughout this trial to -- in-court identification of Mr. Johnson.  And frankly, there wasn't an out-of-court identification.  Photographs were submitted, if the Court recalls, I think was the government's first or second witness, Officer Kneiriem.  And he submitted some photographs, but he never said, you know, This photograph of Kenneth Johnson is that guy sitting over there, or is the same guy, you know, we're all talking about here with respect to Counts 1, 2 and 3.

All of the witnesses, the cooperating witnesses who testified, some of them, you know, never met Mr. Johnson in person.  Some of them only talked to him on the phone.  I

don't think there was any testimony that they actually video conferenced with him.  But in any case, none of them identified this Mr. -- the defendant here as Kenneth Johnson, which is an essential element of the government's case.  And failing that proof, the Court should grant judgment of acquittal under Rule 29.

Your Honor, in *U.S. v. Alexander*, which is 48 F.3rd 1477, 1995, the Ninth Circuit said identification was an essential element.

It also said it's not always necessary to have an in-court identification of a defendant, but in some instances photos may be appropriate, but the circumstances specifically in *Alexander* was there was a police officer who came into court and did attempt to identify the defendant in that case.

So here we don't have that.  I mean, we don't even have the law enforcement officer who took the stand and said, Yeah, that's Kenneth Johnson over there.  And certainly we don't have any cooperating witnesses who did that.  And given the specific testimony surrounding the photographs that were admitted, you know, all it was was a photograph purporting to be of Mr. Johnson, but there was no testimony from that police officer, Officer Kneiriem, about how he knew that it was this Mr. Johnson or tying him to any of the three counts in this case.

THE COURT:  Thank you, Mr. Villa.

**2945**

Other defense motions?

MR. VILLA:  And so, sorry, Your Honor, one last thing.  It was the *Alexander* case where I mentioned at sidebar that I think there could be waiver if the defense goes on to present evidence, if the Rule 29 is denied, and so that's why we're seeking the Court's ruling before we make a decision about calling witnesses.

THE COURT:  All right.  Thank you.  From other defendants, any motions?

MS. FISHER-BYRIALSEN:  Your Honor, we join for the same reasons stated by Mr. Villa for Mr. Johnson -- or for Mr. Johnson on behalf Mr. Clement.

THE COURT:  All right.  Anything, Mr. Reed?

MR. REED:  I would join their motion as well to the extent that Mr. Stinson was not identified in court, and then make a general Rule 29 motion and submit it.

THE COURT:  All right.  Thank you.

Government have comments?

MS. STOKMAN:  Judge, as to the identification, law enforcement Officer Mike Kneiriem testified that he's familiar with the defendants.  He identified them by photograph.  Those photographs are accurate depictions of those -- of the defendants as they sit here today.

He also identified significant -- or nicknames for each defendant, which was -- the name and nickname matched up

in the testimony from the witnesses in this case.  So identification was done through the photographs through Detective Kneiriem.  And then as the witnesses came in, they were identifying the people based upon their names and what their representation was in the AB and their nicknames.  So the government believes that identification is not an issue here.  And that it has been established.

THE COURT:  All right.  Any further comments by the defense?

MR. VILLA:  Judge, I would just say while I agree that several of the witnesses said they know Kenneth Johnson, they believe he's an Aryan Brotherhood member, they know him by the nickname of Kenwood, they never said that it was the defendant.

THE COURT:  All right.  I'll take that matter under submission.

So now --

MS. STOKMAN:  Judge, I'm sorry.  As far as the other Rule 29, does the Court wish the government to go through each element?  We would rely on the evidence as it was presented in court.  We believe that each element has been met for this purpose.

THE COURT:  All right.  Thank you.  But, no, I don't think that's necessary at this time.

All right.  Anything else for today then?

2947

MS. STOKMAN:  Nothing from the government, except to know who the witnesses are for tomorrow.

THE COURT:  All right.  So you-all can talk about that.

Let's take our break.  Thank you.

MR. VILLA:  Thank you, Judge.

(Proceedings were adjourned at 12:56 p.m.)


I, RACHAEL LUNDY, Official Reporter, do hereby certify the foregoing transcript as true and correct.


Dated:  February 6, 2025          /s/ Rachael Lundy_____
                                  RACHAEL LUNDY, CSR-RMR
                                  CSR No. 13815

2948

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. JENNIFER L. THURSTON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 1:20-cr-00238-JLT-SKO |
| Plaintiff, ) | |
| ) | Jury Trial, Day 14 |
| vs. ) | |
| ) | |
| KENNETH BASH, et al. ) | Volume 14 |
| ) | Pgs. 2948 - 3060, inclusive |
| Defendants. ) | |
| ) | |

Fresno, California                    Friday, February 7, 2025

REPORTER'S TRANSCRIPT OF PROCEEDINGS

REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

ER 2283

2949

**APPEARANCES OF COUNSEL**:

| | |
|---|---|
| For the<br>Government: | **STEPHANIE STOKMAN**<br>Assistant U.S. Attorney<br>2500 Tulare Street, Rm. 4401<br>Fresno, California  93721 |
| | **JARED ENGELKING**<br>Department of Justice<br>1301 New York Avenue, N.W.<br>Washington, DC 20005 |
| | **JAMES ROBERT CONOLLY**, **GOVT**<br>U.S. Attorney's Office<br>501 I Street, Suite 10-100<br>Sacramento, CA 95814 |
| For Defendant<br>Johnson: | Law Offices of Andrea Luem<br>Attorneys at Law<br>400 South Forth Street, Suite 500<br>Las Vegas, Nevada  89101<br>BY:  **ANDREA LEE LEUM, ESQ**. |
| | Law Offices of Ryan J. Villa<br>5501 Eagle Rock Avenue NE<br>Suite C2<br>Albuquerque, NM 87104<br>BY:  **RYAN J. VILLA, ESQ**. |
| For Defendant<br>Clement: | Fisher & Byrialsen, PLLC<br>Attorneys at Law<br>99 Park Avenue<br>New York, NY 10016<br>BY:  **JANE FISHER-BYRIALSEN**, **PHV** |
| | Ruhnke And Barrett<br>29 Broadway, Suite 1412<br>New York City, NY 10006<br>BY:  **JEAN DE SALLES BARRETT**, **PHV** |
| For Defendant<br>Stinson: | Law Office of Kenneth Alan Reed<br>406 W 4th Street<br>Santa Ana, CA 92701-4505<br>BY:  **KENNETH ALAN REED, ESQ**. |

2950

Friday, February 7, 2025                    Fresno, California

8:00 a.m.                              Jury Trial Day 14

(The following proceedings were held in open court:)

THE COURT:  All right.  We have everyone here.  We're still waiting on a couple jurors, but is there anything to discuss this morning?

MR. VILLA:  Your Honor, I think just a ruling on the motion for Rule 29.

THE COURT:  Yeah, I took that under submission.

MR. VILLA:  Oh, okay.

THE COURT:  All right.  Anything else?

MS. FISHER-BYRIALSEN:  No, I think just the scheduling, Your Honor.  If we were going to discuss the jury instructions today, and then maybe advise our clients about their rights to testify, if you want that on the record, and the waiver, or whatever the decision everybody has on that.

THE COURT:  I don't feel it's necessary to have it on the record, unless the government wants it, or unless you want it.

MS. FISHER-BYRIALSEN:  That's up to the government and the Court.  I don't --

THE COURT:  Ms. Stokman, do you have a position on that?

MS. STOKMAN:  The government doesn't have a position on that, we'll leave it up to counsel.  We expect that counsel

2951

has advised them properly and they've made that decision, because counsel here is experienced and know what the parameters and law is regarding that decision.

THE COURT: All right. Anything else?

All right. We'll just --

MR. VILLA: Your Honor, sorry, just in terms of scheduling, it sounds like the plan is to do closing on Tuesday?

THE COURT: Yeah.

MR. VILLA: And then, would you have the jury stay and deliberate past 1:30 or do they just go till --

THE COURT: They get to set their own schedule.

MR. VILLA: I'm sorry?

THE COURT: Once they start deliberating, the jury sets the schedule.

MR. VILLA: Okay.

THE COURT: So they'll either decide to stay past 1:30 or they won't. I suspect they will not, but we'll hear from them.

MS. STOKMAN: On that, Judge, I don't know -- and, obviously, we defer to the Court, but knowing where they will be on Tuesday, I'm not sure if it might be helpful for them to have those discussions today in case they want to rearrange their schedule already.

THE COURT: That's a good idea. I'll mention that at

2952

the end.

MR. REED:  Seems like that issue kind of came up a couple days ago and there were some adamant, No, we want to go home.

THE COURT:  Right.

MR. VILLA:  Your Honor --

THE COURT:  Yes.

MR. VILLA:  -- with respect to the witnesses we had intended to call that are in custody, we had a chance to communicate with them this morning.  And based on those communications, we have elected not to call them.

THE COURT:  Okay.

MR. VILLA:  Uh, you know, frankly, they are refusing. And it's our decision not to go through that, not to call them.  So it -- essentially, what we have left to do is just, I guess, in front of the jury just say that we aren't calling any witness.

THE COURT:  Does the government have any rebuttal?

MS. STOKMAN:  No.

THE COURT:  Okay.  So -- darn it.  Okay.  So then we'll go ahead and bring them in and excuse them, with the idea that they will talk about their schedule for Tuesday.  I don't know if you have estimates as to your closing arguments?

MS. STOKMAN:  Judge, there was a time limit, right?

THE COURT:  Yeah.  I'm just wondering, if it's going

2953

to be something less than that because, obviously, we're talking about four and a half hours just of closing arguments if everyone uses their full amount of time, I think.

MR. REED:  Time?

THE COURT:  Yeah, it's that darn courtroom procedure order that I issued that I think had no effect whatsoever.

MR. REED:  I thought it was advisory.

THE COURT:  Oh, advisory.  Yeah, I do a lot of advising...

So I had set an hour for each party.  If it turns out you need, you know, an hour, 15, I'm not going to get the hook out, but an hour is a really long time, especially when you think the jury listens for the first ten minutes and maybe the last ten minutes and --

MR. REED:  I got hook for the extent of that three minutes because judge was all over me because the I was two minutes over.

THE COURT:  Yeah.

MS. FISHER-BYRIALSEN:  Your Honor, just so the record is clear, we do really appreciate all the work the US Marshals have done to bring these guys here.

When we did talk to them, they -- well, one of them indicated that there was no way that he was going to come in the courtroom, which gave us the impression that he would have to be forced and we don't want to put someone through a forced

2954

entry into a courtroom, so --

But we do really appreciate what they did and they worked really hard to make this happen, and we're not -- we weren't doing that to waste anyone's time.

THE COURT: I understand. Thank you.

We are still waiting on one juror. I think you should have all received jury instructions and verdict forms. These, of course, are what we're going to be talking about today. I will note that I -- I've already made the corrections related to the additional experts and adding Mr. True to Number 14 and 15.

One thing that has occurred to me, I've been thinking about it a couple days, and that is, I think Mr. Clement suggested that as to Count 1, there should be a list of predicate acts on which the jury must agree. I didn't include those, but when I think about it and look at the verdict form, if there was a situation in which the jury found guilty as to Count 1 but not as to any of the special sentencing factors, there would maybe be a lack of affirmative evidence as to what the agreement is.

It seems to me the only possible other act -- predicate act could be the fraud. And in some ways it seems to make sense, maybe, to include that, as well as murder, under Count 1 related to predicate acts. Because they've heard so much evidence about that, they're going to get

2955

instruction about that, but there's nothing -- there's nothing on a verdict form that makes reference.

So food for thought when we come back to that.

MR. REED:  I didn't read the two because they have lawyers, but when I read Mr. Stinson's I saw that there's an A, which is on or about October 1st, 2022 -- well, first of all, Mr. Stinson has no VICARs, so I assume that that's what A is in the verdict form, where it says that he conspired to kill Andrew Collins.

THE COURT:  A, there -- that's a sentencing factor question, which would address penalty.

But as to, you know, it seems like there may need to be a fraud slash -- because, again, if the situation is guilt on Count 1, but a no on A, then there is ambiguity as to what their agreement was.  I mean, there is and there isn't.  It's implicit, but --

MR. REED:  There are -- I tend to not -- I try not to ever tell a district court what other district courts have done because district court judges don't like that.

THE COURT:  No, I'll tell you.  I looked at *Yandell*, for example.  They did not do that.

MR. REED:  Yeah, but they've done that in the Central District depending on -- especially when there's multiple predicate acts and they list the predicate acts or two predicate acts the jury must find.  I noticed they didn't

2956

do it on *Yandell* and I assume, because of that, you didn't do it and I just moved on.

THE COURT:  Yeah, I actually worked on this yesterday and I included it and then I thought, well -- and then I thought about it again and it makes sense to me that it's included, just because I would rather the verdict form be clear.

MR. REED:  So I'm not an opponent of confusion, I'm a defense attorney, but I have to say, your interpretation -- I mean, your ruling, because you don't have to interpret.  You say what it is.

When you list what is a predicate act and then -- and then the answer is -- let's say for the sake of argument the jury wants to know, what's A about?  Well, the sentencing factors, they don't get to deal with.

But A is also one of the -- one of the predicate acts as to Mr. Stinson.  Again, I don't care about confusion.

THE COURT:  Yeah.

MR. REED:  But it is confusing, because I'm not going -- we aren't going to argue that the same way.

THE COURT:  Yeah.

MR. REED:  That much I can guarantee you.

THE COURT:  And, of course, the jury doesn't know it's a sentencing factor, so it kind of seems like, you know, we could add B, EDD, you know.  And Ms. Stokman disagrees.

2957

But we're going to have conversation about this, obviously.

But, is the jury now ready?  Let's go ahead and bring the jury in.  They're already going to be annoyed, I think, but --

(Jury enters the courtroom at 8:17 a.m.)

THE COURT:  All right.  Thank you.  We have all of our jury members back.

Did the defense have witnesses?

MS. FISHER-BYRIALSEN:  No, Your Honor.  On behalf of Mr. Clement, the defense rests.

MR. VILLA:  On behalf of Mr. Johnson, we rest.

MR. REED:  On behalf Mr. Stinson, we rest.

THE COURT:  All right.  Does the government have any -- well, obviously no rebuttal evidence.

MS. STOKMAN:  No.

THE COURT:  Ladies and gentlemen, this means that we have concluded the evidence portion of this case.  Generally in a trial, what happens next is the Court will give you instructions that will apply to the law.

After that, you will hear arguments of counsel as to their positions as to how it should turn out.  And then, after that, I'll give you a few additional instructions, and then you will begin to deliberate.

Unfortunately, at this point, for reasons that shouldn't concern you, but will, I can't give the instructions

2958

today.

So that means that what we're going to do is, I'm sorry to have brought you down here today, but we're going to let you go today.  You will come back Tuesday, and we'll start in that process as I've said.

I told you when we began this case that I set the schedule when we're collecting evidence, and in trial, but once you start deliberating, you set your schedule.

And this will not, at least at this point, involve the alternates unless something happens over the weekend.  But -- so I'm going to ask, before you leave today, if you'll just have a general idea, maybe a little discussion about what your schedule will be, once you start deliberating.

