IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>     Plaintiff - Appellee,<br>v.<br>KENNETH JOHNSON,<br>     Defendant - Appellant. | No. 25-3645<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |
| UNITED STATES OF AMERICA,<br>     Plaintiff - Appellee,<br>v.<br>FRANCIS CLEMENT,<br>     Defendant - Appellant. | No. 25-3648<br>No. 1:20-cr-00238-JLT-SKO<br>Eastern District of California |

On Appeal from the United States District Court
For the Eastern District of California
The Honorable Jennifer L. Thurston
D.C. No. 1:20-cr-00238-JLT-SKO

**EXCERPTS OF RECORD**
**VOLUME 13 OF 13**

Ryan J. Villa
The Law Office of Ryan J. Villa
5501 Eagle Rock Ave. NE Suite C2
Albuquerque, NM 87113
Ryan@rjvlawfirm.com

Andrea Lee Luem
Andrea Lee Luem, PHV
400 South Fourth Street, Ste 500
Las Vegas, NV 89101
andrea@luemlaw.com

Counsel for Defendant-Appellant
Kenneth Johnson

Jane Fisher-Byrialsen
Fisher & Byrialsen, PLLC
4600 S. Syracuse Street
Denver, CO 80137
jane@fblaw.org

Jean D. Barrett
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
jeanbarrett@ruhnkeandbarrett.com

Counsel for Defendant-Appellant
Francis Clement

3061

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. JENNIFER L. THURSTON

UNITED STATES OF AMERICA,  )
                           ) 1:20-cr-00238-JLT-SKO
          Plaintiff,       )
                           ) Jury Trial, Day 15
     vs.                   )
                           )
KENNETH BASH, et al.       ) Volume 15
                           ) Pgs. 3061 - 3239, inclusive
          Defendants.      )
_____)

Fresno, California              Tuesday, February 11, 2025

REPORTER'S TRANSCRIPT OF PROCEEDINGS

REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

ER 2397

3062

**APPEARANCES OF COUNSEL**:

| | |
|---|---|
| For the Government: | **STEPHANIE STOKMAN**<br>Assistant U.S. Attorney<br>2500 Tulare Street, Rm. 4401<br>Fresno, California  93721 |
| | **JARED ENGELKING**<br>Department of Justice<br>1301 New York Avenue, N.W.<br>Washington, DC 20005 |
| | **JAMES ROBERT CONOLLY, GOVT**<br>U.S. Attorney's Office<br>501 I Street, Suite 10-100<br>Sacramento, CA 95814 |
| For Defendant Johnson: | Law Offices of Andrea Luem<br>Attorneys at Law<br>400 South Forth Street, Suite 500<br>Las Vegas, Nevada  89101<br>BY:  **ANDREA LEE LEUM, ESQ**. |
| | Law Offices of Ryan J. Villa<br>5501 Eagle Rock Avenue NE<br>Suite C2<br>Albuquerque, NM 87104<br>BY:  **RYAN J. VILLA, ESQ**. |
| For Defendant Clement: | Fisher & Byrialsen, PLLC<br>Attorneys at Law<br>99 Park Avenue<br>New York, NY 10016<br>BY:  **JANE FISHER-BYRIALSEN, PHV** |
| | Ruhnke And Barrett<br>29 Broadway, Suite 1412<br>New York City, NY 10006<br>BY:  **JEAN DE SALLES BARRETT, PHV** |
| For Defendant Stinson: | Law Office of Kenneth Alan Reed<br>406 W 4th Street<br>Santa Ana, CA 92701-4505<br>BY:  **KENNETH ALAN REED, ESQ**. |

3063

Tuesday, February 11, 2025                    Fresno, California

8:00 a.m.                                      Jury Trial Day 15

   (The following proceedings were held in open court:)

          THE COURT:  Okay.  So we are still waiting on a couple of jurors, but I will tell you that they have decided to keep the same schedule in deliberations, 8:00 to 1:30.

          Is there an estimate as to your closing argument, Ms. Stokman?

          MS. STOKMAN:  Judge, it seems to be right about an hour.  So if it starts to hit at the hour place, it's pretty much going to wrap up very quickly after that.

          THE COURT:  So the likelihood is what will happen is I'll give preliminary instructions, they'll argue, we'll take a break, and then who is going to be up next?

          MS. FISHER-BYRIALSEN:  I am, Your Honor.

          THE COURT:  All right.  And your estimate of your argument?

          MS. FISHER-BYRIALSEN:  I think like 30 to 40 minutes.

          THE COURT:  Okay.  And then who is after Ms. Byrialsen, Ms. Luem?

          MS. FISHER-BYRIALSEN:  Ms. Luem and then Mr. Reed, if that's okay.

          THE COURT:  I'm just trying to think of scheduling.

          Ms. Luem, how long is your --

          MS. LUEM:  I anticipate I won't take a full hour.

3064

THE COURT:  All right.  So probably then we'll do those two arguments, take a break, and then, Mr. Reed, we'll go to you.

How long do you think yours will be?

MR. REED:  Around a half hour, but probably less.

THE COURT:  Okay.  All right.  So then we'll probably do that and then go to the government and final instructions and then move from there.

Before we begin, I received the request for the special interrogatories.  Let me start with Mr. Johnson.  I think that's probably the easier one.

I'm not sure I understand the rationale of asking the same questions for the third time.

Ms. Luem, your comments.

MS. LUEM:  I was going to have Mr. Villa address it, but, essentially, it's the same argument that Ms. Barrett is making in terms of delineating the overt acts, as they go to the -- well, I mean, the government has to prove two predicate acts, and those are the two that, uh, Mr. Johnson is charged with.

I think it is -- I think it's a little bit easier for the jury to understand if they have the special interrogatory in terms of the case law.  I believe it's cited at the bottom of Ms. Barrett's request.

THE COURT:  All right.  Anything else on that topic?

3065

MS. LUEM:  No.

THE COURT:  All right.  As to Mr. Johnson, because these exact questions are already asked as to Questions 2 -- 2(c) and 2 -- well, I don't know where the October 1st date comes in, but I'm assuming you're referring to Questions 2(a) and 2(b).

So they were already asked, they're already set forth because they are a duplicate of the sentencing factors questions.  So it just doesn't -- I don't understand at all that situation in requesting that determination for a third time.  So that's not going -- we're not going to do that.

As to Mr. Clement's, I have the same issue as to the murder questions because they're asked twice already, and then I would be more inclined as to the robbery question and the methamphetamine question.

Comments, Ms. Barrett?

MS. DE SALES BARRETT:  Yes, Your Honor.

Your Honor, this is -- I've cited the cases that have made endorsements of the special interrogatories, and I would note that they're all RICO cases and all would have required special findings with regard under *Apprendi*.

It is -- it's a different issue and the jury does not have to go through the verdict sheet in the order in which it appears.  They can read the whole thing first and then make their determinations as to what direction they want to

3066

deliberate and not the direction necessarily from the verdict sheet going 1, 2, 3, et cetera.

So I would submit, Your Honor, that it -- that while they're asking a similar question, it's not identical, for one thing.

And the other thing is that the verdict sheet itself is something that does not control the deliberations of the jury.  And the reality is that the courts that have actually addressed this have basically said that they've approved special interrogatories with regard to predicate acts in RICO cases.

And as I cited, the Third Circuit has model instructions to this effect, and all of it is included in the Third Circuit model instruction, including the findings necessary for the *Apprendi* issue and the special interrogatories.

This is not new stuff.  This is not taking this to Mars.  This is something that is happening regularly in racketeering cases in federal courts across the country.

THE COURT:  Right.  That's why I suggested special interrogatories.  But the issue, though, is what I said on -- the other day on Friday and what I still think is appropriate in this case is that determination only if there is a guilty finding as to Count 1 and answers of no as to all the questions under 2 and not guilty as to all of the other

3067

questions.

Because otherwise, the purpose of this -- the utility is only for purposes of appeal. There is not a necessity. And even the cases you cite don't say it's necessary. They're saying it's not error, which is not my concern because I already have a verdict form that is not error.

So that's where I'm at. And my thinking is -- my question really -- I don't see the point in asking the jury to make the same finding three times. And if you want those different questions, I would be willing to do that, but only in -- on the terms that I've said.

Because there's no -- it's simply, to me, an issue of an appeal. And I haven't heard anything different. Because on purposes of appeal, if there is not a finding as to -- if there is a not guilty and no finding as to the murders, then I could understand on appeal that you would want to know where to focus the argument.

Otherwise, if there are guilty findings and yes findings as to the murder, doesn't really do much. So that's -- that's the thinking.

The question that I have is simply whether the interrogatories should go to the jury at the same time as the verdict form, which is typical. And it brings people what they have -- they don't come to a verdict and then have to be slapped with something else to do.

3068

So there is an expectancy issue, but I'm kind of indifferent.

What is your preference, Ms. Barrett?

MS. DE SALES BARRETT:  Your Honor, if the -- all of the interrogatories don't go in with regard to the charges in the indictment, uh -- then, uh, it makes no sense to me to, uh, single out the two interrogatories having to do with the robberies.

THE COURT:  Okay.

MS. DE SALES BARRETT:  Uh, and in -- but, Your Honor, I would ask that -- I know that we have been doing this informally with regard to submissions, because we've sent the charged requests and things like that by email, but I would request that the Court either mark this or give me permission to tonight file it in PDF on the docket.

THE COURT:  Sure.  Yeah.  Go ahead and file it.

MS. DE SALES BARRETT:  Thank you.

THE COURT:  All right.  Anything else before we --

MR. VILLA:  Your Honor, with respect to the information we received about Mr. True from CDCR --

THE COURT:  Yes.

MR. VILLA:  -- I'd ask that the Court make it an exhibit for the record.

THE COURT:  It's already marked, and it's already been filed.  It's just under seal.

3069

MR. VILLA:  And, Your Honor, there's a redacted version and, I suppose, an unredacted version.  Is the redacted version what's marked and under seal?

THE COURT:  Yes.

MR. VILLA:  And those are the Court's redactions, correct?

THE COURT:  Correct.

MR. VILLA:  And just, you know, for our record, I think there is information in there that was inconsistent with Mr. True's direct trial testimony.  And that's also our position that, although we subpoenaed this information and obtained it, that the United States was obligated, knowing they were going to call Mr. True as a witness, to have produced this information prior to trial.

THE COURT:  And what authority are you relying on for that?

MR. VILLA:  *Brady* and *Giglio*, Your Honor, and *Kyles v. Whitley*, which says that anything within the law enforcements teams --

THE COURT:  That's where I'm going with -- this is a state agency, so I'm more interested in your authority for the proposition that the federal prosecutor must -- has control over what's contained by the state agency.

MR. VILLA:  So, Your Honor, one of the authors of the autobiography was Cope, who I think is part of CDCR.  He was

3070

on the government's original witness list and part of the law enforcement team with the ATF and local authorities.

THE COURT:  Do you have Bates number on that?

MR. VILLA:  For the --

THE COURT:  For the --

MR. VILLA:  Which part?

THE COURT:  The proposition that this person, Cope, was on the investigation team?

MR. VILLA:  I mean, Your Honor, he's on the witness -- the government's witness list.

THE COURT:  I understand that, but you said he was part of the investigation team.  And so I'm trying -- or he or she.  So I'm trying to figure out where you're -- what the source is for that information.

MS. DE SALES BARRETT:  Your Honor, we have received in discovery -- as a result of the *Jencks* material on Mr. Cope, we have received reports in *Jencks* with regard to the investigation conducted here authored by him.

THE COURT:  All right.  So then you know whether -- you know, what that -- what's contained in that.  I don't.

So anything else, then, for the record on that topic?

MS. STOKMAN:  Judge, just from the government, I want to clear up, Cope was not part of the investigative team in this investigation.

The reports that are in discovery were reports

3071

because he was part of the CDCR staff that responded to one of the prison murders.  I believe it was the Hargrave murder that we didn't end up proving.  But he was never a part of the investigative team for the federal case that's here today.

Uh, and in addition, as we made the argument at sidebar and the statement at sidebar, we did not have access to Timothy True's information.  That came through CDCR.  And so the government was not obligated to produce that.

I just want to close the loop that defense had Mr. True up for a recall, but they rested.  They did not recall him.  And I just want to make sure that's clear on the record.

THE COURT:  All right.  Anything else on this topic for the record?

MS. DE SALES BARRETT:  Yes, Your Honor.  With regard to whether or not the government has the obligation, with regard to the homicide that we're talking about, the murder of Mr. Lowrey, that particular homicide, the government is relying -- has relied for investigative purposes completely on the CDCR's investigation and the State of California's -- the investigation of that murder with the exception of any conversations that Agent Gonzalez has had with Mr. True in preparation for his testimony.

Mr. True testified in a probable cause hearing in the State of California.  That was -- we were provided that in

3072

discovery, and the entire investigation underlying that homicide was conducted by the CDCR and the District Attorney's Office and not by the government in this case.

The -- even the autopsy report offered into evidence with regard to this gentleman was done at the request of the state and at the request of the CDCR, not at the request of the government in this case.

And the only reason they have it is because they got the autopsy report in the documents that they got from the CDCR and the State of California.

THE COURT:  Anyone else want to make comments on that?  I mean, I would just note that there was evidence other than what you've described on that topic presented here as to other witnesses, but I appreciate your point.

All right.  Has the jury -- do you know, Irma, if the jury is all here?

THE CLERK:  They are ready.

THE COURT:  All right.  Let's go ahead and bring in the jury.

(Jury enters the courtroom at 8:17 a.m.)

THE COURT:  All right.  Thank you.  We have all of our jury members back in their places.

Ladies and gentlemen, as I indicated on Friday, we are going to begin the morning with me giving you some instructions, then we're going to turn to argument of counsel

3073

and a few more instructions, and then deliberation will occur at that point.

Like before, I do have to read the question -- the instructions to you, so if at any time you can't hear me, if I -- if you need me to repeat it, raise your hand and I will do that.

Members of the Jury, now that you have heard all of the evidence, it is my duty to instruct you on the law that applies to this case. A copy of these instructions will be available in the jury room for you to consult.

It is your duty to weigh and evaluate all the evidence in this case, and in that process, to decide the facts. It is also your duty to apply the law as I give it to you to the facts as you find them whether you agree with the law or not.

You must decide the case solely on the evidence and the law. You will recall that you took an oath promising to do so at the beginning of the case.

You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.

Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases.

3074

Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention.

You must follow all these instructions and not single out some and ignore others.  They are all important.  Please do not read into these instructions or into anything I may have said or done as any suggestion as to what verdict you should return.  That is a matter entirely up to you.

The indictment is not evidence.  The defendants have pleaded not guilty to these charges.  The defendants are presumed to be innocent unless and until the government proves the defendants guilty beyond a reasonable doubt.

In addition, the defendants do not have to testify or present evidence.  The defendants do not have to prove innocence and the government has the burden of proving every element of the charges beyond a reasonable doubt.

A defendant in a criminal case has the constitutional right not to testify.  In arriving at your verdict, the law prohibits you from considering any manner that the defendant did not testify.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced the defendant is guilty.  It is not required that the government prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and

3075

common sense and is based purely on speculation -- oops, sorry.  Let me start that over.

A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation.  It may arise from a careful and impartial consideration of all the evidence or from lack of evidence.

If after a careful and impartial consideration of all the evidence you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty.

On the other hand, if after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that defendant is guilty, it is your duty to find the defendant guilty.

The evidence you are to consider in deciding what the facts are consist of:

One, the sworn testimony of any witness.

Two, the exhibits received in evidence.

Three, the facts accepted by the Court through judicial notice.

And four, any facts to which the parties have agreed.

In reaching your verdict, you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence and you may not consider them in deciding what the facts are.  I will list them for you.

3076

One, arguments and statements by the lawyers are not evidence.  The lawyers are not witnesses.  What they may say -- what they have said in their opening statements, what they may say in closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence.

If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

Questions and objections by the lawyers are not evidence.  Attorneys have a duty to their clients to object when they believe a question is improper under the Rules of Evidence.  But you should not be influenced by the objection or the Court's ruling on it.

Three, testimony that is excluded or stricken or that I have instructed you to disregard is not evidence and must not be considered.  In addition, some evidence may be received only for a limited purpose.  When I instruct you to consider evidence only for a limited purpose, you must do so, and you may not consider that evidence for any other purpose.

Four, anything you may see or hear when court is not in session is not evidence even if what you have seen or heard is done or said by one of the parties or by one of the witnesses.  You are to decide the case solely on the evidence received at the trial.

You have heard recordings that have been received in

3077

evidence.  Displayed to you while listening was a transcript of the recording to help you identify speakers and as a guide to help you listen to the recording.  However, bear in mind that recordings are the evidence, not the transcript.  If you heard something different from what appeared in the transcript, what you heard is controlling.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts from which one can find another fact.

You are to consider both direct and circumstantial evidence.  Either can be used to prove any fact.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give any evidence.

During trial, certain charts were shown to you to help explain the evidence.  These charts were not admitted into evidence and will not go into the jury room with you.  They are not themselves evidence of proof or -- or proof of any facts.  If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and determine the facts from the underlying evidence.

3078

You heard testimony from the following witnesses who testified about his or her opinions and the reason for the those opinions:  One, Dr. Paul Gliniecki; two, Fracia Martinez; three, Daniel Ponce de Leon; four, Benjamin Mendoza; and five, Dr. Eugene Carpenter.

This opinion testimony is allowed because of the specialized knowledge, skill, experience, training, or education of these witnesses.  Such opinion testimony should be judged like any other testimony.

You may accept it or reject it and give it as much weight as you think it deserves, considering the witness's knowledge, skill, experience, training, or education, the reasons given for the opinion, and all other evidence in the case.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness, you may take into account:

One, the opportunity and ability of the witness to see or hear or know the things testified to.

Two, the witness's memory.

Three, the witness's manner while testifying.

Four, the witness's interest in the outcome of the

3079

case, if any.

Five, the witness's bias or prejudice, if any.

Six, whether other evidence contradicted the witness's testimony.

Seven, the reasonableness of the witness's testimony in light of all the evidence.

And eight, any other factor that bears on believability.

Sometimes the witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.

Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide that testimony is not untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.

On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

You must avoid bias, conscious or unconscious, based

3080

upon a witness's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances in your determination of credibility.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.

What is important is how believable the witnesses were and how much weight you think their testimony deserves.

You've heard evidence that Robert Eversole, Brian Rapinoe, Daniel Rubin, Brandon Bannick, Lana Haley, James Field, Kaylen Chandler, Troy Clowers, and Timothy True, witnesses who have testified at this trial, each have prior convictions for felony offenses.  You may consider this evidence in deciding whether or not to believe each witness and how much weight to give the testimony of that witness.

You've heard testimony from Brandon Bannick and James Field, witnesses who pleaded guilty to crimes arising out of the same events for which each of the defendants is on trial.  Their guilty pleas are not evidence against any of the defendants.  You may consider them only in determining each witness's believability.

You've heard testimony from Robert Eversole, Brandon Bannick, James Field, Troy Clowers, and Timothy True. Their testimony was given in exchange for favored treatment from the government in connection with this case.

You've heard testimony from Kaylen Chandler, a

3081

witness who received immunity.  That testimony was given in exchange for a promise by the government that the witness will not be prosecuted and that the testimony will not be used in any case against the witness.

Finally, you heard testimony from Brian Rapinoe, a witness who received compensation from the government in connection with this case.

For these reasons, in evaluating the testimony of these witnesses, you should consider the extent in which or whether each witness's testimony have been influenced by these factors.  In addition, you should examine the testimony of these witnesses with greater caution than that of other witnesses.

A separate crime is charged against one or more of the defendants in each count.  The charges have been joined for trial.

You must decide the case of each defendant on each crime charged against that defendant separately.

Your verdict on any count as to any defendant should not control your verdict on any other count as to any other defendant.

All of the instructions apply to each defendant and to each count unless an instruction states that it applies only to a specific defendant or count.

You've heard testimony that the defendants were

3082

members of the Aryan Brotherhood.  Gang membership alone without more does not prove that someone has entered a criminal agreement.  As a result, you must not infer from the alleged gang membership alone without more that Mr. Clement, Mr. Johnson, or Mr. Stinson committed the crimes charged.

You have heard that each defendant has been convicted of a crime.  You may not consider a prior conviction as evidence of guilt of the crimes for which the defendants are now on trial.

The indictment charges that the offenses were committed on or about or in or about certain dates.  Although it is necessary for the government to prove beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged in the indictment, it is not necessary for the government to prove that the offense was committed precisely on the date charged.

An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident.  The government is not required to prove that the defendant knew that his or acts or omissions were unlawful.

You may consider evidence of a defendant's words, acts, or omissions, along with all other evidence, in deciding whether the defendant acted knowingly.

I will now explain to you the general law regarding conspiracies.

3083

Every count has instructions. In addition to those, this instruction on conspiracies generally applies to the RICO conspiracy charged in Count 1.

First, beginning and ending on about the dates set forth in the counts below, there was an agreement between two or more persons to commit at least one crime as charged in the indictment and explained below.

And two -- or second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

A conspiracy is a kind of criminal partnership, an agreement of two or more persons to commit or one or more crimes. The crime of conspiracy is the agreement to do something unlawful. It does not matter whether the crime agreed on was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy.

It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. You must find that there was a plan to commit at least one of the crimes alleged in the indictment as an object of the conspiracy with all of you agreeing as to the particular crime which the conspirators agreed to commit.

3084

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some objective or purpose of the conspiracy even though the person does not have full knowledge of all the details of the conspiracy.

Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators.  On the other hand, one who has no knowledge of a conspiracy but happens to act in a way which furthers some object or purpose of conspiracy, does not thereby become a conspirator.

Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators or merely by knowing that a conspiracy exists.

Count 1 charges a violation of Section 1962(d) of Title 18 of the United States Code, that the defendants Kenneth Johnson, Francis Clement, and John Stinson, along with others known and unknown, knowingly and intentionally conspired with at least one other person to conduct or to participate in the conduct of the affairs of the racketeering enterprise.

Specifically, the indictment alleges that the enterprise is the Aryan Brotherhood, including its leaders, members, and associates.  This offense is called "RICO conspiracy."

"RICO" refers to the Racketeer Influenced and Corrupt

3085

Organizations Act found at Sections 1961 and 1962 of Title 18 of the United States Code.

For a defendant to be found guilty of this charge, the government must prove each of the following elements beyond a reasonable doubt as to each defendant:

First, that the charged enterprise existed.

Second, the charged enterprise was or would be engaged in or its activities effected or would effect interstate or foreign commerce.

Third, that beginning at a time unknown, but no later than in and around 2015 and continuing to at least on or about March 1st of 2023, the defendant knowingly agreed that a conspirator was or would be employed by or associated with the enterprise.

Fourth, the defendant knowingly agreed that a conspirator would conduct or participate either directly or indirectly in the conduct of the affairs of the enterprise.

And fifth, the defendant agreed that a conspirator did or would knowingly participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity; that is, a conspirator did or would commit at least two acts of racketeering activity.

The defendant must have been aware of the essential nature and scope of the enterprise and intended to participate in it.

3086

The government is not required to prove that the defendant personally committed any act of racketeering activity or agreed to do so.

The government is not required to prove that the parties to or members of the conspiracy were successful in achieving any or all of the objects of the conspiracy.

You may consider the evidence presented of racketeering acts committed or agreed to be committed by any coconspirator in furtherance of the enterprise's affairs to determine whether the defendant knew that at least one member of the conspiracy would commit two or more racketeering acts.

To establish the first element of the RICO conspiracy in Count 1, the government must prove that an enterprise existed that was engaged in or had an affect on interstate commerce.

An enterprise is a group of people who had associated together for a common purpose of engaging in a course of conduct over a period of time.

This group of people, in addition to having a common purpose, must have an ongoing organization, either formal or informal.  The personnel of the enterprise, however, may change and need not be associated with the enterprise for the entire period alleged in the indictment.

This group of people does not have to be a legally recognized entity such as a partnership or a corporation.

3087

This group may be organized for a legitimate and lawful purpose or it may be organized for an unlawful purpose.

Therefore, the government must prove beyond a reasonable doubt that this group of people:

One, associated for a common purpose of engaging in a course of conduct.

Two, the association of these people was an ongoing formal or informal organization.

Three, the group was engaged in or had an effect upon interstate or foreign commerce.

And four, the group had longevity sufficient to permit the associates to pursue the enterprise's purpose.

The government need not prove that the enterprise had any particular organizational structure.

Interstate commerce includes the movement of goods, services, money, and individuals between states.  These goods can be legal or illegal.  Only a minimal effect on commerce is required and the effect need only be probable or potential, not actual.

It is not necessary to prove the defendant's own acts affected interstate commerce as long as the enterprise's acts had such an effect.

You are instructed that drug trafficking, even local trafficking, has a substantial effect on interstate commerce.

The government must prove that the enterprise was

3088

engaged in racketeering activity.  Racketeering activity means the commission of certain crimes.  These include acts of murder, robbery, fraud, and drug trafficking in violation of state or federal law.

The government must prove beyond a reasonable doubt that the enterprise was engaged in at least one of the crimes listed above.

To establish a pattern of racketeering activity, the government must prove each of the following beyond a reasonable doubt:

One, at least two acts of racketeering were committed within a period of ten years of each other.

Two, the acts of racketeering were related to each other, meaning that there was a relationship between or among the acts of racketeering.

And three, the acts of racketeering amounted to or posed a threat of continued criminal activity.

With respect to the second element above, acts of racketeering are related if they embraced the same or similar purposes, results, participants, victims, or methods of commission, or were otherwise interrelated by distinguishing characteristics.

Sporadic, widely separated, or isolated criminal acts do not form a pattern of racketeering activity.  Two racketeering acts are not necessarily enough to establish a

3089

pattern of racketeering activity.

The RICO statute defines a racketeering act to be any of a list of certain crimes, some of which are federal crimes and some of which are state crimes.

I will now list the racketeering acts charged in this case and describe them.

The pattern of racketeering alleged in this case consists of acts involving:  i, murder; ii, conspiracy to commit murder; iii, attempted murder; iv, robbery; v, conspiracy to commit robbery; vi, conspiracy to distribute and possess with the intent to distribute a controlled substance; vii, distribution of a controlled substance and intent; and viii, fraud.

I will now instruct you on the definition of each of these racketeering activities and -- that the leaders, members, and associates of the enterprise are alleged to have contemplated as part of their conspiracy.

The crime charged in Count 1 is RICO conspiracy, which is the agreement to conduct the affairs of the Aryan Brotherhood through a pattern of racketeering.  No racketeering act need to have been committed or even attempted by anyone.  Rather, it is sufficient that you find that the defendant knew or contemplated that one or more members of the conspiracy, not necessarily the defendant, would commit at least two acts of racketeering in furtherance of a conspiracy.

3090

To convict the defendant of the RICO conspiracy offense, your verdict must be unanimous as to the racketeering activity the defendant knew or contemplated would be committed. For example, at least two acts of murder, conspiracy to commit murder, robbery, conspiracy to commit robbery, drug trafficking, fraud, or one of each or any combination thereof.

I will instruct you on the specific racketeering acts alleged in this case.

To prove that a defendant is guilty of murder under California law, the government must prove that:

One, the defendant committed an act that caused the death of the alleged victim.

And two, when the defendant acted, he had a state of mind called malice aforethought.

The defendant has malice aforethought if he unlawfully intended to kill.

Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time.

An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act.

3091

A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

To prove that a defendant is guilty of conspiracy to commit murder under California law, the government must prove that:

One, the defendant intended to agree and did agree with one or more persons to intentionally and unlawfully kill.

Two, at the time of the agreement the defendant and one or more persons in the conspiracy intended that one or more of them would intentionally and unlawfully kill.

Three, one of the persons committed at least one overt act alleged to have accomplish the killing.

And four, at least one of these overt acts was committed in California.

To decide whether the defendant committed this overt act, consider all of the evidence presented about the overt act.

Conspiracy to commit murder requires an intent to kill.

The members of the alleged conspiracy must have an agreement and intent to commit murder.  It is not necessary that any of the members of the alleged conspiracy actually met

3092

or came to a detailed or formal agreement to commit the crime.

An agreement may be inferred from the conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime.

An overt act is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed-upon crime.

The overt act must happen after defendant has agreed to commit the crime. The overt act must be more than an act of agreeing or planning to commit the crime, but it does not have to be a criminal act itself.

A member of a conspiracy does not have to personally know the identity or roles of all the members of the conspiracy.

To prove that a defendant is guilty of attempted murder under California law, the government must prove that:

One, the defendant took at least one direct but ineffective step toward killing another person.

And two, the defendant intended to kill that person.

A direct step requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to kill. It is a direct

3093

movement toward the commission of a crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt.

To prove that a defendant is guilty of soliciting another person to commit murder under California law, the government must prove that:

One, the defendant requested or asked another person to commit or join in the commission of murder.

Two, the defendant intended that the crime of murder be committed.

And three, the other person received the communication containing the request.

To prove that a defendant is guilty of robbery under California law, the government must prove that:

One, the defendant took property that was not his own.

Two, the property was in the possession of another person.

Three, the property was taken from the other person or his or her immediate presence.

Four, the property was taken against that person's will.

Five, the defendant used force or fear to take the property or to prevent the person from resisting.

3094

And six, when the defendant used force or fear, he intended to deprive the owner of the property permanently or to remove the property from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property.

A person takes something when he or she gains possession of it and moves it some distance. The distance moved may be short.

Fear, as used here, means fear of injury to the person himself or herself.

An act is accomplished by fear if the other person is actually afraid. The other person's actual fear may be inferred from the circumstances.

Property is within a person's immediate presence if it is sufficiently within his or her physical control that he or she could keep possession of it if not prevented by force or fear.

An act is done against a person's will if that person does not consent to the act. In order to consent, a person must act freely and voluntarily and know the nature of the act.

To prove that a defendant is guilty of attempted robbery under California law, the government must prove that:

One, the defendant took a direct or ineffective step toward committing robbery as defined in the previous

3095

instruction.

And two, the defendant intended to commit robbery.

A direct step requires more than merely planning or preparing to commit or obtaining or arranging for something needed to commit.

A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to commit. It is a direct movement toward the mission of a crime after preparations are made. It is an intermediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt.

To prove that a defendant is guilty of conspiracy to commit robbery under California law, the government must prove that:

One, the defendant intended to agree and did agree with one or more persons to commit robbery.

Two, at the time of the agreement, the defendant and one or more persons in the conspiracy intended that one or more of them would commit robbery.

Three, one of the persons committed at least one overt act alleged to accomplish the taking of property.

And four, at least one of these overt acts was committed in California.

3096

To decide whether the defendant committed this overt act, consider all of the evidence presented about the overt act.

Conspiracy to commit robbery requires an intent to commit robbery.

