# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,  
    Plaintiff - Appellate,

v.

FRANCIS CLEMENT,  
    Defendant - Appellant.

**No. 25-3648**  
D.C. No. 1:20-cr-00238-JLT-SKO-12  
Eastern District of California, Fresno

---

UNITED STATES OF AMERICA,  
    Plaintiff - Appellate,

v.

KENNETH JOHNSON,  
    Defendant - Appellant.

**No. 25-3645**  
D.C. No. 1:20-cr-00238-JLT-SKO-11  
Eastern District of California, Fresno

---

## OPENING BRIEF OF APPELLANT FRANCIS CLEMENT

---

*Counsel for Defendant-Appellant Mr. Francis Clement:*

JANE FISHER-BYRIALSEN  
Fisher & Byrialsen, PLLC  
4600 S. Syracuse Street  
Denver, CO 80137  
jane@fblaw.org

JEAN D. BARRETT  
Ruhnke & Barrett  
47 Park Street  
Montclair, NJ 07042  
jeanbarrett@ruhnkeandbarrett.com

**ORAL ARGUMENT IS REQUESTED**

**Table of Contents**

Table of Contents .................................................................................i

Table of Authorities ......................................................................... iii

Jurisdictional Statement ......................................................................1

Custody Status.....................................................................................1

Statement of the Issues........................................................................1

Statement of Facts................................................................................2

Summary of Argument ........................................................................5

Reviewability and Standard of Review ................................................6

    Issue I.      This Court reviews *Brady and Giglio* violations *de novo* ..........6

    Issue II.     Sufficiency of the evidence is reviewed *de novo*........................7

    Issue III.    Objection to Consecutive Sentencing .........................................9

Argument............................................................................................10

    I.       The court abused its discretion in denying the motion for mistrial when the Government's *Giglio/Brady* violation came to light during the trial testimony of informant Brian Rapinoe .................10

        A. Additional Facts ...........................................................10

        B. Argument.....................................................................17

           1. The government's failure to disclose the Rapinoe impeachment material violated Brady v. Maryland ........................................17

           2. The trial court abused its discretion in denying the motion for mistrial..................................................................27

    II.      The Evidence Presented at Trial was Insufficient to Sustain the Convictions Because the Government Failed to Prove Identity ..................30

    III.    Imposition of Consecutive Sentences of Life without Release was an Abuse of Discretion .................................................................34

Statement with Respect to Oral Argument...........................................38

Conclusion ..........................................................................................38

Certificate of Compliance with Type-Volume Limit Typeface Requirements and Type Style Requirements ..................................................................................39

Certificate of Service ..........................................................................................40

## Table of Authorities

**Cases**                                                                 **Page**

*Berger v. United States,* 295 U.S. 78, 88 (1935) ......................................................28

*Brady v. Maryland*, 373 U.S. 83, 87 (1963) ...............................................17, 18, 20

*Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir.1997) ...........................................22

*Davis v. Alaska,* 415 U.S. 308, 316–17 (1974).......................................................26

*Gall v. United States,* 552 U.S. 38, 49 (2007) .......................................................36

*Giglio v. United States*, 405 U.S. 150 (1972) ...............................18, 19, 20, 21, 22

*Gonzalez v. Wong,* 667 F.3d 965, 982 (9th Cir.2011) .............................................26

*In re Winship*, 397 U.S. 358, 364 (1970) ...............................................................34

*Klein v. Martin,* No. 25–51, Slip. Op. at 607 U.S. ____ (2026) ............................23

*Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ......................................................18, 24

*Mooney v. Holohan,* 294 U.S. 103 (1935) ........................................................17, 18

*N. Mariana Islands v. Bowie,* 236 F.3d 1083, 1089 (9th Cir.2001) .......................28

*Napue v. Illinois,* 360 U.S. 264 (1959) ........................................................17, 18, 26

*Rita v. United States*, 551 U.S. 338, 347–348 (2007) .............................................36

*Singh v. Prunty,* 142 F.3d 1157, 1162 (9th Cir.1998)..............................................25

*Strickler v. Greene,* 527 U.S. 263, 281–82 (1999) ......................................18, 23, 27

*Thomas v. United States,* 343 F.2d 49 (9th Cir.1965) .............................................19

*Victor v. Nebraska,* 511 U.S. 1, 5 (1994) ...............................................................34

*United States v. Agurs,* 427 U.S. 97, 111 (1976) ....................................................23

*United States v. Alexander*, 48 F.3d 1477, 1489–90 (9th Cir. 1995) ...................8, 33

*United States v. Bagley,* 473 U.S. 667, 682 (1985) ............................................21, 23

*United States v. Bernal-Obeso,* 989 F.2d 331, 333–34 (9th Cir. 1993) ..................21

*United States v. Blanco,* 392 F.3d 382, 387 (9th Cir.2004) ...............................6, 22

*United States v. Brooke,* 4 F.3d 1480, 1489 (9th Cir.1993) ...................................25

*United States v. Brumel-Alvarez,* 991 F.2d 1452, 1461 (9th Cir.1992) ..................22

*United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020) ..........................................29

*United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008) ........................27, 28, 29

*United States v. Cloud*, 102 F.4th 968, 977 (9th Cir. 2024) ......................22, 27, 29

*United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir. 1985) ..........................20

*United States v. Howell*, 231 F.3d 615, 624 (9th Cir. 2000) .....................................7

*United States v. Jernigan,* 492 F.3d 1050, 1053 (9th Cir.2007)...............................24

*United States v. Katakis,* 800 F.3d 1017, 1024 (9th Cir. 2015) ...............................34

*United States v. Kohring,* 637 F.3d 895, 905–06 (9th Cir.2011) ........................26, 29

*United States v. Lucas,* 963 F.2d 243, 247 (9th Cir.1992) ........................................8

*United States v. Merino,* 44 F.3d 749, 754 (9th Cir. 1994) ......................................9

*United States v. Mincoff*, 574 F.3d 1186, 1192 (9th Cir. 2009) ...............................6

*United States v. Oruche,* 484 F.3d 590, 595–96 (D.C.Cir.2007) .............................6

*United States v. Pelisamen,* 641 F.3d 399, 408 (9th Cir.2011) ................................7

*United States v. Pool,* 660 F.2d 547, 560 (5th Cir. 1981) ......................................33

*United States v. Price,* 566 F.3d 900, 907 n. 6 (9th Cir.2009) .......... 6, 20, 22, 24-26

*United States v. Sedaghaty*, 728 F.3d 885, 899–900 (9th Cir. 2013) ............. 6, 23-26

*United States v. Shaffer,* 789 F.2d 682, 689 (9th Cir.1986) ....................................21

*United States v. Sudikoff*, 36 F. Supp. 2d 1196, 1201 (C.D. Cal. 1999) ..... 18, 21-22

*United States v. Sullivan*, 159 F.4th 579, 588 (9th Cir. 2025)...................................7

*United States v. Thompson*, 127 F.4th 1204, 1209 (9th Cir. 2025)............................9

*United States v. Zuno–Arce,* 44 F.3d 1420, 1425 (9th Cir.1995)...............................7

**Statutes**

18 U.S.C. § 1959 ..................................................................................................2

18 U.S.C. § 3553 .................................................................................. 6, 36-37

**Other Authority**

Fed. R. App. P. 4 ................................................................................................1

Fed. R. App. P. 28 ..............................................................................................1

Fed. R. Crim. P. 29 ............................................................................................8

U.S. Department of Justice, *Prosecution of Public Corruption Cases*, 117-18 (National Institute of Justice 1988) available at https://www.ojp.gov/ncjrs/virtual-library/abstracts/prosecution-public-corruption-cases ...........................................19

## JURISDICTIONAL STATEMENT

The United States District Court for the Eastern District of California had jurisdiction pursuant to 18 U.S.C. § 3231. This court's jurisdiction arises under 28 U.S.C. § 1291. *See* Fed. R. App. P. 28(A)(4)(D). Mr. Clement was found guilty on all counts at a jury trial held January 6, 2025 through February 15, 2025. *See* 2-ER-175-177. The district court entered its final judgment on May 23, 2025. *See* 1-ER-47 Mr. Clement timely noticed this appeal June 6, 2025. *See* 2-ER-270. *See also* Fed. R. App. P. 4(b)(1).