If you -- I mean, coming in at 8:00, I know is hard, maybe you want to come at 9:00.  I don't know, maybe you want to work all day.  It's all up to you.  So if you can have some preliminary discussions about that because it may mean that you want to change something in your afternoon, I don't know, but if you'll do that before you leave today, I'd appreciate that.

Although it feels like maybe now is the time to start deliberating, it is not.  You have to withhold your consideration and your decisions about this case, your opinions, until after your hear the instructions, after you hear the arguments, and after you hear the views of your

2959

fellow jurors.

So while it might be tempting at this point to talk about it or to form opinions, I am going to still instruct you, until we meet again and you're in the deliberation room, please don't form any opinions about this case.

Please don't discuss this case. Please don't let anyone discuss it with you. Please don't do any independent research, including visiting any sites, looking on the internet, going to any place that has been mentioned in this trial or consulting the media of any type.

And of course, if you see anything in the media about this case, please do not read it, and report that to me.

All right, though, otherwise, I'm so sorry to bring you down here today, but have a nice weekend and we'll see you on Tuesday. And again, Tuesday at eight o'clock and then we'll go to your schedule after that.

(Jury exits the courtroom at 8:21 a.m.)

THE COURT: All right. To the instructions.

MS. FISHER-BYRIALSEN: Your Honor, before we move into that, Mr. Clement has a question that I'm relaying.

THE COURT: Okay.

MS. FISHER-BYRIALSEN: Uh, he's wondering, and I don't know if Mr. Johnson has the same concern, that they -- during deliberations, do they have to be at the courthouse and shackled up in that cell back there or can they brought over

2960

once there's a verdict?

Another reason for Mr. Clement's concern is that he's finally been approved to have dentures, and of course, that's now set for the next two weeks.

THE COURT:  Starting when?

MS. FISHER-BYRIALSEN:  I think it was starting this week.  So through next week is when the procedure is going to be scheduled, and he doesn't want to miss that either.

THE COURT:  I do not want him to miss that.  On the other hand, to bring them -- I mean, that can be an hours' long process.  And so while I -- I mean, it's truly up to you-all whether you want to come or not.

I don't know how long it would take.  I don't see us -- I mean, I think we're going to take most of the morning at least, maybe the full normal day before the jury even starts deliberating.  I don't know if they're going to deliberate beyond that.

So I guess I can't advise you, but, yes, if you come over, you're going to be at the -- the US Marshals will host you in the way that they have.

DEFENDANT CLEMENT:  Well, if it's longer than a day, I mean, just if I can come and get called.

THE COURT:  Yeah.  Yeah.  If you just refuse to get on the bus, that's fine too.

DEFENDANT CLEMENT:  It won't be held against us?

2961

THE COURT:  No, no, no, no, no.

DEFENDANT JOHNSON:  Well, wait --

(Court reporter gains clarification.)

MR. VILLA:  I think what -- I know what you're saying.

Your Honor, I think what Mr. Johnson is saying is if there's, like, a jury note or they need to play an exhibit in open court or something, that he doesn't need to be brought back for that --

DEFENDANT CLEMENT:  Yeah.

MR. VILLA:  -- just for the verdict.

THE COURT:  Right.  But, you know, if they come to a verdict, my point was it could be hours before we could get Mr. Clement, Mr. Johnson, Mr. Stinson from Fresno County Jail.  It seems like it should take ten minutes, but it will take hours.  And I mean -- and so that's the problem.  And hours is not something that we generally will wait on a verdict, especially -- I mean, if it comes at five o'clock, that could be a problem.

DEFENDANT CLEMENT:  Can you read it without us?

THE COURT:  We could, yeah.  It's truly -- all of this is up to you whether you want to be here.  Like I said a few days -- weeks ago, I will not ever try to force you to come.  Okay?

DEFENDANT CLEMENT:  I mean, just sitting in there all

2962

day long.

THE COURT:  I know.  I get it.

DEFENDANT CLEMENT:  I got issues with that.

THE COURT:  Mr. Stinson has already signed a waiver, so if he chooses not to come, Mr. Reed, you have that authority.

You-all might want to do that in case --

DEFENDANT CLEMENT:  Right.

THE COURT:  -- there's not a -- I mean, because if you fall ill, we might be in the same situation as last time where I don't know if it's a voluntarily absence or not.  So that's the concern about that.

So if you guys want to execute one of those, there would be no question if you choose not to come.

DEFENDANT JOHNSON:  I just want to come for the verdict.  That's it.

THE COURT:  Yeah.  Well, you'll be here on Tuesday, and maybe you can think about it and decide what to do after that.

All right.  Let's talk about jury instructions.

MR. VILLA:  Judge, one easy one might be the verdict form for Mr. Johnson, I think inadvertently included the Brizendine homicide, but he's not charged with that.

THE COURT:  All right.  I'm sorry.  Oh, yeah, right. Okay.

2963

MS. STOKMAN:  That's Section C on his verdict --

THE COURT:  Yeah.  Okay.

MS. STOKMAN:  Also maybe an easy verdict form request from the government is that on the murder in aid of racketeering counts, that we also list the victim names just because some of them are, you know -- they don't have an indictment in front of them.  It would probably be helpful for them to know which count they're being asked to decide on.

THE COURT:  Okay.  And so you're saying -- for example, I'm looking at page 3 of Mr. Johnson's.  It should be as to Count 2, Roshanski?

MS. STOKMAN:  Correct.

THE COURT:  And then the other one --

MS. STOKMAN:  Ruslan, yes, with the long last name on 4.  And then Mr. Clement would have those two as well as Michael Brizendine as to Count 4.  Count 5 is Ronald Ennis, and Count 6 is James Yagle.

(Court reporter gains clarification.)

THE COURT:  Are there any objections to that?

MS. DE SALES BARRETT:  No, Your Honor.

MR. VILLA:  No, Your Honor.

THE COURT:  We'll make that correction.

All right.  Do we want to talk about verdict form first, then?  That's fine with me.  Let's maybe do that.

Ms. Stokman, you did not seem to agree with the idea

2964

of listing the relevant predicate acts under Count 1.  Let me hear what your comments are.

MS. STOKMAN:  Yes.  I know the reference to the *Yandell* case in Sacramento was made.  And in that verdict form, they also did not lay out every predicate act that would fall under RICO.  That was a special sentencing addition as well.

It's the government's position that special interrogatories are not required without an *Apprendi* issue, and here it only applies when there's a sentencing factor that would cause the sentence to go over the statutory maximum, which on Count 1 is 20 years, unless there is a special sentencing factor.

The government is limited to the predicates that it noticed in the indictment as far as special sentencing factors, but when it comes to racketeering offenses and racketeering predicate acts, the government is not limited to those that are in the indictment.

And so it would be much more confusing for them to have to lay out all of those predicate acts when it is inherent in the instructions as it is in such -- like an 846 drug conspiracy.  They do not find overt acts.  That is inherent in the actual instructions of the crime.  That would be the same here.

And so multiple courts have found that this is not

2965

required when it comes to a RICO conspiracy, and the -- as far as confusion, I think that it would create -- it's our position that it would create much more confusion than it would be helpful and that the Court has properly addressed the special sentencing factors, which is required.

We also will note that we were specific in what those special sentencing factors related to. We don't think that *Yandell* properly did that as far as being specific. And so in the government's proposed verdict forms, which is what the Court adopted, we believe that the specificity on those special sentencing factors was very important because it isn't -- it isn't a special sentencing factor, necessarily, for a murder count if they didn't find that that defendant was -- was particularly and individually involved in that predicate offense.

THE COURT: You say you have authorities that say that it's not required. Can you let me know what you're referring to?

MS. STOKMAN: Yes. I do not think the Ninth Circuit addresses it directly, but in *United States v. Shenberg* in the 11th Circuit, 89 F.3d 1461, there was a request for a special verdict on a RICO conspiracy, and that was denied and properly upheld.

*United States v. Applins*, A-P-P-L-I-N-S, was the Second Circuit, 637 F.3d 59. And other district courts have

2966

found this to be true as well.

There is a Ninth Circuit case, just one second, which actually went to not a RICO conspiracy, but a RICO -- an outright RICO charge under 1962(a), which the government finds would -- potentially if any charge was to require this to be laid out, it would be that.  A conspiracy is a lot different than that.  And even in that situation, in *United States v. Robertson*, 74 F.3d 1247, the Ninth Circuit found that it was not error for the district court to not use a special verdict form requiring the predicate acts to be listed.

THE COURT:  Can you tell me what you think the harm is?  Are we talking about risk of confusion?  What do you see the harm is in listing the predicate acts for which there's been evidence presented?

MS. STOKMAN:  It would be confusing in -- because it would require the jury to act -- I mean, the way that it's laid out in the proposed instructions from Defendant Clement it is not clear as to how many predicates are involved.  There was a list.  It would -- the list would have to be every predicate offense that we're giving them instructions for that fell under the RICO conspiracy.  And it would be confusing, as it muddies the water, also, with those special sentencing factors, as they would also need to be given.

When the instruction is -- the instruction, courts

2967

have found to be sufficient in letting the jury know what the elements of the RICO conspiracy are and they are supposed to follow those elements in coming to their decision, the elements of that crime are not laid out on a verdict form.

THE COURT:  So you're saying that if that were -- if the predicate acts were listed -- or specifically the murder predicate acts were listed, then there's the potential for inconsistency between Count 1 and the remaining counts?

MS. STOKMAN:  Potentially, and that has happened before when it's been confusing to jurors.  But, yes, that there could be inconsistencies, but also that it would cause some confusion as to why it was laid out.

And, also, it's the government's position that, again, as an element of an offense, that does not require -- RICO conspiracy does not require the elements to be found on a verdict form.  And again, I'll liken it to the conspiracy under 846, which is different than a conspiracy under 371, which does require the jury to find overt acts.  846 inherently, in the instruction, gives the jury what they need, and overt acts are never on a verdict form.

So the likeness to that on the RICO conspiracy with regard to predicate acts is where the government believes that this would be -- it's unnecessary, it causes undue confusion, and it also could very much muddy water in the special sentencing circumstances, which are the more important

2968

elements for defendants to know that the jury came to a unanimous conclusion on.

THE COURT: All right. For the defense, anyone want to talk about that?

MS. DE SALES BARRETT: Yes, Your Honor.

THE COURT: All right. Go ahead.

MS. DE SALES BARRETT: *United States v. Frega, 179 F.3d 793*, Ninth Circuit case in 1999, the Court highlighted the necessity for the jury to identify and unanimously agree upon predicate acts that formed the basis of the RICO conspiracy charge. Court noted the jurors' confusion and lack of clear instructions on identifying predicate acts could lead to nonunanimous verdict, which would be legally inadequate.

And in Your Honor's instructions, Your Honor is telling the jury that they should be unanimous in their considerations of these acts. And as a result of that, if that's not on the verdict sheet, we will never know whether or not they -- what they agreed upon when they agreed upon it. Presumably they could be asked the question if they were unanimous, but if it's not on the verdict sheet, I don't think -- I don't think that it would be very clear as to whether or not they were unanimous in their considerations of which predicate acts they find.

THE COURT: What was the page cite?

2969

MS. DE SALES BARRETT:  Uh, I don't have an exact page, I only have the full cite.

THE COURT:  I have the case here.

MS. DE SALES BARRETT:  Let me see if he's got it.

THE COURT:  It looks to me like this case relates to a failure to give instructions on predicate state bribery acts.  I don't think it deals with the verdict form, does it?  I'm not seeing that.  I'm looking at page 806, 807.

It's an instruction case, isn't it?

MS. DE SALES BARRETT:  Yes, Your Honor.  But I --

THE COURT:  Instructions are going to be given, for sure.  We're talking about does it need to be on the verdict form.

MS. DE SALES BARRETT:  Right.

THE COURT:  This case doesn't seem to speak to that, does it?

MS. DE SALES BARRETT:  Your Honor, if they -- if we need a unanimous decision and the Court is asking for a unanimous decision, then -- on the issue of the predicate act, it seems to me that it is completely reasonable for that to be on the verdict form, so that we can be assured that they are unanimous.

Your Honor is telling them they have to be unanimous, but you're not asking them as to what they were unanimous on.

THE COURT:  Right.  But what I'm trying to get at is

2970

we all know they have to have instructions on predicate acts. I'm trying to figure out what the authority is as to whether it should be on the verdict form.  I think we agree -- I mean, there's no dispute that they have to be instructed, the instructions are already included.  But I don't really think *Frega* advances the conversation much, unless I'm missing something here in my speed read of that case.

MS. DE SALES BARRETT:  There -- let's see.  I don't know how we assure that they are unanimous, Your Honor.

THE COURT:  Well, I mean, they have to be unanimous to come to a verdict.  What you're saying --

MS. DE SALES BARRETT:  Right.

THE COURT:  -- is we wouldn't have certainty as to -- if they do not find the questions following Question 1, the A through whatever, then there might be some uncertainty as to what acts they are relying upon, I think is your argument, which is what occurred to me as well.

MS. DE SALES BARRETT:  Yes, Your Honor.  And what I can say too is logically from the perspective of someone reading this verdict form, and reading the instruction, it is inconsistent, really, not to seek a verdict on those -- seek unanimity on the verdict form because -- and it could be easily overlooked by the jurors with regard to the need for such a finding.

THE COURT:  Any other comments by defense?

2971

MR. VILLA: I just want to make sure there's no dispute about the Lowrey murder needs to be on the verdict form for Count 1. We're just talking about other predicate acts?

THE COURT: Yeah, the question is whether under Count 1, before you get to question -- well, it's kind of set up differently. When I look at -- let me look at Mr. Johnson's form.

When you get to Question 2, it's whether that also has to include whatever predicate acts would, you know, or make sense probably EDD fraud -- well, everything that's listed in the instruction about the predicate acts that are at issue.

MR. VILLA: Yes. So I mean, I agree with Mr. Clement's position that they all need to be included, but for --

THE COURT: But what do you propose as to Question 3, 3 and 4 which relate to Counts 2 and 3? Because the government is saying, look, you know, you if -- you run the risk of an inconsistent verdict.

If they were to say, you know, no, no as to -- no murder as to Count 1 but find Counts 2 and 3, the verdict would be, you know, we would have to reject the verdict. We would have to go back and then we go, well, we've got a problem on our verdict form because it doesn't preclude that.

2972

So I guess another way of doing it -- and this is what brings up Ms. Stokman's point is -- as to a predicate act, you don't include the elements.  You just say this, this, and this.

So this would mean that they would have to be -- I guess it could be done Question 1, predicate acts, EDD fraud. I mean, they're not going to know predicate act, but A, B, you know, say it's EDD fraud, it's distribution of drugs, whatever.

Then you get to the sentencing factors, they'd have to make those decisions, Question 2.  Then you get to Question 3 and 4, uh, seems like you would not list murder as to Count 1 and then there's some confusion as to whether that could be the sole basis for Count 1.  It would suggest otherwise.  I don't think that would make sense either.

MR. VILLA:  Well, the primary concern I have about that we have to include Mr. Lowrey's murder in Count 1 is because it changes the maximum penalty.