The members of the alleged conspiracy must have had an agreement and intent to commit robbery.  It is not necessary that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit that crime.

An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime.

An overt act is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed-upon crime.

The overt act must happen after the defendant has agreed to commit the crime.  The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be a criminal act itself.

A member of a conspiracy does not have to personally know the identity or roles of all the other members.

To prove the defendant is guilty of conspiracy to distribute or possess with the intent to distribute a controlled substances under federal law, the government must

3097

prove that:

One, there was an agreement between two or more persons to distribute and possess with the intent to distribute methamphetamine or fentanyl.

And two, the defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose.

To distribute means to deliver or transfer possession of methamphetamine or fentanyl to another person, with or without any financial interest in that transaction.

To possess with the intent to distribute means to possess with the intent to deliver or transfer possession of methamphetamine or fentanyl to another person, with or without any financial interest in the transaction.

To prove that a defendant is guilty of attempt to distribute or control substance -- a controlled substance under federal law, the government must prove that:

One, the defendant intended to distribute methamphetamine or fentanyl.

And two, the defendant did something that was a substantial step toward committing the crime.

A substantial step is conduct that strongly corroborated a defendant's intent to commit the crime.

To constitute a substantial step, the defendant's acts or actions must unequivocally demonstrate that the crime

3098

will take place unless interrupted by independent circumstances.

Mere preparation is not a substantial step toward committing the crime.

To prove that the defendant is guilty of fraud in connection with identification documents under federal law, the government must prove that:

One, the defendant knowingly possessed an identification document.

Two, the identification document was or appeared to be an identification document of the Department of Motor Vehicles, the DMV.

Three, the identification document was produced without lawful authority.

And four, the defendant knew that the identification document was produced without lawful authority.

Identification document means a document made or issued by or under the authority of the United States government, a state, political division of a state, a sponsoring entity of an event designed as a special event of national significance, a foreign government, political subdivision of a foreign government, an international governmental or an international quasi-governmental organization which, when completed with information concerning a particular individual, is of a type intended or commonly

3099

accepted for the purpose of identification of individuals.

To prove that a defendant is guilty of mail fraud under federal law, the government must prove that:

One, the defendant knowingly participated in a scheme or plan to defraud for the purposes of obtaining money or property by means of false or fraudulent pretenses, representations, or promises.

Two, the statements made as part of the scheme were material; that is, they had a natural tendency to influence or were capable of influencing a person to part with money or property.

Three, the defendant acted with the intent to defraud, that is, the intent to deceive and cheat.

And four, the defendant used or caused to be used the mails to carry out or attempt to carry out an essential part of the scheme.

A mailing is caused when one knows that the mails will be used in the ordinary course of business or when one can reasonably foresee such use.  It does not matter whether the material mailed was itself false or deceptive so long as the mail was used as part of the scheme, nor does it matter whether the scheme or plan was successful or that any money or property was obtained.

If you decide that the defendant was a member of a scheme to defraud and that the defendant had the intent to

3100

defraud, the defendant may be responsible for other co-schemers' actions during the course of and in furtherance of the scheme, even if the defendants did not know what the other co-schemers said or did.

For the defendant to be guilty of an offense committed by a co-schemer in furtherance of the scheme, the offense must be one that the defendant could reasonably foresee as a necessary and natural consequence of the scheme to defraud.

A person may be found guilty of a crime in two ways:

One, he may have directly committed the crime.  I will call that person the perpetrator.

Two, he may have aided and abetted a perpetrator who directly committed the crime.

A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator.

Under California law, to prove that a defendant is guilty of a crime based on aiding and abetting that crime, the government must prove that:

One, the perpetrator committed the crime.

Two, the defendant knew that the perpetrator intended to commit the crime.

Three, before or during the commission of the crime the defendant intended to aid and abet the perpetrator in committing the crime.

3101

And four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime.

Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

If all of these requirements are proved, the government does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor; however, the fact that a person is present at the scene of a crime or fails to prevent the crime does not by itself make him or her an aider or abettor.

Counts 2, 3, 4, 5, and 6 charge certain defendants with committing a crime of violence, specifically, murder and aid of racketeering in violation of Title 18, United States Code Section 1959(a)(1).

For a defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

One, on or about the time period described in each of Counts 2 through 6, an enterprise effecting interstate

3102

commerce existed.

Two, the enterprise engaged in racketeering activity.

Three, the defendant committing or aided and abetted the following crime of violence:  murder, as defined in earlier instructions under California law.

And four, the defendant's purpose in committing or aiding and abetting that murder was to gain entrance to or to maintain or increase his or another person's position in the Aryan Brother enterprise -- I'm sorry, Aryan Brotherhood enterprise.

It is not necessary for the government to prove that his motive was a sole purpose or even the primary purpose of the defendant in committing the charged murder.  You need only find that gaining entrance to or maintaining or increasing his or another person's position in the enterprise was a substantial purpose of the defendant or that he committed the charged crime as an integral aspect of membership in the enterprise.  An incidental motivation, however, is not enough.

In determining the defendant's purpose in committing the murder, you must determine what he had in mind.  Since you cannot look into a person's mind, you have to determine purpose by considering all the fact and circumstances before you.

The specific murders alleged in this case are listed below.

3103

In deciding each count, you must make a separate determination as to each count as well as each defendant.

As to Count 2, the indictment alleges that Defendants Kenneth Johnson and Francis Clement aided and abetted the murder of Allan Roshanski on or about October 4th of 2020.

As to Count 3, the indictment alleges that the Defendants Kenneth Johnson and Francis Clement aided and abetted the murder of Ruslan Meg- -- okay, I'm just going to spell it.  M-E [sic] -G-O-M-E-D-G-A-O-Z-H-I-E-V  on or about October 4th of 2020.

As to Count 4, the indictment alleges that Defendant Francis Clement aided and abetted the murder of Michael Brizendine on or about February 22nd of 2022.

As to Count 5, the indictment alleges that Defendant Francis Clement aided and abetted the murder of Ronald Ennis on or about March 8th of 2022.

As to Count 6, the indictment alleges that Defendant Francis Clement aided and abetted the murder of James Yagle on or about March 8th of 2022.

Pursuant to Section 2(a) of Title 18 of the United States Code, a defendant may be found guilty of murder in aid of racketeering as charged in Counts 2, 3, 4, 5, and 6, even if he personally did not commit the act or acts constituting the crime, but aided and abetted the commission

3104

of the act or acts.

To aid and abet means to intentionally help someone else commit a crime.

To prove a defendant guilty of murder in aid of racketeering by aiding and abetting, the government must prove each of the following beyond a reasonable doubt:

One, someone other than the defendant committed murder in aid of racketeering as defined in the previous instruction.

Two, the defendant aided, counselled, commanded, induced, or procured that person with respect to at least one element of murder in aid of racketeering.

Three, the defendant acted with the intent to facilitate murder in aid of racketeering.

And four, the defendant acted before the crime was completed by the other person.

It is not enough that the defendant merely associated with the person committing the crime or unknowingly or unintentionally did things that were helpful to that person or was present at the scene of the crime.

The evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intent of helping that person commit murder in aid of racketeering.

A defendant acts with the intent to facilitate the crime when the defendant actively participates in a criminal

3105

venture with advanced knowledge of the crime.

The government is not required to prove precisely which defendant acted -- actually committed the crime and which defendant aided and abetted.

All right. Ladies and gentlemen, we're now going to start the closing arguments. Before we do that, why don't we stand up and take a quick stretch and we'll let the government set up.

All right. Is counsel for the government prepared to begin?

MS. STOKMAN: Yes.

THE COURT: All right.

MS. STOKMAN: The Aryan Brotherhood is about power, money, and control. You heard that throughout this trial, and all of those go hand in hand.

The defendants in trial here, John Stinson, Kenneth Johnson, and Francis Clement, were all AB brothers, made members, who exerted control over white inmates within the prison system and whites on the street.

The power is inherent in the AB. You heard from witnesses that this is how the AB operates. With that power comes control, control over what AB associates do and control over the decisions those AB associates make.

You heard from numerous witnesses that if you don't fall in line with AB rules, if you don't follow AB orders, you

3106

can be up to be hurt or even killed.  Obeying an order from an AB member is nonnegotiable.

You heard that violence is very important because these defendants were in prison.  Violence is how the defendants were able to maintain that control.  So they used contraband cell phones to conduct AB business and to order AB orders.

Ultimately, control was important because the defendants were relying on other people to make money.  And money was a big goal.

With power and violence, the AB exerted control and fear over those working on their behalf in order to keep the money flowing.  Because that, at the end of the day, is what kept the enterprise going.

It gave the defendants what they needed in prison, including the phones that they were using to communicate with the outside world, with other AB brothers in other prisons, and more importantly, with the people that they were giving orders to to commit the crimes for them.

I'm going to do a couple of things during my time up here with you.  I'm going to tell you a little bit more about the law as the Judge read it to you.  And I'll walk you through how what you heard during this trial proves the elements of the law and the guilt of these defendants beyond a reasonable doubt.

3107

So let's talk about the charges.

Count 1 is the RICO conspiracy.  Count 2 and 3 are the murder in aid of racketeering charges that pertain to the Lomita murders.  Count 4 is the murder and aid of racketeering charge for the Lancaster murder.  And Counts 5 and 6 are the murder and aid of racketeering charges for the Pomona murders.

Count 1 is the conspiracy to participate in a racketeering enterprise, and what you've heard over and over from numerous witnesses in this case is the RICO conspiracy.

The enterprise is the Aryan Brotherhood, the AB.  As my colleague told you at the beginning of this trial, everything you heard here falls under this charge.

In order for you to find the defendants guilty of Count 1, and all three of them are charged in this, you have to find the five elements that the Judge read to you.

So what are elements?  Elements are just a requirement that the government has to prove beyond a reasonable doubt in order to find the defendants guilty. These are requirements, they're steps.  So I'm going to walk you through what to do with those requirements, with those elements.  But basically, you go through each element one at a time.

First element, once you've found that the government has met its burden and the evidence has shown you that the first element has been proven, you check that element off and

3108

you move to the next one.

Once you've gone through all elements of the crimes charged here in Counts 1 through 6, you've found the defendant guilty of those -- of those crimes.

So let's talk about how the evidence proves each of the elements beyond a reasonable doubt.  The first element here is that the charged enterprise, the Aryan Brotherhood, existed.  This just means that the Aryan Brotherhood exists and it existed during the time of the conspiracy.

You heard a lot of evidence that the AB exists.  It's a white gang.  A group of white people who associate together to commit crimes over time.  And here, the enterprise is more than just the AB made members.  It's the associates on the streets and the white inmates that the AB controls in the prison system.

The enterprise is the gang.  It's the AB members and those associates, the foot soldiers on the street, and the people who testified before you about what the AB was.

AB members are intertwined despite being incarcerated in various locations.  You heard that.  They're using contraband cell phones to communicate, and these defendants were doing the same.  Those phones allowed them to know what other AB members and other AB associates were doing.

You heard that there are three AB brothers that form a three-man council and that these brothers had a more

3109

influential role than the other AB brothers.  But again, the enterprise is just this gang, AB members and the people who you heard from and the other associates who were doing the work for them.

You also heard about common purposes of the AB, the money, the power, the control, and about rules and codes of conduct, that there's absolutely to be no cooperation with law enforcement, that you're not supposed to lie to an AB brother, that you have to follow orders.  Again, following those orders is nonnegotiable because you've seen what happens when you don't.

You heard about the expectation about making money and how a third of the proceeds when money is made within the prison system go back to AB brothers.  And also, that portions of the money made outside prison go back to them as well.

But mostly, you heard about an expectation of violence.  You're expected to commit violence when asked when you're part of this gang.

You heard that from multiple witnesses and you heard it from Robert Eversole and Daniel Rubin, that violence is used for intimidation, for that fear, because that's a control tool.

Violence is used to keep other whites in check, to make examples of the people who disobey the AB rules and their orders, and then you heard about that unquestionable automatic

3110

violence against certain individuals like people who cooperate with law enforcement.

Mostly, you heard that the rules of the AB are enforced through violence. And you saw many examples of this and heard a lot of testimony about how the AB rules are enforced through violence, that the gang commits violence with a purpose.

And you heard that because the rules are enforced through violence, orders from AB members like the defendants are nonnegotiable. They must be followed or that violence is used against those who disobey the orders and the rules.

The murders that you heard about are some examples of rules being enforced through violence because the victims in those murders broke some AB rule. They either owed money to the AB, they failed to follow an AB order, they lied to an AB brother, or they lost money.

So that takes care of Element 1, Aryan Brotherhood exists. And you heard a lot of testimony that it did.

Let's look at Element 2, that the Aryan Brotherhood was engaged in activity that effected interstate or foreign commerce. The Judge told you that that just means it's the movement of items between states. And you heard that drug trafficking has a substantial effect on interstate commerce even when it's done locally.

The fact that the AB engages in drug trafficking is

3111

enough alone to satisfy this element. You heard about how the AB deals drugs within the prison and how they deal drugs on the outside of the prison.

You saw the fentanyl that James Field was trafficking for AB member Waylon Pitchford. This is enough to meet that element. But you also heard more.

You heard that there was drug trafficking going on from California to other states, crossing state lines. And also, Robert Eversole told you that when he was doing that, he was sending drugs to other states, he was also bringing firearms back into California, crossing states lines. This is enough to meet this element.

But finally, you also heard that cell phones were being used a lot. And the use of cell phones is a way to use interstate commerce. It goes with interstate commerce because they are a facility of interstate commerce. So any one of these things satisfies this element and you can check off Element 2.

The third element is that the defendant knowingly agreed a conspirator was or would be associated with the enterprise. This just means that the defendant was associated with the enterprise, with the gang.

For this element all you need to find is that the defendant agreed that someone else, in other words, a coconspirator, another AB associate, another AB member, was

3112

associated with the AB.  But the evidence proves so much more to you.

The evidence proved that all three defendants themselves were part of this gang because all three defendants are, in fact, made members of the Aryan Brotherhood.  They ran this gang.  And you heard this from multiple witnesses from different street gangs, different parts of the state, different prison experiences, that don't all know one another.

So let's talk a little bit about conspiracy.

Conspiracy is when two or more people agree to do something illegal.  The crime is the agreement.  And the defendants became members of the conspiracy to participate in the conduct of the affairs of the Aryan Brotherhood, which simply means that they agreed to be a part of this gang to carry out gang business.

Here are other coconspirators that you heard about during the trial.  These are the AB brothers ordering and the AB associates carrying out the crimes.  They were all part of the conspiracy.  And these aren't all of them.  These are just some names you heard over and over.

The top line are the AB brothers you heard about, some of them.  The second line, you either heard from or heard about.  These individuals were individuals that themselves were up for membership or wanting to become AB brothers.  And then people on the bottom line, like Brandon Bannick,

3113

Evan Perkins, Justin Gray, you didn't hear that they necessarily wanted to become an AB brother, but they were part of the foot soldiers on the street.  They were part of this gang as well.

All the AB associates that you heard from testify that they knew who the AB was, they knew they were working for the AB, and they knew how the AB worked.  They were part of the gang.  And the defendants knew this as well because they are made members.  This is their gang.

You heard a lot of witnesses tell you that John Stinson is an AB brother.  You also heard that John Stinson was part of the three-man council, or the commission.

You heard that from Daniel Rubin, who spoke with Stinson about it, and from Robert Eversole, from Troy Clowers, and from James Field.

This meant that John Stinson was aware of what other AB brothers and what other AB associates were doing.

You also heard that John Stinson knew what other coconspirators in this gang were doing because they were working for him, like Troy Clowers, Daniel Rubin, Brian Rapinoe, and, in fact, that John Stinson sponsored Clowers and Rubin for membership, as well as Andrew Collins, Misfit, who did become a member.

You also heard from a lot of witnesses that

3114

Francis Clement, or Frank, is an AB member.

You also heard that Frank had coconspirators or other AB associates working for him, such as Robert Eversole, Brandon Bannick, Justin Gray, James Field, and Timothy True.

Defendant Kenneth Johnson, who you heard goes by the nickname Kenwood, you also heard a lot of witnesses tell you that he's an AB brother and that he had other AB associates and coconspirators working for him, like Eversole, Evan Perkins, Gray, Bannick, and True.

So that checks off the third element.

Let's look at the fourth, that the defendant knowingly agreed a conspirator would conduct or participate in the affairs of the enterprise.

This just means that the defendant participated in the AB business, gang business, or the defendant agreed that a coconspirator or one of these other people who's a part of this gang would participate in that gang business.

The evidence showed you that the defendants themselves participated in the AB business, but they also knew other people were participating as well.

So some of that testimony and evidence that you saw during the course of this trial as it pertains to John Stinson's conduct, you heard wiretap calls that show that he was involved in the enterprise's affairs, that he was part of the gang business. Those calls show that he had knowledge

3115

of the AB crimes and what other AB members were doing.

For example, you heard a wiretap call in Exhibit 1810 where John Stinson informed the other AB brothers on the call that an individual called Trigger got his rock, that he had become a made member.  The rock is a shamrock.

Stinson said during that call that he made that happen.  Also in that same call, Stinson wanted other AB brothers to find out if an individual named Bobby Stockton was a snitch.

That conference call between AB brothers about AB business also included a discussion about an individual that Defendant Kenneth Johnson told other AB brothers "needed to put down a real one," which Rubin told you means kill someone.

You hear it in these calls and in John Stinson's own voice that he's aware of and involved in the activities of the gang.

He holds a higher status in this gang, as you heard from many witnesses who testified before you, and of course he knows the gang business.  He's directing others to conduct it, and he's ordering the investigation of someone he thinks might be a snitch in that call that you heard.

You also heard extensive evidence about Francis Clement's conduct, his dealings with AB business.  You heard about the murders that he ordered, that he was part of the Hollywood robbery, that he was ordering assaults, and that

3116

he was involved in drug trafficking.

You also heard that Defendant Kenneth Johnson himself was involved in the gang business.  He was involved in drug trafficking with various witnesses that you heard from.  He was involved with EDD fraud, he ordered murders, and, in fact, you heard that one of Frank's connections when he was trying to get Brian Rapinoe drugs was one of Kenwood's connections.  He was involved personally in the AB business.

So that checks off Element Number 4.

Let's go to the fifth element.  This is that the defendant agreed that a conspirator would participate in the conduct and the affairs of the Aryan Brotherhood through a pattern of racketeering, a pattern of racketeering activity, which the Judge told you just means committing certain crimes that relate to each other and are carried out over a certain period of time.

You'll hear, and you heard, that those crimes are what you learned about during the course of this trial:  the drug trafficking, the murders, the robberies, the fraud.  They were carried out by AB brothers and associates over the period of time that you heard about during the trial.

To summarize those crimes, you heard about murders. The murders are racketeering activity.  The double murder in Lomita, the Lancaster murder, the double murder in Pomona, and the prison murder you heard about where they killed

3117

Brandon Lowrey.

But also part of the acts that you heard the Judge tell you that are racketeering activities acts are:  The Hollywood robbery; the drug trafficking, in the prison, to other states; the fentanyl that James Field was trafficking for Waylon Pitchford; the methamphetamine that Defendant Clement was trying to traffic with Brian Rapinoe. You heard about John Stinson trafficking drugs with Daniel Rubin to Tennessee.

You also heard about fraud, EDD fraud, identification fraud, and conspiracies to murder.  These are all racketeering acts that you can find under that fifth element.

The evidence shows you and has proven to you that all of these defendants have met all five elements of Count 1, that the evidence has proven beyond a reasonable doubt that they are guilty of participating in a RICO conspiracy.

So we talked about, then, Count 1, but I want to go into a little bit more detail on the murders because those are also charged in Counts 2 through 6, the murders in aid of racketeering.

You heard on October 4th, 2020, Allan Roshanski and Ruslan Magomedgadzhiev were shot once in the head.

You heard that Kenneth Johnson and Francis Clement ordered the hit because Roshanski disrespected the AB.  Their order enforced the gang's conduct, their code.  It's an

3118

example of the use of violence with a purpose.

So let's talk about what led up to this murder and why it occurred. Roshanski was committing EDD fraud. Lana Haley told you that, Robert Eversole told you that, and Detective Maciel told you that.

You also know this is true from the EDD paperwork that was found in Roshanski's possession the night he died. Roshanski wasn't part of a white gang. So what that meant is that he had to kick up, what you heard witnesses say meant giving proceeds of that criminal activity to AB brothers.

Because that's how it works if you're a white criminal, your money isn't yours alone because you're part of the AB gang. And those AB brothers, they are entitled to some of that money.

As Bannick and Eversole testified, Roshanski disrespected Frank Clement, and disrespect gets you killed, as you have learned. So Roshanski's use was no longer about making money for the AB, but rather an example to set about respect.

You heard that Kenneth Johnson, Kenwood, said this. He said that Roshanski was going to be smoked, which meant he was going to be murdered. You heard from testimony that Kenwood told Eversole that Roshanski was going to be killed and that Eversole needed to talk to Frank and do what Frank asked of him.

3119

And after that, Frank ordered Eversole to walk Justin Gray through the murder.  You heard that Justin Gray was involved with this plan because his brother owed a debt to the AB.

Brandon Bannick also told you that Gray's brother owed a debt to the AB.  Gray's motivation was getting his brother out of trouble with the AB.

But you also heard from Brandon Bannick that he was in debt to Kenwood and that Frank said that if Bannick helped Gray with this murder, that Bannick's debt to Kenwood could be cleared.  That was Bannick's motivation, to get himself out of trouble with the AB.

And Bannick's Facebook messages with Gray are consistent with his testimony that Gray told him they needed to do something.  And the messages are consistent with where Gray was before the murder, at the hotel Eldorado, which Bannick told you he met Gray there and learned that Gray had been ordered to kill somebody.  You know that that someone was Allan Roshanski.

That night cell phone forensics confirmed that Roshanski traveled from San Diego, where he lived, to Lomita. And cell phones forensics from Roshanski's and Gray's phones match the testimony about what happened that night, that Gray's phone was near the location of the murders, because Brandon Bannick told you that the Eldorado was close to where

3120

the murders occurred, and the cell phone forensics confirm that, and that Gray was in contact with Roshanski up until close to when Roshanski was killed.

Bannick told you that while they were in the hotel, Gray received some type of communication that Roshanski was in the area.  And you know this is true because the last call from the victim to Gray is in the area of the murders and right before the murders occurred.

The crime scene evidence also matches what Brandon Bannick told you, that Brandon pulled up and picked -- and parked right in front of Roshanski's vehicle, that Roshanski was not alone, that Bannick and Gray walked up to the two men, and that Gray shot and killed both victims, leaving them dead on the side of a residential street in Lomita.

Bannick told you he didn't take out his gun.  It stayed in the waistband of his pants because it happened too quickly.  And Eversole also confirmed this is what happened, because he told you that Gray informed him that two people showed up instead of one and that Gray had to shoot them both, and Bannick didn't shoot anybody.

Brandon Bannick told you that Gray used a 9mm that night.  And you know this is true because Detective Maciel told you that a shell casing was found that came from a 9mm gun.

3121

The evidence shows you that the accounts you heard about the murder and what led to the murder are accurate.

You also heard that Detective Maciel found methamphetamine and EDD paperwork in Roshanski's car. The EDD documents in other people's names confirms that he was doing EDD fraud. This is consistent with the testimony you heard from Eversole and Lana Haley. The evidence tells you that their account is accurate.

And similar to the items that were in Roshanski's car the night when he was killed, recall that Lana Haley told you when she sold -- stole a vehicle from Roshanski in Wisconsin, he also had methamphetamine in that car. And there was a laptop and devices that I submit to you he was likely doing EDD from.

But also, she told you that a motorcycle helmet was in there that she later sold to Brandon Bannick and then stole off of his boat. And Brandon Bannick told you that's what happened with that helmet as well.

Lana Haley had a conversation with Frank after the murder, and Frank told her that they took care of that situation. And she knew what he was referring to, to Allan's death.

So we discussed already two of the elements that you have to find for murder in aid of racketeering. The AB existed, and they affected interstate commerce, and they

3122

engaged in racketeering activity. So you can check those two elements off.

The third element of Counts 2 and 3 is that the defendant committed or aided and abetted the murder. And aiding and abetting, as you heard from the Judge, just means that you helped somebody or you ordered the crime.

And most of us think of aiding and abetting as helping commit a crime. And that's true. But as you were instructed, it also means the ordering of the crime.

It means that if you order someone to commit a crime and then that person goes to do it, then you've aided and abetted, and you're just as legally guilty of that murder, of that crime as the person who committed it.

You heard that Justin Gray was the person who committed this murder and that individuals who aided and abetted him included Brandon Bannick and Robert Eversole, but they included the defendants Kenneth Johnson and Francis Clement. Because those two AB brothers are who gave the order and who decided that this murder should occur.

So let's look at the fourth element now, the purpose in committing this murder or aiding and abetting this murder.

The Judge told you that it's not necessary for the government to prove that this was the only purpose, this maintaining status, or even the primary purpose, but only the defendants committed the murder as an integral or important

3123

aspect of their membership in the gang, in the Aryan Brotherhood, and the evidence proves that to you.

The purpose was to maintain their position or status within the AB, to further the goals of the AB, and enforce those rules. Maintaining status is maintaining control. It's maintaining that power that comes with being an AB member.

The murders here were to exert fear and control over others who did not follow AB rules. Roshanski disrespected the AB, wasn't paying the AB, and so Defendants Johnson and Clement ordered and aided and abetted in his murder because they were maintaining their status and because that meant they were retaining their power and control.

The murder of Ruslan, because it was the result of the order to kill Roshanski, falls in line with that too. These murders are examples of AB members Johnson and Clement using violence to control what was happening on the street.

So you've gone through all the elements for Counts 2 and 3 and the evidence has shown you that the Defendants Johnson and Clement are guilty beyond a reasonable doubt of those counts.

Let's look at Count 4.

You heard that on February 22, 2022, Michael Brizendine was shot once in the head and once in the arm. Francis Clement and Jason Weaver ordered the murder because Brizendine failed to follow AB orders and he lost AB

3124

money.  Their order enforced the gang's code and it's another example of the use of violence with a purpose.

So let's talk about Brizendine's actions and the events that led to that order.

James Field told you that Frank, Jason Weaver, and AB brother Waylon Pitchford were on a conference call with Field, Michael Brizendine, and others.  That Frank and the other AB members wanted a robbery to occur in Hollywood.

And during that call, Frank told them to get construction clothes to dress like utility workers so that the victim would open the door for them.

Frank also sent the guys from PENI, James Yagle and Ronnie Ennis, to help.  They were present for that call too. And Brandon Bannick confirmed that on the day of the robbery, Frank ordered him and Ennis and Yagle to go to Hollywood for the robbery, but before they made it there, they heard that something had happened and it was over.

The day after the conference call Frank sent James Field a picture of where they were to go in Hollywood.  And Field told you that the photo in Exhibit 1284 is the picture Frank sent.

You heard from Benjamin Mendoza that this photo with the writing on it came from Waylon Pitchford's cell phone, a phone that had been seized in 2022, which is consistent with the time frame around this robbery.  The photo from

3125

Pitchford's phone is consistent with the testimony that Pitchford was also involved in the robbery.

At that house Brizendine kicked the door in. You saw photos from the house that confirm this, the footprint on the door. And Officer Hale told you that the door jamb was splintered, which is consistent with someone kicking in the door.

You know that what happened at the house is how James Field told you it happened. Because only someone who was there would know those details.

THE COURT: I'm sorry, Ms. Stokman. We're actually going to have to take a break.

MS. STOKMAN: Yes.

THE COURT: Ladies and gentlemen, let's go ahead and take a break. Let's go ahead and take 20 minutes. So that will put us -- 20 minutes-ish. Let's put us at ten minutes to 10:00.

(Jury exits the courtroom 9:32 a.m.)

THE COURT: All right. Anything for the record at this time?

MS. STOKMAN: Nothing from the government.

THE COURT: All right. Let's take our break. Thank you.

(Recess held.)

THE COURT: Anything for the record at this time?

3126

MS. STOKMAN:  No.

MS. DE SALES BARRETT:  No, Your Honor.

THE COURT:  All right.  Let's go ahead and bring in the jurors.

(Jury enters the courtroom at 9:52 a.m.)

THE COURT:  All right.  Thank you.  We have everyone back.

Ms. Stokman, you may continue.

MS. STOKMAN:  Yes.

When we breaked, we were speaking about the home during the Hollywood robbery.

You also heard that the victim in that home was zip tied and that the DVR system in the house had been taken out. And you know that that's true because Officer Hale told you that zip ties were found on the kitchen floor and that the DVR system that had cameras around the house had been ripped out.

Give me one second.  Our break made technology kind of stop here.  There we go.

Receipts were also found in Michael Brizendine's truck and his backpack, and those are consistent with the testimony you heard from James Field and Kaylen Chandler about Brizendine being in the Long Beach area around the time of the robberies.

Detective Aguia told you that the hotel key that Brizendine also had in his possession was the hotel in

3127

Long Beach where Brizendine rented a room in the days before and surrounding the robbery and the murder.  That is also consistent with the testimony you heard.  And you know that that room is where that video conference call about the robbery took place.

This evidence shows you that the account of the robbery and the days surrounding the robbery and the murder of Michael Brizendine is accurate.  The purpose of the robbery was simply for money.  There was supposed to be a financial gain, which is why Frank and Weaver accused Field of burning the brothers.

Frank thought that Field was trying to cut him out of the profits from the robbery.  And you heard that Field explained that he thought the cops were being called, that Michael Brizendine kicked the door of the house in, and that wasn't the plan.

For Brizendine to have caused the robbery plan to be botched is a big deal to Weaver and Clement.  Brizendine failed to follow orders and he caused those AB brothers to lose money.  So Frank ordered Field to take care of him, which you heard meant to kill him.  And Weaver ordered the same.

After the calls where Field was told to kill Brizendine, he followed Brizendine to the house in the remote part of Lancaster.  Brizendine was leading the way, and surveillance footage at the house confirms this.  It shows two

3128

vehicles entered the property, Brizendine in the lead and Field in the Mercedes behind him.

The orders to kill Michael Brizendine were given to Field, and James Field told you that he wanted to become an AB brother. He wanted to prove his worth. And so he took those orders and he shot and killed Michael Brizendine. He told you how he did it with Weaver on the phone by asking Brizendine to take the call from the brother.

When Brizendine leaned over to grab the phone, James Field shot him in the head and left Brizendine in the truck, a truck that you heard James Field had previously driven because he showed you where he had crashed the front end.

The photos and the autopsy and the conclusion that you heard from Dr. Gliniecki about the close-range gunshot wound to Michael Brizendine's head is consistent with the testimony that you heard about what happened.

The casings from a 9mm gun that were found by the Detective Aguia are also consistent with what you were told. James Field told you that he used a 9mm gun to kill Michael Brizendine. That gun was later broken down and Brandon Bannick got rid of it.