## CUSTODY STATUS

Appellant Francis Clement is in custody of the California Department of Corrections having served 41 years on a 16 year to life sentence. Following completion of that sentence, he must serve three consecutive state sentences totaling 20 additional years. The sentence in this case of four consecutive life imprisonment sentences in the Bureau of Prisons is consecutive to the California sentences.

## STATEMENT OF THE ISSUES

I.   **Whether the Court abused its discretion in denying the motion for mistrial when the Government's *Giglio* violation came to light during the trial testimony of informant Brian Rapinoe.**

1

**II.**     **Whether Mr. Clement's motion for judgment of acquittal should have been granted because the government failed to prove his identity beyond a reasonable doubt.**

**III.**     **Whether the district court abused its discretion in imposing four consecutive life without release sentences.**

## STATEMENT OF FACTS

The Government alleged that codefendants Francis Clement, Kenneth Johnson, and John Stinson were incarcerated members ("brothers") of the Aryan Brotherhood gang ("AB") who exerted control over non-incarcerated members and ordered violent criminal acts to occur outside prison. *See* 2-ER-240 (Third Superseding Indictment). At all times relevant to the charges, Mr. Clement was incarcerated in the California State prison system. He is not alleged to have personally committed any of the acts alleged.

In Count One, Mr. Clement was charged with a racketeering conspiracy occurring between 2015 and March 1, 2023, in violation of 18 U.S.C. § 1959(d). 2-ER-255 (Third Superseding Indictment). *See* 1-ER-90 (jury instruction 20). The government alleged that as part of his dealings with AB business, Clement engaged in conspiracy to commit murder, robbery, fraud, and drug trafficking. *See* 1-ER-93 (jury instruction 22, defining "racketeering activity"), *and* 1-ER-95 (instruction 24, alleging a pattern of racketeering). As explained in more depth below, in Counts

**2**

Two through Six, the government alleged that Mr. Clement committed five murders in aid of racketeering. *See* 1-ER-109-110 (jury instructions), *and* 1-ER-180-181 (verdict forms).

Mr. Clement was convicted of Count One as charged. *See* 2-ER-178-180 (verdict forms). As part of Count One, the jury found Mr. Clement, while aided and abetted by others, killed Allan Roshanski, Ruslan Magomedgadzhiev, Michael Brizendine, Ronald Ennis, James Yagle, and Brandon Lowrey. *See* 2-ER-179-180 (verdict forms).[1]

Mr. Clement was also convicted in Counts Two through Six with Murder in Aid of Racketeering as both a principal and under a theory of aiding and abetting. *See* 2-ER-180-181 (verdict forms), 2-ER-255-256 (Third Superseding Indictment), *and* 1-ER-109-111 (jury instructions 38 and 39). Those counts related to the deaths of Allan Roshanski (Count Two), Ruslan Magomedgadzhiev (Count Three),

---

[1] The killing of Brandon Lowrey was alleged as a racketeering act in Count One but was not alleged in a separate count. On January 24, 2016, while Mr. Lowrey was a prison inmate at the Kern Valley State Prison, Thrasher Holmeyer killed him. Robert Eversole testified that Mr. Holmeyer said Kenneth Johnson told him to kill Mr. Lowrey. As to the killing of Brandon Lowrey (Count One), Mr. Clement incorporates by reference the statement of facts and citations provided in the Opening Brief filed by codefendant Kenneth Johnson in consolidated case No. 23-3645. See FRAP 28 (i) (In consolidated cases, "any party may adopt by reference a part of another's brief.").

**3**

Michael Brizendine (Count Four), Ronald Ennis (Count Five), and James Yagle (Count Six). *See* 2-ER-180-181 (verdict forms).

As to the killings of Allan Roshanski (Counts One and Two) and Ruslan Magomedgadzhiev (Counts One and Three), Mr. Clement incorporates by reference the statement of facts and citations provided in the Opening Brief filed by co-defendant Kenneth Johnson in consolidated case No. 23-3645. *See* FRAP 28 (i) (In consolidated cases, "any party may adopt by reference a part of another's brief.").

As to the killing of Michael Brezindine (Counts One and Four) ("the Lancaster murder"), the government presented evidence that Mr. Brezindine was killed by James Field on February 22, 2022. *See* 7-ER-1094. James Field testified that Mr. Clement and Jason Weaver ordered the murder of Mr. Brezindine because he had lost AB money and failed to follow orders in connection with a robbery that had been ordered to take place in Hollywood ("the Hollywood robbery.") *See* 7-ER-1070-1072, *and* 7-ER-1088-1094. Field was allegedly motivated by a desire to prove himself because he was up for membership in the AB. *See* 7-ER-1067-1068.

As to the killing of Ronald Ennis and James Yagle (Counts One, Five, and Six) ("the Pomona murders"), the government presented the testimony of Brandon Bannick that, with Mr. Clement on the phone giving instructions, James Field, Evan Perkins, and Bannick shot and killed Mssrs. Yagle and Ennis on March 8, 2022. *See* 10-ER-1847-1850 (Bannick's testimony). *See also* 7-ER-1103-1106, *and* 7-ER-

**4**

1151:20-24 (Field's testimony). The alleged motivation was that Mssrs. Ennis and Yagle had botched a mission where they were supposed to go retrieve money from two other men who owed the AB money. *See* 10-ER-1833-1834, *and* 10-ER-2503-2504.

Mr. Clement was convicted of one count of conspiracy to participate in a racketeering enterprise and five counts of murder in aid of racketeering and sentenced to four consecutive and two concurrent life imprisonment sentences. *See* 1-ER-47-48, 1-ER-61, 2-ER-178-181.

## SUMMARY OF ARGUMENT

On de novo review, this Court should find that the trial court should have granted the motion for mistrial when substantial *Brady/Giglio* violations came to light during the testimony of Brian Rapinoe. Prior to trial, the government had failed to disclose that Mr. Rapinoe was a paid informant. Nor had the government disclosed that he had been terminated from his CI status. By the time the information came to light during trial, Rapinoe was already on the witness stand and it was impossible to repair the damage the nondisclosure had caused. Under these circumstances, the trial judge abused her discretion in denying the motion for mistrial.