With respect to inconsistency between Count 1, 2 and 3, to some extent we can't -- we can only avoid it so much because, you know, the jury could acquit of Counts 2 and 3 for Mr. Johnson, but not Count 1.

And you know, due to the differences in liability when it comes to conspiracy versus VICAR.  You know, RICO conspiracy and the *Pinkerton* doctrine, I think, encompasses a

2973

lot more conduct even though Mr. Johnson isn't necessarily a primary participant.

If he's a conspirator, there's *Pinkerton* liability and so, you know, the jury could convict on Count 1 but not Counts 2 and 3, and that also changes the penalties.

And so I think that we can only avoid inconsistent verdicts so much. And if they did the opposite somehow and said, you know, you're not guilty of Count 1 but you are of Count 2 and 3, you know, I mean, we've got a problem, but I mean, it's the way the case was pled by the government.

THE COURT: Well, the problem would be not so much that there's -- I mean, the verdict would be in order. The verdict form would be in order and in that situation what would be is, you know, there would be a question as to what predicate act or acts that there was unanimity on.

MR. VILLA: Yeah, I think that's separate from the murders. That's a separate issue as far as EDD fraud, robbery, et cetera.

But I do think that there needs to be some -- I mean, they're being instructed on each of those crimes that are alleged in this case under the RICO conspiracy and I do think -- and they're told specifically, you have to find two predicate acts at a minimum.

THE COURT: The other way to do it, I suppose, is to say Count 1, verdict. If it's guilty, then they would go to

2974

Count 2 -- I'm sorry, Question 1.  If it's guilty, they go to Question 2.

If those answers are all no, then Count 2 and 3 would be no, then we could have a final question of if you, you know, find count -- if you answer 1 guilty, but question -- no as to Question 2, not guilty as to 3 and 4, then answer Question 5, which is predicate acts.

MR. VILLA:  I mean, that certainly might work for Mr. Johnson.  I don't know about, you know, the other defendants.  But essentially, you'd be saying if you say no on 2 --

THE COURT:  Then you don't ever get to that question.

MR. VILLA:  -- as to the Lomita murders, then the answer -- you don't need to answer 3 and 4.

THE COURT:  Right.

MS. DE SALES BARRETT:  Well, that would be a similar situation to Mr. Clement.  So -- but the only point that I want to make here, Your Honor, is if the unanimity on predicate acts is an element of the offense, then we need a finding.

THE COURT:  Well, yes and no.  Because -- I guess the question -- maybe we're talking beyond each other, and that is, if there is question -- answer, guilty Count 1, and any of Count 2 has a yes, do you need to dig deeper than that? Probably not, right?

2975

MS. DE SALES BARRETT:  I'm sorry, are we talking -- I'm getting mixed up with sections and counts and --

THE COURT:  Right.  So look at the verdict form.  If Question 1 as to Count 1 --

MS. DE SALES BARRETT:  Yes.

THE COURT:  -- is guilty --

MS. DE SALES BARRETT:  Yes.

THE COURT:  -- and then Question 2 as to any of those listed under Count 2 -- I mean Question 2 are yes, then you have unanimity as to at least one predicate act, right?

MS. DE SALES BARRETT:  Not necessarily -- Your Honor, that -- the problem is that we're taking it, then, out of order.  The question is --

THE COURT:  It is not, though.

MS. DE SALES BARRETT:  -- you're not guilty on Count 1 if you don't have unanimous agreement on a predicate act, which means that the -- you know, if -- if they find they are guilty on Count 1, then directly underneath that should be the inquiry with regard to the predicate act.

THE COURT:  Uh, yes and no.  Because what I suggested -- because it does say:  You must find unanimously -- the instructions say:  You must find unanimously as to the predicate acts.

What I'm talking about more is really in the nature

2976

of a special interrogatory to the jury, and that is, Okay, so you found this.  Tell us why you found that, and here are your options.  Check the box of what your options are.

And adding that as the final question means that they don't have to answer it in certain circumstances, but they do.

So I guess my question to you is, I mean, as a former appellate attorney, I guess my question to you is, do you really want to dig that deep?

MS. DE SALES BARRETT:  I think we should have the jury make a finding on the predicate acts.  I think it needs to be a jury finding on the verdict sheet, and I think it belongs -- it should be incorporated within the verdict of Count 1 prior to the special findings.

THE COURT:  I don't have a problem including it, but if I do it, I'm not going to do it that way because I think it creates a different issue that you're not concerned about that I am concerned about, and that is inconsistencies.

So if you want that, I'll add it as Question -- that will be Question 8, to be decided only in the event of noes as to all Question 2 and not guilty as to Questions 3 through 7.

MS. STOKMAN:  I'm sorry.  If I may, this does not apply to Mr. Stinson, which causes another problem.

Uh, also, again I'll point out that this is asking the jury to show their work as to how they come to the conclusion about Count 1.  That, in essence -- the unanimous

2977

decision is on every element of every crime.  And we are not laying out the other elements.  We're not laying out the elements in the VICAR charges.  That's just not how verdict forms go.

So we'll point again to the fact that case law does not dictate that this is necessary under a RICO conspiracy. It does become confusing.

The standard to reaching the predicate act discussion under Count 1 is different than the special circumstances, and so those -- the separation of that needs to be very clear. Again, there's no *Apprendi* issue here when it comes to the predicate acts that they have to find to go to Count 1.  That does come into play when it comes to special circumstances, including the Lowrey murder, which is why it's on there, because the sentencing is affected.

So the confusion comes in in that we're asking them to show what they are doing in the unanimous decisions on one element of multiple elements of one crime, which the government does not believe is necessary and would be confusing, especially when they could find that the defendants knew or were a part of -- because they don't have to personally commit any of these offenses.  And that's another confusing, I think, element when you're asking them to decide if they have personally been involved in certain things and then you have all these predicate acts that come through.

2978

But in any event, there's then the issue of if they find that there were two instances of, say, murder or two instances of drug trafficking, now are we going to have columns that say these are the predicate offense. How many of these -- I mean, it just becomes very tedious. And again, it's asking them to show their work on an element of a crime that the jury instruction addresses, and there are multiple elements that require the same unanimous vote, and we aren't asking them to show that all in a verdict form.

THE COURT: The only difference, I think, in that circumstance in your argument is the instruction specifically tells them that they have to have unanimity on that issue.

I mean, the other way to do it, and I don't know if any of you practice civil, but in civil cases, the verdict -- this is the -- you know, you never see a verdict form this simple. It's always, you know, If yes on 1, go to Question 7, you know. If no there, go to Question 29. Come back to Number 2 and then spin around three times and sign the verdict form.

So it's not -- juries do it all the time. But the other way to handle this, which addresses everyone's concern, is if it comes back with a yes as to Count 1, no or not guilty as to everything else, we could then have prepared a set of special interrogatories to the jury that the jury would complete at that time to tell us what those acts are. That

2979

preserves your issue for appeal.

But what it doesn't do is introduce the confusion that's potentially in asking them to make decisions, in essence, for example, as to the murder three times.

Because, I mean, the risk is still, if they make this as their verdict form and you have a special interrogatory and it comes back and says, Oh, no, we don't find murder, that's --

MS. DE SALES BARRETT:  Well, Your Honor, that's why I think it belongs as Number 2.

THE COURT:  Yeah, I understand where you're coming from.  I understand all your motivations behind it.  And I understand the various focus, but I'm trying to get a clean verdict, and this seems to be, to me, the best way to do that without introducing the confusion that I think is inherent in what's been proposed.

I don't think it's error to do it either way, but we'll end up -- what I'm suggesting is the way that I think is cleanest, that it -- it poses the least potential.

And what I would do is -- I realize what Ms. Stokman is saying, but the defense has never asked for, Tell me how many times.  They just gave me a list.  That would be your special interrogatory to the jury in the event it was necessary.

MS. STOKMAN:  But, Judge, they have to find two, and

2980

they can absolutely could find two of the same type of offense, which makes that, I think -- the question confusing.

I think what we've seen in other cases this happens is that is a confusing question, especially when that element goes to not whether defendants directly participated in that act, but only knew and agreed that the coconspirators would be engaging in that act.

And so it -- there's just a muddying, I think, of this. And I believe that this is why Courts have not held that this is required.

And again, I'll point to the Ninth Circuit case from '96 that they even said that in a RICO charge, which does -- the requirements for what the defendants actually did are different in that charge versus a conspiracy. Even in that, they did not require that the predicates needed to be laid out in the verdict form. And that is a much stricter standard as to what the defendants themselves needed to be found guilty of.

And if that was not required in that type of situation, a conspiracy case like this certainly would not be required. And that is consistent with other -- other circuits.

THE COURT: I don't disagree with you, I don't think it is required, either. The defense is requesting it. I think -- well, I mean, I think this is what I would be willing

2981

to do, and I don't really care about the language.  If the language is what they proposed, then they would have to live with it, that's what you've requested.  If it is -- you know, we got to put hash marks, that seems to be going a little bit farther than anybody has suggested.

But, I mean, it could say specifically that, all of them could say, Which of these acts, if any -- or it would have to say, Which of these acts -- you know, mirroring some of the language of the instruction, you know, are associated. And that would be, of course, only if we get to that eventuality.

What I'll do at this point, Counsel, is if you want to propose special interrogatories, I don't have to have that at the beginning, we're not going to reference that in any way unless we need that.  Send me it, we'll circulate it and talk about that further.  But it's not going to go on this as to, you know, Sub A under 1.

MR. REED:  Your Honor, I'm assuming that the Court takes the position that --

THE COURT:  Mic, please.

MR. REED:  -- that because the circuit says you don't have to have special verdict forms, means that giving special verdict forms is improper.

THE COURT:  No, I'm not -- I did the exact opposite.

MR. REED:  Because that's kind of what I'm hearing

2982

from the other side of the table.

THE COURT:  I don't think so, but I don't know that ultimately.  I'm just concerned about confusion on this verdict form.

MR. REED:  I understand.  And one of the things I do agree with government counsel is -- is that all three of these defendants don't sit in the same place.

THE COURT:  I agree with that as well.

MR. REED:  And I don't have any interest in arguing on their behalf and they have no interest of arguing on mine, but I do tend to agree with that general statement, they're not all in the same place.

And I have not figured out a way to -- to deal with the question of a special verdict form that -- that dealt with everybody the same way.  So I'm not sure how to deal with this, and I've been struggling with this since I got this case because I know he has no VICARs, which if you have VICARs at the end of the day, the circuit can go, Well, what are these if they're not that?  So you don't get to argue that.

THE COURT:  Uh-huh.

MR. REED:  But Mr. Stinson is, at least in my experience, unique in that respect.  But I'm not sure how to deal with the question of verdict forms that -- that will solve all problems.

THE COURT:  Yeah, that's why I have three.  Because

2983

you're right, you know, it's different, everybody's different. And if you don't want to do that procedure I've talked about, that's no problem for me, either. So that's the way I think -- feel like it should be left at this time. And if that's wrong, then that's to the advantage of the defense too.

All right. Any other issue about the verdict form? If you're going to propose that special interrogatory to the jury, I do need to have that right away so that we can have some discussion about that probably on Tuesday.

MS. DE SALES BARRETT: Yes, Your Honor.

THE COURT: All right. Anything else on the verdict form?

MR. REED: No, not on the verdict forms.

THE COURT: All right. Instructions, then.

MR. REED: I think the Court's instruction did not include the limiting instruction that --

MS. DE SALES BARRETT: What instruction are you talking about, Mr. Reed?

MR. REED: Court's instructions. Jury instruction --

MS. DE SALES BARRETT: Oh.

MR. REED: -- did not include the limiting instruction that the Court gave during the trial itself.

And I think it should be readdressed at the end.

THE COURT: So there is the instruction that when -- when evidence was introduced for a limited purpose, it can be

ER 2318

2984

considered only for that limited purpose.

It does also instruct them that they must consider the defendants individually. I don't think that instruction needs to be repeated. But you, obviously, do think so.

MR. REED: Yes.

THE COURT: And that -- Ms. Stokman, do you have comments about that?

MR. REED: One of the reasons I take that position is because the jury instructions of when the Court gives the law on the case, and this -- and that is the law on the case as to that issue.

MS. STOKMAN: And, Judge, I don't think there's a problem, because the Court did read that out, but the limiting instruction, I think, is important as well. Or in addition, if there's the instruction that the government proposed that goes to all three defendants.

THE COURT: All right. So let me understand. You're saying you don't have a problem with me giving them that instruction again. What I can do is that and --

MS. STOKMAN: Yes.

Yes, as far as that. There were some others that we found were missing, as well, but I won't go to those yet.

THE COURT: But as to that, you're saying you don't have a problem with me giving the limiting instruction I gave during trial and leaving it at that, or are you saying you

2985

want your limiting instruction too?

MS. STOKMAN:  I think it would be more appropriate for the government's limiting instruction.  The Court did give the one specific to Mr. Stinson at trial and during -- or after the evidence that came in, but the limiting instruction regarding -- that would cover all three defendants in that same scenario, if that scenario existed, I think is appropriate.

THE COURT:  Further comments by anyone else?

MS. DE SALES BARRETT:  I want to see what the government is talking about.

THE COURT:  Okay.  I'm trying to pull it up.

It's -- it's at Docket 1770 and Mr. Reed's was Docket 1769.

MS. DE SALES BARRETT:  Unfortunately, I'm going to unreadable content now.

THE COURT:  Sure.  So what Mr. Reed requested and what I read was the model instruction including, you know, 1.11.  And then it said:

"The testimony you just heard concerning Mr. Eversole and the interview that occurred in South Carolina may be considered only for the limited purpose of Mr. Eversole's receipt of a letter from defendants in this case in 2023."

MS. STOKMAN:  And, Judge, I'm sorry.  I think I

2986

misheard the Court.  Can you point me to the Court's instructions where there was a reference to a limiting instruction?  I want to -- I just want to look at that before, because I think I misunderstood that that already existed and what that looked like.

THE COURT:  It is -- it's Instruction Number 7, paragraph 3.

MS. STOKMAN:  I think that covers it, reading the -- reading the Court's addition, When I instruct you -- when I instruct you to consider certain evidence.

I mean, if Mr. Reed would like the Court to add, When I instruct or instructed you, that would be sufficient as well, because that instruction did go out during the course of trial.

MR. VILLA:  And, Judge, for my part, I mean, I think it's also covered by Instruction 4.  To the extent that that was the purpose of the government presenting it, at least in part, I think it would be inappropriate to overly emphasize that, and the instruction the Court gave during trial was sufficient.

MS. STOKMAN:  And, Judge, we have an issue with 4 anyway, but we can address that when we get to it.

THE COURT:  I think isn't there an instruction -- there it is -- well, the instruction related to -- oh, let me just pull it up.

2987

Yeah, so Instruction 16 also addresses the obligation to consider each person separately.  So then --

MR. REED:  Here's the problem that -- and I actually think RICO cases are different, which is one of the reasons that they draw different instructions.  In another part of the RICO instruction on this jury case, the Court is going to say, or the government is going to argue, Mr. Stinson doesn't have to do anything.  If Mr. Stinson is part of the Aryan Brotherhood and he's part of da-da-da Aryan Brotherhood, he can be liable for the two -- you guys call it -- we call overt acts down south, but you guys call it something different up here.