The same camera that showed the headlights of the two vehicles approaching the house also showed one vehicle leaving. And you know that vehicle was the Mercedes being driven by James Field. He told you that he was still on the

3129

phone with Weaver and that Weaver wanted him to turn around and get pictures but he refused.

After the murder, you heard that Frank told Field, Good job.  You did a good job.

So that takes care of the first -- the first two elements, again, of Count 4 because we talked about the fact that the AB exists, it's engaged in interstate commerce activity, and in racketeering activity.

So let's talk about the third element for this count, Count 4, that the defendant committed or aided and abetted the murder.  And you heard evidence that showed you that.

James Field shot Michael Brizendine because he was ordered to do so by Francis Clement and Jason Weaver.

The fourth element, the purpose of this.  Again, the government needs only to prove that the defendant committed the murder by aiding and abetting, by ordering that murder, as an integral or important aspect of the membership in the Aryan Brotherhood, and the evidence proved that to you.

By ordering the murder, Frank was enforcing AB rules, which again, is maintaining his status as a brother.

Brizendine botched a robbery and cost the AB money.  That couldn't go unpunished.  Maintaining order, control, and fear by killing somebody who failed to follow and carry through orders, that's why this murder was ordered.  It's another example of how AB members like Francis Clement

3130

controlled whites on the street with violence.

You've checked off now all of the elements of Count 4 and you can find that Defendant Francis Clement is guilty beyond a reasonable doubt of that murder.

So let's talk about Counts 5 and 6.

You heard that on March 8, 2022, James Yagle and Ronnie Ennis were shot and killed.  Francis Clement ordered the murders because Yagle and Ennis failed to follow AB orders.

This order enforced the gang's code and it's another example of the use of violence with a purpose.

Let's talk about why this was a gang murder and what led up to it.

Both Brandon Bannick and James Field told you that Evan Perkins was doing EDD fraud and that he owed Kenwood money from that fraud.  And Frank sent James Field to Perkins' apartment to help collect that money.

The apartment had been ransacked.  And Frank said that Ennis and Yagle weren't supposed to take anything, but you heard that they had taken items that belonged to Evan Perkins.

Brandon Bannick also testified to the same.  He said that Ennis filled up bags with Perkins' stuff and -- when he wasn't supposed to do so, and that Frank knew about this.

Field and Bannick both told you the reason why Ennis

3131

and Yagle were in trouble.  They were blamed for what happened at Perkins' apartment during this incident, for taking Perkins' things.  But also, they were in trouble for the Rick Rainey and Shifty incident, that kidnapping you heard of.

Brandon Bannick told you that Frank ordered violence against Rick Rainey when Rainey and Shifty were tied up in Perkins' apartment.  Frank wanted Bannick and the others to kill Rick Rainey, but Rick Rainey and Shifty escaped.

Signal messages from Frank confirmed this, that Shifty and Double R, who I submit to you is Rick Rainey, had escaped because the PENI guys had let them do the escape.  And Frank told Field that he needed to get back to Long Beach to take care of this.

So you heard that Field made his way back to Long Beach.  And on the morning of March 8, 2022, Frank said, "We have to dome them too because I think Ronnie is a traitor, homie.  Thank you."

The Signal message confirms that Ennis and Yagle were to be killed.

That night Evan Perkins, Brandon Bannick, James Field, and Matt O'Day met at the Starlite Motel in Bellflower. You know this is true because cell phone forensics for Bannick and Field's phones show them at the Starlite Motel.

The cell phone forensics for Evan Perkins' phone also confirmed that testimony.  As does the Signal message at

3132

7:36 p.m. where Field told Frank that Bannick, O'Day, and Perkins had come to the hotel.  He said, "Bam just pulled up and Matt and Soldier."

You heard that at the motel all four of those individuals, those foot soldiers on the street, got on a call with Frank and Frank told them that Ennis had messed up and said to take care of him.

You heard in testimony that the four individuals then drove to Yagle's house in Perkins' Charger, a car that both Field and Bannick identified and that the Pomona detectives told you they seized when they executed that search warrant at Perkins' house.

Cell phone forensics confirm that Bannick, Field, and Perkins went to Yagle's house, which you were told is on Palo Verde.  At the house Frank ordered both Ennis and Yagle to leave with them.  Frank also said to, Smoke those dudes right now.  But Field and Perkins believed it was a bad idea to kill them in front of Yagle's family at his house.

Before leaving, you heard that Ennis gave Field his 9mm because Ennis believed he would take whatever was coming to him.  They knew that something was going to happen.  And Bannick confirmed that, that Ennis gave his 9mm to Field.

Cell phone forensics show that the phones went back to Bellflower before heading to Pomona.  Perkins drove his Charger with Brandon Bannick and Ronnie Ennis in it and the

3133

Mercedes was being driven by James Yagle, and James Field and Matt O'Day were in that Mercedes.

On the way, Frank gave orders about what to do and where to go.  The Signal messages confirmed that Frank said to them, "Make sure you guys have your gun pulled, and put a seat belt on in case he tries to do some funny maneuvers in the car," referencing the fact that he knew Yagle was driving the Mercedes that Field was riding in.

He said, "Head towards Mount or Mount Clairmont, okay, Montclair, something like that.  Okay.  Head that direction.  We'll find a spot along the way."

And cell phone forensics confirm that they left the Starlite Motel, obeying Frank's orders.

Then you heard that Frank was on speakerphone because he wanted to talk to Yagle.  And he told Yagle, You have one chance to tell the truth or you're done.

Shortly after that, Frank told Yagle he was lying. And this, James Field told you, confirmed that Yagle was supposed to be killed.

The Signal messages also show that the plan was to kill both James Yagle and Ronnie Ennis, and that was confirmed with Frank.  Frank was told that Yagle believed he was supposed to kill Ronnie.  And Field told you that he told Yagle that because he wanted to gain an advantage, because remember, his ankle was broken.

3134

You heard about that where he broke that ankle in that car pursuit, that car crash that happened a little bit after the Lancaster murder.

And Signal messages confirmed that Field would kill Yagle first and get one of them, referring to Bannick or Perkins, to kill Ronnie. And you heard testimony that Perkins was told this as well.

Again, this is confirmed with cell phone forensics where Perkins' phone moved from the Starlite Motel to the area of Pomona where the victims' bodies were found.

James Field's phone also traveled that same path.

Ultimately, Frank got impatient that the murder was taking so long to happen. And Signal messages confirm that he said to hurry up, to find a dark quiet place now.

The Signal messages show that Frank was asked if he wanted to be live during that murder, which you heard various AB brothers requested to be live during the commission of crimes so that they could see that things were happening the way they expected them to happen, again, because control is everything to them.

The license plate readers captured the cars traveling in tandem, and so did the cameras facing the street where the murder occurred, showing the Charger first and then the Mercedes.

Then the cars turned around in that cul-de-sac near

3135

where the murder took place.  And just four minutes after Frank said to hurry up and find a dark place -- a dark, quiet place now, both cars stopped.

Both Field and Bannick told you that they stopped in a really dark area.  And cell phone forensics from Perkins' and Field's phones confirm this is what happened.

Dr. Gliniecki testified that James Yagle died from a single gunshot wound to his chest.

You heard that James Field shot Yagle once, and Brandon Bannick saw that happen.

According to cell phone forensics, the murders happened between about 10:18 and 10:21 p.m., and the Signal messages indicate that Frank was on the phone at 10:19 p.m.

This matches the testimony that you heard.  Frank was on the phone, and he heard Ronnie screaming.  This is also consistent with what Brandon Bannick told you, that Ennis was screaming after he had been shot by Perkins.

Dr. Gliniecki told you that Ronnie Ennis sustained multiple gunshot wounds, and you heard testimony about the same, that Perkins shot Ennis before his gun jammed, and then Bannick shot Ennis three times after that.

And Bannick also told you that he'd shot Ronnie Ennis three -- or a couple more times on the way as the cars drove out of that area because he saw that Ennis was still moving.

Both James Field and Brandon Bannick told you the

3136

types of guns that everybody had that night, that Bannick was caring a 9mm, and, in fact, the casings found at the scene matched this.

Field initially had a .45 from Bannick, but he used Ronnie Ennis' 9mm to shoot James Yagle. And this is consistent with that 9mm bullet that was found at the scene that popped out of James Field's gun when he had to rerack it when he told you that it had jammed initially.

You also heard that Evan Perkins had a .40 caliber on him, and this is consistent with casings at the scene near Ennis' body. The evidence shows you that the accounts of what happened that night are correct.

The cameras at the market on the corner also showed the vehicles coming and then leaving. And in this shot where the Mercedes is behind the Charger on the way from the murder scene, you heard that now James Field is driving that Mercedes, that he's with Matt O'Day, and that they stopped for gas before heading back to the motel. And cell phone forensics match that, showing that they stopped at the ARCO for gas. And you also saw video surveillance that shows that as well.

After the murders, Frank instructed them to go back to the motel. He said that he's proud of them for committing the murders. And Field confirmed that they were okay, that they were heading back to the motel. And cell phone forensics

3137

confirm that that's what they did.

You heard testimony that at the motel they were on a call with Frank.  And you heard that when Bannick questioned why Jimbo got shot, why James Yagle was killed, Field told him that Frank had ordered it.  And messages from Frank on Signal are consistent with that, that Frank gave the orders to kill both Ennis and Yagle.

The next morning Frank said to get rid of the evidence, the guns and the phones.  And you heard that Bannick collected those guns and tossed them between rocks that went into the ocean.

Again, the first two elements of murder and aid of racketeering, we've talked about those.  The third is that the defendant committed it by aiding and abetting.

You heard evidence that James Field, Evan Perkins, and Brandon Bannick are the ones who shot and killed Ennis and Yagle, but they did so under the orders of Frank Clement.

Here, too, the evidence proved that the purpose of defendant ordering and aiding and abetting the murders was to maintain his status in the AB.  Yagle lied to Clement, which is against the rules, Ennis stole from the AB, and Frank blamed them both for not following orders.  Consistent with the other murders, the purpose of ordering both Yagle and Ennis to be killed was to maintain status within the gang, to promote power, control, and fear in order to keep other whites

3138

in line with the orders of the AB members.

The murders of these white gang members by their friends is yet another example of how AB member Francis Clement controlled white street gang members, AB associates, and coconspirators with violence.

And that gives you all the elements of the counts for -- sorry, for the Counts 5 and 6.

So once you've checked through all those elements, you can find Defendant Francis Clement guilty of Counts 5 and 6.

Briefly, before I'm finished -- and I know it's been long, so I'm going to try to get through this.  I want to talk a little bit more about that racketeering activity that Judge Thurston told you about.

The murders that are in Counts 2 through 6, again, are part of the acts of the racketeering activity that you can find in Count 1.  But also, as we talked about earlier, are those other acts that you heard about during the course of this trial.

You heard about drug trafficking, extensive testimony that the AB was engaged in drug trafficking.

Troy Clowers told you that he was bringing drugs into the prisons, and he also had people making money from selling drugs on the outside.

He told you that due to his sponsorship for

3139

membership by John Stinson, that some of the proceeds from what Clowers was doing in his drug trafficking venture went to Stinson.

Daniel Rubin also told you about smuggling drugs into the prison and making money from the sale of drugs on the street. He was giving some of those proceeds to John Stinson as well because, again, he was sponsored to become an AB brother by Stinson.

But he also told you that that drug trafficking venture where they were sending drugs to Tennessee, that John Stinson was a partner with him in that, that they had discussions about what was happening with the drugs going out of state, and that John Stinson confirmed that he was making money from that activity.

You also heard testimony from Robert Eversole about drugs being sold within the prison system and outside of the prisons. And he told you that Kenwood and Frank were getting a profit from that drug trafficking.

You heard also in wiretap call in Exhibit 1809, Kenwood confirmed with AB member Todd Morgan that Kenwood had people on the street dealing drugs for him, that woman Dixie that they were speaking of.

You also heard about AB member Waylon Pitchford ordering Field to pick up fentanyl in Bakersfield. You heard about the drugs that were in Field's vehicle when he crashed

3140

it in San Fernando Valley, and you know that it was fentanyl because DEA Chemist Martinez told you that there was fentanyl powder in the brick that was recovered, and the pills, those blue pills, contained fentanyl.

You also heard Frank Clement in his own words arranging a drug deal with Brian Rapinoe.  In the text messages that Clement sent to Rapinoe, a picture of the methamphetamine that was supposed to be purchased was provided by Frank.

You heard also that Rapinoe recorded the phone calls around this because he was working as a confidential informant with the ATF at that time.

You heard some of the calls between Frank and Rapinoe that discussed, among other things, the price of the drugs, the fact that they were coming from Kenwood's connection, and ultimately that that connection couldn't get the drugs together, and so the deal never went through.

You also heard from multiple witnesses that a lot of fraud was being committed by the AB, specifically, a lot of EDD fraud during 2020 when COVID hit.

Troy Clowers told you that he was committing fraud and that he was sending some of that money to John Stinson. He also told you that Kenwood had taught him and others how to commit EDD fraud.

Robert Eversole told you that he was also committing

3141

EDD fraud and that whatever money he was making, some portion of it was going to Johnson and Clement.

You also heard from Eversole, Field, and Bannick, Evan Perkins was committing fraud. He was committing fraud for Kenwood, that EDD fraud you heard about, that Evan was making fake IDs to help facilitate that fraud, and that Perkins owed a lot of money to Kenwood because of issues that came up during that EDD fraud.

In Perkins' apartment, Pomona detectives found a ton of items that Perkins was using to commit the fraud, including fake IDs, credit cards in other people's names, and, in fact, they told you that Perkins was in the middle of making a fake California driver's license on the TV when they walked into that apartment and they executed that search warrant.

You also heard that Brian Rapinoe was committing fraud too, a lot of EDD fraud, by using the internet to fill out EDD applications, which you saw in Stinson's name. And he would receive benefit cards from this fraudulent representation through the mail from EDD. He spoke to you about how Andrew Collins gave him names and social security numbers to run EDD and how he spoke with both Collins and John Stinson about that EDD fraud.

Rapinoe was arrested with Stinson's EDD card in his pocket, and that caused Andrew Collins, Misfit, to accuse him of stealing.

3142

In wiretap call in Exhibit 1811, it picked up a conversation between AB member Todd Morgan and Andrew Collins, and they were speaking about Rapinoe.

When Collins was talking about that Nazi Lowrider felon who would eventually come back to prison where Collins could finally get him because he had stolen money, that was Brian Rapinoe that he was talking about.  And that call matches what Brian Rapinoe told you was going on with the EDD.

The EDD verification that Megan Garza also told you about confirms this, that EDD cards were going to the address that Rapinoe used in San Diego and that those contained cards for John Stinson and others.

Daniel Rubin also told you that he was running EDD with Collins and that he had conversation with Collins and John Stinson about the EDD.

He told you that in conversations with Stinson, Stinson confirmed he was making money from Collins' EDD.

Lastly, let's go over the conspiracies to commit murders and the other murder that you heard testimony about, because these are all acts under the racketeering activity.

You heard about conspiracies to kill AB members Ronnie Yandell and Andrew Collins.  Daniel Rubin told you that orders came from Stinson and another member of the three-man council.

He told you that orders to kill an AB brother could

3143

only come from members of the council.  Because AB rules said that only the council could sanction the death of another AB brother.

So Rubin told you that he raised his hand to kill Yandell when John Stinson and that other council member said that Yandell needed to die.  But he also told you that he never had the chance to kill Yandell.

Rubin also was on a phone call with John Stinson and another council member when Stinson ordered the death of AB member Andrew Collins.

Steps were taken to carry out that murder.  Rubin told you that he asked around to see if any whites were on the same yard as Collins who could commit this murder but that nobody was, that there wasn't someone they could trust to do that.

And he told you that John Stinson also tried to see if members from other races could be involved in this plot to kill and this conspiracy to kill Andrew Collins.

But you heard that that also never happened, that Collins was never killed.

One of the last witnesses you heard from was Timothy True, and he told you about the murder of Brandon Lowrey, that it was an order from Kenneth Johnson and Francis Clement.  That when they got to the Kern Valley State Prison yard, the yard had been a mess and Johnson and Clement

3144

and other AB brothers wanted it cleaned up.

True testified that after a list was compiled of all the whites who owed money for drug debts, that Brandon Lowrey's name was on the list for owing $500 and that at that point, Johnson and Clement ordered that Brandon Lowrey needed to be killed.

You heard that ultimately, Thrasher Holmeyer volunteered to kill Lowrey.  And Thrasher said that he would put the area of the IE, the Inland Empire, on the map.  And True told you that this was an area that he was also from where he was part of that core street gang.

Thrasher didn't have issues with Lowrey but was raising his hand after an AB order went out.  The plan was for Thrasher to move into the same cell as Lowrey, which you heard CDC Officer Medley say that on January 24, 2016, the day that Lowrey was killed, Lowrey's cellmate was, in fact, Thrasher Holmeyer.

True told you about conversations with Johnson and Clement where they agreed that Holmeyer should kill Lowrey after Holmeyer volunteered.  And he told you that they said this couldn't be just an assault.  This had to end in death.

And Thrasher Holmeyer stabbed Brandon Lowrey ten times in his neck and chest.  Dr. Carpenter said that one of those wounds was fatal because it immobilized Brandon Lowrey and it cut into his spinal cord.

3145

After the murder, Johnson and Clement laughed about Thrasher's willingness to commit the murder.

Kenneth Johnson and Francis Clement ordered this murder so that an example would be made out of Lowrey to the other white inmates to fall in line with the orders of the AB and the rules that the AB had established. And True told you that's exactly what happened. That after Lowrey was killed, that the whites on his yard were in fear and were wanting to clear up their debts.

You heard from Robert Eversole that he was friends with Lowrey and that after Lowrey died, Eversole spoke with Thrasher. Thrasher told Eversole that he killed Lowrey and that he got him to drink moonshine and stabbed him in the neck several times.

The autopsy results show that morphine was in Lowrey's system. Recall that Eversole was telling you what Thrasher told him. Never said that he tried to get him to drink alcohol, and we don't know what happened for sure in that cell. But you do know from Dr. Carpenter that morphine can have the same effect, and there was morphine in the Lowrey's system.

Both True and Eversole told you that Thrasher Holmeyer killed Lowrey because he was told to do it. Thrasher said that the order came from Johnson and that Thrasher liked Lowrey. And True told you the same.

3146

You've heard from multiple witnesses and seen evidence throughout this trial that AB usually sends your friends to kill you.  And that's exactly what happened here.

So let's talk, just wrapping up, about that pattern of racketeering activity.  You heard that you have to find that each defendant knew that two acts were going to be committed and they didn't have to be involved personally, that someone else, another AB associate, another one of those coconspirators, would be committing acts that the Judge read to you.

But you have so much more than that.  You heard about acts that the defendants themselves were participating in as well as acts that they knew other coconspirators were participating in, such as the EDD fraud with Collins through Rapinoe for John Stinson, the Rubin EDD with John Stinson, the drug trafficking with Rubin to Tennessee.

John Stinson was involved in the conspiracy to murder Andrew Collins, the conspiracy to murder Ronnie Yandell, and he knew that others were committing acts as well.  You heard that from Clowers, from Rubin, that he knew they were doing drug trafficking, that he knew Kenwood was drug trafficking, he knew about Eversole's activity, and the activities that were involved with fraud, assaults, and other AB business, that gang business.

There's more than enough for you to find that the

3147

pattern of racketeering activity existed and that John Stinson was part of it.

Same is true for Defendant Francis Clement. You heard that he ordered the Lomita murders, which were two separate murders. He ordered the Pomona murders, which involved two separate victims. He ordered the Lancaster murder, the Hollywood robbery, the assault and murder of Rick Rainey. Drug trafficking evidence came through where he was personally involved with Brian Rapinoe.

You also heard that he ordered the Lowrey murder. And he also knew that others, other coconspirators, were committing fraud, drug trafficking, murders, and assaults.

There is enough here, again, for you to find that Francis Clement was part of the racketeering activity of the AB.

Finally, Kenneth Johnson. He too was part of the racketeering activity that the AB was committing, that gang business. You heard that he was personally involved in drug trafficking with Clowers, he had EDD fraud with Clowers, he ordered the Lomita murders, ordered the Lowrey murder, Evan Perkins was doing fraud for him, that he was aware and engaged in Eversole's drug trafficking, that he had drug trafficking going on his own through that woman Dixie, and that he knew others were committing fraud, assaults, drug trafficking, and murders.

3148

Again, that gives you a check for all of the elements for Count 1, the RICO conspiracy.  And the evidence has shown you that Defendants John Stinson, Kenneth Johnson, and Francis Clement are guilty of Count 1.

The evidence has also shown you that Kenneth Johnson and Francis Clement are guilty of Counts 2 and 3 and that Francis Clement is guilty of Count 4, 5, and 6.

Thank you.

THE COURT:  All right.  Thank you.

MS. FISHER-BYRIALSEN:  May I have a moment?

THE COURT:  Yes, thank you.

MS. FISHER-BYRIALSEN:  Good morning, ladies and gentlemen.  Can you hear me?

The problem with all these green checkmarks you've just seen in the government's closing argument is that they all depend on the witnesses they put on the stand.  They all depend on these cooperators, thieves, fraudsters, drug dealers, and killers.

In her opening, Ms. Barrett told you that the government witnesses were going to be people that you would never trust with the keys to your house to water your plants if you were out of town.  And that's exactly what you've seen here for the last five weeks.

There's a lot of evidence about homicides.  And you saw autopsy pictures and crime scene pictures and heard from

3149

cell phone experts and cops.  But we're not saying that Michael Brizendine and Ruslan and Roshanski and Ennis and Yagle weren't killed and that there wasn't evidence of a robbery in Hollywood Hills or pictures of drugs that Brian Rapinoe never received.

However, the government has not proven that Francis Clement is the person who ordered any of those murders.  Because to believe that, you have to believe the thieves, fraudsters, and drug dealers that were lined up on the stand here for you.

You have to believe that Mr. Clement is the person behind those Signal messages.  And the only person you have telling you that is these fraudsters, thieves, drug dealers, and killers.

The witnesses in this case were already gang members, lifelong gang members.  You heard the list:  Public Enemy No. 1 Death Squad, Nazi Lowriders, COORS Family Skins, Lakeside Gangsters, Supreme Power Skins, just to name a few.

These gang members were committing gangs -- or sorry, were committing crimes long before they did anything for the AB.  But now they have a chance to blame the AB and act like they were intimidated and are now coming forward because they've somehow seen the light and changed their lives.

You heard from James Field, also known as Suspect. He was a Lakeside Gangster, a Supreme Power Skins on the

3150

streets. He's been in and out of the correction facilities since he was 14.

And during the three months you heard him testify about from when -- about December 2019 until he got arrested in his last car crash, he was on a crime spree. He was crashing cars. He broke his ankle. He was in the hospital, then got out. Crashed another car. He's moving drugs, doing robberies, killing people.

In this case he was charged in this RICO conspiracy with three homicides. He's the one who killed Brizendine point blank. He killed James Yagle and Ronnie Ennis. And what was his penalty? What was he facing? Three mandatory life sentences. But he got a cooperation agreement.

You also heard from Robert Eversole, street name Rage, also involved in the criminal justice system since he was 7 or 8 years old.

And you saw him sit up there and get teary-eyed, and -- but when you think about that, I want you to think about who he was, who he is. He's someone that got away with murder. He testified about having people stabbed in prison and he couldn't even remember if those people he ordered stabbed survived or not.

He had a cooperation deal that he also got very emotional about because supposedly it got his family out of trouble, his daughter and his wife and everybody. But those

ER 2486

3151

are the same people that he set up to do crimes for him.

Ask yourselves if that tearful display is consistent with somebody who feels bad or has changed their lives or wants to do the right thing or somebody who's just coming in here to tell you what the government wants you to hear.

Mr. Eversole made a career out of lying and threatening and manipulating people, including his own family. Don't let him manipulate you.

And what did he get in return? He got the farm. He got a ten-year sentence reduction. I mean, you saw him walk in here. He came right in here from the street.

So ask yourself, when you consider all these peoples' testimony, who they are, what their backgrounds are, what their motivations are to be in here.

You heard from Brandon Bannick, Bam Bam, also in and out of prison since age 13, PENI, Public Enemy No. 1, Death Squad. He violated parole, committed fraud, stabbed people in prison he talked about. But he didn't seem too concerned about that because he wasn't caught for those.

He's charged with murders in this case. He testified, he was asked: What kind of acts of violence did you do in prison, assaults?

Yeah, mainly. Battery, assaults and battery on a prisoner, fighting, mutual combat, that type of thing.

We asked: Any stabbings?

3152

I was never caught for any, no.

In his mind if you're not caught, it doesn't matter. But he was caught here. And that's why he came in here and testified, to get out of it.

And what did he get out of it? Same thing as Mr. Field, out of life in prison, gone.

You heard from Brian Rapinoe, also in and out of correction facilities, associated with the Peckerwoods and Skin Woods and Nazi Lowriders, fraudster, tricked people, tricked the EDD for years. Don't let him trick you.

Mr. Rapinoe on the stand talked about how he also had a sudden epiphany and changed his life and now he's different since he got arrested. That's not why he did this. He didn't come in here and testify because he suddenly turned his life around.

He came in here because he got caught and then he got paid $4,400. He just found another way to get paid, paid by the ATF. Not just in this case, but others.

And what else did he get out of it? A cooperation agreement in the Southern District of California. He's not being prosecuted for the federal crimes he did down there.

And then we have Kaylen Chandler. She's been involved in a life of crime I think she said her whole life, and this is another person that they want you to believe. I mean, these are the people you have to believe to find

3153

Mr. Clement guilty.  And you have to believe it beyond a reasonable doubt.

Think about her actions when she found her -- her boyfriend and the father of her child in the red truck.  She didn't call the police.  She ran because she had a warrant.  And then when she was contacted by the police, she lied to them.

But then she got an immunity agreement, and here she is.  And you heard her testify about her benefits.

I asked her (as read):  What does immunity agreement mean to you?

That anything I say can't incriminate me.

And I asked her:  Did they give you immunity for everything you testify about?

Yup.

Just like that.  They pick who sits there and who sits there.

An example of why you can't believe her is about the red truck.

So I say to her (as read):  So let's talk about the red truck that Michael was found in.

Okay.

Do you remember you testified in the grand jury and you were asked whose truck it was?

Yes.

3154

And you answered, That was our truck.  It was the rental that we got.

She says, Correct.

I say, And when you testified there, you were under oath, right?

Correct.

But that wasn't the whole truth about the truck, right?

She says, Yes, it was.

Well, that's not just a rental, correct?

That's the whole truth, yes.

It was a rental you got in a fake name, right?

Right, she says.

But she doesn't seem to think there was anything wrong with that.

(As read):  And you ripped the GPS out of it, right?

Did I?  No.

Well, someone did, right?

Probably.

Well, yes or no?

If they did, I wasn't there for that.

But you know it was ripped out?

I'm sure it was.

Because that's why the rental company never got -- came back, and you got it when you were -- didn't return it,

3155

right?  You never returned the rental car, right?

I did not.

So it's actually stolen, right?

Yes.

Does she strike you as someone who understands what telling the truth is?  Someone who understands what being under oath is?

These are people who have nothing to trade in their lives other than lies.  Lies are the only currency they know.

And how do you know it's lies?  Because not a single one of them came forward until they were caught.  They didn't come forward until they were in trouble, and they didn't come forward and sit here on the witness stand until they got some benefit for it.

And like I mentioned to you earlier, they all want you to believe that they had some moment of clarity and they suddenly became good honest law-abiding people; they finally saw the light and gave up the life of their thieving and frauding and drug dealing and assaulting and killing.  But that's not what happened.

What happened, like I said, is that they were caught, and they got benefits, and they got away with their drug crimes, their gun crimes, their fraud, and their murders.

So think back on what these incentivized victims -- or witnesses all had to say.  How else do you know they aren't

3156

telling the truth?  Because they couldn't tell the same stories.

Let's compare Ms. Chandler and Daniel Rubin, Nutty.

(As read):  Have you ever committed crimes on the behalf of the AB?

No.

Have you ever committed crimes to benefit the AB in some way?

Uh, I mean, no.

Had Daniel Rubin or Nutty ever asked you to do anything unlawful?

Yes.

Well, that doesn't make any sense.

(As read):  What did he ask you to do?

To basically hook some people up that have came out of prison with drugs.

What were you doing for Daniel Rubin?

Just like I said, I was helping out with drugs with people that were getting out.  I was connecting people with drugs.

Well, that's not exactly what Daniel Rubin said.

(As read):  Were you sending Kaylen to pick up and deliver -- or were you sending Kaylen to pick up drugs and deliver them to people who had recently been released from prison?

3157

No.

That's not true?

No.  She did everything for me.  That was just one of the things she did.

Well, she certainly didn't tell you the others?

Well, obviously, yeah.

I don't think I understand what you mean by 'obviously.'

I trusted no men in my area.  Everything that came through my area went through her.

Okay.  So she was committing crimes on your behalf?

Yes.

Compare the testimony of Justin Field and Brandon Bannick about what happened in Pomona.

(As read):  When you arrived back at the hotel -- and this is after they shot Ennis and Yagle in Pomona.

Matt -- I mean Bannick and Soldier were there when we came upstairs, says Field.

And what, if anything, happened when you were in the hotel?

We went in and sat down and Frank called.

And what, if anything, did Frank say?

I had him on speaker.  He said, What happened to Jimbo?  Why did Jimbo get shot?

And did you respond?

3158

I told him, yeah, you told me that if he lied, that you wanted him taken care of.

Well, that's not how Brandon Bannick explained it.

(As read):  So what happened when you were all back in the hotel room?

I ask the same question, but you get a different answer.

(As read):  We were just kind of confused, I mean, you know, about everything that happened.  And -- sorry I can't see that part of the screen -- and Suspect was on the phone with Frank and --

"QUESTION:  Could you hear what Frank was saying?"

"Yeah."

"What did he say?

"I just heard him say, Why did Jimbo get shot?

"And what, if anything, did Suspect say?

"Oh, something different than Suspect said.  He explained that he had given Jimbo Ronnie's gun, or a gun, and he got worried that Jimbo was going to shoot him, and he panicked and shot Jimbo."

So here you have two people explaining the same thing very differently.  And these are the two people that you have to believe are telling you that the person on the end of that have Signal line is Francis Clement.

Then we go to Rage.  He's talking about the Kern

3159

murder, the murder of Brandon Lowrey.

And he said (as read):  Oh, yeah.

He gives a lot of details here.

They got some moonshine, white Lightning, and they got him drunk.

-- meaning Brandon Lowrey.

And he said (as read):  He was about half drunk, but he wasn't -- Thrasher wasn't -- he didn't drink as much.

Thrasher being the person who killed Brandon Lowrey.