Mr. Clement asks this Court to find insufficient evidence for conviction because at trial, no witness made an in-court identification of Mr. Clement. Almost all the alleged contact between testifying witnesses and the person they knew as

"Frank" occurred on call phones. Even though there was some evidence one witness had a videoconference with a person he knew as "Frank," that witness was never asked whether that person was sitting in the courtroom or even whether that person resembled the person sitting at counsel table in the courtroom. While an in-court identification is not a formal requirement for sufficiency of the evidence, it was a practical requirement in this case. Without it, the evidence was insufficient to convict.

Service of four consecutive life sentences is a legal impossibility and an illegal sentence. Mr. Clement has only one life he can give. Mr. Clement submits that the imposition of consecutive life sentences is contrary to the letter and the spirit of both the United States Sentencing Guidelines and 18 U.S.C. § 3553(a).

## REVIEWABILITY AND STANDARD OF REVIEW

**Issue I:** This Court reviews *Brady and Giglio* violations *de novo*. *United States v. Mincoff*, 574 F.3d 1186, 1192 (9th Cir. 2009) (quoting *United States v. Blanco,* 392 F.3d 382, 387 (9th Cir.2004)). The assessment of the materiality under *Brady* is a question of law reviewed de novo. *United States v. Price,* 566 F.3d 900, 907 n. 6 (9th Cir.2009); *see also United States v. Oruche,* 484 F.3d 590, 595–96 (D.C.Cir.2007).

This Court reviews a district court's denial of a mistrial based on *Brady* violations *de novo. United States v. Sedaghaty*, 728 F.3d 885, 899–900 (9th Cir.

**6**

2013); *United States v. Howell*, 231 F.3d 615, 624 (9th Cir. 2000), citing *United States v. Zuno–Arce,* 44 F.3d 1420, 1425 (9th Cir.1995). *See United States v. Pelisamen,* 641 F.3d 399, 408 (9th Cir.2011).

The defense objected immediately when the *Brady/Giglio* violation came to light at trial on January 31, 2025. *See* 9-ER-1682. On February 4, 2025, the defense reiterated their objection in open court (10-ER-1706-1707) and in a written motion filed that evening (2-ER-210) requesting sanctions and dismissal or in the alternative, a mistrial. On the morning of February 5, 2025, the defense continued to seek dismissal or in the alternative, a mistrial. *See* 11-ER-1912-1916, 11-ER-1918-1919, 11-ER-1923-1924, 11-ER-1929. In the afternoon, the defense renewed the motion to dismiss or in the alternative, for a mistrial. *See* 11-ER-2067.

The court orally denied the motions on February 4, 2025 (11-ER-1935) but permitted the defense to delay cross-examination and ordered the government to provide the information to defense counsel. *See* 11-ER-1907-1908, 11-ER-1911-12. On February 5, 2025, the court denied the motions again. *See* 11-ER-2070. The district court commented that the issue was preserved and acknowledged it would be an issue for appeal. *See* 11-ER-1935.

**Issue II:** Sufficiency of the evidence is reviewed de novo. *United States v. Sullivan*, 159 F.4th 579, 588 (9th Cir. 2025). "In reviewing a district court's denial of a motion for judgment of acquittal based on insufficient evidence of identification,

7

[this court applies] the same test that the district court must employ in deciding whether to grant the motion in the first instance." *United States v. Alexander*, 48 F.3d 1477, 1489–90 (9th Cir. 1995), citing *United States v. Lucas,* 963 F.2d 243, 247 (9th Cir.1992). A motion for judgment of acquittal should be granted if, viewing the evidence in the light most favorable to the government, no rational trier of fact could find beyond a reasonable doubt that the defendant is the person who committed the charged crime. *United States v. Lucas,* 963 F.2d at 247 (9th Cir.1992).

At the close of the government's case in chief, Mr. Clement moved for a judgment of acquittal under Fed. R. Crim. P. 29. *See* 12-ER-2280:10-12, joining argument set forth at 12-ER-2277-2279. In a joint argument, the defendants argued that the government failed to present sufficient evidence of his identity, preserving for review the same arguments raised herein. *See* 12-ER-2277-2280. The Court took the matter under advisement. *See* 12-ER-2281:15-16. Mr. Clement elected not to present any evidence. *See* 12-ER-2292:9-10. Mr. Clement renewed the motion for acquittal (12-ER-2394:19-20), and the trial court took it under submission. *See* 12-ER-2395:5-6.

In a written order filed February 22, 2025, the court denied the motion for acquittal. *See* 1-ER-63. The Court agreed that "no witness pointed to the defendants and identified them as those who committed the charged crimes." *See* 1-ER-64:9-10. Instead, the Court relied on the testimony of Detective Knieriem, who discussed

**8**

his familiarity with the Aryan Brotherhood and defendants and identified photographs that were admitted. *See* 1-ER-64:9-18. The court also observed that two witnesses testified they had seen "Frank" on video calls (1-ER-65:4-6), (1-ER-66:5), even though neither testified that the man sitting at counsel table was the same man they saw on those calls.

**Issue III**: At sentencing, defense counsel objected to consecutive sentencing and argued that the Court must impose concurrent life imprisonment sentences for Count 1 (racketeering conspiracy) and the murder in aid of racketeering convictions in Counts 2, 4, and 5, along with concurrent life sentences on Counts 3 and 6. *See* 1-ER-27-28, *and* 1-ER-21:15-18. Defense counsel argued that consecutive life terms were an impossibility and meaningless and raised double jeopardy concerns. *See* 1-ER-24-25, 1-ER-29:12-13, *and* 1-ER-31:17-19. The court overruled the defense objections and imposed four consecutive life sentences on Mr. Clement. *See* 1-ER-34:14-20, *and* 1-ER-35:1-8.

Generally, review is for the abuse of discretion. *United States v. Thompson*, 127 F.4th 1204, 1209 (9th Cir. 2025) ("Our court generally reviews a district court's decision to impose concurrent or consecutive sentences for an abuse of discretion."). However, because the question of whether consecutive life sentences can be imposed is a legal issue, review should be de novo. *United States v. Merino,* 44 F.3d 749, 754 (9th Cir. 1994) ("A district court's application of the Sentencing Guidelines is subject

**9**

to de novo review."); *id.*, at 756 ("[W]hether the district court had legal authority to depart is reviewed de novo.")

## ARGUMENT

**I.     THE COURT ABUSED ITS DISCRETION IN DENYING THE MOTION FOR MISTRIAL WHEN THE GOVERNMENT'S *GIGLIO/BRADY* VIOLATION CAME TO LIGHT DURING THE TRIAL TESTIMONY OF INFORMANT BRIAN RAPINOE.**

### A.     Additional Facts

Brian Rapinoe was a key witness for the prosecution. *See* 9-ER-1647, 10-ER-1712, 11-ER-2072, *and* 12-ER-2114. The government alleged that Rapinoe worked for co-defendant Stinson and another man (Andrew Collins) and submitted fraudulent claims to the California Employment and Development Department ("EDD"); the claims were submitted mainly in codefendant Stinson's name but also at least one in Clement's name. *See* 9-ER-1654-1660. Rapinoe would receive benefit cards from this fraudulent representation through the mail to his address in San Diego. Rapinoe was arrested on November 13, 2020. *See* 12-ER-2151. As set forth more fully below, he immediately reached out to cooperate. *See* 12-ER-2152. He was released from custody in January 2022. *See* 12-ER-2153.