There's -- that -- that argument, which is law and true, is inconsistent with the rest of the instructions. Unless you deal with an issue as the Court did in the trial, you cannot consider this evidence against Mr. Stinson for any purpose, up to and including the law that I give you on RICO as to what somebody else did.  That's why it's different. That's why the situation is different, because it's a RICO case.  And RICO cases are just different.

So the regular limiting instructions don't work, and arguing and saying something that I did that two or three weeks ago and you must remember that now, my position is, highlighting it is exactly the reason that they have it.  And it's confusing if you don't do that, which is the whole

2988

purpose for giving limiting instructions.

THE COURT:  Yeah, but in general, limiting instructions given during trial are not repeated at the end. That's why they're given at the time, which was the argument you made at the time, that you can't wait to give this instruction, you got to do now.  And so I did.  But, you know, in general they are not repeated.

And what's more, when you look at the language of what you proposed and what I gave, then they'll have to go, Well, wait a minute what is that again?  Because that was a specific incident that, truthfully, I'm not even sure we can articulate which predicate act it could go to.

MR. REED:  Well, that's because we don't list the predicate acts, but I get that point.

THE COURT:  So then what do you -- you know, how does that bear on any question that the verdict must decide -- that the jury must decide on the verdict form?

MR. REED:  It doesn't bear on the instructions themselves.  The instructions -- as the Court knows, it's when lawyers start arguing that we -- that we run -- we run afoul or run up against the law.

THE COURT:  Yeah.

MR. REED:  And that's where it comes out.  But maybe, you know, I guess they can step into that bear trap and then I can ask the Court to redo it at that point.

2989

THE COURT:  Yeah.  Yeah, yeah.  You can do that.

MR. REED:  Okay.

THE COURT:  All right.  So I'm not going to do that.

Let's start at the beginning, then.  I assume there's nothing with 1 through 3.  I understand there's some comment about 4.

Ms. Stokman, as to 4?

MS. STOKMAN:  Yes.  The government added this instruction in when we gave the proposed jury instructions.  This was when Evans Perkins was still a defendant in this case.  The only 404(b) evidence that we had noticed was for Mr. Perkins.  Now he's no longer a defendant and this does not apply.

All the acts that have been discussed or -- or come out in evidence throughout the trial that pertain to these defendants are part of the RICO conspiracy.  So this instruction is improper in that respect.

THE COURT:  Comments for anyone else on that?

MS. DE SALES BARRETT:  Your Honor, I think it's general enough that it doesn't portray any particular acts or exclude any particular acts.

THE COURT:  Yeah.  The trouble, though, is line 6 to 7 says, You may not consider this evidence as evidence of guilt.  And, of course, that's exactly what they are supposed to do when it's a RICO situation.  At least that's what jumps

2990

out at me initially.  I mean --

MS. STOKMAN:  And again, the government will point out, this is an instruction that is given when 404(b) evidence --

THE COURT:  Yeah, it's a 404 question, for sure.

MR. VILLA:  And, Your Honor, I mean, I think there were -- there was evidence presented outside the conspiracy time frame, right, including this what we call defense investigation, the government says, you know, we're trying to find informants to kill or something, because apparently that's what we do.

But, you know, there's lots of this information that came after the conclusion of the crimes that -- I mean, parts of our objection were that it was improper 404(b) and the Court overruled that.  But I still think the instruction is appropriate.

THE COURT:  Uh, yes and no.  I mean, because the fact that evidence goes beyond the RICO time frame, though, it goes to other issues too.  For example, you know, the impeachment questions that were brought and the bias questions, the benefit questions, this type of information came after, saying, well, wait a minute, are you in fear for your life.

That type of thing, which is appropriately done in this case, that is not envisioned that this instruction would apply in that circumstance.  And I don't think the limitation

2991

of the -- the up to March of 2023 is -- you know, it doesn't preclude that and it doesn't preclude that from them considering that evidence and evaluating the credibility of the witness.  That's the trouble with that argument.

MR. VILLA:  The other issue, Judge, except different argument, you know, all three of these individuals are in prison.  So of course, the jury will infer that they are prison for committing some other crime.

THE COURT:  Yeah, except there's an instruction that addresses that as well.  That says, hey, you know, we're not talking about that other stuff.

And I wouldn't have given that at all except for, you know, counsel actually introduced the topic, Hey, you know, my clients were in prison -- that was the theme of the defense -- how could they have done this?  And I think there was a -- my recollection is at least one opening statement referenced that situation.  But --

And the evidence clearly, clearly repeatedly talked about where they were housed.  So there was an instruction that says, you know, the fact that they were convicted of crimes does not bear on it.

MR. VILLA:  Which one is that, Your Honor?

THE COURT:  Let me see.

MR. REED:  I remember that instruction in your evidence that the defendants have --

2992

THE COURT:  Number 18.

MR. REED:  Oh, there it is.  Yeah.

THE COURT:  So I think Ms. Stokman is correct about Instruction Number 4 that should -- I mean, we all know that instruction is -- 404(b), that's the -- that's the comments. That's definitely -- we use that in civil cases and in criminal case as 404 issues.

Moving to Number 5, that's just the standard instruction on reasonable doubt.

MR. VILLA:  Judge, just so that our record is clear, we maintain our objection to not including 4.

THE COURT:  Okay.  Thank you.

MS. DE SALES BARRETT:  Mr. Clement as well.

THE COURT:  All right.  As to Instruction 5, 5, 6, 7. I'm going to correct or change 7, paragraph 3 to say "when I have instructed you."  Other than that, any objections to 5 through 8?

MS. STOKMAN:  No.

THE COURT:  All right.  Number 9 I struggled with.

They were showed the chart of the pictures, so that's what I was thinking of here.

MS. STOKMAN:  The government agrees that that would be the demonstrative charts.

THE COURT:  Any other -- anyone have any problem with Number 9?

ER 2327

2993

MS. DE SALES BARRETT:  No, Your Honor.

MR. REED:  No, Your Honor.

MR. VILLA:  No Your Honor.

THE COURT:  Number -- anyone have comments as to 10?

MS. STOKMAN:  Yes.

THE COURT:  Okay.  Go ahead.

MS. STOKMAN:  Judge, we pulled up the actual model instruction and this instruction is generally given and usually given and it's in the comment to the instruction it lays out when there's a confession, which is a statement to law enforcement.

This is not a general statement of defendants' comments throughout the time of a conspiracy or to other co-defendants or witnesses, those are absolutely statements that are part of the evidence.

And this -- this instruction goes to statements to law enforcement where there's some sort of issue with the way that statement came out.

It addresses that when it said, The circumstances under which the defendant may have made it.  And then the comment addresses voluntariness.

And so the government believes that this statement is not applicable here because there was no statement by the defendants to law enforcement that would come under the purview of this instruction.

2994

MS. DE SALES BARRETT:  Your Honor, we agree.

MR. VILLA:  I agree.

THE COURT:  I think you're right.  I just pulled up the comment and it's exactly that.

Mr. Reed, do you have any comments about that?

MR. REED:  No, I agree.

THE COURT:  All right.  I won't give Number 10.

MS. STOKMAN:  Judge, can we just on 11 make sure we have the correct -- the Court indicated experts were added.

THE COURT:  Yeah.  I added Mendoza and Carpenter to the list, so there should be five.

MS. STOKMAN:  And then the chemist Fracia Martinez.

THE COURT:  Okay.

MS. STOKMAN:  And Terrence Pell was not designated as an expert.

THE COURT:  Okay.  So we'll just delete Mr. Pell, add Ms. Martinez.

MS. STOKMAN:  So there should be five total still.

THE COURT:  Okay.  So I think Number 12 is not needed.

MS. STOKMAN:  Government agrees.

MS. DE SALES BARRETT:  Agree, Your Honor.

THE COURT:  Number 13 is just the standard instruction.

MS. DE SALES BARRETT:  Your Honor, with regard to

2995

Number 13, the -- actually, paragraph after the list, we object to that paragraph. This seems to me to be leaning toward the government's arguments about credibility of witnesses and we believe that it is not an appropriate instruction.

THE COURT: All right. They were instructed on this at the onset of the case. This is just the typical preliminary instruction. This is the model instruction. It's exactly the model instruction. And to the extent that the Court is ever on the -- state of the art on anything, this reflects what is the current state of understanding of memory.

I mean, most courts give a pretty significant memory instruction that I've not found necessary up to this point.

Any other comments about Number 13?

MS. STOKMAN: No.

THE COURT: Mr. Reed, any comments?

MR. REED: No.

THE COURT: Oh, I'm sorry. I thought I was -- I'm going to give this instruction. It's -- I understand what you're saying that when a witness says something different from somebody else, then they should consider that as for purposes of credibility, which I believe is encompassed in that instruction as well, so I'm going to overrule that objection.

As to Instruction 14, it does seem to me we should

2996

include Mr. True.  Did I miss anyone else?

MS. STOKMAN:  Yes -- well, not missed, but Rubin's first name is Daniel, not Brian.

THE COURT:  Oh, all right.

MS. STOKMAN:  But otherwise, with the addition of Timothy True, the government agrees with the instruction.

THE COURT:  Anybody else, comments on 14?

MS. DE SALES BARRETT:  No, Your Honor.

THE COURT:  And then also --

MR. VILLA:  No, Your Honor.

THE COURT:  Then also on 15, I need to put Daniel instead of Brian?

MS. STOKMAN:  Yes.

THE COURT:  And add True.

MS. STOKMAN:  Also, there are some changes here that government believes are appropriate.

THE COURT:  All right.

MS. STOKMAN:  So in the first paragraph, it should be Brandon Bannick and James Field.

THE COURT:  Oh, yeah.

MS. DE SALES BARRETT:  Agree.

MS. STOKMAN:  The second paragraph, Mr. Rapinoe and Mr. Rubin did not get favored treatment.  Instead, in the government's proposed instruction which was Number 15 when we submitted them, there is a paragraph about a witness who

2997

received compensation, which would more appropriately apply to Mr. Rapinoe.

THE COURT: I think, though, the evidence on that is a little bigger, because there was a lot of questioning about, hey, you weren't prosecuted. You know, you've committed what -- I don't know, but at least arguably could be crimes that -- for which he has not been prosecuted, in particular, in federal court. And I don't know that the elements of those offenses have been detailed, but at least that was the argument.

MS. STOKMAN: But Judge, there's no agreement to that. There was no immunity on those witnesses for that. I mean, that is not something that played a factor as far as -- so Ms. Chandler is different because she has the letter of immunity, that makes sense.

The other two and also Timothy True -- well, no, Timothy True we believe also the letter would be -- he would be added to that second paragraph.

But for Mr. Rapinoe, it should be the compensation paragraph that the government did put into our proposed instruction regarding this and Daniel Rubin did not receive any favor treatment.

And for the speculation to be that the government could have charged and they didn't charge or they're not -- I mean, that's just a lot to go into this when that -- there's

2998

nothing in the record that would indicate decisions made or if pending charges come in the future.

THE COURT:  All right.

MS. DE SALES BARRETT:  Your Honor --

MR. VILLA:  Judge --

MS. DE SALES BARRETT:  -- if I may, with regard to the argument that the witnesses agreed when they were asked those questions.  Obviously, they agreed that -- that they could have been charged, and they weren't charged.  And that is clearly favorable treatment.

THE COURT:  The trouble with them agreeing is, what -- I didn't hear the elements of the offenses set forth and the fact that they have this belief is certainly important, but I didn't hear, I'll tell you, I didn't really hear sufficient evidence on any of them that says, oh, yeah, we're going to go file a charge today because there's evidence of it.

I didn't hear that, but I do appreciate that's a different issue than do they believe they received something.  I guess the question does --

MR. VILLA:  I mean, Your Honor, I think they admitted to doing stabbings, violence, EDD fraud, drug dealing --

THE COURT:  Right, but --

MR. VILLA:  -- drone drops, things like that on behalf of the Aryan Brotherhood.  That's a federal

2999

racketeering crime that they confessed to on the stand and they're not being charged.

THE COURT:  Well, it's just not simply -- it's not that simple.  You know, it's not them, I stabbed because somebody told me.  You know, there would have to be -- I mean, I'm not saying there's not a potential.  I'm just saying that it can't be charged and there's no -- it couldn't be charged today on what we've heard so far, and this instruction reads like it's an established fact.

So I'm just trying to --

MR. VILLA:  Well --

THE COURT:  Wait a minute.  I'm just trying to noodle out, should it go here, should it go someplace else, should the language be changed in some way.  Because it is an established fact as to, you know, paragraph 1 as to the others.

And I agree Mr. Rubin is probably something we should talk about, because they did receive concrete indisputable benefits.

So when it's something else, when it is a credibility as opposed to an absolute without a doubt benefit, does it -- does it belong here?

And clearly, Mr. Rapinoe should be as to compensation, but if there's a slightly different issue, I don't think we can say it's been established that Mr. Rapinoe

3000

could be prosecuted and is not going to be as a result. Because we don't know any -- we don't have any evidence of that.

MS. STOKMAN:  And Judge, I think I'll remind the Court that Mr. Rapinoe and Mr. Rubin both when they were asked that question, you know, you didn't -- you're not going to get charged, in their own way, they both basically said, I hope not.

I mean, that was the response.  So that does not indicate they believed that testifying would actually cause them to be -- to avoid charges.

In fact, Mr. Rubin waived immunity when he testified in the grand jury.  I mean, there were -- there were steps along the way that indicate that they are not aware whether or not they -- I mean, if they -- they can be charged from their testimony, and I think that the Court is correct, it doesn't establish that they are coming up here, they're hopeful, but that is not what -- there's no agreement on that.  There's been no decision on that as far as they're aware.

And so the government does not believe for those two in that paragraph that that's appropriate.

MR. VILLA:  Judge --

THE COURT:  Let me just back up.  You said that Daniel Rubin testified with immunity.  I'm sorry.  Did I miss that, or was that not introduced?

3001

MS. STOKMAN:  It was not introduced, but I'm letting the Court know he waived immunity for even his grand jury testimony.

MS. DE SALES BARRETT:  I would object to the Court considering anything outside of the scope of the evidence --

THE COURT:  Well, that would be interesting if I was making any factual determinations in this case, which I'm not.

So I just want to know if he's waived it and there was evidence, then I think that we would put that in, but there's not.

So, Mr. Villa --

MR. VILLA:  Judge, the operative word is "favored treatment."  So we're not talking about you will not, have not, and you're never going to be charged.  It's just, Did you get favored treatment?

And not getting charged as of today is favored treatment.  I mean, if the government wanted to put on evidence in response that, Well, actually, we're thinking about that, and we're conducting an investigation right now into that, you know, then maybe we have a different situation. But the only evidence the government -- or the jury heard is that they've committed these crimes for which the federal government has not yet today charged them.

And the question is:  Is that favored treatment.  I mean, we're not talking about concrete, You are not going to

3002

be charged.  Just favored treatment.

THE COURT:  The trouble is everybody else in that paragraph have concrete indisputable favored treatment.