(As read):  And they had someone come to the door and call him so that he was looking out the window talking to him, and he stabbed him through the back of the neck several times.

All right.  So Eversole, Rage, is here on the stand, got a lot of detail here.  But we know this isn't true because compared to the testimony of the coroner, Dr. Eugene Carpenter -- he's got no skin in the game here -- he testified that there was no blood -- I'm sorry, no alcohol in the blood, and his report confirms that.

And then you have the corrections officer, Ethan Medley, who was the one that walked up to the cell.

And he said (as read):  I looked in, and I saw Lowrey laying under the bunk.

Well, if Eversole's detailed account of him being told to stand by the door and talk to someone outside the door and then gets stabbed in the back, he would have been by the

3160

door, not under the bunk.  So another reason you can't believe Eversole.

Why the inconsistencies?  Lies, drugs, incentives from the government.

When we were questioning Field, we asked him if he was on drugs, and he says yeah.

(As read):  So during the time leading up to when you killed Michael Brizendine, you were on drugs?

Yes.

You weren't sleeping much.

And I think him and I have a different understanding of what sleeping much means.

But he says (as read):  No.  I was getting regular sleep.

You were?  Weren't you staying up for days?

Two at a time maybe.

You would stay awake two days at a time?

Yeah.

And the same thing in the period that you were killing Jimbo, you were on drugs?

Yeah.

And I want you not just to think about what these people said, but how forthcoming and smooth they were, all these cooperators, when they were being asked questions from the government compared to how they were when they were asked

3161

questions from the defense.

And use your common sense to evaluate their demeanor. Use your own common sense to evaluate how methamphetamine and heroin use affects people's memories or their behavior. Use your common sense about how staying awake for days affects somebody's behavior and memory of events.

And who didn't you hear from? You heard a lot from Field about the Hollywood robbery and the Lancaster killing and the Pomona killing. You heard from Bannick about Lomita and Pomona killings.

But what about all the other people that were there that you didn't hear from, Sabrina Beck, Haily Chappell, Josh Cornett, Aaron Fogle, Nick, or they called him Scrappy, Matt O'Day? We didn't hear from them because they wouldn't tell you the same story. It would be more inconsistencies.

All you got were the cooperators who benefitted from being here. You heard from Timothy True about the Kern murder. He's got a background of burglary and attempted murder.

He tried to claim that he wasn't getting any benefit from being here, that he wasn't getting anything out of testifying, but he was. He was getting letters from the United States government that he could give to his parole hearing in the hopes of getting out.

And again, use your common sense in judging his

3162

demeanor and how he behaved on cross-examination versus direct examination.  You heard him quibble with Ms. Luem when she asked him why he hadn't had that giant COORS tattoo removed from the front of his neck.

He said something like, Well, tattoos are permanent.

But you could see he had the other ones filled in. He could have easily had that one filled in too.

And Mr. True -- and judge this on your own, but he spent a lot of time trying to make ends meet and make sense of how, you know, his COORS Family Skins was somehow, I don't know, a better gang or different from the Aryan Brotherhood and that the AB was certainly not like how he was.

And I want you to think about the character and the credibility of somebody who thinks like this.

I asked him what COORS was.  And, you know, the left side is him testifying about the Aryan Brotherhood and what he thinks of them.

And he says that (as read):  They are white supremacist, a racist organization, but their everyday beliefs are different.  They believe in using drugs and selling drugs and victimizing white people, murdering white people.

Anything that they can do to benefit the Aryan Brotherhood, it doesn't matter, they believe in it. Whereas when I was a skinhead, we believed in preserving white people.  Drugs -- we weren't allowed to use drugs.  We're not

3163

allowed to steal from people.  We weren't allowed to do anything like that.

And he says --

But you are using drugs, right?

I've used drugs.

So his own COORS Family skinhead rules didn't seem to apply to him.

Then he was asked again later about his COORS Family Skins.  And we asked him (as read):  What does that stand for?

And he says, COORS stands for Comrades of Our Racial Struggle or Children of Our Race Skins.

And I asked him, What does that mean?

He says, It's a neo-Nazi skinhead gang.

And he's been a member of that since he was 18, but he claims to have dropped out in 2016.  And he explains that this is a neo-Nazi skinhead ideologist.

And then compare that to when he talked about the attempted murder that landed him in prison in the first place, and think about if he's someone you can believe beyond a reasonable doubt.

This is him testifying about the attempted murder that landed him in prison.

(As read):  That guy Mr. Smith, the one that you and Lemeur almost beat to death, he's white.

Yes, sir.

3164

Isn't that victimizing white people?

At that time in my life, I was a gang member, and he was another skinhead gang member.  And, you know, I attempted to murder him for my gang.

We heard a lot of people talk about the enterprise or the Aryan Brotherhood enterprise, as the government calls it.  The government has not proven that the crimes committed by Field and Bannick and Rapinoe and everyone else were in furtherance of any enterprise.  There's no evidence of that.  These are street guys doing street crimes like they have their whole lives.

You heard the Judge read the jury instructions to you.  And they're all important, but I want to draw your attention to a few that are especially important in this case.

The Judge told you that you should focus on a witness's memory, focus on the manner that they testified, the witness's interest in the outcome of the case, whether other evidence contradicts their testimony.

And again, you only heard from cooperators in this case about what's supposed to have happened and who's supposed to have ordered it.

Yeah, you heard from the crime scene experts and the CO who found Brandon Lowrey, but they weren't there when anything happened.  They were there after the fact.

Think about how the people's memories and behavior in

3165

this case were affected by their benefits, by their cooperation agreements, by their immunity agreements, by the payments that they were getting for what they were doing, affected by drugs and lack of sleep.  Think about the way they testified and their interest in the outcome of this case.

The Judge went over with you that you heard Brandon Bannick and James Fields are people who plead guilty for crimes.  You can consider that and you should.

Robert Eversole, Brandon Bannick, James Field, Troy Clowers, Timothy True testified in exchange for favorable treatment from the government.  Kaylen Chandler got immunity. Rapinoe got payments.

Then the instruction tells you (as read):  For these reasons, in evaluating the testimony of these witnesses, you should consider the extent to which or whether each witness' testimony may have been influenced by these factors.  You should examine the testimony of these witnesses, in this case all the cooperators, with greater caution than that of other witnesses.

The problem here with all those green checkmarks in the government's closing argument is that you have to treat all those witnesses with greater caution because they are not reliable.

You only heard from cooperators about what's supposed to have happened.  You only heard from thieves, fraudsters,

3166

drug dealers, and killers.  And that's not beyond a reasonable doubt.  Think long and hard about these cooperating witnesses the government wants you to believe beyond a reasonable doubt, their incentives to lie, the benefits they're getting, their demeanor on the stand, like Daniel Rubin and Kaylen Chandler, their massive criminal records.

Beyond a reasonable doubt is not if you kind of believe something or you think it's more likely or not.  Beyond a reasonable doubt is the highest standard of proof in the criminal justice system.

You would not give any of those people on the witness stand the keys to your house to water your plants, and that's why you have to find Mr. Clement not guilty.

THE COURT:  All right.  Thank you.

For Mr. Johnson, please, Ms. Luem.

MS. LUEM:  Just a moment, Your Honor.

Sorry about that.  I know it looks like I'm going to keep you here forever, but I'm not.

I want to start by saying that this trial has been long.  And it was expected to be quite a lot longer.  So we appreciate your time and your attention and your patience with things like this.  And our client Mr. Johnson thanks you.

He is not guilty.  And I'm here to tell you why.

The government in this case has not met their burden of proof.  And as Ms. Byrialsen just told you, the burden of

3167

proof in a criminal case is beyond a reasonable doubt, the highest in any type of case in this country.

The legal system -- a lot of people during jury selection said our criminal justice system is broken.  I disagree.  I think it's one of the greatest systems in the world.  And the reason why is because we have people like you, jurors who come in here, everyday people, who evaluate the evidence, who listen to the witnesses.

We don't have a judge or a two judges deciding somebody's fate.  And in this case, it's more than just money or, you know, civil action or even something as important as, for example, parental rights.  The standard in a criminal case is higher than all of those because you're talking about somebody's liberty.

So we thank you and we ask you to keep the promises that you made during jury selection, to hold the government to their standard of proof beyond a reasonable doubt.

One of the first promises you made was that you would presume Mr. Johnson innocent.  That you understood that concept, that you would follow the law, and that unless the government proved their case, every element of their case to you beyond a reasonable doubt, he would remain innocent in your eyes until then.

And you've heard a lot of bad stuff.  I mean, we're not talking about, you know, a perfect person sitting over

3168

here.  You've heard evidence that he is in prison.  He is incarcerated.  He's done things in the past that put him there.

And, uh, the question for you now is not is he a good guy, is he a bad guy, should he be in prison for those things, it's, did he commit the crimes that they charged in this indictment?  And did they prove them beyond a reasonable doubt?

So at the beginning of this case, the government in their opening statement told you that there was going to be these buckets of information of, you know, violent crimes and RICO acts.  And I submit to you -- and this might be, I don't know, my co-counsel didn't understand it when I said, show me the receipts, but where are the receipts?  That's a question that you should ask yourselves when you get back there in the jury -- jury room.

Who keeps receipts?  And I mean it literally and figuratively.  You know who keeps receipts?  Banks, the California Department of Corrections, phone companies keep receipts and records, government agencies like EDD keep receipts.  And where are those receipts when it comes to Mr. Johnson?

Ms. Byrialsen went through all these cooperators and the statements that they made and how they did these things and they committed these crimes.  And in particular, something

3169

that the government repeated over and over and over through this trial through every witness was that if you're doing crime, you have to kick up to the Aryan Brotherhood, right?

Robert Eversole, I was kicking up to Kenny Johnson. I was paying up to the kitty or the general fund. Where were those receipts? The Department of Corrections keeps track of money that comes in to the prison and goes on to inmate accounts.

They have receipts. They have records. They have the ability to get those records and show if Mr. Johnson was receiving payments from anybody. Where are they? You didn't see any receipts. You didn't see any records. Nobody from CDCR came in and told you, Oh, well, there's an AB general fund and everybody is tithing to it or that any of these guys were receiving payments. Nothing.

You heard from Troy Clowers who said something like he -- he used this catalogue to send drugs in at Kenny Johnson's request through the Department of Corrections and they drill the hole in something and mailed in. Where's the record of that? They keep records of packages coming in to the prison. They keep records of mail. Inmates sign for these things. There was no evidence. All you get is the word of Troy Clowers.

What about wiretaps? You heard testimony that they had wiretaps going during the time of the Lomita homicides.

3170

And I submit to you that while you heard one call that purports to be Kenny Johnson talking to somebody named Todd Morgan, there are no other calls, no other recorded phone calls of Kenneth Johnson talking to anybody about anything.

There are no kites. You heard a lot about kites and passing kites. Where are the kites that have Kenny Johnson's name on them? Where are the kites that Kenny Johnson wrote? There are none. Receipts.

There's no cell phone records that were presented that have his name on them or his phone number. He's on that recorded call giving a phone number. Presumably it's his number. And there was nothing done to corroborate or show that that phone belonged to Mr. Johnson.

Same with Allan Roshanski's phone, which they had, which they recovered. No calls that indicate he was communicating in any way with Mr. Johnson.

We talked a lot about Cellebrite extractions. And you heard from Robert Eversole, who I'm going to talk to you at length in a little bit, I'm sorry to say, but he testified that he had two phones taken shortly before he was ripped out of his cell and charged federally.

The phone that he had at the time that he was arrested, he didn't have it for very long and they took that. But the two prior phones that he had through the months of October and November were taken by law enforcement. They are

ER 2506

3171

in the hands of the California Department of Corrections.

You know who has access to those phones?  They do. They could have taken those phones, Robert Eversole's phones, done a Cellebrite extraction, and seen whether or not there were any communications with Mr. Johnson.  That was not done. Period.

You heard about people committing EDD fraud and that Mr. Johnson was involved in EDD fraud.  The woman who testified, God bless her, right, she was just here to talk about, you know, what she knew and what she did.  And she's got no dog in this fight.  But she said as far as records with Kenny Johnson's name, I don't know anything about that.  I didn't see anything like that.  No receipts.

That is not proof beyond a reasonable doubt.  So we have cooperators, we have thieves, liars, killers, as Ms. Byrialsen told you, but no corroboration, no hard evidence, no receipts.

Instruction Number 14 is important.  And I don't want to spend too much time on it, but I think you all understand, we covered it in jury selection.  You are to evaluate the evidence as to each defendant separately, right?

So Hollywood robbery, Kenny Johnson is not charged, there's no evidence that he had anything to do with it, that he knew anything about it.  James field told you this.  There was a conference call.  Kenny, not on the call.  So we can

3172

just skip past that.

Same with the homicide of Mike Brizendine.  Kenny wasn't charged with that; he didn't know about it.  James Field testified that Kenny Johnson had nothing to do with that.  Kaylen Chandler never even mentioned Kenny's name.  So we can skip past that.

Pomona homicides, again, Kenny not charged with that.  No evidence he had anything to do with it.  I will point out, though, that the government brought up these Signal messages that were going to James Field and his phone around the time of the Pomona homicides where he was allegedly communicating with somebody else in this case.

And Mr. Johnson was reaching out to Mr. Field and trying to get ahold of Mr. Field because this other guy who didn't have a phone was often with Mr. Field.  And Suspect, Mr. Field, wasn't responding to any of Mr. Johnson's messages, right, he wasn't answering.

And at one point, Mr. Johnson said, you know, you're -- You're being disrespectful or, You're disobeying an order and you're in the hat.  Right?  The government tells you what that means and all the witnesses did too, which means you're marked for death, certain death, you're in the hat.

So he sends that message to James Field.  And I asked Mr. Field about that, you know, like you weren't answering and Mr. Johnson was blowing up your phone about something totally

3173

different than what you were involved with.  And what happened to you for disobeying that direct order?  Nothing.  He wasn't assaulted.  He wasn't -- obviously, he wasn't killed.  He wasn't checked.

He said he had a -- he had, like, a good excuse, basically is what he told me.  He told Mr. Johnson that he was sleeping.  Which we know isn't true because he was involved in these murders and all that.

So he lied to Mr. Johnson.  That's, according to them, another violation that results in, you know, immediate death.  That didn't happen.

And we know that Mr. Field was housed at the Fresno County Jail along with Mr. Johnson for some time before he decided to cooperate with the government.  So there's plenty of opportunity for Mr. Johnson to enforce this rule violation.

We heard testimony from Brandon Bannick that he was ordered by somebody to kill Rick Rainey, but he didn't want to do that because he didn't think it was right because Rick Rainey was a -- a brother.  And so he disobeyed that order.

And you know what happened to Mr. Bannick for disobeying a direct order?  Nothing.  He wasn't assaulted.  He wasn't hurt.  He was in the same jail, in the same pod.

Mr. Perkins owed money.  What happens, according to

3174

the government, if you owe money to the AB?  You die.  That's what they say.  That's what all of their witnesses say, the same thing.

It's so strange.  You know, like, every one of these witnesses says exactly the same thing.  You think that's a coincidence?

Well, Mr. Perkins, who was celled in the same unit over at the Fresno County Jail, wasn't assaulted.  Nothing happened to him.

Mr. Rubin, Nutty, testified that he was ordered to kill somebody when he was in prison, and he didn't do it.  And as a result, the AB sponsors that he had, they withdrew their sponsorship, you know, like Nike or something.  Like, We don't -- you know, You're not ours anymore.

He wasn't assaulted.  He says, Well, it was only five days before I locked up.

Well, that's -- five days is a lot of days for somebody to -- to hurt you if they were, in fact, enforcing these rules.

And again, you heard then from Timothy True that this guy Fox was -- was told or asked to kill Brandon Lowrey.  And he said, You know, I really don't want to do that.  I'm kind of worried about the death penalty, so, like, it's just not for me.  No, thank you.

And nothing happened to him, right?  Nothing.

3175

According to True, Holmeyer said, Oh, you know what, I'll do it.  That sounds like fun.

And nothing happened to this individual.  At least as far as we know, no evidence was presented that he was ever assaulted or killed.

Now, that takes me to what I really need to talk to you about, which are the Lomita homicides that Mr. Johnson is charged with.

And this is kind of a funky picture.  It's hard to see.  But this is the backpack that was found -- or the fanny pack that was on one of the victims which contained a cell phone -- this comes from Detective Maciel -- credit cards, most of them were in Roshanski's name, there was, I think, one in the name of a woman by the name of Marina Lampert, a firearm.  There were also in the car narcotics, this EDD paperwork.

And I just want you to ask the question -- look, we know that Allan Roshanski and Allan [sic] Magomedgadzhiev were murdered.  We know that, right?  But why didn't they do anything to investigate this crime?

She says, well, after I think a redirect by the government, Do you usually investigate the victims?

Oh, no, we don't.

Well, they did, actually, for Ennis and Yagle.  You recall they looked at their tattoos.  And I think they may

3176

have done the same here.  But they did not contact any of the people on the paperwork for the EDD, at least there was no testimony to that.  They didn't contact the woman whose credit card Allan had in his possession to see, hey, who might have wanted these guys killed.  They didn't bother to preserve the Ring video that showed the car pull up.  And just because it didn't capture the actual shooting, I guess it wasn't important enough for them to do.

They didn't follow up and interview witnesses that knew Allan and Ruslan.  And they basically just sort of, like, threw their hands up and said, Well, you know what, there's these two dead Russians in the street of Lomita.  We don't know what to do with this.

And then they turn it over to the ATF.

The ATF then decides based off of, I think, an anonymous tip that they got, Well, this must be an AB crime, somehow related to -- because of the EDD paperwork or something.  Who knows?

And then they go from there, right?  And then everything they do is just to collect evidence to confirm their belief that this is an AB-ordered hit.

I very briefly want to talk to you about something that came up during Mr. Eversole's testimony about an interview in South Carolina when he was in custody.

And he said that he was interviewed by investigators

3177

from Mr. Johnson's team.  And I just -- he sort of alluded to the fact that he felt intimidated by this or somehow threatened by this.  And I want you to ask yourselves, think to yourselves for a second, What if I was charged with a crime, okay?  I got pulled in by the federal government, handed an indictment with my name on it, your name on it, saying I am responsible for killing two people who I don't know, who I've never met.  I have no idea why they were killed, how they were killed, who killed them.  I know nothing about this.  Right?  What do you do?  What do you do?

You're innocent of this crime, right?  And you don't know who's accusing you.  There's a secret grand jury that was convened, and somehow your name ends up in this paperwork.

Well, the first thing you do is plead not guilty. The next thing you do, or maybe you can switch the order, is you get a lawyer, you get an investigator, and you start asking questions.  You start reaching out to people, people that you know, maybe like Robert Eversole or other people involved in the case and say, Hey, why am I in this indictment?  Like, what do you know about this?  Do you know anything?  Can you help me figure out, like, why I'm charged with something I know nothing about?

I mean, there is nothing sinister, there's nothing illegal, there's nothing unethical or strange about interviewing potential witnesses.

3178

So any suggestion from Mr. Eversole or the government that that's -- that was a threat towards Mr. Eversole is just -- is just false. Mr. Johnson's investigator, nobody knew at the time that he was a cooperating witness. He told you that.

He said it was -- it was a secret. And so I just -- you know, I talked to them and I told them what I knew and --

Well, he must be a pretty darn good actor. I mean, he sat through that whole interview -- actually, two interviews -- and never let on once that he knew anything about the Lomita homicides, period.

The government has -- I just -- I can't wrap my head around why they think these Lomita murders happened. In opening statement, the government said the message was clear, if the AB says you owe them money and they have -- then they have people who will come and collect. And if you refuse to pay up, you will be killed.

Okay. But who said that Allan Roshanski owed anybody money? Who said that this was discussed with Roshanski, that he was refusing -- I mean, where does this come from?

It's just like a made-up theory that fits with this theory-driven investigation, right?

Lana Haley testified that -- that he was -- he was disrespectful. (As read): Roshanski was disrespecting an AB member.

3179

She's asked, Well, how?

And she says, I don't know.  I don't know.

Well, when?

Nobody knows.

Why?

Uh, who knows.

And then we've got Robert Eversole who reiterates the disrespect thing but then also says the whole point was to get these EDD cards that Roshanski was supposedly going to bring to this meeting 10 or 12 or 13 cards.  Where is the evidence of any of that?

And there's a meeting, supposedly, according to Brandon Bannick, before the killing where they approach the car and have a conversation.  Don't you think there would have been a discussion right then about, like, where's the briefcase or where's this stuff?  But we don't know anything about any of that.

Mr. Bannick testified, and he just said there was a conversation, and then we drove to another location, and I wasn't expecting this to happen.

So what's -- what's the motive for this crime?  So that brings us to Brandon Bannick.  He was there, right?  So presumably, he's the witness that testified in this case that would know the most about why this happened and what happened and the details of -- that, you know, lead up to the motel

3180

room with -- with the other guys and then ultimately, you know, going and doing this murder.

And he told you that, uh -- oh, and also keep in mind, and I think I said this already, he was housed in the Fresno County Jail, according to him, with Mr. Johnson for eight months after they were arrested for these -- these offenses.

He says that he -- that Kenny Johnson didn't know anything about these homicides.  As far as he knew, Kenny knew nothing.  That was his testimony.  Got it on the screen.

You probably remember but (as read):  Nobody told you that Kenny wanted these homicides to happen, correct?

Correct.

Or that they were being done at his request or direction, correct?

Correct.

Okay.  So that's the guy who knows the most about what went down in Lomita, and he's saying, absolutely, Kenny Johnson knew nothing about it.

And he tells it to these people.  That's a fact that they cannot escape.  They cannot get away from that.

But what they have in their back pocket for you is Robert Eversole, Rage, who is a cooperating witness.

And there's that instruction that Ms. Byrialsen showed you.  I won't keep it up there because you have it in

3181

your packet.  But this guy is the definition of an incentivized witness.

He was first arrested around '7 or '8, he says.  He went to prison -- on direct he says he was 18.  On cross-examination he said it was 20.  It doesn't matter.  It was when he was just barely an adult.

He was raised -- I think he said in a Hells Angels family, so he was aware of the Aryan Brotherhood and aware of gangs and those kinds of things from a young age.

He had prior convictions for possession of stolen property, resisting arrest, possession of a firearm, felony drug possession, and then finally, a robbery with use of a deadly weapon, which put him in prison, state prison, for 21 years and 8 months.  He told you exactly 21 years, 8 months.  That's something that's in his brain.

And Mr. Robert "Rage" Eversole was three years to the gate, right?  He had three years left on this very long sentence before he was going to be released to the streets. And who comes along scoops him up?  The federal government, because of things he was doing in jail on the phone.

They yank him out of his cell early in the morning -- or in the middle of the night, I can't remember, they bring him to the Fresno County Jail, and they tell him he's being arrested for federal drug trafficking and gun trafficking charges.

3182

Oh, my gosh, right?  So here I am, I'm about to get out of prison, and now I'm looking at this huge amount of time.  Oh, and guess what else?  Mr. Robert Eversole, your wife is facing charges, your daughter is facing charges, your daughter's baby daddy is facing charges, your stepdaughters are facing charges all for things that you, my friend, asked them to do.  So not only are you not getting out of the prison, these people are all potentially going into prison.

So that's when the deals start to happen, right?  He says first interview, You know what, this is not for me.  I don't think I want to talk you guys.  You know, I'm like a -- James Field, you know.  I've got my stitches tattooed across my mouth.  Well, that didn't last long, did it?

He was looking at 10 to life, he said, or a mandatory 5 to 40.  And then as you know -- so that was in late 2020 that he got brought in, was facing up to life in prison.  And he's home now, ladies and gentlemen.  Mr. Eversole is out of prison.

So you heard from Daniel Rubin, right, another upstanding member of society.  And he told you that Robert Eversole had been a good friend of his and that they -- and that Robert Eversole, when they were in prison together, said, If you want to be a leader and if you want people to listen to you, you have to be charismatic.  You need to learn to be likeable.  Maybe, you know, Mr. Rubin was not as

3183

likeable in the past as he is now.

So that's his schtick, right?  That's Rubin's [sic] thing.  That's what he does.  Like, he gets people to like him.  He gets his family to hide ghost guns in the attic, and gets his daughter to go out and sell an illegal firearm to a confidential informant.  He gets his wife to do this EDD fraud for him and his daughters to cash these fake checks or apply for -- for assistance when they don't actually need it, defraud the State of California.

And that's because they trusted him, right?  Because he was a likable charismatic guy.  And frankly, he was their -- their family member, their father figure, the husband.

He was asked, you know, You found out they were all facing these charges, and those were things that they did at your behest?

And he says, Yes.

And that's when he decides, you know what, I need to cooperate with the government because I've got to get not only myself out of this huge problem that I have, I've got to get them out of this huge problem.  His wife is divorcing him. His family, you know, hates his guts.  And so he -- he starts talking.

He says, Okay, you know what, get me deals for everybody, and I'll -- and I'll tell you what you want to --

3184

want to know.

This is the same instruction that Ms. Byrialsen showed you.  But I do -- I do want you to think specifically when it came to Mr. Eversole's testimony about a couple of these things.  And one of them is the -- they sort of go together, the witness's memory and manner while testifying on the stand.  Direct examination, question, answer, question answer, question, answer.

My co-counsel Mr. Villa gets up on cross-examination, question, Oh, gosh, you know what, I don't remember.

Well, what if I showed you the transcript where you said that, would that help?

Well, maybe.  Uh, nope, it doesn't help.  I still don't remember.

He can't remember anything.  All of the sudden this guy is just -- his brain has been erased.  Does he have an interest in the outcome of the case?  Absolutely.  I mean, that's what his whole cooperation agreement was about, was to get him out of trouble and his family out of trouble.  And guess what?  Now he and his wife have a better relationship than they've ever had before.  Lucky him.

And whether other evidence is contradicted by his -- this testimony, right?  Again, they could have corroborated it.  They could have taken those two phones that the CDCR had and done these Cellebrite extractions and seen if he was

3185

actually talking to Mr. Johnson around that day that the two gentlemen were killed in Lomita.

But they didn't bother to do that.  Do you know why? Because they didn't need to because they had Robert Eversole to say Kenny Johnson told me these guys were going to get smoked.

Conflicting testimony.  Ms. Byrialsen talked about this a little bit, but the two things she didn't talk about were that Mr. Eversole says that when he called Brandon Bannick, he was on a speaker phone and there were like eight people in the room and he was pissed about it.

And Mr. Bannick says that didn't happen.  It was not on speakerphone, I didn't hear who he was talking to, period.

Mr. Eversole testified before the grand jury that at some point Bam piped in and said "Hey, bro" from the background.  That's how he knew it was on speakerphone. Again, Brandon Bannick, denied that ever happened.

There's also two other people, according to Brandon Bannick, that were in the room, including Matt O'Day, who could have corroborated whether or not this phone call happened, whether it was speakerphone or a call, any call. Nah.  You know what?  We don't -- we don't need to bother bringing him in.

This is something that Mr. Eversole fought tooth and nail over.  And you'll recall, and Mr. Villa told you about

this in opening statement, that Mr. Eversole started -- he started agreeing to cooperate early in 2021, a couple months after he was arrested and found out his family were all in big, big trouble.

And he:  Can I get a transcript?

He, first couple of interviews, says, No, I want nothing to do with you.  He meets with them again, Ms. Stokman and Agent Gonzalez, and talks to them about, you know, this and that, different crimes, the Lomita homicides.

He meets with them again, talks to them about Lomita homicides, different crimes, things that he knows about the Aryan Brotherhood.  He meets with them again.

These are all recorded, right?  That's what we were showing him, the transcripts of these recordings.  He says -- you know, talks to them about different crimes, uh, Lomita homicides again in May 2021.  He's meets with them again.  He talks to them about different things.

Let's see.  December '24.  I think this is a duplicate.  He meets with them.

And then in May of '22, just before the government is going to go to the grand jury, Ms. Stokman brings up with Mr. Eversole after all of these -- all of these proffer sessions and says:  "So we talked to you about this, we talked to you, I think we were just trying to get specifics and kind of figure out the players, but you gave us a lot of

3187

information on Frank.  It seems to us, kind of knowing how Kenwood also operates, that this was probably a Frank and K decision.

Was there any indication to you or did you have any conversation with K about the Lomita murder to indicate that he had also like -- you know, him and Frank were kind of putting this directive out?

That comes from the government.  The government is asking a guy who's been sitting through proffer sessions, hours and hours and hours of proffer sessions, about all these different things, including the Lomita homicides.  Gosh, you know what?  This sounds like maybe it's a Frank and Kenny thing.  What do you think about that?

And then he says, Oh, yeah, you're right, you're right.  I did get a call.  Thanks for reminding me.  I did get a call from Kenny that the guy needed to be taken care of.

That's it.  That's the evidence against Kenny Johnson that he ordered the Lomita homicide.  Not from Brandon Bannick who was there at the Lomita homicide, but from this guy who had everything to lose, his life, his wife, his kids.

And they gave him an out.  And he had everything he wanted.  And guess what?  So did they.  Because Kenny Johnson got stuck in this indictment and he's sitting over there and now he's asking you to consider the evidence, the receipts.  He's asking you to find him not guilty.

3188

Robert Eversole is a career criminal.  He comes across as maybe a likable guy.  He's been manipulating people and using people his entire life, including his own family.  And if you think for a second that he's not going to do it to them, that he's not going to do it to you, think again.

In order to convict Kenny Johnson of these Lomita homicides, these Lowrey homicides, you have to believe Robert Eversole beyond a reasonable doubt.  You have to believe beyond a reasonable doubt that it didn't occur to him to mention Kenny Johnson's involvement in Lomita until he was asked by Ms. Stokman years after his arrest.

That is not proof beyond a reasonable doubt.  That is not what our system of justice demands.  It demands so much more.  It demands receipts.  It demands corroboration.  It demands witnesses that tell you the truth.

Mr. Johnson is not guilty.  And I thank you for your time.

THE COURT:  Okay.  Ladies and gentlemen, thank you for your attention so far.  We're going to go ahead and take another break and a little bit longer so you can grab a snack.  And we will return at twelve o'clock.  Thank you very much.

(Jury exits the courtroom at 11:40 a.m.)

THE COURT:  All right.  Anything for the record at this time?

MR. REED:  No, Your Honor.

3189

MS. LUEM:  No.

MS. STOKMAN:  No.

MS. FISHER-BYRIALSEN:  No.

THE COURT:  All right.  We'll take a break.  Thank you.

(Recess held.)

THE COURT:  All right.  Everyone ready?  Let's go ahead and call in the jury.

(Jury enters the courtroom at 12:04 p.m.)

THE COURT:  All right.  We have all of our jury members back.

Mr. Reed, you may begin.

MR. REED:  Thank you, Your Honor.

Good afternoon.  I don't think I've spoken to you-all directly in probably about four weeks now, but you all know that I represent John Stinson.  Usually when I get up, those are the questions that I ask.