Rapinoe claimed to have planned to traffic methamphetamine for Clement while he was working as a confidential informant for the ATF and tape-recording conversations. *See* 9-ER-1672-1680. Rapinoe claimed Clement sent him a photo of the methamphetamine he was supposed to purchase. *See* 9-ER-1675-1677. Rapinoe

**10**

testified that Clement wanted him to purchase the drugs from a Los Angeles drug connection named Mike whose information was provided by Johnson. *See* 9-ER-1680, *and* 10-ER-1713-1714. Rapinoe testified that the connection couldn't obtain the drugs and the deal never went through. *See* 9-ER-1677, *and* 10-ER-1713-1714.

Rapinoe was rewarded for his cooperation. Even though Rapinoe had been trafficking heroin from Mexico into the United States, he wasn't charged with that crime. *See* 12-ER-2118-2120, 12-ER-2124-2128, *and* 12-ER-2130-2131. He testified before a grand jury in the Southern District of California that because of his cooperation, he wasn't "being charged federally." *See* 12-ER-2146, *and* 12-ER-2159.

### ***The government's failure to disclose information***

Not until during his direct testimony at trial was it disclosed that Rapinoe was a paid informant for the ATF, working with the case agent in this case. *See* 11-ER-1900, *and* 11-ER-1926 (government agreed they hadn't given notice until during trial), 11-ER-1935 (same), 11-ER-1928, 11-ER-1933, 11-ER-2094-2095, *and* 10-ER-1705-1707 (defense objection). As explained below, the defense had not been provided (1) any cooperation agreement, (2) his contract/agreement with ATF, (3) payment receipts, and/or (4) information about the fact he was deactivated as an informant for misconduct.

**11**

The chronology of the government's suppression of this evidence, and its rolling disclosures even as it attempted to hasten completion of Rapinoe's testimony, is outlined below:

During Rapinoe's direct examination which began on Friday, January 31, 2025, he testified that when he was arrested in November 2020, he became a paid informant for ATF. *See* 9-ER-1672. The defense objected stating they hadn't received any records of the fact that he was paid and the amounts involved. *See* 9-ER-1682. The court ordered it disclosed by Monday, February 3, 2025. *See* 9-ER-1682.

On the next trial day, February 4, 2025, the defense advised the court that, over the weekend, defense counsel had reviewed a transcript of Rapinoe's testimony before a Southern District of California grand jury in San Diego during which he testified "that he has a cooperation agreement with the government." *See* 10-ER-1700-1701. The government argued the defense was not entitled to Rapinoe's agreement in San Diego because it was in a different district and "had nothing to do with this case and this investigation." *See* 10-ER-1701. The government later reported that after contacting the A.U.S.A. in charge of the San Diego case, it learned

**12**

that "there was no cooperation agreement in the Southern District of California." *See* 10-ER-1744, *and* 10-ER-1783.[2]

Contrary to the court's order the previous Friday (January 31) to provide the defense with records of payments made to Rapinoe, the government had provided only one payment receipt to the defense and hadn't provided Rapinoe's confidential informant contract. *See* 10-ER-1706. Instead, the government claimed that its Jencks Act disclosures included "ATF reports that indicated he was a paid informant," *See* 10-ER-1706, but couldn't direct the court to the Bates numbers of those reports. *See* 10-ER-1710-11. Eventually the government pointed to a notation in the discovery referring to the existence of a confidential informant, but, as the defense noted, not revealing that the informant had been paid. *See* 10-ER-1745. The defense argued that the confrontation clause required disclosure of the confidential informant contract, (10-ER-1707), and the court agreed. *See* 10-ER-1709, *and* 10-ER-1756. Later that same day the government attempted to comply with the order by producing a blank form contract but not the signed one Rapinoe had executed. *See* 10-ER-1757-58.

---

[2] As explained in more detail below, the government's statement was contrary to Rapinoe's later testimony in this trial. See 12-ER-2133, 12-ER-2144-2147, 12-ER-2152, 12-ER-2156-2159.

13

Rapinoe's direct testimony continued on February 4, 2025, but because the government had not provided the documents related to the witness's informant employment, the cross examination was postponed.

After court on February 4, 2025, the government sent an email stating it had "located 2 more payments" made to Rapinoe and that the total paid by the ATF to Rapinoe was $4,200. *See* 2-ER-217. The government also revealed that Rapinoe was deactivated as a confidential informant in 2022 following issuance of an arrest warrant in San Diego County. *See* 2-ER-217.

That evening, the defense filed a *Joint Motion to Dismiss or in the Alternative, for a Mistrial Based on Due Process Violations*. *See* 2-ER-210-217. Defense counsel explained that late on February 4, 2025, counsel for co-defendant Stinson attempted to obtain records from the court in San Diego; however, those efforts were unsuccessful because the court's records had not been scanned and uploaded and anyone seeking the records would have to go to court to obtain a hard copy of the records and, depending upon what might be found, then locate and interview witnesses. *See* 2-ER-211-212. The defense explained they were obligated to investigate the reasons for Rapinoe's deactivation and that this had to take place prior to cross-examination. The defense argued that, because the case was so far into trial at that point, a mistrial was the only appropriate remedy to remedy prejudice and was warranted in the interests of justice. *See* 2-ER-212-216.

**14**

In court on the morning of Wednesday, February 5, 2025, the defense renewed their motion for dismissal or in the alternative, for a mistrial. *See* 11-ER-1912-1916, *and* 11-ER-1923-1924. They explained their investigation had been hampered because of the government's late disclosure. *See* 11-ER-1897-1900. The defense also renewed their motion to dismiss or in the alternative, for a mistrial, based on the fact that Agent Gonzalez had signed receipts showing that he had paid Rapinoe, *See* 11-ER-1921-1922, and the government had failed to disclose that information in advance of trial. *See* 11-ER-1918-1919. The court expressed concern about the nondisclosure. *See* 11-ER-1922. The defense pointed to a pattern of nondisclosure in the case and the prejudice inherent in having to split up Rapinoe's testimony over several days, making a mistrial the appropriate remedy. *See* 11-ER-1923-1924, *and* 11-ER-1929.

The district court acknowledged this would be an issue for appeal and it was preserved, but denied the motion because she hadn't heard "the nuts and bolts about where the prejudice lies." *See* 11-ER-1935. The court took the view that if Rapinoe had been deactivated for a missed appointment with his probation officer, it would not be a big deal (11-ER-1907-1908), but agreed that because nobody "want[s] an issue on appeal," Rapinoe's cross-examination could be delayed. *See* 11-ER-1911-1912.

**15**

In the afternoon of Wednesday, February 5, 2025, the government produced information about Rapinoe's probation violation, which they represented to be for absconding from supervision. *See* 11-ER-2063-64. The government claimed that's all they had obtained. *See* 11-ER-2064. The defense balked because it was merely one page with no little information and renewed the motion to dismiss or in the alternative, for a mistrial. *See* 11-ER-2064-2067. The defense explained they had issued subpoenas to the San Diego Sheriff's Office and also the San Diego Probation Department but had been advised that because the records were in archive storage, it would take at least five days for the agencies to comply. *See* 11-ER-2067-2070. The defense had also attempted to obtain records from the San Diego court but had only been able to obtain a list of cases from an online source. *See* 11-ER-1899, 11-ER-1904-1907, *and* 11-ER-2069-2070. Calling the issue a "nothingburger," the court denied the motion. *See* 11-ER-2070.