MR. VILLA:  And that can be dealt with in argument by the parties.

THE COURT:  Yeah, except you're asking me to tell the jury that they have received it.  Instead what it is is argument that they have received it.

Because the jury will decide whether or not they have received it.  Because the fact that they say, Yeah, I hope I'm not being charged, the questions suggest, Yes, I've committed federal crimes.

Although, I mean, I was concerned at the time, I don't think they have any sort of expertise to say that.  And one guy -- one witness even said, Well, you know, that's -- I think he said, That's above my food chain, or something like that.

So it's not that they have any legal expertise to say, Yeah, I committed a federal crime.  They certainly think they did something that the law doesn't allow.  But I think that that's the trouble with what we're dealing with is you're telling -- you want me to tell the jury they received it as opposed to them deciding.

MS. STOKMAN:  And, Judge, I'll also point out that the beginning of that last sentence says their testimony was

3003

"given in exchange for," which implies a contractual agreement of sorts like a plea agreement, cooperation agreement, immunity letter. And that didn't exist for those two witnesses.

MS. DE SALES BARRETT: Your Honor, Mr. Rapinoe testified that he entered into a cooperation agreement with the government in return for his cooperation in San Diego which led to his cooperation in this case. So --

THE COURT: I know he said that, but then he also said he didn't. And he said it was -- I mean, I don't know. He was all over the map on what exactly he did. And so --

MS. DE SALES BARRETT: Well --

THE COURT: And we know for a fact he didn't testify here in exchange for any cooperation agreement with the government in this case. We know that. And this suggests that he did.

MR. REED: The -- the --

MS. DE SALES BARRETT: It doesn't -- all it says is that you've heard testimony that --

And, you know, it is -- it is not saying that the testimony was true or it was not true. It's just saying that a witness in those circumstances, his testimony should be viewed with greater caution than an ordinary witness. And that's not controversial at all.

THE COURT: Except, again, lines 9 and 10 does say

3004

specifically that it was given in exchange for favored treatment.  And, I mean, Mr. Rapinoe will be included.  I think absolutely it relates to the compensation issue.

But Mr. Rubin, I don't think there is evidence that he -- he testified in exchange for.

But I -- I mean, I'm not saying that you can't have some other sort of instruction somewhere, but I need to know where it is.  Because this -- clearly this instruction is designed for those people who've got concrete arrangements with the government, which is different from just credibility issues.

Unless you see something differently from the Ninth Circuit, that's how I read the comments.

MS. DE SALES BARRETT:  Your Honor, with regard to that, in terms of this instruction, we believe that there should be a paragraph with regard to the admission by these individuals that they were accomplices in Count 1.  Each one of them testified that they were participants in the Aryan Brotherhood enterprise during the period of this indictment.

So there should be a separate paragraph that includes all of those individuals who testified that they themselves were members of the Aryan Brotherhood and -- excuse me -- and committed crimes on behalf of the Aryan Brotherhood.

So we would submit that a section -- a paragraph

3005

should be added listing all of those individuals and Lana Haley as -- because they admitted -- all of them, each one of them admitted committing crimes, from their perspective, on behalf of the Aryan Brotherhood.

THE COURT: All right. Any other comments?

MS. STOKMAN: The government disagrees with that, and that is not where -- the true meaning of that is in paragraph 1 when it comes to Brandon Bannick and James Field.

Additionally, I'll point out that when we were eliciting statements from Ms. Haley, it was defense's position that she was not a coconspirator, and thus, they believed we shouldn't be eliciting coconspirator statements.

So even though -- I know that the government does not believe any of the accomplice argument should be in here -- that is not the purpose of this -- except for the first paragraph, but I will point that out as well.

THE COURT: I think in truth, though, at least to the extent if we add the accomplice language, Brandon Bannick and Mr. Field, probably Mr. Eversole, they've been convicted. I don't think in the -- I don't think that that -- I mean, they've been convicted directly, not as accomplice liability. So I don't think that makes sense.

As to --

MS. DE SALES BARRETT: Excuse me, Your Honor, but Mr. Field -- they have been convicted. For instance,

3006

Mr. Bannick pled guilty as an accomplice to the Lomita killing, if you accept his version of it.

THE COURT:  Well, I don't know what he said.  I mean -- I mean, I do know what he said, but I took his plea. His plea was straight up to the count.

MS. DE SALES BARRETT:  Right.  But you can plead straight up to that count without specifying whether you're a principal or --

THE COURT:  Right.

MS. DE SALES BARRETT:  -- an accomplice because the liability and the punishment is identical.

THE COURT:  Right.  So your point is that I should adjudicate that differently based upon his testimony here or just that he pled guilty to being -- I mean, it could go either way.  It could go a lot of different ways.

MS. DE SALES BARRETT:  I'm saying he testified that he -- he testified that his role in that was as an accomplice.

THE COURT:  There is an instruction, though, that deals with the fact that they've been convicted of these felonies and how that bears on their believability.  What you're suggesting overemphasizes that for sure, and I'm not going to do that.

As to the others -- actually, I think all of them have admitted except for Kaylen Chandler.  And actually, she has immunity.  The rest of them have all admitted their felony

3007

convictions related to the AB, and they are -- the jury is entitled to consider that for purposes of their credibility, and that instruction is given.

At this point, I'm not going to change -- I'm going to delete Mr. Rubin from paragraph 2. I'm going to add Mr. Rapinoe compensation language proposed by the government and --

MS. STOKMAN: He should be deleted from that paragraph as well.

THE COURT: -- and delete him from paragraph 2, add his own paragraph for him in particular.

Let me pull up the language of that. Does everyone have the government's proposed instruction in that regard?

MS. DE SALES BARRETT: Mine disappeared, Your Honor.

MR. VILLA: What's the docket number?

THE COURT: It -- I don't know. Let me pull it up.

MS. STOKMAN: And I can read it into the record as well.

THE COURT: It's Document 1618.

MS. STOKMAN: It was -- I'm sorry.

THE COURT: Oops, I'm sorry. I'm looking at the verdict form.

MS. STOKMAN: I don't have the PACER number, but it was Instruction 15 in what we did file.

MS. DE SALES BARRETT: I guess we're trying to look

3008

it up on PACER.

THE COURT:  It looks like it's 1616.

MS. DE SALES BARRETT:  Okay.  Yes, Your Honor.

MR. VILLA:  What was the number again?

THE COURT:  It's the docket --

MR. VILLA:  No, not the docket number, the instruction number.

THE COURT:  15, she said.

MR. VILLA:  Thank you.

MS. STOKMAN:  Page 21.

MS. DE SALES BARRETT:  Page 21 of the government's proposed instructions.

MS. STOKMAN:  The second -- there's two.  There's a second proposed.  And I don't know if it's the same page number on the first one, but we filed a second -- like a minute -- an amended.  So I'm looking at that one.

THE COURT:  Yeah, that's not 1616.

MR. REED:  Does the Court have some other place it intends to put Mr. Rubin?

THE COURT:  Mr. --

MR. REED:  Rubin.

THE COURT:  Well, not really, because there's no evidence that he had any sort of formalized agreement.  And he would just go with he's been convicted of felonies and 609s.

MR. REED:  Except that Mr. Rubin admits that he was

3009

an associate of the very RICO conspiracy that these guys are being charged in, so he is an accomplice.

I recognize that the fed does not treat accomplices exactly the same way as the state does requiring cooperation, but accomplice testimony is inherently unreliable.  I think the nature of that applies to the Ninth Circuit as well as California.  And he is clearly an accomplice.  He's testified to that.

THE COURT:  This Instruction Number 15 now --

MR. REED:  No, I'm not saying that it applies to this instruction.  What I'm asking, is there some other place where the Court is going to deal with Mr. Rubin, or is he -- does he get on the witness stand with sackcloth and ash and he's suddenly the same as Mendoza or someone else?  I don't think that would be the case.

THE COURT:  What are you proposing, Mr. Reed?

MR. REED:  I'm not sure.  And that's -- that's my question.  Because if you're going to take him out altogether, then I will have a valid -- I'll have to come up with an answer.  If you're going to put him someplace else, then that's different.

MS. DE SALES BARRETT:  (Inaudible).

THE COURT:  I'm sorry?

MS. DE SALES BARRETT:  Accomplice, he does testify as an accomplice.

3010

THE COURT:  The trouble -- gotcha.  Hear it.  It doesn't belong in 15.  If you've got some proposal, I'd like to hear that, but it doesn't belong in 15.  Because accomplice here suggests adjudication or formalized determination.

What you're suggesting is I adjudicate him now based on the evidence presented, and that's not what Instruction 15 relates to.

MR. REED:  I concede that point.  I'm just trying to -- if it doesn't fit in 15 and there's no other place, then I will make some -- try to figure out someplace where I think it goes.

MS. STOKMAN:  There's -- I mean, there's a credibility instruction that we've already given and the Court has addressed today again.  And although that never names every witness, counsel generally tends to use that to argue credibility, and there are factors in that instruction already that would cover this issue.

MR. REED:  We don't argue that for accomplices, Counsel, but I understand your point.

THE COURT:  Well, yeah, but again, I would rather not talk about the legal concept or the legal conclusion that you-all are drawing.  It may be that on credibility you add a proposed modification that says the extent of the involvement of the witness in the acts charged, something like that.

But I'm -- I'm having trouble finding your

3011

instruction.  It does not appear to be in 1616 at page 21.
Oh, it's at page 12 of 1616.

Finally you've heard testimony from Brian Rapinoe,
who received compensation from the government in connection
with this case.  That's the language that was proposed.

MS. STOKMAN:  That came right from the model
instruction.

MS. DE SALES BARRETT:  No objection, Your Honor, to
that -- to adding that.

THE COURT:  Got it.

MS. DE SALES BARRETT:  We still have our objections
as already stated in this particular charge.

THE COURT:  All right.  Anything else?

MR. VILLA:  Mr. Johnson joins those objections.

MS. DE SALES BARRETT:  And Mr. -- is Mr. True's name
being added to any --

THE COURT:  Yes.

MS. DE SALES BARRETT: -- place here?  Okay.

THE COURT:  Yes.  All right.  Moving on to 16.
Any objections to 16?

MS. DE SALES BARRETT:  No, Your Honor.

MS. STOKMAN:  No.

THE COURT:  17?

MS. STOKMAN:  Yes.  The government filed an
opposition to the motion in limine that Brandon Bannick filed

3012

regarding this instruction.  So we point the Court to the arguments in that.  But this instruction is misleading as it pertains to the first element of Count 1, because that absolutely is something that is required to be found in order to even move to the next elements in the RICO conspiracy.

THE COURT:  I took this language and modified it from *Yandell* because it says, Gang membership alone does not prove.

MS. DE SALES BARRETT:  Right.

THE COURT:  Because the whole point is to say, Look, you know, you may find that they are members of this gang, but that doesn't determine the outcome, it's just the first step, in essence.

I mean, we could tighten that up a little bit more, but I thought the alone part was enough.  I mean, I thought what *Yandell* gave, I think that's not correct, but I deleted out what I thought was incorrect.

MS. STOKMAN:  And perhaps, then, if the Court is inclined to keep this, there is a continuing line somewhere that says, uh, something about the elements -- you know, if there's an element of the RICO charge, then those all have to be found, so that they know that that's part of an element of the conspiracy of Count 1 and --

THE COURT:  I mean, Count 1 says you have to be a member or an associate.  This just says basically if you find they're a member.  It doesn't address associate.  But --

3013

MS. DE SALES BARRETT: Your Honor, may I address that?

THE COURT: Yeah.

MS. DE SALES BARRETT: First of all, it doesn't -- the element in Count 1 is that the Aryan Brotherhood is a continuing criminal enterprise. It is -- the name "Aryan Brotherhood" has nothing to do with the element of the offense. And what this -- and what this instruction says is that just because somebody is in the Aryan Brotherhood doesn't mean that they have entered into a criminal conspiracy as defined in this case.

So I think nothing needs to be added to this, this states the law as it stands. Gang membership alone is not sufficient to prove any element of a racketeering offense.

MR. VILLA: And, Judge, I would just add it doesn't have to be a gang for the government to be able to prove it's a racketeering enterprise. So I think it --

MS. DE SALES BARRETT: Right.

MR. VILLA: -- stresses the specific concerns we have about unfair prejudice for being a member of a gang.

MS. STOKMAN: The government's position is that it's unnecessarily confusing when they have to find all elements of the RICO conspiracy, not just the first element that requires -- or first or second element that requires --

MS. DE SALES BARRETT: But you could substitute

3014

Coca-Cola Bottling Company for Aryan Brotherhood in a RICO conspiracy if that were the case.  It is just simply the name.  And that's -- that's the problem here.

MS. STOKMAN:  But that is the gang we're talking about in the RICO conspiracy, so it --

THE COURT:  We're not going to put Coca-Cola, but when I look at Instruction 22, there is not a requirement that they find that they are a member of the Aryan Brotherhood or the enterprise.  What it says is:  The enterprise did this, there was an agreement to conduct the business of the enterprise, they became a part of the conspiracy of the enterprise and, you know, knew that the members of the conspiracy would do this.

It doesn't say you have to find that they were a member or an associate or any sort of -- it just says:

"The indictment alleges that the enterprise is the
    Aryan Brotherhood, including its leaders, members,
    and associates."

MS. STOKMAN:  Judge, I'll also note that in the VICAR instructions, they have to maintain membership, so there's -- just pointing that out that it's the government's position that this is a little confusing when the elements of the offenses charged do require some sort of association or membership or continuing association or membership.  And again, we're asking them to find each element of the crime,

3015

which requires more than just to be a part of it.

MR. REED:  I think when you read 17, 21, and 22 together, they actually are harmonized and they all speak to membership in the criminal partnership or in the conspiracy or the enterprise, they do not say "the gang."  And to say anything -- in fact, I would be very surprised if you could get away without giving 17.  If you give 21 and -- I just think that 17 makes it clear that being in the Aryan Brotherhood is not the element.  It's the other -- it's what 21 and 22 require.

MS. DE SALES BARRETT:  Well, and, Judge, and I would add to that we have objections to -- to including the name "Aryan Brotherhood" in the numbered paragraphs of --

THE COURT:  Well, you do that and then we definitely can't have Number 17.  If you take out the Aryan Brotherhood, then we can't have --

MS. DE SALES BARRETT:  No, it still appears in the first paragraph:  As alleged in the indictment that it's the Aryan Brotherhood.  If you want to say:  Here, as alleged in the indictment, the indictment alleges that it's the Aryan Brotherhood, that's different.  But here, this is a conclusion that the Aryan Brotherhood is the enterprise.  And that is not the law.

MS. STOKMAN:  It's the enterprise that the indictment lays out, which absolutely is needed to explain what charges

3016

and elements of those charges the jury is being asked to decide on.

MS. DE SALES BARRETT:  And that's argument.  That's their position.  That's the -- that's what the indictment says.  It's not what a jury charge -- what a jury should be told with regard to elements of the offense.

THE COURT:  All right.  Looking at 17, I think to address the concerns, what I'll say is, Gang membership alone without more does not prove blah, blah.

MS. DE SALES BARRETT:  I have no objection to that, Your Honor.