This has been a quite a day for me, or the last couple days.  So I didn't know -- I'm not from Fresno so I didn't know anything about this cattlemen thing you guys do.  So my regular hotel room that I'd normally go to, I didn't get to stay there.

So I'm on another side of Fresno that I didn't know about, and I had the pleasure of a mosquito in my room all night.  So I had that little fun.

3190

And then I came to the courtroom today. I didn't know it was going to freeze me all morning. So I've been cold. And now I find that this machine doesn't work with my Apple stuff.

So unfortunately, you don't get to watch another PowerPoint presentation. I'm going to do this old style. I'm just going to talk to you the way lawyers used to do. And I'll bring up some things on what a chart's supposed to say and what I think the evidence says.

But of course, as the Court told you, that's not evidence, what I say it says. It's not evidence of what Ms. Stokman says it says. And in fact, we don't like to say it, but the reality is, if you really want to know what something says, you come back out here and ask the Court to ask the court reporter to read it back to you and you can decide what it says, listen to it. That's how it's done.

This book right here, and there's another book that goes with it, but this is the book on how to prove a criminal case in federal court. There's other book, I don't remember what color it is, but it's called the Evidence Code, and that's how things come in in federal court.

As I sat here listening to the opening statement of the government -- and, you know, lawyers pick sides when they decide who they're going to work for. If you're a criminal defense attorney, for the most part, you don't prove things.

3191

There are some hearings where you do, but for the most part, defense attorneys don't prove anything.

That's not my job.  There is no beyond a reasonable doubt Kenneth Reed standard that I have to deal with.

So I sat through the same trial that you did, not hearing John Stinson's name wondering why John Stinson was here.  Well, I know why he's here, but you may have wondered that.  And I'm listening this morning and I'm hearing, Well, of course John Stinson did this, of course John Stinson did that, of course John Stinson knew what was going on.

And I caught -- saw myself thinking, well, geez, where was I when this was all happening?  Because I didn't hear those things.  But that's closing argument.  Lawyers get to do that.

And if you might remember, if you really were listening hard, on occasion I crossed over into argument when I would ask questions and the Court would sustain the objection.  But now I get to argue and nobody sustains the objection.  Now I can tell you what's happened.

You will not ever hear the word presumption in this case as applied to my client or any of the other defendants. Because the only presumption in this entire book, in the entire instructions that the Court read to you this morning, in the entire instructions that she'll read to you in the afternoon, is presumption of innocence.  There is no other

3192

presumption.  Yet, I think sitting where you're sitting -- let me back up a second.

I didn't talk to you-all directly and I'm not even sure I spoke to you individually about it, but I did mention the concept that being a juror in a criminal case is advanced citizenship.  I think you might remember that.  Now I can tell you why.

Because there's a -- there's a thing that kind of makes you want to go, AB, bad guys, AB, murderer guys, AB, guys tried for murder crimes, they must be guilty.  Why should I spend time thinking about it?

In fact, there were people sitting in the chairs you're sitting in right now who actually said that, I can't be fair because I'm black.  There's a woman that sat -- I'm not going to point at you, ma'am, but there was a woman that sat in your chair that said exactly that, I can't be fair because I'm black.

And to her credit, maybe not for the reasons she thought, but that was a good thing, because she let us know she can't do that.  You-all did just the opposite.  As you were being picked, as we were -- as jurors were being excused, as we were getting down to the last eight or nine, all of you said, That's not me.  I can look at the evidence, I can make the government prove their case beyond a reasonable doubt.

And in my case, because I only represent

3193

John Stinson, I only care about John Stinson.  That's just the way lawyers are.  That's why each defendant gets his own attorney.

My job is to defend.  And I'm not going to go through the history of that, but -- the history of how lawyers get to do what lawyers do, but my job is to defend John Stinson on the two things that he's basically being accused of.

That long jury instruction the Court gave you and the prosecutor talked about where she went through the one through four things, put differently, the government must prove that John Stinson, again, my client, knowingly and intentionally agreed to facilitate a scheme which included the operation of management of an enterprise through a pattern of racketeering acts.

That's a lot of words, got a lot of big words in it.  And I can tell you in lawyer world, there's a whole lot of cases that explain what that really means.  But long and short of it, it's in English, so you take that and that's the template that you chase this case with.

Now, I'll give you two things that I'm stuck with and cannot change.  There are two recordings that if you have time, and if you're not positive, I'd ask you to have the Court read them back -- or excuse me, have them where you can hear them again.

One was a conversation where Mr. Stinson was on the

3194

phone -- or actually, they're both on the phone.  One is a conversation of a bunch of old guys talking old guy talk.  Not one time does John Stinson say, I want you to kill somebody.  Not one time does John Stinson say, I want you to defraud this or defraud that.

He's asking the things that I guess a bunch of guys would do when old guys have been living in prison for a fair part of their life and they start talking about who's doing what.  I would consider that gossip.  And unless somebody explains it to you, but he's speaking English, you can understand what his words are.

Is that dealing with the enterprise?  That's the question to be decided.  I will live with your decision because you promised that you would apply the facts to the law in this case and you would do so impartially.

Even though you may take the position, that probably everyone in this room holds is, that gangs are bad, the Aryan Brotherhood is a gang, and I may not want them sitting at my dinner table.

But that's not what this is about.  This isn't about them sitting at your dinner table.  This is accusing them of a crime -- and sentencing is not your world, but accusing them of a crime.  And's that the key.  And that's always beyond a reasonable doubt.  It doesn't care who the defendant is.

In theory, I don't know -- we don't -- I don't even

3195

know if we have Lady Justice in this -- I'm not from here.  So maybe somewhere around here there's a statute of Lady Justice.  And if you see her, you know she's always blind.  And she's got a couple different things in her hands, but we aren't worried about that part.  But the blind part is the key.  Who the defendant is is not the test.

I was thinking about the witnesses and as they come up, I write down what I think they said.  And sometimes I guess I write down something different than what the government says.  If I'm wrong, she'd give you the test, ask the Court's permission, court reporter will come read it back to you.

Troy Clowers, I listened to what little Troy had to say.  In my presentation, I got a picture of him and everything, but we don't get to do that.  But one of the things I did notice -- and I'm not going to change, I still like doing PowerPoint presentations, but in this particular courtroom when it's done by a PowerPoint, you-all look down at the screen so you're not looking at the lawyer when they are talking to you.  Makes it feel as though we are not talking to each other or we're not -- I'm not communicating.  So maybe this may be the better way.  I can see you looking at me as I'm telling you.

He said, Who's Pops?

We were in the first or second -- it was the second

3196

witness out of the box.  He said, Stinson doesn't do -- and I asked the Court's permission to make the whole statement because I didn't know if we can say that word in here.  She says it's okay.

Stinson doesn't do shit like that, he said that.

I think "shit like that" is the thing he's here for, which he doesn't do, which Clowers said he doesn't do.

Then, later he says, Those older dudes -- I'm assuming John Stinson is an older dude -- Those older dudes, they are way out of the way.

Now, take that Witness Number 2, and add in, when we get all the way back to Witness Number 15, we know John Stinson is at Solano Prison and he's not at the prison where all this other crap is going on.

He's one of the old dudes that's way out of the way. So put that in your regular life.  I don't know where any of you live, but let's say for the sake of argument, everything that happened in this case happened in this room or happened in this part of Fresno County.  And one of you lives in Pixley -- maybe because I'm old enough to know, I think Pixley, I think of Bug Tussle.  I think of Bug Tussle, I think of Petticoat Junction.  I don't know if that's where Pixley is, but I do like the fact that there's a town that goes from something I remember as a kid.

But let's say you live in Pixley, if everything

3197

happened right here in Fresno and you live in Pixley, in order for somebody to convince you or convince your friend or to convince the guy down the street that you, who lives in Pixley got involved in something that happens in Fresno, I think you would have to cover that distance block, right?

How did he do that? He lives in Pixley. The answer is going to be, as we get farther down, is the telephone. And that's going to be a whole other problem. But we're not there yet. But we do know, kind of what like what Troy said, Those old dudes, they are out of the way.

Now, John Stinson is one of those old dudes and he's in Solano. There was not one person that came into this courtroom who said, I was running the yard in Solano for John Stinson. John Stinson is in Solano.

I don't know nothing about the AB, but listening to this case, it sounds like to me that the guy who's in that prison, he may have other guys doing white guy stuff out on the yard.

Seems like to me if you are in that prison and some other guy that's in the same club that you're in, same group, is not in your prison, and he wants that guy to do stuff for him, that might be a problem. Just saying. Seems like one of the things you would have to overcome to get beyond the reasonable doubt part. If you're trying to take the position that something must have happened, if Johnson Stinson must

3198

have done something.

Remember, this book does not say "must have."  This book does not say "presume."  This books does not say "of course John Stinson was involved."

The funny thing is, the guy with the least amount of evidence in this case, the guy that was talked about the least, is on every slide.  John Stinson's picture, every slide, why is that?  Everybody does this.  You lead with your weakness and try to hide it by adding things that have nothing to do with the person you're talking about.

I get it.  This is an adversarial situation.  I'm not blaming them.  I'm not calling them unethical.  That's just the way life is.  That's the way the law is.  That's the way lawyers are.  You get past that.  Make them prove it beyond a reasonable doubt.

I can even get back to that mosquito thing now.  It just dawned on me but give me a minute.

Kaylen Chandler admits that she's committed crimes most of her life, one of my co-counsel already talked about that, only going to be here for a second, denied that she committed crimes for the Aryan Brotherhood, never mentioned John Stinson in her testimony.

It might have behooved her to say, I did it for John Stinson because that seems to be coin of the realm around here, blame John Stinson and something is going to work for

3199

you.  Everybody knows John Stinson.  John Stinson did it. John Stinson, I talked to John Stinson on the phone. John Stinson ordered -- he gave somebody to give some money to give to me to give me to kill somebody else.  John Stinson, John Stinson, John Stinson.  Proof.

Problem is, who's saying it.  If one of you got up and said that on the witness stand from wherever you live in this county, John Stinson, that's one thing, because you don't have any reason at all to lie.  You don't have a history of lying.  You got to understand something, the obvious thing that nobody seems to get in this situation is, if you've been committing crimes all your life, what is the other thing you've been doing all your life?

All of you had grandmothers.  All of you had moms. What is the other thing that goes with committing crimes all of your life?  Lying.

And the fact that you are a dope addict, now you are definitely lying.  There's not a heroin addict in the world that doesn't lie.  And not just lie, they are professionals at it.  One of the witnesses against John Stinson, Mr. Rapinoe, is a heroin addict or was at one time, and he admits that he lies all the time.

We probably need something to bridge John Stinson and Mr. Rapinoe to get past Mr. Rapinoe's lies.

Hold that mark.  That's just logic.  Hold that mark.

3200

I'm going to get to that.

James Field, dude named "Suspect." Testified on January 28, 2025. If I'm wrong about it, ask the court reporter. He does not know John Stinson. He has never spoken to John Stinson. And the one honest thing this dude said is, The only thing I know about John Stinson is what somebody else told me. At least he's honest about it.

Eversole did not work for John Stinson. Oh, it sounds as though, probably was in a different room, and he must have snuck that in maybe when I was talking to John Stinson, but he did not work for John Stinson, has never personally met John Stinson, never been in the same prison as John Stinson, has never been on the same yard as John Stinson. Hmm. I don't care about all of the other lies he may have told, those things he said to you in a courtroom.

Brandon Bannick. I don't remember this Rick Rainey because I wasn't a part -- that wasn't one of the things I looked at, but he did say he didn't know what was going to happen ahead of time. He also said, Do not know John Stinson. He knows John Stinson because his mentor, Matt Hall, told him about John Stinson.

Can you convict him based upon what his friend Matt Hall, who's now dead, what Matt Hall told him about John Stinson? Can I punish any of you because of something your friend told me about you, and your friend's not here to

3201

be cross-examined?  Does that sound fair to you?  Does that sound like that's the makings of beyond a reasonable doubt?

When you want to know how you deal with the evidence, of course you listen to the Court's instructions, but it's pretty much all common sense, and if you do the thing that we do, in our world, which is make the defendants "the Other," make the enemy "the Other," it's always okay.  Because they are "the Other."  And we're afraid of them.

So we don't apply the same rules we would to ourselves.  That's how it becomes okay.  That's why it's advanced citizenship.  That's why you can't do it.

That's not my fault.  That's just the rule.  That's not the government's fault, because they knew going in that those are the rules and you've got to come correct every time you come to federal courthouse.  Every time.

I had this nice chart of all the prisons in California.  Anyway, Solano is in a different place than these other prisons where everything else happened.  I think somebody even said, I wasn't in Solano.

Now Danielle Ponce de Leon, she told us a whole lot of stuff about cell phones.  One of the things that she told, because I tend to -- I'm one of those people that I have to theme things out and then I'll add the facts to it.  But cell phones have a footprint, that was my statement to her.  She finally agreed that was true.  Date, time and location, that's

3202

what cell phones give you.  Sometimes content.

Going to get to another witness, which I don't want to blow it for you, but I'm going to add it to you right now, that guy -- darn it.  His name was Ben Mendoza.  Ben Mendoza said, If I want to know you, if I want to know who you are -- what did he say, ladies and gentlemen? -- give me your phone.  Remember that?

Now, Ben Mendoza wasn't Kenneth Reed's witness.  In fact, you know Kenneth Reed did not call a witness.  Kenneth Reed also did not make an opening statement.  Anyway, the government -- or my position is, you've got to prove your case by yourself.

Ben Mendoza, the government's witness, expert witness in the Correctional Intelligence Task Force, which is a joint partnership between the federal government, FBI; Federal Bureau of Prisons, BOP; and the CDCR.  These are the people here -- these are the people here making this case.

Their witness told you that if you want to know the person, give him their cell phone and they are going to do -- they are going to do their Cellebrite stuff and check it all out.

Now, I want you to hold that thought for a second, because I'm going to put that together with Mr. Rapinoe, but I got to get down to Mr. Rubin first, because Mr. Rubin also testified about John Stinson.  Mr. Rubin says that

3203

John Stinson ordered his men to kill somebody.

And at the time he did this, it sounds as though it was the guy they call "Misfit" who later on become a brother, everybody starts talking about the Aryan Brotherhood rules, about it takes three brothers to order a brother to be killed. Mr. Rubin says he's not a brother, but he says John Stinson called him on the phone or somehow they talked on the phone, he didn't say if it was his phone or how it played out, and John Stinson told him he needed to kill this Misfit guy who was a brother. And you'll add the Yandell thing in, too, because he talked about both of those.

Here's the problem with lies. My father taught me this a long time ago when I used to get caught and get in trouble with him. He said, son -- or Kenny -- you can tell a lie, but a lie, it can't walk. Lies are single dimensional. The moment you start walking around a lie, the moment you kind of look at it a little bit, you realize there's some problems with it.

In this particular case, with those two incidents, which are the whole reason John Stinson is here by the way -- well, the EDD, but I'll get to that -- is this guy says that he talked to John Stinson on the telephone and that John Stinson told him that he needed to kill somebody.

Well, for now, forget the AB rule thing because that also doesn't make sense. John Stinson is not in the prison

3204

where this guy is.  But John Stinson has been around for so long that he's so reckless and so stupid that he would call up a guy who is not a brother and tell him to go kill a brother.

Now, I don't know much about that world except what I read, but my gut would be if a non-brother killed a brother, then the other brothers might be mad about that unless they knew they were supposed to kill him.  But we don't have any evidence of that.  We just have some yard bird saying, John Stinson ordered me to kill somebody.

Now, now let's get to the key part where Ben Mendoza and the other phone lady got together and created a bit of a hurdle for this illogical argument that somehow is supposed to bridge the beyond a reasonable doubt as it applies to John Stinson.

When Mr. Rapinoe got arrested, what did he tell you? They got my phones, they got my computers.  What did Ben Mendoza tell you what they do with phones and computers? Take those two things, those two realities and truisms, and then take this book, which tells you, add the judge's jury instructions to it, what the government, what the United States of America has to do in order to convince you to vote guilty for John Stinson or against John Stinson.  You have to prove the allegation beyond a reasonable doubt.

You can't believe Mr. Rubin by himself.  Even if you want to believe Mr. Rubin by himself, what is the thing that

3205

Ben Mendoza tells you about what they got from Mr. Rubin?  His phones.  And if you want to know what really happened, you've got to look at his phones.  Where?  I don't see a thing about his phones.  I didn't hear any testimony about his phones.  If they did, I would have cross-examined it.  And I didn't fall asleep in this courtroom.

Now, before you get there, before you get there, I'm going to stop you from going where I think you might be going because I've been down this road with jurors before.

I had a case in my district, arguing a case in front of -- the prosecutor and I argued, argued, argued, the jury was hung.  Didn't matter what the split was, but they were hung.  They didn't come back what a verdict.

I talked to the jurors afterwards.  I remember her because I can see her like she was in my face right yesterday.  She says, Well, you didn't prove your case, Mr. Reed.  In fact, neither of you proved your case.  That's why we couldn't come up with a guilty or not guilty.

Well, you don't have to believe me because the Judge will tell you, Mr. Reed does not have a burden.  Mr. Reed doesn't have to prove anything.  There is nothing in this book as to this issue that says Mr. Reed has to prove anything to you.

My job is to alert you to the things that are not there.  I don't have to prove anything except to lay up the

3206

information that needs to be put together.

And in this particular case, I didn't seize the phones, I don't have the information.  I can speculate as to why that information is not here, but that would just be me arguing.  Oh, wait a minute, this is closing, I'm allowed to do that.  I can argue that.

If you had the information that got you over the bridge, I suspect that information would have come in from somebody over there testifying.

We have this phone, we can tell that this -- one of the five phones that we seized from this guy, we analyzed it, somebody comes and explains it, some nice big chart with a pie chart in colors and all those things like the witness did, and show it.  Oh, yeah.  And then one of those calls sent from the Solano area, they recovered where that phone is where Mr. Stinson happened to be staying.  And that's consistent with Mr. Rubin's testimony, ladies and gentlemen.

Now, I've got to be honest.  Mr. Reed is going to cross-examine no matter what, but I didn't hear any of that. Did you?  No.

Could it be that people lie?  Could it be that when you have the information to corroborate your witness, or maybe don't, or maybe you just took the phones and never did -- never looked at it at all, those are all problems for you if you're on the government's side of the table.  But that's

3207

something that can be considered.  I'm not making this up. You know both of those men had their phones taken.

And funny thing is, now that we're talking, Mr. Rapinoe's situation, I'll give you an example of why that's the lie, because Mr. Rapinoe is a drug dealer.  Not just because he's a drug dealer, but that's part of it. Mr. Rapinoe and Mr. Ghost, they did things together.  And Mr. Rapinoe testified that the things he did with Mr. Ghost had nothing to do with the AB.

Remember that?  If you don't, ask the court reporter. Because it's in there.

Number two, Mr. Rapinoe is now getting hit on by some dude named Trip who's an AB guy who's out on the street in San Diego, which is where he was at that time.

What does Rapinoe -- the first thing he says to this guy?  Hey, I'm kicking up to John Stinson.  Take two pieces of testimony.  One, what me and Ghost are doing has nothing to do with the AB.  John Stinson's AB.

Trip says, I don't care, I want my money.  He says, No, I'm already kicking up to John Stinson.  So he's lying to this Trip guy who's worried about taking his money from this ill-gotten drug money that -- what is it, selling cocaine, heroin -- no, wait a minute, methamphetamine, fentanyl and heroin, and ghost guns.  And not the -- whatever he brings back from Mexico.  All federal crimes.  That's a different

3208

question.

I didn't testify to that.  That came from him.  And he testified to that information before a grand jury.  So it means at the time he told that lie, if it was a lie, he was under oath.  And when he comes in and explains this whole story to you, the problem with a lie, ladies and gentlemen, as my daddy told me, it -- you can't walk it around so you can't put two pieces together because lies don't fit.

Was he lying to Trip, was he lying to you, or was he lying to that grand jury back there in San Diego a couple years ago?

Those are the two key John Stinson witnesses, and one guy is coming in telling you, John Stinson ordered me to kill this guy named Misfit.  You would think just a little bit that maybe there'd be one or two witnessed that are going to explain why John Stinson needs to kill Misfit.

If you listen to the Misfit calls, one side of those calls, I need to talk to John.  I get the fact that John Stinson and Misfit seem to talk to each other on the phone.  But when you want the content of that conversation, you need more than, I need to get at John.

Because this guy now says Misfit and John hate each other and John wants to kill him.  All from the same witness who got his phones taken.  And the moment he had to deal with that issue on cross-examination, it became bobbing and weaving

3209

and never said anything straight.

And then he does to me -- granted, maybe it didn't mean that way to you or maybe you didn't see it the way I saw it.  Maybe it's just personal to me.  But when you're on the witness stand, I have no further questions, ladies and gentlemen -- or Your Honor, and this boy under his voice mumbles, Thank God.

And I asked him, What did you say?

Nothing.  Nothing.  I didn't say anything.

That's who he is.  That's who he is.  Not -- forget the disrespectful, that has nothing do with it.  It has to do with the kind of sneaky -- oh, I can't use that word -- it has to do with the kind of person that this guy is.  You get to look at all of that because you judge the facts.

It is advanced citizenship to be a juror.  But you do something that no one else gets to do in a jury trial.  No one, not even the judge -- well, not on the key parts -- you judge the facts.  And you are equipped to do that.

The law is judged by the Court.  The legal issues that we handle or they did handle that you guys had to stay in the back and wonder why we're waiting, those are all Judge issues, the lawyers talking back and forth stuff.  But fact stuff, you own that.  That's why the courtroom is so special.

And nowadays, or this time right now, we can't ever let that go away.  The government is just a party in a

3210

criminal case.  They own nothing except they have a burden.  Never, never, never let them have to go below that burden.  That's your job.  That's why it's advanced citizenship.

And that's why it's so hard.  Because you ain't gotta like the AB.  You don't have any reason to like them.  You need to make your decision in spite of how you may feel about them.

All right.  So I'm circling back to the mosquito.  I've figured out a way to make this work.

Mr. Reed, we've been listening to testimony for five weeks, so many witnesses, so many things, it's just too much.  I'm just one person.  I'm just -- I'm just one guy.  I take care of my mom.  I drive a truck.  I'm a school teacher.  I'm not getting paid to be here.  This is hard for me.  This isn't fun.  I just want to let it go.  It's too much.

You, the 12 of you that make the decision, forever you will be the jury of the United States v. Stinson, Johnson, and Clement.  Okay?  If you think that you are too small to make a difference, I think you try spending a night in a closed room with a mosquito.  A mosquito doesn't weigh next to nothing and he annoyed me the whole night, haunted me the whole night.

That's -- is that an allegory?  I'm not sure of the word.

No matter how insignificant you might feel, your

3211

individual action can still make a difference.  I want you -- or I'm asking you -- I don't even remember what the federal jury instruction says.  I'd probably have to look it up tonight, but I think that the Court demands, asks for, or one of the two, asks for your individual opinion.

That means you don't have to agree with the other 11.  That's just life.  I'm asking you, the 12 of you that stay -- and I just don't remember where the split is, I'm sorry, it's been a while, but -- right there where you are?  Okay.

The 12 of you that stay, I'm asking you for your individual vote and opinion on the facts that are before you.  That's all any of us can ask for.  And it doesn't make a difference if John Stinson is John Stinson, the Aryan Brotherhood member, or if Kenneth Reed someday represents somebody who, I don't know -- I'm trying to think of something that's -- or a nun.  But why would a nun have a criminal case?  I don't know.  I have to think of something really -- I haven't been able to figure one of those out because I haven't done -- represented any nuns.

But somebody else is charged, a beautiful little blonde-haired, blue-eyed kid who's charged with some serious crime that clearly he didn't do and everybody wants to convict him because he's a blonde-haired blue-eyed kid.  That's Stinson, John Stinson in that kid.  As far as you're concerned, it shouldn't be any difference because the evidence

3212

is the evidence.

I don't know how the government gets past those things when it comes to John Stinson. And I'm asking you individually, because I can't talk to you as a -- I can talk to you as a group, but I'm asking you to make that call. Go through any evidence.

And I'm going to assume at the end, no matter how you rule or how you decide, that you went through that hard part, the part that makes it advanced citizenship.

Oh, it's five minutes past where I wanted to go. Anyway, thank you very much for your time.

THE COURT: All right. Thank you, Mr. Reed.

Ms. Stokman.

MS. STOKMAN: You're almost there, this is it.

I'm not going to address everything that defense counsel brought to your attention because I'm going to rely on your memory of what you heard and what you saw during this trial and your ability to talk that out with each other.

But I am going to talk about some things because I think that these are important things for you to remember.

I do want to say that everything you just heard, a lot of that is taking things out of context, and I think that's been the theme throughout this trial. The witnesses have been asked questions and they're asking questions that have been taken out of context from what they actually said.

3213

Today you're here and you're being shown transcripts. Those aren't in evidence.  Again, it's your memory, your notes.  But again, those are being taken out of context.

So let's talk a little bit about what you need to go back there to make this decision.  And I want to remind you of this.

Timothy True told you that Kenneth Johnson said to him that whites are to be used as tools for the benefit of AB members.  And that is what you have heard throughout this case.

Defense wants you to believe that because of what witnesses who sat in front of you have done in their past, that they are not credible, that what they did means that they can't change their ways and that you shouldn't believe them.

But that's not what the evidence showed you, and that's not what the witnesses showed you.

You have that instruction about judging credibility. It is using your common sense.  The Judge gives you things that you can look at to judge someone's credibility, but you know to do that.  We judge people's credibility every day.

And you were able to sit here and watch witnesses talk to you about things they've done in their past, things that they've been charged with, things that they haven't been charged with, and tell you about those, but also about the reasons why they're sitting in front of you.  And you can use

3214

all of that.

Remember their demeanor, remember the way they answered questions. And if those questions were ones that they actually weren't really understanding or if they were clear, all of these things that you already know, you can use to judge credibility. You have those tools.

The standard for judging credibility is not whether or not you would give them the key to your house. That is not what you need to do. You don't have to like these people. You just have to evaluate what they told you and everything surrounding that and come to your conclusion about whether or not you believe what they said to you.

They come from different backgrounds, different perspectives, different times and experiences, and they told you what they experienced through those perspectives. Every one of them told you that they were telling you what they had heard, what they had seen, what they had interacted, and their experience with the AB, which doesn't match up with each other, because they are all individual people who are in different positions and in different places to form those opinions for themselves.

They told you that they were up here telling you their truth, not what the government wanted them to say, not what they think you want to hear in order to find these defendants guilty, but they told you their truth. And I

3215

submit to you, you have enough to believe what they told you.

They, those witnesses that got on the stand and told you about their interactions with the AB, they were also tools used by AB members like the defendants. They were used as tools to make money. They were used as tools for violence.

And of course the people that the defendants were using as tools had criminal histories. That's exactly the type of people they need, criminals who are good at being criminals, because that's who can make money for them, and those are the people willing to run into those fires that they are telling them to go into, like James Field who told you that he wanted to be a member so badly that he was going to kill his friend, this person he became friends with, because that was the order. Tools.

But of course they have the histories that they have, because otherwise, they wouldn't be chosen by these defendants to do what they did. And they were used as tools because if they didn't follow orders, violence could be used against them. Again, that's a nonnegotiable obeyance of orders.

And I know Ms. Luem talked to you about some orders that you heard that are seemingly not met with violence. But you heard who paid the price for the Rick Rainey incident. It was James Yagle and Ronnie Ennis. You heard why Spencer Fox wasn't pushed when he didn't want to commit the Lowery murder, because they were afraid. These defendants here, Johnson and

3216

Clement, were afraid that if they pushed him too hard, he would get scared and he'd go tell people in the prison, and they'd be in trouble.  He'd tell on them.

And that is similar to what you heard in that call that I mentioned to you before with John Stinson and the other AB brothers where they are trying to figure out if Bobby Stockton is a snitch.

Andrew Collins pipes up and says, Hey, I just want to let you guys know, I understand, we want to talk about this guy.  He might be a snitch.  But let me remind you, he's doing a lot of work for us.

So I submit to you that, yes, there are some times when the rules are not consistent with the violence, but think about whether those are occurring with people who have some other benefit for these defendants, like Rubin, who was willing to do anything asked; like Perkins, who although he owed debt -- a debt money, or he owed money, he was making money.  He was good at it.  And you heard that as long as that pressure was on him for that debt, he was still making money.  So think about that.

You also heard that violence was held over those who were given orders but also that there were other motivations that were held over their heads to make them follow the AB rules and to follow orders.  This included taxing.  Taxing people for not answering their phones because they fell

3217

asleep.

And what did Brandon Bannick tell you about that?

He got taxed, like we saw in the messages between Kenwood and Field, because he wasn't answering his phone, and he had racked up thousands of dollars in debt to Kenwood.

And when the time came for him to help Gray with the Lomita murders, that was used as motivation over him to get him to help, You owe us money. Now let's get yourself out of trouble by following an order we give you.

So think about that too. It's not just to make the money, but it's also to motivate people to follow the rules beyond the motivation of violence.

I submit to you that you have enough to find these witnesses credible and reliable based upon their demeanor and the way you observed them and the way they told you what happened.

But also the evidence matches what they told you, and what they told you is consistent with one another.

You'll hear instructions, and I think you might have heard it already, telling you that the testimony of one witness is enough. If you believe that witness, that's enough to meet the burden beyond a reasonable doubt for what that witness is telling you.

But you have more here. Each witness is a piece of a puzzle. They don't know how they interact with the other

3218

pieces of the puzzles, but you do.  You sat here through this entire trial, and you saw how each piece of the puzzles butted up against the other pieces, butted up against the evidence that corroborated what they told you and the testimony of other witnesses who also said the same thing.

You're in the unique position to have heard all of that and to see how this puzzle is put together.

Let's talk a little bit about specific things that help you find that those pieces of the puzzles match when it comes to some of these witnesses.

Brandon Bannick, again, some misrepresentations about how that testimony went about.  And again, it's your recollection of the evidence and your notes that rule, not what we tell you up here.

But the question was asked -- or you were shown a transcript, again, that is not in evidence that Bannick didn't know if Kenwood was involved in the Lomita murders.  But actually what he said was, Nobody told me he was involved directly, that he didn't actually know the answer to that, whether he was or not.

But I submit to you that you know the answer to that based upon what Brandon Bannick told you and you what Robert Eversole told you.  Because Brandon Bannick owed a debt to Kenneth Johnson, and when Frank told him, Brandon Bannick, to go help Justin Gray, that was what Frank told him, If you

3219

go help, the debt to Johnson will be cleared.

You heard that Johnson takes these debts seriously. You heard that from Bannick and from Field, because Perkins' debt was causing Perkins a lot of trouble.