On Thursday, February 6, Rapinoe was cross-examined and his testimony was contradictory at best. He testified he signed a formal agreement in April 2022 and signed an informant agreement in June 2022 that enabled him to get paid for his confidential informant status. *See* 12-ER-2146-2147, 12-ER-2133 (agreeing that, in April 2022, he "took an ink pen to paper and signed a piece of paper that made you a cooperating witness with the ATF"); 12-ER-2137 (agreeing he "signed a contract with the ATF in June of 2022" and he also signed a plea agreement); 12-ER-2144

**16**

(he signed a cooperation agreement with the state about six months before he testified at the grand jury); 12-ER-2146 (agreeing he "actually signed an agreement"); 12-ER-2152 (agreeing he came to an agreement with the U.S. Attorney's office in San Diego and signed a cooperation agreement and that he also signed an agreement with the State); *and* 12-ER-2156 (he signed an "informant agreement"). *See also* 12-ER-2159 (agreeing there was only one agreement, a confidential informant agreement with the ATF); *and* 12-ER-2132-2133 (testifying both that he signed a contract and that he didn't sign a contract). Rapinoe testified he was paid $4,200.00. *See* 12-ER-2147, 12-ER-2157-2158, *and* 11-ER-1900.

**B.      Argument**

**1.      The government's failure to disclose the Rapinoe impeachment material violated Brady v. Maryland.**

The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires the government to disclose to the defense favorable evidence that "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Drawing on prior cases, the *Brady* Court held that such suppression could violate due process. "When seen as an extension of *Mooney* and *Napue,* it becomes clear that *Brady* concerned the danger that a witness may testify at trial, with the jury accepting the testimony as true, when the government has in its possession evidence that is

**17**

relevant to the credibility of the witness." *United States v. Sudikoff*, 36 F. Supp. 2d 1196, 1201 (C.D. Cal. 1999).[3]

The *Brady* requirement of disclosing such material applies to all members of the prosecutorial team. *Giglio v. United States*, 405 U.S. 150 (1972). The government's duty includes "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

There are three components of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82 (1999). All three components are met here.

### ***The information was material and favorable to the defense***

As the U.S. DOJ recognized long ago,

> Criminals are likely to say and do almost anything to get what they want, especially when what they want is to get out of trouble with the law. This willingness to do anything includes not only truthfully spilling the beans on friends and relatives, but also lying, committing perjury,

---

[3] In *Brady,* the Supreme Court reviewed its prior precedent, especially *Mooney v. Holohan,* 294 U.S. 103 (1935) (finding a due process violation in a conviction that was based on perjury solicited by the government) and *Napue v. Illinois,* 360 U.S. 264 (1959) (finding a similar violation when the government, although not soliciting false evidence, allows it to go uncorrected).

**18**

> manufacturing evidence, soliciting others to corroborate their lies with more lies, and double crossing anyone with whom they come into contact.

U.S. Department of Justice, *Prosecution of Public Corruption Cases*, 117-18 (National Institute of Justice 1988) available at https://www.ojp.gov/ncjrs/virtual-library/abstracts/prosecution-public-corruption-cases, last visited 2/24/2026.

Evidence that undermines the credibility of a prosecution witness has long been considered *Brady* material. *See, e.g., Thomas v. United States,* 343 F.2d 49 (9th Cir.1965). Thus, evidence that would show bias, motive to lie or exaggerate, or dishonesty of the witness is within the scope of *Brady.*

In *Giglio,* the Supreme Court found a *Brady*-type due process violation by the government's suppression of evidence of a leniency agreement with an accomplice witness. *Giglio v. United States,* 405 U.S. at 151. The Supreme Court stated that the accomplice witness's "credibility as a witness was ... an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it." *Id.,* 405 U.S. at 154–155. Thus, the suppression of such evidence violated due process.

A *Giglio* violation occurs where the prosecution fails to disclose evidence that impeaches a witness's credibility, *see Giglio*, 405 U.S. at 154. The Supreme Court extended the prosecution's disclosure obligation to include evidence that is useful to

**19**

the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory. *See Giglio*, 405 U.S. at 153. *Brady/Giglio* disclosures should occur at a time when the information would be of value to the accused. *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir. 1985).

Under *Giglio*, trial prosecutors must disclose favorable information without attempting to predict whether its disclosure might affect the outcome of the trial. In *United States v. Price*, 566 F.3d 900 (9th Cir. 2009), the Court remanded the case for a new trial because the prosecution failed to disclose its star witness's past convictions, which could have been used to undermine her credibility. In a footnote to the Court's opinion, the Court set forth instructions for prosecutors in future cases regarding pretrial disclosure of evidence favorable to the accused:

> the proper test for pretrial disclosure of exculpatory evidence should be an evaluation of whether the evidence is favorable to the defense, i.e., whether it is evidence that helps bolster the defense case or impeach the prosecutor's witnesses…[I]f doubt exists, it should be resolved in favor of the defendant and full disclosure made…[T]he government [should therefore] disclose all evidence relating to guilt or punishment which might reasonably be considered favorable to the defendant's case, even if the evidence is not admissible so long as it is reasonably likely to lead to admissible evidence.

*Id*. at 913 n.14, (source cases quotation omitted). The government was obliged to disclose the payments to Rapinoe and the fact he was working as a paid CI. This type of information is always relevant to the witness's credibility because it reveals

**20**

the witness' bias in favor of the government agent for whom he was working, in this case the very case agent who appeared daily at the prosecutors' table during the bulk of the trial and motive to testify to continue to obtain favorable treatment for himself. Therefore, such information is discoverable under *Brady* and *Giglio.* As the court noted in *United States v. Sudikoff*, *supra*, "criminal informants are cut from untrustworthy cloth:"

> By definition, criminal informants are cut from untrustworthy cloth and must be managed and carefully watched by the government and the courts to prevent them from falsely accusing the innocent, from manufacturing evidence against those under suspicion of crime, and from lying under oath in the courtroom…A prosecutor who does not appreciate the perils of using rewarded criminals as witnesses risks compromising the truth-seeking mission of our criminal justice system…By its actions, the government can either contribute to or eliminate the problem. Accordingly, we expect prosecutors and investigators to take all reasonable measures to safeguard the system against treachery. This responsibility includes the duty as required by *Giglio* to turn over to the defense in discovery *all* material information casting a shadow on a government witness's credibility.

*United States v. Bernal-Obeso,* 989 F.2d 331, 333–34 (9th Cir. 1993) (emphasis in original) (citing *United States v. Shaffer,* 789 F.2d 682, 689 (9th Cir.1986).

Evidence is considered material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682 (1985). *E.g.*, *Giglio*, 405

**21**

U.S. at 154 (finding violation because "the Government's case depended almost entirely" on the cooperating witness's testimony, making impeachment crucial); *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir.1997) (finding violation because lack of corroborating evidence at trial made impeachment evidence material).