THE COURT:  And then next line, As a result, you must not infer from the alleged gang membership alone without more.

And I'll do that.

Moving on to Instruction 18, this is the same 609 issue.

MS. STOKMAN:  Judge, we only point out that it's missing a title, but --

THE COURT:  Yeah, well, they don't get titles anyway, so --

19, on or about, any objection?

MS. DE SALES BARRETT:  No, Your Honor.

MS. STOKMAN:  No.

MR. REED:  Your Honor --

MR. VILLA:  No, Your Honor.

3017

MR. REED:  (Inaudible).

THE COURT:  I'm sorry, what?

MR. REED:  Does the jury get numbers?

THE COURT:  Yeah, they get numbers for reference, but they don't get the title, we delete out the title, because it's --

MR. REED:  They get renumbered, because I think --

THE COURT:  Yeah, they'll get renumbered.

MR. REED:  So these numbers will not stay these numbers?

THE COURT:  Correct.  You'll get a revised set.

MR. REED:  Thank you.

THE COURT:  Number 20, knowingly.

21, conspiracy.

22, RICO conspiracy.

MS. STOKMAN:  Judge, this is one that the government had a different proposed instruction.

This -- we understand this is the Ninth Circuit model instruction, but we believe that this is a very confusing and duplicative instruction that doesn't clearly spell out the elements.  And, for example, this instruction has a four -- proposed four-element formulation, the one we gave has five elements.  We believe it clearly defines the elements that are required for the RICO conspiracy.

And just so the Court knows, we consulted with the

3018

racketeering office in DC and made sure that the proposed instruction that we gave did not discount any Ninth Circuit precedent or something that -- it only makes the Ninth Circuit instruction clearer and more appropriate to the law that exists under the RICO conspiracy statute.

THE COURT:  I've looked at that.  I'm having trouble putting my hands on it.

That's, again, in 1616?

MS. STOKMAN:  Judge, I think -- so I don't know if I was correct on the number as it pertained to the 1616 as far as the government's instructions.

But in the most recent instructions filed by the government, proposed instructions, it was under the Instruction Number 24.

MS. DE SALES BARRETT:  Page?

MS. STOKMAN:  In the version I'm looking at, it's page 32.

MR. VILLA:  That's not 1616?

THE COURT:  In 1616, it looks like it's page 23.

MS. DE SALES BARRETT:  Okay.

THE COURT:  Now, see, I went over this and I thought that the charged enterprise, the Aryan Brotherhood, was or would be established.

MS. STOKMAN:  That is correct.

THE COURT:  So that kind of addresses, I guess, what

3019

Ms. Barrett was saying is that that's a fact to be determined by the jury, whether the Aryan Brotherhood was established and then whether it engaged in this conduct.

MS. STOKMAN:  Which is, yes, and in our proposed it is part of the element which is required for them to find unanimously.

MS. DE SALES BARRETT:  Our position is, Your Honor, that the Ninth Circuit instruction is appropriate, but without, as I said before, mentioning the Aryan Brotherhood in paragraphs 1 and 2 -- numbered paragraphs 1 and 2.

MS. STOKMAN:  The government opposes that, as it does state the indictment alleges, which is exactly what is required.

MR. VILLA:  It seems the Court's proposed one covers what the government's trying to establish, is that there was an enterprise.

THE COURT:  Well, except they're also seeking to make the jury determine that there was an enterprise.  What I've listed and what you seem to be agreeing to is conceding that the enterprise existed.  So I guess I'm kind of hearing it two different ways from the defense.  I don't quite know how you want to do that, then, what your -- what your position is in truth.

MR. VILLA:  You're saying Court's first element?

THE COURT:  It assumes.  It doesn't ask for a

3020

finding.

MR. VILLA: It seems to me it does, but I -- I mean, I guess I could be corrected.

I mean, I agree the parenthetical here, the Aryan Brotherhood, should be taken out.

THE COURT: I mean, when you look at the model instructions, it's -- under 1962(c), for example, it says specified enterprise or union.

MR. VILLA: Which it specified in that first paragraph.

THE COURT: I'm just looking at the model instruction. Actually, you know, we probably should just go ahead and take a break now and let's come back in about 15 minutes, five minutes after, and we'll go further at that time.

(Recess held.)

THE COURT: All right. We have everyone back.

In looking at this again during the break, it looks like the government's instruction seems consistent with what we're asking next and instructing next, and that is what an enterprise is. It's saying that -- I mean that Instruction 23 says that they have to determine that there was an enterprise. And so it makes sense to me to include that as an element. Unless you-all are stipulating that the enterprise existed. I don't think the defense is doing that.

3021

MS. DE SALES BARRETT:  No.

MR. VILLA:  No.

MR. REED:  No.

THE COURT:  Okay.  So I think it should be included. When I look at the government's instruction, what strikes me as the primary difference is there's no dates of the conspiracy.  And I think that should be included.

Also, just working off the government's instruction, I think it does make sense, as Ms. Barrett has suggested, that we don't need to keep saying "Aryan Brotherhood" because it is paragraph 1.  The government mentions it just once more, but I think the fact that it's just identified as the enterprise charge system six lines before, I don't think we need that.  I think it should just say, First, the enterprise was established, because there is no evidence that it had not been established.  It either is or it isn't.

MS. STOKMAN:  And Judge, the language is "was or would be" for that.

THE COURT:  I see that, but there's no evidence that there was some formation happening.  So I think it should be, First, that the enterprise was established.

MR. VILLA:  Your Honor, I guess I have concerns about that framework.  I mean, the factual question we want the jury to decide is:  Is it an enterprise, right?  And if that's true, then why don't we just say, if you're going to go along

3022

with that, that, you know, first, the Aryan Brotherhood or you know, the charge enterprise is an enterprise. I don't understand the "was or would be established." Isn't the question just: Is it an enterprise?

THE COURT: No, because you look at Instruction 23, it says, "The first element of RICO, the government must prove that an enterprise existed."

MR. VILLA: So then isn't that the question we want the jury to ask?

THE COURT: Well, you mean you don't like "establish"? You want it to say that the -- that the enterprise existed?

MR. VILLA: Yeah or, you know, it constituted an enterprise or something like that. I don't -- "was or would be established" doesn't seem to be what we're asking the jury to --

THE COURT: I don't have a problem with saying, First, that the enterprise existed. That is exactly consistent with the next instruction.

And second, or Point 2, is the enterprise, I could -- probably should be, I think, beginning at a time unknown like -- the current 22 says, "including the dates of the conspiracy." And then go into the government's that the enterprise engaged in -- well, no, I think that should be "was or would be engaged in."

3023

MS. DE SALES BARRETT:  Yeah, are we talking about the government's second, Your Honor?

THE COURT:  We're talking about the government's second but including the language related to the dates from the current instruction, because I think that that should be included.

MS. STOKMAN:  Judge, I think the dates would more -- I'm sorry -- they would more appropriately go into the third. I'm sorry the dates -- well --

Sorry, Ms. Barrett.  You can go.  I'm trying to make sure that they are consistent here, because they are not exactly the same.  So I'll think about that more.

THE COURT:  Ms. Barrett, you had comments?

MS. DE SALES BARRETT:  I thought there -- no.  I -- uh, it looks like Number 2 is the same on the Court's is the same as the second.

THE COURT:  I'm sorry.  I meant I renumbered it.  So the current Number 1 has dates included.  So I'm just thinking dates should be included somewhere.  Is it there or is it when the defendants are alleged to have entered into it?

MS. STOKMAN:  I think it's more of their knowing --

Yeah.  I think, Judge, it could go into the third element where it first describes when there would be agreements in it.  But again, it's --

THE COURT:  I think the trouble with doing it there

3024

as opposed to the second one, as I understand the indictment, the third superseding indictment, they are talking about -- and there's instruction about multiple conspiracies. And so what they are talking -- what I understand the indictment to say is, this all was happening and then people pop in and out of multiple conspiracies during that time period.

MS. STOKMAN: Judge, that -- we had an issue with the multiple conspiracy, as well, because it is one conspiracy under the racketeering count.

THE COURT: That makes some sense, because --

MS. STOKMAN: Especially when the elements of Count 1 lay out more specifics to what each defendant had to have known or been engaged in.

THE COURT: All right. We can talk about that further.

What do you think about dates, Ms. Stokman? Where do -- you think it should go in 4, point 4?

MS. DE SALES BARRETT: Your Honor, I'm not sure -- where are we defining enterprise if you eliminate Number 1 on your instruction?

THE COURT: The next instruction.

MS. DE SALES BARRETT: Pardon me?

THE COURT: The next instruction, look in your package.

MS. DE SALES BARRETT: I think it has to start.

3025

THE COURT:  Well, I'm -- we can reorder them.  But the next instruction -- well, actually, though, it makes sense, because it's laying out the elements and then the instructions following go through, Okay, Element 1, here's your instruction; Element 2, here's your instruction.  That actually makes sense to me.

MS. STOKMAN:  Judge, we believe that as soon as there's words about knowingly agreeing, it should -- so the third in the government's proposed.

THE COURT:  All right.  Any comments about whether the dates should be included for the defense?

MR. VILLA:  I think dates should be included.

THE COURT:  All right.  Then otherwise, looking at the government's proposed instruction, is there anything else that there's objections to or can we just adopt this one with some formatting changes?

MS. DE SALES BARRETT:  Your Honor, can you point to me where we're defining an enterprise?  Where we're saying --

THE COURT:  Instruction --

MS. DE SALES BARRETT:  -- there was an agreement between two or more persons to conduct and participate directly or indirectly in --

THE COURT:  Let me again direct you to the package, Instruction Number 23.

MS. DE SALES BARRETT:  Oh.

3026

MR. REED:  So this is going to replace 21?

THE COURT:  We're working on 22.

MR. REED:  22, excuse me.  Okay.

THE COURT:  All right.  Moving to 23, that's the enterprise instruction.  I don't think there's even any modification to that.

MS. DE SALES BARRETT:  Yes, Your Honor.

THE COURT:  Okay.

MS. DE SALES BARRETT:  Your Honor, in the second, third sentence, after the word "informal," we believe it should say, "With members or associates who function as a continuing unit."

MS. STOKMAN:  Sorry, I didn't hear that.

THE COURT:  She said, Associates or members who continue as a functioning unit.

I don't think that that's accurate.  I mean, I could see -- I don't have a problem changing "personnel" to "members or associates," but I don't think they have to -- all in the same people have to consider -- have to function as a continuing unit going forward.

MS. DE SALES BARRETT:  Doesn't modify "people."

THE COURT:  I'm sorry, what?

MS. DE SALES BARRETT:  The phrase doesn't modify "people."  That says:

     "This group of people, in addition to having a common

3027

person, must have an organization.  The organization has members and associates who function as a continuing unit."

THE COURT:  Where are you reading?

MS. DE SALES BARRETT:  Oh, I'm sorry.  I'm reading the one wrong.  Sorry, judge.

"This group of people" -- third sentence -- "in addition to having a common purpose, must have an ongoing organization, either formal or informal, with members and associates who function as a continuing unit."

That's what we request that it be added, we would repeat, The law requires a finding -- the law requires a continuing unit -- functioning as a continuing unit over time.

MS. STOKMAN:  Government's pointing out that the second paragraph does lay out more of what is required and that change should not be added or made to the first paragraph.

THE COURT:  What's concerning to me is you say, With members and associates who function as a continuing unit. When you're talking about who, it does modify members and associates as opposed to the formal or informal organization, and I think that is not correct.

What is your -- what are your thoughts, Ms. Barrett, as to how paragraph 2 bears on that question?

MS. DE SALES BARRETT:  I believe that -- paragraph 2

3028

with the numbered?

THE COURT:  Yeah.

MS. DE SALES BARRETT:  I still -- continuity is an element here.  Case here is *US v. Fernandez*, which says:

"An associated-in-fact enterprise requires proof of an ongoing organization, formal or informal, which exhibits a hierarchal or consensual decision-making structure beyond that inherent in the alleged racketeering activity, and in which various associates function as a continuing unit."

THE COURT:  So if Point 3 was changed to "the association," that refers to the ongoing -- or the -- or the organization's continuance.  What I'm concerned about, though, is you -- your language seems to focus on individuals, and maybe that's not how you're intending it, but I think that's how it could be interpreted.

But it does appear that paragraph 2, especially when combined with adding dates to Instruction 22, seems to deal with exactly what you're talking about.  Because I think we agree they don't have to prove that it existed beyond that relevant time period, right?

MS. DE SALES BARRETT:  No, but we do have to show continuity over the course of the time period.  The government has to prove continuity.

MS. STOKMAN:  And, Judge --

3029

THE COURT:  It does say that the enterprise engaged in this common purpose over a period of time.

I'm sorry, Ms. Stokman, I interrupted you.  Go ahead.

MS. STOKMAN:  No, I -- and this might just confuse the issue more, but in our proposed instructions these were a little different here as well.  We were pointing to the three factors that were established in *United States v. Boyle*, [sic] which were only that the enterprise has to have the three features of, one, a purpose; two, relationships among those in the -- those associated within the enterprise; and the longevity that permits these associates to pursue the enterprise purpose.

MS. DE SALES BARRETT:  I believe it's *Boyle* against United States.

THE COURT:  If you prefer that language, I -- I don't have a problem with it.

Is that -- I'm assuming, though, this is not -- well, let me just look it up.

Yeah, I mean, it's not the model instruction.  What I have is the model instruction.  So just FYI.

But Ms. Barrett, you're saying you prefer the government's instruction, then?

MS. DE SALES BARRETT:  No, Your Honor.

THE COURT:  Okay.  Then the model instruction?

MS. DE SALES BARRETT:  I -- this -- are we talking

3030

about -- we're talking about 23 now, is that --

THE COURT:  Correct.

MS. DE SALES BARRETT:  Yes.  Okay.  I prefer the Court's instruction with the addition of the "functioning as a continuing unit" in paragraph 1, and adding "longevity sufficient to permit the members and associates of the group to pursue the group's purpose" added to paragraph 2 as a Number 4.

MS. STOKMAN:  I think if we're going to go with the elements in *Boyle*, then we should go just go through those three that were laid out in this case.

THE COURT:  Well, actually, it -- the element of the impact on interstate and foreign commerce is already instructed in 22, so the model instruction repeats that, for some reason.

So instead of the Point 3 set forth in Instruction 23, uh -- Ms. Barrett, your language is exactly the same as Point 3 of the government's instruction, right?

MS. DE SALES BARRETT:  Point 4 -- no, Your Honor -- Point 3?

THE COURT:  Yeah.

MS. DE SALES BARRETT:  I don't know even know where we're going.  With regard to the language from *Boyle*, yes.

THE COURT:  So what I'm proposing is the language from *Boyle* as Issue 3 here where it says, 1, purpose; 2, the

3031

informal/formal organization; Point 3, longevity sufficient, blah, blah, and not again repeat the instruction related to the impact on interstate and -- and foreign commerce because that's already instructed in the one we just talked about, Number 22.

MS. DE SALES BARRETT:  I have no objection to that, Your Honor.

THE COURT:  Anyone else have comments about that?