And Johnson was arbitrarily fining Perkins for up to half a million dollars and demanding he kept paying all of it, even when significant chunks were being paid.

So think about this:  If Johnson takes those debts seriously, wouldn't he need to allow Frank to use that as motivation to get Bannick to help Gray?  Wouldn't Johnson need to say, Yeah, if he goes and helps, that can clear my debt?

And that's consistent with what Robert Eversole told you, that Johnson and Clement both were involved in the orders to kill Allan Roshanski.

It also -- there was also a moment where a transcript of Brandon Bannick's testimony was shown to you about what was said after the Pomona murders in the hotel room.  And again, the transcript showed you one part but didn't go into the next -- the next question asked.

And the next question that Brandon Bannick got asked about what Field said after they were discussing, Why did Jimbo get killed, was that, Did Field ever mention anything about lying?  And Brandon Bannick said, Yeah.  He said that Jimbo had lied.

That's not inconsistent with what James Field told

3220

you he said.  And again, think about people and their memory. One person's memory is different than another's when it comes to the event because they are focusing on different things.  I submit to you that the memory that's in their brains from this incident is the actual killing of their friends, not necessarily all the statements and what those statements were after when that adrenaline was still in them and they were kind of like processing this moment.

So think of that too.  When you come to this conclusion of whether people are being inconsistent, remember that they are seeing different perspectives because they are different human beings.

So let's talk about Robert Eversole.

He got up there, and he told you that what he was saying to you wasn't what anyone told him to say or what he thought someone expected him to say, that it was his truth.

He told you about Kenwood's involvement in the ordering of the Lomita murders, because that is what he knew. Those are the conversations he had.

This is consistent with what we just talked about with Brandon Bannick and that debt.  But also think of this: The two witnesses who told you how the events of Lomita took place told it to you from their perspective.  And Eversole was in a much more trusted seat within the AB than Brandon Bannick was.

3221

Eversole was up for membership, which, as Daniel Rubin told you, once that happened, it's like you're part of the inner circle.  So of course he's trusted by Johnson and Clement to know that there's a plan to kill someone, where Brandon Bannick wasn't even told that until he talked to Gray.  Because the other person who needed to know the plan was Gray because he was supposed to enforce it.

So think about the difference, too, in that status and why someone would know information that another witness does not.

Eversole also told you that he had extensive discussions about EDD that Roshanski was committing and that Kenwood talked to him about the fact that because he didn't belong to another white organization, his EDD fraud proceeds needed to go up to the AB members.

You know that that was originally why this meeting was scheduled, to get those profits.  But the disrespect came in because in the meantime -- Eversole told you and Brandon Bannick told you that somehow Roshanski had disrespected Frank and that then became this reason for murder.

Yes, the EDD and the owing of money was part of it, but once that disrespect happened, that's when that order came out.

Also, there's a lot of, again, testimony taken out of

3222

context.

When Robert Eversole was asked on cross-examination about why he didn't bring up Kenneth Johnson originally, he was trying to tell you then that he had. But he was pointed to places in the transcript that made it seem like he wasn't talking about Johnson.

And when I got up there and asked him again, Hey, why don't you clarify what you were trying to show before, he told you, There were multiple places in all of these interviews in all of this discussion about Lomita where I was talking about Johnson, because Johnson and Frank -- this was a thing they were doing together.

So you take your memory of how he testified and what he told you, and you put that in the context of the evidence you actually heard on that stand and that was presented in front of you.

He also told you that during the course of his interviews, lengthy interviews, he was asked about multiple different murders that were potentially related to the AB. And he told you that he didn't identify Johnson and Clement as ordering any of those murders because they -- he didn't know if they did. So I submit to you, he's giving you what you need to find his testimony reliable.

He also was not in the room with Brandon Bannick or Justin Gray, or even when Justin Gray was in that hotel room

3223

before Lomita, before Brandon Bannick came in. Robert Eversole was sitting in a prison cell. He wasn't in the room. He didn't know who was there. He thought he heard Brandon Bannick.

Brandon Bannick told you that Gray took a phone call. He didn't know who it was with. We don't know if that was the call to Robert Eversole, but what you do know is that Eversole wasn't in that room, just as he wasn't in the cell where Lowrey was killed. He only knew what he was told because Thrasher Holmeyer told him that.

When Eversole testified, he told you about his own involvement in the Lomita murder, and he told law enforcement about that as well.

Despite being under the cooperation agreement -- and I submit to you because he was under the agreement, which he told you required him to tell the truth, he told the truth is he knew from Lomita that he got the orders from Kenwood and Frank, and he passed those on.

And he got emotional on that stand, if you remember, when he was talking to you about passing those orders on to Justin Gray because Gray was like a brother to him. And he told you and he told law enforcement about Gray's involvement as well.

So I submit to you that what he told you came from his memory and from what happened and was not something he

3224

made up because he thought someone else wanted to hear it.

Timothy True, again, when you heard a little bit about the transcript, from when he testified, just not that long ago, it kind of stopped short in the point that was trying to be made.  If you remember, there was discussion about, Well, how are these ideologies different if you did commit this act?  You killed -- you tried to kill someone from your own gang.  And he said, Well, because the AB kills non-white -- or white nongang members, nongang members.  So in his mind, because he was a criminal, he was a gang member, his mind, that violence, the line was, that, Okay, if it's against other gang members, that's one thing, but when it's against these other people who aren't part of a gang and this isn't the life they chose, I have a problem with that.

So again, we get right up to where they -- you know, his testimony was, and then you weren't told the rest of that story.  But you remember that testimony, so use your memory in that.

James Field told you that the drugs that he took did not affect his behavior.  And again, the evidence, those puzzles pieces, they point -- they jut right up to each other, because the evidence is very consistent with what James Field told you.

It's the robbery.  It's the murders.  It's the cell phone location data that links where everybody is.  His

3225

memory, I submit to you, is perfectly fine, despite all that drug use, because the evidence tells you that it was.

As far as Ruben, he told you that John Stinson found out about Andrew Collins' behavior that Stinson wasn't happy with, and that's why the order went out about Collins.

And again, he talk -- he got up there and told you about his history and his experience.  And I submit to you that, again, the credibility, when you look at different witnesses, they all have different personalities.  And it is based on not only who they are as people, but their experiences within the AB as well.

And some were a little bit more able to kind of soften for you to see that, and some were not.  But that is something that you needed to figure out.  And is that something that you can automatically say they are not telling you the truth about?  Use your common sense and the skills you have to judge credibility and come to the determination.

But again, I submit to you that what you heard is consistent with other witnesses and the evidence.

And lastly, Troy Clowers, this discussion about him today was also taken out of the context.  Clowers told you who John Stinson was, and what he did for him.  And other witnesses also told you John Stinson's role in the AB. Clowers told you that "Pops" was a name that people who were close to John called him, and he wasn't sure if everybody knew

3226

about that because of that reason and Daniel Rubin told you the same.

The comment about the "old dudes" I submit to you means that when you've been in this gang for this long, you're not getting your hands personally dirty anymore.  Sitting back, doesn't that sound like it means you have other people like Clowers and Rubin doing that dirty work for you?  Because that, we know, is the position that John Stinson was in.

He was part of the three-man council, he was a long-standing AB member, and everyone who talked to you about him said that he was pretty high ranking.

As for the witnesses that you didn't hear from and the evidence that you weren't shown, you're not to speculate on that.  And the jury instructions tell you that.  You heard the evidence presented to you from the people who were there, and you heard the orders -- you heard the orders directly from the people who testified.

Those are the people who got in front of you.  The ones who personally committed these offenses and who personally took the orders.  You're not to speculate about what anyone else may or may not say or where they are.  And that's goes for the evidence too.

But you did hear that during the course of the activity of the AB, there was a lot of discussion about using encrypted apps like Signal, and changing phone numbers, and

3227

doing other things to avoid getting detected by law enforcement.

You heard that Cellebrite, it is not often, it's a kind of a rare thing that it would pick up encrypted app messages or details.  And you also heard that when those encrypted apps are being used, it avoids wiretapping that telephone, and also, on a cell phone data, as far as Danielle Ponce de Leon told you, data is the only thing that's going to show up, not calls, not details.  So think about that too.

Consider also why the AB has the rules they have about cooperation.  Why they used violence for control.  It's like True said about the Lowrey murder and Spencer Fox, you kind of go gently on him because you don't know if he's just going to get scared and go talking to law enforcement.

What you saw here is a good example of that.  Most of these witnesses told you that in the end the AB was not what they believed it to be.  And what did that lead to?  It led to testimony about the inner workings of the AB, because when you are part of the gang committing crimes it's the inside people who know the dirt.  And those are the witnesses you heard from.

Inherent in the process of becoming a brother is knowledge of the AB and what it does, and you heard that from witnesses who were up for membership.

ER 2563

3228

But there's a period of time where you have to commit certain crimes, learn about the AB, talk to AB brothers, learn how to act like a brother.  You don't just fall into that position.  It's a process that involves learning, it involves knowledge of the AB and what the AB does.  And all of these defendants have that knowledge.  Not only from that process when they were -- they became members, but also from what they've done while they've been AB brothers.  And what you've heard from these witnesses tells you what they've been doing.

All of these defendants benefitted from the crimes being committed by their associates.  And you heard from those associates, you heard what those crimes were, and you heard the crimes that the defendants themselves were personally involved in.

Their roles as made members allows them to make the rules, to give the orders, to take the money made by other people through drug trafficking, robberies, and fraud.  They also get to benefit from the use of violence including murders.

As you heard, AB members are gods.  They are the elite.  And they rule on fear and power.  Everything you have heard during this trial has been done for or on behalf of the AB.  Everything is in furtherance of the AB and these defendants' position within that enterprise.

The defendants have used whites as tools to their

3229

advantage for way too long.  The witnesses who sat before you, they told you that.  In their testimony, they also told these defendants that.

So now it's time for you to tell them that.  That it's no longer okay to use people as tools for their own benefit, and that they're guilty of the crimes that they've been charged with.  Thank you.

THE COURT:  Ladies and gentlemen, I have a few more instructions, including one that I accidentally skipped earlier.

To prove that a defendant is guilty of distribution of a controlled substance under federal law, the government must prove that, one, the defendant knowingly distributed methamphetamine or fentanyl, and two, the defendant knew the substance was methamphetamine or fentanyl.

To distribute means to deliver or transfer possession of methamphetamine or fentanyl to another person with or without any financial interest in that transaction.

To possess with intent to distribute means possess with intent to deliver or transfer possession of methamphetamine or fentanyl to another person with or without financial interest in the transaction.

When you begin your deliberations, elect one member of the jury as your foreperson who will preside over the deliberations and speak for you here in court.

3230

You will then discuss the case with your fellow jurors to reach agreement if you can do so.

Your verdict, whether guilty or not guilty, must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should.  But do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach unanimous verdict, but, of course, only if each of you can do so after having made your on conscientious decision.  Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Perform these duties fairly and impartially.  You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.

Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion or biases, including unconscious biases.  Unconscious biases are stereotypes, attitudes or preferences that people may consciously reject but may be expressed without conscious

3231

awareness, control or intention.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching agreement if you can do so.

During your deliberations, you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong.

Because you must base your verdict only on the evidence received in the case, and on these instructions, I remind you that you must not be exposed to any other information about the case or the issues it involves.

Except for discussing the case with your fellow jurors during your deliberations, do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.  This restriction includes discussing the case in person, in writing by phone, tablet, computer, or any other means, via email, text messaging, or any internet chat room, blog, website, or any other form of social media.

This restriction applies to communicating with your family members, your employer, the media or press, and the people involved in the trial.  If you are asked or approached in any way about your jury service or anything about this case, you must respond that you've been ordered not to discuss the matter and to report the contact to the Court.

3232

Do not read, watch or listen to any news or media accounts or commentary about the case or anything to do with it.  Do not do any research, such as consulting dictionaries, searching the internet or using other reference materials. And do not make any investigation or in any other way to try to learn about the case on you own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had the opportunity to address.  A juror who violates these restrictions jeopardizes the fairness of these proceedings and a mistrial could result that would require the entire trial process to start over.  If any juror is exposed to any outside information, please notify the Court immediately.

Some of you may have taken notes during the trial. Whether or not you took notes, you should rely on your own memory of what was said.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of your fellow jurors.

The punishment provided by law for this crime is for the Court to decide.  You may not consider punishment in deciding whether the government has proved its case against each defendant beyond a reasonable doubt.

Verdict forms have been prepared for you.  After you have reached unanimous agreement on a verdict, your foreperson

3233

should complete the verdict form according to your deliberations, sign and date it, and, when all three verdict forms are complete, advise the bailiff that you are ready to return to the courtroom.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff signed by any one or more of you.

No member of the jury should ever attempt to communicate with me except by assigned writing.  I will not communicate with any member of the jury on anything concerning the case except in writing or here in open court.

If you send out a question, I will consult with the lawyers before answering it, which may take some time.

You may continue your deliberations while waiting for the answer to any question.

Remember that you are not to tell anyone, including the Court, how the jury stands, whether in terms of vote count or otherwise, until after you have reached a unanimous verdict or have been discharged.

All right.  Can we have the Court's security officer sworn?

(Court Security Officer was sworn.)

THE COURT:  All right.  I will ask our 12 jury members to -- you will be excused for deliberation.  The remaining six of you, you are still retained for purposes of

3234

replacing a juror in the event that occurs.  However, you also at this time will be excused to the jury deliberation room to gather your things and to be excused for -- for today's proceedings.

If you will just make sure -- I know we have contact information for all of you.  And if it becomes necessary, then we will contact you, and you will take the place of a juror if they are excused.

Otherwise, thank you so much.  And you may go back to the jury deliberation room and begin.

(Jury exits the courtroom at 1:13 p.m.)

THE COURT:  The jury members have stepped out.  Is there anything for the record at this time?

MS. DE SALES BARRETT:  Your Honor, there are -- I don't know what the procedure is for the Court in terms of exhibits.  We can do this case by case if the exhibits are remaining out of the -- outside the jury room.  But there are some discrepancies that I have found with regard to the list of what's in evidence and on the list that was circulated by your deputy.

THE COURT:  All right.  Ms. Barrett, what -- what are your discrepancies?

MS. DE SALES BARRETT:  Uh, Your Honor, what I have with regard to this is -- has to do with the 1800 numbers, beginning with 1800.

3235

They -- and this -- this pertains to five exhibits -- six exhibits:  1800, 1806, 1809, 1810, 1811, and 1820.  Those, only the clips are introduced into evidence, not the entire marked exhibit.

You may remember that the CDs were marked as a whole, but the government only offered the clips into evidence, and so I think that should be noted on the form.

THE COURT:  Is that consistent with your recollection, Ms. Stokman?

MS. STOKMAN:  Yes.  The clips were admitted into evidence except -- or unless -- such as 1820, the call itself was very short, so there was no clip.  It was the call.

THE COURT:  Does that sound right, Ms. Barrett?

MS. DE SALES BARRETT:  Yes, Your Honor.

THE COURT:  All right.

MS. LUEM:  I'm sorry.  Just to clarify, on that note, I know that at least two calls, there were redactions that were made both from the transcript and the recording.  So I assume those replaced the original clips that were provided.

MS. STOKMAN:  Yes, they did.

MS. LUEM:  Thank you.

MS. DE SALES BARRETT:  Your Honor, the question I have about the clips is in the event that the jurors request listening to the tapes, and the transcripts are not part of the evidence, it would seem to me that they should only be

3236

listening to the tapes themselves and not viewing the transcripts as they did during the trial.

THE COURT:  Correct.

MS. DE SALES BARRETT:  And then the last thing I have is 1848, I believe, is on the list -- the Court's list as being in evidence.  And I haven't had a chance to check with the government, but I don't believe it's in evidence.

MS. STOKMAN:  That's correct.  There were some items that we had admitted that are not on the admitted list as well, if Ms. Barrett is finished.

MS. DE SALES BARRETT:  I am finished.

THE COURT:  All right.

THE CLERK:  So 1848 is removed.

THE COURT:  Right.

Ms. Stokman?

MS. STOKMAN:  We also had 1829 through 34 -- or 35. I think some of these were already on the admitted list, but not all of them, but they were all admitted.

MS. DE SALES BARRETT:  I agreed, Your Honor.

THE COURT:  1829 through 1835, is that what we're talking about?

MS. STOKMAN:  Correct.

MS. DE SALES BARRETT:  Yes.

THE COURT:  All right.  Anything else for the government?

3237

MS. STOKMAN:  I think that's it.

THE COURT:  Anything else for --

MS. FISHER-BYRIALSEN:  Yes.  Where would you like us to wait?  Do you want us to come back to the courthouse?  Like, how close do we have to be?  And do you want us to be here at 8:00 a.m.?  Just practically speaking, what do we need to do?

THE COURT:  Let me finish this, and I'll definitely get to that.

Is there any other exhibits that you feel have not been marked properly for Mr. Johnson and Mr. Stinson?  All right.

So as to that question, ideally, you will be -- well, not ideally.  I need you to be within about 20 minutes from the courthouse.  When the jury reconvenes in the morning, you don't need to be here.  We're not going to call everyone together, but you do need to be accessible in case there's a question or whatever.

And that does bring up, I know now that Mr. Clement and Mr. Johnson have filed waivers of their appearances, so you will come or not come at your -- your option.  And Mr. Stinson's is already there.

All right.  Anything else, then, at this time?

MS. STOKMAN:  Judge, I'm sorry, I just wanted to confirm.  I think it was 1862 that was the probation

3238

department report on Mr. Rapinoe.  That is not admitted into evidence, correct?  It is just marked because --

THE COURT:  It has been marked.

MS. STOKMAN:  Yes.  Okay.

MS. DE SALES BARRETT:  Let me get there.  Oh, yes.  I don't have it as being in evidence.

MS. STOKMAN:  Just wanted to make sure.

THE COURT:  All right.  Anything else, then?

MR. VILLA:  Yes, Your Honor.

MS. LUEM:  Oh, I'm sorry.  I may have missed this, but is the jury leaving at 1:30 today?

THE COURT:  That's what they had told us, yes.

MR. VILLA:  With respect to tomorrow, Mr. Johnson has submitted a waiver, but he'd like to be present for the verdict.  And in discussing it with the marshals, it seems like that they could facilitate that within, you know, maybe half an hour, maybe slightly more, you know, if there were some hiccups.

So we would ask that -- that that be allowed.  If there's a question or something else, you know, we don't need to bring him.

THE COURT:  Here's the only difficulty:  If the jury were to come back at one o'clock, say, and they need to leave at 1:30, or they come back at 1:10, I mean, that could cause a problem.  That's something to consider.

3239

If -- I mean, if you want to be here, you should come.  If you don't, while I appreciate the marshals' efforts, I can't bring a jury back another day.  I don't want to inconvenience 12 people and incur the cost associated with that for that reason.  I mean, so that's -- that's my position on that.

All right.  Anything else?

MR. VILLA:  Your Honor, and I think he's saying if that's happens, he'll -- he'll live without being here, but otherwise, if it's feasible --

THE COURT:  Okay.

MR. VILLA:  Thank you, Judge.

THE COURT:  All right.  Anything else, then?  All right.  Thank you.

(Proceedings were adjourned at 1:21 p.m.)

I, RACHAEL LUNDY, Official Reporter, do hereby certify the foregoing transcript as true and correct.

Dated:  February 11, 2025        /s/ Rachael Lundy_____
                                 RACHAEL LUNDY, CSR-RMR
                                 CSR No. 13815

ER 2575

3240

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. JENNIFER L. THURSTON

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 1:20-cr-00238-JLT-SKO |
| Plaintiff, | ) | |
| | ) | Jury Trial, Day 16 |
| vs. | ) | |
| | ) | |
| KENNETH BASH, et al. | ) | Volume 16 |
| | ) | Pgs. 3240 - 3265, inclusive |
| Defendants. | ) | |
| | ) | |

Fresno, California                    Wednesday, February 12, 2025

REPORTER'S TRANSCRIPT OF PROCEEDINGS

REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

ER 2576

3241

**APPEARANCES OF COUNSEL**:

| | |
|---|---|
| For the<br>Government: | **STEPHANIE STOKMAN**<br>Assistant U.S. Attorney<br>2500 Tulare Street, Rm. 4401<br>Fresno, California  93721 |
| | **JARED ENGELKING**<br>Department of Justice<br>1301 New York Avenue, N.W.<br>Washington, DC 20005 |
| | **JAMES ROBERT CONOLLY, GOVT**<br>U.S. Attorney's Office<br>501 I Street, Suite 10-100<br>Sacramento, CA 95814 |
| For Defendant<br>Johnson: | Law Offices of Andrea Luem<br>Attorneys at Law<br>400 South Forth Street, Suite 500<br>Las Vegas, Nevada  89101<br>BY:  **ANDREA LEE LEUM, ESQ**. |
| | Law Offices of Ryan J. Villa<br>5501 Eagle Rock Avenue NE<br>Suite C2<br>Albuquerque, NM 87104<br>BY:  **RYAN J. VILLA, ESQ**. |
| For Defendant<br>Clement: | Fisher & Byrialsen, PLLC<br>Attorneys at Law<br>99 Park Avenue<br>New York, NY 10016<br>BY:  **JANE FISHER-BYRIALSEN, PHV** |
| | Ruhnke And Barrett<br>29 Broadway, Suite 1412<br>New York City, NY 10006<br>BY:  **JEAN DE SALLES BARRETT, PHV** |
| For Defendant<br>Stinson: | Law Office of Kenneth Alan Reed<br>406 W 4th Street<br>Santa Ana, CA 92701-4505<br>BY:  **KENNETH ALAN REED, ESQ**. |

3242

Wednesday, February, 12, 2025                Fresno, California

8:25 a.m.                                    Jury Trial Day 16

    (The following proceedings were held in open court before the Judge and all counsel:)

        THE CLERK:  Please remain seated, court is in session.

        THE COURT:  All right.  We have counsel here.  None of the defendants have been transported.  It's my understanding that is at their question; is that right, counsel?

        MS. LUEM:  Yes.

        MR. REED:  Yes, Your Honor.

        MS. FISHER-BYRIALSEN:  Yes.

        THE COURT:  All right.  So if you recall back on February 4th, we had contact by Juror Number 74 indicating that he needed to be excused from jury service, he was having problems with his brother having gotten a job, his mom having a daycare in the home and needing his assistance.  We spoke with him and told him a shortened time frame.  He said he could work it out.

        After -- actually, that very evening, he left two -- well, one really long message saying still wasn't going to work because his brother needed the car, his mom needed him, especially on Wednesdays, to help in the daycare.  And that it wasn't going to be able to work out.  Before I even got -- but

3243

at the same time I got the second message he left saying, We worked it out, my brother and I are going to carpool.  I'm going to come earlier or stay late, whatever it's going to take.  And we found an friend who's unemployed who can help my mom in the daycare.

So it was fine.  Then again today we get a call from him with no explanation saying, I can't be a juror anymore. I'm coming to drop of my badge.

And luckily, we have gotten him to stay to understand what his situation is.  So that's the background.  And I thought it was important to speak with you because my concerns are I don't know what his situation is today.  And he's here, so we can ask him that.  But what do you want to do?  Do you want me to influence him to try to get him to stay and deliberate?

If it were me, I would say no, because this is a person for whatever reason, despite having sat through the entire trial and gotten to this point, is now saying, I can't do it.  So I mean, I could certainly strongly encourage otherwise.  But truly, if he walks out of the building our recourse is a warrant.  On the other hand, do you want somebody like that deliberating on your case?  So --

MS. STOKMAN:  Judge, as far as the government's position, I think our concern would be if this happens again tomorrow and they spent a whole day deliberating and now we

3244

have to start the process over, so I'll just throw that out there.

THE COURT:  Yeah.  And the jury has just now been sitting for an hour because they can't do anything until we have a full panel.  So comments.

MS. FISHER-BYRIALSEN:  So he's not here yet?

THE COURT:  No.  He's here.  We have managed to encourage him to stay, so he is here.

MS. FISHER-BYRIALSEN:  Are they deliberating now?

THE COURT:  No.  Like I said, they can't deliberate. They've just been twiddling their thumbs.

MR. VILLA:  Why not?

THE COURT:  Because he -- he's not deliberating.

MR. VILLA:  Oh, he's not in there?

THE COURT:  No.

MR. VILLA:  Oh, I see.

MS. FISHER-BYRIALSEN:  Is the alternate here?

THE COURT:  The alternate is either -- she's en route or will be here momentarily, because we figured it made sense to get her coming because she -- she was about 45 minutes to an hour away.

MR. VILLA:  I mean, I guess I wonder why.  I mean, I guess we have to talk to him and find out why he can't be a juror.

THE COURT:  I'm interested in that and that's why I

3245

have used the --

MR. REED:  Well --

THE COURT:  -- used the influence to keep him here, but I guess I'm wondering ultimately what is the point.

MR. REED:  We're not asking, is he here.  I think the question is far reaching and the question is, to me -- the answer is, I agree with Court, but I -- so --

MS. FISHER-BYRIALSEN:  I guess another issue for discussion that we need to know that juror -- whatever she was -- seat 13, alternate number 1, has not spoken to anyone about the case because I don't know that they were admonished about that when they were excused last night.

THE COURT:  They were admonished with the rest of the jurors not to do that and then they -- the 12 retired and the other six were told to they were on standby.

But if you want to come in and we can hear every explanation he has -- I guess the question, though, is, do you -- does it matter?  What is he going to say?  Does it matter if I strong-arm -- I don't want to strong-arm him into being a juror now unless you want me to.  I don't think it makes a lot of sense to put somebody in this position at this time who's saying -- and he's not offering explanations up to this point.  He's just saying, I cannot be a juror anymore. And I don't know if it's out of just he's come to the decision that it's too hard, he doesn't want to come to a decision.  I

3246

don't know what the situation is.  We can inquire.  But I guess I just still to the point of what's the point of that inquiry.

MS. STOKMAN:  The government agrees with the Court.

MR. VILLA:  Your Honor, I think we should inquire. It's possible there's some issue we need to know about that could impact the other jurors or maybe it's just unique to him.  I mean, we can hear from him and then you can make a decision.  You don't have to strong-arm him as we're questioning him or anything like that, but I think it's important to know what's going on.

THE COURT:  All right.  I'll tell you, he was unwilling to come into the courtroom.  But he has stayed, so we will see if we can get him to come in.

All right.  We will do that.

(Juror Number 74 enters the courtroom at 9:05 a.m.)

THE COURT:  Good morning, sir.  Thank you for coming in.  I understand that you have some concerns about continuing to serve on the jury.

JUROR NO. 74:  I do, Your Honor.

THE COURT:  Can you explain what those are.

JUROR NO. 74:  So previous I was here regarding my mother and my twin brother, but the financial situation, so it's just that.

But the thing is that it's a lot more difficult being

3247

able to show up for -- for this long because not only is my twin having to, like, work with multiple -- like, he's basically needing rides for other people.  It's causing a lot of issues for his workplace.  So it's affecting his workplace, specifically because we're sharing a car.  I'm giving him rides.  So that's why I've been late a couple times, because there are times where he switches like from place to place, in terms of a workplace specifically.  It's complicated on its own.

And even when we do try to show up, there are times where he ends up being late because, like, they miss him telling him that like -- like miscommunication.  Not just on his end but also his workplace.  It's a whole different situation.  And it's just even more difficult the fact that like he has to rely on me most the time to drive him, and if he gets it wrong, then it ends up causing a lot of issues for him specifically.

For my mother, specifically, she's requiring me to be at the house a lot more.  Her health is like declining.

So as you may recall her arm is broken and she's unable to move it.  The thing is that the original plan was to, okay, potentially she can work on herself, and maybe she'll be able to, like, just work on her arm just so she's able to move more control or reduce the muscle atrophy.

The problem is that she's not doing that.  She -- she

3248

really does need my assistance and emotional support as well.

The thing is, she's constantly at the house because she's really the one taking care of the children now. Originally the plan was I go back home early. But what's been happening is because my twin specifically, he needs me to be there, like, asap to pick him up or move to a different house as well. So my original plan did not work out because we did not consider this to be a problem in the past and it definitely is now.

And going back to my mother, though. Her muscle atrophy is getting worse. Originally, in the past, she was able to move it vertically, a bit horizontally, but she's not even able to do that any more. She's worsening day by day. And you can tell it's been affecting her mentally as well. I've had to come home seeing her sad and stressed out because I'm not there with her specifically.

And even -- uh, I can't deny, I did want to let you know, but when I originally filled out that questionnaire, I wasn't completely descriptive of who I was specifically. I was a college student back then but the reason why I stopped going to college was because a lot of issues happened after year 2022, and those effects still affect me to this day specifically.

And I haven't -- you know, I've been trying to get back on my feet basically, as I said previously. It's

3249

frustrating to just be around people again.  But the reason why that's important is because it's been years since I've been back to college, and it's causing arguments sadly between my mother and father because they mention, Okay, why is he going to jury call when we're in debt, and, He's basically not going to school at the moment.  So that's causing arguments back in my household between my mother and my father, but also between me and him specifically.  It's real uncomfortable to be quite honest.

I can't deny, but not only am I mentally just, like, done, but on top of that, it's hurting my family quite a lot just being here.

THE COURT:  Sir, I think you left a message couple weeks ago in which you said that there was going to be a friend of the family who would be able to help your mom.  What happened with that situation?

JUROR NO. 74:  So that was not.  So that's what we originally thought as well, but she basically didn't keep her promise.  But to be more descriptive, the thing was that she was always busy during the time my mom was busy specifically. And she was really only there whenever it was easy or when my mom didn't even need her.  Because whenever it rains, basically there's no kids there, and that's the only time she would show up.  The thing is that my mom wouldn't even need her at that point because there was nothing to clean because

3250

there were no kids, there's no one to take care of.  So there was no point for her friend being there.

At days where it was actually genuinely busy, she just didn't even bother showing up basically.

THE COURT:  Is it because when it rains the parents don't go to work and they can take care of their children?

JUROR NO. 74:  Correct.  They are all farm workers.

THE COURT:  And you said something happened to you that -- in the past.  I think you said around 2022, that has caused you to have some emotional difficulties; is that what you're saying?

JUROR NO. 74:  Yes, ma'am.

THE COURT:  All right.

JUROR NO. 74:  It's not confirmed -- my bad.  I interrupted you.  Go on.

THE COURT:  I'm sorry.  I don't want to interrupt you.  Go ahead, sir.

JUROR NO. 74:  Although this is not confirmed or diagnosed, I spoke with a doctor and I was -- he's considering diagnosing me with PTSD specifically due to the problems I still have regarding the year 2022.  It still affects me to this day actually.  And how I --

THE COURT:  All right.  So you experienced an event back 2022 that you feel, and a doctor has suggested, may rise to the level of PTSD.  And as a result, it's sounds like you

3251

have enjoyed being around other people, but you are suffering; is that true?