This standard is easily met in this case. "[P]roffers of an accomplice witness that led to a leniency agreement and information that reveals the negotiation pursuant to which that agreement was reached might reasonably be considered favorable to the defendant's case." *United States v. Sudikoff*, 36 F. Supp. 2d at 1202. This is evident in this case. Rapinoe's status as a CI and the payments made to him were relevant to his credibility and within the scope of *Giglio*.

"[E]vidence that would impeach a central prosecution witness [like Rapinoe] is indisputably favorable to the accused." *United States v. Price*, 566 F.3d 900, 907 (9th Cir. 2009). *See Giglio v. United States,* 405 U.S. 150, 154 (1972); *see also, e.g., United States v. Blanco,* 392 F.3d 382, 387 (9th Cir.2004) (*Brady/Giglio* information includes " 'that bears on the credibility of a significant witness in the case.' ") (quoting *United States v. Brumel-Alvarez,* 991 F.2d 1452, 1461 (9th Cir.1992)). It "is not the role of the prosecutor to decide that facially exculpatory evidence need not be turned over because the prosecutor thinks the information is false' or has diminished probative value." *United States v. Cloud*, 102 F.4th 968, 977 (9th Cir. 2024).

**22**

### *The evidence was suppressed.*

This component cannot seriously be contested. The evidence that Rapinoe was paid as an informant was not disclosed until Rapinoe began testifying on direct examination. *See* 9-ER-1672-1673. The government lawyer asked Rapinoe if he began serving as an informant for the government in connection with the investigation into the Aryan Brotherhood after his arrest for EDD fraud in November 2020. The government attorney then asked if he was being paid and Rapinoe said he was. Clearly, it was no surprise to the government that Rapinoe was a paid informant. However, it was a surprise to defense counsel. In response to that information the trial court ordered that the receipts and amounts be turned over to the defense by the next court day. *See* 9-ER-1682.

### *Prejudice resulted*

 The question is whether "the withholding of the evidence undermines our trust in the fairness of the trial and the resulting verdict." *United States v. Sedaghaty*, 728 F.3d 885, 900 (9th Cir. 2013). This standard does not require Mr. Clement to 'demonstrate that the evidence if disclosed probably would have resulted in acquittal." *United States v. Bagley,* 473 U.S. 667, 680 (1985) (discussing *United States v. Agurs,* 427 U.S. 97, 111 (1976)). *See Klein v. Martin,* No. 25–51, Slip. Op. at 607 U.S. ____ (2026) WL 189976 at *4-5 (Jan. 26, 2026) (per curiam) (quoting *Strickler v. Greene*, 527 U.S. 263, 290 (1999)). "The touchstone is the 'reasonable

**23**

probability' of a different result, that is, 'not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *United States v. Sedaghaty*, 728 F.3d at 900 *citing Kyles v. Whitley,* 514 U.S. 419, 434 (1995). The test of materiality "is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles v. Whitley,* 514 U.S. at 434–35. *See United States v. Jernigan,* 492 F.3d 1050, 1053 (9th Cir.2007) (en banc); *United States v. Price*, 566 F.3d 900, 911 (9th Cir. 2009).

Rapinoe was one of the government's star witnesses. There is no question that the case turned on his credibility. Yet, he had great motivation to shade his testimony to please the government, in order to better his position vis-a-vis his own criminal liability. During the time he was working as an informant, he recorded conversations allegedly with Mr. Clement about arranging a deal to purchase methamphetamine. The evidence was offered to prove the purpose and methods and means of the enterprise [indictment par. 14(a), 15(b), the pattern of racketeering activity, indictment Count One, par. 18(f) and racketeering act Count One, par. 20(s)] was totally reliant on Rapinoe's testimony even to the identification of the speaker on the tape recordings. Indeed, the entire case against Mr. Clement relied on informants.

24

*Cf. United States v. Price, supra,* 566 F.3d at 913-914 (concluding the suppressed evidence was material and its suppression required a new trial because "the government's other evidence was circumstantial and inconsistent").

The prejudice here was similar to that in *United States v. Sedaghaty, supra*. There, the undisclosed information concerned government payments to a cooperating witness. The payments were not disclosed until during the trial. "In light of the 'importance of allowing a full and fair cross-examination of government witnesses whose testimony is important to the outcome of the case,'" this Court found a *Brady* violation that merited a new trial. *United States v. Sedaghaty,* at 903 (quoting *United States v. Brooke,* 4 F.3d 1480, 1489 (9th Cir.1993)). Concluding it was "not a case where the impeachment evidence would have been cumulative or marginal," this Court added:

> Payments to a government witness are no small thing. …
> The records of the FBI's payments provide[d] significant
> impeachment evidence that would have shaded the jurors'
> perceptions of [the witness]'s credibility.

*Sedaghaty,* at 900-901. *See Singh v. Prunty,* 142 F.3d 1157, 1162 (9th Cir.1998) (reversing conviction because of *Brady* violation where key witness received undisclosed "substantial benefits in exchange for his testimony," because "disclosure of an agreement to provide ... benefits, as well as evidence of the benefits themselves, could have ... substantially impeached [the witness'] credibility"). *See*

**25**

*also Gonzalez v. Wong,* 667 F.3d 965, 982 (9th Cir.2011) ("Where the withheld evidence opens up new avenues for impeachment, [even if significant impeachment evidence was already introduced] it can be argued that it is still material.").

"The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue v. Illinois,* 360 U.S. 264, 269 (1959). For this reason, "[t]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis v. Alaska,* 415 U.S. 308, 316–17 (1974) (citation omitted).

Here, as in *Sedaghaty,* "important additional grounds for impeachment" were suppressed. *Sedaghaty*, at 902. "[I]t would have added an entirely new dimension to the jury's assessment of [the witness]" such that " 'there is a reasonable probability that the withheld evidence would have altered at least one juror's assessment [of the evidence]' " *Sedaghaty,* at 902, quoting *United States v. Kohring,* 637 F.3d 895, 905–06 (9th Cir.2011) (quoting *Price,* 566 F.3d at 914).

### *The three components of a Brady violation have been met*

There is no doubt that all three components of a *Brady* violation are present: the government's payments to Rapinoe, the fact he was deactivated for misconduct, and the nature of his relationship with the government case agent are all highly

**26**

material and are favorable to the defense as impeachment. All of this information had been known to the government and its agents long before trial. Yet – even during trial – the government did not make a full disclosure. The information was suppressed, either willfully or inadvertently, and substantial prejudice ensued. See *Strickler v. Greene, supra,* 527 U.S. at 281–82. Mr. Clement's right to confront the witnesses and to present defense evidence was violated and he was deprived of a meaningful opportunity to impeach Rapinoe. Thus, the court's rulings violated both the Sixth and Fourteenth Amendments.

"Public trust in our judicial system is reinforced by courts protecting constitutional rights." *United States v. Cloud,* 102 F.4th 968, 981 (9th Cir. 2024). This Court should conclude that Clement's due process rights were violated when the government failed to disclose favorable evidence in a manner that was prejudicial to the outcome of the case.

## 2. The trial court abused its discretion in denying the motion for mistrial.

Well-established precedent in this Circuit supports Mr. Clement's claim that the district court abused its discretion in refusing to grant a mistrial.