MS. STOKMAN:  Judge, I believe -- because 22 does not lay out what interstate commerce -- like, the definition.  In the government's proposed elements, it mentions that that's a requirement, which is absolutely right.

THE COURT:  But then it's --

MS. STOKMAN:  I'm --

THE COURT:  So then four points, then?

MS. STOKMAN:  I think the three -- well, there is a separate interstate commerce instruction which could be, on its own, defining that.  I'm looking through the government's proposed, because I believe we had that in there.

MS. DE SALES BARRETT:  It's paragraph -- it's -- the second to the last paragraph of the Court's Instruction Number 23 defines interstate commerce.

THE COURT:  Right.  But if we delete out that, then it doesn't make sense.

I mean, it could be moved to -- nope.  It's got --

ER 2366

3032

it's got to be included if we -- given how we modified Number 22, it's got to be included there as well.  I think it probably should be just be 4.

MS. STOKMAN:  And then leave the definition in there?

THE COURT:  Yeah.

So now we're at Instruction 24 of the packet, racketeering activity.

MS. DE SALES BARRETT:  All I have is the typo.

THE COURT:  At line 7?  Or what are you referring to?

MS. DE SALES BARRETT:  Yes, Your Honor.

THE COURT:  I'll make that correction.

MS. STOKMAN:  And, Judge, with the addition of the first element of the government's proposed, I think just deleting with respect to the first element.

THE COURT:  Yeah.  So just basically that entire first phrase, just starting, "The government must prove the enterprise."

MS. STOKMAN:  Yes.

THE COURT:  All right.  Instruction 25, any comments?

MS. STOKMAN:  No.

MS. DE SALES BARRETT:  No objection.

THE COURT:  Number 26?  27?

MS. DE SALES BARRETT:  Your Honor, one moment, please.  I'm just trying to coordinate here with regard to -- Your Honor, we -- instead of saying, "Your verdict must be

3033

unanimous as to which two type" -- "which types" -- "type or types of predicate racketeering activity," we request that the Court say, "If you find the government has proven a pattern of racketeering activity beyond a reasonable doubt, all of you must agree on the same two crimes which form a pattern of racketeering activity."

THE COURT:  So you don't want -- are you saying strike the entirety of the paragraph beginning at line 13.

MS. DE SALES BARRETT:  No.  I think I'm just talking about the sentence.

THE COURT:  Which --

MS. DE SALES BARRETT:  Yeah.

THE COURT:  It is only one sentence.

MS. DE SALES BARRETT:  Yeah.  Yeah.  We're saying that if the government proves, that they must agree -- "all of you must agree on the same two crimes" is the important language that we would like to be substituted for "which type or types of predicate racketeering activity," those words.

MS. STOKMAN:  That's inconsistent with what the law says.  This is the -- this is the law as it pertains to that element of Count 1.  And it does explain at the end of the sentence, for example, at least two acts of murder conspiracy, and it lists them, or one of each or any combination thereof.

THE COURT:  Ms. Barrett, I guess I'm still troubled by where you think your language should pop in, because, you

3034

know, they still have to have "the defendant knew" or "contemplated would be committed."  It's not just enough to say two crimes were committed.  That's doesn't get us where we need to -- that would not be a correct instruction.  Sorry.

You seem to be saying maybe after the comma include that, and then -- then start again at "the defendant knew"?

MS. DE SALES BARRETT:  Yes, Your Honor.

THE COURT:  I get what you're saying, but the language, I think, is not exact.  And it suggests the same two crimes, meaning it must be two acts of murder, it must be two acts of fraud, it must be -- and that's not correct.

So I don't think that language is accurate.

MS. DE SALES BARRETT:  We could substitute the "same two predicate acts" for --

THE COURT:  We don't --

MS. DE SALES BARRETT:  -- for "crimes."  And they all have to agree on the same -- that the same acts or the acts -- the two that constitute their racketeering act.

MS. STOKMAN:  We believe as stated it's very clear as to what the requirements are.

THE COURT:  The trouble, though -- I mean, I don't really like this language because you're a lawyer; you understand what predicates are.  Predicate is not defined. And so which type or types of predicate racketeering activity?

When you go back to racketeering activity, they don't

3035

say predicate.  What they say is two acts of racketeering.

MS. STOKMAN:  Oh, I misunderstood.  So the issue is with the word "predicate."

THE COURT:  Well, I mean it's not just that.  It's just -- it's not clear to me.  It says which type or types of predicate racketeering activity, and I think predicate -- I mean, I think we all know what predicate means even outside of the criminal arena, but I don't know how understandable that is, especially since it's not -- I mean, it seems like at least it would make more sense to say which --

MS. STOKMAN:  -- type or types of racketeering activity?  Which has been defined in the pattern of racketeering.  And then the further part of the last of that paragraph says "for example," and then it repeats the predicate -- sorry, without using the word "predicate," the racketeering acts that are in paragraph 2.

THE COURT:  And what if it said, "Your verdict must be unanimous as to"?

MS. DE SALES BARRETT:  Instead of --

THE COURT:  Go ahead.

MS. DE SALES BARRETT:  -- "your verdict must be unanimous," "all of you must agree."

THE COURT:  Well, except those instructions already talk about in terms of unanimity.  That would just be a change-up right there.  I prefer the consistent use of the

3036

terms.

I mean, I really wouldn't care if everything changed to that, but at this point it all says "unanimous."

But in any event, "Your verdict must be unanimous as to the racketeering" -- "the acts of racketeering the defendant knew or contemplated would be committed."

MS. DE SALES BARRETT:  Yes.

MS. STOKMAN:  I think it's accurate as to which type or types, but the word "predicate" can be removed.  With the word "activity," it gives the act -- I mean, it's inherent in that.

THE COURT:  We've already told them they have to -- they have to find a pattern.  Now this is telling them they must find which acts constitute -- are at issue in order to determine whether there's a pattern, right?

MS. STOKMAN:  Maybe it's clearer to say "which type or types of racketeering acts," because that's how the beginning of this instruction reads.  It defines a racketeering act.  That uses that same language.

THE COURT:  Right.

MR. REED: I've always thought they put -- I mean, I don't know why they say "predicate" in there, because if you read the rest of the instruction, it doesn't --

THE COURT:  Yeah.  That's what I was concerned about.

MR. REED:  It's stuck in there.  They don't use it in

3037

the beginning.  They don't use it under 27, 28, 29.

THE COURT:  Yeah, I agree.  "Predicate" just pops up there.  I think for sure we should get rid of that.

So what's proposed is "the type or types of racketeering acts," which is defined.  But I'm not sure I'm convinced by "type or types," because, you know, if -- how is that different than just which racketeering acts?

MR. REED:  Because in the courts where they use -- where they break out the instructions and they use a special verdict form, they list the types of racketeering acts.  So when they use special verdict forms, they break them down by type.

THE COURT:  So what your position, Mr. Reed?

MR. REED:  Because you're not using special verdict form, I don't think --

THE COURT:  So you think it should say "racketeering acts."

MR. REED:  Yeah, because it is more consistent.

I also think they need to add "commit" before "murder" because -- just for continuity.  Every other one has conspiracy to commit a robbery, conspiracy to commit, but murder is by itself.

THE COURT:  So at least two acts of conspiracy to commit.

MR. REED:  Then conspiracy to murder.

3038

THE COURT:  Oh, yeah.

MR. REED:  Robbery.

THE COURT:  So it should just be -- actually, I'm not sure what you said.  At least two acts of --

MS. STOKMAN:  I think he wants to add the word "commit" before the word "murder" on line 21.

MR. REED:  But I don't -- just out of continuity, it seems like it works.

THE COURT:  Oh.

MR. REED:  I never understood this instruction every time I've read it.

MS. STOKMAN:  Judge, I think the most clear thing to do would take out merely the word "predicate."  Because even though I reference "act" before, I am reading again -- sorry -- and I was not reading this fully, line 10 on the third paragraph, "I will instruct you on the definition of each of these racketeering activities."

So I think "activity" is being used as a word purposely.  But if we want to say "which act or acts of racketeering activity" or "type or types" but leave out "predicate."  I think that "predicate," if that's the confusion, can be removed, and it makes sense.

THE COURT:  Well, it says "act or acts."  It can't just be an act.  It has to be acts.  It has to have at least more than one act, right?

3039

Type or types refers to -- I mean, it doesn't -- it's not a -- it's not limited to only one action.  That's a difference between activity and act.  But, you know, I hear what you're saying.  When I look at the subsequent instructions, again, I don't think they are talking about activity.

They are talking about acts again.  I mean, that's the title.  And then when you look into the body of it, it says "an overt act and act."  I don't see "activity" used again.

MR. REED:  They use it again when you go down to 41.

THE COURT:  To 41?

MR. REED:  Yes.

THE COURT:  Well, racketeering activity is defined in the prior one in 25.  But it talks about a racketeering activity are two acts of racketeering.  So I guess that's what I'm -- are we actually trying to have them identify two acts of racketeering activity, which means two acts of racketeering with the other elements?

Actually, that makes sense.  I mean, racketeering activity is not just two acts of racketeering; it's two acts that were related and that posed a threat.  So I've come all the way back around to racketeering activity, but I don't have any heartburn over deleting "type or type" and just saying "which racketeering activity."

3040

Any comments?

MS. STOKMAN:  The government is okay with that proposal.

MS. DE SALES BARRETT:  No comments, Your Honor.

THE COURT:  All right.  So it will say, "Your verdict must be unanimous as to which racketeering activity the defendant knew, contemplated," et cetera.  "Because racketeering activity is defined as at least two acts," et cetera.  All right.

MR. VILLA:  Before we move off that one, Judge.

THE COURT:  Yeah.

MR. VILLA:  Back on that paragraph that starts on line 10.

THE COURT:  Okay.

MR. VILLA:  So the second sentence:  "The crime charged is an agreement to conduct the affairs of the Aryan Brotherhood."

I think instead of Aryan Brotherhood there and above it in the first sentence, it should say "enterprise."

They've already been told what the alleged enterprise is, I think emphasizing it here is improper and it should just say, "Leaders and members and associates of the enterprise are alleged to have contemplated," and "the crime charged in the agreement is to conduct the affairs of the enterprise."

THE COURT:  Ms. Stokman, your comments?

3041

MS. STOKMAN:  We believe it's appropriately in here, as that is the enterprise alleged and already has been discussed as the alleged enterprise in this count.

THE COURT:  What I would be willing to do is strike "Aryan Brotherhood" out at line 11, add "enterprise" in its place, but leave it as to line 13.

MS. STOKMAN:  That's fine.

THE COURT:  With your objection already noted.

Anything else, then, on 26?

MR. VILLA:  No, Judge.

MS. STOKMAN:  No.

THE COURT:  27.

MS. STOKMAN:  Judge, we have a general comment on 27, 28, and 30.

THE COURT:  Okay.

MS. STOKMAN:  Uh, the first line, we believe it's more appropriate to make it consistent with the way that it's spelled out in the other instructions, such as Instruction Number 29, where it would say, "Murder has the following elements."

Because right now it's just talking about racketeering act and not the VICAR charge.  And so those three instructions were just different than the others, but the others have the correct language as far as, "This crime's elements are."

3042

THE COURT:  All right.  I think this is where I deleted off the -- I think it was here -- the degrees.  I wasn't quite sure of the necessity for all the degrees of murder.

MS. STOKMAN:  We're okay with that.

THE COURT:  All right.  I'll change 27 to say, "Murder has the following elements."

28, "Conspiracy to commit murder has the following elements."

Or do you want the California law reference or not?

MS. STOKMAN:  I think the California law is fine to keep in.

THE COURT:  So that be in 27, as well, then?

MS. STOKMAN:  Yes.

MS. DE SALES BARRETT:  I don't understand, Your Honor, why we're removing from here the language that the government must prove this?

MS. STOKMAN:  Because they're not charged with the murder charge itself in the -- in the RICO conspiracy.  It's an act, which means that they need to know what the elements of that act consistent of.  It's still proof, but it's telling them what the elements are under the law that they need to look to to find that racketeering act.

The subsequent murder proof is in the VICAR charges.

MS. DE SALES BARRETT:  I think the government has to

3043

prove it all, but --

THE COURT:  Yeah, it's kind of splitting hairs because it has to be proved by the government.

MS. STOKMAN:  It's just more consistent, we believe, when it lays out, because we've already established in the prior instructions that these acts need to be proven.  And now we're saying, here is an act, this -- these are the elements of that act.

THE COURT:  Yeah, I get it.  But, I mean, saying you have to prove RICO but not prove elements of murder under California law, I mean, you know that's not true.  It's just a matter of whether we remind the jury that these elements have to be proved beyond a reasonable doubt.

I agree with you, Ms. Barrett, I think we should.  I have no problem with it being consistent.  Maybe it says -- actually, I think just leaving as is makes sense, "To prove a defendant is guilty of murder, the government must prove."  To prove that the defendant is guilty of conspiracy to commit murder -- I don't think we need California law, do we?

MR. VILLA:  I think it's required by --

THE COURT:  Well, then we need to include that, also, in Number 27 and then do the same as to 29.

MS. DE SALES BARRETT:  Yeah, we're conforming 29 to the same --

THE COURT:  Yes.

3044

MS. DE SALES BARRETT:  -- introduction language, yes.

THE COURT:  All right.  Anything else as to those instructions?

In 30's language in that preparatory paragraph is a little bit different, but I don't know that it makes any difference in 30.

MS. STOKMAN:  Yes.  But without -- the last paragraph refers back to first or second degree, which was taken out of the --

THE COURT:  Okay.

MS. STOKMAN:  So that does not apply now.

THE COURT:  Yeah.  Delete lines 12 through 14.

Number 31, I'll change the first sentence to be consistent.  Anything else on 31?

MS. DE SALES BARRETT:  No, Your Honor.

MS. STOKMAN:  No.

THE COURT:  Same with 32, I'll change for consistency.  First sentence.

Anything else on 32?

MS. DE SALES BARRETT:  No, Your Honor.

MS. STOKMAN:  No.

THE COURT:  Same as to 33, anything else there?

MS. STOKMAN:  No.

MS. DE SALES BARRETT:  No, Your Honor.

THE COURT:  I'm assuming if no one says anything --

3045

I'm just hearing two noes.  If you don't have anything to say, that's fine, we'll just keep moving.

MR. VILLA:  Correct, Your Honor.

THE COURT:  Number 34.

MS. STOKMAN:  We have a comment on 34, 35, and 36.

THE COURT:  Okay.

MS. STOKMAN:  Just to add, it lays out methamphetamines and fentanyl, but I think there has been testimony about other substances.  So, "or another federally prohibited substance," would be appropriate.

MS. DE SALES BARRETT:  How does the jury know what the federally prohibited substances are?

MS. STOKMAN:  I mean, we -- then I guess heroin was discussed.

THE COURT:  Methamphetamine, fentanyl, heroin, I think somebody talked about marijuana.

MS. STOKMAN:  Yes, that -- marijuana, and I think because of the crossing of state lines, then that testimony would apply.