JUROR NO. 74:  Yes.  I -- uh, maybe you have noticed as well, but I sometimes tend to smile during court.  It's not because I'm confident or happy.  I have a tendency when I'm nervous, I tend to smile.  I was literally smiling, they genuinely do believe I'm confident, but I'm actually extremely nervous just by being here.  Even when I got to the questionnaire, I was already pretty nervous.

THE COURT:  Okay.  And so you've had difficulty kind of coping with the situation the whole time?

JUROR NO. 74:  Yes, like I try to maintain it. That's the thing, you know, what's keeping busy with the note taking especially.  I've wrote quite a lot of notes, roughly over 70 now, I believe.  Which you know, I'm not sure that answers your question, so I do apologize, but --

THE COURT:  Yeah.

All right.  Counsel, does anyone have questions for Juror 74?

MS. STOKMAN:  No.

MR. VILLA:  No, Your Honor.

MS. LUEM:  No.

MS. FISHER-BYRIALSEN:  No.

MR. REED:  No.

THE COURT:  Sir, if you'll just step outside we'll be

ER 2587

3252

right back with you.

(Juror 74 exits the courtroom at 9:12 a.m.)

THE COURT:  All right.  Comments by anyone?

MS. FISHER-BYRIALSEN:  No.

MR. VILLA:  Your Honor, we don't oppose letting him go.

THE COURT:  Mr. Reed, do you agree?

MR. REED:  Yeah.

THE COURT:  All right.  I'll excuse Juror 74.
Replace Juror 74 with Alternate Number 1.

And just to address the issue, Ms. Byrialsen, did you wish to wait and bring her in and question her about overnight, or do you wish for her just to begin deliberation?

MS. FISHER-BYRIALSEN:  Yes, Your Honor, bring her in and ask her, please.

THE COURT:  All right.  So --

MR. REED:  Your Honor, if the Court could specifically ask her, uh -- it's the tendency when you're not on the case anymore, it's not so much talking to other people, it's the thing that all of us do, which is grab our phone and Google what's going on.  That's what I'm more concerned about, if she jaw jabs one of the defendants.

THE COURT:  All right.  So we will wait until she arrives and talk with her.

MR. REED:  Thank you, Your Honor.

3253

THE COURT:  All right.  We'll be off the record.

(Recess held.)

(Alternate Juror 1 enters the courtroom at 9:17 a.m.)

THE COURT:  All right.  Good morning, ma'am.  Thank you so much for coming back today.  I don't think any of us anticipated this, but we do appreciate your availability.

Before we broke yesterday, I went through all the instructions and one of them was that you weren't to discuss the case or do research or allow anyone to discuss the case with you.

Do you remember that instruction?

ALTERNATE JUROR NO. 1:  Yes.

THE COURT:  Did that happen overnight, did you discuss the case --

ALTERNATE JUROR NO. 1:  No.

THE COURT:  All right.

ALTERNATE JUROR NO. 1:  I knew I was the first alternate, so I was like --

THE COURT:  So you were preparing yourself.

ALTERNATE JUROR NO. 1:  Not this bad though.

THE COURT:  All right.  Thank you so much.  That was the only question that I had.

ALTERNATE JUROR NO. 1:  Thank you.

(Alternate Juror No. 1 exits the courtroom at 9:19 a.m.)

THE COURT:  So ordinarily I would give a resumption

3254

of deliberation instruction, but they haven't actually started.  But does anyone want the model instruction 630?  We can modify it.  It basically also tells them not to speculate as to the reasons for the substitution.

MS. FISHER-BYRIALSEN:  I think so.

I think also we need them just to know they are actually going to start deliberating.  So we can get it moving.

(Jury enters the courtroom 9:22 a.m.)

THE COURT:  All right.  Ladies and gentlemen, thank you for coming in.  I do have to give you an instruction.

As you have already observed, Alternate Juror Number 1, who you may know as Juror 88, has been substituted for Juror Number 74, who's been seated in seat 5.  You should not speculate about the reason for the substitution, because this happened so early in your -- well, in the morning, I know you haven't even started your deliberation.

So at this time, I'm going to tell you that now is your beginning point of your deliberation.  And all of the instructions that I gave you before now still apply.  And so you should begin your deliberation including Juror Number 88 as if -- well, I would say you haven't started so there's not really a lot I can say but, go ahead and go forth and begin deliberating.  Thank you very much.

(Jury exits the courtroom at 9:24 a.m.)

3255

THE COURT: All right. The jury members have stepped out.

Anything at this time?

MS. DE SALES BARRETT: No, Your Honor.

MS. LUEM: No, Your Honor.

MS. STOKMAN: No.

MR. VILLA: No, Judge.

THE COURT: Okay. Thank you.

(Recess held.)

THE COURT: All right. We have everyone back. We did receive a jury note.

The jury is requesting the following: All available audio clips of John Stinson.

So I'm going to need counsel to identify what those are and input as to whether you want to be present while it's played. Do you want the jury to listen to it here, or do you want us to set up a computer and send in one of our IT people to operate it for them?

Mr. Reed, R your comments.

MR. REED: I'm thinking, Your Honor.

THE COURT: While you're doing that, can you get that microphone turned on.

MR. REED: Since you're giving me the option, I thought normally in federal court, it's done in open court. But if that's not the requirement in your court, I just

3256

assumed they are allowed to listen to it.

But I don't know, does the Court have a rule once they start listening to it, they have to listen to the entire thing or will they be speaking with each other during that time.

THE COURT:  Well, they can't deliberate with someone else the room.

MR. REED:  Right.

THE COURT:  So while the IT person is there, they can listen, they can for it to be repeated, they can do whatever, but they can't actually deliberate.

MR. REED:  So what you meant by a computer, is that they wouldn't have a computer, there would be someone that can play the item for them.

THE COURT:  Yeah, what they end up with is just the stripped down computer that just will play the audio and that's it.  So maybe they're touching button.

MR. REED:  In that case, I have no problem with them watching or listening to it in the back, with the -- whatever you call that person doing the --

THE COURT:  Button pushing.

MR. REED:  Button pushing.

THE COURT:  For the government?

MS. STOKMAN:  Yes.  The government agrees.  And I believe it's the clips from Exhibit 1810.

3257

THE COURT:  All right.  So we need to be sure we're on the same page here.  So 1810, there's nothing on there except for audio of John Stinson, and that's the only exhibit they need to hear?

MS. STOKMAN:  There should be three clips on the 1810.  So the disc should only have the three clips that were played in court.

MR. REED:  No.  They are not all three John Stinson.

MS. STOKMAN:  That's the same call.

MR. REED:  I understand.

MS. STOKMAN:  Yeah.

MR. REED:  They didn't ask for clips that didn't have John Stinson.  They asked for the ones with John Stinson.

MS. STOKMAN:  Yeah, he's in all three of those.

MR. REED:  I thought it was 1811 that has the longer that had John Stinson.

MS. STOKMAN:  Then I need to check that.  I'm asking Ms. Bullard to bring up the originals because they have -- my recollection was that 10 had the three clips and 1811 only had one clip, which is why I thought it was -10.  But we'll double check that.

THE COURT:  So is she going to come up with her-- because maybe what we need to do is listen to them just to make sure.

MS. STOKMAN:  Well, once I can see the original, I

3258

mean, we can do that, but I will know.  Because I don't have that in front of me right now, but I'll be able to tell when I see the original disc.

MS. DE SALES BARRETT:  Your Honor, although we don't necessarily have a dog in this fight, my concern is this:

The exhibits that we received were solely the ones that -- the clips that it contained the transcripts.

And as I recall the Court saying that clips would be only the audio clips and not the transcripts.

I don't know that we have ever had an opportunity and I guess it would be up to Mr. Reed to check the audio clips to make sure that those were the same ones that he thinks they are, because you never know.

THE COURT:  Yeah, I think it's probably good idea for us to check it.

But I guess I misunderstood.  The audio clips that you have marked, I assume those are played without the transcript, right?

MS. STOKMAN:  I'm not sure what they loaded on those discs.  I think that's right, but I think the government's intention, and maybe counsel can clarify, is that if IT is in there playing it for them, they don't get to see anything, they just are hearing it.

THE COURT:  Yeah, that's how it should be.

I mean, ideally we won't have to do that.  I think we

3259

need to -- let's hear those clips to make sure that we're on the same page and then we'll go from there.

So if you can have your paralegal come up and assist us with that.

MS. STOKMAN:  Judge, it might be quicker if I can run downstairs and grab them.

THE COURT:  Okay.  We'll just go off the record.

(Recess held.)

MS. STOKMAN:  They are the clips from 1810.

And we have verified with the paralegals that the clips on the disc have transcript so they're just need to be played without them being bale to view it.

THE COURT:  All right.  So actually, I did go back to my notes and that's what notes say as well, that it's 1810.

What we'll do then is well get IT staff on it and have them turn off the screen to make sure there's no possible way to see the transcript.

All right.  Anything else then -- or Mr. Reed, do you want to hear those clips?

MR. REED:  No, I'm fine with that.

I do have another question, though.

THE COURT:  Okay.

MR. REED:  And just kind of going forward or in posterity, I didn't understand the exhibit to be the transcripts.  I understand how the technology works, but my

3260

understanding was as far as this exhibit is concerned and this trial for the future, it is not an exhibit that includes a transcript, because transcripts can never be part of the exhibit.  So why or how would those exhibits include a transcript.

MS. STOKMAN:  Because they are synced, and in order to sync them with the transcript, that is when they were cut.

MR. REED:  I understand that.  But what I'm saying is that my understanding of the law is that the audio is the exhibit.  Transcript is an aid for the jury.  So how would it ever become part of the exhibit itself?

THE COURT:  All right.  So I think what I'm hearing actually though is, can we get substitute exhibit for 1810 with the transcripts stripped off?

MR. REED:  Because of the timing, I have no problem making sure the jury can go right away, but --

THE COURT:  Yeah.

MR. REED:  Uh --

THE COURT:  So we'll get a stripped off copy.  But in the meanwhile, we'll use the one that we have and we will have the computer operator have the screen turned off so they only hear the audio.

All right.  Then anything else at this time?

MS. DE SALES BARRETT:  Yes, Your Honor.  I think that I agree with Mr. Reed, and I think all of those exhibits have

3261

to be -- have to be fixed.

MS. STOKMAN:  Yeah, we'll do that now.

THE COURT:  All right.  Thank you.

Anything else then?

MR. REED:  No, Your Honor.

MS. DE SALES BARRETT:  No, Your Honor.

MS. STOKMAN:  No.

THE COURT:  Okay.  Thank you.

(Court's Exhibit A was marked for identification.)

(Recess held.)

THE COURT:  All right.  We have everyone back.

We received a second note from the jury in which they request the following full transcripts of Daniel Rubin testimony and all transcript mentioning Andrew Collins/Misfit's name.

I mean, ordinarily, I would just kick back with, wait, a minute, we already told you, you don't get a transcript.  But I think what happened was transcripts were shown in the closing arguments, so they know there are transcripts.  Because we instruct them initially, There won't be transcripts and then we have transcripts.  So that's that.

So I see this as two issues.  First, we need to decide with to do about Mr. Rubin's testimony.

And then secondly, the question related to all transcripts mentioning Andrew Collins.  That's just -- we

3262

can't do that.  So what we need to know is, what do they need
to know?  Is it a witness?  Is it a topic?  What are we
talking about?  I don't know.

MR. REED:  Well, there were occasions when the
government and the witnesses were using his nickname and not
his real name.

THE COURT:  Yeah, I think that's why --

MR. REED:  I think that's a problem, but I don't know
how to resolve that.  If they ask for the transcript --

THE COURT:  I mean, you're right.  The request is all
transcripts mentioning Andrew Collins, and then Misfit's, in
quotes, name.  So they seem to recognize Andrew Collins has a
the nickname Misfit, and they seem to want everything.  But I
mean, that's just too much.  I mean, that came up maybe --
often, very often.  So I don't know.

Starting with Mr. Rubin's testimony, does anyone have
comments about that?

MR. REED:  No.

MS. STOKMAN:  Judge, is it -- my understanding is
that Your Honor does not do read backs to the jury; is that
correct?

THE COURT:  No.

MS. STOKMAN:  Okay.

THE COURT:  I mean, when I didn't have a
magistrate -- when I was magistrate and didn't have a court

3263

reporter, we would do -- we would have to listen but we almost never did that because it is to difficult.

Here, it's not the same but reading back someone's entire testimony is tedious.

MS. STOKMAN:  Yup.

THE COURT:  And that usually happens here, but -- so what I hear is we could give a transcript.  We would have to go through, take out of the all the sidebar, take out all the objections, that stuff and just leave it with the body of the testimony.  That would be one way of handling it.

MS. DE SALES BARRETT:  Excuse me, Your Honor, I was going to suggest that that is probably the best way of handling it, but I think the jury needs two know it's going to take some time in order to produce the transcript.  And I don't know what their plan is.

THE COURT:  Well, they -- after they gave the note, they said, We're going to leave.

MS. DE SALES BARRETT:  Oh, you forgot tell us that secret.

THE COURT:  Because we were going to scurry around and get there, what they needed.  And I said, no, we were going to -- because they need know what the situation is.  If it was going to be a read back, I want to tell them it's going to be a read back.  But if we can get the transcript, we can have it for them tomorrow.  But they do need to clarify the

3264

Andrew Collins issue.

Any comments from anyone else?

MS. STOKMAN:  I think if the Court tells them there could be specific witnesses, that would maybe narrow it down. But the government agrees, that just searching his name is going to be pretty tedious.

THE COURT:  I mean, we could but it was mentioned in opening statements, closing.  I mean, they are saying "any transcripts."  And I assume they actually mean testimony, but in the most literal sense, this person is mention a lot.

MR. REED:  We can obviously figure out -- at least I think I know exactly what they are looking for.

THE COURT:  I think I do too.

MR. REED:  Yeah.

THE COURT:  But I don't want to tell them what they want.  I want them to tell me what they want.

MR. REED:  I get everything, so it's not everything.

THE COURT:  No, I don't think it is either.

But I think what I'll do then is -- then we will -- appreciate our court reporter for doing that work.  We'll give Mr. Rubin's testimony with those redactions to the jury.

And then I will respond that they need to clarify, you know, exactly what they are looking for related to Mr. Collins and go from there.

All right.  I think it's 1:25.  They did say 1:30.

3265

I'll get this to them right away, but I expect they are already packed up and ready to go.  So --

All right, then.  Thank you.

MR. REED:  Thank you, Your Honor.

(Proceedings concluded at 1:36 p.m.)


I, RACHAEL LUNDY, Official Reporter, do hereby certify the foregoing transcript as true and correct.


Dated:  February 12, 2025          /s/ Rachael Lundy_____
                                   RACHAEL LUNDY, CSR-RMR
                                   CSR No. 13815

ER 2601

3266

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. JENNIFER L. THURSTON

UNITED STATES OF AMERICA,        )
                                 ) 1:20-cr-00238-JLT-SKO
            Plaintiff,           )
                                 ) Jury Trial, Day 17
       vs.                       )
                                 )
KENNETH BASH, et al.             ) Volume 17
                                 ) Pgs. 3266 - 3290, inclusive
            Defendants.          )
                                 )

Fresno, California                  Thursday, February 13, 2025

REPORTER'S TRANSCRIPT OF PROCEEDINGS

REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

ER 2602

3267

**APPEARANCES OF COUNSEL**:

For the
Government:

**STEPHANIE STOKMAN**
Assistant U.S. Attorney
2500 Tulare Street, Rm. 4401
Fresno, California  93721

**JARED ENGELKING**
Department of Justice
1301 New York Avenue, N.W.
Washington, DC 20005

**JAMES ROBERT CONOLLY, GOVT**
U.S. Attorney's Office
501 I Street, Suite 10-100
Sacramento, CA 95814

For Defendant
Johnson:

Law Offices of Andrea Luem
Attorneys at Law
400 South Forth Street, Suite 500
Las Vegas, Nevada  89101
BY:  **ANDREA LEE LEUM, ESQ**.

Law Offices of Ryan J. Villa
5501 Eagle Rock Avenue NE
Suite C2
Albuquerque, NM 87104
BY:  **RYAN J. VILLA, ESQ**.

For Defendant
Clement:

Fisher & Byrialsen, PLLC
Attorneys at Law
99 Park Avenue
New York, NY 10016
BY:  **JANE FISHER-BYRIALSEN, PHV**

Ruhnke And Barrett
29 Broadway, Suite 1412
New York City, NY 10006
BY:  **JEAN DE SALLES BARRETT, PHV**

For Defendant
Stinson:

Law Office of Kenneth Alan Reed
406 W 4th Street
Santa Ana, CA 92701-4505
BY:  **KENNETH ALAN REED, ESQ**.

3268

Thursday, February 13, 2025                    Fresno, California

8:03 a.m.                                      Jury Trial Day 17

    (The following proceedings were held in open court.)

        THE COURT:  All right.  We're back on the record.  We have Mr. Villa, Ms. Barrett, Mr. Reed, and all Counsel for government.

        So yesterday when we broke, we had gone through the jury question, and I responded to the question according to what we said we would do.  That is, they could have the transcript, and they would have to give us more clarity as to what they wanted as to Mr. Collins.

        We went through the process of redacting the transcript, in essence, creating a special excerpt of Mr. Rubin from that day's testimony, incorporating the additional redactions counsel requested.  And then I got the government's brief.

        And in the government's brief, it seemed to suggest somehow that the process wasn't agreed by the government and that the jury should have no expectation of receiving the transcript.  And that's just not where we are at this point.

        So I need to hear what the government's position is, then I'll hear from other counsel.  And then I do think the one point that makes sense, though, is to bring the jury in before they get the transcript, and talk to them, give them further instruction about that.  But --

ER 2604

3269

Mr. Conolly, I think maybe, did you have comments?

MR. CONOLLY:  Well, yes, Your Honor.

I am aware that the government's brief raised some issues that we hadn't discussed in court.  It wasn't until we dug in on Ninth Circuit authority on this that we actually realized, you know, where -- where the prob -- where the pitfalls may be.

Your Honor had mentioned in court about the jury instruction to -- to the jury regarding, you know, their not having the transcript.  So you know, we had -- we had incorporated that as well.

But, you know, the Ninth Circuit places -- and I apologize that I hadn't fully appreciated this during -- during our discussions yesterday, but the Ninth Circuit places a heavy emphasis on the precautions that should be taken if giving transcript testimony back to the jury whether that's read in court or handed over to them.

As we mentioned in our brief, there are a couple cases that say if the jury is asking for specific pieces of evidence that is, in fact, more reason for caution after all.

And we didn't -- you know, we didn't want the Court to stray into this area, unaware as we didn't want to stray into this area ourselves, and that's why we dug in on it.

Unfortunately, we did find the case law was a bit stronger on this point than had been appreciated beforehand.

3270

I realize where we are now that we've said to the jury, you know, you know, you can have this redacted transcript. I think, you know, proper admonitions that are, you know, are in order.

But -- but read back really is -- does seem to be the way that the Ninth Circuit has heavily emphasized that should be the way that the jury should receive any additional -- any additional review of transcript testimony.

THE COURT: All right. I'm glad you appreciate that issue, but that's how I started yesterday saying ordinarily I would say, you know, as I instructed you no transcripts. And then we had the whole discussion about read back is the appropriate response. But we all acknowledge too -- and now when you see the excerpt, it's 118 pages when you don't exclude the redactions, but we're at about over 100 pages.

And so the understanding was while we realize typically would be no read back, in this instance, we would do transcripts. So it's not that there was a lack of the understanding as to what the authority is. So that's what's troubling to me is where we are now.

So if the government is saying, no, you want to go to read back, we can talk about it. At a minimum, the efforts in redacting the transcript would be at least what would be read, but that's where we are.

Has there been a difference of thought on the topic after receiving the government's brief from the defense?

3271

MR. REED:  On behalf of Mr. Stinson, I don't think. We didn't discuss it, but I never would have agreed to a transcript.  It could have had to have been 12 transcripts. But --

I'm sorry.

I would not have wanted one transcript.  There would have had to be 12 transcripts.  You can't break it up into four transcripts, because that promotes grouping, which the circuit doesn't like either when it comes to the deliberations.  I thought we were actually talking about read back.

And if I had a preference, given where we are right now, with the amount of time that it would take to read the number of pages I had to go through -- or actually, I went through somebody else going through and read them, but I think the government's correct.  However, I don't think the cases that they cited are the correct cases for the argument that they are making.  *Sacco* does not say that and that was a video deposition back in the '80s.  My assumption is, what they would have had to do to make a case there, is something outside of what the evidence was in the case.  I mean, they weren't making transcripts from audio things back in the 80s, they don't just press a button and do AI.  They don't -- well, she isn't here today.  They don't have a Heidi.

But the short answer is, if we're talking about a

3272

read back of the number of pages that are in the case, you know, so be it, if that's what the government wishes and that's where -- that's not so much that's what they wish, but I understand their point.

I would just object to a transcript.  If the Court is going to give a transcript, I think it has to be 12.

THE COURT:  You mean --

MR. REED:  12 copies.  Everyone has their own copy. Then they deliberate.  They fight over what they see there, which is the definition of deliberation.

But if it's -- if it's read back by the court reporter, court reporter has instructions and Court tells the court reporter how to deal with it.  So --

THE COURT:  Well, if it's read back, we're all going to sit here and it's going to be read back.

MR. REED:  Okay.

THE COURT:  But I'm a little unsure, Mr. Reed, because I do have the transcript from yesterday, and maybe in retrospect you prefer read back.  If that's the case, I want to be clear today, because yesterday, apparently, we weren't clear.

So what is Mr. Stinson's position for today, does he want read back, or the transcript to be provided?  And the number of transcripts I don't really care about.  It is that process is what I'm interested in.

3273

MR. REED:  I think my preference is probably read back.

THE COURT:  All right.  For Mr. Clement, Ms. Barrett, I think you were most involved yesterday.

MS. DE SALES BARRETT:  Uh, no, Judge, we prefer the transcript to be provided to the jurors because the jurors have already been told that they are going to get it.

THE COURT:  And for Mr. Johnson?

MR. VILLA:  Your Honor, it seems to be the concerns from the case law are unduly emphasizing a particular part. And if the jury is getting the entire transcript and we're not telling them what to do or what not to do with it just, Here you go, best of luck, I don't think we're running afoul of the concerns raised in that case law.  So we prefer they just get the transcript as they were told.

THE COURT:  This testimony in large part relates to mostly to Mr. Stinson, but let me hear from the government again what is your bottom line.

MS. STOKMAN:  Judge, and I'm stepping in just because I think -- we had this discussion.  I think it should be very clear that we were unaware of the position of the Ninth Circuit completely when we were in here yesterday since it came up without us knowing obviously what that note was before we walked into court.

We wanted to cover all bases and make sure this

3274

was -- if this is how we were providing the request back to the jurors that we were meeting the standards the Ninth Circuit requires.  Again we found that the preferences read back, with those same instructions about undue, you know, the emphasis we kind of laid those out in different scenarios of how this could go back.  If it is to give them a transcript, then the same instruction we would ask -- and I think there were either three or four points that the Ninth Circuit has laid out should be given to the jurors that are going back there.  That should absolutely happen no matter what they do, whether they read this transcript by themselves or they hear it read back.

And additionally, they should be instructed to read the entire thing as the case law suggests and then I'll rely on the rest of the government's briefing for the factors that the Ninth has found should be told to them if this is what the Court is going to do.

At the end of the day, I think also if they receive a transcript, we should probably take it back once they're finished, so it doesn't become an exhibit of sorts. Otherwise, if it stays in the deliberation room for the pendency of deliberations, I don't know if that creates another issue.

But given all of that, we are just wanting the Court to see what the instructions are preferred and probably

3275

required in any scenario that Your Honor decides how to handle this.

THE COURT:  Okay.  But I don't think I heard what you want.

MS. STOKMAN:  Our preference is the read back with the instruction, the same instructions about how they should handle that.

THE COURT:  All right.  I appreciate the issue of efficiency, but Mr. Stinson prefers read back, the government does.  I mean, truthfully, I've never given a transcript before.  And like I said, my instinct was not to because that is what is done.  So I guess we'll just do read back.

You-all better get comfortable.

MR. REED:  Your Honor, if I can be clear, what I actually thought the problem was wasn't Rubin.  I thought the problem is going to the next one.

THE COURT:  Yeah, I mean that's --

MR. REED:  That's kind of how I interpreted the issue.

THE COURT:  I've already -- no matter what we do, I was going to include a section of, this is an unusual circumstance as I told you originally, you will not have a transcript, and going forward, you will not have transcripts.

But you're right.  I mean, maybe I don't know what they draw from that conclusion that there are maybe some

3276

transcripts, some no transcripts, but you know, that's the point to that instruction is so that they don't ask for this.

MR. REED:  Right.  Rubin is easy because Rubin is just his testimony.

The second question, which is the Misfit/Collins question, that's where I thought the problem was, not Rubin.

THE COURT:  Well, Misfit Collins issue, I've already kicked it back to them.  And I just said, you know, we're not -- unless you can be more specific.  You know, we can't do anything about that.

And I mean truly to hit every mention of Mr. Collins, that would take a really long time.  They have to be more specific than that.  So I want the jury to have all the information they need, but they have it already.  It's just a matter of digging into their memories and discussing it.

But we'll take that one step at a time.  At this point, we're not talking about -- we're not talking about it all that part of their request.

MR. REED:  Okay.

THE COURT:  All right.  Do we have all the members, jury members?

(Discussion was had off the record.)

THE COURT:  There was another set of requests I was probably a little more vague than I should have been.  I'm not going to exclude questions or responses to which there were no

3277

objections.  So I think there were a couple, maybe it's just a mistake on how it was cited, but if there was an objection, that was sustained, or the question was withdrawn in essence, that should be stricken.  If there was a question, asked answered, no objection, there just no rationale for that to be excluded.

So you should have gotten what we considered to be the finalized excerpt of Mr. Rubin.  Are there any comments about that?

MS. STOKMAN:  The government has reviewed that, and we're -- we do not have any edits or changes or otherwise issues.

THE COURT:  All right.  Ms. Barrett?

MS. DE SALES BARRETT:  No comment, Your Honor.  I did not intend to include situations where there was no objection.

The tricky part was, of course, getting the question out of the transcript where there was an objection that was sustained.

THE COURT:  Right.

MS. DE SALES BARRETT:  And so that's -- that's the only intention I had, Your Honor.

THE COURT:  Okay.  For Mr. Johnson?

MR. VILLA:  No comments.

THE COURT:  Mr. Reed?

MR. REED:  I'm fine with it, Your Honor.

3278

THE COURT:  All right.

MS. STOKMAN:  So the Court has, in the government's brief we filed last night, on page 4, the large paragraph from line 6 through 23, incorporate the instructions that the Ninth Circuit has found to be sufficient when a read back occurs.

THE COURT:  I'm just going to use their model instruction.

Counsel, we can proceed if you want, the court reporter would normally do a read back, but we have the3 transcript.  If you prefer, we can do somebody read question, somebody read answer.

MS. STOKMAN:  Judge, I think that gets into problems just because of emphasis and whose question it was.

Usually when the court reporter reads it back, it's a neutral party and it was the person taking down the words, and that's generally the preference.

THE COURT:  Well, if that's your preference, I get it.  I've seen it both ways.  I've done it both ways, but I mean, for interest from the jury, it's easier with the Q and A, but that's fine.  We'll go ahead and we'll have our court reporter read that.

All right.  We can bring the jury in.

(Jury enters the courtroom at 8:19 a.m.)

THE COURT:  All right.  Good morning, everyone.

Yesterday you sent out a note requesting the

3279

transcript of Mr. Rubin. And I responded to you probably in an inexact way. As I told you at the beginning of the trial, transcripts are not available to the jury. So what you will get instead is read back.

So what I will -- I do need to give you some instruction about read back:

Because a request has been made from read back of the testimony of Daniel Rubin, it will be provided to you. But you are cautioned that read back runs the risk of distorting the trial because of overemphasis of one portion of testimony. Therefore, you will be required to hear all of the witness's testimony on direct and cross-examination to avoid the risk that you might miss a portion bearing on your judgment of what testimony to accept as credible.

The read back could contain errors. The read back cannot reflect matters of demeanor, tone of voice, and other aspects of live testimony. Your recollection and understanding of the testimony controls.

Finally, in your exercise of judgment, the testimony read cannot be considered in isolation but must be considered in the context of all of the evidence presented.

All right. Once again, we're going to have the read back. If at any time, you can't hear, you need to repeat, please raise your hand.

All right. We will have our court reporter conduct

3280

the read back.

(Record read by the court reporter.)

THE COURT:  All right.  Ladies and gentlemen, thank you.  You may return to the jury deliberation and continue your deliberations.

(Jury exits the courtroom at 10:01 a.m.)

THE COURT:  Anything for the record at this time?

MS. LUEM:  No, Your Honor.

MS. DE SALES BARRETT:  No, Your Honor.

MS. STOKMAN:  Nothing.

MR. REED:  No, Your Honor.

(Recess held.)

THE COURT:  All right.  We have everyone back.

We have received another jury note.  The question is this:

Further definition of an overt act and if it would pertain to willfully, intentionally and with deliberation and premedication on Count 1 - 2(b).

MS. FISHER-BYRIALSEN:  Can you repeat that?

MR. REED:  That's not where I thought we were.

THE COURT:  (As read):

Further definition of an overt act and it would pertain to willfully, intentional, and with deliberation and premeditation on Count 1.

And then it says:  "-2(b)."

3281

MR. VILLA:  Which 34?

THE COURT:  Yes and it says no.  No it has no additional detail it just says that.

MR. VILLA:  That's one of the verdict forms.  I just don't know which one.

MS. DE SALES BARRETT:  Okay.  Which one, yeah.

THE COURT:  I mean, we're guessing, but that's the question.

MS. DE SALES BARRETT:  All the verdict forms are different.

THE COURT:  Yes.

MS. DE SALES BARRETT:  On those things.

MS. STOKMAN:  It sounds like they are -- and I'm just guessing but sounds like they maybe need to have the conspiracy to commit murder instruction read to them again.

I mean, because overt act only popped up in that instruction or a conspiracy instruction.

THE COURT:  It's in instruction 26.  They can -- we can just refer them to Instruction 26.  My concern is a little different, and again, because I'm just guessing like everyone else, in some ways it almost feels like they are not answering the -- whichever verdict form they are working on in the order they are supposed to do it.  It sounds like they might be evaluating question 2(b) in connection with count in Question 1 and trying to harmonize the language.  But I don't know that

3282

for a fact.  It may just be -- I don't know.

MS. FISHER-BYRIALSEN:  Your Honor, may we know what verdict 2(b) is on each person's form?

THE COURT:  Sure.  Mr. Stinson does not have a 2(b).

MS. FISHER-BYRIALSEN:  So it's just --

THE COURT:  Mr. Clement, it is relating to the murder of Ruslan.