In *United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008), the court dealt with a situation where the government delivered hundreds of pages of documents, including rap sheets and cooperation agreements, during the trial. The defense

27

argued that the late disclosure prejudiced their case and that recalling witnesses was impractical. The court ultimately dismissed the indictment due to the discovery violations. The court gave meaning to words long echoed in this Circuit:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation [is] to govern impartially ….; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. … [W]hile [the prosecutor] may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States,* 295 U.S. 78, 88 (1935), *quoted in part in Chapman*, 524 F.3d at 1088.[4]

In *Chapman*, the district court dismissed the case and the Ninth Circuit affirmed. The court was "clearly troubled by the government's conduct and its failure to own up to its actions" and its "lack of contrition." *Ibid.* Here, the government exhibited a shockingly lackadaisical attitude toward its discovery obligations in this case and toward its obligation to ensure the defendants have a fair trial.[5]

---

[4] The *Chapman* Court attributes the quotation to *N. Mariana Islands v. Bowie,* 236 F.3d 1083, 1089 (9th Cir.2001); that decision in turn quotes *Berger, supra.*
[5] Because of the Government's repeated discovery violations, Mr. Clement and other defendants filed numerous motions for sanctions.

**28**

The same reasons that prompted a dismissal in *Chapman* provide a basis for reversal here. There, the court was not in a position to adjourn the trial for 2 or 3 weeks and then hope the jurors would still be around to return for trial. The government's nondisclosure was flagrant and it was not the first time they had failed to provide discovery. As here, the defense was substantially prejudiced.

In *United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020), withheld evidence was discovered days into trial. *Id.*, at 1026. *Bundy* confirmed that when favorable suppressed evidence is discovered mid-trial, the materiality standard is benchmarked against the relative value of the evidence in light of the proceedings to date—not as a retrospective evaluation of how the disclosure may have impacted the outcome of a trial that has not yet concluded. *Id.* at 1033. The district court in *Bundy* ultimately declared a mistrial and dismissed the indictment with prejudice as additional withheld evidence trickled in over many days.

In *United States v. Kohring,* 637 F.3d 895 (9th Cir. 2011), this Court held that ordering a new trial can be the appropriate remedy for a *Brady/Giglio* violation. In *United States v. Cloud*, 102 F.4th 968, 980 (9th Cir. 2024), the Ninth Circuit affirmed the trial court's striking of witnesses and imposing sanctions, including monetary damages against the government.

The withholding of critical evidence until after opening statements and after weeks of trial, coming literally during the examination of the witness, is flagrant

**29**

prosecutorial misconduct that has severely prejudiced the defense. The defendants were left scrambling, trying to pick up the pieces in the few moments before cross-examination. This is not fair, nor is it constitutional.

## II. THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUSTAIN THE CONVICTIONS BECAUSE THE GOVERNMENT FAILED TO PROVE IDENTITY.

For this issue, Mr. Clement incorporates by reference the facts, record citations, case precedent, and arguments set forth in the Opening Brief filed by codefendant Kenneth Johnson in consolidated case No. 23-3645. *See* FRAP 28 (i) (In consolidated cases, "any party may adopt by reference a part of another's brief.").

The trial judge found: "In this case, no witness pointed to the defendants and identified them as those who committed the charged crimes." *See* 1-ER-64. The only witness the government called to identify photographs of the defendants was Detective Knieriem. *See* 4-ER-478-487. Although Knieriem testified that Exhibit 1004 was a photograph of Francis Clement, he did not testify that the photograph depicted or even looked similar to the man sitting at counsel table, and Knieriem did not testify that he saw Mr. Clement in court. *See* 4-ER-477-480. He also did not say the photographs were from any time frame that was part of the conduct that formed the basis for the crimes at issue. No other witness was ever asked if the photos resembled the defendants or were in fact the same individuals. The government never asked the Court for a finding that the photos resembled the men on trial.

The trial court cited the testimony of Detective Knieriem and the photographs he went through on the stand. *See* 1-ER-64:9-18. But while Detective Knieriem testified about photos of three individuals bearing the same names as the defendants, he never said the photos were of the defendants or that the photographs resembled the three men who were on trial. No other evidence was presented to prove the identity of either Mr. Johnson or Mr. Clement.

In its written order denying the motion for judgment of acquittal, the court referenced witnesses who claimed to have been on the telephone with "Frank." *See* 1-ER-65-67. But there was no accompanying voice identification testimony offered to link the voice they heard on the telephone with the man sitting at counsel table.

The district court was correct in stating that no one had identified the defendants in open court. Troy Clowers testified he had heard of "Francis Clement," but he had never met him or talked with him. *See* 4-ER-511:9-10. Kaylen Chandler testified she never met "Frank" and only spoke with "Frank" on the phone a couple of times. *See* 6-ER-949:11-12, *and* 6-ER-976:18-21. James Field had merely communicated with "Frank" on the phone. *See* 7-ER-1065:10-12, *and* 7-ER-1071:13-15. Lana Hailey hadn't met "Frank," but had only spoken with him on the phone. *See* 8-ER-1276:5-7. Daniel Rubin testified he communicated with "Frank" through contraband cell phones. *See* 11-ER-1953:22-25.

31

The court also observed that two witnesses – Robert Eversole and James Field – testified they had seen "Frank" on video calls. *See* 1-ER-65:4-6, *and* 1-ER-66:5. Field admitted in his testimony that prior to seeing "Frank" on a video call when he was ordered to kill Mr. Brenzedine, Field had never seen him before. *See* 7-ER-1076:9-10. Otherwise, their communication had been merely phone calls. *See e.g.*, 7-ER-1065:10-12, 7-ER-1071:13-15, 7-ER-1086:14-15, 7-ER-1089:20-21, *and* 7-ER-1176:19-20. Eversole testified "we Facetimed, we messaged, and we called." *See* 8-ER-1454:21. Rapinoe testified he had "Facetimed" with "Frank" about a drug deal. *See* 9-ER-1673:14-15.

Importantly, none of these men – neither Field, Eversole, nor Rapinoe – testified that the man sitting at counsel table was the same man they saw on those calls. These witnesses were not even asked if the man at counsel table resembled the man they remember seeing on any video call.

Two witnesses testified they had been incarcerated with Mr. Clement, but again, neither was asked to make an identification. Mr. Bannick said he was housed in the Fresno jail with Mr. Clement briefly but was never asked if they were in the same cell or if he saw him or knew what he looked like. *See* 10-ER-1854:21.

Timothy True testified that he had been a cellmate with Mr. Clement while they were both in the Kern Valley State Prison. *See* 12-ER-2209:15-18. Critically, this occurred sometime in 2015 or 2016, more than 10 years before trial. *See* 12-ER-

2208:22-25, *and* 12-ER-2211:6-12. Mr. True never said what Mr. Clement looked like then and was not asked if he saw him in court or someone who looked similar. Thus, neither his brief testimony on this remote acquaintance nor his failure to spontaneously indicate the wrong person was on trial is sufficient evidence of Mr. Clement's identity.