MS. DE SALES BARRETT:  But, Your Honor, those things were testified to by the cooperating witnesses with regard to the identification of those drugs.  The question here is what evidence the government has offered to prove the underlying offense as to these defendants.  Not whether or not Mr. Rapinoe was bringing heroin back from Mexico, which he

3046

said he was doing for himself.

MS. STOKMAN:  As is very well known in drug cases and 846, 841 cases, a seizure is not required to prove those offenses.

THE COURT:  No, what she's saying, though, is he did it for his own purposes independent of --

MS. STOKMAN:  Oh, the heroin.  I thought there was discussion of heroin elsewhere, as well, but -- that's why we -- that's why we were trying to give the general federally prohibited substance.

THE COURT:  What about the fentanyl?  I remember somebody talking about having what appeared to be M30s, but instead it was just acetaminophen.  Was there --

MS. STOKMAN:  No, it had Fentanyl in the pills as well -- the lab report and the chemist discussed that, and the powdered fentanyl that was with that.

THE COURT:  Oh, that's right.  Okay, yeah.  You're right.

MS. DE SALES BARRETT:  But I think that those are the only two drugs with regard to the testimony as to -- as alleged in the indictment.  There -- there's nothing to connect the other -- any other drugs to the enterprise, as alleged in the indictment.

THE COURT:  Well, the pattern of racketeering says drug trafficking.  Now, there are other counts alleged, right,

3047

but those are not issue here.  Maybe I'm missing it, but I'm not seeing -- well, there is an S -- paragraph S we're talking about methamphetamine.

But otherwise, I think it's just drug trafficking, right?  And then the evidence is -- refresh my recollection, as to the heroin, was it only -- I mean, I can go back and look, you-all can do that, too, but was there heroin mentioned by someone other than Mr. Rapinoe?

MS. STOKMAN:  There might have been some discussion of heroin within the prison.  That's our recollection, but we're not sure on that.

THE COURT:  What about the marijuana?

MS. STOKMAN:  I think that was in the context of interstate shipment by Mr. Rubin.  But the government is not -- if marijuana is excluded, we're not going to fight that.

THE COURT:  All right.  But the heroin -- I mean, I have to know who said it when for that to be included.  And I understand Ms. Barrett's point.  I mean, unless we are going to tell them what the schedules are, I'm not sure how they are supposed to know what is a federally controlled substance, especially when you got Number 36 that says "methamphetamine or fentanyl."

MS. STOKMAN:  Yes.  We were addressing it for 35 -- or 34, 35, 36, but --

3048

THE COURT:  Okay, yeah.

MS. STOKMAN:  But if the recollection is not that that came in, then the methamphetamine and fentanyl can stand as it is.

THE COURT:  All right.  We'll just -- I mean, I'm not saying it didn't.  I just can't sit here today and say it did, so --

MR. REED:  Your Honor --

THE COURT:  I know.

MR. REED:  -- you're talking about heroin?

THE COURT:  Yes, heroin related to the charges at issue here.

MR. REED:  I think was only Rapinoe.

THE COURT:  I mean, there was discussion, but I don't remember exactly the discussion related to what the drugs were in prison, so we'll just leave it as is, unless there is someone who wants to show me some cite.

MR. REED:  Rapinoe wasn't in prison, but it was talking about the list of things he did.

THE COURT:  No, I wasn't talking about Rapinoe, you're right.  You're right on him.  That -- I agree with that.

All right.  So that's through 36.  Is there anything else, then, as to those?

MS. DE SALES BARRETT:  Your Honor, as is true from

3049

the previous ones, we're going to be changing the introductory sentence?

THE COURT:  Yeah, yeah.

MR. VILLA:  Your Honor, before we move on, Ms. Luem's got to catch a flight, but I'm going to stay here until court is adjourned, if that's okay with you.

THE COURT:  Okay.

MS. LUEM:  And Mr. Johnson --

MR. VILLA:  And Mr. Johnson agrees.

MS. LUEM:  Thank you.

THE COURT:  Okay.  Thank you.

So anything else, then?  Now we're at 37.

MS. STOKMAN:  No.

MS. DE SALES BARRETT:  No, Your Honor.

THE COURT:  37, I thought you made a mistake as to the DMV.  Are we talking about DMV, because --

MS. STOKMAN:  Oh, I'm -- yeah, I didn't catch that. Identification document was or appeared to be -- I think, yes, that is correct.  There's testimony that fake IDs were being made, fake --

THE COURT:  That's what I was -- thought you were talking about what was found in Mr. Perkins' apartment.

MS. STOKMAN:  Yes.

THE COURT:  Okay.  All right.  38.

All right.  39.

3050

Now we're to 40 where the government -- you had an objection to 40?

MS. STOKMAN:  Yes.

THE COURT:  And I do understand now where that's coming from when you compare it to the prior instruction.  I guess, 23, there might have -- let me hear your comments, Ms. Stokman.

MS. STOKMAN:  Yes.  Uh, because Count 1 -- in Count 1 each member associate does not have to know all of the activity or crimes that are being -- that are part of that RICO conspiracy.  It is possible for some members of the enterprise to conspire to deal drugs while others are conspiring to commit murder.  That's addressed in the actual RICO conspiracy.

And other instructions that define the enterprise, the racketeering acts, and all of that is -- is defined and is part of the elements, again, of Count 1.

This is just a little misleading, and it conflicts with those prior instructions about the enterprise and the elements required for Count 1.

THE COURT:  I mean, there definitely was evidence of other conspiracy that don't bear on Count 1.  For example, Mr. Rapinoe, and his friend Ghost, they talked about doing things that were separate from the time he was involved with the AB.

ER 2385

3051

But this seems to talk about the reverse, more that -- I mean, it's looking at the conspiracy and saying if the defendant wasn't part of the charge conspiracy, it doesn't matter if it may have been found with other conspiracies.

I guess the question then is, Is there evidence that any of the defendants were involved in conspiracies that do not bear on Count 1?

MS. STOKMAN:  No.

THE COURT:  Mr. Reed, I see you're wanting to speak. I'm going to ask you to turn on the mic if you choose to.

MR. REED:  I didn't read that instruction that way. I read the instruction as, a juror finding that one of the defendants may have been involved in a conspiracy that was not charged, then I don't see how you can -- I was going to run this instruction through Casetext.

But I don't see how you can -- how you can refuse to give the instruction, is the general statement of the law that's correct.

If you find someone guilty of a conspiracy that's not charged, if you found a conspiracy that's not charged he was involved in, then you can't find him guilty of the charged conspiracy.

THE COURT:  What I was concerned with and was hoping to nail down is, is that a -- is there evidence to suggest -- because I don't want to suggest to the jury that the

3052

defendants were involved in some other conspiracy unless there's -- I mean, I don't remember any evidence of that situation that they were involved in anything other than, at most, Count 1.

So this suggests, hey, you know what, maybe it's -- maybe there's some other conspiracy they're involved in and I don't think there's evidence to support that. I mean, it seems like at a minimum, the last sentence isn't supported by the evidence, or at least the last --

MR. REED: I don't have a strong opinion on that. I think -- I can understand the Court's point. I looked at this more as a general instruction that if you find he did some other bad stuff, but we didn't list that, then that's that.

THE COURT: Right. But if there isn't the other bad stuff, we don't want to tell the jury, Hey, go looking for that other bad stuff, because I don't remember any evidence of that. But if you're saying there was, you know.

MR. REED: I'm just running it through Casetext to see if there's another RICO case that dealt with the issue.

This is just general conspiracy law, that will be my answer to the question, from what I can tell. I don't have any strong opinion.

THE COURT: Anybody else?

MR. REED: Although it was given in *Yandell*.

THE COURT: Yeah.

3053

MS. STOKMAN:  I mean, they had different conspiracies also alleged in multiple counts regarding drug conspiracies and other --

THE COURT:  Anybody have comments?

MS. DE SALES BARRETT:  As to 40, Your Honor.

THE COURT:  I'm sorry?

MS. DE SALES BARRETT:  As to 40.

THE COURT:  40.

MS. DE SALES BARRETT:  Yes.

THE COURT:  Whether it should be given or not given.

MS. DE SALES BARRETT:  We have requested it, so we would request that the Court give it.

THE COURT:  It says in the comment, this is just a standard instruction.  Use this instruction when the indictment charges a single conspiracy and the evidence indicates two or more possible conspiracies.

I would just have to assume that implicit in that is that the other conspiracies in which the defendants are implicated.  But if you think, uh --

MS. STOKMAN:  Judge, I mean, the government's position is that this is not a correct statement of the law under the RICO conspiracy.  Under such a conspiracy, again, using a drug conspiracy as an example, this would make sense when there might be different conspiracies within the overall reaching 846 such as drugs being sent on a certain amount

3054

of -- during a certain time frame to one location with certain people and then other people are doing that to a different location on different dates.

THE COURT: Yeah. In fact, when I pull up the case cited by the -- the comment, *US v. Perry*, it's exactly that situation.

All right. I think Instruction 40 doesn't address -- yeah, I don't think it should be given. It's not -- I'm not going to give 40.

MS. DE SALES BARRETT: Your Honor, there are other conspiracies that are charged.

THE COURT: Right, but what there isn't is -- wait a minute, right. But --

MS. DE SALES BARRETT: As part of predicate acts and you're defining conspiracies.

THE COURT: But what there isn't is -- I mean, they're saying these are -- the predicate acts are the enterprise -- the acts of the enterprise, right, because that's Count 1.

And you know, as it says, the defendants don't have

3055

to be involved in each of those acts in order for the conspiracy to exist.

This suggests that they're involved in a conspiracy outside of Count 1.  I don't think there's evidence to support that, and I don't think we should suggest to the jury that they're involved in something not charged here.

That's what I feel like 40 is saying, especially in light of what *US v. Perry* is talking about.  I think, truthfully, it -- I think it's an unfair characterization of the evidence as to the defendants.

Anyway, I'm not going to give 40.

As to 41, any --

MS. STOKMAN:  Yes.

THE COURT:  -- comments.  Yes?

MS. STOKMAN:  There's a word conspiracies, conspired, that is not -- it's charged as a murder in aid of racketeering and not a conspiracy, so in line 24, in line 27, in lines 2, 5 and 7 of page 45, it's just -- the word conspiracy should be taken out of this instruction since it's not charged as a conspiracy to commit murder in aid of racketeering.

THE COURT:  Okay.  I get it.

Any comments about that?

MS. DE SALES BARRETT:  No, Your Honor.

MR. VILLA:  No, Your Honor.

MS. DE SALES BARRETT:  We do request that in the --

3056

in the preceding paragraph, that is, the first full paragraph after the numbered ones, at -- before an incidental motivation, the sentence beginning with that, we request that the Court put, "murder while a gang member is not necessarily a murder for the purpose of maintaining or increasing position in a gang even if that would have the effect of maintaining or increasing position," his or her position.

THE COURT:  Yeah, I spent a lot of time on this and I went back and forth on what you were saying, and I think this paragraph as stated is accurate.  It talks about the fact that need not be the sole or primary purpose, only that it has this as a substantial purpose.

And it has to be integral, so -- and then I added the incidental motivation is not enough there.  I think that's appropriate.  I think that's correct.  I think what you're saying -- yeah, I don't think that's necessary.  I'm not going do that.  I'm sorry.

MS. STOKMAN:  No, no, no, I'm sorry.  I just had something to add that I didn't, but go ahead.

MR. VILLA:  I just want to make clear Mr. Johnson joins in that request by Mr. Clement.

THE COURT:  Thank you.

All right.  Ms. Stokman, you were saying it should -- at line 24 it should not say --

MS. STOKMAN:  Specific murders in aid of racketeering

3057

alleged in this case are listed below.

THE COURT: And then as to Count 2, you don't want conspired there either.

MS. STOKMAN: No, but our -- in the indictment, the allegation is that the defendants aided and abetted, so it should be instead of conspired, the aided and abetted language should be there on each of the murders listed on the end of page 44 and all on page 45.

THE COURT: All right. Comments about that for Mr. Johnson and --

MS. DE SALES BARRETT: No, Your Honor.

MR. VILLA: No, Your Honor.

THE COURT: All right. So I'll make that change.

MS. STOKMAN: Judge, if it helps, the government has no other issues with the instructions after this except we did find there were missing instructions. But if counsel had issues, then we can go right to those instructions.

THE COURT: All right. So after 42 through the end, is there -- well, I -- I can't imagine you've got a problem with 43. Is there anything wrong with 42?

MS. DE SALES BARRETT: No, Your Honor.

THE COURT: All right. Then what is missing, let's start with the government on that topic?

MS. STOKMAN: Uh, there was an instruction about transcripts and the audio, which would apply because -- that

ER 2392

3058

the transcript is not the evidence, that the audio is.

THE COURT:  Right.  That should be included.  I think everyone agrees on that.

MS. DE SALES BARRETT:  Yes, Your Honor.

MR. VILLA:  Yes, Judge.

MS. STOKMAN:  And I think -- and I'm not sure if it would be a statement of fact, but because of the judicial notice of the UTC, and I believe of Mr. Clement's name there was judicial notice taken, that would be a statement of facts that the Court had given and that instruction is not in here.

THE COURT:  All right.  Anything else that you feel is missing on behalf of the government?

MS. STOKMAN:  No.

MS. DE SALES BARRETT:  May I have a moment, Your Honor?

THE COURT:  Yeah.

MS. DE SALES BARRETT:  Thank you.

THE COURT:  I can start with someone else.  Wait, they're conferring.  Never mind.

MS. DE SALES BARRETT:  Thank you, Your Honor.  We have nothing further.

THE COURT:  Mr. Villa?

MR. VILLA:  Nothing further.

THE COURT:  Mr. Reed?

MR. REED:  Nothing further, Your Honor.

3059

THE COURT:  All right, then.  We'll make these corrections and shoot you out a copy of them.

If it turns out you see something that's not right, let me know that.  We can get you a new set on Monday.  So what I'll typically do on Tuesday is I will give substantive instructions, and then stop and you-all will do your closing.

Then once that's finished, I will go and give the procedural type instructions, so you will be able to use the instructions in your argument, if you choose.

All right.  Anything else?  Anything that counsel needed to talk about?

MS. FISHER-BYRIALSEN:  Your Honor, did the jury indicate if they wanted to end at a certain time or not yet?

(Discussion was had off the record.)

THE COURT:  So we won't know that until Tuesday morning.

MR. VILLA:  Judge, I don't know if we need to since there was no presentation of defense evidence or government evidence in rebuttal, but for the record, we renew our motion for judgment of acquittal.

THE COURT:  All right, on the same grounds.  All right.

MS. DE SALES BARRETT:  We join in that motion, Your Honor.  Thank you.

THE COURT:  I assume.  And Mr. Reed, you join as

3060

well.

The government, you have the same opposition, correct?

MS. STOKMAN:  Yes.

THE COURT:  All right.  I will take that matter under submission as well.  All right.  Thank you.

(Proceedings were adjourned at 11:12 a.m.)

I, RACHAEL LUNDY, Official Reporter, do hereby certify the foregoing transcript as true and correct.

Dated:  February 8, 2025          /s/ Rachael Lundy_____
                                  RACHAEL LUNDY, CSR-RMR
                                  CSR No.  13815

ER 2395