MS. LUEM:  As --

THE COURT:  And I have not pulled up Mr. Clement's but I think it's the same -- I mean, Mr. Johnson, but I think it's the same.

MS. FISHER-BYRIALSEN:  That seems kind of weird.

MR. VILLA:  Judge, would you mind reading the question more time?

THE COURT:  (As read):

"Further definition of an overt act and if it would pertain to," in quotes, "willfully, intentionally, and with deliberation of premedication" on Count 1, and then there's a -2(b).

MS. FISHER-BYRIALSEN:  I mean that would be 2(b) for Lomita.  That -- I mean, that's the wording, unlawfully willfully and intentionally, but it just seems weird.

MS. STOKMAN:  Do you have -- are you reading from the verdict form?

MS. FISHER-BYRIALSEN:  Yes.

ER 2618

3283

MS. STOKMAN:  Can you read that since we didn't bring those up?

THE COURT:  It has that exact language.

MS. STOKMAN:  Okay.

MR. REED:  Those are just yes-or-no answers.

MR. VILLA:  Your Honor, my inclination is to just say:  You have all the instructions available in your jury instruction packet.  I don't think we should take it any farther than that.

MR. REED:  I don't think so.  I stipulate.

MS. DE SALES BARRETT:  I agree, Your Honor.  I mean, it's not really asking the question that can be easily answered or understood.

THE COURT:  Well, I mean, when jurors come back and ask me for further definition, I've given the model instruction.  I usually will just say overt act is defined in Instruction 26, or whatever it is.

MS. DE SALES BARRETT:  Do we know where it is defined?

THE COURT:  In Instruction 26.

MS. DE SALES BARRETT:  26, okay.

MS. LUEM:  Actually, it's -- okay.

MS. DE SALES BARRETT:  26.

MS. STOKMAN:  Judge, I think that the answer, maybe, is also to refer them to 26 that describes overt act, and then

3284

25 is where the other language comes in.

THE COURT:  Well, they are not asking for -- well, I mean, you're right.  This one does define malice of forethought, but willfully, intentionally, and with deliberation is something else.

MR. VILLA:  Judge, while I recognize that this question seems specific to 2(b), which we've deduced as a Lomita homicide, you know, their overt act is also defined later in the instruction for the conspiracy to commit robbery.  And you know, taking this too far, I think we run into trouble if we say anything other than, you know, Refer to your jury instructions.

MS. STOKMAN:  Refer to the racketeering jury instructions, because they have the definitions or something.

MR. VILLA:  No.  Our position is don't refer them to anything specific just:  You have all the instructions on the law in your jury instruction packet.

MS. STOKMAN:  And definitions are within that --

MR. VILLA:  -- including definitions, rather than pointing them to any specific instruction or specific language in the -- in any one instruction.

THE COURT:  All right.  Mr. Villa is right.  It is referenced in every state law conspiracy definition -- or instruction.  Well, at least in those two.

Anything else from the government then?

3285

MS. STOKMAN:  No, nothing.

THE COURT:  I think the difficulty in saying, you know, Refer to 25 and 26, first, there is no, "willful, intentionally, with deliberation premedication" instruction. And suggesting they should go read malice of forethought, I don't know.

Because for all I know -- I mean, we don't know enough to try -- we're just trying to figure out what we think they mean.  And this may not be it at all.  So there's a risk in trying to direct them.

And I think Mr. Villa's point is a good one that 26 and 20 -- nope, 31 both refer to overt acts although there is no 2(b) verdict form that refers to the robbery.  But in any event, it's the same definition.

If I had to guess, 26 makes most sense but I think probably we're just in the position of saying:  You have the instructions.  That's all the instruction we can give you.

Because even my idea that maybe they are not taking it in order.  That's just a guess.  I don't know.

MS. DE SALES BARRETT:  We agree with that, Your Honor.

THE COURT:  All right.  So what I will say is just: You have all the instructions needed to decide -- or to -- You have all the instructions needed to deliberate the case; or, No additional instructions are appropriate.  I don't know.

3286

Anyone have thoughts?

MR. VILLA:  I was thinking something, you know:  All of the instructions on the law including definitions are contained in your jury instruction packet.  So you're sort of telling them it's in there, you know.

THE COURT:  Okay.  Anybody else have comments about that?

MS. FISHER-BYRIALSEN:  No.

MS. DE SALES BARRETT:  Sounds good.

MS. STOKMAN:  The government agrees.

THE COURT:  Okay.  I'll do that then.  Thank you.

(Recess held.)

THE COURT:  All right.  Is everyone prepared to discuss?

All right.  So we received the next jury note.  I've given you all copies of it because I just don't think I can keep reading it over and over until you understood the circumstance.

So in reading it, it seems to me, in response, probably would be the jury's response as to all questions must be unanimous, and then maybe say, the jury may wish to move to question 2(c) if unanimity on question 2(b) cannot be achieved at this time.  In essence, kicking that can down the road a while.

MS. STOKMAN:  Yeah, the government agrees with that.

3287

MS. FISHER-BYRIALSEN:  I mean I guess that just assumes they are doing them in order which --

THE COURT:  Well, that is their instruction.

MS. FISHER-BYRIALSEN:  Okay.

THE COURT:  But I mean it may be that they have decided 2(c), then maybe it should be moved to the next -- the trouble with saying "move to the next question," I don't want them to think that means don't do anything else on 2 and go to 3.

Uh, we can say:  Answer the remaining questions in question 2 and then continue, something like that.

MR. VILLA:  Then 2(c) is different, I think, for Mr. Johnson than it is for Mr. Clement.

THE COURT:  Right.  Good point.

MS. DE SALES BARRETT:  Yeah.

MR. VILLA:  So we don't know which one they are talking about.  I mean, assuming they are talking about both of them, but --

THE COURT:  Good point.  So probably we should say -- well, it doesn't really matter because I don't care what 2(c) may go to just whatever 2(c) is next, move to the next question without suggesting that they don't need to answer all the questions under 2.  That's my concern.

I guess we could say:  Answer the remaining questions under 2 and continue on.

3288

MR. VILLA:  Then there's also -- I don't know that they are there, but there is also the partial verdict instruction.

THE COURT:  Yeah, I don't think we're there, because that instruction is too dangerous at this point when we don't have a verdict.  These are sentencing factors and we need a verdict before I would even contemplate going there.

MR. VILLA:  Well, I mean, they are telling us they've reached a verdict, at least as to Count 1.

THE COURT:  Right.  Well we don't take a partial verdict.  We would need count -- we would need the other questions answered too.

I mean even if we were to say we don't care about those questions under 2, which we do, but if we didn't they still have to do the rest of the verdict form.

MR. VILLA:  But the instructions already tell them, Your verdict must be unanimous, then how do we deviate from that?

THE COURT:  I'm not saying we don't.  I say the answer should be:  The response to all questions must be unanimous.

And then say:  The jury may wish to move to -- we could say, The next question; or, The remaining -- The remaining questions if unanimity on question 2(b) cannot be achieved at this time.  So they can set that aside, move on

3289

and come back as needed.

I mean, sometimes cooler heads prevail after they have time to think.

MR. VILLA:  So that's the question.  If you say that, then are you going to tell them at the end, and then revisit it, you know, come back to it --

THE COURT:  Then we'll deal with that issue when and if that's the only thing left.

All right.  So then the language as to moving forward what I've been saying is, the jury may wish to move to question --

MR. VILLA:  -- the next question?

THE COURT:  -- the next question.

MS. STOKMAN:  Can you just say "move on"?

THE COURT:  The jury may move on and come back to question 2 -- or I don't know.  Just:  The jury may move on if unanimity on 2(b) cannot be achieved at this time.

MS. STOKMAN:  Yeah.

THE COURT:  All right.  Do we want to say "may move on" or "should move on"?  I mean, they don't -- they could sit here and keep deliberating on this one topic.  It seems to me.

MR. VILLA:  I think it's a "may."

MS. STOKMAN:  Yeah.

THE COURT:  Okay.  All right.  Thank you.

(Proceedings adjourned at 1:11 p.m.)

ER 2625

3290

  I, RACHAEL LUNDY, Official Reporter, do hereby certify the

foregoing transcript as true and correct.


Dated:  February 14, 2025   /s/ Rachael Lundy_____
              RACHAEL LUNDY, CSR-RMR
              CSR No. 13815

3291

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. JENNIFER L. THURSTON

UNITED STATES OF AMERICA,　　　)
　　　　　　　　　　　　　　　　） 1:20-cr-00238-JLT-SKO
　　　　　　　Plaintiff,　　　　）
　　　　　　　　　　　　　　　　） Jury Trial, Day 18
　　　　vs.　　　　　　　　　　 )
　　　　　　　　　　　　　　　　)
KENNETH BASH, et al.　　　　　) Volume 18
　　　　　　　　　　　　　　　　） Pgs. 3291 - 3312, inclusive
　　　　　　　Defendants.　　　　)
　　　　　　　　　　　　　　　　)

Fresno, California　　　　　　　　　　Friday, February 14, 2025


REPORTER'S TRANSCRIPT OF PROCEEDINGS


REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

ER 2627

3292

**APPEARANCES OF COUNSEL**:

| | |
|---|---|
| For the<br>Government: | **STEPHANIE STOKMAN**<br>Assistant U.S. Attorney<br>2500 Tulare Street, Rm. 4401<br>Fresno, California  93721 |
| | **JARED ENGELKING**<br>Department of Justice<br>1301 New York Avenue, N.W.<br>Washington, DC 20005 |
| | **JAMES ROBERT CONOLLY, GOVT**<br>U.S. Attorney's Office<br>501 I Street, Suite 10-100<br>Sacramento, CA 95814 |
| For Defendant<br>Johnson: | Law Offices of Andrea Luem<br>Attorneys at Law<br>400 South Forth Street, Suite 500<br>Las Vegas, Nevada  89101<br>BY:  **ANDREA LEE LEUM, ESQ**. |
| | Law Offices of Ryan J. Villa<br>5501 Eagle Rock Avenue NE<br>Suite C2<br>Albuquerque, NM 87104<br>BY:  **RYAN J. VILLA, ESQ**. |
| For Defendant<br>Clement: | Fisher & Byrialsen, PLLC<br>Attorneys at Law<br>99 Park Avenue<br>New York, NY 10016<br>BY:  **JANE FISHER-BYRIALSEN, PHV** |
| | Ruhnke And Barrett<br>29 Broadway, Suite 1412<br>New York City, NY 10006<br>BY:  **JEAN DE SALLES BARRETT, PHV** |
| For Defendant<br>Stinson: | Law Office of Kenneth Alan Reed<br>406 W 4th Street<br>Santa Ana, CA 92701-4505<br>BY:  **KENNETH ALAN REED, ESQ**. |

3293

Friday, February, 14, 2025                    Fresno, California

9:28 a.m.                                  Jury Trial Day 18

(The following proceedings were held in open court:)

THE CLERK:  Court is in session.

THE COURT:  All right.  We have everyone back.  I received another note from the jury.  This time they are asking for the readback of Robert Eversole's testimony.

Just to refresh everyone's recollection, that is in excess of 400 pages.  So obviously, that's what we can do.  We could ask them to narrow it to the topics they're interested in, or we'll just start today and probably have to continue through Wednesday, because there's no way we're going to read 400 pages that quickly.

MR. VILLA:  Your Honor --

MS. DE SALES BARRETT:  Going to be hard to narrow it down, though, because you'd have to have direct and then cross-examination.  And the cross-examination is -- may or may not be factually based on whatever the direct was.

THE COURT:  Right.  It would require us to spend a lot of time in reviewing the transcript to make sure that we had everything on the topic.

MR. VILLA:  Can we just provide them the transcript?  I know it was Mr. Stinson's request yesterday for readback, but at least, on behalf of Mr. Johnson, we're fine with just providing them a transcript.

3294

THE COURT:  I don't think this relates to Mr. Stinson that much.

But Mr. Reed, what's your position?

MR. REED:  I don't have an opinion on this.

THE COURT:  For the government?

MS. STOKMAN:  It's our position still that read back is the more proper or appropriate form of dealing with this, with the instructions the Court read the other day.  It is a lot.  But yeah, I'm not sure unless they have an idea of how to narrow it.  I'm not sure how we do so.

THE COURT:  I'm sorry.  I didn't hear what you said.

MS. STOKMAN:  I'm not sure how you would narrow it unless you have an idea.  And I think the preference is to hear the testimony as a whole anyway because of the instructions that the Ninth has found to be appropriate.

THE COURT:  And yet, that's not entirely correct.  I mean, the model instruction is, you don't have to force the entire transcript reading.  It just depends on what they are asking for.  If it's, they ask for one thing and it creates a likelihood of taking out of context, then the Court can require the entirety, but without knowing if it's just a slice, it's hard to say.

So the government's position is, we either ask for additional information or we listen to the entire readback.

MS. STOKMAN:  Yes.

3295

THE COURT:  All right.

MS. DE SALES BARRETT:  Your Honor, since the cross-examination was focused on the credibility of the witness, we don't believe that the cross-examination can be cut up.

THE COURT:  Okay.  So then your position is, you want to give them the transcript?

MS. DE SALES BARRETT:  Correct.

THE COURT:  All right.  At a minimum, we're going to need to take some time with the transcripts.  I mean, there's -- it went over two days, to make sure we have cleared of whatever needs to be cleared off, in light of -- you know, regardless of how we do it.

So I think we need to take that with the first step.  We'll take a look at it, and go from there.

MS. DE SALES BARRETT:  Your Honor, that is in itself going to be extremely time consuming.  I know that the shorter Rubin testimony took me a solid hour to go through the whole thing.

THE COURT:  I mean generally, in this instance, we wouldn't normally break and redact and do all that, because we just would simply exclude what is excludable.

But in this case, there was a lot of sidebar, which is easy enough to pull out.  We pulled out objections the other day that did not change the question or the answer,

3296

which is not necessary.  They heard the objections the first time.  That's not necessary.  But objections that are sustained wouldn't be reread if it, you know, caused the question to be withdrawn or whatever.

All right.  Some ways -- I mean, clearly, this means we're deliberating Wednesday, because there's no way we can do all this today.

MR. VILLA:  Your Honor, on that note, I hate to interrupt.  We had a brief discussion, I think, with your law clerk about whether they would deliberate on Tuesday versus Wednesday, which whatever --

THE COURT:  Sure they can, but we're going to still be reading on Tuesday and I can't read on Tuesday because I have a calendar.

MR. VILLA:  Oh, you mean if we don't give them the transcript.

THE COURT:  Right.

MR. VILLA:  I see what you're saying.  Okay.

THE COURT:  I guess I'm kind of the mind that if we give them the transcript truthfully -- well, all right.  I think I'm going to take a bit and think about this.

In the meanwhile, if you all want to start looking at the transcript, skim it, see if there's anything, and we can come back.  I'm going to take a look more at the authorities and see, you know, what we're going to do going forward and

3297

where the -- I know the Circuit's authority, but I want to take a look at it a little bit more.

All right. We will just be in recess for a while then.

And we'll mark the note. I'll give that back.

(Courts Exhibit E was marked for identification.)

MS. DE SALES BARRETT: Thank you, Your Honor.

Your Honor, just to clarify, we're -- just because of travel arrangements, et cetera, if we're coming back, can we solidly say we're going to resume on Wednesday as opposed Tuesday?

THE COURT: I mean it kind of depends if I end up coming to the conclusion that we can give them the transcript, then I don't know what the result was because then they could come back on Tuesday because they can deliberate while I'm handling a calendar.

Can you hold off for just a little while until we decide this initially?

MS. DE SALES BARRETT: Oh, yeah. We're experts at this.

(Recess held.)

THE COURT: All right. We have everyone back. I did some research and a lot of circuits say it's no problem to give a transcript.

All right. Never mind, I was just given a jury note

3298

that we have a verdict.

MR. VILLA:  Judge, I don't know if it's still possible to have Mr. Johnson brought over.

THE COURT:  Oh, yeah, yeah.  Let's go ahead and take a break.  It's only eleven o'clock.  We can have the defendants brought over.

I assume Mr. Stinson wishes to come back as well, Mr. Reed?

MS. FISHER-BYRIALSEN:  I -- actually, Mr. Clement did not yesterday when we went to see him, but just see how they react over there, I would say.

THE COURT:  All right.  So we'll ask the marshals to --

MS. FISHER-BYRIALSEN:  To offer it.

THE COURT:  And they either will choose to come or not.

Does that work, Mr. Reed?

MR. REED:  Yes.  My understanding is he does not. However, we weren't talking about verdict.  We were talking about the sentencing, the last conversation we had.  Could be that he wants to come over, but I suspect he does not.

THE COURT:  All right.  So we will take a break and have them transported to the extent they wish to come.  All right.  Thank you.

MS. STOKMAN:  Judge, does that mean a half hour

3299

about, so --

THE COURT:  Hopefully.

MR. CONOLLY:  We'll be standing by.

(Court's Exhibit F was marked for identification.)

(Recess held.)

THE COURT:  All right.  We have everyone back.  We also have Mr. Johnson and Mr. Stinson here.

Is there anything to discuss before we bring in the jury?  As I mentioned, we do have a jury note with a verdict.

MS. FISHER-BYRIALSEN:  No.

MR. REED:  No, Your Honor.

MS. STOKMAN:  No.

MS. LUEM:  No.

THE COURT:  All right.  Let's go ahead and bring the jury in.

(Jury enters the courtroom at 12:32 p.m.)

THE COURT:  All right.  We have all of our jury members back in their places.  I was given a note earlier indicating there is a verdict.

I do have the verdict forms, and they do appear to be in order.

I will now publish the verdicts.

In the matter of United States of America versus Kenneth Johnson.

As to COUNT 1:  Conspiracy to participate in

3300

racketeering enterprise, in violation of Title 18, United States Code, Section 1962(d), we, the jury in this matter, unanimously find the defendant KENNETH JOHNSON:  Guilty.

Question 2)  having found defendant, KENNETH JOHNSON, guilty of the offense charged in Count 1, we, the jury, further unanimously find that as part of that offense, defendant Kenneth Johnson:

a.  On or about October 4th, 2020, while aided and abetted by others, did unlawfully, willfully, and intentionally, and with deliberation and premeditation, kill Allan Roshanski with malice aforethought.

Answer:  Yes.

b.  On or about October 4th of 2020, while aided and abetted by others, did unlawfully, willfully, and intentionally, and with deliberation and premeditation, kill Ruslan Megomedgadzhiev with malice aforethought.

Answer:  Yes.

c.  On or about January 24th of 2016 while aided and abetted by others, did unlawfully, willfully, and intentionally, and with deliberation and premeditation, kill Brandon Lowrey with malice of forethought.

Answer:  Yes.

As to COUNT 2, murder in aid of racketeering (Allan Roshanski) in violation of Title 18, United States Code, Section 1959(a)(1), we, the jury, unanimously find defendant

ER 2636

3301

Kenneth Johnson:  Guilty.

As to COUNT 3, murder in aid of racketeering (Ruslan Megomedgadzhiev), in violation of Title 18, United States Code, Section 1959(a)(1), we, the jury, unanimously find defendant Kenneth Johnson:  Guilty.

As to this verdict form, does Mr. Johnson or the government seek to have the jury polled?

MR. VILLA:  Yes, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, I have just read your verdict as to Mr. Johnson here in open court. I am going to ask each of one of you individually whether the verdict that I just read is your true verdict.  If it is your true verdict, your answer is "yes."  If it is not your true verdict, your answer is "no."

Does everyone understand?  If you don't, please raise your hand.  All right.  Everyone is shaking their heads that they do.

As to Juror Number 1 --

JUROR NO. 1:  Yes.

THE COURT:  Let me ask the question first.

Is the verdict just read here in open court your true verdict, sir?

JUROR NO. 1:  Yes.

THE COURT:  As to Juror Number 2, is this your true verdict that was just read in open court?

ER 2637

3302

JUROR NO. 2:  Yes.

THE COURT:  Juror Number 3, as to the verdict just read in open court, is that your true verdict?

JUROR NO. 3:  Yes.

THE COURT:  And Juror 4, is that your true verdict?

JUROR NO. 4:  Yeah.

THE COURT:  And Juror 5, is that your true verdict?

JUROR NO. 6:  Yes --

THE COURT:  Oops.  Juror 5 is actually -- Yes, ma'am. Is that your true verdict, ma'am?

JUROR NO. 5:  Yes.

THE COURT:  Juror 6, is this your true verdict?

JUROR NO. 6:  Yes.

THE COURT:  Juror 7; is this your true verdict?

JUROR NO. 7:  Yes.

THE COURT:  Juror 8, is this your true verdict?

JUROR NO. 8:  Yes.

THE COURT:  Juror 9, is this your true verdict?

JUROR NO. 9:  Yes.

THE COURT:  And juror 10, is this your true verdict?

JUROR NO. 10:  Yes.

THE COURT:  Juror 11, is this your true verdict?

JUROR NO. 11:  Yes.

THE COURT:  Juror 12, is this your true verdict?

JUROR NO. 12:  Yes.

3303

THE COURT:  All right.  It does appear to be in order.

Moving to the verdict form for Mr. Francis Clement.

As to COUNT 1, conspiracy to participate in racketeering enterprise in violation of Title 18, United States Code, Section 1962(d), we, the jury, in matter unanimously find defendant Francis Clement.

Answer:  Guilty.

Question 2:  Having found defendant, Francis Clement, guilty of the offense charged in Count 1, we, the jury, further unanimously find that as a part of that offense, defendant Francis Clement:

a. On or about October 4th of 2020, while aided and abetted by others, did unlawfully, willfully, and intentionally, and with premeditation and premeditation, kill Allan Roshanski with malice of forethought.

Answer:  Yes.

b. On or about October 4th of 2020, while aided and abetted by others, did unlawfully, willfully, and intentionally, and with deliberation premeditation, kill Ruslan Megomedgadzhiev, with malice aforethought.

Answer:  Yes.

Question c. On or about February 22nd of 2022, while aided and abetted by others did unlawfully, willfully, and intentionally, and with deliberation and premeditation, kill

3304

Michael Brizendine with malice of forethought.

Answer:  Yes.

Question d. On or about March 8th of 2022, while aided and abetted by others, did unlawfully, willfully, and intentionally, and with deliberation and premeditation kill Ronald Ennis with malice of forethought.

Answer:  Yes.

On or about March 8th of 2022, while aided and abetted by others, did unlawfully, willfully, and intentionally, and with deliberation and premedication, kill James Yagle with malice of thought.

Answer:  Yes.

Question f. On or about January 24th of 2016, while aided and abetted by others, did unlawfully, willfully, and intentionally, and with deliberation and premeditation kill Brandon Lowrey with malice aforethought.

Answer:  Yes.

As to COUNT 2, murder in aid of racketeering (Allan Roshanski) in violation of Title 18, United States Code, Section 1959(a)(1), we, the jury, unanimously find Defendant Francis Clement:

Answer:  Guilty.

As to Count 4 -- I'm sorry.  As to Question 4, as to COUNT 3, murder in aid of racketeering (Ruslan Megomedgadzhiev), in violation of Title 18, United States

3305

Code, Section 1959(a)(1), we, the jury, unanimously find defendant Francis Clement:

Answer:  Guilty.

As to COUNT 4, murder in aid of racketeering (Michael Brizendine) in violation of Title 18, United States Code, Section 1959(a)(1), we, the jury, unanimously find defendant Francis Clement:

Answer:  Guilty.

As to COUNT 5, Question 6, murder in aid of racketeering (Ronald Ennis) in violation of Title 18, United States Code, Section 1959(a)(1), we, the jury, unanimously find defendant Francis Clement:

Answer:  Guilty.

As to COUNT 6, as to Question 7, murder in aid of racketeering (James Yagle) in violation of Title 18, United States Code, Section 1959(a)(1), we, the jury, unanimously find defendant Francis Clement:

Answer:  Guilty.

Does Mr. Clement wish to have the jury polled?

MS. FISHER-BYRIALSEN:  No.

THE COURT:  The government?

MS. STOKMAN:  No.

THE COURT:  All right.  As to the verdict form as to Mr. Stinson.

As to the COUNT 1, conspiracy to participate in a

3306

racketeering enterprise, in violation of Title 18, United States Code, Section 1962(d), we, the jury, in the matter unanimously find defendant John Stinson:

Answer:  Guilty.

Question 2:  Having found defendant, John Stinson, guilty of the defense -- of the offense charged in Count 1, we, the jury, further unanimously find as part of that offense defendant, John Stinson:

a. On or about October 1, 2022, continuing to on or about May 1 of 2023, unlawfully, willfully, and intentionally, conspired with others to kill Andrew Collins with malice of forethought.

Answer:  Yes.

Does Mr. Stinson wish to have the jury polled?

MR. REED:  No, Your Honor.

THE COURT:  The government?

MS. STOKMAN:  No.

THE COURT:  All right.  Is there anything else then for the jury at this time from any party?

MS. STOKMAN:  No.

THE COURT:  Ladies and gentlemen, thank you so much for your attention over the last six weeks.  We do certainly appreciate the sacrifice this has been to you and your families and friends and employers.

I have repeatedly told you not to discuss this case.

3307

You are now free from that.  If you wish to discuss this case, it's completely up to you.  Oftentimes the attorneys do want to talk with jurors to find out what they thought about the trial or other questions.

If you would like to participate in that, I'm going to have the jury room available for counsel to come in and ask you those questions.

If you don't want to participate in that, I'm going to give you a head start to grab your things and you can just leave your juror badges and your notes, and leave at that time.

If, after leaving, someone can persist in asking you questions, please come right back here and I will handle that for you.  Otherwise, thank you again so much for your time and your attention.

And at this time you're excused to the jury room and to go about your business.  Thank you.

(Jury exits the courtroom at 12:42 p.m.)

THE COURT:  The jury members have stepped out.  At this time, I do need to refer the matters to probation for the preparation of the presentence report and set it for sentencing.

The dates, I'm being requested by probation is, May 19th.  Does that work for everyone 's calendar?

MS. STOKMAN:  It works for the government.

3308

MR. VILLA:  Your Honor, on behalf of Mr. Johnson, he doesn't intend to participate in an interview.  And also I think, you know, we can have an expedited PSR and sentencing process.  Is there any sooner time frame?

THE COURT:  I'm sure we could in that event.

Irma, could you --

MS. FISHER-BYRIALSEN:  Same goes for Mr. Clement. He's not going to do the interview, Your Honor.

THE COURT:  All right.

MR. REED:  Mr. Stinson as well, Your Honor.

THE COURT:  All right.  Could you inquire then. We'll come back then to that.

Otherwise is there anything for the record at this time?

MS. FISHER-BYRIALSEN:  No.

MR. VILLA:  No, Your Honor.

MR. REED:  No, Your Honor.

THE COURT:  All right.  We'll get that date.  We'll go off the record for a moment.

(Brief recess held.)

THE COURT:  All right.  Let's go back on the record.

So what we're told is probation due to staffing is my understanding they cannot prepare a report any faster than May 19th.  It's not the interview that causes the delay.  It's having the staff to do it.

3309

What we'll do is set for May 19th.  You'll have the opportunity to make your informal objections and go through that process.  If it turns out you get the PSR and there aren't objections, I'm happy to advance the hearing.  So that will give you the option of how to proceed.

Otherwise then, would May 19th work?

MS. FISHER-BYRIALSEN:  If --

THE COURT:  If it doesn't and there's no objection, basically any Monday it could be advanced to, in advance of that.

MS. FISHER-BYRIALSEN:  Okay.

MR. REED:  That's fine, Your Honor.

MS. FISHER-BYRIALSEN:  Can they be released from whatever hold there is on them here?

THE COURT:  No.  They can't until after sentencing.

MS. FISHER-BYRIALSEN:  Even if they want to waive their appearance for that?

THE COURT:  Well, what I would need is a different motion on that.  I'll set it on the 19th or whatever date we want.  Then I could entertain your separate requests on that.

DEFENDANT JOHNSON:  Judge, we're being held in solitary confinement until we get back we're in GP, back where we were.

And Clement is peeing blood for crying out loud. He's been peeing blood for the last two weeks, and he's really

3310

sick.  I've got two holes in my stomach that need to be fixed, you know what I mean?

THE COURT:  I do.

DEFENDANT JOHNSON:  Just saying this place ain't doing it for us.  Basically, we're being arbitrarily held in solitary confinement and being punished.  For -- for what?  Just to get to come back to get sentenced in 90 days or whatever it is.  I mean, there's no point, 90 days there.  We'll be back here.  They can transport us one time.

THE COURT:  Mr. Johnson, are you going to want to come back for sentencing?

DEFENDANT JOHNSON:  Not if you'll let me go.  That's cool.  I don't need it.  My lawyers can handle it.

THE COURT:  I'm sure your attorneys can get something on file right away, and we can deal with that.  And then I'll just hear the request from other defendants as well.

DEFENDANT JOHNSON:  I appreciate it.  Thank you.

MR. VILLA:  Thank you, Judge.

THE COURT:  So May 19th then?

MS. FISHER-BYRIALSEN:  Yeah, is that 9:00 a.m. setting?

THE COURT:  9:00 a.m.

Mr. Reed, does that --

MR. REED:  Yes, Your Honor.  I looked at the Rule 43 waiver that I filed on behalf of Mr. Stinson, which looks like

3311

it would cover everything up to and including the sentencing. If the Court wishes a specific -- a more specific order that says sentencing, because it says "every hearing," I would do that.

THE COURT:  All right.  Let's go ahead and do that.

But Mr. Stinson, while you're here, you're saying you do not want to be returned for purposes of sentence to court.

DEFENDANT STINSON:  No, I do not.

THE COURT:  So, Mr. Reed, if you can just get that on file, I will note that Mr. Stinson does not want to return for purposes of sentencing.

MR. REED:  Yes, Your Honor.

MR. VILLA:  We'll do the same thing, Your Honor. He's also saying orally that he wishes to waive.

And the only other matter I can think of, Judge, is you still have under advisement the Rule 29.  Were you just planning to issue a written opinion on that?

THE COURT:  Yes.

MR. VILLA:  Okay.

THE COURT:  So Mr. Johnson, you're telling me then, you've decided you don't want to come back for sentencing for sure?

DEFENDANT JOHNSON:  I've got six life sentences, Judge, no, I don't want to come back.

THE COURT:  All right.  Thank you.

3312

Anything else then, at this time?  All right.

MS. FISHER-BYRIALSEN:  No.

THE COURT:  I'll set it then for all sentencings on May 19th, at 9:00 a.m.  Thank you.

(Proceedings were concluded at 12:50 p.m.)

I, RACHAEL LUNDY, Official Reporter, do hereby certify the foregoing transcript as true and correct.

Dated:  February 14, 2025          /s/ Rachael Lundy_____
                                   RACHAEL LUNDY, CSR-RMR
                                   CSR No. 13815

ER 2648