"Identification of the defendant as the person who committed the charged crime is always an essential element which the government must establish beyond a reasonable doubt." *United States v. Alexander*, 48 F.3d 1477, 1490 (9th Cir. 1995). While a formal in-court identification is not always necessary, *ibid,* in a case like this one it was, because there was no proof beyond a reasonable doubt that the man sitting at counsel table was the same "Francis Clement" as charged in the Indictment. *Cf. United States v. Pool,* 660 F.2d 547, 560 (5th Cir. 1981), where the court found there was not sufficient evidence that the defendant in the courtroom was the same person the Agent had spoken with on the phone. (The agent had never met defendant Loye and no voice comparisons were made, so the caller's use of the nickname "Chip" did not make out a prima facie case that he was the caller.) Here, the only two witnesses who testified that they saw "Frank's" face were Rapinoe and Eversole; they testified they had "facetimed" with "Frank," but neither identified the defendant sitting at counsel table as that same "Frank."

33

Identification of the defendant as the person who committed the charged crime is a fundamental element of every criminal prosecution because the government bears the constitutional burden of proving every element of the offense beyond a reasonable doubt, including that the specific defendant before the court is the perpetrator. *In re Winship*, 397 U.S. 358, 364 (1970). This requirement stems from the Due Process Clause of the Fifth Amendment and ensures that no person is convicted unless the prosecution establishes their individual culpability with the highest degree of certainty required by law. *Ibid.* Absent proof beyond a reasonable doubt of all elements, including the allegation that Mr. Clement was the "Francis Clement" referred to at trial, the conviction violates the due process clause. U.S. Const. amend. V; *Victor v. Nebraska,* 511 U.S. 1, 5 (1994). "[A] conviction may not be based on mere speculation." *United States v. Katakis,* 800 F.3d 1017, 1024 (9th Cir. 2015). Mr. Clement therefore asks this Court to vacate the convictions on all counts and dismiss the charges against him.

## III. IMPOSITION OF CONSECUTIVE SENTENCES OF LIFE WITHOUT RELEASE WAS AN ABUSE OF DISCRETION.

The jury convicted Mr. Clement of one count of racketeering conspiracy and five counts of murder in aid of racketeering. In its guilty verdict on the conspiracy count, the jury identified as racketeering acts each of the murders charged in the substantive counts. *See* 2-ER-179-80. Taking into account the four murder counts

34

and two additional racketeering acts, the presentence report calculated the combined adjusted offense level as 51, but because of the operation Chapter 5, Part A (application n.2), the report set the total offense level at 43. Presentence Report Under Seal (hereinafter "PSR") at 18. The comment cited in the presentence report reads as follows:

> In rare cases, a total offense level of less than 1 or more than 43 may result from the application of the guidelines...[a]n offense level more than 43 is to be treated as an offense level of 43.

With a criminal history category of V, the report concluded the guideline sentence was life imprisonment without release. PSR at 24. Finally, the probation officer did not "identify any factors that would warrant a sentence outside the advisory guideline system." PSR at 27.

At Mr. Clement's sentencing on May 19, 2025, while conceding that it would be an upward departure, the government argued for life sentences on all counts with consecutive sentences of life without release on four of those counts – namely, consecutive life sentences for Count 1 (racketeering conspiracy) and the murder in aid of racketeering convictions in Counts 2, 4, and 5, along with concurrent life sentences on Counts 3 and 6. *See* 1-ER-27-28, *and* 1-ER-21:15-18 (court summarizing government's argument). Defense counsel objected arguing that the consecutive life terms were an impossibility and meaningless and raised double

**35**

jeopardy concerns. *See* 1-ER-24-25, 1-ER-29:12-13, *and* 1-ER-31:17-19. However, the court granted the Government's upward departure motion and imposed four consecutive life sentences on Mr. Clement. *See* 1-ER-34:14-20, *and* 1-ER-35:1-8. Alternatively, the court noted that if such a departure were improper, the court would vary upward and impose consecutive sentences. *See* 1-ER-34:20-25.

The court based the departure/variance on the nature of the crimes, the number of murders and the trauma suffered by those who actually committed them. *See* 1-ER-32-34. It is submitted that the imposition of consecutive life sentences is contrary to the letter and the spirit of both the United States Sentencing Guidelines and 18 U.S.C. § 3553(a).

The first step in the imposition of sentence in federal courts is to calculate the guideline range. *Rita v. United States*, 551 U.S. 338, 347–348 (2007). The Guidelines are the starting point and initial benchmark but not the only consideration. *Gall v. United States,* 552 U.S. 38, 49 (2007). Two guideline provisions reflect the commonsense notion that such impossible-to-serve consecutive sentences as those imposed here would run contrary to the Sentencing Guidelines themselves. For instance, the Guidelines contain a presumption against consecutive sentences. Guideline 5G1.2(c) provides that if the sentence on the count with the highest maximum term is a sufficient total punishment, then all counts should be concurrent. Furthermore, the fact that the Guidelines treat any level above

**36**

43 as a level 43, demonstrates the Commission's recognition that a life without release sentence is impossible to amplify. Here, the mandatory life sentence for a single murder-in-aid of racketeering is a sufficient total punishment because by operation of law it ends with the death of the defendant. Any sentence beyond a life sentence will never be served, which is why there is no offense level greater than 43.

In 18 U.S.C. § 3553(a) Congress sets forth a number of factors to be considered in imposing sentence, including the Guidelines. Fundamentally, however, the sentence must be "sufficient, but not greater than necessary," to further the purposes of sentencing, including consideration of the seriousness of the offense, whether the sentence will promote respect for the law and lead to just punishment, whether the sentence will provide general and specific deterrence, and whether it will effectively provide the defendant with needed training, medical care, or other correctional treatment. *See id., § 3553(a)(2).* Consecutive sentences of life without release belie the fundamental principle Congress incorporated in 3553(a) that a sentence should not be "greater than necessary." Consecutive life sentences are the exemplars of a greater than necessary sentence. They are fundamentally absurd. Mr. Clement has only a single life and can only serve a single life sentence.

37

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

Counsel requests oral argument to assist the Court in deciding Mr. Clement's appeal by allowing the parties to present arguments, clarify any necessary points, and answer any questions the Court may have after reviewing the briefs.

## CONCLUSION

The judgment should be reversed with instructions to dismiss all counts of conviction. In the alternative, this Court should vacate all convictions and remand for a new trial. In the alternative, this Court should order that all sentences shall be concurrent.

Respectfully submitted,

*s/Jean D. Barrett*
JEAN D. BARRETT
JANE-FISHER-BYRIALSEN

*Attorneys for Appellant Francis Clement*

38

**Certificate of Compliance with Type-Volume Limit**
**Typeface Requirements, and Type Style Requirements**

1.      This document complies with the word limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 8689 words.

2.      This document complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because this document has been prepared using Microsoft Word in 14-point Times New Roman font.

Date: March 5, 2026

*s/ Jane Fisher-Byrialsen*
Jane Fisher-Byrialsen
Fisher & Byrialsen PLLC
4600 S. Syracuse St. Ninth Floor
Denver, CO 80237
Phone: 202-256-5664

jane@fblaw.org

39

**Certificate of Service**

I certify that on March 5, 2026, I electronically filed the foregoing using the CM/ECF system, which will send notification of this filing to:

James Conolly, Assistant US Attorney
James.Conolly@usdoj.gov
Counsel for the United States

*s/ Jane Fisher-Byrialsen*
Jane Fisher-Byrialsen
Fisher & Byrialsen PLLC
4600 S. Syracuse St. Ninth Floor
Denver, CO 80237
Phone: 202-256-5664
jane@fblaw.org

40